## EXHIBIT A

| Authority | Page |
|---|---|
| Al Sadeq v Dechert LLP & Ors [2024] EWCA Civ 28 | 3 |
| B. Thanki et al, The Law of Privilege (3rd edn, OUP 2018) §§1.46 and 2.04. | 69 |
| Balabel & Anor v Air India [1988] Ch 317 | 74 |
| C. Hollander, Documentay Evidence (14th edn, Sweet & Maxwell 2021) 13-02 | 90 |
| C. Passmore, Privilege (4th edn, Sweet & Maxwell 2019) 2-080 | 94 |
| Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd [2019] 1 WLR 791 | 98 |
| Gotha City v Sotheby's & Anor [1998] 1 WLR 114 | 152 |
| Great Atlantic Insurance Co v Home Insurance Co [1981] 1 WLR 529 | 163 |
| H. Malek KC and Professor P. Matthews, Disclosure (6th edn, Sweet & Maxwell 2023) 11-34 to 11-35 | 176 |
| Minter v Priest [1930] AC 558 | 180 |
| Mohammed v Ministry of Defence [2013] EWHC 4478 (QB) | 210 |
| Plummers v Debenhams [1986] BCLC 447 | 221 |
| Price Waterhouse v BCCI Holdings (Luxembourg) SA [1992] BCLC 583 | 234 |
| Property Alliance Group Ltd v Royal Bank of Scotland plc (No 3) [2015] EWHC 3341 (Ch) | 254 |
| R (Jet2.com Ltd) v The Civil Aviation Authority [2020] EWCA Civ 35, [2020] QB 1027 | 262 |
| R (Prudential Plc) v Special Commissioner of Income Tax [2013] UKSC 1, [2013] 2 AC 185 | 311 |
| Rawlinson & Hunter Trustees SA v Akers [2014] EWCA Civ 136, [2014] 4 All ER 627 | 380 |
| Sotheby's v Mark Weiss Ltd [2018] EWHC 3179 (Comm) | 426 |
| Starbev GP Ltd v Interbrew Central European Holding BV [2013] EWHC 4038 (Comm) | 439 |

Three Rivers District Council v Bank of England (No 6) [2005] 1 AC 610 — 451

Three Rivers District Council v Governor and Company of the Bank of England (No 5) [2003] QB 1556 (CA) — 525

USA v Philip Morris Inc [2004] EWCA Civ 330 — 553

USP Strategies & Anor v London General Holdings Ltd & Ors [2004] EWHC 373 (Ch) — 606

Victorygame Ltd v Ahuja Investments Ltd [2021] EWCA Civ 993 — 633

Waugh v British Railways Board [1980] AC 521 — 650

WH Holding Ltd v E20 Stadium LLP [2018] EWCA Civ 2652 — 675

Wiseman v The Commissioners for Her Majesty's Revenue & Customs [2022] UKFTT 00075 (TC) — 671

Neutral Citation Number: [2024] EWCA Civ 28

Case No: CA-2023-001145 (and 001145-A)

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**MR JUSTICE MURRAY**
**[2023] EWHC 795 (KB)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 24/01/2024

**Before :**

**LORD JUSTICE UNDERHILL**
**(Vice-President of the Court of Appeal (Civil Division))**
**LORD JUSTICE MALES**
and
**LORD JUSTICE POPPLEWELL**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **KARAM SALAH AL DIN AWNI AL SADEQ** | **Claimant/ Appellant** |
| - and - | |
| **(1) DECHERT LLP** | **Defendants/ Respondents** |
| **(2) NEIL GERRARD** | |
| **(3) DAVID HUGHES** | |
| **(4) CAROLINE BLACK** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Tamara Oppenheimer KC** and **Simon Paul** (instructed by **Stokoe Partnership Solicitors**) for the **Appellant**
**Philip Edey KC, Luke Pearce KC** and **Sandy Phipps** (instructed by **Enyo Law LLP**) for the **First and Third Respondents**

Hearing dates : 11, 12 and 13 December 2023
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 2:00 pm on 24 January 2024 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

.............................

**003**

**LORD JUSTICE POPPLEWELL:**

**Introduction**

1. This appeal raises a number of important points of law about the scope of legal professional privilege, both litigation privilege and legal advice privilege, and the so called 'iniquity exception'. The appeal is from an order of Murray J dated 19 June 2023 following a judgment handed down on 5 April 2023. The Judge dismissed the claimant's application challenging assertions of legal professional privilege made by the defendants, save in one respect. The claimant appeals against that decision. The defendants cross appeal in relation to the one issue which was decided against them.

**The parties**

2. The claimant, Mr Al Sadeq, is a Jordanian citizen and a Jordanian qualified lawyer, now in his early 40s. In November 2008 he started working as legal adviser for the Ras Al Khaimah Investment Authority ('RAKIA'), the sovereign wealth fund of the Emirate of Ras Al Khaimah ('RAK'). RAK is one of the United Arab Emirates, and is ruled by a Sheikh. The current ruler is Sheikh Saud bin Saqr al-Qasimi ('the Ruler'), whose coronation took place in October 2010 following the death of his father, who had ruled for 62 years. Unlike some of the other Emirates, RAK does not have significant oil reserves, and has focussed on creating an economy with a significant industrial sector. The RAK government, and government-owned companies, have played a significant role in RAK's economy.

3. Mr Al Sadeq was promoted to group legal director of RAKIA in 2010 and became Deputy CEO in June 2011. He resigned from RAKIA in late 2012, moving to Dubai in or around December 2012, where he established an investment business. The Chairman and CEO of RAKIA from the date it was established in 2005 until 2012 was Dr Khater Massaad, a Swiss-Lebanese engineer.

4. RAKIA contends that in or about 2012, it discovered that Dr Massaad had perpetrated systematic and wide ranging frauds against RAKIA and associated entities; and that, together with a number of associates, he had been responsible for misappropriating funds and otherwise causing losses of hundreds of millions of dollars.

5. Mr Al Sadeq was arrested at his home in Dubai on 5 September 2014 and taken from Dubai to RAK, where he has been detained ever since. He was tried in RAK, convicted of fraud, and sentenced to imprisonment in a number of cases before the RAK courts. He contends that he is innocent of any wrongdoing and was wrongly convicted in politically motivated trials.

6. The first defendant, Dechert LLP ('Dechert UK'), is a law firm organised as a limited liability partnership registered in England and Wales and based in London. It is part of the international network of a large and well known global law firm operating under the business name 'Dechert', originally founded in Philadelphia, and operating there through a Pennsylvania limited liability partnership, the full legal name of which is also Dechert LLP ('Dechert US'). It has affiliated offices in a number of other locations worldwide, including Dubai. I shall refer to the global law firm as a whole as 'Dechert' save where it is necessary to identify the particular legal entity involved.

**005**

Sadeq v Dechert LLP

7. Dechert was engaged in 2013 to assist in an investigation of the activities of Dr Massaad and others in relation to what were said to be the suspected frauds. I shall return to the terms and scope of the engagement and the identity of Dechert's clients.

8. The second defendant, Mr Gerrard, was at the material times a partner of Dechert UK, having joined the firm in 2011 from the law firm DLA Piper. He retired as a partner of Dechert UK on 31 December 2020. He was the global co-head of Dechert's white collar and securities litigation practice, and was the lead partner involved in the investigation which forms the subject matter of the present proceedings. The third defendant, Mr Hughes, is also a former partner of Dechert UK, having joined the firm in mid-September 2014. He moved to another law firm in June 2017. The fourth defendant, Ms Black, joined Dechert UK as a senior associate some time in 2011, becoming a partner on 1 January 2015. She left Dechert UK in February 2023.

9. At the hearing before the Judge, all four defendants had single legal representation by Enyo Law LLP ('Enyo') and counsel. Mr Gerrard and Ms Black have subsequently become separately represented. They are respondents to the appeal, but have been content for the argument to be addressed by those representing Dechert and Mr Hughes, without themselves participating in the appeal hearing.

## Dechert's engagement

10. Dechert was first appointed under the terms of a letter of engagement dated 5 June 2013 ('the 2013 Engagement Letter') addressed from Dechert US, through the local Dubai office, to the Investment and Development Office of the government of RAK ('RAK IDO'). It was countersigned by the director of legal affairs at RAK IDO. RAK IDO was established in 2004 and is the investment arm of the government of RAK. There was no evidence before the Judge, or before us, as to the constitutional position of RAK IDO within RAK, but it seems that it was not a separate legal entity and was simply an arm of the RAK government.

11. The 2013 Engagement Letter identified that Dechert had been asked to act "as legal counsel to [RAK IDO] in connection with an investigation into certain historical transactions carried out by subsidiary companies controlled by [RAKIA] on the instruction of Dr Khater Massaad, particularly in relation to activities and investments in Georgia and India, together with any other transactions that are identified by the task force appointed by [RAK IDO]". The letter said that instructions would be received from members of the "IDO task force". The letter identified that the Dechert team would be led by Mr Gerrard, who would be responsible for its overall supervision, and would include, amongst others, Ms Black, who was then a senior associate. The scope of work was defined in paragraph 3, which said that the initial scope of work would be as set out in Schedule 2. Schedule 2 has been wholly redacted in the copy of the 2013 Engagement Letter which has been disclosed. Paragraph 3 of the letter went on: "Though we will be providing strategic input and guidance in relation to the investigation, and providing legal professional privilege, please note that any specific legal advice we provide shall be limited to English, Georgian, UAE and US law. As the investigation progresses a more detailed scope of work will be discussed and agreed with you based on the findings during our initial work phase."

12. The curious reference to legal professional privilege as something that Dechert would be "providing" is explained by Mr Allen, the partner of Enyo with day to day responsibility

**006**

for the conduct of the proceedings, as infelicitous drafting, seeking to convey that the work Dechert would carry out would engage legal professional privilege.

13. In 2014 a further engagement letter was sent dated 12 October 2014 ('the 2014 Engagement Letter'). That was also sent by Dechert US through its Dubai office, this time addressed to the Ruler, and countersigned by him. It described itself as "Master Letter of Engagement – with effect from 1 September 2014". In its opening paragraph it recorded that "prior to the date of this letter our firm was providing legal services to various entities within the Government of Ras Al Khaimah in relation to corporate, restructuring, investigation and litigation matters. Following a decision of [the Ruler] responsibility for those matters has been transferred to Ras Al Khaimah Development LLC ('RAK Development')." RAKIA's pleadings in other proceedings state that RAK Development, which as its name suggests is a separate legal entity as a limited liability company under UAE law, was responsible for (amongst other things) the holding and managing of various assets such as shares, properties and loans which had previously been owned by RAKIA, including the assets which RAKIA alleges were the subject of significant frauds and other wrongdoing committed by Dr Massaad and associates of his.

14. The 2014 Engagement Letter said that its purpose was to confirm Dechert's continued instructions and to use the opportunity to "refresh and update both the description of the matters on which we have been and will continue to be working…". The letter continued: "We will prepare a common interest agreement to be entered into by RAK IDO and RAK Development that will address the issue of legal professional privilege and its preservation in the context of the transfers noted above (including in relation to pre transfer work undertaken by third party advisers). In particular the agreement will formally reflect and confirm the common interest privilege which exists in relation to all relevant RAK parties." There is no further evidence before the court about the existence or terms of such a common interest agreement.

15. The 2014 Engagement Letter identified at paragraph 2 the scope of work, which said that it should be as set out in Annex A subject to being extended by the client as necessary to include additional related work streams and/or new mandates. Annex A in the copy of the letter which has been disclosed is wholly redacted.

*Identifying the lawyer, the client, and the scope of the engagement*

16. Legal professional privilege usually arises in the context of the engagement of a provider of legal services ('the lawyer') by a person ('the client') for the provision of services within the scope of the engagement (although litigation privilege also applies to a litigant conducting or contemplating litigation without legal representation). It is important for the purposes of the issues in the appeal to identify who in this case constituted the lawyer and the client, and what was the scope of the work within the engagement.

*Who was the lawyer?*

17. The countersigned Engagement Letters were from Dechert US, but contemplated investigations and advice into activities in various parts of the world, with the team led by partners and staff from Dechert UK, which might be supplemented from time to time. Specific reference was made in the 2013 Engagement Letter to using attorneys in the Dubai and Tbilisi offices. It is tolerably clear that the engagement was of the global law firm known as Dechert, including as necessary all its constituent affiliated parts and local

offices, irrespective of any separate legal personality they might hold under local law.  It also follows from the nature and terms of the engagement that the concept of legal advice for the purposes of legal advice privilege includes advice under whatever local system of law was considered to apply; and that for the purposes of litigation privilege, proceedings which were putatively in contemplation could include proceedings anywhere in the world in which the global law firm might be able to offer legal advice or assistance (although, as I shall explain, that may not be the limit of contemplated proceedings which may engage litigation privilege).

*Who was the client?*

18.  Mr Allen explains that for the purposes of the disclosure exercise RAK IDO, RAK Development and RAKIA were treated as the client.  Instructions were also taken at times from the Ruler, but he was not, the defendants contend, a client.  We were told that RAKIA was considered a client because it "sat underneath" RAK IDO as the investment arm of the government.  Although RAK IDO was an arm of the government, Dechert did not treat all emanations of government as its client, and the client did not include, for example the public prosecutor.  Nevertheless the 2014 Engagement Letter refers to Dechert having provided legal services to various entities within the RAK government.  On behalf of Mr Al Sadeq, it was submitted that Dechert's client comprised RAK IDO in 2013, and from 2014 RAK Development; and additionally, throughout the retainer, the Ruler.

19. It seems to me that the inclusion of RAKIA as a client could only potentially apply until 1 September 2014, after which RAKIA did not sit beneath the named client RAK Development.  It is in the period after this date that all the events occurred which are relevant to the privilege issues which arise on the appeal.  For present purposes, therefore, the client can be treated as limited to RAK Development during that period.  The fact that the Ruler gave instructions (as it is clear from the evidence that he did) is not sufficient in itself to justify his being treated as the client; however it means, at least, that he was acting as the authorised agent of the client, RAK Development.  Therefore insofar as the intentions or purposes of the client are relevant to the iniquity exception in legal professional privilege, the intentions and purposes of the Ruler can for present purposes be treated as the intentions and purposes of Dechert's client, RAK Development, for whom the Ruler was in this respect an authorised agent.

20. It is not clear exactly when Dechert's engagement came to an end, but it was prior to the disclosure exercise in these proceedings. Their former clients were represented by Allen & Overy LLP ('A&O') in the disclosure exercise for the purposes of ensuring that their privilege was protected.  I shall refer to them as Dechert's clients rather than former clients simply as a convenient shorthand.

*What was the scope of work?*

21. The 2014 Engagement Letter referred to four areas in which services had been provided up to that time, namely "corporate, restructuring, investigation and litigation matters." The scope of work which the Letter identified was to be provided thereafter is unknown because of the redaction of Annex A.  However, it is common ground that the scope of the engagement is to be identified not only by reference to the Engagement Letters, but also to the activities which in practice Dechert undertook from time to time.  Aspects of

the work which Dechert performed call for further examination under the arguments about legal advice privilege and I shall address them there.

22. Whatever the precise confines of the scope of Dechert's role, there is little doubt that its involvement was substantial. Mr Allen states that the scale of the investigation was very significant, noting by way of illustration that between June 2013 and August 2016, some 24,000 time-entries were recorded across four matter files, and there were 146 fee earners working on the investigation from 15 Dechert offices worldwide. Moreover there were other law firms working on these matters including, so the defendants understood, Baker and McKenzie, instructed directly by RAKIA before Dechert's involvement to provide legal advice on one of the frauds allegedly perpetrated by Dr Massaad in what came to be known as the 'Leases Cases'. There were also a number of local law firms engaged to assist with various elements of the investigation, including in particular Al Tamimi, and Hadef and Partners, in RAK.

23. The investigation resulted in civil and criminal proceedings being brought in various jurisdictions, including RAK, Georgia, England, Italy, Switzerland and India, against the following in addition to Mr Al Sadeq, among others:

(1) Dr Massaad, who left RAK in 2012, and was sentenced by the RAK courts to 30 years imprisonment in his absence;

(2) Mr Jihad Quzmar, who worked for the government of RAK as a legal adviser and served as a judge and a member of the Supreme Judicial Council of RAK;

(3) Mr Shahab Izadpanah, a Swiss-Iranian businessman, who had various business interests in RAK and was convicted by the RAK criminal courts in absentia for various acts of criminal conduct in relation to Dr Massaad's activities;

(4) Mr Farhad Azima, a businessman specialising in the aviation sector, against whom proceedings have been brought in this country by RAKIA.

**The present proceedings**

*Mr Al Sadeq's case in these proceedings*

24. Mr Al Sadeq's case in these proceedings is set out in re-re-amended particulars of claim ('P/C') which bear a statement of truth, signed by Mr Tsiattalou, the partner of Stokoe Partnership Solicitors acting for Mr Al Sadeq. The statement of truth says that Mr Al Sadeq believes the facts stated in the document to be true and that Mr Tsiattalou is duly authorised by him to sign the statement of truth. Mr Al Sadeq's case is there summarised as being that Dechert UK, Mr Gerrard, Mr Hughes, and Ms Black violated Mr Al Sadeq's rights, by using threats and/or mistreatment and/or other unlawful methods, to force Mr Al Sadeq to give evidence, including false evidence, in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the Ruler; and in the case of Mr Gerrard and Dechert, that they have continued to attempt to intimidate Mr Al Sadeq and those representing him since he commenced these proceedings. In doing so, and thereby directing and/or being complicit in Mr Al Sadeq's ill treatment and/or torture, they caused Mr Al Sadeq physical, emotional, psychological, moral and financial harm, loss and damage, for which compensation is sought in the proceedings.

25. A summary of the wrongs allegedly committed against Mr Al Sadeq in RAK is given in paragraph 9 and 10 of the P/C, before being much more fully particularised thereafter. Those paragraphs state:

> "9. These wrongs, involving breaches of UAE criminal law and procedure, the UAE Constitution and which are in breach of Mr Al Sadeq's human rights as a matter of UAE and international law, give rise to actionable claims under UAE law, as pleaded at paragraphs 220 to 229 below, and include the following:
>
> 9.1 Kidnap and extraordinary rendition of Mr Al Sadeq from Dubai to RAK.
>
> 9.2 Unlawful detention of Mr Al Sadeq in RAK without arrest or charge.
>
> 9.3 Mr Al Sadeq's detention in solitary confinement for around 560 days between September 2014 and April 2016, first at the General Headquarters of State Security in RAK (the "**GHQ**") and subsequently in a camp run by the Ruler of RAK's private militia, under a false name, without any or any proper due process, no access to legal representation, in unsanitary and inhumane conditions, and without adequate medical attention, exercise or access to his family, who were refused information as to his whereabouts.
>
> 9.4 Interrogation of Mr Al Sadeq by Mr Gerrard and Ms. Black during the period he was detained in solitary confinement in the GHQ and by Mr Gerrard, Mr Hughes and Ms. Black during the period he was detained in solitary confinement in the said militia camp. Mr Gerrard and Mr Hughes made it apparent by their words and actions that they had the power to improve his inhumane conditions if he gave them sufficient "cooperation".
>
> 9.5 Threats by Mr Gerrard and Mr Hughes to Mr Al Sadeq against him, his wife and children at various times as more specifically particularised herein to force him to "cooperate" in building a case against Dr Massaad, Mr Jihad Quzmar, (the former Legal Advisor to the Ruler, and an advisor of long standing) ("**Mr Quzmar**"), Mr Farhad Azima (a US-Iranian businessman who had dealings with RAKIA) ("**Mr Azima**"), and Mr Gela Mikadze (former General Manager of RAKIA's Georgia operations) ("**Mr Mikadze**") and other alleged co-conspirators by giving false evidence, including threats that Mr Al Sadeq's wife would be arrested and imprisoned and that neither of them would ever see their children again.
>
> 9.6 Pressure applied by Mr Gerrard and Ms. Black and Mr Hughes at various times as more specifically particularised herein to Mr Al Sadeq's wife to persuade Mr Al Sadeq to "cooperate" by giving false evidence, including by threatening

her directly with imprisonment and by telling her that if Mr Al Sadeq told them what they wanted he would be released from detention and the inhumane conditions in which he was being kept.

9.7 Forcing Mr Al Sadeq to make knowingly false confessions prepared by Mr Gerrard and Mr Hughes containing evidence which Mr Al Sadeq told them was untrue, in return for promises, subsequently reneged upon, said to have been given by the Ruler of RAK, that he would be released and pardoned if he made the false confessions.

9.8 Steps taken by and/or on the instructions of and/or with the involvement of the First and / or the Second Defendant since the beginning of these proceedings to attempt to compromise Mr Al Sadeq's legal representation, continuing a pattern of unlawful pressure, intimidation, and threats which have amounted to harm.

10. In summary, it is Mr Al Sadeq's case that Mr Gerrard and Mr Hughes and Ms. Black and Dechert were prepared to, and did, violate Mr Al Sadeq's rights,  including by using threats and/or mistreatment and/or unlawful methods to force Mr Al Sadeq to give evidence and/or false evidence, as more specifically particularised below, in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the ruler of RAK; and in the case of the First and/or Second Defendant have continued to attempt to intimidate Mr Al Sadeq and those representing him since he commenced these proceedings. In doing so, and thereby directing and/or being complicit in Mr Al Sadeq's ill treatment and/or torture, they caused Mr Al Sadeq physical, emotional, psychological, moral and financial harm, loss and damage for which compensation is sought in these proceedings."

26. Paragraphs 11 to 19 of the statement of case allege that the Ruler was engaged in a vendetta against Dr Massaad as a result of the Ruler's political struggle with his brothers. Mr Al Sadeq's case is that the strategy of the Ruler, which Dechert was itself involved in assisting, through Mr Gerrard, Mr Hughes and Ms Black, had as its aim the procuring of false evidence from Mr Al Sadeq and others in order to harm Dr Massaad and others; and that it was that impetus, to extract false information, which gave rise to the human rights abuses against Mr Al Sadeq which are alleged in the proceedings.  Mr Al Sadeq was therefore effectively collateral damage in the Ruler's aim to bring down Dr Massaad.

*The disclosure application*

27. Following standard disclosure being given by the defendants, a number of challenges to their claims to privilege were advanced through solicitors' correspondence.  On 8 January 2021 (prior to standard disclosure) Stewart J had ordered a two day hearing to be listed to deal with those anticipated challenges and any other disputed disclosure issues.  Mr Allen made a third witness statement dated 21 May 2021 ('Allen 3') providing information

concerning the defendants' claims to privilege, which, following further correspondence, was supplemented by a fourth witness statement ('Allen 4'). Those witness statements explain in considerable detail the process by which Enyo went about determining what documents were disclosable, including whether the iniquity exception applied where the document would otherwise be privileged. Mr Allen explains that because it was realised early on that a large proportion of the disclosure was likely to engage legal professional privilege, an experienced review team was set up under his supervision, comprising five Enyo associates and one junior counsel. During the course of the review, the team held daily calls, during which specific issues were discussed, queries raised, and Mr Allen's input sought. Sometimes advice was sought from the wider counsel team, including leading counsel. The review process also involved A&O representing Dechert's clients and also RAKIA, for whom Dechert had acted on an earlier matter, these three entities being treated as the relevant privilege holders. Those clients wish to maintain their privilege. A&O's role in the review process was to ensure that privilege was not mistakenly waived.

28. Following further interlocutory activity, adjournments, and directions, the application was eventually listed to be heard on 20 and 21 December 2021. The application which then fell to be heard was contained in an application notice in which the relief was identified in the attached draft order ('the Draft Order'). The application was supported by the sixth witness statement of Mr Tsiattalou ('Tsiattalou 6'), and a second witness statement of Mr Al Haddad, Mr Al Sadeq's current UAE lawyer, whose background includes having been a police officer and public prosecutor in Dubai before going into private practice ('Al Haddad 2'). The evidence in response on behalf of the defendants came in Mr Allen's ninth witness statement ('Allen 9'). Reply evidence served two weeks before the hearing included a third witness statement from Mr Al Haddad ('Al Haddad 3').

**The privilege issues in outline**

29. The issues before the Judge arose in relation to litigation privilege and legal advice privilege, and to the iniquity exception applicable to both. Insofar as they remain live in this appeal, they were, in outline, as follows.

30. As to the iniquity exception, Allen 3, 4 and 9 confirmed that a careful review had been undertaken to consider whether documents fell within the iniquity exception by reference to eight possible iniquities. Mr Allen identified that the threshold test which had been applied to whether such iniquities existed was whether there was a strong prima facie case, in accordance with *Kuwait Airways Corporation v Iraqi Airways Co (No 6)* [2005] EWCA Civ 286 [2005] 1 WLR 2743; and that the relationship between the documents and the iniquity which had to be established so as to fall within the exception was that the documents were "*brought into existence for the purpose of furthering*" the iniquity, in accordance with *Barrowfen Properties v Patel & Ors* [2020] EWHC 2536 (Ch). Applying those criteria, no documents had been found to fall within the iniquity exception.

31. On behalf of Mr Al Sadeq it was contended that the wrong test had been applied at both stages. The threshold test which should have been applied was that of a prima facie case, not strong prima facie case. The three iniquities relied on in the application had been established to that threshold. For the purposes of the application not all of the iniquitous conduct alleged in the P/C was relied on, but only (1) Mr Al Sadeq's unlawful abduction from Dubai and unlawful detention in RAK; (2) the unlawful prison conditions in which he was held in RAK; and (3) the denial of access to legal representation in RAK. As to

**012**

the relationship test, it was formulated in a number of different ways by the end of oral argument before the Judge so as to include documents generated "*in furtherance of*" an iniquity including any document created "*as a result of*" or "*generated by*" or "*reporting on*" or "*concerning*" or "*relating to and/or prompted by*" the iniquity.  It was contended that there were bound to be documents which had not been disclosed which satisfied the tests.  Accordingly an order was sought in paragraph 1 of the Draft order in the following terms:

1. The Defendants shall not be entitled to withhold from inspection any documents or parts thereof which have been generated by or report on the following categories of conduct:

1.1 The detention of Mr Al Sadeq in Dubai on 5 September 2014, his rendition to Ras-Al-Khaimah and subsequent detention in the following locations (as defined in the Amended Particulars of Claim):

(a) GHQ;

(b) Al Barirat;

(c) The Prison Villa;

(d) RAK Central Prison.

1.2 The conditions in which Mr Al Sadeq was detained in the locations identified at paragraph 1.1 above;

1.3 Mr Al Sadeq's access to legal representation during his detention in Ras-Al-Khaimah.

32. As to litigation privilege, there were a number of further issues.  Mr Allen had identified 11 different pieces of litigation which were said to have been in contemplation at various dates, which were set out in a table which went through several iterations, the final one being set out at [117] of Allen 9 ('the Litigation Privilege Table').  It described the litigation in each case and gave the date from which it was contemplated.  The contemplation was said in Allen 4 to be that of both Dechert and its clients.

33. The litigation privilege issues were the following:

(1)  Mr Al Sadeq contended that Mr Allen's evidence was insufficient to establish that the relevant litigation was in contemplation on the dates suggested in the Litigation Privilege Table.  The defendants disputed this.

(2)  Mr Al Sadeq also contended that five of the eleven pieces of litigation, which comprised criminal proceedings or extradition proceedings, could not qualify for the purposes of litigation privilege because Dechert's clients were not parties to such proceedings, but merely alleged victims.  The defendants contended that provided the other ingredients of litigation privilege were fulfilled, there was no requirement that the contemplated proceedings be proceedings to which the clients were or would be a party.  This came to be referred to as the non-party issue.

**013**

(3)   Mr Al Sadeq further contended in relation to the proceedings against him, which were said to be in contemplation from 5 September 2014, that the date could not be justified; and that proceedings could not have been in contemplation before 19 February 2015 because the complaint was not accepted by the public prosecutor until then.

(4)   A further issue arose by reference to the Court of Appeal decision in *Three Rivers District Council & others v Governor and Company of the Bank of England (No 5)* [2003] EWCA Civ 474 [2003] QB 1556, which was concerned not with litigation privilege, but legal advice privilege.  It was common ground that it was binding authority for the proposition that it was not all communications with representatives of the client which attracted legal advice privilege, but only those which took place with employees and representatives who were specifically authorised to seek and receive the advice.  I shall refer to this as the *Three Rivers (No 5)* principle.  The defendants contended that the *Three Rivers (No 5)* principle is wrong and ought to be reversed. They recognised, however, that that can only occur in the Supreme Court, and that the Judge was bound to apply it in relation to legal advice privilege.  Mr Al Sadeq contended that the principle also applied to litigation privilege.  The defendants disputed that it did so.

(5)   These issues were reflected in the order sought at paragraphs 4 and 5 of the Draft Order which was:

> "4. The Defendants shall…..identify the persons who they contend were authorised to conduct the litigation on behalf of their clients, RAK Development LLC and RAK IDO (for the purposes of the litigations set out in the Litigation Privilege table…) and the reasons why they contend that the persons were so authorised.
>
> 5. The Defendants shall not be entitled to withhold from inspection on grounds of litigation privilege documents or parts thereof on the grounds that such communications:
>
> 5.1 Were created for the dominant purpose of the litigation(s) set out in the table at paragraph 36 of Allen 3 [an earlier iteration of the Litigation Privilege table].
>
> 5.2 Are communications between persons not identified as authorised representatives of Dechert's clients pursuant to paragraph 4 of this Order, and third parties.
>
> 5.3 [Alternative to para 5.1] Were created for the dominant purpose of actual or anticipated criminal proceedings in RAK or other jurisdictions;
>
> 5.4 [Alternative to para 5.1] Were created for the dominant purpose of RAK criminal proceedings against Mr Al Sadeq prior to 19 February 2015."

(6)   Paragraph 7 of the Draft Order sought an order that there be a re-review of disclosure, to be conducted by counsel, insofar as any documents had been withheld where that was not permitted in accordance with paragraph 5.

34. In relation to legal advice privilege, Mr Allen explained that where a document had been identified as subject to litigation privilege it was not reviewed separately for legal advice privilege.  This was a pragmatic decision to save the time and cost which a separate review

for legal advice privilege would have entailed.  When the defendants gave their standard disclosure there were no additional documents which were withheld solely on grounds of legal advice privilege.  When subsequent disclosure was given in response to specific disclosure requests, a few documents were withheld on grounds of legal advice privilege alone.

35. Before the Judge there were two issues in respect of legal advice privilege:

   (1) The defendants contended that the *Three Rivers (No 5)* principle was wrong, whilst accepting that the Judge was bound by it.  The point was taken in order to preserve it in the event of an appeal to the Supreme Court.

   (2)  Mr Al Sadeq contended that legal advice privilege could not attach to the investigatory work conducted by Dechert because this was not of a legal nature.  This was disputed.

   (3) These issues were reflected in the orders sought at paragraphs 2 and 3 of the Draft Order:

   > "2. The Defendants shall …….identify the persons whom they contend were authorised at the material times to seek or receive legal advice on behalf of their clients, RAK Development LLC and RAK IDO, and the reasons why they contend those persons were so authorised.
   >
   > 3. The Defendants shall not be entitled to withhold from inspection any documents or parts thereof on grounds of legal advice privilege, which involve:
   >
   > > 3.1 Communications created for the dominant purpose of the Defendants' investigatory work;
   > >
   > > 3.2 Communications between the Defendants and representatives of their clients who are not authorised to seek or receive legal advice;
   >
   > Save that the Defendants shall be entitled to withhold from inspection on grounds of legal advice privilege documents or parts of documents which comprise secondary evidence of separate communications which are themselves subject to legal advice privilege."

   (4) Paragraph 7 of the Draft Order sought an order that there be  a re-review of disclosure, to be conducted by counsel, insofar as any documents had been withheld where that was not permitted in accordance with paragraphs 2 and 3.

**The Judgment**

36. For reasons which remain largely unknown to us, the judgment was not delivered until some 15 months after the two day hearing of the application, which took place on 20 and 21 December 2021.  Save for the *Three Rivers (No 5)* principle applicable to legal advice privilege, by which it was accepted the Judge was bound, he rejected the entirety of the application.

37. The Judge set out the principles applicable to privilege generally and the iniquity exception at paragraphs [39]-[76].  His conclusions on the various issues were as follows.

**015**

38. On the iniquity exception:

(1) Amongst the propositions he treated as not appearing to be in dispute he included that the iniquity exception applies to a document if it is "…intended to further a purpose that is criminal, fraudulent or otherwise iniquitous." (at [105(i)(b)]; and "legal professional privilege is of fundamental importance. The iniquity exception will only be applied in an exceptional case." (at [105(5)]." He accepted the defendants' submission that Mr Allen had taken the correct approach to the "in furtherance of" test; and rejected the formulation put forward on behalf of Mr Al Sadeq as set out in paragraph 1 of the Draft Order ("generate[d] by or report[ing] on" the alleged iniquitous conduct) as too wide (at [112]-[113]).

(2) That was sufficient in itself for the iniquity exception part of the application to fail, and it was not necessary to establish what standard of evidential burden must be met as to the existence of the iniquity, nor whether it was met on the facts of the case (at [114]).

(3) Had it been necessary, he would have applied the threshold of "at least a strong prima facie case, if not a very strong prima facie case" (at [114]); and would have held that with one exception conceded by the defendants, the standard was not met on the evidence (at [115]). His reasoning was expressed to be by way of adoption of the arguments of Mr Edey KC on behalf of the defendants which he had summarised at [101]-[103]. Those paragraphs were relatively brief. There was no analysis of the quite extensive evidence before him, to which I shall return below, perhaps because he did not consider that the point had to be decided in the light of his conclusion on the "in furtherance of" aspect of the exception.

(4) The one exception conceded by the defendants was a reference to the evidence in Allen 9 in relation to a visit by Dr Mitchell to Al Barirat on 29 October 2015 described at [73]-[74]. Dr Mitchell, who is a recognised prisons expert, was instructed to inspect the conditions in Al Barirat in which Mr Al Sadeq and Mr Quzmar were being held, for the purposes of his evidence being put before the Italian Courts in support of an application for the extradition of Mr Izadpanah to RAK. Dr Mitchell found that the conditions were in breach of article 3 of the European Convention on Human Rights ('ECHR'). A note which has been disclosed of his discussions with a Dechert partner recorded that he had been told by the guards at Al Barirat that Mr Al Sadeq and Mr Quzmar were effectively in solitary confinement, were not let out of their cell every day, had no newspapers or books, and had no source of natural light because it was blocked. He concluded there was a clear breach of article 3. Article 3 provides that "no one shall be subjected to torture or to inhuman or degrading treatment or punishment." It is not possible to tell what aspect of article 3 was considered to be breached because of a redaction. Dr Michell's conclusion was that for the purposes of Italian extradition no one could properly be extradited to the facility. It was agreed he would not write a report. A handwritten "post it" on the note suggested that Mr Hughes "has a similar note on paper" and that Mr Buchanan (one of Dechert's instructing contacts at RAK Development) "may want this removed from file". The concession is not recorded in Mr Allen's witness statements but the terms in which it was made, at least as reflected in the skeleton argument in this court, was that this evidence justified a finding that the iniquity threshold was reached in relation to conditions at Al Barirat "at or around 29 October 2015" (the date of Dr Mitchell's visit), but that Mr

Allen had confirmed that there were no documents created as part of or in furtherance of "that breach".

39. In relation to litigation privilege, the Judge held:

(1) Mr Allen's evidence was sufficient to establish that the relevant litigation was in contemplation on the dates suggested in the Litigation Privilege Table: [184]-[186].

(2) Mr Al Sadeq failed on the non-party issue. The Judge described this as the most interesting and difficult issue and addressed it at [187] to [214]. In doing so he made reference to victims of crimes having a "sufficient interest" in the contemplated criminal proceedings to justify the privilege.

(3) In relation to the *Three Rivers (No 5)* point, he said that it was not necessary to make the order sought in paragraph 4 of the Draft Order because the persons authorised to conduct litigation had been resolved in correspondence. He did not address the order sought in para 5.2 of the Draft Order, which required resolution of the dispute as to whether the *Three Rivers (No 5)* principle extended to litigation privilege.

(4) In relation to the point as to the date when proceedings against Mr Al Sadeq were contemplated, he rejected the submission that they could not have been contemplated before the complaint was accepted by the public prosecutor on 19 February 2015 because what mattered was the contemplation of Dechert's clients, and they contemplated proceedings against Mr Al Sadeq from shortly after his arrest.

40. In relation to legal advice privilege he held that:

(1) he was bound by the *Three Rivers (No 5)* principle, as the defendants accepted; and

(2) all the work was undertaken by Dechert "in a relevant legal context" so as potentially to engage legal advice privilege.

## Grounds of Appeal

41. Mr Al Sadeq appeals, with leave, on grounds which challenge the Judge's conclusions on all the issues I have identified which were decided adversely, save that they do not include a challenge to his conclusion that the appropriate merits threshold to apply to the iniquity exception is a strong prima facie case. I shall have to return to this. The Respondents cross-appeal on the *Three Rivers (No 5)* point in relation to legal advice privilege, recognising that this court is bound by the decision, as was the Judge, but again in order to preserve the position for an appeal to the Supreme Court.

## The Further Evidence Applications

42. On 29 June 2023 Mr Al Sadeq applied to adduce further evidence in support of the appeal. The further evidence was:

(1) material exhibited to Mr Tsiattalou's 18th witness statement ('the T18 material') comprising;

(a) an affidavit of a private investigator Mr Page, who was engaged by the Ruler to investigate Dr Massaad in January 2015; and

**017**

    (b)    documents referred to compendiously as 'RAK Projects Reports' which Mr Al Sadeq contends provide evidence of unlawful hacking activities by those engaged by Mr Page and evidence of the fruits of that unlawful hacking;

(2)  further documents referred to in Mr Tsiattalou's 20th witness statement ('the T20 material').

43. The T18 material was not available to Mr Al Sadeq at the time of the hearing before the Judge but became available well before he gave judgment. The T20 material became available after his judgment was handed down.

44. The further evidence application was listed for hearing separately and in advance of the appeal, and was argued over half a day before Underhill V-P on 3 November 2023. He decided that it was arguable that the T18 and T20 documents should be admitted and that the better course was to defer the decision to the full hearing. We have allowed the parties to refer to the material *de bene esse*, indicating that we would rule on admissibility when giving judgment.

## THE INIQUITY EXCEPTION

*The three iniquities defined*

45. As Mr Edey submitted, it is necessary at the outset to identify what Mr Al Sadeq seeks to establish as constituting the iniquities for the purposes of the privilege dispute, which is not identical to that which he seeks to establish in the pursuit of his claim. I shall refer to them as 'the iniquities' rather than 'alleged iniquities' for convenience; I do not, of course, intend to convey by that shorthand any final conclusion about whether they took place; that is a matter to be determined at trial.

46. Allen 4 explained how the iniquity exception to litigation privilege had been addressed in the disclosure exercise, and identified the eight categories of conduct which had been examined for that purpose in the following passage:

> "49. I addressed the question of the iniquity exception in Allen 3:
>
> > "The iniquity exception broadly states that privilege may not be asserted in relation to documents which were brought into existence for the purpose of furthering a criminal or fraudulent purpose (see *Barrowfen Properties v Patel & Ors*). 'Fraud' in this context is to be interpreted in a relatively wide sense (*Barclays Bank plc v Eustice*). If the alleged wrongdoing is in relation to issues to be tried, there must be a strong prima face case of criminal or fraudulent conduct before the iniquity principle will be engaged (*Kuwait Airways Corporation v Iraqi Airways Company*).
>
> The disclosure review team were specifically briefed on this and have been particularly vigilant to ensure that if there are any otherwise privileged documents to which the iniquity exception applies they should be disclosed.
>
> However, there are no documents in relation to which the disclosure review team considered the iniquity exception applies."

**018**

50. The Claimant is not content with this explanation, and now seeks a direction that:

> "The Defendant shall, by 4pm 30 July 2021, provide in writing to the Claimants' solicitors a further explanation of the approach taken during the Defendants' standard disclosure review regarding the issue of whether documents or communications are subject to the crime fraud or iniquity exception to legal professional privilege. In particular, in providing such further explanation the Defendants shall confirm:
>
> a. The categories of conduct alleged in the Particulars of Claim which the Defendants treated as sufficient to engage the iniquity exception; and
>
> b. In considering the requisite iniquitous purpose, the natural person or persons whose purpose the Defendants considered in assessing whether the iniquity exception applied to documents in the Defendants' standard disclosure."
>
> 51. It is not clear to me that the Claimant is entitled to this information…..
>
> 52. Nonetheless, in order to try to resolve the issue without troubling the court, I list out the categories of conduct which arise out of the Claimant's allegations which would engage the iniquity exception if documents were brought into existence for the furtherance of this purpose:
>
> (1) Kidnapping and extraordinary rendition.
>
> (2) Unlawful detention.
>
> (3) Torture and inhumane treatment.
>
> (4) Denial of legal representation.
>
> (5) Threats to the Claimant and his family.
>
> (6) Extracting false confession statements.
>
> (7) Unlawful search of the Claimant's home and offices.
>
> (8) Attempts to hamper the preparation of the Al Sadeq Proceedings.
>
> 53. The second limb of the Claimant's request relates to the natural person or persons whose purpose the Defendants considered in assessing whether the iniquity exception applies. Again, it is not entirely clear where this takes matters. However, I can confirm that in assessing whether the documents were brought into existence for the purposes set out above, the disclosure review team considered the purpose of both Dechert's Clients and the Defendants."

47. In relation to the part of the application concerned with the iniquity exception, contained in paragraph 1 of the Draft Order, Mr Tsiattalou said that Mr Al Sadeq took no issue with the test which Allen 3 and 4 said had been applied, and emphasised two aspects of the principle. The first was that the relevant iniquity was that of the client and there was no need for the solicitor to be involved in the iniquity: the exception applied where the

solicitor was innocent or ignorant of the iniquity and was being used as a tool for the client's iniquitous purpose. The second and related point made was that:

> "50….it is important to note that this application is not concerned with the Defendant's culpability or level of knowledge or involvement in the categories of iniquity relied on. Although Mr Al Sadeq does allege as his case against them in these proceedings that they were sufficiently implicated in those matters to make them liable to him in UAE law, that is immaterial for the purposes of this application, which is not concerned with the Defendants' conduct. For the purposes of this application, what Mr Al Sadeq invites the Court to find established to the relevant standard, are the following matters:
>
> > 50.1 That the privilege holder, or a third party using the privilege holder as an "innocent tool", possessed the relevant iniquitous purpose; and
> >
> > 50.2 That the categories of document over which inspection is sought were generated in "furtherance of" that purpose (in the broad sense I explain below).
>
> 51. As to the latter point, whilst this will be a matter for submissions in due course, I note that the test for whether documents were generated in furtherance of an iniquitous purpose is a relatively broad one. The category of documents to which the exception applies includes those that were created as a result of, or reporting on, the relevant iniquitous conduct.
>
> 52. In light of the above, the Court need not be concerned that in engaging with this analysis it is being asked to take a preliminary view on issues of liability that will arise at the trial of these proceedings. Instead, it is being asked to find (by reference to matters which are either largely unchallenged, or are common ground, as I explain further below) that the wrongdoing to which Mr Al Sadeq was subjected amounted to an iniquitous purpose *(irrespective of the Defendants' knowledge of or involvement in that wrongdoing)*, and that documents were created in furtherance of that purpose (in the sense I have described above) over which privilege has been claimed." (my emphasis)

48. Having referred to the eight categories of iniquity which Mr Allen had identified at [52] of Allen 4, quoted above, Mr Tsiattalou confirmed [56] of Tsiattalou 6 hat Mr Al Sadeq does not address all those categories in his application, and that the matters which form part of the application were the categories of iniquity which were addressed in detail thereafter, which were the three categories identified in paragraph 1 of the Draft Order and were essentially the first four of Mr Allen's eight categories. The other four of Mr Allen's categories clearly involved having to establish conduct in which it was alleged that Dechert was itself knowingly involved. This was obviously a tactical decision for the purposes of the application, so as to seek to limit the need for the court to inquire into, or form a view on, Dechert's knowledge and the propriety of its conduct, for the purpose of establishing iniquity exceptions to the relevant merits threshold.

49. It follows that for the purposes of the arguments on this appeal, the conduct said to amount to iniquitous conduct must be approached on the assumption that Dechert had no knowledge or involvement in it, in the language used in [52] of Tsiattalou 6 which I have highlighted above. Moreover, and importantly, the iniquities relied on for this application

do not include that identified at paragraph 52(6) of Allen 4, namely extracting false confessions, whether or not with Dechert's knowledge or involvement. This is important because Ms Oppenheimer KC submitted that the three iniquities had to be seen as part of the wider iniquitous purpose of seeking to obtain from Mr Al Sadeq false evidence against Dr Massaad and others. This wider context was invoked to justify a number of her submissions, and she criticised the Judge for not approaching them in this way. The criticism is, in my view, unfounded. The application was carefully and deliberately not framed by reference to iniquity in seeking to obtain false evidence, although that is, of course, one of the allegations for trial. It did not need to be because even if the purpose of Mr Al Sadeq's arrest, detention and questioning was simply that he was suspected of fraud, for which he was subsequently convicted and imprisoned, that would not justify unlawful arrest, rendition or detention in the respects alleged in the three iniquities, if made out.

50. Against that background the issues which arise on this appeal in respect of the iniquity exception may be framed as follows:

  (1) Has Mr Al Sadeq established the existence of the three iniquities to the required evidential standard, which I shall call the merits threshold (Issue 1)?

  (2) If so, what is the legal test for the relationship between the communication and the iniquity which must be established in order to bring the exception into play (Issue 2)?

  (3) Are there documents which the defendants have failed to disclose which they ought to have done in the light of the answer to Issues 1 and 2 (Issue 3)?

51. Issue 1 raises the question as to what the merits threshold is. There appeared to be common ground on that, namely that it was 'a strong prima facie case'. There was no appeal from that aspect of the Judge's decision, and no issue on the skeleton arguments on appeal. However it was apparent from the course of the argument that the parties had very different ideas of what that means in practice. Ms Oppenheimer said at one point that it required a real prospect of success. This is the test for strike out or summary judgment, and requires only a degree of probability or conviction which makes it more than fanciful. Mr Edey, on the other hand, suggested that prima facie case means that the iniquity has to be established as more likely than not. At one stage he suggested that strong prima facie case means it must be much more likely than not, and very strong prima facie case means it must be very much more likely than not; but his ultimate submission, as I understood it, was that the difference between prima facie and strong or very strong prima facie was a matter of emphasis of the clarity of the evidence needed, so that strong and very strong here meant clearly and very clearly established on the balance of probabilities. Issue 1 therefore involves two questions:

    (a) What is the merits threshold test (Issue 1(a))? and

    (b) Is that test met in relation to the three iniquities (Issue 1(b))?

**021**

### Issue 1(a): what is the merits threshold test?

*The uncontroversial aspects of the iniquity exception*

52. I start with a number of uncontroversial aspects of the iniquity exception. As is well-known, legal professional privilege encompasses both legal advice privilege and litigation privilege. Broadly speaking, legal advice privilege applies to communications between a lawyer and its client for the sole or dominant purpose of giving or receiving legal advice, and documents which would reveal the contents of such communications; litigation privilege attaches to communications between a lawyer and its client or third parties which are brought into existence for the sole or dominant purpose of use in the conduct of existing or contemplated adversarial litigation: *R v Central Criminal Court, ex pte Francis & Francis* [1989] AC 346; *Three Rivers District Council & others v Governor and Company of the Bank of England (No 6)* [2004] UKHL 48 [2005] 1 AC 610. Where legal professional privilege exists, it is inviolate: there is no balancing exercise to be undertaken between the interest in maintaining privilege and competing interests in disclosure of the communications: *R v Derby Magistrates Court Ex pte B* [1996] AC 487; *Three Rivers (No 6)* at [25]. Legal professional privilege was described by Lord Hoffmann in *R (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2002] UKHL 18 [2003] 1 AC 563 at [7] as a fundamental human right, which the European Court of Human Rights has held is part of the right to privacy protected by article 8 ECHR.

53. There is a principle that privilege does not exist if the document comes into existence in relation to a fraud, crime or other iniquity. The principle finds its modern authoritative origin in *R v Cox and Railton* (1884) 14 QBD 153, and was referred to by Lord Sumner in *O'Rourke v Darbishire* [1920] AC 581 at p.613 as being that a claim for legal professional privilege does not apply to documents which have been brought into existence in the course of or in furtherance of a fraud. I shall have to examine some aspects of the parameters of the principle in greater detail to determine the issues in the appeal, but by way of introduction, the following aspects of the exception were not controversial.

54. The exception applies to criminal cases, as in *Cox and Railton*, and civil cases, as in *O'Rourke v Darbishire*. It applies equally to legal advice privilege and litigation privilege: *Kuwait Airways (No 6)*.

55. The principle is not confined to fraudulent or criminal purposes, but extends to fraud or other equivalent underhand conduct which is in breach of a duty of good faith or contrary to public policy or the interests of justice: *Williams v Quebrada* [1895] 2 Ch 751, 755; *Crescent Farm (Sidcup) Sports Ltd v Sterling Offices Ltd* [1972] Ch 554, 565; *Barclays Bank v Eustice* [1995] 1 WLR 1238, 1249; and *BBGP v Babcock & Brown* [2010] EWHC 2176 (Ch) [2011] Ch 296 at [62]. In *Ventouris v Mountain* [1991] 1 WLR 607 Bingham LJ used the expression "iniquity", reflecting the language used in early formulations of the principle (see *Garside v Outram* (1857) 26 LJ (Ch) 113 and *Cox and Railton* per Stephen J at 171). Whilst formerly often referred to as the fraud exception, it is now most commonly referred to as the iniquity exception.

56. It is not confined to cases in which the legal adviser is party to, or aware of, the iniquity. The relevant iniquitous purpose is that of the client, or if the client is being used as a tool

for the iniquity by a third party, that of the third party: *Cox and Railton, R v Central Criminal Court ex pte Francis* [1989] 1 AC 346.

57. The principled juridical basis for the exception is that it is a necessary ingredient of legal professional privilege that the communication should be confidential; and that the iniquity exception applies where and because the iniquity deprives the communication of the necessary quality of confidence: see the authorities considered in *JSC BTA Bank v Ablyazov (No 13)* [2014] EWHC 2788 (Comm) [2014] 2 CLC 263 at [76]-[92]. It is therefore an exception in the sense of something which prevents the privilege arising in the first place, not an exception in the sense of a disapplication of existing privilege.

58. Communications between a lawyer and client, or with third parties, are confidential if they take place in the usual course of the professional engagement of such a lawyer, notwithstanding that the engagement may concern an iniquity. This is why the iniquity exception does not apply to what Glidewell LJ referred to as the "ordinary run of cases" in *R v Snaresbrook Crown Court Ex pte DPP* [1988] QB 532 at pp. 537-8. Such privilege is not prevented from attaching merely because the solicitor is engaged to conduct litigation by putting forward an account of events which the client knows to be untrue, and which therefore involves a deliberate strategy to mislead the other party and the court, and to commit perjury, as is clear from that case and *Francis*. Accordingly the touchstone in distinguishing such cases from those where the exception applies is whether the iniquity puts the conduct outside the normal scope of such professional engagement or is an abuse of the relationship which falls within the ordinary course of such engagement. This was the conclusion reached from the analysis of the authorities at [93] in *Ablyazov*, cited with approval and applied by this court in *Candey Ltd v Bosheh* [2022] EWCA Civ 1103 [2022] 4 WLR 84 at [70]-[71], [82]-[83]. This was common ground on the current appeal.

59. *Kuwait Airways (No 6)* was an example of conduct falling on the abusive side of the line, such that the iniquity exception applied. That litigation had a tortuous procedural history involving a number of trials and appeals. The disclosure ordered was for the purposes of an imminent trial (the so called Perjury II trial) in which Kuwait Airways was seeking to set aside an earlier judgment on the grounds that findings on which it was based, namely that Iraqi Airways' conduct attracted state immunity from a particular date, had been procured by fraudulently perjured oral evidence and the manufacturing of forged documents and deliberate suppression of genuine documents. Such iniquitous conduct on the part of Iraqi Airways had already been proved in the so called Perjury I trial. David Steel J ordered disclosure of categories of documents (both in the hands of the solicitors, and held internally) relating to the preparations for the oral evidence of six witnesses, and the activity to conceal relevant documents, including those relating to the disclosure process. The Court of Appeal upheld the decision. Longmore LJ, with whom Ward LJ agreed, said at [39] :

> "… no privilege can exist in communications between Iraqi Airways Co and their previous English solicitors (let alone Iraqi Airways Co's internal documentation) in relation to the tactics of and the evidence given in the main action or in the Perjury I action where the fraud was established."

And at [40]:

> "...The present case is far from the ordinary run of cases envisaged by Glidewell LJ and is much more than a mere case where, in the words of Lord Goff [in *Francis*]

a client gives wrong information to his solicitor which "if acted upon would lead to the commission of perjury".  Here there was a widespread conspiracy to deceive the English court which was acted upon and has been proved to have led not only to perjury but to forgery and the perversion of justice on a remarkable and almost unprecedented scale."

*The Kuwait Airways (No 6) test*

60. In *Kuwait Airways (No 6)*, Longmore LJ expressed his conclusions at [42] in these terms:

"42. I would therefore summarise the position thus: (1) the fraud exception can apply where there is a claim to litigation privilege as much as where there is a claim to legal advice privilege; (2) nevertheless it can only be used in cases where there is a strong (I would myself use the words "very strong") prima facie case of fraud, as there was in *Dubai Aluminium Co Ltd v Al-Alawi* [1999] 1 WLR 1964 and there was not in *Chandler v Church* 137 NLJ 451; where the issue of fraud is not one of the issues in the action, a prima facie case of fraud may be enough as in the *Hallinan* case [2005] 1 WLR 766."

61. As I shall explain, I have some difficulty with the second limb of this formulation, but even if an accurate statement of the law, it leaves room for uncertainty about what is meant by the expressions 'prima facie case', 'strong prima facie case' or 'very strong prima facie case', as the rival submissions in this appeal vividly demonstrate.  What is the threshold in terms of the possibility or probability of iniquity which must be established to amount to a prima facie case, a strong prima facie case or a very strong prima facie case?

62. It is highly desirable for the efficient conduct of both civil and criminal litigation, to both of which the iniquity exception applies, that the parties and their legal advisers who are involved in disclosure should be provided with as much clarity as possible on this question.   In other interlocutory contexts, expressions have been used on which authoritative guidance has been given.  In summary judgment applications it is "real prospect of success" on which there is plentiful authority: see e g *Easyair Ltd v Opal Telecom* Ltd [2009] EWHC 339 (Ch) at [15].  In the interim injunctions jurisprudence there must be a serious issue to be tried as to the merits.  In jurisdictional disputes there must be a serious issue to be tried on the merits and a good arguable case as to whether the claim comes within one of the jurisdictional gateways, both of which expressions have received extensive judicial interpretation: see e.g. *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC [2012] 1 WLR 1804 at [71], *Brownlie v Four Seasons Holdings Inc.* [2017] UKSC 80 [2018] 1 WLR 192 at [4]-[8].

63. I have reached the conclusion that save in exceptional cases, the merits threshold for the iniquity exception is a balance of probabilities test: the existence of the iniquity must be more likely than not on the material available to the decision maker, whether that be the party or legal adviser determining whether to give or withhold disclosure, or the court on any application in which the issue arises; and that in an interlocutory context there is no distinction to be drawn between cases in which the iniquity is one of the issues in the proceedings and those where it is not.  This, in my view, is what the cases speaking of a prima facie case have had in mind, and what is meant by a prima facie case in this context (whatever it may mean in other contexts).

**024**

64. That conclusion is dictated by principle and consistent with, and to some extent supported by, the authorities at appellate level, other than *Kuwait Airways (No 6)*. I will address first considerations of principle, and then the authorities.

*Principle*

65. Application of the iniquity exception involves the balance of two competing public policy considerations. On the one hand, there are the policy considerations which underlie the existence of legal professional privilege. It is not here necessary to define them exhaustively. Three quotations will suffice. In *Ventouris v Mountain* Bingham LJ said at p. 611C-D:

> "The doctrine of legal professional privilege is rooted in the public interest, which requires that hopeless and exaggerated claims and unsound and spurious defences be so far as possible discouraged, and civil disputes so far as possible settled without resort to judicial decision. To this end it is necessary that actual and potential litigants, be they claimants or respondents, should be free to unburden themselves without reserve to their legal advisers, and their legal advisers be free to give honest and candid advice on a sound factual basis, without fear that these communications may be relied on by an opposing party if the dispute comes before the court for decision."

66. In *Derby Magistrates Court ex pte B* Lord Taylor CJ said at p. 507C-D:

> "The principle which runs through all these cases, and the many other cases which were cited, is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth. The client must be sure that what he tells his lawyer in confidence will never be revealed without his consent. Legal professional privilege is thus much more than an ordinary rule of evidence, limited in its application to the facts of a particular case. It is a fundamental condition on which the administration of justice as a whole rests."

67. In *Three Rivers (No 6)* Lord Rodger said at [52]:

> "Litigation privilege relates to communications at the stage when litigation is pending or in contemplation. It is based on the idea that legal proceedings take the form of a contest in which each of the opposing parties assembles his own body of evidence and uses it to try to defeat the other, with the judge or the jury determining the winner. In such a system, each party should be free to prepare his case as fully as possible without the risk that his opponent will be able to recover the material generated by his preparations."

68. On the other hand there is a strong public interest in iniquity being uncovered. In *Cox and Railton* at p. 170 Stephen J cited with approval the words of Sir Wiliam Page Wood V-C in *Gartside v Outram*:

> "If [the lawyer] is employed as an attorney in any unlawful or wicked act, his duty to the public obliges him to disclose it; no private obligations can dispense with that universal one which lies on every member of society to discover every design which may be formed contrary to the laws of society to destroy the public welfare."

69. In the context of litigation, this is reinforced by the imperative of the parties being able to adduce before the court all relevant evidence so that the dispute is determined fairly and correctly.  If relevant evidence is concealed, there is a risk of injustice.   In *Three Rivers (No 6)* Lord Carswell described this at [86] as one of the two opposing imperatives, which had to be balanced with the policy underlying the existence for the privilege to determine the bounds of privilege. This is not sufficient of itself to outweigh the policy underlying legal professional privilege which, where it applies, is inviolate from other public policy factors in favour of disclosure.  But it is engaged where the iniquity exception applies, where the policy is that the client/lawyer relationship must not be used abusively to conceal iniquity; and that where it is, the lawyer holds a higher duty to disclose it.  As Kekewich J put it in *Williams v Quebrada Railway, Land and Copper Company* [1895] 2 Ch 751 at p. 755 such an iniquitous transaction should be "disclosed in all its nakedness to the court."  The concept of abuse was captured by Cardozo J in the US Supreme Court decision of *Clark v United States of America* (1933) 289 US 1 at 15:

> "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."

70. Consideration of whether the iniquity exception applies will usually have to take place without the decision maker being able to assess all the evidence which will subsequently be available on the issue.  Where the iniquity is an issue in the proceedings, its existence or otherwise will only be determined at trial, often with the benefit of oral evidence.  The party making the decision when giving disclosure, or more often in practice its legal adviser, has access to limited material; and often, so far as its opponent's case is concerned, no more than allegations in a statement of case.  The Court determining a disclosure application may have evidence of each party's case, but it will rarely be feasible or appropriate to conduct a mini trial on the issue for the purposes of disclosure.  Where the iniquity is not an issue in the proceedings, it may sometimes be possible to try the issue of whether the iniquity exists for the purposes of disclosure in the proceedings, but case management considerations and the need to avoid satellite litigation are likely to render this very much the exception.  Usually the court will be in the same position as where it is an issue in the proceedings, namely having to assess such evidence as the parties put before the court for that purpose, without oral evidence on disputed issues.

71. The party, or legal adviser or court is therefore usually required to decide the issue on a provisional basis which may turn out to be wrong.  If the iniquity is treated as sufficiently established to require disclosure, the communication will be made available; if it should subsequently be held, or appear, that the iniquity did not take place, the privilege will have been wrongly invaded in a way which cannot be reversed.  If, on the other hand, the iniquity is not treated as sufficiently established but does in fact exist, the party to whom disclosure ought to have been made will have been deprived of relevant evidence to which it was entitled in advancing its case, with the consequent adverse impact on its prospects of success.

72. That being so, a test of anything less than a balance of probabilities would be inconsistent with principle.  If the test were real prospect of success, serious issue to be tried, good arguable case, or any other test involving a degree of probability of less than 50%, that would involve the party being required to disclose communications which on the material

available were more likely than not to be privileged.  Since privilege, where it exists, is inviolable, and its loss irremediable, and as it has been described as a fundamental human right, that cannot be a satisfactory test.  The test should therefore be whether the iniquity exists on the balance of probabilities on the material available to the decision maker, whether party, legal adviser or court, at the time the decision is made, save in exceptional circumstances.  That may require a reconsideration, and a different decision, should further material become available, which may occur after the initial decision is taken when conducting standard disclosure or a decision by the court.  But that is something which may arise wherever the merits threshold is set.

73. I add the proviso "save in exceptional circumstances" as a result of considerations which arise in other procedural fields in which, for interlocutory purposes, the court has to reach a provisional conclusion on incomplete evidence, which may result in harm in either direction if it turns out to be wrong.  In the case of interim injunctions this has been addressed by adopting a relatively low merits threshold (serious issue to be tried) but then deciding whether to grant relief by reference to what causes the least irremediable prejudice, balancing on the one hand the harm to the claimant if the injunction is wrongly refused against that to the defendant if it is wrongly granted; the merits of the claim can come in again to play a part in this balancing of harm exercise: see *National Commercial Bank Jamaica Ltd v Olint Corpn Ltd* [2009] UKPC 16 [2009] 1 WLR 1405.

74. Hoffmann J applied this familiar concept of the balance of prejudice to the iniquity exception in refusing disclosure of one class of documents in *Chandler v Church*. Vinelott J suggested a similar approach in *Derby & Co v Weldon (No 7)* [1990] 1 WLR 1157 at 1173A-F, where after reviewing  the  authorities to date, he rejected a merits test of the balance of probabilities as too high in all cases, and concluded that no simple formula could express the strength of the case the plaintiff had to show, which would depend upon the circumstances of each individual case, including the balance of harm.

75. Whilst adopting such an approach to the application of the iniquity exception has some attractions, I do not regard it as satisfactory, for two reasons.  First, in many cases the balance of prejudice test will be impossible to apply.  The competing public policies I have identified are of equal weight: see Lord Carswell in *Three Rivers (No 6)* at [86]-[87]. On one side of the balance will be the effect of wrongly destroying privilege if it should turn out that there was no iniquity.  That will be the same in almost all cases: it is the loss of confidentiality in communications which should remain confidential because of the public interest, not just for that client but all potential clients, in communications involving legal advice or gathering of evidence for proceedings.  It would be difficult to know how to weigh such harm in the light of the principle that where privilege exists it is inviolate and cannot be outweighed by other forms of public interest in disclosure; it is in Lord Hoffmann's words in *Morgan Grenfell* a fundamental human right.  On the other side of the balance will be the effect of wrongly permitting the assertion of privilege if it should turn out that the iniquity occurred.  It will usually be difficult for a court to assess the effect because the court will not usually see the content of the withheld communication, or all the other evidence available to the party seeking disclosure; and even if it sees the document, it will usually be unable to judge to what extent the withheld communication would assist the case of the party seeking disclosure in the light of all the other evidence available to that party.

76. Secondly, it is important to have a test which is as simple and practicable as possible for parties and their legal advisers conducting the disclosure exercise in litigation.  Whilst a

court may occasionally be more readily able to apply a balance of prejudice test, it is an unhelpfully uncertain and imprecise guide for a solicitor conducting the disclosure process, involving as it would an evaluative assessment on a document by document basis of the effect on the ability of the opponent to conduct its case by reference to disclosing or withholding that particular document. Since the solicitor will not usually know the evidence which the opponent has to support its case, at the time they are conducting the disclosure exercise, that will usually involve an impossible evaluative assessment.

77. I would therefore endorse the approach of seeking to identify a generally applicable merits threshold, which was the approach in *Kuwait Airways (No 6)*, subject to the proviso that there may exceptionally be cases which on their particular facts dictate that a balance of harm exercise may have a part to play, where such an exercise is possible. I cannot envisage any circumstances in which that exception will be applicable to a decision taken by a party or its lawyer when conducting disclosure, but it may possibly arise when a court is adjudicating on disclosure. I do not attempt to identify what those circumstances might be, and there are none in the current case. However, I do not wish to be understood as saying that a consideration of the balance of harm can never be relevant. I do, however, emphasise that it will only be in an exceptional case that it might do so, and that generally the answer is to be found in the application of a merits test of the balance of probabilities.

*The authorities*

78. Apart from *Kuwait Airways (No 6)* there are five authorities which require consideration.

79. In *Cox and Railton* Munster obtained a judgment against Railton, and sought execution against Railton's assets. Cox claimed to own the property pursuant to a bill of sale executed by Railton after Munster had obtained judgment. Cox and Railton had been in partnership, and at the trial of the interpleader issue as to whether the goods belonged to Cox pursuant to the bill of sale, Cox produced a copy of the partnership deed which bore an endorsement purporting to be a memorandum of dissolution of the partnership before Munster commenced his claim. Cox and Railton were prosecuted for conspiracy to defraud, the prosecution case being that the bill of sale was a fraudulent bill of sale of partnership assets, entered into by Railton and Cox whilst they were still partners, for the purposes of depriving Munster of the fruits of his judgment; and that the memorandum of dissolution had been falsely backdated at a time after Munster had obtained judgment. At trial, the judge allowed the prosecution to adduce evidence from a solicitor, Goodman, who testified that, after Munster had obtained judgment, Railton and Cox had consulted him and asked whether anything could be done to prevent the property being seized, and in particular whether it could be disposed of by a bill of sale to Cox. They were told they could not do so because the property constituted a partnership asset. Railton asked whether anyone knew about the partnership apart from Goodman and his clerks, and was told not. There was no mention of the partnership having been dissolved. Cox and Railton were convicted, and a case stated by way of appeal as to whether the evidence, over which privilege was claimed, should have been admitted.

80. The judgment of the court comprising ten judges of the Queen's Bench Division sitting *en banc* was given by Stephen J, upholding the conviction on the grounds that the communications fell within the iniquity exception.

**028**

81. The question of the appropriate merits threshold for establishing the relevant iniquity was not directly addressed because the iniquity in question was treated as established by the verdict of the jury.  At p. 165 Stephen J said:

> "We must take it, after the verdict of the jury, that so far as the two defendants, Railton and Cox, were concerned, their communication with Mr Goodman was a step preparatory to the commission of a criminal offence, namely, a conspiracy to defraud."

82. However, of relevance to the current issue is what he said at p. 175, the court having been pressed with the argument that the exception would greatly diminish the privilege if the "secret must be told in order to see if it ought to be kept"; and pressed to give guidance on how to avoid that consequence.  He continued:

> "The only thing we feel authorised to say on this matter is, that in each particular case the Court must determine upon the facts actually given in evidence or proposed to be given in evidence *whether it seems probable* that the accused person may have consulted his legal adviser, not after the commission of the crime for the legitimate purpose of being defended, but before the commission of the crime for the purpose of being guided or helped in committing it." (my emphasis)

83. The emphasised wording in this passage provides support for a balance of probabilities merits test, which is not undermined by the use of the word "may" which follows.

84. In *O'Rourke v Darbishire* [1920] AC 581, a testator appointed Christie, his wife and Darbishire as trustees and executors, Darbishire being his solicitor.  By a will and four codicils various parts of his property were bequeathed to the trustees and executors absolutely.  Subsequently O'Rourke (as representative of the heiress at law and one of the testator's two next of kin) challenged the validity of the will and codicils.  Amongst the grounds of challenge was an allegation in paragraph 12 of the statement of claim that "the form in which the testamentary dispositions of the testator was arranged or settled by [Christie and Darbishire] was a mere fraudulent device or scheme for appropriating to the use of [the testator's] executors a very large proportion of the testator's estate…" (see p.585).  Particulars were provided under that paragraph stating that the fraud was in devising and carrying out the scheme embodied in the will and codicils, whereby the testator was left in the belief that his wishes as to the residue of his estate would be carried out, whereas they intended to appropriate the greater part of the testator's estate for their own use (see p. 600).  The defendants withheld a number of documents on the grounds of legal advice privilege. O'Rourke sought disclosure of the documents, one ground being that the iniquity exception applied.  The House of Lords rejected the argument that the iniquity exception was made out.

85. Each of the four members of the Judicial Committee gave his own judgment.  Viscount Finlay said at p. 604:

> "(c) The appellant also relied on the proposition that no privilege comes into existence with regard to communications made in order to get advice for the purpose of carrying out a fraud.
>
> This is clear law, and, if such guilty purpose was in the client's mind when he sought the solicitor's advice, professional privilege is out of the question. But it is

not enough to allege fraud. If the communications to the solicitor were for the purpose of obtaining professional advice, there must be, in order to get rid of privilege, *not merely an allegation* that they were made for the purpose of getting advice for the commission of a fraud, but there must be something to give *colour to the charge*. The statement must be made *in clear and definite terms*, and there must *further be some prima facie evidence* that it has some foundation in fact. It is with reference to cases of this kind that it can be correctly said that the Court has a discretion as to ordering inspection of documents. It is obvious that it would be absurd to say that the privilege could be got rid of *merely by making a charge of fraud*. The Court will exercise its discretion, not merely as to the terms in which the allegation is made, but also as to the surrounding circumstances, for the purpose of seeing whether the charge is made honestly *and with sufficient probability of its truth* to make it right to disallow the privilege of professional communications. In the present case it seems to me clear that the appellant has not shown such *a prima facie case* as would make it right to treat the claim of professional privilege as unfounded." (my emphasis)

86. Lord Sumner said at p. 613:

"(1) …. No one doubts again that you can neither try out the issue in the action on a mere interlocutory proceeding, nor require the claimant to carry the issue raised to a successful trial before he can obtain production of documents which are only relevant to that issue and only sought for the purpose of proving it. I am, however, sure that it is equally clear in principle that no *mere allegation* of a fraud, even though made in the most approved form of pleading, will suffice in itself to overcome a claim of professional privilege, properly formulated." (my emphasis)

87. He went on at p. 614:

"It is therefore the business of the party claiming production to meet a properly framed claim of professional privilege by showing that the privilege does not attach because it is being asserted for documents which were brought into existence in furtherance of a fraud, and he can only do this by *establishing a prima facie case of fraud in fact*. Evidence, admission, inference from circumstances which are common ground, or "what not," as Lord Halsbury says, may serve for this purpose. I do not pretend to define what material may and what may not be used. The imperfections of his pleadings or the dubious character of his procedure in the action may militate against the claimant's case. The fact that a motion to strike out his pleading has been made and has failed, does not establish that he has a sufficient prima facie case for this purpose. The stage in the action is only an interlocutory one, and the materials must be weighed, such as they are, without the apparatus of a formal trial of an issue. *On such materials the Court must judge whether the claim of privilege is displaced or not*." (my emphasis)

88. Lord Parmoor said at p. 623:

"Whether the circumstances brought to the notice of the Court in a particular case are sufficiently explicit to establish *a prima facie case of definite fraud*, either by allegation, affidavit, or in some other way, will depend on the special facts in each case… (my emphasis)

…

I desire to add that the refusal of the Court to strike out the statement of claim, on the application of the defendants, does not of itself establish any case of prima facie fraud, or make the case other than one of mere surmise and conjecture."

89. Lord Wrenbury said at p. 632

"Further, as regards documents which, upon the principle above stated, are open to inspection the plaintiff must, in asking for them, go at any rate so far as to satisfy the Court that his allegations of fraud are *not merely the bold assertions* of a reckless pleader, but are such as to be regarded seriously *as constituting prima facie a case of fraud resting on solid grounds*." (my emphasis)

90. The decision establishes that a mere allegation of iniquity in a pleading which is not evidence is insufficient to meet the merits threshold, even if it could not be struck out. All four law lords use the expression *prima facie case*, with additional epithets about the strength or cogency of the material. Viscount Finlay's formulation required sufficient probability of the truth of the allegation to make it right to disallow the privilege. Lord Sumner's statement that "On such materials the Court must judge whether the claim of privilege is displaced or not" is suggestive of a determination on the balance of probabilities on the material available.

91. In *Buttes Gas and Oil Co. v. Hammer (No. 3)* [1981] Q.B. 223, a claim was made to displace legal professional privilege in reliance on the iniquity exception. Lord Denning MR, having described the scope of the privilege, and before turning to examine the categories of documents in which privilege had been claimed, said, at p. 246:

"No privilege can be invoked so as to cover up fraud or iniquity. But this principle must not be carried too far. No person faced with an allegation of fraud could safely ask for legal advice. To do away with the privilege—at the discovery stage—there must be strong evidence of fraud—such that the court can say: 'This is such an obvious fraud that he should not be allowed to shelter behind the cloak of privilege.'"

92. Donaldson LJ cited a passage of McNeill J in the court below where he described the allegations of fraud as "no more than the key to an intended fishing operation, to be carried out in the hope that discovery of otherwise privileged documents will produce some peg on which the defendants could seek to justify and to sustain the counterclaim." He added, at p. 252:

"I respectfully agree and find it unnecessary to express any view on how strong a prima facie case of fraud is necessary to defeat a claim for disclosure based upon legal professional privilege, but something exceptional is called for."

93. *R v Gibbins* was a decision of the Court of Appeal Criminal Division on an appeal from a ruling on admissibility of evidence at a preliminary hearing during a trial. Gibbins and others were charged with committing an advance fee fraud. The police were in possession of draft annotated instructions to counsel, prepared by Gibbins' solicitor and annotated by Gibbins, seeking legal advice on the legality of the scheme. One of the answers advanced by the prosecution to Gibbins' claim for legal advice privilege was that the

instructions were prepared, and if not prepared annotated, for the fraudulent purpose of obtaining advice from counsel on a false or incomplete basis in order to use any favourable opinion in furtherance of the fraud.

94. Before the trial judge, Field J, the Crown accepted that it had to show a strong prima facie case, which it equated with the civil balance of probabilities test. "Strong prima facie case" had been the epithet used to describe evidence which had been found to be sufficient in *Barclays Bank plc v Eustice* [1995] 1 WLR 1238 and *Dubai Bank v Al-Alawi* [1999] 1 WLR 196, although in both cases simply as descriptive of the evidence rather than by way of formulating a test, and inferentially in the passage in Donaldson LJ's judgment in *Buttes Gas* quoted above. On behalf of Gibbins it was contended that a criminal standard of beyond reasonable doubt was required. The Judge rejected the criminal standard, and held that the fraud exception was established to the civil standard on the evidence. The Court of Appeal upheld the decision.

95. Potter LJ, giving the judgment of the Court, cited the passage I have quoted above from Stephen J's judgment in *Cox and Railton* at p. 175 and went on at [37]:

> "This passage clearly anticipates that the existence of the fraud exception should be decided upon the test of 'probabilities'. However it seems clear that in subsequent decisions the question "whether it seems probable" has been interpreted as meaning whether the judge is satisfied that there is a prima facie case."

96. The paragraphs which follow make clear that the subsequent decisions being referred to included primarily the passages in *O'Rourke v Darbishire* which I have quoted. At [44] Potter LJ repeated that the test from *Cox and Railton* was one of probability "which test the courts have subsequently refined as the need to demonstrate a prima facie case."

97. At [47]-[50] he said

> "47. While the question for determination by the judge is whether a particular document ostensibly seeking advice was or was not created as part, or for the purposes, of a fraud, the answer is unlikely to be immediately apparent from the terms of the document alone and its admissibility will frequently (indeed usually) require consideration of its contents in the wider context of the fraud of which it is itself alleged to be evidence. When a judge, prior to the trial of the issue of whether that fraud has in fact been established (which in criminal proceedings will ultimately be a question for the jury on the basis of proof beyond reasonable doubt) is faced with the question whether or not to require production of the disputed document with a view to its being used in evidence, his *decision is one which has to be reached upon the facts as they then appear* i.e. prior to the trial at which the nature and existence of the fraud and the probative value of the document will finally be determined by the jury. *Effectively, the judge is only in a position to reach a conclusion upon a provisional or ' prima facie' basis, rather than one of certainty.*(my emphasis)
>
> …
>
> 49. We return to the practicalities of the matter. In the context of a civil or criminal case, where the cause of action pleaded or the charge to be determined at trial is that of fraud, the existence of which is in issue and will only be finally determined

at trial, the judge who is required at the interlocutory stage to determine the question whether or not a document is disclosable for the purpose of admission in evidence at trial under the fraud exception, is in no position finally to determine that question. Such final determination will only be possible at trial in the light of all the evidence, including the oral evidence of the parties and, in particular, that of the defendant if called. Meanwhile, the judge can only realistically cope with the matter *on the basis of the prima facie position i.e. that which appears to be the position at the time of consideration in the absence of further explanation.* Neither policy nor practicality require more than that the judge should be satisfied (i) that a prima facie case of fraud exists and (ii) that, considered in that context, a prima facie case also exists that the document concerned came into existence as part of the fraud. (my emphasis)

50. In this respect, bearing in mind the nature of the proceedings, the importance of the doctrine of LPP, the room for ambiguity and the possibility of innocent explanation, it has been stated (in *Cox and Railton*) that the judge should consider it 'probable' that the document was part of the fraud and (in *Derby v Weldon*) that a 'strong' prima facie case is required (the standard adopted by the judge in this case). We consider that these observations rightly emphasise the need for the judge to be clear in his view that a prima facie case of fraudulent purpose exists. However, we *do not think that any gloss upon the requirement of a prima facie case is desirable either in respect of the charge contained in the indictment or in respect of the purpose behind the document of which disclosure is sought.* (my emphasis)

98. *Gibbins* is therefore authority for the proposition that the test of prima facie case is a test of the balance of probabilities, to be conducted on the basis of the material available at the interlocutory stage at which the decision falls to be made; and that there is no useful purpose in glossing prima facie case with the epithet strong when so understood. A prima facie case is a case which allows a conclusion on a provisional (i.e. prima facie) basis that the iniquity exists. That is a conclusion to be reached on the civil standard of proof of the balance of probabilities.

99. In *R (Hallinan Blackburn Gittings & Nott (a firm)) v Crown Court at Middlesex Guildhall* [2004] EWHC 2726 (Admin) [2005] 1 WLR 766, P was arrested and charged with possession of cocaine with intent to supply, and possession of a stun gun. Hallinan, the firm of solicitors which he instructed, had taken a statement from K who claimed she was present at P's arrest. K's employers told the police that she was in the office at the time she claimed to have been present at the arrest, and the police found evidence supporting that position, including material supporting a clear inference that she had made a false entry in a computer diary as to where she was. There were also e-mails passing between K and M, a junior clerk in barrister's chambers, supporting the case that what K was proposing to say was false. P, K and M were then charged with conspiracy to pervert the course of justice. The police found a folder at K's office with correspondence from the firm and an unsigned copy of her witness statement (stating she was present at the arrest and observed officers planting the drugs). The police required the firm, P's solicitors, to produce K's witness statement, and other material pertaining to K, for the purpose of P's trial on the drugs and gun charges; the firm refused to do so, claiming privilege, and the police applied to the Crown Court for a production order. The judge held that there were reasonable grounds for believing K was party to a conspiracy to pervert the course of justice and that the material was held "with the intention of furthering a criminal purpose".

**033**

P's trial on the drugs and gun offences was adjourned pending judicial review of the judge's decision. Rose LJ, giving the judgment of the Divisional Court upholding the judge's decision, concluded:

> "[25] It is a truism that whether material is legally privileged depends on the circumstances of the particular case. In order to defeat a claim to legal professional privilege, it will not be appropriate, for example in a case where an alibi has been raised, to seek to analyse the issues which are likely to arise in the criminal investigation or trial which gives rise to the initial privilege. To do so, as it seems to me, would be to put the cart, in the form of analysis of the issues, before the horse, that is the trial. Where, however, there is evidence of specific agreement to pervert the course of justice, which is freestanding and independent, in the sense that it does not require any judgment to be reached in relation to the issues to be tried, the court may well be in a position to evaluate whether what has occurred falls within or outwith the protection of legal professional privilege as explained in Cox and Railton.
>
> [26] In the present case, as it seems to me, the judge was fully entitled to conclude that the material here sought had reached the entirely innocent claimants from his client and/or others, whose intention, it could be inferred, was to further their continuing purpose of perverting the course of justice."

100. Although the judge in that case had been satisfied that there were "reasonable grounds for believing" that the material was in furtherance of iniquity, the Divisional Court's reasoning at [26] was implicitly that he had been entitled to reach that conclusion on the material before him. The decision is, therefore, an example of the application of a balance of probability test on the available material.

101. I do not find what was said at [25] entirely easy to follow. Insofar as the first part might suggest that the iniquity can never destroy the privilege where the issue as to the existence of the iniquity is an issue in the proceedings, it would be insupportable in principle and out of line with the authorities where disclosure has been ordered on the basis of the iniquity exception in such circumstances. Indeed, *Hallinan* was itself a case in which the existence of the iniquity was going to be an issue in the relevant proceedings, namely P's trial on the drugs and gun charges, albeit not the iniquity with which he was charged. It was going to be an issue at P's trial whether K was present at the arrest and saw the police plant the drugs, as it appeared she was going to say in evidence, or whether she was elsewhere, as her employers stated and other evidence supported: the question whether she was conspiring to pervert the course of justice by lying about where she was constituted both an issue in the proceedings and the alleged iniquity which destroyed the privilege being claimed. It was an ex tempore judgment, and it may be that its meaning can only be unlocked by a fuller understanding of the argument reflected in [22] where Rose LJ said:

> "As to alibi cases, an example canvassed in the course of argument on both sides, Mr Mitchell submitted that it is unlikely until the trial has taken place that there would be material sufficient to justify an application for a Special Procedure Order. But where, as here, there is freestanding independent material, the police in pursuance of their general duty in relation to the prevention of crime cannot be expected to stand by."

**034**

102. I return finally to *Kuwait Airways (No 6)*, in which what Longmore LJ said was obiter because on the facts of that case the perjury met the threshold of more probable than not, having been established in a previous judicial decision. The three aspects of his formulation with which I find myself unable to agree are first (at [37]), that if all one has is a disputed version of events it will be difficult to say that there is even a prima facie case of fraud; secondly, that a different threshold applies where the iniquity is in issue in the proceedings from that where it is not; and thirdly, that there are degrees of prima facie case from 'prima facie' simpliciter through to 'very strong prima facie', which import different standards as to the degree of probability of the existence of the iniquity or the strength of the evidence required in support.

103. As to the first, if one has a disputed version of events, there may be established a prima facie case of iniquity, in the sense in which that expression is used in this context. What matters is the quality of the disputed evidence on either side, at the time the issue falls to be resolved, which in the present context will usually be at an interlocutory stage. The quality of the evidence can be assessed to determine whether it meets the necessary threshold, whatever that threshold be in terms of probability or plausibility.

104. As to the second, I find it difficult to see any justifiable reason for the distinction between cases in which the iniquity is in issue in the proceedings and those where it is not. The balance of harm will generally be the same in either case. Of course, where the existence of the iniquity is not one of the issues in the proceedings, it may sometimes be possible to have a greater evidential inquiry, without procedural unfairness, perhaps occasionally a full trial on the issue. But that will be a rare case, and accordingly the court will usually have to take a provisional view on the available material, whether or not the iniquity is an issue in the proceedings. This will also be the position of the party or its solicitor in deciding whether to give or withhold disclosure.

105. Moreover, Longmore LJ's formulation is in this respect inconsistent with *O'Rourke v Darbishire* in which the iniquity was an issue in the proceedings, and all four judgments in the House of Lords expressed the test in terms of a prima facie case. Longmore LJ did not refer to those formulations, or to *O'Rourke* at all in the context of this issue.

106. At [29] and [37] Longmore LJ treated the distinction as justified by what was said at [25] of *Hallinan*. He said at [29]:

> "This authority … shows that the exception may not apply if what is in issue is merely an issue in the proceedings e.g. a denial of having committed a crime or (as discussed in the <u>Hallinan</u> case) an assertion of an alibi or telling a lie to a solicitor about the side of the road on which one is driving. The fraud exception is more likely to apply if the evidence of criminality is "free-standing and independent".

I do not myself regard [25] of *Hallinan* as establishing any such proposition. In the posited examples the exception may not apply because there is not the abusive relationship which takes it out of the ordinary run of cases. It is not, however, something which depends upon whether the iniquity is an issue in the proceedings. In any event, I do not understand how a statement as to the circumstances in which the exception does not apply at all can provide guidance as to the merits threshold where it does apply, as Longmore LJ did in his summary at [42].

**035**

107. As to the third, prima facie case is to be equated with a balance of probabilities test, as was held in *Gibbins*. I agree that it is unhelpful to gloss it with the epithets strong or very strong when used in this sense. Those are terms which have been used descriptively of the evidence in particular cases but not as terms defining the test. There seems no justification for a test which imposes a higher burden than the balance of probabilities. Such a conclusion would be contrary to principle: the policy in favour of privilege is not weightier than the policy in favour of the exception. If the epithets strong or very strong are intended to apply to the clarity of the evidence required, as Mr Edey suggested, they are to my mind unhelpful and apt to mislead. Any allegation of fraud or criminality needs to be particularised, and evidence of it cogent, if it is to be taken into account, and this applies as much to the iniquity exception as in other areas of the law. However the test remains simply whether on all the evidence there is a prima facie case.

*Conclusion on issue 1(a)*

108. The merits threshold for the existence of an iniquity which prevents legal professional privilege arising, whether legal advice privilege or litigation privilege, is a prima facie case, which means that on an assessment of the material available to the decision maker, whether that be the party or its legal adviser conducting disclosure, or the court, it appears more likely than not on a balance of probabilities that such iniquity exists. In an interlocutory context there is no distinction to be drawn between cases in which the iniquity is one of the issues in the proceedings and those where it is not. This is subject to the proviso that there might exist exceptional circumstances which could justify a court taking the view that a balance of harm analysis has a part to play.

**Issue 1b  Are the iniquities made out on the material before the court?**

109. I shall first address this question on the basis of the evidence before the Judge and without reference to the further evidence on which Mr Al Sadeq wishes to rely.

110. The detail of Mr Al Sadeq's account in the P/C, so far as the three iniquities are concerned, includes the following.

(1)    As Mr Al Sadeq and his wife returned to their home in Dubai from a social engagement at about 1 am on 5 September, the occupants of a vehicle at their home approached Mr Al Sadeq in his car and pulled him from the vehicle. One of the men showed Mr Al Sadeq an identity card stating he was from RAK state security investigations. The captors said they were going to take him to their headquarters in RAK. Mr Al Sadeq was then forcibly restrained, manhandled into their vehicle and driven out of Dubai to the GHQ in RAK. This, it is alleged, amounted to unlawful kidnap and rendition, in the absence of any request being made to the UAE Federal or Dubai authorities by the RAK authorities for the arrest or extradition of Mr Al Sadeq as required by UAE law.

(2)    On arrival at the GHQ, Mr Al Sadeq was placed in custody in solitary confinement in a small, damp cell without adequate ventilation or sanitation. He was not arrested and was not told what if any charges or allegations were being laid against him. He was kept in the same cell in solitary confinement between 5 September 2014 and 10 September 2014 without being presented to the prosecutorial authorities for questioning or investigation. That is alleged to have been in violation of section 47 of the UAE Law of Criminal Procedure which provides that the police are obliged to interrogate the accused within 24 hours of apprehension and either arrest or order the

**036**

release of the subject; and must present a suspect to the public prosecution service within 48 hours of apprehension. During that period between 5 and 10 September 2014, he was visited by Hamad Al Awadhi, a security/police attaché from the Ruler's court, who told him he was representing the Ruler, who threatened him that if he did not cooperate he would never see the light of day again, or words to that effect. The expected "cooperation" was explained to be that he should provide evidence and testify against Dr Massaad and Mr Quzmar. On 8 September 2014, in the middle of the night, Mr Al Sadeq was interrogated by Mr Gerrard and Ms Black in GHQ. His request for legal representation was refused and at this point he had still not been arrested. He was blindfolded and his hands were tied behind his back during this interrogation. Mr Gerrard began by telling Mr Al Sadeq that he needed to cooperate, that he was in control of Mr Al Sadeq's fate, and that if Mr Al Sadeq did not cooperate he would never be released. Mr Gerrard threatened to have Mrs Al Sadeq arrested.

(3)    On or around 10 September Mr Al-Sadeq was formally arrested for the first time and taken to the public prosecutor in the middle of the night with his head covered with a black bag and shackled by the wrists and ankles. He was there interrogated by the public prosecutor for several hours. Despite his repeated requests he was again prevented from contacting or being represented by a lawyer at that hearing. He was then returned to solitary confinement in the RAK general police headquarters where he was held, at all times in a solitary confinement cell until around early October 2014.

(4)    In around early October, during the middle of the night, Mr Al Sadeq was transferred to Al Barirat Camp in Al Ashkar in RAK. Mr Al Sadeq's case is that this is a camp for the Ruler's private militia and not an official prison within the RAK criminal justice system. On behalf of the respondents it is said that it is an accommodation facility for local guards, who assist local police with various of their duties. It appears to be common ground that it is not an official prison, and that it was not used at the material time to house prisoners other than Mr Al Sadeq and Mr Quzima.

(5)    During the transfer from GHQ to Al Barirat, Mr Al Sadeq was blindfolded with a hood over his head. He was placed in a cell attached to the camp in solitary confinement. The cell measured about 2 metres by 2.5 metres and although it had a window, that had been covered so as to allow no natural sunlight to enter. Mr Al Sadeq was detained in this cell for around 560 days. During the first part of Mr Al Sadeq's detention in Al Barirat he was not allowed clean clothes, he was permitted to wash only rarely, his cell was not cleaned regularly, and initially he was not allowed to leave the cell to use the toilet and was forced to relieve himself in his cell. During the first seven months of his detention he was prevented from walking, exercising or seeing the sun. After a hunger strike he was permitted to walk outside albeit only for short periods and only a couple of times per week. He was repeatedly denied access to medical attention to treat conditions caused by the circumstances of his detention.

(6)    He was denied access to a lawyer throughout the period up to August 2015, despite his desire for one. His wife had engaged a lawyer on his behalf, Dr Al Shamsi, who repeatedly tried to gain access to him but was refused. Dr Al Shamsi was never allowed any proper access to Mr Al Sadeq until around August 2015. Although he was given power of attorney over Mr Al Sadeq's affairs in April 2015 and acted for him in public hearings from that date, he was never allowed to receive any instructions from Mr Al Sadeq at that time. The only time Dr Al Shamsi met Mr Al Sadeq was during his court appearances and even then he was prevented from talking to him alone or in any

effective or adequate manner as between a lawyer and client. Dr Al Shamsi was not allowed to see any of the papers pertaining to any of the cases being brought against Mr Al Sadeq at any time. He was therefore unable effectively to represent Mr Al Sadeq at any of the court hearings which he attended and he ultimately ceased to act for this reason.

(7)     Ultimately as a result of his treatment, threats and pressure being applied to him and to his wife, and as a result of promises that he would be released and pardoned if he cooperated, Mr Al Sadeq finally agreed in principle by about the third quarter of 2015 that he would cooperate by making a false confession and giving false evidence against Dr Massaad and his alleged co-conspirators including Mr Quzmar, Mr Mikadze and Mr Azima so long as he had sufficient binding assurances that he would be released and pardoned.

(8)     On 28 October 2015 the RAK court of first instance passed a sentence of eight years' imprisonment against Mr Al Sadeq. In the same case Dr Massaad received a sentence of 30 years in absentia, and Mr Quzmar was also sentenced to 30 years imprisonment.

(9)     After that conviction, Mr Al Sadeq signed false confessions as a result of promises for his release.  His appeal was unsuccessful.  In mid-April 2016 Mr Al Sadeq was transferred to RAK central prison. Shortly thereafter he was transferred to the second floor of a two storey villa in RAK where he was detained until around August 2016. He was then returned to RAK central prison, where he remains to this day.

*Iniquity 1: The detention of Mr Al Sadeq in Dubai on 5 September 2014, his rendition to RAK, and subsequent detention there*

111. In my view the material clearly establishes a prima facie case (in the sense required) of this iniquity.  The principal reasons for that conclusion are as follows.

112. Mr Al Sadeq's account in the P/C constitutes evidence supported by a statement of truth, and is summarised in Mr Tsiattalou's evidence.  It is not contradicted or disputed by any factual evidence adduced on behalf of the respondents.  Allen 9 states that the defendants do not know what happened at Mr Al Sadeq's arrest, in circumstances in which they were not present, and have not discussed it with those who were.  However, there is no obvious reason why they should not have had such discussions with their former clients about the truth of Mr Al Sadeq's evidence for the purposes of resisting the disclosure application, in which the existence of this and the other iniquities was put in issue.  Had the arrest been lawful, and occurred in a way other than that described by Mr Al Sadeq's P/C and Mr Tsiattalou's evidence, it would have been in the interests of their former clients to say so. There was ready access to A & O, who were representing their former clients in the disclosure process, as a channel of communication.  All Mr Allen says is that there have been no discussions *with those present*; he does not say that there have been no discussions with those responsible for the events.  The result is that Mr Al Sadeq's evidence is uncontradicted in circumstances in which there was an opportunity to answer it.

113. It is common ground on the pleadings that, as a matter of UAE law, a lawful arrest in Dubai would require a written extradition request to be made.  The uncontradicted evidence in Al Haddad 3 is that had such an extradition request been made:

**038**

(1)    it would have been presented to Mr Al Sadeeq when he was arrested; whereas his uncontradicted account of the arrest is that that is not what occurred;

(2)    it would have been referred to in the file concerning the criminal proceedings against Mr Al Sadeq; Mr Al Haddad was provided by the public prosecutor with what was stated to be the full file, and it contains no such reference; on the contrary, the file contains documents in which reference to an extradition request would be expected to appear, had one been made, but which include no such reference;

(3)    had such an extradition request been made it would have been referred to during interrogations of Mr Al Sadeq; whereas there is no suggestion that it was;

(4)    had such an extradition request been made it would have been recorded by the Public Prosecutor and the Court; whereas there is no such record;

(5)    on the last page of the public prosecutor's report of the interrogation of Mr Al Sadeq on 11 September 2014, it is recorded that an order was made for his arrest for 7 days; if an extradition request had been made at an earlier stage the public prosecutor would not have made such an order.

114. Mr Edey suggested that the file might not be complete, and pointed to complaints which Mr Al Sadeq's legal team had themselves made about missing documents. However it would not have been in the interests of the RAK authorities to remove an extradition request from the file had one been made. Moreover, the possibility that it existed and had been removed from the file is met by the uncontradicted evidence of Mr Al Haddad, summarised in the previous paragraph, which contradicts such possibility.

115. It was also common ground that, if an extradition request had been made it would be the receiving state, Dubai, which would carry out the arrest, as one would expect. In the respondent's pleading it is asserted that they understood that Mr Al Sadeq was apprehended by the Dubai police. That is not contained in Mr Allen's evidence and no source for the understanding is identified in the pleading. There is therefore no evidence to contradict Mr Al Sadeq's account that the captors were from RAK: one of the men showed Mr Al Sadeq an identity card stating he was from RAK state security investigations, and the captors said they were going to take him to *their* headquarters in RAK.

116. There has also been disclosed a document in Ms Black's handwriting made on 5 September 2014, the day of the arrest stating "Karam Sadeq arrested in Dubai and shipped to RAK". The word "shipped" is not a natural one for a lawyer to use about a process of lawful extradition.

117. If Mr Al Sadeq's arrest and rendition were unlawful, it follows that there is a prima facie case that his subsequent detention in RAK was unlawful, at least until his conviction. Apart from this, he also relies on further unlawful aspects of that detention in its early stages, separately from the conditions in which he was held which form the subject matter of Iniquity 2. The uncontradicted evidence in Al Haddad 2 is that:

(1)    the RAK Criminal Procedure Code requires a subpoena or arrest warrant to be issued to justify detention of a suspect; and

(2)     the RAK Criminal Procedure Code requires that a judicial police officer must hear the accused's deposition immediately on his arrest; and if he does not submit proof of his innocence he must be sent to the competent public prosecutor within 48 hours, who must then interrogate him within 24 hours and order his arrest or release.

118. The evidence suggests a breach of both these requirements in respect of the period from 5 to 10 September 2014. An arrest order was not made until 11 September 2104. In the meantime Mr Al Sadeq had not been questioned by either a judicial police officer or the public prosecutor; rather he had been interviewed by Hamad Al-Awahdi, a security delegate in the Ruler's court, and thereafter by Mr Gerrard and Ms Black. He was not interviewed by the public prosecutor until 11 September 2014.

*Iniquity 2: the conditions in which Mr Al Sadeq was held in detention*

119. In my view the material also clearly establishes a prima facie case (in the sense required) of this iniquity. The principal reasons for that conclusion are as follows.

120. Mr Al Sadeq's account in the P/C constitutes evidence supported by a statement of truth. It is not contradicted or disputed by any factual evidence adduced on behalf of the respondents. The only evidence adduced through Mr Allen about the conditions in which Mr Al Sadeq was being kept is to the effect that the Dechert fee-earners never saw where Mr Al Sadeq was being kept, all meetings being conducted at offices at Al Barirat; and that Mr Al Sadeq did not raise with any of them anything about the conditions in which he was being detained. The remainder of the evidence addresses whether the Dechert personnel were complicit in any detention in unlawful conditions which might have occurred. It would have been open to the respondents to seek and adduce evidence from their former clients to deny that the conditions at the detention locations were as described by him, but they have not sought to do so. As with Iniquity 1, the result is that Mr Al Sadeq's evidence is uncontradicted in circumstances in which there was an opportunity to answer it.

121. There is further support for Al Sadeq's evidence in contemporaneous documentation.

122. A heavily redacted note of a meeting between Mr Gerrard and Al Tamimi, whose date is unclear, records Mr Gerrard saying that Mr Al Sadeq was "sometimes in shackles". Mr Allen's evidence is that the latter is understood to be a reference to the first meeting between Mr Gerrard and Mr Al Sadeq at GHQ to which Mr Al Sadeq was brought in handcuffs, where Mr Gerrard asked for them to be removed, which they were.

123. There is a note of a meeting between Mr Hughes and Mr Al Sadeq on 7 October 2015 in which Mr Al Sadeq is recorded as saying that he has been in solitary confinement for 13 months, detained in a military prison in a cell about 3m x 1.5m, which he got Mr Hughes to pace out. Another note suggests that Dr Mitchell was told by the Attorney General during his visit a week later that the maximum allowed period for solitary confinement was 7 days.

124. The note of Dr Mitchell's visit on 29 October 2015 is clear evidence that the conditions in which he was being held were in breach of article 3 ECHR, as the respondents accept. That is unlikely to have been a snapshot of conditions which were worse than those in which he was held at the same location, Al Barirat, before or after October 2015. Mr Al Sadeq's evidence is that, on the contrary, the authorities had sought to improve the

**040**

physical conditions for the purposes of his visit. But in any event, there is no reason to suppose that the conditions were worse on the occasion of Dr Mitchell's visit, and no evidence from the respondents to that effect. There is, to my mind, no justification in the material before the court for treating that as iniquitous conduct limited to conditions "at or around 29 October 2015". It is supportive evidence of the unlawfulness of the conditions in which Mr Al Sadeq was being held throughout his detention at Al Barirat.

125. A number of contemporaneous letters written by Mr Al Sadeq also support his evidence about his conditions of detention. One dated 14 November 2014 refers to his being forbidden to go to the washroom without permission and chains, and being in solitary confinement. One dated 6 December 2014 refers to his having been in solitary confinement for 3 months during which he had been allowed only one visit.

126. Mr Al Sadeq also relies on a number of reports from respected bodies such as Amnesty International and the UN High Commissioner for Human Rights asserting breaches of human rights generally by those in authority in RAK, including holding prisoners incommunicado in solitary confinement, as well as human rights abuses in the UAE which are not specific to a particular emirate. These do not take the matter much further, but they are sufficient, at least, to establish that the allegations by Mr Al Sadeq, uncontradicted as they are by evidence from the RAK authorities, are not to be treated as inherently incredible or unlikely.

*Iniquity 3 lack of access to legal representation during Mr Al Sadeq's detention*

127. In my view the material also clearly establishes a prima facie case (in the sense required) of this iniquity. The principal reasons for that conclusion are as follows.

128. Mr Al Sadeq's evidence in the P/C, as summarised above, is that Dr Al Shamsi was appointed to represent him shortly after his arrest in September 2014, but he was denied access to his client, despite repeated requests from Mr Al Sadeq, until at least April 2015, when Dr Al Shamsi was appointed as his lawyer for the conduct of proceedings as required under RAK law; and that thereafter access to Dr Al Shamsi was restricted in a way such as to preclude effective representation.

129. The evidence of the defendants in Allen 9 is that in respect of the period between September 2014 and April 2015, so far as Mr Gerrard and Ms Black were aware, no steps were taken by any lawyer to represent Mr Al Sadeq; Mr Gerrard and Ms Black believed that Mr Al Sadeq was unrepresented on a voluntary basis, since he was a lawyer and able to represent himself; if it were the case that Dr Al Shamsi had been appointed but denied access to his client, Mr Gerrard and Ms Black were unaware of this. This understanding was reflected in one of the media briefing papers produced by Bell Pottinger in March 2015.

130. In relation to the period from April 2015, when the first hearing took place in the Leases Case, Allen 9 states:

(1) Mr Gerrard and Ms Black did take steps to check that Mr Al Sadeq had legal representation, since they were aware that under local law the court should appoint a lawyer at this stage, if the defendant had not already appointed one. In the event, Mr Al Sadeq had around this time instructed Dr Al Shamsi.

(2)  Contrary to the evidence on behalf of Mr Al Sadeq, Dr Al Shamsi appears from the contemporaneous documents to have been actively engaged representing Mr Al Sadeq in various hearings in the Leases Case and conducting settlement negotiations on his behalf.  Various documents were identified, which do indeed reflect Dr Al Shamsi representing Mr Al Sadeq in the proceedings and settlement negotiations.

131.  In relation to the first period there is some contemporaneous support for Mr Al-Sadeq's case:

(1)  a note by Ms Black of 17 September 2014 recorded Mr Al Sadeq saying that his wife had got a lawyer who was not permitted to see him;

(2)  a note of a meeting between Mr Gerrard and Bell Pottinger on 23 February 2015 appears to record Mr Gerrard referring to the two people arrested (Mr Al Sadeq and Mr Quzmar) being in a "brutal legal system" and having "no access to legal advice and not charged"; followed by "not here to talk about the rights + wrongs of legal system";

(3)  a letter of 4 April 2015 from Mr Al Sadeq to the Ruler stated that he had asked the public prosecutor to appoint a lawyer for him but received no response.

132.  The material advanced in the form of reports from Amnesty International and others about human rights abuses in RAK and UAE also includes instances of the denial of legal representation.

133.  Moreover, insofar as one can assess the inherent probabilities, it strikes me as more probable than not that Mr Al Sadeq would have wanted legal representation in the circumstances in which he found himself (of which there is a prima facie case), and all the more so as someone with a background as a lawyer; and less probable that he would have wanted to dispense with legal representation so as to be content with representing himself.

134.  As to the second period, none of the documents relied upon in Allen 9 meet Mr Al Sadeq's evidence that although Dr Shamsi did take part in proceedings and negotiations as his representative, he was denied access to his client in a way which precluded effective advice and representation.  There is no evidence from those at Dechert's former clients to contradict Mr Al Sadeq's account in this respect.

*The Judgment*

135.  Mr Edey submitted that the Judge's conclusion that the iniquities were not made out was an evaluative one on the factual evidence, and is therefore one with which the Court should be slow to interfere, relying on *Assicurazioni Generali v Arab Insurance Group* [2002] EWCA Civ 1642 [2003] 1 WLR 577 at [14]-[16] and *Re Sprintroom* [2019] EWCA Civ 932 [2019] BCC 1031 at [68]-[79].

136.  The difficulty with this submission is that the Judgment does not suggest that the Judge engaged in an evaluative assessment of the evidence which I have identified as supporting each of the iniquities.

137.  As to the first iniquity, the only reason given by the Judge for finding that the iniquity was not established to the standard he was applying was his acceptance of the argument of Mr Edey recorded at [101], that the fact that a copy of the extradition request was not

in the possession and control of the defendants does not mean that no such extradition request exists. That did not engage with the many other aspects of the evidence to which this provided no answer.

138. As to the second iniquity, the Judge addressed this issue by adopting Mr Edey's submission recorded at paragraph [102] of the Judgment. Apart from the concession in relation to Dr Mitchell's visit, that paragraph did not record any argument as to the detail of the evidence but merely the conclusory submission that the evidence did not meet the threshold.

139. As to the third iniquity, the arguments of Mr Edey recorded at [103] of the Judgment, which the Judge adopted, were (1) that from April 2015 it was clear that Mr Al Sadeq was represented by Dr Al Shamsi; (2) prior to that time it was Mr Gerrard's and Ms Black's understanding that he was unrepresented on a voluntary basis; and (3) there was no evidence from Dr Al Shamsi that he was denied access during that first period. Point (1) simply does not meet Mr Al Sadeq's case or his evidence about the factors which precluded effective representation. Point (2) ignores the fact that this is disputed; and does not engage with an evaluation of the evidence to which I have referred. Point (3) is valid, so far as it goes, although it was not a point made in Allen 9 or in oral or written argument on behalf of the respondents in the appeal. It is insufficient to outweigh the other considerations to which I have referred.

*The further evidence application*

140. It is convenient here to consider the further evidence application in the context of Mr Al Sadeq's reliance on the T18 and T20 material in support of the existence of the iniquities. It follows from my conclusions that the iniquities were made out to the relevant standard on the material before the Judge that Mr Al Sadeq does not need to rely upon the further evidence for this purpose. However, I should address the application, which raises at least one important point of principle.

141. This court has a discretion under CPR 52.21(2)(b) to receive evidence on appeal which was not before the lower court. The well-known test in *Ladd v Marshall* [1954] 1 WLR 1489 continues to provide important guidance as to the exercise of the discretion, although the discretion is not confined by it: evidence may be admitted where the test is not fulfilled, or not admitted where it is, if either is dictated by furtherance of the overriding objective (*Hertfordshire Investments Ltd v Bubb* [2000] EWCA Civ 3013 [2000] 1 WLR 2318, 2325E-H; *Yukong Line Ltd v Rendsburg Investments Corporation* [2000] EWCA Civ 358 [2001] 2 Lloyd's Rep 113 at 125; *Hamilton v Al-Fayed (No 2)* [2000] EWCA Civ 3012 [2001] EMLR 15 at [11]; *Terluk v Berezowsky* [2011] EWCA Civ 1534 at [32]).

142. The *Ladd v Marshall* test is that new evidence will be allowed on appeal if three conditions are fulfilled, namely: (1) the evidence could not have been obtained with reasonable diligence for use at first instance; (2) if given, the evidence would probably have an important influence on the result of the case, though it need not be decisive; and (3) the evidence is such as is presumably to be believed.

143. The T18 material does not satisfy the first limb of the *Ladd v Marshall* test, as properly understood. Denning LJ's formulation of that limb referred to the availability of the evidence "for use at the trial". The T18 material was not, with reasonable diligence, available at the time of the hearing before the Judge in December 2021; it became

available piecemeal over the period between the conclusion of the hearing and the delivery of the Judgment.  Evidence which becomes available after a hearing at any time before the order is made may, at the lower court's discretion, be admitted in evidence: *Re Barrell Enterprises* [1973] 1 WLR 19.  Even at that very late stage (and a fortiori prior to circulation of a draft judgment), the approach to the admission of new evidence is likely to be more lenient than on appeal: see *Charlesworth v Relay Roads* [2000] 1 WLR 230, 237F-238D; *Vringo Infrastructure v ZTE* [2015] EWHC 214 (Pat) [2015] RPC 15 at [29] and [40].

144. As a matter of principle, having regard to the rationale of the *Ladd v Marshall* criteria, a party in that position who chooses not to seek to put the evidence before the first instance judge should not ordinarily be permitted to introduce the evidence for the first time on appeal.  The clear rationale behind the first of the *Ladd v Marshall* criteria is that a party ought to put all the evidence on which it wishes to rely before the first instance judge.  It cannot hold something back and see how things turn out at first instance, before seeking to take a different approach on appeal: *Imperial Chemical Industries v Montedison (UK) Ltd* [1995] RPC 449, 468.  As it was put by Lewison LJ (in a different context) in his well-known judgment in *Fage UK v Chobani* [2014] EWCA Civ 5 at [114(ii)], the first instance hearing is not a dress rehearsal but the first and last night of the show.

145. Against that background, in the appeal context, the first limb of the *Ladd v Marshall* test is aimed at determining whether the further evidence could reasonably have been put before the first instance judge and considered as part of their final determination, in the form of an order.  Put another way, the relevant first instance trial or hearing is to be regarded as complete, for the purposes of the first limb, only once the order against which the appeal is brought has been made.

146. Ms Oppenheimer submitted that this was inconsistent with the decision of this court in *Rawding v Seaga UK Ltd* [2015] EWCA Civ 113, in which this court accepted that the first limb of *Ladd v Marshall* was fulfilled in respect of evidence which had become available after the hearing but before the judgment, but which the first instance judge had refused in his discretion to admit on an application to rely upon it at that  stage: see [44].  However, properly understood, the decision is consistent with the interpretation of *Ladd v Marshall* I have suggested.  The material which was admitted as fresh evidence on appeal in fact included material which had become available after judgment and had not been available when the lower court refused to admit further evidence and gave judgment: see [30] and [34] to [37].  The question being addressed in [44], insofar as it related to that part of the material which was available when the lower court was asked to admit it, was whether that court had itself erred in treating it as failing to fulfil the first limb of the *Ladd v Marshall* test as part of the exercise of its discretion: see [29].  The decision was that it had.  The decision is consistent with the position being that if fresh evidence becomes available after the hearing but before the order is made, the correct course is to apply to the lower court for its admission.  At that stage the *Ladd v Marshall* principles will come into play before the lower court, such that if fulfilled the evidence may be admitted at that late stage.  If, however, it is not admitted, despite the first limb of *Ladd v Marshall* being fulfilled, the unsuccessful application to admit in the lower court does not of itself prevent the material meeting the first limb of the *Ladd v Marshall* test if it is sought to be admitted on appeal.  The position would be that the applicant had used reasonable diligence to adduce it "for use at the trial".

**044**

147. Ms Oppenheimer also submitted that such an approach was inconsistent with the decision of this court in *Wood v Gamlings* [1993] PIQR 76. I am unable to agree. That was a case in which the defendant took a new point at the trial which the claimant had not anticipated, and the claimant then applied on appeal to introduce further witness evidence to rebut the point, and sought a retrial. The Court of Appeal admitted the further evidence and ordered a retrial, holding that the claimant could not with reasonable diligence have anticipated the point in question, and that even though the claimant's legal team might have sought an adjournment of the trial, it was not at fault in failing to do so. The case has nothing to say about the situation where new documentary evidence emerges between the hearing and the judgment.

148. In this case all the T18 material had become available, and had been identified as material upon which Mr Al Sadeq wished to rely, in the unusually long period between the hearing and the Judgment being handed down. The proper course was to seek to rely upon it before the Judgment was finalised. This did not need to await the completion of the exercise of receipt and assessment of the material, which came in piecemeal; as soon as became apparent that it might be relied on, that should have been drawn to the attention of the Judge and the respondents, so that case management decisions could be taken as to how to address an application for its admission.

149. It follows that the T18 material does not meet the first limb of the *Ladd v Marshall* test. It was available "for use at the trial".

150. Nor, in my view, does either the T18 or T20 material fulfil the second limb, so far as relevant to the existence of the iniquities. The submission on behalf of Mr Al Sadeq was that the further evidence demonstrates the following.

(1) As part of the Investigation, Dechert's clients were engaged in widespread hacking of Dr Massaad and persons perceived to be associated with him.

(2) The product of that hacking was used by Dechert in the course of the Investigation (the RAK Project Reports having been delivered personally to Mr Gerrard at his home); Dechert contributed to the reports which summarised the product of the hacking for the benefit of Sheikh Saud.

(3) Much of that hacking activity appears not to have been motivated by concerns of fraudulent conduct by Dr Massaad, but rather by (i) concerns about Dr Massaad's current business activities, (ii) concerns about the publicisation of allegations of human rights abuses committed by the RAK Government/Dechert (including in respect of Mr Al Sadeq), and (iii) concerns about Dr Massaad's relationship with Sheikh Saud's brother, Sheikh Faisal.

(4) Dechert's clients and their representatives are understood to have had control over the conditions of Mr Al Sadeq's detention, to the extent that Mr Al Sadeq could be prevented from publicising allegations of human rights abuses by keeping him under "hermetic seal".

(5) Hacking or other unlawful evidence gathering activities were targeted at persons perceived to be associated with Mr Al Sadeq specifically, including his wife, and – strikingly – a "source" (which it is apparent from some of the RAK Projects Reports

**045**

Case 1:23-mc-00208-JGLC-GS    Document 60-1    Filed 04/10/24    Page 46 of 232

Judgment Approved by the court for handing down.                    Sadeq v Dechert LLP

is a euphemism for hacking or a successful target of hacking described as an "Advisor to Mr Al Sadeq's UK legal team").

151. This appeal is only concerned with the three iniquities for the purposes of application of the iniquity exception. It is not concerned with any alleged iniquity comprising hacking. The only potential aspect of the new material relevant to the existence of the three iniquities is that referred to under (4) above in respect of the conditions of Mr Al Sadeq's detention. An examination of the material relied on in that respect, however, shows that there is nothing in it which comes close to having an important influence over whether such iniquity existed.

152. There are no other circumstances which would make it just to receive the T18 or T20 material in evidence on appeal in furtherance of the overriding objective notwithstanding that it fails to fulfil the first limb of the *Ladd v Marshall* test (T18) and the second limb (T18 and T20). The circumstances of the Judgment taking so long to hand down were unusual, but not such as to differentiate this case from any other in which the timing of hand down of judgment is unknown at the time when the new material becomes available.

153. I would therefore refuse the application insofar as the fresh evidence is sought to be relied on in relation to the issue whether the iniquities exist. It is also relied on in the context of one of the arguments on legal advice privilege. I shall revisit the application to rely on the material for that purpose when addressing that argument.

**Issue 2 What is the legal test for the relationship between the communication and the iniquity which must be established in order to bring the exception into play?**

154. The principle recognised by the respondents when conducting disclosure, according to Mr Allen's evidence, was that the relationship between the documents and the iniquity which had to be established, so as to fall within the exception, was that the documents were "*brought into existence for the purpose of furthering*" the iniquity. In fact, however, the respondents did not have to apply that or any test to any of the documents in relation to the three iniquities in issue on this appeal, because the conclusion had been reached that none of the iniquities had been established to the relevant threshold (save as to prison conditions at the date of Dr Mitchell's visit, as to which there were no qualifying documents). The Judge concluded that the correct relationship test had been identified, and that he therefore did not need to decide whether the iniquities existed. Mr Edey urged the same approach upon us. In my view it is mistaken. If, as I have concluded, and contrary to the view taken by those conducting the disclosure exercise, there was sufficient evidence of the three iniquities to meet the relevant merits threshold, it was necessary to undertake an assessment as to whether there are any documents which satisfy the relationship test, so as to fall within the iniquity exception and be disclosed. That assessment has not occurred because of the erroneous approach to the existence of the iniquities. The documents will have to be reviewed afresh for that purpose. Issue 2 therefore determines what relationship test should be applied to that fresh exercise.

155. Ms Oppenheimer criticises the Judge for rejecting Mr Al Sadeq's case on the grounds that the correct test was not that formulated in paragraph 1 of the Draft Order ("*documents …which have been generated by or report on [the detention and rendition, the conditions of detention and access to legal representation]*"). I would accept that it is necessary to identify the correct test, and that an order may then be fashioned in different terms to give as much practical guidance as possible by reference to the individual circumstances of the

case. There remains, however, the dispute as to what that test is. Before the Judge, and before us, Ms Oppenheimer maintained that the correct test was reflected in the Draft Order.

156. Mr Edey submitted that the test was whether the document was one created *as part of or in furtherance of the iniquity*. In this formulation, he submitted, *as part of* covered documents which are iniquitous in themselves, which would also therefore come within the rubric of being in furtherance of the iniquity. This was said to be, in effect, the test which Mr Allen described as having been applied. It would not include, he submitted, documents which merely revealed the iniquity, at least in cases where the solicitor was being used as an innocent tool. So, for example, it would not cover a putative document recording the Ruler describing unlawful conditions in which Mr Al Sadeq was detained, if the respondents had such a document.

157. Ms Oppenheimer too was content to treat the test as being whether the document was one created *as part of or in furtherance of the iniquity*, but took a very different approach as to what was covered by the words *part of*. She submitted that it not only included all documents reporting on or evidencing the iniquity, but extended to all documents where the existence of the iniquity was the reason they existed, in substance a 'but for' test (subject, she submitted, to communications concerned with obtaining *bona fide* legal advice about past iniquitous conduct falling outside the scope of the exception as those would not satisfy the *Ablyazov* "touchstone": see [58 above]).

*Formulations in the authorities*

158. There are a wide variety of different formulations in the authorities. In *Cox and Railton* Stephen J referred at p. 167 to "communications *criminal in themselves or intended to further* any criminal purpose" and communications "*in furtherance of*" such purpose. At p. 169 he approved the headnote of *Gartside v Outram* stating that confidential communications *involving fraud* are not privileged. At p. 171 he quoted Cockburn CJ in *R v Orton* who had said that the exception applies not only to a communication with the immediate object of carrying out the fraud but extends to a communication "which *affects the accomplishment of it* by making the attorney take greater care and use more diligence".

159. In *O'Rourke v Darbishire*, Viscount Finlay referred at p. 604 to communications made *in order to get advice for the purposes of carrying out a fraud*. Lord Sumner at p. 613, in a formulation often subsequently cited as descriptive of the exception, said it applied to communications "brought into existence *in the course of or in furtherance of* a fraud". Lord Parmoor referred at p. 621 to transactions and communications "for such purposes" the purposes being "*to take part in* the concoction of a fraud *or advise his client how to carry through* a fraud". Lord Wrenbury said at p. 632 that "documents *relating to the conception and carrying out* of the alleged fraud" are not protected.

160. In *Butler v Board of Trade* [1971] 1 Ch 680 at pp. 687B-D and 689C Goff J posited a test of whether the communication was made *in preparation for or in furtherance of or as part of* the iniquity. The words "in preparation for" echo the reference to the instruction of the solicitor in *Cox and Railton* being "preparatory" to the commission of the fraud in the passage at p. 165 quoted above.

161. In *Gamlen Chemical Co (UK) Ltd v Rochem Ltd* (unreported 7 December 1977 Court of Appeal (Civil Division) Transcript No 777 of 1979, Templeman LJ said:

"In the light of the existing evidence, and without knowing if, at the trial, that evidence will be disproved, we must, adopting the words of Stephen J [in *Cox & Railton*], determine whether it seems probable the defendants may have consulted their legal advisers before the commission of fraud and for the purpose of being guided and helped wittingly or unwittingly in committing the fraud. A fortiori, if the defendants embarked on a fraudulent activity, communications between the defendants and the solicitors, *made in the course of that activity*, cannot be entitled to privilege and must be disclosed so that, in the words of Kekewich J [in *Williams v Quebrada*], quoted by Goff LJ, 'the whole transaction shall be ripped up and disclosed in all its nakedness to the light of the court." (my emphasis)

162. In *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1986] 1 Lloyd's Rep 336, Parker LJ said at p. 337 that "legal professional privilege does not exist in respect of documents which are in themselves *part of* a criminal or unlawful fraudulent proceeding or, if it be different, communications made *in order to get advice for the purpose of carrying out* a fraud…."

163. In *Dubai Bank v Al-Alawi* Rix J said that "any documents *generated by or reporting on*" the iniquitous conduct fell outside the legitimate area of legal professional privilege. This is the formulation adopted in the Draft Order sought by Mr Al Sadeq.

164. In *Chandler v Church* Hoffmann said that privilege does not attach to a communication between a client and his legal adviser "intended *to facilitate or to guide the client in the commission of a crime or fraud*".

165. In other cases (e.g. *Gibbins* and *Kuwait (No 6)*) the exception has been described in terms which cover all "*communications between the lawyer and the client*". However, these were merely brief descriptors of the principle without seeking to address the nature of the documentation caught by it. The scope of the documentation caught by the exception, where it applies, is clearly not so limited, especially in the context of litigation privilege, but also for legal advice privilege.

*The appropriate formulation*

166. I would favour the formulation that where there is a prima facie case of iniquity which engages the exception, there is no privilege in documents and communications brought into existence as part of or in furtherance of the iniquity. These are two categories, either of which is sufficient. *Part of* will include documents which report on or reveal the iniquitous conduct in question. I do not thereby intend to exclude documents brought into existence in preparation for the iniquity, which *Cox and Railton* indicates are covered by it, and which Goff J expressed in *Butler* as an additional category; they would also be part of the iniquity. This is based on the formulation *in the course of or in furtherance of*, expressed by Lord Sumner in *O'Rourke v Darbishire* at p. 613, and echoed by Templeman LJ in *Gamlen*; but I prefer the rubric *part of* to *in the course of*, for two reasons. First, *in the course of* might suggest some temporal limit, whereas documents revealing the iniquity may come into existence after it is complete and if so should be within the exception. Secondly, it might be interpreted to mean that any documents which would not exist but for the iniquity are caught, which was Ms Oppenheimer's submission (as summarised above at [157]). This is in my view too remote a connection to justify application of the exception.

167. This seems to me a principled solution because the rationale for the exception is that, where it applies, the iniquity should be revealed.  That is reflected in the passages in Stephen J's judgment in *Cox and Railton* at p. 170 approving what was said in *Gartside v Outram* that "If [the lawyer] is employed as an attorney in any unlawful or wicked act, his duty to the public obliges him to disclose it…..";  and his citation with approval at p. 172 of a passage in the judgment of Bovill CJ in *Tichborne v Lushington* that the exception means that the party has "no privilege whatever to close the lips of the attorney from stating the truth."  It is reflected in the vivid expression of Kekewich J in *Williams v Quebrada*, cited with approval by Templeman LJ in *Gamlen*, that "the whole transaction shall be … disclosed in all its nakedness to the light of the court."  Once the iniquity exception applies, the iniquity must be revealed, both as a matter of general public policy for the exposure and punishment of iniquity, and in furtherance of the policy that the court should have the fullest relevant evidence available where the claim to privilege arises out of an abuse of the lawyer/client relationship.

168. It is important to emphasise, however, that the abuse of the lawyer/client relationship is a prerequisite to the exception applying at all, and it may be important to distinguish on a document by document basis whether the exception applies in the first place.  To take a hypothetical example in the context of the present case, suppose that Dechert held a document which recorded information about unlawful conditions in which Mr Al Sadeq was being or had been held.  If that information came to be obtained simply as an incidental consequence of Dechert's general retainer in the investigation, it would be part of Dechert being an innocent tool in the course of their clients perpetrating an iniquity and the exception would apply.  The document would be disclosable as being one created as part of, and revealing, the iniquity.  If, on the other hand, the information were provided for the specific purpose of seeking Dechert's legal advice on whether the detention was or had been lawful, it would not be disclosable.  This is not a function of the scope of documentation caught by the exception where it exists: such a document would just as much reveal an iniquity as in the previous example.  The reason it would not fall to be disclosed is because the iniquity exception would not apply at all.  The example given would fall within the "the ordinary run of cases" in which, so far as the specific document is concerned, the relationship was not an abusive one.

169. It follows that I would reject the approach taken by the respondents in disclosure, and the approach contended for by Mr Edey, as too narrow.  The exception is not limited to documents created *in furtherance of* the iniquity, nor to those which are *part of* it if that expression is to be given the narrow meaning of communications iniquitous in themselves and therefore in furtherance of iniquity, as Mr Edey contended.

**Issue 3 Are there documents which the defendants have failed to disclose by reason of an erroneous approach?**

170. On behalf of Mr Al Sadeq, it was submitted that there were categories of documents which had wrongly been withheld as a result of the erroneous application of the iniquity exception.  These were identified in part simply by references to categories of documents; and in part by inferences to be drawn from specific documents.

171. As to the former, these were identified at paragraphs 32.4, 33.3 and 34.3. of the skeleton argument.  In relation to Iniquity 1, paragraph 32.4 sought "communications between Dechert and Sheikh Saud/Dechert's clients that evidenced Sheikh Saud's or Dechert's client's intention for Mr Al Sadeq to be detained in Dubai as part of the investigation";

and "communications between Dechert and Sheikh Saud/Dechert's client following Mr Al Sadeq's detention, concerning whether Mr Al Sadeq should continue to be detained"; and "communications between Dechert and Sheikh Saud/Dechert's clients about whether the information Mr Al Sadeq had provided to Mr Gerrard was sufficient to justify Mr Al Sadeq's continued detention or release." These are framed much too widely because it is not the fact, but the manner, of Mr Al Sadeq's arrest and detention which forms the relevant iniquity for the purposes of the present application. Whether there are relevant undisclosed documents within these categories which are part of or in furtherance of the iniquity depends upon whether that inference can be drawn from particular documents.

172. Paragraph 33.3(a) and (b) concerns documents describing the conditions in which Mr Al Sadeq was held, which Mr Edey and Mr Allen have confirmed have in fact been disclosed. Paragraph 38 of Allen 3 explained that records of Dechert's discussions with Mr Al Sadeq had not been treated as privileged because they were not confidential, and that "the same was equally true of records detailing the conditions in which the Claimant was kept in prison". Whilst the rationale given would not apply to documents casting light on the detention conditions from sources other than Dechert's own interviews, Mr Edey specifically confirmed on instructions from Mr Allen that that meant that all documents which described or recorded the conditions in which Mr Al Sadeq was held throughout the entire period had been disclosed.

173. In argument Males LJ posited a document recording a conversation with the Ruler which made no direct reference to the actual conditions of detention or whether they were lawful, but involved whether he had now said enough for his conditions to be improved, or whether he should continue to be detained in the same conditions which were designed to encourage further cooperation. Mr Edey submitted that such a document would not meet the "in furtherance of" test, but that depended upon his interpretation of the test, which I consider overly narrow. Such a document might cast light on whether he was being held in unlawful conditions without describing them or stating that they were unlawful, and if so it would fall within the iniquity exception. It is a matter of speculation, however, whether a document of this kind exists and is held by the respondents.

174. Paragraph 33.3(c) of the skeleton argument sought communications with Dr Mitchell, following his inspection, about the conditions of detention at Al Barirat. In oral argument the category was widened to communications with Dr Mitchell more generally. These were said to be bound to exist and to have been in furtherance of iniquity because Dr Mitchell was asked to produce a favourable report on the prison conditions to support the extradition application, but to have been unwilling to do so. It was suggested that Dr Mitchell had been sought to be used in a "white-washing exercise". This was not made good on the evidence, but in any event is not the iniquity which is engaged in the current appeal: the documents were said to be relevant to iniquitous conduct in seeking to extradite Mr Izadpanah to be held in unlawful conditions; whereas the relevant iniquity for the purposes of this appeal comprises the conditions in which Mr Al Sadeq was held. Given that the document which has been disclosed states that Dr Mitchell will not write a report, there are no grounds for inferring that there are any subsequent communications with him which shed light on the conditions of Mr Al Sadeq's detention.

175. Paragraph 34.3 of the skeleton argument sought "communications between Dechert and its client discussing the implications for the investigation of the absence of legal representation for Mr Al Sadeq"; and "communications which evidence the reasons why Mr Al Sadeq was denied legal representation." Insofar as these seek documents which

reveal whether Mr Al Sadeq was denied legal representation they would fall within the iniquity exception. Whether any such documents are held by the respondents and have been withheld from disclosure on the grounds of privilege depends upon inferences to be drawn from particular documents.

176. As to the inferences to be drawn from particular documents Ms Oppenheimer made a number of points.

177. The first arose from the document containing the note of Ms Black of 5 September 2014 recording that Mr Al Sadeq had been arrested in Dubai and shipped to RAK, which had otherwise been wholly redacted. She submitted that the redactions cannot have been properly made because it was very likely that the part disclosed "did not occur in isolation". I can see no basis for inferring that the remainder of the document was concerned with the same subject matter, namely the circumstances of his arrest and transfer to RAK, nor to any other aspect of the iniquities in issue on this appeal.

178. Ms Oppenheimer also relied on a note of Mr Gerrard's questioning of Mr Al Sadeq on 9 September 2014, which referred to the fact that he would need to go and discuss with the Ruler whether Mr Al Sadeq should be prosecuted. This was said to show that there must be records of those discussions which have wrongly been withheld from disclosure. Although I would accept the submission that the inference is that discussions with the Ruler took place, there is no basis for an inference either that they were recorded or reflected in a written document; or, if so, that they would reveal any of the three iniquities in issue in this application, which is a matter of speculation.

179. Ms Oppenheimer also relied on a heavily redacted email of 10 October 2104 from Lloyd Firth of Dechert to Mr Gerrard and Ms Black with a list of issues for them to raise with Mr Buchanan. One was that Mr Al Sadeq had arrived for interview on 1 October 2014 blindfolded. It was submitted that there must have been records of communications with Mr Buchanan as to the conditions in which he was being held. This inference is not supported by the mere reference to arriving blindfolded at an interview somewhere other than his cell, in what, on his case, was a military camp. Blindfolding does not form any part of Mr Al Sadeq's case as to the unlawful conditions of his detention. There is nothing to suggest any discussion of his detention conditions which form the subject matter of Iniquity 2. In any event the respondents have confirmed that all documents which record or describe the conditions in which Mr Al Sadeq was detained have been disclosed.

180. Ms Oppenheimer also submitted that there ought to be disclosed communications between Mr Gerrard and others at Dechert discussing the implications of material obtained by hacking for the case they were building against Mr Al Sadeq, based on documents in the T18 material which she suggested showed Mr Gerrard using one aspect of the fruits of the hacking in his questioning of Mr Al Sadeq. However the T18 material is not admissible as further evidence; and in any event the posited communications are in furtherance of an alleged iniquity comprising hacking, not one of the three iniquities which are engaged in the present appeal. Ms Oppenheimer submitted that a party giving disclosure should take account of any iniquity. However, on the present appeal Mr Al Sadeq has carefully confined the challenge to the three iniquities, and the issue at this stage of the analysis is whether there can be seen to have been a failure to disclose specific documents which fall within the iniquity exception by reference to those three iniquities. This supposed example does not do so.

**051**

181. The same is true of Ms Oppenheimer's reliance on the unredaction of a document which had been made in the light of the T18 and T20 material, being part of a note of Mr Hughes' meeting with the Ruler on 26 April 2016. This was said to show the existence of undisclosed documentation comprising "the fruits of the hacking". Mr Allen explains that the unredaction was made on the basis of the alleged iniquity of hacking. It does not justify any inference of a failure to make disclosure in relation to the three iniquities.

182. A number of other documents were relied on for this purpose in a written note handed up by Ms Oppenheimer on the second day of the hearing, but none gives rise to the inference that documents in relation to any of the iniquities have wrongly been withheld from disclosure by misapplication of the iniquity exception.

*Conclusion on issue 3*

183. The result of my conclusions on issues 1 and 2, if my Lords agree, will be that the disclosure exercise will have to be re-undertaken, unfortunate as that is for the already protracted progress of these proceedings. Whether that will involve disclosure of further documents is, on the material before the court, a matter of speculation. It is not possible to infer from that material that there are documents which have been wrongly withheld from disclosure by misapplication of the iniquity exception.

## LITIGATION PRIVILEGE

184. The following issues arise in respect of litigation privilege:

   (1) Is Mr Allen's evidence sufficient to establish that the relevant litigation was in contemplation on the dates identified in the Litigation Privilege Table (Issue 4)?

   (2) Does litigation privilege extend to criminal proceedings or extradition proceedings, where Dechert's clients were not contemplated as parties to such proceedings, but merely alleged victims (Issue 5)?

   (3) Does the *Three Rivers (No 5)* principle apply to litigation privilege (Issue 6)?

**Issue 4 Is Mr Allen's evidence sufficient to establish that the relevant litigation was in contemplation on the dates identified in the Litigation Privilege Table?**

185. The relevant principles were summarised by Hamblen J in *Starbev GP Ltd v Interbrew Central European Holding BV* [2013] EWHC 4038 (Comm) as follows:

   "11. The legal requirements of a claim to litigation privilege may be summarised as follows:

   (1) The burden of proof is on the party claiming privilege to establish it – see, for example, *West London Pipeline and Storage v Total UK* [2008] 2 CLC 258 at [50].

   (2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in a witness statement are not determinative and are evidence of a fact which may require to be independently proved.

The court will scrutinise carefully how the claim to privilege is made out and the witness statements should be as specific as possible – see, for example, *Sumitomo Corporation v Credit Lyonnais Rouse Ltd* (14 February 2001) at [30] and [39] (Andrew Smith J); *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1729 (Comm) at [52], [53], [86] (Beatson J); *Tchenguiz v Director of the SFO* [2013] EWHC 2297 (QB) at [52] (Eder J).

(3) The party claiming privilege must establish that litigation was reasonably contemplated or anticipated. It is not sufficient to show that there is a mere possibility of litigation, or that there was a distinct possibility that someone might at some stage bring proceedings, or a general apprehension of future litigation – see, for example, *United States of America v Philip Morris Inc* [2004] EWCA Civ 330 at [68]; *Westminster International v Dornoch Ltd [2009] EWCA Civ 1323* at paras [19] – [20]. As Eder J stated in *Tchenguiz* at [48(iii)]: "Where litigation has not been commenced at the time of the communication, it has to be 'reasonably in prospect'; this does not require the prospect of litigation to be greater than 50% but it must be more than a mere possibility".

(4) It is not enough for a party to show that proceedings were reasonably anticipated or in contemplation; the party must also show that the relevant communications were for the dominant purpose of either (i) enabling legal advice to be sought or given, and/or (ii) seeking or obtaining evidence or information to be used in or in connection with such anticipated or contemplated proceedings. Where communications may have taken place for a number of purposes, it is incumbent on the party claiming privilege to establish that the dominant purpose was litigation. If there is another purpose, this test will not be satisfied: *Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, 589-590 (cited in *Tchenguiz* at [54]-[55]); *West London Pipeline and Storage Ltd v Total UK Ltd* at [52].

12. In relation to the Court's approach to the assessment of evidence in support of a claim for privilege, it has been stated that it is necessary to subject the evidence "to "anxious scrutiny" in particular because of the difficulties in going behind that evidence" – per Eder J in *Tchenguiz* at [52]. "The Court will look at 'purpose' from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose" – *ibid.* 48(iv). Further, as Beatson J pointed out in the *West London Pipeline* case at [53], it is desirable that the party claiming such privilege "should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect".

13. As was further stated by Beatson J in the *West London Pipeline* case at [86]:

"(3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority;*

(b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharane* (the Chief Constable's letter)*, Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co,* per A L Smith LJ;

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montivedeo Gas Co; Birmingham and Midland Motor Omnibus Co v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland*."

186. Ms Oppenheimer submits that the claim to litigation privilege fails to meet the evidential requirements there identified, because the evidence amounts to no more than an assertion of when the proceedings were contemplated as set out in the Litigation Privilege Table. She does not suggest that there is any reason to doubt that such proceedings were in contemplation at some stage; or, save in one respect, that there are any positive grounds for the challenging the dates advanced for such contemplation as being wrong or even open to doubt. She takes her stand simply on the insufficiency of the evidence in support, arguing that there are no contemporaneous documents relied on, and no detailed evidence from Dechert or their clients of the elements necessary to fulfil the requirements of the claim to privilege.

187. It is not right that the evidence is limited solely to the Litigation Privilege Table or that there is no further detail or supporting documentation in Mr Allen's evidence, which is to be found in, and referred to in, Allen 9. I need not burden this already lengthy judgment with an analysis of all the material. The short answer to the point is that Mr Allen has explained in his witness statements that it is not possible to give any further detail or supporting documentation without disclosing the very matters which the privilege is designed to protect; and there is no reason to doubt the accuracy of that evidence, despite Ms Oppenheimer's submissions to the contrary.

188. The one respect in which Ms Oppenheimer advances positive grounds for challenging the date on which proceedings were in contemplation relates to criminal proceedings against Mr Al Sadeq himself. Mr Allen initially identified the date in the table simply as "September 2014", which was later clarified in Allen 9 [173] as being the date of his arrest, which was 5 September 2014. Ms Oppenheimer's submission was that criminal proceedings could not have been in contemplation prior to the date when a criminal complaint was filed with, and accepted by, the public prosecutor which was on or about 19 February 2015. This was because the public prosecutor cannot have contemplated such proceedings before that date. I can see no merit in the argument. If, as I conclude in relation to issue 5, litigation privilege can attach in relation to proceedings to which the privilege holder is not a party, the contemplation of the public prosecutor is irrelevant to

**054**

the inquiry.    It is the contemplation of the privilege holder, Dechert's clients, which determines the date from which privilege attaches.  There is no reason in principle, or in the circumstances of this case, why those clients could not reasonably have contemplated criminal proceedings being brought against Mr Al Sadeq well before a formal complaint was made to the prosecuting authority, and the evidence suggests the contrary:  Baker & McKenzie had been investigating the Leases Cases well before Dechert's engagement in 2013; a note of Mr Gerrard's questioning of Mr Al Sadeq on 9 September 2014 referred to the fact that he would need to go and discuss with the Ruler whether Mr Al Sadeq should be prosecuted; and it is clear from the evidence that Dechert met the public prosecutor to discuss the case on 10 September 2014.

189. Ms Oppenheimer also submitted that because the date had been identified as "September" when the disclosure review occurred, there must have been excluded documents coming into existence between 1 and 8 September.  This treated the date for contemplation of proceedings not as the date of arrest, 5 September, but 9 September, perhaps because the rubric in that part of the table included a reference to Mr Al Sadeq having made admissions on 9 September 2014 when first interviewed by Dechert. That gave rise to some confusion in the skeleton arguments and argument on appeal as to whether the date taken had been 5 or 9 September, but Mr Allen has confirmed his evidence in Allen 9, and reconfirmed in correspondence following the hearing, that the date on which such proceedings were contemplated was 5 September.

190. Ms Oppenheimer's argument assumes that the date taken in the review was 1 September, but there is no warrant for drawing that inference simply because the table was in, its first iteration, not precise about the date within September which was used.  Mr Allen's evidence is that it was 5 September, the date of arrest.  That disposes of the point.

**Issue 5 Does litigation privilege extend to criminal proceedings or extradition proceedings, where Dechert's clients were not contemplated as parties to such proceedings?**

191. On behalf of Mr Al Sadeq it is submitted that litigation privilege is not capable of applying in relation to litigation, actual or contemplated, to which the person asserting privilege is not and does not expect to be a party.  The respondents submit that where, and only where, the ingredients for litigation privilege are fulfilled, it does so apply, whilst recognising that given the nature of the ingredients which have to be fulfilled, it will be a rare case where the test is met in relation to such litigation.  Both sides invoke principle and authority in support of their argument.  The Judge referred to the privilege attaching in relation to litigation in which the client had a "sufficient interest".  Mr Edey made clear that it was not his contention that this was an additional ingredient which required to be fulfilled; rather it was a description of the kind of non-party litigation by reference to which the ingredients of litigation privilege would be fulfilled, given that the person claiming privilege must show that the relevant communications were for the dominant purpose of either enabling legal advice to be sought or given, and/or seeking or obtaining evidence or information to be used in or in connection with such anticipated or contemplated proceedings.

192. I shall again address the arguments first by reference to principle, and then by reference to the authorities upon which the parties relied.

*Principle*

193. The starting point is the rationale for litigation privilege, which is twofold. First, there is the principle running through all the cases considered by Lord Taylor CJ in *Derby Magistrates Court ex pte B* giving rise to his summary at p. 507C-D that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth and that a client must be sure that what he tells his lawyer in confidence will never be revealed without his consent. Or as Bingham LJ put it in *Ventouris v Mountain* at p. 611C-D, it is necessary that actual and potential litigants, be they claimants or respondents, should be free to unburden themselves without reserve to their legal advisers, and their legal advisers be free to give honest and candid advice on a sound factual basis, without fear that these communications may be relied on by an opposing party if the dispute comes before the court for decision. This applies as much to litigation privilege as to legal advice privilege: see *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 per Sir George Jessel MR at p. 649; *Waugh v British Railways Board* [1980] AC 521 per Lord Wilberforce at p. 531D-E. That rationale only applies where a lawyer is engaged, which was the context in which the privilege was developed in the 19th century cases, but litigation privilege is also enjoyed by a person acting without a lawyer in relation to actual or contemplated litigation (as Lord Carswell's formulation of the privilege in *Three Rivers (No 6)* at [102] encompasses). This is explained by the second rationale, which is that expressed by Lord Rodger in *Three Rivers (No 6)* at [52], that in an adversarial system each party should be free to prepare his case as fully as possible without the risk that his opponent will be able to recover the material generated by his preparations. It is, in substance, the protection of a confidential space for a person and their lawyers to communicate with third parties, with candour on both sides, for the dominant purpose of litigation. The parties referred to this in argument as the 'safe space' rationale, although this shorthand needs using with care: privilege applies to communications and not to everything which happens within a safe space or "zone of privacy": see *Loreley Financial Ltd v Credit Suisse Securities Ltd* [2022] EWCA Civ 1484 [2023] 1 WLR 1425 at [41].

194. It is important to keep in mind that the protection is not, however, limited to protection from disclosure to the opponent in the adversarial litigation, at least where a lawyer is involved. It extends to any form of compulsory disclosure, such as disclosure to regulatory or tax authorities (see *Morgan Grenfell*). Thus it continues to exist after the litigation has come to an end unless and until waived by the privilege holder.

195. Provided the dominant purpose ingredient is fulfilled, there seems no principled basis for limiting the scope of litigation to that to which the person is a party. That may be a matter of happenstance and would produce unjust anomalies, as can be seen from a number of illustrative examples.

    (1) It would involve a distinction between a private prosecution, to which the privilege holder would be party, and a public prosecution to which it would not.

    (2) It is well known that in a number of jurisdictions, compensation can be awarded in criminal proceedings pursuant to a civil complaint as part of the criminal process. Indeed in this country, compensation orders in favour of a victim can be made by way of sentence, following conviction, in purely criminal proceedings, without the victim being a party to them. If communications come into existence for the dominant purpose of such criminal proceedings, with a view to seeking a compensation order as

**056**

part of the sentence, it is difficult to see any good reason for the privilege being denied where it would exist for the purposes of a civil suit.

(3)    The point is well illustrated by the position in RAK, where, as Mr Allen explains, a claim for compensation can be made by the victim within criminal proceedings, without the need to issue separate civil proceedings but without becoming a party to the criminal proceedings.  We were given to understand that such a civil claim had been made in the criminal proceedings which were pursued against Mr Al Sadeq in RAK.  Moreover in RAK a victim has to make a formal criminal complaint, providing evidence about what is alleged to have occurred, before such criminal proceedings will be brought by the public prosecutor.  In the kind of complex fraud which it was contemplated would form the subject matter of criminal proceedings against Mr Al Sadeq and others, that would require considerable investigation and gathering of evidence, and all the more so in this case where it appears that the public prosecutor was reliant on the resources and expertise of Dechert and their clients.  It would be anomalous and unjust to deny privilege to that evidence gathering exercise, in contemplation of criminal proceedings which encompass a civil claim, when it would attach if the civil claim were to be advanced in civil rather than criminal proceedings.

(4)    It is common for liability insurers to have the conduct of proceedings to which their assured are parties, but they are not.  It would be absurd if litigation privilege attached to communications by the assured for the dominant purpose of gathering evidence and conducting the proceedings, but not to those of the insurers who commonly undertake that function.  Other non-parties, such as litigation funders, may play a significant part in the conduct of proceedings,.  Ms Oppenheimer suggested that insurers and litigation funders should be treated as "equivalent to" a party for the purposes of the privilege, but the principled basis for doing so can only be because they have an interest in the outcome, in those examples a financial interest. That, however, may equally be true of non-parties to litigation who have no control over it, as the next example illustrates.

(5)    Similar anomalies would exist in relation to group litigation in its various forms, whether under a Group Litigation Order, by the case management of multiple claims by test cases and lead proceedings, as in the well-known Lloyds litigation in the 1990s (see *Deeny v Gooda Walker Ltd* [1994] CLC 1224 and the many related cases); and the recent test case in relation to business interruption arising out of the COVID pandemic (*Financial Conduct Authority v Arch Insurance (UK) Ltd and others* [2021] UKSC 1  [2021] AC 649); or collective proceedings in competition cases, where only the class representative(s), not the class members, are parties (see *Nippon Yusen Kabushiki Kaisha & Ors v Mark McLaren Class Representative Ltd* [2023] EWCA Civ 1471).  In those cases non-parties may well have a part to play in evidence gathering for use in actual or contemplated litigation to which they are not themselves parties, and the twin rationales for litigation privilege are equally applicable in such cases.

(6)    A similar anomaly would arise where two concerns form a joint venture company which becomes party to litigation, with each concern wishing to conduct its own process of advice and evidence gathering in relation to how the litigation should be conducted by the joint venture company (as to which they might not agree). The Buncefield litigation (*Colour Quest Ltd and others v Total Downstream UK Plc and others* [2019] EWHC 540 (Comm)) vividly illustrates such a situation, although as it

**057**

happens the joint venturers in that litigation were themselves made parties in addition to the joint venture company.

(7) Serious allegations may be made against a person, X, in litigation between others to which, for whatever reason, he may not be a party. Or X may be a witness or potential witness who wants advice as to the assistance he can and should give to a party. X may well wish to be advised in relation to the litigation, including whether and how they should participate in it, either formally by becoming a party or being a witness, or informally by providing assistance or evidence to a party. The advice would be covered by legal advice privilege but it would be anomalous, and contrary to principle, if communications by X or his lawyers with third parties for the dominant purpose of giving and getting such advice were not protected by privilege.

196. Ms Oppenheimer emphasised the reference in Lord Carswell's formulation in *Three Rivers (No 6)* at [102], to the "conducting" of proceedings, which was adopted and applied by this court in *Director of the Serious Fraud Office v Eurasian Natural Resources Corpn* [2018] EWCA Civ 2006 [2019] 1 WLR 791 at [64]-[66], and in *Lorely Financial v Credit Suisse* at [33]:

"The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and the qualifications expressed in the modern case-law is that communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied:

(a) litigation must be in progress or in contemplation;

(b) the communications must have been made for the sole or dominant purpose of conducting that litigation;

(c) the litigation must be adversarial, not investigative or inquisitorial."

197. Ms Oppenheimer submitted that the 'safe space' rationale could not apply to those not conducting or contemplated as conducting the litigation, who would have no need of such a 'safe space'. I cannot accept this argument for a number of reasons. First the safe space rationale is not limited to protection from disclosure to opponents in the litigation, as I have explained. Secondly, a person gathering evidence for the purpose of its use by another in conducting litigation in which it has an interest *does* come within the 'safe space' rationale. Thirdly, the 'safe space' rationale is not the only one for litigation privilege; it also covers communications for the purposes of taking legal advice on the merits of contemplated proceedings, engaging the rationale identified in *Derby Magistrates*, as Lord Carswell himself recognised at [85]. Ms Oppenheimer derived some support for her proposition that the advice must relate to the conduct of proceedings from what was said by the Court of Appeal at [15] of *WM Holding Ltd v E20 Stadium LLP* [2018] EWCA Civ 2652. However, that does not detract from the fact that the 'safe space' rationale is not the only rationale for litigation privilege. Finally, those having conduct of litigation are not always parties, as for example with insurers.

198. Ms Oppenheimer also emphasised that litigation privilege was confined to adversarial litigation, and argued that the rationale could not therefore extend to criminal proceedings in which the victim was not, as a non-party, in an adversarial role. However, criminal proceedings are adversarial, and a public prosecutor brings such proceedings to vindicate

**058**

the harm to the victim, which in substance means that the victim stands in an adversarial role to the defendant.  Moreover, where the victim is seeking compensation from the defendant, the stances taken by the victim and the defendant are directly adversarial without the victim being a party.

199. Ms Oppenheimer further submitted that extending the privilege to non-parties was fundamentally at odds with the criminal disclosure regime in England and Wales, which treats communications between the police or prosecuting authority and victims and witnesses, taking place for the dominant purpose of the criminal proceedings, as disclosable, and not covered by any privilege held by the victim or witness.  There seemed to be two strands to the argument, one addressed to pre-existing privilege in material in the hands of the victim or witness, and the other, which I understood to be the main point, to privilege, in the hands of the victim or witness,  becoming attached to communications with them, where and because the victim or witness contemplates that the communication is for the dominant propose of use in a prosecution.

200. As to the first category, where privilege already exists in the hands of the victim or witness prior to the material being sought by, or coming into the hands of, the prosecution, victims and other non-parties are entitled to assert privilege to resist disclosure of material which is privileged.  The *Derby Magistrates Court* case was an application of this principle in respect of legal advice privilege.  There is no reason for a different approach to material which is subject to pre-existing litigation privilege.  Where such material is provided voluntarily, privilege will be waived because it will lose its confidentiality, being disclosed to the police or prosecution in contemplation that it may be used for the purposes of criminal investigation and/or prosecution.  Where, however, the privilege is not waived, and it comes into the possession of the police by other means, say a search or via a third party, the privilege holder can still assert the privilege to prevent its disclosure or use for so long as the privilege subsists.  Ms Oppenheimer submitted that this would be an unsatisfactory restriction on the evidence available for criminal prosecutions where, for example, the victim had previously sought a report which was unfavourable and which would undermine the prosecution's case.  But that is simply the consequence of the privilege being inviolate where it exists, and not being susceptible to competing public interest considerations whether in civil or criminal proceedings. It would apply equally if the pre-existing privilege attached by reason of existing or contemplated civil proceedings. If the prosecution were aware of the contents of such a report because it had come into their hands, that might affect whether a prosecution should be pursued, but that is a separate question.

201. As to the second category, the respondents' case does not have the consequence that victims and witnesses will have privilege in communications with the police and prosecuting authorities by reason of the dominant purpose of the victim or witness being their use in existing or contemplated prosecutions.  Victims and witnesses will not hold privilege in such communications, consistently with the respondents' case, for one or both of two reasons.  First, that is so because in this situation the person whose purpose has to be examined is the person who procures the communication (see *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027 discussed below), which in the posited circumstances will usually be the police or public prosecutor, not the victim or witness.  Secondly, that is so because the communications will lack the necessary quality of confidence.  The victim or witness will contemplate that they will be made public by their use in the proceedings. The very contemplation which gives rise to

what would otherwise attract privilege, namely use in public proceedings by the police or prosecuting authority, is what prevents privilege attaching. This meets the main point advanced by Ms Oppenheimer.

202. Principle therefore supports the respondents' position on this issue.

*The authorities*

203. *Waugh v BRB* is the leading modern authority on litigation privilege. There Lord Edmund Davies at p. 543H-544B endorsed the principle as being that expressed by Barwick CJ in *Grant v Downs* (1976) 135 CLR 674, 677 in the following terms:

> "Having considered the decisions, the writings and the various aspects of the public interest which claim attention, I have come to the conclusion that the court should state the relevant principle as follows: a document which was produced or brought into existence either with the dominant purpose of its author, or of the person or authority under whose direction, whether particular or general, it was produced or brought into existence, of using it or its contents in order to obtain legal advice or to conduct or aid in the conduct of litigation, at the time of its production in reasonable prospect, should be privileged and excluded from inspection."

204. There is nothing in that formulation which requires the privilege holder to be party to the litigation. Nor do I read Lord Carswell's formulation in *Three Rivers (No 6)* at [102] as including such a limitation. I would read the word "parties" in that paragraph as being used simply to mean persons claiming privilege, to distinguish them from the third parties with whom they are communicating, rather than to impose a requirement that the litigation in existence or contemplation must be litigation to which the privilege holder is formally a party.

205. The same is true of the definition of legal professional privilege in s. 10(1)(b) of the Police and Criminal Evidence Act 1984 which provides:

> "Subject to subsection (2) below, in this Act "items subject to legal privilege" means— … (b) communications between a professional legal adviser and his client or any person representing his client or between such an adviser or his client or any such representative and any other person made in connection with or in contemplation of legal proceedings and for the purposes of such proceedings."

206. In *Guinness Peat v Fitzroy Robinson*, a claim was brought by the plaintiff building developers against the defendant architects. The defendants had written a letter to their liability insurers to notify them of the claim, before the proceedings began, as was required by the terms of the policy. The letter expressed views as to the merits of the claim, and was inadvertently disclosed to the plaintiff upon discovery. On learning of the mistake, the defendants sought to restrain the plaintiff from relying on it on the grounds it was privileged. The privilege was upheld at first instance and on appeal. The leading judgment in this court was given by Slade LJ. The dominant purpose of the architects had not been for advice or use in respect of contemplated litigation but rather to comply with the policy requirement (p. 1035C). The defendants did not therefore have their own litigation privilege to assert. Nevertheless, it was held that because the insurers had been responsible for procuring the letter to be written, it was their dominant purpose which was relevant, and that purpose was for advice and or use in contemplated litigation (pp.

**060**

1036D-E and 1037B-C).  That left the question whether the defendants could claim the privilege, notwithstanding that the insurers had had the relevant contemplation.  Slade LJ addressed this question at p. 1038G-1039B, holding that by reason of the common interest between the defendants and their insurers the defendants themselves had common interest privilege.  The conclusion that the defendants held privilege in the document was therefore premised on the privilege being that of the insurers.  This is direct authority that litigation privilege can arise by reason of contemplation of litigation to which the person having that contemplation is not a party, in that case, the insurers.  Ms Oppenheimer relied on the passage at p. 1038G describing the position in that case as one "where the insurers will in all but name be the effective defendants to the proceedings."  That was not, however, the reasoning for the decision that the insurers had their own privilege, which had earlier been identified solely by reference to their having procured the document and had the litigation in contemplation.

207. A similar approach was adopted by Aikens J in *Winterthur Swiss Insurance Company v AG (Manchester) Ltd (in liquidation)* [2006] EWHC 839 (Comm), obiter at [92]-[93] and [139(1)], in holding in respect of the "pre-ATE policy documents" that had the dominant purpose test been made good, the litigation privilege would have been that of the ATE insurers, notwithstanding that they were not contemplated as being parties to the litigation.

208. In *Gibbins*, Potter LJ said at [46]:

"So far as policy is concerned, it is clear that the existence and application of the rule respecting LPP is one of policy which applies equally to civil and criminal proceedings and is applicable *whether or not the party relying upon it is or is not a party to, or witness in, the proceedings*." (my emphasis)

209. The two appellate authorities upon which Ms Oppenheimer principally relied were *Schneider v Leigh* [1955] 2 QB 195 and *USA v Philip Morris Inc* [2004] EWCA Civ 330 [2004]1 CLC 811.

210. In *Schneider v Leigh* [1955] 2 QB 195 the plaintiff was involved in a road accident with a vehicle owned by a company, Pedigree, and brought a personal injury claim against Pedigree.  Pedigree's solicitors instructed an expert, Dr Leigh, to prepare a medical report, and then wrote to the plaintiff quoting two paragraphs from the report. The plaintiff commenced proceedings against Dr Leigh for libel, and Dr Leigh claimed privilege on the basis that the report was prepared for the purpose of the claim between the plaintiff and Pedigree.  A majority of the Court of Appeal (Romer and Hodson LJJ) held that the report could be disclosed in the libel action.  That was to be permitted only once the claim between the plaintiff and Pedigree had concluded, based on a concession offered by counsel for the plaintiff for the benefit of Pedigree.

211. At pp. 202-203, Hodson LJ said:

"It is essential to bear in mind that the privilege is the privilege of the litigant, accorded to him in order that he may be protected in preparing his case, and not the privilege of his witnesses as such. The litigant can waive the privilege if he chooses, and if he does so the proofs of his witnesses can be shown to the opposing party without the witnesses having any ground for complaint. What is being sought here is, in effect, to extend the umbrella of the protection which the privilege gives the

company to the defendant, who is, on the hypothesis that he is the author of the libel, to be looked at for the purpose of this application as a proposed witness on behalf of the company. In this capacity not only has he no privilege of his own, but he is under no duty to assert the right of the company to resist the production of any documents."

212. Romer LJ, after referring to the fact that the report attracted litigation privilege in the hands of Pedigree said at p. 205:

"In order to establish this claim the defendant must show, as it seems to me, either that the privilege in the first action is one which he as well as the company can assert, or that he at least has such an individual right to share in the protection which the privilege affords to the company that the latter cannot waive the privilege without his consent. In my judgment, however, neither of these views is capable of being sustained. The privilege which exists in the first action is, in my opinion, that of the company and of no one else; and the company can at any time waive the privilege without the defendant's consent and, indeed, without any reference to him at all.

213. Singleton LJ in his dissenting judgment treated the privilege of the client, Pedigree, as "inuring for the benefit of the witness".

214. The decision is of relatively narrow application.  It is authority for the proposition that a witness has no litigation privilege of their own in documents brought into existence for the purposes of the litigation, and was so treated by Croom-Johnson LJ in another decision of this court, *The Aegis Blaze* [1986] 1 Lloyd's Rep 203 at 210.  It is also authority that the witness cannot rely on the client's privilege where the client has itself waived the privilege, as must have occurred by Pedigree's solicitors in that case having sent extracts of the report to the plaintiff, which explains Romer LJ's reference to waiver at the end of the passage quoted, and may also explain Hodson LJ's reference to waiver and the last part of the passage quoted: as Ms Oppenheimer herself submitted, if the client had not waived the privilege, the expert *would* be bound to assert the privilege of those instructing them.  It forms no authority for the proposition that a client cannot have litigation privilege in a communication made in contemplation of litigation to which it is not a party: there is nothing in the decision to suggest that Pedigree could not have asserted its own privilege, had it not been waived, notwithstanding that it was not a party to the subsequent libel claim.  Nor was it a case in which the privilege arose by reference to contemplation of proceedings to which Pedigree was not party: there was no question of Pedigree having litigation privilege by reason of any contemplation of subsequent libel proceedings; the privilege arose simply out of contemplated use in the existing personal injury proceedings brought against Pedigree.

215. Ms Oppenheimer submitted that if the respondents' case were correct, Dr Leigh would have been able to assert his own privilege, having produced the report which he contemplated was for use in the proceedings to which he was not a party.  However, as *Guinness Peat* illustrates, the person whose dominant purpose falls to be addressed is not necessarily the maker of the document or author of the communication, but rather the person who procures it.  The privilege in documents produced by witnesses, and communications with them, will be that of the client who procures such documents or communications, not that of the witness.

**062**

216. In *USA v Philip Morris Inc* the relevant issue was simply whether the litigation there in contemplation, which was a third party disclosure application by way of a letter of request, was adversarial in the sense required for litigation privilege to attach.  At [72]-[73] Brooke LJ, giving the leading judgment in this court, held that it was not.  There is nothing in either the reasoning or the decision to support a proposition that litigation privilege cannot extend to documents brought into existence in contemplation of litigation to which the person having that contemplation is not a party.

217. Finally, there is the decision of Moulder J in *Minera Las Bambas SA v Glencore Queensland Ltd* [2018] EWHC 286 (Comm), which is a reasoned decision on the point in favour of Mr Al Sadeq's case on this issue.  Her essential reasoning is that the rationale for litigation privilege is that a party should be free to seek evidence without having to disclose it to the other side, which cannot apply unless the privilege holder is party.  This reasoning is unsound, because the privilege, where it exists, is wider than merely protection against disclosure to the opposing party in the litigation; and for the reasons I have endeavoured to explain, the principled application of the rationale for the privilege points to the opposite conclusion.

218. The authorities, therefore, support the respondents' case on this issue.

*Conclusion on issue 5*

219. I would therefore resolve this issue in favour of the respondents.

220. I would leave open the question whether there has additionally to be a sufficient interest in the contemplated proceedings, over and above satisfying the dominant purpose test, because if that is a requirement, it was plainly satisfied in this case. Ms Oppenheimer argued that it was fatal that Dechert's clients were not the victims in the contemplated criminal proceedings in RAK.   It was said that the victims were RAKIA, not RAK Development.   It is not clear that the factual premise for this submission is correct: RAK Development was described as holding and managing various assets such as shares, properties and loans which had previously been owned by RAKIA, including the assets which RAKIA alleges were the subject of significant frauds and other wrongdoing committed by Dr Massaad and associates of his.  However, assuming the losses to be those of RAKIA alone, who from 2014 were not Dechert's client, nevertheless RAK Development would in my view have a sufficient interest in proceedings in which RAKIA was the victim by reason of the role described.   Cases where the dominant purpose test is satisfied but the party claiming privilege is essentially a stranger to the litigation are likely to be extremely rare; and whether there is an additional requirement of a sufficient interest in the proceedings in all cases is better determined if and when it arises for decision.

**Issue 6: Does the *Three Rivers (No 5)* principle apply to litigation privilege?**

221. On behalf of Mr Al Sadeq it is contended that litigation privilege only applies to communications with Dechert or third parties by individuals authorised to conduct litigation on behalf of Dechert's client, RAK Development, on the grounds that this is a principled extension of the *Three Rivers (No 5)* principle which applies to legal advice privilege.  The Judge did not determine this issue.  He said at [183] that it was not necessary to make the order sought at paragraph 4 of the Draft Order because the need to do so appeared to have been resolved by correspondence "as discussed above".  Paragraph

4 sought identification of the individuals authorised to conduct the contemplated proceedings. This appears to be a reference to correspondence to which he referred at [117], but unfortunately that was concerned to identify those authorised to give and seek legal advice in the context of legal advice privilege. It did not address who was authorised to conduct litigation. The parties have confirmed that there was no other correspondence which did so. The Judge did not, in any event, seek to address paragraph 5.2 of the Draft Order which required the issue to be resolved, even if the identity of the individuals was not in issue. Equally unfortunately, the time constraints of the appeal hearing meant that neither side addressed any oral argument to this issue, although it was addressed briefly in the skeleton arguments.

222. The principle, applicable to legal advice privilege, has received considerable criticism, both judicially and by leading commentators, and has not been followed in other jurisdictions: see *SFO v ENRC* at [123]-[130]; *R (Jet2.com) v Civil Aviation Authority* [2020] EWCA Civ 35 [2020] QB 1027 at [47]-[58]; and *Hollander* on Documentary Evidence 14th edn. 17-10 to 17-11. It is, however, binding in relation to legal advice privilege on all courts below the Supreme Court.

223. Its rationale does not, however, apply to litigation privilege. Legal advice privilege is confined to communications which the lawyer has with its client (either directly or through the intermediate agent of either), and does not extend to communications with third parties. It is necessary, therefore, to have a rule for the purposes of legal advice privilege as to which natural persons qualify as 'the client' where the client is an entity with legal personality, such as a company. By contrast, litigation privilege extends to communications with third parties, and all legal and natural persons come within the scope of that description; it encompasses any legal or natural person who is not the client. It would include employees of the client, communication with whom fell outside the scope of legal advice privilege in application of the *Three Rivers (No 5)* principle because they were not authorised to seek or receive legal advice on behalf of the client. If an individual who receives the instructions at a third party company to provide information is not authorised to do so, that individual is still a third party, just as much as an individual not authorised to give or receive legal advice.

224. Moreover, the authority on which Mr Al Sadeq's case on this issue focusses is not the authority of the sender or recipient of the communication to send or receive it (which is what the *Three Rivers (No 5)* principle was concerned with); rather it focusses on the authority of persons to conduct litigation. Such authority is irrelevant to litigation privilege: communications with third parties can be covered by the privilege irrespective of any role the third party may or may not have in conducting the litigation. Third party witnesses have no role in the conduct of the litigation, and no authority to conduct it, but the privilege can nevertheless attach to communications with them. This applies irrespective of my conclusion on Issue 4 that the client need not be a party to the contemplated litigation.

225. I would therefore conclude that the *Three Rivers (No 5)* principle has no application to litigation privilege.

**LEGAL ADVICE PRIVILEGE**

226. Paragraph 3.1 of the Draft Order sought an order that documents or parts thereof involving communications created for the dominant purpose of the defendants'

investigatory work could not be withheld from inspection on the grounds of legal advice privilege. In support of that case, Ms Oppenheimer relied on evidence that a large part of their work involved activities by way of investigation which it was said involved no legal skills or analysis, but were rather the type of activities ordinarily carried out by police such as interviewing, searches of premises and briefing and providing evidence to the public prosecutor; and, it was said, the work of a public prosecutor itself.

227. In Mr Allen's evidence he explains that there are very few documents for which legal advice privilege alone was claimed, because where documents were treated as attracting litigation privilege they were not reviewed separately for legal advice privilege. None were withheld on the basis of legal advice privilege alone in the original disclosure, and only a very few on that basis subsequently. This issue is not, therefore, of great significance in the light of my conclusions on the litigation privilege issues which are in the respondents' favour. The re-review required by my conclusions on the iniquity exception will not affect the nature of documentation caught by this issue, because to the extent that the iniquity exception applies more widely than was previously thought, it will prevent legal advice privilege arising, just as much as litigation privilege.

228. The approach to this issue is illuminated by the relevant principles summarised in *Jet2.com*, derived from earlier authority.

   (1)  For legal advice privilege to apply to a particular communication it has to be shown that its dominant purpose was legal advice given by a lawyer (at [70]-[96] and *Three Rivers (No 6)* at [50]).

   (2)  The advice must be legal advice, not commercial advice (at [46]). This means that the communication must be made "in a legal context", but in that context legal advice is widely defined (at [60]). It is not confined to advice on the application of the law, or to communications which expressly seek or give legal advice, but includes advice as to what the client should do in the relevant legal context (at [68] citing *Three Rivers (No 6)* at [62], derived from Taylor LJ in *Balabel v Air India* [1988] Ch 317, 330). It applies not just to legal advice as such, but to advice given with the benefit of the lawyer's skill as a lawyer or "through a lawyer's eyes" (at [67]). It applies to the "continuum of communications" aimed at "keeping both informed so that advice may be sought or given as required" (at [68] quoting from *Three Rivers (No 6)* at [111] again derived from Taylor LJ in *Balabel*).

   (3)  The terms of engagement of the lawyer, to give legal advice, are not determinative of whether the communication is in a legal context for these purposes, although they make a good starting point; the test for privilege must be applied document by document (at [67]).

   (4)  The privilege will attach not only to communications which fulfil these criteria but also to those which disseminate or would otherwise reveal their contents (at [45]).

   (5)  It follows from these criteria that most communications from and to the client are likely to be set in a legal context and to attract privilege, although a particular communication may not do so (at [69(ii)]).

229. There can be no real doubt that Dechert was appointed as a law firm for its legal expertise. Such legal expertise extends not only to advice on black letter law and its application to

**065**

particular facts, but also to the practical aspects of legal proceedings and preparations therefor, including advice as to what evidence can and should be sought in the legal context of its use in assessing liability and/or bringing proceedings.  The skills of a lawyer extend to "taking statements", "assembling the facts and handling the evidence", and "an exercise in advocacy" in the words of Lord Carswell in *Three Rivers (No 6)* at [114].  That is a legal context which will generally cover investigatory work such as interviewing those suspected of crimes, or potential witnesses, and the presentation of evidence to a public prosecutor in a form which assists in relation to a potential prosecution, even to the extent (to use the words in one of the T18 documents) of bringing it to the prosecutor on a golden platter.  Dechert was engaged in the investigatory process to bring their lawyers' skills to that process and to conduct it through lawyers' eyes.  The evidence adduced on behalf of Mr Al Sadeq on this application does not establish that, as Ms Oppenheimer suggested, Dechert was "stepping into the shoes" of the public prosecutor, or acting as a "quasi-public prosecutor"; but had it been doing so, that would, in my view, involve acting in a legal context against the background of being instructed to provide legal advice in relation to suspected fraud.   I would therefore reject Ms Oppenheimer's submission that because the work might also have been undertaken by a non-lawyer, such as a policeman or a public prosecutor, it fell outside the legal context in which Dechert was instructed as a global law firm.  A blanket order of the width sought in paragraph 3.2 of the Draft Order, applying to all investigatory work, cannot be justified.

230. The issue therefore boils down to whether there are grounds for inferring that the respondents applied the test too widely to any documents which were concerned with some particular aspect or part of their investigatory role (there being very few such documents in which legal advice privilege alone was claimed at all).  It is accepted by the respondents that any document created as part of a *purely* investigative role, divorced from the respondents' role as lawyers, would not be privileged.  However, Mr Allen's evidence was that he applied the legal advice privilege test to each document over which that privilege has been claimed.  The approach he and his team adopted was that Dechert and the individuals concerned were instructed as lawyers by its client, and their investigatory work was generally carried out in that context and capacity and using their professional skills as lawyers.  That did not result in a blanket claim to legal advice privilege for all documents resulting from investigative work: a number of communications with the public prosecutor, for example, had been disclosed; and it was accepted that communications for the purposes of public relations did not attract legal advice privilege.   I conclude that, subject to consideration of the further evidence, there is nothing from which it can be inferred that Mr Allen or his team wrongly claimed legal advice privilege in relation to communications involving any particular aspect of the respondents' investigative activities.

*The Further Evidence application revisited*

231. Ms Oppenheimer sought to rely on the T18 and T20 material as relevant to this issue.  Mr Page instructed a team whose investigation gave rise to the RAK Project Reports, allegedly obtaining information by unlawful hacking.  The respondents accept that for the purposes of the iniquity exception there is a prima facie case of such unlawful hacking.  The material is said to be relevant to the current issue on the grounds that it shows that as part of the investigation, the product of the hacking was shared with and used by Dechert in the course of its investigation; and that much of the hacking appears to have been motivated not so much by concerns about fraudulent conduct by Dr Massaad but rather

by (i) concerns about his current business activities (ii) concerns about the publication of human rights abuses by the RAK government and/or Mr Al Sadeq and (iii) concerns about Dr Massad's relationship with the Ruler's brother; and that hacking or other unlawful evidence gathering activities were targeted at persons perceived to be associated with Mr Al Sadeq, specifically including his wife and an unidentified advisor to his legal team.

232. I have already observed that none of the T18 material, on which this is primarily based, meets the first limb of the *Ladd v Marshall* test. There is no good reason for admitting it in this context, any more than in the context of the issue as to the existence of the iniquities.

233. Moreover, assuming it to establish that which it is suggested it establishes, that would not justify the blanket order sought in relation to all Dechert's investigatory work; nor is there any more particular order fashioned and supported by a proper inference that legal advice privilege has wrongly been claimed in respect of any documents surrounding this aspect of Dechert's involvement. The substance of what the fresh evidence is relied on to show is that Dechert was communicating with Mr Page in respect of the activities of those Mr Page engaged, and receiving and using the fruits of those activities. If those activities were unlawful, that affects whether the iniquity exception is engaged (in respect of an iniquity which is not the subject matter of the present appeal, but which Mr Edey confirmed will require a further review to be undertaken in the light of amendments and proposed amendments to the P/C since the date of the disclosure application). But that apart, the nature of the activity does not assist Mr Al Sadeq's case on legal advice privilege in the present appeal. If a lawyer uses others to gather evidence, that is a classic example of activity within a legal context. Insofar as it is said to show that Dechert was to investigate (i) concerns about Dr Massaad's current business activities (ii) concerns about the publication of human rights abuses by the RAK government and/or Mr Al Sadeq and (iii) concerns about Dr Massaad's relationship with the Ruler's brother, again it is not self-evident that such investigations would not arise in a legal context.

234. Moreover, the material is addressed to particular aspects of Dechert's work, and it cannot justify a blanket prohibition on claiming legal advice privilege in relation to *any* of Dechert's investigatory work, which is the order sought, and which the Judge correctly rejected. The documentation relied on does nothing to support a submission that documents in relation to these aspects of Dechert's such activity have wrongly been withheld from disclosure on the grounds of legal advice privilege, in the few instances where such privilege has been invoked to withhold disclosure.

235. Ms Oppenheimer also relied on one particular document in the T20 material comprising an email sent by Mr Gerrard to Mr Page on 27 March 2015. The email referred to a meeting the previous week in which Mr Page had apparently offered to send Dechert a report in relation to Dr Massaad and others and their business interests. It continued: "We discussed how we might proceed going forward and in particular whether it would be appropriate that Dechert formally instruct you….so as to attempt to cover any work product under legal professional privilege. With this in mind we have cced the client and Gavin Watson [a Dechert partner] for their views."

236. The logical implication is that Mr Gerrard thought that by Dechert instructing Mr Page, privilege could attach where it would not have attached whilst Mr Page was engaged by the Ruler. Whether he was right about that, and if so the propriety of the suggested course, are not matters which I need to decide. Its only relevance in the present context is as to

**067**

Dechert's role, and in that context it is simply further evidence that Dechert was intended to receive and use Mr Page's "work product".

237. In this context, therefore, the T18 and T20 material fails to fulfil the second limb of *Ladd v Marshall* and should not be admitted for that reason.

238. I would accordingly refuse the further evidence application in this context too.

*The Three Rivers (No 5) principle applicable to legal advice privilege*

239. It is common ground that we are bound by the *Three Rivers (No 5)* principle in relation to legal advice privilege, and that the cross appeal must therefore be dismissed.

**DELAY**

240. This court has repeatedly emphasised the importance of judgments, even in complex matters, being delivered within three months, and the adverse impact of delay not just on the parties but also on public confidence in the justice system (see *Bank of St Petersburg v Arkhangelsky* [2020] EWCA Civ 408 at [84]). Delay, even inordinate and inexcusable delay, is not itself a ground for allowing an appeal, but where there has been lengthy delay an appellate court has to exercise special care in reviewing the judge's findings of fact and reasoning: see *Dansingani v Canara Bank* [2021] EWCA Civ 714, at [85]. As I have said, we are unaware of any reason for the length of the delay in this case, which in the absence of some exceptional personal circumstances is unacceptably long and regrettable. Nevertheless, the delay has not ultimately affected the approach to determining the issues which have arisen on the appeal.

**CONCLUSION**

241. I would therefore dispose of the appeal and cross appeal in accordance with the principles I have articulated, and hear the parties further on the form of an appropriate order in the light of those conclusions.

**LORD JUSTICE MALES:**

242. I agree.

**LORD JUSTICE UNDERHILL:**

243. I also agree.

**068**

# THE LAW OF PRIVILEGE

## THIRD EDITION

*Editor*

BANKIM THANKI QC
*MA (Oxon.)*

*Contributors*

CHLOE CARPENTER   *LLB (London), BCL (Oxon.)*
JAMES CUTRESS   *BA (Oxon.), BCL (Oxon.), LLM (Harvard)*
PATRICK GOODALL QC   *LLB (Soton), BCL (Oxon.)*
HENRY KING QC   *MA (Oxon.), ACA*
REBECCA LOVERIDGE   *BA (Oxon.), BCL (Oxon.)*
TAMARA OPPENHEIMER   *BCL (Oxon.), MA (Oxon.)*
ROSALIND PHELPS QC   *BA (Oxon.), BCL (Oxon.)*
NIK YEO   *LLB (Hons), BA (Hons) (Melb.), BCL (Oxon.)*

*Foreword by*
LORD NEUBERGER OF ABBOTSBURY



OXFORD
UNIVERSITY PRESS

*Chapter 1: Legal Professional Privilege: Fundamental Principles*

out inquiring as to whether a leniency applicant may be prepared to waive privilege over certain material during the course of a possible criminal cartel prosecution, albeit making it clear that any refusal to waive privilege will not have any adverse consequences for the leniency application and that granting such a waiver would not yield any advantage to the leniency applicant.[154]

**1.45**  The SFO has stated that, in the context of the requirement under the Deferred Prosecution Agreement Code of Practice for 'genuine unequivocal co-operation', it will not require a corporate to waive any genuinely well-founded claim to legal professional privilege, although it will expect a corporate to provide the factual narrative that underpins any self-report[155] but does not consider itself to be constrained from asking for voluntary production of privileged material.[156] Claims to privilege which the SFO regards as false or exaggerated will be treated as uncooperative, as may be efforts by a corporate to structure an investigation so as to cloak communications with potential witnesses in privilege, whereas the SFO will view the voluntary production of privileged documents or the structuring of an investigation in such a way as not to attract privilege claims over interviews of witnesses as a '*significant mark of cooperation*'. In practice, therefore, the SFO does incentivize a corporate which is subject to investigation by the SFO and which wishes to secure leniency by entering into a Deferred Prosecution Agreement seriously to consider waiving privilege in respect of documents revealing the underlying facts being investigated by the SFO.

## H. Who are Lawyers for the Purposes of the Privilege?

**1.46**  It has been accepted for several hundred years that the answer to this question is essentially 'professional legal advisers'[157] or 'professional lawyers'.[158] Who are professional legal advisers or professional lawyers for the purposes of legal professional privilege? In *Derby Magistrates* Lord Taylor, in his seminal analysis of the origins and development of legal advice privilege,[159] noted that the case of *Wilson v Rastall* had 'decided that the privilege is confined to the three cases of counsel, solicitor and attorney'.[160] Since *Wilson's* case there has never been any serious doubt that the privilege is confined to communications with professional lawyers.[161] In *R (Prudential PLC) v Special Commissioner of Income Tax* the Supreme Court has

---

[154] 2013 Leniency Guidance, paras 3.15–3.23.

[155] The role and remit of the SFO, speech given by Michael Wagstaff, Joint Head of Bribery and Corruption, speaking at the eleventh Annual Information Management, Investigations Compliance eDiscovery Conference, 18 May 2016.

[156] *Alun Milford, SFO General Counsel*, speech to an audience of compliance professionals at the European Compliance and Ethics Institute, Prague, 29 March 2016.

[157] *Lawrence v Campbell* (1859), 4 Drew 485, 490; *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, 317, 321 (CA).

[158] *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, 649 (*per* Jessel MR).

[159] *R v Derby Magistrates' Court, ex p B* [1996] 1 AC 487, 504–6 (HL).

[160] The term 'attorney' was previously used in England and Wales for lawyers who practised in the common law courts. In 1873, however, attorneys were re-designated as solicitors (which had hitherto been the title for those lawyers who practised in the courts of equity).

[161] *Wilson* followed the result in the *Duchess of Kingston's Case* (1776) 1 East PC 469. See the comprehensive survey by C Passmore, *Privilege* (3rd edn, 2006), para 1.177 ff. The early cases are replete with references to the privilege extending to a variety of legally qualified professional advisers: *Bolton v Liverpool Corporation* (1833) 1 M & K 88 (counsel); *Greenough v Gaskell* (1833) 1 M & K 98 (solicitor); *Herring v Clobery* (1842) 1 Ph 91 (attorney); *Carpmael v Powis* (1846) 1 Ph 687 (solicitor); *Pearce v Foster* (1885) LR 15 QBD 114

*H. Who are Lawyers for the Purposes of the Privilege?*

recently confirmed that legal professional privilege is applicable only to communications with a solicitor or barrister, or an appropriately qualified foreign lawyer.[162]

**Status or function?**    In the *Prudential* case an attempt was made to argue that the concept of **1.47** 'legal adviser' was broad enough at common law to encompass a chartered accountant advising on tax law. This was rejected by Charles J at first instance,[163] by the Court of Appeal,[164] and by a majority of the Supreme Court. Lord Neuberger (with whom Lords Walker, Hope, Mance, and Reed agreed) noted that it was universally believed that legal advice privilege only applies to communications in connection with advice given by members of the legal profession.[165] He commented that it was hard to see why, as a matter of pure logic, the privilege should be restricted to communications with legal advisers who happened to be qualified lawyers—but he held that the restriction was explicable by reference to history and that any extension beyond lawyers was a matter for Parliament rather than the judiciary. In particular, any extension by the judiciary would give rise to an unacceptable risk of uncertainty, would raise policy issues best left to Parliament, and would involve changing the law in an area in which Parliament had already relevantly legislated and declined to legislate.[166]

**The paradigm—qualified solicitor or barrister in independent practice**    Thus there is no **1.48** doubt that at common law a duly qualified solicitor[167] and a barrister,[168] in independent (ie non in-house) practice and subject to an appropriate regime of professional ethics and discipline,[169] are relevant lawyers for the purposes of legal professional privilege provided that they have been instructed as lawyers.[170] In England and Wales this applies whether the lawyer is self-employed or works at a law firm, and, if they work at a law firm, irrespective

---

(solicitor). In *Andersen v Bank of British Columbia* (1876) 2 Ch D 644, at 650–1, Sir George Jessel MR observed that the object of legal professional privilege was to protect a party who wishes to take the advice of 'members of the legal profession'. In *Wheeler v Le Marchant* (1881) 17 Ch D 675, 681–2 (CA), Sir George Jessel MR emphasized the limited character of the privilege, being restricted to obtaining the assistance of lawyers. See generally E Bray, *The Principles and Practice of Discovery* (1885), 356–7.

[162] *R (Prudential PLC) v Special Commissioner of Income Tax* [2013] 2 AC 185.

[163] [2009] EWHC 2494 (Admin).

[164] *R (Prudential PLC) v Special Commissioner of Income Tax* [2011] QB 669.

[165] There are a number of modern cases which can be cited in support of the restriction of legal professional privilege to communications with lawyers: *Minter v Priest* [1930] AC 558, 581 (HL); *AG v Mulholland* [1963] 1 All ER 767, 771 (CA); *D v NSPCC* [1978] AC 171, 244 (HL); *Paragon Finance PLC v Freshfields* [1999] 1 WLR 1183, 1188 (CA); *R v Derby Magistrates' Court, ex p B* [1996] 1 AC 487, 507–8 (HL).

[166] *R (Prudential PLC) v Special Commissioner of Income Tax.* [2013] 2 AC 185, paras 37, 39, 45–7, 49, 52 ff, 80, 91, 100.

[167] *Greenough v Gaskell* (1833) 1 M & K 98, 101, 103; *Carpmael v Powis* (1846) 1 Ph 687, 692; *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, 658 (CA); *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, 322 (CA); *Wheeler v Le Marchant* (1881) 17 Ch D 675, 682, 683, 684–5 (CA).

[168] *Greenough v Gaskell* (1833) 1 M & K 98, 101, 103; *Mayor and Corporation of Bristol v Cox* (1884) 26 Ch D 678; *Lowden v Blakey* (1889) 23 QBD 332.

[169] *AM&S Europe Ltd v Commission of the European Communities* [1983] 1 QB 878, 906, 914. Wigmore, 580 ff.

[170] Cf *Walter Lilly & Company v Mackay* [2012] 6 Costs LO 809, [2012] EWHC 649 at [17] where communications between the client and barristers were held not to be covered by legal professional privilege because they had not been instructed as barristers. The client had instructed a claims consultants *company*. The client claimed privilege in his communications with the company on the basis that he had understood that the employees he had dealt with were employed practising barristers. The Court held that even if they were, the client had not retained the company to provide the services of barristers or solicitors; it had retained the company as claims consultants and so privilege could not be claimed. The legal qualifictions of the barristers were incidental to the nature of the retainer.

- between a client[4] and a lawyer[5] or an intermediate agent[6] of either
- made in confidence[7]
- for the purpose[8] of giving or obtaining legal advice or assistance.[9]

Some of these requirements are subject to qualifications discussed below and are not as straightforward as they might at first appear. For example, an actual communication passing between lawyer and client is not in fact required in all circumstances.[10]

**Third party communications not covered**    In this jurisdiction, legal advice privilege does **2.03** not apply where the communication is between the lawyer or client and a *third party*:[11] that is the province of litigation privilege[12] and such communications will only be privileged if litigation is at least in contemplation.[13] In his seminal work on discovery first published in 1885, Edward Bray commented that there was no a priori reason why such communications should not be privileged if obtained to enable the lawyer to advise in relation to matters not connected with litigation, but observed that, however, 'such is the rule'.[14] This remains the rule in the twenty-first century in this jurisdiction at least.[15] Communications falling outside the ambit of legal advice privilege in England and Wales will therefore include communications between:

- lawyer and third party
- client and third party.

Such communications with third parties will only be subject to legal advice privilege if **2.04** they amount to the dissemination of privileged communications, for example within or in some cases beyond a client organization, or if they constitute secondary evidence of privileged communications.[16] In the case of companies and other legal persons, the boundaries

---

[4] See Section B below.
[5] See Section C below.
[6] See Section E(2) below.
[7] See Section E(3) below.
[8] As to whether a test of 'dominant purpose' applies to legal advice privilege, see Section H below.
[9] See Section F below.
[10] See Section E(1) below.
[11] Third party in this context means a person or entity who is not acting as an agent. Where the communication is with an agent of the lawyer or of the client then legal advice privilege is in principle available, as to which see para 2.02 above and para 2.74 below.
[12] *Wheeler v Le Marchant* (1881) 17 Ch D 675, 682, 683, 685 (CA) (communications between surveyors (third parties) and solicitors were not protected by legal advice privilege. They would only be protected by litigation privilege to the extent that they were written after litigation was in prospect); *Re Highgrade Traders* [1984] BCLC 151, 161, 164 (CA) (reports sent by loss adjusters, specialist fire investigators, and chartered accountants to client for purpose of client obtaining legal advice were not protected by legal advice privilege because communications were between client and third parties, but were protected by litigation privilege). See also *Ventouris v Mountain* [1991] 1 WLR 607, 618 (CA); *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160, 164. Litigation privilege is covered in Chapter 3 below. Cf the position in Australia where communications between the client or lawyer and a third party are protected by legal advice privilege if the dominant purpose of the communication is the client seeking or obtaining legal advice–see paras 2.81–2.82 below.
[13] See para 3.50 below.
[14] E Bray, *Principles and Practice of Discovery* (1885), 403.
[15] Although other jurisdictions do not apply this rule and hold that legal advice privilege applies to communications between a third party and a client or a third party and a lawyer provided that the dominant purpose of the communication is the seeking of legal advice. See paras 2.80–2.82 below.
[16] See para 4.30 ff below.

between client and third parties are not as clearly delineated as they were previously thought to be prior to the decision of the Court of Appeal in *Three Rivers 5*.[17]

## B. Who is the Client?

2.05    Legal advice privilege is available to the client (or his/her successor in title). It is available whether the client is a layman or a lawyer; a lawyer will have need of the services of another lawyer on occasions.[18] It is available to legal persons, such as companies, local authorities, and government departments, as well as natural persons. In the case of individuals, difficulties do not usually arise as to whether a particular communication is with the client.[19] However, with legal persons which can only act through officers or employees, there is more difficulty. This issue is analysed in detail below in the light of *Three Rivers 5* and subsequent litigation. In summary as regards corporations and other legal persons the law in this jurisdiction is:

- the 'client' is the legal person seeking legal advice;
- only those communications involving the individuals expressly or impliedly authorized by or on behalf of the client entity to give instructions (in the sense of being tasked with obtaining the advice[20]) to the lawyer and the individuals expressly or impliedly authorized on behalf of the client entity to receive the legal advice will attract legal advice privilege. The person(s) authorized to give such instructions need not be the same person(s) authorized to receive and/or act on advice.[21]

### (1) *Three Rivers*

2.06    **Factual background to the *Three Rivers* litigation**    In July 1991, BCCI collapsed and shortly afterwards the Chancellor of the Exchequer announced that there would be an inquiry into the supervision of BCCI under the 1979 and 1987 Banking Acts conducted by Lord Justice Bingham.[22]

2.07    Shortly after the Bingham Inquiry had been established, the Governor of the Bank of England appointed three Bank officials to deal with all communications between the Bank and the Inquiry. These officials, and other Bank personnel appointed to assist them from time to time, became known as the Bingham Inquiry Unit ('BIU'). The BIU had no formal legal status. The Bank retained solicitors Freshfields to advise generally in relation to the Inquiry. Freshfields also retained counsel to act on behalf of the Bank. Freshfields and

---

[17]  See Section B below.
[18]  *B v Auckland District Law Society* [2003] 2 AC 736, para 45 (PC). A more difficult question arises where a law firm advises itself, but it is suggested that such communications ought to be privileged: see *Somatra Ltd v Sinclair Roche & Temperley* [2000] 1 WLR 2453, 2467 (CA) and para 2.39 below.
[19]  Issues may arise as to whether a communication with a person other than the client was with an agent of the client, as to which see para 2.74 ff below, whether the original client is still able to claim the privilege or whether the privilege has vested in the successor in title to the client. As to the latter point see paras 1.37–1.38 above.
[20]  *Director of Serious Fraud Office v Eurasian Natural Resources Corporation Ltd* [2017] Lloyd's Rep FC 330, para 74.
[21]  Ibid, para 84.
[22]  See the judgment of Tomlinson J, [2002] EWHC (Comm) 1118, para 29; affirmed by the Court of Appeal in *Three Rivers DC v Bank of England (No 4)* [2003] 1 WLR 210, para 46; *Three Rivers 5*, para 2; *Three Rivers 6*, para 82.

317

1 Ch.

A                    [COURT OF APPEAL]

BALABEL AND ANOTHER v. AIR INDIA

1988  March 1, 2; 16          Lord Donaldson of Lymington M.R.,
                                         Parker and Taylor L.JJ.

B  Practice—Discovery—Privilege—Professional privilege—Conveyancing
     transaction—Communications between defendant and solicitors—
     Documents not incorporating specific legal advice—Whether
     privileged

        The plaintiffs brought an action against the defendant, an
C  Indian corporation, in which they claimed, inter alia, specific
     performance of an agreement for an underlease of business
     premises. In support of the allegations in their statement of
     claim relating to the negotiations for the underlease the plaintiffs
     sought discovery of three categories of documents, namely,
     communications between the defendant and its solicitors other
     than those seeking or giving legal advice; drafts, working papers,
     attendance notes and memoranda of the defendant's solicitors
     relating to the proposed new underlease; and internal communica-
D  tions of the defendant other than those seeking advice from the
     defendant's Indian legal advisers. Master Munrow upheld the
     defendant's claim to privilege. On appeal by the plaintiffs Judge
     Paul Baker Q.C., allowing the appeal in respect of specified
     documents, held that documents which simply recorded
     information, transactions or meetings at which the plaintiffs had
     been present were not privileged.
        On appeal by the defendant:—
E      Held, allowing the appeal, that the purpose of legal
     professional privilege was to enable legal advice to be sought
     and given in confidence; that a document was covered by
     privilege if it had been made confidentially for the purposes of
     legal advice, construing such purposes broadly, and that legal
     advice included advice as to what should prudently and sensibly
     be done in the relevant legal context; that in order to be
F  disclosable a document had to be material and relevant; that, in
     view of the increased range of assistance given by solicitors to
     their clients not all solicitor and client communications were
     privileged, but that in a conveyancing transaction communications
     passing in the handling of that transaction were privileged even
     though they did not incorporate a specific piece of advice,
     provided that their aim was the obtaining of appropriate legal
     advice; and that, accordingly, the defendant's claim to privilege
G  for the documents should have been upheld (post, pp. 329H—
     330A, D, F—331A, G—332G).
        Greenough v. Gaskell (1833) 1 My. & K. 98; Minter v.
     Priest [1929] 1 K.B. 655, C.A.; [1930] A.C. 558, H.L.(E.) and
     In re Sarah C. Getty Trust [1985] Q.B. 956 considered.
        Decision of Judge Paul Baker Q.C., sitting as a judge of the
     Chancery Division, reversed.

H

        The following cases are referred to in the judgment of Taylor L.J.:

     Anderson v. Bank of British Columbia (1876) 2 Ch.D. 644, C.A.
     Carpmael v. Powis (1846) 1 Ph. 687

318

*Committee of Receivers of Galadari v. Zealcastle Ltd.* (unreported), 6    A
    October 1986, Scott J.
*Conlon v. Conlons Ltd.* [1952] 2 All E.R. 462, C.A.
*Gardner v. Irvin* (1878) 4 Ex. D. 49, C.A.
*Getty (Sarah C.) Trust, In re* [1985] Q.B. 956; [1985] 3 W.L.R. 302; [1985]
    2 All E.R. 809
*Great Atlantic Insurance Co. v. Home Insurance Co.* [1981] 1 W.L.R. 529;
    [1981] 2 All E.R. 485, C.A.
                                                                        B
*Greenough v. Gaskell* (1833) 1 My. & K. 98
*Jones v. Pugh* (1842) 1 Ph. 96
*Lawrence v. Campbell* (1859) 4 Drew. 485
*Minet v. Morgan* (1873) L.R. 8 Ch. App. 361
*Minter v. Priest* [1929] 1 K.B. 655, C.A.; [1930] A.C. 558, H.L.(E.)
*Original Hartlepool Collieries Co. v. Moon* (1874) 30 L.T. 193, 585
*O'Rourke v. Darbishire* [1920] A.C. 581, H.L.(E.)
                                                                      C
*Pearse v. Pearse* (1846) 1 De G. & Sm. 12
*Smith-Bird v. Blower* [1939] 2 All E.R. 406
*Wheeler v. Le Marchant* (1881) 17 Ch.D. 675, C.A.

The following additional case was cited in argument:
*Wentworth v. Lloyd* (1864) 10 H.L. Cas. 589, H.L.(E.)

                                                                        D
APPEAL from Judge Paul Baker Q.C., sitting as a judge of the
Chancery Division.

By a writ dated 15 July 1985 and an amended statement of claim the
plaintiffs, Ahmed Kamal Balabel and Elsa Balabel, sought against the
defendant, Air India, an Indian corporation, inter alia, specific
performance of an underlease of business premises known as 11–13
Clifford Street and 17–18 New Bond Street, London. The plaintiffs   E
sought discovery of documents under three heads, namely, (1)
communications between the defendant and its solicitors other than
those seeking advice; (2) drafts, working papers, attendance notes and
memoranda of the defendant's solicitors relating to the proposed new
underlease; and (3) internal communications of the defendant other than
those seeking advice from their Indian legal advisers. On 14 October   F
1987 Master Munrow upheld the defendant's claim to privilege for the
requested documents. The plaintiffs appealed to Judge Paul Baker Q.C.
who, on 28 January 1988, allowed the appeal in respect of specified
documents.

The defendant appealed on the grounds that (1) the judge failed to
give effect to the principle laid down in *Carpmael v. Powis* (1846) 1 Ph.
687; (2) the judge erroneously drew a distinction between conveyancing   G
in the 19th century and conveyancing in the 20th century for the purpose
of distinguishing *Carpmael v. Powis* on the basis that advice on title had
been more widely required in the 19th century; (3) the judge
had erroneously distinguished written communications from oral
communications for the purpose of distinguishing the present case from
*Carpmael v. Powis* and *In re Sarah C. Getty Trust* [1985] Q.B. 956; (4)
the judge failed to have sufficient regard to the rationale of legal   H
professional privilege namely to permit the fullest and frankest discourse
between solicitor and client; (5) the judge failed to take account of the
requirement for a solicitor to be fully informed of his client's affairs and

A    for a client to be fully informed of all actions taken on his behalf by his solicitor to enable the client to seek and the solicitor to give full and proper advice; (6) the judge failed to have regard to the duty of a solicitor generally retained by a client in relation to a proposed conveyancing transaction to maintain a constant review of the transaction with a view to giving the client all necessary advice whether it had been expressly sought or not; and (7) the judge failed to have regard to the

B    artificiality of looking at individual documents in isolation and designating them as privileged or not privileged according to whether or not they contained or sought legal advice.

The facts are stated in the judgment of Taylor L.J.

C    *Gavin Lightman Q.C.* and *Beverley Rogers* for the defendant. There is no issue regarding the documents in the third category (internal communications of the defendant). Solicitor and client communications upon matters within the ordinary business of a solicitor and referable to the relationship are privileged: see *Greenough v. Gaskell* (1833) 1 My. & K. 98; *Jones v. Pugh* (1842) 1 Ph. 96; *Carpmael v. Powis* (1846) 1 Ph. 687; *Pearse v. Pearse* (1846) 1 De G. & Sm. 12; *Lawrence v. Campbell*

D    (1859) 4 Drew. 485; *Minet v. Morgan* (1873) L.R. 8 Ch.App. 361 and *Original Hartlepool Collieries Co. v. Moon* (1874) 30 L.T. 193, 585. See also the discussion of the last case in *Bray on Discovery,* pp. 368, and pp. 372–373 for the general principle. The privilege extends to the obtaining of legal advice and assistance: see *Wheeler v. Le Marchant* (1881) 17 Ch.D. 675 and *O'Rourke v. Darbishire* [1920] A.C. 581. Whether the subject matter of privileged communications is expressed as

E    "matters within the ordinary scope of a solicitor's employment" or as "legal advice and assistance" it covers all matters upon which a solicitor's skill might be utilised and upon which a solicitor is commonly consulted. To define privilege broadly is consistent with its purpose and rationale, namely, full and frank discourse between solicitor and client. The proper discharge of a solicitor's duty requires him not simply to give advice when requested, but also to inform the client of progress in the

F    transaction he is handling on the client's behalf, to seek further instructions as necessary and to warn the client against hazards which he, as a layman, might not appreciate.

Except for *Smith-Bird v. Blower* [1939] 2 All E.R. 406, *Committee of Receivers of Galadari v. Zealcastle Ltd.* (unreported), 6 October 1986, a decision of Scott J., and possibly the *Original Hartlepool* case, 30 L.T.

G    585, the authorities which refer to "legal advice" are reconcilable with the authorities expressing the principle in wider terms, on the basis that "legal advice" is shorthand for "legal advice and assistance."

The most important case is *Minter v. Priest* [1929] 1 K.B. 655. The ratio of the Court of Appeal decision survives the decision in the House of Lords [1930] A.C. 558, and is still binding; it was on the application of the principle to the facts that the appeal was allowed.

H    *Smith-Bird v. Blower* [1939] 2 All E.R. 406 is wrong. The only authority cited in argument on the question of privilege was *O'Rourke v. Darbishire* [1920] A.C. 581. It has been disapproved by the Privy Council and the Court of Appeal on the issue of an unnamed principal.

320

In *Great Atlantic Insurance Co. v. Home Insurance Co.* [1981] 1    A
W.L.R. 529, 534–536, Templeman L.J. reviews the authorities on the
ambit of legal professional privilege and concludes that all communications
between solicitor and client are privileged when the solicitor is acting as
a solicitor, subject to exceptions to prevent fraud and crime. In *In re
Sarah C. Getty Trust* [1985] Q.B. 956 it was held that a verbal report by
a solicitor to his client of information received from a third party was
privileged, and could not be separated from those parts of the    B
communication giving advice. *Committee of Receivers of Galadari v.
Zealcastle Ltd.* (unreported), 6 October 1986 is wrong for the same
reason as *Smith-Bird v. Blower* [1939] 2 All E.R. 406.

It is impossible as a matter of fact to distinguish legal advice and
legal assistance. This court is bound by the decision in *Minter v. Priest*
[1929] 1 K.B. 655. The judge was in error in following the *Galadari*    C
case.

*Michael Burton Q.C.* and *Ian McCulloch* for the plaintiffs. For the
older authorities on privilege, see *Gardner v. Irvin* (1878) 4 Ex.D. 49;
*Wheeler v. Le Marchant,* 17 Ch.D. 675; *Minter v. Priest* [1930] A.C.
558, 581 and *O'Rourke v. Darbishire* [1920] A.C. 581, 602. These are
binding or persuasive in support of disclosure of communications unless    D
they are expressly or impliedly for the purpose of legal advice. The most
that can be said about the ratio of the Court of Appeal decision in
*Minter v. Priest* [1929] 1 K.B. 655 is that it is an important obiter dictum
of two of the members of the House of Lords. If it had been set out in
the speeches of the House of Lords it would have been no more than
obiter dictum. What Lord Atkin said [1930] A.C. 558, 584–585 has to be
taken together with what he said at p. 581.    E

When one comes to look at more recent applications of the principle,
*Smith-Bird v. Blower* [1939] 2 All E.R. 406 is right and ought to be
accepted. In *In re Sarah C. Getty Trust* [1985] Q.B. 956 the question
was whether, once communications are privileged because they are for
the purpose of obtaining legal advice, part of the communications can be
extracted. It was held that it could not. The communications there were    F
oral. The same principle was applied in *Great Atlantic Insurance Co. v.
Home Insurance Co.* [1981] 1 W.L.R. 529. But that is a different
question. The *Galadari* case is the next modern example of the
application of the principle. It is correctly decided. Privilege is limited to
documents connected with the giving or receiving of advice unless and
until litigation privilege arises and brings down a total blanket.    G

*Greenough v. Gaskell,* 1 My. & K. 98; *Jones v. Pugh,* 1 Ph. 96, and
*Lawrence v. Campbell,* 4 Drew. 485, would all be decided differently
today. The solicitor has the same privilege as the client. They were
rightly dealt with by Scott J. in the *Galadari* case. *Pearse v. Pearse,* 1
De G. & Sm. 12 is plainly a case of information imparted to a solicitor
for the purpose of legal advice. *Carpmael v. Powis,* 1 Ph. 687, is
inconsistent with the Court of Appeal decision in the *Original Hartlepool*    H
case, 30 L.T. 585, and *Gardner v. Irvin,* 4 Ex.D. 49, but it is not
binding, and can be interpreted as a case on information supplied with a
view to legal advice. None of the old cases should stand in the way of a

321

**1 Ch.**                    Balabel v. Air India (C.A.)

A   practical solution to the interests of the profession and the public and of justice.

The rationale of privilege is that it is only obtainable on the basis of obtaining legal advice. If on the proper construction of a particular letter it was sent for the purpose of obtaining such advice, privilege is available whether it was expressly sought or not. The justification is that it is the advice which is protected, interpreting advice on a generous basis.

B   A solicitor's privilege must be so limited. There is no other basis on which the privilege can be structured. Solicitors can play many different roles now. Only the giving of advice cloaks communications with protection.

The consequence of the defendant's submissions is that there is no difference between litigation privilege and advice privilege. Litigation

C   privilege must be wider than legal advice privilege.

*Lightman Q.C.* in reply. No adverse inference can be drawn against a client claiming privilege: see *Wentworth v. Lloyd* (1864) 10 H.L.Cas. 589. In *Conlon v. Conlons Ltd.* [1952] 2 All E.R. 462 the question arose whether a solicitor had been authorised to enter into a contract on behalf of a client. It was held that inquiries were permissible to see whether the solicitor had authority, but it would not be permissible to

D   obtain a letter giving instructions to settle a case on such terms as "if the facts are such-and-such, settle for £x, if not, settle for £y."

What is essential is a clear practical test for solicitors, because this is an everyday problem. The test put forward on behalf of the defendant is clear and simple to apply, as well as being supported by authority.

[The court examined in private the documents for which the

E   defendants claimed privilege.]

*Cur. adv. vult.*

16 March. The following judgments were handed down.

F   TAYLOR L.J.   This case raises an important point concerning legal professional privilege. Broadly, the issue is whether such privilege extends only to communications seeking or conveying legal advice, or to all that passes between solicitor and client on matters within the ordinary business of a solicitor.

This appeal arises from an action for specific performance of an agreement for an underlease, alleged to have been made in either May

G   or November 1984. The respondent plaintiffs are husband and wife and are directors of Marchcoin Ltd. The appellant defendant, Air India, is an Indian corporation and is the lessee of premises in Clifford Street and New Bond Street in London. On 9 July 1982 an underlease of these premises was assigned to Marchcoin Ltd. for a term expiring on 31 May 1984. Marchcoin Ltd. fell into arrears with the rent. The defendant forfeited the lease, obtaining possession by a judgment dated 11 October

H   1983. On 11 January 1984 Marchcoin Ltd. was granted relief from the forfeiture on paying the arrears in full. Although their underlease was due to expire on 31 May 1984, Marchcoin Ltd. enjoyed the protection of Part II of the Landlord and Tenant Act 1954.

322

In January 1984 negotiations began for the grant to them of a new      A
underlease on the expiration of their existing underlease. Slaughter &
May were the solicitors acting for Marchcoin Ltd. and the respondents.
The defendant's solicitors were Bulcraig & Davis (later Bulcraigs), the
partner in charge being Mr. Anthony Wade.

On 3 February 1984 Marchcoin Ltd. served a notice requesting the
grant of a new tenancy under section 26 of the Act of 1954. On 20      B
March the defendants served a counter-notice opposing such a grant.
Negotiations continued. Eventually, on 15 July 1985, the plaintiffs
started proceedings claiming specific performance of an agreement for
an underlease as well as damages and an account. The agreement was
pleaded in the alternative in paragraphs 4 to 7 of the amended statement
of claim. Since the allegations made there are relevant to the issue on
this appeal, I set out those paragraphs:                               C

"4. By an agreement made between the first named plaintiff orally
on behalf of himself the second named plaintiff and Marchcoin Ltd.
and one da Gama the local regional director for the United
Kingdom of the defendant on its behalf at the offices of the
defendant 17–18 New Bond Street in the City of Westminster on 10
May 1984 it was orally agreed (inter alia):—(a) That in consideration   D
of Marchcoin Ltd. not relying on its rights under the said Act the
defendant would grant to the plaintiffs an underlease of the said
premises 11–13 Clifford Street and 17–18 New Bond Street for a
term of 20 years from 1 June 1984 at a rent to be negotiated
between advisors to be paid quarterly with a rent review every five
years. (b) The covenants in the said underlease should be similar to
those in the underlease under which Marchcoin Ltd. was holding      E
over. (c) The said underlease should be prepared by solicitors at the
expense of the plaintiffs.
"5. Pursuant to the said agreement and in part performance thereof
the plaintiffs:—(a) Procured Marchcoin Ltd. not to be proceed with
the said proceedings CH 1984 of No. 2525. (b) Instructed their
solicitors Messrs. Slaughter & May to proceed on their behalf to      F
negotiate and approve the terms of the said lease. (c) Instructed
their valuers to negotiate the said rent. (d) Agreed the said rent
prior to 6 November 1984 at a figure of £35,000 per annum for the
first two years of the term of the lease and £38,000 per annum for
the next three years thereof. (e) From 25 May 1984 undertook to
Marchcoin Ltd. to pay the rent of the premises required by the
defendant.                                                            G
"6. Pursuant to the said agreement on 6 November 1984 the
solicitors to the defendant sent under cover of their letter dated 6
November 1984 to the said solicitors to the plaintiffs an engrossed
counterpart of the underlease of the said premises to which the
plaintiffs will refer at trial for its full terms and is copied and
annexed hereto marked 'A.'
"7. Further if contrary to the contention of the plaintiffs hereinbefore   H
set forth this . . . court should hold that the agreement set forth and
the matters relied upon in paragraphs 4 and 5 hereof do not
constitute an agreement whereof this . . . court can decree specific

323

**1 Ch.**                    Balabel v. Air India (C.A.)                    Taylor L.J.

performance then the plaintiffs aver and contend that an agreement as set forth in paragraph 4 hereof was concluded between the parties prior to 22 November 1984.

"Particulars. The plaintiffs will rely as the note and memorandum thereof on the engrossed counterpart of the said underlease and letter set forth in paragraph 6 and the defendants' letter to the plaintiffs dated 22 November 1984."

In support of these allegations the plaintiffs sought from the defendant discovery of documents under three heads. (1) Communications between the defendant and its solicitors other than those seeking or giving legal advice. (2) Drafts, working papers, attendance notes and memoranda of the defendant's solicitors relating to the proposed new underlease. (3) Internal communications of the defendant other than those seeking advice from their Indian legal advisers.

The defendant's solicitors declined to disclose the requested documents on grounds of legal professional privilege. The issue came before Master Munrow on 14 October 1987. He upheld the defendant's claim of privilege, stating that a document passing during a transaction does not have to incorporate a specific piece of legal advice to obtain that privilege. The plaintiffs appealed. They also issued a subpoena duces tecum against Mr. Wade, the defendant's solicitor, which he applied to have set aside. The case came before Judge Paul Baker Q.C., sitting as a High Court judge. On 28 January 1988 he discharged the subpoena but allowed the appeal in respect of specified documents, taking a different view from the master on the point of principle. From his decision the defendant now appeals to this court, having been granted leave by Nicholls L.J. on 4 February 1988.

In the course of his judgment Judge Paul Baker reviewed the authorities. He sought to distinguish those which supported a broad view of the scope of legal professional privilege. In the result he adopted the approach of Scott J. in *Committee of Receivers of Galadari v. Zealcastle Ltd.* (unreported), 6 October 1986. He concluded:

"The [defendant] in my judgment [is] entitled to withhold all communications which seek or convey advice, even though parts of them may contain narratives of facts or other statements which in themselves would not be protected. On the other hand, documents which simply record information or transactions, with or without instructions to carry them into execution, or which record meetings at which the plaintiffs were present, are not privileged."

The issue before this court is whether the judge's test was correct or whether privilege extends, as the defendant argued, to all communications between solicitor and client on matters within the ordinary business of the solicitor and which are referable to the relationship.

The importance of the point in this case is clear. There is an issue as to whether any agreement for a fresh underlease was made. In so far as the plaintiffs rely upon an oral agreement, they would require in order to enforce it a memorandum in writing pursuant to section 40 of the Law of Property Act 1925. They hope to find it in the defendant's documents.

324

Taylor L.J.                    Balabel v. Air India (C.A.)                    [1988]

If the defendant is right, there would be a blanket of privilege over   A
all the documents in dispute since clearly all the steps whether advisory
or executive taken by a solicitor in the course of negotiations for a lease
would be within the scope of his ordinary business. On the judge's
ruling, a selective exercise was required to withhold only those documents
seeking or giving advice and to disclose any which merely recorded
information or events or gave instructions. He carried out that exercise
and ruled that a number of documents specified in the schedule to his   B
order should be disclosed.

It is common ground that the basic principle justifying legal
professional privilege arises from the public interest requiring full and
frank exchange of confidence between solicitor and client to enable the
latter to receive necessary legal advice. Originally it related only to
communications where legal proceedings were in being or in contempla-   C
tion. This was the rationale which distinguished the solicitor and client
relationship from that between any other professional man and his
client. There is no doubt that legal professional privilege now extends
beyond legal advice in regard to litigation. But how far?

Mr. Lightman, counsel for the defendant, has referred to a long
series of decisions from 1833 until today. He submits that with the
exception of three cases, which he does not shrink from saying were   D
wrongly decided, the authorities support his proposition.

He began with *Greenough v. Gaskell* (1833) 1 My. & K. 98, which
he says is the first case extending privilege to communications where
litigation was not contemplated. Although mentioned in later cases as
the fons et origo of the broad view, the judgment of Lord Brougham
L.C. is somewhat equivocal. It is true that after stating it would be a   E
violation of professional confidence for a solicitor to disclose a matter
committed to him in his professional capacity, even if proceedings were
not pending or in contemplation, Lord Brougham L.C. went on, at
p. 102:

> "If, touching matters that come within the ordinary scope of
> professional employment, they receive a communication in their   F
> professional capacity, either from a client, or on his account, and
> for his benefit in the transaction of his business, or, which amounts
> to the same thing, if they commit to paper, in the course of their
> employment on his behalf, matters which they know only through
> their professional relation to the client, they are not only justified in
> withholding such matters, but bound to withhold them . . ."

But this passage is both preceded and followed by dicta which speak in   G
terms of "professional advice." Lord Brougham L.C. said, at p. 101:

> "To force from the party himself the production of communications
> made by him to professional men, seems inconsistent with the
> possibility of an ignorant man safely resorting to professional advice
> . . ."

  H

He said, at p. 102:

> "the protection would be insufficient, if it only included communica-
> tions more or less connected with judicial proceedings: for a person

A  oftentimes requires the aid of professional advice upon the subject of his rights and his liabilities, with no reference to any particular litigation, and without any other reference to litigation generally than all human affairs have, in so far as every transaction may, by possibility, become the subject of judicial inquiry."

B  Mr. Lightman went on to refer to *Jones v. Pugh* (1842) 1 Ph. 96; *Carpmael v. Powis* (1846) 1 Ph. 687; *Pearse v. Pearse* (1846) 1 De G. & Sm. 12; *Lawrence v. Campbell* (1859) 4 Drew. 485 and *Minet v. Morgan* (1873) L.R. 8 Ch. App. 361. The high watermark, in these older cases, of authority for the broad scope of privilege contended for by the defendant is *Carpmael v. Powis*, 1 Ph. 687. Lord Lyndhurst L.C. said, at p. 692:

C  "I am of opinion that the privilege extends to all communications between a solicitor, as such, and his client, relating to matters within the ordinary scope of a solicitor's duty. Now it cannot be denied that it is an ordinary part of a solicitor's business to treat for the sale or purchase of estates for his clients. For some purposes his intervention is indispensable in such transactions: he is to draw the agreements, to investigate the title, to prepare the conveyance. All
D  these things are in the common course of his business. But it is said that the fixing of a reserved bidding and other matters connected with the sale are not of that character, inasmuch as they might be entrusted equally well to anyone else. It is impossible, however, to split the duties in that manner without getting into inextricable confusion. I consider them all parts of one transaction—the sale of an estate: and that a transaction in which solicitors are ordinarily
E  employed by their clients. That being the case, I consider that all communications which may have taken place between the witness and his client in reference to that transaction are privileged."

Of the later cases Mr. Lightman relies upon *Minter v. Priest* [1929] 1 K.B. 655; [1930] A.C. 558; *Great Atlantic Insurance Co. v. Home Insurance Co.* [1981] 1 W.L.R. 529 and *In re Sarah C. Getty Trust*
F  [1985] Q.B. 956. In particular he contends that the decision of the Court of Appeal in *Minter v. Priest* is in his favour and is binding upon this court. That was a defamation case. The respondents' solicitor was approached to assist in obtaining a loan for the deposit on a contemplated purchase of a house, the intention being that, if the loan were obtained, the proposed purchasers would employ the respondent to complete the
G  purchase. The respondent was alleged to have defamed the appellant in the course of his interview with the proposed purchasers and the issue was whether one of the latter was entitled to claim privilege from disclosing what happened at the interview. The decision of the Court of Appeal [1929] 1 K.B. 655 was on the footing that what passed at the interview was between clients and a solicitor acting in his professional capacity and within the ordinary scope of his business as a solicitor. The
H  court upheld the claim to privilege. The House of Lords [1930] A.C. 558 reversed the decision on the ground that the respondent was not acting as a solicitor at the relevant time because, so far from undertaking the duty of a solicitor on the proposal made to him, the respondent made a

326

Taylor L.J.                    Balabel v. Air India (C.A.)                    [1988]

counter-proposal involving a malicious scheme from which he was to    A
profit jointly with the proposed purchasers. Accordingly, the dicta both
in the Court of Appeal and in the House of Lords touching upon the
extent of legal professional privilege where the relationship of solicitor
and client does exist were not essential to the determination of the case,
and in my judgment are not binding upon this court. Nevertheless, they
are of strong persuasive authority.

All three members of the Court of Appeal approved the decision in    B
*Carpmael v. Powis*, 1 Ph. 687, and two of them cited Lord Lyndhurst
L.C.'s judgment. Lawrence L.J. said, at p. 675:

"It has long since been established that it is not necessary for
the purpose of obtaining protection from disclosure that the
communications should be made either during or relating to an
actual or expected litigation, and that it is sufficient that they pass    C
as professional communications in a professional capacity: . . ."

That proposition was apparently not contested by counsel for the
respondent. Greer L.J. said, at pp. 683–684:

"After some difference of opinion it has been established that the
privilege is not confined to the conduct of litigation, or to advice    D
obtained for the purposes of existing or contemplated litigation. It
applies to communications between client and solicitor in respect of
all matters that come within the ordinary scope of professional
employment:"

In the House of Lords [1930] A.C. 558, Lord Buckmaster, with whom
Lord Thankerton agreed, said, at p. 568:                                 E

"The relationship of solicitor and client being once established, it is
not a necessary conclusion that whatever conversation ensued was
protected from disclosure. The conversation to secure this privilege
must be such as, within a very wide and generous ambit of
interpretation, must be fairly referable to the relationship, but
outside that boundary the mere fact that a person speaking is a    F
solicitor, and the person to whom he speaks is his client affords no
protection."

Lord Atkin put the test more restrictively, and Mr. Burton on behalf
of the plaintiffs relies upon his speech. He adopted the test stated by
Cotton L.J. in *Gardner v. Irvin* (1878) 4 Ex. D. 49, 53: "professional
communications of a confidential character for the purpose of getting    G
legal advice." Lord Atkin continued, at p. 581:

"As to this it is necessary to avoid misapprehension lest the
protection be too limited. It is I think apparent that if the
communication passes for the purpose of getting legal advice it must
be deemed confidential. The protection of course attaches to the
communications made by the solicitor as well as by the client. If    H
therefore the phrase is expanded to professional communications
passing for the purpose of getting or giving professional advice, and
it is understood that the profession is the legal profession, the
nature of the protection is I think correctly defined. One exception

083

327

1 Ch.        Balabel v. Air India (C.A.)        Taylor L.J.

A    to this protection is established. If communications which otherwise would be protected pass for the purpose of enabling either party to commit a crime or a fraud the protection will be withheld. It is further desirable to point out, not by way of exception but as a result of the rule, that communications between solicitor and client which do not pass for the purpose of giving or receiving professional advice are not protected. It follows that client and solicitor may

B    meet for the purpose of legal advice and exchange protected communications, and may yet in the course of the same interview make statements to each other not for the purpose of giving or receiving professional advice but for some other purpose. Such statements are not within the rule: . . .”

C    *Great Atlantic Insurance Co. v. Home Insurance Co.* [1981] 1 W.L.R. 529 was a case in which a memorandum from American legal advisers to the plaintiff was undoubtedly privileged since it contained advice. However, part of the memorandum had been disclosed and the issue was whether that disclosure waived privilege as to the whole document. At p. 535A Templeman L.J. cited the speech of Lord Buckmaster in *Minter v. Priest* [1930] A.C. 558, 568 and said, at pp. 535–536:

D    “The plaintiffs were seeking and the American attorneys were proffering advice in connection with a business transaction. The fact that litigation was not then contemplated is irrelevant. This appeal may serve a useful purpose if it reminds the profession that all communications between solicitor and client where the solicitor is acting as a solicitor are privileged subject to exceptions to prevent

E    fraud and crime and to protect the client and that the privilege should only be waived with great caution.”

*In re Sarah C. Getty Trust* [1985] Q.B. 956 raised the question whether an oral report by a solicitor to his client which included advice but also included information received by the solicitor from third parties was privileged. Mervyn Davies J. said, at pp. 964–965:

F    “My conclusions after considering the authorities put before me are: (1) Professional communications in a professional capacity for the purpose of getting or giving professional advice are privileged: see Lord Atkin in *Minter v. Priest* [1930] A.C. 558, 581. (2) The communications made between Paul and Mr. Treves fall within (1). (3) I have not been referred to any authority which suggests that

G    one may encroach upon communications that are basically privileged with a view to hiving off from the communications some parts thereof said to be, for some reason, separable from the main theme of the communicating, i.e., the giving and receiving of advice. (4) In particular, I do not find anything to justify me in saying that ‘the given information’ in this case ought to be separated from the rest of what was said between Paul and Mr. Treves so as to become

H    not privileged. (5) In so far as it is open to me I see no grounds for suggesting any exception to (1) in the way of allowing a solicitor to be questioned about what it is that he has conveyed to his client about information he may have received in a professional capacity

328

from a third party. On the contrary I think that to breach the   A
blanket of privilege in the way suggested would erode to an
unacceptable degree the wholesome protection that has been
provided by the law for the reasons explained by Lord Brougham in
*Greenough v. Gaskell* (1833) 1 My. & K. 98."

Mr. Burton, in addition to relying upon Lord Atkin's speech in
*Minter v. Priest* [1930] A.C. 558, referred the court to five other cases.   B
In *Original Hartlepool Collieries Co. v. Moon* (1874) 30 L.T. 193, 585
the issue was, as here, whether an agreement for a lease had been
made. Of that issue, James L.J. said, at p. 585:

> "The communications between a man and his solicitor, with respect
> to that, may be wholly irrespective of any question of professional
> advice or assistance of any kind. The communications may be   C
> made, authorising the solicitor to enter into a bargain, or to give
> directions to somebody else to enter into a bargain. Communications
> may happen to be made with a man who happens to be a solicitor,
> which would be of exactly the same character as, and neither more
> nor less privileged or confidential than, communications between a
> man and his steward, or between a man and his land agent, who   D
> did not happen to be a solicitor."

*Wheeler v. Le Marchant* (1881) 17 Ch.D. 675 was an action for
specific performance of a building contract. Privilege was claimed for
letters passing between the defendants' solicitors and their surveyors. It
was held that the letters were not privileged unless prepared for the
purpose of obtaining information, evidence or legal advice with reference   E
to litigation existing or contemplated between the parties. Sir George
Jessel M.R. said, at pp. 681–682:

> "The protection is of a very limited character, and in this country is
> restricted to the obtaining the assistance of lawyers, as regards the
> conduct of litigation or the rights to property. It has never gone
> beyond the obtaining legal advice and assistance, and all things   F
> reasonably necessary in the shape of communication to the legal
> advisers are protected from production or discovery in order that
> that legal advice may be obtained safely and sufficiently."

It is suggested by Mr. Lightman that the use in that passage of the
word "assistance" as well as "advice" broadens the scope of the privilege,
but Brett L.J., at p. 683, and Cotton L.J., at pp. 684 and 685, refer only   G
to legal advice.

In *Smith-Bird v. Blower* [1939] 2 All E.R. 406 the defendant agreed
to sell property to an agent of the plaintiff's and gave him a note to that
effect. The agent produced the note to the defendant's solicitors and
paid a deposit. The solicitors sought confirmation of the agreement from
their client, the defendant. In reply the defendant confirmed the note of
authority given to the plaintiff's agent "to convey the property to him   H
for £510." Luxmoore L.J., sitting as an additional judge in the Chancery
Division, ruled, at p. 410, that the defendant's confirmation to his
solicitors was not privileged

329

1 Ch.                    Balabel v. Air India (C.A.)                    Taylor L.J.

"because the letter was written by the defendant, not for the purpose of obtaining legal advice from his solicitors, but in answer to an inquiry by them to inform them of the fact that he had agreed to sell the property in question to Mr. Brown: . . ."

Luxmoore L.J. referred to a dictum of Viscount Finlay in *O'Rourke v. Darbishire* [1920] A.C. 581, 602:

"Trustees are entitled to consult a solicitor with reference to the affairs of the trust, and the communications between them and their legal adviser are privileged if for the purpose of obtaining legal advice. . . . Of course the privilege is confined to communications genuinely for the purpose of getting legal advice. It would not extend to mere business communications with reference to the trust, not for the purpose of getting legal advice."

Finally, Mr. Burton relies upon the decision of Scott J. in the most recent of the decided cases, *Committee of Receivers of Galadari v. Zealcastle Ltd.*, 6 October 1986. In that case the defendant wished to enforce a charge it had obtained against Mr. Galadari's interest in a property. The legal title to the property was discovered to be vested in a company. The defendant sought disclosure of documents in the possession of Mr. Galadari's solicitors to establish his beneficial interest. The scope of the privilege attaching to such documents was contested. Scott J. noted the conflict in the authorities and suggested there might be a distinction between cases where discovery was sought from the solicitor and those where the discovery was sought from the client. He said:

"I am therefore satisfied that I ought to approach the present case by applying the principle expressed by Lord Atkin in *Minter v. Priest* rather than by considering whether the broader view of privilege, which might perhaps be relevant in a case like *Greenough v. Gaskell*, where only the solicitor was being sued, is still good law. With that principle in mind I must I think look at the documents which are in issue in the case and come to a conclusion whether they can fairly be regarded as a request by Mr. Galadari . . . for legal advice or whether the documents represent the giving of legal advice either to Mr. Galadari or to an agent of his. These documents would be privileged. But none of the documents which simply record the transaction which Mr. Galadari had instructed his solicitors to implement, or document the putting into effect of the transaction, or the formation of the Swiss company, or which passed between Norton Rose and the vendor's solicitors on the acquisition of 10, Curzon Place, or the conveyance documents, would, in my view, be documents in respect of which Mr. Galadari could claim protection on the grounds of legal professional privilege."

These cases undoubtedly show a divergence of judicial authority as to the scope of the privilege. It is therefore important to go back to the basic principle justifying such privilege as an exception to the general rule that all relevant evidence is discoverable and admissible. That principle is that a client should be able to obtain legal advice in

330

Taylor L.J.                    Balabel v. Air India (C.A.)                    [1988]

confidence. Sir George Jessel M.R. put it as follows in *Anderson v.*    A
*Bank of British Columbia* (1876) 2 Ch.D. 644, 648, 649:

> "The meaning of the rule is, I understand, truly laid down by Lord
> Brougham in the case of *Greenough v. Gaskell* . . . The object and
> meaning of the rule is this: that as, by reason of the complexity and
> difficulty of our law, litigation can only be properly conducted by
> professional men, it is absolutely necessary that a man, in order to    B
> prosecute his rights or to defend himself from an improper claim,
> should have recourse to the assistance of professional lawyers, and
> it being so absolutely necessary, it is equally necessary, to use a
> vulgar phrase, that he should be able to make a clean breast of it to
> the gentleman whom he consults with a view to the prosecution of
> his claim, or the substantiating his defence against the claim of
> others; that he should be able to place unrestricted and unbounded    C
> confidence in the professional agent, and that the communications
> he so makes to him should be kept secret, unless with his consent
> (for it is his privilege, and not the privilege of the confidential
> agent), that he should be enabled properly to conduct his litigation."

Although originally confined to advice regarding litigation, the    D
privilege was extended to non-litigious business. Nevertheless, despite
that extension, the purpose and scope of the privilege is still to enable
legal advice to be sought and given in confidence. In my judgment,
therefore, the test is whether the communication or other document was
made confidentially for the purposes of legal advice. Those purposes
have to be construed broadly. Privilege obviously attaches to a document
conveying legal advice from solicitor to client and to a specific request    E
from the client for such advice. But it does not follow that all other
communications between them lack privilege. In most solicitor and client
relationships, especially where a transaction involves protracted dealings,
advice may be required or appropriate on matters great or small at
various stages. There will be a continuum of communication and
meetings between the solicitor and client. The negotiations for a lease
such as occurred in the present case are only one example. Where    F
information is passed by the solicitor or client to the other as part of the
continuum aimed at keeping both informed so that advice may be
sought and given as required, privilege will attach. A letter from the
client containing information may end with such words as "please advise
me what I should do." But, even if it does not, there will usually be
implied in the relationship an overall expectation that the solicitor will at    G
each stage, whether asked specifically or not, tender appropriate advice.
Moreover, legal advice is not confined to telling the client the law; it
must include advice as to what should prudently and sensibly be done in
the relevant legal context.

It may be that applying this test to any series of communications
might isolate occasional letters or notes which could not be said to enjoy
privilege. But to be disclosable such documents must be not only    H
privilege-free but also material and relevant. Usually a letter which does
no more than acknowledge receipt of a document or suggest a date for a
meeting will be irrelevant and so non-disclosable. In effect, therefore,

331
I Ch.                    Balabel v. Air India (C.A.)              Taylor L.J.

A  the "purpose of legal advice" test will result in most communications
   between solicitor and client in, for example, a conveyancing transaction
   being exempt from disclosure, either because they are privileged or
   because they are immaterial or irrelevant.

      What documents, then, are disclosable on this test? The answer is
   provided by cases such as *Smith-Bird v. Blower* [1939] 2 All E.R. 406
   and *Conlon v. Conlons Ltd.* [1952] 2 All E.R. 462. In the former case
B  the client's letter to his solicitor informed him of a fait accompli,
   namely, that he had agreed to sell the property to the plaintiff's agent.
   As Mervyn Davies J. said in the *Getty* case [1985] Q.B. 956, 964:

      "*Smith-Bird v. Blower* . . . is a case simply of a letter written by a
      client to his solicitor being regarded as unprivileged in that the
      letter was not written for the purpose of obtaining legal advice."

C
      Likewise in *Conlon v. Conlons Ltd.* [1952] 2 All E.R. 462, privilege
   was held not to extend to a communication from a client to his solicitor
   authorising him to offer terms of settlement. Morris L.J. said, at p. 466:

      "It is, I think, plain that, if there are professional communications
      between a solicitor and his client of a confidential character for the
D     purpose of getting legal advice, then, in general, there is privilege
      and protection. But that is not the case here. The interrogatories
      are directed to the three letters, and the plaintiff is invited to look
      at the three letters. When those letters are examined a fair and
      reasonable reading of them is: 'My client authorises me to say to
      you that he will accept such and such an amount in settlement.'
      That being so, an inquiry whether the plaintiff did or did not
E     authorise his solicitor to write those letters is not an inquiry as to
      communications passing between the plaintiff and his solicitor
      confidentially. There is no suggestion in this case of asking for the
      disclosure of anything that the solicitors may have said to the
      plaintiff in regard to his claim generally or by way of giving advice
      as to the prospects of the action. The inquiry that is raised is
F     whether the plaintiff did or did not authorise his solicitor to write
      certain letters which state that the plaintiff will accept a certain
      sum."

      A hypothetical instance put in argument by Mr. Burton would be a
   case in which a client going on extended holiday instructed his solicitor
   to collect rents from his tenants. If an issue subsequently arose as to
G  whether the landlord had waived any right to forfeiture, the
   communication of those instructions to his solicitor would be disclosable
   and admissible because there would be no question of their being
   related to the obtaining of legal advice.

      It follows from this analysis that those dicta in the decided cases
   which appear to extend privilege without limit to all solicitor and client
   communication upon matters within the ordinary business of a solicitor
H  and referable to that relationship are too wide. It may be that the broad
   terms used in the earlier cases reflect the restricted range of solicitors'
   activities at the time. Their role then would have been confined for the
   most part to that of lawyer and would not have extended to business

332

adviser or man of affairs. To speak therefore of matters "within the    A
ordinary business of a solicitor" would in practice usually have meant
the giving of advice and assistance of a specifically legal nature. But the
range of assistance given by solicitors to their clients and of activities
carried out on their behalf has greatly broadened in recent times and is
still developing. Hence the need to re-examine the scope of legal
professional privilege and keep it within justifiable bounds.

By contrast, the formulation adopted by Judge Paul Baker and    B
quoted earlier in this judgment is in my view too restrictive. It suggests
that a communication only enjoys privilege if it specifically seeks or
conveys advice. If it does so, it is privileged, notwithstanding it may also
contain "narratives of facts or other statements which in themselves
would not be protected." However, the second half of the judge's
formulation implies that all documents recording information or
transactions with or without instructions or recording meetings lack    C
privilege if they do not specifically contain or seek advice. The passage
cited above from the judgment of Scott J. in *Galadari's* case, 6 October
1986, is to the same effect. In my judgment that formulation is too
narrow. As indicated, whether such documents are privileged or not
must depend on whether they are part of that necessary exchange of
information of which the object is the giving of legal advice as and when
appropriate. Accordingly, I agree with the formulation made by Master    D
Munrow in the present case, subject to the additional words which I
have placed in brackets. He said:

> "Once solicitors are embarked on a conveyancing transaction they
> are employed to ensure that the client steers clear of legal
> difficulties, and communications passing in the handling of that
> transaction are privileged (if their aim is the obtaining of appropriate    E
> legal advice) since the whole handling is experience and legal skill
> in action and a document uttered during the transaction does not
> have to incorporate a specific piece of legal advice to obtain that
> privilege."

Judge Paul Baker applied his more restrictive test to the documents
in the present case. Those documents have been produced to this court.
In the light of the principles stated above, I am of the opinion the    F
defendant's claim that the documents are privileged should have been
upheld.

Accordingly I would allow this appeal.

PARKER L.J.   I agree.

LORD DONALDSON OF LYMINGTON M.R.   I also agree.
                                                                G

*Appeal allowed with costs in Court*
*of Appeal and below.*
*Leave to appeal refused.*

*Solicitors: Hobson Audley & Co.; Howard Kennedy.*

R. C. W.

                                                                H

# DOCUMENTARY EVIDENCE

Fourteenth Edition

**CHARLES HOLLANDER Q.C. M.A. (Cantab.)**
*Brick Court Chambers*
*Temple Chambers, Hong Kong*

SWEET & MAXWELL

 THOMSON REUTERS

Published in 2021 by Thomson Reuters,
trading as Sweet & Maxwell.
Thomson Reuters is registered in England & Wales, Company No.1679046.
Registered Office and address for service:
5 Canada Square, Canary Wharf, London, E14 5AQ.
For further information on our products and services, visit
*http://www.sweetandmaxwell.co.uk.*

Computerset by Sweet & Maxwell.
A CIP catalogue record for this book is available from the British Library.

ISBN (print): 978-0-414-09202-0

ISBN (e-book): 978-0-414-09204-4

ISBN (print and e-book): 978-0-414-09203-7

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the Queen's Printer for Scotland.
All rights reserved. No part of this publication may be reproduced, or
transmitted in any form, or by any means, or stored in any retrieval system of
any nature, without prior written permission, except for permitted fair dealing
under the Copyright, Designs and Patents Act 1988, or in accordance with the
terms of a licence issued by the Copyright Licensing Agency in respect of
photocopying and/or reprographic reproduction. Application for permission for
other use of copyright material, including permission to reproduce extracts in
other published works, should be made to the publishers. Full acknowledgement
of the author, publisher and source must be given.



Thomson Reuters, the Thomson Reuters Logo and Sweet & Maxwell ® are
trademarks of Thomson Reuters.

© 2021 Thomson Reuters

# CHAPTER 13

# Privilege: General Principles

## 1.  WHAT PRIVILEGE INVOLVES

### A.  THE REQUIREMENT OF CONFIDENTIALITY

There can be no privilege unless the communication is confidential[1] but not all confidential communications can be said to be privileged. If, therefore, an otherwise privileged document has entered the public domain there can be no claim for privilege.[2] But in the normal course, communications between solicitor and client will be presumed confidential.[3] If a solicitor sends his client a transcript of a hearing in open court or a copy of a letter sent to the opposing party, there is no relevant confidentiality in that document so no claim for privilege can be made. Similarly, a conversation with a solicitor in the presence of the police is not confidential and not privileged.[4] However, on occasion what is meant by confidentiality is slightly different in relation to privilege from what is meant under the law of confidence and this is discussed in relation to legal advice and litigation privilege in Chapters 17 and 18.

**13-01**

### B.  TWO CATEGORIES OF PRIVILEGE

The two categories of privilege are legal advice privilege and litigation privilege. Legal advice privilege is narrower in ambit but can be claimed more widely. It protects communications between client and lawyer which are part of the continuum of the giving and getting of legal advice. It does not require the existence or contemplation of legal proceedings. Litigation privilege only applies where adversarial proceedings are in reasonable contemplation, but is wider in ambit. It protects communication which come into existence for the dominant purpose of gathering evidence for use in proceedings, and will include communications with third parties if they come into existence for that dominant purpose. These two forms of privilege are considered in detail in Chapters 17 and 18.

**13-02**

In the Court of Appeal in *Three Rivers (No.5)*[5] Lord Phillips MR had suggested that in 2004 it was not easy to see the justification for legal professional privilege outside litigation. He said:

---

[1]  *Glencore International AG v Commissioner of Taxation* [2019] HCA 26, discussed at Ch.12.

[2]  For loss of confidentiality giving rise to loss of privilege see *SL Claimants v Tesco Plc (CMC)* [2019] EWHC 3315 (Ch) at [37], per Hildyard J.

[3]  *Minter v Priest* [1930] A.C. 558 at 581, per Lord Atkin. The solicitor has an obligation to keep the affairs of his client confidential: *Parry-Jones v Law Society* [1969] 1 Ch. 1; [1968] 2 W.L.R. 397; [1968] 1 All E.R. 1775.

[4]  *R. v Braham and Mason* [1976] V.R. 547.

[5]  *Three Rivers DC v Bank of England (No.5)* [2003] EWCA Civ 474; [2003] Q.B. 1556; [2003] 3 W.L.R. 667.

"The justification for litigation privilege is readily understood. Where, however, litigation is not anticipated it is not easy to see why communications with a solicitor should be privileged. Legal advice privilege attaches to matters such as the conveyance of real property or the drawing up of a will. It is not clear why it should. There would seem little reason to fear that, if privilege were not available in such circumstances, communications between lawyer and client would be inhibited. Nearly fifty years have passed since the Law Reform Committee looked at this area. It is perhaps time for it to receive a further review."[6]

The Court of Appeal had suggested that privilege was a privilege "in aid of litigation", owing its public policy justification to the need for a client to be able to act with candour to his lawyer in litigation. When *Three Rivers (No.6)*[7] was heard by the House of Lords, this analysis was rejected. All their lordships recognised that the maintenance of legal advice privilege was as important as litigation privilege, and that the public policy justification, namely of ensuring that those who consult lawyers do so with candour in the knowledge that the lawyer's mouth is "shut forever".[8] Lord Carswell said:

"… the cases establish that, so far from legal advice privilege being an outgrowth and extension of litigation privilege, legal professional privilege is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege …".[9]

## C. Legal Professional Privilege Distinguished from other Objections to Disclosure

**13-03** By contrast to the absolute nature of privilege, in the case of public interest immunity, the balance to be drawn between the different interests is central to the decision whether to require disclosure[10]; and although "without prejudice" privilege is commonly regarded as a form of privilege, it differs from privilege simpliciter in that it is based on a mixture of contract and public policy and cannot in general be waived by one party alone. The privilege against self-incrimination shares with legal professional privilege that it permits a person to decline to give disclosure or to answer questions, and can be waived by the party entitled to the privilege; however, it is not concerned with lawyer-client communications.

## D. Privilege Belongs to the Client

**13-04** The rule is established for the client's benefit, not for the lawyer. Privilege can therefore be waived by the client but not the lawyer.[11] The lawyer is under a professional obligation to assert the privilege until it is waived by the client.[12] Thus, the lawyer has no locus to assert the privilege in his own right or commence proceed-

---

6   *Three Rivers (No.5)* [2003] Q.B. 1556; [2003] 3 W.L.R. 667 at [39].
7   *Three Rivers DC v Bank of England (No.6)* [2004] UKHL 48; [2005] 1 A.C. 610; [2004] 3 W.L.R. 1274.
8   See *Wilson v Rastall* [1792] 4 Durn & E. 753 at 759, per Buller J; 100 E.R. 1283; (1792) 4 Term Rep. 753.
9   *Three Rivers (No.6)* [2004] 3 W.L.R. 1274 at [105].
10  The distinction was pointed out by Scott VC in *Re Barings* [1998] 1 All E.R. 673.
11  *Wilson* 100 E.R. 1283; (1792) 4 Term Rep. 753; cited in *R. v Derby Magistrates Court Ex p. B* [1996] A.C. 487; [1995] 3 W.L.R. 681; [1995] 4 All E.R. 526.
12  *R. v Central Criminal Court Ex p. Francis & Francis (A Firm)* [1989] A.C. 346; [1988] 3 W.L.R. 989; (1989) 88 Cr. App. R. 213 at 383, per Lord Griffiths.

# PRIVILEGE

### FOURTH EDITION

## COLIN PASSMORE
*Senior Partner*
*Simmons & Simmons LLP*

SWEET & MAXWELL

 THOMSON REUTERS

First Edition 1998 (Published by CLP)
Second Edition 2006 (Published by   PL Law))
Third Edition 2013
Fourth Edition 2020

Published in 2020 by Thomson Reuters, trading as Sweet & Maxwell.
Thomson Reuters is registered in England & Wales, Company No. 1679046.
Registered office and address for service:
5 Canada Square, Canary Wharf, London E14 5AQ.

For further information on our products and services, visit *http
www.sweetandmaxwell.co.uk*.

Computerset by Sweet & Maxwell.
Printed and bound in the UK by CPI Group (UK) Ltd, Croydon, CR0 4    .
No natural forests were destroyed to make this product; only farmed timber
was used and replanted.
A CIP catalogue record of this book is available from the British Library.

ISBN: 9780414057531

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the Queen's Printer for Scotland.

All rights reserved. No part of this publication may be reproduced or
transmitted in any form or by any means, or stored in any retrieval system of
any nature, without prior written permission, except for permitted fair dealing
under the Copyright, Designs and Patents Act 1988, or in accordance with the
terms of a licence issued by the Copyright Licensing Agency in respect of
photocopying and or reprographic reproduction. Application for permission for
other use of copyright material, including permission to reproduce extracts in
other published works, should be made to the publishers. Full
acknowledgement of author, publisher and source must be given.

Thomson Reuters, the Thomson Reuters Logo and Sweet & Maxwell     are
trademarks of Thomson Reuters.

2020 Colin Passmore

munication is privileged from disclosure in legal proceedings where it is made "between a person or his patent agent" or "for the purpose of obtaining, or in response to a request for, information which a person is seeking for the purpose of instructing his patent agent", it now provides that: "Where a patent attorney acts for a client in relation to a matter mentioned in subsection (1), any communication, document, material or information to which this section applies is privileged from disclosure in like manner as if the patent attorney had at all material times been acting as the client's solicitor." That seems to bring the impact of *Three Rivers (No.5)* into play in relation to both statutory privileges.

### 5.   ADVICE PRIVILEGE: THIRD PART  COMMUNICATIONS AND LITIGATION PRIVILEGE CONTRASTED

Advice privilege cannot protect from disclosure a communication between either the client or his lawyer and a third party. Communications with third parties are protected only when they are made in respect of litigation.[136] This is because, as the Court of Appeal held in *Wheeler v Le Marchant*[137] in 1881, it is not necessary, in order to enable a person freely to communicate with his lawyer and to obtain legal advice, that any privilege be extended to such communications. As will be seen in Ch.3, different considerations come into play to justify extending privilege to third party communications prepared in connection with litigation.

*Wheeler v Le Marchant* was an action for specific performance of an agreement under which the defendants were to grant a lease of land to the plaintiff upon his constructing certain buildings on the land. The defendants objected to producing documents that consisted of confidential correspondence between their solicitors and their current and former estate agents and surveyors. This correspondence took place at a time where no litigation was in progress or in contemplation, and related to the obtaining of information sought by the solicitors for enabling them the better to advise their clients.

In the Court of Appeal, Sir George Jessel MR rejected the defendants' claim to privilege since it would have resulted in an extension of the protection afforded by the rule:

> "The solicitor, being consulted in a matter as to which no dispute has arisen, thinks he would like to know some further facts before giving his advice, and applies to a surveyor to tell him what the state of a given property is because it is desired or required by the solicitor in order to enable him the better to give legal advice. It appears to me that to give such protection would not only extend the rule beyond what has been previously laid down, but beyond what necessity warrants."[138]

It follows from this decision that under English law,[139] if a client asks his solicitor to engage an expert valuer to advise him whether the asking price of a property

---

[136] As was noted in the previous section at para.2-054, the Court of Appeal in *Three Rivers (No.5)* suggested (with respect, erroneously) that there was less of a temptation for a client to make a clean breast to his legal adviser where there is no litigation in contemplation: [2003] EWCA Civ 474; [2003] Q.B. 1556 at 1579  1580, [26]. Because employees of a company who are not regarded as "the client" because of the *Three Rivers (No.5)* decision just discussed are treated as third parties, then communications with them can be protected where litigation privilege is available.

[137] (1881) 17 Ch D 675.

[138] (1881) 17 Ch D 675 at 682.

[139] As will be explored in Ch.4, the Australian courts have challenged this approach and indeed their jurisprudence so far as concerns the interpretation of *Wheeler v Le Marchant* has developed in a dif-

[220]

which he is contemplating purchasing is a fair one, the valuer's report will not be privileged. The report will therefore be disclosable in any subsequent litigation in which it is relevant because it does not satisfy the essential requirement of having been prepared for the dominant purposes of that (or any other) litigation. But if he is engaged to value that same property following a sale and purchase, because a dispute has arisen between the purchaser and the vendor, then his report, if made for the dominant purpose of that dispute (and otherwise compliant with the requirements of litigation privilege), will be protected. This distinction is worth bearing in mind where, for example, banking or corporate finance solicitors engage external accountants to assist with an ongoing non-contentious transaction, since all too frequently it is not appreciated that the accountants' work is not privileged.

Another decision arising out the collapse of the BCCI banking group in 1991 affords a modern illustration of the *Wheeler* principle. In *Price Waterhouse v BCCI oldings (Luxembourg) SA*,[140] Price Waterhouse partners were members of an investigating committee set up by the BCCI banking group in the months before its collapse in order to report on the recoverability of various loans. The committee's terms of reference required it to report to BCCI's solicitors, to enable them to give legal advice to BCCI. The question arose whether the committee's reports were protected by advice privilege in the hands of Price Waterhouse. Millett J. held that they were not protected: Price Waterhouse the committee was producing material for BCCI and, at BCCI's direction, sending it to their solicitors. Millett J. held that Price Waterhouse's position was no different from that of the surveyors in *Wheeler v Le Marchant*.[141]

*Three Rivers (No.5)*[142] also affords an example of the unavailability of litigation privilege to protect third party communications in the form of internal communications of the employees of the Bank of England made in connection with a private, non-statutory inquiry. As noted, the bank accepted that the nature of the Bingham Inquiry was essentially non-adversarial so that its claim to privilege had to be confined to one made under the advice head, a claim that failed before the Court of Appeal. It does not follow that litigation privilege will be unavailable for communications with third parties made in connection with other types of enquiries, such as under taxation, financial services or companies legislation. Each will depend on their own facts as to whether they have taken on an adversarial character that would justify a claim to litigation privilege. This issue is examined in more detail

---

ferent direction that enables third party communications to come under the umbrella of advice privilege in certain situations. This is particularly so having regard to the decision in *Pratt  old-ings Pty Ltd v Commissioner of Taxation* [2004] FCAFC 122. The Singaporean Court of Appeal has been impressed by the Australian approach to such issues and has likewise signalled an intention to extend advice privilege in certain circumstances to third party communications: see *Skandinaviska Enskilada Banken AB (Publ)  Singapore Branch v Asia Paci  c Breweries (Singapore) PTE Ltd* [2007] 2 S.L.R. 367, discussed in Ch.4, Section 2.

[140] [1992] B.C.L.C. 583.

[141] See also *Great Atlantic Insurance Co v  ome Insurance Co* [1981] 1 W.L.R. 529, where an oral report by an insurance expert made to US attorneys about the results of an insurance business was not privileged because litigation was not at the time in prospect. Accordingly, in the litigation that subsequently resulted, it would have been possible to summons both the expert and the attorney to give evidence about their discussion (although a memorandum written by the attorney to his clients in which he recorded that same discussion was privileged): see per Templeman L.J. at [1981] 1 W.L.R. 529 at 532 and 534.

[142] [2003] EWCA Civ 474; [2003] Q.B. 1556.

[221]

791
[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)

*A*

Court of Appeal

## *\*Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (Law Society intervening)*

### [2018] EWCA Civ 2006

*B*

2018  July 3, 4, 5;        Sir Brian Leveson P, Sir Geoffrey Vos C, McCombe LJ
          Sept 5

*Evidence — Privilege — Legal professional privilege — Documents generated during investigation by company's lawyers and accountants into company's own activities — Serious Fraud Office subsequently commencing criminal investigation into company's activities and seeking production of documents —*

*C*

*Whether documents subject to litigation privilege — Whether Serious Fraud Office investigation to be treated as litigation for purposes of such privilege — Whether reasonable contemplation of such investigation amounting to reasonable contemplation of criminal proceedings — Whether documents subject to legal advice privilege — Scope of client for purposes of legal advice privilege — Criminal Justice Act 1987 (c 38), s 1(3)*

*D*

The defendant company instructed solicitors and forensic accountants to carry out investigations into the possibility that some of its foreign subsidiaries had been involved in public sector bribery and corruption. During the course of those investigations, which lasted some two years, the defendant was in communication with the Serious Fraud Office, whose Self-Reporting Guidelines encouraged companies to self-report cases of overseas corruption with a view to reaching a civil settlement as a means of avoiding prosecution. In due course, the Serious Fraud Office

*E*

commenced a criminal investigation into the defendant's activities, pursuant to section 1(3) of the Criminal Justice Act 1987[1]. As part of that investigation, it issued notices under section 2(3) of the 1987 Act compelling the defendant to produce various documents which had been generated during the defendant's own investigations. The defendant resisted production of those documents on the grounds that they were privileged, contending that the documents were subject either to (i) litigation privilege, in that they had been made with the sole or dominant purpose of conducting adversarial litigation, namely criminal prosecution by the Serious Fraud

*F*

Office, that was in progress or reasonably in contemplation, or (ii) legal advice privilege, in that they were communications which had passed between the defendant and its lawyers, acting in their professional capacity, in connection with the provision of legal advice. On a claim by the Serious Fraud Office, the judge granted a declaration that the documents were not so privileged.

On the defendant's appeal—

*Held*, allowing the appeal in part, (1) that not every manifestation of concern by

*G*

the Serious Fraud Office would properly be regarded as adversarial litigation for the purposes of a claim to litigation privilege, nor did the fact that a criminal investigation by the Serious Fraud Office was reasonably in contemplation necessarily mean that litigation, in the form of a criminal prosecution, was also reasonably contemplated; that, however, where the Serious Fraud Office had specifically made the prospect of its criminal prosecution clear to the putative defendant, and legal advisers had been engaged to deal with that situation, there was a clear basis for concluding that

*H*

criminal prosecution was in reasonable contemplation; that, further, the fact that a putative defendant could not say with certainty that a prosecution was likely did not in itself prevent proceedings being in reasonable contemplation; that, on the facts,

[1] Criminal Justice Act 1987, s 1(3): "The Director may investigate any suspected offence which appears to him on reasonable grounds to involve serious or complex fraud."

© 2019 The Incorporated Council of Law Reporting for England and Wales

792

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**     [2019] 1 WLR

given that the whole subtext of the relationship between the defendant and the Serious Fraud Office had been the possibility, if not the likelihood, of prosecution if the defendant did not report itself to the Serious Fraud Office leading to a civil settlement, a criminal prosecution by the Serious Fraud Office had been reasonably in contemplation at the time when the documents in question had been created; that, further, legal advice given so as to head off, avoid or even settle reasonably contemplated proceedings was as much protected by litigation privilege as advice given for the purpose of resisting or defending such contemplated proceedings; that, on the facts, the documents in question had been brought into existence for the dominant purpose of avoiding or resisting the reasonably contemplated criminal prosecution; and that, accordingly, all the documents for which the defendant claimed litigation privilege were so privileged (post, paras 91–93, 96–101, 102, 112–114, 118–122).

(2) That Court of Appeal authority established that communications between an employee of a corporation and the corporation's lawyers could not attract legal advice privilege unless that employee had been tasked with seeking and receiving such advice on behalf of the corporation; that none of the documents in question contained information that had been communicated to the defendant's solicitor by anyone authorised to seek or receive legal advice on behalf of the defendant or its subsidiaries; and that, accordingly, those documents were not protected by legal advice privilege (post, paras 123, 130, 133, 144).

*Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556, CA followed.

*Per curiam.* Confining legal advice privilege to communications passing between the lawyer and the "client", in the sense of the instructing individual or those employees of a company authorised to seek and receive legal advice on its behalf, puts large corporations in a less advantageous position than individuals or small businesses. The information upon which large corporations seek legal advice is unlikely to be in the hands of the main board of directors or those it appoints to seek and receive legal advice. English law is out of step with the international common law in this respect. It is a classic example of an area where one might expect to see commonality between the laws of common law countries, particularly when so many multinational companies operate across borders and have subsidiaries in numerous common law countries (post, paras 127, 129).

Decision of Andrews J [2017] EWHC 1017 (QB); [2017] 1 WLR 4205 reversed in part.

The following cases are referred to in the judgment of the court:

*AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) EU: C:1982:157; [1983] QB 878; [1983] 3 WLR 17; [1983] 1 All ER 705, ECJ
*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, CA
*Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002] EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140, CA
*Axa Seguros v Allianz Insurance plc* [2011] EWHC 268 (Comm); [2011] Lloyd's Rep IR 544
*B v Auckland District Law Society* [2003] UKPC 38; [2003] 2 AC 736; [2003] 3 WLR 859; [2004] 4 All ER 269, PC
*Bailey v Beagle Management Pty Ltd* [2001] FCA 185
*Baker v Campbell* (1983) 153 CLR 52
*Bilta (UK) Ltd v Royal Bank of Scotland* [2017] EWHC 3535 (Ch); [2018] Lloyd's Rep FC 202
*Comr of Inland Revenue v West-Walker* [1954] NZLR 191
*Citic Pacific Ltd v Secretary for Justice* [2016] 1 HKC 157
*Datec Electronic Holdings Ltd v United Parcels Services Ltd* [2007] UKHL 23; [2007] 1 WLR 1325; [2007] Bus LR 1291; [2007] 4 All ER 765; [2007] 2 All ER (Comm) 1067, HL(E)

© 2019 The Incorporated Council of Law Reporting for England and Wales

A   *Greenough v Gaskell* (1833) 1 My & K 98
   *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison* [1997] 1 Lloyd's
      Rep 160
   *Highgrade Traders Ltd, In re* [1984] BCLC 151
   *Jones v Smith* [1999] 1 SCR 455
   *L (A Minor) (Police Investigation: Privilege), In re* [1997] AC 16; [1996] 2 WLR 395;
      [1996] 2 All ER 78, HL(E)
B   *Lyell v Kennedy* (1884) 27 Ch D 1, CA
   *Newman v Highland School District No 203* (2016) 188 Wn 2d 769
   *Plummers v Debenhams plc* [1986] BCLC 447
   *R v Central Criminal Court, Ex p Francis & Francis* [1989] AC 346; [1988] 3 WLR
      989; [1988] 3 All ER 775; 88 Cr App R 213, HL(E)
   *R v Jukes* [2018] EWCA Crim 176; [2018] Lloyd's Rep FC 157; [2018] 2 Cr App R 9, CA
   *R (Bowen) v Secretary of State for Justice* [2017] EWCA Civ 2181; [2018] 1 WLR
C      2170, CA
   *R (Soma Oil and Gas Holdings Ltd) v Director of the Serious Fraud Office* [2016]
      EWHC 2471 (Admin); [2017] Lloyd's Rep FC 18, DC
   *RBS Rights Litigation, In re* [2016] EWHC 3161 (Ch); [2017] 1 WLR 1991; [2017]
      1 BCLC 726
   *Serious Fraud Office v Rolls-Royce plc* [2017] Lloyd's Rep FC 249
   *Skandinaviska Enskilda Banken AB (Publ); Singapore Branch v Asia Pacific
D      Breweries (Singapore) Pte Ltd* [2007] 2 SLR 367; [2007] SGCA 8
   *Smech Properties Ltd v Runnymede Borough Council* [2016] EWCA Civ 42; [2016]
      JPL 677, CA
   *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, CA
   *Tesco Stores Ltd v Office of Fair Trading* [2012] CAT 6; [2012] Comp AR 188, CAT
   *Three Rivers District Council v Governor and Company of the Bank of England
      (No 5)* [2002] EWHC 2730 (Comm); [2003] CP Rep 34; [2003] EWCA Civ 474;
E      [2003] QB 1556; [2003] 3 WLR 667, CA
   *Three Rivers District Council v Governor and Company of the Bank of England
      (No 6)* [2004] UKHL 48; [2005] 1 AC 610; [2004] 3 WLR 1274; [2005] 4 All ER
      948, HL(E)
   *United States of America v Philip Morris Inc (British American Tobacco
      (Investments) Ltd intervening)* [2003] EWHC 3028 (Comm); [2004] EWCA Civ
      330; [2004] 1 CLC 811, CA
F   *Upjohn Co v United States* (1981) 449 US 383
   *Ventouris v Mountain* [1991] 1 WLR 607; [1991] 3 All ER 472; [1991] 1 Lloyd's Rep
      441, CA
   *Waugh v British Railways Board* [1980] AC 521; [1979] 3 WLR 150; [1979] 2 All ER
      1169, HL(E)
   *Westminster International BV v Dornoch Ltd BV* [2009] EWCA Civ 1323, CA
   *Wheeler v Le Marchant* (1881) 17 Ch D 675, CA
G
   The following additional cases were cited in argument:

   *AB v Ministry of Justice* [2014] EWHC 1847 (QB)
   *Astex Therapeutics v Astrazeneca AB* [2016] EWHC 2759 (Ch)
   *Esso Australia Resources Ltd v Federal Comr of Taxation* [1999] HCA 67; 201 CLR
      49
H   *National Westminster Bank plc v Rabobank Nederland* [2006] EHWC 2332
      (Comm)
   *Pratt Holdings Pty Ltd v Comr of Taxation* [2004] 136 FCR 357
   *Starbev GP v Interbrew Central European Holdings BV* [2013] EWHC 4038
      (Comm)
   *Visx v Nidex Co Ltd* [1999] FSR 91

© 2019 The Incorporated Council of Law Reporting for England and Wales

794

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Airey v Ireland* CE:ECHR:1979:1009JUD000628973; 2 EHRR 305
*Campbell v United Kingdom* CE:ECHR:1992:0325JUD001359088; 15 EHRR 137
*Derby v Weldon (No 10)* [1991] 1 WLR 660; [1991] 2 All ER 908
*Foxley v United Kingdom* CE:ECHR:2000:0620JUD003327496; 31 EHRR 25
*General Accident Assurance Co v Chrusz* (unreported) 14 September 1999, Court of
    Appeal for Ontario
*Hashman v United Kingdom* CE:ECHR:1999:1125JUD002559494; 30 EHRR 241,
    GC
*Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20; [1997]
    3 WLR 95; [1997] ICR 606; [1997] 3 All ER 1, HL(E)
*Michaud v France* CE:ECHR:2012:1206JUD001232311; 59 EHRR 9
*Minster v Priest* [1929] 1 KB 655, CA
*Pratt Holdings v Comr of Taxation* [2003] FCA 6
*Property Alliance Group Ltd v Royal Bank of Scotland plc (No 2)* [2015] EWHC
    3187 (Ch); [2016] 1 WLR 992
*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995]
    4 All ER 526; [1996] 1 Cr App R 385; [1996] 1 FLR 513, HL(E)
*R v Manchester Crown Court, Ex p Rogers* [1999] 1 WLR 832; [1999] 4 All ER 35;
    [1999] 2 Cr App R 267, DC
*R v Secretary of State for the Home Department, Ex p Anderson* [1984] QB 778;
    [1984] 2 WLR 725; [1984] 1 All ER 920, DC
*R v Secretary of State for the Home Department, Ex p Leech* [1994] QB 198; [1993]
    3 WLR 1125; [1993] 4 All ER 539, CA
*R (Daly) v Secretary of State for the Home Department* [2001] UKHL 26; [2001]
    2 AC 532; [2001] 2 WLR 1622; [2001] 3 All ER 433, HL(E)
*R (Medical Justice) v Secretary of State for the Home Department* [2011] EWCA Civ
    1710, CA
*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21;
    [2003] 1 AC 563; [2002] 2 WLR 1299; [2002] 3 All ER 1; [2002] STC 786,
    HL(E)
*R (Unison) v Lord Chancellor* [2017] UKSC 51; [2017] 3 WLR 409; [2017] ICR
    1037; [2017] 4 All ER 903, SC(E)
*Reis v CIBC Mortgages Inc* (unreported) 18 April 2011, Superior Court of Justice for
    Ontario
*Unilever plc v The Proctor & Gamble Co* [2000] 1 WLR 2436; [2001] 1 All ER 783,
    CA

**APPEAL** from Andrews J

By a Part 8 claim form the claimant, the Director of the Serious Fraud Office, sought a declaration that certain documents generated during investigations undertaken between 2011 and 2013 by solicitors and forensic accountants into the activities of the defendant, Eurasian Natural Resources Corpn Ltd, and its subsidiaries, were not subject to legal professional privilege. By a decision dated May 8 2017, Andrews J [2017] EWHC 1017 (QB); [2017] 1 WLR 4205 allowed the claim, holding that (1) a criminal investigation by the Serious Fraud Office was not to be treated as adversarial litigation for the purposes of a claim to litigation privilege; (2) litigation privilege did not extend to third party documents that had been created in order to obtain legal advice as to how best to avoid contemplated litigation; and (3) where the party asserting privilege was a corporate entity, legal advice privilege attached only to communications between the entity's lawyer and those individuals who were authorised as the entity's agent to

© 2019 The Incorporated Council of Law Reporting for England and Wales

**101**

A   communicate with the lawyer for the purpose of obtaining legal advice on that entity's behalf. The trial judge found accordingly that all but five of the defendant's documents were not privileged.

By an appellant's notice filed on 30 May 2017 the defendant appealed on the grounds that: (1) the judge had wrongly interpreted the ratio of *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556 as to what kinds of documents could be the subject of legal advice privilege; (2) the judge ought to have regarded certain of the documents as privileged as lawyers' working papers; (3) the judge had wrongly held that no criminal prosecution was reasonably in contemplation; (4) none of the documents had been created with the sole or dominant purpose of defending anticipated criminal proceedings; and (5) on the facts, the judge had been wrong to hold that the documents had been created on the understanding that they would be provided to the claimant.

By a respondent's notice, the claimant submitted that: (1), even if *Three Rivers District Council* were to be interpreted as the defendant claimed, it was now well established that legal advice privilege could only be established where the dominant purpose of the communication was to obtain legal advice, which was not the case here, since the solicitors' primary engagement was to undertake an investigation into the facts; and (2) in relation to litigation privilege, the judge had been justified to reach her decision on the facts of the case.

The facts are stated in the judgment of the court, *post*, paras 5–44.

*Bankim Thanki QC*, *Tamara Oppenheimer* and *Rebecca Loveridge* (instructed by *Hogan Lovells International llp*) for the defendant.

*Jonathan Fisher QC*, *James Segan* and *Eesvan Krishnan* (instructed by *Eversheds Sutherland llp*) for the Serious Fraud Office.

*Dinah Rose QC* and *David Pievsky* (instructed by *Reed Smith llp*) for the Law Society, intervening.

The court took time for consideration.

5 September 2018. **SIR GEOFFREY VOS C** handed down the following judgment of the court.

*Introduction*

1   This appeal raises important issues as to the proper scope of legal professional privilege. The defendant, Eurasian Natural Resources Corporation Ltd ("ENRC"), had asserted that certain documents generated during investigations into its activities by its solicitors and forensic accountants ("the Documents") were the subject of legal advice privilege and/or litigation privilege. The Documents related to fraudulent practices allegedly committed in Kazakhstan and Africa, which had been notified to ENRC by a whistle-blower, and included notes made by ENRC's outside solicitors of some 184 interviews (including with its current and former employees). The Director ("the Director") of the Serious Fraud Office ("the SFO") claimed declarations that the Documents were *not* the subject of legal professional privilege. Andrews J essentially granted the declarations sought.

© 2019 The Incorporated Council of Law Reporting for England and Wales

796
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**    [2019] 1 WLR

**2**  ENRC submitted that Andrews J was wrong because she misinterpreted the Court of Appeal's decision in *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556 ("*Three Rivers (No 5)*") as to the kind of documents that could be the subject of legal advice privilege.  She ought not to have held that communications with a client for these purposes were only those with an employee who was specifically tasked to seek and obtain legal advice.  Instead, the judge ought to have held that, to attract legal advice privilege, all that was necessary was that the employee in question was authorised by the client to provide the information to the company's lawyer.  The ratio decidendi of *Three Rivers (No 5)* was that only communications between client and lawyer were privileged.  It was not necessary for the Court of Appeal there to decide which representatives of the client could claim privilege, because the client was the Bingham Inquiry Unit, not the Bank of England itself.  The dicta concerning employees in *Three Rivers (No 5)* were, therefore, obiter.  In any event, ENRC submitted that the judge ought to have regarded certain of the Documents as privileged as lawyers' working papers.  The SFO submitted in response that, even if *Three Rivers (No 5)* were to be interpreted as ENRC claimed, it was now well established that legal advice privilege could only be established where the dominant purpose of the communication was to obtain legal advice, which was not the case here, since the solicitors' primary engagement was to undertake an investigation into the facts.

**3**  In relation to litigation privilege, ENRC argued that the judge wrongly held that (i) no criminal prosecution was reasonably in contemplation[1*] and (ii) none of the Documents was created with the sole or dominant purpose of defending anticipated criminal proceedings.  On the facts, the judge was also wrong to hold that the Documents had been created on the understanding that they would be provided to the SFO.  The SFO, on the other hand, contended that the judge's conclusions were amply justified on the facts.

**4**  We will return to these arguments below.  It is first necessary to set out some of the factual background, which is important because ENRC ultimately contests the judge's approach to the evidence and contemporaneous documents.

*Factual background*

**5**  ENRC is a company incorporated under the laws of England and Wales.  It is part of a multinational group of companies operating in the mining and natural resources sector.  It was a public limited company until 14 January 2014, and a FTSE-100 listed company between 2007 and 2013.  Until 2009/2010, its principal operations were carried out through a wholly-owned subsidiary, Sokolov-Sarbai Mining Production Association ("SSGPO"), in Kazakhstan.  At the same time, it was diversifying its operations through acquisitions of companies operating in various parts of Africa.  It is undoubted that ENRC and its subsidiaries operated in countries perceived as being high risk in terms of public sector bribery and corruption:

---

\* *Reporter's note.*  The superior figures in the text refer to notes which can be found at the end of the judgment of the court on p 844.

© 2019 The Incorporated Council of Law Reporting for England and Wales

**103**

see *R (Soma Oil and Gas Holdings Ltd) v Director of the Serious Fraud Office* [2017] Lloyd's Rep FC 18, paras 4–5, per Gross LJ.

6    The SFO was constituted under section 1(1) of the Criminal Justice Act 1987 ("CJA 1987"). Its functions include the investigation and prosecution of crimes involving serious or complex fraud, domestic and overseas bribery and corruption. Section 1(3) of the CJA 1987 allows the SFO to investigate any suspected offence which appears to the Director on reasonable grounds to involve serious or complex fraud. Section 2(4) allows the Director to require production of any specified documents which appear to him to relate to an investigation he is undertaking, and section 2(9) allows the person under investigation to refuse to disclose documents on the grounds of legal professional privilege.

7    In 2009/2010, ENRC became aware of allegations of criminality on the part of certain African companies that it was seeking to acquire. In particular, its mid-2010 acquisition of a company called Camrose Resources Ltd ("Camrose") gave rise to litigation (which has since settled) with a Canadian company, First Quantum Minerals ("FQM"). FQM alleged that a copper mine had been unlawfully appropriated by the government of the African country in question and sold to a company allegedly linked to a friend of that country's President. The buyer had then procured the sale of that company to ENRC as part of the Camrose deal. It was ENRC's recorded view in August 2010 that those allegations were "in large part unsubstantiated, but bearing in mind the low threshold for suspicion it is not possible to discount them completely".

8    On 20 December 2010, ENRC received an e-mail from an apparent whistle-blower alleging corruption and financial wrongdoing within SSGPO ("the whistle-blower e-mail"). Having brought the whistle-blower e-mail to the attention of ENRC's board of directors, ENRC's audit committee engaged DLA Piper United Kingdom llp ("DLA Piper") to investigate the allegations it contained. The investigation was headed by Mr Neil Gerrard ("Mr Gerrard"), who was at the time DLA Piper's head of litigation.

9    On 15 March 2011, ENRC's then general counsel Mr Randal Barker ("Mr Barker") e-mailed one of the company's non-executive directors, saying:

"I think you and the other members of the Audit Committee need to be careful not to be too bullish about regulatory risk, especially . . . given where we are reputationally post-Camrose (I can sense from GC 100 [an association of 100 large companies' general counsel] meetings with the MoJ and the SFO that we are firmly on the radar and I expect an investigation in due course, which is why I have upgraded our dawn raid procedures recently)."

10    On 8 April 2011, there were media reports that Mr Eric Joyce MP had written to the SFO, asking it to investigate ENRC and whether it had adequate procedures to prevent bribery in connection with its acquisition of Camrose. His essential complaint was that ENRC should have asked more questions about the Camrose deal.

11    On 17 April 2011, ENRC's head of compliance Mr Cary Depel ("Mr Depel") wrote an internal e-mail to colleagues, in which he said: "I predict a sh!tstorm [sic] and a [SFO] dawn raid . . . before summer's over . . . the company's 'books and records' will be a [first] port of call."

© 2019 The Incorporated Council of Law Reporting for England and Wales

798
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

That e-mail was forwarded to ENRC's chief executive officer, and also to Mr Barker, who commented that Mr Depel was "fundamentally correct—we need to be prepared".

12  Around the same time, ENRC instructed Forensic Risk Alliance ("FRA"), a firm of forensic accountants, to undertake a books and records review. The review, which was led by FRA's co-founder Mr Toby Duthie ("Mr Duthie"), began on 12 May 2011. According to the witness statements of Mr Duthie and ENRC's solicitor Mr Daniel James Spendlove ("Mr Spendlove"), its main purpose was to identify and address issues within ENRC's accounting records that might have exposed the company to liability under bribery and corruption legislation or the Companies Act 2006, and its secondary purpose was compliance related, namely to assist Jones Day with the legal advice that it was providing to ENRC on its compliance programme. It will be seen that the judge did not accept this evidence, and considered that the review was commissioned primarily for compliance purposes.

13  On 21 April 2011, Mr Gerrard wrote a letter to Mr Barker, in response to a request to provide a written advice "in order to ensure that all possible practical steps are taken to maintain legal professional privilege over documents and communications created in relation to this investigation". That letter, in so far as is relevant and not covered by legal advice privilege, said:

> "The internal investigation at SSGPO relates to conduct that is potentially criminal in nature. Adversarial proceedings may occur out of the internal investigation and, in our view, both criminal and civil proceedings can be reasonably said to be in contemplation. There is a possibility that this view may be challenged by third parties in the future, but if this is accepted, litigation privilege will apply."

14  On 23 April 2011, Mr Gerrard left DLA Piper to join Dechert llp ("Dechert"), and the ENRC investigation transferred with him.

15  By summer 2011, FRA's scope of work had expanded, in that it was now providing support for Dechert's investigations into SSGPO and Africa (including data gathering and hosting) as well as reviewing ENRC's books and records. On 15 July 2011, FRA was formally instructed by Dechert, by means of a letter which said:

> "We would remind you that we believe litigation to be in reasonable contemplation and as a result litigation privilege applies to the work we have asked you to undertake. Should you be contacted by any party regarding this matter, we would ask you to assert this position robustly and contact us immediately . . ."

16  On 9 August 2011, *The Times* published an article referring to the specific allegations that had been made in the whistle-blower e-mail.

17  On 10 August 2011, Mr Keith McCarthy ("Mr McCarthy"), Chief Investigator of the SFO, wrote to Mr Beat Ehrensberger ("Mr Ehrensberger"), who had by this time replaced Mr Barker as ENRC's general counsel. His letter referred to a recent discussion between himself and Mr Richard Alderman ("Mr Alderman"), then the Director, about "recent intelligence & media reports concerning allegations of corruption and wrongdoing by [ENRC]". It urged ENRC to consider carefully the SFO's 21 July 2009 Self-

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    reporting Guidelines "Approach of the Serious Fraud Office to dealing with overseas corruption" ("the Guidelines") whilst undertaking its internal investigations, and invited Mr Ehrensberger to meet with the SFO further to discuss matters. It also said that Mr McCarthy and Mr Alderman "would like to discuss with you, at this office, ENRC's governance and compliance programme and its response to the allegations as reported". Mr McCarthy concluded by saying that the SFO was not carrying out a criminal
B    investigation into ENRC at that stage.

18    It is worthwhile interposing some salient aspects of the Guidelines as follows:

"Discussions with business and professional advisers have revealed a lot of interest in a system of self reporting cases of overseas corruption to us. We have been asked for any additional guidance we can give with
C    respect to our policies on this and in particular on the benefits to be obtained from self reporting.

"As will be seen from this Guide, the benefit to the corporate will be the prospect (in appropriate cases) of a civil rather than a criminal outcome as well as the opportunity to manage, with us, the issues and any publicity proactively. The corporate will be seen to have acted responsibly by the
D    wider community in taking action to remedy what has happened in the past and to have moved on to a new and better corporate culture."

"The term 'corporate' is used in this Guide for convenience. As the context requires, it can refer to the group, a UK company or an overseas subsidiary. It is not to be construed restrictively . . .

"2. A key question for *the corporate and its advisers* will be the timing
E    of an approach to us. We appreciate that a corporate will not want to approach us unless it had decided, following *advice and a degree of investigation by its professional advisers*, that there is a real issue and that remedial action is necessary. There may also be *earlier engagement between the advisers and us* in order to obtain an early indication where appropriate (and subject to a detailed review of the facts) of our approach. We would find that helpful but we appreciate that this is *for*
F    *the corporate and its advisers to consider*. We would also take the view that the timing of an approach to the US Department of Justice is also relevant. If the case is also within our jurisdiction we would expect to be notified at the same time as the DoJ.

"3. [The SFO, when contacted about these issues,] will assume that *the corporate's professional advisers are familiar with this Guide* and our
G    approach.

"4. Very soon after the self report and the acknowledgement of a problem we will want to establish the following:

"• is the Board of the corporate genuinely committed to resolving the issue and moving to a better corporate culture?

"• is the corporate prepared to work with us on the scope and handling of any additional investigation we consider to be
H    necessary?

"• at the end of the investigation (and assuming acknowledgement of a problem) will the corporate be prepared to discuss resolution of the issue on the basis, for example, of restitution through civil recovery, a programme of training and culture change, appropriate

© 2019 The Incorporated Council of Law Reporting for England and Wales

800

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**    [2019] 1 WLR

action where necessary against individuals and at least in some    *A*
cases external monitoring in a proportionate manner?

"• does the corporate understand that any resolution must satisfy the public interest and must be transparent? This will almost invariably involve a public statement although the terms of this will be discussed and agreed by the corporate and us.

"• will the corporate want us, where possible, to work with regulators    *B*
and criminal enforcement authorities, both in the UK and abroad, in order to reach a global settlement?

"5. A very important issue for the corporate will be whether the SFO would be looking for a criminal or a civil outcome. Without knowing the facts, no prosecutor can ever give an unconditional guarantee that there will not be a prosecution of the corporate. Nevertheless, we want to settle self referral cases that satisfy para 4 civilly wherever possible. An    *C*
exception to this would be if board members of the corporate had engaged personally in the corrupt activities, particularly if they had derived personal benefit from this. In those cases we would, in fact, be likely to commence our own criminal investigation. *Professional advisers will have a key role here* because of their knowledge of our approach. We shall look at the public interest in each case. We would in those    *D*
circumstances be looking for co-operation from the corporate and would be prepared to enter into plea negotiation discussions within the context of the Attorney General's Framework for Plea Negotiations."

"10. Subject to what has been said in paras 8 and 9, the discussions with the SFO will be confidential. Any information received by us will be regarded as information acquired for the purposes of our powers under the Criminal Justice Act 1987 and therefore only to be used in accordance    *E*
with that Act.

"*The investigation*

"11. If both sides are satisfied with the answers to the issues in paragraph 4 above, then we will discuss the scope of any further investigation needed. Wherever possible, *this investigation will be carried out by the corporate's professional advisers*. This will be at the    *F*
expense of the corporate. We undertake to look at this in a proportionate manner and to have regard, where appropriate, to the cost to the corporate and the impact on the corporate's business.

"12. We appreciate that document recovery and analysis will be a very significant issue in any investigation. Electronic searches will be needed. *We are able to discuss the methodology for this with the corporate and its advisers* to ensure that the cost is proportionate to the amount and    *G*
seriousness of the issues reported. We shall also be prepared to discuss the steps taken by the corporate and its advisers to ensure that material (and, in particular, electronic material) is preserved.

"13. We will also want to be involved in regular update discussions concerning the progress of any further investigation."

"*What happens if there is no self referral*

"24. Self referral together with action by the corporate to remedy the    *H*
problem of corruption will reduce the likelihood that we may discover the corruption ourselves through other means. If this happens we would regard the failure to self report as a negative factor. The prospects of a criminal investigation followed by prosecution and a confiscation order

© 2019 The Incorporated Council of Law Reporting for England and Wales

**107**

A      are much greater, particularly if the corporate was aware of the problem and had decided not to self report.

"25. Corporates will need to be aware of the length and expense of an investigation by the SFO . . . *Professional advisers will need to advise their corporate clients about the impact of these investigations.* There is also a serious prospect that we will learn about the corruption issue from another agency . . . We will assume in those circumstances that the corporate has chosen not to self report. The chances of a criminal investigation leading to prosecution are therefore high." (Emphasis added.)

B

19    It is worth noting the numerous references in these passages in the Guidelines to the "corporate's" professional advisers. It was plainly envisaged by the Guidelines that the company considering self-reporting to the SFO would be in receipt of professional legal advice, both before and during the process. This, in our judgment, is an important aspect of the factual background.

C

20    On 19 August 2011, Mr Ehrensberger wrote to the SFO, in response to its 10 August 2011 letter, accepting the SFO's invitation to meet. He said that he was happy to discuss ENRC's governance and compliance programme and its response to the allegations reported in the press, that ENRC understood the merits of self-reporting, and that he looked forward to discussing the topic with the SFO at the meeting.

D

21    On 22 September 2011, Jones Day advised ENRC in a memorandum that :"There are therefore significant risks inherent in engaging in the voluntary disclosure regime including the loss of privilege and confidentiality in the documents that must be provided to the SFO as part of the process." This was one of several pieces of new evidence admitted by us (without objection) during the hearing.

E

22    The first meeting between ENRC and the SFO took place on 3 October 2011. Mr Alderman and Mr McCarthy attended for the SFO. Mr Gerrard of Dechert, Mr Sion Richards ("Mr Richards") of Jones Day and Mr Ehrensberger attended for ENRC. Mr McCarthy's minutes of the meeting recorded that:

F

"INTRODUCTION"

"The SFO could give no assurance that it would not undertake enforcement action and that ENRC should take the matter very seriously.

"ENRC COMMENTS

"[Mr Ehrensberger] stated that ENRC had taken the letter from SFO very seriously and that the Board were keen to ensure that as a Company they are fully compliant and that governance is properly applied across the group . . .

G

"A full risk assessment was being pursued, covering a range of different countries that ENRC was involved in. Interviews with staff on 'the ground' are being pursued to understand how all aspects of the business work.

H

"The SFO made the point that intelligence and information suggested that the company indicated the production of false statements and paperwork generally. The SFO stressed that the company needed to show that there was a commitment to get behind the documents and to satisfy the SFO that the company had 'adequate procedures'."

© 2019 The Incorporated Council of Law Reporting for England and Wales

*A*

"The SFO invited [Mr Gerrard] to explain his role.  [Mr Gerrard] confirmed that he was appointed by the Audit Committee [of ENRC] as part of their investigative policy . . .

"A forensic analysis is taking place.  They were reviewing a number of e-mails and DPA issues in Kazakhstan.  They had been undertaking interviews and [Mr Gerrard] was looking to close inquiries in November. He will report to the company around his findings and the company were concerned about what exactly the SFO were worried about and where its focus was centred.  The SFO confirmed that it would not be advising the company.  The company needed to satisfy the SFO that it has adequate procedures and were invited to make a disclosure at its earliest point."

*B*

"The SFO will be proportionate and will need to speak with the company or its advisers on how we will get to the next level, once the Company Board have considered the issues.

*C*

"CONCLUSION

"The SFO made no assurances to the company that it would not take any other enforcement action.

"The SFO made it clear that if the company were to make a self-disclosure it would be able to manage its discussion with the US Department of Justice.  The company would need to consider how it would deal with any issue that it discovered that may have an impact on its FCPA obligations.

*D*

"The company representatives were invited to present the position to the Board and to respond to the SFO with recommendations to take the matter forward."

23   It may be noted that ENRC had not at that stage decided that it would self-report under the Guidelines.  It was continuing its investigations.

*E*

24   On 7 October 2011, Mr McCarthy e-mailed Mr Alderman saying that he had just spoken to Mr Gerrard, who had said that ENRC (through him) would make a voluntary disclosure the following week.  That, in fact, never happened.

25   On 9 November 2011, Mr Ehrensberger wrote to Mr Alderman and Mr McCarthy, informing them that he had met the previous day with ENRC's board of directors to seek their approval to (i) conduct further reviews of ENRC's operations and (ii) engage with the SFO regarding the results of those reviews, and that the board had been entirely supportive of his proposal.

*F*

26   On 30 November 2011, ENRC met again with the SFO.  The meeting was attended by Mr Ehrensberger, Mr Gerrard of Dechert and Mr Richards of Jones Day for ENRC, and Mr Alderman, case manager Mr Mark Thompson ("Mr Thompson") and case lawyer Ms Hannah von Dadelszen ("Ms von Dadelszen") for the SFO.  Ms von Dadelszen's meeting note of the following day recorded that:

*G*

"[Mr Gerrard] said that ENRC have literally an army of advisers on bribery act systems and procedures.  The tests that have been undertaken on those systems have raised red flags.  The company are keen to tackle the issue and be full and frank."

*H*

"It was agreed that [Mr Gerrard] would meet with [Mr Thompson] and [Ms von Dadelszen] in December 2011 to discuss the scope of the review.

© 2019 The Incorporated Council of Law Reporting for England and Wales

**109**

"[Mr Alderman] appreciated that there were cultural issues within the company's business. Those issues could be discussed. After [the meeting in December 2011] we would then have another meeting to track progress with the red flags.

"It was agreed that [Mr Gerrard] is the contact point [with the SFO]. [Mr Gerrard] confirmed that the investigation had been going for some months now. Phase 1 has been a books and records review. This has been done in Africa, the UK and Switzerland. Phase 2 will be a deeper review. FRA will help with that review.

"[Mr Gerrard] said the specific work being done in Kazakhstan concerned an allegation from a whistle-blower regarding SSGPO (a subsidiary). A large number of people are alleged to be involved. It is a corruption and fraud allegation. [Mr Gerrard] has not seen any substantive evidence confirming the allegations yet . . ."

27   The third meeting between ENRC and the SFO took place on 20 December 2011, and was attended by Mr Ehrensberger, Mr Gerrard and Mr Richards for ENRC, and Mr Thompson and Ms von Dadelszen for the SFO. By this time, some 20 of Dechert's interviews with ENRC staff had already taken place. Ms von Dadelszen's meeting note of 23 December 2011 recorded that:

"[Mr Ehrensberger] made the following comments:
"• A board meeting was held on 9 December 2011;
"• Anti-corruption issues are a real focus of the board;
"• [Mr Ehrensberger] has been given a mandate to disclose [to the SFO] anything he feels appropriate."
"Dick Gould [of the SFO ('Mr Gould')] then joined the meeting.
"[Mr Gould] advised that timescales are very important and the onus is on the company to supply the relevant information.
"[Mr Gerrard] was confident of 'having something' within a month or two."
"[Ms von Dadelszen] said the SFO would want something in writing. Perhaps by the end of February [2012].
"[Mr Gerrard] said we have to find out what the issues are first. Can't currently put anything into writing.
"[Mr Gould] suggested that the company put together a presentation for the end of February.
"[Mr Gerrard] agreed and said a presentation would be fine. Will deal with investigation review, the plan, milestones, interviews and a timetable going forward . . ."

28   On 5 March 2012, Mr Gerrard and Mr Ehrensberger again met with the SFO. Using a 21-page PowerPoint presentation, Mr Gerrard informed the SFO of the status, current results and future timetable of Dechert's investigations. The presentation concluded that the next meeting between ENRC and the SFO was to be a "progress report" in May 2012.

29   That (fifth) meeting took place on 10 May 2012, and was attended by Mr Mehmet Dalman ("Mr Dalman"), who had recently been appointed Chairman of ENRC, Mr Gerrard, and Messrs Thompson and Gould for the SFO. Mr Thompson's meeting note recorded that Mr Dalman informed the SFO of the ENRC board's commitment to transparency, co-operation and

openness, to which end he had taken personal charge of the investigation work. Mr Thompson expressed concern that progress had been slow and that nothing substantive had yet been reported by ENRC to the SFO.

30  In early June 2012, Mr Thompson followed up this concern by requesting a further progress update meeting with ENRC. That meeting took place on 18 June 2012, and was attended by ENRC's deputy general counsel Mr Simon Zinger ("Mr Zinger"), Mr Gerrard, and Messrs Thompson and Gould for the SFO. Mr Thompson's meeting note of the same day recorded that:

> "[Mr Thompson] said he had concerns because it was the middle of June and no substantive report had been made. If the investigation had stalled or been obstructed this would be regarded very negatively. For a civil settlement to be entertained, it was essential that the investigation findings were disclosed in the near future . . ."
>
> "[Mr Gould] said that the process had already taken too long and if [Mr Gerrard's] investigation was being restricted in scope then the inevitable outcome would be a recommendation that a criminal investigation be commenced by the SFO . . .
>
> "[Mr Gould] also said that ENRC should consider submitting a proposal for the disposal of the case by way of settlement when they finalise their report . . .
>
> "[Mr Gerrard] then outlined progress made in respect of the Kazakhstan investigation . . . [He] said that progress had been good and they had almost finished . . .
>
> "In respect of Africa, [Mr Gerrard] said that progress had been limited . . . there were problems with the company's fragmented IT architecture . . .
>
> "[Mr Thompson] asked further questions about the progress of the work. [Mr Gerrard] said that he was now reporting to the Special Investigation Committee and that Jones Day were no longer involved. The committee comprises . . . Mr Dalman, Terence Wilkinson (senior independent director) [('Mr Wilkinson')] and [Mr Ehrensberger]. [Mr Gerrard] is going to suggest that [Mr Zinger] replaces [Mr Ehrensberger].
>
> "There was a discussion about the next steps and the timetable to be adopted. [Mr Gerrard] said that he felt that this was still a case where a settlement could sensibly be reached . . ."

31  On 20 July 2012, there was a further meeting between ENRC (Mr Dalman, Mr Wilkinson, Mr Zinger, Mr Gerrard and Mr Duthie) and the SFO (Mr Thompson and Mr Gould). Mr Gerrard gave a detailed update on the progress of his investigations, with reference to a 61-page PowerPoint presentation. That presentation set out ENRC's "investigation team", which by this time included Mr Alasdair Simpson ("Mr Simpson") of Addleshaw Goddard llp ("Addleshaws") as "special adviser" to the Special Investigation Committee. It explained that, in relation to the Kazakhstan investigation, 80 employees had so far been interviewed, and 522,361 electronic documents and 89 lever arch files of hard copy documents reviewed. It also set out the scope and timetable of the Africa investigation, and confirmed that FRA's books and records review was in the final stages. Finally, it emphasised ENRC's "commitment to [a] full and frank process".

© 2019 The Incorporated Council of Law Reporting for England and Wales

32   On 9 October 2012, the SFO withdrew the Guidelines and changed its approach to corporate self-reports.  The new guidelines included the statement that "All supporting evidence including, but not limited to e-mails, banking evidence and witness accounts, must be provided to the SFO's Intelligence Unit as part of the self-reporting process".  The judge described the change, at para 23 of her judgment, as moving "the focus back towards the role of the SFO as a prosecutor, reflecting a policy shift by the incoming Director of the SFO, David Green QC".

33   The next meeting between ENRC and the SFO took place on 28 November 2012, and was attended (amongst others) by Mr Dalman, Mr Gerrard, Mr Duthie, Mr Simpson and Mr Thompson.  Mr Gerrard gave a further progress update with the aid of a PowerPoint presentation.  That presentation stated ENRC's "commitment to full transparency", that ENRC was "fully committed to 'doing the right thing' ", ENRC's "commitment to [a] full and frank process", and that Dechert would "report fully to the SFO in due course".  It concluded by again affirming ENRC's "continued commitment to [a] full and frank process".

34   On 12 December 2012, Dechert wrote a letter to Mr Gould saying that:

"As you are aware we have prepared a draft report regarding our investigation into SSGPO, a subsidiary of ENRC.

"ENRC entered into a corporate self-report process with the SFO under:

"● *the Attorney General's Guidelines on Plea Discussions in Cases of Serious or Complex Fraud* dated 18 March 2009; and

"● *the Approach of the Serious Fraud Office to Dealing with Overseas Corruption* dated 21 July 2009.

"We note that the SFO restated its approach to corporate self-reports on 9 October 2012 . . .

"Given the restatement, we would like confirmation that ENRC is still part of the corporate self-reporting process prior to Dechert submitting our report on SSGPO.  Any report submitted by Dechert to the SFO will be submitted under a limited waiver of legal professional privilege for the purposes of the corporate self report only.

"Should an equitable settlement not be reached between the SFO and ENRC, please confirm that it is accepted that the report will not be used by the SFO as evidence of any wrongdoing or in any criminal proceedings against either ENRC, any subsidiary of ENRC or any employee or director of ENRC or its subsidiaries."

That was the first time that ENRC or its advisers had expressly said to the SFO that they considered ENRC to be in a self-reporting process, and also the first mention to the SFO of legal professional privilege.  The SFO submitted, in relation to this document, that it was clear at some point between 2011 and 2012 that self-reporting was actually taking place, and that nobody would have dreamt at that stage that ENRC would refuse to disclose its interview notes to the SFO.

35   On 21 January 2013, Mr Patrick Rappo ("Mr Rappo"), the SFO's head of Bribery and Corruption Business Area, replied to Mr Gerrard.  He said that the SFO did not consider that ENRC had entered the self-reporting process, because the company had not yet made any report of wrongdoing.

© 2019 The Incorporated Council of Law Reporting for England and Wales

806
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

In relation to ENRC's claim to privilege and the way in which the SFO    *A*
intended to use the Dechert report, he said the following:

> "It is a matter for ENRC and its legal advisers as to which, if any,
> elements of the reports are covered by [legal professional privilege], and
> whether they waive any privilege that may attach.
>
> "However please be aware that in assessing whether a company has
> adopted 'a genuinely proactive approach' the Guidance on Corporate    *B*
> Prosecutions states that 'the prosecutor needs to establish whether
> sufficient information about the operation of the company in its entirety
> has been supplied . . . This will include making witnesses available and
> disclosure of the details of any internal investigation'.
>
> "In light of the fact that we have not seen these reports, no assurances
> can or will be given . . . that we accept [they are] subject to [legal
> professional privilege] . . .    *C*
>
> "No assurances can or will be given at this stage as to what use the SFO
> will make of any report that may be provided to it.
>
> "The SFO cannot and will not give any assurance in relation to
> underlying material, or evidence, upon which the reports are based, or
> which is provided in support of the reports.
>
> "We are concerned at the apparent lack of progress . . .    *D*
>
> "Therefore if we do not receive your report on Kazakhstan by close of
> business on Thursday, 31 January 2013, we will have no option but to
> open a [formal] criminal investigation [under section 1(3) of the CJA
> 1987] into ENRC's activities there, with a view to the exercise of our
> investigative powers.
>
> "Assuming your report is received, we can agree a timeline for . . . the    *E*
> report in relation to [the African country]."

36    On 29 January 2013, Mr Dalman responded to Mr Rappo's letter in
the following terms:

> "I am both concerned and disappointed with your letter, in particular,
> your comments regarding the corporate self-reporting process. Dechert
> have been engaged to conduct an independent in depth investigation    *F*
> exercise, to which the company has devoted a very substantial amount of
> management time and resource at all levels, and alongside this we have
> been engaged in an ongoing programme considering and implementing
> appropriate remedial actions. The SFO have of course been kept well
> briefed along the way . . .
>
> "You will be able to gauge the volume of work that has been carried
> out when you read the draft report dated 12 December 2012 in respect of    *G*
> Kazakhstan (in the form requested in your letter) that we intend to deliver
> to you on or before 31 January 2013.
>
> "In relation to Africa, that extensive investigation is continuing, fully
> supported by me and the Board . . . We look forward to engaging with
> you on the timetable for submission of that report.
>
> "It remains our prime objective to reach an equitable settlement . . .    *H*
> and we want to engage with you to discuss a settlement in relation to
> Kazakhstan as soon as appropriate."

37    On 30 January 2013, Mr Gerrard wrote to Mr Rappo in similar terms,
enclosing the draft report on Kazakhstan referred to by Mr Dalman above.

© 2019 The Incorporated Council of Law Reporting for England and Wales

807

[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)

A    38    On 28 February 2013, Dechert submitted to the SFO its final report on the Kazakhstan investigation, which ran to some 470 pages.

39    On 14 March 2013, Mr Gerrard presented his findings from the Africa investigation to the ENRC board.

40    On 27 March 2013, ENRC terminated Dechert's retainer and engaged Fulcrum Chambers to represent it. On the same day, there was a meeting between ENRC and the SFO, at which the SFO was informed of ENRC's change in legal team, and also of a pending board reshuffle in which several senior personnel were to leave ENRC.

B

41    On 28 March 2013, the SFO served on Mr Gerrard a notice under section 2A(1) of the CJA 1987, as inserted, informing him that the Director was determining whether to start an investigation into ENRC, as it appeared that a corruption offence may have taken place, and requiring him to produce documents relevant to that determination by 8 April 2013. A notice of 8 April 2013 extended that deadline to 27 April 2013.

C

42    On 25 April 2013, the SFO announced that the Director had accepted ENRC for criminal investigation. Accordingly, Mr Gould wrote to Mr Gerrard informing him that the section 2A(1) notice was withdrawn and that a notice under section 2(3) of the CJA 1987 would shortly be served. There followed, between 25 April and 8 October 2013, a series of section 2(3) notices addressed to Mr Gerrard, Mr David Williams QC of Fulcrum Chambers, and Sir Paul Judge who was a non-executive director of ENRC. These notices led to ENRC asserting legal professional privilege in relation to the Documents, and the current dispute ensued.

D

43    Ultimately, on 2 February 2016, the SFO issued a Part 8 claim against ENRC for a declaration that documents in four specific categories were not "information or . . . any document which ENRC would be entitled to refuse to disclose or produce on grounds of legal professional privilege in proceedings in the High Court" within the meaning of section 2(9) of the CJA 1987. The SFO's pleaded case was that neither litigation privilege nor legal advice privilege attached to the documents in the first place, not that any privilege had been waived.

E

44    After a four-day trial at which oral evidence was called, Andrews J [2017] 1 WLR 4205 made an order dated 12 May 2017 declaring in the terms sought that the documents in the first, second and fourth categories as described in para 26 of the particulars of claim were not privileged.

F

*Andrews J's judgment*

45    After her introduction, the judge explained the SFO's self-reporting regime, the Guidelines and the 2012 Guidelines that replaced them. Importantly, she said at para 24 that it was unnecessary to consider whether ENRC was in fact engaged in a self-reporting process, because this would not be inconsistent with ENRC contemplating that there was a real prospect of prosecution.

G

46    The judge then set out the four categories of Documents as follows:

H

"*Category 1*
"26. This category comprises notes taken by Dechert of the evidence given to them by individuals (including employees and former employees or officers of ENRC and of its subsidiary companies such as SSGPO; their suppliers; and other third parties with whom they had dealings) when

© 2019 The Incorporated Council of Law Reporting for England and Wales

**114**

asked about the events being investigated.  184 documents have been identified as falling within this category, created in the period from 10 August 2011 to 25 March 2013 . . .

"27. 85 individuals were interviewed in respect of the Kazakhstan investigation . . ."

"*Category 2*

"29. This category comprises materials generated by [FRA] as part of [the] 'books and records' reviews they carried out in London, Zurich, Kazakhstan and Africa . . . The books and records work started on 12 May 2011 and continued until at least 11 January 2013.

"30. The parties have agreed that the present claim in relation to Category 2 is concerned only with ENRC's claim to litigation privilege in respect of this class of documents, and that ENRC retains the right to claim legal advice privilege in respect of any individual document falling within this category.  These proceedings will therefore not determine whether any prospective claim for legal advice privilege in respect of specific documents falling within Category 2 would be justified."

"*Category 3*

"32. This category comprises documents indicating or containing the factual evidence presented by [Mr Gerrard] to ENRC's Nomination and Corporate Governance Committee and/or the ENRC Board on 14 and 15 March 2013."

"*Category 4*

"34. This comprises 17 documents referred to in a letter dated 22 August 2014 sent to the SFO by Fulcrum Chambers . . .

"35. Of these documents, nine are said to comprise the FRA reports (or appendices thereto) and therefore litigation privilege is asserted on the same basis as for the Category 2 documents.  A further six of these documents are said to be e-mails or letters 'enclosing copies of the FRA books and records reports, or otherwise relating to FRA's books and records work' . . . The claim to LPP in respect of these documents will therefore stand or fall with the claim in respect of the Category 2 documents.

"36. The final two documents in Category 4 are e-mail communications between [Mr Ehrensberger] of ENRC and a senior ENRC executive, dated 5 and 6 October 2010, which on ENRC's case 'record requests for, and the giving of, legal advice by a qualified lawyer acting in the role of a lawyer, and accordingly are subject to legal advice privilege'.  Mr Ehrensberger, a qualified Swiss lawyer, was employed by ENRC at that time as its head of mergers and acquisitions.  He had previously been its general counsel, a role which he resumed on 1 July 2011."

47    The judge then dealt briefly with the burden of proof and nature of evidence generally required to establish legal professional privilege.  She explained that ENRC was unable to adduce evidence from those whose state of mind was in issue, nor from Mr Gerrard, but said that she had some sympathy for the position in which the company found itself and, in any event, had to make her decision based on the evidence that was available.

48    The judge then considered the law on litigation privilege, noting at para 54 the trend in the authorities strictly confining its ambit.  She cited

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Bailey v Beagle Management Pty Ltd* [2001] FCA 185, a decision of the Federal Court of Australia, in relation to which she said that:

"59. I was referred by Mr Fisher QC, on behalf of the SFO, to [*Bailey v Beagle*] . . . The judge, Goldberg J, decided that a document had been brought into existence for the purpose of being given to the opposing party (a trustee) in order to persuade him that a proposed settlement was an appropriate financial settlement. He held that the document was not subject to litigation privilege. He made these observations at para 11: 'One has to be careful about the use of the phrase "brought into existence for the purpose of the conduct of the litigation", as a distinction should be drawn between bringing a document into existence for the purpose of conducting litigation by a party on the basis that the document will not be shown to the other party . . . and a document brought into existence during the course of litigation for the purpose of settling the litigation, which is intended to be shown to the other party. Properly characterised, it is not correct to say that a document is brought into existence for the purpose of conduct of litigation, and so is privileged from production, if it is brought into existence, albeit to try and settle the litigation, but for the purpose of being shown to the other side.' I respectfully agree with and adopt that analysis, which must apply with equal force in a situation such as this, where litigation has not commenced.

"60. As that case illustrates, advice given in connection with the conduct of actual or contemplated litigation may include advice relating to settlement of that litigation once it is in train. The conduct of ongoing proceedings embraces litigation tactics, and must include bringing them to an end by agreement short of trial. It would make no sense to deny litigation privilege to, for example, a report of an actuary or accountant dealing with quantum which is intended to assist solicitors to advise their client whether to accept or reject an offer made under CPR Pt 36.

"61. However, I reject ENRC's submission that by parity of reasoning, litigation privilege extends to third party documents created in order to obtain legal advice as to how best to *avoid* contemplated litigation (even if that entails seeking to settle the dispute before proceedings are issued). There is no authority cited in support of that proposition, and it self-evidently contradicts the underlying rationale for the privilege. Equipping yourself with evidence to enable you to conduct your defence free from the risk that your opponent will discover how you are preparing yourself . . . is something entirely different from equipping yourself with evidence that you hope may enable you (or your legal advisers) to persuade him not to commence proceedings against you in the first place."

49    The judge then turned to consider the law on legal advice privilege. In relation to how the "client" is defined for this purpose, she said the following:

"70. The question of who was the 'client' . . . did not directly arise . . . [in *Three Rivers (No 5)* [2003] QB 1556]. However, the judgment of the Court of Appeal supports the proposition that where the party asserting privilege is a corporate entity, legal advice privilege attaches only to communications between the lawyer and those individuals who are

© 2019 The Incorporated Council of Law Reporting for England and Wales

authorised to obtain legal advice on that entity's behalf. Communications between the solicitors and employees or officers of the client, however senior in the corporate hierarchy, who do not fall within that description will not be subject to legal advice privilege."

"72. Mr Lissack [counsel for ENRC] relied on the way in which the judgment in the *Three Rivers (No 5)* case was interpreted by the Court of Appeal of Singapore in the case of *Skandinaviska Enskilda Banken AB (Publ) v Asia Pacific Breweries (Singapore) Pte Ltd* [2007] 2 SLR 367 . . .

"73. . . . However . . . The narrower interpretation, consistent with the *Three Rivers (No 5)* case, is that the employee must be authorised to seek/obtain the legal advice that is the reason for the communication . . . If and to the extent the Singapore court was adopting the wider interpretation, namely, that even if the employee is only authorised to provide the solicitors with information that would equip them to give legal advice to others within the company, that is a communication 'for the purpose of obtaining legal advice', that was the proposition which the Court of Appeal expressly rejected."

"81. In *In re RBS Rights Issue Litigation* . . . Hildyard J concluded . . . that the decision in the *Three Rivers (No 5)* case was based on principles of general application, which . . . remain binding law in England and Wales. He said, and I agree, that this was confirmed by the way that the decision was attacked by counsel and analysed by the House of Lords in the *Three Rivers (No 6)* case."

"86. Mr Lissack submitted that the decision of Hildyard J was wrong and . . . inconsistent with . . . the correct interpretation of the *Three Rivers (No 5)* case. He did not suggest that that case was wrongly decided, only that it was misunderstood. He submitted that if the solicitor is retained . . . to carry out certain investigations in order to provide the company with legal advice, and that requires him to speak to persons other than the directly instructing body within the company, the substance of his communications with those persons is governed by legal advice privilege.

"87. I cannot accept that submission, which in my judgment is both contrary to authority and wrong in principle . . ."

"90. As Hildyard J succinctly put it at para 64 in *In re RBS Rights Issue Litigation* [2017] 1 WLR 1991, 'the fact that an employee may be authorised to communicate with the corporation's lawyer does not constitute that employee the client or a recognised emanation of the client'. I agree . . . The information coming from the employee to the lawyer cannot be equated with instructions or information emanating from the client unless he has been tasked by the client with seeking or obtaining the legal advice on the client's behalf.

"91. I would have reached that decision as a matter of principle in the absence of the decision of Hildyard J, but I am fortified in my conclusion by his analysis in *In re RBS Rights Issue Litigation* and the conclusion he reaches at para 93 . . ."

"93. On the current state of the law, the decision in *In re RBS Rights Issue Litigation* is plainly right, and there is no justification for my departing from it. Given the tenor of the authorities, including the *Three Rivers (No 5)* case, if there is to be any change of approach to bring the law in this jurisdiction into line with the more liberal approach adopted in

© 2019 The Incorporated Council of Law Reporting for England and Wales

other jurisdictions, it will have to be made by the Supreme Court or by Parliament."

50  Finally on the law, the judge dealt with the principles governing privilege attaching to lawyers' work product, a sub-species of legal advice privilege. She concluded, at para 97, that:

"In my judgment, the approach taken by Warren J [in *Stax Claimants v Bank of Nova Scotia Channel Islands Ltd* [2007] EWHC 1153 (Ch)] and Hildyard J [in *In re RBS Rights Issue Litigation*] is right, and the protection afforded to lawyers' working papers is justified if, and only if, they would betray the tenor of the legal advice. A verbatim note of what the solicitor was told by a prospective witness is not, without more, a privileged document just because the solicitor has interviewed the witness with a view to using the information that the witness provides as a basis for advising his client. In other words, the client cannot obtain the protection of legal advice privilege over interview notes that would not be privileged if he interviewed the witness himself, or got a third party to do so, simply because he procured his lawyer to interview the witness instead."

51  The judge then dealt with the facts at paras 98–148. It is worth highlighting the following findings of fact that she made.

52  In relation to the period before the SFO contacted ENRC on 10 August 2011, the judge found that:

"102. . . . There is no evidence that in the period from the date of the Camrose acquisition in 2010 to around early April 2011, even whilst the litigation with First Quantum was being fought in the full glare of publicity, anyone at ENRC feared that any such investigation into the African acquisitions would uncover evidence of any behaviour by ENRC that could come anywhere near crossing the threshold for a prosecution to be initiated, still less evidence that such a prosecution was reasonably in contemplation."

"104. DLA Piper's role was purely investigatory: their job was to find the facts and report on them to ENRC. The fact that a fact-finding investigation was commissioned with a view to ENRC obtaining legal advice on what to do once the facts were known, does not mean that the information provided to the investigators by third parties would be subject to litigation privilege . . .

"105. . . . There is no evidence that on receipt of the whistle-blower report, the Board anticipated that the SFO would prosecute ENRC or any of its officers (even if what was alleged turned out to have some truth in it). Taken at its highest, the evidence suggests that the Board and the audit committee were concerned about the prospect of a formal SFO *investigation* into the affairs of ENRC and SSGPO if the SFO ever got wind of these allegations."

"113. . . . Mr Spendlove and Mr Duthie refer in their evidence to the provisions of the Companies Act 2006 relating to specific records that must be kept by a company, and to the fact that failure to keep them is a criminal offence. The Head of Compliance was concerned that if inadequacies were found in the books and records, this could be used as a 'Trojan horse' to enable the authorities to look more closely at the affairs

© 2019 The Incorporated Council of Law Reporting for England and Wales

812

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

of ENRC . . . I am satisfied on the totality of the evidence that the work    A
that FRA was engaged to undertake at that stage was essentially
compliance-related; it was designed to ascertain whether there were any
such deficiencies, and to report upon them, so that ENRC could put its
house in order if necessary."

"118. Of course, it was always possible that the internal investigation
into the allegations relating to SSGPO would turn up information which,
if it ever came to the attention of the SFO, might result in criminal    B
proceedings; but at that stage the investigation had not yet done so, and
on the evidence before me, whether it would or not remained a matter of
pure speculation. Objectively, criminal proceedings were not even a
'distinct possibility', let alone a real prospect—at most, they were one of a
range of hypothetical outcomes from a hypothetical future SFO criminal
investigation."    C

53    Regarding the dialogue between ENRC and the SFO from 10 August
2011 onwards, the judge found that:

"129. Between 26 September 2011 and March 2013 there were over
30 meetings and discussions between ENRC and/or Dechert and the SFO,
during which Mr Gerrard and Mr Ehrensberger, among others,    D
repeatedly assured the SFO that ENRC was committed to engaging
openly with the SFO and giving them its full co-operation, and that they
had a mandate from ENRC's Board to do so. There were three major
presentations to the SFO in Dechert's offices, on 5 March 2012, 20 July
2012 and 28 November 2012, mainly focusing on Kazakhstan. There is
evidence that the report into Kazakhstan was reviewed by Addleshaws for
some considerable period before it was submitted to the SFO in December    E
2012. However, the SFO was never told about the results of Dechert's
investigations into ENRC's African acquisitions."

"135. On 9 November 2011 Mr Ehrensberger wrote a letter to the
SFO . . . There is no ambiguity about that letter. The message that it
conveys is that ENRC is going to carry out further investigations of its
operations (i e in addition to the ongoing review of the whistleblower
allegations pertaining to Kazakhstan) and share the results of those    F
investigations with the SFO. In context, this could only be a reference to
an investigation of the African acquisitions. Mr Ehrensberger was
promising the SFO that, when the results of the internal investigation
were obtained, ENRC would share them with the SFO and engage fully
with the SFO in respect of whatever information emerged. Obviously,
there could be no meaningful engagement if the results of the further    G
investigations were not shared. It must have been intended by ENRC, at
least at that stage, that whatever Dechert found out from the individuals
to whom it spoke in the course of its investigations would be passed on in
due course to the SFO, whether or not it evidenced wrongdoing."

54    The judge concluded her factual summary by saying the following,
in relation to how she would approach the claim:    H

"147. Although it would be possible, with the benefit of hindsight, to
put a less charitable interpretation on ENRC's behaviour during the
period of dialogue with the SFO, no evidence has been adduced to support
the thesis that ENRC and Mr Gerrard were pretending to engage in the

© 2019 The Incorporated Council of Law Reporting for England and Wales

**119**

813

[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)

A  self-reporting process to keep the SFO at bay . . . I will therefore approach the claim for LPP on the basis that ENRC and Mr Gerrard were acting in good faith throughout, and that they meant what they said when they repeatedly assured the SFO of their willingness to co-operate fully and to share the results of their internal investigations with them.

"148. I will also approach the claim on the basis that ENRC accepted the advice it had been given by Mr Gerrard on 21 April 2011 relating to

B  the Kazakh investigation. However, the fact that a client believes that it has a viable argument that documents generated in the course of an internal fact-finding investigation will be privileged does not mean that they are privileged."

55  Against that background, the judge proceeded to deal with ENRC's claims to litigation privilege (paras 149–176), in which respect her main

C  reasoning and conclusions were as follows:

"149. Adopting the test in *United States of America v Philip Morris Inc* [2003] EWHC 3028 (Comm), ENRC must establish that, as at 19 August 2011 [which the judge had said at para 131 was 'the latest date at which, on ENRC's pleaded case, criminal litigation was reasonably in prospect'], it was 'aware of circumstances which rendered litigation between itself

D  and the SFO a real likelihood rather than a mere possibility'. In my judgment, the claim for litigation privilege falls at the first hurdle because ENRC is unable to satisfy that test; but even if a prosecution had been reasonably in contemplation, the documents for which litigation privilege is claimed were not created with the dominant purpose of being used in the conduct of such litigation (which expression includes obtaining legal

E  advice pertaining to the conduct of such litigation)."

"151. Whilst I accept that ENRC anticipated that an SFO investigation was imminent, and that such an investigation was reasonably in contemplation by no later than 11 August 2011 when the SFO's letter arrived, that is not enough to make out a claim for litigation privilege. Such an investigation is not adversarial litigation . . ."

"160. However, the situation is rather different where the investigation

F  is into suspected criminality. One critical difference between civil proceedings and a criminal prosecution is that there is no inhibition on the commencement of civil proceedings where there is no foundation for them, other than the prospect of sanctions being imposed after the event. A person may well have reasonable grounds to believe they are going to be subjected to a civil suit at the hands of a disgruntled neighbour, or a

G  commercial competitor, even where there is no properly arguable cause of action, or where the evidence that would support the claim has not yet been gathered. Criminal proceedings, on the other hand, cannot be started unless and until the prosecutor is satisfied that there is a sufficient evidential basis for prosecution and the public interest test is also met. Criminal proceedings cannot be reasonably contemplated unless the prospective defendant knows enough about what the investigation is

H  likely to unearth, or has unearthed, to appreciate that it is realistic to expect a prosecutor to be satisfied that it has enough material to stand a good chance of securing a conviction.

"161. Of course, a person who knows that he has committed a criminal offence may reasonably anticipate that if certain facts come to

© 2019 The Incorporated Council of Law Reporting for England and Wales

814

Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR

light, a prosecution is likely to follow, even if there is no investigation currently underway.  Likewise, the state of knowledge of the prospective defendant may be such that, even before the investigation has concluded, it knows that it has, in Mr Lissack's words, 'a problem which makes criminal prosecution a real rather than fanciful prospect'.  The difficulty for ENRC in the present case is that there is no evidence that it was ever aware that it had any such problem, or of anything more tangible than a fear that one might emerge."

"163. Mr Spendlove's evidence about the contemplation of criminal proceedings amounts to little more than generalised assertions with no substantive evidence to back them up, and that is not good enough.  The totality of the evidence establishes that criminal proceedings were not in the reasonable contemplation of ENRC at any material time, and for the avoidance of doubt that includes the whole period of dialogue between ENRC and the SFO . . .

"164. Even if I am wrong about that, and criminal proceedings were in reasonable contemplation at any material time, none of the Disputed Documents was created for the dominant purpose of deployment in, or obtaining legal advice relating to the conduct of, such anticipated criminal proceedings . . . I am not persuaded that taking legal advice in relation to the conduct of future contemplated criminal litigation was even a subsidiary purpose of the creation of those documents, let alone the dominant purpose.  The information was not being gathered to form part of a defence brief.

"165. . . . Mr Spendlove states that it is his understanding that the reason why ENRC instructed DLA Piper and Mr Gerrard to investigate those allegations was 'to advise in relation to [a formal SFO] intervention, including a criminal investigation leading to a prosecution by the SFO, and to minimise the risk of this happening'.  However, the contemporaneous documents established that this is not an accurate reflection of the reasons for DLA's instruction; its role was a fact-finding one . . .

"166. Even if Mr Spendlove's characterisation of the reasons for the instruction of lawyers to carry out the internal investigation into SSGPO had been accurate, (a) what third parties told Dechert about events in Kazakhstan could have little or no bearing on legal advice about how to deal with the SFO, and (b) even if it were relevant, any factual information which would be used as the basis for legal advice concerning how to avoid an SFO investigation into the same matters would not be subject to litigation privilege in any event.  Avoidance of a criminal investigation cannot be equated with the conduct of a defence to a criminal prosecution."

"170. Moreover, documents created with the specific purpose or intention of showing them to the potential adversary in litigation are not subject to litigation privilege . . .

"171. The information generated in respect of the African investigation, and all but a fraction of the information generated in respect of the pre-existing Kazakh investigation, was something that ENRC intended to be shared with the SFO before and at the time when the relevant documents were created, and the dominant purpose for which those documents were created was to enable reports to be prepared

© 2019 The Incorporated Council of Law Reporting for England and Wales

815

[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)

A    to show to the SFO and presentations to be made to the SFO, at a time when the relationship was collaborative rather than adversarial. The contemporaneous documentary evidence in this regard is overwhelming . . .

"172. For all the above reasons, none of the documents in Category 1 or Category 3 satisfies the test for litigation privilege.

B    "173. So far as Category 2 and the FRA documents in Category 4 are concerned, the dominant purpose of the documents generated by FRA was plainly to meet compliance requirements or to obtain accountancy advice on remedial steps as part and parcel of the comprehensive books and records review. There is a wealth of contemporaneous documents pointing towards the conclusion that the books and records review had little or nothing to do with the preparation of a defence to, or obtaining

C    legal advice in respect of, prospective criminal litigation . . .

"174. ENRC contended that it was unsurprising that it would wish to promote (internally and externally) the compliance effect of the review, not least because it would be beneficial for a large corporate to be seen to be taking steps with a beneficial compliance effect. Likewise, it was unsurprising that ENRC would not wish to draw attention to the fact that

D    the review was initiated to enable it to obtain advice and assistance in connection with anticipated SFO action. That point only holds good so far as documents that would be seen by persons outside the ENRC group and its advisers are concerned. The absence of *internal* documentation supporting the proposition that the review was designed to generate documents for the purpose of obtaining advice about the defence of anticipated criminal proceedings is less easy to explain, if that really was

E    the dominant purpose of the exercise."

"176. . . . The claim for litigation privilege therefore fails in respect of all the categories of documents for which it is made."

56    The judge then addressed ENRC's claims to legal advice privilege at paras 177–190 as follows:

F    "177. The short answer to the alternative claim for legal advice privilege in respect of documents in Category 1 is that there is no evidence that any of the persons interviewed . . . were authorised to seek and receive legal advice on behalf of ENRC, and the communications between those individuals and Dechert were not communications in the course of conveying instructions to Dechert on behalf of the corporate client. The evidence gathered by Dechert during its investigations was intended by

G    ENRC to be used to compile presentations to the SFO as part of what it viewed as its engagement in the self-reporting process. If and to the extent that it was also intended by ENRC to take legal advice on the fruits of Dechert's investigations, and that was one purpose of making the interview notes, the documents formed part of the preparatory work of compiling information for the purpose of enabling the corporate client to

H    seek and receive legal advice, and are not privileged.

"178. . . . A claim for privilege over lawyers' working papers will only succeed if the documents would betray the trend of the legal advice. That cannot be the case here, because on the evidence, the documents are merely notes of what the lawyers were told by the witnesses . . .

© 2019 The Incorporated Council of Law Reporting for England and Wales

816
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**    [2019] 1 WLR

"179. ENRC submitted that because the notes were taken by a lawyer, the process inevitably represented the work of the lawyer's mind and his selection of what should be written down, so that taken as a whole, these matters inevitably gave a clue as to the trend of the advice. I cannot accept that submission, which is contrary to the approach of Bingham LJ [in *Parry v News Group Newspapers* (1990) 140 NLJ 1719] and has no principled foundation. A similar claim for privilege over documents of this type was made and rejected in *In re RBS Rights Issue Litigation* [2017] 1 WLR 1991, albeit that it appears from the report of that case that the evidence before Hildyard J was of a better quality than the evidence in this case. As he put it, the fact that a selection of information is made is not sufficient to 'cloak' the selected information with privilege."

"187. . . . I find that ENRC has made out its claim for privilege over the five Category 3 documents.

"188. That leaves the two remaining documents in Category 4, namely, the October 2010 e-mail exchange in which a senior person within ENRC asked Mr Ehrensberger to read an attached document and let him know what he thought, and Mr Ehrensberger did so. It is ENRC's evidence that the e-mails 'record requests for and the giving of legal advice by a qualified lawyer acting in the role of a lawyer' on the basis that although he was the head of mergers and acquisitions at the time, 'virtually all Mr Ehrensberger's time as Head of Mergers and Acquisitions was spent acting as a lawyer'.

"189. However, the contemporaneous documents do not support that characterisation of Mr Ehrensberger's role . . .

"190. The objective evidence . . . establishes that Mr Ehrensberger was engaged by ENRC at the time of these communications not as a lawyer but as a 'man of business', with the effect that legal advice privilege did not attach to communications of this nature, even if legal advice was being sought and was given in the exchange. Mr Ehrensberger may well have felt that he was acting as a lawyer for most of the time that he was the head of M&A, because M&A work will often have a legal dimension . . . But that is not good enough for privilege to attach to the e-mails; at the time of this exchange, his professional duty was not to act as a legal adviser to ENRC. If the person sending the information to Mr Ehrensberger had wanted privileged legal advice he should have sent it to general counsel. These documents are not privileged."

57    The remainder of the judge's judgment dealt with submissions by ENRC to the effect that she should refuse to exercise her discretion to grant the declaratory relief sought by the SFO. Those submissions were rejected, so that the relief was granted in respect of all the categories of Documents except for Category 3: paras 191–205.

*The issues requiring determination*

58    The parties did not agree a clear list of the issues for the court's determination. Mr Bankim Thanki QC, leading counsel for ENRC, put the issues concerning legal advice privilege at the front of his submissions on the Category 1 documents. He sought to persuade the court to address the long-standing academic dispute as to what *Three Rivers (No 5)* [2003] QB 1556

© 2019 The Incorporated Council of Law Reporting for England and Wales

**123**

A  actually decided, and to overrule the judge on the basis that the wider view of the ratio of that case was the correct one.  We take the view, however, that the judge regarded this case as one primarily about litigation privilege and that is how we should approach the matter.

59  Moreover, whilst we do not under-estimate the importance of the *Three Rivers (No 5)* question, we do not think that this court should ignore
B  the clear determination of the Court of Appeal in that case.  Even if significant parts of that determination are properly to be regarded as carefully considered obiter dicta rather than strictly ratio, it would be highly undesirable for us to enter into an unseemly disagreement with it, particularly when the House of Lords has already declined in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610 ("*Three Rivers (No 6)*"), after full argument, to decide the
C  points that Mr Thanki urges us to decide.  The House correctly concluded that those points were not strictly raised before it in *Three Rivers (No 6)*, and noted that it had expressly refused permission to appeal the decision in *Three Rivers (No 5)*.  If the ambit of *Three Rivers (No 5)* is to be authoritatively decided differently from the weight of existing opinion, that decision will, in our judgment, have to be made by the Supreme Court rather
D  than this court.

60  On the basis of that introduction, it seems to us that, as matters were eventually argued, the following issues should be addressed in the following order:

*Litigation privilege*

E  (i) Issue 1: Was the judge right to determine that, at no stage before all the Documents had been created, criminal legal proceedings against ENRC or its subsidiaries or their employees were reasonably in contemplation?

(ii) Issue 2: Was the judge right to determine that none of the Documents was brought into existence for the dominant purpose of resisting contemplated criminal proceedings against ENRC or its subsidiaries or their
F  employees?

(iii) Issue 3: In the circumstances, which if any of the Category 1, 2 or 4 documents are protected by litigation privilege?

*Legal advice privilege*

(iv) Issue 4: What did *Three Rivers (No 5)* [2003] QB 1556 actually
G  decide?

(v) Issue 5: Does a claim for legal advice privilege require the proponent to show that the information was obtained for the dominant purpose of obtaining legal advice?

(vi) Issue 6: Was the judge right to conclude that none of the Documents was protected by legal advice privilege on the basis: (a) that the information they contained was not communicated to ENRC's solicitor by anyone
H  authorised to give or receive legal advice on behalf of ENRC or its subsidiaries? (b) that the information they contained was not communicated to ENRC's solicitor for the purpose of obtaining legal advice, but rather for the purposes of that solicitor's investigation of the facts? (c) that there was overwhelming evidence that ENRC had always intended and/or agreed to

© 2019 The Incorporated Council of Law Reporting for England and Wales

818
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)     [2019] 1 WLR**

share the information they contained with the SFO as part of a self-reporting process?

(vii) Issue 7: Are the answers to issue 6 above different if the employees in question are ex-employees at the time that the information is imparted?

(viii) Issue 8: Was the judge right to hold that lawyers' working papers are only protected by legal advice privilege if they would betray the tenor of the legal advice? (ix) Issue 9: If not, was the judge right to deny any or all of the Documents the benefit of legal advice privilege as lawyers' working papers?

*The basic parameters of legal professional privilege*

61   It is important to first set out the basic parameters of legal professional privilege, since some of the extensive argument has rather tried to reinvent the wheel.

62   In *R v Central Criminal Court, Ex p Francis & Francis* [1989] AC 346[2], the House of Lords approved the principle that the various statutory definitions of legal professional privilege accurately reflected the common law. The parties agreed that the definition in section 10(1) of the Police and Criminal Evidence Act 1984 provided an appropriate example of this definition, as follows:

> "Subject to subsection (2) below, in this Act 'items subject to legal privilege' means— (a) communications between a professional legal adviser and his client or any person representing his client made in connection with the giving of legal advice to the client; (b) communications between a professional legal adviser and his client or any person representing his client or between such an adviser or his client or any such representative and any other person made in connection with or in contemplation of legal proceedings and for the purposes of such proceedings . . ."

63   The House of Lords in *Three Rivers (No 6)* [2005] 1 AC 610 dealt with the submission that no fundamental distinction should be drawn between communications in connection with litigation and other communications: see Lord Carswell at para 103. The House rejected that contention, accepting instead that "the cases established that, so far from legal advice privilege being an outgrowth and extension of litigation privilege, legal professional privilege is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege, and that it is litigation privilege which is restricted to proceedings in a court of law in the manner which the authorities show" (Lord Carswell at para 105), and "there is substantial force in the Law Society's submissions, and a well founded case has been made out for the retention of legal advice privilege in its present form" (para 106). Legal advice privilege and litigation privilege, therefore, have different characteristics.

64   The requirements for litigation privilege were as stated by Lord Carswell in *Three Rivers (No 6)* at para 102 as follows:

> "communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole

© 2019 The Incorporated Council of Law Reporting for England and Wales

819

**[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**

*A*  or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial."

65   The elements of legal advice privilege, which was first recognised in *Greenough v Gaskell* (1833) 1 My & K 98, are also set out in Lord Carswell's speech in *Three Rivers (No 6)*, para 111, as follows:

*B*  "After examining the authorities in detail, Taylor LJ said, at p 330 [in *Balabel v Air India* [1988] Ch 317]: 'Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business.  Nevertheless, despite that extension, the purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence.  In my judgment, therefore, the test is whether the communication or other document was made confidentially for the *C*  purposes of legal advice.  Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege.  In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or *D*  appropriate on matters great or small at various stages.  There will be a continuum of communication and meetings between the solicitor and client . . . Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach.  A letter from the client containing information may end with such words as 'please advise me what I should do'.  But, even if it does not, there will *E*  usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether asked specifically or not, tender appropriate advice.  Moreover, legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context.'

"In a later passage, at pp 331–332, relied upon by the Court of Appeal [2004] QB 916 as support for its conclusions Taylor LJ stated: 'It follows *F*  from this analysis that those dicta in the decided cases which appear to extend privilege without limit to all solicitor and client communications upon matters within the ordinary business of a solicitor and referable to that relationship are too wide.  It may be that the broad terms used in the earlier cases reflect the restricted range of solicitors' activities at the time. Their role then would have been confined for the most part to that of *G*  lawyer and would not have extended to business adviser or man of affairs. To speak therefore of matters "within the ordinary business of a solicitor" would in practice usually have meant the giving of advice and assistance of a specifically legal nature.  But the range of assistance given by solicitors to their clients and of activities carried out on their behalf has greatly broadened in recent times and is still developing.  Hence the need to re-examine the scope of legal professional privilege and keep it within *H*  justifiable bounds.'

"I agree with the view expressed by Colman J in *Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow Holding* [1995] 1 All ER 976, 982 that the statement of the law in [*Balabel v Air India* [1988] Ch 317] does not disturb or modify the principle affirmed in

© 2019 The Incorporated Council of Law Reporting for England and Wales

820
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

*Minter v Priest* [1929] 1 KB 655, that all communications between a solicitor and his client relating to a transaction in which the solicitor has been instructed for the purpose of obtaining legal advice will be privileged, notwithstanding that they do not contain advice on matters of law or construction, provided that they are directly related to the performance by the solicitor of his professional duty as legal adviser of his client."

66   Whilst none of these definitions is actually determinative of the issues in this case, stating them at the outset avoids the need for the wide ranging review of the authorities that was undertaken in argument.  At this level, at least, these definitions carry the authoritative weight of the House of Lords in the most recent case on the subject of legal professional privilege. There is no need for us to re-examine whether they are accurate.  They may be taken to be so.

*A brief resumé of Three Rivers (No 5) and Three Rivers (No 6)*
   *Three Rivers (No 5)*

67   The background to the *Three Rivers* litigation is well known. Following the collapse of the Bank of Credit and Commerce International SA ("BCCI"), a private non-statutory inquiry was set up on behalf of the Chancellor of the Exchequer and the Bank of England ("the Bank").  The purpose of the inquiry, which was led by Bingham LJ, was "to inquire into the supervision of BCCI under the Banking Acts; to consider whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations".  The Bank's communication with the inquiry was through three officials known as the Bingham Inquiry Unit ("the BIU"), who instructed external solicitors, Freshfields Bruckhaus Deringer llp ("Freshfields"), to advise on the preparation and presentation of the Bank's evidence and submissions.

68   The claimants in the litigation, the liquidators and creditors of BCCI, had sued the Bank for misfeasance in public office with respect to its supervision of BCCI.  During disclosure, the Bank had claimed legal advice privilege in relation to numerous documents that had been sent to Freshfields.  The Bank was unable to claim litigation privilege because the inquiry was not adversarial.  The issue in *Three Rivers (No 5)* [2003] QB 1556 arose from the fact that many of those documents had been prepared not by the BIU but by other employees of the Bank.  The claimants maintained that such documents did not fall within the ambit of legal advice privilege, and the Court of Appeal agreed, overturning the first instance decision of Tomlinson J *Three Rivers District Council v Governor and Company of the Bank of England* [2003] CP Rep 34.

69   The Court of Appeal was considering four categories of documents as follows:

(i) Documents prepared by Bank employees, which were intended to be sent to and were in fact sent to Freshfields;

(ii) Documents prepared by Bank employees with the dominant purpose of the Bank's obtaining legal advice but not, in fact, sent to Freshfields;

(iii) Documents prepared by Bank employees, without the dominant purpose of obtaining legal advice, but in fact sent to Freshfields; and

(iv) Documents prepared by ex-employees of the Bank.

© 2019 The Incorporated Council of Law Reporting for England and Wales

821

[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)

70  The competing arguments of the parties were summarised by Longmore LJ at paras 4–5 of the judgment of the court.  The claimants said that the BIU was the client of Freshfields (rather than the Bank), and submitted that documents prepared by the Bank's employees or ex-employees, whether prepared for submission to or at the direction of Freshfields or not, did not attract legal advice privilege "as being no more than raw material on which the BIU would, thereafter, seek advice".  The claimants said that "only communications between solicitor and client, and evidence of the content of such communications" were privileged, and:

"Preparatory materials obtained before such communications, even if prepared for the dominant purpose of being shown to a client's solicitor, even if prepared at the solicitor's request and even if subsequently sent to the solicitor, did not come within the privilege."

71  On the other hand, the Bank submitted that "as a matter of general principle, any document prepared with the dominant purpose of obtaining the solicitor's advice upon it came within the ambit of the privilege, whether or not it was actually communicated to the solicitor".  It will be observed that neither side's arguments, as explained by the court, focused on what was meant by the term "client" for the purposes of legal advice privilege.

72  Longmore LJ made a detailed analysis of the history of legal professional privilege by reference to the 19th century cases.  It is not necessary to track that history in this judgment.  It suffices to say that he concluded with a detailed reference to the Court of Appeal's decision in *Wheeler v Le Marchant* (1881) 17 Ch D 675, which he said was "a case of legal advice privilege", and that "In that context it was held that documents obtained from a third party to be shown to a solicitor for his advice did not fall within the privilege".

73  Longmore LJ cited finally the following passage from Cotton LJ's judgment in *Wheeler's* case, pp 684–685:

"It is said that as communications between a client and his legal advisers for the purpose of obtaining legal advice are privileged, therefore any communication between the representatives of the client and the solicitor must be also privileged.  That is a fallacious use of the word 'representatives'.  If the representative is a person employed as an agent on the part of the client to obtain the legal advice of the solicitor, of course he stands in exactly the same position as the client as regards protection, and his communications with the solicitor stand in the same position as the communications of his principal with the solicitor.  But these persons were not representatives in that sense.  They were representatives in this sense, that they were employed on behalf of the clients, the defendants, to do certain work, but that work was not the communicating with the solicitor to obtain legal advice.  So their communications cannot be protected on the ground that they are communications between the client by his representatives and the solicitor.  In fact, the contention of the [Banks] comes to this, that all communications between a solicitor and a third person in the course of his advising his client are to be protected.  It was conceded there was no case that went that length, and the question is whether, in order fully to develop the principle with all its reasonable consequences, we ought to protect such documents.  Hitherto such

© 2019 The Incorporated Council of Law Reporting for England and Wales

**128**

822

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)     [2019] 1 WLR**

communications have only been protected when they have been in contemplation of some litigation, or for the purpose of giving advice or obtaining evidence with reference to it.   And that is reasonable, because then the solicitor is preparing for the defence or for bringing the action, and all communications he makes for that purpose, and the communications made to him for the purpose of giving him the information, are, in fact, the brief in the action, and ought to be protected. But here we are asked to extend the principle to a very different class of cases, and it is not necessary, in order to enable persons freely to communicate with their solicitors and obtain their legal advice, that any privilege should be extended to communications such as these."

74    Longmore LJ, at para 18, concluded from that passage that:

"Here Cotton LJ, unlike in his judgment in [*Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315], considers each of the two categories of legal professional privilege and decides in terms that the documents in question do not fall within the first category because they are not communications between solicitor and client and not within the second category because litigation is not contemplated.  This case thus makes clear that legal advice privilege does not extend to documents obtained from third parties to be shown to a solicitor for advice."

75    He then recorded that the Bank had submitted that "communications from an employee are different", because "a corporation can only act through its employees".  Longmore LJ accepted that that was true but did not think that the argument could enable the Bank to succeed.  We interpose that this is precisely the argument that Mr Thanki adopted before us in this case. Longmore LJ then supported his conclusion at the end of para 18 by saying that:

"the passage cited from *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 shows that information from an employee stands in the same position as information from an independent agent.  It may, moreover, be a mere matter of chance whether a solicitor, in a legal advice privilege case, gets his information from an employee or an agent or other third party.  It may also be problematical, in some cases, to decide whether any given individual is an employee or an agent and undesirable that the presence or absence of privilege should depend upon the answer."

76    The relevant passages from the Court of Appeal's judgments in *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 ("*Anderson*") were those he had cited at para 14, after which he had commented as follows:

"These two citations show that information given by an employee to an employer or fellow-employee, or information given by an agent to a principal, stands in the same condition as matters known to the client and does not, of itself, attract privilege in the first of Mellish LJ's two categories.  This is so even though, on the facts, it is intended that it be shown to a solicitor."

77    It seems, therefore, that Longmore LJ was fully aware that the distinction between legal advice and litigation privilege had not been elucidated in *Anderson*, but none the less concluded that the holding that

© 2019 The Incorporated Council of Law Reporting for England and Wales

A employees "stood in the same condition" as agents was relevant to the Bank's argument that employees should be treated differently from them. It seems to us that this line of reasoning was essential to Longmore LJ's decision and is not one from which we should depart even if, on one analysis, it can be argued to be obiter.

78   We should also say that we do not think that Longmore LJ intended, in the above passage in para 18, to refer to the part of the judgment in
B *Anderson* that he had mentioned in para 15 when dealing with Brett LJ's judgment in *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315. At pp 320–321 in the *Southwark* case, Brett LJ had paraphrased what James LJ had said in *Anderson*, read together with what Mellish LJ had said in *Anderson*, as "if a party seeks to inspect a document which comes into existence merely as the materials for the brief, or that which is equivalent to
C the brief, then the document cannot be seen, for it is privileged". But that was not, we think, the part to which Longmore LJ was referring when he said that the passage from *Anderson* supported his holding. Indeed, he expressly said at the end of para 15 that the "rule" identified and addressed by Brett LJ was concerned with litigation privilege, not legal advice privilege, and was therefore irrelevant to the question before him.

79   Longmore LJ's first conclusion on legal advice privilege is at para 21
D as follows:

> "We, therefore, conclude that the 19th century authorities established that legal advice privilege was a well-established category of legal professional privilege, but that such privilege could not be claimed for documents other than those passing between the client and his legal
E advisers and evidence of the contents of such communications."

80   Longmore LJ then rejected the Bank's subsidiary argument that the principles emanating from the 19th century cases had been varied in the more recent decisions, before concluding at para 31 that:

> "We therefore conclude that the Bank is not entitled to privilege in any of the four categories itemised at the beginning of this judgment.
F Mr Stadlen asked what the position would be if the Governor himself had noted down what he remembered in relation to the supervision of BCCI with the intention of giving it to the BIU for transmission to Freshfields. No privilege has been claimed for any such specific document but, as it seems to us, Mr Pollock [counsel for the claimants] was right to say that on the evidence before the court, the BIU, which was established to deal with inquiries and to seek and receive Freshfields' advice, is for the
G purpose of this application, the client rather than any single officer however eminent he or she may be. It follows that no separate consideration need be given to the position of ex-employees who are, obviously, in no better position for the purpose of any claim to privilege."

81   We can fully accept that the Court of Appeal *could* have decided
H *Three Rivers (No 5)* [2003] QB 1556 on the simple basis that Freshfields' client was the BIU (not the Bank), and the documents had been prepared by the Bank (not the BIU), so that the position of the particular Bank employee who had prepared them was irrelevant to the question of legal advice privilege. We do not, however, think that, fairly read, that was the Court of Appeal's reasoning. As we have explained, it seems to us that Longmore LJ

© 2019 The Incorporated Council of Law Reporting for England and Wales

824
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

reasoned that, because agents and employees, on authority, stood in the same position in relation to legal professional privilege, once it was established that only communications between the lawyer and the client, and not between the lawyer and an agent of the client, could attract legal advice privilege, communications between a lawyer and an employee of the client (other than employees specifically tasked with seeking and receiving legal advice) could also not be privileged. As we have said, we are not sure that it is necessary for us to determine whether this reasoning was the ratio decidendi, but if that did have to be decided, we would hold that it was.

*Three Rivers (No 6)*

82    *Three Rivers (No 6)* [2005] 1 AC 610 concerned a distinct disclosure application from that in issue in *Three Rivers (No 5)*. It was *not* an appeal against the Court of Appeal's decision in *Three Rivers (No 5)* and, as we have said, the Bank had been refused permission for such an appeal by the House of Lords. None the less, the Bank urged the House to reconsider *Three Rivers (No 5)* when it argued *Three Rivers (No 6)*. The House unanimously declined that invitation.

83    Lord Scott of Foscote said the following:

"20. . . . The Bank plainly believe that the Court of Appeal order in *Three Rivers (No 5)* went too far. But the Bank's petition for leave to appeal was refused and this is not an appeal against that order. Moreover the Bank has discharged the disclosure obligation required by that order. However, the narrow scope allowed by the Court of Appeal in the judgment now under appeal to 'legal advice' has heightened the concerns of many about the approach to legal advice privilege inherent in the first Court of Appeal judgment. This explains in part the applications for leave to intervene in this appeal made by the Attorney General, by the Law Society and by the Bar Council. Each has been given leave to intervene . . .

"21. The written submissions from the interveners . . . make clear their concern that [*Three Rivers (No 5)*] may have gone too far in treating communications between Freshfields and employees of the Bank, other than the BIU, as being for privilege purposes communications between Freshfields and third parties. Your Lordships have been invited to clarify the approach that should be adopted to determine whether a communication between an employee and his or her employer's lawyers should be treated for legal advice privilege purposes as a communication between the lawyers and their client. This is of particular importance for corporate clients, who can only communicate through employees or officers.

"22. The employee/client point does not, however, arise as an issue on this appeal . . . The point is, therefore, so far as the current litigation between the claimants and the Bank is concerned, strictly moot. Nothing turns on it. None the less your Lordships have been asked to express a view on the point. I will return to it."

"46. One of the matters debated at the Court of Appeal hearing that led to the *Three Rivers (No 5)* judgment . . . was whether, or which, communications between Freshfields and the Bank employees or ex-employees, or officers or ex-officers, could qualify for legal advice

© 2019 The Incorporated Council of Law Reporting for England and Wales

825

**[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**

A

privilege . . . This is not an issue which arises for decision on this appeal but, for reasons which I have explained (see paras 20–21), submissions have been made to your Lordships on the issue and your Lordships have been invited to express views on them. I think your Lordships should decline the invitation for a number of reasons.

B

"47. First, the issue is a difficult one with different views, leading to diametrically opposed conclusions, being eminently arguable. Second, there is a dearth of domestic authority . . . Third, whatever views your Lordships may express, and with whatever unanimity, the views will not constitute precedent binding on the lower courts. The guiding precedent on the issue will continue to be . . . *Three Rivers (No 5)*. Fourth, if and when the issue does come before the House (or a new Supreme Court) the panel of five who sit on the case may or may not share the views of your

C

Lordships, or a majority of your Lordships, sitting on this appeal. Fifth, and finally, this House, represented by an Appeal Committee of three, refused leave to appeal against the *Three Rivers (No 5)* judgment.

"48. For all these reasons I think your Lordships should refrain from expressing views on the issue. Nothing that I have said should be construed either as approval or disapproval of the Court of Appeal's ruling on the issue in *Three Rivers (No 5)*. The issue simply does not arise

D

on this appeal."

84    Lord Carswell said the following on the same point:

"72. The court [in *Three Rivers (No 5)*] accepted that Freshfields' client was the BIU . . . but its conclusions did not turn so much on the identity of the authors of the documents in question as on the more general point

E

that in the court's view legal advice privilege, as distinct from litigation privilege, was restricted to communications between a client and his legal advisers, to documents evidencing such communications, and to documents that were intended to be such communications even if they were not in fact communicated. None of the four categories of documents concerned in the appeal came within that description and accordingly they were not covered by privilege. It rejected the Bank's

F

argument that communications from an employee were so covered, even though it recognised that a corporation can only act through its employees."

"118. . . . Mr Sumption [counsel for the Bank] urged that we should express an opinion on the correctness of the decision of the Court of Appeal in *Three Rivers (No 5)* . . . which he submitted raised important

G

issues about privilege which should be resolved. The Court of Appeal in that case found against the Bank and your Lordships refused the Bank's petition for leave to appeal. Disclosure of large numbers of documents has been made in accordance with the order of the Court of Appeal and Mr Sumption gave an undertaking on behalf of the Bank that, if the House were to rule that the decision of the Court of Appeal was incorrect, the documents already disclosed will continue to be admissible in the

H

present action and no point will be taken about the judge having seen them. I should be reluctant, in the absence of a very pressing need, to express an opinion on issues which are not before the House—even though we permitted some argument on them to be put before us—the more so when leave to appeal was refused. For that reason, and for those

© 2019 The Incorporated Council of Law Reporting for England and Wales

826

**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)     [2019] 1 WLR**

given by my noble and learned friend Lord Scott of Foscote in discussing this issue, I do not propose to express any opinion on it. Having said that, I am not to be taken to have approved of the decision in *Three Rivers (No 5)*, and I would reserve my position on its correctness."

85 Lord Rodger of Earlsferry specifically agreed with Lord Scott's approach to the *Three Rivers (No 5)* issue at para 49, as did Baroness Hale of Richmond at para 63, whilst Lord Brown of Eaton-under-Heywood expressed general agreement with the speeches of Lords Scott and Carswell at para 122.

*The litigation privilege issues*

*Issue 1: Was the judge right to determine that, at no stage before all the Documents had been created, criminal legal proceedings against ENRC or its subsidiaries or their employees were reasonably in contemplation?*

86 This issue was not addressed extensively in oral argument by either side, but ENRC handed in a detailed note on the evidence relating to litigation privilege in the course of the first day of its submissions. We have considered that note, both parties' written submissions, and the materials that the parties referred to, in detail. ENRC's main challenge to the judge's conclusion was that she placed too little weight on the evidence of Mr Spendlove. Mr Spendlove had said, for example, at para 66 of his first statement that Mr Gerhard Ammann and Mr Dalman had:

"confirmed to him that DLA Piper's advice that criminal proceedings could be reasonably said to be in contemplation as at 21 April 2011 reflected their understanding of the effect of the often repeated advice that had been given by Mr Gerrard up to that point, namely that there was a real and serious risk of law enforcement and/or regulatory intervention, including criminal prosecution."

This view was, according to Mr Thanki, consistent with all the contemporaneous documents and, in particular, Mr Gerrard's 21 April 2011 letter to Mr Barker.

87 In addition to its factual arguments, ENRC contended that:

(i) The judge wrongly failed to hold that the SFO investigation, which she had correctly found was under way by no later than 11 August 2011, was properly to be regarded as adversarial litigation: see, for example, *Tesco Stores Ltd v Office of Fair Trading* [2012] Comp AR 188, para 44, and *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 26–27.

(ii) The judge misunderstood that, once an SFO criminal investigation was reasonably in contemplation, so was a criminal prosecution: see *United States of America v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening)* [2004] 1 CLC 811, para 66, per Brooke LJ ("*Philip Morris CA*"), *Plummers v Debenhams plc* [1986] BCLC 447, 454, per Millet J and *Westminster International BV v Dornoch Ltd BV* [2009] EWCA Civ 1323 at [25]–[31], per Etherton LJ ("*Dornoch*").

(iii) Even though a party anticipating litigation may need to establish further facts before it can say with certainty that proceedings are likely, that does not prevent that party satisfying the test that litigation is a real prospect: see *Dornoch* supra, and *Axa Seguros v Allianz Insurance plc* [2011] Lloyd's Rep IR 544, para 43, per Christopher Clarke J.

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    (iv) The judge's distinction between criminal and civil proceedings failed to take account of the authorities already mentioned and the fact that the Guidelines show that a party may have a reasonable fear of prosecution even if it does not yet have concrete evidence of its own wrongdoing.

88    This aspect of the appeal is, in our judgment, primarily factual, but the judge did not see ENRC's witnesses cross-examined.  In these circumstances, it seems to us that the Court of Appeal could, in theory at least, be in as good a position as the judge to evaluate the facts: see *Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2003] 1 WLR 577, paras 14–16, per Clarke LJ and *Datec Electronic Holdings Ltd v United Parcels Services Ltd* [2007] 1 WLR 1325, paras 45–50, per Lord Mance.

89    We have taken full account also of the recent dicta of this court in *Smech Properties Ltd v Runnymede Borough Council* [2016] JPL 677, para 29, per Sales LJ approved in *R (Bowen) v Secretary of State for Justice* [2018] 1 WLR 2170, paras 70–73, per McCombe LJ.  Sales LJ said:

> "Where an appeal is to proceed, like this one, by way of a review of the judgment below rather than a re-hearing, it will often be appropriate for this court to give weight to the assessment of the facts made by the judge below, even where that assessment has been made on the basis of written evidence which is also available to this court.  The weight to be given to the judge's own assessment will vary depending on the circumstances of each particular case, the nature of the finding or factual assessment which has been made and the nature and range of evidential materials bearing upon it.  Often a judge will make a factual assessment by taking into account expressly or implicitly a range of written evidence and making an overall evaluation of what it shows.  Even if this court might disagree if it approached the matter afresh for itself on a re-hearing, it does not follow that the judge lacked legitimate and proper grounds for making her own assessment and hence it does not follow that it can be said that her decision was 'wrong'."

90    We certainly accept that the judge undertook a careful and detailed evaluation of the documents and what the witnesses had said.  Her view, in essence, was that it was rather different to say that an SFO prosecution was in the reasonable contemplation of the defendant than to say that civil proceedings were in reasonable contemplation of a potential defendant.  She relied on the need for the SFO to conclude that there was a sufficient evidential basis for prosecution and that the public interest test was met, and thought that ENRC had not even turned its mind to what might be discovered.  Whilst she acknowledged what Mr Spendlove had said, she did not think that it was sufficient since it amounted to little more than a generalised assertion.  She was certainly influenced by the fact that ENRC had no corporate knowledge of any of the matters alleged in advance of a detailed investigation.  The SFO supported the judge's factual conclusions and contended that she had applied the correct legal principles.

91    After careful consideration, we have reached the conclusion that the judge was wrong to conclude that a criminal prosecution was not reasonably in prospect once the SFO had written its letter of 10 August 2011.  This is, we think, a case where this court has actually had both the time and the

© 2019 The Incorporated Council of Law Reporting for England and Wales

828
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)** [2019] 1 WLR

A

ability to give it as good an opportunity of examining the evidence as was available to the judge.

92 The contemporaneous documents do not, as the judge suggested, show that ENRC failed at the first hurdle of showing that, as at 19 August 2011, it was "aware of circumstances which rendered litigation between itself and the SFO a real likelihood rather than a mere possibility" (adopting the test in *United States of America v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening* [2003] EWHC 3028 (Comm)). Those documents demonstrate, we think, the reverse. We refer to the following points in particular:

B

(i) In December 2010, ENRC received the whistle-blower e-mail alleging corruption and financial wrongdoing within SSGPO and appointed DLA Piper to investigate the allegations.

(ii) By March 2011, ENRC's general counsel had made clear that he thought from his GC 100 contacts that ENRC was firmly on the SFO's radar and that he expected an investigation in due course, which was why he had "upgraded [ENRC's] dawn raid procedures".

C

(iii) In April 2011, ENRC's head of compliance predicted an "SFO dawn raid . . . before summer's over".

(iv) In April 2011, Mr Gerrard wrote to Mr Barker saying that the "internal investigation at SSGPO [related] to conduct that is potentially criminal in nature" and that "Adversarial proceedings might occur out of the internal investigation and, in our view, both criminal and civil proceedings can be reasonably said to be in contemplation".

D

(v) When the SFO finally wrote to ENRC on 10 August 2011, it said that the SFO was not carrying out a criminal investigation at that stage, but asked that ENRC consider the Guidelines carefully.

E

(vi) The Guidelines expressly said that: "no prosecutor can ever give an unconditional guarantee that there will not be a prosecution"; "Professional advisers will have a key role"; any information received by the SFO would be for the purposes of its powers under the CJA 1987; wherever possible, the investigation would be carried out by the "corporate's" own professional advisers; and participation in the self-reporting process would increase "the prospect (in appropriate cases) of a civil rather than a criminal outcome" by reducing the likelihood that the SFO would discover corruption itself.

F

(vii) On 22 September 2011, Jones Day advised ENRC that, if it engaged in the voluntary disclosure regime, it would lose privilege in relation to the documents that it provided to the SFO. What is notable about this memorandum is the assumption at that time that legal professional privilege would otherwise attach to those documents.

G

(viii) At the first meeting between ENRC and the SFO on 3 October 2011, the SFO said that could give no assurance that it would not prosecute.

(ix) On 18 June 2012, the SFO met ENRC and expressed concern at the absence of a report, saying that "If the investigation had stalled or been obstructed this would be regarded very negatively. For a civil settlement to be entertained, it was essential that the investigation findings were disclosed in the near future".

H

(x) On 12 December 2012, Dechert wrote to the SFO mentioning legal professional privilege and asking for confirmation that: "if an equitable settlement [were not] reached between the SFO and ENRC, . . . that it [was] accepted that the report [would] not be used by the SFO as evidence of any

© 2019 The Incorporated Council of Law Reporting for England and Wales

A   wrongdoing or in any criminal proceedings against either ENRC, any subsidiary of ENRC or any employee or director of ENRC or its subsidiaries." The reply gave no such assurances.

93    In these circumstances, it seems to us that the whole subtext of the relationship between ENRC and the SFO was the possibility, if not the likelihood, of prosecution if the self-reporting process did not result in a civil settlement. This subtext was supported by Mr Spendlove's evidence. Whilst

B   that evidence was hearsay, it was not suggested that he was being untruthful. His statement that Mr Ammann and Mr Dalman had told him that DLA Piper had advised that criminal proceedings could be reasonably said to be in contemplation as at 21 April 2011 was supported by the documents we have mentioned before and after that date. That view, Mr Spendlove said, had reflected their understanding of the effect of the oft-repeated advice of

C   Mr Gerrard to the effect that "there was a real and serious risk of law enforcement and/or regulatory intervention, including criminal prosecution". We do not think it was open to the judge to disregard that evidence, as she appears to have done.

94    Andrews J may have been justified in thinking that the process was at an early stage triggered simply by the whistle-blower e-mail and the press

D   allegations relating to Camrose, but that did not mean that the SFO was not taking a serious and concerted interest in ENRC's activities in Kazakhstan and Africa.

95    We accept also that Mr Gerrard's view was not conclusive, and he may have wanted to create a situation where legal professional privilege covered what he was doing, but that again does not mean that a criminal prosecution was not actually in contemplation.

E   96    As regards ENRC's first legal point under this heading, we are not sure that every SFO manifestation of concern would properly be regarded as adversarial litigation, but when the SFO specifically makes clear to the company the prospect of its criminal prosecution (over and above the general principles set out in the Guidelines), and legal advisers are engaged to deal with that situation, as in the present case, there is a clear ground for

F   contending that criminal prosecution is in reasonable contemplation.

97    Secondly, we do not think that Etherton LJ's dicta in *Dornoch* [2009] EWCA Civ 1323 lead inevitably to the conclusion that once an SFO criminal investigation is reasonably in contemplation, so too is a criminal prosecution. As Etherton LJ concluded at para 36 of *Dornoch*:

G   "Each case turns on its own facts and will be judged in the light of the facts as a whole. Neither a statement on behalf of the insurer as to its state of mind, nor the mere fact of retaining solicitors, will separately or together necessarily be sufficient to satisfy the requirements for litigation privilege."

Here, however, the documents and evidence pointed clearly towards the contemplation of a prosecution if the self-reporting process did not succeed

H   in averting it.

98    Thirdly, whilst a party anticipating possible prosecution will often need to make further investigations before it can say with certainty that proceedings are likely, that uncertainty, in our judgment, does not in itself prevent proceedings being in reasonable contemplation. In the present case,

© 2019 The Incorporated Council of Law Reporting for England and Wales

the uncertainty was a function of ENRC not having the information required to evaluate the whistle-blower e-mail or the Camrose issues. An individual suspected of a crime will, of course, know whether he has committed it. An international corporation will be in a different position, but the fact that there is uncertainty does not mean that, in colloquial terms, the writing may not be clearly written on the wall. We think the judge was wrong to regard the uncertainty as pointing against a real likelihood of a prosecution. The reasoning in paras 162–163 of her judgment could not outweigh the clear indications of a likely prosecution contained in the documents to which we have referred.

99    The judge's distinction between civil and criminal proceedings was, in our judgment, illusory. Of course, civil proceedings are sometimes brought without foundation, but here there was no suggestion that the threat of criminal prosecution was anything other than extremely serious. We are conscious, in this connection, of two matters in particular. First, the Bribery Act 2010 was not actually in force at the relevant time, and secondly, that difficulties may arise in prosecutions in respect of conduct undertaken overseas. Despite these factors, ENRC was actually being told in this case that, if it did not co-operate and allow its professional advisers to undertake an investigation, prosecution would be even more likely. It would be wrong for it to be thought that, in a criminal context, a potential defendant is likely to be denied the benefit of litigation privilege when he asks his solicitor to investigate the circumstances of any alleged offence.

100    These conclusions are not, we think, invalidated by the Court of Appeal Criminal Division's decision in *R v Jukes* [2018] Lloyd's Rep FC 157. In that case, the defendant had signed a statement shortly after a fatal industrial accident accepting that he was responsible for the company's health and safety. The Court of Appeal (Flaux LJ, Nicola Davies J and Judge Bidder QC) upheld the judge's decision that the statement was not covered by litigation privilege, because criminal proceedings were not in contemplation, and any privilege would anyway have attached to the company, which had not asserted it. The court did approve paras 160–161 of Andrews J's judgment, but did so having decided that no adversarial litigation was in progress when the statement was made to the company, because matters were still at an investigatory stage. That was a decision on the facts, where the defendant had not been interviewed by the Health and Safety Executive and the police until 16 months after the statement. The approval of Andrews J's approach was, in our view, obiter. For the reasons we have given, Andrews J was not right to suggest a general principle that litigation privilege cannot attach until either a defendant knows the full details of what is likely to be unearthed or a decision to prosecute has been taken. The fact that a formal investigation has not commenced will be one part of the factual matrix, but will not necessarily be determinative.

101    In these circumstances, we would allow ENRC's appeal against the judge's finding that, at no stage before all the Documents had been created, criminal legal proceedings against ENRC or its subsidiaries or their employees were reasonably in its contemplation. It seems to us that ENRC was right to say that they were in reasonable contemplation when it initiated its investigation in April 2011, and certainly by the time it received the SFO's August 2011 letter.

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    *Issue 2: Was the judge right to determine that none of the Documents was brought into existence for the dominant purpose of resisting contemplated criminal proceedings against ENRC or its subsidiaries or their employees?*

102    Andrews J began her treatment of this issue at para 59 by approving Goldberg J's dictum in *Bailey v Beagle Management Pty Ltd* [2001] FCA 185. That, as it seems to us, was the wrong starting point. The fact that solicitors prepare a document with the ultimate intention of showing that document to the opposing party does not, in our judgment, automatically deprive the preparatory legal work that they have undertaken of litigation privilege. We can imagine many circumstances where solicitors may spend much time fine-tuning a response to a claim in order to give their client the best chance of reaching an early settlement. The discussions surrounding the drafting of such a letter would be as much covered by litigation privilege as any other work done in preparing to defend the claim. We doubt, therefore, the correctness of the legal principles that the judge stated at para 61 of her judgment, and the way that she applied them at paras 168–171. In both the civil and the criminal context, legal advice given so as to head off, avoid or even settle reasonably contemplated proceedings is as much protected by litigation privilege as advice given for the purpose of resisting or defending such contemplated proceedings.

103    It was common ground that the test to be adopted in relation to documents prepared for reasons which only included (but were not limited to) the conduct of litigation is that identified by the House of Lords in *Waugh v British Railways Board* [1980] AC 521 ("*Waugh*"). The document over which privilege was asserted was a report prepared by officers of the British Railways Board ("the Railways Board") into a fatal railway accident, it being clear, on the facts, that the report had been prepared for two purposes of equal importance (namely railway safety and litigation), and also that such reports were required to be prepared after all accidents, regardless of whether litigation was contemplated: see the judgment of Lord Wilberforce at pp 530–531. In a judgment with which the other members of the House agreed in terms or in substance, he identified the test to be adopted, at p 533, in these terms:

> "It appears to me that unless the purpose of submission to the legal adviser in view of litigation is at least the dominant purpose for which the relevant document was prepared, the reasons which require privilege to be extended to it cannot apply."

104    That test has been applied in the subsequent decisions in this area of the law. Thus in *In re Highgrade Traders Ltd* [1984] BCLC 151 ("*Highgrade*"), it was made clear that the exercise of determining dominant purpose in each case is a determination of fact, and that the court must take a realistic, indeed commercial, view of the facts. That case concerned reports commissioned by the insurers into the cause of a fire, where arson by an officer of the insured was suspected. The court concluded that the reports had not been commissioned as a matter of academic interest. Oliver LJ (with whom Robert Goff LJ agreed) explained, at pp 173–174:

> "What, then, was the purpose of the reports? The learned judge found a duality of purpose because, he said, the insurers wanted not only to obtain the advice of their solicitors, but also wanted to ascertain the cause

© 2019 The Incorporated Council of Law Reporting for England and Wales

832
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**    [2019] 1 WLR

of the fire.  Now, for my part, I find these two quite inseparable.  The insurers were not seeking the cause of the fire as a matter of academic interest in spontaneous combustion.  Their purpose in instigating the inquiries can only be determined by asking why they needed to find out the cause of the fire.  And the only reason that can be ascribed to them is that of ascertaining whether, as they suspected, it had been fraudulently started by the insured.  It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow.  The claim had been made and there was no indication that it was not going to be pressed, particularly after Mr MR's acquittal.  It is, as it seems to me, entirely unrealistic to attribute to the insurers an intention to make up their minds independently of the advice, which they received from their solicitors, that the claim should or should not be resisted.  Whether they paid or not depended on the legal advice which they received, and the reports were prepared in order to enable that advice to be given.  The advice given would necessarily determine their decision and would also necessarily determine whether the anticipated litigation would or would not take place.  The learned judge (I have already quoted this passage from his judgment) said ([1983] BCLC 137, 148): 'In my view, the reports were commissioned for two purposes: (a) to enable Phoenix to make up its mind about whether to resist the insurance claim on the ground that the fire was or was probably caused by the insured and (b) to place evidence of the cause of the fire in the hands of the solicitors if the reports should suggest with some probability that the fire was caused by the insured.'

"He seems here, as I read his judgment, at this point to have been of the opinion that *Waugh* established that it was only if the documents were brought into existence for the dominant purpose of actually being used as evidence in the anticipated proceedings that privilege could attach and that the purpose of taking advice on whether or not to litigate (which is, in substance, what the decision to resist the claim amounted to) was some separate purpose which did not qualify for privilege.  That, in my judgment, is to confine litigation privilege within too narrow bounds and it reproduces what I believe to be the fallacy inherent in the note in the Supreme Court Practice to which I have referred.  No doubt the purpose was 'dual' in the sense that the documents might well serve both to inform the solicitors and as proofs of evidence if proceedings materialised.  But, in my judgment, the learned judge failed to appreciate that the former purpose was itself one which would cause the privilege to attach."

105   Similarly, in *Bilta (UK) Ltd v Royal Bank of Scotland* [2018] Lloyd's Rep FC 202 ("*Bilta*"), Sir Geoffrey Vos C concluded that RBS was not spending large sums on legal fees for the primary purpose of dissuading HMRC from issuing an assessment against it, if that could even properly be regarded as a purpose distinct from the litigation purpose.

106   In the course of argument, the SFO suggested that there was a tension between the decision in *Highgrade* and the House of Lords' decision in *Waugh*, and that the latter should be followed here.  We do not accept that the decisions are irreconcilable: they follow an identical principle, reaching different conclusions for fact-specific reasons.  The House of Lords specifically concluded that the fatal accident report over which privilege was

© 2019 The Incorporated Council of Law Reporting for England and Wales

A asserted had been prepared for two purposes of equal importance only one of which concerned litigation whereas in *Highgrade*, as Oliver LJ explained at pp 174–175 of his judgment:

"The instant case is not, in my judgment, on all fours . . . with [*Waugh*]. In . . . [*Waugh*] the documents in question would, in any event, have had to be produced for the [Railway Board's] internal purposes in

B connection with railway safety.  Those seem to me to be quite different circumstances from those of the instant case where there was no purpose for bringing the documents into being other than that of obtaining the professional legal advice which would lead to a decision whether or not to litigate . . .

". . . it seems incontrovertible on the facts of this case that the insurers had very early and very justifiably formed the view that litigation was

C probable and that Mr Speyer's further advice would be required to enable them to present their solicitors with the full material required to enable them to give proper advice on the insurers' future conduct in relation to the claim.  For my part, therefore, I would hold that the specific documents sought by the liquidator are, in the circumstances of this case, the subject matter of privilege.  I emphasise the words 'in the circumstances of this

D case' for it is, I think, clear from [*Waugh*] that, whenever the question arises, the court is concerned to determine the actual intention of the party claiming privilege and, where it discerns a duality of purpose, to determine what is the dominant purpose."

107    The facts of this case lie between *Waugh* on the one hand and *Highgrade* and *Bilta* on the other.  In the former there was an express finding

E of dual purpose.  In the latter two cases, it is difficult to see what the alternative purpose was.  In relation to *Highgrade*, the only real interest for the insurers was in ascertaining whether potential proceedings under the fire policy could successfully be defended; in the latter, HMRC had made it clear that they were pursuing the tax and the company had to determine the extent to which such proceedings could be defended.

F    108    The position in this case is not quite as clear cut.  The SFO's letter of 10 August 2011 urged careful consideration of its Guidelines, impliedly identifying the benefits of self-reporting, but also said expressly that it wanted to discuss "ENRC's governance and compliance programme and its response to the allegations as reported".  We have already decided that a criminal investigation and a potential prosecution was reasonably in the contemplation of ENRC at the time that it commissioned DLA Piper's

G investigation.  ENRC had been advised by its solicitors to that effect, even if it could reasonably be suggested that the solicitors had put the risk at a higher level than could, perhaps, have been justified objectively.  In these circumstances, the issue becomes whether it would have been reasonable to regard ENRC's dominant purpose as being to investigate the facts to see what had happened and deal with compliance and governance or to defend those proceedings.  Andrews J held that it was the former.

H    109    In our judgment, in this case, the answer can be achieved by unpacking the words "compliance" and "governance".  Although a reputable company will wish to ensure high ethical standards in the conduct of its business for its own sake, it is undeniable that the "stick" used to enforce appropriate standards is the criminal law and, in some measure, the civil law

© 2019 The Incorporated Council of Law Reporting for England and Wales

834
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

also.  Thus, where there is a clear threat of a criminal investigation, even at *A* one remove from the specific risks posed by the SFO should it start an investigation, the reason for the investigation of whistle-blower allegations must be brought into the zone where the dominant purpose may be to prevent or deal with litigation.

110   In the period which has elapsed since the decision of Andrews J, proceedings have been pursued by ENRC against Dechert and, with the consent of the parties, the pleadings have been made available to the court. *B* In those circumstances, the SFO submitted that the conclusion as to dominant purpose is inconsistent with the content of Dechert's defence in the proceedings.  The SFO relied in particular on the following paragraphs:

> "9. ENRC originally instructed [DLA Piper] . . . and subsequently Dechert . . . to investigate allegations of wrongdoing at ENRC's subsidiary, SSGPO, in Kazakhstan.  That investigation had nothing to do *C* with the SFO, but was initiated by ENRC's Audit Committee for corporate governance reasons . . .
>
> "10. The need to investigate serious wrongdoing by the management of ENRC and its subsidiaries remained a key motivation for retaining the Defendants independent of the self-reporting process with the SFO . . ."
>
> "83. . . . (2) . . . The risk of UK criminal investigations or proceedings *D* was not a material factor in ENRC's decision to instruct Dechert to investigate the Kazakhstan Allegations . . ."

111   Those paragraphs do not alter the true factual position for three reasons.  First, pleadings filed in a separate action by a party that did not give evidence in these proceedings are of limited value to this court even if, which is by no means clear, they should properly be admitted bearing in mind the *E* criteria for the admission of further evidence.  Secondly, the views of Dechert on dominant purpose can never be conclusive as to the true motivations of the relevant individuals at ENRC, with which this court is concerned. Finally, and most importantly, even if litigation was not the dominant purpose of the investigation at its very inception, it is clear from the evidence that it swiftly became the dominant purpose.  We have already observed under issue 1 that, in April 2011 (some three months before the first *F* Category 1 document was created), Dechert advised ENRC that "both criminal and civil proceedings can be reasonably said to be in contemplation" so that documents arising out of the investigation were covered by litigation privilege, and that, in September 2011 (shortly after the first Category 1 document was created), Jones Day advised the company that privilege would be lost if those documents were shared with the SFO under *G* the voluntary disclosure regime.  Mr Spendlove's evidence, which as we have said has never been suggested to be untruthful, is that ENRC took that advice on board.

112   We turn now to the judge's conclusion at para 171 that there was overwhelming evidence that the Category 1 documents were created for the specific purpose of being shown to the SFO.  We disagree with this important *H* conclusion.  In our judgment, looking fairly at the documentation as a whole, one can see that ENRC never actually agreed to disclose the materials it created in the course of its investigation to the SFO.  It certainly gave the SFO repeated indications that it would make "full and frank disclosure" and that it would produce its eventual report to the SFO.  But it never actually

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    committed to producing its interviews and intermediate work product to the SFO. That was part of what frustrated the SFO and ultimately led to the breakdown of the self-reporting process. It suffices to take a few examples from the chronology set out above:

(i) The Guidelines themselves, which the SFO sent to ENRC at the outset, gave the clear impression that the self-reporting "corporate" would be in receipt of professional legal advice, both before and during the process.

B    (ii) On 7 October 2011, four days after the first meeting between ENRC and the SFO, an internal SFO e-mail recorded that Mr Gerrard had said that ENRC would make a voluntary disclosure the following week. In fact, it never did so.

(iii) The note of the second meeting between the SFO and ENRC on 30 November 2011 recorded that ENRC was "keen to tackle the issue and be full and frank". This frankness never totally materialised.

C    (iv) The note of the third meeting between ENRC and the SFO on 20 December 2011 recorded that Mr Ehrensberger had been "been given a mandate to disclose [to the SFO] anything he feels appropriate". Again, this did not happen.

(v) At the fifth meeting on 10 May 2012, Mr Dalman informed the SFO of the ENRC Board's commitment to transparency, co-operation and openness, but the SFO expressed concern that progress had been slow and that nothing substantive had yet been reported by ENRC to the SFO.

D    (vi) The note of the 18 June 2012 meeting recorded the SFO as saying that "For a civil settlement to be entertained, it was essential that the investigation findings were disclosed in the near future". It does not appear that, at least at that stage, even the SFO was expecting voluntary disclosure of all Dechert's work product.

E    (vii) The PowerPoint presentations of 20 July 2012 and 28 November 2012 gave the SFO detailed updates on the progress of the interviews and investigations, and confirmed ENRC's "commitment to [a] full and frank process", but did not actually disclose either concrete results or statements of any sort.

F    (viii) On 12 December 2012, Dechert wrote to the SFO suggesting for the first time that it was engaged in a self-reporting process pursuant to the Guidelines, and asking, given the withdrawal of the Guidelines on 9 October 2012, for "confirmation that ENRC is still part of the corporate self-reporting process prior to Dechert submitting our report on SSGPO". ENRC also said that: "Any report submitted by Dechert to the SFO will be submitted under a limited waiver of legal professional privilege for the purposes of the corporate self report only." Whilst it is true, as the SFO submitted, that one could conclude from this document that self-reporting had begun at some stage between August 2011 and December 2012, in fact, Dechert and ENRC had promised nothing in relation to the interview notes and lawyers' work product. Moreover, after this stage, Dechert was expressly asserting legal professional privilege, and even the 28 February 2013 disclosure of Dechert's report on the Kazakhstan investigation was the subject of a specific waiver of legal professional privilege.

G

H

113    In these circumstances, we conclude that, not only was a criminal prosecution reasonably in ENRC's contemplation, but the judge ought also to have determined that the Category 1 documents were brought into

© 2019 The Incorporated Council of Law Reporting for England and Wales

existence for the dominant purpose of resisting or avoiding those (or some other) proceedings.

114    The same can be said of the FRA documents in Categories 2 and 4. The books and records review was commissioned at around the same time as the Dechert investigation, and FRA's work formed part of that investigation from, at the latest, 15 July 2011 (when FRA was formally instructed by Dechert). The judge's conclusion that the dominant purpose of the review was compliance and remediation (which itself might have been intended to avoid or deal with litigation) sits uncomfortably with that background, and is also in stark contrast to the evidence of Mr Duthie and Mr Spendlove. In our judgment, the judge failed to adequately explain at paras 173–176 why she rejected that evidence. She did not specify any of the "wealth of contemporaneous documents" that she said supported her conclusion. She seemed to rely mainly on the absence of contemporaneous evidence pointing in the opposite direction, even though ENRC's submission, which she recorded at para 174 (see para 55 above), provided a plausible explanation for the absence of such evidence. In those circumstances, her conclusion cannot stand.

115    For the avoidance of doubt, nothing in this analysis should be taken to impact adversely on the operation of the scheme set out in Schedule 17 to the Crime and Courts Act 2013 in relation to deferred prosecution agreements ("DPA") or the circumstances in which the court is asked to approve a DPA pursuant to section 45 of that Act. The Act achieved Royal Assent on the same day that the SFO here determined to commence a criminal investigation and therefore was not necessarily the focus of the earlier discussions with ENRC but the purpose of the scheme (overseen by the court) has been to develop a mechanism whereby companies are encouraged to self-report, accept a negotiated penalty for breaches of the law identified and to undertake monitored governance and compliance reviews. The benefit is to avoid both the cost and non-penal consequences of conviction.

116    It is, however, obviously in the public interest that companies should be prepared to investigate allegations from whistle-blowers or investigative journalists, prior to going to a prosecutor such as the SFO, without losing the benefit of legal professional privilege for the work product and consequences of their investigation. Were they to do so, the temptation might well be not to investigate at all, for fear of being forced to reveal what had been uncovered whatever might be agreed (or not agreed) with a prosecuting authority. The remedy for the SFO is not to allow prevarication and delay (which might be said to have occurred in this case) to prevent a timeous investigation, when it becomes clear that the company is not wholeheartedly reporting its own conduct and making appropriate waivers of privilege. Whether the fact that an investigation has been formally commenced should ultimately deprive a prosecutor of the opportunity of agreeing a DPA will be for the prosecutor to decide in the light of all the circumstances.

117    In any event, to determine whether a DPA is in the interests of justice, and whether the terms of the particular DPA are fair, reasonable and proportionate, the court must examine the company's conduct and the extent to which it co-operated with the SFO. Such an examination will consider whether the company was willing to waive any privilege attaching

© 2019 The Incorporated Council of Law Reporting for England and Wales

837

**[2019] 1 WLR    Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)**

to documents produced during internal investigations, so that it could share those documents with the SFO: see, for example, *Serious Fraud Office v Rolls-Royce plc* [2017] Lloyd's Rep FC 249, paras 19–21, 35–39 and 121. Had the court been asked to approve a DPA between ENRC and the SFO, the company's failure to make good on its promises to be full and frank would undoubtedly have counted against it. All this, however, is quite different from the question that actually arises, namely whether the Documents were covered by privilege in the first place.

118    Finally in this connection, it is worth summarising what seems to have gone wrong with the judge's consideration of the question of dominant purpose. First, she started with Goldberg J's dictum that documents prepared for the purpose of settling or avoiding a claim are not created for the dominant purpose of defending litigation. That was, in our view, an error of law. Secondly, she did not properly understand the way in which *Waugh* [1980] AC 521 and *Highgrade* [1984] BCLC 151 are to be understood. The policy of the board in *Waugh* requiring it to investigate all accidents was a distinct purpose that prevented the possible litigation being the dominant purpose. The need to identify the cause of the fire in *Highgrade* or to investigate the existence of corruption in this case was just a subset of the defence of contemplated legal proceedings. Thirdly, the judge misinterpreted the contemporaneous material, thinking wrongly that it showed that ENRC always intended or agreed to share the core material they obtained from their interviews and investigations with the SFO (as opposed to any report they ultimately prepared). Instead, the material clearly demonstrates that no such formal agreement was ever made. ENRC certainly led the SFO to believe it might in the future waive privilege in such material, but it never actually did so. It was noteworthy that the SFO never even contended for a waiver of privilege.

119    For these reasons, we have concluded that the judge ought to have concluded that the Documents were brought into existence for the dominant purpose of resisting or avoiding contemplated criminal proceedings against ENRC or its subsidiaries or their employees.

*Issue 3: In the circumstances, which if any of the Category 1, 2 or 4 documents are protected by litigation privilege?*

120    In our judgment, applying the basic principles already adumbrated, all the interviews undertaken by Dechert were covered by litigation privilege. That seems to us to have been the SFO's own understanding from the Guidelines and its discussions with ENRC between August 2011 and March 2013. Whilst the SFO several times reserved its position, its own Guidelines made clear its expectation that the company's lawyers would be undertaking an investigation and would then report to the SFO. The repeated requests for full and frank disclosure seem to me to have been a plea for that privilege to be waived.

121    We do not see that the books and records review is in a different position. It was part of ENRC's fact-finding process at a time when criminal prosecution was in reasonable contemplation, and was also undertaken for the dominant purpose of resisting or avoiding that prosecution. Litigation privilege is also claimed for most of the documents in Category 4. With the exception of the two October 2010 e-mails exchanged with Mr Ehrensberger

© 2019 The Incorporated Council of Law Reporting for England and Wales

838
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)    [2019] 1 WLR**

(for which litigation privilege is not claimed), it is accepted that these documents follow the approach taken to Category 2.

122    Accordingly, in our judgment, the Category 1, 2 and 4 documents (with the exception of the two e-mails we have mentioned) are, contrary to the judge's decision, covered by litigation privilege.

*The legal advice privilege issues*

*Issue 4: What did Three Rivers (No 5) actually decide?*

123    Our conclusions under issues 1 to 3 make the question of legal advice privilege far less important. Since, however, the matter has been fully argued and the Law Society intervened to assist the court, we will say briefly how we would have determined these matters. As will be apparent from what we have already said, we would have determined that *Three Rivers (No 5)* [2003] QB 1556 decided that communications between an employee of a corporation and the corporation's lawyers could not attract legal advice privilege unless that employee was tasked with seeking and receiving such advice on behalf of the client, as the BIU was in *Three Rivers (No 5)*.

124    In this context, we were much pressed with the argument that, if *Three Rivers (No 5)* actually decided what we have decided it did, it was wrong. As we have already said, this is a question that, in our judgment, can only be determined by the Supreme Court. In deference, however, to Mr Thanki's and Ms Dinah Rose QC's arguments, we can say that we can see much force in what they submitted.

125    First, we do not think that a meticulous analysis of the 19th century authorities should be determinative, because, in our judgment, those cases were decided when the distinction between litigation privilege and legal advice privilege was very much in its infancy. It is more important that a principled analysis of the purpose of legal advice privilege should be undertaken. Lord Scott in *Three Rivers (No 6)* [2005] 1 AC 610 set out the parameters as follows:

> "28. So I must now come to policy. Why is it that the law has afforded this special privilege to communications between lawyers and their clients that it has denied to all other confidential communications? In relation to all other confidential communications, whether between doctor and patient, accountant and client, husband and wife, parent and child, priest and penitent, the common law recognises the confidentiality of the communication, will protect the confidentiality up to a point, but declines to allow the communication the absolute protection allowed to communications between lawyer and client giving or seeking legal advice. In relation to all these other confidential communications the law requires the public interest in the preservation of confidences and the private interest of the parties in maintaining the confidentiality of their communications to be balanced against the administration of justice reasons for requiring disclosure of the confidential material. There is a strong public interest that in criminal cases the innocent should be acquitted and the guilty convicted, that in civil cases the claimant should succeed if he is entitled to do so and should fail if he is not, that every trial should be a fair trial and that to provide the best chance of these

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    desiderata being achieved all relevant material should be available to be taken into account. These are the administration of justice reasons to be placed in the balance. They will usually prevail."

"30. The second sentence of the cited passage [from *Three Rivers (No 6)* in the Court of Appeal] does, however, pose a question of great relevance to this appeal. It questions the justification for legal advice privilege where the legal advice has no connection with adversarial

B    litigation. A number of cases in our own jurisdiction and in other common law jurisdictions have sought to answer the question. In *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, Lord Taylor of Gosforth CJ said, at pp 507, 508: 'In *Balabel v Air India* [1988] Ch 317 the basic principle justifying legal professional privilege was again said to be that a client should be able to obtain legal advice in confidence. The

C    principle which runs through all these cases . . . is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth. The client must be sure that what he tells his lawyer in confidence will never be revealed without his consent . . . once any exception to the general rule is allowed, the client's confidence is necessarily lost.' In *R (Morgan Grenfell & Co Ltd) v Special Comr of*

D    *Income Tax* [2003] 1 AC 563, 607, para 7 Lord Hoffmann referred to legal professional privilege as 'a necessary corollary of the right of any person to obtain skilled advice about the law' and continued: 'Such advice cannot be effectively obtained unless the client is able to put all the facts before the adviser without fear that they may afterwards be disclosed and used to his prejudice.' "

E    126    Lord Scott also referred to passages to a similar effect in *B v Auckland District Law Society* [2003] 2 AC 736, para 47 per Lord Millett, in *Upjohn Co v United States* (1981) 449 US 383, per Justice Rehnquist in the US Supreme Court, in *Jones v Smith* [1999] 1 SCR 455, 474–475, per the Supreme Court of Canada, in *Baker v Campbell* (1983) 153 CLR 52, per Murphy J and Wilson J in the High Court of Australia at pp 89 and 95

F    respectively, in *Comr of Inland Revenue v West-Walker* [1954] NZLR 191, and in *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913, per Advocate General Slynn. He then concluded his section on the rationale for legal advice privilege with the following [2005] 1 AC 610, para 34:

"None of these judicial dicta tie the justification for legal advice

G    privilege to the conduct of litigation. They recognise that in the complex world in which we live there are a multitude of reasons why individuals, whether humble or powerful, or corporations, whether large or small, may need to seek the advice or assistance of lawyers in connection with their affairs; they recognise that the seeking and giving of this advice so that the clients may achieve an orderly arrangement of their affairs is strongly in the public interest; they recognise that in order for the advice

H    to bring about that desirable result it is essential that the full and complete facts are placed before the lawyers who are to give it; and they recognise that unless the clients can be assured that what they tell their lawyers will not be disclosed by the lawyers without their (the clients') consent, there will be cases in which the requisite candour will be absent. It is obviously

© 2019 The Incorporated Council of Law Reporting for England and Wales

*A*

true that in very many cases clients would have no inhibitions in providing their lawyers with all the facts and information the lawyers might need whether or not there were the absolute assurance of non-disclosure that the present law of privilege provides. But the dicta to which I have referred all have in common the idea that it is necessary in our society, a society in which the restraining and controlling framework is built upon a belief in the rule of law, that communications between *B* clients and lawyers, whereby the clients are hoping for the assistance of the lawyers' legal skills in the management of their (the clients') affairs, should be secure against the possibility of any scrutiny from others, whether the police, the executive, business competitors, inquisitive busybodies or anyone else (see also paras 15.8–15.10 of *Zuckerman's Civil Procedure* (2003) where the author refers to the rationale *C* underlying legal advice privilege as 'the rule of law rationale'). I, for my part, subscribe to this idea. It justifies, in my opinion, the retention of legal advice privilege in our law, notwithstanding that as a result cases may sometimes have to be decided in ignorance of relevant probative material."

**127**  This last passage makes clear that large corporations need, as *D* much as small corporations and individuals, to seek and obtain legal advice without fear of intrusion. If legal advice privilege is confined to communications passing between the lawyer and the "client" (in the sense of the instructing individual or those employees of a company authorised to seek and receive legal advice on its behalf), this presents no problem for individuals and many small businesses, since the information about the case will normally be obtained by the lawyer from the individual or board *E* members of the small corporation. That was the position in most of the 19th century cases. In the modern world, however, we have to cater for legal advice sought by large national corporations and indeed multinational ones. In such cases, the information upon which legal advice is sought is unlikely to be in the hands of the main board or those it appoints to seek and receive legal advice. If a multinational corporation cannot ask its *F* lawyers to obtain the information it needs to advise that corporation from the corporation's employees with relevant first-hand knowledge under the protection of legal advice privilege, that corporation will be in a less advantageous position than a smaller entity seeking such advice. In our view, at least, whatever the rule is, it should be equally applicable to all clients, whatever their size or reach. Moreover, it is not always an answer *G* to say that the relevant subsidiary can seek the necessary legal advice and, therefore, ask its own lawyers to secure the necessary information with the protection of legal advice privilege. In a case such as the present, there may be issues between group companies that make it desirable for the parent company to be able to procure the information necessary to obtain its own legal advice.

**128**  We were referred specifically in this connection to a decision of the *H* Singapore Court of Appeal in *Skandinaviska Enskilda Banken AB (Publ); Singapore Branch v Asia Pacific Breweries (Singapore) Pte Ltd* [2007] 2 SLR 367, where Andrew Phang Boon Leong JA held at paras 41–42 that the ratio of *Three Rivers (No 5)* was that only the BIU was authorised to

© 2019 The Incorporated Council of Law Reporting for England and Wales

A communicate with the bank's lawyers, and that "since a company can only act through its employees, communications made by [authorised employees] would be communications 'made on behalf of the client', and can attract legal advice privilege". In addition, in *Citic Pacific Ltd v Secretary for Justice* [2016] 1 HKC 157, the Hong Kong Court of Appeal (Lam VP, Barma JA and Poon J) concluded that a dominant purpose test in legal advice privilege was

B to be preferred to the narrow definition of the "client" adopted in *Three Rivers (No 5)*: see paras 39–56 in the judgment of the court, and paras 53–55 in the context of large corporations.

129 Finally in this connection, it seems to us, as Ms Rose submitted on behalf of the Law Society, that English law is out of step with the international common law on this issue. It is undoubtedly desirable for the common law in different countries to remain aligned so far as its

C development is not specifically affected by different commercial or cultural environments in those countries. In this regard, legal professional privilege is a classic example of an area where one might expect to see commonality between the laws of common law countries, particularly when so many multinational companies operate across borders and have subsidiaries in numerous common law countries.

D 130 If, therefore, it had been open to us to depart from *Three Rivers (No 5)* [2003] QB 1556, we would have been in favour of doing so. For the reasons we have given, however, we do not think that it is open to us, so it is a matter that will have to be considered again by the Supreme Court in this or an appropriate future case.

E *Issue 5: Does a claim for legal advice privilege require the proponent to show that the information was obtained for the dominant purpose of obtaining legal advice?*

131 The SFO submitted that it should in any event be held that, if information passed to a company's lawyers by employees who were not authorised to seek and receive legal advice could be the subject of legal

F advice privilege, a further qualification should be added, namely that the information must be shown to have been obtained for the dominant purpose of obtaining legal advice. This, submitted Mr James Segan for the SFO, was established by a line of cases including, for example, *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison* [1997] 1 Lloyd's Rep 160, 168, per Rix J, *Three Rivers (No 5)* [2003] CP Rep 34, paras 20, 21, 26 and 30, per Tomlinson J at first instance and *Philip Morris CA* [2004] 1 CLC 811,

G paras 43 and 77, per Brooke LJ.

132 In the light of the approach that we have adopted thus far to legal advice privilege, it would not be appropriate to reach any final conclusion on this submission. In our judgment, however, it is hard to see why the suggested additional qualification is necessary, when the privilege can, by definition, only be claimed when legal advice is being sought or given. It is

H one thing to say that litigation privilege can only be claimed where the communication is created for the dominant purpose of the litigation, but entirely another to say that legal advice privilege can only be claimed where the communication is created for the dominant purpose of seeking legal advice. The second is tautologous.

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Issue 6(a): Was the judge right to conclude that none of the Documents was protected by legal advice privilege on the basis that the information they contained was not communicated to ENRC's solicitor by anyone authorised to give or receive legal advice on behalf of ENRC or its subsidiaries?*

133    If legal advice privilege were all that could have been claimed, the judge would, in our view, have been right to follow *Three Rivers (No 5)* [2003] QB 1556 and decide that the Category 1 documents were not protected by legal advice privilege. Those documents did not contain information that was communicated to ENRC's solicitor by anyone authorised to seek or receive legal advice on behalf of ENRC or its subsidiaries. The same applies to the two e-mails of October 2010 in Category 4 that were exchanged with Mr Ehrensberger at a time when he was not ENRC's general counsel, and when he was acting, as the judge said, as a man of business. Legal advice privilege was not claimed in relation to the FRA documents in Categories 2 and 4 (although ENRC retained the right to claim legal advice privilege in respect of any individual FRA document as the judge said at para 30).

134    We have already explained why we would have reached a different conclusion on the Category 1 documents, were this court not bound by *Three Rivers (No 5)*.

*Issue 6(b): Was the judge right to conclude that none of the Documents was protected by legal advice privilege on the basis that the information they contained was not communicated to ENRC's solicitor for the purpose of obtaining legal advice, but rather for the purposes of that solicitor's investigation of the facts?*

135    The judge rejected this aspect of the claim to legal advice privilege on the ground that "The evidence gathered by Dechert during its investigations was intended by ENRC to be used to compile presentations to the SFO as part of what it viewed as its engagement in the self-reporting process" and "the documents formed part of the preparatory work of compiling information for the purpose of enabling the corporate client to seek and receive legal advice, and are not privileged".

136    For the reasons that we have already given under issue 2 above, we are of the clear view that the dominant purpose of the preparation of the interview notes and the documents review was to resist or avoid contemplated criminal proceedings against ENRC or its subsidiaries or their employees.

*Issue 6(c): Was the judge right to conclude that none of the Documents was protected by legal advice privilege on the basis that there was overwhelming evidence that ENRC had always intended and/or agreed to share the information they obtained with the SFO as part of a self-reporting process?*

137    We have dealt with this point at para 112 above. For the reasons given in that paragraph, we do not think that the documentation demonstrates that ENRC ever intended or agreed to share the information it obtained with the SFO. ENRC, as we have also already said, certainly gave the SFO indications that it was going in the future to make full and frank disclosure, but in fact it never formally agreed to do so or actually did so,

© 2019 The Incorporated Council of Law Reporting for England and Wales

A

B

C

D

E

F

G

H

*A*  before it retreated to the position that everything was covered by legal professional privilege. Accordingly, this was not a valid reason for depriving ENRC of legal advice privilege.

*Issue 7: Are the answers to issue 6 above different if the employees in question are ex-employees at the time that the information is imparted?*

*B*  138  In the light of the conclusions already reached, this issue does not really arise. It is not doubted that interviews by ENRC's lawyers with ex-employees for the purpose of resisting contemplated proceedings are covered by litigation privilege. The question is only whether interviews with ex-employees would be covered by legal advice privilege. ENRC argued that ex-employees were as likely to have information relevant to defending legal
*C*  proceedings as current employees, and that if the rationale was to enable the lawyer to gain a full picture of the facts, then information obtained from ex-employees should be as privileged as that secured from current staff.

139  In our judgment, information obtained from ex-employees falls into the same category as that obtained from third parties, which ENRC accepts cannot be held to be covered by legal advice privilege at this level.
*D*  An ex-employee is in all respects equivalent to a third party, and however desirable it might be that information obtained from such a person should be covered by legal advice privilege, we do not think that that is, on any analysis, the current law. As the SFO submitted, the only authority emanates from the United States, where there are two cases pointing in different directions: *Newman v Highland School District No 203* (2016) 188 Wn 2d
*E*  769 and *Upjohn Co v United States* (1981) 449 US 383.

140  This is an issue that can be considered if and when the Supreme Court has cause to decide a challenge to the correctness of *Three Rivers (No 5)* [2003] QB 1556.

*Issue 8: Was the judge right to hold that lawyers' working papers are only protected by legal advice privilege if they would betray the tenor of the legal
*F*  advice?*

141  Once again, this issue does not now strictly arise. The judge decided at paras 95–97 and 180 that the Category 1 documents were not privileged under the heading of lawyers' working papers. She held that the evidence did not establish on the balance of probabilities that the interview notes would betray the tenor of the legal advice given to ENRC or any aspect
*G*  of it. Mr Thanki submitted that the test the judge applied was wrong, and that all that was required for lawyers' working papers to be privileged was that they were confidential documents created by a lawyer for the purpose of giving legal advice. He said that Hildyard J in *In re RBS Rights Litigation* [2017] 1 WLR 1991 had wrongly relied on observations made in a different context in *Lyell v Kennedy* (1884) 27 Ch D 1, 26, and *Ventouris v Mountain*
*H*  [1991] 1 WLR 607.

142  Since we have held that the interview notes here are covered by litigation privilege, it is not necessary for us to resolve this question. It seems to us that it would be better if it were considered in the context of the Supreme Court's future consideration of legal advice privilege.

© 2019 The Incorporated Council of Law Reporting for England and Wales

844
**Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (CA)     [2019] 1 WLR**

*Issue 9: If not, was the judge right to deny any or all of the Documents the* A
*benefit of legal advice privilege as lawyers' working papers?*

143    For the same reasons, it is not necessary to answer this question.

*Conclusion*

144    For the reasons that we have tried to give as shortly as possible, we
will allow the appeal against Andrews J's declarations that the documents in     B
Categories 1, 2 and 4 (save for the two Ehrensberger e-mails) were not
covered by litigation privilege, but otherwise dismiss the appeal.

Notes

1. As opposed to a criminal investigation, which she held was in reasonable
contemplation by no later than 11 August 2011 (see para 151 of the judgment).
2. See Lord Goff at [1989] AC 346, 392G–393C and 395D–E, and Lord Griffiths at     C
pp 384H–385A. Lord Brandon agreed with the outcome proposed by Lords Goff and
Griffiths, but did not mention the point about the statute reflecting the common law.

<em>Appeal allowed in part.</em>

PHILIP PACANOWSKI, Barrister

D

E

F

G

H

© 2019 The Incorporated Council of Law Reporting for England and Wales

114

[1998]

[COURT OF APPEAL]                                    A

\*GOTHA CITY v. SOTHEBY'S AND ANOTHER

1997   June 18, 19                Staughton, Aldous and Hutchison L.JJ.

Practice—Discovery—Privilege—One defendant disclosing legal advice
to another in circumstances where confidentiality assumed—Whether    B
privilege waived—Whether plaintiff entitled to copies of disclosed
documents

The second defendant bought a 17th century painting from a
German woman and placed it with the first defendant for sale by
auction. The plaintiff claimed to be the owner of the painting and
brought an action against the defendants for its recovery. On an
application by the plaintiff the master made an order pursuant to    C
R.S.C., Ord. 24, rr. 7 and 11 for specific discovery and inspection
of copies of letters, opinions or other documents provided to the
second defendant by its legal advisers, in which it was said
privilege had been lost by virtue of those documents having been
copied to the first defendant, and of copies of minutes or
attendance notes of meetings or telephone conversations between
the second defendant and its legal advisers and the first defendant.
The judge dismissed an appeal by the second defendant.              D
    On appeal by the second defendant:—
    Held, allowing the appeal, that since litigation was not in
contemplation when the documents came into existence the
documents were not privileged on that ground; that the issue was
whether the disclosure of the documents and information was
confidential in the absence of any express agreement to that effect;
that confidentiality could be implied where it would be expected    E
to be assumed by those involved and it was a plain inference that
the communications about the advice received by the second
defendant were intended to be confidential as between the first
and second defendants; and that, accordingly, in the circumstances
privilege had not been waived (post, pp. 118A, 121G, 122B–D,
123D–E, 124A).
    Decision of Mr. Nigel Baker Q.C. sitting as a deputy judge of    F
the Queen's Bench Division reversed.

The following cases are referred to in the judgments:

Attorney-General v. Guardian Newspapers Ltd. (No. 2) [1990] 1 A.C. 109;
    [1988] 3 W.L.R. 776; [1988] 3 All E.R. 545, H.L.(E.)
Balabel v. Air India [1988] Ch. 317; [1988] 2 W.L.R. 1036; [1988] 2 All E.R.
    246, C.A.
British Coal Corporation v. Dennis Rye Ltd. (No. 2) [1988] 1 W.L.R. 1113;    G
    [1988] 3 All E.R. 816, C.A.
Crescent Farm (Sidcup) Sports Ltd. v. Sterling Offices Ltd. [1972] Ch. 553;
    [1972] 2 W.L.R. 91; [1971] 3 All E.R. 1192
Derby & Co. Ltd. v. Weldon (No. 7) [1990] 1 W.L.R. 1156; [1990] 3 All E.R.
    161
Downey v. Murray [1988] N.I. 600
Goldberg v. Ng (1994) 33 N.S.W.L.R. 639                                      H
Network Ten Ltd. v. Capital Television Holdings Ltd. (1995) 36 N.S.W.L.R.
    275
Reg. v. Braham and Mason [1976] V.R. 547

The following additional cases are cited in argument:

Bank of Nova Scotia v. Hellenic Mutual War Risks Association (Bermuda)
    Ltd. (Note) (No. 2) [1992] 2 Lloyd's Rep. 540

The Weekly Law Reports 16 January 1998

115

I W.L.R.                    Gotha City v. Sotheby's (C.A.)

A   *Formica Ltd. v. Secretary of State acting by the Export Credits Guarantee
        Department* [1995] 1 Lloyd's Rep. 692
    *G.E. Capital Corporate Finance Group Ltd. v. Bankers Trust Co.* [1995]
        1 W.L.R. 172; [1995] 2 All E.R. 993, C.A.
    *Getty (Sarah C.) Trust, In re* [1985] Q.B. 956; [1985] 3 W.L.R. 302; [1985]
        2 All E.R. 809
    *Great Atlantic Insurance Co. v. Home Insurance Co* [1981] 1 W.L.R. 529;
        [1981] 2 All E.R. 485, C.A.
B   *Svenska Handelsbanken v. Sun Alliance and London Insurance Plc.* [1995]
        2 Lloyd's Rep. 84


    The following cases, although not cited, were referred to in the skeleton
arguments:

    *Alan (W. J.) & Co. Ltd. v. El Nasr Export and Import Co.* [1972] 2 Q.B. 189;
C       [1972] 2 W.L.R. 800; [1972] 2 All E.R. 127, C.A.
    *Anderson v. Bank of British Columbia* (1876) 2 Ch.D. 644, C.A.
    *British and Commonwealth Holdings Ltd. v. Quadrex Holdings Inc.*
        (unreported), 4 July 1990, Gatehouse J.
    *Buttes Gas and Oil Co. v. Hammer (No. 3)* [1981] Q.B. 223; [1980] 3 W.L.R.
        668; [1980] 3 All E.R. 475, C.A.
    *Calcraft v. Guest* [1898] 1 Q.B. 759, C.A.
D   *Hellenic Mutual War Risks Association (Bermuda) Ltd. v. Harrison* [1997]
        1 Lloyd's Rep. 160
    *Highgrade Traders Ltd., In re* [1984] B.C.L.C. 151, C.A.
    *Leif Hoegh & Co. A/S v. Petrolsea Inc. (No. 2)* [1993] 1 Lloyd's Rep. 363
    *Price Waterhouse v. B.C.C.I. Holdings (Luxembourg) S.A.* [1992] B.C.L.C.
        583
    *Unilateral Investments Ltd. v. V.N.Z. Acquisitions Ltd.* [1993] 1 N.Z.L.R. 468
E   *Ventouris v. Mountain* [1991] 1 W.L.R. 607; [1991] 3 All E.R. 472, C.A.
    *Waugh v. British Railways Board* [1980] A.C. 521; [1979] 3 W.L.R. 150; [1979]
        2 All E.R. 1169, H.L.(E.)
    *Wheeler v. Le Marchant* (1881) 17 Ch.D. 675, C.A.


    INTERLOCUTORY APPEAL from Mr. Nigel Baker Q.C. sitting as a deputy
judge of the Queen's Bench Division.
F       By an order dated 5 November 1996 made on the application of the
plaintiff, the City of Gotha (a body corporate), in an action against the
defendants, Sotheby's (an unlimited company) and Cobert Finance S.A.
(a Panamanian company), Master Trench made an order for discovery of,
inter alia, copies of any letters, opinions or other documents whatsoever
provided to the second defendant by its legal advisers in which possible
legal professional privilege had subsequently been lost because they ceased
G   to be confidential by virtue of their being copied to third parties (including
the first defendant) during the period 29 November 1988 to 30 March
1992 and minutes or attendance notes of any meetings or telephone
conversations held between those dates between (i) the second defendant
and/or its legal advisers and (ii) third parties (including the first defendant)
whether they were prepared by the second defendant, its legal advisers or
H   the third party in each case. An appeal by the second defendant was
dismissed by the deputy judge on 3 December 1996.
    By a notice of appeal dated 24 January 1997 the second defendant
appealed to the Court of Appeal with the leave of the single judge granted
on 22 January 1997. The grounds of appeal were that the judge (i) erred
in concluding that the second defendant had waived legal advice privilege
by copying material to the first defendant and allowing the first defendant's
representatives to attend a meeting with the second defendant's lawyers;

153

The Weekly Law Reports 16 January 1998

116

Gotha City v. Sotheby's (C.A.)                    [1998]

(ii) erred in concluding that there was no common interest as between the   A
first and second defendants; (iii) gave insufficient weight to the plaintiff's
evidence that the first and second defendants were acting in tandem in
investigating title to a painting the ownership of which was the subject
matter of the action; (iv) erred in not holding that legal advice privilege
applied between a prospective seller and its agent; (v) gave insufficient
weight to the fact that it was for the plaintiff to establish that the second
defendant's claim to privilege was unfounded; (vi) wrongly gave weight to   B
the fact that litigation was not in prospect in concluding that no common
interest privilege applied and (vii) wrongly concluded that the presence of
the first defendant's representatives at a meeting with the second
defendant's lawyers meant a loss of confidentiality and privilege.

The facts are stated in the judgment of Staughton L.J.

  C

*Bankim Thanki* for the second defendants.
*Alexander Layton Q.C.* and *Monica Carss-Frisk* for the plaintiff.
The first defendant did not appear and was not represented.

STAUGHTON L.J.   This consolidated action is pending in the Queen's
Bench Division. It is about the ownership of a painting called the Holy   D
Family with Saints John and Elizabeth and Angels by Joachim Wtewael.
Presently it is in the custody of Sotheby's, who are the first defendants.
They hold it on the instructions of Cobert Finance S.A., a Panamanian
company who claim to be the owners of the painting, having bought it in
March 1989 from Mrs. Breslav of Berlin. Rival claimants are the Federal
Republic of Germany and the City of Gotha, which is in Thuringia in the
eastern part of Germany. They are the plaintiffs in the consolidated   E
action.

The present appeal is from an order of Mr. Nigel Baker Q.C. sitting
as a deputy judge of the Queen's Bench Division. He dismissed an appeal
from an order of Master Trench concerned with discovery. That was an
order that Cobert Finance S.A. should disclose no less than seven
categories of documents. It is important to note that no order was made   F
against Sotheby's. There had been another occasion when an order was
sought against Sotheby's and was refused on the ground that they had
interpleaded.

The order of Master Trench, upheld by the deputy judge, was very
wide. It is unfortunately typical of the sort of orders that are sought under
R.S.C., Ord. 24, r. 7, which should always be scrutinised with great care
by a master or judge who is asked to make them. The parts that are in   G
dispute are paragraphs 7 and 8 as follows:

"7. Copies of any letters, opinions or other documents whatsoever
provided to the second defendant by its legal advisers in which
possible legal professional privilege has subsequently been lost because
such documents ceased to be confidential by virtue of their being
copied to third parties (including the first defendant) during the   H
period 29 November 1988 to 30 March 1992.

"8. Minutes or attendance notes of any meetings or telephone
conversations held between 29 November 1988 and 30 March 1992
held between (i) the second defendant and/or its legal advisers and
(ii) third parties (including the first defendant) whether such minutes
or notes were prepared by the second defendant, the second
defendant's legal advisers or the third party in each case."

The Weekly Law Reports 16 January 1998

117

1 W.L.R.　　　　　　Gotha City v. Sotheby's (C.A.)　　　　　Staughton L.J.

A　The master had ordered discovery in those two categories on affidavit and inspection, as well as other categories which are not now in dispute. His order was upheld by the judge, who refused leave to appeal. However, leave was granted on a written application by Potter L.J., who also stayed the order of the master and the judge in respect of the two categories.

The ground of the judge's decision was that there had been a waiver of privilege in relation to the documents in categories 7 and 8. The judge B reached that conclusion because the documents, or the information in them in the case of category 8, had been disclosed to Sotheby's by Cobert Finance. That, the judge held, was a waiver of privilege in relation to all the world, it would seem.

The facts briefly are that the painting first reached Sotheby's from Mrs. Breslav in November 1988. She, at that time, was advised by Herbert C Smith, solicitors. When she sold the painting to Cobert Finance in March 1989 Herbert Smith were retained by them. The painting was to be sold at auction by Sotheby's on 1 April 1992. However, on 31 March there was a letter from Frere Cholmeley on behalf of the City of Gotha that resulted in the picture being withdrawn from sale. The contention apparently is that the painting was stolen from the City of Gotha, or its museum, during or at any rate at the end of the Second World War. The D property is said to lie in the City of Gotha or the Federal Republic of Germany.

The documents with which we are concerned, in general terms and not with complete accuracy, are said to have come into existence between 29 November 1988 and 30 March 1992. At the time of the hearing before the deputy judge there were thought to be only two documents which E might be within the description of those two paragraphs. One was a copy of a letter from Herbert Smith to Cobert Finance; Cobert sent a copy to Sotheby's. It was agreed that this letter contained legal advice and so was privileged when it was first sent by Herbert Smith to Cobert and received by them. But it was argued that there was a waiver of that privilege when the letter was shown to Sotheby's. The date of that letter was 5 December 1990. That raises a question under paragraph 7 of the judge's order. It has F since been discovered that there are four other documents which are said to be of a similar nature. Those, we are told, were revealed by Cobert for the first time yesterday. In consequence there is as yet no affidavit relating to them.

The second document which was considered by the judge was a minute of a meeting which took place between Herbert Smith, Cobert Finance G and Sotheby's on 14 November 1990. That meeting was for the purpose of Herbert Smith receiving information for the purpose of giving legal advice. The information, it is agreed, would have been privileged if only Herbert Smith and Cobert had been present at the meeting and only they received the minute. But it is said that there was a waiver of privilege because Sotheby's were present when advice was sought and given. That raises a question under paragraph 8 of the judge's order.

H　Mr. Layton, who appears for the plaintiff today, produced some new evidence in which he identified two further documents to which he said the order should apply. The reason that it was new evidence was because it was in an affidavit of Cobert which the judge ordered, so there could be no possible objection on that ground. But the grounds upon which we are asked to order production of those documents have got nothing to do with waiver, or with what was discussed with the judge or so far as we can see before the master. They are totally different points that are raised.

155

The Weekly Law Reports 16 January 1998

118

Staughton L.J.          Gotha City v. Sotheby's (C.A.)                    [1998]

I should have said that it is agreed that litigation was not in    A
contemplation until April 1992. It follows that there can be no question
here of the kind of privilege which applies when litigation is contemplated.
The basis of privilege claimed before us is the other variety of legal
professional privilege described as follows in *The Supreme Court Practice
1997*, vol. 1, para. 24/5/6, p. 431:

> "Letters and other communications passing between a party, or his    B
> predecessors in title, and his, or their solicitors are privileged from
> production, provided they are, and are sworn to be, confidential, and
> written to, or by, the solicitor in his professional capacity, and for the
> purpose of getting legal advice or assistance for the client . . ."

That is enlarged somewhat on p. 432:

> "The principle that a client should be able to obtain legal advice    C
> in confidence requires that, where professional privilege applies to
> lawyer-client communications, internally circulated documents or
> parts of documents revealing such communications are also privileged,
> whatever the purpose, other than fraud, for which such documents
> are brought into existence."

The principle is restated by Taylor L.J. in *Balabel v. Air India* [1988]    D
Ch. 317, 330 where he said:

> "In my judgment, therefore, the test is whether the communication or
> other document was made confidentially for the purposes of legal
> advice. . . . Where information is passed by the solicitor or client to
> the other as part of the continuum aimed at keeping both informed
> so that advice may be sought and given as required, privilege will    E
> attach."

Now of course legal professional privilege can come to an end. It can
end by waiver, although some say that a more correct description is loss
of confidentiality. To my mind it does not matter, for present purposes,
which is the correct rationale for the ending of privilege. That appears in
a number of authorities and indeed is not, it would seem, any longer    F
controversial in this case. The first is *Attorney-General v. Guardian
Newspapers Ltd. (No. 2)* [1990] 1 A.C. 109, where Sir John Donaldson M.R.
said, at p. 177:

> "(3) As a general proposition, that which has no character of
> confidentiality because it has already been communicated to the
> world, i.e., made generally available to the relevant public, cannot    G
> thereafter be subjected to a right of confidentiality: *O. Mustad & Son
> v. Dosen (Note)* [1964] 1 W.L.R. 109. However, this will not
> necessarily be the case if the information has previously only been
> disclosed to a limited part of that public."

Now that case was concerned with the breach of a duty of confidence
said to have been owed by W. to the Crown. It was not concerned with    H
legal professional privilege and the waiver of it, but it may be of some
assistance to the present problem.

Next we were referred to *Style and Hollander on Documentary Evidence*,
6th ed. (1997), p. 224:

> "If the document is read out on the television news or in open
> court then confidentiality is lost once and for all. No further question
> of privilege arises. But it is important to bear in mind that it is

The Weekly Law Reports 16 January 1998

119

1 W.L.R.                   Gotha City v. Sotheby's (C.A.)                Staughton L.J.

A    possible for a document to cease to be confidential as between some parties and not others. If A shows a privileged document to his six best friends, he will not be able to assert privilege if one of those friends sues him because the document is not confidential as between him and the friend. But the fact six other people have seen it does not prevent him claiming privilege as against the rest of the world."

B    Next we were referred to *Cross and Tapper on Evidence*, 8th ed. (1995), pp. 474–475, cited by the deputy judge in this case:

   "Legal professional privilege may always be waived by the client. While making the advice public would certainly amount to waiver, it is arguable that more limited disclosure, seeking to exclude the claimant may not do so. The fact that a conversation between a client and his solicitor takes place in the presence of a third party does not
C    necessarily amount to a waiver, although it will no doubt usually be held to have this effect. If a presumptively privileged document is offered to an opponent to read, the privilege is waived whether or not he reads it."

   I have, I must say, some doubt about the word "usually" in that passage, but maybe it is a question of degree.
D    The Australian case of *Reg. v. Braham and Mason* [1976] V.R. 547 was concerned with a conversation which took place between a person in a police station and his solicitor on the telephone, when the telephone call was made in the presence of a police officer. During the telephone call the accused admitted the offence. Lush J. said, at p. 549:

   "In my opinion, each case must be examined to see whether the
E    communication was one which should be classed as confidential. The fact of the presence of a third party should be examined to see whether that presence indicates that the communication was not intended to be confidential, or whether the presence of the third party was caused by some necessity or some circumstances which did not affect the primary nature of the communication as confidential; and
F    it is with these matters in mind that I look at the situation here. I do not regard it as decisive that Braham did not ask to be alone when he spoke to his solicitor, but I find in the circumstances described as I have set them out, no real indication that this communication was intended to be confidential, or that it was only made in the presence of Inspector Phelan as a matter of necessity. It appears to me that so far as the situation between Braham and Inspector Phelan at the time
G    was concerned, it is most likely that Braham considered that there was no reason why Inspector Phelan should not hear the conversation because what he was telling his solicitor was in substance what he had been telling Inspector Phelan for the last hour or more."

   One can readily understand that decision. If somebody chooses to communicate with his solicitor in public, so to speak, there are grounds
H    for concluding that he does not intend the conversation to be confidential.
   The next case, and perhaps that which is closest to the present in many ways, is *Crescent Farm (Sidcup) Sports Ltd. v. Sterling Offices Ltd.* [1972] Ch. 553. In that case A had sold land to B on terms that if B ever wanted to sell it he should give first refusal to A to buy it back. That was in 1959. In 1965 B contracted to sell to C subject to A's rights, if any. A then required B to sell part of the land back to him. B took counsel's opinion. His solicitors then sent that opinion, or a copy of it, to C. Thereafter B

120

Staughton L.J.          Gotha City v. Sotheby's (C.A.)                    [1998]

did sell the land to C and A sued both B and C. A sought discovery of    A
the opinion; privilege was claimed. Goff J., as I see it, dealt with two
points, although the second only very briefly. For the most part he
considered whether the documents were privileged in the hands of C
because his title was derived from the title of B. At least that is how it
seems to me. That point does not arise today. Goff J. said, at p. 564:

> "Of course, as Sir Nathaniel Lindley M.R. said in *Calcraft v. Guest*    B
> [1898] 1 Q.B. 759, 761, privilege may be waived, but I cannot
> regard communicating this confidential information to a particular
> prospective purchaser as a waiver."

That, as it seems to me, must have been part of the grounds of the
decision.

Two other authorities of some note are, firstly, *British Coal Corporation*  C
*v. Dennis Rye Ltd. (No. 2)* [1988] 1 W.L.R. 1113, 1120–1121. There
Neill L.J. said:

> "I turn, therefore, to the second ground relied on by the plaintiff.
> This ground, which may not have been as fully developed before the
> judge as it was before us, seems to me, on the facts of the present
> case, to be of much more importance than the first ground. Legal
> professional privilege of the kind which is relied on in this case is a    D
> rule of evidence which protects a party to civil litigation from being
> obliged to give discovery of documents which have come into
> existence for the dominant purpose of being used in and for that
> litigation. The documents with which we are concerned, witness
> statements and experts' reports, clearly fall within this category. So
> much is common ground. The issue is whether this privilege has been    E
> waived or is otherwise no longer available to the plaintiff. Thus it is
> said on behalf of the defendants that the privilege has been lost
> because these copy documents have come into their hands quite
> properly and in circumstances in which the plaintiff either gave its
> approval or acquiescence, or at any rate (in the case of the Category
> A documents) where the plaintiff ought to have foreseen that by
> making the documents available to the police copies might reach the    F
> defendants in accordance with the practice authorised by the Attorney-
> General's guidelines. It is further argued that if the plaintiff had
> wished to preserve its privilege it should have declined to make any
> documents available in the criminal proceedings, except pursuant to
> an order of the court, and even then only on the basis that it expressly
> reserved its privilege. In my opinion this part of the case can be dealt    G
> with quite shortly. The documents, when they came into existence,
> were plainly protected by legal professional privilege of the kind to
> which I have referred. The privilege was a privilege from discovery in
> the action for which they were prepared, that is, the present action.
> Has anything happened which has caused that privilege to be waived
> or otherwise lost? In my judgment the answer to this question is
> plainly 'No.' Let it be assumed that all the documents have come into    H
> the possession of the defendants with the implied consent of the
> plaintiff and that it could be established that they would have supplied
> the Category B documents even without an order of the court.
> Nevertheless it is clear that the plaintiff made the documents available
> for a limited purpose only, namely to assist in the conduct first of a
> criminal investigation and then of a criminal trial. This action of the
> plaintiff, looked at objectively as it must be, cannot be construed as

The Weekly Law Reports 16 January 1998

121

1 W.L.R.                     Gotha City v. Sotheby's (C.A.)              Staughton L.J.

A        a waiver of any rights available to them in the present civil action for
         the purpose of which the privilege exists."

            That was referred to in a passage from the judgment of the New South
         Wales Court of Appeal in *Goldberg v. Ng* (1994) 33 N.S.W.L.R. 639
         which has been shown to us as quoted in *Network Ten Ltd. v. Capital
         Television Holdings Ltd.* (1995) 36 N.S.W.L.R. 275, 284. Kirby P. said
B        33 N.S.W.L.R. 639, 651:

            "The English Court of Appeal has held that, where communica-
            tions, the subject of legal professional privilege, are disclosed to a
            third party by the holder of the legal professional privilege for a
            limited and specific purpose, legal professional privilege is only waived
            for that limited and specific purpose as against the third party and
C           not as against the privilege holder's opposing litigant: see *British Coal
            Corporation v. Dennis Rye Ltd. (No. 2)* [1988] 1 W.L.R. 1113 and
            *Goldman v. Hesper* [1988] 1 W.L.R. 1238. That is, it is possible to
            have a limited waiver of legal professional privilege in respect of a
            non-litigant third party, and yet maintain fully that privilege against
            a litigant party. This is even more the case where the holder of the
            privilege has disclosed the relevant communication upon the condition
D           that privilege and confidentiality be maintained and that condition
            has been accepted."

         Kirby P. then referred in more detail to the two cases cited and to the
         Irish case of *Downey v. Murray* [1988] N.I. 600, 653 and said that those
         cases

E           "establish that . . . it is possible for the holder of legal professional
            privilege to disclose relevant privileged material to a third party for a
            limited and specific purpose in a specific context, and that limited
            waiver of the privilege will not prevent the holder of the privilege
            from maintaining that privilege as against the opposing litigant. It is
            also clear that the absence of an express reservation of confidentiality
            and/or privilege is not fatal to the operation of the limited waiver."

F
         Mr. Layton, as I have said, at the end of the day is disposed to accept
         that there may, in certain circumstances, be a waiver as regards one third
         party or more but not the whole world. That does not seem to me to have
         been a view that the judge took. He seems to have attached importance to
         *Derby & Co. Ltd. v. Weldon (No. 7)* [1990] 1 W.L.R. 1156. Mr. Layton
         did not rely on that case today, understandably. It seems to be dealing
G        with the rule that privilege will not be regarded as a ground for not
         disclosing documents in certain circumstances where fraud is involved.
         That is not this case as far as we know.

            At the end of the day it seems to me that the issue is: were the
         documents and the information disclosed to Sotheby's in confidence? It is
         fair to say that when they interpleaded they swore an affidavit, as they
H        were required to do by R.S.C., Ord. 17, r. 3(4)(b), saying that they did
         not collude with either claimant. Sotheby's are not represented here today.
         I say nothing about whether the documents we have been shown are
         consistent with that assertion.

            We have the affidavit of Miss Kiesselbach, who is the solicitor for
         Cobert Finance. What she says in relation to the documents is this:

            "*Category 7* . . . 49. The fact that the document referred to in
            paragraph 32(g) of Ms Burras's affidavit was copied to the first

The Weekly Law Reports 16 January 1998

122

Staughton L.J.        Gotha City v. Sotheby's (C.A.)        [1998]

defendant does not mean that it ceased to be confidential or came    A
into the public domain so as to lose any claim to privilege.

"*Category 8* . . . 51. The meeting referred to in paragraph 32(h)
of Ms Burras's affidavit was concerned with and was held for the
purpose of the giving of legal advice by Herbert Smith to their client
and for receiving information by Herbert Smith to that end. The
presence of third party does not, in my respectful submission, vitiate
the privilege which arises in respect of such communications."        B

It is noticeable, as Aldous L.J. pointed out in the course of the
argument, that neither the disclosure of the document to Sotheby's nor
the meeting was expressly said to be confidential. We must therefore infer
that there was no express agreement to that effect. There can certainly be
an implied agreement. This is the sort of situation where, in the ordinary
way, one would expect confidentiality to be assumed by all present rather    C
than expressly agreed upon. Here they were, Cobert Finance disclosing
their legal advice to Sotheby's, who were going to be the auctioneers to
sell the picture. There is some evidence of an occasion when the parties
were agreed that some information should not be made available to
the City of Gotha. That is reflected in a letter from Sotheby's to
Mr. Montgomery of Cobert Finance on 7 December 1990. It appears    D
to me to be a plain inference that the communications were intended to
be confidential and understood to be confidential as between Cobert
Finance and Sotheby's.

We have heard a great deal about common interest privilege, which is
not defined as well as one might hope. Hutchison L.J. put the point, in
the course of the argument, that common interest may well be a ground
for inferring an agreement as to confidentiality. Mr. Layton accepted that    E
those are certainly the circumstances here. Whether or not there is
sufficient community of interest to justify common interest privilege is not
a matter upon which I express any view. What I do say is that both
Cobert Finance and Sotheby's were presumably anxious that there should
be a sale of this picture with a good title by Sotheby's at their auction
house. They have a common interest, not in the technical sense but in    F
plain ordinary language, to that extent. One can see that pursuit of that
interest might well require that the legal advice received by Cobert Finance
should remain confidential between them.

That, accordingly, means that I do not agree with the conclusion of
the deputy judge when he held that privilege had been waived in relation
to these two documents. In my judgment the right conclusion is to set
aside the whole of paragraphs 7 and 8 of the order made by the master    G
and upheld by the judge, because the ground upon which the judge upheld
it goes entirely. It may be that there could be a new order in relation to
the documents referred to in the new evidence. That is not before us. If a
new order is sought in relation to those documents application must be
made to the master. He will no doubt be told that what we have decided
is that there can be a limited waiver of privilege such that, in general, it is    H
preserved; and that has happened in this case. Mr. Layton helpfully
produced a proposed alteration to the order today in these terms. He
asked that there be an affidavit of documents relating to the documents of
the description in schedule 1. Schedule 1 contains:

"1. Copies of any letters, opinions or other documents provided
to Cobert by its legal advisers for the purpose of providing legal
advice or assistance concerning or in connection to the painting which

123

1 W.L.R.                    Gotha City v. Sotheby's (C.A.)                    Staughton L.J.

A    have been copied to third parties (including Sotheby's) in the period 29 November 1988 to 30 March 1992. 2. Minutes or attendance notes of any meetings or telephone conversations concerning or in connection with the painting held between 29 November 1988 and 30 March 1992 between (i) Cobert and/or its legal advisers and (ii) third parties (including Sotheby's) whether such minutes or notes were prepared by Cobert, Cobert's legal advisers or third parties in
B    each case."

Then, in relation to schedule 2, there was an order for inspection. Schedule 2 contained the two documents which the judge considered and we too have considered. A revised order in that form would have accurately reflected the problem that was before the master, and it is that
C    argument that we have rejected in relation to those two documents. There should, however, be an affidavit relating to the four documents said to be in the same category, category 7, which were first revealed yesterday. It said that the plaintiffs cannot ascertain whether those documents are properly covered by a claim for privilege. I would, if required, order such an affidavit in relation to those four documents.

D    Mr. Layton sought to put forward today two new grounds of waiver in relation to the letter of 5 November 1990, and the information and minutes of 14 November. Apart from the fact that it is very late in the day to produce new grounds of waiver I can see no sufficient argument of waiver to justify that course.

In the result I would allow this appeal, and quash paragraphs 7 and 8 of the judge's order. If required I would order an affidavit relating to the
E    four documents that were disclosed for the first time yesterday.

ALDOUS L.J. Staughton L.J. has dealt in detail with the issues that arose and I agree with everything he has said. I also agree with the order that he proposes. However, I would wish to draw attention to the necessity of litigants carefully complying with the rules relating to discovery. The
F    second defendant in this case was ordered to provide inspection of classes of documents; at least one of such classes was so widely drawn as to include within it documents that might not be relevant and could be privileged on any basis. That was accepted by Mr. Layton, who agreed that one class at least had to be notionally limited to documents that were relevant. It is also supported by the draft order that is now sought so as
G    to accurately set out the request that should have been made.

The form of the order that was made was the direct result of the affidavit in support. Discovery of the classes of documents being sought was supported, as required by R.S.C., Ord. 24, r. 7, by an affidavit. The deponent of that affidavit said: "I believe all such documents are relevant to the issue in this action and are or have been in the possession or
H    custody or power of the second defendant." That statement was in my view incorrect. It is important, when applications for specific discovery under Ord. 24, r. 7 are made, that the documents or classes of documents for which discovery is being sought are clearly and carefully defined. A deponent of the required affidavit must consider carefully whether he can say on oath that each document, or all the documents within a class, have been in the possession, custody or power of the other party, and that all the documents the subject of the application relate to the matters

161

The Weekly Law Reports 16 January 1998

124

Aldous L.J.                Gotha City v. Sotheby's (C.A.)                [1998]

in question. The rule specifically requires an affidavit in support. No      A
solicitor should swear an affidavit without being satisfied that the
application is not too widely drafted and the opinion he expresses is
soundly based.

HUTCHISON L.J.  I agree with both judgments and there is nothing
I would wish to add.

B

*Appeal allowed with costs.*

*Solicitors: Herbert Smith; Frere Cholmeley Bischoff.*

G. F.

C

D

[COURT OF APPEAL]

\*KINGS QUALITY HOMES LTD. v. A.J. PAINTS LTD.

1997  April 18                     Staughton, Otton and Schiemann L.JJ.

    *County Court—High Court—Proceedings transferred from—Circuit*      E
    *judge hearing appeal from order made by deputy district judge in*
    *High Court before transfer—Whether jurisdiction to hear appeal—*
    *County Courts Act 1984 (c. 28), s. 40(5)(7) (as substituted by*
    *Courts and Legal Services Act 1990 (c. 41), s. 2(1))*[1]
    *Practice—Parties—Substitution—Application to substitute plaintiffs—*
    *Cause of action time-barred—Whether judge entitled to have regard*
    *to merits in considering application—R.S.C., Ord. 20, r. 5*[2]*—*      F
    *County Court Rules 1981 (S.I. 1981 No. 1687 (L.20)), Ord. 15,*
    *r. 1(1)*[3]

       In September 1994 the plaintiff company brought an action in
    the High Court against the defendants claiming damages for
    breach of contract for loss arising out of defective painting works
    carried out in 1989 to the house where its managing director
    lived. In September 1995 the action was ordered to be transferred      G
    from the High Court district registry to the county court. On
    14 November a deputy district judge in the High Court granted
    an application by a firm in which the managing director was a
    partner to be substituted as plaintiffs in the action even though

---

[1] County Courts Act 1984, s. 40(5)(7), as substituted: see post, p. 130A, B–C.
[2] R.S.C., Ord. 20, r. 5: "(2) Where an application to the court for leave to make the
amendment mentioned in paragraph (3) . . . is made after any relevant period of limitation      H
current at the date of issue of the writ has expired, the court may nevertheless grant such
leave in the circumstances mentioned in that paragraph if it thinks it just to do so. . . .
(3) An amendment to correct the name of a party may be allowed under paragraph (2)
notwithstanding that it is alleged that the effect of the amendment will be to substitute a
new party if the court is satisfied that the mistake sought to be corrected was a genuine
mistake and was not misleading or such as to cause reasonable doubt as to the identity of
the party intending to sue . . ."
[3] County Court Rules 1981, Ord. 15, r. 1(1): "the court may allow or direct . . . (b) any
person to be . . . substituted as a party to the proceedings, if the amendment . . . is such that
the High Court would have power to allow in a like case."

The Weekly Law Reports, April 24, 1981

529

1 W.L.R.

**A**

[HOUSE OF LORDS]

\* SANTILLO  :   .   :   .   :   :   :   .   . PETITIONER

AND

SECRETARY OF STATE FOR THE

**B**   HOME DEPARTMENT .   .   .   .   .   . RESPONDENT

1981  April 9                     Lord Russell of Killowen, Lord Scarman
                                       and Lord Bridge of Harwich

PETITION by the applicant for leave to appeal to the House of Lords
from the decision of the Court of Appeal in *Reg.* v. *Secretary of State*
**C** *for the Home Department, Ex parte Santillo* [1981] 2 W.L.R. 362.
The Appeal Committee dismissed the petition.

R. C. W.

---

**D**

[HOUSE OF LORDS]

\* HARMAN   .    .   .   .   .   .   :   .   . PETITIONER

AND

HOME OFFICE   .    .   .   .   .   .   . RESPONDENT

**E** 1981  April 9                 Lord Russell of Killowen, Lord Scarman
                                       and Lord Bridge of Harwich

PETITION for leave to appeal to the House of Lords from the decision
of the Court of Appeal in *Home Office* v. *Harman* [1981] 2 W.L.R. 310.
The Appeal Committee allowed the petition.

**F**                                                   R. C. W.

---

[COURT OF APPEAL]

**G** \* GREAT ATLANTIC INSURANCE CO. *v.* HOME INSURANCE CO.

AND OTHERS

1981  Jan. 14, 15; 28                    Templeman and Dunn L.JJ.

*Practice—Discovery—Privilege—Professional privilege—Communi-
    cation between plaintiffs and legal advisers—Part of communi-*
**H** *cation read by counsel in opening trial—No intention to waive
    any privilege—Whether communication severable for purposes
    of privilege—Whether privilege waived*

When preparing documents for trial the plaintiff's solicitors
disclosed a document which comprised the first two paragraphs
of a memorandum sent to the plaintiffs by American attorneys
in their capacity as legal advisers to the plaintiffs. The solicitors
regarded the remainder of the memorandum as privileged but
failed to make it clear that the memorandum contained

**163**

The Weekly Law Reports, April 24, 1981

530

**Gt. Atlantic Insurance v. Home Insurance (C.A.)**        **[1981]**

additional matter in respect of which privilege was claimed.  A
In opening the trial counsel for the plaintiffs read the document
to the judge, unaware that it was incomplete and without any
intention of waiving any privilege. When later in the trial it
emerged that the document did not represent the whole of the
memorandum the third defendants applied for disclosure of
the additional matter. The judge ordered the plaintiffs to dis-
close the whole of the memorandum.

On appeal by the plaintiffs: —                                B

*Held,* dismissing the appeal, that the whole of the memo-
randum, being a communication to the plaintiffs from their
legal advisers, was privileged (post, p. 534B); that the memo-
randum dealt with a single subject matter and so was not
capable of being divided into two separate and distinct memo-
randa; that, accordingly, privilege could not be waived as to
part and asserted as to the remainder (post, p. 536A–C); that the
deliberate introduction by the plaintiffs' counsel of part of the  C
memorandum into the trial record effectively waived privilege
with regard to the whole memorandum (post, pp. 537H, 540E–F);
and that there was no discretion by which the court could
restore and enable the plaintiffs to assert privilege in respect
of the whole or part of the memorandum (post, pp. 540G—
541A).

*Wilson* v. *Northampton and Banbury Junction Railway
Co.* (1872) L.R. 14 Eq. 477; *Churton* v. *Frewen* (1865) 2  D
Drew & Sm. 390 and *Burnell* v. *British Transport Commission*
[1956] 1 Q.B. 187, C.A. applied.

Decision of Lloyd J. affirmed.

The following cases are referred to in the judgment of Templeman L.J.:

*Anderson* v. *Bank of British Colombia* (1876) 2 Ch.D. 644, C.A.

*Ashburton (Lord)* v. *Pape* [1913] 2 Ch. 469, C.A.                E

*Belsham* v. *Harrison* (1846) 15 L.J.Ch. 438; sub. nom. *Belcham* v. *Percival*
   7 L.T. O.S. 300.

*Burnell* v. *British Transport Commission* [1956] 1 Q.B. 187; [1956] 2 W.L.R.
   61; [1955] 3 All E.R. 822, C.A.

*Butler* v. *Board of Trade* [1971] Ch. 680; [1970] 3 W.L.R. 822; [1970] 3
   All E.R. 593.

*Buttes Gas and Oil Co.* v. *Hammer (No. 3)* [1980] 3 W.L.R. 668; [1980] 3  F
   All E.R. 475, C.A.

*Causton* v. *Mann Egerton (Johnsons) Ltd.* [1974] 1 W.L.R. 162; [1974] 1
   All E.R. 453, C.A.

*Churton* v. *Frewen* (1865) 2 Drew. & Sm. 390.

*Doland (George) Ltd.* v. *Blackburn Robson Coates & Co.* [1972] 1 W.L.R.
   1338; [1972] 3 All E.R. 959.

*Goldstone* v. *Williams, Deacon & Co.* [1899] 1 Ch. 47.              G

*Griffiths* v. *Evans* [1953] 1 W.L.R. 1424; [1953] 2 All E.R. 1364, C.A.

*Lyell* v. *Kennedy* (1884) 27 Ch.D. 1, C.A.

*Macfarlan* v. *Rolt* (1872) L.R. 14 Eq. 580.

*Matthews* v. *Munster* (1887) 20 Q.B.D. 141, C.A.

*Minter* v. *Priest* [1930] A.C. 558, H.L.(E.).

*Nea Karteria Maritime Co. Ltd.* v. *Atlantic & Great Lakes Steamship
   Corporation* (unreported), December 11, 1978, Mustill J.
                                                                    H
*Procter* v. *Smiles* (1886) 55 L.J.Q.B. 527, C.A.

*Wheeler* v. *Le Marchant* (1881) 17 Ch.D. 675, C.A.

*Wilson* v. *Northampton and Banbury Junction Railway Co.* (1872) L.R.
   14 Eq. 477.

The following additional cases were cited in argument:

*Cameron's Coalbrook, etc. Railway Co., In re The* (1857) 25 Beav. 1.

*Calcraft* v. *Guest* [1898] 1 Q.B. 759, C.A.

The Weekly Law Reports, April 24, 1981

531

1 W.L.R.          Gt. Atlantic Insurance v. Home Insurance (C.A.)

A
 *Davis* v. *Spurling* (1829) 1 Russ. & M. 64.
 *Humphery* v. *Humphery and Wake* (1917) 33 T.L.R. 433.
 *Jones* v. *Jones* [1970] 2 Q.B. 576; [1970] 3 W.L.R. 20; [1970] 3 All
  E.R. 47, C.A.
 *Lodge* v. *Prichard* (1851) 4 De G. & Sm. 587.
 *Prince* v. *Samo* (1838) 7 Ad. & El. 627.
 *Randle* v. *Blackburn* (1813) 5 Taunt. 245.
B
 *Reg.* v. *Leverson* (1868) 11 Cox C.C. 152.
 *Waugh* v. *British Railways Board* [1980] A.C. 521; [1979] 3 W.L.R. 150;
  [1979] 2 All E.R. 1169, H.L.(E.).

 INTERLOCUTORY APPEAL from Lloyd J.

 In the course of the trial of an action by the plaintiffs, Great Atlantic Insurance Co., the third defendants, C. E. Heath & Co. (International)
C Ltd., applied for the disclosure of certain plaintiffs' documents for which the plaintiffs claimed privilege. On December 16, 1980, Lloyd J. ordered, inter alia, that in respect of a memorandum dated May 2, 1980, and entitled "Great Atlantic Insurance Co. Dispute with Elger" the entire memorandum should be disclosed to the third defendants.

 By notice of appeal dated December 19, 1980, the plaintiffs appealed
D on the grounds that (1) the judge was wrong in law to hold that the first two paragraphs of the memorandum were privileged when in fact they merely summarised and passed on information to the plaintiffs; (2) in disclosing the first two paragraphs, neither the plaintiffs nor their legal advisers were intending to waive privilege, nor did they do so; (3) at no time did any competent officer of the plaintiffs authorise their legal advisers to disclose any privileged document; (4) even if the first two
E paragraphs of the memorandum were privileged and such privilege had been waived, there had been no waiver of privilege as to the remaining part of the document which dealt with a separate and distinct subject matter; and (5) in the circumstances in which the plaintiffs had disclosed the first two paragraphs, no rule of the law of evidence or any requirement of fairness demanded that the whole document be disclosed.

F  The facts are stated in the judgment of Templeman L.J.

 At the conclusion of the hearing of the appeal Templeman L.J. announced that the appeal would be dismissed for reasons to be given later.

 *Patrick Phillips Q.C.* and *Paul Walker* for the plaintiffs.
 *Johan Steyn Q.C.* and *Jeffrey Gruder* for the third defendants.

G
            *Cur. adv. vult.*

 January 28. TEMPLEMAN L.J. read the following judgment. This is an appeal from an order made by Lloyd J. on the 14th day of a trial which is still progressing whereby he ordered the plaintiffs to give discovery of parts of a memorandum for which the plaintiffs claim
H privilege. In granting leave to appeal the judge made observations deprecating any appeal in the course of a trial but he considered that he was constrained in the exceptional circumstances to grant leave. I agree wholeheartedly that appeals in the course of a trial should be firmly prevented or discouraged save in the most exceptional circumstances. Such appeals cause difficulties for the litigants, for the trial judge and for this court. In the present case, for example, this court has been inevitably hampered, notwithstanding the assistance of experi-

**165**

532

Templeman L.J.    Gt. Atlantic Insurance v. Home Insurance (C.A.)          [1981]

enced counsel, by a necessarily brief and incomplete recital of the facts,  A
some of which remain in dispute, and by the necessity for a speedy
resolution of this appeal. I intend no criticism. Indeed it is a credit
to all concerned that the plaintiffs' cause of action in a matter of great
complexity with large sums of money at stake only arose on June 11,
1980, and trial of the action began before Lloyd J. on November 24,
1980.

By an underwriting agency agreement dated June 2, 1977, the second  B
defendants, Afia, authorised the third defendants, C. E. Heath & Co.
(International) Ltd., to enter into re-insurance agreements as agents for
and on behalf of the first defendants, Home Insurance Co. In November
1977, in exercise or in purported exercise of their authority, Heath entered
into an agreement with the plaintiffs, Great Atlantic Insurance Co., which
are insurers, and the fourth to eight defendants, which are companies  C
carrying on marine insurance broking business under the inspiration of
Mr. Elger. The agreement of 1977 was replaced by a quota share marine
and aviation re-insurance agreement dated January 9, 1978, whereby
marine insurance sought by clients of, and negotiated by, Mr. Elger and
his companies would be accepted by the plaintiffs while Home would
re-insure to the extent of 90 per cent. of the risk. On March 29, 1978,  D
Heath confirmed to the plaintiffs that the re-insurance agreement made
on January 9, 1978, was effective and was binding on Home by reason
of the authority vested in Heath by the underwriting agency agreement
dated June 2, 1977.

In 1980 the plaintiffs became worried about the results of insurance
business negotiated by Elger, accepted by the plaintiffs and re-insured
by Home. The plaintiffs sent out an insurance expert, a Mr. Alexander,  E
to investigate Elger's business and he made a written report commenting
very adversely on the conduct and results of Elger's business. This report
is not a document for which privilege against disclosure in legal proceed-
ings can be claimed by the plaintiffs or has been claimed by the plaintiffs.

About the same time as he made his report, Mr. Alexander orally
reported the results of his investigation and discussed the results of his  F
visit to Elger's offices with a representative of the firm of American
attorneys who were acting for the plaintiffs as their lawyers. No privilege
can be claimed for what Mr. Alexander said to the American repre-
sentative because litigation was not at the time in prospect in the present
proceedings: see *Wheeler* v. *Le Marchant* (1881) 17 Ch.D. 675. Heath
could for example subpoena Mr. Alexander and the American repre-
sentative to give evidence of what was said between them.                 G

By a memorandum dated May 2, 1980, the American attorneys wrote
to the plaintiffs setting out in the first two paragraphs of that memo-
randum an account of the discussions between Mr. Alexander and the
representative of the American attorneys. The memorandum then con-
tinued with additional matter which, according to the sworn affidavit of
a partner in the plaintiffs' English firm of solicitors, dealt with " questions
of strategy affecting both the Elger and Marlow matters." For present  H
purposes the " Marlow matters " need no explanation; they are connected
with the difficulties which had arisen over the Elger matters.

In this appeal the plaintiffs argue that the first two paragraphs of the
memorandum are not privileged because they are merely an account of a
discussion which was itself not privileged. They argue that the additional
matter was privileged. Heath claim that the whole of the memorandum

**166**

The Weekly Law Reports, April 24, 1981

533

**1 W.L.R.          Gt. Atlantic Insurance v. Home Insurance (C.A.)    Templeman L.J.**

A  was privileged and that the privilege has been waived in the circumstances which I shall shortly narrate and that Heath are entitled to see the whole of the memorandum including the additional matter for which privilege is asserted. The judge agreed with Heath.

In June 1980 Home and Afia repudiated the 1977 re-insurance agreement and also the substituted re-insurance agreement dated January 9, 1978. Home and Afia denied that Heath had authority to bind either
B  Home or Afia to the 1978 agreement. The plaintiffs in the present proceedings are seeking a declaration that both Home and Afia are bound by the 1977 and 1978 agreements. If the plaintiffs fail in any respect because Heath did not possess the necessary authority to bind Home and Afia, then in the same action the plaintiffs seek damages from Heath for breach of warranty of authority.

C      It is part of Heath's reamended defence that the plaintiffs connived with Home and Afia in connection with the repudiation by Home and Afia of the 1977 and 1978 re-insurance agreements. The report by Mr. Alexander and the memorandum from the plaintiffs' American attorneys dated May 2, 1980, are said to be relevant to this defence in that they support the plaintiffs' case as to the reason for a meeting held in London in June 1980 between representatives of the plaintiffs and Afia at which
D  it is said by Heath that the connivance between the plaintiffs and Home and Afia took place.

The plaintiffs' English solicitors intended to give discovery of the first two paragraphs of the memorandum dated May 2, 1980, and intended to claim privilege for the additional matter contained in that memorandum. The plaintiffs' solicitors did not intend and the plaintiffs did
E  not intend to waive any privilege in respect of any document. By mishap, no doubt due to the speed with which this litigation has been conducted, the plaintiffs' solicitors failed to claim privilege or to make clear that they were claiming privilege in respect of the additional matter contained in the memorandum. The plaintiffs' solicitors, however, only provided to the defendants and for use in the trial copies of the memorandum limited to
F  the first two paragraphs and excluded the additional matter for which privilege was intended to be claimed and is now claimed. In the result none of the defendants is aware of the contents and terms of the additional matter.

In the course of his opening speech in the first days of the trial which began on November 24, 1980, the plaintiffs' counsel read to the judge in open court the first two paragraphs of the memorandum dated May 2,
G  1980, which formed part of a bundle of agreed documents. At that stage the plaintiffs' counsel was not aware that the two paragraphs only represented part of the contents of the memorandum and he had no knowledge of the additional matter and he had no intention of waiving privilege in respect of the whole or part of the memorandum or any other privileged document.

H      A few days later the plaintiffs' counsel and Heath's counsel discovered that the memorandum as read to the judge was incomplete and did not include the additional matter which the plaintiffs' solicitors believed to be privileged and for which they intended to claim privilege. Heath's counsel on behalf of Heath asked for disclosure of the additional matter on the ground that part of a document having been put before the court by the plaintiffs, Heath were entitled to see the whole of the document whether or not that document had originally been privileged. The plain-

167

The Weekly Law Reports, April 24, 1981

534

Templeman L.J.    Gt. Atlantic Insurance v. Home Insurance (C.A.)    [1981]

tiffs declined to disclose the additional matter in the memorandum on    A
the grounds that the first two paragraphs were not privileged and had
been disclosed for that reason, but that the additional matter was privi-
leged and that privilege had not been waived. Lloyd J. decided in favour
of Heath, and ordered disclosure of the whole of the memorandum. With
leave of the judge, the plaintiffs appeal to this court.

   The first question is whether the whole of the memorandum dated
May 2, 1980, was privileged or, as the plaintiffs' English solicitors thought,    B
the first two paragraphs were not privileged and therefore were bound
to be disclosed. In my judgment, the whole of the memorandum was
privileged because it was a communication by the plaintiffs' American
attorneys to the plaintiffs relating to a matter, namely the Elger matter,
upon which the American attorneys were instructed to act as legal
advisers to the plaintiffs. The fact that the memorandum included an    C
account of a conversation between Mr. Alexander and a representative
of the American attorneys, which conversation was not privileged, does
not alter the confidentiality attaching to the memorandum as a whole
by virtue of the relationship between the Amercian attorneys in their
capacity as legal advisers and the plaintiffs in their capacity as clients of
those legal advisers.
                                                                        D
   In *Anderson v. Bank of British Columbia* (1876) 2 Ch.D. 644,
658 Mellish L.J. drew a distinction between privileged communications
between solicitor and client and information which is obtained by a
solicitor from a third party, which information is not necessarily con-
nected with litigation, is not obtained for the purpose of litigation and
is not privileged.

   In *Wheeler v. Le Marchant*, 17 Ch.D. 675 this distinction was affirmed.    E
Sir George Jessel M.R., at p. 681, said that information obtained by
a solicitor from a third party was only protected where it had " come
into existence after litigation commenced or in contemplation . . ." But
the protection afforded to communications between a solicitor and his
client is wider. The protection is applied and is, said Sir George Jessel
M.R., at p. 682:                                                        F

      ". . . restricted to the obtaining the assistance of lawyers, as regards
      the conduct of litigation or the rights to property. It has never gone
      beyond the obtaining legal advice and assistance, and all things
      reasonably necessary in the shape of communication to the legal
      advisers are protected from production or discovery in order that
      that legal advice may be obtained safely and sufficiently. . . . a    G
      communication with a solicitor for the purpose of obtaining legal
      advice is protected though it relates to a dealing which is not the
      subject of litigation, provided it be a communication made to the
      solicitor in that character and for that purpose. . . . It is a rule
      established and maintained solely for the purpose of enabling a man
      to obtain legal advice with safety."                               H

Similarly Brett L.J. said, at p. 683:

      " The rule as to the non-production of communications between
      solicitor and client is a rule which has been established upon grounds
      of general or public policy. It is confined entirely to communications
      which take place for the purpose of obtaining legal advice from
      professional persons."

The Weekly Law Reports, April 24, 1981

535

**1 W.L.R.        Gt. Atlantic Insurance v. Home Insurance (C.A.)    Templeman L.J.**

A    In *Minter* v. *Priest* [1930] A.C. 558 the House of Lords affirmed that a communication between solicitor and his client is privileged provided that the relationship of solicitor and client is established and that the communication is " such as, within a very wide and generous ambit of interpretation, must be fairly referable to the relationship . . . : " *per* Lord Buckmaster at p. 568.

B    The clearest authority relevant to the present point is to be found in *Wilson* v. *Northampton and Banbury Junction Railway Co.* (1872) L.R. 14 Eq. 477 where in a specific performance action the plaintiffs sought disclosure of inter alia correspondence between the defendants and their solicitors subsequent to the contract but previous to the commencement of litigation and before the litigation was in contemplation. Malins V.-C. said, at pp. 482–483:

C    " I think cases of this kind are better decided upon principle. Here is a contract entered into which has led to litigation, and how is it possible for anybody to point out the precise moment between the date of the contract and the filing of the bill when the dispute arose? . . . It is of the highest importance . . . that all communications between a solicitor and a client upon a subject which may

D    lead to litigation should be privileged, and I think the court is bound to consider that . . . almost any contract entered into between man and man . . . may lead to litigation before the contract is completed. Any correspondence passing between the date of the contract which afterwards becomes the subject of litigation and the litigation itself is, in my opinion, on principle, within the privilege extended to the non-production of communications between solicitors and clients . . .

E    it is absolutely essential to the interests of mankind that a person should be free to consult his solicitor upon anything which arises out of a contract which may lead to litigation; that the communications should be perfectly free, so that the client may write to the solicitor, and the solicitor to the client, without the slightest apprehension that those communications will be produced if litigation

F    should afterwards arise on the subject to which the correspondence relates."

Finally, at p. 484, Malins V.-C. repeated the principle:

" . . . all correspondence between solicitors and clients relating to the subject matter of a contract which has been entered into, and which may lead to litigation—whether it has done so or may do so,

G    which may lead to litigation—whether it has done so or may do so, whether it is probable or improbable that it will do so—ought certainly to be privileged."

In the present case the correspondence between the American attorneys and the plaintiffs related to the Elger matter and to the re-

H    insurance contract which had been entered into and which, as history relates, have led to litigation. Such correspondence " ought certainly to be privileged."

In the present case the relationship of solicitor and client between the American attorneys and the plaintiffs is undoubted. The plaintiffs were seeking and the American attorneys were proffering advice in connection with a business transaction. The fact that litigation was not then contemplated is irrelevant. This appeal may serve a useful purpose

**169**

The Weekly Law Reports, April 24, 1981

536

**Templeman L.J.    Gt. Atlantic Insurance v. Home Insurance (C.A.)          [1981]**

if it reminds the profession that all communications between solicitor    A
and client where the solicitor is acting as a solicitor are privileged subject
to exceptions to prevent fraud and crime and to protect the client and
that the privilege should only be waived with great caution. This principle
applies equally to communications between a client and his foreign
lawyers or attorneys: *Macfarlan* v. *Rolt* (1872) L.R. 14 Eq. 580.

The second question is whether, the whole of the memorandum being
a privileged communication between legal adviser and client, the plain-    B
tiffs may waive the privilege with regard to the first two paragraphs of
the memorandum but assert privilege over the additional matter. In my
judgment, severance would be possible if the memorandum dealt with
entirely different subject matters or different incidents and could in effect
be divided into two separate memoranda each dealing with a separate
subject matter. The judge, with the experience of 14 days of the trial    C
and after reading the whole of the memorandum, came to the conclusion
that the first two paragraphs of the memorandum and the additional matter
dealt with the same subject matter. Knowing far less about the circum-
stances, I would be slow to come to a different conclusion. Having
read the whole memorandum, I agree with him. Indeed the affidavit
of Mr. Williams, of the plaintiffs' English solicitors, makes this plain.    D

Mr. Phillips who appeared for the plaintiffs argued that severance is
permissible where the part disclosed is only an account of a discussion
which itself is not privileged. But once it is decided that the memorandum
deals with only one subject matter, it seems to me that it might be or
appear dangerous or misleading to allow the plaintiffs to disclose part
of the memorandum and to assert privilege over the remainder. In the
present case the suspicions of Heath which have not unnaturally been    E
aroused by the disclosure of only part of the memorandum can only be
justified or allayed by disclosing the whole. It would be undesirable for
severance to be allowed in these circumstances. In my judgment, the
simplest, safest and most straightforward rule is that if a document is
privileged then privilege must be asserted, if at all, to the whole document
unless the document deals with separate subject matters so that the docu-    F
ment can in effect be divided into two separate and distinct documents
each of which is complete.

Support for this simple method of dealing with the matter is to be
found in *Churton* v. *Frewen* (1865) 2 Drew. & Sm. 390. In that case a
privileged report contained copies of, extracts from and references to
documents and records which had been culled from a public registry
and for which no privilege could be asserted. The plaintiffs sought    G
discovery of so much of the report as consisted of "copies or extracts
from or references to documents or records in the Bishop's Registry at
Lewes . . ." Disclosure was refused on the grounds, stated at p. 394:

" . . . it would be very dangerous, and trench very much upon the
principle which protects the report itself, if that were permitted;
for it would be hardly possible to seal up and effectually protect    H
from inspection those parts which constitute the report, and which
it is admitted there is no right to see. Such a report would most
probably (indeed, from its nature, almost necessarily) be not merely
a collection of extracts from, and copies of ancient records, with a
distinct and separate report referring to them; but the extracts and
copies would be so interspersed with . . . observations and comments
. . . as to render it quite impossible to separate the different portions."

**170**

The Weekly Law Reports, April 24, 1981

537

**1 W.L.R.        Gt. Atlantic Insurance v. Home Insurance (C.A.)    Templeman L.J.**

A        It is true that in the present case the first two paragraphs can be divided from the remainder of the memorandum but they deal with the same subject matter. Waiver of part of a document is bound to lead to grave difficulties for all parties and to many unjustified suspicions.

Mr. Phillips relied on *Belsham* v. *Harrison* (1846) 15 L.J. Ch. 438, reported under the name of *Belcham* v. *Percival* in 7 L.T. O.S. 300. In that case the personal representative of a deceased defendant filed a
B    defence referring to a draft answer prepared for the deceased and setting out parts of the contents of the draft answer. The plaintiffs were refused disclosure of the whole of the draft answer. No reasons were given for the decision which may be bound up with the niceties of pleading. I derive no assistance from this case. Mr. Phillips referred to *Lyell* v. *Kennedy* (1884) 27 Ch.D. 1, 24 and to *Buttes Gas and Oil Co.*
C    v. *Hammer* (*No. 3*) [1980] 3 W.L.R. 668, 683, 687–688, 703 but these citations do not assist him to show that where a document refers to one subject matter privilege may be waived with regard to part of that document and asserted with regard to the remainder.

The third question is whether privilege in respect of the memorandum dated May 2, 1980, was in fact waived by or on behalf of the plaintiffs.
D    Neither the plaintiffs nor any of the plaintiffs' legal advisers intended to waive any privilege. The plaintiffs' English solicitor intended to disclose the first two paragraphs of the memorandum which he wrongly but excusably considered must be disclosed. The plaintiffs' counsel, who read the memorandum in open court, did not know that the memorandum which he read was an incomplete part of a document. The plaintiffs in so far as they were in attendance by their directors and officers knew
E    nothing of what was going on. The plaintiffs and all their legal advisers never intended to waive any privilege.

The plaintiffs' legal advisers introduced and intended to introduce before the judge in open court during the trial a document which proved to be part of the memorandum. It is true that the plaintiffs now say that the first two paragraphs of the memorandum are of no
F    assistance to them and of no harm to the defendants and could have been omitted and would have been omitted if they had realised that they were introducing part of a privileged document. But the plaintiffs' legal advisers did not read the first two paragraphs of the memorandum as a result of a mistake induced by any of the defendants, and it is difficult to see how the mistake which the plaintiffs did make could fairly be rectified after the first two paragraphs of the memorandum had been
G    read to the judge.

In interlocutory proceedings and before trial it is possible to allow a party who discloses a document or part of a document by mistake to correct the error in certain circumstances. Where a document has been disclosed as a result of misconduct by the defendants, against the will of the plaintiffs and in any event not by the deliberate act of the plaintiffs,
H    then remedial action both before and during the trial may be possible. But in my judgment the plaintiffs deliberately chose to read part of a document which dealt with one subject matter to the trial judge, and must disclose the whole. The deliberate introduction by the plaintiffs of part of the memorandum into the trial record as a result of a mistake made by the plaintiffs waives privilege with regard to the whole document. I can see no principle whereby the court could claim to exercise or could

171

538

Templeman L.J.   Gt. Atlantic Insurance v. Home Insurance (C.A.)          [1981]

fairly and effectively exercise any discretion designed to put the clock    A
back and to undo what has been done.

In *Burnell* v. *British Transport Commission* [1956] 1 Q.B. 187 counsel
for the defendant cross-examining a witness put to the witness certain
observations made by the witness in a written statement. Denning L.J.
said, at p. 190:

> "... although this statement may well have been privileged from    B
> production and discovery in the hands of [the defendants] at one
> stage, nevertheless when it was used by cross-examining counsel in
> this way, he waived the privilege, certainly for that part which was
> used; and in a case of this kind, if the privilege is waived as to the
> part, it must, I think, be waived also as to the whole. It would be
> most unfair that cross-examining counsel should use part of the
> document which was to his advantage and not allow anyone, not    C
> even the judge or the opposing counsel, a sight of the rest of the
> document, much of which might have been against him."

In *George Doland Ltd.* v. *Blackburn, Robson Coates & Co.* [1972]
1 W.L.R. 1338 the deliberate waiver of privilege of certain communi-
cations between solicitor and client relating to two particular subject
matters before litigation became pending or contemplated involved    D
waiver of any other communications relating to those two subject matters.
but did not involve waiver of the further privilege which applied to
documents which were brought into existence after litigation was pend-
ing or contemplated. In *Nea Karteria Maritime Co. Ltd.* v. *Atlantic and
Great Lakes Steamship Corporation* (unreported) decided by Mustill J.
on December 11, 1978, Mustill J. succinctly summarised the position as    E
follows:

> "I believe that the principle underlying the rule of practice exem-
> plified by *Burnell* v. *British Transport Commission* is that where a
> party is deploying in court material which would otherwise be privi-
> leged, the opposite party and the court must have an opportunity
> of satisfying themselves that what the party has chosen to release    F
> from privilege represents the whole of the material relevant to the
> issue in question. To allow an individual item to be plucked out of
> context would be to risk injustice through its real weight or meaning
> being misunderstood. In my view, the same principle can be seen
> at work in *George Doland Ltd.* v. *Blackburn, Robson Coates & Co.*
> in a rather different context."

G

I agree and would only add that it would not be satisfactory for the
court to decide that part of a privileged document can be introduced
without waiving privilege with regard to the other part in the absence
of informed argument to the contrary, and there can be no informed
argument without the disclosure which would make argument unnecessary.

Mr. Phillips attempted to distinguish the decisions in *Burnell* v.
*British Transport Commission* [1956] 1 Q.B. 187 and *George Doland*    H
*Ltd.* v. *Blackburn Robson Coates & Co.* [1972] 1 W.L.R. 1338 on the
ground that it was necessary in those cases for the whole statement to
be disclosed in order that the consistency of the testimony of a witness
could be scrutinised. In my judgment, however, the rule that privilege
relating to a document which deals with one subject matter cannot be
waived as to part and asserted as to the remainder is based on the
possibility that any use of part of a document may be unfair or mis-

The Weekly Law Reports, April 24, 1981

539

1 W.L.R.        Gt. Atlantic Insurance v. Home Insurance (C.A.)    Templeman L.J.

A  leading, that the party who possesses the document is clearly not the person who can decide whether a partial disclosure is misleading or not, nor can the judge decide without hearing argument, nor can he hear argument unless the document is disclosed as a whole to the other side. Once disclosure has taken place by introducing part of the document into evidence or using it in court it cannot be erased.

B  The fourth question is whether the introduction of the memorandum into the trial record by the plaintiffs' counsel was effective to waive the privilege which belonged to the plaintiffs personally and which the plaintiffs did not wish to waive.

The general principle is that " a solicitor is the agent of his client in all matters that may reasonably be expected to arise for decision in the cause: " *per* Denning L.J. in *Griffiths* v. *Evans* [1953] 2 All E.R.
C  1365, 1371. In *Matthews* v. *Munster* (1887) 20 Q.B.D. 141 the defendant's counsel in the absence of the defendant and without his express authority in open court consented to a verdict for the plaintiff for £350 and costs and agreed that all imputations should be withdrawn against the plaintiff. This settlement was held to be a matter within the apparent general authority of counsel and was binding on the defendant. Lord Esher M.R. said, at p. 143:
D

" But when the client has requested counsel to act as his advocate . . . he thereby represents to the other side that counsel is to act for him in the usual course, and he must be bound by that representation so long as it continues, so that a secret withdrawal of authority unknown to the other side would not affect the apparent authority of counsel. The request does not mean that counsel is to
E  act in any other character than that of advocate or to do any other act than such as an advocate usually does. The duty of counsel is to advise his client out of court and to act for him in court, and until his authority is withdrawn he has, with regard to all matters that properly relate to the conduct of the case, unlimited power to do that which is best for his client. I apprehend that it is not
F  contended that this power cannot be controlled by the court. It is clear that it can be, for the power is exercised in matters which are before the court, and carried on under its supervision. If, therefore, counsel were to conduct a cause in such a manner that an unjust advantage would be given to the other side, or to act under a mistake in such a way as to produce some injustice, the court has authority
G  to overrule the action of the advocate."

The provisions of the last paragraph of Lord Esher M.R.'s judgment do not avail the plaintiffs in the present case because the action of the plaintiffs' counsel in disclosing part of the memorandum in open court cannot be overruled. What is done is done.

To this general rule, there is, according to Mr. Phillips, an exception
H  in the case of waiver because the privilege belongs to the client and not to the solicitor. For this proposition he cited *Procter* v. *Smiles* (1886) 55 L.J.Q.B. 527 and other authorities which establish that a solicitor in an action to which a client is not a party or in which the solicitor is not representing a client cannot waive the client's privilege. In *Procter* v. *Smiles* the client was not a party to the action and did not confer any express or implied authority on the solicitor to waive privilege. The solicitor was a defendant to a libel action and pleaded justification. The

The Weekly Law Reports, April 24, 1981

540

**Templeman L.J.   Gt. Atlantic Insurance v. Home Insurance (C.A.)**                    **[1981]**

solicitor objected to answering certain interrogatories administered by   A
the plaintiffs on the ground that the answers would involve the solicitor
in disclosing information of a confidential nature procured by the solicitor
as solicitor for a third party for the purpose of litigation pending or
threatened against that third party. Lord Esher M.R. refused to order
the solicitor to disclose the privileged information notwithstanding that
the solicitor might already have disclosed part. Different considerations   B
apply in the present case in which as in *Matthews* v. *Munster*, 20 Q.B.D.
141 the plaintiffs who are entitled to the privilege have instructed solicitors
and counsel to represent them for all the purposes of the action and are
bound by the decisions made by their legal advisers within the scope
of their ostensible authority including authority to conduct the case in
such manner as they think in the interests of the clients, involving
decisions as to waiver of privilege and other matters connected with the   C
proceedings.

In *Causton* v. *Mann Egerton (Johnsons) Ltd.* [1974] 1 W.L.R. 162
Lord Denning M.R. in a dissenting judgment held that the defendant's
solicitors had entered into a binding agreement with the plaintiff's
solicitors for the exchange of certain medical reports including medical
reports for which the defendant could claim privilege. This agreement   D
amounted to waiver of privilege and came within the authority of the
solicitor to conduct litigation on behalf of his client. Stamp and Roskill
L.JJ. decided that there was no agreement. In the absence of such an
agreement it was not necessary for them to express and they reserved
their views on the question of whether a waiver can be affected by a
solicitor without the authority of his client. In my judgment this
authority does not assist the plaintiffs in the present case. It certainly   E
does not establish the principle for which Mr. Phillips contends, that
the waiver of privilege is an exception to the general rule that the legal
advisers of a client have ostensible authority to bind him in any matter
which arises in or is incidental to litigation. In my judgment when
counsel in the course of a trial introduces into the record a document
or part of a document he thereby effectively waives any privilege attach-   F
ing to that document which could otherwise be asserted by his client.

That proposition is supported by *Goldstone* v. *Williams, Deacon &
Co.* [1899] 1 Ch. 47 to which Dunn L.J. referred in the course of
argument. Stirling J. said, at p. 52:

> "It has been decided that notes of proceedings in open court . . .
> are, as a rule, not privileged, but must be produced. . . . on the   G
> ground . . . that the administration of justice in this country is a
> matter of public interest, and to be conducted (again as a general
> rule) in public, and, consequently, that there can be nothing privi-
> leged or confidential which passes in open court."

The fifth question is whether there is any general or special discretion
equitable or otherwise which will enable the court in this instance to   H
restore and enable the plaintiffs to assert privilege in respect of the
whole of the memorandum or in respect of that part which has not
been introduced in evidence so far. In the instant case Lloyd J. decided
that if there was such a discretion it would not be proper for him to exercise
it in favour of the plaintiffs. The experienced judge who, as I have said,
had already endured 14 days of the trial and who had read the whole
of the memorandum decided that this was not a case in which he should

174

The Weekly Law Reports, May 1, 1981

541

1 W.L.R.         Gt. Atlantic Insurance v. Home Insurance (C.A.)    Templeman L.J.

A  exercise any discretion vested in him. There being no grounds for saying that the judge did not properly consider the exercise of his discretion, this court will not interfere.

In any event I am not persuaded that any discretion exists. Mr. Phillips relied on *Lord Ashburton* v. *Pape* [1913] 2 Ch. 469. The court granted an injunction to restrain the use of stolen privileged documents. A man who is entitled to assert privilege over a document does not waive

B  that privilege by suffering the misfortune of the theft of those documents from his custody or from the custody of his solicitor. In *Butler* v. *Board of Trade* [1971] Ch. 680 the Board of Trade through the Official Receiver obtained a copy of a letter written by the plaintiff's solicitor to the Official Solicitor in connection with the affairs of a company which subsequently went into compulsory liquidation. The Board of Trade were therefore

C  innocent recipients of privileged information. Goff J. was of the opinion that the principles to be found in *Lord Ashburton* v. *Pape* [1913] 2 Ch. 469 applied not only where documents were stolen but where documents were innocently conveyed in breach of confidence. He nevertheless held, at p. 690:

"... it would not be a right or permissible exercise of the equitable

D      jurisdiction in confidence to make a declaration at the suit of the accused in a public prosecution in effect restraining the Crown from adducing admissible evidence relevant to the crime with which he is charged."

These two authorities have no relevance to the present case. The court has no jurisdiction to relieve the plaintiffs from the consequences

E  of their own mistakes particularly as those consequences cannot be wholly eradicated; part of the memorandum has in fact been read to the trial judge.

For these reasons I would dismiss the appeal.

DUNN L.J. I entirely agree with the judgment of Templeman L.J.

F  and have nothing to add.

*Appeal dismissed with costs.*

Solicitors: *McKenna & Co.; Ince & Co.*

C. N.

G

H

**175**

LITIGATION LIBRARY

# DISCLOSURE

SIXTH EDITION

by
PAUL MATTHEWS B.C.L. (Oxon.), LL.D. (Lond.)
A Specialist Civil Circuit Judge (Chancery)
An ordinary judge of the Courts of Appeal of Guernsey and Jersey
Visiting Professor, King's College London

and

HODGE M. MALEK KC B.C.L., M.A. (Oxon.)
One of His Majesty's Counsel,
A Bencher of Gray's Inn
A Recorder of the Crown Court
Chairman of the Competition Appeal Tribunal
A Deputy High Court Judge (Chancery)
A Deemster in the Isle of Man
Chairman of the Appeals Committee of the Human Fertilisation and Embryology
Authority

WITH A FOREWORD BY
THE RT. HON SIR JULIAN FLAUX
Chancellor of the High Court

SWEET & MAXWELL



THOMSON REUTERS

First edition 1992
Second edition 2000
Third edition 2007
Fourth edition 2012
Fifth edition 2017
Sixth edition 2024

Published in 2024 by Thomson Reuters, trading as Sweet & Maxwell.
Thomson Reuters is registered in England & Wales, Company No. 1679046.
Registered office and address for service:
5 Canada Square, Canary Wharf, London E14 5AQ.

For further information on our products and services, visit http://
www.sweetandmaxwell.co.uk.

Computerset by Sweet & Maxwell.
Printed and bound by CPI Group (UK) Ltd, Croydon, CR0 4YY.
A CIP catalogue record of this book is available from the British Library.

Print ISBN: 978-0-414-10991-9

E-book ISBN: 978-0-414-10994-0

Print and E-book ISBN: 978-0-414-10993-3

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the King's Printer for Scotland.

All rights reserved. No part of this publication may be reproduced or
transmitted in any form or by any means, or stored in any retrieval system of
any nature, without prior written permission, except for permitted fair dealing
under the Copyright, Designs and Patents Act 1988, or in accordance with the
terms of a licence issued by the Copyright Licensing Agency in respect of
photocopying and/or reprographic reproduction. Application for permission for
other use of copyright material, including permission to reproduce extracts in
other published works, should be made to the publishers. Full
acknowledgement of author, publisher and source must be given.



Thomson Reuters, the Thomson Reuters Logo and Sweet & Maxwell ® are
trademarks of Thomson Reuters.

© Paul Matthews & Hodge M. Malek KC 2024

350     INTRODUCTION AND LEGAL PROFESSIONAL PRI ILEGE

L      d   n      d

The privilege only extends to the lawyer advising his own client, and a communication between the lawyer and the third party (not being the agent of either lawyer or client for the purposes of such communication) should not be not privileged under this head.[207] Thus, if the lawyer at the client's request writes to the client's auditors to inform them of the state of the client's legal affairs (debts, titles, claims made, actual or prospective litigation), then, even if the letter should amount to advice, it may not be advice to the client (because the auditor is independent of the company), and hence, the original in the auditors' hands ought not to be privileged under this head.[208] On this view, as the auditor is not the company's agent, the document is not disclosable by the company as in its  control ,[209] but would have to be produced by the auditor to the court if sought by witness summons directed to it,[210] or under the third party disclosure procedure.[211] Any copy of that letter retained by the lawyer would, depending on the precise facts, either be retained on behalf of the client (when it would be in the client's control)[212] or as part of the lawyer's working papers (when it would not).[213] But, as a copy of a non-privileged document, almost certainly made for a non-privileged purpose, it would not itself be privileged.[214] On this view, in order to maintain privilege, the lawyer must write directly to the client with advice on the position. The client may then permit the auditor to inspect the advice (on a confidential basis, so as not to waive the privilege).[215] But this may not be acceptable to the auditor. The client must then choose.

The decision of Mann J in   SP Strategies Ltd v London General Holdings Ltd[216] to some extent supports, but to some extent also cuts across this analysis. There a client who had received legal advice supplied a copy of that advice, for commercial reasons but in confidence, without intending to waive privilege, to a third party who could not have been within the scope of  common interest privilege . The  udge held that, not only was there no waiver in the original of the advice (still in the client's hands), but the new copy in the hands of the third party was also privileged from production. Reliance was placed on authorities dealing with waiver,[217] but also on the recent statement of Longmore LJ in Three Rivers ( o. ) in the Court of Appeal,[218] where he concluded that the nineteenth century authorities allowed privilege to  documents…passing between the client and his legal

---

207     heeler v Le Marchant (1881) 17 Ch. D. 675 CA  Price   aterhouse v BCCI Holdings (Luxembourg) SA  1992  B.C.L.C. 583  Mitsubishi Electric Australia Pty Ltd v Victorian  ork Cover Authority  2002  4  .R. 332  Commissioner of Taxation v Pratt Holdings Ltd (2004) 207 A.L.R. 217 Fed.Ct.Aus. (FC)  Three Rivers District Council v Bank of England ( o. ) 2005  1 A.C. 610 HL.

208     Ten Pty Ltd v  estpac (2005) 215 A.L.R. 131 NSW Sup.Ct.  cf. McGregor Clothing Co Ltd's Trade Mark  1978  F.S.R. 353, which seems wrong on principle  Pratt Holdings Pty Ltd v Commis sioners of Taxation (2004) 207 A.L.R. 217 Fed.Ct.Aus. (FC). As to whether it might fall under litigation  privilege, see paras 11-56  11-57, below.

209  See Ch.5, paras 5-85  5-105, above.

210  See Ch.10, paras 10-02  10-36, above.

211  See Ch.4, paras 4-55  4-57, above.

212  See Ch.5, para.5-89, above.

213  See Ch.5, para.5-89, above.

214  See paras 11-37  11-38 and 11-42  11-43, below.

215  See Ch.16, para.16-12, below.

216   SP Strategies Ltd v London General Holdings Ltd  2004  EWHC 373 (Ch), followed in Citic Paci c Ltd v Secretary for Justice  2011  HKCFI 1843 at  75   78 .

217  The Good Luck  1992  2 Lloyd's Rep. 540 (dissemination of privileged advice inside corporate client)  City of Gotha v Sotheby's  1998  1 W.L.R. 114 (case about waiver  privileged status assumed).

218  Three Rivers District Council v Bank of England ( o. ) 2003  Q.B. 1556. The House of Lords in Three Rivers District Council v Bank of England ( o. ) 2005  1 A.C. 610 declined to rule on the

advisers and evidence of the contents of such communications… .[219] The Judge considered that the copy supplied of the legal advice was merely evidence of the original advice. Yet in context Longmore LJ in referring to evidence of privileged communications was surely referring to records made of advice to be retained by the lawyer or his client. He could not have been referring to the case where a fresh copy of the advice was made for the purpose of supply to a third party, informing him of its contents. The communication to the third party was, ex hypothesi, not made for a privileged purpose, and is hence not privileged. This is so, even though (as is seen later)[220] the act of informing the third party in confidence does not normally waive privilege in the original. If the Judge in USP is right, either Judges since the nineteenth century have seriously misunderstood the old authorities on this point, or Longmore LJ drew too wide a principle from those authorities. It is submitted that neither is correct, and the Judge was wrong to rely on the dictum of Longmore LJ for the proposition which he did. It is further submitted that the correct position remains as stated in the previous paragraph, though it must be accepted that, until an appellate court rules on the point, some uncertainty will persist.

## Confidn

It is crucial for the existence of the privilege that the contents of the communication should be confidential. Thus endorsements on counsel's brief as to the order of the court,[221] depositions taken in the presence of the other party in the course of an action (whether filed in court[222] or not[223]), shorthand or other notes of proceedings in open court,[224] or of proceedings at an arbitration between the same parties,[225] and correspondence[226] or notes of meetings or conversations[227] between opposing lawyers are not capable of being covered by privilege, because their contents are not confidential. In Australia both video[228] and audio[229] tapes of non-confidential views and conversations have been held not privileged, even though made for the purpose of obtaining legal advice. But a lawyer's "work product", or other results of the exercise of professional skill and judgment, (e.g. notes of research into or collections of extracts from public documents) can nonetheless be sufficiently confidential as to attract privilege.[230] Where a lawyer has acted for two parties[231] between whom the question of privilege arises, communications between the lawyer

---

correctness of the decision in Three Rivers (No. 6), but it is notable that the statements of principle of their lordships about legal advice privilege nowhere refer to any such idea as "evidence of the contents of such communications".

[219] Three Rivers District Council v Bank of England (No. 5) [2003] Q.B. 1556 at [19] (emphasis supplied).

[220] See Ch.16, paras 16-12—16-13, below.

[221] Nicholl v Jones (1865) 2 H. & M. 588.

[222] Goldstone v Williams [1899] 1 Ch. 47; Trade Practices Commission v Ampol Petroleum Victoria Pty Ltd (1994) 127 A.L.R. 533 Fed.Ct.Aus.

[223] Visc Inc v Videx Co [1999] F.S.R. 91 CA.

[224] Re Worswick (1888) 38 Ch. D. 370; Ainsworth v Wilding [1900] 2 Ch. 315 at 320; Lambert v Home [1914] 3 K.B. 86 CA; Parry v News Group Newspapers Ltd (1990) 140 New L.J. 1719 CA; Comfort v Department for Constitutional Affairs unreported 4 July 2005 E.A.T. (Burton J).

[225] Rawstone v Preston Corp (1885) 30 Ch. D. 116.

[226] Gore v Harris (1851) 21 L.J. Ch. 10; Ford v Tennant (1863) 32 Beav. 162.

[227] Parry v News Group Newspapers Ltd (1990) 140 New L.J. 1719 CA; Hayes v Dowding [1996] P.N.L.R. 578.

[228] J Corp Pty Ltd v Australian Builders Labourers Federation Union of Workers (1992) 110 A.L.R. 510 Fed.Ct.Aus. as to litigation privilege, see para.11-37, below.

[229] Telebooth Pty Ltd v Telstra Corp Ltd [1994] 1 V.R. 337 Sup.Ct. Vic.

[230] Lyell v Kennedy (No. 3) (1884) 27 Ch. D. 1 CA at 25, 27, 31; Lambert v Home [1914] 3 K.B. 86 at 90, 92; R. v Board of Inland Revenue Ex p. Goldberg [1989] Q.B. 267; Kupe Group Ltd v Seamar

[HOUSE OF LORDS.]

H. L. (E.)*   MINTER (Pauper) . . . . . . . . .  APPELLANT;

1930
                                        AND
March 20.  PRIEST . . . . . . . . . . . . .  RESPONDENT.

*Defamation—Slander—Solicitor and Client—Professional Privilege.*

In an action for defamation it is for the judge and not for the jury to decide whether an occasion is privileged or not, and the question of express malice, which destroys the privilege, if it is qualified privilege, ought to be put to the jury only after the judge has ruled that the occasion is privileged.

Communications passing between a solicitor and a prospective client with a view to the client retaining the solicitor on professional business are privileged from disclosure, even if the solicitor does not accept the retainer.

Conversations between a solicitor and client relating to the business of obtaining a loan for the deposit on the purchase of real estate are privileged from disclosure, as the business is professional business within the ordinary scope of a solicitor's employment.

Where the relation of solicitor and client is established, any conversation passing between them, to be protected from disclosure, must be fairly referable to that relation; it must be for the purpose of giving or receiving professional advice.

S., who was in treaty with the appellant for the purchase of a house of which the latter was the owner subject to two mortgages, and T., who had arranged with S. for a share of the profit on a resale of the house, interviewed the respondent, a solicitor, and proposed that he should find the money for the deposit and should in that event act as their solicitor in the completion of the purchase. The respondent refused, and in giving his reasons for his refusal slandered the appellant, with whom he had had previous dealings, and he then suggested to S. and T. that he should purchase the house on their behalf with the connivance of the first mortgagee for the amount due on his mortgage with a view to a resale at a profit to be divided between the three. T. repeated the slander to the appellant and gave an account of the interview. In an action by the appellant against the respondent for slander the respondent pleaded that the slander was uttered on a privileged occasion and under such circumstances as to make it a privileged communication. At the trial of the action T., who was called as a witness to prove publication, claimed privilege, but the judge disallowed the claim on the ground that he was entitled to know the facts relating to the interview, and T. then confirmed

---

* *Present :* LORD BUCKMASTER, VISCOUNT DUNEDIN, LORD WARRINGTON OF CLYFFE, LORD ATKIN, and LORD THANKERTON.

A. C.                    AND PRIVY COUNCIL.                    559

his statement to the appellant. The jury, in answer to questions put by the judge, found that at the time when the slander was uttered the relationship of solicitor and client did not exist between the respondent and S. and T., and that the respondent was actuated by malice, and they assessed the damages at 1500*l.*; and judgment was entered accordingly :—

*Held*, (1.) that the evidence of T. was rightly admitted, but that the judge ought to have decided for himself whether the occasion was privileged before putting to the jury the question of malice; (2.) by Lord Buckmaster, Lord Warrington of Clyffe, Lord Atkin, and Lord Thankerton (Viscount Dunedin being of opinion that there ought to be a new trial) that the slander was not protected from disclosure on the ground of privilege.

Whether the privilege arising from the relation of solicitor and client affords an absolute protection to the solicitor despite the subsequent waiver by the client, *quaere*.

*More* v. *Weaver* [1928] 2 K. B. 520 observed upon.

Decision of the Court of Appeal [1929] 1 K. B. 655 reversed.

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

APPEAL from an order of the Court of Appeal (1) setting aside a judgment of Horridge J. in favour of the appellant for 1500*l.*

The action was brought by the appellant against the respondent, a solicitor, for damages for slander uttered by the latter to a Mr. Simpson and a Mr. Taylor at an interview held at the respondent's office between the respondent, Mr. Simpson and Mr. Taylor.

The respondent pleaded that the slander was uttered on a privileged occasion and under such circumstances as to make it a privileged communication.

The action was tried before Horridge J. and a special jury.

The jury found a verdict in favour of the respondent for 1500*l.*, and judgment was entered accordingly.

The Court of Appeal (Lord Hanworth M.R., Lawrence and Greer L.JJ.) upheld the claim of privilege and ordered judgment to be entered for the respondent.

The facts are fully stated in the report of the case before the Court of Appeal and are summarized in the headnote.

1930. Feb. 6, 7, 10. *H. Infield* and *C. G. Austin* for the appellant. The principles of law have been misapplied by

(1) [1929] 1 K. B. 655.

3            2 Q 2

**181**

H. L. (E.)
1930
MINTER
v.
PRIEST.

the Court of Appeal to the facts of this case, which have been found by the jury in favour of the appellant. The Court of Appeal held that Simpson and Taylor had on the material occasion consulted the respondent as a solicitor and upon professional business, that the communication made by the respondent to Simpson and Taylor was in consequence privileged from disclosure, that Taylor, the only witness called on behalf of the appellant to prove publication of the slander, had claimed such privilege in the witness box, and that there was therefore no admissible evidence of publication to go to the jury. The expression " privilege " is used in two distinct senses : (1.) Privilege from disclosure ; (2.) Privilege as a defence to an action for defamation. The former concerns only the compellability or admissibility of evidence and is not necessarily based on the relationship of solicitor and client. For instance, it relieves a witness of the necessity of answering questions which might reasonably incriminate him. It relates to documentary as well as to oral evidence and is not limited to evidence given at the trial of an action. When it operates it gives complete protection. The most common instance is the protection from disclosure of communications passing between a solicitor and his client upon the subject-matter of the professional employment of the solicitor by the client. It is based upon public policy, and is intended to enable a client to communicate freely with his solicitor without fear that the communications passing between them will be disclosed. Although it is the duty of the solicitor to claim such privilege for the benefit of his client, if called upon to disclose such communications, yet it is the privilege of the client : *Russell* v. *Jackson* (1) ; *Baker* v. *Carrick.* (2) The client may therefore waive the privilege by authorizing the solicitor to make disclosure : *Carpmael* v. *Powis* (3), and when once the privilege has been waived the evidence becomes admissible. The defence of privilege in an action for defamation is based upon the privilege of the occasion upon which the defamatory

(1) (1851) 9 Ha. 387.          (3) (1846) 15 L. J. (Ch.) 275, 277 ;
(2) [1894] 1 Q. B. 838.          1 Phil. 687.

A. C.  AND PRIVY COUNCIL.  561

communication is made. In the case of communications passing between a solicitor and his client upon the subject-matter of the solicitor's professional employment by the client the privilege is founded upon the same general principle as the privilege from disclosure in the case of similar communications: *Browne* v. *Dunn* (1), and this privilege again is the privilege of the client. Privilege in the law of defamation is either absolute or qualified. In the present case the claim of the witness Taylor to privilege from disclosure and the claim of the respondent to privilege as a defence to the present action for defamation are both based upon the relationship of solicitor and client existing in fact or in prospect between the respondent on the one side and Simpson and Taylor on the other at the time when the defamatory communications were made. There being here a dispute as to the existence of such relationship Taylor's evidence was rightly admitted in order to ascertain whether such relationship existed at the material time in fact or in prospect: *Reg.* v. *Cox and Railton* (2); *Bullivant* v. *Attorney-General for Victoria* (3); *Wilson* v. *Rastall.* (4) If the relationship did not actually exist and there was no reasonable prospect of its coming into existence the claim to privilege fails under each of the two heads: *Browne* v. *Dunn.* (1) Furthermore, it was necessary to inquire into the circumstances to ascertain whether the communication was germane to the subject-matter of the respondent's alleged professional employment and whether it had nothing else in view: *More* v. *Weaver* (5); *Browne* v. *Dunn.* (1) " It is for the judge, and the judge alone, to determine as a matter of law whether the occasion is privileged, unless the circumstances attending it are in dispute, in which case the facts necessary to raise the question of law should be found by the jury ": *Adam* v. *Ward.* (6) The facts in this case being in dispute, so far as the privilege of the occasion was concerned, the learned judge was right to leave the questions

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

(1) (1893) 6 The Reports, 67.
(2) (1884) 14 Q. B. D. 153, 175.
(3) [1901] A. C. 196, 203, 204.
(4) (1792) 4 T. R. 753, 758.
(5) [1928] 2 K. B. 520, 524.
(6) [1917] A. C. 309, 318.

H. L. (E.)

1930

MINTER

*v.*

PRIEST.

to the jury as to the actual or prospective relationship of solicitor and client. The questions of fact which he had to answer in relation to the admissibility of evidence were identical with those which the jury had to answer, he was not requested to find them himself and, in the appellant's submission, he was entitled to have their answers uninfluenced by his finding of the facts. The two kinds of privilege are exceptions to the general principles as to the admissibility of evidence and as to the liability for defamatory statements published without lawful justification, and should not be extended beyond the requirements of public policy : *Russell* v. *Jackson.* (1) The onus of establishing the relationship of solicitor and client upon which the claim for privilege was based was upon the respondent, and this onus he has failed to discharge. Simpson and Taylor approached the respondent with a view to his finding the deposit money for the proposed purchase of the Hertford Street property from the appellant, and the respondent's employment was conditional upon his doing so. The lending of money to a client is not normally within the professional business of a solicitor, but may become so if it forms part of the transaction in which the solicitor is or is to be professionally employed by the client : *Hagart and Burn-Murdoch* v. *Inland Revenue Commissioners.* (2) In the present case, as the professional employment was subject to a condition which was never fulfilled, the actual relationship of solicitor and client never came into existence. This case therefore falls outside the scope of authorities such as *Jones* v. *Pugh* (3); *Carpmael* v. *Powis* (4); and *Pearse* v. *Pearse* (5), in which the relationship of solicitor and client having been established, the transaction could not be dissected so as to leave part privileged and to deprive such part of privilege as would not, if it had stood alone, been privileged as falling within the ordinary scope of a solicitor's business. It may be said that at the outset there was a prospective employment, but that prospect disappeared as

(1) 9 Ha. 387, 391.                    (3) (1842) 1 Phil. 96.
(2) [1929] A. C. 386.                    (4) 1 Phil. 687.
                    (5) (1846) 1 De G. & Sm. 12.

**A. C.**　　　　AND PRIVY COUNCIL.　　　　563

soon as the respondent decided not to accept the conditions. H. L. (E.)
The respondent then proposed to Simpson and Taylor that
he should purchase the property on their behalf with the
connivance of the first mortgagee for the amount due on his
mortgage, and that they should all share the profit on a resale
of the property. It was in connection with this suggested
scheme that the slanders were uttered by the respondent.
At the time of their publication therefore there was neither
an actual nor a prospective employment of the respondent
as solicitor : *Greenough* v. *Gaskell* (1), but his position was
that of a joint adventurer. The finding of the jury is
conclusive as to this, for the only evidence of malice which
was left to the jury was this suggested scheme, which was
put to the jury as showing that the respondent was using
the occasion for the purpose of crabbing the deal and making
a profit out of the property for himself. Where a
communication is made by a client to his solicitor for an
illegal or improper purpose, such as the commission of a
crime or the perpetration of a fraud, both the communication
and the occasion are deprived of privilege : *Russell* v.
*Jackson* (2) ; *Reg.* v. *Cox and Railton.* (3) Those decisions
apply a fortiori to the case of a contemplated fraud by a
solicitor. The respondent's proposal was in fraud of the
second mortgagee and of the appellant as beneficial owner of
the property. In order that privilege should exist the
communications must be made in professional confidence
and in the legitimate course of professional employment
to a professional adviser in his character of attorney for the
purpose of obtaining legal advice and assistance ; and they
must be germane to the occasion and have such advice and
employment and nothing else in view : *Reg.* v. *Cox and
Railton* (4) ; *Russell* v. *Jackson* (5) ; *Anderson* v. *Bank of
British Columbia* (6); *Wheeler* v. *Le Marchant* (7); *Bramwell*
v. *Lucas* (8); *Browne* v. *Dunn.* (9) In the circumstances

1930

MINTER
*v.*
PRIEST.

(1) (1833) 1 My. & K. 98, 104.　　(5) 9 Ha. 387.
(2) 9 Ha. 387. 391.　　(6) (1876) 2 Ch. D. 644, 653.
(3) 14 Q. B. D. 153, 169, 170.　　(7) (1881) 17 Ch. D. 675, 683.
(4) 14 Q. B. D. 153, 168.　　(8) (1824) 2 B. & C. 745, 749.
(9) 6 The Reports, 67, 80.

**185**

H. L. (E.)
1930
MINTER
*v.*
PRIEST.

of the present case Taylor's claim to privilege from disclosure and the respondent's claim to privilege in the law of defamation, based on the actual or intended relationship of solicitor and client, both fail. Assuming that Taylor had any claim to privilege from disclosure the evidence shows that he waived such claim. As the appellant succeeded at the trial on other points it was not necessary for him to argue this point, but it was open for him to do so in the Court of Appeal, as in fact he did : *Waller & Son, Ld.* v. *Thomas.* (1) The only privilege in defamation which the respondent was entitled to claim was the qualified privilege based on common interest, and this could not avail him in view of the finding of malice by the jury.

*Sir Henry Maddocks K.C.* and *A. E. Woodgate* for the respondent. The communications between the respondent and Simpson and Taylor at the interview of January 9, 1928, were made in reference to business of a professional nature and were privileged from disclosure : *Lawrence* v. *Campbell* (2), approved by Lord Watson in *Lyell* v. *Kennedy* (*No.* 2). (3) The judge ought to have upheld Taylor's claim for privilege and to have held that there was no evidence of publication of the alleged slanders. Assuming that Taylor's evidence was rightly admitted, it showed that the alleged slanders were spoken at a time when professional privilege had been established and before it was determined. The judge ought to have made a ruling upon the question of privilege and to have withdrawn the case from the jury : *Watson* v. *M'Ewan.* (4) Communications passing between a solicitor and a prospective client with a view to the client retaining the solicitor on professional business are privileged, even though the solicitor declines to act : *Cromack* v. *Heathcote.* (5) In the circumstances the raising of the money for the deposit was within the ordinary scope of a solicitor's business, and the whole of the communications which passed at that interview were privileged. When the relationship of solicitor

(1) [1921] 1 K. B. 541, 547.      (3) (1883) 9 App. Cas. 81, 90.
(2) (1859) 4 Drew. 485, 490.      (4) [1905] A. C. 480, 487.
(5) (1820) 2 B. & B. 4.

and client is established communications passing between
them, if relevant to the matter on hand, are absolutely
privileged : *More* v. *Weaver* (1), following a dictum of
Lord Bowen in *Browne* v. *Dunn*. (2) Communications which
pass between a solicitor and client to enable either party
to commit a fraud are not within the protection, but the
fraud must be clearly alleged and a prima facie case must
be made out : *Bullivant* v. *Attorney-General for Victoria*. (3)
It is said that Taylor had waived his privilege, but (1.) the
onus of proof of waiver was on the appellant and he has failed
to discharge it ; (2.) the privilege claimed was the privilege
of both Simpson and Taylor and waiver by Taylor alone
would not be sufficient ; (3.) if *More* v. *Weaver* (1) is right,
even if the privilege were waived by the client, the solicitor
would still be protected.

*H. Infield* in reply. Taylor could waive his privilege
without the sanction of Simpson, as he owed Simpson no
contractual or other duty of non-disclosure. *More* v.
*Weaver* (1), so far as it decides that the privilege is absolute
as regards communications passing between solicitor and
client, introduces an unnecessary and unwarranted innovation
into the law of defamation and should be overruled. The
dictum of Lord Bowen in *Browne* v. *Dunn* (2), on which the
decision rested, was merely the expression of a doubt—a
doubt which was not shared by the other Lords, all of whom
referred to the allegation of malice, which they held to be not
proved.

The House took time for consideration.

1930. March 20. LORD BUCKMASTER. My Lords, the
appellant was the plaintiff in the action out of which this
appeal has arisen—an action which was brought by him to
recover damages for slander against the respondent. The
appellant succeeded at the trial, and the jury awarded him
1500*l.* as damages. This verdict was set aside by the Court
of Appeal on the ground that the slander was protected from

(1) [1928] 2 K. B. 520.         (2) 6 The Reports, 67, 80.
(3) [1901] A. C. 196, 203, 204.

H. L. (E.)
1930

MINTER
v.
PRIEST.

Lord
Buckmaster.

disclosure because of privilege, and that and that only is the question on this appeal.

The privilege claimed is that which covers communications between a solicitor and his client, a privilege the maintenance of which is essential in the best interests of society; the examination, therefore, of the circumstances in which it is said that discussion between a solicitor and a person consulting him is not privileged need careful scrutiny.

The appellant is a man who deals in real property, the respondent a solicitor, both carrying on their work in London.

In the course of his business the appellant in the year 1923 bought certain premises known as 19 Hertford Street, London, for 8250l.; whether he purchased the freehold or the leasehold interest is not explained, nor is it material.

The respondent had acted as solicitor for the appellant in this transaction and apparently the whole purchase price was provided by various mortgages, the original first mortgagee, from whom the purchase was made, leaving 7000l. as a first charge on the property.

The deposit on the purchase was provided by the respondent's wife, who ultimately sued the appellant for the amount, and the appellant in turn sued both the respondent and his wife to set aside documents relating to the sale, the exact nature of which is not disclosed, and this litigation was compromised in June, 1925. These incidents are only material for the purpose of showing that the relationship of the parties was not of a friendly nature. In 1925 at the instance of one of the puisne mortgagees a receiver was appointed of the premises and the appellant subsequently took steps to secure their sale. For this purpose he approached a man named Taylor, who is an accountant, and gave him a commission note for 100l. agreeing to pay him 100l. if he found a purchaser for the property at the price of 9500l. The commission note is not in evidence and it seems uncertain whether it was conditional on finding a purchaser or on completion, but probably it was the latter. Taylor introduced a man named Simpson as a person prepared to purchase

A. C.                AND PRIVY COUNCIL.                567

at this price, and made some arrangement with him to
share the profit on a resale, an arrangement which, if Taylor
were the agent of the appellant, was in fraud of his principal.
Simpson placed the matter in the hands of Messrs. Parker &
Thomas as his solicitors. This firm was also acting as
solicitors for Taylor in connection with the purchase by him
from the appellant of a house known as 57 Fairlop Road,
an incident only deserving notice because of the disreputable
arrangement said by Taylor to have been made between
him and the appellant by which the real purchase price of
1050*l.* was to be inflated in the conveyance by 300*l.* in order
to raise more money on mortgage from certain named
persons. It is only right to add that this alleged contemplated
crime is denied by the appellant and was not known to
Messrs. Parker & Thomas.

The difficulty in effecting a contract with Simpson arose
at an early stage over the proposed deposit. The draft
contract had put the amount on the usual basis at 950*l.* This
had been altered on Simpson's behalf to the nominal sum of
5*l.* and Taylor, who was conducting the proceedings, had
been instructed by the appellant to agree it at 475*l.* At
this stage an interview took place, on January 9, 1928,
between Taylor and Simpson and Sir William Thomas, one
of the partners of Messrs. Parker & Thomas, at their offices.

According to Taylor's evidence at that interview the finding
of the deposit only was discussed, and Sir W. Thomas said :
" You may see Mr. Priest (the respondent) with Mr. Simpson ;
you may tell him that I stand down and he can act." This
statement he subsequently modified by saying—the gist
of the conversation was " I cannot find the money. Mr. Priest
might find the money ; if he does, of course I have no
objection to his acting for you." Taylor and Simpson then
went to the respondent's office, explained the purpose of their
visit and in response the respondent uttered the alleged
slanders.

I have gone into this matter in some detail, because it is
contended that the relationship of solicitor and client never
existed between the parties at this interview, since the

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord
Buckmaster.

H. L. (E.)
1930

MINTER
*v.*
PRIEST.

Lord
Buckmaster.

employment of the respondent was conditional on his lending the deposit.

Such a conclusion is, in my opinion, indefensible. I agree with the Court of Appeal upon this point. From one solicitor the parties were sent to another to see if he could do what the first would not, and the idea that it was possible to split the interview into two parts, treating the first as a proposal to lend money personally and the second, contingent on this, to act as a solicitor is, to my mind, outside the bounds of reasonable inference.

I am not prepared to assent to a rigid definition of what must be the subject of discussion between a solicitor and his client in order to secure the protection of professional privilege. That merely to lend money, apart from the existence or contemplation of professional help, is outside the ordinary scope of a solicitor's business is shown by the case of *Hagart and Burn-Murdoch* v. *Inland Revenue Commissioners.* (1) But it does not follow that, where a personal loan is asked for, discussions concerning it may not be of a privileged nature.

In this case the contemplated relationship was that of solicitor and client, and this was sufficient.

There is much to be said in favour of the view that, so far as Taylor was concerned, this privilege was waived, but it does not follow that this enabled the conversation to be disclosed. Simpson was also present as a possible client and no authority has been quoted to establish that in these circumstances it was possible for Taylor to waive a privilege which was as much Simpson's as his own.

The relationship of solicitor and client being once established, it is not a necessary conclusion that whatever conversation ensued was protected from disclosure. The conversation to secure this privilege must be such as, within a very wide and generous ambit of interpretation, must be fairly referable to the relationship, but outside that boundary the mere fact that a person speaking is a solicitor, and the person to whom he speaks is his client affords no protection.

(1) [1929] A. C. 386.

**A. C.**         AND PRIVY COUNCIL.                    569

According to the evidence in this case the respondent began by making statements as to the character of the appellant, which might in the circumstances have been properly privileged, but he concluded by a proposal that he could get the first mortgagee to sell for 7000*l.* and then they would resell and the three divide the profit. The jury found that this was done maliciously, and found also that at the time when the words complained of were uttered the relationship of solicitor and client did not actually exist between the respondent and either Taylor or Simpson; this, in my opinion, means that the respondent never really undertook the duty of solicitor, but that the conversation from first to last was nothing but the disclosure of a malicious scheme to deprive the appellant of any chance of effecting a contract with a view to the respondent making and sharing with the others a profit on another disposition of the property. Such a finding is in close agreement with the direction given by the learned judge who, after explaining what had taken place, adds: "It is said that that makes it quite clear that Priest was not using this occasion honestly for the purpose of considering whether the advance should be made or not by him or his clients, but that he (Priest) was using it to crab the deal, and get the property and make a profit out of it. If this statement is correct, it is clear that if somebody else bought he would pay the deposit, because what he said was that if Simpson and Taylor liked to buy through him (Priest) he would pay the deposit and buy for 7000*l.*, and it is said that that shows that upon that occasion he was not really using the occasion for discussing whether he should advance the money or not, but he was using these words for the indirect purpose of crabbing the deal and getting the property himself, in order to make a profit out of it in another way. If he did that, then the occasion is not privileged, and he is responsible in the same way as if the words had been uttered on any other occasion. Have I made that clear? (The Jury) Yes, my Lord."

The learned judge then said the answer to this could be found under the head of malice, and this the jury accordingly did find.

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord
Buckmaster.

H. L. (E.)

1930

MINTER
v.
PRIEST.

Lord
Buckmaster.

Upon these findings, in my opinion, the cloak of privilege is stripped off the whole conversation and, as the learned judge said, the respondent " is responsible in the same way as if the words had been uttered on any other occasion."

This view does not appear to have been present to the minds of the Court of Appeal, whose judgment rests on propositions of law which, subject to a reservation I will shortly mention, I think are accurate.

There remain two matters which deserve comment. The case as presented was one of difficulty for the learned judge, but I think his duty was to have determined whether the privilege was well claimed or no, for he it was on whom was cast the duty of saying what was evidence for the jury to consider.

The Court of Appeal seem to regard this as equivalent to the necessary exclusion of the evidence, the relationship being once proved, but, if that were so, privilege could be claimed for matters wholly outside its scope. Had the witness said that everything that took place was as between a solicitor and his client it would, in ordinary circumstances, have been difficult to displace his statement, but here the witness on his own showing was untrustworthy and the conversation had been put in writing so that it was possible to show that from its character it did not answer the description.

Finally the case of *More* v. *Weaver* (1) was quoted as showing that if once privilege were established, even if it were waived by the client, the occasion would still protect the solicitor even if acting maliciously. That the occasion would still be privileged so that the solicitor could avail himself of the fact in proceedings for libel is clear. I only desire to add without decision that it does not follow that when once the privilege due to the relationship is waived, the privilege of the occasion is absolute.

For these reasons I think the appeal should be allowed.

VISCOUNT DUNEDIN. My Lords, the facts of this case have been set forth by the noble Lord on the Woolsack and I do

(1) [1928] 2 K. B. 520.

not repeat them. The first observation I wish to make is that it is essential to distinguish between the privilege which allows a witness to decline to answer questions and the privilege which attaches in respect of statements made. The first is essentially a personal privilege and it exists in respect of various relationships or positions. I do not attempt to give an exhaustive category. The one in point in this case, is the relationship of solicitor and client. Therefore, in this case, if nothing else had previously happened and Taylor had been put in the box to say what passed between him and Priest once it was shown that Taylor went to see Priest as a solicitor, I think he would have claimed privilege effectually.

Now, the first argument of the respondent here is, that that being the case, the learned judge ought to have taken pro non dicto all that was said by Taylor in the box, and withdrawn the case from the jury and found for the respondent, because there was no evidence of the publication of the slander. But here something had previously happened. Taylor had told, and had allowed to be committed to writing, all that he afterwards said in the box. Now, as I say, this privilege is personal. I do not think that there is a right in Priest to insist on a privilege which Taylor himself had made non-effectual. This disposes of the first part of the case.

But now comes the question of privilege in respect of statements made, and in so far as the slander consisted in statements made by Priest, it is clear, though Taylor could waive any privilege belonging to himself, he could not waive any privilege enjoyed by Priest. The question that therefore first arises is, had Priest in the circumstances any privilege? My Lords, I had occasion in the case of *Adam* v. *Ward* (1) to make observations in this House on the question of privilege. I have carefully reconsidered these observations, and I have re-read many of the numerous cases which are to be found on this branch of the law, and I adhere to what I then said. I do not weary your Lordships by repetition, but the gist of the matter was that really it is the occasion

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Viscount
Dunedin.

(1) [1917] A. C. 309, 332.

**193**

H. L. (E.)
1930
MINTER
v.
PRIEST.

Viscount
Dunedin.

which is privileged, though it is natural enough to speak of the privilege as belonging to the defendant who wishes to avail himself of the doctrine. Now, whether an occasion is privileged or not is for the judge to decide, and not for the jury, and the question of express malice, as it has been called, which destroys the privilege, if it is qualified privilege, ought only to be put to the jury after the judge has ruled whether the occasion is privileged or not. This is no new doctrine of mine. The dictum, which has been cited again and again, is that of Lord Esher in *Hebditch* v. *MacIlwaine*. (1) "The question whether the occasion is privileged, if the facts are not in dispute, is a question of law only, for the judge, not for the jury. If there are questions of fact upon which the question depends, they must be left to the jury, but when the jury have found the facts, it is for the judge to say whether they constitute a privileged occasion."

My Lords, it is here that, in my opinion, this trial was erroneously conducted. There were really no facts in dispute, for the only evidence as to what happened was the evidence of Taylor, and Priest did not go into the box. The questions put by the learned judge to the jury were really not questions as to disputed facts, but were questions calculated to get from the jury the inference they drew from the facts, in other words, I think he practically asked the jury to determine whether the occasion was privileged or not. I think he ought himself to have ruled whether the occasion was privileged or not. If he had taken the view which I understand your Lordships take, he would have held the occasion was not privileged, and he would have had no reason to put any question to the jury except as to damages, for that the words spoken were calumnious could not be contested.

I may say here that I think that so far the learned judges of the Court of Appeal were perfectly right. They disregarded the verdict of the jury and came to the conclusion for themselves that the occasion on which the words were spoken was at a meeting between a person seeking advice from a solicitor and that solicitor. Now that conclusion is a wrong

(1) [1894] 2 Q. B. 54, 58.

**194**

A. C.          AND PRIVY COUNCIL.                    573

conclusion in the view of your Lordships, but what I mean    H. L. (E.)
is that they were right in disregarding the verdict of the      1930
jury and coming to a conclusion for themselves. Having      MINTER
come to the conclusion they did they were bound by          *v.*
*More* v. *Weaver* (1), or at least thought they were.       PRIEST.

It seems to me that the way in which the learned judge      Viscount
tried the case was to obliterate the distinction between two  Dunedin.
perfectly different ways open to the plaintiff of meeting the
defence of privilege—(1.) to contend that the occasion was
not privileged, and (2.) that, on the assumption it was
privileged, he could prove express malice which would destroy
the privilege. Further the questions which he did put,
taken as indicative of what he would have asked himself
before coming to a decision, were inadequate. The questions
as to the situation were: "(Q.) At the time the words
complained of were uttered, did the relationship of solicitor
and client actually exist between the defendant on the one
part, or Simpson and Taylor, or one, and which, of them on
the other part ?—(A.) No, neither. (Q.) Did the defendant
reasonably believe that Simpson and Taylor, or one, and
which, of them would wish to retain him as solicitor ?—
(A.) No. Neither."

Now, if a man goes to a solicitor, as a solicitor, to consult
and does consult him, though the end of the interview may
lead to the conclusion that he does not engage him as his
solicitor or expect that he should act as his solicitor,
nevertheless the interview is held as a privileged occasion.
This follows I consider from the judgment of this House in
the case of *Browne* v. *Dunn* (2), reported only in a not very
well known set of reports, but I have read the judgments
in the Journals of the House. The real question was,
therefore, not as put, but was: Were the statements made
when the defendant was no longer giving advice as a solicitor,
but was introducing a proposal of his own as a speculator ?
It is said that the jury really answered this by finding malice,
and I think in the light of a certain part of the charge that
is possible. But I cannot think that "malice" is what

(1) [1928] 2 K. B. 520.          (2) 6 The Reports, 67.

A. C. 1930.                    3                2 R

574                                HOUSE OF LORDS                                [1930]

H. L. (E.)  changes a privileged occasion into a non-privileged occasion.
1930     " Malice," says Lord Esher, in *Nevill* v. *Fine Arts and General*
MINTER   *Insurance Co.* (1), "is a state of the mind," and that cannot
  *v.*      alter an occasion. What it can do is to destroy the privilege,
PRIEST.   if it is a qualified privilege, which arises from the occasion.
Viscount  Now, it might seem that this is a distinction without a
Dunedin.  difference; that is not so, and for this reason. If the finding
          of the judge is that the occasion is not privileged, the plaintiff
          need not prove malice, for malice will be inferred from the
          slanderous words used, but if the judge finds the occasion
          privileged, it must be either absolute privilege or qualified
          privilege. If it is absolute privilege, then malice cannot be
          proved to take it away, secus if it is qualified privilege. Now,
          the most recent authority on privilege as between solicitor
          and client is that it is absolute: *More* v. *Weaver* (2), and that
          case bound both Horridge J. and the Court of Appeal. But
          it must be admitted that the older authorities point rather
          the other way, and that the privilege of solicitor and client has
          been generally dealt with in the books as qualified privilege.

          In the view that your Lordships are taking of the occasion
          being no longer privileged, it is not necessary to decide the
          question of whether *More* v. *Weaver* was right or not, but
          if the decision of Horridge J. when, after the jury had
          answered his questions, he ruled "no privilege" meant that
          although the occasion was privileged the privilege was
          destroyed by malice, it would be necessary to decide whether
          *More* v. *Weaver* was right or not. Now, I have several times
          used the expression "whether the occasion was no longer
          privileged." I have done so on purpose, because I understand
          that all your Lordships agree with me in thinking, whatever
          the view of Horridge J. was—I am uncertain what it was—
          that at the outset it was a privileged occasion, because
          Simpson and Taylor had been sent by one solicitor to another,
          so that they approached Priest as a solicitor.

          Now, I have been forced to be more discursive than
          I would wish, and I should therefore like to lay down clearly
          how I think the trial ought to have been conducted.

          (1) [1895] 2 Q. B. 156, 169.          (2) [1928] 2 K. B. 520.

**A. C.**                 AND PRIVY COUNCIL.                 575

H. L. (E.)

1930

MINTER
v.
PRIEST.

Viscount
Dunedin.

When Taylor, on being put in the box, pleaded privilege to the effect that he did not wish to say anything, I think the learned judge ought to have ruled that there was no such privilege in respect that Taylor had already communicated and so published the result of the interview between Simpson and him on the one hand and Priest on the other. After that ruling Taylor should have been examined and cross-examined, and then if that had been done I do not doubt that his counsel would have put Priest in the box. He did not do so because, the learned judge having refused at this stage to dispose of privilege, he was afraid of losing his claim to absolute privilege if he put his client in the box. If, after Priest had given his evidence, there was a conflict of testimony between him and Taylor, then I think the judge might and ought to have put questions to the jury calculated to bring out which version of the facts they believed, but having done that, he should have ruled that the occasion was either privileged or not before he put any question as to malice. If he ruled that the occasion was not privileged, then the only question left was damages. If he ruled that it was, then in the state of the authorities which bound him he ought to have found for the defendant.

Holding these views I think there should be a new trial, because I think the judge's conduct of the case prevented the defendant's counsel from putting his client in the box. If however the evidence as given is to be taken as the whole evidence in the case, then on that evidence I should come to the conclusion that the occasion on which the words were spoken was not privileged.

LORD WARRINGTON OF CLYFFE. My Lords, the question arising on this appeal is whether the respondent (the defendant in an action for slander brought against him by the appellant) is entitled to be absolutely protected against an action founded on the defamatory words in question on the ground that, as he alleges, they formed part of confidential professional communications between him and certain alleged clients. The Court of Appeal have held that he is so entitled.

3          2 R 2

**197**

H. L. (E.)

1930

MINTER
v.
PRIEST.

Lord
Warrington
of Clyffe.

The learned judge before whom the case was tried held that the words were spoken on a privileged occasion in the ordinary sense, but as the jury found that there was express malice this qualified privilege afforded no defence, and judgment was entered for the appellant for damages and costs. This judgment was set aside by the Court of Appeal and judgment entered for the respondent with costs.

The only question, therefore, is whether the Court of Appeal were right in holding the respondent to be entitled to the absolute privilege claimed by him.

I think this question may be decided on a short issue of fact —namely, did the relation of solicitor and client exist either actually or in intention at the time the words were uttered ?

The facts may be shortly stated.

In November, 1927, the appellant was the owner, subject to two mortgages, of 19 Hertford Street which he had recently purchased with a view to a resale thereof at a profit.

He employed one Taylor to find him a purchaser at 9500*l.* and agreed if he did so to pay him 100*l.* on completion of the purchase.

Taylor introduced one Simpson as the purchaser and terms of an agreement for sale and purchase at 9500*l.* were settled. The amount of the deposit was to be 475*l.* At the material date the draft agreement had been prepared but the agreement itself had not then and never has been signed.

In the negotiations and the settlement of the draft agreement Sir William Thomas acted as solicitor for Simpson.

Simpson had no money wherewith to pay the deposit and applied to Sir William Thomas to lend him the amount. This Sir William refused to do and advised Simpson and Taylor who was with him at the time to apply to the respondent saying that if he, the respondent, found the money he, Sir William, would stand down and the respondent might act as solicitor in carrying out the deal.

Taylor's position demands some explanation. He was the vendor's agent and yet was employing himself in helping the purchaser to find the funds for going on. The fact is Simpson was buying only for resale at a profit

**A. C.**                    AND PRIVY COUNCIL.                    577

in which Taylor was to share—a not very creditable H. L. (E.)
arrangement.

Taylor and Simpson then approached the respondent with
the object of obtaining from or through him money for the
deposit with the intention if, and only if, he found the money
then to employ him as their solicitor in carrying out the
transaction. The conclusion I draw from Taylor's evidence
is that as soon as he knew what was required of him the
respondent refused to find the money, and accordingly from
that moment any professional relation even in intention
ceased, and words spoken thereafter would not be entitled
to the privilege accorded to professional communications.

The words complained of were uttered subsequently to the
determination of such relation actual or intentional as
previously existed and related to a matter entirely irrelevant
to that about which Taylor and Simpson had approached
him—namely, the provision of the deposit and the subsequent
carrying out of the deal.

The fact is, as appears from Taylor's account of the
interview, that the respondent had conceived the idea of
inducing the first mortgagee to sell to him or his nominee
for 7000*l.* only, the amount due to him, thus ousting both
the second mortgagee and the appellant. Accordingly he
set to work to abuse the appellant and throw aspersions on
his honesty with a view to inducing Simpson and Taylor
to throw up the proposed deal and to enter into the scheme
of obtaining the property at a lower price. The ultimate
goal was (I need hardly say) the division of any profits amongst
the three.

I desire it to be understood that I do not differ from the
view of the Court of Appeal that the original approach was
by a client to a solicitor or intended solicitor. It cannot be
denied that it is part of a solicitor's business to carry out
contracts for sale and purchase of land and incidentally
thereto to advance or procure the advance of money necessary
for those purposes. But if the meaning of the remarks of
the members of the Court is that it is part of a solicitor's
business to lend money independently of any professional

1930

MINTER
*v.*
PRIEST.

Lord
Warrington
of Clyffe.

578    HOUSE OF LORDS    [1930]

H. L. (E.)
1930

MINTER
v.
PRIEST.

Lord
Warrington
of Clyffe.

employment, I must say with all respect that I do not agree, and I think that any such view is inconsistent with the decision of this House in *Hagart and Burn-Murdoch* v. *Inland Revenue Commissioners.* (1)

I do not base the conclusion at which I arrive on the findings of the jury as to the non-existence of the relation of solicitor and client ; this issue was a collateral issue and therefore one on which the judge ought to have ruled after hearing such evidence on the point as seemed to him to be necessary. I think this House is entitled now to rule as it may think the judge ought to have ruled at the trial, and that is, in my opinion, that when the statements complained of were made there was no relation of solicitor and client actual or in intention between the respondent and Taylor and Simpson or either of them and that the respondent is not entitled to any privilege other than that usually attaching to words spoken on a privileged occasion and without malice.

On this ground I think the appeal should be allowed, the judgment of the Court of Appeal set aside and that of Horridge J. restored.

In the view I take of the facts it is unnecessary to discuss the true nature and extent of the professional privilege claimed. How far, if at all, can a solicitor, in reliance on that privilege, defend himself against an action founded on defamation, against which on the facts of the case the ordinary qualified defence of privileged occasion would not be a protection owing to the existence of express malice ? It must not be assumed however that in abstaining from answering this question I accept all the statements on this head to be found in the judgment in this case, and in *More* v. *Weaver.* (2) So far as I am concerned the question whether the absolute privilege of the client extends to protect the solicitor must be treated as open.

I agree to the order proposed by my noble and learned friend on the Woolsack.

LORD ATKIN (read by LORD THANKERTON). My Lords, this slander action was tried before Horridge J. and a special

    (1) [1929] A. C. 386.        (2) [1928] 2 K. B. 520.

**200**

A. C.                    AND PRIVY COUNCIL.                    579

Middlesex jury. It raised important questions arising out of confidential relations between solicitor and client. That very experienced judge found the case difficult, as it indubitably was. It is not surprising that even with such competent hands at the wheel in the shallows of a tortuous passage the ship once or twice grounded. I do not propose to recapitulate the facts. The publication alleged was at an interview between the defendant, a solicitor, and two gentlemen, Taylor and Simpson, who had gone to interview him with a view to procuring a loan of a sum of 450*l.* for the purpose of a deposit on a purchase by Simpson from the plaintiff of a house in Hertford Street. Taylor was the plaintiff's agent in the transaction and was to receive a commission of 100*l.* if the deal went through.

My Lords, confidential communications passing between solicitor and client are doubly guarded in the law. It is important to emphasize the twofold nature of the protection given; for they are commonly said to be privileged and the word unfortunately tends to confuse two entirely distinct rights.

In the first place they are protected from disclosure whether by production of documents or in oral evidence. This protection is part of the law of evidence. It has no direct relation to the question whether the communication itself constitutes a cause of action. Neither the solicitor nor the client need be party to the action in which the question of evidence arises. Also it matters not whether the action be for defamation, fraud (subject to limitations to be discussed), breach of trust, breach of contract or otherwise; if the communication comes within the prescribed rule it is inadmissible in evidence. The object is no doubt to enable the persons concerned to communicate freely without fear of exposing themselves or others to actions. But the right to have such communications so protected is the right of the client only. In this sense it is a " privilege," the privilege of the client. If the client chooses to withdraw the veil, the law interposes no further difficulty. The communications are then available as evidence.

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord Atkin.

580                          HOUSE OF LORDS                          [1930]

H. L. (E.)    Once the communications have been admitted in evidence
1930    the second protection comes into force. This affects the
MINTER    question how far the communications can form part of a
*v.*    cause of action. They have become evidential: are they
PRIEST.    actionable? The protection here is limited. As far as I know
Lord Atkin.    it is confined to actions of defamation. I am not aware of
any authority which would prevent a client from revealing
communications made to him by his solicitor for the purpose
of bringing an action of fraud, breach of trust, or negligence
against him: just as the communications may if disclosed
by the client be used as evidence in any actions by or against
a third party. In actions of defamation, however, the
communications are "privileged." To what extent this
protection goes is in dispute in this case. The defendant's
contention, relying upon the recent decision of the Court of
Appeal in *More* v. *Weaver* (1), is that the communications
are absolutely privileged, so that no action of defamation
can be brought upon them. The plaintiff's contention is that
the privilege is only a qualified privilege, i.e., that they
receive only the ordinary protection of other confidential
communications—namely, that the occasion upon which they
are made is a privileged occasion, and the plaintiff to succeed
must prove express malice. The main question in this case
is whether the words complained of were confidential
communications between solicitor and client so as to be
entitled to the twofold protection I have mentioned. The
test for such protection has been defined in different words
in a number of cases. I think it is best expressed in two
phrases used in the Court of Appeal in the leading case of
*O'Shea* v. *Wood.* (2) Lindley L.J. adopts the language of
Cotton L.J. in *Gardner* v. *Irvin* (3): "professional com-
munications of a confidential character for the purpose of
getting legal advice." Kay L.J. refers to the language of
Kindersley V.-C. in *Lawrence* v. *Campbell* (4), and adopted
by Lord Selborne L.C. in *Minet* v. *Morgan* (5), communications

(1) [1928] 2 K. B. 520.             (3) (1878) 4 Ex. D. 49, 53.
(2) [1891] P. 286, 289.             (4) (1859) 4 Drew. 485, 490.
                    (5) (1873) L. R. 8 Ch. 361, 368.

A. C.  AND PRIVY COUNCIL.  581

passing as "professional communications in a professional capacity." The Lord Justice prefers the former phrase, and emphasizes the importance of the confidential character. As to this it is necessary to avoid misapprehension lest the protection be too limited. It is I think apparent that if the communication passes for the purpose of getting legal advice it must be deemed confidential. The protection of course attaches to the communications made by the solicitor as well as by the client. If therefore the phrase is expanded to professional communications passing for the purpose of getting or giving professional advice, and it is understood that the profession is the legal profession, the nature of the protection is I think correctly defined. One exception to this protection is established. If communications which otherwise would be protected pass for the purpose of enabling either party to commit a crime or a fraud the protection will be withheld. It is further desirable to point out, not by way of exception but as a result of the rule, that communications between solicitor and client which do not pass for the purpose of giving or receiving professional advice are not protected. It follows that client and solicitor may meet for the purpose of legal advice and exchange protected· communications, and may yet in the course of the same interview make statements to each other not for the purpose of giving or receiving professional advice but for some other purpose. Such statements are not within the rule : see per Lord Wrenbury *O'Rourke* v. *Darbishire*. (1)

Not all communications therefore passing between solicitor and client are protected. How is the question of protection from disclosure to be determined, when there is a dispute? If the judge admits the evidence of what was said or written he destroys the protection : if he does not hear the evidence he cannot determine the dispute.

It is necessary also to remember that this dilemma is presented for solution to the judge alone. The question is one of admissibility of evidence : and on all such questions it is for the judge to decide after hearing, if necessary, evidence

(1) [1920] A. C. 581, 629.

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord Atkin.

H. L. (E.)
1930
MINTER
*v.*
PRIEST.
Lord Atkin.

on both sides bearing on any contested question of fact relevant to the question. Thus the question whether a confession is voluntary or a deposition admissible as a dying deposition are questions to be determined by the judge and not the jury : cf. *Bartlett* v. *Smith.* (1)

Fortunately the procedure is settled by opinions expressed in this House which appear to me to be authoritative. The question has arisen in two cases where it was suggested that the protection did not apply, because the communications passed for the purpose of enabling the client or the solicitor, as the case might be, to commit a fraud or fraudulent breach of trust.

In *Bullivant* v. *Attorney-General for Victoria* (2) a question had arisen in litigation in Victoria as to whether a testator had made certain conveyances before his death " with intent to evade the payment of duty " under a colonial statute. A commission had been ordered in Victoria to examine witnesses in this country and witnesses were duly summoned under the English statute 22 Vict. c. 20, the Evidence by Commission Act, 1859. One of the witnesses claimed professional protection. The suggestion for the plaintiffs was that the communications were for the purpose of enabling the client to commit a fraud or illegality—namely, to evade payment of duty. This House held that there was no fraud alleged or proved.

Lord Halsbury referring to the dilemma says : " The line which the Courts have hitherto taken, and I hope will preserve, is this—that in order to displace the prima facie right of silence by a witness who has been put in the relation of professional confidence with his client, before that confidence can be broken you must have some definite charge either by way of allegation or affidavit or what not. I do not at present go into the modes by which that can be made out." He expands this by saying at the trial the judge would have to satisfy himself that the issue to be tried was whether there was a fraud or not, and that this was a piece of evidence relevant to establish the fraud.

(1) (1843) 11 M. & W. 483, 486.       (2) [1901] A. C. 196, 201, 203.

In *O'Rourke* v. *Darbishire* (1) the plaintiff suggested that communications which prima facie were entitled to protection passed for the purpose of carrying out a fraud. Most of the learned Lords who decided the case expressed their opinion upon this point. Lord Finlay says: "The statement" (i.e., of fraud) "must be made in clear and definite terms, and there must further be some prima facie evidence that it has some foundation in fact."

Lord Sumner says : "The right of the one party to have discovery and inspection and the right of the other, within certain areas, to be protected from inspection, are parallel rights ; in itself neither is paramount over the other. It is therefore the business of the party claiming protection to meet a properly framed claim of professional privilege by showing that the privilege does not attach because it is being asserted for documents which were brought into existence in furtherance of a fraud, and he can only do this by establishing a prima facie case of fraud in fact. Evidence, admission, inference from circumstances which are common ground or 'what not,' as Lord Halsbury says, may serve for this purpose." See also per Lord Parmoor and Lord Wrenbury.

The above cases referred to evidence taken on commission and to discovery of documents and related to the exemption from protection based on fraud ; but it seems obvious that the same principles apply when the question arises on the trial : and where the protection is attacked not on the ground of fraud, but on the ground that the communications did not pass for the purpose of giving or receiving professional advice at all.

In the present case the contention of the plaintiff was that the words complained of were not in fact professional communications, but were uttered for the independent purpose of securing to the solicitor an interest in a different transaction in the same property. The learned judge ought to have himself decided whether the evidence of publication was admissible. He allowed it to be given, apparently intending the final decision to be made by the jury. In leaving any question of evidence to the jury he was I think wrong :

(1) [1920] A. C. 581, 604, 614, 622, 633.

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord Atkin

**205**

H. L. (E.) though the position was made difficult by the decision in
1930     *More* v. *Weaver* (1) that the professional communications even
MINTER   if proved are not actionable. It would appear on principle
*v.*     that any contested question of fact relating to the actionable
PRIEST.  as opposed to the evidential character of the words would
Lord Atkin. rightly be for the jury. The judge is clearly put in a difficulty.
Nevertheless, I think it clear that on the question whether
the words shall be admitted in evidence, i.e., whether there
shall be any material for the jury to come to a decision, the
judge himself must rule. In the present case I think that
there was ample prima facie evidence from the nature of the
words alleged to be used that some other purpose than
professional advice was intended by the defendant, and that
the evidence was rightly admitted. I am inclined to think
that when once the judge has rightly come to the conclusion
that the evidence is admissible the contest as to protection
from disclosure is over. The seal is broken : the statements
cannot be resealed. The only question that would remain is
whether the words so disclosed are relevant to establish a
cause of action. In the present case, however, as, in my
view, it was finally established by the verdict of the jury
that the words never were protected, the precise effect of a
judge's ruling need not be determined. To determine the
question whether the words were entitled to professional
protection the judge left certain questions to the jury with
directions on the law. I agree with the judgments in the
Court of Appeal in thinking that on this matter the learned
judge took too restricted a view of the relations which bring
into existence the protection. It is not necessary that the
relations should have reached the definite status of solicitor
and client. The solicitor may not be willing to be employed
as a solicitor by the person with whom he may be communi-
cating. If a person goes to a professional legal adviser for
the purpose of seeing whether the professional person will
give him professional advice, communications made for the
purpose of indicating the advice required will be protected.
And included in such communications will be those made on

(1) [1928] 2 K. B. 520.

**A. C.**                    AND PRIVY COUNCIL.                    585

occasions such as the present where the parties go to a solicitor
for the purpose of seeing whether he will either himself
advance or procure some third person to advance a sum of
money to carry out the purchase of real property. Such
business is professional business, and communications made
for its purpose appear to me to be covered by the protection,
whether the solicitor eventually accedes to the request or not.
If the matter rested here we should have to consider whether
the proper remedy was not a new trial.   But there is a finding
of the jury which is not affected by the direction complained of,
and appears to me to dispose of the matter.   In the event
of the jury finding as they did that the relation of solicitor
and client did not exist, the judge rightly in his view of the
law ruled that the occasion would be a privileged occasion,
and left to the jury the question of express malice.   I have
carefully perused the passages of the judge's summing up on
this point, and it seems to me clear that the only suggested
evidence of malice which was left to the jury was evidence
from which they might infer that the words were not spoken
for the purpose of giving professional advice on the trans-
action of the purchase of the property from the plaintiff,
but for the purpose of destroying the proposed clients'
confidence in that transaction in order to induce them to enter
into a different transaction by which a different purchaser
as a nominee would buy from the first mortgagee at a reduced
price : and the three persons, the two alleged clients and the
solicitor, would share in the profits of a resale.   The finding
of the jury that there was express malice must be taken to
affirm this view of the facts, for no other case was made before
them or left to them.   There appears to me to be ample
evidence to support the finding.   Construed as above, I
think that the jury have found on admissible evidence that
the words complained of were not spoken " for the purpose
of giving or receiving professional advice " but were spoken
for a purpose independent of professional advice—namely, to
carry out a speculation in real property and to enable the
solicitor to secure a participation in its profits.   Communi-
cations made in such circumstances are not entitled to

H. L. (E.)

1930

MINTER
*v.*
PRIEST.

Lord Atkin.

H. L. (E.)    protection from disclosure. They could not therefore be
1930        entitled to the absolute protection from being actionable laid
MINTER      down in *More* v. *Weaver* (1): they are not protected by
v.          qualified privilege, being spoken with express malice, and the
PRIEST.     verdict for the plaintiff must stand. It is true that the damages
Lord Atkin. given are large, but the words spoken were seriously defama-
            tory, and nothing appears to indicate that the jury must have
            taken into their consideration matters not properly relevant to
            the assessment of damages for the words spoken in the cir-
            cumstances of this case. In this view of the case it becomes
            unnecessary to consider whether evidence of the publication
            was admissible on the ground that the witness Taylor had
            waived the protection given by law. While I have little doubt
            that the witness himself had waived the protection, I am left
            in doubt whether such waiver would of itself have made the
            evidence admissible in the absence of proof of waiver by the
            other proposed client Simpson. As the admissibility does not
            turn upon waiver I desire to leave this matter open.

            It also becomes unnecessary to consider the important
            question whether the law really is as decided in *More* v.
            *Weaver* (1), that communications protected from disclosure
            are when disclosed absolutely privileged. In that case the
            female plaintiff appeared in person and the contrary con-
            struction was therefore not argued by counsel; the decision
            considerably extends the protection which up to its date
            had been confined to communications made by judge, counsel
            and witnesses in the course of judicial proceedings, and is
            based upon a view of public policy which appears to be
            somewhat widely stated and is certainly not the view accepted
            in Scotland. I prefer to leave the correctness of the decision
            entirely open for consideration hereafter in this House. In
            my opinion the appeal should be allowed, and the verdict
            and judgment for the plaintiff restored with costs in Court
            of Appeal.

            LORD THANKERTON. My Lords, I am in entire agreement
            with the opinion of my noble and learned friend on the

                            (1) [1928] 2 K. B. 520.

**A. C.**            AND PRIVY COUNCIL.                    587

Woolsack, and I also desire to reserve my opinion as to the       H. L. (E.)

contention, based on the case of *More* v. *Weaver* (1), that, if       1930

the privilege be established, the solicitor, despite subsequent       MINTER

waiver by the client, would still be protected by such       *v.*
                                                                       PRIEST.
privilege.

> *Order of the Court of Appeal reversed, and judgment*
> *of Horridge J. restored. The respondent to*
> *pay the costs in the Court of Appeal, and also*
> *the costs of the appeal to this House to be*
> *taxed in the manner usual when the appellant*
> *sues in forma pauperis. Cause remitted back*
> *to the King's Bench Division to do therein*
> *as shall be just and consistent with this*
> *judgment.*

> *Lords' Journals*, March 20, 1930.

Solicitors for the appellant : *Clarke & Co.*

Solicitors for the respondent : *Freeman, Haynes & Co.*

(1) [1928] 2 K. B. 520.

209

Case No: HQ12X03367

**Neutral Citation Number: [2013] EWHC 4478 (QB)**
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

**Date: 02/12/2013**

**Before** :

**MR JUSTICE LEGGATT**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Serdar Mohammed** | **Claimant** |
| **- and -** | |
| **Ministry of Defence** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Richard Hermer QC, Ben Jaffey and Nikolaus Grubeck** (instructed by **Leigh Day**) for the
**claimant**
**James Eadie QC**, **Karen Steyn and Marina Wheeler** (instructed by **Treasury Solicitors**) for
the **defendant**

Hearing date: 22 November 2013
- - - - - - - - - - - - - - - - - - - -

# Ruling No.2

**210**

**Mr Justice Leggatt :**

1. An issue has arisen as to whether the defendant is entitled to redact certain information from documents disclosed in these proceedings on the ground that the information is subject to legal professional privilege.  The claimant argues that the defendant has lost the right to do so in circumstances where copies of the documents without such redactions were disclosed, and in some cases referred to in open court, in earlier proceedings and the defendant has allowed the claimant's solicitors to inspect in these proceedings the unredacted versions of the documents

**The earlier proceedings**

2. The earlier proceedings were proceedings for judicial review brought on the application of Maya Evans.  Her claim concerned the policy and practice of the UK in transferring to the Afghan authorities suspected insurgents detained by UK armed forces in Afghanistan.  The defendant's policy at the time was that such detainees were to be transferred to the Afghan authorities within 96 hours or released but were not to be transferred where there was a real risk that they would suffer torture or serious mistreatment.  The claimant did not dispute the legality of this policy, but contended that the practice of transferring detainees was unlawful on the ground that there was a real risk of torture or serious mistreatment if they were transferred to the Afghan authorities.

3. The hearing of the <u>Maya Evans</u> action took place in April 2010 and judgment was given in June 2010.

4. In the <u>Maya Evans</u> proceedings the defendant disclosed a large amount of documentation.  The Divisional Court in its judgment given on 25 June 2010 described the disclosure exercise undertaken by the defendant as "massive, costly and time-consuming": see <u>R (Maya Evans) v Secretary of State for Defence</u> [2010] EWHC 1445 (Admin).  As part of that exercise, information was redacted on grounds that it was (a) irrelevant, (b) protected by legal professional privilege and/or (c) the subject of public interest immunity.

5. The defendant has also emphasised that the disclosure exercise was carried out under considerable pressure of time and points out that a letter dated 9 November 2009 sent by the defendant's solicitors to the solicitors for Maya Evans in connection with the disclosure exercise contained the following statement:

> "We do not waive legal professional privilege in relation to any legal advice which has been released to you as part of the disclosure process where the document was relevant to the issues in question.
>
> In addition where documents which attract legal professional privilege have through inadvertence not been redacted, privilege is not waived in respect of those documents."

**Subsequent disclosure of documents from the Maya Evans proceedings**

6.      Before the current action for damages was commenced, the present claimant brought proceedings for judicial review.  In May 2012, the defendant's solicitors agreed that documents disclosed in the Maya Evans proceedings could be passed by the solicitors who acted for Maya Evans to the solicitors acting for the present claimant for use in his judicial review proceedings.

7.      The claimant subsequently decided to discontinue his claim for judicial review and to pursue the present action for damages, which was commenced in August 2012.  In a letter dated 25 February 2013, the defendant's solicitors agreed that the claimant's solicitors could inspect for the purposes of this action the documents disclosed by the defendant in the judicial review proceedings without prejudice to the question of whether those documents were indeed relevant to the matters in issue in the present action.  Those documents included, by reason of the agreement in May 2012, the documents previously disclosed in the Maya Evans proceedings.

8.      On 3 June 2013 the defendant's solicitors asked the claimant's solicitors to indicate which documents disclosed in the judicial review proceedings they considered relevant to the preliminary issues which had by then been ordered in the present action.  The purpose of the request was said to be so that the redactions in any documents agreed to be relevant could be reviewed and public interest immunity claimed where necessary.

9.      On 11 June 2013 the claimant's solicitors sent a list of such documents which included a number of documents originally disclosed in the Maya Evans proceedings. In further letters dated 8 October 2013 and 14 October 2013 the claimant's solicitors pressed for confirmation that the defendant was content for the claimant to rely on the versions of the documents which his solicitors already had in their possession.  On 15 October 2013 the defendant's solicitors requested an explanation of the relevance of each document from the Maya Evans proceedings included in the list provided.  Such an explanation was given on 17 October 2013.

10.     On 7 November 2013 the defendant's solicitors wrote to say that they had now reviewed the documents disclosed in the Maya Evans proceedings included in the claimant's list and found that they contained some material which through error had not been redacted.  This was said to include some material over which legal professional privilege should have been claimed.

11.     On 20 November 2013 the defendant's solicitors provided copies of the documents said to contain such privileged information with that information now redacted.

**The issue**

12.     The claimant does not dispute that the information which the defendant now seeks to redact is subject to legal professional privilege but argues that the right to assert such privilege has been waived.  In the case of two documents it is also submitted that the right to claim privilege has been lost because the information has entered the public domain.

**212**

13.    I heard argument on this issue (along with issues of public interest immunity) on 22 November 2013.  However, because of the short notice at which the issue arose, I gave the claimant permission to file evidence and both parties permission to file further written submissions on 25 November 2013 and reserved my judgment on the issue.

**The legal principles**

14.    The term 'waiver of privilege' is an imprecise one, which is capable of referring to at least five legally distinct ways in which a right to assert privilege may be lost:

i)    What might be called a 'true' waiver occurs if one party either expressly consents to the use of privileged material by another party or chooses to disclose the information to the other party in circumstances which imply consent to its use.  Such a waiver may be either general or limited in scope.

ii)    Where a party waives privilege in the above sense by deliberately deploying material in court proceedings, the party also loses the right to assert privilege in relation to other material relating to the same subject matter: see e.g. Great Atlantic Insurance Co. v Home Insurance Co. [1981] 1 WLR 529.  The underlying principle is one of fairness to prevent 'cherry picking': see e.g. Brennan v Sunderland City Council [2009] ICR 479, 483-4 at [16].

iii)    Similarly, a party who by suing its legal advisor puts their confidential relationship in issue cannot claim privilege in relation to information relevant to the determination of that issue.  Again the governing principle is one of fairness: see e.g. Paragon Finance v Freshfields [1999] 1 WLR 1183.

iv)    Because privilege only protects information which is confidential, if the information concerned ceases to be confidential, privilege cannot be claimed. Where a party does an act which has the effect of making information public, this has sometimes been described as a waiver of privilege (see e.g. Goldstone v Williams (1899) 1 Ch 47), but it is more accurate to say that privilege cannot be claimed because confidentially has been lost.

v)    Where a party comes into possession of privileged material by any means, and even if without the knowledge or consent of the other party, the receiving party is free to use such material subject to the equitable jurisdiction of the court to restrain a breach of confidence.

15.    It is the last two of these principles which are relied on by the claimant in this case.

**Loss of confidentiality**

16.    As mentioned, two of the documents now in issue were referred to in open court at the hearing of the Maya Evans case.  The claimant submits that the documents thereby entered the public domain and lost their confidentiality.

17.    The defendant disputes this.  In a further note submitted after the oral argument, the defendant argues that confidentiality attaches to information and is not lost merely

because reference is made in open court to a document which contains confidential information if the information itself is not made public.

18. I accept that information does not necessarily enter the public domain just because a document containing it is mentioned in open court, or even because the information itself is disclosed in open court. However, there are, as I see it, two routes by which in such circumstances the confidentiality of information may be lost.

19. First, sufficient publicity may be given to information disclosed in open court that it can no longer be regarded as confidential. This is a question of fact and degree. Frequently and no doubt typically, however, passing references to documents in open court do not attract sufficient publicity to cause them to lose their confidentiality in this way.

20. Second, there is a general public right of access, based on the principle of open justice, to documents read or referred to in court: see R (Guardian News & Media Ltd) v Westminster Magistrates Court [2013] QB 618. For this reason, I take the default position to be that reference to a document containing confidential information in open court will put the information into the public domain and deprive it of its confidential character. This is, however, subject to the power of the court to prevent or restrict the further publication or use of the information, and thereby preserve its confidentiality, if there is good reason to do so.

21. The subsequent use of documents disclosed in litigation is now governed by CPR r.31.22. This provides:

> "(1) A party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed, except where –
>
> (a) the document has been read to or by the court, or referred to at a hearing which has been held in public;
>
> …
>
> (2) The court may make an order restricting or prohibiting the use of the document which has been disclosed, even where the document has been read to or by the court, or referred to, at a hearing which has been held in public.
>
> (3) An application for such an order may be made –
>
> (a) by a party; or
>
> (b) by any person to whom the document belongs."

22. Usually, an application for an order under CPR r.31.22(2) is made in the proceedings in which the document has been disclosed. There is nothing in the language of the rule, however, which so confines it; and I see no reason in principle why such an application should not be made in subsequent proceedings to restrict or prohibit the use of a document by a party who has acquired the document from a party to whom it was disclosed in the earlier proceedings. The fact that no application is made until

**214**

much later may be a very relevant factor in deciding whether to make an order. However, it should not preclude the making of an order if it is still practicable to preserve the confidentiality of information contained in the document and the balance of competing interests is demonstrably in favour of doing so.

23.   In my view, therefore, the fact that two of the documents now in issue were referred to in open court at the hearing of the Maya Evans case does not of itself prevent the defendant from claiming privilege over information disclosed in those documents. Its effect is to place the onus on the defendant to apply for and justify the making of an order under CPR r.31.2(2), whereas for the other documents in issue it is the claimant who must seek the permission of the court.

**Inadvertent disclosure**

24.   That requirement to seek permission arises, where inadvertent disclosure of privileged material has occurred, pursuant to CPR r.31.20. This provides:

> "Where a party inadvertently allows a privileged document to be inspected, the party who has inspected the document may use it or its contents only with the permission of the court."

25.   In Al Fayed v Commissioner of Police of the Metropolis (No 1) [2002] EWCA Civ 780, the Court of Appeal considered that the principles which govern the operation of this rule are the same as apply at common law where an injunction is sought to prevent the use of inadvertently disclosed confidential information. The Court of Appeal summarised the relevant principles (at paragraph 16 of the judgment) as follows:

> "i) A party giving inspection of documents must decide before doing so what privileged documents he wishes to allow the other party to see and what he does not.
>
> ii) Although the privilege is that of the client and not the solicitor, a party clothes his solicitor with ostensible authority (if not implied or express authority) to waive privilege in respect of relevant documents.
>
> iii) A solicitor considering documents made available by the other party to litigation owes no duty of care to that party and is in general entitled to assume that any privilege which might otherwise have been claimed for such documents has been waived.
>
> iv) In these circumstances, where a party has given inspection of documents, including privileged documents which he has allowed the other party to inspect by mistake, it will in general be too late for him to claim privilege in order to attempt to correct the mistake by obtaining injunctive relief.
>
> v) However, the court has jurisdiction to intervene to prevent the use of documents made available for inspection by mistake

**215**

where justice requires, as for example in the case of inspection procured by fraud.

vi) In the absence of fraud, all will depend upon the circumstances, but the court may grant an injunction if the documents have been made available for inspection as a result of an obvious mistake.

vii) A mistake is likely to be held to be obvious and an injunction granted where the documents are received by a solicitor and:

a) the solicitor appreciates that a mistake has been made before making some use of the documents; or

b) it would be obvious to a reasonable solicitor in his position that a mistake has been made;

and, in either case, there are no other circumstances which would make it unjust or inequitable to grant relief.

viii) Where a solicitor gives detailed consideration to the question whether the documents have been made available for inspection by mistake and honestly concludes that they have not, that fact will be a relevant (and in many cases an important) pointer to the conclusion that it would not be obvious to the reasonable solicitor that a mistake had been made, but is not conclusive; the decision remains a matter for the court.

ix) In both the cases identified in vii) a) and b) above there are many circumstances in which it may nevertheless be held to be inequitable or unjust to grant relief, but all will depend upon the particular circumstances.

x) Since the court is exercising an equitable jurisdiction, there are no rigid rules."

**The redactions**

26.    The claimant produced a confidential annex to its skeleton argument for the hearing on 22 November 2013 which identifies passages in six documents which the defendant now proposes to redact where the claimant takes issue with the redaction. In the defendant's open bundle the redacted versions of these documents appear at tabs H1, J6, H3, J3, J5 and J7. I shall rule on whether the claimant is entitled to assert privilege over the particular passages in those documents highlighted in the claimant's annex. If disputes arise in relation to any other passages or documents, I hope they can be resolved by agreement in the light of the approach set out in this ruling.

**216**

**Relevance**

27.    In the further note filed after the oral argument, the defendant has submitted that, before any question of waiver arises, the court should consider whether the information in question meets the standard disclosure test.  This is on the basis that the claimant is said to be seeking disclosure of the information for which the defendant is now claiming privilege.

28.    I do not accept that contention.  The claimant is not seeking disclosure and does not need to do so, as his solicitors already have the documents in unredacted form in their possession and have been allowed to inspect them in these proceedings (in so far as the defendant's agreement to do so was needed).  The defendant has reserved the right to contest the relevance of the documents but that will go to whether they are admissible in evidence.  The present question is only whether the court should make an order to preclude their use on grounds of confidentiality.  In any event, I do not consider that any of the passages highlighted by the claimant is so clearly irrelevant that I should exclude the material at this stage.

**The relevant legal test**

29.    As mentioned earlier, it is not in dispute that the information which the defendant now wishes to redact is privileged.  Nor is it in dispute that the disclosure of that information both in the <u>Maya Evans</u> proceedings and in this action – by allowing the present claimant's solicitors to inspect the documents disclosed in the <u>Maya Evans</u> proceedings – was inadvertent.  In these circumstances, applying the principles stated in <u>Al Fayed</u>, it is too late for the defendant to claim privilege unless the documents were made available to the claimant's solicitors for inspection as a result of an obvious mistake.

30.    It seems to me that such an obvious mistake would similarly need to be the starting point for an attempt to restrain the use of the two documents referred to in open court in the earlier proceedings.  The grounds required to justify restricting the use of a privileged document which has been inadvertently disclosed must in principle be at least as strong, if not stronger, where the permission of the court is not needed to use the document as are required where such permission is needed under CPR r.31.20.  CPR r.31.20 does not apply to the documents referred to in open court as the solicitors for Maya Evans were entitled to pass those documents to the present claimant's solicitors, who are likewise entitled to use them irrespective of the defendant's agreement, unless and until an order is made under CPR r.31.22(2).

31.    In each case, even if an obvious mistake is shown, the question will ultimately be whether it is just and equitable to prevent use of the material in these proceedings.

**The claimant's understanding**

32.    The claimant's solicitor, Ms Keren Adams, has made a witness statement in which she says that the documents now in issue first came to her attention in May 2013 when reviewing the trial bundles from the <u>Maya Evans</u> case to identify any documents on which the claimant wishes to rely in the present proceedings.  She says that she did not believe that the information contained in the documents, despite including references to internal legal advice, had been disclosed in error.  Ms Adams

**217**

gives several reasons for this.  For present purposes it is sufficient to say that I accept her evidence that she did not appreciate that any mistake had been made by the defendant until 7 November 2013, when the defendant first indicated the intention to claim privilege over previously unredacted parts of some of the documents on which the claimant wishes to rely.

33.    I must therefore next consider whether it would have been obvious to a reasonable solicitor who inspected the documents that a mistake had been made.    The formulation of the fifth principle stated by the Court of Appeal in Al Fayed (quoted above) implies that the court should assume for this purpose that detailed consideration is given by the solicitor to the question whether the documents have been made available for inspection by mistake.  That assumption seems to me, with respect, to be appropriate: it would not generally be equitable to allow a party to benefit from a mistake because his solicitors have not given detailed consideration from which the mistake would have been obvious.  Such consideration should clearly take account of background information within the solicitor's knowledge.  However, since the test is one of obviousness, it is also clear that where such consideration gives rise to mere suspicion or doubt about the matter the reasonable solicitor is not obliged to make any further enquiries of the other party before making use of the documents.

34.    I think it unlikely that Ms Adams gave detailed consideration when reviewing the documents in May 2013 to the question whether the passages for which privilege is now claimed were left unredacted by mistake.  I think it more likely that this was simply not something that occurred to her until the claim of privilege was made.  Even so, the fact that it was not evident to her that a mistake had been made is, I think, still relevant although not decisive when considering whether the existence of the mistake would be obvious to a reasonable solicitor in her position who received the documents.

**Matters within the knowledge of the claimant's solicitors**

35.    I do not consider that the defendant is entitled to rely, as against this claimant, on the letter dated 9 November 2009 referred to at paragraph 5 above.  That is because the letter was sent in the Maya Evans proceedings to the solicitors acting for the claimant in those proceedings, and there is no evidence that the present claimant's solicitors were or ought to have been aware of the letter before it was produced on this application.  Nevertheless, the claimant's solicitors would have been aware that the process of disclosure in the Maya Evans case was a massive exercise undertaken under considerable pressure of time, with a resulting possibility of error.  Furthermore, there is no evidence which I have seen to suggest that any further review of the documents disclosed in the Maya Evans proceedings was carried out by the defendant at the time when the defendant agreed to those documents being inspected by the present claimant's solicitors either for use in the judicial review proceedings or for use in the current action.

36.    Two other matters which the defendant contends that the claimant's solicitors would reasonably be expected to have known are:

       i)      The fact that it is rare for Government to disclose privileged material especially without making it expressly clear that that is being done (and why); and

**218**

ii)     The fact that the information disclosed included records of advice given by the Attorney General in circumstances where there is a well known and well established convention that disclosure is not made of the fact that a Law Officer has been consulted, let alone of the content of any such advice.

37.     In her witness statement Ms Adams has not disputed these facts or her awareness of them.

38.     A reasonable solicitor who gave detailed consideration to the question would also, however, have been aware that in the <u>Maya Evans</u> case the defendant had placed positive reliance on the defendant's view that the UK did not have the power to intern insurgents captured in Afghanistan but only had power to detain them temporarily (for a period of up to 96 hours): see the defendant's skeleton argument for the hearing in that case at paragraph 18.

**The particular passages**

39.     The first document listed in the claimant's annex (H1 in the defendant's bundle) is a discussion of detention policy in Afghanistan including the legal basis for it.  The document contains several passages now proposed to be redacted which expressly record legal advice.   However, although the defendant would not ordinarily be expected to disclose the content of any legal advice, in circumstances where he was placing positive reliance in the <u>Maya Evans</u> proceedings on the absence of any legal basis for detaining individuals beyond 96 hours as part of the background to and imperative need for the UK's transfer policy, I do not consider that it would be obvious to a reasonable solicitor that the defendant had not deliberately disclosed the content of the relevant legal advice.

40.     It would be all the less obvious that the disclosure was inadvertent given the reference made to document H1 in open court by the defendant's counsel at the hearing of the <u>Maya Evans</u> case.  The purpose of the reference was to show that active consideration had been given to obtaining international agreement to an extension of the period for which the UK could detain individuals and the improbability that any such extension could be agreed.  It is evident from the page reference and what was said by the defendant's counsel that the part of the document to which the court's attention was being directed was paragraph 11, which set out three possible solutions to the problem of detention, and paragraph 12, which pointed out difficulties which each of these lines of action faced.  Paragraph 12 expressly referred to "MOD Legal Advice".  In my view, it would reasonably be assumed that the decision to refer to this advice was deliberate.  I consider that the same applies to other references to legal advice in the same document which formed part of the background to the issues to which the defendant specifically drew attention in argument.

41.     Different considerations apply, in my view, to the references included in two other documents (J6 and J3) to advice given by the Attorney General.  Neither of the two passages is relevant to the issues which I have just mentioned.  Moreover, I accept the defendant's contention that a reasonable solicitor would be aware of the established convention that the Government does not disclose the advice of Law Officers.  In these circumstances I consider that it would have been obvious to the reasonable solicitor that the passages recording such advice had been left unredacted by mistake.

**219**

42.    There are no other circumstances which in my view make it inequitable to redact those passages now.  Furthermore, I am told that in the case of document J3 the defendant in fact wrote to the solicitors for Maya Evans on 10 March 2010 informing them that the passage in question had been inadvertently disclosed, claiming legal professional privilege, enclosing a correctly redacted version of the document and asking that the version inadvertently disclosed should be shredded.  This raises an additional equity in favour of restraining the subsequent use of the unredacted version which ought never to have been given to the claimant's solicitors.

43.    In relation to document H3, I do not consider that a reasonable solicitor would regard the information which the defendant now wishes to redact as falling into any different category from the rest of the paragraph which contains it and which the defendant is not otherwise claiming to be privileged.  I therefore do not think it would have been obvious on reviewing the document that a mistake had been made in disclosing the information or that it would be equitable now to prevent the claimant from using it.

44.    In relation to document J5, I do not consider it at all obvious that the passage proposed to be redacted records legal advice, as opposed to the public position of the UK – which has no doubt been informed by legal advice but is not itself privileged information.  In these circumstances I again do not think it would be obvious to a reasonable solicitor that a mistake had been made in disclosing the information or equitable to prevent the claimant from using it.

**Conclusion**

45.    For these reasons, I decline to give permission to the claimant to use in these proceedings the unredacted versions of the two documents (J6 and J3) which refer to advice given by the Attorney General.  In the case of document J6, which was referred to at a public hearing in the Maya Evans proceedings, I will also make an order under CPR r.31.22(2) that no use may be made by the claimant of the unredacted version of the document.  I do, however, give permission to the claimant, in so far as it is needed, to use the other documents listed in the claimant's annex (H1, H3, J5 and J7) without the redactions identified in that annex which the defendant now wishes to make.

**220**

# Plummers Ltd v Debenhams plc

*a*

CHANCERY DIVISION
MILLETT J
23, 25, 28 APRIL 1986

*b* *Dispute under loan agreement – Accountant's report prepared with debtor's assistance – Whether entitled to legal professional privilege.*

The defendants granted leases of three department stores to the plaintiffs and also sold to them the retail businesses being carried on in the stores. The transaction was financed by a loan from the defendants secured by a fixed *c* and floating charge. Repayment of the loan was to be made in equal yearly instalments, the first being due in March 1986. The loan was also repayable on demand on the happening of a number of events of default one of which was the inability of the plaintiffs to pay their debts as they fell due. The loan agreement provided that so long as any part of the loan remained outstanding the plaintiffs would provide the defendants with various items of financial *d* information relating to their trading activities. The plaintiffs encountered financial difficulties and it became clear that they would have difficulty in meeting the scheduled payments. Negotiations took place between the parties in September 1984 and the plaintiffs alleged that it was agreed to defer the payment of the first instalment due under the loan for one year until March 1987. This was denied by the defendants. The defendants were taken over in *e* 1985 and the new controllers decided to enforce the strict legal rights against the plaintiffs but faced the problem that the plaintiffs alleged that the loan had been rescheduled and that any attempt to enforce their loan would be resisted. The defendants, on the advice of their solicitors, instructed a firm of accountants to review the plaintiffs' position so that they could obtain legal *f* advice on whether a demand for the immediate repayment of the whole sum should be made. The plaintiffs were unaware of the purpose of the inquiries and co-operated with the accountant carrying out the inquiries. On the basis of this information a report was prepared. The plaintiffs commenced proceedings alleging an oral agreement to reschedule the debt. The defendants denied any such agreement and counterclaimed for a declaration that they *g* were entitled to appoint a receiver to enforce their debt as, inter alia, the plaintiffs were unable to pay their debts as they fell due. In the present proceedings the plaintiffs applied for an order to obtain a copy of the accountant's report on their affairs prepared for the defendants which the defendants objected to producing on the grounds of legal professional privilege.

*h*
**Held:** Defendants' claim of privilege upheld. Documents obtained for the purpose of obtaining legal advice with respect to pending or contemplated litigation were entitled to legal professional privilege even though the litigation was only contemplated by the party seeking the advice and the other prospective party to the litigation was ignorant of the fact that any such *i* litigation might arise. However, to invoke the privilege successfully it was necessary for litigation to be actively contemplated by the party seeking the advice but it was not necessary for it to be pending or threatened. On the

facts, the report was prepared with the dominant, if not the sole, purpose of obtaining legal advice as to whether the defendants could serve a demand for the whole of the outstanding sum owed to them by the plaintiffs. Such a *a* demand would have inevitably led (as in fact it did) to litigation and the report was accordingly subject to legal professional privilege. There was nothing in the circumstances of the way in which the report had been compiled, involving as it did the co-operation of the plaintiffs, which deprived it of legal professional privilege as the plaintiffs had not been actively misled and there *b* was no evidence to suggest that the defendants obtained any more information than what they were entitled to as a matter of contract.

### Cases referred to in judgment

*Alfred Crompton Amusement Machines Ltd v Commissioners of Customs and Excise (No 2)* [1973] 2 All ER 1169, [1974] AC 405, [1973] 3 WLR 268, *c* HL.

*Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Rly Co* [1913] 3 KB 850, CA.

*Highgrade Traders Ltd, Re* [1984] BCLC 151, CA.

*Jones v Great Central Rly Co* [1910] AC 4, HL.

*Ogden v London Electric Rly Co* (1933) 49 TLR 542, [1933] All ER Rep 896, *d* CA.

*Seabrook v British Transport Commission* [1959] 2 All ER 15, [1959] 1 WLR 509.

*Waugh v British Rlys Board* [1979] 2 All ER 1169, [1980] AC 521, [1979] 3 WLR 150, HL..

*e*

### Application

Under the terms of a loan agreement dated 31 March 1980 made between the plaintiffs, Plummers Ltd, as borrowers and the defendants, Debenhams plc, as lenders, the defendants agreed to advance sums to be repayable by the plaintiffs in five equal annual instalments commencing on 31 March 1986 *f* ('the debt'). The whole of any outstanding indebtedness was made payable on demand in various specified events of default, including the inability of the plaintiffs at anytime to pay their debts as they fell due. By writ of summons issued on 13 January 1986 the plaintiffs commenced an action against the defendants in which they alleged, and the defendants denied, an oral agreement to reschedule the debt so that the first instalment would not be- *g* come due until 31 March 1987, in return for their release by the plaintiffs of any claims in respect of certain misrepresentations which they alleged had been made to them in 1980 in the purchase of retail stores. The defendants counterclaimed for a declaration that by reason, inter alia, of the inability of the plaintiffs to pay their debts as they fell due, the defendants were entitled *h* to demand immediate repayment of the whole of the outstanding indebtedness, and, in default of such payment, to appoint a receiver. This was an application by the plaintiffs for inspection of a report made by Price Waterhouse, on the advice of the defendants' solicitors, who had needed it in order to be in a position to advise the defendants in relation to their rights against the plaintiffs. The report was admitted to be relevant to the issues in the *i* proceedings and it appeared in Part 2 of the 1st schedule to the defendants' list of documents. The defendants objected to the production of the report

on the grounds of legal professional privilege. The facts are set out in the judgment.

*Anthony Bompas* for the plaintiffs.
*Stephen Silber* for the defendants.

MILLETT J: This cases raises some novel and difficult questions of legal and professional privilege. In February 1980 the defendants granted leases to the plaintiffs of three department stores in Southampton, Hove and Eastbourne, and sold to them the retail businesses carried on there. The finance required for the acquisition and working capital was provided to the plaintiffs by the defendants by way of loan secured by a debenture containing fixed and floating charges. The loan was repayable by equal yearly instalments, the first of which was payable on 31 March 1986. The whole of any outstanding indebtedness was made payable on demand in various specified events of default. These included not only the failure of the plaintiffs to pay an instalment when it became due or breach of any of their other obligations, but also the inability of the plaintiffs at any time to pay their debts as they fell due.

By cl 10.1 of the loan agreement dated 31 March 1980 the plaintiffs agreed with the defendants that for so long as any part of the loan or other sums secured by the debenture remained outstanding, the plaintiffs would keep the defendants informed of the progress of the plaintiffs' business and that of every subsidiary of the plaintiffs and would furnish them to such extent and in such form and detail as the defendants might from time to time reasonably require with particulars of any matters concerned with and arising out of the activities of the plaintiffs and every such subsidiary and in particular copies of the trading and profit and loss account and audited balance sheet in respect of each financial year of the plaintiffs and every such subsidiary forthwith on the same becoming available and financial statements, management and other accounts in respect of the plaintiffs and such subsidiaries in such form and at such intervals as the defendants might reasonably require.

In September 1982 and September 1983, pursuant presumably to their rights under cl 10.1 of the loan agreement, the defendants commissioned Price Waterhouse to review the financial position and prospects of the plaintiffs and report thereon. Price Waterhouse obtained the consent and co-operation of the plaintiffs for their investigations, and in due course copies of their reports were supplied, apparently on a voluntary basis, to the plaintiffs.

Subsequently, the plaintiffs ran into financial difficulties and surrendered two of the leases to the defendants, retaining only the store at Southampton. By 1983 or perhaps 1984 it was evident that the plaintiffs would be likely to have difficulty in meeting the scheduled repayments. In September 1984 discussions took place between representatives of the parties, and the plaintiffs claim that the defendants agreed to reschedule the repayments so that the first instalment would not become due until 31 March 1987. The plaintiffs had been complaining of misrepresentations alleged to have been made to them at the time of their purchase in 1980.

In the present action, commenced by writ issued on 13 January 1986, the plaintiffs allege and the defendants deny an oral agreement to reschedule the debt in return for the release by the plaintiffs of any claims in respect of the alleged misrepresentations. The defendants counterclaim for a declaration

that, by reason, inter alia, of the inability of the plaintiffs to pay their debts as they fall due, the defendants are entitled to demand immediate repayment of the whole of the outstanding indebtedness and in default of such payment *a* to appoint a receiver.

In August 1985 the defendants were acquired by Burton Group plc. On 9 September 1985 there was a meeting attended by Mr Wilson, the chairman and chief executive of the plaintiffs, Mr Dietz, director of mergers and acquisitions of Burtons, and Mr Hillyard and Mr Outcalt, employees and re- *b* presentatives of the defendants. At that meeting, Mr Wilson described the alleged agreement to reschedule the debt, and when asked by Mr Dietz what he would do if the defendants declined to proceed with it, said that he would have no option but to consult his professional advisers.

By October 1985 the defendants had decided to enforce their strict legal rights against the plaintiffs, and to take legal advice for this purpose. They *c* were anxious to obtain payment on 31 March 1986 of the first instalment pursuant to the loan agreement, but they were aware from what they had been told on 9 September that their entitlement to payment of that instalment on that date was disputed, and that any claim to payment was likely to be resisted.

On 22 October 1985 Mr Outcalt attended a meeting with the defendants' *d* solicitors, Messrs Clifford-Turner, and instructed them about the problem that had arisen with the plaintiffs. At that stage, the defendants were expecting to have to exercise their powers under the debenture to appoint a receiver, or (though this must have been much less likely) to present a petition for the winding up of the plaintiffs, or perhaps both. Clifford-Turner advised that *e* Price Waterhouse be consulted again. I infer that it had occurred to them that, if it could be established that the plaintiffs were unable to pay their debts as they fell due, so that an event of default had occurred, the defendants could demand and take steps to recover immediate repayment of the whole of the outstanding indebtedness, without the need to resolve the dispute concerning the alleged agreement to reschedule the debt. *f*

On 25 October 1985 a meeting took place between representatives of Clifford-Turner, Price Waterhouse and the defendants. Mr Outcalt has deposed that at that time there was a definite prospect of litigation in that the defendants were anxious to place the plaintiffs in receivership, or alternatively in winding up. The defendants knew that if they sought to appoint a receiver, there was a definite prospect that the plaintiffs would seek to bring proceed- *g* ings against the defendants, either restraining the appointment or seeking a declaration that it was invalid or seeking to claim damages for the wrongful appointment of the receiver. The defendants also realised that there was a very strong chance that if they sought to wind up the plaintiffs, the petition would be opposed by the plaintiffs. Further, the defendants were anxious to *h* obtain payment on 31 March 1986 of the first instalment pursuant to the loan agreement made in 1980 and there was a definite prospect that this would lead to proceedings.

At the meeting on 25 October 1985 it was agreed that the Southampton office of Price Waterhouse would review the plaintiffs' position so as to provide information which would enable Clifford Turner to advise the defen- *i* dants on their rights. It was decided that Mr Wilson should be approached in order to obtain his co-operation.

ChD　　　　Plummers Ltd v Debenhams plc (Millett J)　　　　451

Following that meeting, Mr Rogers of Price Waterhouse attended at the plaintiffs' premises and inspected the ledgers, management accounts and other financial records of the plaintiffs, and questioned the plaintiffs' officers and staff. He received full co-operation from the plaintiffs' officers and staff, and everything he asked to see was apparently produced to him.

At no stage during his investigations did Mr Rogers say anything to suggest that the purpose of his investigation was related to any possible legal proceedings. He has explained that he did not regard it as his duty to inform the plaintiffs of the purpose of his inquiries. He recognised that if he were to tell them what the defendants were proposing, they would have adopted a very hostile attitude. Mr Rogers has deposed that he was anxious not to mislead the plaintiffs in any way, and I accept that he did not actively mislead them. But I have no doubt that he knowingly left them with the impression that the purpose of his investigations was to enable the defendants to evaluate the commercial risks involved in any decision to support continued trading by the plaintiffs; and that he deliberately concealed the fact that, subject only to the obtaining of favourable legal advice, the defendants had already decided to withdraw support and enforce their strict legal rights.

The plaintiffs' impression must have been confirmed by the terms of two letters both dated 7 November 1985 and written by Mr Dietz on behalf of Burtons. The first addressed to Mr Wilson was in these terms:

> 'I would like to thank you for your co-operation in facilitating Price Waterhouse's review of your business. I was expecting their final report some time next week after which it may be appropriate to meet to discuss the future. You should know, however, that it is not our present intention to agree to any rescheduling of the loan repayments. I have written to the auditors accordingly and enclose a copy of the letter for your information.'

The second letter to the plaintiffs' auditors is in the following terms:

> 'Dear Sirs, As you are no doubt aware Debenhams is now a subsidiary of the Burton Group. The Burton Group has now taken over the management of all Debenhams' investments, including their loan to Plummers. We are writing to you therefore in response to your letter to Debenhams of 21st August 1985 concerning the possibility of rescheduling the repayments of their loan to Plummers. Price Waterhouse will have contacted you already in connection with a review of Plummers' operations which they have undertaken on our behalf. Although we have not had the benefit of their final report as yet, they have nevertheless given us some idea of their conclusions, and we are therefore writing to inform you that we are not willing to grant any indulgence to your client in respect of the amount and/or timing of the repayment of instalments under the capital loan agreement.'

Mr Rogers duly prepared a report, which was discussed in draft on 4 November 1985 with Mr Outcalt and a representative of Clifford-Turners. His final report was produced on or shortly after 12 November 1985, and it was addressed not to the defendants but to Burtons. I have not seen it, but I

[1986] BCLC 447

take it to consist of or include information obtained from the plaintiffs' own financial records or supplied by the plaintiffs' officers and staff in response to Mr Rogers's questions, Mr Rogers's analysis of that information and assessment of the plaintiffs' financial position as at 30 September 1985, and his advice in respect thereof. It is admitted to be relevant to the issues in the present proceedings, and it appears in Pt 2 of the Sch 1 to the defendants' list of documents. The defendants object to producing the report for inspection, and claim legal professional privilege in respect thereof; hence the present application by the plaintiffs.

Two questions have been argued before me. The first is whether the report is covered by legal professional privilege; the second is whether, having regard to the circumstances in which the information contained in the report was obtained from the plaintiffs, the defendants can maintain their claim to privilege.

On the first question, privilege is claimed for the report as a communication between Price Waterhouse and the defendants, produced or brought into existence in order to be submitted to the defendants' legal advisers for the purpose of obtaining legal advice on pending or contemplated litigation. The report is thus alleged to fall within the second of the two categories of document for which privilege may be claimed and which were carefully distinguished by Lord Edmund-Davies in *Waugh v British Rlys Board* [1979] 2 All ER 1169 at 1181, [1980] AC 521 at 541-542, where he said:

> 'It is for the party refusing disclosure to establish his right to refuse. It may well be that in some cases where that right has in the past been upheld the courts have failed to keep clear the distinction between (a) communications between client and legal adviser, and (b) communications between the client and third parties, made (as the Law Reform Committee (Cmnd 3472, para 17) put it) "for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice upon pending or contemplated litigation".'

In *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Rly Co* [1913] 3 KB 850 at 856, Buckley LJ described the privilege as extending to a document –

> 'procured as materials upon which professional advice should be taken in proceedings pending, or threatened, or anticipated.'

In the recent case of *Re Highgrade Traders Ltd* [1984] BCLC 151 at 173, Oliver LJ described it as extending to –

> 'documents coming into existence for the purpose of obtaining advice in connection with the prosecution or defence of a claim.'

The plaintiffs' first point is that the report was addressed to, and must be taken to have been commissioned by and prepared for, Burtons and not the defendants. That fails on the evidence. The report was produced for the benefit and purpose of the defendants, not Burtons. It was commissioned on

ChD    Plummers Ltd v Debenhams plc (Millett J)    453

the advice of Clifford-Turner, who were the defendants' solicitors, and who needed it in order to be in a position to advise the defendants in relation to their rights against the plaintiffs. Burtons enjoyed no rights against the plaintiffs. The individual who attended the various meetings with Clifford-Turner and Price Waterhouse was Mr Outcalt, an employee of the defendants. Even if the report was commissioned by Burtons (as to which there is no direct evidence, and the only evidence at all is the wording of the second of the two letters by Burtons to the plaintiffs' auditors), and in so far as it was addressed to Burtons, then Burtons were acting as agents for the defendants.

The plaintiffs' second point is that, at the time that the report was obtained, there was no litigation in contemplation, at least by the plaintiffs. They had no reason to think that their claim that a rescheduling of the debt had been agreed was in dispute, and no suspicion that there might be any other ground for litigation between the parties. In fact, the last sentence of the second of the two letters dated 7 November 1985, which I have read, and which came into existence before the report was finalised, might be thought to be inconsistent, to say the least, with the acceptance by the defendants of the plaintiffs' contentions. But in my judgment, it is sufficient if litigation is contemplated by the party who seeks legal advice. Often, of course, it will also be contemplated by the other party, and this will certainly be the case where it is the prospective defendant who seeks advice. But legal professional privilege is equally available to prospective plaintiffs.

In *Re Highgrade Traders Ltd* [1984] BCLC 151 at 172, Oliver LJ said of the decision of the House of Lords in *Alfred Crompton Amusement Machines Ltd v Commissioners of Customs and Excise (No 2)* [1973] 2 All ER 1169, [1974] AC 405:

> '... I am, for my part, unable to agree ... that to extend privilege to documents coming into existence before the decision to instruct the solicitor actually to make or resist the claim is in any way inconsistent with [that decision]. Such a proposition appears to me to be at variance with the decision of the House of Lords in *Waugh's* case, from which it is, I think, clear that, if litigation is reasonably in prospect, documents brought into being for the purpose of enabling the solicitors to advise whether a claim shall be made or resisted are protected by privilege, subject only to the caveat that that is the dominant purpose for their having been brought into being.'

If, as is clear from that case, the privilege covers documents obtained for the purpose of enabling solicitors to advise a party whether to make a claim, and that it extends to documents obtained or brought into existence before the decision to make the claim is made, then it must necessarily extend to documents obtained or brought into existence before that decision is notified to the other side. I see no good reason in logic or principle for requiring a party to warn the other side that he is contemplating making a claim, or rejecting his demand, or for restricting the privilege to documents obtained or brought into existence only after such warning has been given. There is no trace in any of the authorities of any such requirement, and I decline to introduce it. It was said that this would widen the category of legal professional privilege to an unacceptable degree, and even destroy the dividing line

between the two categories of privilege described by Lord Edmund-Davies in *Waugh*'s case, for legal advice when given will usually bear not only on the client's rights but on other parties' rights as well. I disagree. There must be a real prospect of litigation. Where it is neither pending nor threatened, it must be in the active contemplation of the party seeking advice. This is a real requirement, and it is sufficient to dispose of the more fanciful cases suggested in the course of argument.

The plaintiffs' next point, that even if litigation was in contemplation, the Price Waterhouse report was not brought into existence for the purpose of obtaining legal advice to enable it to be prosecuted or defended, was altogether more formidable. If the contemplated litigation is identified as that arising from the plaintiffs' claim that the debt had been rescheduled, the report would not assist the defendants to resist the claim, but enable them to avoid it. By asserting the plaintiffs' inability to pay their debts, the defendants could simply side-step the plaintiffs' claim, and proceed to enforce their security at once.

The truth of the matter, it was said, was that the defendants sought legal advice, not to enable them to meet the plaintiffs' claim, but to decide whether or not to appoint a receiver, and thus enforce their security without recourse to the courts at all. Material brought into existence for the purpose of obtaining such advice was not, it was submitted, covered by privilege at all. It could not be brought within the scope of the privilege by suggesting that the defendants might have chosen to proceed by presenting a petition for the compulsory winding up of the plaintiffs; this course of action was so unlikely that it could be disregarded. Nor could it be brought within the scope of the privilege by asserting a clear prospect that, if a receiver were appointed, his appointment would be challenged by the plaintiffs. Unless and until the decision to appoint a receiver was taken and immediate payment of the outstanding debt demanded, no such challenge could be mounted. Even then, it was far from certain that such a challenge would be made. Accordingly, it was submitted, pending the demand, or at least the decision to make the demand, there was no litigation in contemplation; or alternatively the legal advice was not sought in connection with such litigation. Reliance for those submissions was placed on *Jones v Great Central Rly* [1910] AC 4; and *Alfred Crompton Amusement Machines Ltd v Customs and Excise Commissioners (No 2)* to which I have already referred. In my judgment, neither case supports the submissions, which are inconsistent with the decision of the Court of Appeal in *Re Highgrade Traders Ltd*.

In *Jones v Great Central Rly*, information was supplied by a member of a trade union to officials of the union in order to enable them to decide whether he was entitled to bring an action for wrongful dismissal at the expense of the union and with the assistance of the union's solicitor. It was also supplied for the purpose of furnishing the solicitor with information which would enable him to conduct the action which the workman contemplated and desired. These were two quite separate purposes. The information was, however, supplied in the first instance not to the solicitor, but to the officials of the union, who had themselves to consider and act on it. In those circumstances, the material was not privileged, since it was communicated to persons who were neither solicitors nor agents for the solicitors, and for the purpose of obtaining a decision from them, not for the purpose of obtaining legal

advice. It could not subsequently become privileged by being furnished to solicitors in order to enable them to conduct the litigation. In the present case, by contrast, the Price Waterhouse report was obtained for the sole purpose of being laid before the defendants' solicitors and obtaining advice from them whether or not to demand immediate repayment of the outstanding indebtedness.

In *Crompton*'s case the Commissioners of Customs and Excise claimed privilege for documents obtained by them for the purpose of performing their statutory duty of making a valuation leading to the preparation and issue of a computation of purchase tax. The valuation was one which the commissioners were under a statutory obligation to make, and there was provision for reference to arbitration in the event of a dispute. Arbitration was reasonably contemplated by the commissioners as likely to follow their valuation, whatever their valuation might be.

The commissioners claimed legal professional privilege in respect of: (1) communications with their salaried legal advisers in order to obtain advice; (2) communications with their legal advisers in order to obtain evidence for the anticipated arbitration; (3) internal communications with their officers and agents concerning the proper assessment of the purchase tax payable by the company; and (4) documents received in confidence from third parties. There was no argument in the House of Lords with regard to the first set of communications, so the decision of the Court of Appeal that they were privileged stands. The House held that privilege attached to the second set, even if it were assumed that litigation had to be anticipated to found it; so there was a clear decision that in the circumstances of that case litigation was in prospect. The majority held that the third and fourth sets were not subject to legal professional privilege because they came into existence for a single purpose, to assist the commissioners to form an opinion about the basis on which purchase should be paid by the company and not for the dual purpose of enabling an opinion to be formed and resisting the company's contentions in the consequential arbitration.

In the *Crompton* case [1973] 2 All ER 1169 at 1183–1184, [1974] AC 405 at 432–433 Lord Cross said:

> 'Here the two purposes for which the documents in question were obtained or came into existence were parts of a single wider purpose – namely, the ascertainment of the wholesale value in the manner prescribed by the Act. The first, and the sole immediate, purpose was to help the commissioners to fix what in their opinion was the true value; the second purpose was to help the solicitor, if the commissioners' opinion was challenged, to prepare their case for the arbitration. It was not – and hardly could have been – suggested that the mere fact that the commissioners would know in every case that their opinion might be challenged would itself enable them to claim that such documents as are in question here would be the subject of legal professional privilege whenever in fact their opinion was challenged. What is said to make them privileged in this case is the fact that the commissioners happened to expect that there would be an arbitration and called in the solicitor to "hold their hands" in the early stages. But, even so, in this case just as much as in cases in which no arbitration was in fact anticipated the

> commissioners had to form their own opinion as to value on the evidence available to them, including these documents, before any arbitration could take place. This feature of the case appears to me to distinguish it from the *Ogden v London Electric Rly Co* (1933) 149 LT 476 or *Seabrook v British Transport Commission* [1959] 2 All ER 15, [1959] 1 WLR 509 type of case and to make it analogous to *Jones v Great Central Railway Co* [1910] AC 4. [In that case the House] held that the letters in question were not the subject of legal professional privilege because the union authorities had themselves to consider them and act on them before the solicitor was employed to conduct the case. So here the commissioners had to form their own opinion as to value before the solicitor would use the documents for the purpose of defending their opinion in the anticipated arbitration.'

So there again the dominant, and indeed the sole immediate, purpose for which the documents were required was to enable persons who were not solicitors to reach an independent decision of their own, which they were required to make in any event, whether or not litigation was likely to follow.

In *Re Highgrade Traders Ltd* the premises of a family company and the whole of its stock were destroyed by fire and the son of the controller of the company who assisted in the business was prosecuted for arson and acquitted on the direction of the judge. The company claimed under a policy of fire insurance. The insurers were suspicious of the circumstances surrounding the fire and, suspecting arson, commissioned a number of expert reports including, interestingly, a report by a firm of accountants. As a result of these reports, the insurers concluded that they had no obligation to honour the policies, and duly notified the company of their decision. Subsequently, the company went into liquidation, and the liquidator sought production of the reports under s 268 of the Companies Act 1948. The insurers claimed legal professional privilege. Upholding the claim to privilege, the Court of Appeal held that documents brought into existence with the dominant purpose of obtaining legal advice as to whether a legal claim should be made or resisted, and which would lead to a decision whether or not to litigate, were protected by legal professional privilege; and that it was not necessary that the documents be brought into existence only after the decision to make or resist a claim had been made.

The Court of Appeal treated the questions whether the claim should be resisted, and whether or not to litigate, as two sides of the same coin; and refused to attribute to the clients the unrealistic intention to make up their minds, independently of the advice they received from their solicitors, that the claim should or should not be resisted. As Oliver LJ said ([1984] BCLC 151 at 173–174):

> 'It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow. The claim had been made and there was no indication that it was not going to be pressed, particularly after [the result of the criminal proceedings]. It is, as it seems to me, entirely unrealistic to attribute to the insurers an intention to make up their minds, independently of the advice which they received from their solicitors, that the claim should or should not be resisted. Whether they paid or not depended on the legal advice which they received, and

a
the reports were prepared in order to enable that advice to be given. The advice given would necessarily determine their decision and would also necessarily determine whether the anticipated litigation would or would not take place.'

b
Yet in that case, despite the rejection of the company's claim under the policy, no litigation in fact followed; and by the time the case came before the Court of Appeal it was quite possible that it never would. Indeed, the liquidator wanted to see the reports for the very purpose of enabling him to decide whether to pursue the company's claim under the policy to the point of litigation. Certainty of litigation is therefore not required: a reasonable prospect at the time the evidence is obtained is sufficient.

c
I therefore turn to consider whether in October or November 1985 there was a reasonable prospect of litigation and, secondly, whether the purpose for which the report was commissioned was to enable advice to be obtained in connection with that litigation.

d
In October 1985, the plaintiffs were indebted to the defendants in a substantial sum, the first instalment of which would fall due under the terms of the original loan agreement on 31 March 1986. The plaintiffs were claiming that those terms had been varied by a subsequent oral agreement, as a result of which they were not obliged to make any repayment until a year later. The defendants, for their part, were determined to enforce their strict legal rights against the plaintiffs, and demand payment of the first instalment on 31 March 1986 and if possible of the whole outstanding indebtedness either then or even earlier.

e
Why, then, did the defendants commission the Price Waterhouse report? It was commissioned in order to enable the defendants' solicitors to give advice whether there were grounds for asserting that the plaintiffs were unable to pay their debts. Why was that relevant? It was relevant because it would entitle the defendants to demand immediate repayment of the whole sum outstanding. That would make it unnecessary to resolve the question whether the debt had been rescheduled as alleged. By enabling the defendants to demand immediate payment of the whole outstanding debt, it would bring pressure on the plaintiffs to withdraw or compromise their claim to defer payment of the first instalment.

f

g
In my judgment, the Price Waterhouse report was brought into existence with the dominant, and perhaps the sole, purpose of obtaining legal advice whether a demand for immediate repayment of the whole sum should be served; that is to say, whether a legal claim should be made. Would that in turn lead to a decision whether or not to litigate? It is said that litigation was far from certain: the defendants could proceed to appoint a receiver out of court, and there was no reason to suppose that the demand for the appointment would be challenged. In my judgment, that is completely unrealistic. The plaintiffs were asserting the absence of any obligation to pay even the first instalment until 31 March 1987. They were in financial difficulties, and would obviously resist a claim that they should pay the whole sum either then or earlier. A demand for immediate repayment of the whole outstanding debt would, at one and the same time, reject the plaintiffs' claim and assert a greater obligation on their part. Litigation was virtually inevitable. It would be surprising if the defendants' demand for immediate repayment, accom-

h

i

panied by a threat to appoint a receiver in default, did not produce an immediate application to the court for an injunction. In practice, recognising the uncertainty of the ground on which the demand would be based, the defendants might well have followed a demand for repayment not by the immediate appointment of a receiver but by a writ. Adopting the words of Oliver LJ in *Re Highgrade Traders* [1984] BCLC 151 at 173: it was, in my judgment, entirely clear that, if the defendants demanded immediate payment, and that demand was resisted, litigation would inevitably follow. Furthermore, whether the defendants demanded immediate payment depended on the legal advice they received from their solicitors; and the Price Waterhouse report was prepared in order to enable that advice to be given.

I see no reason to ignore what has in fact happened. Following the Price Waterhouse report, the defendants rejected the plaintiffs' claim that the debt had been rescheduled. The plaintiffs then commenced the present action, and the defendants counterclaimed for a declaration that they were entitled to demand immediate repayment of the debt and in default to appoint a receiver. All that has occurred could easily have been foreseen in October 1985, when the Price Waterhouse report was commissioned.

Given the conflicting positions adopted by the parties in October 1985, the debtor asserting that no payment was due until March 1987, and the creditor seeking the earliest possible repayment of the whole debt, litigation was inevitable unless one or other gave way. In my judgment, the Price Waterhouse report is covered by legal professional privilege.

That brings me to the second question: having regard to the circumstances in which the evidence on which the report was based was obtained from the plaintiffs, can the defendants maintain their claim to privilege? The plaintiffs assert that they cannot. The defendants obtained that evidence by deliberately suppressing the true purpose for which they required it, and they cannot now rely on that purpose in order to found the claim to privilege.

It is clear that no case of express or implied waiver of privilege or of estoppel can be made out. There was no waiver, since the defendants would not have agreed to it, and the plaintiffs, who were wholly unaware of the true purpose for which the defendants wanted the information sought, naturally did not ask for it. So far as the plaintiffs are concerned, they may well have taken the request for information to be a repetition of what had occurred in 1982 and 1983, and they may well have expected the report to be made available to them again as previous reports had been. But they did not stipulate for this; and if they had done so, it is probable that Price Waterhouse would have been asked to prepare two reports, one of which could safely be disclosed to the plaintiffs, and which omitted the advice of Price Waterhouse; and the other of which, containing Price Waterhouse's own assessment and advice, could be withheld under the claim of privilege. Nor can estoppel be made out, since there was no express representation on which the plaintiffs relied, and estoppel can be founded on silence only where there is a duty to speak.

If the plaintiffs' claim to inspection is to be made out, it must in my judgment be based on a broader principle. Legal professional privilege is a privilege, an exception to the general rule that all relevant documents must be produced. If privilege is to be successfully claimed for material based on information obtained from the other party to the contemplated litigation, it