is argued, it may well be that full disclosure of the purpose for which that information is required should be made. I assume, without deciding, that it is not open to a party to litigation to withhold production of a relevant document by claiming that the purpose for which it was brought into existence was to obtain legal advice in connection with contemplated litigation, when that purpose was deliberately concealed from the other party, and when the document contains and its conclusions are based on evidence obtained from the other party only by suppressing the purpose for which it was required.

But in my judgment, that is not this case. The information which Price Waterhouse obtained was information to which the defendants were contractually entitled under cl 10.1 of the loan agreement. That did not, of course, entitle the defendants to send in Price Waterhouse to the plaintiffs' premises, question the plaintiffs' staff, or make their own investigations; but that went only to the manner in which the defendants obtained the information they required, not the nature or extent of that information. There is no evidence that the information provided to Price Waterhouse by the plaintiffs went beyond that to which the defendants were entitled as matter of contract; and no basis for contending that the information was extracted only by suppression of the truth. Suppression of the truth no doubt avoided hostility on the part of the plaintiffs, and made the task of Price Waterhouse a good deal easier than it might otherwise have been; but the evidence they obtained was evidence to which the defendants were entitled as a matter of right, and without disclosure of the purpose for which it was required.

For these reasons, I uphold the defendants' claim to privilege, and dismiss the plaintiffs' application for inspection.

*Application dismissed.*

Solicitors: *Nabarro Nathanson* (for the plaintiffs); *Clifford-Turner* (for the defendants).

Jacqueline Metcalfe   Barrister.

# Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA and others

CHANCERY DIVISION
MILLETT J
10, 11, 14, 15, 16, 17, 18, 21 OCTOBER 1991

*Legal professional privilege – Whether bank could claim such privilege in documents prepared by or produced to accountants investigating the bank's problem loans – Circumstances in which the production of documents subject to legal professional privilege can be compelled under s 39 of the Banking Act 1987 – Duty of confidentiality – Whether accountants entitled to disclose confidential information to a non-statutory inquiry inquiring into the supervision of the bank – Criminal Justice Act 1987, s 2 – Banking Act 1987, s 39.*

Price Waterhouse (PW) performed several different functions for the Bank of Credit & Commerce International SA and its associated companies (BCCI), including co-ordinating the worldwide audits of the companies in the group, reviewing the consolidation of their accounts, preparing reports for the College of Banking Supervisors, and from October 1990 acting as a member of the committee of investigation set up by BCCI's controlling shareholders and later reconstituted as an internal committee of BCCI to investigate problem loans made by BCCI. Under the terms of reference of the committee PW was required to report to BCCI's solicitors to enable them to give legal advice to BCCI. Following the collapse of BCCI the Serious Fraud Office and the Bank of England served various notices on PW requiring the production of certain documents under s 2 of the Criminal Justice Act 1987 and s 39 of the Banking Act 1987 respectively. The Bank of England and the Treasury set up a non-statutory inquiry to inquire into the supervision of BCCI under the Banking Acts. PW wished to co-operate with the inquiry but considered it could not do so because information and documents in its possession relating to BCCI were confidential and/or subject to legal professional privilege. PW sought declarations that: (1) it was not precluded from complying with notices under s 2 of the Criminal Justice Act 1987 or under s 39 of the Banking Act 1987 by any claim of BCCI that documents referred to in the notices were subject to legal professional privilege by reason only of having been prepared by or produced to PW in the course of the investigation into problem loans; (2) a proper claim by BCCI to legal professional privilege did not constitute a reasonable excuse for non-compliance by PW with any notice served under s 39 of the Banking Act 1987, except in the circumstances set out in s 39(13) of that Act; (3) PW was not precluded by any duty of confidence or by legal professional privilege from supplying documents and information to the inquiry.

**Held** – (1) BCCI could not claim legal professional privilege in documents prepared by or produced to PW in the course of the investigation into problem loans. The documents were not privileged as communications made by BCCI to

[1992] BCLC 583

234

its legal advisers through the medium of PW, as PW was producing material for BCCI and was not merely an agent passing on a communication to BCCI's legal advisers. Further, although one of the purposes of the investigation was for BCCI *a* to obtain legal advice in connection with possible litigation for the recovery of the problem loans it was not the dominant purpose and the documents were therefore not privileged as documents brought into being for the purpose of contemplated litigation. The declaration sought would therefore be granted.

(2) PW could be compelled under s 39 of the Banking Act 1987 to produce *b* documents which were covered by legal professional privilege. The obligation to comply with a s 39 notice extended to documents covered by legal professional privilege, that privilege being impliedly excluded except in the circumstances set out in s 39(13). A declaration would be granted accordingly.

(3) PW's duty not to divulge confidential information was subject to a right to disclose such information where there was a higher public interest in disclosure *c* than in maintaining confidentiality. On the facts, the public interest in the effective regulation and supervision of authorised banking institutions outweighed the public interest in maintaining confidentiality. A declaration would be granted in favour of PW that it was not precluded by any duty of confidentiality or by legal professional privilege from supplying information to the inquiry, limited to information relevant to the terms of reference of the inquiry *d* and excluding material subject to the duty of banking confidentiality and legal professional privilege except where specifically requested by the inquiry.

### Cases referred to in judgments

A-G v Guardian Newspapers Ltd (No 2) [1988] 3 All ER 545, [1990] 1 AC *e* 109, [1988] 2 WLR 805, HL.
Bank of England v Riley [1992] 1 All ER 769, CA.
Beloff v Pressdram Ltd [1973] 1 All ER 241.
Comrs of Customs and Excise v Harz [1967] 1 All ER 177, [1967] 1 AC 760, [1967] 2 WLR 297, HL.
EMI Records Ltd v Spillane [1986] 2 All ER 1016, [1986] 1 WLR 967. *f*
Francome v Mirror Group Newspapers Ltd [1984] 2 All ER 408, [1984] 1 WLR 892, CA.
Gartside v Outram (1856) 26 LJ Ch 113.
Highgrade Traders Ltd, Re [1984] BCLC 151, CA.
Initial Services Ltd v Putterill [1967] 3 All ER 145, [1968] 1 QB 396, [1967] 3 WLR 1032, CA. *g*
Lion Laboratories Ltd v Evans [1984] 2 All ER 417, [1985] QB 526, [1984] 3 WLR 539, CA.
Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] All ER Rep 550, CA.
Waugh v British Railways Board [1979] 2 All ER 1169, [1980] AC 521, [1979] *h* 3 WLR 150, HL.
Wheeler v Le Marchant (1881) 17 Ch D 675, CA.

### Summons

By their re-amended originating summons, the plaintiffs, Price Waterhouse, applied to the court for the following relief: (1) a declaration that Price Water- *i* house was not precluded from complying, whether through its partners or employees, with (i) any notice served on Price Waterhouse or any of its partners

pursuant to s 39 of the Banking Act 1987, or (ii) any notice served on Price Waterhouse or any of its partners pursuant to s 2 of the Criminal Justice Act 1987, by any claim made by the defendants or any of them that any documents referred to in any such notice were subject to legal professional privilege by reason only of (a) the fact that such documents were prepared by or produced to Price Waterhouse in the course of its participating in an investigation established after October 1990 into problem loans made by the defendants, and (b) the terms upon which the said investigation was conducted and such documents were prepared or produced. (2) Further, or alternatively, a declaration that an otherwise proper claim by the defendants or any of them to legal professional privilege did not of itself contribute reasonable excuse for non-compliance by Price Waterhouse with any such notice served pursuant to s 39 as aforesaid, save in the circumstances set out in s 39(13) of the Banking Act 1987. (3) A declaration that Price Waterhouse was not precluded by reason of any obligation of confidence owed to the defendants or any of them or by reason of any claim by the defendants or any of them to legal professional privilege, from supplying, whether through their partners or employees or otherwise, documents and information to Bingham LJ in the course of an inquiry being conducted by him into the supervision of BCCI pursuant to a request of the Chancellor of the Exchequer dated 22 July 1991. The first six defendants were (1) BCCI Holdings (Luxembourg) SA, (2) Bank of Credit and Commerce International SA, and (3) to (6) four other associated companies. The Bank of England, the Fraud Office, and the Treasury were also joined as defendants. Part of the application was heard in camera. The facts are set out in the judgment.

David Oliver QC and Paul Girolami (instructed by Herbert Smith) for Price Waterhouse.
Richard Sheldon and Susan Prevezer (instructed by Lovell White Durrant) for the first, second, third, fourth and sixth defendants.
Nicholas F Stadlen QC (instructed by Freshfields) for the Bank of England.
A W H Charles and Philip Havers (instructed by the Treasury Solicitor) for the Treasury and the Bank of England re the Bingham Inquiry.
Richard Drabble (for the Serious Fraud Office).
The fifth defendant took no part in the proceedings.

18 October 1991. The following judgment was delivered in open court.

MILLETT J. Following the collapse of Bank of Credit & Commerce International SA and its associated companies (BCCI), the accountancy firm of Price Waterhouse has found itself in possession of highly sensitive information and documentation which have been or are likely to be demanded of it by various statutory and non-statutory bodies. The present application is brought by Price Waterhouse in order to resolve the conflict between its duty and concern to preserve the confidentiality of its former clients and its duty and wish to co-operate with the authorities.

The first defendant, BCCI Holdings (Luxembourg) SA, is the holding company. The second defendant, Bank of Credit & Commerce International SA, is the principal banking subsidiary which formerly carried on business in Europe and the Middle East. It had branches in the United Kingdom and is registered under s 691 of the Companies Act 1985 as an overseas company carrying on business

586    **Butterworths Company Law Cases**    [1992] BCLC

in Great Britain. It was formerly an authorised bank and was and remains subject to the regulatory powers of the Bank of England. Both defendants are registered in Luxembourg where they are in gestion controlée. The second *a* defendant is also in provisional liquidation in England.

The third, fourth and sixth defendants are associated companies registered in the Cayman Islands. The fifth defendant is another associated company registered in Gibraltar. Each of these defendants is in provisional liquidation in its own jurisdiction. *b*

Other parties which have been joined as defendants are the Bank of England, the Serious Fraud Office and the Treasury.

Price Waterhouse performed several different functions in relation to BCCI. From June 1987 it was responsible for co-ordinating the worldwide audits of companies in the group and for reviewing the consolidation of their accounts. From time to time it prepared reports for the College of Banking Supervisors, a *c* body specially set up in 1988 to supervise and regulate the affairs of the BCCI, on which the Bank of England was represented together with the regulatory authorities of other countries. The present application derives from the fact that from October 1990 partners of Price Waterhouse were members of a special committee of investigation initially established by the government of Abu Dhabi, representing the controlling shareholders, and later reconstituted as an internal *d* committee of BCCI to investigate certain problem loans made by companies in the group.

The application was prompted by service upon Price Waterhouse of notices dated 19 July 1991 and 14 August 1991, issued by the Serious Fraud Office under s 2 of the Criminal Justice Act 1987 and a notice dated 5 August 1991 *e* and issued by the Bank of England under s 39 of the Banking Act 1987. These required the production of certain specified documents to the Serious Fraud Office and the Bank of England respectively. The documents so specified are or include documents brought into existence for the purposes of the investigating committee. Accordingly, Price Waterhouse finds itself in what it describes as a dilemma. *f*

> 'To the extent that legal professional privilege attaches to the documents sought that privilege is vested in some or all of the defendants, not in Price Waterhouse. Price Waterhouse cannot therefore itself dispose of the matter simply by waiving privilege. If it provides documents which are legally professionally privileged to the Serious Fraud Office and the Bank of *g* England, it is at risk of legal proceedings being brought by the defendants. If, on the other hand, it fails to provide such documents to the Bank of England (and also to the Serious Fraud Office in circumstances where the documentation is ultimately held not to be privileged), then it is at risk of criminal sanction, for having failed 'without reasonable excuse' to comply *h* with the requirements imposed by the s 2 and s 39 notices respectively. Whilst Price Waterhouse wishes to comply with notices served upon it by the appropriate investigatory and regulatory authorities, Price Waterhouse does not wish to be in breach of any duties owed to the defendants.'

Price Waterhouse has therefore sought the consent of its former clients to comply *i* with the notices and has obtained the consents of the provisional liquidators of the companies in provisional liquidation and the commissaires of the companies

in gestion controllée, but it is not satisfied that it has sufficient consents to enable it to rely on them. The notices which prompted the application have been complied with in accordance with the directions of Sir Nicolas Browne-Wilkinson V-C on 27 August 1991 ([1992] BCLC 579), but since then further notices have been served by the Serious Fraud Office on 8 and 9 October 1991, and Price Waterhouse has been given to understand that further notices are intended to be served by the Bank of England.

At the end of July 1991 an inquiry into the supervision of BCCI was set up under the chairmanship of Bingham LJ at the request of the Chancellor of the Exchequer and the Governor of the Bank of England. Its terms of reference are –

> 'to enquire into the supervision of BCCI under the Banking Act; to consider whether the action taken by all the United Kingdom authorities was appropriate and timely; and to make recommendations.'

It is a private inquiry and has not been established under any statutory power. Price Waterhouse wishes to co-operate with the inquiry, but is constrained by the fact that all information and documents in its possession which relate to the affairs of its former clients, whether or not subject to legal professional privilege, are confidential.

BCCI have appeared before me by counsel to claim legal professional privilege. This attitude is understandable and is not to be criticised. BCCI have repeatedly made clear their wish to co-operate fully with the authorities. The provisional liquidators and commissaires do not object to full compliance with the statutory notices served by the Serious Fraud Office and the Bank of England even if the documents required to be produced are privileged, and the provisional liquidators of the first defendant have been so directed by the court. BCCI are prepared to consider the terms of any further notices which are served on them with a view to producing the documents required, notwithstanding their privileged nature, provided that this will not interfere with the conduct of the liquidation; but they wish to have an opportunity on each separate occasion to give or withhold consent and, if necessary, to seek the directions of the Companies Court.

*Question 1*

Question 1 of the re-amended originating summons seeks:

> 'A declaration that Price Waterhouse is not precluded from complying, whether through its partners or employees, with – (i) any notice served upon Price Waterhouse or any of its partners pursuant to s 39 of the Banking Act 1987, or (ii) any notice served upon Price Waterhouse or any of its partners pursuant to s 2 of the Criminal Justice Act 1987, by any claim made by the defendants or any of them that any documents referred to in any such notice are subject to legal professional privilege by reason only of (a) the fact that such documents were prepared by or produced to Price Waterhouse in the course of its participating in an investigation established after October 1990 into problem loans made by the defendants, and (b) the terms upon which the said investigation was conducted and such documents were prepared or produced.'

It is to be observed that the question is very narrowly drawn. This is deliberate. It is concerned only with documents which came into existence for the purposes of the investigating committee and which attract legal professional privilege, if at all, by reason only of that fact, or by reason of the terms upon which the investigation was conducted and upon which such documents were prepared or produced. It is not concerned with documents which attract privilege for other reasons or by reason of their contents. The question for decision, therefore, is whether the circumstances in which the investigating committee was established and carried out its functions were such as to give rise to legal professional privilege for the documents which it generated. These consist of drafts, reports, notes and working-papers of the investigating teams (consisting of staff of Price Waterhouse and Ernst & Young) or of the investigating committee. Not all these documents are in the possession of Price Waterhouse. The extent of the relevant documentation in its possession is described in Miss Eban's first affidavit and need not be repeated by me.

[The court adjourned into camera. On adjourning back into open court:]

MILLETT J.
*Legal professional privilege*
BCCI have put their claim to privilege in two ways.

*(1) Communication with a view to obtaining legal advice*
Legal professional privilege attaches to all communications made in confidence between a client and his legal adviser for the purpose of giving or obtaining legal advice. Litigation does not have to be in contemplation. It does not matter whether the communication is directly between the client and his legal adviser or is made through an intermediate agent of either.

   BCCI claim that documents brought into existence on or after 6 February 1991 attract legal professional privilege under this head. The investigating committee, it is submitted, was reconstituted as a committee appointed by BCCI and thereby became an internal committee of BCCI. Its function, as described in its terms of reference, was to report to BCCI's legal advisers to enable them to give legal advice to BCCI. Price Waterhouse (or the investigating committee) was the means of communication between BCCI (the client) and Allen & Overy (the legal adviser).

   In my judgment, the claim is untenable. In *Re Highgrade Traders Ltd* [1984] BCLC 151, Oliver LJ dealt with a similar argument. He said (at 164):

> 'The proposition is that it is sufficient to support a claim to privilege merely to show that the documents were prepared at the behest of the insurers for the purpose of obtaining legal advice to be given to them by their solicitors, and it is a proposition which, it is said, is supported by a statement on p 452 of the Supreme Court Practice 1982 in the notes to RSC Ord 24, r 5. What is said there is this: "*Third party as medium of communications.* – So confidential letters or communications between a party and his solicitor, in his professional capacity, made through a clerk or agent employed by the solicitor (*Wheeler v Le Marchant* (1881) 17 Ch D 675 at 682, CA), or, and by the client in order to convey information to or from the solicitor" – and a number of cases are cited – "are privileged." In my judgment, this passage is referring merely to the situation where

the client, in communicating with his solicitor, uses as the medium of communication either the solicitor's agent or his own agent. It is not directed – and the authorities referred to (in particular *Wheeler v Le Marchant* (1881) 17 Ch D 675) show this – to the situation where, there being no litigation in progress or contemplation, the client or the solicitor procures a third party to provide information collected by the third party to the solicitor. It does not, in my judgment, support at all the proposition advanced by the appellant and, if it does, then it seems to me clearly to be wrong and to be irreconcilable with the following passage from the speech of Lord Edmund-Davies in *Waugh v British Railways Board* [1979] 2 All ER 1169 at 1181, [1980] AC 521 at 541–542, where he says this: "It is for the party refusing disclosure to establish his right to refuse. It may well be that in some cases where that right has in the past been upheld the courts have failed to keep clear the distinction between (a) communications between client and legal adviser, and (b) communications between the client and third parties, made (as the Law Reform Committee put it) 'for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice upon pending or contemplated litigation'."'

Price Waterhouse (or the investigating committee) was not merely the appointed channel of communication. It was not merely an agent for communicating material from BCCI to Allen & Overy; it was charged with the duty of bringing the material into existence. In so far as it reported to Allen & Overy (if indeed it did), it was not passing on a communication from BCCI; it was producing material for BCCI and, at BCCI's direction, forwarding it to Allen & Overy direct instead of to BCCI with a view of its being sent on to Allen & Overy. In my judgment, its position was not essentially different from that of the surveyors in *Wheeler v Le Marchant* (1881) 17 Ch D 675 or the loss-adjusters and other experts in *Re Highgrade Traders Ltd*. I should add that the investigating committee did not become an internal organ of BCCI, though in my view it would not matter if it did. The report in question in *Waugh v British Railways Board* [1979] 2 All ER 1169, [1980] AC 521 was prepared by employees of the board, inter alia, for transmission to the board's legal advisers for the purpose of obtaining legal advice; yet the present head of privilege was neither invoked nor referred to in the speeches of any of their Lordships.

*(2) Documents produced for the purpose of litigation*
A different privilege attaches to documents brought into existence for the purpose of actual or contemplated litigation. Where this is only one of several purposes for which the documents are brought into existence, legal professional privilege attaches to them only if it was the dominant purpose: see *Waugh v British Railways Board* [1979] 2 All ER 1169, [1980] AC 521.

It has been conceded before me that the prospect of possible litigation for the recovery of some at least of the problem loans was in contemplation in or about October 1990 when the investigating committee was first established by the government of Abu Dhabi. It has also been conceded that one of the purposes of the investigation and therefore one of the purposes for which documents were prepared by or produced to Price Waterhouse in the course of the investigation, was to obtain legal advice in connection with or to prepare for such litigation.

But I am satisfied that that was not the dominant purpose. On the contrary, I consider that it was a very subsidiary purpose indeed.

The investigation was established on the recommendation of Price Waterhouse as the auditor of BCCI. The primary concern was to establish the amount of the possible losses which had resulted from the problem loans, in order to enable proper provision to be made for them in the 1990 accounts, and to quantify the amount of further financial support which was required from the controlling shareholders. A further, though possibly subsidiary, purpose was to ascertain whether the conditions under which the promised support would be forthcoming (ie that there had been no fraud or other impropriety) were satisfied. Another, and certainly subsidiary purpose, was to recommend improvements in management control.

The board of BCCI, the auditors, and the regulatory authorities all needed to know what was the true financial position of BCCI, and this required an investigation in order to establish the facts. If BCCI itself or its controlling shareholders did not set an investigation in motion, it was feared that the regulatory authorities would. BCCI's financial position depended, in part at least, on the recoverability of the problem loans and that might require legal advice as to the prospects of success if resort had to be made to legal proceedings. But just as in *Waugh v British Railways Board* the board needed to establish the facts whether or not litigation ensued, so the board of BCCI, the auditors and the controlling shareholders needed to establish BCCI's financial position whether or not recovery proceedings were necessary.

Given that the dominant purpose of the investigation was to establish the facts necessary to enable BCCI's financial position to be determined, documents brought into existence in the course of the investigation did not in my judgment attract legal professional privilege merely because legal advice might be necessary in order fully to evaluate the financial implications of the facts. The obtaining of legal advice is not an end in itself. To attract privilege it must be for the purpose of actual or contemplated proceedings. In *Re Highgrade Traders Ltd* a claim to privilege was raised in respect of reports obtained by insurers who were suspicious of the circumstances attending a fire on the premises of their insured. Oliver LJ said ([1984] BCLC 151 at 173):

> 'What, then, was the purpose of the reports? The learned judge found a duality of purpose because, he said, the insurers wanted not only to obtain the advice of their solicitors, but also wanted to ascertain the cause of the fire. Now, for my part, I find these two quite inseparable. The insurers were not seeking the cause of the fire as a matter of academic interest in spontaneous combustion. Their purpose in instigating the inquiries can only be determined by asking why they needed to find out the cause of the fire. And the only reason that can be ascribed to them is that of ascertaining whether, as they suspected, it had been fraudulently started by the insured. It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow.'

In the present case it was necessary to determine the extent to which the problem loans were recoverable, in order to establish BCCI's financial position and to decide whether recovery proceedings should be taken. But the two purposes were quite independent of each other. There was nothing of merely academic

interest in the former; it was of vital concern not only to BCCI, but also to the controlling shareholders, the auditors, and the regulatory authorities. I am satisfied that this was the dominant purpose of the investigation, and was quite independent of the possible need to take recovery proceedings, and that accordingly the documents in question do not attract legal professional privilege.

BCCI have not seriously disputed this in relation to documents brought into existence before 6 February 1991, but submit that when the investigating committee was reconstituted there was a change in the purpose of the investigation as well as in the identity of the body on whose instructions it was to be conducted. They submit that the relevant purpose is that of BCCI, not Price Waterhouse or the investigating committee, and that this is conclusively determined by the terms of reference given by BCCI to the reconstituted committee.

I agree that the relevant purpose is that of BCCI, and that the scope of the investigation which the investigating committee was authorised to conduct is delimited by the committee's terms of reference. But I do not agree that BCCI's purpose in establishing the reconstituted committee is conclusively determined by its terms of reference. In my judgment, it is to be objectively ascertained by a consideration of all the relevant evidence. The ostensible purpose expressed in the committee's terms of reference is evidence, but not conclusive evidence, of the true purpose. In the present case, its evidential value is negligible, having been manifestly contrived for the specific purpose of attracting legal professional privilege.

There is no evidence to suggest, and no reason to suppose, that BCCI's purposes in authorising an investigation by the reconstituted committee in January 1991 were any different from those of the controlling shareholders in setting up the original committee in October 1990. BCCI had its own motive for submitting to an investigation, for the controlling shareholders insisted upon it as a condition of providing financial support, and this remained the position throughout. But the need to establish BCCI's financial position, in order to enable adequate provision to be made for the problem loans and to quantify the level of support required from the controlling shareholders, was common to both BCCI and the controlling shareholders. The scope of the investigation remained the same, and the only reason for reconstituting the committee as a committee appointed by BCCI instead of by the controlling shareholders was to avoid breaching BCCI's duty of confidence to its customers.

Legal professional privilege would not and could not be claimed for documents generated by the separate investigation into ICIC, the dominant purpose of which was to establish the relationship between ICIC and BCCI and assess the implications of the financial position of ICIC for that of BCCI.

Accordingly, I am satisfied that none of the documents prepared by or provided to Price Waterhouse in the course of its participation in the investigation conducted by the investigating committee whether before or after 6 February 1991 attracts legal professional privilege by reason only of that fact.

I will grant the declaration sought by para 1 of the reamended originating summons as I read it, ie with the addition of the word 'only' after the word 'reason' in the appropriate place.

*Question 2*

Question 2 of the re-amended originating summons asks further or alternatively to question 1 above, for a declaration that:

'... an otherwise proper claim by the defendants or any of them to legal professional privilege does not of itself constitute reasonable excuse for non-compliance by Price Waterhouse with any such notice served pursuant   *a* to s 39 as aforesaid, save in the circumstances set out in s 39(13) of the Banking Act 1987.'

A similar question could have been, but has not been, raised in relation to s 2 of the Criminal Justice Act 1987.   *b*

My answer to question 1 makes it strictly unnecessary to answer question 2, but although not strictly necessary to be decided, I will deal with it, as it has been fully argued and is of some relevance to the issues which arise under question 3.

Section 39 of the 1987 Act, so far as material, provides:   *c*

'... (3) The Bank may – (a) by notice in writing served on an authorised institution require it to produce, within such time and at such place as may be specified in the notice, such document or documents of such description as may be so specified; (b) authorise an officer, servant or agent of the Bank, on producing evidence of his authority, to require any such   *d* institution to provide him forthwith with such information, or to produce to him forthwith such documents, as he may specify, being such information or documents as the Bank may reasonably require for the performance of its functions under this Act.

(4) Where, by virtue of subsection (3) above, the Bank or any officer, servant or agent of the Bank has power to require the production of any   *e* documents from an authorised institution, the Bank or that officer, servant or agent shall have the like power to require the production of those documents from any person who appears to be in possession of them; but where any person from whom such production is required claims a lien on documents produced by him, the production shall be without prejudice   *f* to the lien ...

(11) Any person who without reasonable excuse fails to comply with a requirement imposed on him under this section shall be guilty of an offence and liable on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding the fifth level on the standard scale or to both ...   *g*

(13) Nothing in this section shall compel the production by a barrister, advocate or solicitor of a document containing a privileged communication made by him or to him in that capacity.'

Question 2 is predicated on the supposition that some at least of the documents   *h* which may be required to be produced to the Bank of England are covered by legal professional privilege, and is intended to raise the question whether Price Waterhouse can nevertheless be compelled to produce such documents. But in my judgment the reference to sub-s(11) is misplaced. That subsection presupposes the existence of a legal obligation to comply with the notice to which a reasonable excuse for non-compliance can be addressed. If the person served   *i* with a notice cannot be compelled to produce a privileged document, he does not need a reasonable excuse for not doing so. If, on the other hand, he can be

**Ch D        Price Waterhouse v BCCI Holdings (Millett J)        593**

compelled to produce a document even though it is privileged, the mere fact it is privileged cannot afford a reasonable excuse for his failure to produce it.

The real question, therefore, is whether, on the true construction of s 39 as a whole, a person may be compelled to produce privileged documents. In my judgment he may. My reasons are as follows:

1. Although s 39 merely authorises the bank to serve a notice requiring documents to be produced, a corresponding obligation to comply with the notice is necessarily implied: see *Bank of England v Riley* [1992] 1 All ER 769. Indeed, sub-s (11) makes failure to comply without reasonable excuse an offence.

2. It is not necessary for there to be express words to exclude the privilege against self-incrimination: see *Comrs of Customs and Excise v Harz* [1967] 1 All ER 177, [1967] 1 AC 760; *Bank of England v Riley* [1992] 1 All ER 769; *EMI Records Ltd v Spillane* [1986] 2 All ER 1016, [1986] 1 WLR 967. The exclusion of legal professional privilege is a fortiori.

3. There was a clear context in those cases to enable the exclusion of the privilege against self-incrimination to be implied. No such context exists in s 39 to enable the exclusion of legal professional privilege to be implied.

4. In the absence of sub-s (13) it might be a nice question whether the obligation to comply with a s 39 notice extended to documents covered by legal professional privilege.

5. A comparison of sub-s (13) with its predecessor (s 16(8) of the Banking Act 1979) shows that it is not merely inserted ex abundanti cautela. The scope of the exception was deliberately widened in 1987.

6. Once the conclusion is reached that sub-s (13) is not merely ex abundanti cautela, it must be taken not only as making an exception to documents which may be required to be produced but also as marking the limits of that exception.

7. It follows that, except to the extent they are excluded by sub-s (13), privileged documents must be produced.

It may be thought strange that the Bank of England should be unable to compel the production of documents from the lawyer when it can compel their production from his client. But in my judgment that demonstrates that Parliament was not concerned to protect the interests of the client but those of the lawyer.

I will grant a declaration sought but not, I think, in the terms of question 2. I will leave it to counsel to consider an alternative formulation.

21 October 1991. The following judgment was delivered in open court.

MILLETT J. I come now to question 3 of the re-amended originating summons. It seeks a declaration that Price Waterhouse is not precluded by reason of any obligation of confidence owed to the defendants or any of them, or by reason of any claim by the defendants or any of them to legal professional privilege, from supplying, whether through their partners or employees or otherwise, documents or information to Bingham LJ in the course of an inquiry being conducted by him into the supervision of BCCI, pursuant to a request of the Chancellor of the Exchequer dated 22 July 1991.

The inquiry has been set up by the Treasury and the Bank of England (which I will call 'the bank') and is being conducted on their behalf by Bingham LJ. Its terms of reference are to inquire into the supervision of BCCI under the Banking

Acts, to consider whether the action taken by all the United Kingdom authorities was appropriate and timely, and to make recommendations. The inquiry is non-statutory; it has no statutory power to enforce the attendance of witnesses or compel the production of documents. Its proceedings will take place in private. The results of the inquiry will be made public, subject to certain necessary restrictions in order to avoid prejudicing any criminal proceedings and to comply with the provisions of the Banking Act 1987.

In a press announcement reported on 1 August 1991, it was made by the inquiry:

> 'It is fully appreciated that much of the material the Inquiry will have to consider will be, for different reasons and to varying extents, confidential. Since the Inquiry is required to report, no blanket undertaking of confidentiality can be given. Those submitting documents and giving evidence are, however, invited to indicate (if possible in advance) areas claimed to be confidential, with grounds for the claim where these are not obvious. Where satisfied that a claim is well-founded, the Inquiry will respect such claim, so far as the law requires or its duty to report permits.'

In the first instance, any dissemination of information which is given to the inquiry will be very limited, but the possibility of eventual publication to the general public cannot be excluded. Before that happens, however, there will be several opportunities to protect confidentiality. First, a witness can refuse to divulge confidential information to the inquiry, for he is not compellable. Secondly, Bingham LJ can exclude such information from his report, or refer to it in a way which respects its confidentiality. Thirdly, the Treasury and the bank can exclude it from any published version of the report.

The secretary of the inquiry has requested Price Waterhouse to submit evidence together with copies of all supporting documents, and has indicated the main areas of interest to the inquiry. These cover:

(1) Any communications with the bank pursuant to s 47 of the Banking Act 1987; (2) Any audited accounts for BCCI held pursuant to s 45(1) of the Act; (3) Any audited accounts of ICIC; (4) Any internal working papers of Price Waterhouse relating to the supervision of BCCI.

Price Waterhouse is anxious to comply with the request. It considers that it has a public duty to co-operate with the inquiry which has been set up by the Crown and the bank, being the relevant regulatory body, to serve an important public interest. Most of the material and information in the possession of Price Waterhouse is confidential to BCCI. Some of it is covered by legal professional privilege. Much of it is also covered by the duty of banking confidentiality owed by BCCI to its customers, a duty to which Price Waterhouse is likewise subject. Other material and information derive from the role of Price Waterhouse in giving financial advice to the controlling shareholders in BCCI and is confidential to them.

The provisional liquidator of the second defendant has been authorised by the Companies Court to provide information to the inquiry. The attitude of BCCI is as I have previously described. It wishes to be afforded an opportunity to see in advance the evidence which Price Waterhouse intends to present to the inquiry with a view to giving or withholding its consent. This would go far to

vitiate the confidentiality of the inquiry and the speed and effectiveness of its procedures.

### BCCI's concerns

Mr Fagan, BCCI's solicitor, has deposed to BCCI's concern at the prospect of any breach of banking confidentiality. I quote from his affidavit in these proceedings:

> 'The release by a third party of documents which are the subject of such a duty of confidentiality would prima facie constitute a breach of that duty. Although in this jurisdiction compulsion of law ought to be sufficient , defence to any claim in respect of any such breach, the position may not be the same in other jurisdictions and the disclosure of documents may render our clients liable to both civil and criminal proceedings. Messrs Allen & Overy obtained legal advice from a number of foreign jurisdictions in this regard (copies of which were obtained by my firm yesterday, and these are being reviewed by my firm). Initial indications are that if the defendants disclose documents in compliance with notices in breach of the defendants' duty of confidence to their customers: (1) in respect of customers in Switzerland, France, Panama, Bahrain and Bangladesh, this would expose the defendants to potential civil and criminal proceedings; (2) in respect of customers in Hong Kong, Gibraltar, Oman, United Arab Emirates and Kuwait there is a potential exposure to civil proceedings (and in the case of Oman it may render loans irrecoverable). I understand that the position relating to the disclosure of similar information by a third party, that is Price Waterhouse, might have similar consequences for the defendants but that it would be necessary to review each individual item of information and investigate the circumstances in which it came into the possession of the defendants and the third party which, in the circumstances of this case, is not something on which we are able to give our clients detailed advice at this stage. However, the potential exposure of the defendants to civil and criminal liabilities is clearly a matter of concern to the court-appointed officers (and the boards of the first and second defendants) since inter alia it may give rise to further claims against the defendants' estates.'

I have some difficulty in relating this concern to the attitude which has been adopted by BCCI to the disclosure of confidential information. There is clearly a distinction to be drawn between disclosure by BCCI and disclosure by a third party such as Price Waterhouse. In the latter case, as Mr Fagan says, the attitude taken in foreign jurisdictions may depend upon the circumstances in which the information came into the hands of the third party. So no doubt it may, for disclosure by a third party of information to which he should never have been allowed access is hardly less culpable than disclosure by BCCI. But in the present case Price Waterhouse was clearly entitled to access to all the material in question, and BCCI's customers must be taken to have given implied consent to that access. By appearing on and opposing the present application, BCCI will have done everything in their power to prevent disclosure, but if Mr Fagan's fears have any basis in fact, it would be positively dangerous for BCCI to consent to

disclosure by Price Waterhouse. It would appear to be far safer for Price Waterhouse to disclose material without any prior reference to BCCI.

*a*

*The duty of confidentiality*

Whereas legal professional privilege is normally an answer to compulsory disclosure to a court of law or, in most cases, to a body having statutory powers to require disclosure, confidentiality alone affords protection only against voluntary disclosure without the consent of the person to whom the duty of confidentiality is owed. Had the inquiry been set up under the Tribunals of Inquiry and Evidence Act 1921, it could have compelled the disclosure of confidential information, though not of material covered by legal professional privilege. As the inquiry is non-statutory, it must rely on the voluntary co-operation of witnesses who agree to provide evidence to it.

*b*

It is now well settled that where one party is in possession of information in respect of which he owes a duty of confidentiality to another, he is not ordinarily at liberty to divulge that information to a third party without the consent or against the wishes of that other: see *A-G v Guardian Newspapers Ltd (No 2)* [1988] 3 All ER 545 at 624, [1990] 1 AC 109 at 214, per Bingham LJ. It is also well established that although there is a strong public interest in maintaining confidentiality, this may be outweighed by some countervailing public interest in disclosure, and that the latter is not limited to the public interest in detecting or preventing wrong-doing. In *A-G v Guardian Newspapers Ltd (No 2)* [1988] 3 All ER 545 at 649–650, [1990] 1 AC 109 at 268, Lord Griffiths said:

*c*

*d*

'The courts have, however, always refused to uphold the right to confidence when to do so would be to cover up wrongdoing. In *Gartside v Outram* (1856) 26 LJ Ch 113 it was said that there could be no confidence in iniquity. This approach has been developed in the modern authorities to include cases in which it is in the public interest that the confidential information should be disclosed: see *Initial Services Ltd v Putterill* [1967] 3 All ER 145, [1968] 1 QB 396, *Beloff v Pressdram Ltd* [1973] 1 All ER 241 and *Lion Laboratories Ltd v Evans* [1984] 2 All ER 417, [1985] QB 526. This involves the judge in balancing the public interest in upholding the right to confidence, which is based on the moral principles of loyalty and fair dealing, against some other public interest that will be served by the publication of the confidential material. Even if the balance comes down in favour of publication, it does not follow that publication should be to the world through the media. In certain circumstances the public interest may be better served by a limited form of publication perhaps to the police or some other authority who can follow up a suspicion that wrongdoing may lurk beneath the cloak of confidence. Those authorities will be under a duty not to abuse the confidential information and to use it only for the purpose of their inquiry. If it turns out that the suspicions are without foundation, the confidence can then still be protected: see *Francome v Mirror Group Newspapers Ltd* [1984] 2 All ER 408, [1984] 1 WLR 892. On the other hand, the circumstances may be such that the balance will come down in favour of allowing publication by the media: see *Lion Laboratories Ltd v Evans* [1984] 2 All ER 417, [1985] QB 526. Judges are used to carrying out this type of balancing exercise and I doubt if it is wise to try to formulate rules to guide the use of this discretion

*e*

*f*

*g*

*h*

*i*

that will have to be exercised in widely differing and as yet unforeseen circumstances. I have no doubt, however, that in the case of a private claim to confidence, if the three elements of quality of confidence, obligation of confidence and detriment or potential detriment are established, the burden will lie on the defendant to establish that some other overriding public interest should displace the plaintiff's right to have his confidential information protected.'

Lord Goff said ([1988] 3 All ER 545 at 659, [1990] 1 AC 109 at 282):

'The third limiting principle is of far greater importance. It is that, although the basis of the law's protection of confidence is that there is a public interest that confidences should be preserved and protected by the law, nevertheless that public interest may be outweighed by some other countervailing public interest which favours disclosure. This limitation may apply, as the judge pointed out, to all types of confidential information. It is this limiting principle which may require a court to carry out a balancing operation, weighing the public interest in maintaining confidence against a countervailing public interest favouring disclosure. Embraced within this limiting principle is, of course, the so-called defence of iniquity. In origin, this principle was narrowly stated, on the basis that a man cannot be made the confidant of a crime or a fraud (see *Gartside v Outram* (1856) 26 LJ Ch 113 at 114 per Page Wood V-C). But it is now clear that the principle extends to matters of which disclosure is required in the public interest (see *Beloff v Pressdram Ltd* [1973] 1 All ER 241 at 260 per Ungoed-Thomas J and *Lion Laboratories Ltd v Evans* [1984] 2 All ER 417 at 432–433, [1985] QB 526 at 550 per Griffiths LJ). It does not however follow that the public interest will in such cases require disclosure to the media, or to the public by the media. There are cases in which a more limited disclosure is all that is required (see *Francome v Mirror Group Newspapers Ltd* [1984] 2 All ER 408, [1984] 1 WLR 892).'

*The two competing public interests*
*(1) Against disclosure*
There is a strong public interest in the maintenance of the duty of confidentiality. Once the duty is established, the burden lies on the party who owes the duty to justify disclosure. The public interest in the maintenance of the duty is most marked where the material in question is not only confidential but also privileged. Legal professional privilege is a creation of the common law. It was created because it was found to be necessary for the effective administration of justice. There is, as has often been stated, a strong public interest that a court of law should have all relevant evidence made available to it, but this public interest is outweighed by the public interest in respecting legal professional privilege.

The importance of maintaining such privilege is recognised by Parliament which, as I have already pointed out, has excepted privileged material from material the production of which may be compelled by a tribunal of inquiry set up under the Tribunals of Inquiry and Evidence Act 1921. In conferring powers of search and seizure, or to compel the production of documents, whether on the police or other investigatory bodies, Parliament has ordinarily excepted

privileged material, see Police and Criminal Evidence Act 1984, s 8(1) (d); Drug Trafficking Offences Act 1986, s 27 9(a); the Criminal Justice Act 1987, s 2(9); the Companies Act 1985, s 452(1) (a). To this impressive list, s 39 of the Banking Act 1987 provides a notable exception.

There is also a marked public interest in the preservation of banking confidentiality. In *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461 at 472–473, [1923] All ER Rep 550 at 554, Bankes LJ said:

> 'In my opinion it is necessary in a case like the present to direct the jury what are the limits, and what are the qualifications of the contractual duty of secrecy implied in the relation of banker and customer. There appears to be no authority on the point. On principle I think that the qualifications can be classified under four heads: (a) where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer.'

Under para (b) Bankes LJ instanced cases where a higher duty than the private duty is involved, as where danger to the state of public duty may supersede the duty of the agent to his principal.

Those observations now need to be read in the light of the speeches in *A-G v Guardian Newspapers (No 2)* [1988] 3 All ER 545, [1990] 1 AC 109. Nevertheless, there seems no reason to doubt the general correctness of the statement in *Paget's Law of Banking* (10th edn, 1989) p 256, based on a remark of Bankes LJ in the *Tournier* case [1924] 1 KB 461 at 474, [1923] All ER Rep 550 at 555 that:

> 'The giving of information to the police, for instance in regard to a customer suspected of a crime, would be unwarranted.'

In conferring powers of search and seizure or to compel the production of documents, Parliament has sometimes singled out banking confidentiality for special protection, allowing it to be preserved unless some responsible authority considers that disclosure is necessary. On the other hand, in cases of sufficient gravity, Parliament has expressly limited the contractual duty of confidentiality, including banking confidentiality, in order to permit and possibly encourage the voluntary disclosure to the police of information relating to funds derived from drug trafficking or belonging to terrorists, see Drug Trafficking Offences Act 1986, s 24(3)(a), and Prevention of Terrorism (Temporary Provisions) Act 1989, s 12 (1). In these cases at least, the dictum of Bankes LJ in *Tournier*'s case no longer represents the law.

*(2) In favour of disclosure*
In the course of argument, two countervailing public interests in favour of disclosure have been advanced: (i) the public interest in the effective supervision of authorised banking institutions, and (ii) the public interest in ensuring that an inquiry into the adequacy of such supervision should have access to all relevant material.

In my judgment the second is properly to be regarded as merely an aspect of the first. It cannot stand by itself. There is certainly an important public interest

in ensuring that a court of law has all relevant material made available to it, but the courts have never assumed or been granted power to compel the production of all such material, regardless of its nature or source. That would amount to an intolerable invasion of privacy. Statute and rules of court made under statutory power have long established the circumstances in which production can be compelled in the interests of justice, and have thereby resolved the conflict between two competing public interests. A sharp distinction has been drawn between the position of those who are litigants and those who are not. In a civil action, for example, a litigant, whether plaintiff or defendant, must give discovery of all documents 'relating to matters in question in the action', see RSC Ord 24, r 1(1). This is a wide test. The documents do not need to be admissible in evidence. It is sufficient that they are or may be relevant to an issue in the case. But a third party is under no similar obligation to assist the parties, save in exceptional circumstances he is not subject to the process of discovery at all. If, unknown to the parties, he has information in his possession which is relevant to their litigation, he is under no duty to tell them. He may choose to do so, but the choice is his. If he cannot tell them without breaking a duty of confidence owed to another, then he can be restrained from doing so. The fact that if he does tell them he can then be subpoenaed to give evidence and compelled to disclose the confidential information in his possession merely reinforces his original duty not voluntarily to place himself in that position. If it is a question of volunteering disclosure, the choice should surely be taken by the person to whom the duty of confidence is owed rather than by the person who owes it.

There remains, however, the important public interest in the effective supervision of authorised banking institutions. Some guide to the respective weight which Parliament has accorded to supervision and investigation on the one hand, and banking and other confidentiality on the other, can be derived from the relevant provisions of the Companies Act 1985 and the Banking Act 1987. Extensive powers to compel the attendance of witnesses and the production of documents are conferred upon inspectors appointed under the Companies Act. Section 452(1A) enables them to require the disclosure of material subject to banking confidentiality where the duty of confidentiality is owed to or by the company whose affairs are under investigation, or where the requirement is authorised by the Secretary of State. A customer who is unfortunate enough to maintain an account with a bank whose affairs are being investigated under the Companies Act will find that the inspectors have access to confidential information relating to his account. The power of the bank under s 39 of the Banking Act 1987 to obtain information and require the production of documents overrides legal professional privilege and banking confidentiality. When it comes to the supervision of authorised banks and the investigation of companies' affairs, Parliament has decreed that even banking confidentiality (and in the former case legal professional privilege) must yield to what it considers to be a higher public interest.

In order to conduct the effective supervision of authorised banking institutions, it must be necessary or at least expedient for the bank from time to time to monitor and review the adequacy of its own performance. How it chooses to do so is a matter for the bank. It could do so through the medium of its own internal procedures. It has chosen to delegate to an independent inquiry the review of the adequacy of its supervision of BCCI. There must, it is submitted

on behalf of Price Waterhouse, be at least as great if not a greater public interest in the proper conduct of that inquiry, given its purpose, as there was in the effective supervision of BCCI in the first place.

The submissions on behalf of Price Waterhouse, however, go much further than that. The inquiry, it is submitted, has been established within the framework of the Banking Act 1987. It is 'an arm of the Bank of England' reviewing its own performance as an integral part of the supervisory function itself. Accordingly, any material which is required in order to carry out such a review can be compulsorily obtained by the bank by exercise of its statutory powers. If the inquiry needs any documents from Price Waterhouse, it is submitted, it only has to ask the bank to obtain them under s 39(4). Price Waterhouse is merely seeking to volunteer material which could be obtained from it compulsorily and by a more circuitous route. The argument merits consideration, though it is capable of providing only a partial answer to the present question, for s 39(4) covers only documents and explanations of the contents of documents and not information generally.

*Statutory functions of the Bank of England*

Section 39 confers power on the bank to obtain information and require the production of documents which 'it may reasonably require for the performance of its functions under this Act'. Those functions are prescribed by s 1 of the Act. They are set out in the first two subsections as follows:

> 'The Bank of England (in this Act referred to as "the Bank") shall have the powers conferred on it by this Act and the duty generally to supervise the institutions authorised by it in the exercise of those powers.
>
> (2) It shall also be the duty of the Bank to keep under review the operation of this Act and developments in the field of banking which appear to it to be relevant to the exercise of its powers and the discharge of its duties.'

Effective supervision by the bank may from time to time require it to review the adequacy of its own performance, and accordingly the bank has power to conduct such a review in any manner which it considers appropriate. Such a review would be 'for the purpose of enabling or assisting the bank to discharge its functions' under the Act. The bank's power to take action for that purpose is implicitly recognised by s 83 of the Act, but in my judgment such a review is not itself part of the supervisory process, and in conducting it the inquiry is not itself performing the function of supervising BCCI.

Nor in my judgment is the inquiry 'reviewing the operation' of the Act. A review of the operation of the Act is not the same as a review of the bank's performance of its functions under the Act. It has been submitted on behalf of Price Waterhouse, albeit faintly and somewhat desperately, that the collapse of BCCI was a major 'development in the field of banking'; but the collapse is not being kept under review, nor is the inquiry charged with the duty of doing so. In my judgment the words refer to developments of a more enduring but less spectacular kind.

In my judgment, therefore, the argument that the inquiry could obtain documents from Price Waterhouse by asking the bank to require their production under s 39(4) is untenable. The bank may require their production only if it

appears necessary for the performance of its own supervisory function, not for the purpose of enabling the inquiry to review the bank's performance. On the other hand, I am satisfied that the inquiry has been set up for the purpose of enabling or assisting the bank to discharge its functions under the Act, and that accordingly information concerning the affairs of BCCI or any of its customers or shareholders which is in the possession of the bank, whether obtained by the exercise of compulsory powers or not, may properly be disclosed by the bank to the inquiry: see ss 82 and s 83(1).

*Resolving the conflict*

I have not found the resolution of the conflict between the two competing public interests to be at all easy. In all the cases cited to me in which the public interest in favour of disclosure has prevailed, it has been the public interest in the detection or prevention of wrong-doing, or in preventing a miscarriage of justice, or in the maintenance of public safety. An express contractual undertaking not to make disclosure in such circumstances would be against public policy. However, if those who set up the inquiry had thought that the public interest required that all relevant material should be made available to it, they could have set it up under the Tribunal of Inquiries and Evidence Act 1921. No doubt there were good reasons for not doing so. But they were content to rely upon the voluntary submission of evidence by those willing to co-operate with the inquiry. Where the information is confidential, the choice whether to volunteer it ought prima facie in my view to rest with the person to whom the duty of confidence is owed, rather than with the person who owes it. An express contractual undertaking not to co-operate with the inquiry would not, I apprehend, be contrary to public policy. That, however, is not the test which has been laid down by the authorities. The duty of confidentiality, whether contractual or equitable, is subject to a limiting principle. It is subject to the right, not merely the duty, to disclose information where there is a higher public interest in disclosure than in maintaining confidentiality.

I have reached the conclusion that in the particular circumstances of the present case the public interest in favour of disclosure ought to prevail. The considerations which have weighed with me are as follows:

(1) There is an important public interest in the effective regulation and supervision of authorised banking institutions and the protection of depositors. This has been recognised by Parliament by the enactment of the Banking Act itself.

(2) By the terms of s 39 of the Act, Parliament has chosen to accord greater weight to that public interest than to the maintenance of confidentiality including banking confidentiality and even legal professional privilege.

(3) If it is in the public interest to require confidential information to be disclosed to the bank in order to enable it to perform its supervisory functions under the Act, there is at least as great a public interest in the disclosure of such information to an inquiry set up to review the bank's past performance of its statutory functions, provided that the dissemination of such information is no wider in the latter case than would be authorised in the former.

(4) This is given statutory recognition in s 83 of the Act. Once confidential information has been obtained by the bank, whether compulsorily or voluntarily, Parliament has authorised its disclosure where that is necessary for the purpose of enabling or assisting the bank to perform its statutory functions.

[1992] BCLC 583

(5) I do not find the distinction between documents which the bank obtained in the performance of its functions and those which it should have obtained but failed to obtain an attractive one for present purposes. From the point of view of the persons to whom the duty of confidentiality is owed, there is no discernible distinction between the two categories of documents.

(6) The subject matter of the inquiry is at a level which is at once more abstract and more remote from the details of underlying banking transactions than is involved in the routine supervision of an authorised bank. It is therefore less likely that the details of particular accounts will require to be identified and the occasions on which banking confidentiality is invaded are likely to be fewer and less serious.

(7) The inquiry has undertaken to respect confidentiality where it can properly do so, and may be relied upon to allow witnesses to protect it so far as possible. The extent to which confidentiality will be invaded will depend upon the judgment of responsible persons at several different levels.

(8) In all the cases which have been cited to me in which the disclosure of confidential information has been resisted, albeit unsuccessfully, the disclosure has been not merely against the wishes of the person to whom the duty is owed, but has been contrary to his interests, often very seriously so indeed. That has not been demonstrated to my satisfaction in the present case.

### Conclusion

I will grant a declaration in favour of Price Waterhouse. In my judgment, however, the terms of the declaration sought are too wide. It should be limited to material which is relevant to the terms of reference of the inquiry. Price Waterhouse should be required to maintain the confidentiality of underlying banking transactions, and material covered by legal professional privilege, except and to the extent that disclosure of such information is specifically requested by the inquiry in any particular case.

*Declarations accordingly.*

Jacqueline Metcalfe  Barrister.

Chancery Division

# Property Alliance Group Ltd *v* Royal Bank of Scotland plc (No 3)

### [2015] EWHC 3341 (Ch)

2015 Nov 5, 6; 20                                                                 Birss J

*Evidence — Privilege — Litigation privilege — Claimant's managing director making secret audio recordings of meetings with former employees of defendant — Defendant applying for inspection of recordings and transcripts of recordings — Whether privileged*

The claimant brought a claim against the defendant bank, alleging that it had been mis-sold swap contracts. The claimant's managing director arranged meetings with two of the bank's former employees purportedly for the purpose of maintaining contact and to discuss future business opportunities. The managing director's real intention was to obtain information and evidence of benefit to the claimant's action against the bank. To that end he secretly recorded the meetings. The bank applied, inter alia, for inspection of the audio recordings of the meetings and the transcripts of those recordings. The claimant asserted litigation privilege over the recordings and transcripts on the ground that they had been produced for the dominant purpose of conducting litigation.

On the application—

*Held*, granting the application, that where a recording was made of a meeting, so far as the dominant purpose requirement was concerned, it was immaterial that the recording was for use in litigation, what mattered was the dominant purpose of the meeting; that the purpose was to be assessed objectively, taking into account all the evidence, including the evidence of what the persons involved said their intentions were; that since the two former employees of the bank had been induced to attend the meetings by deception, it was fair and correct to assess the dominant purpose from their point of view; that so assessed their dominant purpose was to catch up and discuss future business; and that, accordingly, the meetings were not privileged and so neither were the recordings or the transcripts of the recordings (post, paras 29–30, 32–33, 40– 42).

**APPLICATION**

By an application notice dated 22 October 2015 the defendant, Royal Bank of Scotland plc, applied, inter alia, for inspection, pursuant to CPR r 31.19(5), of certain audio recordings, secretly made by the founder and managing director of the claimant, Property Alliance Group Ltd, at meetings with two of the defendant's former employees, and the transcripts of those recordings, over which the claimant asserted litigation privilege.

The facts are stated in the judgment.

*Tim Lord QC* and *Kyle Lawson* (instructed by *Cooke Young & Keidan LLP*) for the claimant.
*David Railton QC* and *Adam Sher* (instructed by *Dentons*) for the defendant.

The court took time for consideration.
20 November 2015. **BIRSS J** handed down the following judgment.

**1** This is the second judgment dealing with issues arising at the hearing on 5–6 November 2015 in these proceedings. This judgment deals with privilege. The earlier one (*Property Alliance Group Ltd ("PAG") v Royal Bank of Scotland plc ("RBS")* [2015] EWHC 3272 (Ch)) dealt with PAG's amendments to the particulars of claim to plead fraudulent misrepresentation and with disclosure.

**2** The earlier judgment summarises the nature of the proceedings: see the judgment as a whole and paras 1 to 18 in particular. In brief PAG contends that RBS mis-sold swap contracts to PAG in the period 2004–2008. The allegations include misrepresentations relating to LIBOR. PAG also contends that in breach of contract RBS transferred PAG into RBS's turnaround division (called the Global Restructuring Group ("GRG")). Certain misconduct relating to manipulation

1

Property Alliance Group Ltd v Royal Bank of Scotland plc (No 3)          [2016] 4 WLR 3
(Ch D)

of LIBOR has been admitted by RBS but otherwise PAG's claim is denied. PAG terminated the swaps in 2011 by paying £8m to RBS. The claim form was issued on 17 September 2013.

3 The issues addressed in this judgment derive from RBS's application of 22 October 2015, seeking: (i) inspection pursuant to CPR r 31.19(5) of certain audio recordings and transcripts of those recordings over which PAG has asserted privilege; (ii) an order under CPR r 31.20 granting permission for use by RBS of a document (the "Kilty/Rubens e-mail") over which PAG claims privilege but which was inadvertently disclosed by PAG to RBS; (iii) an order that PAG should re-review each claim to privilege made in its disclosed list of documents and produce a new list providing further particularity.

4 There was also an application for specific disclosure under CPR r 31.12 of further audio recordings and transcripts but that was disposed of in evidence during the hearing. The evidence from PAG is that there are no further recordings and transcripts in the class sought and so there is no need to make an order.

5 I can deal with point (iii) at the outset. I agree with RBS that it is right and proportionate to require PAG to re-review each claim to privilege made in its list of documents. RBS made a number of criticisms of PAG's approach to privilege in the original list, many of which have been accepted expressly or implicitly by PAG. It is unnecessary to consider those criticisms in any detail. I will mention only the following points. First, the background to this matter is that in these proceedings PAG has already subjected RBS's claims to privilege to detailed scrutiny, leading as it did to inspection of certain privileged RBS documents by the court: see my judgment at [2015] EWHC 1557 (Ch) and the consequent judgment of Snowden J at [2015] EWHC 3187 (Ch). RBS submitted that it is only fair that the other side should be held to the same high standard. I agree. Second, there have been real difficulties with each of the four categories of privilege claimed by PAG. Most stark was the claim to common interest privilege in certain documents when that claim was demonstrably misconceived, but there have been problems across the board. Third is PAG's disclosure report and electronic documents questionnaire, which do not mention the existence of audio files, even compendiously as the subject of a privilege claim: see below. Given that the claimant must have been well aware of their existence: see below, this is surprising. I will require PAG to re-review its privilege claim.

*Issue (i)—the recordings and transcripts*

6 The audio recordings and transcripts which RBS seeks to be allowed to inspect are recordings of meetings which took place between Mr David Russell, the founder and managing director of PAG and two individuals, Mr Matthew Jones and Mr Anthony Goldrick. Both were employed by RBS at the time that PAG entered into the swap contracts. At the time each met with Mr Russell they were no longer RBS employees.

7 Mr Russell made the audio recordings surreptitiously without telling Mr Jones or Mr Goldrick. His reason for doing this was to gather evidence for this claim. PAG asserts litigation privilege over these materials. RBS contends they are not privileged.

*The facts*

8 Mr Jones had been employed by RBS from 1988 until October 2009. From 1992 to 2003, he worked in a group called Specialised Lending Services. This group later became the GRG. In 2003, Mr Jones moved to RBS's Corporate Real Estate Finance team, where he acted as relationship manager for a number of borrowers, including PAG.

9 Mr Jones left RBS's employment in October 2009 and took up a position at Barclays in January 2010. While at Barclays, he intended to target PAG as a potential client and was therefore actively in contact with Mr Russell. The two met several times during this period. Mr Jones left Barclays in January 2013 to take up a similar role at Santander in April 2013.

10 Shortly after Mr Jones had begun working for Santander he was contacted by Mr Russell, who asked if he would be available for a quick "catch up". This was on 25 June 2013. They met at an office owned by PAG at 39 Princess Street in Manchester, which was called Frank Rostron's, a shirt shop. Mr Russell arranged for the meeting to be recorded, unbeknownst to Mr Jones.

11 At the meeting, Mr Russell and Mr Jones discussed whether there might be opportunities for PAG and Santander to do more work together in the future. Mr Russell made it clear that he would prefer to work with Mr Jones if the relationship between PAG and Santander was to develop. Mr Jones subsequently spoke with his senior director about the meeting with Mr Russell. Mr Jones has stated in his witness statement that he did not consider that the content of the conversation was confidential.

12 Mr Russell arranged for a subsequent meeting under similar circumstances, which took place on 21 November 2013. This meeting was also recorded, without Mr Jones's prior

2

knowledge or consent. During this second meeting, Mr Russell began discussing the hedging that PAG had entered into with RBS and asked Mr Jones if he would act as a witness for PAG in a claim against RBS. Mr Jones declined and sought to withdraw from the conversation.

13 The facts are similar with Mr Goldrick. Mr Goldrick worked in a variety of roles at RBS between 1982 and 2012 and set up a dedicated property lending team outside of London in 1999. In 2003 he was promoted as a regional Senior Director for Property Finance, which involved managing RBS's Corporate Real Estate business across the north of England. During this time, he was introduced to PAG and a number of other clients with whom he maintained a "high-level" relationship. Mr Goldrick became the Head of Real Estate Finance Portfolio Management for the north of England from January 2009 until he left RBS in September 2012 to set up his own consultancy business.

14 Between May 2012 and June 2013, Mr Goldrick communicated extensively with Mr Russell about acting as a consultant to PAG. Mr Goldrick met Mr Russell on 4 April 2013, where they discussed a potential role for Mr Goldrick as a consultant to PAG. Mr Russell subsequently asked Mr Goldrick to attend a meeting at Frank Rostron's on 25 June 2013. Mr Russell arranged for this meeting to be recorded but he did not reveal this to Mr Goldrick. At this meeting, Mr Goldrick recalls that hedging was discussed, especially in the context of the restructuring/refinancing discussions that PAG was having with GRG around this time. Following the meeting, Mr Goldrick sent Mr Russell a draft consultancy agreement. It is clear that he believed that the only intent and purpose behind the meetings with Mr Russell was to discuss the potential provision of his services to PAG as a consultant.

15 Mr Russell arranged for the recording of a further meeting, which took place on 21 November 2013. Again, Mr Goldrick did not know that he was being recorded. One of the things that Mr Russell told Mr Goldrick during this meeting was that PAG had instructed Cooke, Young and Keidan LLP in relation to a claim about the swaps. At a subsequent meeting on 19 November 2014 Mr Russell asked Mr Goldrick to assist PAG with its claim against RBS. Mr Goldrick declined. That meeting was not recorded.

16 It is clear that Mr Russell's true motive throughout was to seek information and evidence which might assist him in the claim which his company was going to bring against RBS. To further that end, Mr Russell deliberately deceived Mr Jones and Mr Goldrick about his motives. Mr Russell did not think either individual would meet him if he told them why he wanted to meet them and he was right about that. Mr Russell did not tell either of them that the meetings were being recorded because he thought Mr Jones and Mr Goldrick would be more likely to speak openly about RBS if they believed that they were speaking "off the record". He was obviously right about that too.

17 Mr Jones and Mr Goldrick both confirmed in their evidence that they believed the meetings were to discuss the furthering of their respective business relationships with PAG and both were disappointed when they discovered Mr Russell's deception.

*The law*

18 The essential requirements for establishing the existence of litigation privilege were summarised by Lord Carswell in *Three Rivers District Council v Governor and Co of the Bank of England (No 6)* [2005] 1 AC 610, para 102:

> "communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial."

19 Elements (a) and (c) are clearly satisfied in this case. The point in issue between the parties relates to element (b). The debate is whether or not the recordings and transcripts can be said to have been produced for the "dominant purpose" of conducting the present litigation.

20 The requirement of dominant purpose emphasised by Lord Carswell in the *Three Rivers District Council* case was also discussed in the House of Lords in *Waugh v British Railways Board* [1980] AC 521: see e g Lord Wilberforce, at p 533. At pp 543 to 544, Lord Edmund Davies approved the following passage from the judgment of Barwick CJ in *Grant v Downs* (1976) 135 CLR 674, 677:

3

> "a document which was produced or brought into existence either with the *dominant* purpose of its author, or of the person or authority under whose direction, whether particular or general, it was produced or brought into existence, of using it or its contents in order to obtain legal advice or to conduct or aid in the conduct of litigation, at the time of its production in reasonable prospect, should be privileged and excluded from inspection." (My emphasis.)

21 PAG submits that it is clear from this passage that the emphasis on dominant purpose focuses on the dominant purpose of the person who made or procured the creation of the communication or document. It cites a number of further authorities in support of its position: *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027; *Winterthur Swiss Insurance Co v AG (Manchester) Ltd* [2006] EWHC 839 (Comm) and *West London Pipeline & Storage Ltd v Total UK Ltd* [2008] 2 CLC 258. It is sufficient to refer to the *Guinness Peat Properties Ltd* case. There the Court of Appeal upheld a claim to privilege in relation to a letter from a firm of architects to their professional indemnity insurers. The letter gave notice of a potential claim against the firm and made a number of admissions. The Court of Appeal considered that the relevant purpose of the allegedly privileged document was that of the insurers who had requested the letter, ie to obtain notice of potential claims so that they could take legal advice. This purpose was privileged. The judgment of Slade LJ at p 1037B emphasised the importance of viewing the dominant purpose of the relevant document objectively by reference to the evidence.

22 PAG contends that it is plain that the point of all this was to gather evidence of the case; the fact that Mr Jones and Mr Goldrick did not know of this purpose does not alter that. The recordings only exist because Mr Russell wanted them for the litigation and indeed the meetings only took place because Mr Russell wanted them to for the same reason.

23 RBS argues that what matters is the dominant purpose of the meetings and that was business not litigation. The fact that secret recordings were made for the litigation cannot help PAG if that was not the dominant purpose of the meetings.

24 RBS relies on a number of authorities from English and other common law countries' courts concerning the recording of conversations. The first two, English, cases are *Grant v Southwestern and County Properties Ltd* [1975] Ch 185 and *Parry v News Group Newspapers Ltd* [1990] 140 NLJ 1719, CA. These cases establish that a record of a non-privileged conversation, whether it is in the form of a recording, a verbatim note or a transcript, cannot itself be privileged if the underlying conversation was not privileged: see in particular Bingham LJ in *Parry's* case.

25 The next three are *Telebooth Pty Ltd v Telstra Corpn Ltd* [1994] 1 VR 337, *Crisford v Hazard* [2000] 2 NZLR 729, CA and *Woori Bank v KDB Ireland Ltd* [2005] IEHC 451. These relate to surreptitious recordings.

26 In the *Telebooth Pty Ltd* case Hedigan J in the Supreme Court of Victoria rejected the submission that the fact that a tape recording was made for the litigation meant it was privileged even though the conversation it recorded, which was between the parties to the claim, was not. The conversation was between Mr Harris of the claimant and Mr Kinchin of the defendant. Mr Harris secretly recorded the conversation for the purposes of the action. The essence of the judge's judgment can be seen from the following, at pp 347–348:

> "The conversation that took place is admittedly non-confidential. In the circumstances here prevailing, it seems to me that it would be anomalous, contrary to the principle which drives legal professional privilege and an encouragement to inappropriate use of the client solicitor relationship, to conclude that the tape recording of the non-confidential conversation is privileged.
>
> "It is not necessary to consider whether or not a handwritten note taken of the conversation would be privileged in similar circumstances although I should say that there must be powerful arguments in support of the view that such a note taken for the purpose of giving it to the solicitor would not be privileged.
>
> "But the tape is not a note of the conversation, an impression of it or a description of it. It contains the actual conversation in electronic form. It evokes the voices of each party's agent, instantaneously encapsulating the non-confidential communications. It is the conversation. Kinchin was as much the author of it as Harris. The policy basis of legal professional privilege confidentiality in the public interest is wholly lacking when what is solely sought to be protected is the actual reproduction of the voices of the parties speaking in a non confidential mutual communication.

4

[2016] 4 WLR 3    Property Alliance Group Ltd v Royal Bank of Scotland plc (No 3)
(Ch D)

> "The conversation itself is admitted not to be privileged. If the solicitor had been present it would not have been privileged. If Kinchin's statements had been made directly to Harris' solicitor, the conversation would not be privileged. The law should be slow to extend the boundaries of legal professional privilege so as to protect a known non-confidential communication simply because a record of it is made and deposited with the lawyer of one of the parties."

27 In *Crisford's* case the New Zealand Court of Appeal rejected a claim to privilege in a tape recording of a conversation between the defendant and a possible witness, Ms Harris. After being contacted by the defendant but before speaking to him in detail, Ms Harris called the claimant's solicitor. The solicitor asked her to tape the conversation in case any statements would be of value in the litigation. She did so without telling the defendant. The claimant claimed privilege in the tape recording. The court held, applying the *Telebooth Pty Ltd* case and *Grant's* case, that the tape was no more than an exact replica of the conversation which had taken place and that such a recording of a non-privileged conversation would not be privileged. The court also held that the conversation was not privileged and so the claim to privilege failed.

28 In the *Woori Bank* case Finlay Geoghegan J sitting in the Irish High Court considered whether transcripts of secret recordings of conversations with witnesses (who did not know the purpose of the conversations) could be privileged. The judge ruled no such privilege could be claimed. Following the *Telebooth Pty Ltd* case she found that a verbatim record of a communication would not be privileged simply because the recording was created for the purposes of the litigation; one needed to look instead at the underlying conversation and whether that was privileged. The judge held that the conversations were not confidential and so could not be privileged since it was common ground that confidentiality was a prerequisite for the claim to privilege.

29 PAG submitted that all of the cases referred to by RBS (with the exception of the *Woori Bank* case) related to situations involving meetings between the parties to litigation, which should be distinguished from the situation in which Mr Russell met a potential witness (i e a third party). I do not accept that submission. In my judgment the relevant legal principle, which these cases illustrate, is that a verbatim recording or transcript of a non-privileged conversation is not privileged even though it can be said that the reason the recording was made was for use in the litigation. The fact that the conversation may have been a non-privileged conversation between parties to the litigation or a non-privileged conversation with a witness or possible witness makes no difference. If the recorded conversation was not privileged, then the recording is not privileged either. The question I have to decide does not concern private notes made of conversations, it concerns recordings.

30 So the question turns on whether the conversations themselves are privileged and that in turn depends on the application of the dominant purpose test.

31 Both parties submitted that dominant purpose is to be assessed objectively, however, they interpreted this in different ways. RBS contended that the term objective in this context meant from the point of view of a dispassionate observer who was aware only of the information which had "crossed the line" between the two parties, in other words, passed openly between them. So Mr Russell's secret purpose was irrelevant. The only facts known to an objective observer were the facts known to Mr Jones and Mr Goldrick. Looked at that way the purpose of the meeting was to catch-up or to discuss the possibility of working with PAG in the future.

32 PAG's argument is that the requirement for an objective assessment in this context does not mean what RBS refer to at all. It means that the decision is one for the court to arrive at objectively, taking into account all the evidence, including evidence of the parties' intentions. It is objective in the sense, for example, that the court is not bound to accept what a party says now in a witness statement about his intentions at the time. PAG submits that assessed this way it is manifest that what Mr Russell says now about his intentions at the time is true. From his perspective, viewed objectively, the purpose of the meeting was for gathering evidence that could be used in PAG's claim against RBS.

33 In my judgment PAG is correct about the nature of the objective test to be applied. The test is objective in the sense that the decision is one for the court not the parties. The decision is arrived at objectively, taking into account all the evidence. That includes evidence of what the persons involved say their intentions were. RBS's submission is in effect that the court is to imagine a sort of officious bystander. That seems to me to be unnecessarily complicated.

34 PAG submits that the legal analysis that applies here is indistinguishable from that in the situation in which a solicitor arranges a meeting with a potential witness in order to take a proof

5

Property Alliance Group Ltd v Royal Bank of Scotland plc (No 3)        [2016] 4 WLR 3
(Ch D)

of evidence. The witness may have a variety of motives for agreeing to meet, but – provided litigation is reasonably in contemplation – the communications at the meeting (and any proof of evidence that is prepared) are privileged because the purpose of the solicitor will invariably be to gather evidence for use in, or in connection with, that litigation. For this PAG refer to the textbook *Hollander, Documentary Evidence*, 12th ed (2015), pp 17 to 30 and to *China National Petroleum Corpn v Fenwick Elliott* [2002] TCLR 427, paras 44 to 53. PAG submitted that privilege does not depend on whether the solicitor's purpose is communicated to the witness or not. The purpose of the meeting was to gather evidence and that is sufficient to attract privilege.

35 RBS submits that the deception which occurred in this case cannot be ignored and contends that the English courts do not generally find in favour of individuals who obtain evidence by deliberate deception. In *Plummers v Debenhams plc* [1986] BCLC 447 Millett J stated, obiter, at p 459:

> "it is not open to a party to litigation to withhold production to a relevant document by claiming that the purpose for which it was brought into existence was to obtain legal advice in connection with contemplated litigation, when that purpose was deliberately concealed from the other party, and when the document contains and its conclusions are based on evidence obtained from the other party only by suppressing the purpose for which it was required."

36 This was applied in a first instance decision by Judge Toulmin QC: *London Fire and Emergency Planning Authority v Halcrow Gilbert & Co Ltd* [2005] BLR 18 the facts of which are similar to the present case. RBS also submits that the key rationale of litigation privilege, being that it encourages anyone who knows relevant facts to be able to state them fully and candidly: see the speech of Lord Wilberforce in *Waugh v British Railways Board* [1980] AC 521 has no application to the current case.

37 Finally the parties drew attention to a debate amongst the authors of textbooks about the question of whether a conversation has to be confidential in order to attract privilege. RBS says that the communications in issue cannot be privileged because the dominant purpose of the meeting was not litigation and the meeting was not subject to conditions of confidentiality: see *Passmore, Privilege*, 3rd ed (2013) p 3-005. PAG referred to a passage in *Thanki, The Law of Privilege*, 2nd ed (2011) p 3-33) which suggests that the requirement of confidentiality does not require the existence of a legal duty of confidence but is better characterised in the words used by Aldous LJ in *Bourns Inc v Raychem Corpn* [1999] 3 All ER 154, 167–168 as something "not properly available for use". RBS maintained that in English law, confidentiality is a prerequisite for litigation privilege.

38 For reasons appearing below, I do not have to resolve the point on confidentiality. One can see why it can cause difficulties. A witness is free to speak to the lawyers for either side, or both. The fact they have spoken to one side cannot preclude a witness from speaking to or assisting the other. That is what the maxim that "there is no property in a witness" is referring to. On the other hand one can proliferate examples in which one side's lawyers give a witness information about the case which may be confidential. The fact that this can happen does not, logically, have anything to do with whether a proof of evidence prepared by the solicitor at the meeting would be covered by litigation privilege.

*Assessment*

39 I have considered the parties legal submissions in some depth in deference to the argument but in the end I believe the answer is clear.

40 Plainly, assessed objectively today, Mr Russell's purpose in arranging the meetings was to gather evidence for the litigation. Equally plainly, assessed objectively today, the purpose of the ex-RBS employees in attending the meeting was to catch up and discuss possible future business. I am bound to say that starting from just these facts, it does not make a lot of sense to pretend that one can distil a dominant purpose from these two clear but entirely divergent purposes.

41 In my judgment the critical point is that Mr Russell actively deceived Mr Jones and Mr Goldrick. Mr Russell induced them to attend and speak freely by representing to Mr Jones and Mr Goldrick that the meeting was a catch up and was concerned with possible future business. Mr Russell knew or it was obvious to him that they were only likely to attend and speak on that basis. It is the existence of this deception which distinguishes the circumstances from the example of the solicitor taking a proof of evidence relied on by PAG. In this case Mr Russell cannot complain if the court concludes that the fair and correct way of assessing what the dominant purpose of the meeting was, is to look at it from Mr Jones and Mr Goldrick's point of view. If

6

259

Mr Russell had not misled these two gentlemen then things might be different but that is not what happened.

42 I find that the dominant purpose of the meetings was not for the purposes of the litigation. Therefore the meetings were not privileged and so neither are the recordings or the transcripts of the recordings. RBS is entitled to inspection.

*Issue (ii) the Kilty/Rubens e-mail*

43 The reason RBS found out about the existence of the recordings and transcripts of Mr Jones and Mr Goldrick is because they are referred to in a document, the Kilty/Rubens e-mail, which was disclosed to RBS by PAG as part of its disclosure in the action. The e-mail was between Mr John Kilty, a third party consultant engaged by PAG and Mr Philip Rubens, a partner at PAG's solicitors Cooke, Young and Keidan ("CYK"). The content of this e-mail referred to the existence of at least two of the recordings and transcripts. By the e-mail, Mr Kilty was sending comments on the transcripts to the solicitors and indicated that Mr Russell's observations would also follow.

44 PAG claims that the e-mail is privileged. There was a debate about the privilege claim and RBS points out that the basis for it changed in correspondence, but RBS do not now dispute that it is a privileged document.

45 CPR r 31.20 provides: "Where a party inadvertently allows a privileged document to be inspected, the party who has inspected the document may use it or its contents only with the permission of the court."

46 Before me RBS sought permission under this provision to use the e-mail for the purposes of its application above relating to the recordings and transcripts whose existence came to its attention only as a result of the e-mail. PAG did not seriously oppose the grant of permission and I dealt with that during the hearing. Clearly permission to make the application was appropriate.

47 However that leaves open a dispute between the parties about what happened after the e-mail was inadvertently disclosed. The circumstances are these. The e-mail was included in disclosure provided for inspection on 15 June 2015 and discovered by Dentons in August 2015. On 28 September RBS's solicitors Dentons wrote at length to CYK about the e-mail. The letter includes a statement that Dentons anticipated that PAG might wish to claim privilege. CYK confirmed privilege was claimed and correspondence ensued about its basis. In its application notice dated 22 October, supported by a witness statement from Mr Coulthard of Dentons and also statements from Mr Jones and Mr Goldrick dated 14 and 18 October, RBS applied for permission under CPR r 31.20.

48 The problem, PAG submits, is that it is plain that RBS and its lawyers made extensive use of the privileged e-mail without the court's permission, contrary to CPR r 31.20. In his witness statement Mr Coulthard admits that use was made of the e-mail (which it plainly was). He states that the e-mail indicated to RBS that there had been serious non-disclosure by PAG of relevant documents (that is of the recordings and transcripts, which I have held were not privileged) and that it was essential to speak to Mr Jones and Mr Goldrick. Mr Coulthard explains that the only use made was as part of the investigation into whether there was a proper basis for claiming relief under CPR r 31.20. He states that RBS has made no other use of the e-mail.

49 The difficulty I have with the stance taken by RBS in this matter starts from the e-mail itself. On its face the Kilty/Rubens e-mail is an e-mail between someone at PAG (Mr Kilty's e-mail address in the e-mail is johnkilty@pag.local) to PAG's solicitor with conduct of this case. The date is 15 November 2013, after the claim form was issued. The content of the e-mail discusses evidence relating to the case with RBS.

50 It is clear that the solicitor for one side does not owe a duty of care to the other party: see Clarke LJ in *Al-Fayed v Comr of Police of the Metropolis* [2002] EWCA Civ 780, para 16). Nevertheless considering this particular e-mail, it would have been obvious to any reasonable solicitor that the e-mail was likely to be privileged and that a mistake was likely to have been made. Mr Coulthard's evidence does not address this at all. His evidence is focussed on what happened later, after the letter of 28 September 2015 was sent to CYK. The evidence does not state when Mr Jones or Mr Goldrick were first contacted but it is apparent from the 28 September letter that they had already been spoken to before it was sent to CYK. The e-mail was obviously identified well before that date.

51 It is true that after 28 September PAG's position shifted and the claim to privilege was confused but this has nothing to do with what took place before 28 September and cannot retrospectively justify whatever took place, particularly when the claim to privilege in the e-mail is now accepted.

7

Property Alliance Group Ltd v Royal Bank of Scotland plc (No 3)        [2016] 4 WLR 3
(Ch D)

**52** The fact that the e-mail indicated that there may have been serious non-disclosure by PAG of relevant documents does not alter the fact that RBS needed permission under rule 31.20 to use the e-mail in order to do what was done. Given the nature of the Kilty/Rubens e-mail a letter should have been written about it as soon as it was identified and if RBS wished to do what they did do, an application for permission to use it ought to have been made at the earliest opportunity. Neither step was taken when it should have been. The legal team for RBS did not have permission to use the e-mail in the manner in which they did at the time and the stance taken on this application does not face up to that. What was revealed by the e-mail itself, and PAG's subsequent change of position in correspondence, amount to mitigating factors but they do not justify the conduct of the RBS legal team in this matter. It seems to me that an appropriate sanction would be in costs and I will hear the parties about that when this is handed down.

*Application granted.*

SCOTT MCGLINCHEY, Barrister

8

**261**

A                                 Court of Appeal

## Regina (Jet2.com Ltd) v Civil Aviation Authority
## (Law Society intervening)

### [2020] EWCA Civ 35

B    2019  Dec 4, 5;                        Patten, Hickinbottom, Peter Jackson LJJ
     2020  Jan 28

*Practice — Disclosure — Legal professional privilege — Defendant resisting
     disclosure of documents sent to multiple addressees on grounds subject to legal
     advice privilege — Whether documents privileged — Whether necessary to show
     that dominant purpose of communication to give or seek legal advice — Proper*
C    *approach to multi-addressee communication*

     The defendant regulator issued a press release criticising the claimant airline,
among others, for not having signed up to a voluntary alternative dispute resolution
scheme.  When the claimant wrote to the regulator to take issue with the content of
the press release, the regulator sent the claimant a letter reiterating its criticisms and
leaked all the correspondence between the parties to a national newspaper.  The
D    claimant sought judicial review of the regulator's decisions to issue the press release
and to leak the correspondence.  In the course of those proceedings the claimant
applied for disclosure of various documents, including all drafts of the regulator's
letter and all records of any discussions concerning those drafts.  The regulator
resisted disclosure, contending that the documents sought were subject to legal
advice privilege since the regulator's in-house lawyers had given advice in relation to
the drafts and had been involved in the related discussions.  The judge granted the
E    disclosure sought.  The regulator appealed on the grounds that the judge had erred:
(i) in holding that legal advice privilege would only apply where the document in
question had been brought into existence with the dominant purpose of it or its
contents being used to give or seek legal advice; and (ii) in the approach he had
adopted when considering whether e-mails which had been sent to multiple
addressees were protected by legal advice privilege.
     On the appeal—
     *Held*, dismissing the appeal, (1) that there were no good grounds for not
F    following the preponderance of authority, which at least accepted that the dominant
purpose test applied to legal advice privilege, and good grounds for doing so,
including the fact that the dominant purpose test undoubtedly applied to litigation
privilege and the fact that generally other common law jurisdictions applied the test
to legal advice privilege; that, therefore, in order for legal advice privilege to apply to
a particular communication or document, it had to be shown that the dominant
purpose of that communication or document had been to obtain or give legal advice;
G    and that, accordingly, the judge had been correct to proceed on that basis (post,
paras 87–96, 123, 124).
     *Grant v Downs* (1976) 135 CLR 674 and *Waugh v British Railways Board*
[1980] AC 521, HL(E) applied.
     *Three Rivers District Council v Governor and Company of the Bank of England
(No 5)* [2003] QB 1556, CA and *Three Rivers District Council v Governor and
Company of the Bank of England (No 6)* [2005] 1 AC 610, HL(E) considered.
H    Dicta in *Director of the Serious Fraud Office v Eurasian Natural Resources
Corpn Ltd (Law Society intervening)* [2019] 1 WLR 791, paras 131–132, CA not
applied.
     (2) That where a communication had been sent simultaneously to multiple
addressees, including a lawyer, the communication would be subject to legal advice
privilege if its dominant purpose had been to settle the instructions to the lawyer,

© 2020 The Incorporated Council of Law Reporting for England and Wales

1028
**R (Jet2.com Ltd) v CAA (CA)**                                    **[2020] QB**

*A*

even if that communication had been sent to the lawyer himself by way of information or was part of a rolling series of communications; that, however, if the dominant purpose had been to obtain the commercial views of the non-lawyer addressees, it would not be so privileged, even if a subsidiary purpose had been to obtain legal advice from the lawyer addressee; that the response from the lawyer, if it contained legal advice, would almost certainly be privileged, even if copied to more than one addressee; that, further, where a communication disclosed or was likely to disclose the nature and content of legal advice, then it would in any event be privileged; that in order to determine whether a document disclosed or might disclose the nature and content of legal advice it was necessary to look at the document in the context of the communications which preceded and followed it; that, in the present case, the judge had properly applied the dominant purpose test in the context of multi-addressee communications; and that, accordingly, there were no grounds to interfere with the conclusion that the documents did not attract legal advice privilege (post, paras 100–103, 123, 124).

*B*

*C*

Decision of Morris J [2018] EWHC 3364 (Admin); [2019] ACD 28 affirmed.

The following cases are referred to in the judgment of Hickinbottom LJ:

*AWB Ltd v Cole* [2006] FCA 571; 152 FCR 382
*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, CA
*Balabel v Air India* [1988] Ch 317; [1988] 2 WLR 1036; [1988] 2 All ER 246, CA
*Bank of Nova Scotia v Hellenic Mutual War Risks Mutual Association (Bermuda) Ltd (The Good Luck) (No 2) (Note)* [1992] 2 Lloyd's Rep 540

*D*

*Cie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55, CA
*Citic Pacific Ltd v Secretary for Justice* [2015] HKCA 293; [2016] 1 HKC 157
*Crompton (Alfred) Amusement Machines Ltd v Customs and Excise Comrs (No 2)* [1972] 2 QB 102; [1972] 2 WLR 835; [1972] 2 All ER 353, CA
*Curlex Manufacturing Pty Ltd v Carlingford Australia General Insurance Ltd* [1987] 2 Qd R 335

*E*

*Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (Law Society intervening)* [2018] EWCA Civ 2006; [2019] 1 WLR 791; [2019] 1 All ER 1026, CA
*Dore v Leicestershire County Council* [2010] EWHC 34 (Ch)
*Esso Australia Resources Ltd v Comr of Taxation of the Commonwealth of Australia* [1999] HCA 67; 201 CLR 49

*F*

*Financial Services Compensation Scheme Ltd v Abbey National Treasury Services plc* [2007] EWHC 2868 (Ch)
*Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] EWHC 158 (Ch); [2006] 2 All ER 599
*GE Capital Corporate Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172; [1995] 2 All ER 993, CA
*General Accident Fire and Life Assurance Corpn Ltd v Tanter* [1984] 1 WLR 100; [1984] 1 All ER 35, CA

*G*

*Gotha City v Sotheby's* [1998] 1 WLR 114, CA
*Grant v Downs* (1976) 135 CLR 674
*Greenough v Gaskell* (1833) 1 My & K 98
*Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027; [1987] 2 All ER 716, CA
*Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160

*H*

*L (A Minor) (Police Investigation: Privilege), In re* [1997] AC 16; [1996] 2 WLR 395; [1996] 2 All ER 78, HL(E)
*Minter v Priest* [1930] AC 558, HL(E)
*Paragon Finance plc (formerly National Home Loans Corpn plc) v Freshfields* [1999] 1 WLR 1183, CA

© 2020 The Incorporated Council of Law Reporting for England and Wales

1029

[2020] QB                                            R (Jet2.com Ltd) v CAA (CA)

*Pratt Holdings Pty Ltd v Comr of Taxation* [2004] FCAFC 122; 136 FCR 357

*Property Alliance Group Ltd v Royal Bank of Scotland plc* [2015] EWHC 3187 (Ch); [2016] 1 WLR 992

*RBS Rights Issue Litigation, In re* [2016] EWHC 3161 (Ch); [2017] 1 WLR 1991

*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995] 4 All ER 526, HL(E)

*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21; [2003] 1 AC 563; [2002] 2 WLR 1299; [2002] 3 All ER 1, HL(E)

*Raiffeisen Bank International AG v Asia Coal Energy Ventures Ltd* [2020] EWCA Civ 11; [2020] 1 WLR 2298, CA

*Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific Breweries (Singapore) Pte Ltd* [2007] SGCA 9; [2007] 2 SLR 367

*Tanap Investments (UK) Ltd v Tozer* [1991] EGCS 108, CA

*Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2002] EWHC 2730 (Comm); [2003] CP Rep 34; [2003] EWCA Civ 474; [2003] QB 1556; [2003] 3 WLR 667, CA

*Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] UKHL 48; [2005] 1 AC 610; [2004] 3 WLR 1274; [2005] 4 All ER 948, HL(E)

*USP Strategies plc v London General Holdings Ltd* [2004] EWHC 373 (Ch); The Times, 30 April 2004

*United States v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening)* [2003] EWHC 3028 (Comm); [2004] 1 CLC 811; [2004] EWCA Civ 330; [2004] 1 CLC 811, Moore-Bick J and CA

*V v V (Financial Relief)* [2009] EWHC 2901 (Fam); [2010] 2 FLR 516

*Ventouris v Mountain* [1991] 1 WLR 607; [1991] 3 All ER 472, CA

*Waugh v British Railways Board* [1980] AC 521; [1979] 3 WLR 150; [1979] 2 All ER 1169, HL(E)

*Wheeler v Le Marchant* (1881) 17 Ch D 675, CA

The following additional cases were cited in argument:

*Edwards v Bairstow* [1956] AC 14; [1955] 3 WLR 410; [1955] 3 All ER 48, HL(E)

*Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529; [1981] 2 All ER 485, CA

*Lyell v Kennedy* (1884) 27 Ch D 1, CA

*Nea Karteria Maritime Co Ltd v Atlantic & Great Lakes Steamship Corpn (No 2)* [1981] Com LR 138

*Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] EWCA Civ 218; [2004] QB 916; [2004] 2 WLR 1065; [2004] 3 All ER 168, CA

*Upjohn Co v United States* (1981) 449 US 383

The following additional cases, although not cited, were referred to in the skeleton arguments:

*AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) EU:C:1982:157; [1983] QB 878; [1983] 3 WLR 17; [1983] 1 All ER 705, ECJ

*Addlesee v Dentons Europe llp* [2019] EWCA Civ 1600; [2020] Ch 243; [2019] 3 WLR 1255; [2020] 1 All ER 124, CA

*B v Auckland District Law Society* [2003] UKPC 38; [2003] 2 AC 736; [2003] 3 WLR 859; [2004] 4 All ER 269, PC

*Campbell v United Kingdom* CE:ECHR:1992:0325JUD001359088; 15 EHRR 137

*Federal Trade Commission v Boehringer Ingelheim Pharms Inc* (2018) 892 F 3d 1264

*Financial Reporting Council Ltd v Sports Direct International plc* [2018] EWHC 2284 (Ch); [2019] 2 All ER 974

© 2020 The Incorporated Council of Law Reporting for England and Wales

264

1030
**R (Jet2.com Ltd) v CAA (CA)**                                  **[2020] QB**

*Fortress Value Recovery Fund I llc v Blue Skye Special Opportunities Fund lp* [2014]    A
    EWHC 1052 (Comm)
*Holyoake v Candy* [2017] EWHC 387 (Ch)
*Hutchison 3G UK Ltd v EE Ltd* (unreported) 6 October 2017, Sir Ross Cranston
*Imerman v Tchenguiz* [2009] EWHC 2902 (QB); [2010] Lloyd's Rep PN 221
*Kellogg Brown and Root Inc, In re* (2014) 756 F 3d 754
*Magnesium Elektron Ltd v Neo Chemicals and Oxides (Europe) Ltd (No 2)* [2017]
    EWHC 2957 (Pat); [2018] FSR 11                                              B
*Michaud v France* CE:ECHR:2012:1206JUD001232311; 59 EHRR 9
*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583
*R v Campbell* [1999] 1 SCR 565
*R v Manchester Crown Court, Ex p Rogers* [1999] 1 WLR 832; [1999] 4 All ER 35,
    DC
*R v Secretary of State for Transport, Ex p Factortame* (1997) 9 Admin LR 591, DC
*R (Prudential plc) v Special Comr of Income Tax (Institute of Chartered Accountants*    C
    *in England and Wales intervening)* [2013] UKSC 1; [2013] 2 AC 185; [2013]
    2 WLR 325; [2013] 2 All ER 247, SC(E)
*Tickell v Triflestra* (1990) 24 NSWLR 548
*Unilever plc v The Proctor & Gamble Co* [2000] 1 WLR 2436, [2001] 1 All ER 783,
    CA

**APPEAL** from Morris J                                                          D
    By a claim form issued on 12 April 2018 in the Administrative Court of
the Queen's Bench Division the claimant, Jet2.com Ltd, sought judicial
review of decisions of the defendant, the Civil Aviation Authority, (i) to issue
a press release on 27 December 2017 promoting a new voluntary alternative
dispute resolution scheme to mediate consumer complaints and which
criticised, inter alios, the claimant for electing not to participate in the
scheme, and (ii) to publish correspondence between itself and the claimant    E
by supplying the correspondence to a national newspaper which included
detailed references to the contents of the correspondence in two articles in
which it criticised the claimant for its stance viz the scheme. The grounds for
the claim were that: (1) although section 83 of the Civil Aviation Act
2012 gave the authority the power to publish information and advice to
assist consumers in comparing services and facilities or for improving the
standards of air transport services, it did not give the authority the power    F
to publicly criticise the claimant through the press release and publication
of the correspondence; (2) the authority had acted for the unauthorised
purpose of seeking to damage the claimant's trading interests and reputation
through its criticism and by seeking both to punish the claimant for its
decision and pressurise it to join the scheme voluntarily, or alternatively, that
the authority had taken into account irrelevant matters by acting in such a    G
way; (3) the publications were in breach of the authority's duty of
procedural fairness; and (4) the decision to publish was irrational. By an
order dated 8 June 2018 Turner J granted permission to proceed with the
claim.
    By an application notice dated 26 October 2018 the claimant applied for
disclosure of several categories of documents including any draft versions of
a letter sent to it by the authority on 1 February 2018 ("the letter") and    H
records of any discussions in connection with such drafts. On 10 December
2018 Morris J [2018] EWHC 3364 (Admin); [2019] ACD 28 granted the
application and ordered disclosure of the specified documents, including
specific e-mails and attachments linked to the drafting of the letter, having

© 2020 The Incorporated Council of Law Reporting for England and Wales

rejected the authority's contention that they were not subject to legal advice privilege. On 5 February 2019 Morris J [2019] EWHC 336 (Admin) refused permission to appeal against that decision, declaring that, if contrary to the first judgment, an e-mail dated 24 January 2018 disclosed by the authority was subject to the privilege, then the authority had waived privilege on all drafts of the letter and all records of discussions of those drafts. The judge granted permission to appeal against that declaration.

By an appellant's notice filed on 19 March 2019 and with permission of the Court of Appeal (Haddon-Cave LJ) granted on 7 June 2019 the authority: (1) appealed against the judgment of 10 December 2018 on the grounds that the judge had erred (i) in holding that claims for legal advice privilege were in principle subject to a dominant purpose test of whether a communication or document was brought into existence for the dominant purpose of it or its contents being used to obtain legal advice, (ii) in the proper approach to whether multi-addressee communications such as e-mails from or to clients to both lawyers and non-lawyers were protected by legal advice privilege, and (iii) in indicating that an assessment of whether an e-mail or its attachment was privileged had to be assessed in each instance without reference to the other; and (2), contingent on the authority succeeding on the first appeal, appealed against the judgment of 5 February 2019 on the ground that the judge had erred in his approach to determining the scope of any collateral waiver.

On 24 October 2019 Patten LJ granted permission for the Law Society to intervene by way of written submissions only.

The facts are stated in the judgment of Hickinbottom LJ, post, paras 6–34.

*Sam Grodzinski QC*, *Tamara Oppenheimer* and *Anna Medvinskaia* (instructed by *Mayer Brown International llp*) for the Civil Aviation Authority.

Privilege is important to the rule of law. Legal advice privilege ("LAP") extends to all confidential communications made between a client and a lawyer for the purpose of giving or obtaining legal advice, irrespective of whether litigation has commenced. LAP contains four elements: (a) a communication (written or oral), (b) between a client and their lawyer (or an intermediary of either), (c) made in confidence, and (d) for the purpose of giving or obtaining legal advice on sensible further steps within the "relevant legal context", which, once characterised, extends to everything generated by that context. The documents are evidence of what the context is. LAP attaches to documents that, while they do not contain legal advice, nevertheless form part of the "continuum of communications" made for that broad purpose. LAP is entirely different to litigation privilege (applying to communications between a party or their solicitor and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation) which has three elements: (a) litigation must be in progress or contemplated; (b) it must have been made for the sole or dominant purpose of conducting the litigation; and (c) the litigation must be adversarial rather than investigative or inquisitorial. Those elements do not apply to LAP: see *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, paras 27, 35, 37, 38, 44, 45, 49, 50, 58–61, 62, 102, 105, 111, 119, 122. The "relevant legal context" for

© 2020 The Incorporated Council of Law Reporting for England and Wales

these purposes is broad and not confined to advice concerning the client's legal rights and liabilities.  The test is whether the lawyer is reasonably being consulted because of his or her legal skills.  Once a legal context is established, the next question is whether the relevant communication falls within it: see *Balabel v Air India* [1988] Ch 317, 330F–G on the origin of the "relevant legal context" and the "continuum of communications", plus *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2016] 1 WLR 992 and *Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd* [2019] 1 WLR 791, paras 63, 65–124, 130, 132, which rejected a submission that there is no fundamental distinction between communications in connection with litigation and other communications.  All information between client and solicitor aimed at keeping both of them informed so that advice can be given as and when required is covered so it is therefore tautologous or unnecessary to examine whether each and every communication has been created for the dominant purpose of seeking advice.

There is no dominant purpose test for LAP in English law.  The whole purpose of privilege will be undermined if such a test applies and some communications between client and lawyer with a purpose of giving or obtaining legal advice are disclosable.  It is inconsistent with *Balabel*, which was endorsed unanimously by the House of Lords in *Three Rivers (No 6)*.  Whilst authoritatively defining the test for LAP, Lord Carswell in *Three Rivers (No 6)*, paras 83–84 and para 111 did not refer to "dominant purpose" as being an element of that test (and neither did Taylor LJ in *Balabel*).  Although it is strictly obiter, see also the unanimous conclusion following full argument of substantial persuasive authority by the Court of Appeal in *Eurasian* [2019] 1 WLR 791, para 132 that there is no dominant purpose requirement for LAP.  Any suggestion in *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160, 167–168 (which placed practical emphasis on the purpose of the retainer in LAP) and *United States v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening)* [2004] 1 CLC 811 that a dominant purpose test applies pre-dates *Three Rivers (No 6)*.  Nor does *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* either at first instance [2003] CP Rep 34, paras 3 and 26–28, per Tomlinson J or on appeal [2003] QB 1556, paras 4–6, 24, 28–37 support a dominant purpose test.  See also *Waugh v British Railways Board* [1980] AC 521, 622G–623 concerning litigation privilege, which is not the same as LAP, *Grant v Downs* (1976) 135 CLR 674, *Passmore, Privilege*, 3rd ed (2013), paras 2-099–2-107 and *Hollander, Documentary Evidence*, 13th ed (2018), para 17-16, although *Thanki (ed), The Law of Privilege*, 3rd ed (2018), para 2-177 is more tentative as to whether *Three Rivers (No 6)* establishes that a dominant purpose test applies to LAP.

[Reference was also made to *Lyell v Kennedy* (1884) 27 Ch D 1 and *Upjohn Co v United States* (1981) 449 US 383.]

Where there is a multi-addressee communication between both lawyers and non-lawyers, internally and with third parties, involving discussion of both commercial matters and the provision of legal advice, the whole of that communication is subject to LAP because it contains legal advice.  A document-specific dominant purpose test does not apply.  The control mechanism is therefore provided by the requirement for a relevant legal

© 2020 The Incorporated Council of Law Reporting for England and Wales

context within the scope of LAP as set out in *Balabel* and approved in *Three Rivers (No 6)*, at para 111, namely that a lawyer is sent the communication for the purposes of giving legal advice.

The inclusion of a dominant purpose criterion into LAP is unnecessary and would mean that requests for advice and input made simultaneously to lawyers and other non-lawyers would effectively result in the loss of LAP in the communications with the lawyers. All such communications should, applying *Balabel* and *Three Rivers (No 6)*, be regarded as within the "continuum of the communication" between lawyer and client, which includes the necessary exchange of information for the purpose of obtaining legal advice as and when appropriate and therefore covered by LAP. That continuum cannot be supposed to have ended once the communication is simultaneously copied to another individual unless (a) the communication is for the dominant purpose of seeking or giving legal advice, or (b) it discloses the nature of the advice sought or received once the evidence shows that the communication took place as part of a continuum in a relevant legal context. It is unnecessary to bring addressees in and out of the chain unless there is some clearly severable part of it, which will be very unlikely in any event.

*Property Alliance Group* [2016] 1 WLR 992, paras 1, 7, 9, 10, 28, 31, 32 applies *Balabel* and *Three Rivers (No 6)* and illustrates the difficulty of a parsing approach when trying to strip out which bits of a continuum apply. LAP will not attach to a communication if a lawyer is not copied for the purposes of providing any legal input. *Hollander, Documentary Evidence* does not advocate a dominant purpose test for determining the privileged status of multi-addressee communications addressed to both lawyers and non-lawyers, but rather suggests that such communications need to be analysed as separate constituent communications to each of the addressees.

The material in a document or the information contained within the communication remains privileged if copied to other representatives and/or employees of the client: see *Bank of Nova Scotia v Hellenic Mutual War Risks Mutual Association (Bermuda) Ltd (The Good Luck) (No 2) (Note)* [1992] 2 Lloyd's Rep 540. The material may be communicated or disclosed to a limited number of third parties in circumstances expressly or impliedly preserving the absolute confidentiality of the information/document without losing its privileged status: see *Gotha City v Sotheby's* [1998] 1 WLR 114 and *USP Strategies plc v London General Holdings Ltd* [2004] EWHC 373 (Ch); The Times, 30 April 2004.

A request for advice and input may very often be made simultaneously to lawyers and other executives as part of the continuum of communication in a relevant legal context. A narrow approach to LAP, whereby the continuum is only protected in a multi-addressee context if the communication contains an express request or provision for legal advice and is otherwise broken if other recipients receive the e-mail, was expressly rejected in *Three Rivers (No 6)* [2005] 1 AC 610. To protect communications covered by LAP by separating out specific communications between client and lawyer from other workstreams and to cease the practice of seeking the simultaneous views of lawyers and non-lawyers is likely to be artificial and cumbersome, particularly in an in-house context, and increase the number of communications and workload. It may also be wholly impracticable in situations where urgent advice and input is required from a number of individuals, including the lawyer.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*A*

LAP protects communications (and documentary records of such communications). It is artificial to analyse the privileged status of an e-mail divorced from whatever it attaches and vice versa. An e-mail and its attachment cannot be regarded as a separate communication and must be looked at as a whole. It is often pure happenstance whether the text of a draft letter is sent as an attachment to a covering e-mail or is set out within the body of the e-mail. However, documents or communications not made in privileged circumstances cannot become privileged simply because they are handed to the solicitor for the purposes of seeking legal advice: see *Ventouris v Mountain* [1991] 1 WLR 607, 616.

*B*

Collateral waiver over other documents may apply where loss of privilege in a document can lead to waiver of privilege in other material: see *Paragon Finance plc (formerly National Home Loans Corpn plc) v Freshfields* [1999] 1 WLR 1183, 1188D. A restrictive approach should apply to collateral waiver because LAP is a fundamental right.

*C*

The rationale is fairness. The court is concerned to avoid having an incomplete picture of the relevant events and to avoid a party waiving privilege in a partial or selective manner so that unfairness or misunderstanding may result: see *General Accident Fire and Life Assurance Corpn Ltd v Tanter* [1984] 1 WLR 100 (applying *Nea Karteria Maritime Co Ltd v Atlantic & Great Lakes Steamship Corpn (No 2)* [1981] Com LR 138 and approved by the Court of Appeal in *Tanap Investments (UK) Ltd v Tozer* [1991] EGCS 108 and *Paragon Finance*, at p 1188D).

*D*

One begins by identifying the "transaction" or "issue" in respect of which privilege has been waived. That is often limited to the contents of a particular e-mail or other communication. The transaction is not the same as the *subject matter* of the conversation or communication, and does not extend to all matters relating to the subject matter of the conversation. The "purpose" of a voluntary disclosure of legal advice or factual instructions provided to lawyers for the purposes of obtaining legal advice and/or in connection with the conduct of litigation is an important consideration and relevant both for analysing the relevant "transaction" and assessing the fact-sensitive question of fairness, which may apply if it is apparent that further disclosure is required. A party may generally disclose some but not all documents falling within a privileged category: see *Nea Karteria*, p 139; *General Accident*, paras 113–115, *Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] 2 All ER 599, paras 11–14, 18–21 and *Dore v Leicestershire County Council* [2010] EWHC 34 (Ch) at [17]–[19], [27]

*E*

*F*

[Reference was also made to *Cie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55.]

*G*

*Charles Béar QC* and *Nicolas Damnjanovic* (instructed by *Norton Rose Fulbright llp*) for the airline.

Legal advice privilege ("LAP") attaches to communications passing between lawyer and client in the relevant legal context of the ordinary business between lawyer and client, which includes the legal advice provided by the lawyer (and extends to the sifting and presentation of material for an inquiry with potentially important reputational consequences) within the overall relationship with the client. It is the content, purpose and context of the communication as the underlying interaction—including documents

*H*

© 2020 The Incorporated Council of Law Reporting for England and Wales

containing the information, questions and answers about the communication and any secondary evidence of the communication—that is critical in generating the privilege: see *Balabel v Air India* [1988] Ch 317, 317–319C, 321F, 323F–G, 324F, 330D–331A, 332D–F (citing from *Greenough v Gaskell* (1833) 1 My & K 98 as the original leading case) and *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, paras 26, 35, 36, 38, 70, 76, 79, 84, 111.

LAP is only available for communications with a dominant purpose of seeking or obtaining legal advice or assistance: see *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] CP Rep 34, paras 24, 26–32, 34; [2003] QB 1556, paras 5–6, 21–22, 24–28, 30–33, 35 (citing *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160, 167–168), *United States v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening)* [2004] 1 CLC 811, paras 22–23, 38(iii), 39, 77–83, *Three Rivers (No 6)* [2004] QB 916, as part of the ratio, and [2005] 1 AC 610, 643, 644, 664G–H, 665C, 657B, 667C–D, 662C–F, 683B and *Hollander, Documentary Evidence*, 13th ed (2018), para 17-16. *Waugh v British Railways Board* [1980] AC 521, 531–532, 535–536, approving the dominant purpose test in *Grant v Downs* (1976) 135 CLR 674, 677 concerned litigation privilege, which is, with LAP, one of the constituent parts of a single privilege: see *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16.

The observation on the application of a dominant purpose test applying to LAP in *Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (Law Society intervening)* [2019] 1 WLR 791, para 132 is clearly obiter and made in an entirely different context. Further, the court in *Eurasian* failed to address the earlier authorities and it does not dislodge the preponderance of authority to the effect that dominant purpose is required for LAP to apply.

*Thanki (ed), The Law of Privilege*, 3rd ed (2018) supports the dominant purpose test at least if multi-addressee communications are potentially privileged: see paras 2-186, 2-177, 2-181, 2-183, 2-184. *Hollander, Documentary Evidence*, 13th ed (2018), at paras 17-16–17-17 argues that the dominant purpose will apply in certain circumstances, such as the in-house lawyer who is also being consulted in a commercial capacity, and that it is difficult to see what other test could apply.

[Reference was also made to *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027.]

Overseas authority also supports the application of the dominant purpose test to LAP: see *Pratt Holdings Pty Ltd v Comr of Taxation* (2004) 136 FCR 357, paras 1, 82–84, 105, *AWB Ltd v Cole* (2006) 152 FCR 382, paras 66, 70, 77, 101–102, 112, 115, 117, *Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific Breweries (Singapore) Pte Ltd* [2007] 2 SLR 367, paras 62–65 and *Citic Pacific Ltd v Secretary for Justice* [2016] 1 HKC 157, paras 48, 50, 63.

The internal dissemination of legal advice is well established as being privileged (see *Bank of Nova Scotia v Hellenic Mutual War Risks Mutual Association (Bermuda) Ltd (The Good Luck) (No 2) (Note)* [1992] 2 Lloyd's Rep 540). A multi-addressee document can in principle be created for both legal and non-legal advice purposes but it is to be treated as a composite communication with discrete legal and non-legal communications flowing

© 2020 The Incorporated Council of Law Reporting for England and Wales

together in the same document. The non-legal communication, in an e-mail for example, does not become privileged merely by inclusion as part of a composite document simply because one recipient is a lawyer contacted for the purpose of obtaining legal advice. It is the substance as to the dominant purpose of the communication rather than the form that is crucial: see the Australian authority of *Pratt Holdings Pty Ltd v Comr of Taxation* 136 FCR 357, paras 45–46.

The legal and non-legal communications may be so interlinked in a document that they cannot be disentangled even by redaction unless the dominant purpose test applies to the individual intermingled communications or whether one must look at the mixed document as a whole. The dominant purpose test does not have much of a role to play prior to that point provided redaction is a possibility. Once communications have been separated out, their purposes in a sense have become separate. There are then two sole purposes within the document, provided one can continue to regard them as separate communications.

While no English authority has previously considered this issue, the approach in *Hollander, Documentary Evidence*, at para 17-17 has the benefit of common sense in that each recipient of an e-mail holds it as a separate document, and each is a separate communication. Moreover, since LAP depends on the identity of the parties to the communication, it follows that each communication between separate persons must receive separate consideration.

To allow a communication between executives requesting non-legal advice to become privileged merely because it is addressed to a lawyer seeking legal advice would extend the law of privilege more than is reasonable. Documents would be withheld even though they would have been created regardless of the legal context. It will be possible for organisations with in-house lawyers to throw a cloak of privilege over a wide range of managerial communications, simply by bundling them together with a request for legal advice.

LAP does attach where more than one lawyer is involved in seeking or obtaining legal advice and non-lawyers communicate with each other as part of that process. One cannot look at the onwards dissemination without examining the prior communications and the legal advice communicated to the client. The privilege applies to that scenario where there is a single purpose communication or central communication with ancillary communications.

The concept of a continuum of communication taken from *Balabel* [1988] Ch 317 is not consistent with the analysis of discrete communications for different purposes co-existing in a single document. It is aimed at an entirely different problem of whether individual communications between lawyer and client, not themselves specifically seeking or providing any legal advice, are nonetheless a communication for the purpose of legal advice or assistance.

Contrary to *Eurasian* [2019] 1 WLR 791, there is no tautology in applying a dominant purpose test to a multi-addressee communication. The test by its nature impacts on filtering out documents which may or may not have existed according to whether there was some legal process afoot. The whole purpose of legal privilege as a doctrine is to encourage people to make

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   full disclosure to their own lawyers and the lawyers to make full disclosure in return. It is subject to an underlying principle called the causal principle whereby the principle will not attach to a document if it would have been created in any event. That would merely provide an adventitious and unjustified advantage: see *Waugh* [1980] AC 521, 525.

A dominant purpose test for LAP as in litigation privilege is one which strikes the right balance between two self-evident public interests: first, in maintaining the ability for people to consult their legal advisors in confidence, and second, in courts reaching decisions on the basis of all available relevant material. There must be a balance between the right to confidential legal advice and full and candid disclosure.

The common law balances the right to withhold otherwise disclosable material, even where it potentially undermines the fairness of proceedings because it involves the obtaining of legal advice, and consideration of the respective weight of purpose. Otherwise, large amounts of internal and external material could be excluded from disclosure simply because a lawyer had been copied into a communication and requested to provide his legal advice when appropriate (see *Ventouris v Mountain* [1991] 1 WLR 607, 612, 619, 621, 622 on the policy background).

The notion that to send a separate e-mail to each group is wholly impracticable, even in cases of urgency, is not one that can be taken seriously, let alone as a reason why the public interest in obtaining relevant material for judicial proceedings should be overridden. There must not be a large-scale derogation from accepted parameters of disclosure by the simple expedient of placing a lawyer in the (actual or virtual) room. All communications between anyone in the group would become privileged because, on that approach, they would form part of a "continuum of communications" between lawyer and client.

Bearing in mind the requirement in *AWB Ltd v Cole* (2006) 152 FCR 382, paras 112, 114, 115, 117, 127, 132 to be specific on whether a document has been influenced by legal advice, any suggestion that an e-mail can only be considered in some sort of conjoined way with an attachment does not have any basis in principle. It is possible even within a single document, let alone a series of documents, to distinguish separate sentences: see *Curlex Manufacturing Pty Ltd v Carlingford Australia General Insurance Ltd* [1987] 2 Qd R 335 and *GE Capital Corporate Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172. The content of each document is the crucial factor, although each part of a series of communications has to be scrutinised, which is the necessary consequence of an order for disclosure.

The onus is on the party claiming privilege to put evidence before the court when the question of privilege arises to show that the disclosure of a particular document, not in itself constituting a lawyer/client communication directly, would lead to the disclosure of the substance of the legal advice taken.

[Reference was also made to *Minter v Priest* [1930] AC 558, 579–581.]

When considering waiver, the principles require identification of the "transaction" or "issue" in respect of which the privileged material has been deployed and an assessment of what fairness requires. Waiver need be taken no more widely than is necessary to achieve fairness. The appellate court will only interfere with an exercise of discretion by the court below where

© 2020 The Incorporated Council of Law Reporting for England and Wales

1038
R (Jet2.com Ltd) v CAA (CA)                                    [2020] QB
Argument

the judge misapplied the principles or was plainly wrong: see *Tanap Investments (UK) Ltd v Tozer* [1991] EGCS 108.

Disclosure of an unprivileged part of a document is not a waiver of privilege for the rest, even where both deal with the same subject matter: see *GE Capital* [1995] 1 WLR 172, 173C, 175G–H, 176D–F and also *Curlex* [1987] 2 Qd R 335, 336–341.

In terms of collateral waiver, there is a factual distinction within a multi-addressee e-mail sent by a non-lawyer but involving other lawyers, and e-mails that include specific legal advice.

*Grodzinski* replied.

Where more than one non-lawyer within the client organisation is involved in the process of preparing internal or external instructions to a lawyer, that process and the documents generated by it are covered by legal advice privilege. The privilege is not lost where a lawyer has sent legal advice which is then forwarded on internally to other non-lawyers because it conveys the substance of the advice. Otherwise, the protection set out in *Balabel v Air India* [1988] Ch 317 and endorsed in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610 would be compromised. Even if one were to take one e-mail as a composite whole and then ascertain the dominant purpose of the document, that is also contrary to the broad protection offered by *Balabel* and *Three Rivers (No 6)*, provided the e-mail was sent by somebody in the client organisation to a lawyer for legal advice, because the privilege covering lawyer and client communication cannot be removed if there are other recipients of the e-mail.

There can be no causal test in the sense that a document will not attract privilege if it would have been written anyway. Otherwise, the privilege would hardly ever apply. One must examine the specific facts.

In terms of the redaction process, the balance should be struck in favour of maintaining privilege where redaction of privileged parts becomes impracticable and unfeasible: see *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529 and *GE Capital Corporate Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172.

As a matter of policy, a person must be permitted to consult his lawyer in confidence. It is a strong and absolute privilege: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 507, 511–512 in the criminal context.

When considering whether waiver applies, the extent of the transaction to be examined concerns where it occurs and what is said on a particular occasion. The transaction does not extend to the whole subject matter of those conversations: see *Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] 2 All ER 599, 605F–G. The scope of the transaction can be informed by the purpose of the disclosure: see *Dore v Leicestershire County Council* [2010] EWHC 34 (Ch).

[Reference was also made to *Edwards v Bairstow* [1956] AC 14, *General Accident Fire and Life Assurance Corpn Ltd v Tanter* [1984] 1 WLR 100 and *Tanap Investments (UK) Ltd v Tozer* [1991] EGCS 108.]

*David Pievsky* (instructed directly) for the *Law Society*, intervening by written submissions only.

The court took time for consideration.

© 2020 The Incorporated Council of Law Reporting for England and Wales

28 January 2020. The following judgments were handed down.

**HICKINBOTTOM LJ**

*Introduction*

1    In considering legal advice privilege ("LAP") in 1881, Bacon VC said:

"This subject is always a difficult one. On the one hand, I have to consider the right of the plaintiff to discovery, and on the other hand, to consider what are the rights of the defendants to protect themselves against disclosing anything that has taken place in the course of confidential communications." (*Wheeler v Le Marchant* (1881) 17 Ch D 675, 677.)

In the event, the Vice Chancellor held that letters which passed between solicitors and surveyors in relation to the grant of a lease, sent with no litigation active or contemplated, were privileged from disclosure in later proceedings for the specific performance of the lease. Four days later, the Court of Appeal disagreed concluding that the letters were disclosable, and overturned his judgment. Since then, the subject has not become any more straightforward. Indeed, given the more complex arrangements that now exist for commercial transactions and the obtaining of legal advice, including new modes of communication between those involved in such activities, the difficulties have been compounded.

2    This appeal raises important issues concerning LAP, notably: (i) whether, for a communication to fall within the scope of that privilege, it must have had the dominant purpose of seeking or giving legal advice; and (ii) in the light of the answer to (i), the proper approach to determining the privileged status of e-mail communications between multiple parties where one of the senders or recipients is a lawyer. It also potentially raises issues concerning the proper approach to the collateral waiver of privilege in respect of documents otherwise non-disclosable, as the result of the voluntary disclosure of other privileged documents.

3    The issues arise in the context of judicial review proceedings issued on 12 April 2018, brought by the respondent Jet2.com Ltd ("Jet2"), a company operating flights to and from the United Kingdom, against the appellant Civil Aviation Authority ("the CAA"), the UK aviation industry regulator, challenging the lawfulness of the CAA's decisions (i) to issue a press release in December 2017 and (ii) subsequently to publish correspondence between the CAA and Jet2 in February 2018 including the provision of such correspondence to the *Daily Mail*. Both the press release and the CAA correspondence criticised Jet2's refusal to participate in an alternative dispute resolution scheme for the resolution of consumer complaints which the CAA had promoted and in which almost all other large domestic airlines, and a substantial number of non-domestic airlines flying into the UK, had chosen to participate ("the ADR Scheme"). The grounds of challenge to those decisions relevant to this appeal are that the CAA had no power to make the publications or alternatively, if it had such power, it exercised the power for unauthorised and improper purposes, namely to damage Jet2's trading interests, to punish Jet2 for its decision not to join the ADR scheme and to put pressure on Jet2 to join the voluntary scheme.

© 2020 The Incorporated Council of Law Reporting for England and Wales

**274**

1040
R (Jet2.com Ltd) v CAA (CA)                                                [2020] QB
Hickinbottom LJ

*A*

**4** On 16 January 2018, before the publication of the correspondence (and, of course, well before the issue of proceedings), Jet2 wrote to the CAA complaining about the press release ("the 16 January 2018 letter"); to which the CAA responded on 1 February 2018 ("the 1 February 2018 letter"). Given the grounds of challenge, Jet2 made an application in the judicial review claim for disclosure of several categories of document, including (e) all drafts of the 1 February 2018 letter and (f) all records of any discussions of those drafts. Morris J concluded that all of those documents should be disclosed. Following a further hearing, he held that, even if he had found that those documents were privileged, that privilege was waived by the CAA in respect of all of those documents by the disclosure of an e-mail dated 24 January 2018 from Matthew Buffey, the CAA's Head of Consumer Enforcement Department, to several CAA employees including Serena Lim, a principal legal adviser. In this appeal, the CAA contend that the judge erred in both judgments, and in ultimately concluding that all drafts of the 1 February 2018 letter and records of discussion of the drafts should be disclosed.

*B*

*C*

**5** Before us, Sam Grodzinski QC, Tamara Oppenheimer and Anna Medvinskaia of counsel, appeared for the CAA; and Charles Béar QC and Nicolas Damnjanovic of counsel for Jet2. We also had the benefit of written submissions from David Pievsky of counsel for the Law Society of England and Wales as intervener. At the outset, I thank them all for their contribution to the debate.

*D*

### The factual background

**6** For many years, consumer groups and governments, both national and European, have been anxious to increase protection for consumers, including ensuring prompt and proportionate disposal of consumer complaints.

*E*

**7** Parliament and Council Directive 2013/11/EU of 21 May 2013 on alternative dispute resolution for consumer disputes requires member states to ensure that consumers can, on a voluntary basis, access ADR processes for disputes concerning contractual relations between consumers and traders. In the UK, that Directive is enforced through the Alternative Dispute Resolution for Consumer Disputes (Competent Authorities and Information) Regulations 2015 (SI 2015/542) ("the 2015 Regulations"), which provide for an ADR Scheme which is bilaterally voluntary, i e trader and consumer are each able to elect whether or not to adopt it.

*F*

**8** So far as the air passenger industry is concerned, the CAA has for many years funded a service, the Passenger Advice and Complaints Team, which has a scheme to mediate consumer complaints ("the PACT Scheme"). However, under the 2015 Regulations, the CAA is the designated competent authority; and it is a vigorous proponent of the new ADR scheme, expressing support for primary legislation to make participation in the scheme mandatory for the air passenger industry. In the meantime, it has the express objective of obtaining full participation in the scheme, and closing down the PACT Scheme. But, at present, the ADR Scheme is still voluntary; and Jet2 has chosen not to participate in it. Jet2 continues to rely on the PACT Scheme.

*G*

*H*

**9** As part of its promotion of the new ADR Scheme, on 27 December 2017, the CAA published a policy document, *ADR in the Aviation Sector—a*

© 2020 The Incorporated Council of Law Reporting for England and Wales

*First Review* (CAP 1602) ("the review"), together with a press release headed "Thousands more airline passengers are now receiving compensation thanks to [ADR]" ("the press release") criticising airlines who had opted not to participate in the new scheme.

10    The press release gave the number of airlines which had signed up to the new scheme; and identified others by name which had not, urging them to do so.  It singled out Jet2, the largest UK airline not to have signed up, for particular criticism.  It said: "Jet2, the Leeds-based airline, one of the largest UK airlines, has 'inexplicably and persistently' refused to sign up—denying its customers access to a fair arbitration service, which can legally resolve disputed complaints fairly and efficiently."  The internal quotation was a reference to observations by Andrew Haines, the CAA's Chief Executive Officer, whom the Press Release quoted more fully, as follows:

> "ADR is good for UK consumers, which is why it is extremely disappointing that Jet2, one of the UK's largest airlines, has so far inexplicably and persistently refused to sign up, denying their passengers, access to an independent arbitration service.
>
> "Clearly this decision puts Jet2's customers, and those of other airlines that haven't yet signed up, at a distinct disadvantage, and in many cases, could mean their passengers are denied the fundamental rights they are entitled to.
>
> "I am therefore calling on Jet2 and other airlines including Aer Lingus and Emirates to commit to ADR in the interests of their passengers."

11    Jet2 considered that these comments were false (or, at least, misleading) and unfair.  On 16 January 2018, its Executive Chairman, Philip Meeson, wrote to Mr Haines, complaining about the tone and content of the press release and giving reasons why Jet2 had not signed up for the ADR Scheme: it considered ADR untried and untested in this context, and unsuited to the resolution of delay and cancellation claims which formed over 90% of the complaints made and which could, in Jet2's view, better be resolved by other means.  On 18 January 2018, Jet2 issued its own press release; and, at some point, it put its 16 January 2018 letter onto its own website.

12    Following receipt of the 16 January 2018 letter and Jet2's press release, the CAA considered an appropriate response.  In particular, in an internal e-mail dated 18 January 2018 to Richard Moriarty (then Group Director of CAA's Consumer and Markets Group, and later Mr Haines's successor as Chief Executive Officer), Richard Stephenson (CAA's Communications Director), Andrew McConnell (CAA's Senior Communications Adviser) and Mr Buffey, Mr Haines said:

> "We should develop a narrative around Jet2.  They have been (one of) the most litigious airline disputing 261, threatening legal action against the CAA.  References to their billionaire chairman might not go amiss in the process.  We could share it with Jet2 as our rebuttal of any continuation of such misleading information.
>
> "Attack dogs please Lord S"

"261" is a reference to Parliament and Council Regulation (EC) No 261/2004 of 11 February 2004 establishing common rules on

© 2020 The Incorporated Council of Law Reporting for England and Wales

compensation and assistance to passengers in the event of denied boarding   *A*
and of cancellation or long delay of flights.  "Lord S" is a reference to
Mr Stephenson, the inference of the last line of the e-mail being that
Mr Haines wished to see vigorous positive media publicity in response to
Jet2's stance.

13   On 24 January 2018, Mr Buffey circulated a first draft response to
the 16 January 2018 letter.  The draft was sent under a covering e-mail,
addressed to Mr Moriarty, Jackie Knight (a CAA Consumer Enforcement   *B*
Department Manager) and Serena Lim (a principal legal adviser with the
CAA), in which Mr Buffey said: "I wouldn't quite call it 'attack dog' style.
More of a cranky alpaca.  Anyway, see what you think.  I'd like to get it to
[Mr Haines] and [Mr Stephenson] by cop Thursday if possible."  That is the
only draft of that letter that was before Morris J (or is now before us);
although, as will shortly be apparent, there were other drafts and internal   *C*
communications within the CAA before the response was finalised.

14   Mr Haines eventually responded to Mr Meeson on 1 February 2018
in a letter which, whilst making it clear that it was not suggested that Jet2
provided a poor overall service, further criticised it for the stance it had
taken in relation to the ADR Scheme.  In particular, it said:

> "Your letter was surprising and extremely disappointing on two fronts;   *D*
> your apparent disregard for the rights of customers when your levels of
> service fall below that which you say you aspire to and secondly the poor
> and inconsistent case you make in seeking to defend, what I regard, as
> your indefensible position."

> "It is unfortunate that you chose to put forward such a transparently
> narrow and self-interested set of arguments against ADR but, more   *E*
> importantly, the arguments are redundant for the reason I set out below."

In dealing with the arguments Mr Meeson had put forward in his earlier
letter, Mr Haines repeated the criticism of denying customers their
fundamental rights and asserted that, in publishing the review and press
release, the CAA was pursuing a proper purpose by drawing attention to
Jet2's ongoing failure to participate in the ADR Scheme.  Mr Haines   *F*
concluded by reserving the right to publish the correspondence between the
CAA and Jet2 on the issue.

15   That correspondence was in fact provided by the CAA to the *Daily
Mail* which, on 6 February published an online article and the following day
an article in the *Money Mail* section of the newspaper (headed, "In a leaked
letter, Jet2 boss reveals why it won't join new flight delay compensation
scheme . . . Too many customers will win their money back!"), with a   *G*
follow-up article on 19 February 2018.  The articles referred in detail to the
correspondence, including quotations, as well as to the press release.  They
repeated some of the criticisms of Jet2 made in the 1 February 2018 letter,
and generally adopted the CAA stance on the issue of participation in the
new scheme.

*H*

*The proceedings*

16   On 12 April 2018, Jet2 issued judicial review proceedings
challenging the CAA's decision to publish the press release and the post-
press release correspondence to the press, on four grounds.

© 2020 The Incorporated Council of Law Reporting for England and Wales

(i) The publications by the CAA were ultra vires. Whilst section 83 of the Civil Aviation Act 2012 gives the CAA the power to publish information and advice for the purpose of assisting consumers to compare services and facilities used in connection with the use of air transport services or with a view to improving the standards of such services, it does not give it the power publicly to criticise Jet2 for choosing not to participate in the new ADR Scheme. Thus, the CAA had no power to issue the press release or to publicise the correspondence as it did.

(ii) In publishing the press release and the correspondence, the CAA acted for unauthorised purposes, namely to damage Jet2's trading interests and reputation by singling it out for severe criticism and thereby punishing Jet2 for its decision not to join the new scheme and to put pressure on Jet2 to take the voluntary step of joining the scheme. Alternatively, by acting in such a way, the CAA took into account such matters, which were irrelevant.

(iii) The publications were made in breach of the duty of procedural fairness.

(iv) The decision to publish was irrational.

This appeal particularly concerns (i) and (ii).

17    On 8 June 2018, Turner J granted permission to proceed on the basis that there was an arguable case.

18    On 3 August 2018, the CAA served detailed grounds of opposition which, so far as relevant, contended that (i) publication of the press release and correspondence fell within section 83, and (ii) there was no improper purpose, the purpose of publication being to promote the interests of consumers by making them aware of which airlines had not signed up to the new scheme which (the CAA considered) benefited customers.

19    That formal response to the claim was accompanied by a witness statement of Mr Moriarty dated 3 August 2018. Mr Moriarty made the following observations about Mr Haines's e-mail of 18 January 2018 quoted above (see para 12). He said (at para 27):

"The phrase 'billionaire chairman' in the first paragraph was a reference to Mr Meeson. I consider that it was inappropriate to suggest that any part of the CAA's 'narrative' should be making reference to any individual in this way, and Mr Haines also acknowledges that it was inappropriate to have made such a reference. The CAA does not and should not make negative personal comments about individuals within businesses, and in fact, no comment about Mr Meeson personally was made externally by the CAA. The phrase 'attack dogs' in the second paragraph was a reference to pressing on with the CAA's media publicity. 'Lord S' is a reference to Mr Stephenson. Mr Haines' passion for consumer rights did, on occasion, lead him to express himself in colourful terms. This e-mail was not reflective of any part of the approach taken by the CAA. This can be seen from an e-mail sent to Mr Haines by one of my colleagues, Mr Buffey, and from the content of the material that we published."

The e-mail to which Mr Moriarty refers was exhibited to his statement. It was not in fact to Mr Haines, but was the e-mail of 24 January 2018 to Mr Moriarty, Ms Knight and Ms Lim, quoted at para 13 above.

© 2020 The Incorporated Council of Law Reporting for England and Wales

20   On 26 October 2018, Jet2 made an application for specific A
disclosure of several categories of document including all drafts of the
1 February 2018 letter and all CAA records of any discussions concerning
those drafts, said to be necessary in order to understand the CAA's reasons
and purpose behind the publication of the 1 February 2018 letter and
therefore relevant to the "improper purposes" ground of challenge.

21   In response, the CAA relied upon a statement of Ms Lim dated B
13 November 2018, which confirmed that there were further drafts of the
1 February 2018 letter and there were internal discussions about those drafts
by several people within the CAA including Mr Haines.  However, she said
(at para 13) that either she or Dilsha Caldera (another in-house legal adviser
at the CAA) "were involved in those discussions and gave advice in relation
to the various drafts, the content of which advice is privileged and the CAA
does not waive privilege in that advice". C

22   The disclosure application came before Morris J who, in a judgment
dated 10 December 2018 [2018] EWHC 3364 (Admin); [2019] ACD 28
("the December 2018 judgment"), found that, so far as the preparation of
the response to the 16 January 2018 letter was concerned, the CAA lawyers
"became involved for the purpose of giving legal advice; and were not
involved merely as members of the in-house team of executives providing D
commercial advice" (see para 98).  That finding remains unchallenged.

23   In terms of legal principle, he held as follows.

(i) Claims to LAP are subject to a dominant purpose test.  In respect of
that proposition, Morris J cited and relied upon the following: (a) *Three
Rivers District Council v Governor and Company of the Bank of England
(No 5)* [2003] CP Rep 34 (the first instance judgment of Tomlinson J ("*Three
Rivers (No 5) (Comm Ct)*"), itself citing *Hellenic Mutual War Risks* E
*Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep
160, 167–168; (b) *Three Rivers District Council v Governor and Company
of the Bank of England (No 5)* [2003] QB 1556, para 32 (the judgment of
this court (Lord Phillips of Worth Matravers MR, Sedley and Longmore LJJ)
on appeal from Tomlinson J ("*Three Rivers (No 5)*") as commended by Lord
Carswell in *Three Rivers District Council v Governor and Company of the* F
*Bank of England (No 6)* [2005] 1 AC 610 ("*Three Rivers (No 6)*") at
para 70; (c) the judgment of Moore-Bick J in *United States v Philip Morris
Inc (British American Tobacco (Investments) Ltd intervening)* [2004] 1 CLC
811, para 38 ("*Philip Morris (Comm Ct)*"); and (d) the textbook *Hollander,
Documentary Evidence*, 13th ed (2018) ("*Hollander*") at para 17-16.  From
these authorities, the judge concluded (at para 95(4)) that:
G
    "Whilst I am aware of academic commentaries suggesting that the
    point is not free from doubt, in my judgment, on the current state of the
    first instance authorities and obiter observations in the Court of Appeal,
    claims for [LAP] are, in principle, subject to a dominant purpose test,
    namely whether the communication or document was brought into
    existence with the dominant purpose of it or its contents being used to
    obtain legal advice . . ." H

(ii) Therefore (also at para 95(4)):

    "in normal cases of an e-mail sent to an external lawyer, the issue of
    dominant purpose is unlikely to arise . . . However, the issue may be

© 2020 The Incorporated Council of Law Reporting for England and Wales

more acute where material is sent to in-house lawyers, who may have a dual role in the company.  Lawyers, particularly in-house solicitors, may often take part in general business discussions which do not involve legal advice.  Where the in-house lawyer is clearly being asked for legal advice, privilege is likely to attach.  However, where the in-house lawyer is being consulted also as an executive about a largely commercial issue, then the dominant purpose test will fall to be applied."

(iii) With regard to communications sent to multiple addressees, some of whom are lawyers and some of whom are not, he said that the position was not established by authority; but, he continued (at para 95(5)):

"In my judgment, if the dominant purpose of the e-mail is to seek advice from the lawyer and others are copied in for information only, then the e-mail is privileged, regardless of who it is sent to.  If on the other hand, the dominant purpose of the e-mail is to seek commercial views, and the lawyer is copied in, whether for information or even for the purpose of legal advice, then the e-mail, in so far as it is sent to the non-lawyer, is not privileged.  Further, if sent to the non-lawyer for a commercial comment, but sent to the lawyer for legal advice, then, in my judgment, the e-mail is not protected by privilege, unless it or the non-lawyer's response discloses or might disclose the nature of the legal advice sought and given."

24    Applying those principles to this case, the judge found as follows.

"99. Against this background and applying the above principles, any draft of the 1 February letter created before the [CAA's] in-house lawyers were consulted or created without any involvement of in-house lawyers is not privileged.  That is the case, even if it were known that in due course legal advice would be taken on the draft, unless the dominant purpose of the person creating the draft was to seek legal advice on it.

"100. Further drafts of the 1 February letter are not covered by privilege unless specifically drafted by the lawyers or for the dominant purpose of obtaining legal advice.  Such drafts do not subsequently attract privilege when they were shown to the in-house lawyers.  However if a particular draft was created by the in-house lawyers, or by another specifically for the purpose of seeking or giving legal advice then that draft will be privileged.

"101. On the basis that the [CAA's] in-house lawyers were instructed for the purposes of obtaining legal advice, then any communication with those lawyers (to and fro) and including comments and advice on the draft letter (whether on the document itself or in a covering communication) are covered by [LAP].  Moreover any further communication between non-lawyer executives which discloses or might disclose or concerns comments and advice from the in-house lawyers in relation to the draft of the 1 February letter is also covered by legal advice privilege.

"102. Where a draft of the 1 February letter (or even discussion about such a draft) was sent in one e-mail to both in-house lawyers and other non-lawyer personnel within the [CAA] (such as the e-mail of 24 January which has already been voluntarily disclosed), then, even assuming that in

© 2020 The Incorporated Council of Law Reporting for England and Wales

1046
R (Jet2.com Ltd) v CAA (CA)                                    [2020] QB
Hickinbottom LJ

so far as the e-mail was sent to the in-house lawyer it is privileged, in so
far as it is also sent to a non-lawyer, neither the e-mail nor the response of
the non-lawyer is protected by [LAP], *unless* the content of the e-mail, or
the response from the non-lawyer, discloses or is likely to disclose the
nature and content of the legal advice sought and obtained.  If the e-mail
to the non-lawyer clearly seeks, and the response provides, commercial
views, with no connection to the legal advice, then it is not covered by
[LAP]; here the dominant purpose of the e-mail, as sent to the non-lawyer
and any enclosed draft was to obtain commercial views.  The e-mail of
24 January falls into this category.  (I add that if, contrary to the
foregoing, a multi-addressee e-mail of this type is in principle covered by
privilege, there would be a strong argument that, assuming Ms Lim was
copied in for the purpose of seeking legal advice, in any event by
disclosing the e-mail of 24 January the [CAA] has, in this case, waived
privilege in this class of document)."

25    The CAA indicated an intention to appeal against the order for
disclosure; and, when directed by the judge to reconsider the privilege
status of documents falling within categories (e) and (f), it did not
disclose any further documents on the basis that all documents were
covered by LAP either as found by the judge or as claimed by it pending
an appeal.

26    At a further hearing on 19 December 2018, the CAA was directed
to provide a more detailed witness statement in relation to privilege,
identifying separately each e-mail and each attachment over which privilege
was claimed and explaining which documents it considered would be
privileged under the December 2018 judgment and which would not be
privileged under that judgment but over which the CAA still claimed
privilege and why.

27    The CAA responded by way of a witness statement of Imogen
Brooks (another principal legal adviser with the CAA), dated 22 January
2019, which considered each of the relevant documents in an annex, Annex
A.  In the light of the requirements of the 19 December 2018 order, she
identified and considered e-mails and any attachment(s) discretely (see
paras 17–18 of her statement).  On the basis of the December 2018
judgment, as set out in para 10 of her statement, in relation to each e-mail
and attachment, she applied the following approach:

"(a) First, one asks: is the dominant purpose of the multi-addressee
e-mail or an attachment to a multi-addressee e-mail to seek or give legal
advice?  If so, then the e-mail or the attachment to that e-mail, as the case
may be, is privileged.

"(b) If the answer to sub-paragraph (a) above is no, then one asks: does
the e-mail or the attachment disclose; or is it 'likely' to disclose; or 'might'
it disclose, the nature and content of the legal advice sought from, or
given by, the in-house lawyer?  If so, the e-mail or attachment to that
e-mail is privileged.  I have understood the word 'might', as connoting a
realistic possibility."

In my view, Ms Brooks was correct to construe Morris J's judgment as
applying to documents and communications which would, *or might*

© 2020 The Incorporated Council of Law Reporting for England and Wales

*realistically*, disclose legal advice.  It seems to me that he was using "likely" in that sense (rather than as meaning more likely than not).

28  However, Ms Brooks also applied this approach in a way consistent with Morris J's finding (at para 102 of the December 2018 judgment) that the 24 January 2018 e-mail (see para 13 above) was not protected from disclosure by LAP: contrary to the CAA's own view that that e-mail was covered by privilege (and, by disclosing it, the CAA did not waive privilege over more than that e-mail itself), the judge held that that e-mail and attachment (i) was not prepared for the dominant purpose of obtaining legal advice and was not copied to the other (non-lawyer) individuals for information only, and (ii) did not disclose the nature of the legal advice being sought nor might it do so (see paras 10–16 of her statement).

29  Applying this approach, in respect of 11 documents, Ms Brooks was unable to determine whether, on the basis of the December 2018 judgment, they were privileged or not, because of two particular problems, namely, in determining whether a document disclosed (or might disclose) the nature of legal advice, sought or given, it was unclear from the judgment whether (i) the particular document should be looked at discretely or in the context of the communications which preceded and followed it, and (ii) it is necessary for legal advice to be specifically requested (paras 23–26). (In the event, at the 4 February 2019 hearing, on the basis of proportionality and pragmatism, without conceding that the documents were in fact not privileged, the CAA indicated that it would treat these documents as disclosable under the December 2018 judgment.)

30  Otherwise, on the basis of the approach she adopted, in respect of most of the other documents she listed, Ms Brooks accepted that it could not be said that either (i) the dominant purpose was to seek legal advice, or (ii) the e-mail/attachment disclosed or might disclose the nature of the legal advice being sought from or given by the in-house lawyer.  Such documents would therefore not be covered by LAP on the basis of the December 2018 judgment.  However, in respect of these documents, she said: "CAA claims privilege on the basis that the e-mail forms part of the continuum of communications between a client and lawyer, for the purposes of seeking or receiving legal advice."  The concept of a "continuum of communications between a client and lawyer" derives from *Balabel v Air India* [1988] Ch 317 ("*Balabel*"), to which I shall return shortly (see para 62 and following below).

31  A further hearing took place on 4 February 2019 to determine the CAA's application for permission to appeal.  In response to that application, in an alternative to its primary submission that none of these communications was privileged, if and in so far as they were privileged, Jet2 submitted for the first time that an appeal would have no real prospect of success because, amongst other things, by disclosing the 24 January 2018 e-mail, the CAA had waived privilege in all communications concerning the draft 1 February 2018 letter.

32  In a further judgment handed down on 5 February 2019 [2019] EWHC 336 (Admin) ("the February 2019 judgment"), Morris J accepted that submission.  In respect of the scope of the "transaction" over which

© 2020 The Incorporated Council of Law Reporting for England and Wales

there had been a waiver of privilege by disclosure of the 24 January 2018 e-mail, he said this (at para 22):

> "As regards the 'transaction', the issue between the parties is whether the transaction is limited to the e-mail itself or whether it is the course of correspondence and discussion. Whilst in some cases the transaction may be limited to the document disclosed itself, I do not accept that that is the position here. The transaction must, at the very least, include the preceding 'attack dogs' e-mail from Mr Haines. Indeed, the transaction or issue in respect of which the disclosure was made by Mr Moriarty is the approach taken by the CAA in response to [the] 16 January letter. That involved a single process of internal discussion, which does not have discrete parts, and the e-mail of 18 January and the e-mail of 24 January form part of that single process. The fact that the process of discussion took place by way of e-mails is not of itself a basis for distinguishing it from circumstances where the discussion may have taken place in an oral conversation at one and the same time."

He consequently concluded that the transaction in question comprised all drafts of the 1 February 2018 letter, and e-mails and internal discussion about those drafts, in the period between the 16 January letter to the publication of the *Daily Mail* article on 7 February 2018; and fairness required disclosure of the entire chain of discussion whether or not individual documents include legal advice (see paras 23–24).

33 In two appeals, the CAA sought permission to appeal to this court, submitting that, in holding that the drafts and communications about the drafts were not privileged (or, if privileged, that privilege had been waived), the judge made four errors of law.

*Ground 1*: He erred in holding that claims for LAP are in principle subject to a dominant purpose test, i e that the privilege will only apply where the document or other communication was brought into existence with the dominant purpose of it or its contents being used to give or seek legal advice.

*Ground 2*: Particularly as the result of the dominant purpose test which he applied, he erred with respect to the proper approach to be adopted when considering whether multi-addressee communications (notably e-mails from or to both lawyers and non-lawyers) are protected by LAP.

*Ground 3*: He erred in holding that an assessment of whether an e-mail and any attachment must be carried out discretely and without reference to any attachment or covering e-mail respectively.

*Ground 4*: In a separate appeal in respect of the February 2019 judgment (which is contingent upon the CAA succeeding, under grounds 1–3, in showing that the drafts, etc, were privileged), the CAA contend that the judge erred in his approach to collateral waiver. In particular, the judge incorrectly found that the relevant "transaction" for the purposes of collateral waiver extended to all e-mails and internal discussions in the period from the 16 January 2018 letter up to the publication of the *Daily Mail* article on 7 February 2018, in that the voluntary disclosure of the 24 January 2018 e-mail resulted in the collateral waiver of privilege in respect of all those documents.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    34   Morris J gave permission to appeal in respect of ground 4; and, on 7 June 2019, Haddon-Cave LJ granted permission to appeal on all other grounds.

*Legal advice privilege*
  *Introduction*

B    35   In line with the principle that the best probative evidence should be available to the court, admissible and relevant communications are generally disclosable in legal proceedings even if they are confidential.  However, there is a rule that evidence which falls within the scope of legal professional privilege does not have to be disclosed, even if it is admissible and relevant to the issues in the litigation.

C    36   As originally formulated by the courts, the privilege covered only confidential communications made between a lawyer and his client, or a lawyer or client and a third party, which came into existence for the purposes of litigation ("litigation privilege").  The rationale of the privilege was said to be that "it is absolutely necessary that a man, in order to prosecute his rights or defend himself from an improper claim, should have resource to the assistance of professional lawyers" and that "he should be able to make a clean breast of it to the gentlemen whom he consults" in the sure knowledge that his communications to and from the lawyer will be "kept secret" unless disclosed with his consent (*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, 649, per Sir George Jessel MR); and that a party in adversarial proceedings had no right to have access to his opponent's brief nor any obligation to disclose any part of that brief.

D

E    37   However, in *Greenough v Gaskell* (1833) 1 My & K 98, Lord Brougham LC held that the privilege applied to all confidential communications between a lawyer and his client made for the purposes of giving or obtaining legal advice, whether or not there were existing or contemplated proceedings (i e LAP).  This appeal concerns LAP.

38   LAP involves the right to withhold disclosure of relevant, and possibly crucial, evidence from legal proceedings; and consequently it potentially detracts from the fairness of those proceedings.  Such a right requires powerful justification.  Having comprehensively reviewed the authorities, the rationale for LAP was described by Lord Taylor of Gosforth CJ (with whom the rest of the Appellate Committee of the House of Lords agreed) in *R v Derby Magistrates' Court, Ex p B* [1996] AC 487 ("*Ex p B*"), at p 507c–d, as follows:

F

G        "The principle which runs through all these cases, and the many other cases which were cited, is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth.  The client must be sure that what he tells his lawyer in confidence will never be revealed without his consent.  Legal professional privilege is thus much more than an ordinary rule of evidence, limited in its application to the facts of a particular case.  It is a fundamental condition on which the administration of justice as a whole rests."

H

39   Legal professional privilege is regarded of such importance that it has been described as "absolute"; but, like most rights, it is not absolute in the true sense of that word.  As I describe below (paras 74 and following),

© 2020 The Incorporated Council of Law Reporting for England and Wales

**284**

1050
R (Jet2.com Ltd) v CAA (CA)                                      [2020] QB
Hickinbottom LJ

where a document is produced for the purpose of litigation, it will  *A*
nevertheless be disclosable if that is not its dominant purpose.  Furthermore,
the right of the client to withhold disclosure of the evidence cannot be relied
upon where to do so would further fraud or crime.  Nevertheless, the vital
nature of the privilege, and its underlying rationale, has been regularly
emphasised by the courts.  Two examples will suffice.

40    First, Lord Hoffman in *R (Morgan Grenfell & Co Ltd) v Special*  *B*
*Comr of Income Tax* [2003] 1 AC 563, 606–607, para 7 (with whom the rest
of the Appellate Committee agreed), said this:

"[Legal professional privilege] is a fundamental human right long
established in the common law.  It is a necessary corollary of the right of
any person to obtain skilled advice about the law.  Such advice cannot be
effectively obtained unless the client is able to put all the facts before the  *C*
adviser without fear that they may afterwards be disclosed and used to his
prejudice.  The cases establishing this principle are collected in the speech
of [Lord Taylor in *Ex p B* [1996] AC 487].  It has been held by the
European Court of Human Rights to be part of the right of privacy
guaranteed by article 8 of the [European Convention for the Protection of
Human Rights and Fundamental Freedoms] (*Campbell v United*  *D*
*Kingdom* (1992) 15 EHRR 137; *Foxley v United Kingdom* (2000) 31
EHRR 637) and held by the European Court of Justice to be part of
Community law: *AM & S Europe Ltd v Commission of the European
Communities* (Case 155/79) [1983] QB 878."

41    Second, Lord Scott of Foscote in *Three Rivers (No 6)* [2005] 1 AC
610, para 34, having considered the relevant authorities, continued:  *E*

"None of these judicial dicta tie the justification for [LAP] to the
conduct of litigation.  They recognise that in the complex world in which
we live there are a multitude of reasons why individuals, whether humble
or powerful, or corporations, whether large or small, may need to seek
the advice or assistance of lawyers in connection with their affairs; they
recognise that the seeking and giving of this advice so that the clients may  *F*
achieve an orderly arrangement of their affairs is strongly in the public
interest; they recognise that in order for the advice to bring about that
desirable result it is essential that the full and complete facts are placed
before the lawyers who are to give it; and they recognise that unless the
clients can be assured that what they tell their lawyers will not be
disclosed by the lawyers without their (the clients') consent, there will be  *G*
cases in which the requisite candour will be absent.  It is obviously true
that in very many cases clients would have no inhibitions in providing
their lawyers with all the facts and information the lawyers might need
whether or not there were the absolute assurance of non-disclosure that
the present law of privilege provides.  But the dicta to which I have
referred all have in common the idea that it is necessary in our society, a
society in which the restraining and controlling framework is built upon a  *H*
belief in the rule of law, that communications between clients and
lawyers, whereby the clients are hoping for the assistance of the lawyers'
legal skills in the management of their (the clients') affairs, should be
secure against the possibility of any scrutiny from others, whether the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A police, the executive, business competitors, inquisitive busybodies or anyone else (see also paras 15.8 to 15.10 of *Zuckerman's Civil Procedure* (2003) where the author refers to the rationale underlying legal advice privilege as 'the rule of law rationale'). I, for my part, subscribe to this idea. It justifies, in my opinion, the retention of [LAP] in our law, notwithstanding that as a result cases may sometimes have to be decided in ignorance of relevant probative material."

B

**42** The original formulation of LAP as set out in *Greenough v Gaskell* 1 My & K 98 essentially continues to apply. Lord Rodger of Earlsferry put it thus in *Three Rivers (No 6)* [2005] 1 AC 610, para 50: "[LAP] attaches to all communications made in confidence between solicitors and their clients for the purpose of giving or obtaining legal advice even at a stage when litigation is not in contemplation." As Mr Grodzinski submitted, it is therefore necessary for the party seeking to rely on the right to withhold evidence to satisfy the criteria of each of four elements: there must be (a) a communication (whether written or oral); (b) between a client and a lawyer, or a lawyer and his client; (c) made in confidence; (d) for the purpose of giving or obtaining legal advice.

C

**43** The focus of this appeal (and, especially, grounds 1 and 2) is whether the "purpose" in (d) must be the dominant purpose; but some aspects of the other elements are also pertinent to the issues before us. The following five propositions, relevant to this appeal, arise from the authorities. The first three propositions are uncontroversial; the other two require some greater consideration.

D

E *Proposition 1*

**44** Although the older cases (decided at a time when legal advice was generally obtained from or through solicitors in private practice) concern external lawyers, LAP applies to communications, not only with a lawyer in independent practice, but also with an in-house lawyer (see, e g, *Alfred Crompton Amusement Machines Ltd v Customs and Excise Comrs (No 2)* [1972] 2 QB 102, and *Financial Services Compensation Scheme Ltd v Abbey National Treasury Services plc* [2007] EWHC 2868 (Ch) at [9]).

F

*Proposition 2*

**45** Although the privilege attaches to communications between a lawyer and his client, the law recognises that legal advice is not given for hypothetical purposes, but to be considered and (in so far as accepted) applied by the client. It is therefore well-established that it covers, not only a document from the lawyer containing advice and the client's own written record of advice (whether given in writing or orally), but also any communication (again, whether written or oral) passing on, considering or applying that advice internally (*Bank of Nova Scotia v Hellenic Mutual War Risks Mutual Association (Bermuda) Ltd (The Good Luck) (No 2) (Note)* [1992] 2 Lloyd's Rep 540, 540–541, per Saville J, and *USP Strategies plc v London General Holdings Ltd* [2004] EWHC 373 (Ch) at [19(c)], per Mann J). Indeed, there are circumstances in which the privilege will attach to the dissemination of advice to third parties (*USP Strategies* and *Gotha City v Sotheby's* [1998] 1 WLR 114). Equally, LAP attaches to communications

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

1052
R (Jet2.com Ltd) v CAA (CA)                                    [2020] QB
Hickinbottom LJ

from a lawyer to a third party containing information provided by the client to the lawyer which is covered by LAP and which the client has given the lawyer authority to disclose (*Raiffeisen Bank International AG v Asia Coal Energy Ventures Ltd* [2020] 1 WLR 2298, para 63).

*Proposition 3*

46   The privilege applies to communications only for the purpose of obtaining or giving legal advice, and not (e g) other professional or commercial advice.  *Wheeler v Le Marchant* 17 Ch D 675 (cited in para 1 above) concerned the disclosure of various documents passing between a client and his surveyor, which appear to have included not only primary factual information but also surveying advice and opinion.  Cotton LJ said (at pp 684–685):

> "It is said that as communications between a client and his legal advisers for the purpose of obtaining legal advice are privileged, therefore any communication between the representatives of the client and the solicitor must be also privileged.  That is a fallacious use of the word 'representatives'.  If the representative is a person employed as an agent on the part of the client to obtain the legal advice of the solicitor, of course he stands in exactly the same position as the client as regards protection, and his communications with the solicitor stand in the same position as the communications of his principal with the solicitor.  But these persons were not representatives in that sense.  They were representatives in this sense, that they were employed on behalf of the clients, the defendants, to do certain work, but that work was not the communicating with the solicitor to obtain legal advice.  So their communications cannot be protected on the ground that they are communications between the client by his representatives and the solicitor.  In fact, the contention of the respondents comes to this, that all communications between a solicitor and a third person in the course of his advising his client are to be protected.  It was conceded there was no case that went that length, and the question is whether, in order fully to develop the principle with all its reasonable consequences, we ought to protect such documents.  Hitherto such communications have only been protected when they have been in contemplation of some litigation, or for the purpose of giving advice or obtaining evidence with reference to it.  And that is reasonable, because then the solicitor is preparing for the defence or for bringing the action, and all communications he makes for that purpose, and the communications made to him for the purpose of giving him the information, are, in fact, the brief in the action, and ought to be protected.  But here we are asked to extend the principle to a very different class of cases, and it is not necessary, in order to enable persons freely to communicate with their solicitors and obtain their legal advice, that any privilege should be extended to communications such as these."

Therefore, as Longmore LJ said in *Three Rivers (No 5)* [2003] QB 1556, para 18: "This case thus makes clear that [LAP] does not extend to documents obtained from third parties to be shown to a solicitor to advise."

© 2020 The Incorporated Council of Law Reporting for England and Wales

*Proposition 4*

**47**   The second proposition to which I referred concerns the extent to which legal advice, privileged when given, can be disseminated internally and externally without the loss of privilege, where the law has taken a flexible and realistic approach, reflecting the realities of modern corporate and commercial arrangements.  However, the law has taken a somewhat different approach to the collection of material, internally and externally, for the purpose of obtaining legal advice, based upon the principle set out in *Wheeler v Le Marchant* 17 Ch D 675.  The fourth proposition derived from the authorities is that material collected by a client (or by his lawyer on his behalf) from third parties or independent agents for the purposes of instructing lawyers to give advice is not covered by LAP; and, further, where the relevant client is a corporation, documents or other materials between an employee of that corporation and a co-employee or the corporation's lawyers, even if required or designed to equip those lawyers to give legal advice to the corporation, do not attract LAP unless the employee was tasked with seeking and receiving such advice on behalf of the company (*Three Rivers (No 5)* [2003] QB 1556, para 8 and following, and the judgment of this court (Sir Brian Leveson P, Sir Geoffrey Vos C and McCombe LJ) in *Director of the Serious Fraud Office v Eurasian Natural Resources Corpn Ltd (Law Society intervening)* [2019] 1 WLR 791 ("*Eurasian*") especially at paras 79–81 and 123–130).

**48**   On this issue, *Three Rivers (No 5)* is binding upon this court (see *Eurasian*, para 130); but, like the constitution of this court in *Eurasian*, I find parts of the judgment, including this part, difficult.

**49**   The background to the *Three Rivers* litigation is both well known and helpfully set out in *Eurasian* (at paras 67–81).  For the purposes of this appeal, I can be brief.  The claimants were the liquidators and creditors of Bank of Credit and Commerce International SA ("BCCI"), who sued the Bank of England ("the bank") for misfeasance in public office in respect of its supervision of BCCI following its commercial collapse.  The claimants sought disclosure of various documents sent by the bank to solicitors instructed to advise on the preparation and presentation of the bank's evidence before an inquiry into the supervision of BCCI chaired by Bingham LJ, namely Freshfields Bruckhaus Deringer llp ("Freshfields").

**50**   The bank instructed, and only communicated with, Freshfields through something called "the Bingham Inquiry Unit" ("the BIU"), comprising three of the bank's officials.  The issue concerned the extent to which documents sent by the BIU to Freshfields were privileged from disclosure in the litigation.  Although a number of sub-issues concerning disclosure arose, all of the relevant documents were sent to Freshfields.  The role of that firm was the subject of scrutiny; but no issue arose in respect of e-mails or other communications sent simultaneously to lawyers and non-lawyers for their respective advice/input, as it does in this case.

**51**   The inquiry was not adversarial, and so litigation privilege did not apply.  The issue in *Three Rivers (No 5)* was whether the bank could claim LAP, despite the fact that many of the documents sent to Freshfields were not prepared by the BIU but by other employees of the bank.  At first instance, Tomlinson J held that LAP applied [2003] CP Rep 34.  On appeal, this court disagreed.  Permission to appeal to the House of Lords was refused

© 2020 The Incorporated Council of Law Reporting for England and Wales

1054
R (Jet2.com Ltd) v CAA (CA)                                            [2020] QB
Hickinbottom LJ

(p 1583G). In *Three Rivers (No 6)* [2005] 1 AC 610, the House of Lords    A
declined to determine or express views on the issue; and thus "The guiding
precedent on the issue [continues] to be the Court of Appeal judgment in
*Three Rivers (No 5)*" (see paras 46–48 per Lord Scott, with whom Lord
Rodger (at para 49), Baroness Hale of Richmond (at para 61), and Lord
Brown of Eaton-under-Heywood (at para 119), agreed; confirmed in
*Eurasian* [2019] 1 WLR 791 at the paragraphs cited above).

    **52**  In *Three Rivers (No 5)* [2003] QB 1556, on this issue, citing 19th    B
century authorities (including the passage from the judgment of Cotton LJ in
*Wheeler v Le Marchant* 17 Ch D 675 quoted above: para 46), and passages
from the judgments of Mellish LJ and Baggallay JA in *Anderson v Bank of
British Columbia* 2 Ch D 644 (cited at para 36 above), Longmore LJ said (at
para 19):

> "By the end of the 19th century it was, therefore, clear that [LAP] did    C
> not apply to documents communicated to a client or his solicitor for
> advice to be taken upon them but only to communications passing
> between that client and his solicitor (whether or not through any
> intermediary) and documents evidencing such communications."

    **53**  Longmore LJ then went on to hold that, for these purposes, agents or    D
employees who were not instrumental in instructing the lawyers could be
equated with third parties; so that documents or other information given by
an employee to an employer or a fellow-employee did not attract LAP,
even though on the facts it was intended to be shown to a lawyer (see
paras 22–31). Thus, on the facts of the case, he found that the bank was not
able to rely on LAP in respect of any of the documents prepared by its
employees for the purposes of instructing Freshfields.                      E

    **54**  I do not find that analysis, or conclusion, easy; nor, it seems, did the
constitution of this court in *Eurasian* [2019] 1 WLR 791, in which one of the
questions for the court was: "What did *Three Rivers (No 5)* actually
decide?" (See paras 124–130.) Having carefully considered the judgment
in *Three Rivers (No 5)* and found that this was an essential part of
Longmore LJ's reasoning (so that the court should not depart from it, even if    F
on one view it could be argued that it was obiter: see para 77), Sir Geoffrey
Vos C, giving the judgment of the court in *Eurasian*, concluded as follows (at
para 81):

> "We can fully accept that the Court of Appeal *could* have decided
> *Three Rivers (No 5)* on the simple basis that Freshfields' client was the
> [Bingham Inquiry Unit ("the BIU")] (not the bank), and the documents    G
> had been prepared by the bank (not the BIU), so that the position of the
> particular bank employee who had prepared them was irrelevant to the
> question of [LAP]. We do not, however, think that, fairly read, that was
> the Court of Appeal's reasoning. As we have explained, it seems to us that
> Longmore LJ reasoned that, because agents and employees, on authority,
> stood in the same position in relation to legal professional privilege, once
> it was established that only communications between the lawyer and the    H
> client, and not between the lawyer and an agent of the client, could attract
> [LAP], communications between a lawyer and an employee of the client
> (other than employees specifically tasked with seeking and receiving legal
> advice) could also not be privileged. As we have said, we are not sure that

© 2020 The Incorporated Council of Law Reporting for England and Wales

1055
[2020] QB
R (Jet2.com Ltd) v CAA (CA)
Hickinbottom LJ

A   it is necessary for us to determine whether this reasoning was the ratio decidendi, but if that did have to be decided, we would hold that it was."

55   The constitution of this court in *Eurasian* indicated that, if it had been open to it to depart from *Three Rivers (No 5)* on this issue, it would have done so. In addition to the preference for common law jurisdictions to be in step on such issues as this—*Three Rivers (No 5)* being out of step

B   with overseas common law on this issue—the court considered that the foundation of Longmore LJ's judgment (ie an analysis of 19th century authorities) was unsafe, because those cases were decided at a time when the distinction between litigation privilege and LAP was "very much in its infancy", and without any of the principled analysis of LAP which has subsequently taken place (see paras 38 and following above). Having quoted

C   from Lord Scott's speech in *Three Rivers (No 6)* [2005] 1 AC 610 (including the passage from para 34, quoted at para 41 above), the Chancellor continued (at para 127):

"This last passage makes clear that large corporations need, as much as small corporations and individuals, to seek and obtain legal advice without fear of intrusion. If [LAP] is confined to communications passing

D   between the lawyer and the 'client' (in the sense of the instructing individual or those employees of a company authorised to seek and receive legal advice on its behalf), this presents no problem for individuals and many small businesses, since the information about the case will normally be obtained by the lawyer from the individual or board members of the small corporation. That was the position in most of the

E   19th century cases. In the modern world, however, we have to cater for legal advice sought by large national corporations and indeed multinational ones. In such cases, the information upon which legal advice is sought is unlikely to be in the hands of the main board or those it appoints to seek and receive legal advice. If a multinational corporation cannot ask its lawyers to obtain the information it needs to advise that corporation from the corporation's employees with relevant first-hand

F   knowledge under the protection of [LAP], that corporation will be in a less advantageous position than a smaller entity seeking such advice. In our view, at least, whatever the rule is, it should be equally applicable to all clients, whatever their size or reach. Moreover, it is not always an answer to say that the relevant subsidiary can seek the necessary legal advice and, therefore, ask its own lawyers to secure the necessary

G   information with the protection of [LAP]. In a case such as the present, there may be issues between group companies that make it desirable for the parent company to be able to procure the information necessary to obtain its own legal advice."

56   I respectfully agree. In addition:

(i) *Three Rivers (No 5)* [2003] QB 1556 does not appear to allow for any

H   caveats to the proposition that material sent by a third party/agent/employee to a lawyer (and vice versa) is not covered by LAP. However, where lawyers are instructed, the individual within a corporation instructing them must be able to ensure that the instructions are in accordance with the wishes of the senior executives in the company, which may involve input from more junior

© 2020 The Incorporated Council of Law Reporting for England and Wales

1056
R (Jet2.com Ltd) v CAA (CA)                                    [2020] QB
Hickinbottom LJ

employees who are knowledgeable about the relevant issues. Internal communications settling instructions must be covered by LAP. It is unclear to me how the proposition in *Three Rivers (No 5)* quite allows for that.

(ii) For no obvious reason, the law in relation to LAP as set out in *Three Rivers (No 5)* in respect of collection of information for the instruction of lawyers appears to be out of line with the law in respect of the dissemination of advice from lawyers, once received (ie Proposition 2, as described in para 45 above).

57   For those reasons, like the constitution of the court in *Eurasian* [2019] 1 WLR 791, on the basis of both principle and practical application, I respectfully doubt both the analysis and conclusion of this court in *Three Rivers (No 5)* on this issue; and, had it been in this court's power, I too would be disinclined to follow it.

58   But, as I have indicated, we do not have that power. In *Three Rivers (No 5)*, this court held that communications between an employee of a corporation and the corporation's lawyers does not attract LAP unless that particular employee was tasked with seeking and receiving such advice on behalf of the client; and, as confirmed in *Three Rivers (No 6)* [2005] 1 AC 610, para 47, per Lord Scott and *Eurasian*, that is binding on this court. As Hildyard J succinctly put it in *In re RBS Rights Issue Litigation* [2017] 1 WLR 1991, para 64:

> "there can be no real doubt as to the present state of the law in this context . . . : *Three Rivers (No 5)* confines [LAP] to communications between lawyer and client, and the fact that an employee may be authorised to communicate with the corporation's lawyer does not constitute that employee the client or a recognised emanation of the client."

59   However, the facts of this case—and the issue to which they give rise—are significantly different from those in *Three Rivers (No 5)*. In that case, the relevant lawyers (Freshfields) were external; and the issue was whether, in advising on the presentation of evidence to the Bingham Inquiry, they were involved qua lawyers; and therefore whether the communications concerning that advice could be in respect of "legal advice" so that they were covered by LAP. The relevant lawyers in this case were in-house; and Morris J found that the in-house lawyers were involved in the internal correspondence qua lawyers rather than merely as executives providing commercial advice (see para 22 above). The relevant non-lawyers were all relatively senior executives. There appears to be no evidence suggesting that any of those involved in the relevant internal correspondence did not have the ability to seek legal advice from those lawyers, or that, for these purposes, they were not "an emanation of the client". It seems to me that, on the evidence, in this case each of the non-lawyers involved fell within the scope of "client" so far as the lawyers involved were concerned. Therefore, leaving aside for the moment the question of whether the purpose has to be "dominant", LAP will attach to any confidential communication between a lawyer and a non-lawyer in this case, made for the purpose of giving or obtaining legal advice. As I understood his submissions, Mr Béar did not suggest the contrary.

© 2020 The Incorporated Council of Law Reporting for England and Wales

1057

[2020] QB
R (Jet2.com Ltd) v CAA (CA)
Hickinbottom LJ

*Proposition 5*

60   The focus therefore turns to the scope of "legal advice" for these purposes, and the fifth proposition namely that, for LAP to apply, the communication must be made "in a legal context" (the first limb), but otherwise "legal advice" is widely defined (the second limb).

61   As I have described, LAP applies to a confidential communication between a client and a lawyer for the purpose of giving and obtaining legal advice. Whilst this appeal focuses on that purpose, many of the authorities—even those upon which the parties rely as providing some assistance to the "dominant purpose" issue—primarily concern the relationship between lawyer and client, and the scope of "legal advice" in that context.

62   In *Balabel* [1988] Ch 317, this court considered the issue of whether LAP extends only to communications particularly seeking or conveying legal advice or to all that passes between lawyer and client on matters within the ordinary business of a lawyer. Taylor LJ, having reviewed the authorities (which, he accepted, were divergent in respect of the scope of the privilege), continued (at pp 330D–331A):

"Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business. Nevertheless, despite that extension, the purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence. In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice. Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and client. The negotiations for a lease such as occurred in the present case are only one example. Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach. A letter from the client containing information may end with such words as 'please advise me what I should do'. But, even if it does not, there will usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether asked specifically or not, tender appropriate advice. Moreover, legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context.

"It may be that applying this test to any series of communications might isolate occasional letters or notes which could not be said to enjoy privilege. But to be disclosable such documents must be not only privilege-free but also material and relevant. Usually a letter which does no more than acknowledge receipt of a document or suggest a date for a meeting will be irrelevant and so non-disclosable. In effect, therefore, the 'purpose of legal advice' test will result in most communications between solicitor and client in, for example, a conveyancing transaction being

© 2020 The Incorporated Council of Law Reporting for England and Wales

**292**

1058
R (Jet2.com Ltd) v CAA (CA)                                    [2020] QB
Hickinbottom LJ

A

exempt from disclosure, either because they are privileged or because they are immaterial or irrelevant."

63    Similarly, in *Three Rivers (No 6)* [2005] 1 AC 610, para 111, Lord Carswell, having quoted from *Balabel*, said that it did not disturb or modify the principle affirmed in *Minter v Priest* [1930] AC 558 (in which it was held that conversations between a solicitor and client relating to the business of obtaining a loan for the deposit for the purchase of land were privileged, as the business was professional business within the ordinary scope of a solicitor's employment), namely:

B

"all communications between a solicitor and his client relating to a transaction in which the solicitor has been instructed for the purpose of obtaining legal advice will be privileged, notwithstanding that they do not contain advice on matters of law or construction, provided that they are directly related to the performance by the solicitor of his professional duty as legal adviser of his client."

C

64    Those cases, therefore, confirmed both limbs of Proposition 5.
65    In respect of the first limb, I can be brief, because Morris J found that the lawyers engaged in the internal correspondence here were indeed involved qua lawyers, and so communications made to them were generally made in an appropriate "legal context".    However, there was some discussion before us about whether the dominant purpose test applied to the legal context, in the sense of whether the dominant purpose of the role or retainer of (or instructions to) the relevant lawyer had to be for giving or seeking legal advice.  In *The Sagheera* [1997] 1 Lloyd's Rep 160, 168, Rix J suggested that in practice it might, so that, if the dominant purpose of the retainer is the obtaining and giving of legal advice, "although it is in theory possible that individual documents may fall outside that purpose, in practice it is unlikely", whereas, if the dominant purpose of the retainer is some business purpose, the documents will not be privileged unless specific legal advice is given and/or sought.  *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2016] 1 WLR 992, to which we were referred, is an example of a case in which the scope of the retainer of (in that case, external) lawyers, coupled with a properly broad (rather than nit-picking) approach to the continuum of communications, resulted in all of the memoranda for and minutes of meetings prepared by the lawyers in the context of a regulatory investigation being covered by LAP.

D

E

F

66    In this context, it is worthy of note that all of their Lordships in *Three Rivers (No 6)* [2005] 1 AC 610 emphasised the need for a "relevant legal context" (see, e g, Lord Scott at para 38) but all (except, perhaps, Lord Carswell: see, e g, para 84) declined to import a dominant purpose test for legal context or the lawyer's brief, although Sir Sydney Kentridge QC (for the Law Society, which intervened) had expressly argued for such (see p 632E–G). For example, Lord Rodger referred to a requirement that the lawyer is instructed "qua lawyers" (at para 58); or whether, in the circumstances of that particular case, Freshfields were being asked "to put on legal spectacles when reading, considering and commenting on the drafts" of material for presentation to the Bingham Inquiry (at para 60).

G

H

67    In his submissions, in considering whether documents are the subject of LAP, Mr Grodzinski emphasised the importance of the purpose of the

© 2020 The Incorporated Council of Law Reporting for England and Wales

1059

[2020] QB

R (Jet2.com Ltd) v CAA (CA)
Hickinbottom LJ

relevant lawyer's retainer and role. I accept that, despite some suggestions to the contrary in previous cases, the general instructions to and role of the relevant lawyer make a good starting point, particularly given the court's acceptance that the breadth of "legal advice" in this context includes a lawyer giving advice with the benefit of his skills as a lawyer or "through a lawyer's eyes". However, it is not determinative of the different question as to whether a specific document passing between them is subject to LAP. It is clear from the authorities that, even if the dominant purpose of a lawyer's retainer (or his "dominant role") is related to that of giving legal advice, that is not conclusive on the question of whether LAP applies to a particular communication between lawyer and client (*Philip Morris* [2004] 1 CLC 811, 860, para 79, per Brooke LJ with whom Scott Baker and Chadwick LJJ agreed, on appeal from Moore Bick J referred to in para 23(i)(c) above). Therefore:

> "If part of a solicitor's duties embrace the giving of legal advice on his client's rights, liabilities and obligations, and a further significant part of his duties relate to activities which cannot be so characterised, then the two recent decisions of this court in the *Three Rivers* cases [i e *Three Rivers (No 5)* and *Three Rivers (No 6)* in the Court of Appeal [2004] QB 916: it had not yet then reached the House of Lords] show that it is too simplistic to refer to the dominant purpose of the original retainer, or to try and identify the dominant purpose of a role assumed over a number of years, involving the solicitor in many different activities."

*Three Rivers (No 5)* [2003] QB 1556 also said that authority did not justify a shift of focus from the dominant purpose for which a document is prepared to the "dominant purpose of the retainer" (see para 28). I will return to what *Three Rivers (No 5)* and *Three Rivers (No 6)* [2005] 1 AC 610 did say about "dominant purpose" shortly (see paras 84 and following below).

68   However, as to the second limb of Proposition 5, it is now well established and uncontroversial that LAP covers more than just communications between lawyers and clients with regard to what the law is. *Balabel* [1988] Ch 317 indicated that the scope of LAP in this regard is wide, in two ways. First, it includes advice on the application of the law or, as Taylor LJ put it, "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context". That was endorsed in *Three Rivers (No 6)* [2005] 1 AC 610 (see para 62 per Baroness Hale, expressing the agreed view of the Appellate Committee). Second, once a legal context is established, LAP applies, not just to those communications which expressly seek or give legal advice, but also to the "continuum of communications" between a lawyer and client aimed at "keeping both informed so that advice may be sought and given as required". That again was endorsed in *Three Rivers (No 6)* (see, e g, para 111 per Lord Carswell, quoted at para 63 above, with whom Lord Rodger, Baroness Hale and Lord Brown agreed). In arguing that dominant purpose does not apply to LAP, Mr Pievsky for the Law Society relied on the fact that *Balabel* did not expressly require a document to have such a purpose for LAP to apply: but that does not seem to me to add force to his argument. *Balabel* primarily concerned the scope of "legal advice". Whether or not that test applied to LAP was not at issue in that case.

© 2020 The Incorporated Council of Law Reporting for England and Wales

1060
R (Jet2.com Ltd) v CAA (CA)                                          [2020] QB
Hickinbottom LJ

**69**    Therefore, summarising the position as indicated by the authorities    A
(and still leaving aside for the time being the issue of whether the relevant
purpose has to be "dominant"):

(i) Consideration of LAP has to be undertaken on the basis of particular
documents, and not simply the brief or role of the relevant lawyer.

(ii) However, where that brief or role is qua lawyer, because "legal
advice" includes advice on the application of the law and the consideration    B
of particular circumstances from a legal point of view, and a broad approach
is also taken to "continuum of communications", most communications to
and from the client are likely to be set in a legal context and are likely to be
privileged. Nevertheless, a particular communication may not be so—it may
step outside the usual brief or role.

(iii) Similarly, where the usual brief or role is not qua lawyer but (e g) as a
commercial person, a particular document may still fall within the scope of    C
LAP if it is specifically in a legal context and therefore, again, falls outside
the usual brief or role.

(iv) In considering whether a document is covered by LAP, the breadth of
the concepts of legal advice and continuum of communications must be
taken into account.

(v) Although of course the context will be important, the court is unlikely    D
to be persuaded by fine arguments as to whether a particular document or
communication does fall outside legal advice, particularly as the legal and
non-legal might be so intermingled that distinguishing the two and severance
are for practical purposes impossible and it can be properly said that the
dominant purpose of the document as a whole is giving or seeking legal
advice.

(vi) Where there is no such intermingling, and the legal and non-legal can    E
be identified, then the document or communication can be severed: the parts
covered by LAP will be non-disclosable (and redactable), and the rest will be
disclosable (see, e g, *Curlex Manufacturing Pty Ltd v Carlingford Australia
General Insurance Ltd* [1987] 2 Qd R 335 and *GE Capital Corporate
Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172).

(vii) A communication to a lawyer may be covered by the privilege even if    F
express legal advice is not sought: it is open to a client to keep his lawyer
acquainted with the circumstances of a matter on the basis that the lawyer
will provide legal advice as and when he considers it appropriate.

*Ground 1: legal advice privilege and purpose*

**70**    That leads me to the first question which has to be considered in this    G
appeal, at the heart of grounds 1 and 2, namely does a claim for LAP require
the proponent to show that the relevant document or communication was
created or sent for the dominant purpose of obtaining legal advice?

**71**    Although it has been said that litigation privilege and LAP are
"integral parts of a single privilege" (*In re L (A Minor) (Police Investigation:
Privilege)* [1997] AC 16, 33E, per Lord Nicholls of Birkenhead), it is now
generally accepted that they are two distinct limbs of legal professional    H
privilege with different characteristics (see, e g, *Waugh v British Railways
Board* [1980] AC 521, 541G–H per Lord Edmund-Davies, *Three Rivers
(No 6)* [2005] 1 AC 610, para 103 per Lord Carswell, and *Eurasian* [2019]
1 WLR 791, para 63). One obvious difference is that established by *Wheeler*

© 2020 The Incorporated Council of Law Reporting for England and Wales

**295**

*v Le Marchant* 17 Ch D 675 (see paras 1 and 46 above): whilst LAP is restricted to communications between lawyer and client (and vice versa), litigation privilege can attach to communications with other individuals. The categories are therefore distinct; but, of course, overlapping; as communications between solicitor and client concerning litigation may fall into both categories.

72   Despite their differences, each limb of the privilege is defined in part by reference to the purpose of the relevant communication: in respect of litigation privilege, the purpose of pursuing or defending actual or proposed litigation and, in respect of LAP, the purpose of giving or seeking legal advice.

73   There consequently arose an issue as to whether, in circumstances in which a communication had more than one purpose, it was sufficient for the privilege to attach for one purpose to be for litigation or for obtaining/seeking legal advice, or whether that had to be the appreciable, dominant or even sole purpose.

74   The issue first arose in Australia. In *Grant v Downs* (1976) 135 CLR 674, a widow sued the New South Wales Government after her husband died in a psychiatric hospital. The widow considered the hospital to blame. In accordance with standard practice, the relevant government department obtained reports on the death. When the widow sought discovery of the reports, litigation privilege was claimed. It was said that the reports were prepared for a number of purposes: to assist in determining whether there had been a breach of staff discipline, to detect whether there were any faults in the hospital's systems and procedures, and to enable the department to obtain legal advice as to its possible liability and to obtain legal representation in the event of any coronial or civil proceedings.

75   A majority of the High Court of Australia adopted a sole purpose test for both limbs of the privilege; but, in a dissenting judgment, Barwick CJ preferred a dominant purpose test. He said (at p 677):

"Having considered the decisions, the writings and the various aspects of the public interest which claim attention, I have come to the conclusion that the court should state the relevant principle as follows: a document which was produced or brought into existence either with the *dominant purpose* of its author, or of the person or authority under whose direction, whether particular or general, it was produced or brought into existence, of using it or its contents in order to obtain legal advice or to conduct or aid in the conduct of litigation, at the time of its production in reasonable prospect, should be privileged and excluded from inspection." (Emphasis added.)

That test was ultimately adopted in Australia, for both limbs of the privilege, in *Esso Australia Resources Ltd v Comr of Taxation of the Commonwealth of Australia* (1999) 201 CLR 49. In Australia, it is now well established that the dominant purpose test applies to LAP (see, e g, *AWB Ltd v Cole* (2006) 152 FCR 382).

76   The dominant purpose issue first arose in this jurisdiction in *Waugh* [1980] AC 521, the facts of which did not substantially differ from those of *Grant v Downs*. A railway employee died in a collision between locomotives. His widow sued the railway board. There was an internal inquiry into the accident, resulting in a report which was prepared for two

© 2020 The Incorporated Council of Law Reporting for England and Wales

**296**

purposes which were (the court held) of equal rank and weight: to assist the board to decide whether there was a need to revise safety and operational procedures, and to obtain legal advice in anticipation of litigation. Discovery of the report was sought in the claim. The House of Lords, overruling previous authority to the effect that the privilege applied where one substantial purpose for bringing the document into existence was that it should be available for legal advice in anticipation of litigation and approving the passage of the judgment of Barwick CJ in *Grant v Downs* quoted above, held that the report was disclosable because its dominant purpose was not to obtain legal advice for litigation.

77    *Waugh* was a case which proceeded on the basis that the effective limb of legal professional privilege, if any, was litigation privilege; and it is uncontroversial that it established that, for litigation privilege to be claimed, the relevant communication must have had the dominant purpose of pursuing or defending actual or contemplated litigation. The question raised by ground 1 is whether, in this jurisdiction, the same principle applies to LAP: must the relevant communication have had the dominant purpose of giving or obtaining legal advice?

78    Mr Grodzinski for the CAA, and Mr Béar for Jet2, agreed that there was no authority directly on point; but each contended, as his primary submission, that the preponderance of authority was in his favour.

79    Mr Grodzinski's "core submission" was that the application of the dominant purpose test to LAP is inconsistent with *Three Rivers (No 6)* [2005] 1 AC 610. He submitted that it was telling that, in authoritatively defining the test for LAP, Lord Carswell in *Three Rivers (No 6)* at para 111 did not refer to "dominant purpose" as being an element of that test (nor, indeed, did Taylor LJ in *Balabel* [1988] Ch 317). Other authorities which suggest that it is, such as *The Sagheera* [1997] 1 Lloyd's Rep 160, *Philip Morris* [2004] 1 CLC 811 and *Three Rivers (No 5)* [2003] QB 1556 (although Mr Grodzinski submitted that this last judgment, when read as a whole, did not in any event support the proposition that the dominant purpose test applies to LAP) were decided before *Three Rivers (No 6)* and therefore have to be read in the light of the authoritative definition set out in that case. In any event, he said, the issue was recently considered in *Eurasian* [2019] 1 WLR 791, in which this court squarely addressed the issue and firmly concluded (at para 132) that the dominant purpose test did not apply to LAP. Because of its findings in relation to other issues (see para 55 and following above), that was formally obiter; but nevertheless, he submitted, the issue had been fully argued before the court, and it was obiter of substantial persuasive authority. This court should follow it.

80    Mr Béar submitted, to the contrary, that *The Sagheera*, *Three Rivers (No 5)*, *Three Rivers (No 6)* and *Philip Morris* all held or accepted that the dominant purpose test was applicable. That was in general line with both overseas authority, and the leading textbooks. The observations in *Eurasian* were clearly obiter, and were made in the entirely different context of a case in which the relevant lawyers were external solicitors retained to provide legal advice, so that a dominant purpose test was not pertinent in practice. Furthermore, the court failed to grapple with the earlier authorities. *Eurasian* could not dislodge the preponderance of authorities to the effect that dominant purpose is required for LAP to apply.

© 2020 The Incorporated Council of Law Reporting for England and Wales

81    Below, Morris J held that the balance of authority was in favour of the dominant purpose test; and, whilst *Eurasian* expressed a contrary view, it was obiter and was insufficient to undermine the preponderant view of the earlier authorities. I agree.

82    In respect of authorities, the generally held view is that *Waugh* [1980] AC 521 did not purport to say anything about the position with regard to LAP (see, e g, *Hollander*, para 17-16, *Passmore, Privilege*, 3rd ed (2013), para 2-099 ("*Passmore*") and *Thanki (ed), The Law of Privilege*, 3rd ed (2018), para 2-177 ("*Thanki*")).  Indeed, neither party before us submits that *Waugh* is directly applicable to the case before us, or that any indication in that case could be more than obiter in respect of LAP, the case being determined on the basis of litigation privilege criteria.

83    However:

(i) In *Waugh*, on the basis of the defendant's contentions, both litigation privilege and LAP applied, the issue being whether the report had been prepared for the purpose of procuring legal advice in respect of anticipated litigation.

(ii) In *Waugh*, the majority of their Lordships approved the relevant passage from Barwick CJ's judgment in *Grant v Downs* 135 CLR 674: see Lord Wilberforce at pp 532–533, Lord Simon of Glaisdale at pp 534 and 537, and Lord Edmund-Davies at pp 543–544.

(iii) In respect of the relevant purpose test, *Grant v Downs* did not draw any distinction between litigation privilege and LAP.  In my view, that is clear from the words used by Barwick CJ; but that view has been confirmed in *The Sagheera* [1997] 1 Lloyd's Rep 160, 167, *Three Rivers (No 5)* (Comm Ct) [2003] CP Rep 34, paras 24 and 26–27, and Slade LJ in the leading judgment in *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027, 1043F–1045A.  On one reading of the judgment of Longmore LJ in *Three Rivers (No 5)* [2003] QB 1556, paras 24–25, he considered that that interpretation was incorrect, and, when properly read, Barwick CJ was restricting himself to a principle that applied to litigation privilege only; but: (a) in my respectful view, the words used by Barwick CJ were unambiguous; on their face, they were intended to apply to both limbs of legal professional privilege; (b) if they were intended to apply to both limbs of legal professional privilege, I do not see how that is in any conflict with *Wheeler v Le Marchant* 17 Ch D 675 which concerned a different aspect of LAP (i e whether it applied to communications that did not concern legal advice); (c) the interpretation of Barwick CJ's words adopted in *Three Rivers (No 5)* fails to take into account the judgment of the majority (at p 682), which applied the sole purpose test to both limbs of the privilege; (d) as I have described, it is not the interpretation put on those words by other courts in this jurisdiction; and (e) importantly, in the face of those observations in *Three Rivers (No 5)*, the Federal Court of Australia has expressly denied that that interpretation is correct, stating that the principle formulated by Barwick CJ "was intended to be declaratory of the law for the future; was stated compendiously; and had equal application to both manifestations of the privilege" (*Pratt Holdings Pty Ltd v Comr of Taxation* (2004) 136 FCR 357, para 16, per Finn J).

(iv) Whilst I accept that *Waugh* [1980] AC 521 was decided on the basis that litigation privilege applied, none of their Lordships suggested that there

© 2020 The Incorporated Council of Law Reporting for England and Wales

1064
R (Jet2.com Ltd) v CAA (CA)                                          [2020] QB
Hickinbottom LJ

was a distinction between litigation privilege and LAP in this regard. A
Indeed, in applying *Grant v Downs*, if anything, it seems to me that overall
they suggested that there was no distinction (see, e g, at p 532H per Lord
Wilberforce, and at p 543B per Lord Edmund-Davies). In my view, there is
force in the observation of Tomlinson J in *Three Rivers (No 5)* (Comm Ct)
[2003] CP Rep 34, para 26, where he said:

B
"I do not regard it as plausible to suggest that their Lordships did not
appreciate that the test which they were approving was stated in terms
which apparently embraced legal professional privilege in both its
manifestations, [LAP] and litigation privilege. It would I think be
surprising if their Lordships uncritically adopted a passage of such
apparent generality if they thought that a different approach was called
for in relation to [LAP] to which the passage apparently, or at any rate on C
one obvious reading, made reference."

84   Turning to the *Three Rivers* cases, in respect of the appeal from
Tomlinson J (i e *Three Rivers (No 5)* [2003] QB 1556 in the Court of Appeal)
on this issue, again, I do not find the judgment as clear as it might have been.
Whether the dominant purpose test applies to LAP was in issue before
Tomlinson J; and the Court of Appeal judgment appears to record that D
Tomlinson J held that it did (see para 7). However, by the time the
application came before the Court of Appeal, it seems that that issue was not
further contested (see the record of argument, especially at p 1559F–G, where
the bank appears to accept that the dominant purpose test does apply), the
core issue being, as I have described, whether that test applied to documents
emanating from employees of the bank. But the judgment at least assumed E
that that is the test. Notably, there are references throughout the judgment
to "dominant purpose" without adverse comment; and there is a lengthy
passage (at paras 32–37) on the issue of whether, had the resolution of
the earlier issues required it, "the internal documentation of the bank,
which came into existence after the setting up of the Bingham Inquiry, was
indeed prepared with the dominant purpose of obtaining [legal] advice". F
Mr Grodzinski could not explain why the court embarked on such an
exercise if, as a matter of principle, the dominant purpose test could not even
contingently be applicable.

85   Mr Pievsky forcefully submitted that the House of Lords in *Three
Rivers (No 6)* [2005] 1 AC 610 did not refer to "dominant purpose" in the
context of LAP, suggesting that their Lordships did not consider that it
applied. However, the Appellate Committee did not expressly consider the G
dominant purpose point in that case: their Lordships did not have to deal
with it in the context of that appeal, and clearly declined so to do. However,
the Court of Appeal (the constitution of which included both Lord
Phillips MR and Longmore LJ, who had also sat on *Three Rivers (No 5)*)
again at least appears to have assumed that the dominant purpose test
applied. The issue was not whether that test applied, but whether it had H
been satisfied (see, e g, para 6). In their Lordships' speeches on appeal, there
are numerous references to the test, again without adverse comment.
Indeed, Lord Carswell, at para 70, appears clearly to support the
proposition that the test applied, expressly referring to Tomlinson J's

© 2020 The Incorporated Council of Law Reporting for England and Wales

reasoning in regard to the test in *Three Rivers (No 5)* (Comm Ct) [2003] CP Rep 34 and saying that he considered it had "considerable force".

86   In *Philip Morris* (Comm Ct) [2004] 1 CLC 811, Moore-Bick J seems to have considered (at para 38) that *Three Rivers (No 5)* held that it was a condition of LAP applying that the relevant communication "must be for the dominant purpose of obtaining or giving legal advice"; which the Court of Appeal confirmed without adverse comment (para 77).

87   In each of these authorities, therefore, it seems to have been at least accepted by the court without any adverse comment that the dominant purpose test applies to LAP.  In so far as the Court of Appeal in *Three Rivers (No 5)* and the House of Lords in *Three Rivers (No 6)* accepted the test applied, then acceptance (even if made on the basis of a concession by the proponent of LAP) was made by the highest courts in circumstances in which, in my view, it is inconceivable that an acceptance or assumption would have been made without adverse comment unless it was considered that the test was applicable.  On that issue, as I have indicated, I agree with the sentiments of Tomlinson J in *Three Rivers (No 5)* (Comm Ct) (quoted at para 83(iv) above).

88   The only authority to suggest that the dominant purpose test does not apply is *Eurasian* [2019] 1 WLR 791.  Because the court considered it was bound by *Three Rivers (No 5)* to proceed on the basis that communications between an employee of a corporation and the corporation's lawyers could not attract LAP unless that employee was tasked with seeking and receiving such advice on behalf of the client (which was determinative in the *Eurasian* case), it did not have to determine the issue of dominant purpose.  However, it said:

"131. The SFO submitted that it should in any event be held that, if information passed to a company's lawyers by employees who were not authorised to seek and receive legal advice could be the subject of legal advice privilege, a further qualification should be added, namely that the information must be shown to have been obtained for the dominant purpose of obtaining legal advice.  This, submitted Mr James Segan for the SFO, was established by a line of cases including, for example, [*The Sagheera* at] p 168, *Three Rivers (No 5)* [(Comm Ct) at] paras 20, 21, 26 and 30. . . and *Philip Morris* [in the Court of Appeal] at paras 43 and 77. . .

"132. In the light of the approach that we have adopted thus far to legal advice privilege, it would not be appropriate to reach any final conclusion on this submission.  In our judgment, however, it is hard to see why the suggested additional qualification is necessary, when the privilege can, by definition, only be claimed when legal advice is being sought or given.  It is one thing to say that litigation privilege can only be claimed where the communication is created for the dominant purpose of the litigation, but entirely another to say that legal advice privilege can only be claimed where the communication is created for the dominant purpose of seeking legal advice.  The second is tautologous."

89   However:
(i) The observations made by the court were clearly obiter: indeed, the court expressly indicated that it was inappropriate to reach a conclusion on the issue in that case.

© 2020 The Incorporated Council of Law Reporting for England and Wales

(ii) The court did not consider any of the authorities on the issue, domestic or overseas. Particularly given the preponderance of authority in favour of the dominant purpose test applying, I consider that this substantially detracts from the persuasive weight of these observations.

(iii) The court considered that the qualification that the purpose had to be "dominant" was unnecessary and "tautologous" because LAP can "only be claimed when legal advice is being sought or given". However, litigation privilege can only apply when litigation is pending or in reasonable contemplation and, in terms of rationale, there appears to me to be no relevant difference in principle between the two limbs of the privilege. *Eurasian* [2019] 1 WLR 791 concerned external lawyers, whose role was to provide legal advice; and the court does not appear to have considered the possibility of a document being created, as here, partly for the purpose of obtaining legal advice but partly for some other reason such as obtaining non-legal advice. This possibly reflects other cases which appear to fail to take into account the possibility that a communication to a lawyer to obtain legal advice may be part of a multi-addressee e-mail which also seeks advice/input from non-lawyers, which is the case before us.

90   In the circumstances, I do not consider that *Eurasian* significantly undermines the authorities which either hold or accept that the dominant purpose test applies to LAP.

91   We were also referred to three legal textbooks, with which I should briefly deal.

(i) *Passmore* (at para 2-100) accepts that the dominant purpose test as an element of LAP "received a measure of approval" in *Three Rivers (No 5)* [2003] QB 1556; but submits that:

"the approach of the House of Lords to the identification of legal advice [in *Three Rivers (No 6)*] is such that the dominant purpose test has no obvious role to play in determining claims for [LAP] under the England law, which is now concerned only with establishing a 'relevant legal context' in which legal advice is sought or given."

I agree that *Three Rivers (No 5)* gives support to the inclusion of the test; but, for the reasons I have given, I do not agree that the requirement for the establishment of a "relevant legal context" avoids the need for consideration of the purpose element.

(ii) *Thanki* suggests "tentatively" that the House of Lords in *Three Rivers (No 6)* [2005] 1 AC 610 did not consider that dominant purpose had any application to "pure" lawyer-client communications (para 2-177); but accepts that, even if that be the case, "where a communication is not purely between lawyer and client but between lawyer and client and another party or parties (for example a group of professional advisers) [ie this case], the dominant purpose test must apply" (para 2-184).

(iii) *Hollander* submits that there is no suggestion in *Three Rivers (No 6)* that dominant purpose has any role to play in LAP (para 17-16); but, in respect of documents sent to multiple addressees, submits that these should be treated as separate communications as between the various participants (rendering the principle of dominant purpose in this context redundant). For the reasons I have given, it seems to me that, in most cases, this approach will, if applied correctly, give rise to the same result as applying a dominant

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  purpose test; and, in any event, on that basis, the relevant e-mails passing between non-lawyers will be disclosable.

92  I accept that this court may not be formally bound by the authorities which are considered above; but each party contested the appeal on the basis that these authorities, whilst not binding, were important, if not crucial, in giving guidance. In so far as we are not formally bound, I consider the authorities of considerable persuasive weight, and we should follow them

B  unless there is good reason not to do so.

93  Mr Grodzinski's submissions on this ground were heavily reliant upon the authorities which, he contended, were adverse to dominant purpose being an element of LAP. However, in support of his submissions, he relied upon three other matters.

(i) He stressed the importance of the privilege to the rule of law:

C  he submitted that, if the dominant purpose test applies, then some communications between client and lawyer which have as a purpose the giving or obtaining of legal advice will be disclosable, undermining the whole purpose of the privilege. However, legal professional privilege is an important but, as I have described (para 39 above), not an absolute principle. As I have indicated, where the material over which privilege is

D  claimed is crucial to an issue in proceedings, it potentially undermines the fairness of a trial. The common law is not bound to acknowledge a right to withhold evidence that would otherwise be disclosable simply because the relevant material has, as simply one, minor purpose, the obtaining of legal advice, without consideration of the respective weight of purpose. It is entitled to balance the public interest in these respective principles, and draw

E  a line between them. Otherwise, as Mr Béar submitted, swathes of internal and external material could be excluded from disclosure simply because a lawyer had been copied in and asked for his legal advice as and when he considered it appropriate to give it.

(ii) Mr Grodzinski submitted that the logic of privilege in a communication being lost by reason of it being copied to non-lawyers is

F  contrary to the principle that a privileged document in the form of legal advice may be circulated internally (and even, in some circumstances, to third parties) without that privilege being lost. I accept that that is the case; but, as I have described, that is the result of *Three Rivers (No 5)* [2003] QB 1556 taking the view it did take over the collection of material for the purposes of briefing lawyers (see paras 47 and following above).

(iii) Mr Grodzinski accepts that LAP requires some control mechanism;

G  but submits that it is found in the "definition" of LAP found in Lord Carswell's speech in *Three Rivers (No 6)* [2005] 1 AC 610 (see para 63 above), namely in the requirement that the lawyer is sent the communication for the purposes of giving legal advice. He submitted that the inclusion of a dominant purpose criterion into LAP is unnecessary, and would mean that requests for advice and input made simultaneously to lawyers and other, non-lawyer executives

H  would effectively result in the loss of LAP in the communications with the lawyers. Properly, he submitted, all such communications should be regarded as part of the "continuum of communication" between client and lawyers, and so be covered by LAP. However, for the reasons I set out under ground 2, I do not consider this point to have any real force. In particular, it is to be

© 2020 The Incorporated Council of Law Reporting for England and Wales

1068
R (Jet2.com Ltd) v CAA (CA)                                         [2020] QB
Hickinbottom LJ

noted that, in *Three Rivers (No 6)*, para 111, Lord Carswell was especially     A
addressing the issue of the ambit of "legal advice"; and, as Lord Carswell
himself observed (at para 110), in construing judicial pronouncements,
context is vital. In particular, he clearly did not have in mind the possibility of
(e g) simultaneous communications by a single e-mail to lawyers and
non-lawyers. I was unimpressed by the submission that the result I favour will
make life difficult for those who wish to obtain legal and non-legal advice     B
simultaneously, because (a) there is no indication that that causes a problem in
other Commonwealth countries, such as Australia and Singapore, which have
adopted the dominant purpose test for LAP, and (b) LAP is a privilege, and
those who wish to take advantage of it should be expected to take proper care
when they do so.

94   For those reasons, I do not consider that there is any good ground for
not following the preponderance of authority which supports the inclusion     C
of a dominant purpose criterion into LAP.

95   Further, in my view there are good grounds for including such a
criterion.

(i) Although they do have some different characteristics, litigation
privilege and LAP are limbs of the same privilege, legal professional
privilege. It is uncontroversial that the dominant purpose test, grown out of     D
*Grant v Downs* 135 CLR 674, applies to litigation privilege. For the reasons
I have given, I am unpersuaded that *Eurasian* [2019] 1 WLR 791 is correct
to consider the limbs as fundamentally different with regard to purpose.
In my view, there is no compelling rationale for differentiating between
limbs of the privilege in this context. The "dominant purpose" test in
litigation privilege fixed by *Waugh* [1980] AC 521 derives from Australian
jurisprudence, which has since *Grant v Downs* treated the purpose test     E
(whatever it might be) as applying to both limbs of the privilege.

(ii) Whilst I accept that the position is not uniform, generally the common
law in other jurisdictions has incorporated a dominant purpose test in both
limbs of legal professional privilege, e g, in addition to Australia above
(considered above: see paras 74–75), Singapore (*Skandinaviska Enskilda
Banken AB (Publ), Singapore Branch v Asia Pacific Breweries (Singapore)*     F
*Pte Ltd* [2007] 2 SLR 367) and Hong Kong (*Citic Pacific Ltd v Secretary for
Justice* [2016] 1 HKC 157, paras 51–62). This not only suggests that such a
test is able to work in practice; but this is a legal area in which there is
advantage in the common law adopting similar principles.

96   For those reasons, whilst I readily accept that the jurisprudence is far
from straightforward and the authorities do not speak with a single, clear
voice, I consider Morris J was correct to proceed on the basis that, for LAP     G
to apply to a particular communication or document, the proponent of the
privilege must show that the dominant purpose of that communication or
document was to obtain or give legal advice. I would dismiss the appeal on
ground 1.

*Ground 2: legal advice privilege and multi-addressee communications*     H

97   Most of the documents which are the subject of the disclosure
application giving rise to this appeal are e-mails sent to a number of
addressees, one or more of whom were in-house lawyers (who, Morris J
found, were acting qua lawyers) but one or more of whom were non-lawyers.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    98    Of these e-mails in the December 2018 judgment, he held:

(i) The dominant purpose criterion applied; so that, if the dominant purpose of the e-mail was to obtain legal advice from an in-house lawyer, then it would be privileged, even if it also at the same time sought the commercial views of others. However, if its dominant purpose was to seek commercial views, then the e-mail would not be privileged even if it was contemporaneously sent to a lawyer for the purpose of giving legal advice (see paras 95(5) and 102).

(ii) However, even if the dominant purpose is not in respect of obtaining legal advice, it may still be privileged if it "discloses or is likely to disclose the nature and content of the legal advice sought and obtained" (see para 102), or if it "might disclose" such advice (see para 101).

99    As I have found in respect of ground 1, the dominant purpose criterion does apply to LAP. Of most of the e-mails in respect of which disclosure is sought, the CAA accepts that it cannot be said that (i) the dominant purpose was to seek legal advice, or (ii) the e-mail/attachment might realistically disclose the nature of the legal advice being sought from, or given by, the in-house lawyer (see para 30 above). To a large extent, ground 1 would appear effectively to resolve the issues in ground 2.

100    In respect of these e-mails, I generally agree with the approach applied by Morris J in paras 99–102 of the December 2018 judgment. In my view, the following is the appropriate approach to multi-addressee e-mails such as those of which Jet2 seek disclosure in this case.

(i) As I have indicated, the dominant purpose test applies to LAP. As I have indicated (para 67 above), although the general role of the relevant lawyer may be a useful starting point (and may, in many cases, in practice be determinative), the test focuses on documents and other communications and has to be applied to each such.

(ii) In respect of a single, multi-addressee e-mail sent simultaneously to various individuals for their advice/comments, including a lawyer for his input, the purpose(s) of the communication need to be identified. In this exercise, the wide scope of "legal advice" (including the giving of advice in a commercial context through a lawyer's eyes) and the concept of "continuum of communications" must be taken fully into account. If the dominant purpose of the communication is, in substance, to settle the instructions to the lawyer then, subject to the principle set out in *Three Rivers (No 5)* [2003] QB 1556 (see paras 47 and following above), that communication will be covered by LAP. That will be so even if that communication is sent to the lawyer himself or herself, by way of information; or if it is part of a rolling series of communications with the dominant purpose of instructing the lawyer. However, if the dominant purpose is to obtain the commercial views of the non-lawyer addressees, then it will not be privileged, even if a subsidiary purpose is simultaneously to obtain legal advice from the lawyer addressee(s).

(iii) The response from the lawyer, if it contains legal advice, will almost certainly be privileged, even if it is copied to more than one addressee. Again, whilst the dominant purpose test applies, given the wide scope of "legal advice" and "continuum of communications", the court will be extremely reluctant to engage in the exercise of determining whether, in respect of a specific document or communication, the dominant purpose was

© 2020 The Incorporated Council of Law Reporting for England and Wales

the provision of legal (rather than non-legal) advice.  It is difficult to conceive of many circumstances in which such an exercise could be other than arid and unnecessary.

(iv) There was some debate before us—as there is in the textbooks (e g in *Hollander* (see para 91(iii) above))—as to whether multi-addressee communications should be considered as separate bilateral communications between the sender and each recipient, or whether they should be considered as a whole.   My preferred view is that they should be considered as separate communications between the sender and each recipient.  LAP essentially attaches to communications.  Where the purpose of the sender is simultaneously to obtain from various individuals both legal advice and non-legal advice/input, it is difficult to see why the form of the request (in a single, multi-addressee e-mail on the one hand, or in separate e-mails on the other) in itself should be relevant as to whether the communications to the non-lawyers should be privileged.  That is not to say, of course, that the form may not in some cases reveal the true purpose of the communication, e g it may appear from the form of the e-mail that the dominant purpose of the e-mail is to settle the instructions to the lawyer who has merely been copied in by way of information, or to the contrary that the dominant purpose of sending the e-mail to the non-lawyers is to obtain their substantive (non-lawyer) input in any event.

(v) In my view, there is some benefit in taking the approach advocated by *Hollander*, at para 17-17, namely to consider whether, if the e-mail were sent to the lawyer alone, it would have been privileged.  If no, then the question of whether any of the other e-mails are privileged hardly arises.  If yes, then the question arises as to whether any of the e-mails to the non-lawyers are privileged, because (e g) its dominant purpose is to obtain instructions or disseminate legal advice.

(vi) However, whether considered as a single communication or separate communications to each recipient, and whilst there may perhaps be "hard cases", I doubt whether in many cases there will be any difference in consequence, if the correct approach to LAP is maintained.  Where there is a multi-addressee e-mail seeking both legal advice and non-legal (e g commercial) advice or input, if regarded as separate communications, those to and from the lawyer will be privileged: otherwise, they will not be privileged, unless the real (dominant) purpose of a specific e-mail to/from non-lawyers is that of instructing the lawyer.  If it is not for that purpose, in most cases, the communication as a whole will clearly not have the dominant purpose of obtaining legal advice.

(vii) I agree with Morris J, that, where a communication might realistically disclose legal advice (in the sense of there being a realistic possibility of it disclosing such advice), then that communication will in any event be privileged (see para 27 above).  However, in respect of the relevant documents in this case, on the basis of that test, as I understand it, Ms Brooks appears to have considered that none would or might disclose such advice (see para 28 above).

(viii) Mr Grodzinski suggested that this approach would cause difficulties in terms of meetings (including records of meetings), attended by non-lawyers and lawyers, at which commercial matters were discussed with the lawyer adding legal advice and input if and when required.  The whole of

© 2020 The Incorporated Council of Law Reporting for England and Wales

1071

[2020] QB

R (Jet2.com Ltd) v CAA (CA)
Hickinbottom LJ

A  what transpires at such a meeting, he submitted, should be the subject of LAP. However, I disagree; and consider the same principles set out above as applying to documents and other communications are applicable. Legal advice requested and given at such a meeting would, of course, be privileged; but the mere presence of a lawyer, perhaps only on the off-chance that his or her legal input might be required, is insufficient to render the whole meeting the subject of LAP so that none of its contents (including any notes, minutes or record of the meeting) are disclosable. If the dominant purpose of the meeting is to obtain legal advice (or, subject to the principle set out in *Three Rivers (No 5)* [2003] QB 1556 (see paras 47 and following above), to settle instructions to a lawyer), unless anything is said outside that legal context, the contents of the meeting will be privileged. If the dominant purpose of the discussions is commercial or otherwise non-legal, then the meeting and its contents will not generally be privileged; although any legal advice sought or given within the meeting may be. It is likely that, where not inextricably intermingled, the non-privileged part will be severable (and, on disclosure, redactable) (see para 69 above).

101  As I have described (see para 29 above), on considering whether each document satisfied the criteria (i e whether (i) the dominant purpose was to seek legal advice, or (ii) the e-mail/attachment might realistically disclose the nature of the legal advice being sought from, or given by, the in-house lawyer), Ms Brooks identified two matters which, she considered, disenabled her from determining whether the document was or was not privileged. Neither of these went to dominant purpose. However, she considered that, in determining whether a document disclosed (or might disclose) the nature of legal advice, sought or given, it was unclear from the December 2018 judgment whether (i) it is necessary for legal advice to be specifically requested, and (ii) the particular document should be looked at discretely or in the context of the communications which preceded and followed it. In respect of (i), it is not necessary for advice to have been specifically requested: as has been clear since *Balabel* [1988] Ch 317, it is sufficient for a legal adviser to have been sent material upon which to advise if he or she considers advice necessary or appropriate. As to (ii), in considering whether any document might disclose legal advice, of course it has to be considered in context: only in the context of communications which preceded and followed it can it be determined whether a document might disclose legal advice.

102  Finally, to deal with a discrete point, before Morris J it was contended on behalf of the CAA that the 24 January 2018 e-mail was covered by privilege. In my view, the judge was right to conclude that it was not: although the e-mail was sent to three people including a lawyer (Ms Lim), it was clearly not its dominant purpose to obtain legal (as opposed to non-legal commercial) advice.

103  For those reasons, ground 2 fails.

H  *Ground 3: separate consideration of e-mails and attachments*

104  The effect of the December 2018 judgment and the order which followed it was to require the CAA to assess whether each e-mail and each attachment, considered separately, was privileged in accordance with the judgment.

© 2020 The Incorporated Council of Law Reporting for England and Wales

**306**

105    Mr Grodzinski submitted that that approach was wrong, because *A* LAP protects communications (or records of communications) and an attachment to an e-mail cannot be regarded as a separate communication from the e-mail itself.  The difference in approach may have some practical consequences.  He posed the example of a senior executive sending an e-mail to multiple recipients, including a lawyer, attaching a draft document prepared by the lawyer; and, in the covering e-mail, suggesting some amendments and asking for the views of his (non-lawyer) colleagues.  It was submitted that, looked at as a whole, both e-mail and attachment would be privileged as they would reveal the nature of the legal advice given; but, looked at separately, the attachment would be privileged, but the e-mail would not.

106    This ground did not feature heavily before us.  I do not consider that it raises any point of principle, nor does it appear to bear upon whether any of the relevant documents in this case are privileged or not.  I can deal with it shortly.

107    It is well established that a document which is not privileged does not become so simply because it is sent to lawyers, even as part of a request for legal advice (*Ventouris v Mountain* [1991] 1 WLR 607, 616F, and *V v V (Financial Relief)* [2010] 2 FLR 516, para 14).  In giving disclosure, some separate consideration of substantive documents and attachments therefore has to be undertaken.  Whilst an e-mail and attachment can be regarded as a single communication, separate consideration will need to be given to the attachment, given that it will have been received or created by the sender, and therefore may require discrete consideration.  I do not find Mr Grodzinski's example of assistance.  In that case, it is likely that the e-mail, considered separately, will be privileged as inevitably disclosing legal advice received (in the form of the draft letter).

108    I do not consider that Morris J erred in requiring the separate consideration of e-mails and attachments for the purposes of identifying documents that are covered by LAP and those which are not.  I would refuse the appeal on this ground.

*Ground 4: waiver*

109    In the February 2019 judgment, Morris J held that if, contrary to his primary conclusion that they were not, the relevant documents were privileged, then privilege in all the documents was waived by the CAA by its disclosure of the 24 January 2018 e-mail (referred to in para 12 above).  Mr Grodzinski submitted the judge was wrong to do so, because (i) he wrongly identified the relevant "transaction" in respect of which privilege had been waived, and (ii) he was wrong to conclude that, the 24 January 2018 e-mail having been disclosed, fairness required the disclosure of all the drafts of the 1 February 2018 letter and internal correspondence about those drafts.

110    As I have concluded that the relevant documents are not privileged, this ground has become academic.  I will deal with it shortly.

111    The relevant principles are uncontroversial.  Although the voluntary disclosure of a privileged document may result in the waiver of privilege in other material, it does not necessarily have the result that privilege is waived in all documents of the same category or all documents relating to all issues

© 2020 The Incorporated Council of Law Reporting for England and Wales

1073
[2020] QB                                    R (Jet2.com Ltd) v CAA (CA)
                                             Hickinbottom LJ

A  which the disclosed document touches.  However, voluntary disclosure
cannot be made in such a partial or selective manner that unfairness or
misunderstanding may result: *Paragon Finance plc (formerly National Home
Loans Corpn plc) v Freshfields* [1999] 1 WLR 1183, 1188D, per Lord
Bingham of Cornhill CJ.

B  112  Collateral waiver of privilege allows for documents and other
material that would otherwise be non-disclosable on public interest grounds,
to be required to be disclosed even though the individual with the right to
withhold disclosure objects.  The courts have therefore imposed certain
constraints on collateral waiver.

113  The starting point is to ascertain "the issue in relation to which
the [voluntarily disclosed material] has been deployed", known as the
"transaction test" (*General Accident Fire and Life Assurance Corpn Ltd v
C  Tanter* [1984] 1 WLR 100, 113D, per Hobhouse J), waiver being limited
to documents relating to that "transaction" subject to the overriding
requirement for fairness.  The "transaction" is not the same as the subject
matter of the disclosed document or communication, and waiver does not
apply to all documents which could be described as "relevant" to the issue, in
the usual, *Peruvian Guano* sense of the term as used in disclosure (*Cie
D  Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11
QBD 55).

114  In *Fulham Leisure Holdings Ltd v Nicholson Graham & Jones*
[2006] 2 All ER 599, having reviewed the relevant authorities, Mann J
described the approach thus:

"18. What those citations show is that it is necessary to bear in mind
E  two concepts.  First of all, there is the actual transaction or act in respect
of which disclosure is made.  In order to identify the transaction, one has
to look first at what it is in essence that the waiving party is seeking to
disclose.  It may be apparent from that alone that what is to be disclosed is
obviously a single and complete 'transaction'—for example, the advice
given by a lawyer on a given occasion . . . [One] is in my view entitled to
look to see the purpose for which the material is disclosed, or the point in
F  the action to which it is said to go . . . Mr Croxford [counsel for the
claimant, which sought to rely on LAP] submitted that the purpose of the
disclosure played no part in a determination of how far the waiver went.
I do not agree with that; in some cases it may provide a realistic,
objectively determinable definition of the 'transaction' in question.  Once
the transaction has been identified, then those cases show that the whole
G  of the material relevant to that transaction must be disclosed.  In my view
it is not open to a waiving party to say that the transaction is simply what
that party has chosen to disclose (again contrary to the substance of a
submission made by Mr Croxford).  The court will determine objectively
what the real transaction is so that the scope of the waiver can be
determined.  If only part of the material involved in that transaction has
been disclosed then further disclosure will be ordered and it can no longer
H  be resisted on the basis of privilege.

"19. Once the transaction has been identified and proper disclosure
made of that, then the additional principles of fairness may come into
play if it is apparent from the disclosure that has been made that it is in
fact part of some bigger picture (not necessarily part of some bigger

© 2020 The Incorporated Council of Law Reporting for England and Wales

**308**

'transaction') and fairness, and the need not to mislead, requires further disclosure.  The application of this principle will be very fact sensitive, and will therefore vary very much from case to case . . ."

The purpose of the voluntary disclosure, which has prompted the contention that privilege in other material has been collaterally waived, is therefore an important consideration in the assessment of what constitutes the relevant "transaction" (see also *Dore v Leicestershire County Council* [2010] EWHC 34 (Ch) at [18]–[19] also per Mann J).

115    In this case, the 24 January 2018 e-mail was voluntarily disclosed by the CAA as an attachment to Mr Moriarty's statement served in support of its defence to the claim (see paras 19 above).  Mr Moriarty explained (at para 27 of his statement) that the purpose of that disclosure was to show that the language used by Mr Haines in his e-mail of 18 January 2018 was "not reflective of any part of the approach taken by the CAA".  Mr Moriarty said that: "This can be seen from an e-mail sent to Mr Haines by one of my colleagues, Mr Buffey [attached as an exhibit], . . . and from the content of the material that we published."

116    Morris J accepted that that was the purpose of disclosure (February 2019 judgment at para 21).  However, he concluded that the relevant "transaction" extended to all e-mails and internal discussions in the period between the 16 January 2018 letter and the publication of the Daily Mail article on 6/7 February 2018, ie all of the documents of which disclosure was sought under categories (e) and (f).

117    Mr Béar submits that the judge was entitled to draw that conclusion.  He referred to the relevant authorities, and the correct principles (as briefly described above); and he was entitled to make (as he did), (i) the factual finding that the approach of the CAA to Jet2 at the time was "a single process of internal discussion, which does not have discrete parts", and (ii) the assessment that fairness required the disclosure of the whole chain of correspondence, without which disclosure of the 24 January 2018 e-mail alone would be misleading.  Mr Béar referred us to the unreported judgment of this court in *Tanap Investments (UK) Ltd v Tozer* [1991] EGCS 108, in which judgment was given on 11 October 1991, which (rightly) emphasised that this court will only interfere with an exercise of discretion by the court below where the judge misapplied the principles or was plainly wrong.

118    Mr Grodzinski submitted that the judge erred in law in proceeding on the basis that the relevant "transaction" extended to everything that was relevant to the response to the 24 January 2018 e-mail (notably the drafts of the 1 February 2018 letter), including all drafts and all e-mail discussions of the drafts.  Having regard to the purpose of the voluntary disclosure (which did not involve disclosing any legal advice, or anything to do with the request or provision of legal advice), the relevant transaction should have been limited to the 24 January 2018 e-mail itself; nor did fairness require any wider disclosure.

119    On this issue, I prefer the submissions of Mr Grodzinski.  In my view, the purpose and nature of the voluntary disclosure are crucial; and, in this case, I consider Morris J unfortunately failed properly to take these matters into account.  As the judge accepted, the disclosure was not in respect of any legal advice; and so it could not be said that there was any risk

© 2020 The Incorporated Council of Law Reporting for England and Wales

of the e-mail presenting a partial or selective disclosure of legal advice and thus there was no risk of unfairness that might have been caused by such partial disclosure.  The purpose of the e-mail was modest: it was intended to show that (in Mr Moriarty's words) the language used by Mr Haines in his e-mail of 18 January 2018 was "not reflective of any part of the approach taken by the CAA"; or, perhaps more accurately, that not all of the executives at CAA shared the approach suggested by Mr Haines' earlier e-mail.  It cannot be right that such a modest voluntary disclosure could result in the collateral waiver (and thus the forced disclosure by the CAA) in respect of all the internal communications relating to the drafting of the 1 February 2018 letter, including those that expressly reveal legal advice from the CAA's lawyers; nor is that what the law (or fairness) requires.

120  In my view, the relevant transaction so far as the voluntary disclosure is concerned is restricted to the 24 January 2018 e-mail itself.  Fairness does not require more.

121  For those reasons, had I concluded that the relevant documents were privileged, I would have held that that privilege was not waived in respect of any of them by the voluntary disclosure of the 24 January 2018 e-mail.

*Conclusion*

122  For those reasons, I find none of the determinative grounds made good; and, subject to my Lords Patten and Peter Jackson LJJ, I would dismiss the appeal.

**PETER JACKSON LJ**
123  I agree.

**PATTEN LJ**
124  I also agree.

*Appeal dismissed.*

SCOTT MCGLINCHEY, Barrister

© 2020 The Incorporated Council of Law Reporting for England and Wales

310

185

[2013] 2 AC                R (Prudential plc) v Special Comr of Income Tax (SC(E))

A
Supreme Court

**Regina (Prudential plc and another) *v* Special Commissioner of Income Tax and another (Institute of Chartered Accountants in England and Wales and others intervening)**

B
[2013] UKSC 1

2012  Nov 5, 6, 7;                    Lord Neuberger of Abbotsbury PSC, Lord Hope of
2013  Jan 23                          Craighead DPSC, Lord Walker of Gestingthorpe,
                                      Lord Mance, Lord Clarke of Stone-cum-Ebony,
                                      Lord Sumption, Lord Reed JJSC

C
*Practice — Discovery — Legal professional privilege — Accountants advising taxpayer company on tax law — Inspector of taxes serving notices requiring disclosure of communications passing between taxpayer and accountants — Whether advice given by accountants on tax law protected by legal advice privilege — Whether material sought privileged — Taxes Management Act 1970 (c 9), s 20(1)(3) (as substituted by Finance Act 1976 (c 40), s 57(1), Sch 6 and amended by Finance Act 1989 (c 26), s 142)*

D
The second claimant company obtained advice from a firm of accountants on the tax law aspects of a proposed transaction. An inspector of taxes, with the consent of a special commissioner, served notices on the company under section 20(1) of the Taxes Management Act 1970[1], and on its parent company, the first claimant, under section 20(3), requiring them to deliver to the inspector documents containing information relevant to the company's tax liability. The material sought included communications passing between the company and the accountants during the giving of the advice. In judicial review proceedings the claimants challenged the issue of the notices on the ground, inter alia, that the material sought was covered by legal advice privilege. The judge dismissed the claim on the basis that legal advice privilege applied only to advice given by a member of the legal profession. The Court of Appeal dismissed the claimants' appeal.

E
On the claimants' appeal—

*Held*, dismissing the appeal (Lord Clarke of Stone-cum-Ebony and Lord Sumption JJSC dissenting) that, at common law, legal advice privilege was universally understood as applying only to communications between a client and its lawyers, acting in their professional capacity, in connection with the provision of legal advice; that, so understood, the ambit of the privilege was clear, consistent and certain and was accepted and allowed for by the rules and practice of the courts and in legislation; that it would therefore be an extension beyond the long-established, and current, limits of the privilege if it were to apply to legal advice given by professional persons other than lawyers; that, since there was no evidence establishing a pressing need for such an extension, the consequences of which were difficult to assess but it would be likely to lead to lack of clarity and uncertainty, and since the question whether the privilege should be extended raised issues of policy which should be left to Parliament, and since Parliament had enacted legislation which had extended the privilege but not in respect of tax advice given by accountants, on the basis that it was otherwise limited to members of the legal profession, it would be inappropriate for the court to extend the law as the claimants sought; and that, accordingly, legal advice privilege would not be extended to communications in connection with advice given by professional persons other than lawyers, even where that advice was legal advice which the professional person was

F

G

H

[1] Taxes Management Act 1970, s 20(1)(3), as substituted and amended: see post, para 3.

© 2013 The Incorporated Council of Law Reporting for England and Wales

186
R (Prudential plc) v Special Comr of Income Tax (SC(E))                 [2013] 2 AC

qualified to give (post, paras 19, 29, 37, 51–55, 61–62, 66, 67–69, 76, 77, 80–81, 82, 89–92, 93, 100–101).    A

    *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, HL(E) considered.

    *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, HL(E) distinguished.

    Decision of the Court of Appeal [2010] EWCA Civ 1094; [2011] QB 669; [2011] 2 WLR 50; [2011] 1 All ER 316 affirmed.    B

The following cases are referred to in the judgments:

*AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878; [1983] 3 WLR 17; [1983] 1 All ER 705; [1982] ECR 1575, ECJ
*Attorney General v Mulholland; Attorney General v Foster* [1963] 2 QB 477; [1963] 2 WLR 658; [1963] 1 All ER 767, CA
*Bath (Lady) (Executors of) v Johnston* 12 November 1811, FC    C
*Berd v Lovelace* (1577) Cary 62
*Calley v Richards* (1854) 19 Beav 401
*Campbell v United Kingdom* (1992) 15 EHRR 137
*Crompton (Alfred) Amusement Machines Ltd v Customs and Excise Comrs (No 2)* [1972] 2 QB 102; [1972] 2 WLR 835; [1972] 2 All ER 353, CA; [1974] AC 405; [1973] 3 WLR 268; [1973] 2 All ER 1169, HL(E)
*D v National Society for the Prevention of Cruelty to Children* [1978] AC 171; [1977] 2 WLR 201; [1977] 1 All ER 589, HL(E)    D
*Daniels Corpn International Pty Ltd v Australian Competition and Consumer Commission* [2002] HCA 49; 213 CLR 543
*Dennis v Codrington* (1580) Cary 100
*Dormeuil Trade Mark* [1983] RPC 131
*Dorset Yacht Co Ltd v Home Office* [1970] AC 1004; [1970] 2 WLR 1140; [1970] 2 All ER 294, HL(E)    E
*Duncan, decd, In re* [1968] P 306; [1968] 2 WLR 1479; [1968] 2 All ER 395
*Esso Australia Resources Ltd v Federal Comr of Taxation* [1999] HCA 67; 201 CLR 49
*Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529; [1981] 2 All ER 485, CA
*Greenough v Gaskell* (1833) 1 My & K 98
*Johnson v Unisys Ltd* [2001] UKHL 13; [2003] 1 AC 518; [2001] 2 WLR 1076; [2001] ICR 480; [2001] 2 All ER 801, HL(E)    F
*Kingston's (Duchess of) Case* (1776) 20 State Tr 355; 1 Leach 146
*Lawrence v Campbell* (1859) 4 Drew 485
*Leslie v Grant* (1760) 5 Brown's Supp 874
*M'Cowan v Wright* (1852) 15 D 229
*Macfarlan v Rolt* (1872) LR 14 Eq 580
*M'Leod v M'Leod* (1744) 38 Mor 16754
*Marcic v Thames Water Utilities Ltd* [2003] UKHL 66; [2004] 2 AC 42; [2003] 3 WLR 1603; [2004] 1 All ER 135, HL(E)    G
*Minter v Priest* [1930] AC 558, HL(E)
*Moseley v Victoria Rubber Co* (1886) 3 RPC 351
*Narden Services Ltd v Inverness Retail and Business Park Ltd* [2008] CSIH 14; 2008 SC 335, Ct of Sess
*New Victoria Hospital v Ryan* [1993] ICR 201, EAT
*Northesk (Earl of) v Cheyn* (1680) 1 Mor 353    H
*Parry-Jones v Law Society* [1969] 1 Ch 1; [1968] 2 WLR 397; [1968] 1 All ER 177, CA
*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995] 4 All ER 526, HL(E)
*R v McClure* 2001 SCC 14; [2001] 1 SCR 445

© 2013 The Incorporated Council of Law Reporting for England and Wales

187
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))

A  *R v Secretary of State for the Home Department, Ex p Simms* [2000] 2 AC 115;
      [1999] 3 WLR 328; [1999] 3 All ER 400, HL(E)
   *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21;
      [2003] 1 AC 563; [2002] 2 WLR 1299; [2002] 3 All ER 1, HL(E)
   *Slade v Tucker* (1880) 14 Ch D 824
   *Swidler & Berlin v United States* (1998) 524 US 399
   *Three Rivers District Council v Governor and Company of the Bank of England
B     (No 6)* [2004] UKHL 48; [2005] 1 AC 610; [2004] 3 WLR 1274; [2005] 4 All ER
      948, HL(E)
   *Upjohn Co v United States* (1981) 449 US 383
   *Van der Mussele v Belgium* (1983) 6 EHRR 163
   *Ventouris v Mountain* [1991] 1 WLR 607; [1991] 3 All ER 472, CA
   *Wamphray (Creditors of) v Lady Wamphray* (1675) 1 Mor 347
   *West Midland Baptist (Trust) Association (Inc) v Birmingham Corpn* [1970] AC 874;
C     [1969] 3 WLR 389; [1969] 3 All ER 172, HL(E)
   *Wheeler v Le Marchant* (1881) 17 Ch D 675, CA
   *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159, CA
   *Wilson v Rastall* (1792) 4 Durn & E 753
   *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70; [1992]
      3 WLR 366; [1992] 3 All ER 737, HL(E)
   *Wright v Arthur* (1831) 10 S 139, Ct of Sess

D
   The following additional cases were cited in argument:

   *Agassi v Robinson (No 2)* [2005] EWCA Civ 1507; [2006] 1 WLR 2126; [2006] 1 All
      ER 900, CA
   *Akzo Nobel Chemicals Ltd (supported by Council of the Bars and Law Societies of
      the European Union, interveners) v Commission of the European Communities*
      (Case C-550/07P) [2011] 2 AC 338; [2011] 3 WLR 755; [2011] Bus LR 1458;
E     [2011] All ER (EC) 1107, ECJ
   *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, Jessel MR and CA
   *Apple Computer Australia Pty Ltd v Wily* [2002] NSWSC 855
   *B v Auckland District Law Society* [2003] UKPC 38; [2003] 2 AC 736; [2003]
      3 WLR 859; [2004] 4 All ER 269, PC
   *Baker v Campbell* (1983) 153 CLR 52
   *Balabel v Air India* [1988] Ch 317; [1988] 2 WLR 1036; [1988] 2 All ER 246, CA
F  *Barclays Mercantile Business Finance Ltd v Mawson* [2004] UKHL 51; [2005] 1 AC
      684; [2004] 3 WLR 1383; [2005] 1 All ER 97, HL(E)
   *Belfast City Council v Miss Behavin' Ltd* [2007] UKHL 19; [2007] 1 WLR 1420;
      [2007] 3 All ER 1007, HL(NI)
   *Bolkiah (Prince Jefri) v KPMG* [1999] 2 AC 222; [1999] 2 WLR 215; [1999] 1 All ER
      517, HL(E)
   *Bolton v Law Society* [1994] 1 WLR 512; [1994] 2 All ER 486, CA
G  *Broome v Cassell & Co Ltd* [1972] AC 1027; [1972] 2 WLR 645; [1972] 1 All ER
      801, HL(E)
   *C (A Minor) v Director of Public Prosecutions* [1996] AC 1; [1995] 2 WLR 383;
      [1995] 2 All ER 43, HL(E)
   *Carr v Swart; Lawcover Pty Ltd v Swart* [2007] NSWCA 337
   *Chantrey Martin v Martin* [1953] 2 QB 286; [1953] 3 WLR 459; [1953] 2 All ER
      691, CA
H  *Coleman v Attridge Law* (Case C-303/06) [2008] ICR 1128; [2008] All ER (EC)
      1105, ECJ
   *Comr of Inland Revenue v West-Walker* [1954] NZLR 191
   *Couch v United States* (1973) 409 US 322
   *Countryside Ltd Partnership v Comr of Internal Revenue* (2009) 132 TC 347, United
      States Tax Ct

© 2013 The Incorporated Council of Law Reporting for England and Wales

188
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC

*Dadourian Group International Inc v Simms* [2008] EWHC 1784 (Ch)                    A

*Descôteaux v Mierzwinski* [1982] 1 SCR 860

*Donoghue v Stevenson* [1932] AC 562, HL(Sc)

*Falsone v United States* (1953) 205 F 2d 734

*Foxley v United Kingdom* (2000) 31 EHRR 637

*General Mediterranean Holdings SA v Patel* [2000] 1 WLR 272; [1999] 3 All ER 673

*Glengallan Investments Pty Ltd v Arthur Andersen* [2001] QCA 115; [2002] 1 Qd R
    233                                                                              B

*Grant v Downs* (1976) 135 CLR 674

*Halis v Turkey* (Application No 30007/96) (unreported) given 23 May 2002, ECtHR

*Hall (Arthur JS) & Co v Simons* [2002] 1 AC 615; [2000] 3 WLR 543; [2000] 3 All
    ER 673, HL(E)

*Herrington v British Railways Board* [1972] AC 877; [1972] 2 WLR 537; [1972]
    1 All ER 749, HL(E)

*Hill v William Hill (Park Lane) Ltd* [1949] AC 530; [1949] 2 All ER 452, HL(E)     C

*Jankauskas v Lithuania* (Application No 59304/00) (unreported) given 24 February
    2005, ECtHR

*Jones v Great Central Railway Co* [1910] AC 4, HL(E)

*Jones v Kaney* [2011] UKSC 13; [2011] 2 AC 398; [2011] 2 WLR 823; [2011] 2 All
    ER 671, SC(E)

*Jones v United Kingdom* (Application No 42639/04) (unreported) given
    13 September 2005, ECtHR                                                         D

*Kjeldsen, Busk Madsen and Pedersen v Denmark* (1976) 1 EHRR 711

*L (A Minor) (Police Investigation: Privilege), In re* [1997] AC 16; [1996] 2 WLR 395;
    [1996] 2 All ER 78, HL(E)

*Launchbury v Morgans* [1973] AC 127; [1972] 2 WLR 1217; [1972] 2 All ER 605,
    HL(E)

*Leary v Federal Comr of Taxation* (1980) 32 ALR 221

*McE v Prison Service of Northern Ireland (Northern Ireland Human Rights
    Commission intervening)* [2009] UKHL 15; [2009] AC 908; [2009] 2 WLR 782;     E
    [2009] 4 All ER 335, HL(NI)

*McGuinness v Attorney General of Victoria* (1940) 63 CLR 73

*McKerr, In re* [2004] UKHL 12; [2004] 1 WLR 807; [2004] 2 All ER 409, HL(NI)

*Manser v Dix* (1855) 1 K & J 451

*Medcalf v Mardell* [2002] UKHL 27; [2003] 1 AC 120; [2002] 3 WLR 172; [2002]
    3 All ER 721, HL(E)

*Monro v Revenue and Customs Comrs* [2008] EWCA Civ 306; [2009] Ch 69; [2008]    F
    3 WLR 734, CA

*Myers v Director of Public Prosecutions* [1965] AC 1001; [1964] 3 WLR 145; [1964]
    2 All ER 881, HL(E)

*Paragon Finance plc (formerly National Home Loans Corpn plc) v Freshfields* [1999]
    1 WLR 1183, CA

*Petrov v Bulgaria* (Application No 15197/02) (unreported) given 22 May 2008,
    ECtHR                                                                           G

*Pinner v Everett* [1969] 1 WLR 1266; [1969] 3 All ER 257, HL(E)

*President of India v La Pintada Cia Navigacion SA* [1985] AC 104; [1984] 3 WLR
    10; [1984] 2 All ER 773, HL(E)

*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583

*Prudential plc v Revenue and Customs Comrs* [2009] EWCA Civ 622; [2009] STC
    2459, CA

*R v Allen* [2001] UKHL 45; [2002] 1 AC 509; [2001] 3 WLR 843; [2001] 4 All ER    H
    768, HL(E)

*R v Central Criminal Court, Ex p Francis & Francis* [1989] AC 346; [1988] 3 WLR
    989; [1988] 3 All ER 775, HL(E)

*R v Chief Constable of the Royal Ulster Constabulary, Ex p Begley* [1997] 1 WLR
    1475; [1997] 4 All ER 833, HL(NI)

© 2013 The Incorporated Council of Law Reporting for England and Wales

314

189

[2013] 2 AC          R (Prudential plc) v Special Comr of Income Tax (SC(E))

A    *R v Clegg* [1995] 1 AC 482; [1995] 2 WLR 80; [1995] 1 All ER 334, HL(NI)
     *R v Inland Revenue Comrs, Ex p Banque Internationale à Luxembourg SA* [2000]
          STC 708
     *R v Inland Revenue Comrs, Ex p TC Coombs & Co* [1991] 2 AC 283; [1991] 2 WLR
          682; [1991] 3 All ER 623, HL(E)
     *R v Manchester Crown Court, Ex p Rogers* [1999] 1 WLR 832; [1999] 4 All ER 35,
          DC
B    *R v National Post* 2010 SCC 16; [2010] 1 SCR 477
     *R v Secord* [1992] 3 NZLR 570
     *R v Uljee* [1982] 1 NZLR 561
     *Rv Umoh* (1986) 84 Cr App R 138, CA
     *R (Carson) v Secretary of State for Work and Pensions* [2005] UKHL 37; [2006] 1 AC
          173; [2005] 2 WLR 1369; [2005] 4 All ER 545, HL(E)
     *R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2010]
C         UKSC 54; [2011] 2 AC 15; [2011] 2 WLR 1; [2011] PTSR 185; [2011] 1 All ER
          729, SC(E)
     *R (Daly) v Secretary of State for the Home Department* [2001] UKHL 26; [2001]
          2 AC 532; [2001] 2 WLR 1622; [2001] 3 All ER 433, HL(E)
     *R (Nicklinson) v Ministry of Defence* [2012] EWHC 2381 (Admin); 127 BMLR 197,
          DC
     *Ramsay (WT) Ltd v Inland Revenue Comrs* [1982] AC 300; [1981] 2 WLR 449;
D         [1981] 1 All ER 865, HL(E)
     *Rio Tinto Ltd v Comr of Taxation* [2006] FCA 1200; 235 ALR 127
     *Rondel v Worsley* [1969] 1 AC 1; [1967] 3 WLR 1666; [1967] 3 All ER 993, HL(E)
     *S (Minors) (Care Order: Implementation of Care Plan), In re* [2002] UKHL 10;
          [2002] 2 AC 291; [2002] 2 WLR 720; [2002] 2 All ER 192, HL(E)
     *S County Council v B* [2000] Fam 76; [2000] 3 WLR 53
     *Scandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific
          Breweries (Singapore) Pte Ltd* [2007] SGCA 9; [2007] 2 SLR (R) 367
E    *Shaw v Director of Public Prosecutions* [1962] AC 220; [1961] 2 WLR 897; [1961]
          2 All ER 446, HL(E)
     *Sheldrake v Director of Public Prosecutions* [2004] UKHL 43; [2005] 1 AC 264;
          [2004] 3 WLR 976; [2005] 1 All ER 237, HL(E)
     *Showboat Entertainment Centre Ltd v Owens* [1984] 1 WLR 384; [1984] ICR 65;
          [1984] 1 All ER 836, EAT
     *Slavutych v Baker* [1976] 1 SCR 254
F    *Smith v Daniell* (1874) LR 18 Eq 649
     *Smith v Jones* [1999] 1 SCR 455
     *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, CA
     *Spectrum Plus Ltd, In re* [2005] UKHL 41; [2005] 2 AC 680; [2005] 3 WLR 58;
          [2005] 4 All ER 209, HL(E)
     *Three Rivers District Council v Governor and Company of the Bank of England
          (No 5)* [2003] EWCA Civ 474; [2003] QB 1556; [2003] 3 WLR 667, CA
G    *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, CA
     *Tower v Minister of National Revenue* 2003 FCA 307; [2004] 1 FCR 183
     *Tower MCashback LLP 1 v Revenue and Customs Comrs* [2011] UKSC 19; [2011]
          2 AC 457; [2011] 2 WLR 1131; [2011] 3 All ER 71, SC(E)
     *United Mining and Finance Corpn Ltd v Becher* [1910] 2 KB 296
     *United States v Arthur Young & Co* (1984) 465 US 805
     *United States v Kovel* (1961) 296 F 2d 918
H    *Valero Energy Corpn v United States* (2009) 569 F 3d 626
     *Wallersteiner v Moir (No 2)* [1975] QB 373; [1975] 2 WLR 389; [1975] 1 All ER
          849, CA
     *Waterford v Commonwealth of Australia* (1987) 163 CLR 54
     *Waugh v British Railways Board* [1980] AC 521; [1979] 3 WLR 150; [1979] 2 All ER
          1169, HL(E)

© 2013 The Incorporated Council of Law Reporting for England and Wales

190
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Argument

*Wentworth v Lloyd* (1864) 10 HL Cas 589, HL(E)
*Zuma v National Director of Public Prosecutions* [2008] ZACC 13; 2009 (1) SA 1

**APPEAL** from the Court of Appeal

By his judgment dated 14 October 2009 Charles J [2011] QB 669 dismissed claims for judicial review made by the claimants, Prudential plc and Prudential (Gibraltar) Ltd, in respect of the issue of two written notices dated 16 November 2007 served on them by the second defendant inspector of taxes, Philip Pandolfo, with the consent of the first defendant, the Special Commissioner of Income Tax, under section 20 of the Taxes Management Act 1970, requiring them to deliver to the inspector documents in their possession or power which might contain information relevant to the tax liability of the second claimant but which, they claimed, was protected from disclosure by legal professional privilege, being material relating to the tax advice given to the second defendant by its accountants, PricewaterhouseCoopers LLP.

By an appellant's notice filed on 24 November 2009 and pursuant to permission granted by the Court of Appeal (Elias LJ) on 31 December 2009 the claimants appealed on the ground that the judge had erred in law in failing to recognise that the principles on which legal professional privilege was based necessarily applied to legal advice on tax law from an accountant and that he had been wrong to suggest that the privilege should not be extended to other communications because of the competing public interest in favour of disclosure.  On 13 October 2010, the Court of Appeal (Mummery, Lloyd and Stanley Burnton LJJ) [2011] QB 669 dismissed the appeal and refused their application for permission to appeal.

Pursuant to permission granted on 13 April 2011 by the Supreme Court (Lord Walker of Gestingthorpe, Lord Mance and Lord Dyson JJSC), the claimants appealed.  The issue for the Supreme Court, as set out in the statement of facts and issues agreed by the parties, was whether legal advice privilege applied to communications between a client and an accountant seeking and giving legal advice on tax law.

The Institute of Chartered Accountants, the Law Society, the General Council of the Bar of England and Wales and AIPPI UK intervened in the appeal.  The Legal Services Board intervened by way of written submissions only.

The facts are stated in the judgment of Lord Neuberger of Abbotsbury PSC.

*Lord Pannick QC* and *Conrad McDonnell* (instructed by *PricewaterhouseCoopers Legal LLP*) for the claimants.

Clients seek and obtain legal advice on tax law from accountants as much as, if not more than, from lawyers; and accountants are widely, and correctly, regarded as having professional expertise in relation to tax law: see the judgment of Charles J [2011] QB 669, 691, paras 64–65, and of the Court of Appeal, [2011] QB 669, 701, para 2; *Agassi v Robinson (No 2)* [2006] 1 WLR 2126, para 80 and *The Law of Privilege*, 2nd ed (2011), ed Bankim Thanki QC, para 1.53.

Legal advice privilege ("LAP") is a fundamental principle of the common law, enabling people effectively to seek and obtain legal advice on their rights and duties while guaranteeing that candid discussions will be protected from disclosure, irrespective of whether they are involved in either

© 2013 The Incorporated Council of Law Reporting for England and Wales

**316**

191

[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
                                                                          Argument

A  current or contemplated legal proceedings; and the privilege belongs to the client, not to the adviser: see *Greenough v Gaskell* (1833) 1 My & K 98, 103 and *Ventouris v Mountain* [1991] 1 WLR 607, 611. The principle is based on three policy judgments made by the courts: (1) clients must be able to seek and receive legal advice if the proper administration of justice is to be maintained; (2) sound legal advice can only be given if the client is candid with the legal adviser; and (3) to ensure candour, the law must guarantee

B  that the communications between client and legal adviser remain confidential unless the client consents to disclosure: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 507–509; *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, 646, 650–651, 659; *B v Auckland District Law Society* [2003] 2 AC 736, 756–759; *R (Morgan Grenfell & Co Ltd) v Special Comr of*

C  *Income Tax* [2003] 1 AC 563, 606–607, 612 and *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913 (Advocate General Slynn).

   Those policy reasons for adopting and maintaining LAP apply where legal advice on tax law is given by accountants since they are the professionals with expertise in that field of law. If their advice is to be sought and obtained on an effective basis, clients and advisers need to know that their

D  communications are protected from disclosure, just as communications between clients and lawyers are protected. The principles of LAP are concerned with the function that is being performed, not with the status of the adviser who provides the advice. The existence of LAP does not therefore depend on whether the adviser is a lawyer or an accountant: see the *Morgan Grenfell* case, at pp 613–614. [Reference was made to *S County*

E  *Council v B* [2000] Fam 76.]

   There is no reason why the relationship of lawyer and client should receive special protection under the common law, distinguished from the position of accountants when they are advising on tax law. The bases on which the contrary is asserted are flawed. In particular, while access to justice is a vital component of a civilised society and essential to the rule of law, which may explain why the relationship between an individual and a

F  doctor or a priest is not privileged, it is not a valid answer in respect of accountants who are providing advice on tax law. They, as a profession, are competent and regulated to do so; they make an important contribution to the administration of justice and LAP applies in respect of their advice, or should do so. The basis of the privilege is not that lawyers have a special relationship with the courts. LAP is not confined to advice in the context of

G  court proceedings, and it is not based on the theoretical notion that lawyers are answerable to the court. There is no substantive justification for the difference between lawyers and accountants. It cannot be regarded simply as "anomalous" that the privilege applies to advice from foreign lawyers, who have no relationship with the domestic courts and no regulator in this country, or that it applies even where the client mistakenly believes he is communicating with a lawyer who has, for example, ceased to practise: see

H  *Lawrence v Campbell* (1859) 4 Drew 485; *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529 and *Calley v Richards* (1854) 19 Beav 401.

   The fact that LAP extends beyond the giving of pure legal advice to advice given "in the relevant context" (see the *Three Rivers (No 6)* case [2005] 1 AC

© 2013 The Incorporated Council of Law Reporting for England and Wales

192

R (Prudential plc) v Special Comr of Income Tax (SC(E))          [2013] 2 AC

Argument

610, pp 651, 659) does not undermine its being given by an accountant rather than by a solicitor or barrister, since the advice is, or may be, given as much in a legal context as the giving of the same advice by a lawyer. Similarly the suggestion that the need to keep LAP within strict limits because of its inevitable restriction on the court's ability to discover the truth, does not justify a distinction between legal advice on tax law given by a lawyer and that given by an accountant.

The Human Rights Act 1998, applying the European Convention for the Protection of Human Rights and Fundamental Freedoms, protects LAP and requires any limitation to be justified. LAP, being a fundamental human right, is protected by the right to respect for private life guaranteed by article 8 and is also applicable to fair trial issues arising under article 6: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, 614; *Foxley v United Kingdom* (2000) 31 EHRR 637, paras 43–44, 50 and *Campbell v United Kingdom* (1992) 15 EHRR 137, paras 46–48.

Although article 8 is a qualified right, interference has to be justified: see article 8.2. As a fundamental human right LAP should be defined by the court in such a way as to give full effect to the interests of the clients it is designed to protect. They should be able to seek and obtain confidential legal advice on the law from an appropriate professional adviser in whom they have confidence. There is no justification, consistent with Convention rights, for treating legal advice from accountants, and the recipients of that advice, less favourably than legal advice from lawyers on tax law. The Court of Appeal erred in concluding that article 14 did not apply because the less favourable treatment identified did not arise on the basis of the status of the person (the client) enjoying that right, but on the basis of the status of the person from whom the advice was obtained. As a matter of discrimination law, a person may be the victim of less favourable treatment contrary to article 14, read with a substantive Convention right, because of the characteristics, not of that person himself, but of another person with whom he associates: see *Showboat Entertainment Centre Ltd v Owens* [1984] 1 WLR 384 and *Coleman v Attridge Law* (Case C-303/06) [2008] ICR 1128. In the present context the claimants will be victims of a breach of article 8 read with article 14 if they are less favourably treated by reason of the status of their adviser.

European law, as implemented by Parliament, recognises that article 8 creates at least a prima facie right to maintain confidentiality in relation to the giving of legal advice by accountants on tax law: see Second Money Laundering Directive (2001/97/EC)); Proceeds of Crime Act 2002, section 330(6)(10)(14), as amended by the Proceeds of Crime Act 2002 and Money Laundering Regulations 2003 (Amendment) Order 2006 (SI 2006/308) made under section 2(2) of the European Communities Act 1972.

There is no statutory provision which excludes the application, or extension, at common law of LAP to legal advice from accountants on tax law: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563. The Taxes Management Act 1970, as amended by Schedule 36 to the Finance Act 2008, does not do so: it does not satisfy the test that any restriction must be expressly stated in or arise by necessary implication from the relevant legislation or that clear legislative words are required to remove a fundamental right: see the *Morgan Grenfell* case [2003] 1 AC 563 and *R v Secretary of State for the Home Department,*

© 2013 The Incorporated Council of Law Reporting for England and Wales

193
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
                                                                            Argument

*Ex p Simms* [2000] 2 AC 115. [Reference was made to sections 20, 20A, 20B(2)(3)(8)(9) and 20BA read with paragraph 5 of Schedule 1AA to the 1970 Act (inserted by section 149(2) of and Schedule 39 to the Finance Act 2000), and paragraph 23 of Schedule 36 to the Finance Act 2008.]

The Court of Appeal was wrong to suggest that the scope of LAP at common law could be identified from the fact that Parliament had made provision for the treatment of documents in the hands of lawyers and others, including accountants, in the context of tax liabilities, but had chosen to legislate to apply LAP to non-lawyers only in specific and limited circumstances: see the Administration of Justice Act 1985, section 33 (licensed conveyancers); the Copyright, Designs and Patents Act, section 280 (patent attorneys) and the Trade Marks Act 1994, section 87 (trade mark attorneys). Those statutory provisions at most suggest either that Parliament thought LAP at common law did not to apply to communications between a client and an accountant on tax law, or that the matter was in doubt. But, if Parliament so believed, it was mistaken, and its mistake cannot alter the proper scope of LAP, as defined at common law. A ruling by the court that LAP extends to legal advice given on tax law by accountants does not make any statutory provision unworkable: see *West Midland Baptist (Trust) Association (Inc) v Birmingham Corpn* [1970] AC 874, 898. It is also relevant that the provision of legal services is no longer exclusively the preserve of professional lawyers and that the giving of tax advice is not a reserved legal activity within the meaning of the Legal Services Act 2007. The submissions made on behalf of the Institute of Chartered Accountants in respect of that Act are adopted.

The practical difficulty of identifying the scope of LAP, if applied to accountants, cannot justify the court ruling against the claimants. LAP will apply where the person from whom the legal advice is sought and obtained is a member of a profession which (1) has as one of its functions, the provision of confidential legal advice to clients, (2) is recognised by the court as having such expertise and (3) is a professional body which makes provision for ensuring the maintenance of proper standards by controlling entry and regulating conduct. Chartered accountants and members of the Chartered Institute of Taxation satisfy that test and other accountants may do so: see the practical test set by Parliament for "a relevant . . . adviser" in section 330(14) of the Proceeds of Crime Act 2002.

In relation to legal advice from accountants, LAP only applies to communications which seek and provide legal advice in contexts where the profession of accountancy is recognised by the court and the profession as claiming and enjoying expertise professionally so to advise. But since LAP is not confined to strictly legal advice (see the *Three Rivers (No 6)* case) communications between client and accountant on tax law would be subject to the same principle. The applicability of LAP cannot depend on the individual competence of the particular accountant to give legal advice any more than LAP depends on the individual competence of the relevant lawyer. The principles relate to the recognised competence of the profession as a whole.

It must follow that LAP applies if members of professions other than accountancy are recognised by the court as having legal expertise in the giving of legal advice to clients in confidence and where they are members of a professional body which recognises that function and makes provision for

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

testing competence as a condition of membership and regulates its members. Where those principles can be satisfied in respect of another profession, LAP should apply in that other context for the same reasons as it applies to legal advice from lawyers and accountants.

B

Although the case law is helpful as identifying the principled basis of LAP, previous decisions rarely addressed the present issue. Many older cases define LAP by reference to legal advice given by lawyers since the issue for the court's determination relates to such advice so given and not given by other professionals: see *Moseley v Victoria Rubber Co* (1886) 3 RPC 351. *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159; *Dormeuil Trade Mark* [1983] RPC 131 and *Tower v Minister of National Revenue* [2004] 1 FCR 183 do not assist; *Chantrey Martin v Martin* [1953] 2 QB 286 is distinguished. The *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967) (Cmnd 3472) does not deal with the issue.

C

There is no good reason for leaving the issue to Parliament. LAP is a legal principle created and developed by the common law as part of the administration of justice; the court should protect the principle and determine how it should develop in the light of modern circumstances: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487; *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563; *Herrington v British Railways Board* [1972] AC 877, 921; *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70, 173–174, 200; *Alfred Crompton Amusement Machines Ltd v Customs and Excise Comrs (No 2)* [1972] 2 QB 102, 129 and *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529, 535–536. It would always be open to Parliament to restrict the scope of LAP if it disapproved of the court's decision, subject to the impact on human rights and the clarity of the legislation: see the *Morgan Grenfell* case.

D

E

*Patricia Robertson QC* (instructed by *Simmons & Simmons LLP*) for the first intervener, the Institute of Chartered Accountants.

The submissions of the claimant are supported. LAP serves an important public interest in the confidential provision of legal advice to clients: see *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, 646, 650–651, 659 and *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913 (Advocate General Slynn). The primacy given by the courts below to the test of status rather than that of function is misplaced. The test of status is not a principled or logical place to draw the line and the arbitrary nature of such a distinction is underlined by the fact that it does not confer common law privilege on all lawyers, but only on three specific types: solicitors, barristers and, by extension, foreign lawyers.

F

G

That limitation, which is, in any event, bedevilled with anomaly, cannot stand in the modern age. A patent agent was not a variety of lawyer and so a client did not have common law privilege: see *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159. But, given their intervening development and contemporary role, are not patent and trade mark attorneys "lawyers" now? And could it be said that the common law, but for the intervention of Parliament (see the Legal Services Act 2007), would not recognise LAP for the clients of licensed conveyancers? Will LAP only apply to an individual

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    who holds a valid, current practising certificate?  See, by contrast, *Calley v Richards* (1854) 19 Beav 401.  If the *Calley* case is correct, can the client of a struck off solicitor, who holds himself out as a solicitor, claim LAP in respect of advice he has given?  See *Dadourian Group International Inc v Simms* [2008] EWHC 1784 (Ch).

A number of serious questions therefore arise as to the scope and application of LAP as it applies to lawyers.  Unless a clear, guiding principle
B    is established by way of response, the basis on which a logical, principled distinction can credibly be drawn between lawyers, or some of them, and chartered accountants, or any other regulated profession which may give advice, will remain in doubt.

The answer depends on function, not status.  It should be sufficient that when an accountant, or other professional, is functioning as a specialised
C    legal adviser, and, in so doing, is qualified and regulated in a way which offers comparable protection to the public interest to that which applies to a barrister or solicitor, he is to be treated as performing the function of a lawyer for the purposes of LAP.  The boundary between advice which is not legal in character and specialised legal advice is not inherently more difficult to identify when the advice comes from an accountant than when it comes from a solicitor who is also qualified as an accountant (whose advice will,
D    also, be privileged only if it has a relevant legal context: see *Balabel v Air India* [1988] Ch 317, 330).

The answer does not, therefore, depend on status.  In any event it is illogical to justify a special status for barristers and solicitors by reference to their role in the administration of justice, given the common law extension of LAP to foreign lawyers.  That extension is better understood as an
E    example not of comity but of a functional approach.  Accountants are equally integral to the administration of justice in the context of tax litigation and, having regard to the complex, pluralist mix of overlapping regimes for reserved legal activities under the umbrella of the 2007 Act, regulation for lawyers is no more unified than it is for accountants.

Solicitors and barristers do not stand in an unique position in relation to the administration of justice.  The advice they give clients about their legal
F    rights and obligations, in circumstances where the application of legal expertise to a set of facts is central to the service they provide, is the same as that provided by accountants.  There is no principled answer by reference to the wider public interest or to the perspective of the clients for whose protection the privilege applies, to justify the distinction drawn.

While the public interest requires disclosure of material relevant to
G    litigation before the courts, it also requires a clear and rational basis for situations where LAP justifies withholding relevant material.  There is now a misalignment between the policy basis for LAP, promoting the administration of justice and access to justice, and the scope of the privilege as defined in the current case by the courts below.  The boundaries of the privilege should instead be based on what best serves the policy.

The scope of LAP, as a creature of the common law, is as apt for
H    development by the common law, rather than by Parliament, as it was in cases where the courts were prepared to make bold developments: see, for example, *Donoghue v Stevenson* [1932] AC 562.  There is no suggestion that the regulation of chartered accountants is inadequate to safeguard the administration of justice.  The professional rules applicable to them under

© 2013 The Incorporated Council of Law Reporting for England and Wales

the Institute of Chartered Accountants in England and Wales, and to members of the Chartered Institute of Taxation, offer comparable protection for the public interest. Such rules, enabling clients to access advice on a privileged basis from chartered accountants and chartered tax advisers is likely to further, rather than hinder, the administration of justice and access to justice.

LAP should be held to apply to a chartered accountant or chartered tax adviser when advising a client on tax law, if the privilege would have attached to advice given by a solicitor or barrister. As a general principle LAP should apply when recognition of that privilege would, in the circumstances, promote the administration of justice and would further enable access to justice. Factors which would do so would include (1) the giving of legal advice which was central to the service the client reasonably expected from the type of professional; (2) the legal advice is sought or given from a professional which would be privileged if given by a solicitor or barrister; and (3) regulation of the professional so as to provide safeguards that are no less effective than those applying to a solicitor or barrister in respect of integrity, independence, maintenance of client confidentiality, competence in giving legal advice and compliance with the law. Those who belong to the category of professional accountants are so regulated and are clearly identifiable.

While the current case relates to events which pre-date the coming into force of the Legal Services Act 2007, and does not therefore involve tax advice from an accountant, accountancy firm or a multi-disciplinary partnership, authorised or licensed under that Act, the Supreme Court should be aware of the impact of the Act, in particular, on whether and how common law LAP will apply to the different authorised entities to which the Act applies.

Parliament's policy in passing the 2007 Act was to open up the legal services market to innovation and new entrants; thereby widening access to justice and encouraging competition but ensuring that, in doing so, the public interest and the core professional values which traditionally underpinned the services of solicitors and barristers were not compromised. In particular Parliament has had to address whether and how LAP should apply to individuals and business structures "authorised" for the purposes of the Act, where the advice would not, or might not, be given by solicitors or barristers: see section 190(1)–(7) of the 2007 Act. The interpretation of that section is in a number of respects dependent upon, and so would alter with, the common law analysis. It does not purport to provide an exhaustive code, but rather a partial answer which can only be correctly interpreted and applied once the scope of privilege at common law is determined. Far from expressly excluding common law privilege with the clarity required to meet the *Morgan Grenfell* tests (see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563) section 190(7) expressly preserves any wider privilege which may exist at common law or under any other statutory provisions.

Parliament may have expected the common law to have continued to adapt, more flexibly than legislation, to change the ways in which legal services are delivered and to accept that LAP applies to accountants as to solicitors and barristers. Or, even if the Supreme Court rejects that extension, Parliament might expect that the common law would attach

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  "solicitor-like" privilege to the status of an authorised person. Alternatively Parliament may expect the common law to distinguish between authorised persons of a certain kind, such as solicitors, barristers and foreign lawyers, and other authorised persons, such as an accountant authorised for a reserved legal activity, and to accord LAP to the former group only. But whatever Parliament has achieved by the drafting of section 190 will depend on the common law "overlay" which will inform the interpretation of that

B  section.

*James Eadie QC* and *Patrick Goodall* (instructed by *Solicitor, Revenue and Customs*) for the revenue.

The revenue has the function and statutory duty to administer the United Kingdom's complex tax system. It is at a disadvantage to the taxpayer in

C  circumstances where he and his advisers know the details of his affairs but the revenue does not and is dependent on frank disclosure by the taxpayer of the relevant material which may bear on his liability to tax. The revenue's difficulties can be acute in relation to tax avoidance schemes where the position may be opaque and the true nature of the arrangements must be ascertained: see *WT Ramsay Ltd v Inland Revenue Comrs* [1982] AC 300; *Barclays Mercantile Business Finance Ltd v Mawson* [2005] 1 AC 684 and

D  *Tower MCashback LLP 1 v Revenue and Customs Comrs* [2011] 2 AC 457.

The revenue therefore requires access to relevant information and where the taxpayer does not disclose sufficient material statutory investigative powers are available on notice for delivery and disclosure by the taxpayer and any other person in whose possession or power that material may be: see *R v Allen* [2002] 1 AC 509; *R v Inland Revenue Comrs, Ex p TC Coombs &*

E  *Co* [1991] 2 AC 283 and section 20(1)–(3) of the Taxes Management Act 1970. But notification does not require a person to disclose documents to which LAP, properly so called, applied: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563 and section 20B(8), as inserted by section 57(1) of and Schedule 6 to the Finance Act 1976, as amended by section 126(4) of the Finance Act 1988 and section 144(7) of the Finance Act 1989.

F  Express, but different, provision is however also made in respect of tax advisers and accountants by a carefully delineated equivalent of legal professional privilege which could only be claimed in prescribed circumstances: see section 20B(9)(10) of the 1970 Act. When the legislation was passed, Parliament could not have intended that legal professional privilege would extend to accountants and the statute leaves no room for

G  such an extension. The specific provisions relating to tax advisers and accountants, now re-enacted in Schedule 36 to the Finance Act 2008, provide an enhanced statutory right not otherwise available at common law which was, and is, intended to be exhaustive: see *Monro v Revenue and Customs Comrs* [2009] Ch 69 and *R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2011] 2 AC 15.

Where Parliament has entered the field and mapped out its boundaries,

H  there is no room for the court to fashion, as a matter of common law, a further remedy going beyond and rendering redundant the specific and limited statutory provisions: see *Johnson v Unisys Ltd* [2003] 1 AC 518. In particular, the court is not to be expected to confer a much wider and inconsistent privilege: see *Wilden Pump Engineering Co v Fusfeld* [1985]

© 2013 The Incorporated Council of Law Reporting for England and Wales

198
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Argument

FSR 159, 168. The position is unaffected by the *Morgan Grenfell* case which
is distinguished.

Legal professional privilege is a single integral privilege, whose sub-heads
are LAP and litigation privilege: see *Three Rivers District Council v
Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610,
para 105. LAP, which alone is in play in the current case, covers
communications between lawyer and client, or the agent of either, for the
purpose of seeking or furnishing legal advice whether or not in the context of
litigation; there must be a relevant legal context for the advice to attract the
privilege; the privilege is the right of the client, not the lawyer; and the
privilege is absolute and cannot be overridden by competing public policy
considerations: see *Waugh v British Railways Board* [1980] AC 521; the
*Three Rivers* case, paras 38, 50–51, 59, 62, 65, 111, 114; *Balabel v Air India*
[1988] Ch 317, 330; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487,
504–505, 508–509; the *Morgan Grenfell* case [2003] 1 AC 563, paras 25
and 37 and *B v Auckland District Law Society* [2003] 2 AC 736,
paras 46–54.

The case law has always spoken with one voice. The privilege only
attaches to lawyer-client the communications and never to those involving
other professionals: see *Greenough v Gaskell* (1833) 1 My & K 98; *Wilson v
Rastall* (1792) 4 Durn & E 753; *Anderson v Bank of British Columbia*
(1876) 2 Ch D 644, 650–651, per Jessel MR, and, at p 656, James LJ;
*Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, 321–322;
*Slade v Tucker* (1880) 14 Ch D 824, 827–828; *Wheeler v Le Marchant*
(1881) 17 Ch D 675, 681–682; *D v National Society for the Prevention of
Cruelty to Children* [1978] AC 171, 244; *Attorney General v Mulholland;
Attorney General v Foster* [1963] 2 QB 477, 489; *Minter v Priest* [1930] AC
558, 581; *In re Duncan, decd* [1968] P 306, 311; *Paragon Finance plc
(formerly National Home Loans Corpn plc v Freshfields* [1999] 1 WLR
1183, 1188; *Three Rivers District Council v Governor and Company of the
Bank of England (No 5)* [2003] QB 1556 and *Three Rivers District Council
v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610,
paras 28 and 58.

All attempts to persuade the courts to extend privilege beyond the legal
profession have failed: see *Chantrey Martin v Martin* [1953] 2 QB 286,
293–294; *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159, 167;
*New Victoria Hospital v Ryan* [1993] ICR 201, 203–204 and *Prince Jefri
Bolkiah v KPMG* [1999] 2 AC 222, 234.

It is settled at common law that LAP is linked to the legal profession and
that the privilege is not derived from the purpose and nature of the advice
and assistance. Status is thus central to the test. The function test does not
apply. It is not enough that a person without formal legal professional
qualification is performing the functions of a legal adviser: see *Dadourian
Group International Inc v Simms* [2008] EWHC 1784 (Ch) at [119]–[128];
*R v Umoh* (1986) 84 Cr App R 138; *New Victoria Hospital v Ryan* [1993]
ICR 201; *R v Secord* [1992] 3 NZLR 570; *Moseley v Victoria Rubber Co*
(1886) 3 RPC 351; *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159
and *Dormeuil Trade Mark* [1983] RPC 131.

The courts have long recognised that the object of LAP is the
encouragement of candour between a client and his lawyer in aid of the
administration of justice. It is much more than an ordinary rule of evidence;

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   it is a fundamental condition on which the administration of justice as a whole rests. It is not based on a general maintenance of confidentiality in a person's dealings with a professional, but reflects the fact that it is strongly in the public interest that communications between clients and lawyers should be secure against the possibility of scrutiny from others: see *Three Rivers District Council v Governor and Company of the Bank of England (No 6)*

B   [2005] 1 AC 610, paras 28, 34, 54–55, 61, 86, 106, 120; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 507, 510; the *Morgan Grenfell* case [2003] 1 AC 563, para 31; *Grant v Downs* (1976) 135 CLR 674, 685; *D v National Society for the Prevention of Cruelty to Children* [1978] AC 171, 231–232; *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 32; *Prince Jefri Bolkiah v KPMG* [1999] 2 AC 222, 236; *B v Auckland District Law Society* [2003] 2 AC 736, para 47 and *McE v Prison Service of*

C   *Northern Ireland (Northern Ireland Human Rights Commission intervening)* [2009] AC 908.

Determining the limits of LAP has required the courts to strike a balance between the competing imperatives of (a) minimizing the withholding of relevant information from the trial court and (b) avoiding unfairness by requiring individuals to reveal confidential information between their

D   lawyers. In striking that balance, whilst recognising that LAP prevails, courts have stressed that the privilege should be strictly confined within the narrowest limits consistent with its principles: see *Waugh v British Railways Board* [1980] AC 521 and the *Three Rivers (No 6)* case [2005] 1 AC 610.

Extending the common law as now claimed would run counter to the established position and underlying policy. The link to the legal profession provides a practical, coherent and workable limit to the right to claim the

E   privilege when viewed and balanced against the competing public interest of maximising the relevant probative material before the court: see *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 950; *Akzo Nobel Chemicals Ltd (supported by Council of the Bars and Law Societies of the European Union, interveners) v Commission of the European Communities* (Case C-550/07P) [2011] 2 AC

F   338; *R v McClure* [2001] 1 SCR 445; *Baker v Campbell* (1983) 153 CLR 52 and *Tower v Minister of National Revenue* [2004] 1 FCR 183, paras 43–44.

Making status rather than function the central reference point serves to ensure certainty and consistency of application. There is a clearly defined and easily identifiable qualification for the attachment of privilege. If function rather than status were made the touchstone the result would be

G   uncertainty and lack of clarity and precision. Designing function as the reference point would encourage a dissection of communications and a narrow analysis of individual documents to establish whether privilege would apply and one inevitable by-product would be a significant increase in satellite litigation.

The functions of an accountant also point away from the usual principles of LAP. An accountant's role is more likely to extend to that of the client's

H   "man of business" than could be said of his lawyer; and acting as the promoter of a tax avoidance scheme is in the nature of an entrepreneurial activity: see *Leary v Federal Comr of Taxation* (1980) 32 ALR 221. [Reference was made to *Prudential plc v Revenue and Customs Comrs* [2009] STC 2459.]

© 2013 The Incorporated Council of Law Reporting for England and Wales

200
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Argument

Any change to the common law position is constitutionally a matter for Parliament, not for judicial development: see *Myers v Director of Public Prosecutions* [1965] AC 1001, 1021; *Launchbury v Morgans* [1973] AC 127, 136; *C (A Minor) v Director of Public Prosecutions* [1996] AC 1, 28; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 512; *Johnson v Unisys Ltd* [2003] 1 AC 518, para 37; *Sheldrake v Director of Public Prosecutions* [2005] 1 AC 264; *In re S (Minors) (Care Order: Implementation of Care Plan* [2002] 2 AC 291; *R v Chief Constable of the Royal Ulster Constabulary, Ex p Begley* [1997] 1 WLR 1475; *President of India v La Pintada Cia Navigacion SA* [1985] AC 104; *R v Clegg* [1995] 1 AC 482 and *R (Nicklinson) v Ministry of Defence* (2012) 127 BMLR 197.

All previous extensions to common law legal professional privilege have been effected by Parliament. Such special provision has been made by way of statutory extensions in respect of patent agents and attorneys (see section 280 of the Copyright, Designs and Patents Act 1988), trade mark agents and attorneys (see section 87 of the Trade Marks Act 1994), licensed conveyancers (see section 33 of the Administration of Justice Act 1985, as amended by the Legal Services Act 2007); authorised persons and the relevant lawyer of a licensed body: see section 190 of the Legal Services Act 2007. If the claimants were correct, those provisions would have been superfluous. In the main the extensions relate to the particular subject matter relevant to the profession in question and permit LAP to arise in carefully defined circumstances. In contrast, LAP at common law applies to advice sought or given by members of the legal profession in relation to any area of the law. Section 190 of the 2007 Act is predicated on the basis that LAP does not apply to accountants.

The question whether such an extension should be made has been considered and rejected recently and on a number of occasions in the past: see *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967) (Cmnd 3472); *Report of the Committee on Enforcement Powers of the Revenue Departments* (1983) (Cmnd 8822); Director General of Fair Trading's report on *Competition in professions* (2001) (OFT328), paras 190, 440; Schedule 36 to the Finance Act 2008. Parliament has therefore positively elected to extend LAP by statute to other classes of professionals and, although it has considered the matter, it has decided not to do so in the case of accountants.

Given the limited extension provided by section 20B(9)(10) of the 1970 Act any further modification or extension is a matter for Parliament. Many statutes include provisions as to the scope of privilege in particular circumstances, often framed by reference to communications with "a professional adviser". In so providing Parliament has set acceptable limits consistently with the common law and by reference to status, rather than function: see *R v Central Criminal Court, Ex p Francis & Francis* [1989] AC 346.

Given the breadth of the legislation that might be affected and the wide-ranging and serious implications of a change in the law, as well as the wide policy implications, Parliament is best placed to balance and evaluate the numerous competing interests and considerations in play. Any retrospective change in the law, which would be the ordinary consequence of the declaratory nature of judicial decision-making, could have serious,

© 2013 The Incorporated Council of Law Reporting for England and Wales

**326**

A undesirable and unforeseen ramifications: see *In re Spectrum Plus Ltd* [2005] AC 680.

A projected change to the scope of LAP made at common law to include accountants would, of necessity, confer the same absolute protection as is currently enjoyed by lawyers. But a more nuanced approach would be available to Parliament which could legislate after undertaking such consultation as it thought necessary and weighing up the competing public
B interests. Since any change would have to be clear and certain, both as to nature and content, it would be best achieved through legislation: see *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, para 121 and *Upjohn Co v United States* (1981) 449 US 383, 393.

Any extension of LAP so far made to accountants in other jurisdictions
C has been the result of statutory intervention. [Reference was made to *The Laws of Scotland: Stair Memorial Encyclopaedia*, Evidence (Reissue 2006), paras 205 and 209; *Privilege in Perspective: Client Legal Privilege in Federal Investigations*, 107, Australian Law Reform Committee (2007), ch 6, paras 6.281, 6.283, 6.278; "Privilege in relation to tax advice", Australian Law Reform Commission Report No 26 (Evidence) (2011), ch 38;
D *McGuinness v Attorney General of Victoria* (1940) 63 CLR 73, 103–103; *Baker v Campbell* 153 CLR 52, 128; *Glengallan Investments Pty Ltd v Arthur Andersen* [2001] 1 Qd R 233; *Tower v Minister of National Revenue* [2004] 1 FCR 183, paras 35–38; *R v Uljee* [1982] 1 NZLR 561, 568; "Tax and privilege: a proposed new structure" Government of New Zealand Discussion Document, (2002); Taxation (Base Maintenance and Miscellaneous Provisions) Act 2005, section 122; *Falsone v United States*
E (1953) 205 F 2d 734, 739; *Couch v United States* (1973) 409 US 322, 335; *Valero Energy Corpn v United States* (2009) 569 F 3d 626, 630; Internal Revenue Code, section 7525(a) as amended as from (1998) by Pub L 105–206, 112 Stat 751.]

LAP, properly described, is a fundamental human right of the client: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, paras 7 and 39. Interference with the privacy of the client's
F communications with his lawyer infringes article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms: see *Foxley v United Kingdom* (2000) 31 EHRR 637 and *Campbell v United Kingdom* (1992) 15 EHRR 137. However article 8 read with article 14 does not require an extension of LAP to accountants. *Showboat Entertainment Centre Ltd v Owens* [1984] 1 WLR 384 and
G *Coleman v Attridge Law* (Case C-303/06) [2008] ICR 1128 are distinguished on their facts. In so far as article 8 operates at all, it does so at a low level: see *Belfast City Council v Miss Behavin' Ltd* [2007] 1 WLR 1420, para 16. The rights it protects are qualified and interference may be justified as necessary in a democratic society for the economic well-being of the state, and in the public interest in the securing of payment of taxes: see article 8.2; and *R v Inland Revenue Comrs, Ex p Banque Internationale à*
H *Luxembourg SA* [2000] STC 708, 723. Article 14 requires a proper basis for discrimination. But here discrimination, if it exists, is not on the basis of the status of the person enjoying the right, but of the person from whom he wishes to obtain advice: see *Van der Mussele v Belgium* (1983) 6 EHRR 163, para 46 and *Akzo Nobel Chemicals Ltd (supported by Council of the Bars*

© 2013 The Incorporated Council of Law Reporting for England and Wales

202
R (Prudential plc) v Special Comr of Income Tax (SC(E))              [2013] 2 AC
Argument

*and Law Societies of the European Union, interveners) v Commission of the European Communities* (Case C-550/07P) [2011] 2 AC 338, paras 52, 58, 95, 96.

The Second Money Laundering Directive (2001/97/EC) does not assist the claimants' argument under article 8. The provisions of the Directive, implemented in domestic law by amendment to the Proceeds of Crime Act 2002, are not concerned with privilege but with the circumstances in which professional persons do not commit offences relating to suspected money laundering: see section 330(6)(10)(14). The Directive does no more than recognise the possibility of an accountant being exempt from disclosing suspected money laundering. It does not support a contention that the common law should be developed to extend LAP to accountants.

*Sir Sydney Kentridge QC, Tom Adam QC* and *Tim Johnston* (instructed by *Herbert Smith Freehills LLP*) for the second intervener, the Law Society.

LAP applies only to communications between a client and his or her lawyer acting as such. That position has been established over centuries of the common law and sound reasons of public policy justify it. The claimants' submission is inconsistent with leading academic texts, a long line of judicial authority and the conclusions of the committees which examined the scope and operation of privilege in English law.

The established meaning of LAP, whether as a term of art or in general usage, is that privilege which covers, and is restricted to, communications between lawyer and client. Wherever, before the instant case, the view was expressed that privilege should also apply to legal advice on tax sought and obtained from accountants, what was recommended was an extension of LAP by legislation. The idea that advice given by a non-lawyer was privileged had been unanimously rejected; there was no controversy over the scope of the common law and no dissentient voices: see *Halsbury's Laws of England*, 5th ed, vol 11 (2009), para 559; *Phipson on Evidence*, 17th ed (2009), para 23.25; *Cross & Tapper on Evidence*, 12th ed (2010), pp 438–439, *The Law of Privilege*, 2nd ed (2011), ed Bankim Thanki QC, para 1.52 and *Pattenden, The Law of Professional-Client Confidentiality* (2003), paras 16.16, 16.42.

Judicial authority is to the same effect: see, for example, *Anderson v Bank of British Columbia* (1876) 2 Ch D 644; *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315; *Wheeler v Le Marchant* (1881) 17 Ch D 675; *Slade v Tucker* (1880) 14 Ch D 824 and *Smith v Daniell* (1874) LR 18 Eq 649. [Reference was also made to *Bray, The Principles and Practice of Discovery* (1885); *Sixteenth Report (Privilege in Civil Proceedings)* of the Law Reform Committee (1967) (Cmnd 3472), para 54 and *Report of the Committee on Enforcement Powers of the Revenue Departments* (1983) (Cmnd 8822), paras 26.1.1, 26.1.3.]

Parliament, when legislating to extend privilege from time to time, has always recognised that established meaning of LAP: see section 33 of the Administration of Justice Act 1985 (licensed conveyancers); section 280 of the Copyright, Designs and Patents Act 1988 (patent agents); section 87 of the Trade Marks Act 1994 (trade mark agents); section 63 of the Courts and Legal Services Act 1990, replaced by section 190 of the Legal Services Act 2007 (authorised advocates, litigators, conveyancers and probate service providers). None of the extensions would have been necessary or

© 2013 The Incorporated Council of Law Reporting for England and Wales

203

[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Argument

A    appropriate had the common law been of the breadth contended for by the claimants.

That understanding of the current state of the law is understood by at least some of the bodies which regulate accountants: see the Guidance issued by the Institute of Chartered Accountants in England and Wales, para 2.35(b); Rulebook of the Association of Chartered Certified Accountants (2012), Section B1, para 26. The privilege has never been B    understood to apply to communications to or from any other adviser. When Parliament uses the term "legal professional privilege", as it does in paragraph 23 of Schedule 36 to the Finance Act 2008, it must be taken to have intended to mean the privilege which is possessed by a client of a legal practitioner. In other common law jurisdictions the same meaning applies. Any new privilege for tax advice, as in the United States and New Zealand, has been created by legislation. The broad meaning for which the claimants C    contend has not been recognised. No common law or civil law jurisdiction has recognised the right to seek privileged advice from an accountant as a fundamental right. [Reference was made to *Slavutych v Baker* [1976] 1 SCR 254; *Tower v Minister of National Revenue* [2004] 1 FCR 183; *R v National Post* [2010] 1 SCR 477; *Baker v Campbell* (1983) 153 CLR 52; "Privilege in relation to tax advice", Australian Law Reform Commission Report No 26 D    (Evidence) (2011), ch 38; *Privilege in Perspective: Client Legal Privilege in Federal Investigations*, 107, Australian Law Reform Committee (2007); *United States v Kovel* (1961) 296 F 2d 918; *United States v Arthur Young & Co* (1984) 465 US 805; *Couch v United States* (1973) 409 US 322; *Wigmore, Evidence in Trials at Common Law*, vol 8, (1961 McNaughton rev), p 567, paras 2296 and 2300; *Valero Energy Corpn v United States* (2009) 569 F 3d E    626; "Tax and privilege: a proposed new structure" Government of New Zealand Discussion Document, (2002); Taxation (Base Maintenance and Miscellaneous Provisions) Act 2005; section 8 of the Evidence Act 1908 (New Zealand); section 54 of the Evidence Act 2006 (New Zealand) and *Comr of Inland Revenue v West-Walker* [1954] NZLR 191; Singapore Evidence Act 1893, as amended (2012), sections 128 and 131; *Scandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific F    Breweries (Singapore) Pte Ltd* [2007] 2 SLR 367; *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583; *M'Cowan v Wright* (1852) 15 D 229; *Narden Services Ltd v Inverness Retail and Business Park Ltd* 2008 SC 335; *The Laws of Scotland: Stair Memorial Encyclopaedia*, Evidence (Reissue 2006), para 209; *Zuma v National Director of Public Prosecutions* 2009 (1) SA 1; *Schwikkard and van der Merwe, Principles of G    Evidence*, 3rd ed (2009), pp 152–153 and *L H Hoffmann, South African Law of Evidence*, 2nd ed (1963), p 194.

While it is possible for a legislature to order the incidence of privilege differently from the overwhelming weight of international and domestic common law authority, the position reached at common law, apart from the intervention of statute, is based on sound public policy principles, not on arbitrary or historical anomaly.

H    The reason that English law has allowed a client to communicate in absolute confidence only with his lawyer is because of the unique role played by lawyers in the administration of justice: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 504–507. The claimants are wrong to suggest that all, or any, skilled advisers on the law are equally involved in the

© 2013 The Incorporated Council of Law Reporting for England and Wales

administration of justice whatever their professional qualification. It is well *A*
recognised in the domestic jurisdiction and throughout the common law
world that lawyers have a unique role in the administration of justice which
goes beyond the giving of skilled advice. That role is the consequence of the
symbiotic relationship between lawyers and the courts. Solicitors, as officers
of the court, are subject to its immediate disciplinary jurisdiction; the court
ultimately controls those who may be admitted to and who remain on the *B*
Roll of Solicitors and is concerned to maintain the reputation of trust which
is integral to the profession: see sections 47 and 50 of the Solicitors Act
1974; *United Mining and Finance Corpn Ltd v Becher* [1910] 2 KB 296;
*Bolton v Law Society* [1994] 1 WLR 512; *New Victoria Hospital v Ryan*
[1993] ICR 201; *R v McClure* [2001] 1 SCR 445; *Three Rivers District
Council v Governor and Company of the Bank of England (No 6)* [2005]
1 AC 610, para 31; *Baker v Campbell* 153 CLR 52 and *McNicol, Law of* *C*
*Privilege* (1992).

It is not possible to view any other profession through that lens.
Accountants are not officers of the court, they are not subject to its
jurisdiction and discipline in the same way, they do not owe the court the
same duties and their function is not inextricably woven into the fabric of
the legal system even if they give advice about the law. The rationale for *D*
extending LAP to foreign lawyers is based on comity and reciprocity since
they are regarded as officers of the courts within their respective jurisdictions
but that has never been the subject of detailed analysis: see *In re Duncan,
decd* [1968] P 306 and *Lawrence v Campbell* (1859) 4 Drew 485. *Calley v
Richards* (1854) 19 Beav 401 is an exceptional case, but demonstrates that
the focus is on the status, rather than the function, of the relevant
professional. *Great Atlantic Insurance Co v Home Insurance Co* [1981] *E*
1 WLR 529 does not assist. *Macfarlan v Rolt* (1872) LR 14 Eq 580 and
*Manser v Dix* (1855) 1 K & J 451 are not in point.

The rules of professional bodies which regulate accountants have not
been informed by a culture, developed over the centuries, of preserving
clients' privilege. It goes no further than that of bankers where
confidentiality arises simply from contract: see *Tournier v National
Provincial and Union Bank of England* [1924] 1 KB 461. Contrast *Medcalf* *F*
*v Mardell* [2003] 1 AC 120 and *General Mediterranean Holdings SA v Patel*
[2000] 1 WLR 272. The disciplinary sanction available to the profession of
solicitors is very different from that available to accountants: every solicitor
is under the control of a single statutory regulator, the Solicitors Regulation
Authority, and there is no equivalent single point of statutory control for
accountants. There are clear differences in the breadth of legal training *G*
which members of the two professions undergo. However well qualified in
the ability to advise on tax, accountants have a narrow legal training.

LAP is a right to resist the compulsory disclosure of information and is
thus an exception to the general principle that all relevant evidence should be
before the courts. The claimants' core submission would transform that
exception to a general principle, it would cause needless confusion in an area
where certainty is of great significance and it should be rejected. The *H*
privilege should be kept within its original and narrow context: see *Three
Rivers District Council v Governor and Company of the Bank of England
(No 6)* [2005] 1 AC 610, paras 28 and 36 and *B v Auckland District Law
Society* [2003] 2 AC 736, para 67.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    In any event the decision whether to extend the privilege is for Parliament, rather than the courts, as Parliament has already made provision for limited extensions, including the limited extension provided by section 20B(9)(10) of the Taxes Management Act 1970 for tax advisers.  In addition to the extensions made in respect of licensed conveyancers under section 33 of the Administration of Justice Act 1985, patent agents (now attorneys) under

B    section 280 of the Copyright, Designs and Patents Act 1988, trade mark agents (now attorneys) under section 87 of the Trade Marks Act 1994 and authorised advocates, litigators, conveyancers and probate service providers under section 63 of the Courts and Legal Services Act 1990, now replaced by section 190 of the Legal Services Act 2007, a number of statutes create investigatory powers which are subject to exemptions in respect of privileged documents.  To accede to the claimants' core submission would be

C    to render such statutory provisions redundant and profoundly alter the meaning and effect of a whole network of legislation.  [Reference was made to *Hill v William Hill (Park Lane) Ltd* [1949] AC 530, 547, 552 and *Pinner v Everett* [1969] 1 WLR 1266, 1273.]  The common law should not be advanced in a way which in effect abolishes that carefully developed statutory framework.

D    Having regard to the *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967) (Cmnd 3472); *Report of the Committee on Enforcement Powers of the Revenue Departments* ("the Keith Committee") (1983) (Cmnd 8822), and to the parliamentary debates during the passage of the Finance Act 1989, Parliament has not only discussed, but has rejected, all but a limited degree of extension.  In so concluding Parliament has not relied on any mistaken assumption: reliance on *West*

E    *Midland Baptist (Trust) Association (Inc) v Birmingham Corpn* [1970] AC 874 is misplaced.  Any principle that the common law may be advanced even where Parliament has intervened does not apply.  In view of Parliament's consideration and rejection of the claimed extension, the courts should not intervene and override or render superfluous the statutory scheme it has enacted: see *R v Chief Constable of the Royal Ulster Constabulary, Ex p Begley* [1997] 1 WLR 1475 and *In re McKerr* [2004] 1 WLR 807.

F    *Herrington v British Railways Board* [1972] AC 877 and *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 are distinguished on their facts.

Properly understood, the legislation and regulations which govern money laundering provide no support to the claimants.  They are an independent statutory regime, driven by their own policy considerations.  They do not

G    create a statutory privilege in communications between accountant and client, still less do they acknowledge the existence of such a privilege at common law.  They do not bestow any right on the client, but operate to provide accountants with a defence to what would otherwise be a criminal offence: see the Second Money Laundering Directive (2001/97/EC); the Proceeds of Crime Act 2002, section 330(6)(b), as amended by the Proceeds of Crime Act 2002 and Money Laundering Regulations 2003 (Amendment)

H    Order 2006 (SI 2006/308), and section 330(10).

The claim to privilege is made here in the context of a marketed tax avoidance scheme.  The marketing of such a scheme is an entrepreneurial, rather than a professional, activity: see *Leary v Federal Comr of Taxation* (1980) 32 ALR 221; *Carr v Swart; Lawcover Pty Ltd v Swart* [2007]

© 2013 The Incorporated Council of Law Reporting for England and Wales

206
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Argument

NSWCA 337, paras 65–68; *Apple Computer Australia Pty Ltd v Wily*
[2002] NSWSC 855, para 11; *Rio Tinto Ltd v Comr of Taxation* (2006)
235 ALR 127, para 22 and *Countryside Ltd Partnership v Comr of Internal
Revenue* (2009) 132 TC 347, 354–355.

The relationship between solicitor and client is one of trust entailing the
duty of the former to act solely in the latter's interest. The marketer of a tax
avoidance scheme does not stand in that relationship. The operation of
common law LAP if such market conditions are to apply have caused
concern: see the Keith Committee, at para 26.3.1, pp 540–541 and
"Disclosure of tax avoidance schemes", the Law Society (2011), para 3.2.
The notion that LAP should simply be applied to tax advice given by
accountants therefore presents problems which could not be overcome save
by legislation.

As the claimants submit, LAP, as currently understood as between lawyer
and client, is a fundamental common law human right which is recognised,
respected and relied on: see *R (Morgan Grenfell & Co Ltd) v Special Comr
of Income Tax* [2003] 1 AC 563, paras 7, 25; *R (Daly) v Secretary of State
for the Home Department* [2001] 2 AC 532, para 30; *Three Rivers District
Council v Governor and Company of the Bank of England (No 6)* [2005]
1 AC 610, para 54 and *R v Derby Magistrates' Court, Ex p B* [1996] AC 487,
504. The right is, however, narrowly defined to confidential correspondence
with a professional lawyer. The new, much broader, right asserted by the
claimants, has no legal heritage and no credible claim to "fundamental"
status. They cannot endow their new form of LAP with the status of a
fundamental right by analogy with the pre-existing fundamental right to
LAP.

The jurisprudence of the European Court of Human Rights recognises
different confidential relationships as attracting the protection of article 8 to
differing degrees. The lawyer-client relationship enjoys particularly strong
protection and is in principle privileged: see *Campbell v United Kingdom*
(1992) 15 EHRR 137, para 46; *Foxley v United Kingdom* (2000) 31 EHRR
637, para 43; *Jankauskas v Lithuania* (Application No 59304/00)
(unreported) given 24 February 2005, para 22 and *Petrov v Bulgaria*
(Application No 15197/02) (unreported) given 22 May 2008, paras 42–45.
Advice from an accountant is confidential, for the purposes of article 8, but
does not enjoy the same protection as correspondence with a lawyer. But,
in the law of the European Court of Human Rights, lawyer-client
confidentiality is not absolute. Common law LAP goes beyond the
requirements of the Convention and accordingly a common law extension
cannot be asserted on the basis of article 8. Nor is there any basis for
asserting discrimination, contrary to article 14, by association with an
accountant. Article 14 is only concerned with differences of treatment
which have as their basis a personal characteristic by which persons are
distinguishable from each other: see *Halis v Turkey* (Application
No 30007/96) (unreported) given 23 May 2002; *Jones v United Kingdom*
(Application No 42639/04) (unreported) given 13 September 2005 and
*Kjeldsen, Busk Madsen and Pedersen v Denmark* (1976) 1 EHRR 711.

Clients who have actively chosen to instruct an accountant, rather than a
lawyer, cannot complain of discrimination arising out of their own informed
choice: see *Akzo Nobel Chemicals Ltd (supported by Council of the Bars
and Law Societies of the European Union, interveners) v Commission of the*

© 2013 The Incorporated Council of Law Reporting for England and Wales

332

207
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Argument

*European Communities* (Case C-550/07P) [2011] 2 AC 338, para 96. Clients of accountants and clients of lawyers are not comparable groups for the purposes of article 14 and in any event the distinction falls well within the UK Government's margin of appreciation: see *Van der Mussele v Belgium* (1983) 6 EHRR 163 and *R (Carson) v Secretary of State for Work and Pensions* [2006] 1 AC 173. Common law LAP distinguishes between clients of lawyers and clients of other professional advisers in accordance with the law and is a proportionate means of securing the administration of justice. If any discrimination arises, it is objectively and reasonably justified.

*Bankim Thanki QC, Ben Valentin, Henry King* and *Rebecca Loveridge* (instructed by *Field Fisher Waterhouse LLP*) for the third intervener, the General Council of the Bar.

If accepted, the claimants' position would represent a significant and unjustified departure from the long settled limits of LAP and would constitute a significant inroad into the principle, necessary for the sound administration of justice, that relevant material should be placed before the court. There is a real risk that extension of the privilege as sought would introduce considerable uncertainty into the scope of LAP which would undermine its utility.

The claimants' submission is unsustainable that as a matter of common law, LAP encompasses client-accountant communications. Nor should the common law be extended as the claimants submitted: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487; *Wilson v Rastall* (1792) 4 Durn & E 753; *Duchess of Kingston's Case* (1776) 20 State Tr 355 and *Minter v Priest* [1930] AC 558.

The courts have always been prepared to develop the common law, exercising an appropriate caution and having regard to the value of legal certainty: see *Broome v Cassell & Co Ltd* [1972] AC 1027, 1054. But whenever there has been an extension of LAP beyond the lawyer-client relationship it has been achieved by statute and after consultation and consideration by Parliament, and then only in narrowly prescribed areas and in respect of professionals whose services are directly comparable to lawyers. Parliament has not seen fit to make such an extension to accountants despite suggestions that it should do so: see the *Report of the Committee on Enforcement Powers of the Revenue Departments* (1983) (Cmnd 8822), para 26.6.13 and the Director General of Fair Trading's report on *Competition in professions* (2001) (OFT328), paras 190, 440(v). But Parliament's failure to change the law is not an accident: see *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967), para 54 and the Department for Constitutional Affairs report, *Competition and regulation in the legal services market* (July 2003), paras 56–61. Where Parliament has feared to tread it is not for the courts to rush in: see *Shaw v Director of Public Prosecutions* [1962] AC 220, 275, per Lord Reid; *C (A Minor) v Director of Public Prosecutions* [1996] AC 1, 28; *Myers v Director of Public Prosecutions* [1965] AC 1001, 1021 and *R (Nicklinson) v Ministry of Defence* (2012) 127 BMLR 197, para 78. The extension now sought is sufficiently far-reaching as to exceed the proper ambit of incremental development by the common law; it ought therefore to be considered by Parliament and only adopted after extensive consultation: see Andrews, "Lawyer-Client Confidentiality: European and English

© 2013 The Incorporated Council of Law Reporting for England and Wales

208
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Argument

Perspectives" in *Zeitschrift für Zivilprozess International"* ZZP Int 15 (2010) 31. [Reference was made to *Privilege in Perspective: Client Legal Privilege in Federal Investigations*, 107, Australian Law Reform Committee (2007), ch 6, paras 6.281, 6.283, 6.278 and "Privilege in relation to tax advice", Australian Department of the Treasury Discussion Paper (2011).]

The particular importance of certainty if LAP is to achieve its raison d'être distinguishes it from the circumstances in which the courts have been willing to make significant developments to the common law: in the present case the court is asked to permit an extension which would be likely to create great uncertainty as to the information which would fall within or outside the privilege and would increase satellite litigation in which other long-established aspects of the privilege would have to be revisited and explored in the context of its application to accountants and other professions: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 507 and *B v Auckland District Law Society* [2003] 2 AC 736, para 54. Such uncertainty might also infringe the client's fundamental right under article 8 to respect for his privileged communications with his lawyer.

The Second Money Laundering Directive (2001/97/EC) sought to allow for safe harbours from obligatory disclosure and attendant criminal sanctions; it did not seek to define the scope or application of LAP. The fact that the European Parliament decided to legislate to provide for the possibility of an exemption from the obligation to report suspected money laundering for external accountants and tax advisers does not bear on the present issue. And it does not follow from the fact that Parliament amended section 330 of the Proceeds of Crime Act 2002 so as to provide the exemption permitted by the Directive for accountants in certain circumstances that the court should extend the boundaries of LAP. The amendment does not address LAP and, in any event, was made without parliamentary debate by subordinate legislation (see the Proceeds of Crime Act 2002 and Money Laundering Regulations 2003 (Amendment) Order 2006 (SI 2006/308)) pursuant to section 2(2)(4) of the European Communities Act 1972. By contrast, when the Proceeds of Crime Bill was debated the special, and long-established, position of professional legal advisers was recognised. The enactment of section 330(14), made in a different context and focusing on specific exemptions to disclosure obligations, could not, therefore, be regarded as a blueprint for extending privilege at common law.

The term "accountant" is not statutorily defined and there is no licence requirement or regulatory restriction confining its use. Unlike the term "lawyer" "accountant" has no readily available definition. And there is a range of different bodies which regulate accountants in different ways and under different rules and standards. Extension of LAP to accountants would cause uncertainty by inevitably producing contentious issues as to the scope of the profession. In context the proposed expansion runs counter to the emphasis by domestic and foreign courts in keeping LAP within strict limits: see *Balabel v Air India* [1988] Ch 317, 332; *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556; *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610; *Grant v Downs* (1976) 135 CLR 674; *Waterford v Commonwealth of Australia* (1987) 163 CLR 54; *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79)

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  [1983] QB 878 and *Akzo Nobel Chemicals Ltd (supported by Council of the Bars and Law Societies of the European Union, interveners) v Commission of the European Communities* (Case C-550/07P) [2011] 2 AC 338. That approach results from the absolute nature of the privilege and its consequence is the inevitable curtailment of the judicial search for truth: see *Baker v Campbell* (1983) 153 CLR 52 and *Wentworth v Lloyd* (1864) 10 HL Cas 589.

B    Equally undefined and therefore uncertain is the ambit of the privilege in respect of "tax law". LAP applies in relation to client-lawyer communications which go beyond informing the client of the law and effectively extends to any advice given in legal context. The contours of the advice have been shaped by the status of the adviser as a lawyer, the essential nature of a lawyer's role and its focus on him as a specifically legal adviser.

C  An extension to client-accountant communications would produce highly contentious issues as to its scope: see *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529; *Balabel v Air India* [1988] Ch 317; *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610 and *R v Manchester Crown Court, Ex p Rogers* [1999] 1 WLR 832.

D    LAP is recognised as a fundamental human right, based not only on the general right to privacy but also on the right of access to justice: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, paras 7, 16. The right to respect for privacy conferred by article 8 provides no basis for extending LAP beyond the legal profession. Withholding information may violate the article 6 right to a fair trial: see *Pattenden, The Law of Professional-Client Confidentiality* (2003),

E  pp 568–569. The interaction of articles 6 and 8 has prevented, in the European jurisprudence, the recognition of LAP as absolute. With regard to article 14, LAP does not operate in a discriminatory way because the differing treatment of the professions is based on a number of factors, including the centrality of the lawyer's position in the administration of justice and different training and entry requirements: see the *Akzo* case

F  [2011] 2 AC 338. Articles 8 and 14 do not compel the court to re-define the established contours of LAP as a matter of English common law. LAP can be a substantial impediment to the discovery of the truth in an individual case. If it were extended to non-lawyers the potential inroad into the public interest in disclosure could be considerable. If it were extended to accountants, it would need to be extended to a range of other professionals who give advice about the law in the course of their professional duties.

G  Extension across all such professions would have significant limitations on disclosure. [Reference was made to *Jones v Great Central Railway Co* [1910] AC 4; *New Victoria Hospital v Ryan* [1993] ICR 201 and *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610.]

    The principle of LAP is based on the status of the adviser: lawyers are distinguished by their central role in the administration of justice, a role

H  which is not shared by accountants: see *Baker v Campbell* 153 CLR 52; *R v McClure* [2001] 1 SCR 445; *B v Auckland District Law Society* [2003] 2 AC 736 and *McNicol, TheLaw of Privilege* (1992). The breadth of the protection attaching to communications with legal advisers means that, for reasons of public policy, communications with no other advisers have been

© 2013 The Incorporated Council of Law Reporting for England and Wales

permitted to come within the scope of the privilege at common law. *A*
Although litigation is the context in which the principle is usually invoked, it
arises from the nature of the lawyer-client relationship and its constitutional
significance: see *Three Rivers District Council v Governor and Company of
the Bank of England (No 6)* [2005] 1 AC 610, para 61. In the final analysis
lawyer-client communications represent a limited and readily controllable
exception to the public interest in disclosure based on the centrality of the
lawyer-client relationship to the administration of justice. The line has to be *B*
drawn somewhere, and the focus of the professional lawyer's role as a
specifically legal adviser allows for a sensible and practically workable
demarcation. [Reference was made to *Wallersteiner v Moir (No 2)* [1975]
QB 373; *Arthur JS Hall & Co v Simons* [2002] 1 AC 615; *Jones v Kaney*
[2011] 2 AC 398 and *Rondel v Worsley* [1969] 1 AC 1.]

The case law of other common law jurisdictions shows that the only *C*
relevant professional is a lawyer: see *Esso Australia Resources Ltd v Federal
Comr of Taxation* (1999) 201 CLR 49; *Daniels Corpn International Pty Ltd
v Australian Competition and Consumer Commission* (2002) 213 CLR 543;
*R v Uljee* [1982] 1 NZLR 561; *Upjohn Co v United States* (1981) 449 US
383; *Swidler & Berlin v United States* (1998) 524 US 399; *Descôteaux v
Mierzwinski* [1982] 1 SCR 860 and *Smith v Jones* [1999] 1 SCR 455. *D*
Equivalent protection for lawyer-client communications is justified on the
same basis in the jurisprudence of the Court of Justice of the European Union
and the European Court of Human Rights: see *AM & S Europe Ltd v
Commission of the European Communities* (Case 155/79) [1983] QB 878,
892–898, 909–919, 949–951 and *Campbell v United Kingdom* (1992)
15 EHRR 137.

Under the Legal Services Act 2007, when it comes into force, *E*
multidisciplinary practices will be permitted for the first time and lawyers
and accountants will be able to work alongside each other in a single
practice. That does not alter the analysis that leads to the conclusion that
LAP should not be extended to accountants. If changes are to be made, the
proper course is for Parliament, not the courts, to make them. Parliament
has given careful and detailed consideration to the issue when passing the *F*
2007 Act, culminating in section 190 which makes no such extension.
The advent of the Act accordingly does not require any such extension by the
courts.

*Michael Edenborough QC* and *James Tumbridge* (instructed by
*Gowlings (UK) LLP*) for the fourth intervener, AIPPI United Kingdom.

LAP is a long-established creature of the common law; it has evolved over *G*
the years in response to particular facts and issues arising in individual cases
and the various justifications advanced for its existence have not been
consistently logical. Parliament has regularly considered the proper scope of
the privilege and its potential extension to non-lawyers. Independently of
Parliament, the courts have shown a marked reluctance to expand that scope
and have adopted the cautious approach evidenced in the present case
[2011] QB 669. *H*

There is a conflict between the public policy of having before the court all
material to decide the case on the best possible information and the public
policy of ensuring that a person presents his case fully and frankly to his legal
adviser so as to receive the best possible legal advice on his legal position, in

© 2013 The Incorporated Council of Law Reporting for England and Wales

the certain knowledge that their communications will remain confidential. In the domestic jurisdiction the paramount position of the privilege is considered essential for the administration of justice and no question of balancing the competing interests arises. In other jurisdictions the position is different; the privilege is not absolute and a balance may have to be struck. Yet in those jurisdictions it cannot be said that the administration of justice is thereby rendered futile or that where privilege has not been accorded the system has not worked. In the domestic jurisdiction, clients and non-lawyer advisers have apparently been conducting business effectively without the benefit of any recognised privilege. [Reference was made to *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487; *B v Auckland District Law Society* [2003] 2 AC 736 and *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967) (Cmnd 3472).]

As a consequence of the paramount nature of the privilege in the domestic jurisdiction, the situations in which the privilege may be invoked have been limited and restricted to solicitors and barristers on the basis of their nexus with the administration of justice and in particular through their involvement in legal proceedings. The fact that solicitors are officers of the court has always identified that particular link in contrast with other professionals; and the same result applies to barristers through their code of conduct. [Reference was made to *Calley v Richards* (1854) 19 Beav 401.] Since lawyers do not stand in a special relationship with the justice system when they are considering the provision of legal advice outside the context of litigation, that special relationship has been stretched to include the giving of advice outside the specific context of legal proceedings. Historically it was natural to confer the right on lawyers' communications, since only lawyers were considered qualified to advise on legal matters, and there was accordingly no need to identify the status of the provider of such advice.

The common law has therefore evolved to a stage where LAP is limited to advice given by lawyers, and the same advice given by non-lawyers does not qualify: the line has been drawn by reference to the status of the adviser, not the nature of the advice. In that context the reticence of Parliament in limiting extensions to other professions appears to be in line with and approve the cautious approach adopted by the common law.

But the need for increasingly specialist legal advice from non-lawyers who were expert in their particular speciality, has required the scope of the protection to be expanded. That was so, in particular, in the case of patents and trade marks where the advice of a patent or trade mark agent, now attorney, was not privileged: see *Moseley v Victoria Rubber Co* (1886) 3 RPC 351; *Dormeuil Trade Mark* [1983] RPC 131 and *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159. The statutory regime, adopted by Parliament after numerous reports and submissions, conferred privilege, including LAP, in limited circumstances on a wider range of authorised persons: see section 280 of the Copyright, Designs and Patents Act 1988, as amended by the Legal Services Act 2007; section 87 of the Trade Marks Act, as amended by the 2007 Act and section 190 of the Legal Services Act 2007.

Extension, as in the case of patent and trade mark attorneys and other authorised persons, should not be left to the evolution of the common law but should be effected by legislation. The position of foreign lawyers presents a

© 2013 The Incorporated Council of Law Reporting for England and Wales

further anomaly.  Having regard to the explanation given by the Law Society, *A*
if privilege were to be extended to accountants, it is difficult to see why, on the
basis of comity, it should not also apply to foreign accountants.  It is therefore
a matter for Parliament to consider and, if it so decides, to expand the
categories of professionals to whose activities LAP should attach.

*Lord Pannick QC* replied.
*B*
The court took time for consideration.

23 January 2013.  The following judgments were handed down.

**LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **LORD
WALKER OF GESTINGTHORPE JSC** agreed)
*C*
*Introductory*

1    The specific issue raised by this appeal is whether, following receipt of
a statutory notice from an inspector of taxes to produce documents in
connection with its tax affairs, a company is entitled to refuse to comply on
the ground that the documents are covered by legal advice privilege ("LAP"),
in a case where the legal advice was given by accountants in relation to a tax    *D*
avoidance scheme.  The more general question raised by this issue is whether
LAP extends, or should be extended, so as to apply to legal advice given by
someone other than a member of the legal profession, and, if so, how far
LAP thereby extends, or should be extended.

*The statutory provisions applicable in this case*    *E*

2    The statutory provisions in force at the time during which the events
giving rise to the present proceedings took place were in the Taxes
Management Act 1970 ("TMA").  All references in this judgment to sections
are to sections of that Act, unless the contrary is stated.

3    Section 20(1)(a) provided that an inspector of taxes

"may by notice in writing require a person . . . to deliver to him such    *F*
documents . . . as (in the inspector's reasonable opinion) contain, or may
contain, information relevant to— (i) any tax liability to which that
person is or may be subject, or (ii) the amount of any such liability . . ."

Section 20(3) extended this power to require "any other person" to
"deliver . . . or . . . make available" such documents to an inspector.  By
virtue of section 20(7), an inspector needed the consent of the special or    *G*
general commissioners before serving a notice under either subsection.

4    It was established by *R (Morgan Grenfell & Co Ltd) v Special Comr
of Income Tax* [2003] 1 AC 563 ("*Morgan Grenfell*") that the provisions of
section 20 could not be invoked to force anyone to produce documents to
which LAP attached.  Lord Hoffmann, at paras 7 and 9, said that a statute
could only remove such "a fundamental human right" if it "expressly stated"    *H*
that it was doing so, or if the intention "appear[ed] by necessary
implication", and, as Lord Hobhouse of Woodborough emphasised, at
para 45, "a necessary implication is a matter of express language and logic
not interpretation".

© 2013 The Incorporated Council of Law Reporting for England and Wales

213

A    5    Section 20A, inserted by the Finance Act 1976 ("the 1976 Act"), empowered an inspector to call for documents to be produced by a person who had "stood in relation to others as a tax accountant" and who had been convicted of an offence relating to tax or had had a penalty imposed on him under section 99. Section 20D(2), also inserted by the 1976 Act, explained that "a person stands in relation to another as tax accountant" when "he assists the other in the preparation of returns or accounts to be made or
B    delivered by the other for any purpose of tax . . ."

6    Section 20B was also inserted by the 1976 Act (and was amended in 1988, 1989 and 1990). Section 20B(1) required an inspector, before serving a notice under section 20(1) or (3) on any person, to give that person "a reasonable opportunity to deliver (or . . . make available) the documents in question . . ."

C    7    Section 20B also included the following subsections:

"(8) A notice under section 20(3) . . . or section 20A(1) does not oblige a barrister, advocate or a solicitor to deliver or make available, without his client's consent, any document with respect to which a claim to professional privilege could be maintained.

"(9) Subject to subsection . . . (11) . . . below, a notice under
D    section 20(3) . . . — (a) does not oblige a person who has been appointed as an auditor for the purposes of any enactment to deliver or make available documents which are his property and were created by him or on his behalf for or in connection with the performance of his functions under that enactment, and (b) does not oblige a tax adviser to deliver or make available documents which are his property and consist of relevant communications.

"(10) In subsection (9) above 'relevant communications' means
E    communications between the tax adviser and— (a) a person in relation to whose tax affairs he has been appointed, or (b) any other tax adviser of such a person, the purpose of which is the giving or obtaining of advice about any of those tax affairs; and in subsection (9) above and this subsection 'tax adviser' means a person appointed to give advice about the tax affairs of another person (whether appointed directly by that other
F    person or by another tax adviser of his).

"(11) . . . subsection (9) above shall not have effect in relation to any document which contains information explaining any information, return, accounts or other document which the person to whom the notice is given has, as tax accountant, assisted any client of his in preparing for, or delivering to, the inspector or the Board."

G    8    Section 20BA was inserted by section 149(1) of the Finance Act 2000, and it extended the power granted by section 20 to make an order for the delivery of documents by any person who appears to have such documents in his possession or power. Paragraph 5(1) of Schedule 1AA, as inserted by paragraph 1 of Schedule 39 to the 2000 Act, exempted from the ambit of section 20BA "items subject to legal privilege", which were defined in
H    paragraph 5(2) as:

"(a) communications between a professional legal adviser and his client or any person representing his client made in connection with the giving of legal advice to the client; (b) communications between a professional legal adviser and his client or any person representing his

© 2013 The Incorporated Council of Law Reporting for England and Wales

**339**

*A*

client or between such an adviser or his client or any such representative and any other person made in connection with or in contemplation of legal proceedings and for the purposes of such proceedings; and (c) items enclosed with or referred to in such communications and made— (i) in connection with the giving of legal advice . . ."

*B*

9   These various provisions of TMA have now been replaced by provisions contained in section 113 of, and Schedule 36 to, the Finance Act 2008.  While there are differences between the regime in TMA and that in the 2008 Act, they are of no significance for present purposes.  Paragraph 23 of Schedule 36 to the 2008 Act, which effectively replaces section 20B(8), provides that:

*C*

"(1) An information notice does not require a person— (a) to provide privileged information, or (b) to produce any part of a document that is privileged.
"(2) For the purpose of this Schedule, information or a document is privileged if it is information or a document in respect of which a claim to legal professional privilege, or (in Scotland) to confidentiality of communications as between client and professional legal adviser, could be maintained in legal proceedings."

*D*

And paragraphs 24 to 26 of Schedule 36 to the 2008 Act contain provisions relating to communications with "auditors" and with "tax advisers", which are similar to those in subsections (9) to (11) of section 20B.

*The factual and procedural background to this appeal*

*E*

10   In 2004, the international firm of chartered accountants, PricewaterhouseCoopers ("PwC"), devised a tax avoidance scheme ("the scheme").  In accordance with the requirements of Part 7 of the Finance Act 2004, PwC disclosed the scheme to the Commissioners for Inland Revenue, or Her Majesty's Revenue and Customs ("HMRC") as they became a year later and as I will refer to them.  At about this time the Prudential group of companies instructed PwC to advise them in connection with certain overseas holdings, and PwC identified that the scheme could be adapted for their benefit.  Thereafter the Prudential group implemented the scheme, which involved a series of transactions ("the Transactions").

*F*

11   The details of the scheme and the Transactions do not matter for present purposes.  It is enough to say that the aim of the scheme was to give rise to a substantial tax deduction in Prudential (Gibraltar) Ltd, a subsidiary company of Prudential plc, which could then be set off against the profits of that company, which profits were ordinarily chargeable to corporation tax in this country.

*G*

12   Mr Pandolfo, the inspector of taxes responsible for this aspect of the Prudential group's tax liabilities, considered it necessary to look into the details of the Transactions (for reasons which are not challenged).  To that end, he served notices under section 20B(1) on Prudential (Gibraltar) Ltd and Prudential plc (together "Prudential") giving them the opportunity to make available specified classes of documents in relation to the Transactions prior to his serving notices under section 20(1)(3).  Prudential disclosed many of the documents requested by Mr Pandolfo, but refused to disclose

*H*

© 2013 The Incorporated Council of Law Reporting for England and Wales

215
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Neuberger of Abbotsbury PSC

A  certain documents ("the disputed documents") on the ground that Prudential was entitled to claim legal advice privilege in respect of them.

13  Mr Pandolfo considered that questions were raised by the documents which were disclosed, and he sought authorisation from the Special Commissioners under section 20(7) to require Prudential to disclose the disputed documents. Such authorisation was given, and, on 16 November 2007, Mr Pandolfo served notices under section 20(1)(3) on Prudential (Gibraltar) Ltd and Prudential plc respectively, requiring disclosure of the disputed documents.

14  Prudential then issued the present application for judicial review challenging the validity of those notices on the ground that they sought disclosure of documents which related to the seeking (by Prudential) and the giving (by PwC) of legal advice in connection with the Transactions, which were therefore said to be excluded from the disclosure requirements of section 20 by virtue of LAP, in accordance with the decision of the House of Lords in *Morgan Grenfell*.

15  That application came before Charles J, who rejected it on the ground that, although the disputed documents would have attracted LAP (and would have been thereby excluded from the disclosure requirements of section 20) if the advice in question had been sought from, and provided by, a member of the legal profession, no such privilege extended to advice, even if identical in nature, provided by a professional person who was not a qualified lawyer. His decision [2009] EWHC 2494 (Admin) was upheld, substantially for the same reasons, by the Court of Appeal (Mummery, Lloyd and Stanley Burnton LJJ) [2010] EWCA Civ 1094. Both decisions are now reported [2011] QB 669.

16  Prudential now appeal to this court.

*Legal advice privilege*

17  Where legal professional privilege ("LPP") attaches to a communication between a legal adviser and a client, the client is entitled to object to any third party seeing the communication for any purpose, unless (i) the client has agreed or waived its right, (ii) a statute provides that the privilege can be overridden, (iii) the document concerned was prepared for, or in connection with, a nefarious purpose, or (iv) one of a few miscellaneous exceptions applies (e g in a probate case where the validity of a will is contested).

18  As Lord Carswell explained in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610 ("*Three Rivers*"), para 105, LPP "is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege". This case is concerned with the first of those subheads, legal advice privilege ("LAP").

19  In summary terms, as is common ground on this appeal, LAP applies to all communications passing between a client and its lawyers, acting in their professional capacity, in connection with the provision of legal advice, i e advice which "relates to the rights, liabilities, obligations or remedies of the client either under private law or under public law": *Three Rivers (No 6)* [2005] 1 AC 610, para 38, per Lord Scott of Foscote.

20  The development and rationale of LAP are explained in terms which I could not begin to improve on by Lord Sumption JSC in paras 111–121 below. In modern times, LPP, and more particularly LAP, have been fully

© 2013 The Incorporated Council of Law Reporting for England and Wales

341

216
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

considered and refined in a number of authoritative decisions, which speak for themselves.  Particularly as they throw no direct light on the issue thrown up by this appeal, it is only necessary to identify three points which emerge from them before turning to the issue itself.

21    First, LAP exists to ensure that there is what Rehnquist J referred to in the Supreme Court of the United States as "full and frank communication between attorneys and their clients", which "promote[s] broader public interests in the observance of law and administration of justice": *Upjohn Co v United States* (1981) 449 US 383, 389, quoted by Lord Scott in *Three Rivers (No 6)* at para 31.  As Lord Scott went on to explain at para 34, the principle

"that communications between clients and lawyers, whereby the clients are hoping for the assistance of the lawyers' legal skills . . . should be secure against the possibility of any scrutiny from others, whether the police, the executive, business competitors, inquisitive busybodies or anyone else" is founded upon "the rule of law."

22    Secondly, LAP exists solely for the benefit of the client.  As Bingham LJ said in *Ventouris v Mountain* [1991] 1 WLR 607, 611, the expression "legal professional privilege" is "unhappy" in so far as it suggests that the privilege is that of the legal profession, when it is "the client who enjoys the privilege".  Thus, as Lord Hoffmann pointed out in *Morgan Grenfell* at para 37, "If the client chooses to divulge the information, there is nothing the lawyer can do about it".

23    Thirdly, LAP is a common law principle, which was developed by the judges in cases going back at least to the 16th century: see *Berd v Lovelace* (1577) Cary 62, which, together with subsequent cases, is discussed in the opinion of Lord Taylor of Gosforth CJ in *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 504–505.  As Lloyd LJ said in the Court of Appeal [2011] QB 669, 709, para 30, LAP and its rationale was probably first coherently characterised in a judgment by Lord Brougham LC in *Greenough v Gaskell* (1833) 1 My & K 98, 102–103.  (Litigation privilege seems to have developed rather later: see per Lord Carswell in *Three Rivers (No 6)*, para 96.)

*The issue on this appeal*

24    This appeal is concerned with the breadth of LAP, in the sense of the types of advisers with whom communications can attract LAP.  The particular issue on this appeal is whether LAP should attach to communications passing between chartered accountants and their client in connection with expert tax advice given by the accountants to their client, in circumstances where there is no doubt that LAP would attach to those communications if the same advice was being given to the same client by a member of the legal profession.

25    The case advanced by Lord Pannick QC for Prudential, supported by Ms Patricia Robertson QC for the Institute of Chartered Accountants for England and Wales, was that this court should hold that LAP does attach to such communications.  This case is based on the proposition that LAP is a common law right created by the judges, which should be applied, and if necessary extended, so as to accord with the principles which underlie and justify the right.

© 2013 The Incorporated Council of Law Reporting for England and Wales

217
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
                                              Lord Neuberger of Abbotsbury PSC

A    26    More particularly, it is said that, given that LAP is justified by the rule of law, and that it exists for the benefit of a client who seeks and receives legal advice, for instance on its tax affairs, there is no principled basis upon which it can be restricted to cases where the adviser happens to be a member of the legal professions, as opposed to a qualified accountant. This point was said to be reinforced by reference to relatively modern developments, in particular the fact that the great majority of legal advice on taxation matters

B    is now given by accountants rather than by lawyers. In addition reliance was placed on (i) section 330 of the Proceeds of Crime Act 2002 ("POCA"), (ii) the Human Rights Act 1998 ("the HRA"), and (iii) the Legal Services Act 2007.
      27    The contrary case was advanced by Mr James Eadie QC for HMRC, supported by Sir Sydney Kentridge QC for the Law Society, Mr Bankim

C    Thanki QC for the Bar Council, and Mr Michael Edenborough QC for AIPPI UK. Their case was that it has been universally assumed that LAP is restricted to advice given by lawyers, and the court should not extend it to accountants in connection with tax advice for a number of reasons.
      28    Those reasons, in summary form, were that (i) the effect of extending LAP would involve a potentially nuanced policy decision, with unpredictable

D    and potentially wide-ranging public and forensic consequences, which is therefore best left to Parliament, and (ii) Parliament has legislated on the assumption that LAP is restricted to advice given by lawyers, and has further considered and rejected a proposal to extend LAP to tax advisers. It was also argued that there is a good principled reason in the modern world to restrict LAP to advice given by lawyers.

E    *The ambit of LAP as it is generally understood*

      29    There is room for argument whether, by allowing Prudential's appeal, we would be extending the breadth of LAP or would simply be identifying the breadth of LAP. On the former view we would be changing the common law; on the latter view, we would be declaring what the common law always has been. I do not think it necessary to address this

F    issue, as the important point for present purposes is that it is universally believed that LAP only applies to communications in connection with advice given by members of the legal profession, which, in modern English and Welsh terms, includes members of the Bar, the Law Society, and the Chartered Institute of Legal Executives ("CILEX") (and, by extension, foreign lawyers). That is plain from a number of sources, which speak with

G    a consistent voice.
      30    First, there are clear judicial statements of high authority to that effect over the past century and more. Sir George Jessel MR referred to LAP as being "confined to communications between a client and his legal adviser, that is, between solicitor and client or barrister and client" in *Slade v Tucker* (1880) 14 Ch D 824, 828, a view he repeated in *Wheeler v Le Marchant* (1881) 17 Ch D 675, 681–682. In *Minter v Priest* [1930] AC 558, 581, Lord

H    Atkin said that a "[professional] communication pass[ing] for the purpose of getting legal advice . . . must be deemed confidential", and added that it should be "understood that the profession is the legal profession". More recently, the view that LAP is confined to advice from lawyers was repeated by Lord Denning MR in *Attorney General v Mulholland* [1963] 2 QB 477,

© 2013 The Incorporated Council of Law Reporting for England and Wales

343

218
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

489–490, in a passage approved by Lord Edmund-Davies in *D v National Society for the Prevention of Cruelty to Children* [1978] AC 171, 243–244.

31    Secondly, in three more recent cases, on the basis that LAP is confined to advice given by lawyers, the courts have refused to extend LAP to legal advice given by a trade mark agent, a patent agent, or a personnel consultant: see, respectively, *Dormeuil Trade Mark* [1983] RPC 131 (Nourse J), *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159 (CA, Waller and Dillon LJJ), and *New Victoria Hospital v Ryan* [1993] ICR 201 (EAT, Tucker J).

32    Thirdly, and unsurprisingly, the current editions of textbooks on privilege and evidence state that LAP is limited to communications in connection with obtaining legal advice from qualified lawyers: see the summary given by Charles J at first instance in this case [2011] QB 669, 683, para 45(5).

33    Fourthly, more than one significant official report has expressed the view, and proceeded on the basis, that LAP is restricted to legal advice given by a professional lawyer. Thus, the *Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings)* (1967) (Cmnd 3472) stated at para 24, in relation to LAP that "the category of professional legal advisers is confined to barristers and solicitors"; the committee included Lord Pearson, Diplock LJ, Winn LJ, Megarry J and Roger Parker QC (later Parker LJ). To the same effect, chapter 26 of the 1983 *Report of the Committee on Enforcement Powers of the Revenue Departments* (Cmnd 8822) ("the Keith Report") prepared by a committee presided over by Lord Keith of Kinkel, proceeds on the clear basis that LAP was limited to communications with a client's lawyers and did not extend to communications with their tax accountants, even where these communications involve the seeking and giving of legal advice.

34    Fifthly, in 2003, the Government (by which I mean the executive as opposed to Parliament) rejected a proposal, which had been made in 2001, by the Director General of Fair Trading that legal advice given by accountants should be subject to the same privilege as that conferred upon advice given by professional lawyers. This shows that both the Director General and the Government clearly proceeded in the belief that legal advice was not protected by LAP unless given by a member of the legal profession.

35    Sixthly, and more importantly, Parliament has legislated in a way which plainly implies that it assumes that LAP is limited to advice given by lawyers. Thus, there are the statutory extensions of LAP to patent attorneys, to trade mark agents and to licensed conveyancers: see respectively section 280 of the Copyright, Designs and Patents Act 1988, section 87 of the Trade Marks Act 1994 (as amended by the Legal Services Act 2007), and section 33 of the Administration of Justice Act 1985. Then there are the provisions of section 20B of TMA itself: the terms in which subsection (8) is expressed, particularly when one looks at subsections (3) and (9), plainly show that Parliament believed that there was a difference in the tax advice given by "a barrister, advocate or a solicitor", as opposed to the more generic "tax adviser".

36    Seventhly, the substantial re-enactment of the relevant provisions of TMA in paragraphs 23 to 26 of Part 4 of Schedule 36 to the Finance Act 2008 were considered in the usual way by the House of Commons Public Bill Committee. In their deliberations on the Finance Bill on 10 June 2008, the

© 2013 The Incorporated Council of Law Reporting for England and Wales

344

A   Committee actually discussed extending LAP to tax advice given by accountants through the medium of an amendment to what is now paragraph 23 of Schedule 36 to the 2008 Act: see the Hansard report of this discussion, (Public Bill Committee Debates), cols 606–608. No details were given to us as to what happened following those discussions, but what is clear is that Parliament none the less decided in Schedule 36 to the 2008 Act

B   to maintain the difference between (i) a person with whom communications attracted "legal professional privilege" (in England and Wales, and a "professional legal adviser" in Scotland) in paragraph 23, and (ii) a "tax adviser" in paragraph 25. Although it could be said to beg the question which we have to decide, a combination of the general understanding as to the breadth of LPP and the absence of any suggestion of a Parliamentary intention to depart from TMA in this connection, leads to the clear

C   conclusion, in my view, that paragraph 23 was intended to be limited to professional lawyers.

*The implications of allowing this appeal*

37   If we were to allow this appeal, we would therefore be extending LAP beyond what are currently, and have for a long time been understood to

D   be, its limits. Indeed, we would be extending it considerably, as the issue cannot simply be treated as limited to the question whether tax advice given by expert accountants is covered by LAP. While that is the specific question between the parties, it is just a subset, no doubt an important subset, of a much larger set. To concentrate on tax advice given by accountants would be wrong, because it would ineluctably follow from our accepting

E   Prudential's argument that legal advice given by some other professional people would also be covered.

38   In that connection, Sir Sydney pointed out in argument that there have been some variations in the way in which Prudential has formulated its case as to the precise breadth of LAP. In my view, the most powerful formulation is that favoured by Lord Sumption JSC, namely that LAP is

F   confined to cases where legal advice is given by a professional person "whose profession ordinarily includes the giving of legal advice". It is the most powerful formulation because it is the simplest and the most consistent with the basis on which LAP has been justified by the courts.

*The case for allowing this appeal*

G   39   There is no doubt that the argument for allowing this appeal is a strong one, at least in terms of principle, as anyone reading Lord Sumption JSC's judgment can appreciate. LAP is based on the need to ensure that a person can seek and obtain legal advice with candour and full disclosure, secure in the knowledge that the communications involved can never be used against that person. And LAP is conferred for the benefit of the client, and may only be waived by the client; it does not serve to protect

H   the legal profession. In light of this, it is hard to see why, as a matter of pure logic, that privilege should be restricted to communications with legal advisers who happen to be qualified lawyers, as opposed to communications with other professional people with a qualification or experience which enables them to give expert legal advice in a particular field.

© 2013 The Incorporated Council of Law Reporting for England and Wales

220
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

40    This is especially true at the present time when, as Lord Pannick pointed out, almost all qualified lawyers specialise in limited fields, and when the provision of legal advice is no longer a service limited to professional lawyers, as (in terms of practice) is demonstrated by the specific example of tax advice, and as (in terms of law) is illustrated by the fact that the provision of legal advice is not a "reserved legal activity" under the 2007 Act.

41    As Charles J said [2011] QB 669, 691, paras 64–65:

"64. . . . [there is] a compelling, and indeed unanswerable, case that in modern conditions accountants have the expertise to advise on tax law and it is firms of accountants, rather than firms of solicitors, who do give such advice and represent clients in disputes with the revenue on many aspects of their tax affairs. Further many firms of accountants now employ lawyers to advise on tax and what they, and qualified accountants in the same firm, do in this context is the same . . .

"65. So, in my view, [it has been] shown that accountants do what lawyers are described as doing in the cases that establish [LAP]. This has been the case for some time and in my view an equivalent position can be said to exist in respect of other professions."

### The principled arguments for restricting LAP to lawyers' advice

42    The principled arguments for restricting LAP to communications with professional lawyers which have been put forward appear to me to be weak, but not wholly devoid of force. They are based on (i) the close connection between members of the legal profession and the court, (ii) historical observations and relics (albeit important relics), such as the involvement of the court in disciplinary procedures of solicitors and barristers, (iii) the duties to the court owed by members of their profession, and (iv) the view that solicitors and barristers are in a 'special position', in that they are held by the courts to higher standards than members of other professions.

43    At any rate, to modern eyes, it is hard to see why the connection between lawyers and the courts, and in particular the reliance which judges place upon lawyers to act properly, is a good reason in principle for limiting LAP to the legal profession. One can see why the argument might have carried real weight 150 years ago, but for the point to convince today would require something more than such a general statement. Judicial and other observations from the 19th century are of little use, as we are now in a world where a great deal of legal advice is tendered by professional people other than members of the legal profession, as is recognised by the fact, mentioned above, that giving legal advice is not a reserved legal activity under the 2007 Act.

44    The appeal functions of the judges in the disciplinary procedures of the legal profession do not seem to me, at least in general, to be much greater than their judicial review functions in relation to the disciplinary procedures of other professions. It is also true that solicitors and barristers owe a formal duty to the court, but (i) that duty only would be relevant in connection with litigation, whereas LAP goes much wider, and (ii) every professional person involved in litigation can fairly be said to have a duty to the court.

45    Such principled justification as there is for the restriction of LAP to lawyers seems to me to be further undermined by the extension of LAP

© 2013 The Incorporated Council of Law Reporting for England and Wales

221
[2013] 2 AC    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Neuberger of Abbotsbury PSC

which the court has approved to all foreign lawyers, without (it would seem) regard to their particular national standards, regulations or rules with regard to privilege. That extension appears to originate from *Lawrence v Campbell* (1859) 4 Drew 485 (Kindersley V-C), and was approved and applied in *Macfarlan v Rolt* (1872) LR 14 Eq 580 (Wickens V-C), *In re Duncan, decd* [1968] P 306 (Ormrod J), and *Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529, 536 (Templeman LJ). (I do not consider, however, that Prudential's argument is assisted by the fact that advice from employed lawyers attracts LAP: that seems entirely consistent with the notion that LAP applies where legal advice is being sought from or given by members of the legal profession.)

46   In the light of these points, particularly as it is entirely a creation of the common law for the benefit of individuals or companies seeking and obtaining legal advice, I accept that there is a strong case in terms of logic for allowing this appeal.

*Conclusion: introductory*

47   While I accept that it would accord with its underlying logic to extend LAP as Prudential contend, "The life of the [common] law has not been logic", as Oliver Wendell Holmes Jr observed on the first page of *The Common Law* (1881). As he went on to say, the life of the common law "has been experience". The common law has been created and developed by judges over more than eight centuries, and, as Holmes also observed, "In order to know what it is, we must know what it has been . . ."

48   It is therefore inevitable that the common law will include some rules which, while entirely valid today, have limitations or other aspects which are only explicable by reference to historical practices or beliefs. LAP, as it is currently understood, is such a rule. There is no doubt that the justification for LAP is as valid in the modern world as it was when it was first developed by the courts. However, its restriction to advice from members of the legal profession, while it can fairly be said to be illogical in the modern world, is explicable by reference to history. In particular, until the last century, (i) it was very rare for any professional person other than a lawyer to give legal advice, and (ii) the connection between the legal profession and the courts was thought to be of greater significance than it is now.

49   Where a common law rule is valid in the modern world, but it has an aspect or limitation which appears to be outmoded, it is by no means always right for the courts to modify the aspect or remove the limitation. In any such case, the court must consider whether the implications of the proposed modification or removal are such that it would be more appropriate to leave the matter to Parliament. The court must also consider whether the aspect or limitation in question has led to problems, and whether it has been assumed, approved or disapproved impliedly or expressly by Parliament. And if Parliament has unequivocally endorsed the aspect or limitation then the courts should not, of course, alter it.

50   Subject to that last qualification, the question whether to remove or modify the aspect of the rule in question must inevitably be considered on a case by case basis. Where the court decides that it is inappropriate to remove or modify, it is, in my view, wrong to characterise the result as unprincipled: in a common law system, no well-understood rule or aspect of a rule can sensibly be so described.

© 2013 The Incorporated Council of Law Reporting for England and Wales

222
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

51    Turning to this case, then, despite the powerful arguments advanced    A
to the contrary, and in agreement with the clear and careful judgments
below, I consider that we should not extend LAP to communications in
connection with advice given by professional people other than lawyers,
even where that advice is legal advice which that professional person is
qualified to give.

52    I reach this conclusion for three connected reasons, which together    B
persuade me that what we are being asked to do by Prudential is a matter for
Parliament rather than for the judiciary.  First, the consequences of allowing
Prudential's appeal are hard to assess and would be likely to lead to what is
currently a clear and well understood principle becoming an unclear
principle, involving uncertainty.  Secondly, the question whether LAP should
be extended to cases where legal advice is given from professional people
who are not qualified lawyers raises questions of policy which should be left    C
to Parliament.  Thirdly, Parliament has enacted legislation relating to LAP,
which, at the very least, suggests that it would be inappropriate for the court
to extend the law on LAP as proposed by Prudential.

*Conclusion: uncertainties and unknown consequences*

53    At the moment, although there are inevitably still arguments about    D
whether a party can rely on LAP on particular facts, these arguments are
very much at the margins (as Lord Scott recognised in *Three Rivers (No 6)*
[2005] 1 AC 610, para 43).  That is because the presently accepted state of
the law on LAP is clear to any professional advisers who need to understand
it, and relatively easy to explain to their clients who are meant to benefit
from it.  The implications for society, for the courts, and for the executive, of
LAP only applying where it is members of the legal profession who are giving    E
the advice, have been generally understood, accepted and allowed for by the
rules and practice of the courts and in legislation.

54    The suggested reformulation proffered by Lord Sumption JSC is, as
I have said, clear and principled in conceptual terms.  However, closer
examination of the suggestion that LAP should apply in any case where legal
advice is given by a person who is a member of a "profession [which]    F
ordinarily includes the giving of legal advice" suggests to me that this is an
inappropriate formulation for us to adopt, as it would carry with it an
unacceptable risk of uncertainty and loss of clarity in a sensitive area of law.

55    For example, it is unclear to me whether occupations such as town
planners, engineers, or pension advisers would be members of a "profession"
for this purpose.  They require training and qualifications, and they have
associations, with rules and disciplinary procedures.  Further, like, for    G
instance, actuaries, auditors, architects and surveyors (undoubtedly
professionals), they often, as a result of education and/or experience, have
considerable specialist legal expertise, on which clients draw and expect to
be able to draw.  And that may well become more in point now that legal
advice is not a reserved legal activity under the 2007 Act.

56    As I see it, it could be necessary for a court to delve into the    H
qualifications or standing, and maybe into the rules and disciplinary
procedures, of a particular group of people to decide whether the group
constitutes a profession for the purpose of LAP.  So there would be room for
uncertainty, expenditure and inconsistency, if the court had to decide such
an issue.

© 2013 The Incorporated Council of Law Reporting for England and Wales

57 Further, I am not clear quite how a court is to decide whether a profession is one which "ordinarily includes the giving of legal advice". Many chartered surveyors, architects and accountants, for instance, may not ordinarily give legal advice, but there are many who do. Should the issue be judged by reference to the profession generally, a particular branch of the profession (which could lead to definitional issues), or the practice of the particular member of the profession in the case, and, if this last possibility is correct, would the issue be determined on that member's say-so? In addition, I suspect that much of the advice given by most members of those professions could not infrequently be characterised as "legal" in nature by some people but not by others.

58 Consider cases such as (i) a town planner instructed to try and obtain planning permission for a development or to advise whether it was needed or what had to be done to get it, (ii) a pension consultant asked to advise on whether a payment could be made, or a contribution should be demanded, by trustees of a pension scheme, (iii) a valuation surveyor asked to advise on rental value under a rent review clause or for rating purposes, or (iv) an auditor asked as to the appropriate treatment of a receipt or debt. In each such case, the issue on which advice is sought may well involve a point of law on which the professional concerned is well qualified to advise. In each case, it could very well be open to argument whether LAP attached to such advice.

59 So long as LAP is limited to advice from members of the legal profession, the strong, and justified, presumption will be that LAP does apply in connection with any communications in that context, because lawyers normally only give legal advice. However, where members of other professions give legal advice, it will often not represent the totality of the advice, and there may well be difficult questions to resolve, as to whether, and, if so, in respect of which documents, LAP could be claimed. For instance, it is unclear whether LAP would apply where the legal advice is only subsidiary, and, if so, how one determines subsidiarity; and, in a case where LAP could be claimed, there may be difficulties in deciding how to deal with documents (which may frequently be the majority of documents concerned with the giving of advice in the case) which contain legal and non-legal advice.

60 The specific issue in *Three Rivers (No 6)* provides the basis for an example of my concerns. In that case, it was held that advice to a client as to how to present its case at an inquiry was privileged if it was given by the client's lawyers, who were also giving general legal advice, which was undoubtedly subject to LAP. I am unclear whether, on Prudential's case, it would follow that a letter from town planning experts advising their client how to present its case at a planning inquiry would attract LAP; the answer might, for instance, depend on whether the advisers were also giving legal advice, but that would seem inconsistent with the requirement for consistency across the professions inherent in Prudential's case. And if LAP would apply in such a case, there might be obvious difficulties in disentangling letters seeking or giving both legal and technical advice.

*A policy issue best left to Parliament*

61 Apart from these concerns, it seems to me that this appeal gives rise to an issue, possibly a series of issues, of policy, which constitutes an area into which the courts should generally be reluctant to tread. Rather than

© 2013 The Incorporated Council of Law Reporting for England and Wales

224
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

extending LAP beyond its present accepted boundaries, we should leave it to Parliament to decide what, if anything, it wishes to do about LAP.

62    Much of what is said in the preceding section of this judgment demonstrates that quite wide questions of public policy may be thrown up by Prudential's argument.  The general implications of extending the generally understood limits of LAP as suggested by that argument could clearly have significant implications, which, at least in my view, would be very difficult to identify, let alone to assess.  To put it at its lowest, they may well have significant consequences which should be considered through the legislative process, with its wide powers of inquiry and consultation and its democratic accountability.

63    There are no doubt many pieces of legislation giving the executive the power to call for documents, in respect of which LAP could be invoked to avoid delivering up such documents.  One of the most vital functions of the courts is to protect citizens against abuses by the executive, but that role must be exercised with discrimination.  However, it would, I think, require exceptional circumstances before that function was invoked to create a new right, or to extend an existing right substantially beyond what is currently understood by everyone, including Parliament when enacting such legislation, to be its existing limits.

64    In addition, there is the fast changing landscape of the legal terrain following the passing and implementation of the Legal Services Act 2007.  That Act is also another indication that Parliament is ready to change common law practices which involve special rules for lawyers when it wishes to do so.

65    Another reason why the present issue should be left to Parliament is that the extension of LAP to professions other than lawyers may only be appropriate on a conditional or limited basis.  That is an aspect which can be properly considered and implemented by Parliament, and cannot appropriately be assessed, let alone imposed, by the courts.  This point is well illustrated by reference to the very type of case with which this appeal is concerned.  In 1983, when the Keith Committee recommended that LAP should be extended to communications in connection with tax advice given by expert accountants, it included two qualifications.  The first was that the privilege should be overridden where it

"would . . . unreasonably impede the ascertainment of facts necessary to the proper determination of the taxpayer's tax liabilities, being facts not otherwise capable of ascertainment": para 26.6.5.

The second was that LAP should not extend to advice given by in-house professional advisers: para 26.6.13.  It would be open to Parliament to impose such types of restriction or condition: it would not realistically be open to the courts.

66    Further, as demonstrated by the facts set out in paras 33–34 above, the sort of extension to the currently understood law of LAP sought by the appellants has been (i) reported on by two committees, (ii) discussed in a parliamentary committee, and (iii) proposed to the executive.  Despite thinking it appropriate to extend LAP to certain other professions, as explained in para 35 above, Parliament has apparently chosen not to extend LAP to accountants giving tax advice.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    67   Of course, in another case, points such as these could be overcome if
the court was satisfied that there was a pressing need, in terms of the rule of
law, injustice or even practicality, for the common law to move from its
generally understood position in a particular area.  However, although there
is evidence of some concern about the presently understood limits of LAP,
there is no evidence that even gets near establishing a pressing need to
change those limits.

B

*Parliament has relevantly legislated and declined to legislate*

68   Parliament has on a number of occasions legislated relevantly in this
field.  On three occasions it thought it appropriate to extend LAP, and did so
on the basis that LAP was limited to advice given by members of the legal
profession.  I have in mind section 280 of the Copyright, Designs and Patents
C    Act 1988, section 87 of the Trade Marks Act 1994, and section 33 of the
Administration of Justice Act 1985, referred to in para 35 above.  All these
provisions would have been demonstrably unnecessary if the breadth of LAP
was as Prudential submits.

69   Parliament also legislated in the very field with which this appeal is
concerned on the assumption that LAP only applies to advice given by
lawyers: see section 20B of TMA and paragraphs 23 to 26 of Part 4 of
D    Schedule 36 to the 2008 Act, referred to in paras 6–9 above.

70   Lord Pannick sought to meet this point by relying on the approach
adopted by the House of Lords in *Morgan Grenfell*, where it was held that
although the general words of sections 20 and 20B of the TMA might appear
to imply the removal of LAP in some circumstances, they did not do so
because, as already mentioned, "An intention to override such [a
E    fundamental human right] must be expressly stated or appear by *necessary*
implication" (emphasis added)—to quote from Lord Hoffmann [2003] 1 AC
563, para 8.

71   In my opinion, that principle does not apply here, although I accept
that one must be careful about placing too much weight on the points I have
identified in paras 63 and 64 above.  The reason that it does not apply is that,
F    in *Morgan Grenfell*, the revenue was arguing that what undoubtedly was
universally accepted as being LAP in common law had been impliedly cut
down by legislation.  Given that there was therefore no doubt that the LAP
claimed by the appellant in that case existed at common law, it was to be
expected that, if the 1970 Act had been intended to cut down LAP,
"Parliament [would have] squarely confront[ed] what it [was] doing and
accept[ed] the political cost": per Lord Hoffmann in *R v Secretary of State*
G    *for the Home Department, Ex p Simms* [2000] 2 AC 115, 131, cited by Lord
Hobhouse in *Morgan Grenfell*, para 44.

72   But the position in this case is different from the position in that case,
even though in both cases HMRC seek to rely on implication (rather than
necessary implication) to defeat the taxpayer's argument based on LAP.  The
difference arises from the fact that in this case, as demonstrated from the
discussion in paras 30–36 above, the generally accepted view is that the type
H    of LAP invoked by Prudential does not exist.  In other words, HMRC's
contention is not that a statutory provision impliedly shows that Parliament
intended to remove LAP which plainly would otherwise exist (as in *Morgan
Grenfell*): rather it is that a number of recent statutory provisions clearly
show that Parliament, along with the courts, the textbook writers, and the

© 2013 The Incorporated Council of Law Reporting for England and Wales

writers of relevant reports, considered the type of LAP contended for by    *A*
Prudential does not exist.

*Various other points*

73    I referred in para 45 above to four cases where it was held that LAP
applied where the advice was tendered by foreign lawyers. In none of those
cases does it appear that there was any significant analysis as to why and to    *B*
what extent LAP was to be accorded where it was a foreign lawyer who had
given the advice. It is none the less understandable why LAP was so
extended: the extension was, I suspect, based on fairness, comity and
convenience. While that extension does rather undermine much of the
principled justification for LAP being confined to cases where the advice is
given by professional lawyers, it is consistent with the argument that the    *C*
court should restrict LAP to its currently understood bounds for reasons of
practicality and certainty.

74    Nor do I consider that HRA or POCA take the case any further. The
decision and reasoning of the Strasbourg court in *Van der Mussele v Belgium*
(1983) 6 EHRR 163, *AM & S Europe Ltd v Commission of the European
Communities* (Case 155/79) [1983] QB 878, and *Campbell v United
Kingdom* (1992) 15 EHRR 137 effectively undermine any suggestion that it    *D*
would somehow be contrary to article 14 of the Convention to hold that
LAP applies to communications with professional lawyers and not with
other professional people. Nor do I accept the argument that so to hold
would infringe article 8 read together with article 14. As for section 330 of
POCA, it is in a form which was intended to give effect to the Second Money
Laundering Directive (2001/97/EC) (OJ 2001 L344, p 76), and I do not see    *E*
how it can be said to represent any sort of indication by Parliament as to its
understanding of the extent of LAP.

75    I am also unimpressed by Prudential's reliance on the 2007 Act. At
best, it merely acknowledges two realities which I have accepted anyway,
namely that legal advice is now given by many professional people other
than lawyers, and that lawyers can work in firms with other professionals,    *F*
and vice versa: the only change affected by the 2007 Act is that lawyers can
now go into partnership with people in other professions.

*Disposition*

76    For these reasons, I would dismiss this appeal.

                                                                        *G*
**LORD HOPE OF CRAIGHEAD DPSC**

77    For the reasons given by Lord Neuberger of Abbotsbury PSC, Lord
Mance and Lord Reed JJSC I too would dismiss this appeal. I should like to
add just a few words of my own to explain why I am of that opinion.

78    A search for a principled answer might well lead one to the
conclusion that there was no good reason at all for holding that the tax
advice of chartered accountants should be treated differently from similar    *H*
advice given by a barrister or a solicitor, as Lord Sumption JSC's powerfully
reasoned judgment so ably demonstrates. He starts from the position that
English law has always taken a functional approach to legal advice privilege,
and that all one needs to do is to recognise as a matter of fact that much legal

© 2013 The Incorporated Council of Law Reporting for England and Wales

227

**[2013] 2 AC**                 **R (Prudential plc) v Special Comr of Income Tax (SC(E))**
**Lord Hope of Craighead DPSC**

A    advice falling within the principles governing legal advice privilege is given today by people who are not lawyers: see paras 123 and 128, below.

79    If the issue is approached on that basis, I agree that it is quite difficult to see how in principle according barristers and solicitors a special status on this matter can be justified. I would find it very hard to distinguish between the legal and factual basis for any claim of privilege in this respect as B    between chartered accountants on the one hand and lawyers on the other. The functions that they perform when giving tax advice are essentially the same in each case. And I would certainly not find it possible to draw any relevant distinction between these two professions as to their standards of training or discipline.

80    My starting point, however, is the same as that indicated by Lord Neuberger PSC: see para 29. The reason why the issue is before us at all in C    this case is quite simple. It is to be found in what people generally understand the position to be. Legal advice privilege, as generally understood, applies only to advice that is given by lawyers. If we were to declare that the matter is to be determined not by the profession to which the adviser belongs but by the function that he is performing, we would be changing the ambit of the privilege. And it would be a significant change D    because the position as generally understood has clearly defined limits and, in consequence, the inestimable advantages of clarity and certainty. Can we be certain that that will be so if the privilege were to be extended to tax advice by chartered accountants, on the ground that they too are advisers whose profession has as an ordinary part of its function the giving of skilled legal advice? If the privilege were to be extended that far, what about tax advice given by other members of the accountancy profession? As Sir E    Sydney Kentridge QC put it, the change we are asked to make would need a very good reason—evidence that something was not working properly. I agree with Lord Neuberger PSC that no such pressing need has been demonstrated, and that to adopt the functional test would give rise to a significant risk of uncertainty.

81    I also think that the courts are not best placed to assess how F    profound such a change would be, whether there are good reasons of policy for making it and what protections, if any, are needed to ensure that the ambit of the privilege is kept within limits that are acceptable. Principle is an uncertain guide in such matters, if all one has to go on is the function that is being performed by the adviser. We do not need go down that road, and it seems to me that the wiser course is not to do so. If there are reasons of G    public policy for making the change, the matter should be left to Parliament.

**LORD MANCE JSC**

82    I have had the great advantage of reading the judgments prepared by Lord Neuberger of Abbotsbury PSC, with whom Lord Hope of Craighead DPSC agrees, and Lord Sumption JSC, with whom Lord Clarke of Stone-cum-Ebony JSC agrees. I come down on the same side as Lord H    Neuberger PSC, basically for all the reasons which he gives. I add only a few words, principally to address the suggested logic of recognising that clients of tax accountants enjoy legal advice privilege ("LAP") in respect of tax advice given them professionally by such accountants paralleling the LAP normally enjoyed by the clients of lawyers.

© 2013 The Incorporated Council of Law Reporting for England and Wales

**353**

A

83    LAP has developed and been accepted on a general basis in respect of lawyers because they are lawyers and their business is normally dealing with legal matters.  There has been no particular occasion to examine specific areas of legal advice or lawyers' activity, in order to consider whether it merits special treatment and, if so, how such areas of their activity would be defined.

B

84    Such questions do however arise in respect of Prudential's current claim that the courts should recognise the underlying logic of LAP and accept that it applies in respect of legal advice given professionally in any particular area where the professional who gives it is a member of a profession which has as an ordinary part of its function the giving of skilled legal advice in that particular area.

C

85    The relevant profession here is accountancy and the relevant area the giving of tax advice.  But there are, as Lord Neuberger PSC notes in paras 54 to 60, other professions which might be said to give legal advice in particular areas in the course of their ordinary professional activity.

86    In relation to tax or any other particular areas where legal advice is given professionally, specific considerations may exist which could on examination point away from a recognition of LAP, or away at least from its recognition on an unqualified basis.  That was certainly the conclusion of the Keith Committee, when it recommended that LAP be recognised in respect of tax advice by accountants, but only on a significantly qualified basis: see Lord Neuberger PSC's judgment, para 65.

D

87    Similarly, when the New Zealand Parliament legislated by the Taxation (Base Maintenance and Miscellaneous Provisions) Act 2005 in June 2005 to create a statutory privilege in relation to any confidential "tax advice document", it did so by inserting into the Tax Administration Act 1994 a complex of statutory provisions (sections 20B to 20G) requiring the relevant "tax advisor" to be a member of an "approved advisor group" approved by the Commissioner on Inland Revenue and providing that disclosure must nonetheless be made, from any tax advice document, of "tax contextual information".  This was defined to include, inter alia, (a) a fact or assumption relating to a transaction that has occurred or is postulated by the person creating the tax advice document; (b) a description of a step involved in the performance of a transaction that has occurred or is postulated by the person creating the tax advice document; (c) advice that does not concern the operation and effect on the person of tax laws; (d) advice that concerns the operation and effect on the person of tax laws relating to the collection by the Commissioner of debts payable to the Commissioner; (e) a fact or assumption relating to advice that is referred to in paragraph (c) or (d); and (f) a fact or assumption from, or relating to the preparation of (i) financial statements of the person, or (ii) a document containing information that the person is required to provide to the Commissioner under an Inland Revenue Act.

E

F

G

88    In Australia the Law Reform Commission, in *Privilege in Perspective: Client Legal Privilege in Federal Investigations* (Final Report (2007) ALRC 107, chapter 6) supported "the New Zealand model of creating a separate 'tax advice privilege', rather than simply extending client legal privilege to accountants giving tax advice"; and it did this specifically because it would allow Parliament greater control over the operation and

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

scope of tax advice privilege: para 6.278. As to the nature of the control, it said, para 6.281:

> "The ALRC is also supportive of the provision in the New Zealand legislation which does not apply the privilege to contextual information provided for the purpose of providing tax advice. It should be very clear in the operation of this privilege that only the advice itself will be protected, and not any other information that may form part of the accountant's file or briefing. The legislation should state that no privilege should apply to 'tax contextual information' given for the purpose of providing tax advice. 'Tax contextual information' should be defined as information about:
> - a fact or assumption that has occurred or is postulated by the person creating the tax advice document;
> - a description of a step involved in the performance of a transaction that has occurred or is postulated by the person creating the tax advice document; or
> - advice that does not concern the operation and effect of tax laws."

89 The justification of LAP advanced in respect of lawyers includes candour—that is, that it enables clients to provide their lawyers with all the facts and matters that they might need to advise on the law: see e g the quotation from Lord Scott in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, quoted by Lord Sumption JSC at para 118. But it is evident from paras 86–88 above that, when the present issue has been considered by law reform committees or legislators in the United Kingdom, New Zealand and Australia, this justification has not been felt to have the same force. Rather, a specific need has been felt to ensure, by appropriate legislative qualification of the scope of LAP, that the revenue is put in possession of a full understanding of the facts and the nature of the relevant transactions, so as to be able then to advise itself as to the correct legal conclusions to be derived therefrom as a matter of tax law.

90 Another, not unrelated, feature of this case, to which I attach considerable importance, is that the United Kingdom Parliament has on a number of occasions not only treated lawyers as the only persons whose advice gives rise to LAP on the part of their clients (see Lord Neuberger PSC's judgment, para 35 et seq), but has also specifically decided to maintain a distinction between lawyers and tax advisers when it was suggested that the latter's advice ought to give rise to a general LAP paralleling that existing in respect of lawyers' advice: Lord Neuberger PSC, para 36.

91 If LAP extended to professions other than lawyers, it is accepted that it would not be on a general basis, but that a careful distinction, in practice normally irrelevant in the case of lawyers, would have to be drawn between privileged and non-privileged activities. Although such a distinction can sometimes be relevant with lawyers (e g where a lawyer acts as a "man of business" or purely administratively, rather than as a lawyer), it is not normally so. But in the case of other professions, the distinction would become highly relevant and would not necessarily be easy to draw.

92 For all these and the other reasons given by Lord Neuberger PSC, any recognition in respect of tax accountants of a privilege which has

© 2013 The Incorporated Council of Law Reporting for England and Wales

traditionally been and is still regarded as relevant only to legal advice given *A*
by lawyers in the course of their profession, or of any parallel privilege,
should in my opinion take place, if at all, in Parliament, not in the courts.

**LORD REED JSC**

93   I agree that this appeal should be dismissed, for the reasons given by
Lord Neuberger of Abbotsbury PSC, Lord Hope of Craighead DPSC and
Lord Mance JSC.   *B*

94   The argument that existing legal principle already recognises the
privilege claimed by the appellants, although powerfully put by Lord Clarke
of Stone-cum-Ebony and Lord Sumption JJSC, is not one that I find
persuasive.

95   The process of reasoning by which a legal principle is derived from a
body of authority was explained by Lord Diplock in *Dorset Yacht Co Ltd v*   *C*
*Home Office* [1970] AC 1004, 1058–1059.   Speaking of the law of
negligence, his Lordship explained that the process involved two stages, the
first of which was inductive, and involved an analysis of the characteristics
of the conduct and relationship involved in each of the decided cases:

> "This analysis leads to a proposition which can be stated in the form:
> 'In all the decisions that have been analysed a duty of care has been held   *D*
> to exist wherever the conduct and the relationship possessed each of the
> characteristics A, B, C, D, etc, and has not so far been found to exist when
> any of these characteristics were absent.'   For the second stage, which is
> deductive and analytical, that proposition is converted to: 'In all cases
> where the conduct and relationship possess each of the characteristics A,
> B, C, D, etc, a duty of care arises.'   The conduct and relationship involved   *E*
> in the case for decision is then analysed to ascertain whether they possess
> each of these characteristics.   If they do the conclusion follows that a duty
> of care does arise in the case for decision."

96   Applying that approach in the context of legal advice privilege, in
each of the decided cases in which the privilege was held to exist, the
relationship of the persons between whom the communication passed was   *F*
that of client (or prospective client) and professional lawyer acting as such;
and the privilege has not so far been held to exist when any of the
characteristics of that relationship were absent.   One can therefore deduce
from the authorities a principle which applies when that relationship exists.
That relationship does not however exist in the present case.

97   As Lord Diplock explained (ibid), again in the context of the law of
negligence, where the conduct or relationship which is involved in the case at   *G*
hand lacks at least one of the characteristics which have been identified, the
court has a choice whether or not to extend the kinds of conduct or
relationships which give rise to a duty of care:

> "And the choice is exercised by making a policy decision as to whether
> or not a duty of care ought to exist if the characteristic which is lacking
> were absent or redefined in terms broad enough to include the case under   *H*
> consideration . . .   The choice to extend is given effect to by redefining the
> characteristics in more general terms so as to exclude the necessity to
> conform to limitations imposed by the former definition which are
> considered to be inessential."

© 2013 The Incorporated Council of Law Reporting for England and Wales

231
[2013] 2 AC          R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Reed JSC

A    98    Applying that approach in the present context, since the case at hand lacks one of the characteristics which has been present in all previous cases in which legal advice privilege has been held to exist, the court has a choice whether or not to extend legal advice privilege to situations where legal advice was sought from a professional person other than a lawyer. That choice is exercised by making a policy decision of the kind which Lord Diplock explained. It is open to the court to redefine the characteristics of

B    legal advice privilege in more general terms, for example by holding that legal advice, given in the exercise of a professional activity which involves the giving of such advice, is subject to legal advice privilege. It is also open to the court to adhere to the narrower principle which can be derived from the existing body of case law. A judgment has to be made as to the most appropriate course of action.

C    99    That judgment, in this case, requires a number of considerations to be taken into account, as Lord Neuberger PSC has explained. There are considerations which weigh in favour of an extension of the principle. In particular, it can be argued that the underlying rationale of the privilege favours its application whenever legal advice is sought from a person who is suitably qualified to give such advice, whether that person is a member of the legal profession or of some other profession whose activities include the

D    giving of legal advice.

100    There are on the other hand countervailing considerations. One which seems to me to be particularly significant is that the privilege must be capable of being relied upon if it is to serve its purpose of enabling clients and their legal advisers to communicate with each other with complete candour. It is therefore highly desirable that the privilege should, as far as

E    possible, be based upon a principle which is clear, certain and readily understood. The existing common law principle meets those requirements. The variety of possible formulations of an extended common law principle, and the consequent scope for debate as to whether particular professional persons, in particular situations, would or would not fall within its scope, would detract from the certainty and clarity which presently exist.

F    101    More fundamentally, it is necessary to give consideration to the respective roles, in relation to the development of this area of the law, of the courts, the executive and the legislature. In doing so, it is necessary to have regard to the measures taken (or not taken) in this area by the executive and the legislature, after consultation and consideration of a wider character than can be carried out by courts determining disputes between particular parties. In my judgment, having regard particularly to the latter

G    consideration, the court should decide the case as Lord Neuberger PSC proposes.

102    No question arises in this appeal as to the scope of the privilege in Scots law. It may nevertheless be helpful to add some observations about the case from a Scottish perspective, given the likely interest in the case in Scotland as well as in England and Wales. My observations are not however intended to pre-empt a full discussion of the matter should the issue arise in

H    Scottish proceedings.

103    The law in this area developed separately in Scotland from in England. The two systems have however developed in the same direction. There are a number of differences in the case law in relation to particular aspects of the law, but the general principle, its fundamental importance,

© 2013 The Incorporated Council of Law Reporting for England and Wales

and the considerations of public policy which underlie it, are common to both systems.

104   By the late 17th century it was established in Scotland that an advocate was not bound to disclose "any private advice or secret of his calling or employment": *Creditors of Wamphray v Lady Wamphray* (1675) 1 Mor 347, 348; *Earl of Northesk v Cheyn* (1680) 1 Mor 353; *Stair, The Institutions of the Law of Scotland*, 3rd ed (1759), IV.xliii.8. The rationale was explained by Sir George Mackenzie as being the public interest in persons being able to obtain legal advice based upon complete knowledge of the relevant circumstances:

> "An Advocate is by the Nature of his Imployment tied to the same Faithfulness that any Depositor is: For his Client has depositate in his Breast his greatest Secrets; and it is the Interest of the Common-wealth, to have that Freedom allowed and secured without which Men cannot manage their Affairs and private Business: And who would use that Freedom if they might be ensnared by it? This were to beget a Diffidence betwixt such who should, of all others, have the greatest mutual Confidence with one another; and this will make Men so jealous of their Advocates that they will lose their private Business, or succumb in their just Defence, rather than Hazard the opening of their Secrets to those who can give them no Advice when the case is Half concealed, or may be forced to discover them when revealed." *(Observations upon the 18th Act of the 23rd Parliament of King James the Sixth against Dispositions made in Defraud of Creditors etc* (1675), in *Sir George Mackenzie's Works,* vol 2 (1755), p 44.)

105   It became clear during the 18th century, if not earlier, that this approach also applied to other types of lawyer engaged in legal proceedings (*M'Leod v M'Leod* (1744) 38 Mor 16754), and that the concept of a "secret" extended to anything of which a lawyer had been informed by his client: *Leslie v Grant* (1760) 5 Brown's Supp 874. A crucial step in the further development of the principle was taken in *Executors of Lady Bath v Johnston*, 12 November 1811, FC, which has been interpreted (notably in *M'Cowan v Wright* (1852) 15 D 229) as having decided that the privilege was not confined to communications made in connection with legal proceedings which were then pending or in contemplation. It was also understood by the early 19th century, if not earlier, that the privilege was that of the client, not the lawyer: see e g Bell, *Principles of the Law of Scotland*, 4th ed (1839), pp 833–834, para 2254. The general principle, as it was understood by the mid-19th century, was summarised by Lord Wood in *M'Cowan v Wright*, at p 237:

> "The rule by which the communications between clients and their legal advisers are protected from discovery, is one of great value and importance, and, within its legitimate limits, ought to be strictly observed. According to the law of Scotland, such communications are privileged although they may not relate to any suit depending or contemplated, or apprehended . . ."

106   Comparing the Scottish authorities down to that date with the review of the English case law by Lord Brougham LC in *Greenough v Gaskell* (1833) 1 My & K 98, it could be said that the general principles

© 2013 The Incorporated Council of Law Reporting for England and Wales

233

[2013] 2 AC                R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Reed JSC

A governing the privilege of communications between lawyer and client in the two jurisdictions were in alignment; and that is reflected in the citation of numerous authorities from England as well as Scotland in Bell's account of the subject. More recent development of these general principles, notably in *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, where the privilege was characterised as a fundamental human right, has not depended on matters peculiar to either jurisdiction.

B 107 In Scotland, as in England and Wales, all the cases in which the privilege has been upheld appear to have concerned lawyers acting in a professional capacity, clerks or assistants acting on their behalf, or other intermediaries to whom a communication had been made for transmission to or from such a person. It has been held that the privilege did not attach to communications made to an accountant (*Wright v Arthur* (1831) 10 S 139); C but the case was not one in which it was suggested that the accountant had given legal advice, and it long pre-dated the era in which the giving of tax advice, in particular, became one of the principal areas of practice of many accountants. It is not apparent that the courts have hitherto been required to make a judgment as to whether the privilege ought to be confined to legal advice given by lawyers acting as such, as opposed to legal advice given by members of other professions.

D 108 As far as I have ascertained, therefore, the authorities do not foreclose the possible application of the privilege to advice given by accountants. Nevertheless, as in England and Wales, the general understanding is that the privilege applies only to members of the legal professions. In *Narden Services Ltd v Inverness Retail and Business Park Ltd* 2008 SC 335, 338 for example, the court described the notion of legal E professional privilege (an expression which was adopted in that case, and has been used in subsequent cases, in preference to the older term "confidentiality", which could lead to confusion between the privilege and the different sense in which "confidentiality" is employed in other contexts), as enshrined in the common law of Scotland, as

F "(in broad terms) a right of absolute privilege in respect of communications emanating between a solicitor and a client relating to advice and also in respect of any documents, including those coming from accountants, which were prepared in the contemplation of litigation".

The apparent implication is that documents prepared by accountants may come within the scope of litigation privilege (in the older terminology, post litem motam confidentiality) if they were prepared in contemplation of G litigation, but that legal advice privilege is confined, in broad terms, to communications between a solicitor and his client. The court was not however addressing the question whether the scope of the privilege might be extended where legal advice was given by accountants.

109 Textbooks proceed on a similar basis, assuming that the privilege applies only where advice is given by lawyers, but not specifically addressing the question whether it might also apply where legal advice was given by H members of other professions. The title on Evidence in the *Stair Memorial Encyclopaedia of the Laws of Scotland* (2006 reissue), for example, states that "the privilege is restricted to communications made to professionally qualified and instructed lawyers" (para 205), and that any attempt to plead privilege by "bankers, accountants and other professional business and

© 2013 The Incorporated Council of Law Reporting for England and Wales

234
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Lord Reed JSC

personal advisers" will fail: para 209. *Ross & Chalmers, Walker & Walker, The Law of Evidence in Scotland,* 3rd ed (2009), similarly proceed on the basis that the privilege is confined to professional lawyers: para 10.2.7.

110  As in England and Wales, bodies concerned with law reform have also proceeded on the basis of such an understanding. The Keith Report, discussed by Lord Neuberger PSC, concerned the United Kingdom as a whole, and was prepared by a committee presided over by a Scottish member of the Appellate Committee of the House of Lords. It discussed the relevant rules of Scots law, which it described as not differing materially from the English rules, although some differences in matters of detail were noted: para 26.1.5. This area of the law was also considered by the Scottish Law Commission in its Memorandum No 46, *The Law of Evidence* (1980), vol 2, where it expressed the view that "solicitor/client privilege is reasonably well-defined and works satisfactorily in practice": para S 21. The Commission did not suggest that the privilege applied, or ought to apply, in situations where legal advice was sought from members of other professions; nor was that issue touched upon in the reports which followed upon the consultative memorandum.

111  As in relation to England and Wales, Parliament has legislated in relation to Scotland in ways which assumed that legal advice privilege was confined to advice given by lawyers. Section 20B of the Taxes Management Act 1970 and the replacement provisions in Schedule 36 to the Finance Act 2008, discussed by Lord Neuberger PSC, apply to Scotland. So also do sections 280 and 284 of the Copyright, Designs and Patents Act 1988 and section 87 of the Trade Marks Act 1994, which extended the privilege under Scots law to patent attorneys and trade mark agents respectively. Section 22 of the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990 made provision for communications made to or by a licensed conveyancer or registered executry practitioner to be protected from disclosure "in like manner as if the practitioner had at all material times been a solicitor acting for the client".

112  Finally, just as Parliament legislated in the Legal Services Act 2007 to create a framework for the future of the provision of legal services, and for the regulation of such provision, in England and Wales, a comparable framework was created by the Scottish Parliament in the Legal Services (Scotland) Act 2010. The provision of legal advice is a legal service falling within the scope of the legislation: section 3. The professions whose members can own or control a licensed provider of legal services under the Act include chartered accountants and chartered certified accountants: Licensed Legal Services (Specification of Regulated Professions) (Scotland) Regulations 2012 (SSI 2012/213). The Act makes express provision in section 75, headed "professional privilege", that communications made to or by a licensed provider (or a designated person within the licensed provider) in the course of its acting as such in its provision of legal services, are

"in any legal proceedings, privileged from disclosure as if the licensed provider or (as the case may be) the person had at all material times been a solicitor acting for the client".

Since that provision applies only to licensed providers and designated persons within such providers, it therefore applies only where a licence has

© 2013 The Incorporated Council of Law Reporting for England and Wales

**360**

A been granted; and such grants are dependent upon the existence of appropriate regulatory schemes and licensing rules.

113 Against that background, if the question were to arise in Scotland whether the common law privilege should be extended to legal advice given by accountants, the courts would have to make a policy decision, as I have explained. That decision would have to be made in the context which I have discussed, including the enactment of legislation, following consultation and B consideration in the Scottish Parliament, providing the privilege where other professions are involved in the provision of legal services, on a conditional and limited basis.

**LORD SUMPTION JSC** (dissenting)

114 In my opinion the law is that legal professional privilege attaches to C any communication between a client and his legal adviser which is made (i) for the purpose of enabling the adviser to give or the client to receive legal advice, (ii) in the course of a professional relationship, and (iii) in the exercise by the adviser of a profession which has as an ordinary part of its function the giving of skilled legal advice on the subject in question. The privilege is a substantive right of the client, whose availability depends on the character of the advice which he is seeking and the circumstances in D which it is given. It does not depend on the adviser's status, provided that the advice is given in a professional context. It follows, on the uncontested evidence before us, that advice on tax law from a chartered accountant will attract the privilege in circumstances where it would have done so had it been given by a barrister or a solicitor. They are performing the same function, to which the same legal incidents attach.

E 115 The starting point for any analysis of these matters is the rationale of the privilege attaching to the process of obtaining legal advice. It has been described by the Supreme Court of the United States as "the oldest of the privileges for confidential communications known to the common law": *Upjohn Co v United States* (1981) 449 US 383, 389. In some respects its development has been peculiar to the English common law and those legal systems which have adopted it. In most civil law countries, the protection of F professional confidences is founded on the status of the adviser. In French law, which can stand as the paradigm case, information given to an adviser in the course of a confidential professional relationship is subject to the rules governing the "secret professionel". The source of the confidence is the professional obligations of the adviser, and the provisions of the Penal Code which reinforce them with criminal sanctions. Consistently with this G approach, French law like most European civil law systems accords the same protection to other confidential professional relationships, for example with doctors or priests, and indeed has in recent times extended it to some non-professional ones: see Code Pénal, article 226-13. English law originally protected professional confidences on a similar basis. The origins of the privilege have been traced in the speech of Lord Taylor of Gosforth CJ in *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 504–507 and in H *Holdsworth, A History of English Law*, 3rd ed, vol IX (1944), pp 201–202. It originated in the practice of the Court of Chancery in the years after the statute of 1562 which first made witnesses compellable: see *Berd v Lovelace* (1577) Cary 62; *Dennis v Codrington* (1580) Cary 100. By the early 18th century most writers were agreed that it was based on the protection of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

236
R (Prudential plc) v Special Comr of Income Tax (SC(E))          [2013] 2 AC
Lord Sumption JSC

A

honour of the adviser, who would be discredited by being required to disclose his client's confidences.  It followed that the adviser was permitted but not compellable to give evidence of them.  This theory was disposed of by Lord Mansfield in the *Duchess of Kingston's Case* (1776) 20 State Tr 355, 574.  The famous surgeon Sir Caesar Hawkins declined to give evidence against the duchess on her trial for bigamy, saying: "I do not know how far any thing that has come before me in a confidential trust in my profession should be disclosed consistent with my professional honour."  Lord Mansfield ruled that he must testify, because if the sole ground of refusal was the protection of his honour, it was a sufficient answer to those who might subsequently impugn it that he was compellable.  In the half-century following this decision, the juridical basis of the privilege was redefined by the courts.  It became a right of the client, which was justified as serving a specific public interest in his freedom of action in dealings with his legal advisers.  In *Wilson v Rastall* (1792) 4 Durn & E 753, it was established (i) that the privilege was a right of the client, not of the lawyer, (ii) that the lawyer was therefore precluded from giving evidence of privileged matters even if he was willing to, and (iii) that the privilege was not confined to the litigation in which disclosure was sought nor to litigation in which the client was a party, but extended to any litigation in which it was sought to compel the production of documents or the appearance of a witness.

B

C

D

116  In *Greenough v Gaskell* 1 My & K 98, Lord Brougham LC reviewed the case law going back to the late 18th century.  In a judgment which is generally regarded as the foundation of the modern law, he held that the privilege was unaffected by the question whether proceedings were pending or contemplated,

E

"for a person oftentimes requires the aid of professional advice upon the subject of his rights and his liabilities, with no reference to any particular litigation, and without any other reference to litigation generally than all human affairs have, in so far as every transaction may, by possibility, become the subject of judicial inquiry": p 102.

In a celebrated passage, Lord Brougham LC said, at p 103:

F

"The foundation of this rule is not difficult to discover.  It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, though certainly it may not be very easy to discover why a like privilege has been refused to others, and especially to medical advisers.  But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings.  If the privilege did not exist at all, every one would be thrown upon his own legal resources; deprived of all professional assistance, a man would not venture to consult any skilful person, or would only dare to tell his counsellor half his case.  If the privilege were confined to communications connected with suits begun, or intended, or expected, or apprehended, no one could safely adopt such precautions as might eventually render any proceedings successful, or all proceedings superfluous."

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

237

[2013] 2 AC                R (Prudential plc) v Special Comr of Income Tax (SC(E))
                                                                Lord Sumption JSC

A    The only exception to the principle thus stated which Lord Brougham LC
was prepared to recognise was the case where the communication for which
privilege was claimed was made to a professional legal adviser but not in the
course of a professional relationship with him: see pp 104–115. This was
not an indirect way of recognising the special status of professional lawyers.
It is clear from the context that the point which Lord Brougham LC was
B    making was that the privilege attaches only to legal advice taken in a
professional context, i e not in a social one.

117    Not every one has applauded the principle as it was developed in
the late 18th and early 19th centuries. But it is fair to say that many of its
critics have been animated by broader misgivings about the whole process of
forensic inquiry and the role of the legal profession in it. Jeremy Bentham,
who regarded lawyers as obstacles to the administration of justice, famously
C    characterised legal professional privilege as a doctrine which turned the
lawyer into the accomplice of his client. His views were the subject of a
ferocious refutation in the pages of the *Edinburgh Review* by Thomas
Denman, a barrister, member of Parliament, and lifelong friend of Lord
Brougham LC, later to become Lord Chief Justice, who restated the classic
view of the privilege as fundamental to the rights of the citizen. History has
D    gone Denman's way and not Bentham's. Lord Brougham LC's judgment in
*Greenough v Gaskell* remains to this day the classic statement of the
rationale for legal advice privilege. In *AM & S Europe Ltd v Commission of
the European Communities* (Case 155/79) [1983] QB 878, 913, Sir Gordon
Slynn, Advocate General, after reviewing the law relating to the protection
of confidences imparted to lawyers across the member states of the European
E    Community observed

    "Whether it is described as the right of the client or the duty of the
    lawyer, this principle has nothing to do with the protection or privilege of
    the lawyer. It springs essentially from the basic need of a man in a
    civilised society to be able to turn to his lawyer for advice and help, and if
    proceedings begin, for representation; it springs no less from the
F    advantages to a society which evolves complex law reaching into all the
    business affairs of persons, real and legal, that they should be able to
    know what they can do under the law, what is forbidden, where they must
    tread circumspectly, where they run risks."

More recently, in *Three Rivers District Council v Governor and Company of
the Bank of England (No 6)* [2005] 1 AC 610, Baroness Hale of Richmond
G    took up the same theme at para 61:

    "It may thus impede the proper administration of justice in the
    individual case. This makes the communications covered different from
    most other types of confidential communication, where the need to
    encourage candour may be just as great. But the privilege is too well
    established in the common law for its existence to be doubted now. And
H    there is a clear policy justification for singling out communications
    between lawyers and their clients from other professional
    communications. The privilege belongs to the client, but it attaches both
    to what the client tells his lawyer and to what the lawyer advises his client
    to do. It is in the interests of the whole community that lawyers give their

© 2013 The Incorporated Council of Law Reporting for England and Wales

363

A

> clients sound advice, accurate as to the law and sensible as to their conduct."

I do not propose to multiply citations, but it is right to point out that precisely the same underlying rationale has been given for the privilege in modern times by the Supreme Court of the United States: *Upjohn Co v United States* 449 US 383, 389; *Swidler & Berlin v United States* (1998) 524 US 399, 403. By the High Court of Australia: *Esso Australia Resources Ltd v Federal Comr of Taxation* (1999) 201 CLR 49, para 35; *Daniels Corpn International Pty Ltd v Australian Competition and Consumer Commission* (2002) 213 CLR 543, para 44 (McHugh J). And by the Supreme Court of Canada: *R v McClure* [2001] 1 SCR 445, paras 36–39.

B

118  Doubts have sometimes been expressed about how important the assurance of absolute confidentiality really is to clients who consult legal advisers, particularly when they do so in civil or non-contentious matters. How often these doubts are justified is impossible to say. We can assume that they sometimes, perhaps often are. As Lord Scott pointed out in *Three Rivers (No 6)* [2005] 1 AC 610, para 34, it is

C

> "obviously true that in very many cases clients would have no inhibitions in providing their lawyers with all the facts and information the lawyers might need whether or not there were the absolute assurance of non-disclosure that the present law of privilege provides."

D

It does not matter for two reasons. The first is that the law is that the confidence must be protected if proper legal advice is to be obtained. It has been established in this sense for many years and no one is asking us to depart from it. The second, which is perhaps more satisfying, is that it would be wrong to depart from it in any event. The underlying principle is that those clients who do wish to consult a lawyer on the basis of absolute confidence should be entitled to do so, notwithstanding that absolute confidence may be less important to others.

E

119  Consistently with the underlying principle, the modern case law has developed the law of privilege in three principal respects which are relevant to the issues on this appeal. First, the courts have held that the privilege is absolute, subject only to a narrowly defined exception for cases where the client is seeking legal advice in order to enable himself the better to commit a fraud or crime. In *R v Derby Magistrates' Court, Ex p B* [1996] AC 487 the House of Lords, after reviewing the case law on the juridical basis of the privilege from its origins in the 16th century, held that it did not depend on balancing the public interest in sustaining the confidence against any competing public interest. In the circumstances of that case, it could not be overridden even if the information withheld was likely to be material evidence to exonerate a man charged with murder. Second, although litigation (civil or criminal) will generally be the occasion for seeking disclosure of information said to be privileged, the modern case law has reaffirmed the principle first stated by Lord Brougham LC that the privilege does not just exist in aid of forensic litigation. It attaches to confidences given in circumstances where no proceedings were contemplated or where the proceedings contemplated were not litigation but, for example, a domestic or public inquiry: *Three Rivers District Council v Bank of England (No 6)* [2005] 1 AC 610. Third, in *R (Morgan Grenfell & Co Ltd) v Special*

F

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A *Comr of Income Tax* [2003] 1 AC 563, Lord Hoffmann, with whom the rest of the House of Lords agreed, recognised at para 7 what was implicit in these propositions, namely that the privilege was not a mere procedural incident of the forensic process, but a "fundamental human right long established in the common law", which was "a necessary corollary of the right of any person to obtain skilled advice about the law".

B 120  Legal advice privilege is sometimes described as essential to the effective administration of justice, and Lord Brougham LC himself put it that way. By this, they did not mean the effective conduct of legal proceedings. On the contrary, as Baroness Hale pointed out in her speech in *Three Rivers* (quoted above), privilege may obstruct the forensic process by making relevant evidence unavailable. Lord Scott pointed out in the same case, para 34, that the relevant public interest was in reality the rule of law,

C which depends upon the citizen being able without inhibition to find out what his legal position is. The complexity of the modern law and its progressive invasion of the interstices of daily life, have made this a public interest of greater importance than ever before. It is perhaps particularly significant in the area of tax law, where the citizen is brought up against the power of the state and the law is often technically complex.

D 121  From the origins of the privilege in the late 18th century to the present day, the case law refers to it as attaching to the advice of lawyers, i e barristers, solicitors and attorneys and, in the very early days of the doctrine, the scriveners who drew up wills, charters and other legal instruments.  In most of the early cases lawyers were identified in contradistinction not to other sources of professional legal advice, but to professionals whose advice was not legal at all, such as priests or doctors.

E Once this distinction became too well understood to require repetition, the references in the cases to the advice of lawyers persisted but simply reflected the assumption that lawyers were the only source of skilled professional legal advice. Until modern times, this assumption was correct. The routine resort to accountants for legal advice on tax does not seem to have become common until the 1960s. The only English case before this one to address directly the difference between legal advice received from barristers and

F solicitors on the one hand and other legal advisers on the other was *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159, in which it was held that patent agents were not lawyers and that privilege did not attach to their advice. I shall say something more about this case below.

122  Once it is appreciated (i) that legal advice privilege is the client's privilege, (ii) that it depends on the public interest in promoting his access to

G legal advice on the basis of absolute confidence, and (iii) that it is not dependent on the status of the adviser, it must follow that there can be no principled reason for distinguishing between the advice of solicitors and barristers on the one hand and accountants on the other.  The test is functional.  The privilege is conferred in support of the client's right to consult a skilled professional legal adviser, and not in support of his right to consult the members of any particular professional body.  The findings of

H Charles J, which are borne out by the evidence, show that today there are at least three professions whose practitioners have as part of their ordinary professional functions the giving of skilled legal advice on tax. Accountants are among them. Any distinction for this purpose between some skilled professional advisers and others is not only irrational, but inconsistent with

© 2013 The Incorporated Council of Law Reporting for England and Wales

240
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Lord Sumption JSC

the legal basis of the privilege. It would make it dependent not just on the
nature of the advice or the circumstances in which it was given, which have
always been relevant considerations, but to a substantial degree on the status
of the adviser, which has not been a relevant consideration for 250 years.

123   It is consistent with the view that I have expressed that the courts
have in recent times expanded the categories of lawyer whose advice may
attract privilege, in particular to cover salaried legal advisers and foreign
lawyers.   This development has been the natural consequence of the
functional character of the test combined with the law's pragmatic
willingness to recognise the changing patterns of professional life.   The
privilege attaching to the advice of salaried legal advisers was first
recognised judicially by the Court of Appeal in *Alfred Crompton
Amusement Machines Ltd v Customs and Excise Comrs (No 2)* [1972] 2 QB
102.   Lord Denning MR, at p 129, justified the result primarily on the
ground that, although the communications of a corporation with an in-
house legal adviser were internal to the corporation, nevertheless the adviser
was performing the same function as the lawyer in independent practice.
Relevant communications with foreign lawyers have for many years
attracted the same privilege for the same reason.   In *Lawrence v Campbell*
(1859) 4 Drew 485 privilege was claimed in English litigation for
communications between a Scottish client and a Scottish solicitor practising
in London.   Kindersley V-C held, at p 491, that "the same principle that
would justify an Englishman consulting his English solicitor would justify a
Scotchman consulting a Scotch solicitor."   Subsequently, communications
with foreign lawyers were treated as being entitled as a matter of course to
the same privilege as communications with English lawyers in like
circumstances: see *Macfarlan v Rolt* (1872) LR 14 Eq 580; *In re Duncan,
decd* [1968] P 306; *Great Atlantic Insurance Co v Home Insurance Co*
[1981] 1 WLR 529, 535–536. Sir Sydney Kentridge QC, appearing for the
Law Society, described these cases as "anomalous".   But he did not suggest
that they were wrong.   I think that they were clearly right, and I do not
regard them as anomalous.   They reflect the functional approach which
English law has always taken to legal advice privilege.

124   The only sustained arguments addressed to us for treating
barristers and solicitors as having a special status justifying their unique
treatment by the law of privilege were (i) that other professionals did not
have the same stringent legal obligations of non-disclosure as lawyers; and
(ii) that barristers and solicitors have a unique relationship with the courts.

125   The first of these points can be shortly dealt with.   If privilege
attaches to the tax advice of accountants in the same circumstances as it
would attach to similar advice from a barrister or solicitor, then its legal
incidents are exactly the same in either case.   It does not matter that the
professional rules of at least some accountants permit them to disclose
confidential client information in some circumstances in which it could not
lawfully be disclosed by a solicitor.   These rules do not prevent accountants
from assuming more stringent and less qualified obligations, and they would
be treated as doing so by giving advice in privileged circumstances.   This is
because the juridical source of the accountant's duty in relation to privileged
material is the right of the client under the law of privilege, not the
accountant's professional rules.

© 2013 The Incorporated Council of Law Reporting for England and Wales

126   The second reason for attributing a unique status to the advice of barristers and solicitors was that the existence of the privilege has always depended on the close relationship of the courts with the legal professions. The authority of the judges, it is said, has always been the ultimate source of standards of admission and of the disciplinary powers exercisable over legal practitioners. But they have never been concerned with the professional standards or organisation of the accountancy profession. Sir Sydney Kentridge, who was mainly responsible for developing this argument, did not of course suggest that accountants were unworthy of being treated on a par with solicitors and barristers, nor was any such suggestion advanced by any one else on this appeal. His point was that judicial recognition and supervision of the legal profession was historically part of the basis on which privilege attached to their advice. This, he submitted, was not something that could be ignored simply because others have come to perform the same functions. This approach was to some extent invited by the concession of the appellants that the privilege would attach only to communications with members of "recognised" professions. But in my view the argument, like the concession which provoked it, is mistaken. In the first place, the main judicial safeguard against abuse lies, as Lord Denning MR pointed out in the *Alfred Crompton* case (p 129), in the right of the court to examine the legal and factual basis for any claim of privilege at the time when it is made. The court is in as good a position to do this when accountants are involved as it is when the advice was sought from lawyers. Secondly, none of the statements of principle in the case law have identified the relationship of lawyers with the court or the arrangements for the admission or discipline of lawyers as a relevant factor. If it had been, then the English courts would not have recognised a privilege for legal advice which was wholly independent of any forensic proceedings, actual or prospective. Nor would they have recognised the privilege attaching to the advice of foreign lawyers. There is no suggestion in any of the cases about foreign legal advice of any interest on the part of the English court in the standards of their training or discipline, and they are certainly not amenable to the supervision of English judges. Nor could Romilly MR have recognised the privilege attaching to the advice of a person whom the client believed to be a solicitor and professionally consulted on that basis, but who in fact was not: see *Calley v Richards* (1854) 19 Beav 401. Third, the legal basis of the privilege was worked out by the courts at a time when most claims for legal advice privilege concerned communications with solicitors and attorneys, whose professional standards were then notoriously low. Many of them were not enrolled and the court's supervision of their professional practices was nominal or non-existent. This was particularly true of attorneys, who practised in the common law courts and whom Sir Vicary Gibbs, Chief Justice of Common Pleas from 1813, once memorably described as "the growling jackals and predatory pilot fish of the law": see *The Oxford History of the Laws of England*, vol XI (2010), p 1110 (the whole of this chapter repays reading). The high modern standing of solicitors (as all of them were called after 1873) was due very largely to the work of the Law Society, which was founded after 1825 to address this perception, and which together with its provincial affiliates gradually transformed the profession in the course of the 19th century.

© 2013 The Incorporated Council of Law Reporting for England and Wales

127    Neither Charles J nor the Court of Appeal took issue with these    A
points in principle.  On the contrary, Charles J considered [2011] QB 69,
paras 64–65 that the appellants had put forward

> "64. . . . a compelling, indeed unanswerable, case that in modern
> conditions accountants have the expertise to advise on tax law and it is
> firms of accountants, rather than firms of solicitors, who do give such
> advice and represent clients in disputes with the revenue on many aspects    B
> of their tax affairs . . .
> "65. So in my view, Prudential have shown that accountants do what
> lawyers are described as doing in the cases that establish LPP."

The courts below decided the question mainly on the ground that the wider
implications of recognising a privilege attaching to the advice of accountants
made it a matter for Parliament.  Most of the argument addressed to us on    C
behalf of the respondents and those interveners who supported them, was
directed to this proposition.  In reality, it comprises three distinct points.
The first is a classic "floodgates" argument, namely that it would involve an
extension of scope of the privilege which would considerably increase the
number of persons whose advice qualified.  The second argument is that
recognising the privilege attaching to accountants' advice would directly    D
conflict with statute.  The third is that fixing the boundaries of the privilege
for legal advice from non-lawyers and determining the conditions on which
it was exercisable were inherently legislative processes.

128    The main difficulty about the first point is its premise.  This is that
by recognising the privilege attaching to the legal advice of accountants we
would be extending the scope of the privilege at common law.  In my view
this premise is wrong.  Acceptance of the appellants' basic submission would    E
not involve any change to the principles governing the availability of legal
advice privilege.  It would only involve recognising that as a matter of fact
much legal advice falling within those principles is nowadays given by legal
advisers who are not barristers and solicitors but accountants.  It is the
function of the courts, and in particular of this court, to ensure that changes
in legal, commercial or social practice are properly reflected in the way that
the law is applied.  I do not doubt that as a result the number of claims to    F
privilege will be increased.  But that is because the growing complexity of tax
law and the increasing number of people and organisations affected by it,
have led to an exponential increase in the number of people seeking legal
advice.  A mere increase in the number of people who can take advantage of
an existing rule of law cannot be a good reason for failing to apply general
principles coherently.  Nor can it justify an arbitrary distinction between    G
different professions performing exactly the same function.

129    The second point (that the supposed extension of the privilege
would be directly inconsistent with statute) was based on the provisions of
sections 20 and 20B of the Taxes Management Act 1970, which were the
legal basis of the revenue's demand in this case.  Section 20(1) confers on an
Inspector of Taxes the power to call for documents in the possession or
power of the taxpayer, and section 20(3) confers on him a corresponding    H
power to call for documents from third parties such as advisers.  By
section 20(9), these provisions are subject to the restrictions in section 20B.
Under section 20B(3), only the Commissioners of Inland Revenue (not an
Inspector) may exercise the power under section 20(1) or (3) against a

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   barrister, advocate or solicitor. And by section 20B(8), a barrister, advocate or solicitor is not obliged to produce any document for which legal professional privilege could be maintained. Section 20B(9)(11) make additional provision for dispensing auditors and "tax advisers" from having to produce relevant communications which are their property (i e, in effect, their working papers) or which are merely explanatory. For this last

B   purpose, a "tax adviser" means any person appointed to give advice about the tax affairs of another person. The argument is that these sections make special provision for the assertion of privilege in respect of communications with barristers and solicitors, thus implicitly excluding the assertion of privilege for communications with any one else. The point is said to be reinforced by the fact that Parliament has made distinct provision in section 20B(9) for documents in the possession of a broader category of "tax

C   advisers". In my view this argument cannot be accepted in the light of the decision of the House of Lords in *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, which concerned the same provisions of the Taxes Management Act 1970. The relevant advice in that case had been given by solicitors and counsel, but the argument was similar. Section 20B(8) expressly preserved legal professional privilege in respect of

D   documents requisitioned from third parties under section 20(3) but not in respect of documents requisitioned from the taxpayer himself under section 20(1). The point made for the Inland Revenue, as summarised by Lord Hoffmann at para 10, was that

E     "Parliament has provided a number of specific safeguards and restrictions for the protection of the taxpayer, including an express preservation of LPP for documents in the possession of a barrister, advocate or legal adviser. It therefore necessarily follows that no wider qualification of the general words of section 20(1) was intended": see also para 21.

  The argument failed essentially because the provisions relating to privilege in this part of the Act could not be regarded as a complete code governing its

F   availability. Section 20B(8) was held to be directed at a limited problem arising from dicta in *Parry-Jones v Law Society* [1969] 1 Ch 1, which appeared to suggest that documents in the hands of a lawyer were protected only by the law of confidence, not by privilege. As for section 20B(9), that was held to be irrelevant because it was not concerned with privilege at all: see paras 14 and 19. More generally, Lord Hoffmann, with whom the rest of

G   the Appellate Committee agreed, held at para 8 that the fundamental character of the client's right to invoke privilege meant that it could be overridden by statute only if an intention to do so was "expressly stated or appear[s] by necessary implication." As Lord Hobhouse pointed out in his concurring judgment, at para 45,

H     "A *necessary* implication is one which necessarily follows from the express provisions of the statute construed in their context. It distinguishes between what it would have been sensible or reasonable for Parliament to have included or what Parliament would, if it had thought about it, probably have included and what it is clear that the express language of the statute shows that the statute must have been included.

© 2013 The Incorporated Council of Law Reporting for England and Wales

**369**

A necessary implication is a matter of express language and logic not interpretation.”

The decision in *Morgan Grenfell* illustrates the difficulty of arguing that statutory provisions expressly reserving legal professional privilege in some circumstances impliedly override it in all others. The most that can be said about section 20B(8) in the present context is that, like some other statutes conferring power to requisition documents or information, it assumes that privilege is available only in cases where a barrister, advocate or solicitor is involved. That is understandable at a time when no court had pronounced on the application of privilege to tax advice given by any one else. But it is axiomatic that the assumptions of Parliament are not the same as its enactments. In my view it is impossible to spell out of these provisions a necessary implication that Parliament intended to confine the privilege to communications with lawyers even if the common law extended it to others. On the footing that privilege attaches to communications about tax advice from accountants on exactly the same basis as corresponding communications with lawyers, I can discern no rational reason why Parliament should have intended to distinguish between them. The truth is that Parliament was not intending to deal with the advice of non-lawyers at all.

130    I come therefore to the third of the arguments for leaving the present issue to Parliament, which is to my mind the strongest of them. It can fairly be summarised as follows:

(1) Legal professional privilege has been extended by statute to patent and trade mark attorneys, licensed conveyancers, and persons who without being barristers or solicitors are authorised to provide certain legal services under the Courts and Legal Services Act 1990 or the Legal Services Act 2007. There has been no equivalent extension to accountants.

(2) A substantial number of statutes confer on the police or regulatory and disciplinary bodies the powers to obtain documents or information, subject to reservations for legal professional privilege which refer to “professional legal advisers”. Other provisions, such as section 2 of the Criminal Justice Act 1987 (which confers a corresponding power on the Serious Fraud Office), preserve legal professional privilege subject to exceptions which refer in terms to “lawyers”.

(3) The possibility of extending the privilege to accountants was considered on a number of occasions between 1967 and 2008, but on none of them was Parliament prompted to extend the privilege to the advice of accountants.

(4) More generally, the question which professionals qualify would be left uncertain if the appellants’ argument succeeded. They are seeking the recognition only of the privileged status of tax advice given by members of the Institute of Chartered Accountants and the Chartered Institute of Taxation, but the principle which is said to justify such recognition would be capable of affecting a wider and wholly uncertain category of legal adviser.

In my view, none of these considerations require this court to refrain from giving a principled answer to the question posed on this appeal.

131    The first point to be made is that we are not here concerned with social or economic issues or other issues of macro-policy which are classically the domain of Parliament. Nor are we concerned with legal

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    principles derived from statute.  Legal professional privilege is a creation of the common law, whose ordinary incidents are wholly defined by the common law.  In principle, therefore, it is for the courts of common law to define the extent of the privilege.  The characterisation of privilege as a fundamental human right at common law makes it particularly important that the courts should be able to perform this function.  Fundamental rights should not be left to depend on capricious distinctions unrelated to the legal

B    policy which makes them fundamental.

132    Statute has intervened frequently in the past half-century, but it is important to appreciate on what basis it has done so.  In the great majority of cases, statute has intervened for the limited purpose of reserving privilege when creating new powers to obtain documents or information by compulsion.   Sometimes, the privilege is reserved subject to some

C    qualification, although the commonest qualification relates to the right to require a lawyer to disclose his client's name and address, something that would not necessarily be privileged anyway.  Section 20 of the Taxes Management Act 1970 is one of the earliest interventions of this kind.  They have become commoner as statutory regulation has become more pervasive and powers of compulsion have multiplied.  Some of the enactments in question, like the Taxes Management Act itself, assume that the privilege

D    applies only to communications involving barristers and solicitors.  Some of them, particularly in more recent times, have assumed that it applies to communications involving "legal advisers" or "professional legal advisers", a term which would naturally include any person who gives legal advice in the course of his profession.  Provisions of these kinds are not concerned to define the extent or incidents of the privilege at common law.  They operate

E    by reference to the common law as it is declared by the courts.  They may proceed on assumptions about the categories of legal adviser to which the relevant common law applies, which may be expressed with greater or lesser precision.  Either way, assumptions of this kind are entirely consistent with the courts continuing to perform their historic role of clarifying and developing the common law.  Indeed, the regularity of statutory intervention makes it the more important for the courts to declare the common law so

F    that Parliament can proceed on a correct assumption about what it is.  The problem at the moment is that Parliament is legislating against the background of assumptions about the common law which are contrary to principle, discriminatory and out of date.  Only the courts can be expected to rectify that state of affairs.  Certainly, the frequency of references to privilege in statutes providing for the compulsory provision of documents or

G    information has not prevented the courts from recognising the privileged status of relevant dealings with foreign lawyers.  A French notary or a German Rechtsanwalt, for example, could not properly be described as a "barrister" or "solicitor" for the purposes of section 20B(8) of the Taxes Management Act, but it would be surprising to hear it said that a client who consulted one of these professionals could not claim privilege for their communications in response to a requisition under section 20.

H    133    The other purpose for which statute has intervened in recent years is to recognise certain professional activities other than those of barristers and solicitors as attracting the privilege.  I find it difficult to attach much significance to this.   None of the enactments in question attempt a comprehensive scheme of recognition which could make the omission of

© 2013 The Incorporated Council of Law Reporting for England and Wales

**371**

accountants' tax advice significant.  There has been piecemeal legislation applying the privilege to certain professional activities of patent and trade mark attorneys and licensed conveyancers.  In the case of patent and trade mark agents, this was necessary in order to reverse the effect of *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159, which had held that their activities did not attract privilege.  A more systematic attempt to address the issue was made by section 63 of the Courts and Legal Services Act 1990, which has now been superseded by section 190 of the Legal Services Act 2007.  Section 190(2) of the 2007 Act provides that where advocacy, litigation, conveyancing or probate services are provided by individuals who are not barristers or solicitors, legal professional privilege is to attach "in like manner as if [the individual] had at all material times been acting as [his] client's solicitor."  By section 190(4), it is also to attach where a body licensed by the Legal Services Board provides services through a person who is a "relevant lawyer" or acts under the supervision or direction of a "relevant lawyer".  "Relevant lawyers" include solicitors, barristers, Scottish advocates, registered foreign lawyers, European lawyers and also an indeterminate category of persons authorised by the Board to carry on a "reserved legal activity".  These provisions can contribute very little to the present debate for two reasons.  First, legal advice is not as such covered by the statutory scheme.  It is regulated only so far as it is incidental to one of the services specified for the purpose of subsection (2) or the "reserved legal activities" relevant to subsection (4).  The latter are defined in section 12.  Secondly, section 190(7) provides that the rest of the section is "without prejudice to any . . . rule of law by virtue of which a communication, a document, material or information is privileged from disclosure."  So far as any policy can be discerned which is relevant to the present issue, it is to enable legal services to be supplied on a comparable basis as to privilege and other matters, irrespective of traditional demarcation lines between barristers, advocates and solicitors on the one hand and other persons providing the same services on the other.

134   There is a well-established difference between a case where Parliament has merely made assumptions about the common law in framing legislation, and cases where the legislation in question is workable only if that assumption is correct.  It was pointed out by Lord Reid in *West Midlands Baptist (Trust) Association (Inc) v Birmingham Corpn* [1970] AC 874, 898F–G, and the courts have implicitly addressed it on many occasions.  *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 is one of them.  The House of Lords extended the right to restitution of unlawfully demanded tax, notwithstanding that important policy considerations were engaged and notwithstanding extensive statutory intervention in the relevant area.  Lord Slynn of Hadley observed, at p 200:

"I do not consider that the fact that Parliament has legislated extensively in this area means that no principle of recovery at common law can or should at this stage of the development of the law be found to exist.  If the principle does exist that tax paid on a demand from the Crown when the tax was the subject of an ultra vires demand can be recovered as money had and received then, in my view, it is for the courts to declare it.  In so doing they do not usurp the legislative function.  I regard the proper approach as the converse.  If the legislature finds that

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    limitations on the common law principle are needed for reasons of policy
or good administration then they can be adopted by legislation . . .”

At the other extreme, in *Marcic v Thames Water Utilities Ltd* [2004] 2 AC
42 and *Johnson v Unisys* [2003] 1 AC 518 the suggested developments of the
common law would have made apparently comprehensive schemes of
statutory regulation unworkable in the manner which Parliament intended.
B    In a case like this, where the suggested development conflicts with some of
the assumptions of Parliament but not with its intentions, the courts should
be extremely wary before acceding to invitations to leave those assumptions
uncorrected when their practical application has become anomalous or
incoherent in the light of modern developments.

135    Over the years, there have been some proposals to protect
communications with accountants relating to tax advice by statute. Their
C    rejection or abandonment is said by the respondents to suggest that
Parliament has taken a position on the question. In 1967, the Law Reform
Committee advised in its the Sixteenth Report (Cmnd 3472) against creating
a statutory privilege for confidential professional relationships generally.
The privilege would have been an enhanced rule of confidentiality along the
same lines as the “secret professionel” in most European civil law
D    jurisdictions. It would have applied to doctors, priests, bankers and
accountants. It is, however, clear that the Committee was dealing with the
possibility that such a privilege might be desirable by virtue of the
confidential character of the relationship, rather than any public interest in
enabling persons to take legal advice. This has nothing to do with legal
professional privilege. The Keith Committee came rather closer to the mark
E    when they reported in 1983 on the enforcement powers of the revenue
departments (Cmnd 8822). The Committee considered (para 26.6.13) that
“there does not appear to be any reason to distinguish between a legally
qualified tax agent and any other, at least in the tax field”. They
recommended by a majority that the privilege should extend to non-legally
qualified tax agents in private practice who were members of an
incorporated society of accountants or the Institute of Taxation. They
F    considered that the privilege should be subject in all cases (including
lawyers) to a right in the tribunal to override it where its exercise would
unreasonably impede the ascertainment of the facts. For reasons which do
not appear to be recorded, nothing came of this proposal. It would have
involved an extension of the categories of relevant adviser but some
significant restrictions of the scope of the privilege. This may have been why
G    it got no further. In 2003, the Government rejected a recommendation of
the Director General of Fair Trading that accountants’ legal advice should be
privileged on the same basis as that of lawyers, on the ground that the
discrimination between them was anti-competitive. Its stated reason was
that it was undesirable to increase the number of people who could decline
on the ground of privilege to produce information about money-laundering
transactions or tax avoidance schemes. Finally, there was a brief discussion
H    in the committee stage of the Finance Bill 2008 of a proposed amendment to
Schedule 36, which substantially re-enacted the various powers of the
revenue departments to requisition documents or information. Schedule 36
as enacted does in fact allow “tax advisers” (generally accountants) to
withhold material requisitioned by the revenue if they constitute

© 2013 The Incorporated Council of Law Reporting for England and Wales

248
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Lord Sumption JSC

communications for the purpose of giving or obtaining advice about a client's tax affairs. The proposed amendment was directed to the fact that whereas the advice of lawyers was to be privileged in the hands of both the adviser and the client, the corresponding statutory protection for communications with "tax advisers" applied only to material in the hands of the adviser. The same material could be obtained by compulsion from the client himself. The Financial Secretary to the Treasury said that the Government was reluctant to extend the protection for privileged material too widely but would consider the position, and on that basis the amendment was withdrawn. The matter does not seem to have resurfaced. The differentiation between material in the hands of the adviser and in the hands of the client was criticised as irrational by Lord Hoffmann in *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563 at para 22, in the context of section 20B(8) of the Taxes Management Act 1970, which made a similar distinction in a case where the advice was sought from a lawyer. The same criticism was made by Sir Gordon Slynn as Advocate General in *AM & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913–914. It is a poor advertisement for the coherence of English statute law in this area. In my view these proposals and their reception fall a very long way short of suggesting that Parliament has implicitly taken a position on the application of legal professional privilege to communications with accountants. The material shows that the Government is reluctant to increase the number of claims to privilege in tax investigations, which will surprise no one. I do not think that it shows any more than that. Only the Keith Report and the Government response to the proposals of the Director General of Fair Trading directly address the question whether privilege or some statutory equivalent should attach to communications with accountants. The former appears to have been rather cursorily discussed in Parliament and the latter not at all. The proposal in 2008 to deal with the anomalous distinction between materials in the hands of a tax adviser and his client was discussed in Parliament, but was left inconclusively in Limbo.

136    Looking at these matters in the round, one point stands out. Most of the policy considerations urged upon us on this appeal ultimately rest on concerns that privilege may get out of hand if it may be claimed in respect of legal advice from non-lawyers. It is said that only Parliament can address this problem so far as it is one. I do not underestimate these concerns. But I do not think that they impinge on the issue in this appeal. This is because, although there are perfectly rational reasons why one might wish to see the scope of legal professional privilege limited or the occasions for claiming it curtailed, there are no rational reasons for addressing the issue by discriminating between different categories of legal adviser performing precisely the same function. If privilege is abused by professional legal advisers, and there is no evidence that it is, then the answer lies in (i) the scrutiny to which all claims to privilege are ultimately exposed in court, and (ii) in a sufficiently extreme case, professional disciplinary sanctions against those involved. None of this requires an arbitrary distinction to be made between different kinds of legal adviser which has no basis in principle. If on the other hand, the scope of privilege at common law is thought to be too broad, then the remedy is legislation to modify the common law principles as they apply to all professionals performing the relevant functions and not just

© 2013 The Incorporated Council of Law Reporting for England and Wales

A some of them.  As applied to tax advice this should be straightforward if there is enough parliamentary support for it: there is a Finance Bill once a year.  But none of this has anything to do with the present appeal.  We are not here concerned with the breadth of the scope of privilege at common law, but only with identifying the categories of adviser to which the existing principles apply.

B 137  I turn, finally, to the argument that in recognising that privilege attaches to the advice of members of the Institute of Chartered Accountants or the Chartered Institute of Taxation, we would be acknowledging a principle which would let in an uncertain and potentially large category of other professionals.  I would accept that so far as other professionals are found to be giving legal advice on substantially the same basis as barristers and solicitors do, the privilege will apply to them in the same way.

C Coherence and rationality demand nothing less.  But fears of a flood of privilege claims arising from the activities of supernumerary legal advisers strike me as extravagant.  The privilege is confined, as it always has been, to the taking of legal advice in the course of a professional relationship with a person whose profession ordinarily includes the giving of legal advice. There are other advisory professions whose practitioners although not lawyers require some knowledge of law.  A chartered surveyor advising on

D the structural integrity of a building may require a knowledge of the building regulations.  An investment banker advising on a takeover may require a knowledge of the Takeover Code and associated regulatory codes.  An auditor will require a basic knowledge of company and insolvency law.  The activities of these professionals will no doubt be informed by their understanding of the relevant law.  But it does not follow that their

E profession has as an ordinary part of its functions the giving of legal advice. The legal element involved in their advisory work is likely to be purely incidental to the exercise of a broader advisory function.  The distinctive feature of accountants' advice on tax law is that advice on tax law is itself the service which clients routinely seek from them.  I very much doubt whether many other professions will find themselves in the same position.  It may be that patent agents did in 1984 when the Court of Appeal held in *Wilden*

F *Pump Engineering Co v Fusfeld* [1985] FSR 159 that their legal advice did not attract privilege.  But so far as this decision is based on the proposition that communications for the purpose of giving or receiving legal advice are never capable of being privileged if given by non-lawyers, I think that it was wrong.  As far as patent and trade mark attorneys are concerned, the point no longer matters.  Their position has since been regulated by statute.

G 138  I would allow the appeal and remit the case to the High Court to decide whether the material requisitioned by the respondent would have been privileged if a solicitor or barrister had performed the functions that the accountants performed, and a direction to quash the notices if it would have been.

**LORD CLARKE OF STONE-CUM-EBONY JSC** (dissenting)

H 139  I have read the judgments of Lord Neuberger of Abbotsbury PSC, Lord Sumption JSC and Lord Hope of Craighead DPSC with great interest. I agree with Lord Sumption JSC that the appeal should be allowed, essentially for the reasons he gives.  I briefly summarise my reasons for reaching that conclusion because the true position at common law does seem

© 2013 The Incorporated Council of Law Reporting for England and Wales

250
R (Prudential plc) v Special Comr of Income Tax (SC(E))                [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

to me to be a matter of some importance and I hope that the whole issue will *A* be considered by Parliament as soon as reasonably practicable.

140    The striking feature of the judgments of Lord Neuberger PSC and Lord Sumption JSC, and indeed of Lord Hope DPSC, is to my mind that they agree what the common law is or should be if the issue is treated as one of principle.  As I see it, that principle can readily be seen by taking a simple example.  Suppose that two individuals, A and B, have the same problem, *B* the solution to which depends upon an application of the legal principles of taxation law to the same, or substantially the same, facts.  Suppose that A seeks advice from, say, Freshfields, and that B seeks advice from, say, PricewaterhouseCoopers.  Each asks the same question and gives an account of what are substantially the same facts to the person from whom the advice is sought.  Each is receiving legal advice.  The question for decision in this appeal is whether the information given and the advice received are *C* privileged as legal advice.  Are both A and B entitled to claim the privilege and refuse to disclose to HMRC the information and the advice?

141    In my opinion, the only principled answer to that question is yes.  It is accepted on all sides that the privilege is that of the client, that is A and B, and not that of either the solicitors or the accountants.  It is also accepted that, as recently confirmed in *R (Morgan Grenfell & Co Ltd) v Special Comr* *D* *of Income Tax* [2003] 1 AC 563, the privilege is a "fundamental human right long established in the common law", which was "a necessary corollary of the right of any person to obtain skilled advice about the law": per Lord Hoffmann, with whom the other members of the House of Lords agreed, at para 7.  As Lord Sumption JSC says at para 122, the privilege depends upon the public interest in promoting A and B's access to legal advice on the basis of absolute confidence. *E*

142    It seems to me to follow that, if the common law treats the information and advice as privileged in the case of A, principle requires that it must do the same in the case of B.  The advice is the same legal advice in both cases and the expertise of the adviser in each case is broadly similar, if not the same.  Indeed some accountants may be able to give more specialised legal advice than some solicitors.  I agree with Lord Sumption JSC, for the reasons *F* he gives (at para 122), that the privilege is conferred in support of the client's right to consult a skilled professional adviser and not in support of a right to consult the members of any particular professional body.  On the respondents' case, as Lord Sumption JSC describes at para 123, the privilege extends to advice given by salaried legal advisers and to foreign lawyers.  According to Lord Neuberger PSC at para 29, it also extends to members of CILEX.  The *G* privilege also applied historically to scriveners.  It is thus clear that it is not limited to advice given by solicitors and barristers.  If it extends to foreign lawyers, it is to my mind impossible to see how it can properly be denied in the case of advice given by an accountant qualified to give advice on the law of tax.

143    It is important to note that the issue in this appeal relates only to legal advice privilege and not litigation privilege.  It is thus not directly related to the administration of the courts by judges.  Lord Scott put it *H* clearly in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2005] 1 AC 610, para 34:

"None of these judicial dicta tie the justification for legal advice privilege to the conduct of litigation.  They recognise that in the complex

© 2013 The Incorporated Council of Law Reporting for England and Wales

251
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    world in which we live there are a multitude of reasons why individuals, whether humble or powerful, or corporations, whether large or small, may need to seek the advice or assistance of lawyers in connection with their affairs; they recognise that the seeking and giving of this advice so that the clients may achieve an orderly arrangement of their affairs is strongly in the public interest; they recognise that in order for the advice to bring about that desirable result it is essential that the full and complete

B    facts are placed before the lawyers who are to give it; and they recognise that unless the clients can be assured that what they tell their lawyers will not be disclosed by the lawyers without their (the clients') consent, there will be cases in which the requisite candour will be absent. It is obviously true that in very many cases clients would have no inhibitions in providing their lawyers with all the facts and information the lawyers

C    might need whether or not there were the absolute assurance of non-disclosure that the present law of privilege provides. But the dicta to which I have referred all have in common the idea that it is necessary in our society, a society in which the restraining and controlling framework is built upon a belief in the rule of law, that communications between clients and lawyers, whereby the clients are hoping for the assistance of

D    the lawyers' legal skills in the management of their (the clients') affairs, should be secure against the possibility of any scrutiny from others, whether the police, the executive, business competitors, inquisitive busybodies or anyone else (see also paras 15.8–15.10 of *Zuckerman's Civil Procedure* (2003) where the author refers to the rationale underlying legal advice privilege as 'the rule of law rationale'). I, for my part, subscribe to this idea. It justifies, in my opinion, the retention of

E    legal advice privilege in our law, notwithstanding that as a result cases may sometimes have to be decided in ignorance of relevant probative material."

144    That same analysis seems to me to lead to the conclusion that where advice on tax law is sought from and given by an accountant it should be subject to legal advice privilege in the same way and that there is no

F    difference between the positions of A and B in my example. It was no doubt considerations of this kind that led Charles J to say in this case at first instance [2011] QB 669, paras 64–65, in my opinion correctly, that there is a compelling, indeed unanswerable, case that in modern conditions accountants have the expertise to advise on tax law and that it is firms of accountants rather than firms of solicitors who give such advice and

G    represent clients in disputes with the HMRC on many aspects of their tax affairs. He concluded that the respondents had shown that accountants do what lawyers are described as doing in the cases that establish legal advice privilege.

145    Lord Neuberger PSC has demonstrated that the ambit of the privilege as widely understood is that it is limited to lawyers and does not extend to accountants. He has not, however, been able to point to any

H    principled analysis of the reason why it is so limited. The decided cases do not provide such an analysis. For example, in a case entitled *Dormeuil Trade Mark* [1983] RPC 131, in which privilege was claimed in respect of the disclosure of correspondence between the plaintiffs and their trade mark agents, although Nourse J rejected the claim, he did not give any principled

© 2013 The Incorporated Council of Law Reporting for England and Wales

252
R (Prudential plc) v Special Comr of Income Tax (SC(E))                    [2013] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

basis for doing so. He noted at p 136 that historically cases had been    A
conducted only by solicitors and counsel and added:

> "[Counsel for the defendants] says that in those days it was never
> necessary for anybody to consider whether the privilege should apply in a
> case where other professional men, far less non-professional men, were
> concerned in advising clients, or indeed in conducting litigation on their
> behalf. He says that in these days the rule should be different. Like the    B
> learned Master, I see great force in that submission. It does seem to me to
> be a little odd and possibly perverse, that if a trade mark agent is entitled
> to advise a client in relation to certain legal matters and to conduct certain
> legal proceedings on his behalf, the same privilege should not apply as
> would certainly apply in a case where the advice was being given and the
> proceedings were being conducted by a solicitor. Nevertheless I do not    C
> think it is open to me in this court to fly in the face of the established rule,
> as enunciated in *Wheeler v Le Marchant*, the statement of Chitty J in
> *Moseley v Victoria Rubber Co,* and the fact that in 1968 the legislature
> seemed to think it was necessary expressly to extend the privilege to the
> case of patent agents."

In the circumstances Nourse J made the order with some reluctance. He    D
certainly did not identify the principle behind the rule. Nor did either of the
cases he referred to. In *Wheeler v Le Marchant* (1881) 17 Ch D 675, the
Court of Appeal made it clear that the privilege was limited to legal advice
obtained from professional persons, by which was meant, as Nourse J put it
at p 135, persons who have a full legal qualification here or abroad. In
*Moseley v Victoria Rubber Co* (1886) 3 RPC 351 Chitty J had said that it    E
was quite clear that communication between a man and his patent agent
were not privileged. He did not identify the rationale for such a rule. Nor to
my mind did *Wilden Pump Engineering Co v Fusfeld* [1985] FSR 159. In any
event, I agree with Lord Sumption JSC (at para 137) that, to the extent that
that decision was based on the proposition that communications for the
purpose of giving or receiving legal advice are never capable of being
privileged if given to non-lawyers, it was wrong.    F

146 Legal advice privilege is a creature of the common law. As such it
should be capable of redefinition to cater for changed conditions. If
principle requires that it should apply to situations to which it was
previously thought not to apply, I can see no reason why this court should
not so state, unless prevented from doing so, either expressly or necessary
implication, by statute. We have been referred to no such statute. Attention
has been drawn to a number of areas in which Parliament may have assumed    G
that the common law was different. However, in my opinion the principle
identified by Lord Slynn in *Woolwich Equitable Building Society v Inland
Revenue Comrs* [1993] AC 70, 200 (and quoted by Lord Sumption JSC at
para 134 above), applies equally to the issue for decision in this appeal. He
put the point thus:

> "I do not consider that the fact that Parliament has legislated    H
> extensively in this area means that no principle of recovery at common
> law can or should at this stage of the development of the law be found to
> exist. If the principle does exist that tax paid on a demand from the
> Crown when the tax was the subject of an ultra vires demand can be

© 2013 The Incorporated Council of Law Reporting for England and Wales

253
[2013] 2 AC                    R (Prudential plc) v Special Comr of Income Tax (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A  recovered as money had and received then, in my view, it is for the courts to declare it. In so doing they do not usurp the legislative function. I regard the proper approach as the converse. If the legislature finds that limitations on the common law principle are needed for reasons of policy or good administration then they can be adopted by legislation . . .”

147  If principle requires the court to hold that legal advice privilege
B  extends to advice given by accountants on a professional basis, the court should in my opinion so declare. As Lord Slynn put it, if the legislature finds that limitations on that principle are required for reasons of policy they can be adopted by legislation. It is of interest to note that when the Keith committee considered the position, it could not identify a rationale for the distinction advanced on behalf of the respondents and it did not recommend the continuation of the status quo. As Lord Sumption JSC observes at
C  para 135, it recommended that the privilege should extend to at least some tax advisers but that it should be subject to a limitation in all cases. As Lord Sumption JSC says, the matter was only cursorily discussed in Parliament. In all the circumstances, I do not think that any of the pragmatic considerations identified by Lord Neuberger PSC and Lord Hope DPSC are sufficient to confer the privilege on A in my example and to deny it to B. I agree with
D  Lord Sumption JSC’s striking conclusion at the end of para 131 that fundamental rights should not be left to depend on capricious distinctions unrelated to the legal policy which makes them fundamental.

148  Lord Sumption JSC expresses the view in para 114 that the privilege extends to advice given by members of a profession which has as an ordinary part of its function the giving of skilled legal advice. I would expect that criterion to be satisfied only where, and to the extent, that they are
E  members of a properly regulated professional body.

149  For these reasons, which are essentially the same as those of Lord Sumption JSC, I would allow the appeal and make the order which he proposes.

*Appeal dismissed.*

F  DIANA PROCTER, Barrister

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

# <sup>a</sup> Rawlinson and Hunter Trustees SA and others v Akers and another

[2013] EWHC 2297 (QB), [2014] EWCA Civ 136

<sup>b</sup>

QUEEN'S BENCH DIVISION

EDER J

10, 11, 26 JULY 2013

<sup>c</sup>

COURT OF APPEAL, CIVIL DIVISION

MOORE-BICK, TOMLINSON AND RYDER LJJ

30 JANUARY, 20 FEBRUARY 2014

<sup>d</sup> *Disclosure and inspection of documents – Legal professional privilege – Litigation privilege – Dominant purpose for which documents created – Reports prepared for liquidators into loans made by Icelandic bank to claimants – Reports shown to Serious Fraud Office – Contents of reports used by SFO to obtain search and arrest warrants in respect of claimants – Warrants later set aside – Claimants bringing action for damages against SFO – Claimants applying for third party disclosure of reports in* <sup>e</sup> *possession of liquidators – Whether reports produced for sole or dominant purpose of conducting litigation.*

Two brothers, RT and VT, used finance provided by an Icelandic bank, Khf, to acquire a large share and property portfolio, which was held through discretionary trusts and offshore companies. When Khf collapsed in 2008 a <sup>f</sup> Resolution Committee appointed in Iceland to unravel its affairs requested GT, a forensic accountancy firm, to investigate substantial loans made by the bank shortly before its collapse to O Ltd, a British Virgin Islands company used by the brothers' discretionary trusts. O Ltd was unable to repay the loans in full and went into liquidation. The appellants, a director and partner of GT, were appointed joint liquidators of O Ltd. They commissioned GT to prepare five <sup>g</sup> reports for the committee. The reports were said to have been commissioned in order to assist the joint liquidators in formulating their response to proceedings brought in Guernsey against O Ltd and its associated companies and to prepare a defence and counterclaim, at counsel's request to assist counsel in providing advice regarding litigation strategy in the Guernsey <sup>h</sup> proceedings, and to enable the liquidators to obtain information and legal advice and brief counsel in connection with litigation which was contemplated against various potential defendants. The reports suggested that there were serious irregularities in the making of the loans and were shown to the Serious Fraud Office (the SFO) which was given sight of the reports but not permitted to copy them. On the basis of the reports and other evidence the SFO laid an <sup>j</sup> information before the Central Criminal Court alleging that there was a deliberate, concerted and dishonest conspiracy between senior Khf executives and RT and VT to defraud and steal funds from the bank. The SFO obtained warrants to arrest RT and VT and search their premises but the warrants were later set aside on the grounds that the information and evidence relied on by the SFO had failed properly to set the allegations out in a fair manner. RT and

**380**

VT and their discretionary trusts then brought an action claiming damages of *a* more than £300m against the SFO for losses alleged to have been suffered as a result of the unlawful arrests, searches and seizures. In support of their claim they applied under CPR 31.17, which provided for disclosure against a person not a party to the proceedings, for disclosure of the five reports on the grounds that the SFO had relied on the reports in applying for the warrants but without possession was unable to disclose them. The liquidators contested the *b* application on the grounds of litigation privilege, because they had been prepared for the purpose of being used to obtain legal advice from a lawyer about actual or anticipated litigation. The judge held that, subject to the issue of litigation privilege, it was in principle necessary and appropriate to make an order under CPR 31.17(3) against the liquidators for disclosure of the reports *c* because they were likely to support the claimants' case and/or harm the SFO's case and disclosure was necessary in order to dispose fairly of the claim. On the issue of litigation privilege, the judge applied the principle that the privilege only covered communications prepared with the dominant purpose of being used to obtain legal advice and ordered the liquidators to disclose the reports. They appealed to the Court of Appeal. *d*

**Held** – In order for a communication to be subject to litigation privilege, adversarial litigation had to be in progress or contemplated and the communication had to have been produced for the sole or dominant purpose of conducting that litigation, or if litigation had not been commenced at the time of the communication it at least had to be 'reasonably in prospect', in the *e* sense of being more than a mere possibility. The mere fact that a document was produced for the purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of such litigation, was not sufficient to found a claim for litigation privilege if the purpose could not properly be characterised as the 'dominant purpose'. On the facts, none of the five reports satisfied the 'dominant *f* purpose' test, since although they were said to have been produced for the 'dominant purpose' of enabling the liquidators to obtain information and advice in connection with litigation which was contemplated against various potential defendants, the liquidators had different roles as liquidators but also as members of GT and plainly their first duty in obtaining the reports was to *g* obtain information simply to establish what if any assets or liabilities existed and what if any steps were open to them to collect in the assets or to reduce or discharge the liabilities, which meant that they fell far short of the threshold imposed by the 'dominant purpose' test. The appeal would therefore be dismissed (see [8], [13]–[15], [19], [22]–[29], below).

Dicta of Lord Carswell in *Three Rivers DC v Bank of England (No 5)* [2005] *h* 4 All ER 948 at [102] applied.

Dicta of Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583 at 590–591 considered.

*j*

**Notes**
For orders for disclosure against a person not a party, and for the nature of legal professional privilege, see 11 *Halsbury's Laws* (5th edn) (2009) paras 550, 558.

QBD and CA    Rawlinson and Hunter Trustees v Akers    629

a **Cases referred to**

*B v Auckland District Law Society* [2003] UKPC 38, [2004] 4 All ER 269, [2003] 2 AC 736, [2003] 3 WLR 859.

*BBGP Managing General Partner Ltd v Babcock & Brown Global Partners* [2010] EWHC 2176 (Ch), [2011] 2 All ER 297, [2011] Ch 296, [2011] 2 WLR 496.

b *British Coal Corp v Dennis Rye Ltd (No 2)* [1988] 3 All ER 816, [1988] 1 WLR 1113, CA.

*Chandris Lines v Wilson & Horton* [1981] 2 NZLR 600, NZ HC.

*Frankson v Home Office* [2003] EWCA Civ 655, [2003] 1 WLR 1952.

*Galileo Group Ltd, Re, Elles v Hambros Bank Ltd* [1998] 1 All ER 545, [1999] Ch 100, Ch D.

c *Gotha City v Sotheby's* [1998] 1 WLR 114, CA.

*Great Atlantic Insurance Co v Home Insurance Co* [1981] 2 All ER 485, [1981] 1 WLR 529, CA.

*Highgrade Traders Ltd, Re* [1984] BCLC 151, CA.

*Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow (a firm)* [1995]
d 1 All ER 976, QBD.

*Neilson v Laugharne* [1981] 1 All ER 829, [1981] QB 736, [1981] 2 WLR 537, CA.

*Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, Ch D.

*R (on the application of Prudential plc) v Special Comr of Income Tax* [2013] UKSC 1,
e [2013] 2 All ER 247, [2013] 2 AC 185, [2013] 2 WLR 325.

*R (Rawlinson and Hunter Trustees) v Central Criminal Court* [2012] EWHC 2254 (Admin), [2013] 1 WLR 1634, DC.

*Three Rivers DC v Bank of England (No 5)* [2004] UKHL 48, [2005] 4 All ER 948, sub nom *Three Rivers DC v Bank of England (No 6)* [2005] 1 AC 610, [2004] 3 WLR 1274.

f *United States of America v Philip Morris Inc* [2004] EWCA Civ 330, [2004] All ER (D) 448 (Mar); affg [2003] EWHC 3028 (Comm), [2003] All ER (D) 191 (Dec).

*Wallace Smith Trust Co Ltd (in liq) v Deloitte Haskins & Sells* [1996] 4 All ER 403, [1997] 1 WLR 257, CA.

*Waugh v British Railways Board* [1979] 2 All ER 1169, [1980] AC 521, [1979]
g 3 WLR 150, HL.

*West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1729 (Comm), [2008] 2 CLC 258, [2008] All ER (D) 294 (Jul).

*Westminster International BV v Dornoch Ltd* [2009] EWCA Civ 1323, [2009] All ER (D) 37 (Sep).

h
**Applications**

The claimants in two actions against the Director of the Serious Fraud Office (the SFO), namely (1) Robert Tchenguiz and R20 Ltd (the RT claimants) and (2) Rawlinson and Hunter Trustees SA, Vincos Ltd, Euro Investments Overseas Inc, Vincent Tchenguiz and Amora Investments Ltd (the VT
j claimants), applied under CPR 31.17 for third party disclosure of reports in the possession of the respondents, Stephen John Akers and Mark McDonald, the joint liquidators of Oscatello Investments Ltd, which were shown to the SFO and allegedly used by it to lay informations before Judge Paul Worsley QC at the Central Criminal Court to obtain search and arrest warrants in respect of Robert and Vincent Tchenguiz. The facts are set out in the judgment of Eder J

and the judgment of the Divisional Court in judicial review proceedings in *R (Rawlinson and Hunter Trustees) v Central Criminal Court* [2012] EWHC 2254 (Admin), [2013] 1 WLR 1634 in which the warrants were set aside.

*Rosalind Phelps* and *James Duffy* (instructed by *Stephenson Harwood LLP*) for the VT claimants.

*Joe Smouha QC*, *Alex Bailin QC* and *Alison Macdonald* (instructed by *Shearman & Sterling (London) LLP*) for the RT claimants.

*Dominic Dowley QC*, *James Eadie QC* and *Simon Colton* (instructed by *Slaughter and May*) for the SFO.

*William Trower QC* and *David Allison* (instructed by *Chadbourne & Parke LLP*) for the joint liquidators.

*Judgment was reserved*

26 July 2013. The following judgment was delivered.

**EDER J.**

INTRODUCTION

[1] The background to these present proceedings is to be found in the judgment of the Divisional Court in judicial review proceedings in *R (Rawlinson and Hunter Trustees) v Central Criminal Court* [2012] EWHC 2254 (Admin), [2013] 1 WLR 1634, delivered on 31 July 2012 (the Divisional Court judgment). Those proceedings concerned the business interests of two individuals, ie Robert Tchenguiz (RT) and Vincent Tchenguiz (VT), and the companies and trusts through which their businesses are carried on in relation to what was and is said to be the unlawful entry, search and seizures by or at the instigation of the defendant, the Serious Fraud Office (the SFO), at certain premises in London as well as the arrests and investigations connected to this. In broad terms, there are two groups of claimants, ie those referred to as the R & H (Rawlinson and Hunter Trustees SA) or VT claimants and those referred to as the RT claimants. In summary, they say that the searches, arrest and investigation and the publicity surrounding them had a disastrous effect on their business interests causing very extensive financial losses and reputational harm; and they now seek damages in these proceedings in the total sum of approximately £300m. The substantive hearing of that claim is now scheduled to take place in 2014.

THE PRESENT APPLICATION

[2] This judgment deals with the VT claimants' application under CPR 31.17 for third party disclosure from Stephen Akers and Mark McDonald, the liquidators of Oscatello Investments Ltd (the joint liquidators and Oscatello respectively).

[3] In particular, disclosure is sought of five specific documents (the reports) which were prepared by a firm of accountants, ie Grant Thornton, on the instructions of the joint liquidators, who are also partners/directors of Grant Thornton. These reports were shown to the SFO by Grant Thornton, but were not permitted to be copied by the SFO. Thus, although the Grant Thornton reports played what the claimants submit was a key role in the information placed before Judge Worsley by the SFO in March 2011 in support of the orders then sought by the SFO (the information) and obtaining of the warrants, these will not be disclosed by the SFO in the present proceedings.

383

QBD        Rawlinson and Hunter Trustees v Akers (Eder J)        631

[4] There is no similar formal application by the RT claimants but Mr Trower QC expressly agreed that no separate formal application was necessary. In effect, therefore, this application should be treated as an application on behalf of all claimants.

[5] The application is opposed by the joint liquidators on three main grounds, ie (i) necessity/relevance; (ii) litigation privilege; and (iii) discretion. In support of such opposition (in particular with regard to the claim for litigation privilege), the joint liquidators rely upon a statement dated 5 July 2013 of Mr John Verrill, a solicitor, licensed insolvency practitioner and partner in the firm of Chadbourne & Parke (London) LLP. I deal below with each of these points in turn but it is convenient to summarise at the outset the role of the joint liquidators and the relevant background to the present application.

THE JOINT LIQUIDATORS

[6] The facts relating to the appointment of the joint liquidators and their conduct of the liquidation are set out in Mr Verrill's statement. Certain of such facts are or may be in issue but without prejudice to any such possible dispute in the future, it is convenient to adopt for present purposes the brief summary set out in Mr Trower's skeleton argument which was as follows.

[7] The joint liquidators act as liquidators of Oscatello and a number of additional companies registered in the British Virgin Islands (together the Oscatello companies).

[8] The Oscatello companies formed part of a complex group of companies including their subsidiary undertakings which, at all material times (following a restructuring of the group in late 2007) were ultimately controlled by Investec Trust (Guernsey) Ltd (Investec) and Bayeux Trustees Ltd (together with Investec, the Tchenguiz discretionary trust trustees) in their capacity as joint trustees of the Tchenguiz discretionary trust.

[9] The main beneficiaries of the Tchenguiz discretionary trust were Robert Tchenguiz (RT) and his children and remoter issue. The Tchenguiz discretionary trust was settled on 26 March 2007 by a declaration of trust made by, among others, Investec in its capacity as trustee of the Tchenguiz family trust, pursuant to a power to settle new trusts contained in the Tchenguiz family trust instrument. The beneficiaries of the Tchenguiz family trust include RT and his brother VT.

[10] The Oscatello companies performed two main roles: (i) they held positions by way of direct equity/debt investments; and (ii) they participated in large-scale derivatives and futures trading. Investment decisions were made by the Tchenguiz discretionary trust trustees in conjunction with or at the direction of R20 Ltd (R20). From around the date of the inception of the Tchenguiz discretionary trust in March 2007, R20 advised the Tchenguiz discretionary trust and the companies held under its umbrella (including the Oscatello companies) on their general commercial and investment strategies. RT is a director of R20.

[11] In around late 2007 the Oscatello companies were restructured. A framework agreement providing the basis for the continued operation of the Oscatello companies was concluded with, among others, the Icelandic bank Kaupthing hf (Kaupthing). Kaupthing and certain of its subsidiaries agreed to continue to fund the Oscatello companies' operations by way of an overdraft facility and other forms of lending, secured over shares in the Oscatello

companies. That funding was used principally for the purposes of purchasing and servicing equity and debt instruments in the form of contracts for differences and credit default swaps.

[12] The amount of funding provided by Kaupthing to the Oscatello companies increased rapidly throughout 2008, largely as a consequence of a need to meet margin calls as asset values deteriorated. By the end of 2008 Kaupthing had collapsed and the Oscatello companies could no longer meet their obligations.

[13] On 10 December 2008 Mr Akers and Mr McDonald were appointed as joint receivers over the shares of the Oscatello companies.

[14] On 18 August 2009 Mr Akers and Mr McDonald were appointed as joint liquidators of a number of the Oscatello companies.

[15] On 16 February 2010 Mr Akers and Mr McDonald were appointed as joint liquidators of Oscatello.

[16] The appointment of Mr Akers and Mr McDonald as liquidators has been recognised in England and Wales by order of this court dated 31 March 2010 made pursuant to the terms of the Cross Border Insolvency Regulations 2006. Their appointment as liquidators has also been recognised in Guernsey by order of the Royal Court of Guernsey dated 21 April 2011.

[17] The joint liquidators estimate that the shortfall in the assets of the Oscatello companies to meet the claims of its creditors is in excess of £1,950,000,000.

[18] The liquidation of the Oscatello companies has been exceptionally complex. There has been worldwide litigation, including complex and hard fought proceedings in London, the Isle of Man, Guernsey and the British Virgin Islands. The Oscatello companies have frequently found themselves on the other side of litigation to parties associated with RT and VT. One example is provided by the proceedings pending before the Royal Court of Guernsey. The Guernsey proceedings concern a claim by the Tchenguiz discretionary trust trustees against Oscatello and others seeking to challenge the terms and enforceability of intra-group lending by the Oscatello companies. RT is a protector of the Tchenguiz discretionary trust and gave oral evidence to the Guernsey court.

[19] According to Mr Verrill, it is likely that there will be further litigation between the Oscatello companies and parties associated with VT and RT. In this regard:

(i) the joint liquidators continue actively to consider the commencement of proceedings against a large number of parties (including those associated with RT and VT) in order to recover assets or to receive compensation in respect of assets of the Oscatello companies which appear to have been misapplied; and

(ii) the solicitors to the VT claimants have indicated that they are contemplating claims against the joint liquidators arising from the criminal proceedings brought by the SFO. The solicitors to the VT claimants have made a number of very serious allegations, including an allegation that the joint liquidators provided misleading and inaccurate information to the SFO for the purpose of damaging VT and the Tchenguiz family trust and forcing the settlement of civil actions on unfavourable terms. The alleged losses sustained by the Tchenguiz family trust are said to amount to in excess of £2.5bn.

BACKGROUND

[**20**] The relevant background to the present application was summarised in Ms Phelps's skeleton argument. For present purposes, it is convenient to adopt that summary subject to certain additions/amendments in the light of certain points made by Mr Trower.

[**21**] The starting point is the information. This referred extensively to the reports prepared by Grant Thornton—for example, para 59 (referring to an 'in depth analysis of Oscatello Investments Ltd' done by Grant Thornton); and para 76 which stated:

> 'Grant Thornton, who have been appointed by the Resolution Committee of Kaupthing Bank in the [sic] Iceland, have carried out extensive financial forensic analysis of this complex structure which was put forward by Robert Tchenguiz as collateral for the substantial borrowing from Kaupthing. A number of Reports have been prepared by Grant Thornton detailing their findings and these have been reviewed by the SFO',

and para 125 which stated:

> 'Grant Thornton has been appointed by the Resolution Committee in Iceland in order to analyse the Kaupthing lending to Tchenguiz connected companies and to consider potential offences and potential defendants.'

[**22**] In the course of the judicial review proceedings, after the SFO had conceded that the warrants concerning VT should be quashed, the SFO (via the Treasury Solicitor) wrote a detailed letter to the judicial review claimants dated 21 February 2012 relating to the errors in the information. The letter stated that the investigation into VT had been triggered by a telephone call from Grant Thornton on 9 September 2010, following which the SFO were permitted to view draft reports prepared by Grant Thornton. It was obvious from that letter that detailed notes had been taken of the material provided by Grant Thornton and viewed by the SFO.

[**23**] In March 2012, well before the substantive judicial review hearing, the solicitors representing the judicial review claimants wrote to the solicitors for Grant Thornton (Simmons & Simmons), enclosing a copy of the Treasury Solicitor's letter of 21 February 2012. The letter was copied to Mr Akers and stated that the substantive judicial review hearing was listed to start on 22 May 2012. The letter highlighted the concerns about the role played by Grant Thornton in providing information to the SFO. The letter asked for copies of any documents shown to the SFO, and specifically asked Grant Thornton (at para 43) to explain the basis for any assertion that the reports were privileged, including the identity of the person or persons on whose behalf the rights were being asserted. The letter ended by pointing out (in para 111) that it was intended to provide Grant Thornton with an adequate opportunity to consider the concerns and to provide an answer to them before the substantive hearing and that the option of joining the proceedings as an interested party was available. It was also made clear that the correspondence would be placed before the court, as in the event happened.

[**24**] In response, Simmons & Simmons for Grant Thornton refused to provide the documents, on the basis, inter alia, that the information provided by Grant Thornton to the SFO was information which Grant Thornton received or prepared during the course of activities carried out on behalf of its client, the Resolution Committee of Kaupthing; and that information was

confidential as a matter of Icelandic law and Grant Thornton could not answer the questions raised without breaching professional rules of confidentiality. Grant Thornton (via Simmons & Simmons) also declined to play any part in the substantive judicial review proceedings, which drew some criticism from the Divisional Court, as set out below. No mention was made by Simmons & Simmons in the letter of legal professional privilege, or of any alleged interest of the joint liquidators in the Grant Thornton reports. The close involvement of Grant Thornton was subsequently explained in more depth in a detailed witness statement submitted by Mr Brinkworth of the SFO.

MR BRINKWORTH'S STATEMENT

[**25**] Meanwhile, at a directions hearing on 22 February 2012, the SFO was ordered to serve evidence relating to the matters set out in the 21 February 2012 letter, essentially in order to explain the SFO's position. In his statement served on 30 April 2012 Mr Brinkworth said in terms (at para 8) that—

'In this overview I have referred almost exclusively to Reports prepared by [Grant Thornton], the firm appointed as joint liquidators by Kaupthing hf's (Khf's) Resolution Committee following the bank's collapse, and the SFO during the course of its investigation. These Reports provide a useful (and fair) summary of the basis of the core allegations within the information, and particularly those relating to Pennyrock.'

[**26**] Mr Brinkworth's statement went on to refer (as had the 21 February 2012 letter) to a number of Grant Thornton reports which the SFO were permitted to view but not to copy, apparently on the ground that they were privileged (see paras 26, 31 and 36). As set out in more detail below, detailed notes taken from a number of the reports sought in this application were exhibited to Mr Brinkworth's statement and referred to in open court during the course of the judicial review hearing. The Divisional Court judgment recorded the reliance placed on Grant Thornton by the SFO and in particular the following ([2013] 1 WLR 1634 at [94] and [96]):

'It is now clear that the basis of much of what was said to be suspected criminality was based on information provided by Grant Thornton and to a lesser extent Weil, Gotshal and Manges. The Information disclosed that Grant Thornton had been appointed by the Resolution Committee to analyse the lending by Kaupthing and the entities connected with VT and RT. The Information disclosed the involvement of Grant Thornton in the allegations made against RT and in respect of Oscatello and the litigation against Oscatello to which we have referred at para 30 … This is a case where it appears that the SFO relied very heavily on the work and conclusions of Grant Thornton …'

The Divisional Court (at [195]–[197]) commented on the lack of co-operation of Grant Thornton:

'[195] However, as we have set out at paras [43]–[44] above, these allegations rest upon what the SFO were told by Grant Thornton on and after 9 September 2010. We only have the notes of the meeting and not the copy of the report of Grant Thornton. They declined in answer to a request from VT to make available the evidence on which such serious allegations were advanced to the SFO. We therefore do not know the basis of Grant Thornton's opinion on the valuation carried out by Oliver

Wyman or their opinion on the acceptance of that valuation in the audited accounts. Certainly the allegation (which we have set out at para [43]) made by Grant Thornton to the SFO that VT may have misled the auditors as to the period on which the actuarial valuation was made was unfounded, the entire basis of valuation is recorded in note 7 to the accounts. Nor do we know the basis of the contention of Grant Thornton and the Resolution Committee that Kaupthing had not conducted due diligence.

[196] Lord Goldsmith severely criticised this conduct of Grant Thornton, having put them on notice on 15 March 2012 and invited them to become a party to the proceedings and to state whether the allegations were maintained. Grant Thornton acknowledged the receipt of this notice in a letter written by their solicitors on 9 May 2012. They stated that they would not become a party, they had not been served with the proceedings and were not in a position to provide information because of the confidentiality provisions of Icelandic law, the Code of Ethics of the Institute of Chartered Accountants and legal professional privilege. They contended that no criticism should be made of their conduct, as the SFO had accepted that the misstatements to the judge were its fault. Lord Goldsmith made clear that the fact that the allegations were still being maintained was continuing to have an adverse effect on the interests of [the Tchenguiz family trust] and VT and preventing [the Tchenguiz family trust] from repaying the Pennyrock loan.

[197] We do not consider that it is for us to comment on the conduct of Grant Thornton, save to say that it is unfortunate that the court does not know the basis for the criticism of the actuarial valuation and the audited accounts. It is perhaps difficult to understand how provisions of Icelandic law or the Code of Ethics of the Institute of Chartered Accountants or legal professional privilege could have permitted Grant Thornton to assist the SFO, after service of a s 2 notice, in making allegations of criminal conduct against RT and VT in relation to the valuation and the accounts, but not to be in a position to assist this court by providing the basis for those two specific allegations when VT and RT challenged by way of judicial review the case made against VT and RT by the SFO who had relied on Grant Thornton's views on those two specific allegations. From the observations we have made in para [195], the provision of information would have been of assistance to the court.'

[**27**] Following the Divisional Court judgment, the VT claimants renewed their requests for disclosure of the reports prepared by Grant Thornton, by letter dated 31 August 2012 from Simmons & Simmons.

[**28**] On 20 September 2012 Skadden Arps, acting on behalf of the joint liquidators, wrote to the Divisional Court with copies to various parties including the VT claimants' solicitors, Stephenson Harwood. The letter related to the then pending application to use documents from the judicial review proceedings for the purposes of other proceedings. The letter stated that such application was likely to relate to information and/or documents which belong to Oscatello and which were confidential and/or privileged. It asked that a copy of the application be provided, so that Oscatello could consider whether to intervene.

[**29**] In the event an order was subsequently made by the court dated *a* 19 November 2012 which provided that Mr Brinkworth's statement and exhibits be deemed to be in the public domain.

[**30**] The VT claimants again renewed their disclosure requests of the reports on 13 February 2013. Notwithstanding extensive correspondence dating back to March 2012, there was, Ms Phelps submitted, no suggestion at this stage that the reports shown by Grant Thornton to the SFO were prepared for anyone *b* other than Kaupthing acting through its Resolution Committee—see (i) Mr Brinkworth's statement; (ii) the Simmons & Simmons letter referred to in para [24] above, which referred in terms to the information being provided to the SFO on behalf of Grant Thornton's client, Kaupthing; and (iii) the Divisional Court judgment (at para [4]) where it was stated: *c*

'… in the account of the factual background we refer to Grant Thornton's reports. Grant Thornton and Weil, Gotshal and Manges were appointed on the collapse of Kaupthing by the group responsible for its affairs known as the Resolution Committee to seek to recover funds for the creditors. Their reports formed an important basis for the SFO's *d* investigation, as we shall explain.'

[**31**] On 15 March 2013 Chadbourne & Parke wrote to say that it had 'recently' been instructed by the joint liquidators of Oscatello. They asked for time to consider the 'ownership and control' of certain of the reports in order to determine the scope of any litigation privilege attaching. Their further letter *e* of 26 March 2013 described the five reports the subject of this application and confirmed that they had been shown to the SFO. It was asserted that the reports were covered by litigation privilege—a point which had not been taken by Simmons & Simmons during the judicial review itself. (As I understand, it was only in the letter from Skadden Apps dated 20 September 2012 referred to above that any question of privilege had previously been suggested.) *f*

[**32**] By letter dated 28 June 2013 Stephenson Harwood invited Chadbourne & Parke to explain properly the basis for the assertion that the reports were privileged, but it was not until the service of Mr Verrill's statement that any proper attempt was made to do this (beyond the bare assertions of the 26 March 2013 letter). This claim is considered further below. *g*

[**33**] In the meantime other Grant Thornton reports referred to in Mr Brinkworth's statement were disclosed by Simmons & Simmons (by letter of 13 March 2013), who stated that Kaupthing (ie the Winding Up Committee which was the successor to the Resolution Committee) considered the reports to be confidential but that, contrary to what Simmons & Simmons had previously asserted, Icelandic law would permit their disclosure. No point was *h* taken in relation to privilege.

[**34**] The RT claimants also sought disclosure of the reports in correspondence (by letters of 21 June 2013 and 2 July 2013).

THE FIVE REPORTS *j*

[**35**] The five reports which are the subject of the present application are now described in para 29 of Mr Verrill's statement as follows:

(i) A draft report dated 23 August 2010 drafted in the context of proceedings brought in Guernsey against members of the Oscatello group of companies (the first draft Guernsey report).

389

QBD        Rawlinson and Hunter Trustees v Akers (Eder J)        637

a    (ii) A draft report dated 21 December 2010, together with exhibits, considering the broader implications of the Guernsey application for the Oscatello group of companies (the second draft Guernsey report).

(iii) A draft memorandum dated 17 September 2010 on the formation and trading of the Oscatello group of companies (the draft Oscatello memorandum).

b    (iv) A draft report dated 25 October 2010 considering the circumstances surrounding the entry into certain contracts for difference and credit default swaps by Roxinda Ltd, a member of the Oscatello group of companies (the draft Roxinda memorandum).

(v) A draft report dated 22 December 2010 considering the role and

c    involvement of R20 and its employees and/or directors in the Oscatello structure and, in particular, their role in transactions entered into by the Oscatello group of companies (the draft R20 report).

[36] Paragraph 29 of Mr Verrill's statement also seeks to explain the basis upon which these reports were 'commissioned'. This is crucial to the present argument advanced by the joint liquidators that all five reports attract litigation

d    privilege; and it is therefore convenient to set out verbatim what Mr Verrill says in that paragraph:

'29. The reports commissioned by the joint liquidators include the reports which form the subject of the VT claimants' application. I summarise the content of each of the reports below. I am providing, as

e    noted above, this summary of the general subject matter of the reports in order to assist the Court in determining whether litigation privilege attaches to them and in no manner is this intended to be a waiver or partial waiver of privilege in the reports:

(1) the joint liquidators commissioned a draft report dated 23 August 2010, in order to assist the joint liquidators in formulating their response to

f    the Guernsey proceedings and to enable their Guernsey solicitors to provide instructions to counsel (the First Draft Guernsey Report). The First Draft Guernsey Report was included in instructions sent to Guernsey counsel on 15 November 2010. The recovery available to Oscatello in the Guernsey proceedings, put forward by Investec, was materially different depending on a number of scenarios. The First Draft Guernsey Report was

g    prepared entirely to enable the joint liquidators and their legal advisors to respond to the varying scenarios and to prepare a Defence and Counterclaim quantifying the amounts claimed. Specifically it was to identify all inter-company balances that should be reversed and to calculate the effect of the these balances/reversals on dividends to creditors;

h    (2) the joint liquidators commissioned a draft report dated 21 December 2010, following a meeting with counsel on 30 November 2010, the dominant purpose of which was to enable the joint liquidators to consider with counsel the broader implications of the Guernsey proceedings for the Oscatello companies (the Second Draft Guernsey Report). In particular, the Second Draft Guernsey Report was produced following a request by

j    the joint liquidators' Guernsey counsel for a memorandum regarding the inter-company loans to assist counsel in providing advice regarding litigation strategy. As stated in paragraph 26, the report was produced to help establish (a) how the original debts due from the Tchenguiz family trust arose, (b) whether these debts were properly described as loans, and if so, what the terms of the loans were, (c) the terms under which the debts

**390**

due to Oscatello's subsidiary companies were novated to the Tchenguiz discretionary trust, as at 24 August 2007, and whether the debts were properly described as loans and if so, what the terms of the loans were, and (d) clarification as to the terms under which the debts due to Oscatello's subsidiaries were transferred from the Tchenguiz discretionary trust to Oscatello as at 21 December 2007 and whether the debts were accurately described as loans, and if so, what the terms of the loans were. The report took the form of a summary and analysis of information obtained from the books and records of the Oscatello companies. The report enabled the joint liquidators' solicitors to fully understand the accounting treatment of the loan transactions to enable them to advise on strategy for the litigation proceedings in Guernsey. The Second Draft Guernsey report was sent to Guernsey counsel on or around 21 December 2010;

(3) the joint liquidators commissioned a draft memorandum dated 17 September 2010 on the formation and trading history of the Oscatello companies (the Draft Oscatello Memorandum). The Draft Oscatello Memorandum was commissioned for the dominant purpose of enabling the joint liquidators to obtain information and legal advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, it addresses, among other things, various transactions which the joint liquidators consider unusual or irregular and identifies potential causes of action as well as the defendants to possible claims. The memorandum was produced to assist the joint liquidators in assessing the potential claims against other parties by Oscatello, and its related subsidiaries. It highlighted unusual and irregular transactions, specifically the Framework and Overdraft agreements, the position of other lenders in the Oscatello Group, a number of share transactions and CDS transactions and breaches of covenants and the validity of the Framework agreement. The report went on to highlight the potential defendants to any claim made in respect of the above findings, these potential defendants include parties to the SFO proceedings HQ12XO5082 and HQ13XO0414. On or around 17 September 2010 the Oscatello Report was provided to the liquidators' legal advisors in London for the purposes of obtaining advice and formulating draft particulars of claim;

(4) the joint liquidators commissioned a draft memorandum dated 25 October 2010 considering the circumstances surrounding the entry into certain contracts for difference and credit default swaps by Roxinda Ltd (Roxinda), a member of the Oscatello companies (the Draft Roxinda Memorandum). The Draft Roxinda Memorandum was commissioned for the dominant purpose of assisting the joint liquidators in connection with obtaining information and legal advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, it addresses, among other things, the circumstances surrounding the entry into certain contracts for differences and credit default swaps by Roxinda, at a time when it is believed Roxinda was insolvent, it also seeks to identify civil recovery opportunities. On or around 22 September 2011 the Draft Roxinda Report was provided to counsel in London for the purposes of obtaining advice and formulating draft particulars of claim; and

QBD        Rawlinson and Hunter Trustees v Akers (Eder J)        639

(5) Following a meeting with counsel on 30 November 2010, the joint liquidators commissioned a draft memorandum dated 22 December 2010 providing details of the individuals from R20 who were involved in the transactions referred to in the Oscatello Report (the Draft R20 Report). The Draft R20 Report was commissioned to brief counsel and in order to assist the joint liquidators in obtaining information and advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, the Draft R20 report was commissioned following a request from the joint liquidators' counsel to enable him to advise on potential claims against various possible defendants identified in the Oscatello Report. The purpose of this report was to supplement the Oscatello Report and to set out the evidence needed to demonstrate which individuals from R20 were potentially involved with irregular and unusual transactions. On or around 22 December 2010 the R20 Report was provided to counsel in London for the purposes of obtaining advice and formulating draft particulars of claim.'

[37] As I say, this explanation provides the foundation for the joint liquidators' claim for litigation privilege. I consider this below but it is convenient to deal first with the related questions of necessity, relevance and discretion.

NECESSITY/RELEVANCE/DISCRETION
[38] CPR 31.17(3) provides as follows:

'(3) The court may make an order under this rule only where—(a) the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs.'

[39] As submitted by Mr Trower, there are three requirements that must be met for the court to grant an order for disclosure under CPR 31.17(3), viz:

(i) the court must be satisfied that the documents are 'likely' to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings;

(ii) the court must be satisfied that disclosure is 'necessary'; and

(iii) the court must be satisfied that the case is an appropriate one for the exercise of its discretion.

[40] In considering these matters, Mr Trower made plain that whilst the joint liquidators and their legal advisors have a general understanding of the issues raised by the present proceedings, they do not have the heightened understanding of the issues that the court will have through its case management of the proceedings; and that accordingly although they are not in a position to make detailed submissions on these matters, the joint liquidators wished to draw attention to the following points when the court is considering whether the jurisdictional gateways are satisfied in respect of each of the reports. These points are as follows.

[41] First, Mr Trower submitted that the court must be satisfied that the reports are documents that are not merely (potentially) relevant to the issues in the present proceedings but are 'likely' to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and that

392

this is, in effect, a much higher test than the one which applies with regard to ordinary disclosure inter partes. In that context, Mr Trower submitted that it was the joint liquidators' understanding that VT's arrest was based solely on the basis of his participation in a transaction referred to by the SFO as 'the Pennyrock loan', pursuant to which it was alleged that VT and RT obtained loan facilities from Kaupthing through substantial material and fraudulent misrepresentations; that only two of the reports make references to the Pennyrock loan, viz the draft Oscatello memorandum and the draft R20 report; and that, moreover, such references are very minor when seen in the context of the reports as a whole.

[42] Second, Mr Trower submitted that the court must also be satisfied that disclosure of the reports is 'necessary' to dispose fairly of the claim or to save costs. In that context, Mr Trower submitted that the court may decide that it is not necessary to order disclosure of the reports in circumstances where the SFO relied not on the reports but on their notes, in support of the criminal prosecution; that para 9 of Mr Brinkworth's statement makes it clear that he does not suggest that any of the errors in the information relied upon in the criminal proceedings derive from the documents shown to the SFO by third parties such as Grant Thornton; and that it seems that two draft reports, specifically on the Pennyrock loan prepared by Grant Thornton for Kaupthing dated 17 September 2010 and 26 October 2010 (and exhibits thereto), and shown to the SFO, have already been disclosed to the VT claimants.

[43] Third, Mr Trower submitted that even if the requirements of CPR Pt 31.17 are otherwise satisfied, the court must be satisfied that the case is an appropriate one for the exercise of its discretion to order disclosure when weighing up competing public interests: Matthews and Malek, *Disclosure* (4th edn, 2012), para 4.64. In that context, Mr Trower submitted that two such competing interests arise for consideration in the present case viz:

(i) The public interest in facilitating the success of investigations by the preservation of the confidentiality of the reports. In this regard:

(a) The reports were shown to the SFO in response to the service of a notice pursuant to s 2 of the Criminal Justice Act 1987 requiring the provision of information and the production of documents. The court should ensure that any loss of confidentiality is restricted to the criminal proceedings alone.

(b) The court should, as observed by Neill LJ in *Wallace Smith Trust Co Ltd (in liq) v Deloitte Haskins & Sells* [1996] 4 All ER 403, [1997] 1 WLR 257, give careful consideration to questions of confidentiality when considering whether to order the disclosure of information provided to the SFO pursuant to the exercise of its powers under the Criminal Justice Act 1987. Similar observations were made by Scott Baker LJ in *Frankson v Home Office* [2003] EWCA Civ 655, [2003] 1 WLR 1952, at [13]–[17] when considering a request for disclosure pursuant to CPR 31.17 in civil proceedings of interviews given under caution to the police.

(ii) There is a strong public interest in restricting disclosure and preserving confidentiality where the document was produced for the dominant purpose of litigation which is being conducted or which is contemplated by a liquidator in accordance with his duties as an officer of the court in the interests of an insolvent estate. This public interest is particularly strong where the document addresses pending or contemplated litigation against the very parties who seek disclosure in another context. In this regard:

(a) The first and second Guernsey reports were commissioned by the joint liquidators for the sole or dominant purpose of enabling the joint liquidators to

respond to the Guernsey proceedings and, in particular, to enable their Guernsey solicitors and counsel to prepare a defence and counterclaim in the Guernsey proceedings and advise on litigation strategy. The Guernsey litigation remains pending before the Royal Court of Guernsey and entities associated with RT and VT are on the other side of the Guernsey litigation. Accordingly, even if the court were otherwise to consider that privilege in the reports had been lost, there are strong reasons for refusing to order the disclosure of the reports.

(b) The draft Oscatello memorandum, the draft Roxinda memorandum and the draft R20 report were commissioned by the joint liquidators for the dominant purpose of obtaining legal advice in connection with litigation which was, and remains, contemplated against various potential defendants (including entities associated with VT and RT). Accordingly, even if the court were otherwise to consider that privilege in the reports had been lost, there are strong reasons for refusing to order the disclosure of the reports.

(iii) This public interest is all the more significant in circumstances where the party seeking disclosure is threatening claims adverse to the insolvent estate for whose benefit the documents have been produced. The solicitors to the VT claimants have made very serious allegations against the joint liquidators in relation to the assistance provided to the SFO, including an allegation that the joint liquidators provided misleading and inaccurate information to the SFO for the purpose of damaging VT and the Tchenguiz family trust and forcing the settlement of civil actions on unfavourable terms. The VT claimants have alleged that the Tchenguiz family trust has sustained losses in excess of £2.5bn and have threatened to bring a claim against the joint liquidators. Accordingly, even if the court were otherwise to consider that privilege in the reports had been lost, there are strong reasons for refusing to order the disclosure of the reports.

(iv) Finally, if the court were otherwise minded to order disclosure, it is suggested that the very fact that there are complex proceedings involving the same parties which are pending or contemplated means that it would be appropriate for the court to make explicit provision for the non-use of the reports in any other proceedings and the destruction of the reports following the conclusion of the proceedings brought against the SFO.

[44] I accept the broad thrust of these submissions to the extent that they relate to the court's approach to the present application and the general considerations which the court should consider before deciding to make any order for disclosure. I also bear well in mind the importance of not prejudging any issue which the court will ultimately have to determine in the course of the present proceedings.

[45] However, bearing all these considerations in mind, I am quite sure that, subject to the question of litigation privilege, the requirements of CPR Pt 31.17 are satisfied and that the case is an appropriate one for the exercise of its discretion. In summary, this is for the reasons as summarised in paras 27–28 of Ms Phelps's skeleton argument which I accept, viz:

(i) Self-evidently, the conduct of the investigation, including in particular the actions, knowledge and state of mind of the SFO in obtaining the warrant and continuing the investigation are at the heart of the present case. As set out above, some or all of the Grant Thornton reports shown to the SFO played a central role in the investigation, and the preparation of the information. Mr Brinkworth's overview of the investigation referred 'almost exclusively' to the Grant Thornton reports, including express reference to at least four out of

the five reports at issue here. The Divisional Court also plainly felt that they were relevant to the judicial review proceedings. Given that the SFO did not make facsimile copies, the reports themselves will not be disclosed by the SFO in the present proceedings.

(ii) Overall the reports are likely to support the VT claimants' case and/or harm that of the SFO because:

(a) They form a very important part of the information shown to, and taken into account by, the SFO in the core decisions at issue in these proceedings. As the Divisional Court noted, the SFO did not engage its own independent expert to analyse the relevant issues and allegations but relied very heavily on Grant Thornton (who, the court found were not independent but had an interest in the civil proceedings brought by the Tchenguiz family trust against Kaupthing—see the Divisional Court judgment [2013] 1 WLR 1634 at [94]–[96]).

(b) Although the SFO took some notes of certain of the reports, they did not copy them out verbatim, and disclosure from the joint liquidators is the only way in which the court will have a complete picture of what the SFO investigators saw at the time.

(c) Further, the VT claimants make specific allegations in their particulars of claim arising from the very fact that the SFO uncritically accepted the Grant Thornton input despite the fact that Grant Thornton were obviously lacking in impartiality: see paras 99.2, 116.3–116.8 of the particulars of claim. The information actually seen by the SFO, as well as the notes taken, are plainly relevant to the VT claimants' case in this regard.

(d) The SFO also relies in its defence on the information provided to it by Grant Thornton; see for example para 7(2) where the SFO alleges that it had regard to information from Grant Thornton and was entitled to do so (although it remains neutral as to whether there was any culpability in the part played by Grant Thornton). The material actually provided by Grant Thornton and seen by the SFO is plainly relevant to this allegation, as well.

[46] Thus, it is my conclusion that it is in principle necessary and appropriate to make an order against the joint liquidators for disclosure of all five reports subject (i) to any special order with regard to confidentiality and use of such reports (as to which I would hope the parties will be able to agree an appropriate draft form of wording for my approval); and (ii) litigation privilege.

LITIGATION PRIVILEGE

[47] Under this head, two main issues arose. First, there is the threshold question, viz whether the documents are properly the subject of a claim for litigation privilege. Second, on the assumption that the claim for litigation privilege is prima facie made out, whether such privilege has been 'lost' by virtue of the fact that the documents (or at least the information contained in such documents) are no longer 'confidential' but, on the contrary, are now in the 'public domain'.

[48] As to the first question, Ms Phelps submitted that the applicable principles were as follows:

(i) Advice given by accountants does not attract legal advice privilege: *R (on the application of Prudential plc) v Special Comr of Income Tax* [2013] UKSC 1, [2013] 2 All ER 247, [2013] 2 AC 185. Accordingly, the joint liquidators have to satisfy the court that the test for litigation privilege is made out.

QBD        Rawlinson and Hunter Trustees v Akers (Eder J)        643

(ii) For a communication to be subject to litigation privilege it must have been made with the dominant purpose of being used in aid of or obtaining legal advice from a lawyer about actual or anticipated litigation: Thanki, *The Law of Privilege* (2nd edn, 2011) paras 6.68ff and the cases there cited.

(iii) Where litigation has not been commenced at the time of the communication, it has to be 'reasonably in prospect'; this does not require the prospect of litigation to be greater than 50% but it must be more than a mere possibility: *United States of America v Philip Morris Inc* [2004] EWCA Civ 330, [2004] All ER (D) 448 (Mar) at paras [67]–[68]; *Westminster International BV v Dornoch Ltd* [2009] EWCA Civ 1323, [2009] All ER (D) 37 (Sep) at [19]–[20] per Etherton LJ.

(iv) The burden of proof is on the party claiming privilege to establish that the dominant purpose test is satisfied: *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1729 (Comm), [2008] 2 CLC 258 at [50]. A mere claim in evidence before the court that the document was for a particular purpose will not be decisive: *Neilson v Laugharne* [1981] 1 All ER 829 at 833 and 837, [1981] QB 736 at 745 and 750 per Lord Denning and Oliver LJ. The court will look at 'purpose' from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose: see *Thanki,* para 3.75 and the cases cited at footnotes 187 and 188.

(v) The evidence in support of a claim for litigation privilege ought to be given by the individual responsible for the creation of the document and whose motivation and state of mind is in issue. Without this it will be more difficult, and may be impossible, to satisfy the requirements for litigation privilege: *Westminster International BV v Dornoch Ltd* [2009] All ER (D) 37 (Sep) at [21]–[22].

(vi) Evidence from that person must be specific enough to show something of the deponent's analysis of the purpose for which the documents were created, and should refer to such contemporary material as it is possible to do without disclosing the privileged material: *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] 2 CLC 258 at [53].

[49] I accept those submissions apart from the proposition as formulated in sub-para (v) which seems to me at least arguably to go beyond what is stated in *Westminster International BV v Dornoch.*

[50] Further, Ms Phelps submitted (and I accept) that the court should look at the present claims to privilege with 'anxious scrutiny' for two main reasons, viz:

(i) The alleged interest of the joint liquidators (as distinct from Kaupthing as Grant Thornton's client) in the reports has only recently emerged. Further, the privilege points were not raised by Simmons & Simmons before the Divisional Court and were not taken by Kaupthing (who have permitted disclosure of other apparently similar Grant Thornton reports without mention of privilege).

(ii) The joint liquidators are not neutral third parties but a partner and director of Grant Thornton (as the purported 'client' of Grant Thornton), at least one of whom (Mr Akers) was personally involved in direct liaison with the SFO concerning the Tchenguiz investigation. These parties are seeking to withhold relevant Grant Thornton reports in circumstances where Grant Thornton and the SFO have been subjected to criticism by the Divisional Court as to the circumstances in which Grant Thornton provided information to the SFO. It is also the case that the VT claimants make substantial criticisms about

Grant Thornton both in this litigation, and in the original Commercial Court claim. It is the latter which, the VT claimants allege, triggered Grant Thornton to 'tip off' the SFO in September 2009.

[51] In support of the claim for privilege, Mr Trower submitted that litigation privilege will attach to a document where the document was produced for the dominant purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of, such litigation: see *Waugh v British Railways Board* [1979] 2 All ER 1169 at 1182–1183, [1980] AC 521 at 542–544 per Lord Edmund-Davies; that the evidence contained in para 29 of Mr Verrill's statement as I have quoted above establishes that the documents were indeed produced for such 'dominant purpose'; and that accordingly the documents were and are the subject of litigation privilege. Further, Mr Trower submitted that if the documents are so privileged then, subject to any loss or waiver of privilege, the privilege cannot be overridden by any other public interest. The latter proposition was not in dispute and is one which I readily accept. However, the main issue in this context was whether the evidence contained in Mr Verrill's statement is sufficient to justify the claim to litigation privilege in relation to one or more of the reports. In my view, it is not for the reasons set out below.

[52] First, as submitted by Ms Phelps, it is important to bear in mind that Mr Verrill is not the individual who was involved in producing any of the reports; nor was he involved in relation to the instructions given at the time to order such production. However, as submitted by Mr Trower, that is not necessarily fatal. Notwithstanding the observations made in the cases referred to by Ms Phelps, I see no reason in principle why someone in the position of Mr Verrill (who is, in his capacity as a solicitor, an officer of the court) should not give evidence as to the provenance and purpose for which a document is produced on information and belief. However, if that is done, I accept that it is entirely proper and justifiable to subject such evidence a fortiori to 'anxious scrutiny' in particular because of the difficulties in going behind that evidence. I did not understand Mr Trower to disagree with that approach although he submitted that if I was not satisfied with the evidence as it stood, I could and should in effect adjourn the matter to permit cross-examination of Mr Verrill or to allow the joint liquidators to put in further evidence. I do not accept that submission at least in the circumstances of the present case. The joint liquidators have had ample notice of this application and I see no reason why they should be given what would in effect be a second bite at the cherry. That does not seem to me to be consistent with the overriding objective.

[53] Second, it is perhaps an obvious point—but one worth emphasising in the present context – that the mere fact that a document is produced for the purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of such litigation, is *not* sufficient to found a claim for litigation privilege. It is only if such purpose is one which can properly be characterised as the 'dominant purpose' that such claim for litigation privilege can properly be sustained. So much is manifest from *Waugh v British Railways Board*. Inevitably, difficulties arise where documents are produced for a dual purpose. Further, I recognise that such difficulties are or may be particularly acute where documents come into existence, as in the present case, on the instructions of liquidators who are under statutory duties with regard (so far as possible) to the orderly collection of assets and settlement of liabilities. In the first instance at least, the proper performance of such duties may require the liquidators to obtain information

QBD    Rawlinson and Hunter Trustees v Akers (Eder J)    645

simply to identify what (if any) assets or liabilities exist or perhaps what legal proceedings might *possibly* be brought against any third parties. Ultimately, once obtained, such information may well be important to enable liquidators to decide what if any legal proceedings might *possibly* be pursued; and, further down the line, such information may *in fact* be used for or in connection with pending or contemplated litigation or of conducting or aiding in the conduct of such litigation. However, unless such documents were originally produced for the 'dominant purpose' as stated above, they cannot, in my view, be the subject of a proper claim for litigation privilege.

[**54**] Some at least of these difficulties were the focus of the decision of Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583. Although that decision was reversed in a later case on another point, the observations of the learned judge are, in my view, particularly relevant in the present context (at 590–591):

'The board of BCCI, the auditors, and the regulatory authorities all needed to know what was the true financial position of BCCI, and this required an investigation in order to establish the facts. If BCCI itself or its controlling shareholders did not set an investigation in motion, it was feared that the regulatory authorities would. BCCI's financial position depended, in part at least, on the recoverability of the problem loans and that might require legal advice as to the prospects of success if resort had to be made to legal proceedings. But just as in *Waugh v British Railways Board* the board needed to establish the facts whether or not litigation ensued, so the board of BCCI, the auditors and the controlling shareholders needed to establish BCCI's financial position whether or not recovery proceedings were necessary. Given that the dominant purpose of the investigation was to establish the facts necessary to enable BCCI's financial position to be determined, documents brought into existence in the course of the investigation did not in my judgment attract legal professional privilege merely because legal advice might be necessary in order fully to evaluate the financial implications of the facts. The obtaining of legal advice is not an end in itself. To attract privilege it must be for the purpose of actual or contemplated proceedings. In *Re Highgrade Traders Ltd* ([1984] BCLC 151) a claim to privilege was raised in respect of reports obtained by insurers who were suspicious of the circumstances attending a fire on the premises of their insured. Oliver LJ said ([1984] BCLC 151 at 173): "What, then, was the purpose of the reports? The learned judge found a duality of purpose because, he said, the insurers wanted not only to obtain the advice of their solicitors, but also wanted to ascertain the cause of the fire. Now, for my part, I find these two quite inseparable. The insurers were not seeking the cause of the fire as a matter of academic interest in spontaneous combustion. Their purpose in instigating the inquiries can only be determined by asking why they needed to find out the cause of the fire. And the only reason that can be ascribed to them is that of ascertaining whether, as they suspected, it had been fraudulently started by the insured. It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow." *In the present case it was necessary to determine the extent to which the problem loans were recoverable, in order to establish BCCI's financial position and to decide whether recovery proceedings should be taken. But the two purpose(s) were quite independent of each other. There was nothing of merely academic interest in the*

**398**

*former; it was of vital concern not only to BCCI, but also to the controlling shareholders, the auditors, and the regulatory authorities. I am satisfied that this was the dominant purpose of the investigation, and was quite independent of the possible need to take recovery proceedings, and that accordingly the documents in question do not attract legal professional privilege.'* (My emphasis.)

[55] This passage is, in my view, important because it illustrates the relatively high threshold imposed by the 'dominant purpose' test; and serves to emphasise that if, for example, documents are produced to determine the extent to which 'problem loans' are recoverable in order to establish the financial position of a company, such exercise is quite independent of the possible need to take recovery proceedings and will not (at least on that basis) attract litigation privilege. However, I fully recognise that each case must turn on its own facts, the essential question in each case being whether, with regard to particular documents or classes of documents, the party claiming the privilege can satisfy the 'dominant purpose' test.

[56] Bearing these considerations in mind, I turn to consider Mr Verrill's evidence as quoted above with regard to each of the reports.

FIRST DRAFT GUERNSEY REPORT

[57] This draft report is dealt with in para 29(1) of Mr Verrill's statement. The first thing to note is that the date referred to is the date of the report itself; Mr Verrill does not state *when* this report was 'commissioned' although it would seem that the report must have been prepared after the commencement of the Guernsey proceedings. However, Mr Verrill does not in terms say explicitly that this document was produced for the dominant purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of, such litigation. Rather, what he says in relevant respects is that the report was 'commissioned' in order to 'assist' the joint liquidators in formulating their response to the Guernsey proceedings; that the recovery available to Oscatello was materially different depending on a number of scenarios; and that it was prepared 'entirely' to enable the joint liquidators and their legal advisors to respond to varying scenarios and to prepare a defence and counterclaim. I recognise that the last reference comes closest to satisfying the dominant purpose test. However, the reference to responding to 'varying scenarios' is somewhat equivocal; and the use of the conjunctive 'and' suggests a dual purpose, ie the report was prepared for the purpose of responding to the varying scenarios *and* preparing a defence and counterclaim. Moreover, the final sentence of this paragraph then goes on to state: 'Specifically [this report] was to identify all inter-company balances that should be reversed and to calculate the effect of these balances/reversals on dividends to creditors.' To my mind, it is difficult if not impossible to understand how this last sentence fits in with the earlier part of this sub-paragraph. Further, if that last sentence is correct, it seems to me that such exercise is one which the joint liquidators were bound to carry out in any event and, echoing the words of Millett J in *Price Waterhouse v BCCI* [1992] BCLC 583, it is an exercise which would be 'independent' of the possible need to take recovery proceedings. On that basis, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report. Finally, I do not consider that the fact the report was subsequently sent to Guernsey counsel on 15 November 2010 changes the position. Not only is this almost

three months after the date of the report but such fact cannot have the effect of creating litigation privilege if such privilege did not exist when the report was originally produced.

SECOND DRAFT GUERNSEY REPORT

[58] This draft report is dealt with in para 29(2) of Mr Verrill's statement. Again, I note that he does not state when it was 'commissioned' although he does say that it was commissioned following a meeting with counsel on 30 November 2010; and it must have been produced shortly thereafter because Mr Verrill states that it was sent to Guernsey counsel on or around 21 December 2010. Thus, the report was plainly prepared after the commencement of the Guernsey proceedings. Here, Mr Verrill's language is different from what he says in relation to the first draft Guernsey report. In particular, he states explicitly that this report was commissioned for the 'dominant purpose … to enable the joint liquidators to consider with counsel the broader implications of the Guernsey proceedings for the Oscatello companies' Even this, however, is somewhat vague. What, might one ask, are the 'broader implications' here referred to? If this is intended to refer to the financial consequences of the various possible outcomes of the Guernsey proceedings then I am extremely doubtful that this would give rise to litigation privilege. Mr Verrill then states that this draft report was produced 'following a request by the joint liquidators' counsel for a memorandum regarding the inter-company loans to assist counsel in producing advice regarding litigation strategy'. Mr Verrill then goes on to explain in some detail that the draft report was produced to 'help establish' certain matters; and took the form of 'a summary and analysis of information obtained from the books and records of the Oscatello companies'. I am prepared to accept that the production of this summary and analysis of Oscatello's books and records was important, even perhaps essential, for the purpose of deciding litigation strategy in the Guernsey proceedings. However, it seems to me that it does not necessarily follow that this satisfies the 'dominant purpose' test. Again, it seems to me that the last sentence of this paragraph in Mr Verrill's statement is important: 'The report enabled the joint liquidators' solicitors to fully understand the accounting treatment of the loan transactions to enable them to advise on strategy for the litigation proceedings in Guernsey.' If, as this sentence would appear to suggest, such draft report was necessary in order for the joint liquidators' solicitors to understand the accounting treatment of the loan transactions, then it seems to me difficult to see how the dominant purpose test is satisfied even if, as Mr Verrill also states, this was to enable the solicitors to advise on strategy for the litigation. If such document did not exist already, it also seems to me difficult to understand how the joint liquidators could perform their basic statutory duties. For all these reasons, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report.

DRAFT OSCATELLO MEMORANDUM

[59] This draft memorandum is dealt with in para 29(3) of Mr Verrill's statement. It is important to note that the explanation given as to the purpose for which it was produced is very different from either of the first two draft reports, viz it has nothing to do with the Guernsey proceedings nor any other then existing proceedings. Rather, Mr Verrill states that it was commissioned 'on the formation and trading history of the Oscatello companies'. Again, although Mr Verrill gives the date of the draft memorandum, it is noteworthy

that he does not state the date when it was actually 'commissioned'. He then goes on to state that it was commissioned for the dominant purpose of enabling the joint liquidators 'to obtain information and advice in connection with litigation which was, and remains, contemplated against various potential defendants'. Although the magic words 'dominant purpose' are used, it seems to me significant that there were no relevant extant proceedings at that stage and although he does indeed say that litigation 'was, and remains contemplated', such statement is, to my mind, entirely vague and lacks specificity. For example, Mr Verrill states that such litigation was and remains contemplated 'against potential defendants' but does not specify who such potential defendants might be. On the contrary, Mr Verrill goes on to state that the draft memorandum addresses, among other things, various transactions which the joint liquidators consider unusual or irregular and 'identifies *potential* causes of action as well as the defendants to *possible* claims' (my emphasis). Although it is true that Mr Verrill then states that the draft memorandum highlighted a number of what are said to be 'unusual and irregular' specific transactions and potential defendants, such language—in particular the reference to 'potential' causes of action and 'possible claims' – seems to me to fall far short of the necessary threshold referred to in the cases cited above, ie *United States of America v Philip Morris Inc* [2004] All ER (D) 448 (Mar) at paras [67]–[68]; *Westminster International BV v Dornoch Ltd* [2009] All ER (D) 37 (Sep) at paras [19]–[20] per Etherton LJ. Mr Trower emphasised that the fact that this draft memorandum was, as stated by Mr Verrill, provided to the joint liquidators' legal advisors in London for the purpose of obtaining advice and formulating draft particulars of claim on 17 September (ie on the same date of the draft memorandum), supports the claim for litigation privilege. In broad terms, that may well be so. However, it seems to me that the critical question is what was the purpose for which the draft memorandum was originally produced rather than its actual use. For that reason, the fact that the draft memorandum was provided to the joint liquidators' legal advisors is not, in my view, determinative. Moreover, it seems to me plain and obvious that the fact that the draft memorandum was provided to the legal advisors does not mean that litigation was 'reasonably in prospect' rather than a mere possibility at that stage (if that is the relevant stage). In that context, Ms Phelps relied on the fact that even now—almost three years after the date of the first report—no proceedings have been initiated. I do not consider that such fact is necessarily determinative; but I agree that it points strongly against any suggestion that litigation was reasonably in prospect when this draft memorandum was produced.

[60] For all these reasons, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report.

DRAFT ROXINDA MEMORANDUM

[61] This draft memorandum is dealt with in para 29(4) of Mr Verrill's statement. Although Mr Verrill again uses the magic words—'dominant purpose'—I would make similar comments to those in respect of the draft Oscatello memorandum which I have just set out above and need not repeat. It is true that although Mr Verrill explains that this draft memorandum addresses the circumstances surrounding the entry into certain contracts and also seeks to identify what are described as 'civil recovery opportunities', it seems to me that this language again falls short of the necessary threshold of litigation having to be reasonably in prospect. Further, I should note that Ms Phelps

relied on the fact that, according to Mr Verrill, although this memorandum is dated 25 October 2010, it was not provided to counsel in London until almost a year later, ie 22 September 2011; and I agree that this further supports the conclusion which I have reached, ie that the dominant purpose test is not satisfied in respect of this draft memorandum.

DRAFT R20 REPORT

[62] This draft report is dealt with in para 29(5) of Mr Verrill's statement. I originally considered that the explanation provided there by Mr Verrill in relation to the production of this draft report set out the strongest case for litigation privilege. In particular, it is noteworthy that Mr Verrill's evidence is that such draft report was commissioned at a later stage, ie following a meeting (on 30 November 2010) with—and a specific request by—the joint liquidators' counsel for a document providing details of the individuals from R20 who were involved in the transactions referred to in the Oscatello report (which I understand to refer to the draft Oscatello memorandum); and it was provided shortly thereafter on 22 December 2010 to counsel 'for the purposes of obtaining advice and formulating draft particulars of claim'. However, again, it seems to me that Mr Verrill's statement falls short of establishing that there was even at this stage any relevant litigation which was 'reasonably in prospect' as opposed to a mere possibility. Thus, Mr Verrill states that this draft report was commissioned 'to enable [counsel] to advise on *potential* claims against various *possible* defendants identified in the Oscatello Report' (my emphasis added). Again, it seems to me that this conclusion is fortified by the fact, as submitted by Ms Phelps, that even now (ie some 2½ years later), no litigation has been instituted.

[63] For all these reasons, it is my conclusion that the dominant purpose test has not been satisfied in respect of this draft report.

LOSS OF CONFIDENTIALITY

[64] Ms Phelps submitted that, at least with regard to three of the reports, ie the first draft Guernsey report, the Oscatello memorandum and the draft R20 report, even if such reports were initially the subject of litigation privilege, nevertheless such privilege was lost. In essence, this was, she submitted, because there had been a loss of confidentiality in respect of such reports and that the information contained in them was now in the public domain.

[65] Given my conclusions as stated above, this point does not arise for decision. However, both Ms Phelps and Mr Trower addressed me on the point and I propose to deal with it briefly.

[66] First, at the risk of repetition, it is convenient to summarise the factual foundation of Ms Phelps's submission, viz that as appears from Mr Brinkworth's statement, copies of these three reports were shown to the SFO; detailed notes of such reports were taken by the SFO; such notes were then exhibited to Mr Brinkworth's statement, adduced in evidence in open court during the judicial review hearing before the Divisional Court and referred to extensively both in argument and in the Divisional Court judgment; and the Divisional Court made a specific order that all of the exhibits to Mr Brinkworth's statement including specifically these notes were in the 'public domain'. These matters were not in dispute.

[67] Second, it is important to emphasise the limited nature of the argument. In particular, Ms Phelps did not suggest that there had been any specific waiver as such. Nor did she suggest that there had been any 'collateral waiver'. This is

relevant because, relying upon Mr Verrill's statement, Mr Trower submitted *a* that the disclosure of the information contained in the three reports referred to above had, in effect, been made without the authority of the joint liquidators. In particular, Mr Trower submitted that the position was, in summary, as follows:

(i) the SFO inspected the reports in response to the service of a notice pursuant to s 2 of the Criminal Justice Act 1987 requiring the provision of *b* information and the production of documents;

(ii) the SFO's investigators who attended Grant Thornton's offices were informed that the reports were legally privileged documents;

(iii) the SFO investigators were further informed that they were not permitted to take copies of the reports; *c*

(iv) each of the reports, at the foot of each page, contains a statement that the document is 'Strictly privileged, private and confidential';

(v) the joint liquidators did not authorise the SFO investigators to take notes from the reports and were not aware that the SFO had taken any notes, let alone verbatim notes, until they reviewed the witness statement of Mr Brinkworth filed in the judicial review proceedings; *d*

(vi) the joint liquidators did not authorise the SFO to publish the notes taken from the reports in open court whether as part of the judicial review proceedings or otherwise; and

(vii) the joint liquidators believed that the SFO reviewed the reports in order to assist with developing lines of enquiry in their investigations. *e*

[68] The 'no authority point' was hotly disputed on the part of the claimants. However, Ms Phelps submitted that, in any event, the cat was now out of the bag; and that, at least so far as the argument concerning loss of confidentiality is concerned, it matters not whether such escape was with or without the authority of the joint liquidators. That was also a matter of dispute but, for present purposes, I am prepared to assume in favour of the claimants that that *f* proposition is correct; and that on this basis it is unnecessary to resolve the 'no authority point'.

[69] Third, as to the applicable principles, Mr Trower submitted in summary as follows:

(i) It is well established that a limited waiver of privilege does not necessarily cause the privilege to be lost: see *B v Auckland District Law Society* [2003] UKPC *g* 38, [2004] 4 All ER 269 at [68], [2003] 2 AC 736, per Lord Millett:

> 'It must often be in the interests of the administration of justice that a partial or limited waiver of privilege should be made by a party who would not contemplate anything which might cause privilege to be lost, and it would be most undesirable if the law could not accommodate it.' *h*

(ii) Where a document has been disclosed to a limited number of third parties (in this case officers of the SFO) the question is whether the circumstances are such that there has been an express or implied preservation of the overall confidentiality as against the rest of the world: see *Thanki*, para 5.13. *j*

(iii) Cases such as *Gotha City v Sotheby's* [1998] 1 WLR 114 at 122 and *Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow* [1995] 1 All ER 976 demonstrate that confidentiality, and therefore privilege, will be maintained where the circumstances in which the communications were made lead to the inference that the information was intended to be confidential.

(iv) In applying these principles, the courts have taken a generous view in circumstances where copies of privileged reports have been made available to prosecuting authorities: see e g *British Coal Corp v Dennis Rye Ltd (No 2)* [1988] 3 All ER 816, [1988] 1 WLR 1113, where the plaintiff in a civil action had provided copies of privileged documents produced for the purpose of the civil action to the police who were investigating the defendants' conduct. A prosecution followed, in the course of which some of the privileged documents provided to the police were disclosed to the defendants under the Attorney-General's *Guidelines on Disclosure of Information* and further privileged documents were ordered to be provided to the defendants by the judge at the criminal trial. Following the acquittal of the defendants, the plaintiff sought an order that the defendants deliver up to them all the privileged material and an order restraining the defendants from making any use of the privileged materials in the civil action or any other legal proceedings between the parties. The defendants resisted the application, contending that the waiver of privilege in favour of the police and the production of documents at the criminal trial amounted to a loss of privilege which could be relied on by the defendant for the purposes of the civil proceedings. The Court of Appeal granted the relief sought by the plaintiff. Neill LJ stated as follows ([1988] 3 All ER 816 at 821–822, [1988] 1 WLR 1113 at 1121–1122):

> '… it is clear that the plaintiff made the documents available for a limited purpose only, namely to assist in the conduct first of a criminal investigation and then of a criminal trial. This action of the plaintiff, looked at objectively as it must be, cannot be construed as a waiver of any rights available to it in the present civil action for the purpose of which the privilege exists … In my judgment the action of the plaintiff in making documents available for the purpose of the criminal trial did not constitute a waiver of the privilege to which it was entitled in the present civil proceedings. Its action … was in accordance with its duty to assist in the conduct of the criminal proceedings, and could not properly be construed as an express or implied waiver of its rights in its own civil litigation. Indeed, it would in my view be contrary to public policy if the plaintiff's action in making the documents available in the criminal proceedings had the effect of automatically removing the cloak of privilege which would otherwise be available to them in the civil litigation for which the cloak was designed.'

(v) Accordingly, the *British Coal* case demonstrates that disclosure of privileged materials to the criminal justice authorities (even where those materials are then disclosed to a defendant to criminal proceedings) will not result in a more general loss of privilege. Moreover, it should be noted that whereas the plaintiff in *British Coal* consented to the use of the privileged material in the criminal proceedings, no such consent was given by the joint liquidators in the present case.

(vi) The principle that the disclosure of privileged materials to the criminal justice authorities will not result in a more general loss of privilege is hardly surprising as a contrary conclusion would amount to a strong disincentive for those with relevant knowledge to assist the criminal justice authorities in circumstances where those authorities could not use their compulsory powers of disclosure to obtain such information, since those powers do not cover the

disclosure of privileged information. There is an important public interest in *a* facilitating the success of investigations by an assurance of confidentiality and the preservation of privilege.

(vii) It would therefore be a surprising conclusion if the provision of documentation to the SFO in response to the service of a notice pursuant to s 2 of the Criminal Justice Act 1987 were to lead to a loss of privilege. Any loss of confidentiality must be seen as restricted to the criminal proceedings alone. *b*

(viii) The court has taken a similar approach in relation to the confidentiality of documents produced pursuant to a request by the Bank of England under the provisions of the Banking Act 1987: see *Re Galileo Group Ltd* [1998] 1 All ER 545, [1999] Ch 100.

[70] Ms Phelps submitted, in effect, that although such submissions may be *c* relevant in the context of 'waiver' of privilege, they are not relevant here where the issue is one of loss of confidentiality. In support of that submission, Ms Phelps submitted in summary as follows:

(i) It is a pre-condition to any claim for privilege that the documents in question are confidential: see per Lord Scott in *Three Rivers DC v Bank of England (No 5)* [2004] UKHL 48, [2005] 4 All ER 948 at [24], sub nom *Three* *d* *Rivers DC v Bank of England (No 6)* [2005] 1 AC 610 at [24], and *BBGP Managing General Partner Ltd v Babcock & Brown Global Partners* [2010] EWHC 2176 (Ch), [2011] 2 All ER 297 at [45]–[50], [2011] Ch 296 per Norris J.

(ii) Analytically therefore, confidentiality is a separate issue to that of loss or waiver of privilege: see *Thanki,* para 5.04 and para 1.27:

> *e*
> 'Confidentiality does not by itself enable privilege to be claimed, but if it is not confidential there can be no question of legal professional privilege arising or being maintained.'

(iii) While it is sometimes possible to maintain privilege where documents have been disclosed to a third party for a limited purpose, this is impossible once the information which is sought to be protected has been referred to in *f* open court. Once this has occurred, the information in question is in the public domain and will no longer be capable of protection by privilege: see *Thanki,* paras 5.11–5.12; *Passmore on Privilege* para 7.027–7.049 especially at paras 7.034–7.037; *Great Atlantic Insurance Co v Home Insurance Co* [1981] 2 All ER 485, [1981] 1 WLR 529; and *Gotha City v Sotheby's* [1998] 1 WLR 114 at *g* 118–119, where the following passage from *Style & Hollander on Documentary Evidence* (6th edn) p 224 was cited with approval:

> 'If the document is read out on the television news or in open court then confidentiality is lost once and for all. No further question of privilege arises. But it is important to bear in mind that it is possible for a document to cease to be confidential as between some parties and not others. If A *h* shows a privileged document to his six best friends, he will not be able to assert privilege if one of those friends sues him because the document is not confidential as between him and the friend. But the fact six other people have seen it does not prevent him claiming privilege as against the rest of the world.'
> *j*

[71] For present purposes, I am prepared to assume in favour of the claimants that these propositions are correct. However, as submitted by Mr Trower, it seems to me that even on the assumption that there was a loss of confidentiality in respect of the information contained in the notes as exhibited to Mr Brinkworth's statement, it does not necessarily follow that there was or is

a loss of confidentiality in the three reports themselves. In that context, Ms Phelps submitted that the material reproduced in the notes taken by the SFO investigators and exhibited to Mr Brinkworth's statement is very detailed and appears to amount to a 'substantial proportion' of the reports in question; that this is, in effect, confirmed by Mr Verrill himself when he refers in para 33 of his statement to the notes as 'handwritten verbatim notes which amounts to copying'; that there is no reason to think that the relevant reports have not been substantially reproduced; and that therefore privilege in these reports themselves cannot, therefore, be maintained. Further, Ms Phelps sought to rely in particular upon a passage in *Passmore,* p 322 fn 68 and the case there cited from New Zealand, *Chandris Lines v Wilson & Horton* [1981] 2 NZLR 600.

[72] I am unable to accept the thrust of these submissions. As to *Chandris Lines v Wilson & Horton*, it seems to me that, as submitted by Mr Trower, that case is distinguishable as it concerned a waiver of privilege by the person entitled to assert it. Here, as I have stated, Ms Phelps has expressly disavowed any reliance on 'waiver' or 'collateral waiver' but advanced the claimants' case on the basis simply of loss of confidentiality. In that context, even on the assumption that the relevant reports have been 'substantially reproduced' in the notes, it seems to me that the only relevant loss of confidentiality which has occurred is in respect of the information actually set out in the notes taken by the SFO and exhibited to Mr Brinkworth's statement, no more, no less. However, the reports themselves are not in the public domain; and in my judgment, it follows that there has been no loss of confidentiality in such reports.

[73] It might be thought that this conclusion rests on a fine distinction which has no merit. However, it seems to me necessarily to follow from the limited nature of the argument advanced by Ms Phelps which is based simply on alleged loss of confidentiality and not on any waiver or collateral waiver.

[74] Be all this as it may, I should repeat that the arguments relating to loss of confidentiality are, in my judgment, irrelevant given my earlier conclusion that the joint liquidators' claim to assert litigation privilege in respect of the five reports fails.

CONCLUSION

[75] For these reasons, it is my conclusion that the joint liquidators' claim to assert litigation privilege in respect of the five reports fails. Counsel are accordingly requested to seek to agree a draft order together (including any specific terms with regard to confidentiality and use of the reports as referred to above, costs and any other consequential matters). Failing agreement, I will deal with any outstanding issues.

*Applications granted.*

**Appeal**
The liquidators appealed.

*William Trower QC* and *David Allison* (instructed by *Chadbourne & Parke LLP*) for the joint liquidators.
*Charles Hollander QC*, *Rosalind Phelps* and *James Duffy* (instructed by *Stephenson Harwood LLP*) for the claimants.

20 February 2014. The following judgments were delivered.

**TOMLINSON LJ.**

[1] In these proceedings Robert and Vincent Tchenguiz (RT and VT) and companies and trusts associated with them through which their business is conducted seek damages from the Director of the Serious Fraud Office (the SFO). As is well known, in March 2011 RT and VT were arrested at their homes and search warrants were executed both at their residences and at business premises of the associated companies. The claimants say that the searches and seizures by or at the instigation of the Director were unlawful as were the arrests and investigations connected therewith. They say that the searches, arrests and investigations and the publicity surrounding them had a disastrous effect on their business interests, causing extensive financial losses and reputational harm.

[2] The application for the search warrants was made to Judge Paul Worsley QC at the Central Criminal Court. It is said by the claimants that five reports (the reports) prepared by Grant Thornton UK LLP (Grant Thornton) played a key role in the preparation of, and informed the content of, the material placed before the judge in support of the application for the search warrants, which application was made under s 2(4) of the Criminal Justice Act 1987. Those reports were shown to the SFO by Grant Thornton prior to the application. The SFO was not permitted to make copies. Thus the SFO will not be in a position to disclose the reports in the action for damages brought against it.

[3] Not unnaturally the claimants have sought disclosure of the reports from those able to disclose them, the appellants on this appeal. An application has been made against them in the proceedings for third party disclosure pursuant to CPR 31.17. The appellants, Mr Akers and Mr McDonald, are both chartered accountants. Mr Akers is a partner in Grant Thornton. Mr McDonald is a director of Grant Thornton (BVI) Ltd. They are the joint liquidators of a group of companies referred to in the proceedings as the 'Oscatello companies'. The joint liquidators say that they commissioned the five reports, so they acknowledge that they are in a position to disclose them.

[4] Eder J in the Commercial Court [2013] EWHC 2297 (QB) decided that it is in principle necessary and appropriate to make an order for disclosure of all five reports. The reports are plainly relevant not just to the case which the claimants wish to put forward but also to the defence of the SFO that it was entitled to have regard to information made available to it by Grant Thornton. These issues were contested before the judge but his decision thereon is not sought to be challenged on appeal.

[5] The joint liquidators also resisted disclosure claiming that the reports are protected by litigation privilege. The judge rejected this claim and directed disclosure. It is this aspect alone of his decision which is the subject of this appeal.

[6] The claim to privilege is supported by a witness statement dated 5 July 2013 of Mr John Verrill, a solicitor, licensed insolvency practitioner and partner in the firm of Chadbourne and Parke (London) LLP.

[7] The background to the applications is important and was summarised succinctly by the judge. There is no purpose in my doing anything other than reproduce that summary here:

> '**The joint liquidators**
> [6] The facts relating to the appointment of the joint liquidators and their conduct of the liquidation are set out in Mr Verrill's statement.

CA      Rawlinson and Hunter Trustees v Akers (Tomlinson LJ)    655

Certain of such facts are or may be in issue but without prejudice to any such possible dispute in the future, it is convenient to adopt for present purposes the brief summary set out in Mr Trower's skeleton argument which was as follows.

[7] The joint liquidators act as liquidators of Oscatello and a number of additional companies registered in the British Virgin Islands (together the Oscatello companies).

[8] The Oscatello companies formed part of a complex group of companies including their subsidiary undertakings which, at all material times (following a restructuring of the group in late 2007) were ultimately controlled by Investec Trust (Guernsey) Ltd (Investec) and Bayeux Trustees Ltd (together with Investec, the Tchenguiz discretionary trust trustees) in their capacity as joint trustees of the Tchenguiz discretionary trust.

[9] The main beneficiaries of the Tchenguiz discretionary trust were Robert Tchenguiz (RT) and his children and remoter issue. The Tchenguiz discretionary trust was settled on 26 March 2007 by a declaration of trust made by, among others, Investec in its capacity as trustee of the Tchenguiz family trust, pursuant to a power to settle new trusts contained in the Tchenguiz family trust instrument. The beneficiaries of the Tchenguiz family trust include RT and his brother VT.

[10] The Oscatello companies performed two main roles: (i) they held positions by way of direct equity/debt investments; and (ii) they participated in large-scale derivatives and futures trading. Investment decisions were made by the Tchenguiz discretionary trust trustees in conjunction with or at the direction of R20 Ltd (R20). From around the date of the inception of the Tchenguiz discretionary trust in March 2007, R20 advised the Tchenguiz discretionary trust and the companies held under its umbrella (including the Oscatello companies) on their general commercial and investment strategies. RT is a director of R20.

[11] In around late 2007 the Oscatello companies were restructured. A framework agreement providing the basis for the continued operation of the Oscatello companies was concluded with, among others, the Icelandic bank Kaupthing hf (Kaupthing). Kaupthing and certain of its subsidiaries agreed to continue to fund the Oscatello companies' operations by way of an overdraft facility and other forms of lending, secured over shares in the Oscatello companies. That funding was used principally for the purposes of purchasing and servicing equity and debt instruments in the form of contracts for differences and credit default swaps.

[12] The amount of funding provided by Kaupthing to the Oscatello companies increased rapidly throughout 2008, largely as a consequence of a need to meet margin calls as asset values deteriorated. By the end of 2008 Kaupthing had collapsed and the Oscatello companies could no longer meet their obligations.

[13] On 10 December 2008 Mr Akers and Mr McDonald were appointed as joint receivers over the shares of the Oscatello companies.

[14] On 18 August 2009 Mr Akers and Mr McDonald were appointed as joint liquidators of a number of the Oscatello companies.

[15] On 16 February 2010 Mr Akers and Mr McDonald were appointed as joint liquidators of Oscatello.

[16] The appointment of Mr Akers and Mr McDonald as liquidators has been recognised in England and Wales by order of this court dated

31 March 2010 made pursuant to the terms of the Cross Border Insolvency *a* Regulations 2006. Their appointment as liquidators has also been recognised in Guernsey by order of the Royal Court of Guernsey dated 21 April 2011.

[17] The joint liquidators estimate that the shortfall in the assets of the Oscatello companies to meet the claims of its creditors is in excess of *b* £1,950,000,000.

[18] The liquidation of the Oscatello companies has been exceptionally complex. There has been worldwide litigation, including complex and hard fought proceedings in London, the Isle of Man, Guernsey and the British Virgin Islands. The Oscatello companies have frequently found themselves on the other side of litigation to parties associated with RT and VT. One *c* example is provided by the proceedings pending before the Royal Court of Guernsey. The Guernsey proceedings concern a claim by the Tchenguiz discretionary trust trustees against Oscatello and others seeking to challenge the terms and enforceability of intra-group lending by the Oscatello companies. RT is a protector of the Tchenguiz discretionary trust and gave oral evidence to the Guernsey court. *d*

[19] According to Mr Verrill, it is likely that there will be further litigation between the Oscatello companies and parties associated with VT and RT. In this regard:

(i) the joint liquidators continue actively to consider the commencement of proceedings against a large number of parties (including those associated with RT and VT) in order to recover assets or to receive *e* compensation in respect of assets of the Oscatello companies which appear to have been misapplied; and

(ii) the solicitors to the VT claimants have indicated that they are contemplating claims against the joint liquidators arising from the criminal proceedings brought by the SFO. The solicitors to the VT claimants have made a number of very serious allegations, including an allegation that the *f* joint liquidators provided misleading and inaccurate information to the SFO for the purpose of damaging VT and the Tchenguiz family trust and forcing the settlement of civil actions on unfavourable terms. The alleged losses sustained by the Tchenguiz family trust are said to amount to in excess of £2.5bn. *g*

### Background

[20] The relevant background to the present application was summarised in Ms Phelps's skeleton argument. For present purposes, it is convenient to adopt that summary subject to certain additions/amendments in the light of certain points made by Mr Trower.

[21] The starting point is the information. This referred extensively to the *h* reports prepared by Grant Thornton—or example, para 59 (referring to an "in depth analysis of Oscatello Investments Ltd" done by Grant Thornton); and para 76 which stated: "Grant Thornton, who have been appointed by the Resolution Committee of Kaupthing Bank in the [sic] Iceland, have carried out extensive financial forensic analysis of this complex structure which was put forward by Robert Tchenguiz as collateral for the *j* substantial borrowing from Kaupthing. A number of Reports have been prepared by Grant Thornton detailing their findings and these have been reviewed by the SFO", and para 125 which stated: "Grant Thornton has

been appointed by the Resolution Committee in Iceland in order to analyse the Kaupthing lending to Tchenguiz connected companies and to consider potential offences and potential defendants."

[22] In the course of the judicial review proceedings, after the SFO had conceded that the warrants concerning VT should be quashed, the SFO (via the Treasury Solicitor) wrote a detailed letter to the judicial review claimants dated 21 February 2012 relating to the errors in the information. The letter stated that the investigation into VT had been triggered by a telephone call from Grant Thornton on 9 September 2010, following which the SFO were permitted to view draft reports prepared by Grant Thornton. It was obvious from that letter that detailed notes had been taken of the material provided by Grant Thornton and viewed by the SFO.

[23] In March 2012, well before the substantive judicial review hearing, the solicitors representing the judicial review claimants wrote to the solicitors for Grant Thornton (Simmons & Simmons), enclosing a copy of the Treasury Solicitor's letter of 21 February 2012. The letter was copied to Mr Akers and stated that the substantive judicial review hearing was listed to start on 22 May 2012. The letter highlighted the concerns about the role played by Grant Thornton in providing information to the SFO. The letter asked for copies of any documents shown to the SFO, and specifically asked Grant Thornton (at para 43) to explain the basis for any assertion that the reports were privileged, including the identity of the person or persons on whose behalf the rights were being asserted. The letter ended by pointing out (in para 111) that it was intended to provide Grant Thornton with an adequate opportunity to consider the concerns and to provide an answer to them before the substantive hearing and that the option of joining the proceedings as an interested party was available. It was also made clear that the correspondence would be placed before the court, as in the event happened.

[24] In response, Simmons & Simmons for Grant Thornton refused to provide the documents, on the basis, inter alia, that the information provided by Grant Thornton to the SFO was information which Grant Thornton received or prepared during the course of activities carried out on behalf of its client, the Resolution Committee of Kaupthing; and that information was confidential as a matter of Icelandic law and Grant Thornton could not answer the questions raised without breaching professional rules of confidentiality. Grant Thornton (via Simmons & Simmons) also declined to play any part in the substantive judicial review proceedings, which drew some criticism from the Divisional Court, as set out below. No mention was made by Simmons & Simmons in the letter of legal professional privilege, or of any alleged interest of the joint liquidators in the Grant Thornton reports. The close involvement of Grant Thornton was subsequently explained in more depth in a detailed witness statement submitted by Mr Brinkworth of the SFO.

**Mr Brinkworth's statement**

[25] Meanwhile, at a directions hearing on 22 February 2012, the SFO was ordered to serve evidence relating to the matters set out in the 21 February 2012 letter, essentially in order to explain the SFO's position. In his statement served on 30 April 2012 Mr Brinkworth said in terms (at para 8) that—"In this overview I have referred almost exclusively to Reports prepared by [Grant Thornton], the firm appointed as joint liquidators by Kaupthing hf's (Khf's) Resolution Committee following the

**410**

bank's collapse, and the SFO during the course of its investigation. These       *a*
Reports provide a useful (and fair) summary of the basis of the core
allegations within the information, and particularly those relating to
Pennyrock."

[26] Mr Brinkworth's statement went on to refer (as had the 21 February
2012 letter) to a number of Grant Thornton reports which the SFO were
permitted to view but not to copy, apparently on the ground that they       *b*
were privileged (see paras 26, 31 and 36). As set out in more detail below,
detailed notes taken from a number of the reports sought in this
application were exhibited to Mr Brinkworth's statement and referred to in
open court during the course of the judicial review hearing. The Divisional
Court judgment recorded the reliance placed on Grant Thornton by the       *c*
SFO and in particular the following ([2013] 1 WLR 1634 at [94] and [96]):
"It is now clear that the basis of much of what was said to be suspected
criminality was based on information provided by Grant Thornton and to
a lesser extent Weil, Gotshal and Manges. The Information disclosed that
Grant Thornton had been appointed by the Resolution Committee to
analyse the lending by Kaupthing and the entities connected with VT and       *d*
RT. The Information disclosed the involvement of Grant Thornton in the
allegations made against RT and in respect of Oscatello and the litigation
against Oscatello to which we have referred at para 30 … This is a case
where it appears that the SFO relied very heavily on the work and
conclusions of Grant Thornton …" The Divisional Court (at [195]–[197])
commented on the lack of co-operation of Grant Thornton:       *e*

    "[195] However, as we have set out at paras [43]–[44] above, these
allegations rest upon what the SFO were told by Grant Thornton on and
after 9 September 2010. We only have the notes of the meeting and not
the copy of the report of Grant Thornton. They declined in answer to a
request from VT to make available the evidence on which such serious       *f*
allegations were advanced to the SFO. We therefore do not know the
basis of Grant Thornton's opinion on the valuation carried out by Oliver
Wyman or their opinion on the acceptance of that valuation in the
audited accounts. Certainly the allegation (which we have set out at
para [43]) made by Grant Thornton to the SFO that VT may have misled
the auditors as to the period on which the actuarial valuation was made       *g*
was unfounded, the entire basis of valuation is recorded in note 7 to the
accounts. Nor do we know the basis of the contention of Grant
Thornton and the Resolution Committee that Kaupthing had not
conducted due diligence.

    [196] Lord Goldsmith severely criticised this conduct of Grant
Thornton, having put them on notice on 15 March 2012 and invited       *h*
them to become a party to the proceedings and to state whether the
allegations were maintained. Grant Thornton acknowledged the receipt
of this notice in a letter written by their solicitors on 9 May 2012. They
stated that they would not become a party, they had not been served
with the proceedings and were not in a position to provide information       *j*
because of the confidentiality provisions of Icelandic law, the Code of
Ethics of the Institute of Chartered Accountants and legal professional
privilege. They contended that no criticism should be made of their
conduct, as the SFO had accepted that the misstatements to the judge
were its fault. Lord Goldsmith made clear that the fact that the

allegations were still being maintained was continuing to have an adverse effect on the interests of [the Tchenguiz family trust] and VT and preventing [the Tchenguiz family trust] from repaying the Pennyrock loan.

[197] We do not consider that it is for us to comment on the conduct of Grant Thornton, save to say that it is unfortunate that the court does not know the basis for the criticism of the actuarial valuation and the audited accounts. It is perhaps difficult to understand how provisions of Icelandic law or the Code of Ethics of the Institute of Chartered Accountants or legal professional privilege could have permitted Grant Thornton to assist the SFO, after service of a s 2 notice, in making allegations of criminal conduct against RT and VT in relation to the valuation and the accounts, but not to be in a position to assist this court by providing the basis for those two specific allegations when VT and RT challenged by way of judicial review the case made against VT and RT by the SFO who had relied on Grant Thornton's views on those two specific allegations. From the observations we have made in para [195], the provision of information would have been of assistance to the court.'

[27] Following the Divisional Court judgment, the VT claimants renewed their requests for disclosure of the reports prepared by Grant Thornton, by letter dated 31 August 2012 from Simmons & Simmons.

[28] On 20 September 2012 Skadden Arps, acting on behalf of the joint liquidators, wrote to the Divisional Court with copies to various parties including the VT claimants' solicitors, Stephenson Harwood. The letter related to the then pending application to use documents from the judicial review proceedings for the purposes of other proceedings. The letter stated that such application was likely to relate to information and/or documents which belong to Oscatello and which were confidential and/or privileged. It asked that a copy of the application be provided, so that Oscatello could consider whether to intervene.

[29] In the event an order was subsequently made by the court dated 19 November 2012 which provided that Mr Brinkworth's statement and exhibits be deemed to be in the public domain.

[30] The VT claimants again renewed their disclosure requests of the reports on 13 February 2013. Notwithstanding extensive correspondence dating back to March 2012, there was, Ms Phelps submitted, no suggestion at this stage that the reports shown by Grant Thornton to the SFO were prepared for anyone other than Kaupthing acting through its Resolution Committee—see (i) Mr Brinkworth's statement; (ii) the Simmons & Simmons letter referred to in para [24] above, which referred in terms to the information being provided to the SFO on behalf of Grant Thornton's client, Kaupthing; and (iii) the Divisional Court judgment (at para [4]) where it was stated: "… in the account of the factual background we refer to Grant Thornton's reports. Grant Thornton and Weil, Gotshal and Manges were appointed on the collapse of Kaupthing by the group responsible for its affairs known as the Resolution Committee to seek to recover funds for the creditors. Their reports formed an important basis for the SFO's investigation, as we shall explain."

[31] On 15 March 2013 Chadbourne & Parke wrote to say that it had "recently" been instructed by the joint liquidators of Oscatello. They asked for time to consider the 'ownership and control' of certain of the reports in

order to determine the scope of any litigation privilege attaching. Their *a* further letter of 26 March 2013 described the five reports the subject of this application and confirmed that they had been shown to the SFO. It was asserted that the reports were covered by litigation privilege—a point which had not been taken by Simmons & Simmons during the judicial review itself. (As I understand, it was only in the letter from Skadden Apps *b* dated 20 September 2012 referred to above that any question of privilege had previously been suggested.)

[32] By letter dated 28 June 2013 Stephenson Harwood invited Chadbourne & Parke to explain properly the basis for the assertion that the reports were privileged, but it was not until the service of Mr Verrill's statement that any proper attempt was made to do this (beyond the bare *c* assertions of the 26 March 2013 letter). This claim is considered further below.

[33] In the meantime other Grant Thornton reports referred to in Mr Brinkworth's statement were disclosed by Simmons & Simmons (by letter of 13 March 2013), who stated that Kaupthing (ie the Winding Up Committee which was the successor to the Resolution Committee) *d* considered the reports to be confidential but that, contrary to what Simmons & Simmons had previously asserted, Icelandic law would permit their disclosure. No point was taken in relation to privilege.'

[8] It was central to the submissions of Mr William Trower QC for the joint liquidators that their position should be considered independently of that of *e* Grant Thornton. That submission is self-evidently correct, as the joint liquidators owe duties to the court and to the creditors which are quite independent of their status as partners in or employees of any Grant Thornton firm or company. But, as Mr Charles Hollander QC for the respondents pointed out, Mr Akers had during the relevant history worn different hats. Although they had an earlier involvement as detailed above, it was in February *f* 2010 that Mr Akers and Mr McDonald became joint liquidators of Oscatello. On 29 October 2009 Mr Akers and other members of Grant Thornton Insolvency Services met with the SFO. It was at that meeting that Mr Akers suggested that co-operation between Grant Thornton and the SFO should be possible, but identified the conundrum that the SFO needed first to have access to s 2 (scilicet of the Criminal Justice Act 1987) powers in order to gain sight of *g* the report into Grant Thornton's investigation, whilst the evidence contained in Grant Thornton's report appeared to represent the best material upon which reliance could be placed in order to justify starting a formal SFO investigation. I mention this not to suggest impropriety—as mentioned above, claims against the joint liquidators are apparently contemplated and I express no view whatever on matters irrelevant to the present appeal. The point is simply that *h* the involvement of Mr Akers in his different capacities, coupled with the belated manner in which the interest of the joint liquidators in the reports was revealed, rendered it incumbent on Mr Verrill to disentangle the roles of Grant Thornton and the joint liquidators with some care and specificity.

[9] I should say a little more about the proceedings in Guernsey. They were *j* brought in March 2010. Mr Verrill described these proceedings at paras 25–27 of his witness statement in these terms:

'25. The Guernsey Proceedings originally focused on the validity of loans between TDT and the Companies, with the Former Trustees initially disputing that they were in fact loans. It was later admitted during the

CA      Rawlinson and Hunter Trustees v Akers (Tomlinson LJ)      661

hearing that the "loan arrangements" are loans which are due and payable to the Companies. As such, the main point of disagreement remaining between the parties to be addressed by the Guernsey Court's judgment is the application of Article 32 of the Trusts (Jersey) Law 1984 ("Article 32").

26. Under conventional trust law, a creditor's claim is against a trustee personally and a creditor does not have a claim to the trust property itself. The trustee has a right of indemnity out of the trust fund (ie assets of the TDT). The only way in which a creditor has access to the trust fund is if the trustee is unable to pay the claim and the creditor is able to be subrogated to the trustee's claim for indemnity. Article 32 provides that where a trustee is a party to a transaction and the other party knows that the trustee is acting as trustee, any claim by the other party shall be against the trustee as trustee and shall only extend to the trust property. The applicability scope and interpretation of Article 32 in this case is therefore crucial to determining the recoverability of funds for the companies from the Former Trustees.

27. Possible outcomes of the Guernsey Proceedings are that the Companies have recourse to (1) the assets of the TDT, (2) the Former Trustees personally, or (3) both 1 and 2. The Joint Liquidators believe, based on legal advice received, that at a minimum they will have recourse to the assets of the TDT to try and recover some value from the loans.'

[10] Mr Trower points out that the Guernsey proceedings, although initiated by the debtors, are in essence loan recovery proceedings which have been on foot since very shortly after the appointment of the joint liquidators. He emphasises the extent of the shortfall for creditors, almost £2bn, and that central to the prospect of recovery is the enforceability of intra-group lending. In that regard, he suggests, it is in the nature of this liquidation that it would be highly litigious, and that that is something which it should be accepted is likely to have been uppermost in the minds of the joint liquidators from the outset. Whilst Mr Trower understandably did not put it in this way, it would I consider be wrong to allow subsequent events to obscure that at any rate Mr Akers, from the outset, evidently approached his task upon the footing that there were matters worthy of investigation by the SFO. However, the point cuts both ways. The judge accepted the submission of Ms Phelps, who argued the case for the claimants below, that the joint liquidators are not neutral third parties. Mr Trower was critical of this, but his submission in this regard is I think unrealistic. Of course the joint liquidators are to be regarded as having conscientiously discharged their duties to the creditors and to the court, but it would be equally wrong to ignore that Mr Akers has worn more than one hat and that both Grant Thornton and, distinctly, the liquidators face possible claims arising out of their conduct. Ultimately, the significance of this lies, I think, in the heavy burden it imposes upon the joint liquidators in terms of disentangling their role from that of Grant Thornton when seeking to make good the claim to litigation privilege.

[11] The judge described the five reports, the subject of this application, in this way:

'[35] The five reports which are the subject of the present application are now described in para 29 of Mr Verrill's statement as follows:

(i) A draft report dated 23 August 2010 drafted in the context of proceedings brought in Guernsey against members of the Oscatello group of companies (the first draft Guernsey report).

414

(ii) A draft report dated 21 December 2010, together with exhibits, considering the broader implications of the Guernsey application for the Oscatello group of companies (the second draft Guernsey report).

(iii) A draft memorandum dated 17 September 2010 on the formation and trading of the Oscatello group of companies (the draft Oscatello memorandum).

(iv) A draft report dated 25 October 2010 considering the circumstances surrounding the entry into certain contracts for difference and credit default swaps by Roxinda Ltd, a member of the Oscatello group of companies (the draft Roxinda memorandum).

(v) A draft report dated 22 December 2010 considering the role and involvement of R20 and its employees and/or directors in the Oscatello structure and, in particular, their role in transactions entered into by the Oscatello group of companies (the draft R20 report).'

[12] Although Mr Verrill's witness statement must of course be read and considered as a whole, it is in para 29 that he seeks to explain the basis upon which the reports were commissioned. The judge set out this paragraph in extenso (at [36]) and so shall I:

'29. The reports commissioned by the joint liquidators include the reports which form the subject of the VT claimants' application. I summarise the content of each of the reports below. I am providing, as noted above, this summary of the general subject matter of the reports in order to assist the Court in determining whether litigation privilege attaches to them and in no manner is this intended to be a waiver or partial waiver of privilege in the reports:

(1) the joint liquidators commissioned a draft report dated 23 August 2010, in order to assist the joint liquidators in formulating their response to the Guernsey proceedings and to enable their Guernsey solicitors to provide instructions to counsel (the First Draft Guernsey Report). The First Draft Guernsey Report was included in instructions sent to Guernsey counsel on 15 November 2010. The recovery available to Oscatello in the Guernsey proceedings, put forward by Investec, was materially different depending on a number of scenarios. The First Draft Guernsey Report was prepared entirely to enable the joint liquidators and their legal advisors to respond to the varying scenarios and to prepare a Defence and Counterclaim quantifying the amounts claimed. Specifically it was to identify all inter-company balances that should be reversed and to calculate the effect of the these balances/reversals on dividends to creditors;

(2) the joint liquidators commissioned a draft report dated 21 December 2010, following a meeting with counsel on 30 November 2010, the dominant purpose of which was to enable the joint liquidators to consider with counsel the broader implications of the Guernsey proceedings for the Oscatello companies (the Second Draft Guernsey Report). In particular, the Second Draft Guernsey Report was produced following a request by the joint liquidators' Guernsey counsel for a memorandum regarding the inter-company loans to assist counsel in providing advice regarding litigation strategy. As stated in paragraph 26, the report was produced to help establish (a) how the original debts due from the Tchenguiz family trust arose, (b) whether these debts were properly described as loans, and if so, what the terms of the loans were, (c) the terms under which the debts due to Oscatello's subsidiary companies were novated to the Tchenguiz

**415**

CA      Rawlinson and Hunter Trustees v Akers (Tomlinson LJ)      663

discretionary trust, as at 24 August 2007, and whether the debts were properly described as loans and if so, what the terms of the loans were, and (d) clarification as to the terms under which the debts due to Oscatello's subsidiaries were transferred from the Tchenguiz discretionary trust to Oscatello as at 21 December 2007 and whether the debts were accurately described as loans, and if so, what the terms of the loans were. The report took the form of a summary and analysis of information obtained from the books and records of the Oscatello companies. The report enabled the joint liquidators' solicitors to fully understand the accounting treatment of the loan transactions to enable them to advise on strategy for the litigation proceedings in Guernsey. The Second Draft Guernsey report was sent to Guernsey counsel on or around 21 December 2010;

(3) the joint liquidators commissioned a draft memorandum dated 17 September 2010 on the formation and trading history of the Oscatello companies (the Draft Oscatello Memorandum). The Draft Oscatello Memorandum was commissioned for the dominant purpose of enabling the joint liquidators to obtain information and legal advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, it addresses, among other things, various transactions which the joint liquidators consider unusual or irregular and identifies potential causes of action as well as the defendants to possible claims. The memorandum was produced to assist the joint liquidators in assessing the potential claims against other parties by Oscatello, and its related subsidiaries. It highlighted unusual and irregular transactions, specifically the Framework and Overdraft agreements, the position of other lenders in the Oscatello Group, a number of share transactions and CDS transactions and breaches of covenants and the validity of the Framework agreement. The report went on to highlight the potential defendants to any claim made in respect of the above findings, these potential defendants include parties to the SFO proceedings HQ12XO5082 and HQ13XO0414. On or around 17 September 2010 the Oscatello Report was provided to the liquidators' legal advisors in London for the purposes of obtaining advice and formulating draft particulars of claim;

(4) the joint liquidators commissioned a draft memorandum dated 25 October 2010 considering the circumstances surrounding the entry into certain contracts for difference and credit default swaps by Roxinda Ltd (Roxinda), a member of the Oscatello companies (the Draft Roxinda Memorandum). The Draft Roxinda Memorandum was commissioned for the dominant purpose of assisting the joint liquidators in connection with obtaining information and legal advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, it addresses, among other things, the circumstances surrounding the entry into certain contracts for differences and credit default swaps by Roxinda, at a time when it is believed Roxinda was insolvent, it also seeks to identify civil recovery opportunities. On or around 22 September 2011 the Draft Roxinda Report was provided to counsel in London for the purposes of obtaining advice and formulating draft particulars of claim; and

(5) Following a meeting with counsel on 30 November 2010, the joint liquidators commissioned a draft memorandum dated 22 December 2010

**416**

providing details of the individuals from R20 who were involved in the transactions referred to in the Oscatello Report (the Draft R20 Report). The Draft R20 Report was commissioned to brief counsel and in order to assist the joint liquidators in obtaining information and advice in connection with litigation which was, and remains, contemplated against various potential defendants. In particular, the Draft R20 report was commissioned following a request from the joint liquidators' counsel to enable him to advise on potential claims against various possible defendants identified in the Oscatello Report. The purpose of this report was to supplement the Oscatello Report and to set out the evidence needed to demonstrate which individuals from R20 were potentially involved with irregular and unusual transactions. On or around 22 December 2010 the R20 Report was provided to counsel in London for the purposes of obtaining advice and formulating draft particulars of claim.'

[13] There was no dispute either before the judge or before us as to the applicable principles. I summarise the manner in which the judge put it (at para [48] of his judgment). For a communication to be subject to litigation privilege it must have been made with the dominant purpose of being used in aid of or obtaining legal advice from a lawyer about actual or anticipated litigation: Thanki, *The Law of Privilege* (2nd edn, 2011) para 3.68ff and the cases there cited. Where litigation has not been commenced at the time of the communication, it has to be 'reasonably in prospect'; this does not require the prospect of litigation to be greater than 50%, but it must be more than a mere possibility: see *United States of America v Philip Morris Inc* [2004] All ER (D) 448 (Mar) at paras [67]–[68]; *Westminster International BV v Dornoch Ltd* [2009] All ER (D) 37 (Sep) at [19]–[20] per Etherton LJ. The burden of proof is on the party claiming privilege to establish that the dominant purpose test is satisfied: see *West London Pipeline and Storage v Total UK* [2008] 2 CLC 258 at [50] per Beatson J. A mere claim in evidence before the court that the document was for a particular purpose will not be decisive: see *Neilson v Laugharne* [1981] 1 All ER 829 at 833 and 837, [1981] QB 736 at 745 and 750 per Lord Denning and Oliver LJ. The court will look at 'purpose' from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose: see *Thanki,* para 3.75 and the cases cited at footnotes 187 and 188. The evidence in support must be specific enough to show something of the deponent's analysis of the purpose for which the documents were created, and should refer to such contemporary material as is possible without disclosing the privileged material: see *West London Pipeline and Storage v Total UK* [2008] 2 CLC 258 at [53] per Beatson J.

[14] To this summary of the principles I would add a reference to the speech of Lord Carswell in *Three Rivers DC v Bank of England (No 5)* [2005] 4 All ER 948 at [102], [2005] 1 AC 610:

'The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and the qualifications expressed in the modern case law is that communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole

or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial.'

I particularly note the emphasis on the conduct of the litigation as the dominant purpose which must be identified.

[**15**] The judge was I think right to emphasise in his judgment (at [53])—

'that the mere fact that a document is produced for the purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of such litigation, is *not* sufficient to found a claim for litigation privilege. It is only if such purpose is one which can properly be characterised as the "dominant purpose" that such claim for litigation privilege can properly be sustained.'

It was the identification of dominant purpose which here presented the biggest challenge, since plainly the first duty of the liquidators was to obtain information simply to establish what if any assets or liabilities existed and what if any steps were open to the liquidators to collect in the assets or to reduce or discharge the liabilities.

[**16**] It was suggested that the judge misunderstood or placed undue emphasis upon the following passage from the judgment of Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583 at 590–591 which the judge reproduced in his judgment (at [54]):

'The board of BCCI, the auditors, and the regulatory authorities all needed to know what was the true financial position of BCCI, and this required an investigation in order to establish the facts. If BCCI itself or its controlling shareholders did not set an investigation in motion, it was feared that the regulatory authorities would. BCCI's financial position depended, in part at least, on the recoverability of the problem loans and that might require legal advice as to the prospects of success if resort had to be made to legal proceedings. But just as in *Waugh v British Railways Board* ([1979] 2 All ER 1169, [1980] AC 521) the board needed to establish the facts whether or not litigation ensued, so the board of BCCI, the auditors and the controlling shareholders needed to establish BCCI's financial position whether or not recovery proceedings were necessary. Given that the dominant purpose of the investigation was to establish the facts necessary to enable BCCI's financial position to be determined, documents brought into existence in the course of the investigation did not in my judgment attract legal professional privilege merely because legal advice might be necessary in order fully to evaluate the financial implications of the facts. The obtaining of legal advice is not an end in itself. To attract privilege it must be for the purpose of actual or contemplated proceedings. In *Re Highgrade Traders Ltd* ([1984] BCLC 151) a claim to privilege was raised in respect of reports obtained by insurers who were suspicious of the circumstances attending a fire on the premises of their insured. Oliver LJ said ([1984] BCLC 151 at 173): "What, then, was the purpose of the reports? The learned judge found a duality of purpose because, he said, the insurers wanted not only to obtain the advice of their solicitors, but also wanted to ascertain the cause of the fire. Now, for my part, I find these two quite inseparable. The insurers were not seeking the cause of the fire as a matter of academic interest in spontaneous

**418**

combustion. Their purpose in instigating the inquiries can only be determined by asking why they needed to find out the cause of the fire. And the only reason that can be ascribed to them is that of ascertaining whether, as they suspected, it had been fraudulently started by the insured. It was entirely clear that, if the claim was persisted in and if it was resisted, litigation would inevitably follow." *In the present case it was necessary to determine the extent to which the problem loans were recoverable, in order to establish BCCI's financial position and to decide whether recovery proceedings should be taken. But the two purpose(s) were quite independent of each other. There was nothing of merely academic interest in the former; it was of vital concern not only to BCCI, but also to the controlling shareholders, the auditors, and the regulatory authorities. I am satisfied that this was the dominant purpose of the investigation, and was quite independent of the possible need to take recovery proceedings, and that accordingly the documents in question do not attract legal professional privilege.'* (Eder J's emphasis.)

[17] The judge said of this passage (at [55]):

'This passage is, in my view, important because it illustrates the relatively high threshold imposed by the "dominant purpose" test; and serves to emphasise that if, for example, documents are produced to determine the extent to which "problem loans" are recoverable in order to establish the financial position of a company, such exercise is quite independent of the possible need to take recovery proceedings and will not (at least on that basis) attract litigation privilege. However, I fully recognise that each case must turn on its own facts, the essential question in each case being whether, with regard to particular documents or classes of documents, the party claiming the privilege can satisfy the "dominant purpose" test.'

[18] I would agree that if the first sentence of para [55] stood alone, it would be possible to suggest that the judge had mis-characterised the proper approach in that an exercise to establish the financial position of a company need not necessarily be quite independent of the possible need to take recovery proceedings. In the *Price Waterhouse* case [1992] BCLC 583 at 590, as Millett J found in a passage just before that cited by the judge, the investigation was established on the recommendation of Price Waterhouse as the auditor of BCCI. The primary concern was to establish the amount of the possible losses which had resulted from the problem loans, in order to enable proper provision to be made for them in the 1990 accounts, and to quantify the amount of further financial support which was required from the controlling shareholders. A further, though possibly subsidiary, purpose was to ascertain whether the conditions under which the promised support would be forthcoming (ie that there had been no fraud or other impropriety) were satisfied. Another, and certainly subsidiary purpose, was to recommend improvements in management control. I agree with Mr Trower that the role of the joint liquidators was here very different from the role of the auditors to BCCI. Furthermore, it is manifest that uppermost in the minds of both the auditors and the board of BCCI was the need to establish the extent of losses so as to permit proper provisions to be made and to quantify the extent of further financial support required. That was the dominant purpose of the investigation. However, I do not think that Eder J lost sight of the need in every case to identify the dominant purpose, as the second sentence of para [55] of his judgment demonstrates.

a [**19**] The essential reasoning of the judge is to be found (at paras [57]–[63]) which I cannot avoid reproducing in full:

'**First draft Guernsey report**

[57] This draft report is dealt with in para 29(1) of Mr Verrill's statement. The first thing to note is that the date referred to is the date of the report itself; Mr Verrill does not state *when* this report was "commissioned" although it would seem that the report must have been prepared after the commencement of the Guernsey proceedings. However, Mr Verrill does not in terms say explicitly that this document was produced for the dominant purpose of obtaining information or advice in connection with pending or contemplated litigation, or of conducting or aiding in the conduct of, such litigation. Rather, what he says in relevant respect is that the report was "commissioned" in order to "assist" the joint liquidators in formulating their response to the Guernsey proceedings; that the recovery available to Oscatello was materially different depending on a number of scenarios; and that it was prepared "entirely" to enable the joint liquidators and their legal advisors to respond to varying scenarios and to prepare a defence and counterclaim. I recognise that the last reference comes closest to satisfying the dominant purpose test. However, the reference to responding to "varying scenarios" is somewhat equivocal; and the use of the conjunctive 'and' suggests a dual purpose, ie the report was prepared for the purpose of responding to the varying scenarios *and* preparing a defence and counterclaim. Moreover, the final sentence of this paragraph then goes on to state: "Specifically [this report] was to identify all inter-company balances that should be reversed and to calculate the effect of these balances/reversals on dividends to creditors." To my mind, it is difficult if not impossible to understand how this last sentence fits in with the earlier part of this sub-paragraph. Further, if that last sentence is correct, it seems to me that such exercise is one which the joint liquidators were bound to carry out in any event and, echoing the words of Millett J in *Price Waterhouse v BCCI* [1992] BCLC 583, it is an exercise which would be "independent" of the possible need to take recovery proceedings. On that basis, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report. Finally, I do not consider that the fact the report was subsequently sent to Guernsey counsel on 15 November 2010 changes the position. Not only is this almost three months after the date of the report but such fact cannot have the effect of creating litigation privilege if such privilege did not exist when the report was originally produced.

**Second draft Guernsey report**

[58] This draft report is dealt with in para 29(2) of Mr Verrill's statement. Again, I note that he does not state when it was "commissioned" although he does say that it was commissioned following a meeting with counsel on 30 November 2010; and it must have been produced shortly thereafter because Mr Verrill states that it was sent to Guernsey counsel on or around 21 December 2010. Thus, the report was plainly prepared after the commencement of the Guernsey proceedings. Here, Mr Verrill's language is different from what he says in relation to the first draft Guernsey report. In particular, he states explicitly that this report was commissioned for the "dominant purpose … to enable the joint liquidators to consider with counsel the broader implications of the Guernsey proceedings for the Oscatello companies". Even this, however, is somewhat vague. What,

might one ask, are the "broader implications" here referred to? If this is intended to refer to the financial consequences of the various possible outcomes of the Guernsey proceedings then I am extremely doubtful that this would give rise to litigation privilege. Mr Verrill then states that this draft report was produced "following a request by the joint liquidators' counsel for a memorandum regarding the inter-company loans to assist counsel in producing advice regarding litigation strategy". Mr Verrill then goes on to explain in some detail that the draft report was produced to "help establish" certain matters; and took the form of "a summary and analysis of information obtained from the books and records of the Oscatello companies". I am prepared to accept that the production of this summary and analysis of Oscatello's books and records was important, even perhaps essential, for the purpose of deciding litigation strategy in the Guernsey proceedings. However, it seems to me that it does not necessarily follow that this satisfies the "dominant purpose" test. Again, it seems to me that the last sentence of this paragraph in Mr Verrill's statement is important: "The report enabled the joint liquidators' solicitors to fully understand the accounting treatment of the loan transactions to enable them to advise on strategy for the litigation proceedings in Guernsey." If, as this sentence would appear to suggest, such draft report was necessary in order for the joint liquidators' solicitors to understand the accounting treatment of the loan transactions, then it seems to me difficult to see how the dominant purpose test is satisfied even if, as Mr Verrill also states, this was to enable the solicitors to advise on strategy for the litigation. If such document did not exist already, it also seems to me difficult to understand how the joint liquidators could perform their basic statutory duties. For all these reasons, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report.

**Draft Oscatello memorandum**

[59] This draft memorandum is dealt with in para 29(3) of Mr Verrill's statement. It is important to note that the explanation given as to the purpose for which it was produced is very different from either of the first two draft reports, viz it has nothing to do with the Guernsey proceedings nor any other then existing proceedings. Rather, Mr Verrill states that it was commissioned "on the formation and trading history of the Oscatello companies". Again, although Mr Verrill gives the date of the draft memorandum, it is noteworthy that he does not state the date when it was actually "commissioned". He then goes on to state that it was commissioned for the dominant purpose of enabling the joint liquidators "to obtain information and advice in connection with litigation which was, and remains, contemplated against various potential defendants". Although the magic words "dominant purpose" are used, it seems to me significant that there were no relevant extant proceedings at that stage and although he does indeed say that litigation "was, and remains contemplated", such statement is, to my mind, entirely vague and lacks specificity. For example, Mr Verrill states that such litigation was and remains contemplated "against potential defendants" but does not specify who such potential defendants might be. On the contrary, Mr Verrill goes on to state that the draft memorandum addresses, among other things, various transactions which the joint liquidators consider unusual or irregular and "identifies *potential* causes of action as well as the defendants to *possible* claims" (my emphasis). Although it is true that Mr Verrill then

states that the draft memorandum highlighted a number of what are said to be "unusual and irregular" specific transactions and potential defendants, such language—in particular the reference to "potential" causes of action and "possible claims"—seems to me to fall far short of the necessary threshold referred to in the cases cited above, i e *United States of America v Philip Morris Inc* [2004] All ER (D) 448 (Mar) at paras [67]–[68]; *Westminster International BV v Dornoch Ltd* [2009] All ER (D) 37 (Sep) at paras [19]–[20] per Etherton LJ. Mr Trower emphasised that the fact that this draft memorandum was, as stated by Mr Verrill, provided to the joint liquidators' legal advisors in London for the purpose of obtaining advice and formulating draft particulars of claim on 17 September (i e on the same date of the draft memorandum), supports the claim for litigation privilege. In broad terms, that may well be so. However, it seems to me that the critical question is what was the purpose for which the draft memorandum was originally produced rather than its actual use. For that reason, the fact that the draft memorandum was provided to the joint liquidators' legal advisors is not, in my view, determinative. Moreover, it seems to me plain and obvious that the fact that the draft memorandum was provided to the legal advisors does not mean that litigation was 'reasonably in prospect' rather than a mere possibility at that stage (if that is the relevant stage). In that context, Ms Phelps relied on the fact that even now—almost three years after the date of the first report—no proceedings have been initiated. I do not consider that such fact is necessarily determinative; but I agree that it points strongly against any suggestion that litigation was reasonably in prospect when this draft memorandum was produced.

[60] For all these reasons, I am not satisfied that the dominant purpose test is satisfied in respect of this draft report.

**Draft Roxinda memorandum**

[61] This draft memorandum is dealt with in para 29(4) of Mr Verrill's statement. Although Mr Verrill again uses the magic words – "dominant purpose" – I would make similar comments to those in respect of the draft Oscatello memorandum which I have just set out above and need not repeat. It is true that although Mr Verrill explains that this draft memorandum addresses the circumstances surrounding the entry into certain contracts and also seeks to identify what are described as "civil recovery opportunities", it seems to me that this language again falls short of the necessary threshold of litigation having to be reasonably in prospect. Further, I should note that Ms Phelps relied on the fact that, according to Mr Verrill, although this memorandum is dated 25 October 2010, it was not provided to counsel in London until almost a year later, i e 22 September 2011; and I agree that this further supports the conclusion which I have reached, i e that the dominant purpose test is not satisfied in respect of this draft memorandum.

**Draft R20 report**

[62] This draft report is dealt with in para 29(5) of Mr Verrill's statement. I originally considered that the explanation provided there by Mr Verrill in relation to the production of this draft report set out the strongest case for litigation privilege. In particular, it is noteworthy that Mr Verrill's evidence is that such draft report was commissioned at a later stage, i e following a meeting (on 30 November 2010) with—and a specific request by—the joint liquidators' counsel for a document providing details of the individuals from R20 who were involved in the transactions referred to in the

Oscatello report (which I understand to refer to the draft Oscatello memorandum); and it was provided shortly thereafter on 22 December 2010 to counsel "for the purposes of obtaining advice and formulating draft particulars of claim". However, again, it seems to me that Mr Verrill's statement falls short of establishing that there was even at this stage any relevant litigation which was 'reasonably in prospect' as opposed to a mere possibility. Thus, Mr Verrill states that this draft report was commissioned "to enable [counsel] to advise on *potential* claims against various *possible* defendants identified in the Oscatello Report" (my emphasis). Again, it seems to me that this conclusion is fortified by the fact, as submitted by Ms Phelps, that even now (ie some 2½ years later), no litigation has been instituted.

[63] For all these reasons, it is my conclusion that the dominant purpose test has not been satisfied in respect of this draft report.'

[20] Although we are in as good a position as was the judge to reach a conclusion on the question whether the dominant purpose test was in each case satisfied, I need hardly point out that this court will hesitate long before interfering with a careful assessment of this nature by a judge experienced in the relevant field, who has correctly directed himself as to the applicable legal principles.

[21] I agree with Mr Trower that the judge appears to have overlooked that there was in Mr Verrill's witness statement, in paragraphs other than para 29, several assertions to the effect that all the reports had been produced at the request and instruction of the joint liquidators for the dominant purpose of obtaining information to be provided to the joint liquidators' legal advisors to obtain advice in connection with litigation which, in certain cases, had been commenced and, in other cases, was and remains actively contemplated by the joint liquidators—see for example para 7. Mr Verrill's witness statement (at para 8) states that the reports are said to have been commissioned for the dominant purpose of use in litigation. This criticism of the judgment does not however take Mr Trower very far, and in fairness he did not suggest that it did.

[22] A more substantial criticism is that the judge (at para [57]) appears to suggest that if the purpose of commissioning a report was to conduct an exercise which the liquidators were bound to carry out in any event, irrespective of whether litigation was pending or in contemplation, then such a purpose would necessarily be independent of the possible need to take recovery proceedings. I suspect that the judge may here be guilty of over-compression in expression. He was however only "echoing" the words of Millett J, not applying them, no doubt because Millett J did not put forward such a proposition but rather concluded that the two purposes there potentially in play *were* independent of each other. I agree with Mr Trower that in the minds of the joint liquidators it would by no means necessarily be the case that identification of intra-company balances which should be reversed would be independent of the possible or even the contemplated need to take recovery proceedings. The real difficulty however for Mr Trower, and what informs everything which Eder J says in this paragraph, is that in circumstances which call for clarity and precision, for the reasons already discussed, Mr Verrill made no effort to grapple with the obvious need to establish which of dual or even multiple purposes was dominant if a plausible claim to privilege was to be made out. Thus in the penultimate sentence of para 29(1) Mr Verrill proffers two purposes, the first of which is vague and the second of which is on the

face of it independent of the first, although it need not necessarily be so. The final sentence puts forward something which is on the face of it a different purpose, much more narrow than to inform response to 'varying scenarios', and which, whilst it might embrace use in the conduct of contemplated litigation, need not necessarily do so. Looked at in the round, the judge's assessment concerning the first draft Guernsey report is as it seems to me unimpeachable.

[**23**] The same is true of the second draft Guernsey report. Mr Trower's principal complaint here is that the judge wrongly concluded that the process of understanding the accounting treatment of the loan transactions was independent of the formulation of litigation strategy. It is true that the judge expressed difficulty in understanding how the dominant purpose could be satisfied if there were two purposes of this nature. I would agree with Mr Trower that the two purposes are not necessarily independent of each other, but his difficulty is again that it was incumbent on Mr Verrill to demonstrate that they were *not* independent of each other, and that the dominant purpose was for use in the conduct of litigation. In that regard Mr Verrill needed to bear in mind that by their letter of 26 March 2013 Chadbourne and Parke had said of this report:

> 'A draft report dated 21 December 2010, together with exhibits, considering the broader implications of the Guernsey Application for the Oscatello group of companies. … The Second Guernsey Report was prepared by Grant Thornton on behalf of the Joint Liquidators to assist them in obtaining strategic advice in the context of the Guernsey Application.'

The second sentence of this passage comes nowhere near establishing a claim to litigation privilege. Repetition of the 'broader implications' formula in Mr Verrill's witness statement is completely inimical to a conclusion that Mr Verrill has properly identified as dominant the purpose of use in the conduct of proceedings, actual or contemplated.

[**24**] The real thrust of Mr Trower's criticism so far as concerns the Oscatello memorandum is that the judge overlooked the essentially litigious nature of these liquidations. It is, he suggested, a feature of such a liquidation that litigation is an obvious possibility and thus a real prospect. Mr Hollander in riposte suggested that it cannot be right even with liquidations of this nature to assume that everything that a liquidator does is in contemplation of litigation. I agree with Mr Hollander. Moreover, in *USA v Philip Morris* [2003] EWHC 3028 (Comm), [2003] All ER (D) 191 (Dec) at first instance, Moore-Bick J, as my Lord then was, said (at [46]):

> 'The requirement that litigation be "reasonably in prospect" is not in my view satisfied unless the party seeking to claim privilege can show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility.'

The Court of Appeal rejected a submission that this set the hurdle too high. Even bearing in mind the realities of these liquidations which supply the context for Mr Verrill's witness statement, I agree with the judge that the language of '[identifying] potential causes of action as well as the defendants to possible claims' falls short of the necessary threshold.

[25] The features of the draft Roxinda memorandum which in my view cried out for explanation were that—(i) although dated 25 October 2010, it was not supplied to counsel in London for the purpose of obtaining advice and formulating draft particulars of claim until 'around' 22 September 2011, ie very nearly one year later; and (ii) no proceedings have yet emerged. Neither of these points is conclusive but the failure to deal with them deprives the claim to privilege of plausibility. Mr Trower was inclined to suggest that the judge's apostrophising of the expression 'civil recovery opportunities' represented an implied rejection of its relevance, but on reflection it seems to me that the judge in fact identified the purpose of seeking to identify such opportunities as telling in favour of the claim to privilege, as indeed I think it in principle does. I agree however with the judge that overall the explanation of the circumstances in which this report was commissioned falls short of what is required in order to sustain the claim.

[26] Like the judge I consider on reflection that the description of the circumstances in which the draft R20 report was commissioned sets out the strongest case for litigation privilege. In particular, I note that it was commissioned following an express request from counsel to enable them to advise on potential claims against various possible defendants identified in the Oscatello report. I would not therefore be as critical as, impliedly, was the judge over the use of the word 'possible' bearing in mind that there had been a positive identification of the relevant individuals in the Oscatello report. There is also I consider some force in Mr Trower's rhetorical question, for what purpose could this report be said to have been commissioned other than for use in the conduct of litigation. However, that is not quite the right question, since the relevant litigation needed to have been reasonably in prospect. In that regard Mr Verrill again needed to deal with the circumstance that in the more than 2½ years that elapsed since production of the report no proceedings had been begun. There is in my view no basis on which we could legitimately differ from the judge's assessment that even in this case the dominant purpose test has not been satisfied.

[27] I would dismiss this appeal.

**RYDER LJ.**
[28] I agree.

**MOORE-BICK LJ.**
[29] I also agree.

*Appeal dismissed.*

Peter Hutchesson   Barrister (NZ).

**425**



Neutral Citation Number: [2018] EWHC 3179 (Comm)

Case No: CL-2017-000071

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, 7 Rolls Buildings
Fetter Lane, London EC4A 1NL

Date: 26/11/2018

**Before** :

**MR. JUSTICE TEARE**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |
|---|---|
| **Sotheby's** | **Claimant** |
| - and - |  |
| **(1) Mark Weiss Limited** | **Defendant** |
| **(2) Fairlight Art Ventures LLP** |  |
| **(3) Mark Adrian F. Weiss** |  |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Emily Wood** (instructed by **Freshfields Bruckhaus Derringer LLP**) for the **Claimant**
**Tom Ford** (instructed by **Stephenson Harwood LLP**) for the **First and Third Defendants**
**Richard Wilson QC and Shyam Thakerar** (instructed by **Mackrell Turner Garrett**) for the
**Second Defendant**

Hearing dates: 24 October and 14 November 2018
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE TEARE

**426**

**Mr. Justice Teare :**

Introduction

1.   This is an application for inspection of certain documents which have been disclosed by Sotheby's, the Claimant, but in respect of which inspection has been withheld on the grounds of litigation privilege. Mark Weiss Ltd., the First Defendant, claims the right to inspect the documents on the grounds that they are not protected by litigation privilege.

2.   The documents in question are the correspondence passing between Sotheby's (itself, or through its solicitors Freshfields) and two art experts, Mr. Martin and Mr. Twilley, in the period from 27 April 2016 until 11 July 2016.

3.   The application is made in an action which concerns a painting described as *"Frans Hals, 'Portrait of a Gentleman, half length, wearing Black', signed with monogram lower right: FH, oil on oak panel, 13 ½ by 10 ½ in."* which had been acquired by Mark Weiss Ltd. (and Fairlight Art Ventures LLP, the Second Defendant) in June 2010. In June 2011 Mark Weiss Ltd. appointed Sotheby's exclusive agent for a period of three months to sell the painting by private treaty for a minimum price of US$10,750,000. Sotheby's did so in June 2011 but the contract contained an offer by Sotheby's to rescind the sale and return the purchase price if Mr. Hedreen, the Buyer, provided written evidence raising doubts as to the authenticity or attribution of the painting, and Sotheby's determined that the painting was counterfeit. The Buyer did so on 27 May 2016, having obtained a report from Mr. Martin. On 11 July 2016 Sotheby's, having commissioned Mr. Twilley to conduct a peer review of Mr. Martin's report, determined that the painting was a counterfeit, rescinded the sale and on 14 July paid US$11,287,500 to the Buyer. In these proceedings Sotheby's seek rescission of its contract with Mark Weiss Ltd. and repayment of the purchase price. The right to rescission is denied by Mark Weiss Ltd., who relies upon a term referred to in these proceedings as the "generally accepted views" proviso in the agreement between Sotheby's and the Buyer and alleges that Sotheby's actions were a breach of a fiduciary duty owed to Mark Weiss Ltd.

Litigation privilege

4.   There is no dispute that in order to claim litigation privilege in respect of the correspondence between Sotheby's and Mr. Martin and the correspondence between Sotheby's and Mr. Twilley that correspondence must have been brought into existence for the "dominant purpose" of being used in contemplated litigation. The relevant principles were summarised in *Starbev GP Ltd. v Interbrew Central European Holdings* [2013] EWHC 4038 (Comm) at paragraphs 11-13 by Hamblen J.

> 11. The legal requirements of a claim to litigation privilege may be summarised as follows:
>
> (1) The burden of proof is on the party claiming privilege to establish it – see, for example, *West London Pipeline and Storage v Total UK* [2008] 2 CLC 258 at [50].

(2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in a witness statement are not determinative and are evidence of a fact which may require to be independently proved. The court will scrutinise carefully how the claim to privilege is made out and the witness statements should be as specific as possible – see, for example, *Sumitomo Corporation v Credit Lyonnais Rouse Ltd* (14 February 2001) at [30] and [39] (Andrew Smith J); *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1729 (Comm) at [52], [53], [86] (Beatson J); *Tchenguiz v Director of the SFO* [2013] EWHC 2297 (QB) at [52] (Eder J).

(3) The party claiming privilege must establish that litigation was reasonably contemplated or anticipated. It is not sufficient to show that there is a mere possibility of litigation, or that there was a distinct possibility that someone might at some stage bring proceedings, or a general apprehension of future litigation – see, for example, *United States of America v Philip Morris Inc* [2004] EWCA Civ 330 at [68]; *Westminster International v Dornoch Ltd* [2009] EWCA Civ 1323 at paras [19] – [20]. As Eder J stated in *Tchenguiz* at [48(iii)]: "Where litigation has not been commenced at the time of the communication, it has to be 'reasonably in prospect'; this does not require the prospect of litigation to be greater than 50% but it must be more than a mere possibility".

(4) It is not enough for a party to show that proceedings were reasonably anticipated or in contemplation; the party must also show that the relevant communications were for the dominant purpose of either (i) enabling legal advice to be sought or given, and/or (ii) seeking or obtaining evidence or information to be used in or in connection with such anticipated or contemplated proceedings. Where communications may have taken place for a number of purposes, it is incumbent on the party claiming privilege to establish that the dominant purpose was litigation. If there is another purpose, this test will not be satisfied: *Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, 589-590 (cited in *Tchenguiz* at [54]-[55]); *West London Pipeline and Storage Ltd v Total UK Ltd* at [52].

12. In relation to the Court's approach to the assessment of evidence in support of a claim for privilege, it has been stated that it is necessary to subject the evidence to "anxious scrutiny" in particular because of the difficulties in going behind that evidence" – per Eder J in *Tchenguiz* at [52]. "The Court will look at 'purpose' from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose" – *ibid.* 48(iv). Further, as Beatson J pointed out in the *West*

**428**

*London Pipeline* case at [53], it is desirable that the party claiming such privilege "should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect".

13. As was further stated by Beatson J in the *West London Pipeline* case at [86]:

"(3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority.*

(b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharane* (the Chief Constable's letter)*, Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co,* per A L Smith LJ.

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montivedeo Gas Co; Birmingham and Midland Motor Omnibus Co v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland*.

(4) Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it:

(a) It may conclude that the evidence does not establish a legal right to withhold inspection and order inspection: *Neilson v Laugharane; Lask v Gloucester Health Authority.*

(b) It may order a further affidavit to deal with matters which the earlier affidavit does not cover or on which it is unsatisfactory: *Birmingham and Midland Motor Omnibus Co Ltd v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

(c) It may inspect the documents: see CPR 31.19(6) and the discussion in *National Westminster Bank plc v Rabo Bank Nederland* and *Atos Consulting Ltd v Avis plc (No. 2).* Inspection should be a solution of last resort, in part because of the danger of looking at documents out of context at the interlocutory stage. It should not be undertaken unless there is

**429**

credible evidence that those claiming privilege have either misunderstood their duty, or are not to be trusted with the decision making, or there is no reasonably practical alternative.

(d) At an interlocutory stage a court may, in certain circumstances, order cross-examination of a person who has sworn an affidavit, for example, an affidavit sworn as a result of the order of the court that a defendant to a freezing injunction should disclose his assets: (*House of Spring Gardens Ltd v Wait; Yukong Lines v Rensburg; Motorola Credit Corp v Uzan (No. 2)*). However, the weight of authority is that cross-examination may not be ordered in the case of an affidavit of documents: *Frankenstein's* case; *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* and *Fayed v Lonrho*. In cases where the issue is whether the documents exist (as it was in *Frankenstein's* case and *Fayed v Lonrho*) the existence of the documents is likely to be an issue at the trial and there is a particular risk of a court at an interlocutory stage impinging on that issue."

5. Reference was also made to a recent decision of the Court of Appeal in *SFO v ENRC Ltd.* [2018] EWCA Civ 2006. There was a suggestion that this decision changed or at any rate clarified the law in those cases where a document was brought into existence for two purposes, one of which was for use in litigation. However, I do not consider that the decision changed the law. On the contrary the Court of Appeal confirmed (at paragraph 103) the statement of principle by Lord Wilberforce in *Waugh v British Railways Board* [1980] AC 520 that:

> "It appears to me that unless the purpose of submission to the legal adviser in view of litigation is at least the dominant purpose for which the relevant document was prepared, the reasons which require privilege to be extended to it cannot apply."

6. That is entirely consistent with paragraph 11(4) of Hamblen J.'s comprehensive statement of the relevant principles in *Starbev GP Ltd. v Interbrew Central European Holdings*.

7. The Court of Appeal in SFO v *ENRC* added that:

> "The exercise of determining dominant purpose in each case is a determination of fact, and that the court must take a realistic, indeed commercial, view of the facts."

Sotheby's dealings with Mr. Martin

8. The material facts appear to be these. Mr. Martin provided his services pursuant to a contract (said to be dated 19 April 2016) between his company, Orion Analytical LLC, and Sotheby's. Sotheby's, by clause 2, warranted that the Owner (Mr. Hedreen) authorised Sotheby's to retain Mr. Martin "to conduct the work described herein." It is to be expected that Sotheby's would require that authority in circumstances where

Mr. Martin's work was expected to involve tests on the painting. That work was "an independent and objective investigation" of the painting. By clause 6 Mr. Martin was not, "as part of this Agreement, [to] provide expert consultation as a consulting expert or testifying expert."

9.     Mr. Martin commenced work on 24 April 2016 and within 4 days reached a "negative conclusion" about the attribution and authenticity of the painting.

10.    By letter dated 5 May 2016 Sotheby's informed Mr. Martin that in the light of his "evolving view" that the painting was not authentic it was possible that there would be litigation "between the Buyer, the Seller and Sotheby's." The letter continued as follows:

> "All correspondence between you and Sotheby's relating to this matter is in the context of that anticipated litigation, to enable Sotheby's to understand the strengths and weaknesses of its position and to make the right legal and commercial decisions in anticipation of that potential litigation. Such correspondence is privileged against disclosure in that litigation if it occurs."

11.    The letter advised Mr. Martin to mark all correspondence "Prepared in anticipation of litigation: Legally Privilged" but also advised him to ensure that his comments were consistent with his role as an independent expert focussing on technical issues associated with the painting "and not with any strategy associated with the litigation or the various claims".

12.    By letter dated 18 May 2016 Stephenson Harwood on behalf of Mark Weiss Ltd. advised Sotheby's that the offer to rescind in the sale contract was "not engaged". Sotheby's replied on 20 May 2016 saying that a conclusion on the authenticity of the painting had not yet been reached.

13.    Mr. Martin issued his report on 23 or 24 May 2016. (There appear to be copies bearing each date). Sotheby's case is that Mr. Hedreen, when providing written evidence to Sotheby's raising doubt as to the authenticity of the painting, relied upon the report dated 24 May 2016 from Mr. Martin; see paragraph 12 of the Particulars of Claim.

14.    On or about 25 May 2016 Sotheby's and Mark Weiss Ltd. exchanged experts' reports. By letter dated 26 May 2016 Freshfields required clarification from Stephenson Harwood of aspects of the expert report relied upon by Mark Weiss Ltd. Counsel for Sotheby's described the parties as having "locked horns" and as having "drawn battle lines".

15.    On 28 June 2016 Sotheby's determined to set up a committee to be chaired by Mr. Goss, the CFO of Sotheby's, "to take an important decision as to whether Sotheby's should determine that the Property was counterfeit." Mr. Goss has said that this was a "corporate decision having legal and financial consequences that would be my responsibility". The other members of the committee "brought a great deal of experience of evaluating works of art."

**431**

16.     The committee met on 7 July 2016. It had a file of documents which included Mr. Martin's report, a peer review of that report by Mr. Twilley, a report commissioned by Mark Weiss Ltd. and comments on that report by Mr. Martin and Mr. Twilley. The meeting began with a short presentation, said to be "legally privileged", on the purpose of the meeting, the gravity of the proceedings, the legal issues associated with the decision and the various contracts Sotheby's had entered into. The committee had the benefit of telephone advice from Mr. Martin who presented his research and findings to the Committee. The meeting lasted some 75-90 minutes and concluded that it was "overwhelmingly likely" that the painting was counterfeit. As a result Sotheby's decided that the painting was counterfeit and, on 11 July 2016, decided that the sale should be rescinded. Shortly afterwards the purchase price was returned by Sotheby's to the Buyer.

Sotheby's claim to privilege

17.     The claim to privilege in respect of Sotheby's correspondence with Mr. Martin is explained in this way by Mr. Scott of Freshfields in his witness statement.    At paragraph 14 (j) (into which, for ease of discussion, I have inserted sentence numbers) Mr. Scott said :

> "(1) However, following Mr. Martin providing his view that the Property was a counterfeit, Mr. Martin was instructed to produce a formal, detailed report. (2) The draft of that report, and the communications between Freshfields, internal Sotheby's counsel and Mr. Martin in respect of that report, are privileged, since that report was being developed at a time when litigation was in prospect and for the dominant purpose of being deployed in that litigation (or potentially settling that litigation). (3) It is wrong to suggest that the preparation of this formal report was done by Sotheby's with the purpose of fulfilling some contractual obligation. (4) All the way through the preparation of the report, the fact that the matter was likely to end up in court (if the report could not be used to persuade the other side to settle) was the perspective from which the report was being prepared by all parties, and was the very reason why Freshfields had been engaged and that Sotheby's was spending resource on Freshfields' litigation advice. (5) Freshfields were advising on the report, and on its role in the forthcoming decision as to whether to rescind (which would almost inevitably result in proceedings being issued), from the perspective of how it would be used as evidence in the litigation. (6) I understand from Sotheby's that had litigation not been contemplated, then findings from Mr. Martin would have been sought, but no detailed written report of this kind would have been embarked upon and Freshfields would not have been engaged to undertake this exercise with Mr. Martin."

18.     I have not found this explanation easy to accept. There is no doubt that litigation with Mark Weiss Ltd (and/or the Buyer) was contemplated but what was also contemplated was the need for Sotheby's, in the context of its agreement with the Buyer, to determine whether the painting was counterfeit, and if so, to rescind the sale and

**432**

return the purchase price. Thus sentence 5 refers to the "forthcoming decision as to whether to rescind." That decision was taken on (or soon after) 11 July 2016. Thus the correspondence between Sotheby's and Mr. Martin in the period from 27 April 2016 to 11 July 2016 would appear to have been generated for two purposes: one, to enable that decision to be taken and two, for use in the litigation contemplated between Sotheby's and Mark Weiss Ltd. (and/or the Buyer).

19.    Mr. Scott said in sentence 3 that "it is wrong to suggest" that the report was prepared "for the purpose of fulfilling some contractual obligation." That appears to be based upon the suggestion in sentence 6 that had litigation not been contemplated no detailed written report would have been embarked upon and Freshfields would not have been engaged to undertake this exercise with Mr. Martin.

20.    I have carefully considered this evidence of Mr. Scott. I have done so with the required "anxious scrutiny". I have also sought to take, as Miss Wood on behalf of Sotheby's submitted I should (quoting from the *ENRC* case), a "realistic, indeed commercial, view of the facts."

21.    The agreement between Sotheby's and the Buyer required the Buyer to provide "written evidence raising doubts as to the authenticity or attribution of the Property." Thus a written report was required by the Buyer and, consistent with that, I was told that it was always intended that the final report would be provided to the Buyer. The very same written report would doubtless be used by Sotheby's not only to decide whether to rescind the sale but also in the contemplated litigation with Mark Weiss Ltd. (and/or the Buyer).

22.    This application concerns a claim to privilege, not in respect of Mr. Martin's report, but in respect of the correspondence passing between Sotheby's, for whom Freshfields were acting from 27 April 2016, and Mr. Martin. The position, assessed objectively, as it has to be, appears to me to be that that correspondence took place for two purposes. The first was that Sotheby's had a contractual decision to make as to whether the painting was counterfeit and whether the sale would be rescinded. The second was that Mr. Martin's report would doubtless be used by Sotheby's in the contemplated litigation with Mark Weiss Ltd. (and/or the Buyer). Indeed, the letter dated 5 May 2016 from Sotheby's to Mr. Martin stated in terms that "all correspondence between you and Sotheby's relating to this matter is in the context of that anticipated litigation, to enable Sotheby's to understand the strengths and weaknesses of its position and to make the right legal and commercial decisions in anticipation of that potential litigation." That neatly identifies the two purposes. The commercial decision is obviously the decision whether or not to declare the painting counterfeit and, if so, to rescind the contract with the Buyer.

23.    Both purposes were, it seems to me, of equal importance and relevance. At any rate Sotheby's is unable, in my judgment, to establish that the second purpose was the dominant of the two purposes.

24.    Mr. Scott also said in his evidence:

> "Aside from the production of the report, Mr. Martin had a separate role in this litigation, of advising and assisting Sotheby's and Freshfields in the presentation of Sotheby's case

**433**

to the Defendants, to Stephenson Harwood and to the experts appointed by the First and Third Defendants…. Mr. Martin's communications in that role are very clearly privileged as they are all either: (i) from a time at which litigation was reasonably in prospect and for the dominant purpose of the conduct of litigation; or (ii) communications for the purpose of settling and/or narrowing the dispute between Sotheby's and the Defendants."

25. Mr. Scott does not say, but it seems likely, that this suggested "separate role" refers to the letter dated 5 May 2016. However, that letter expressly recognises that one of the purposes of the contemplated correspondence between Sotheby's and Mr. Martin was to enable Sotheby's to make the right "commercial" decisions. The important commercial decision which Sotheby's had to take was whether the painting was a fake and if so to rescind the contract with the Buyer. Thus there was no "separate role".

26. Mr. Martin, in his statement, said that his "work" was done in two phases. The first was an initial examination of the painting over 4 days from 24 April 2016. "Subsequent to this initial examination and conclusion, I was instructed by Sotheby's to undertake further work to respond to questions raised by the seller and the seller's experts". This is also likely to be a reference to the letter dated 5 May 2016. At first sight this might be regarded as support for Mr. Scott's evidence that Mr. Martin had a "separate role." But that, as I have said, is not consistent with the terms of the letter.

27. Moreover, it seems clear from Mr. Martin's report that he continued doing further work of the type required by the consultation agreement; see paragraph 21 of the report and by way of particular examples paragraphs 40, 65-66 and 83. That work was the investigation of the authenticity of the painting. In circumstances where he had expressed a negative opinion about the authenticity of the painting after his initial examination his further work was required to confirm and support that opinion. That further work, culminating in a formal written opinion dated 24 May 2016, was required by Sotheby's both to enable it to decide whether or not to exercise its option to rescind the sale and to provide evidence to support Sotheby's in the contemplated litigation with Mark Weiss Ltd. But both purposes were, in my judgment, of equal importance. Neither could be said to be the dominant purpose. After 24 May 2016 it seems likely that the correspondence between Sotheby's and Mr. Martin related to how to deal with points made by Mark Weiss Ltd. and their expert. But that correspondence was also required to enable Sotheby's, and in particular the Committee, to form its opinion as to whether the painting was fake. Thus the Committee had before it, not only Mr. Martin's report, a peer review of that report by Mr. Twilley and a report commissioned by Mark Weiss Ltd. but also comments on that report by Mr. Martin and Mr. Twilley. Those comments must have been elicited after 24 May 2016.

28. Miss Wood submitted, on behalf of Sotheby's, that it was wholly unrealistic and uncommercial to suggest that the communications between Sotheby's and Mr. Martin would have existed had there been no threat of litigation. But Sotheby's needed to be sure that it was entitled to rescind the sale and that its position in the contemplated litigation with Mark Weiss Ltd. was sound and well supported. Mr. Martin's written report, its drafts and the associated correspondence were created for both purposes.

That appears to me to be the "realistic, indeed commercial view of the facts". The commercial decision which Sotheby's had to take was whether or not the painting was counterfeit and, if so, to rescind the contract with the Buyer. Mr. Goss described the decision as "important". One can readily understand why. Sotheby's, one of the world's leading fine art auction houses, cannot have relished taking a decision that a painting it had sold was a fake. That is no doubt why a committee was specially convened to take that decision. Of course, Mr. Goss had also been advised of the "the legal issues associated with the decision", which must have included the contemplated litigation. But it appears to me to be unrealistic to suggest that had there been no threat of litigation there would have been no correspondence with Martin beyond requesting and receiving his report.

29.    Miss Wood also sought to adopt the reasoning of the Court of Appeal in *SFO v ENRC Limited* in support of its conclusion that the documents in that case were brought into existence for the dominant purpose of resisting or avoiding criminal proceedings. In that case, which concerned an allegation by a whistleblower of alleged corruption and financial wrongdoing and the documents created thereafter, the question was whether the dominant purpose behind the creation of those documents was the need of ENRC to investigate the facts to see what had happened and deal with compliance and governance issues or to defend a contemplated criminal prosecution; see paragraph 108. The Court of Appeal approached that question in paragraph 109 as follows:

> "Although a reputable company will wish to ensue high ethical standards in the conduct of it business for its own sake, it is undeniable that the "stick" used to enforce appropriate standards is the criminal law and, in some measure, the civil law also. Thus, where there is a clear threat of a criminal investigation, even at one remove from the specific risks posed by the SFO should it start an investigation, the reason for the investigation of whilstle-blower allegations must be brought into the zone where the dominant purpose may be to prevent or deal with litigation."

30.    The Court of Appeal then addressed the evidence and the judge's conclusions in paragraphs 110-112 before concluding in paragraph 113 that the documents in question were brought into existence for the dominant purpose of resisting or avoiding criminal proceedings.

31.    Miss Wood submitted that the *ENRC* case and the present case were analogous, in that litigation would "inevitably" follow from the taking of a particular commercial decision. She said that in the present case the "stick" which motivated the correspondence with Mr. Martin was the contemplated civil proceedings with Mark Weiss Ltd. and so, using the same reasoning as the Court of Appeal, the dominant purpose of that correspondence was to assist Sotheby's in that litigation.

32.    The assessment of dominant purpose is fact sensitive and so it is unsafe to use the determination of dominant purpose in one case to assist in identifying the dominant purpose in another. That is particularly so where the facts of the two cases are so very different, as they are here. The "stick" analogy was no doubt appropriate in *SFO v ENRC* where criminal proceedings were used to enforce appropriate standards of

corporate governance. But in the present case whilst civil proceedings were in contemplation they were not a "stick" in the sense used in *SFO v ENRC Ltd*. I do not read the *ENRC* case as deciding that whenever litigation is the "inevitable" consequence of taking a particular commercial decision, the dominant purpose of documents produced for the making of that decision is necessarily their use in the contemplated litigation.

33. Miss Wood also relied upon the decision in *Re Highgrade Traders* [1984] BCLC 151. However, that also concerned a quite different factual context, namely, a report commissioned by insurers into the cause of a fire where arson was suspected. It was argued that the report was brought into existence for two purposes: one, to inform the insurers' solicitors as to whether the insurance claim could be resisted and, two, to ascertain the cause of the fire. But Oliver LJ held at p. 173 H that it was "entirely unrealistic to attribute to the insurers an intention to make up their minds, independently of the advice which they received from their solicitors, that the claim should or should not be resisted." As was said by the Court of Appeal in *SFO v ENRC Ltd*. at paragraph 107 it was "difficult to see what the alternative purpose" in *Highgrade* was. By contrast, in the present case there are two purposes which cannot in a realistic and commercial sense be regarded as one and the same. They are connected in the sense that if Sotheby's determined that the painting was a fake and rescinded the contract of sale, it was likely, perhaps inevitable, that litigation would ensue with Mark Weiss Ltd. But I am unable to regard them as being one and the same as was the case in *Highgrade*.

34. The decision in the present case must be based upon the evidence in this case. I have paid particular regard to (i) the terms of the contract between Sotheby's and the Buyer pursuant to which Sotheby's would, in certain circumstances, have to form a view that a painting which it had sold was a fake, (ii) the terms of the contract between Sotheby's and Mr. Martin pursuant to which Mr. Martin was to provide his opinion as to the authenticity of the painting but was not to provide "expert consultation as a consulting expert or testifying expert", (iii) the terms of the letter dated 5 May to Mr. Martin which identified two purposes for correspondence with Mr. Martin, one being the commercial decisions which Sotheby's had to take, (iv) the importance or gravity of any decision by Sotheby's that a painting it had sold was a fake, and (v) the fact that the Committee had before it the comments of Mr. Martin on the opposing expert's views which must have been elicited in correspondence with him. Those matters show, in my judgment, that Sotheby's are unable to establish that the dominant purpose of the correspondence with Mr. Martin was use in contemplated litigation. That was *a* purpose of the correspondence. But it was not the dominant purpose.

35. I recognise that Mr. Scott has expressed a different view in his witness statement and has said that the dominant purpose was use in the contemplated litigation but, using the language of Beatson LJ (see above, as quoted by Hamblen J) I am "reasonably certain" that he has misconceived the character of the documents.

36. In these circumstances it is unnecessary for me to deal with the alternative argument advanced by Mr. Ford on behalf of Mark Weiss Ltd. that the contract with Mr. Martin was made by Sotheby's on behalf of the Buyer so that Mr. Martin's work was not for Sotheby's at all. This submission was made on the basis of statements made by Sotheby's and indeed on the basis of Sotheby's own pleading. I will simply say that

**436**

the contract itself does not suggest Sotheby's entered into the contract solely as agent for the Buyer. Once this issue came to light Sotheby's decided that its pleading was mistaken and that it will amend its pleading. There appears much to be said for the view now put forward by Sotheby's that Mr. Martin was instructed by Sotheby's to undertake an examination of the painting and that Sotheby's was permitted by the Buyer to so instruct him.

<u>The correspondence with Mr. Twilley</u>

37.    The purpose of Sotheby's engagement of Mr. Twilley was set out in Freshfield's letter dated 13 May 2016 in these terms:

> "1.4 To ensure that it has a proper basis for exercising its discretion to rescind the Seller's contract, if necessary, and that this position is robust in any litigation, Sotheby's would like to have Mr. Martin's analysis subjected to a peer review."

38.    Clause 3.2 further said:

> "3.2 Your role is not argue for or against the Painting's authenticity but to reach your own independent view on the quality and reliability of Mr. Martin's work, any flaws that you may identify, any particular challenges that could be made to it and, hence, as to how robust his conclusions, whatever they may be, are."

39.    It seems to me that clause 1.4 encapsulates the dual purpose of Mr. Twilley's work, namely one, to ensure that Sotheby's had a proper basis for rescinding the sale and, two, to ensure that Sotheby's position in the contemplated litigation was robust. That being so it is clear, in my judgment, that use in litigation cannot be said to be the dominant purpose of Mr. Twilley's work for Sotheby's. Just as with Mr Martin, such use was one of two purposes.

40.    Mr. Scott has expressed a different view. In his witness statement at paragraphs 24 and 25 he said:

> "24. Mr. Twilley was engaged on 13 May 2016, at a time when, as I have explained, litigation was in contemplation: both sides had appointed external litigation counsel and were preparing rival reports. The peer review by Mr. Twilley was commissioned in order to strengthen Sotheby's case before a Court or to increase the prospects of settlement. Had this litigation not been contemplated, the Twilley review would never have been commissioned.
>
> 25. The dominant, indeed the sole, purpose of Mr. Twilley's engagement and all of the Legal teams' communications with him was therefore the contemplated litigation between Sotheby's and the defendants. Accordingly, Mr. Twilley's review, and the correspondence between him and the Legal Team in relation to it, is protected by litigation privilege.

41.    Mr. Scott does not mention clause 1.4 which demonstrates that Mr. Twilley was engaged for two purposes, not one. Again, I am "reasonably certain" that his approach to the question of litigation privilege is in error. Mr. Scott referred to clause 4.2 which stated:

> "4.2 All correspondence and all preparatory papers for your advice will be legally privileged, as they are being prepared in contemplation of litigation…"

42.    It is true that they were being prepared in contemplation of litigation but unless that was their dominant purpose they are not privileged. Thus clause 4.2 cannot assist Sotheby's in showing that on an objective basis the correspondence and preparatory papers are privileged.

43.    Miss Wood submitted in her skeleton argument that "it ought to be beyond argument" that the communications with Mr. Twilley are privileged but she too made no reference in her skeleton argument to clause 1.4.

Conclusion

44.    For the reasons I have given the correspondence with both Mr. Martin and Mr. Twilley was for two purposes, first, to enable Sotheby's to decide whether the painting was a fake and, if so, to rescind the sale of the painting, and second, to enable Sotheby's to defeat the arguments of Mark Weiss Ltd. in the anticipated litigation. Sotheby's own decision as to the authenticity of the painting and whether to rescind the sale was an important decision for Sotheby's. Recovering the sale price from Mark Weiss Ltd. in the anticipated litigation was also important to Sotheby's. But Sotheby's is unable to show that the latter was the dominant purpose of the correspondence. It must follow that the correspondence is not protected by litigation privilege. Inspection is therefore ordered.

Case No: 2012-1398

Neutral Citation Number: [2013] EWHC 4038 (Comm)
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane, London, EC4A 1NL

Date: 18/12/2013

**Before**:

**MR JUSTICE HAMBLEN**
- - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **Starbev GP Ltd** | **Claimant** |
| **- and -** | |
| **Interbrew Central European Holding BV** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -

**Lord Grabiner QC and Simon Colton** (instructed by **Allen & Overy**) for the **Claimant**
**Ali Malek QC and Richard Brent** (instructed by **Skadden, Arps, Slate, Meagher & Flom
(UK) LLP**) for the **Defendant**

Hearing dates: 12 December 2013
- - - - - - - - - - - - - - - - - - - -
Judgment

**439**

Mr Justice Hamblen :

**Introduction**

1. The Claimant ("Starbev") applies under CPR 31.19(5) challenging the claim of the Defendant ("ICEH") to withhold inspection of two categories of documents on the ground of litigation privilege.

2. The documents consist of:

   (1) Documents relating to advice received from Barclays in April 2012 concerning the structuring of the consideration for the sale by Starbev of the Central and Eastern European brewing business ("the Business") that it had previously acquired from ICEH ("the Barclays documents").

   (2) Documents relating to ICEH's dealings with KPMG after 20 July 2012 in the course of work done for ICEH in relation to an agreement known as the Contingent Value Right Agreement ("CVR") ("the KPMG documents").

**Factual background**

3. In summary, the underlying claim concerns the proper construction and application of the CVR pursuant to which ICEH is entitled to deferred consideration (i.e. an "Excess Return Payment") following its sale of the Business to investment funds ("the CVC Funds"). Starbev is the investment vehicle through which the CVC Funds' acquisition was indirectly made. The sale completed on 2 December 2009.

4. The claim has arisen because on 3 April 2012 Starbev entered into an agreement with a subsidiary of Molson Coors to re-sell the Business. The consideration was a cash payment of €1,437m and a non-transferable Note ("the Note") of not less than €500m redeemable after December 2012. The claim concerns whether and the extent to which ICEH is entitled to a share of these proceeds.

5. So far as material to the present application, ICEH's entitlement arises if the "Cash proceeds" of the sale to Molson Coors exceed certain thresholds, which are determined by reference to the "Investment Amount".

6. "Investment Amount" is defined in the CVR as "the aggregate Cash Investments in Starbev Interests made by the Investor and applied by Starbev in acquiring Relevant Interests at the SPA Completion" (clause 1.1).

7. The higher the Investment Amount figure, the less to which ICEH is entitled by way of an Excess Return Payment. Moreover, the relevant multiple applicable to the Investment Amount itself varies, depending on the time that has expired from the date of completion of the original sale of the Business.

8. The CVR contains an anti-avoidance provision in clause 4.4.3. This provides that, where a transaction is structured "with the purpose of reducing payments to ABI [i.e. ICEH]", that transaction is to be treated as an "Equity Return", defined (so far as relevant) as "Cash proceeds".

2

440

9.      The CVR also contains a right for ICEH to appoint independent accountants to "verify and report to [ICEH] on the amount and timing of any such payments and transactions and any other transactions relevant to the calculation of the IRR, whether the Investment Threshold has been exceeded and each Excess Return Payment." (clause 3.3).

10.     The issues in the proceedings are set out in the List of Issues but may be summarised as being:

(1) Whether the "Investment Amount" is €720m (adjusted to €717,489,388.03) as Starbev claims or some other (lower) figure as ICEH contends;

(2) Whether ICEH is estopped by convention from contending that the Investment Amount is different to that claimed by Starbev and notified to it in December 2009;

(3) Whether the transaction by which Starbev sold the Business to Molson Coors was structured with the purpose of reducing the payments due to ABI under the CVR and engages the anti-avoidance provisions in clause 4.4 of the CVR (introduced by amendment in November 2013).

**The law relating to "litigation privilege"**

11.     The legal requirements of a claim to litigation privilege may be summarised as follows:

(1) The burden of proof is on the party claiming privilege to establish it – see, for example, *West London Pipeline and Storage v Total UK* [2008] 2 CLC 258 at [50].

(2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in a witness statement are not determinative and are evidence of a fact which may require to be independently proved. The court will scrutinise carefully how the claim to privilege is made out and the witness statements should be as specific as possible – see, for example, *Sumitomo Corporation v Credit Lyonnais Rouse Ltd* (14 February 2001) at [30] and [39] (Andrew Smith J); *West London Pipeline and Storage Ltd v Total UK Ltd* [2008] EWHC 1729 (Comm) at [52], [53], [86] (Beatson J); *Tchenguiz v Director of the SFO* [2013] EWHC 2297 (QB) at [52] (Eder J).

(3) The party claiming privilege must establish that litigation was reasonably contemplated or anticipated. It is not sufficient to show that there is a mere possibility of litigation, or that there was a distinct possibility that someone might at some stage bring proceedings, or a general apprehension of future litigation – see, for example, *United States of America v Philip Morris Inc* [2004] EWCA Civ 330 at [68]; *Westminster International v Dornoch Ltd* [2009] EWCA Civ 1323 at paras [19] – [20]. As Eder J stated in *Tchenguiz* at [48(iii)]: "Where litigation has not been commenced at the time of the communication, it has to be 'reasonably in prospect'; this does not require the

3

prospect of litigation to be greater than 50% but it must be more than a mere possibility".

(4) It is not enough for a party to show that proceedings were reasonably anticipated or in contemplation; the party must also show that the relevant communications were for the dominant purpose of either (i) enabling legal advice to be sought or given, and/or (ii) seeking or obtaining evidence or information to be used in or in connection with such anticipated or contemplated proceedings. Where communications may have taken place for a number of purposes, it is incumbent on the party claiming privilege to establish that the dominant purpose was litigation. If there is another purpose, this test will not be satisfied: *Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, 589-590 (cited in *Tchenguiz* at [54]-[55]); *West London Pipeline and Storage Ltd v Total UK Ltd* at [52].

12.    In relation to the Court's approach to the assessment of evidence in support of a claim for privilege, it has been stated that it is necessary to subject the evidence "to "anxious scrutiny" in particular because of the difficulties in going behind that evidence" – per Eder J in *Tchenguiz* at [52].  "The Court will look at 'purpose' from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose" – *ibid.* 48(iv). Further, as Beatson J pointed out in the *West London Pipeline* case at [53], it is desirable that the party claiming such privilege "should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect".

13.    As was further stated by Beatson J in the *West London Pipeline* case at [86]:

"(3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority.*

(b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharane* (the Chief Constable's letter)*, Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co,* per A L Smith LJ.

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montivedeo Gas Co; Birmingham and Midland Motor Omnibus Co v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

4

(4) Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it:

(a) It may conclude that the evidence does not establish a legal right to withhold inspection and order inspection: *Neilson v Laugharane; Lask v Gloucester Health Authority.*

(b) It may order a further affidavit to deal with matters which the earlier affidavit does not cover or on which it is unsatisfactory: *Birmingham and Midland Motor Omnibus Co Ltd v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

(c) It may inspect the documents: see CPR 31.19(6) and the discussion in *National Westminster Bank plc v Rabo Bank Nederland* and *Atos Consulting Ltd v Avis plc (No. 2).* Inspection should be a solution of last resort, in part because of the danger of looking at documents out of context at the interlocutory stage. It should not be undertaken unless there is credible evidence that those claiming privilege have either misunderstood their duty, or are not to be trusted with the decision making, or there is no reasonably practical alternative.

(d) At an interlocutory stage a court may, in certain circumstances, order cross-examination of a person who has sworn an affidavit, for example, an affidavit sworn as a result of the order of the court that a defendant to a freezing injunction should disclose his assets: (*House of Spring Gardens Ltd v Wait; Yukong Lines v Rensburg; Motorola Credit Corp v Uzan (No. 2)*). However, the weight of authority is that cross-examination may not be ordered in the case of an affidavit of documents: *Frankenstein's* case; *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* and *Fayed v Lonrho.* In cases where the issue is whether the documents exist (as it was in *Frankenstein's* case and *Fayed v Lonrho*) the existence of the documents is likely to be an issue at the trial and there is a particular risk of a court at an interlocutory stage impinging on that issue."

## The Barclays documents

14.    I propose to consider this claim to privilege first as it comes first in time.

15.    The individual within ICEH who was involved in seeking the advice of Barclays was Mr Golden (Vice-President, Mergers and Acquisitions).

16.    His evidence is that:

(1) Having received notification in an email dated 3 April 2012 that the consideration for the re-sale of the Business by Starbev included the Note, he was "immediately suspicious" and considered that "by deferring part of the consideration, Starbev was attempting to take advantage of the fact that the Investment Threshold was

5

443

potentially significantly greater … after December 2012", as per witness statement of Robert Golden.

(2) Having subsequently been informed that Starbev was of the view that the Investment Amount was €720m (and not €500m as he had believed), it seemed to him that "Starbev had deliberately structured the sale of the Business in order to "game" the CVR and thereby eliminate (rather than simply reduce, as I had initially thought) ICEH's Excess Return Payment".

(3) As a result, it occurred to Mr Golden "that ICEH would end up in another dispute with Starbev".

(4) He "therefore sought advice from ABI's advisors, Barclays Capital, as to what steps were available to ABI to challenge the structuring of the sale to Molson Coors, with a view to discussing this further with ABI's legal advisors".

17. ICEH submits that this evidence is corroborated by evidence of Mr Caton to similar effect and by the following facts and matters:

(1) The background of disputes between ICEH/ABI and Starbev relating to the implementation of the agreement for the sale of the Business as set out in Mr Golden's statement.

(2) The evidence of ICEH's litigation solicitor, Mr Southwell of Skadden Arps, Slate, Meagher & Flom (UK) LLP, that the advice received from Barclays Capital was shared with ABI's then legal advisors, Clifford Chance (its corporate solicitors).

(3) The fact that one of KPMG's roles, when first instructed in June 2012 was stated to be to "support ABI and CC's [Clifford Chance LLP] investigation of CVC [i.e. the CVC Funds] compliance with the anti-avoidance clauses in the CVR agreement".

18. In the light of that evidence ICEH submits that it has shown both that litigation was reasonably anticipated and that the dominant purpose of instructing Barclays was in connection with that anticipated litigation.

19. I am not satisfied that Mr Golden's evidence goes this far. I consider the effect of his evidence to be that he had a suspicion concerning the sale of the Business by Starbev and instructed Barclays to investigate in order to see if there was substance to his suspicion. Barclays' role was investigatory. Unless and until they confirmed that there was substance to Mr Golden's suspicion there was no real reason to anticipate litigation.

20. This is borne out by his statement that "it occurred to me that ICEH would end up in another dispute with Starbev". This suggests no more than that such a dispute was a possibility. It does not connote that it was reasonably anticipated both that there would be such a dispute and that it would result in litigation. Whether or not it would do so was unlikely to be known until Barclays investigated and reported.

6

**444**

21. That Barclays' role was investigatory is borne out by a number of contemporaneous documents which refer to their role as one of checking the position and calculating the payment that might be likely to come to ICEH as a result of the sale. For example, following notification of the sale, Mr Golden sent an email on 3 April 2012 stating: "See notice below from CVC re agreement to sell Starbev to Molson Coors. We will follow up with <u>a review the impact on ABI's CVR</u>…" (emphasis added). Later that day Mr Golden responded to an email from Mr Caton which set out the likely payout for ICEH from the sale by stating: "Thanks Nick. Please <u>check it with….Barclays</u>". Also that day Mr Golden responded to an email in which he was informed by tax counsel that the gain from the sale should be tax free by stating: "Fantastic, not sure about potential payout given deferred nature of some of the price... <u>in process of trying to calc</u>." (emphasis added).

22. Further, as the contemporaneous documents show, ICEH had good and independent reason to have these checks and calculations made because of earlier public statements made to the effect that additional payments of US$800 million might be received in the future from the sale to Starbev. This purpose for getting Barclays to "check" "calc" and "review the impact on ABI's CVR" was not addressed in its evidence.

23. Although it is said that Barclays' advice was to be and was shared with its corporate solicitors, Clifford Chance, that takes the matter little further. They may well have been part of the investigatory exercise, but that is all it was at that stage.

24. Finally, as considered below, it is striking that ICEH's evidence is that litigation was not reasonably anticipated in early July 2012 when KPMG was instructed, even though its instruction included investigation of the anti-avoidance position. This is seemingly inconsistent with litigation being reasonably anticipated in relation to such matters over two months before.

25. For all these reasons I am not satisfied that it has been shown that litigation was reasonably anticipated at the time that Barclays was instructed to provide advice, still less that such litigation was the dominant purpose of so instructing them. The claim for litigation privilege relating to the advice is accordingly not made out.

**The KPMG documents**

26. The individual within ICEH who was involved in the appointment of KPMG, and specifically instructed KPMG to prepare a written report after 20 July 2012, was Mr Nick Caton, at the time a Director in the Global Acquisitions and Mergers group.

27. His evidence is that:

(1) KPMG were originally appointed in early July 2012 in order (amongst other tasks) to conduct an "audit" (under clause 3.3 of the CVR) of the various notices that Starbev had sent ICEH under the terms of the CVR. That audit included auditing the Investment Amount, which Starbev alleges to be €720m as adjusted.

(2) In the course of that exercise KPMG identified various additional documents that it required to complete the audit. That information was provided on 18 July 2012

7

445

and was discussed with KPMG who reported in a call on 20 July 2012. In the course of that call it emerged that there were good factual grounds to suppose that the Investment Amount was not €720m: KPMG pointed to the fact that Starbev's accounts indicated that it had subscribed for only €699.6m of preferred equity certificates in Caspian and that approximately €15.4m of those had been issued as consideration for the supply of certain services by Starbev to Caspian.

(3) Mr Caton says that on 20 July 2012:

    (a) "it became clear to me that ICEH was likely to dispute Starbev's quantification of the Investment Amount … I anticipated that it might well end up in litigation"; and

    (b) "I therefore instructed KPMG to prepare a written report of its conclusions and the arguments that might be available to ICEH to challenge Starbev's analysis, for the purposes of that prospective litigation".

28.     ICEH submits that Mr Caton's evidence is corroborated by the following facts and matters:

(1) Prior to July 2012, there had been a history of post-completion disputes between ICEH and Starbev, one of which had resulted in adversarial proceedings.

(2) In January 2012, based on information received from Lazard, the board of ABI (the parent company of ICEH) had received a presentation on ICEH's potential "Excess Equity Return" on the assumption that the Investment Amount was €517m.  The significance of the KPMG investigation in this context is that it provided factual support for ABI's pre-existing supposition that Starbev had exaggerated the Investment Amount: the KPMG oral report on 20 July 2012 demonstrated that there was a substantive issue here.

(3) Mr Southwell states that the communications from KPMG after 20 July 2012 "followed and were responsive to privileged legal advice" and that KPMG was asked for its views on the quantum of the Investment Amount "on the basis that there would be an adversarial dispute".

(4) As a matter of fact, following the further communications from KPMG, on 21 August 2012 (i.e. just a month later) ICEH formally wrote to Starbev setting out its position on the Investment Amount. It can be seen from that letter that it was dependent on KPMG's investigations and input (the analysis provided is based on "information provided to KPMG by Starbev") and, although the letter is not described as a pre-action letter, it ends with an express reservation of rights "arising out of, or in connection with, the CVR Instrument" i.e. in substance it is a pre-action letter. Starbev replied to that letter on 3 September 2012 and sent a letter before action on 28 September 2012.

29.     ICEH therefore accepts that the purpose of instructing KPMG in June 2012 was to carry out an audit pursuant to its rights under the CVR.  That is borne out by a number of contemporaneous documents including KPMG's written retainer.  It contends that as a result of KPMG's investigations and oral reports, by 20 July 2012 not only was

litigation reasonably anticipated but the dominant purpose of instructing KPMG thereafter became such litigation.  Starbev challenges this and submits that it is contrary to the contemporaneous documentation, which documentation is not addressed in ICEH's evidence.

30.    Starbev places particular reliance on KPMG's retainer letter dated 4 July 2012 which provided:

> "We set out below the terms of the engagement of KPMG LLP to carry out work in connection with a review of certain payments and transactions connected to a contingent value right entered into between [ABI] and [Starbev] dated 2 December 2009 (the "CVR") and certain books and records relating to each payments and transactions (the "Engagement"), as discussed recently...
>
> 1  Scope of the work
>
> We have discussed and agreed with you the scope of our work which is set out in full in Appendix 1. Attention is drawn to the limitations in the scope of our work set out therein.
>
> Any agreed developments in the scope of our work as the engagement progresses will be recorded in writing and will be subject to the terms set out in this letter unless otherwise agreed in writing.
>
> This engagement letter covers only the work under clause 3.3 of the CVR. It does not cover any assistance in your reaching agreement with Starbev Sàrl and Starbev LP in relation to the amount of any Earnout Consideration. If we are instructed to assist you in connection with any further work, we will agree the parameters under which we will operate and set out our responsibilities in an addendum to this letter...
>
> 2  Reporting
>
> During the course of the engagement we may supply oral, draft or interim advice or reports or presentations of our interim findings to Ms. Randon or an authorised ABI representative identified in writing by Ms. Randon.
>
> Following completion of our work we shall report formally in writing to Ms. Randon
>
> Our report(s) will present the findings of our work for the purpose of assisting you with your enquiries in connection with the proposed Engagement.

<p style="text-align:center">9</p>

3  Timetable

A provisional timetable for the delivery of our services is as follows, together with the assumptions on which it is based. We shall use all reasonable endeavours to meet this timetable.

Commence work        - 5 July 2012 (subject to information availability)

Draft report        -    within    two    weeks    from commencement of work

Our work will be dependent upon receiving without undue delay full co-operation from all relevant officials of Starbev Sàrl and Starbev LP and their timely disclosure to us of all information as we may need for the purposes of our work."

[emphasis added]

31.    In relation to the retainer Starbev emphasises in particular: (i) that it confirms that KPMG's retainer only covered audit work under clause 3.3; (ii) that the next stage contemplated was seeking "agreement" with Starbev, assistance for which was not covered; (iii) that KPMG would report in writing; (iv) that any developments in the scope of work would be recorded in writing, and (v) that no mention is made of anticipated litigation.  As Starbev points out, not only does the retainer make no mention of litigation, but the next stage contemplated was discussion and agreement rather than disputation and litigation.

32.    Starbev also stresses an email sent by Mr Caton to KPMG on 20 July, the day on which it is claimed litigation privilege incepted.  It stated:

"Subject: Project Black Sea CVR summary

Richard, Olga, Ivan,

I hope you're doing well. As part of our normal process with projects such as these, we'd like a written summary that outlines the work you've done the past couple weeks with respect to the Black Sea CVR. I know the investigation is not yet complete, but I think it would be helpful if we could review a draft version of the report by the middle of next week. Please let me know if you disagree or prefer another process."

33.    As Starbev points out: (i) the email makes no mention of anticipated litigation, either as the context to, or the purpose for, the request for a written summary – on the contrary, the request was described as "part of our normal process";  (ii) the scope of this request goes no further than KPMG had already agreed to in its retainer letter, and (iii) the report was to cover work which had already been done, "the past couple weeks" – i.e.  before litigation was allegedly in prospect.  These are compelling points which were not sought to be addressed by ICEH in evidence.

10

34.    Reference was also made to an email recording a conference call on 20 July which included representatives of Clifford Chance which was said to be a "catch up call to discuss our next steps on Black Sea". Starbev points out that if, as ICEH asserts, litigation was reasonably anticipated at that time then Clifford Chance would have been duty bound to advise ICEH of the need to preserve disclosable documents. As CPR 31 BPD, para 7 makes clear, this is to be done "as soon as litigation is contemplated". In the event this was not done until an internal instruction was given by Mr Katerberg, the group legal director on 5 October 2012. Starbev submits that that timing is itself of significance, although Mr Katerberg explained that it was his practice to give such instruction where litigation is more likely than not.

35.    As the authorities make clear it is necessary to subject the evidence claiming litigation privilege "to "anxious scrutiny". This is all the more so when a related claim to such privilege has already been rejected by the court. Further, as Beatson J pointed out in the *West London Pipeline* case at [53], it is desirable that the party claiming such privilege "should refer to such contemporary material as it is possible to do".

36.    In the present case Mr Caton has not sought to address still less to explain the contemporaneous documents which, for the reasons set out above, contradict or at the very least question his assertion of privilege. None of those documents are privileged.

37.    Further, there is an inherent implausibility in the claim for privilege made. At the date of the retainer on 4 July 2012 litigation was not reasonably anticipated and the primary purpose for instructing KPMG was to carry out a clause 3.3 audit. By 20 July 2012, however, it is asserted that not only had litigation become a purpose for instructing KPMG, but that it had become the dominant purpose for so doing. Within a couple of weeks the original purpose of instructing KPMG had been relegated to a purely subsidiary role. Further, there is no explanation in the evidence as to why and how the original purpose became so diminished.

38.    In addition, there is no record of the KPMG retainer being changed or extended. On ICEH's evidence KPMG was now being asked to fulfil a very different role, yet its retainer remained the same.

39.    Yet further, the instruction to produce a report related to work which had been commissioned as a clause 3.3 audit, which had already been done and which KPMG were already obliged to produce in written form and the production of which was said to be part of "normal process". It is difficult to see how the purpose of doing work already done can be changed by an instruction to put it in writing in such circumstances.

40.    Reliance was placed on the evidence of Mr Southwell, but he was not instructed or involved at the material time and so he can only give second hand evidence. ICEH suggested that if I was doubtful as to its claim for privilege I should inspect the documents myself. However, as the authorities make clear, that is a matter of last resort. It is generally undesirable for the Court to consider material which is not to be shown to one of the parties and I am not persuaded that it would be appropriate for me to do so in this case. If ICEH has a good claim for litigation privilege, it should have been able to make it good without reference to privileged material.

11

449

41.    Having carefully considered the parties' evidence and submissions I am not satisfied that it has been shown that litigation had become the dominant purpose of instructing KPMG by 20 July 2012.  In so far as it is necessary I consider that it is reasonably certain that the witness evidence on this issue is incorrect when one has regard to the evidence as a whole, and in particular to the contemporaneous documents.  It may be that by 20 July litigation was reasonably anticipated. It may also be that that contemplated litigation had become a purpose for instructing KPMG.  However, I do not accept that it has been established that it had become the dominant purpose for so doing.

42.    For all these reasons I am not satisfied that the claim for litigation privilege has been made out in relation to the KPMG report it was instructed to produce on 20 July 2012.

**Conclusion**

43.    For the reasons outlined above I do not consider that the claim for litigation privilege has been made out as claimed by ICEH.  The Barclays advice and the KPMG report, together with documents relating thereto up to the time of the production of the advice/report respectively, should therefore be disclosed.  As to when the curtain of litigation privilege came down, it may be that there is an alternative date which ICEH wishes to put forward in the light of my ruling.  The latest date would be likely to be 28 September 2012 when the letter before action was sent.  ICEH may, however, wish to contend for an earlier date such as at or around the time of its letter of 21 August 2012.  The advice and report are likely to shed light on the appropriate date to be taken.  I would hope that this would be capable of agreement.  If not, then the parties may seek a further ruling.

610
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC

House of Lords                                          *A*

# Three Rivers District Council and others *v* Governor and Company of the Bank of England (No 6)

## [2004] UKHL 48

2004  July 26, 27, 28, 29;          Lord Scott of Foscote, Lord Rodger of Earlsferry,   *B*
        Nov 11                       Baroness Hale of Richmond, Lord Carswell and
                                         Lord Brown of Eaton-under-Heywood

*Practice — Discovery — Privilege — Legal advice privilege — Action alleging misfeasance in public office in respect of defendant's supervision of bank — Communications between defendant and solicitors relating to assistance and advice on presentation of evidence to inquiry into defendant's supervision of bank — Application for disclosure of communications — Defendant claiming legal advice privilege — Whether communications privileged*

*C*

The claimants, the liquidators and creditors of a bank ("BCCI"), brought an action against the Bank of England for misfeasance in public office in respect of its supervision of BCCI before its collapse. They sought an order for inspection and disclosure of communications passing between the Bank's "inquiry unit" and its solicitors during the course of an inquiry set up to inquire into its supervision. The Bank claimed legal advice privilege in respect of all solicitor/client communications. The judge held that it was entitled to claim privilege only in respect of communications for the purpose of seeking or obtaining advice as to its legal rights and obligations, not communications relating to presentation of its evidence to the inquiry so as to be least likely to attract criticism. The Court of Appeal dismissed an appeal by the Bank from his order.

*D*

On appeal by the Bank—

*Held*, allowing the appeal, that it was desirable as a matter of public policy that communications between clients and their lawyers for the purpose of obtaining legal advice should be privileged from discovery notwithstanding that as a result cases might have to be decided in the absence of relevant probative material; that "legal advice" extended to advice as to what should prudently and sensibly be done in a "relevant legal context", which would include the presentation of a case to an inquiry by someone whose conduct might be criticised by it; and that, accordingly, communications between the Bank's inquiry unit and its lawyers regarding presentation of its case to the inquiry for the purpose of persuading it that its discharge of its public law obligations under the Banking Acts was not deserving of criticism and had been reasonable were privileged ( post, paras 34–38, 43–45, 49, 58–61, 83–84, 105, 111–112, 113–114, 116–117, 120–122).

*E*

*F*

Dicta of Taylor LJ in *Balabel v Air India* [1988] Ch 317, 330, 331, CA applied.

Decision of the Court of Appeal [2004] EWCA Civ 218; [2004] QB 916; [2004] 2 WLR 1065; [2004] 3 All ER 168 reversed.

*G*

The following cases are referred to in their Lordships' opinions:

*A M & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878; [1983] 3 WLR 17; [1983] 1 All ER 705; [1982] ECR 1575, ECJ

*H*

*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, Sir George Jessel MR and CA

*Argyll (Duke) v Argyll (Duchess)* 1962 SC(HL) 88, HL(Sc)

*B v Auckland District Law Society* [2003] UKPC 38; [2003] 2 AC 736; [2003] 3 WLR 859; [2004] 4 All ER 269, PC

**451**

611

A  *Baker v Campbell* (1983) 153 CLR 52
*Balabel v Air India* [1988] Ch 317; [1988] 2 WLR 1036; [1988] 2 All ER 246, CA
*Bolton v Liverpool Corpn* (1833) 1 M & K 88
*Bullivant v Attorney General for Victoria* [1901] AC 196, HL(E)
*Carpmael v Powis* (1846) 1 Ph 687
*Comr of Inland Revenue v West-Walker* [1954] NZLR 191
*Daniels Corpn International Pty Ltd v Australian Competition and Consumer*
B      *Commission* [2002] HCA 49; 213 CLR 543
*Descoteaux v Mierzwinski* (1982) 141 DLR (3d) 590
*Esso Australia Resources Ltd v Federal Comr of Taxation* [1999] HCA 67; (1999)
     201 CLR 49
*Great Atlantic Insurance Co v Home Insurance Co* [1981] 1 WLR 529; [1981] 2 All
     ER 485, CA
*Greenough v Gaskell* (1833) 1 M & K 98
C  *Hagart and Burn-Murdoch v Inland Revenue Comrs* [1929] AC 386, HL(Sc)
*Herring v Clobery* (1842) 1 Ph 91
*Hickman v Taylor* (1947) 329 US 495
*Highgrade Traders Ltd, In re* [1984] BCLC 151, CA
*Holmes v Baddeley* (1844) 1 Ph 476
*Jones v Smith* [1999] 1 SCR 455
*Jordan v United Kingdom* (2001) 37 EHRR 52; 11 BHRC 1
D  *Kingston's (Duchess of ) Case* (1776) 20 StTr 355
*L (A Minor) (Police Investigation: Privilege), In re* [1997] AC 16; [1996] 2 WLR 395;
     [1996] 2 All ER 78, HL(E)
*Lawrence v Campbell* (1859) 4 Drew 485
*Lobo Machado v Portugal* (1996) 23 EHRR 79
*Minet v Morgan* (1873) LR 8 Ch App 361
*Minter v Priest* [1929] 1 KB 655, CA; [1930] AC 558, HL(E)
E  *Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow* [1995] 1 All
     ER 976
*Parry-Jones v Law Society* [1969] 1 Ch 1; [1968] 2 WLR 397; [1968] 1 All ER 177,
     CA
*Pearse v Pearse* (1846) 1 De G & Sm 12
*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583
*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995]
F      4 All ER 526, HL(E)
*R (Amin) v Secretary of State for the Home Department* [2003] UKHL 51; [2004]
     1 AC 653; [2003] 3 WLR 1169; [2003] 4 All ER 1264, HL(E)
*R (Middleton) v West Somerset Coroner* [2004] UKHL 10; [2004] 2 AC 182; [2004]
     2 WLR 800; [2004] 2 All ER 465, HL(E)
*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21;
     [2003] 1 AC 563; [2002] 2 WLR 1299; [2002] 3 All ER 1, HL(E)
G  *Seabrook v British Transport Commission* [1959] 1 WLR 509; [1959] 2 All ER 15
*Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, CA
*Three Rivers District Council v Bank of England (No 3)* [2001] UKHL 16; [2003]
     2 AC 1; [2001] 2 All ER 513, HL(E)
*Three Rivers District Council v Bank of England* [2002] EWHC 1118 (Comm)
*Three Rivers District Council v Governor and Company of the Bank of England*
     *(No 5)* [2002] EWHC 2730 (Comm); [2003] EWCA Civ 474; [2003] QB 1556;
H      [2003] 3 WLR 667, CA
*Upjohn Co v United States* (1981) 449 US 383
*Ventouris v Mountain* [1991] 1 WLR 607; [1991] 3 All ER 472, CA
*Waugh v British Railways Board* [1980] AC 521; [1979] 3 WLR 150; [1979] 2 All
     ER 1169, HL(E)
*Wheeler v Le Marchant* (1881) 17 Ch D 675, CA

**452**

612
**Three Rivers DC v Bank of England (No 6) (HL(E))**              [2005] 1 AC

The following additional cases were cited in argument:                    A

*Buttes Gas and Oil Co v Hammer (No 3)* [1981] QB 223; [1980] 3 WLR 668; [1980]
    3 All ER 475, CA
*Calcraft v Guest* [1898] 1 QB 759, CA
*Campbell v United Kingdom* (1992) 15 EHRR 137
*D v National Society for the Prevention of Cruelty to Children* [1978] AC 171;
    [1977] 2 WLR 201; [1977] 1 All ER 589, HL(E)
*Foster v Hall* (1831) 29 Mass (12 Pick) 89                               B
*Foxley v United Kingdom* (2000) 31 EHRR 637
*Grant v Downs* (1976) 135 CLR 674
*Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)*
    [1997] 1 Lloyd's Rep 160
*Hobbs v Hobbs and Cousens* [1960] P 112; [1959] 3 WLR 942; [1959] 3 All ER 827
*McCowan v Wright* (1852) 15 D 229
*O'Rourke v Darbishire* [1920] AC 581, HL(E)                              C
*O'Shea v Wood* [1891] P 286, CA
*R (Alconbury Developments Ltd) v Secretary of State for the Environment,*
    *Transport and the Regions* [2001] UKHL 23; [2003] 2 AC 295; [2001] 2 WLR
    1389; [2001] 2 All ER 929, HL(E)
*R (Daly) v Secretary of State for the Home Department* [2001] UKHL 26; [2001]
    2 AC 532; [2001] 2 WLR 1622; [2001] 3 All ER 433, HL(E)
*Smurfit Paribas Bank Ltd v AAB Export Finance Ltd* [1990] 1 IR 469       D
*Three Rivers District Council v Bank of Credit and Commerce International SA*
    [2003] EWHC 2565 (Comm) 4 November 2003, Tomlinson J
*United States of America v Philip Morris Inc* [2004] EWCA Civ 330
*Swinder & Berlin v United States* (1998) 524 US 399

**APPEAL** from the Court of Appeal
    This was an appeal by the defendants, the Governor and Company of the    E
Bank of England, by leave of the House of Lords (Lord Scott of Foscote,
Lord Rodger of Earlsferry and Baroness Hale of Richmond) given on
28 April 2004 from the decision of the Court of Appeal (Lord Phillips of
Worth Matravers MR, Longmore and Thomas LJJ) on 1 March 2004
dismissing its appeal against an order of Tomlinson J [2003] EWHC 2565
(Comm) made on 4 November 2003 on an application for discovery made
by the claimants, Three Rivers District Council and others and the Bank of    F
Credit and Commerce International SA (in liquidation).
    The facts are stated in the opinions of Lord Scott of Foscote and Lord
Carswell.
    On 5 July 2004 the House of Lords, on report from an Appeal Committee
(Lord Scott of Foscote, Lord Rodger of Earlsferry, Baroness Hale of
Richmond, Lord Carswell and Lord Brown of Eaton-under-Heywood),    G
allowed a petition by the Attorney General praying that he might be heard or
otherwise intervene in the appeal to the extent of giving him leave to lodge
written submissions only.  On 13 July 2004 similar orders were made on
petitions for intervention by the General Council of the Bar of England and
Wales and the Law Society of England and Wales.
    At the conclusion of the hearing of the appeal on 29 July 2004 their
Lordships announced that the appeal would be allowed for reasons to be    H
given later.

    *Jonathan Sumption QC*, *Bankim Thanki QC* and *Ben Valentin* for the
Bank.  The Court of Appeal's intellectual starting point in both judgments,

**453**

which is wrong, is that legal professional privilege is essentially a privilege in aid of litigation. The overall effect is to reduce legal professional privilege to very little more than a privilege ancillary to forensic litigation in the narrowest sense. The practice followed until now is correct. Communications between a client and his lawyer relating to the presentation of material to an inquiry should be privileged in exactly the same way, and for the same reasons, as they would be if they related to litigation, that is, if they are made (i) by a person authorised by the client to make that communication on his behalf, (ii) in the course of a professional relationship between lawyer and client and (iii) for the purpose of enabling the client to obtain advice and assistance of a legal nature. It may be necessary for some purposes to differentiate between litigation and other proceedings, but the distinction has no bearing on the issue in this appeal. In the context of proceedings of either kind there is no relevant distinction between "presentational" and "legal" advice or between legal advice and other forms of legal assistance, and there is no place for such distinctions in a rational system of law.

Five points may be made. (1) The object of the privilege attaching to lawyer-client communications is the encouragement of candour between a client and his lawyer of a kind that will often be inhibited by the prospect of disclosure. That is a public interest that requires not just that their exchanges should be immune from compulsory disclosure but also that any rule so protecting them should be absolute in its terms, because there is no other way in which a client can be given the necessary degree of assurance that what he says is between himself and his lawyer. An unclear privilege is as good as no privilege at all: see *Upjohn Co v United States* (1981) 449 US 383, 393. (2) The law does not distinguish between lawyer-client communications generated in connection with litigation and other lawyer-client communications. The protection of privilege extends to lawyer-client communications as such, and its scope is precisely the same whether litigation is contemplated or not. It is only in the context of communications with third parties that the prospect of litigation makes any difference. (3) Whether in connection with litigation or not, the privilege for lawyer-client communications protects legal advice and legal assistance, which has always been treated as part of legal advice. It therefore extends beyond communications for the purpose of giving or receiving advice about propositions of law or legal rights and obligations. It means advice of a kind that it is part of the proper function of a lawyer to give by virtue of his legal skills. "Legal skills" extend to advocacy, to advice about what to do in the relevant legal context (*Balabel v Air India* [1988] Ch 317, 330, per Taylor LJ) and to what Dr Johnson in 1776 (see *Boswell, Life of Johnson*, ed Birkbeck Hill (1950), vol 5, p 26) called "the art and power of arranging evidence", ie points of fact, not just points of law. (4) A "relevant legal context" need not necessarily be litigation. It extends to any contexts calling for specifically legal expertise, including non-contentious matters such as the drawing up of a legal document: anything requiring legal assistance whether or not rights and liabilities are involved. The Court of Appeal was wrong to say that the Bingham Inquiry was not a "legal context" because it was not concerned with determining legal rights or obligations. (5) The Court of Appeal's view has unacceptable practical consequences. Its test is uncertain and involves fine distinctions. It seriously undermines the object of the privilege by making it difficult to predict with any assurance, even with the

454

aid of legal advice, whether a particular sequence of communications will be    *A*
privileged or not.

On (1), the policy basis for the privilege, most of the early cases suggest
that the privilege was originally founded exclusively on the lawyer's
obligation of confidence to his client. If that view had persisted, it would
have been logical to apply it to other confidential professional relationships,
e g with doctors or priests. In England, however, it has been clear since the    *B*
*Duchess of Kingston's Case* (1776) 20 St Tr 355 that the privilege is based
not on the legal enforcement of the lawyer's honourable obligations but on
the public interest in the client having uninhibited access to legal advice and
assistance, which is why it is confined to lawyers.

It was also established quite early that to be privileged a communication
between lawyer and client did not have to have anything to do with
litigation, either actual or anticipated. Until recently, however, litigation    *C*
was the only context in which privilege would be invoked, because until the
20th century courts of law were the only authorities with a legal power to
compel disclosure. In the 20th century a large number of non-judicial bodies
such as the Inland Revenue, the Law Society, the police and some inquiries
have been given such power. It is now clear that the privilege for lawyer-
client communications, although probably no other privilege, is not    *D*
procedural and is not just an adjunct to litigation. It is a personal
substantive right and a fundamental human right, based on the perception
that access by the public to legal assistance is in itself in the public interest.
The essential principle is that a person should be able to have recourse to a
lawyer in circumstances that enable him to place unrestricted confidence in
him. Subject to immaterial exceptions, this requires that he should have the
absolute assurance that the communications between them will remain    *E*
secret. [Reference was made to *Parry-Jones v Law Society* [1969] 1 Ch 1;
*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC
563; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487 and *B v Auckland
District Law Society* [2003] 2 AC 736.]

On (2), it is fundamental that, although litigation is the context in which
legal professional privilege is usually invoked, it is not a privilege in aid of
litigation. It arises from the nature of the lawyer-client relationship and    *F*
applies regardless of the existence of actual or contemplated litigation: see
*Greenough v Gaskell* (1833) 1 M & K 98, 103. Almost all the authorities
are concerned with the situation where a lawyer has been retained to advise
about some current transaction, such as the drafting of a will or contract,
that has not yet and may never become contentious. This case is quite
different. Once one has identified the purpose of the privilege, there is no    *G*
logic in distinguishing between lawyer-client communications made for the
purpose of litigation and those made for some other purpose, except as
regards third parties. It is the obtaining of legal advice and nothing more: see
*Pearse v Pearse* (1846) 1 De G & Sm 12; *Herring v Clobery* (1842) 1 Ph
91 and *Minet v Morgan* (1873) LR 8 Ch App 361. It is not correct to assert
as a general proposition that clients do not need secrecy to encourage
candour when litigation is not in prospect. It may play a larger part in doing    *H*
so in some cases than in others, but the right to claim privilege depends not
on the value of secrecy in any particular case but on principles that apply
generally: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 508. As
to third parties, see *Anderson v Bank of British Columbia* (1876) 2 Ch D

615
[2005] 1 AC                    Three Rivers DC v Bank of England (No 6) (HL(E))

A  644; *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315 and
*Wheeler v Le Marchant* (1881) 17 Ch D 675, 684–685, per Cotton LJ.
The real distinction is between lawyer-client communications and
communications with third parties: see *Great Atlantic Insurance Co v Home
Insurance Co* [1981] 1 WLR 529; *Waugh v British Railways Board* [1980]
AC 521; *In re Highgrade Traders Ltd* [1984] BCLC 151 (Oliver and
Goff LJJ); *Ventouris v Mountain* [1991] 1 WLR 607 and *In re L (A Minor)
B  (Police Investigation: Privilege)* [1997] AC 16. *Greenough v Gaskell* has not
been superseded by subsequent legal developments. The essential point that
it decided has been regarded as uncontroversial ever since by courts at every
level: see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 510 (Lord
Nicholls of Birkenhead). The protection of such communications is a
fundamental human right: see *R (Morgan Grenfell & Co Ltd) v Special
C  Comr of Income Tax* [2003] 1 AC 563, 606–607, para 7 (Lord Hoffmann),
616, para 47 (Lord Hobhouse of Woodborough). The same justification has
been given, irrespective of whether litigation was contemplated, by the
Supreme Court of the United States and the High Court of Australia: see
*Upjohn Co v United States* 449 US 383, 389, 397–402, *Swidler & Berlin v
United States* (1998) 524 US 399 (which says the same as *Upjohn*), 403;
*Esso Australia Resources Ltd v Comr of Taxation of the Commonwealth of
D  Australia* (1999) 201 CLR 49, 64–65, para 35 and *Daniels Corpn
International Pty Ltd v Australian Competition and Consumer Commission*
(2002) 192 ALR 561, 573–574, para 44, 583–584, paras 85–87. Their
jurisprudence is ultimately derived from English law, and their legal
procedures are broadly comparable to English procedures, but equivalent
protection for lawyer-client communications is justified on the same basis in
E  the jurisprudence of the European Court of Justice and the European Court
of Human Rights: see *A M & S Europe Ltd v Commission of the European
Communities* (Case 155/79) [1983] QB 878, 892–898, 909–919, especially
at pp 913, 949–951. Article 6 of the Convention for the Protection of
Human Rights and Fundamental Freedoms applies where litigation is
contemplated and article 8 where it is not: see *Campbell v United Kingdom*
(1992) 15 EHRR 137, 160–161, paras 46, 48. [Reference was also made to
F  *Descoteaux v Mierzwinski* (1982) 141 DLR (3d) 590; *Jones v Smith* [1999]
1 SCR 455; *Comr of Inland Revenue v West-Walker* [1954] NZLR 191;
*Baker v Campbell* (1983) 153 CLR 52 and *R (Daly) v Secretary of State for
the Home Department* [2001] 2 AC 532.]
    On (3), it follows from the rationale of lawyer-client communication
privilege and of legal professional privilege generally that whatever "legal
G  advice" may mean it must be the same whether litigation is contemplated
or not, because there is no distinct privilege for litigation except in the
case of third party communications. If the privilege for lawyer-client
communications does not extend to "presentational advice", logically it
would not extend to it in litigation either. The creation of a special head of
privilege for litigation in respect of lawyer-client communications would
conflict not only with previous decisions of the House of Lords but also with
H  the policy underlying the privilege and its rationale. The Court of Appeal's,
and the claimants', approach lumps together wholly transactional advice
with proceedings before a tribunal liable to make contentious findings
against those involved. The documents in question in *Balabel v Air India*
[1988] Ch 317 were created long before there was any question of litigation.

**456**

616
**Three Rivers DC v Bank of England (No 6) (HL(E))**          [2005] 1 AC

*Balabel* achieves a satisfactory balance between the various considerations involved and ought to be followed. The only authority for a limitation of the privilege to advice about legal rights or obligations is the 16th Report of the Law Reform Committee, Privilege in Civil Proceedings (1967) (Cmnd 3472): see paras 7, 17, 18 and 19. The suggestion in paragraph 17 that all legal professional privilege, even for lawyer-client communications, is connected to the adversarial nature of English procedure is wrong. The authorities quite clearly show that it is only the privilege for third party communications that depends on litigation or the exigencies of the adversary system. The only relevance of the adversary system is in the context of the principle that protects the confidentiality of the adversary's brief for trial, and that is relevant to third party communications only. The suggestions in paragraphs 18 and 19 as to the privilege being in aid of litigation reflect the view current at the time when the report was published, as expressed by Lord Diplock in *Parry-Jones v Law Society* [1969] 1 Ch 1 but rejected in *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563. The modern law recognises that it is not simply a rule of evidence nor simply a procedural adjunct to the processes of litigation but a substantive personal right. [Reference was also made to *Greenough v Gaskell* 1 M & K 98; *Carpmael v Powis* (1846) 1 Ph 687 and *Minter v Priest* [1929] 1 KB 655.]

On (4), only *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 has suggested a distinction between litigation and other proceedings, and then for a purpose that has nothing to do with the protection of the confidential relationship between lawyer and client, namely the protection of third party communications. One of the vices of the Court of Appeal's judgment, as a number of commentators have observed, is that it produces a drastic limitation on the scope of privilege for transactional advice, which is very often not concerned, or not exclusively concerned, with legal rights and liabilities. It is not the case that advice on transactions does not require the protection of privilege to encourage candour. An advocate dealing with the facts is as much, if nor more, dependent on candour from his client as an adviser on points of law. [Reference was made to the Report of the Royal Commission on Tribunals of Inquiry (1966) (Cmnd 3121) ("the Salmon Inquiry"), pp 17–18, paras 30, 32 (principles 3, 4 and 6); the Report of the Inquiry into the Export of Defence Equipment and Dual-Use Goods to Iraq and Related Prosecutions (Sir Richard Scott V-C), 15 February 1996 ("the Scott Inquiry"), paras A2.4, p 761, K1.3, p 1743, K1.4, pp 1744–1746, K1.6, p 1757 and App A, Pt D1(i) ("Proposed Procedure for Hearings"), para 3(d); "Effective Inquiries: A consultation paper produced by the Department for Constituitonal Affairs", Cons Ppr CP 12/04 (6 May 2004) ("the DCA Consultation Paper"), para 10, p 12 and Phillips LJ's Chairman's Note on Lawyers (the BSE inquiry) (5 November 1998).] *R (Amin) v Secretary of State for the Home Department* [2004] 1 AC 653 (see at paras 15, 31 and 38, pp 661–662, 672 and 673) recognises, first, that an inquisitional inquiry may have a vital role in attributing blame, albeit that it may not itself fix the legal consequences of that blame; secondly, that even in the context of an inquiry that is not fixing the legal consequences of blame the right to consult a lawyer may in appropriate cases be a basic right, which the family in that case had. The family was similarly represented at the Hutton Inquiry. The availability of skilled legal advice to witnesses and those under investigation assists the efficient conduct of the inquiry and thus

457

A   serves the public interest. The immediate effect of the Court of Appeal's judgment is likely to be that lawyers will have to advise their clients not to cooperate with inquiries that lack statutory powers of compulsion.

The identity of the client when the lawyer is instructed by a corporation is ascertained by referring to the policy justifying the privilege, namely to encourage complete candour in imparting the facts to the lawyer. A corporate client, which can only act through agents, does that by whichever of his employees performs that function. The distinction drawn by the Court of Appeal between employees who give the lawyers their formal instructions and receive their advice and employees who supply information about what happened is inconsistent with the purpose of the privilege. [Reference was made to *Upjohn Co v United States* 449 US 383; *Anderson v Bank of British Columbia* 2 Ch D 644, 657 and *Wheeler v Le Marchant* 17 Ch D 675.]

On (5), any rule about privilege has to be sufficiently clear-cut to enable a client to know exactly what will be privileged and what will not: see *B v Auckland District Law Society* [2003] 2 AC 736. The Court of Appeal's distinction between legal and presentational advice is practically impossible to make. [Reference was made to *Three Rivers District Council v Bank of Credit and Commerce International SA* [2003] EWHC 2565 (Comm), para 8 (Tomlinson J).]

The Court of Appeal may have been misled by the habitual classification of legal professional privilege under the heads of "litigation privilege" and "legal advice privilege". "Litigation privilege" should properly be used only to describe a head of privilege that depends for its existence on litigation being in progress or contemplated. The only category of documents that falls under this head is that of communications between lawyer or client on the one hand and a true third party on the other. None of the restrictions on the scope of privilege for third party communications has any bearing on the privilege for lawyer-client communications, which does not differ as between litigation and other proceedings: see *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 24–25. The distinction between litigation and other occasions for taking legal advice was only introduced to deal with issues relating to true third party communications. Even as applied thereto, the distinction between litigation and other proceedings turns on the adversarial character of litigation, not on the fact that it is concerned with legal rights and obligations. There is nothing about the inquisitorial nature of some proceedings that makes it less appropriate to protect the confidentiality of lawyer-client communications relating to them. The fine distinctions underlying the Court of Appeal's decision are not rational or workable.

The Court of Appeal's distinction between "legal" and "presentational" advice is unsupportable. General formulations are not wholly consistent and tend to be sensitive to the factual context, but they generally treat legal advice as synonymous with legal assistance and refer to the test as turning on whether the communication related to matters within the ordinary scope of a lawyer's professional employment. Taylor LJ's modern formulation of the principle in *Balabel v Air India* [1988] Ch 317, 330–332 accords with the authorities, reflects a realistic view of the professional functions of lawyers and achieves a proper balance between the need to protect confidential communications between a lawyer and his client and the need to prevent

618
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC

abuses arising from the artificial interposition of a lawyer in cases where he    *A*
has no specifically legal function to perform. A rule that limited the privilege
to communications for the purpose of seeking or giving advice about legal
rights and obligations would frequently frustrate its purpose. A client whose
confidences are subsequently to become the subject of a claim to protection
will often have no idea whether his problem gives rise to a legal issue, a
presentational issue or some combination of the two, or whether it may do    *B*
so in the future. An understanding of the work of tribunals, the objective
analysis of documentary and oral evidence, independence of judgment about
fact and persuasiveness in its presentation are all specifically legal skills. The
dividing line between presentational and legal advice will often be unclear.
Much apparently presentational advice will be guided by the adviser's views
about the law that are not expressed and on which he is not expected to
advise.    *C*
     There are many tribunals proceedings before which are undoubtedly legal
proceedings but that are not litigation and not concerned with legal rights or
obligations, e g planning inquiries, coroners' inquests and many inquiries
into accidents and disasters. Care proceedings under the Children Act 1989
are not litigation: see *In re L (A Minor) (Police Investigation: Privilege)*
[1997] AC 16. It would appear to follow from the Court of Appeal's    *D*
judgments that advice given by a lawyer to, say, an objector at a planning
inquiry or a parent represented in care proceedings cannot be regarded as
legal advice and is not privileged. This gives rise to potential injustice. By
contrast, privilege in respect of lawyer-client communications may be
claimed in situations where not only is there no litigation but there are no
proceedings at all, e g where a statutory power to requisition information is
conferred on an administrative body such as the Inland Revenue or the    *E*
Office of Fair Trading. Unless the statute specifically provides otherwise, a
power to requisition information, however widely framed, is subject to any
privilege that may subsist in the information sought: see *R (Morgan Grenfell
& Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563 and *B v
Auckland District Law Society* [2003] 2 AC 736.
     The Court of Appeal [2004] QB 916, 933–934 recognised that its narrow
test of "legal advice" would produce unacceptable anomalies. It appears to    *F*
have considered that there were some professional relationships between
lawyer and client that would attract legal professional privilege regardless of
whether any legal rights or obligations were in play and others that would
not (see at p 934, para 34), but it proposed no principled test for
distinguishing between one category and another. If advice about how to
present the facts is "legal advice" when the client is worried about being sued    *G*
or prosecuted before another tribunal, it should not be different when the
client is worried about his reputation. What is legal advice must depend on
the nature of the advice and the context in which it is given, not on the
motive of the client in asking for it. The Court of Appeal's suggestion that a
party's concern for its reputation might entitle it to take presentational
advice from a lawyer with the protection of legal professional privilege if it
were an individual but not if it were a corporation gives rise to insuperable    *H*
problems in the common situation where an employer and the employees
involved jointly instruct and receive advice from a lawyer.
     It is clear on the authorities, and was implicitly accepted by the Court of
Appeal, that there is no distinction between "legal" and "presentational"

advice in the case of lawyer-client communications concerning actual or anticipated litigation. Since there is a single head of privilege for lawyer-client communications, based on the same policy considerations and having the same ambit, whether litigation is contemplated or not, the real question is not whether the Bingham Inquiry was "litigation" but whether the role of solicitors and counsel in assisting the Bank to present its evidence to the Bingham Inquiry in the most favourable light was, in Taylor LJ's phrase in *Balabel v Air India* [1988] Ch 317, 332, "advice and assistance of a specifically legal nature". It plainly was. It is plain from the report of the Salmon Inquiry (Cmnd 3121), paras 30 and 32, pp 17–18, especially the third of the six "cardinal" principles, at para 32, p 18, the report of the Scott Inquiry (1996) (non-statutory) and Phillips LJ's "Chairman's Note on Lawyers" (1998) regarding the conduct of the BSE inquiry (non-statutory) that the fact that participants may be criticised is sufficient justification for the involvement of lawyers, even in contexts (such as the Scott Inquiry and the Phillips Inquiry) where there is no real prospect of civil liability. It is equally plain that the specifically legal skills that justify their involvement are not only, or even mainly, in the realm of advice about legal rights and obligations. The main benefits lie in their capacity to give skilled advice about fact and their experience in the handling of evidence. If the decision of the Court of Appeal stands, a lawyer will be bound to warn his client that what he says to him may be liable to subsequent disclosure. The inhibiting effect of this on the client must be obvious, even if there is no prospect of subsequent litigation on the same subject. It would be highly undesirable to depart from the policy underlying the privilege at a time when (i) the proliferation of legal and regulatory intervention in people's lives makes it more necessary than ever, (ii) the resort to tribunals other than ordinary courts of law is increasingly common, and (iii) the policy has been reaffirmed by the courts of the major common law jurisdictions and adopted as necessary in the interests of justice by international courts of great eminence applying treaties that are part of the law of the United Kingdom. It is not appropriate, save in exceptional circumstances, to depart from established legal policy on which practitioners will have relied.

Although the Bingham Inquiry may not have been concerned with legal rights and obligations in private law, it was certainly concerned with the performance of the Bank of England's legal duties. Those duties were enforceable in the ordinary courts by all the ordinary public law remedies and, in the case of bad faith, by private law remedies as well. The role of the Bank's lawyers in defending the Bank's performance of its duties before the Bingham Inquiry was no different in principle from the role that they would have played in defending it on judicial review or in a civil action for damages where bad faith was alleged. The evidence was that the Bank was concerned about the prospect of civil litigation, as, in hindsight, it had good reason to be. It was not its main concern, but it was significant. Tomlinson J [2002] EWHC 2730 (Comm), para 15 regarded the risk of litigation as "obvious".

[Reference was also made to section 1(4) of the Banking Act 1987 and *Three Rivers District Council v Governor and Company of the Bank of England* [2002] EWHC 1118 (Comm).]

*Gordon Pollock QC*, *Barry Isaacs* and *Nathan Pillow* for the claimants. Following the decision in *Three Rivers District Council v Governor and*

**460**

*Company of the Bank of England (No 5)* [2003] QB 1556 the Bank disclosed    A
interview notes and various statements, which proved to be a veritable gold-
mine of factual information as to what had happened during its years of
supervision of BCCI and as to what various of its officials had really thought.
That is a stark reminder that the natural use of privilege is to conceal from
the court relevant material and demonstrates the extent to which the trial
judge in the present case would have been misled had the Bank succeeded in    B
its attempt to keep secret the contemporaneous account of events that it
obtained from its officials and ex-officials.  During the course of argument in
*Three Rivers (No 5)* Sedley LJ commented on the oddity of a public
institution such as the Bank seeking to hide such matters from view.  It is
because of the fact that privilege can be used in this way that the courts have
warned of the need to ensure that privilege is jealously watched and kept
within its proper bounds: see per Lord Edmund-Davies in *Waugh v British*    C
*Railways Board* [1980] AC 521, 543B–D, Bingham LJ in *Ventouris v*
*Mountain* [1991] 1 WLR 607, 611–612 and Taylor LJ in *Balabel v Air India*
[1988] Ch 317, 331–332.

The Bank's submission that the judge and the Court of Appeal were
wrong to conclude that legal advice in the context of legal advice privilege
was limited to advice concerning the Bank's rights and liabilities and that its    D
proper meaning was advice given "in the course of a professional
relationship between lawyer and client . . . for the purpose of enabling the
client to obtain advice and assistance of a legal nature" is unsupported by
any extant authority and inconsistent with authority.   The similar
proposition advanced by it below to the effect that "once a solicitor had been
instructed, legal advice privilege extended to all communications between
solicitor and client on matters within the ordinary business of the solicitor    E
and referable to the relationship" was the formulation advanced and
rejected by the Court of Appeal in *Balabel v Air India*.

The Bank's case mischaracterises both the issues and the reasoning and
approach of the Court of Appeal.   The Court of Appeal founded its
judgments in both appeals not on the a priori starting point that legal
professional privilege was a privilege in aid of litigation but on a careful    F
analysis of the authorities and the conclusion that they provided a binding
answer.

Privilege should not be allowed to stray beyond the limit justified by the
particular nature of each different type of situation in which it arises.  In this
respect, there is inevitably a difference between litigation privilege and
privilege in a non-litigious context.  In the context of adversarial litigation
there is little difficulty in identifying the powerful countervailing factors that    G
are sufficiently weighty to outweigh the fundamental principle that all
relevant material should be before the court.   One of these is that the
material that is granted the cloak of privilege does not pre-exist the
litigation.

The Bingham Inquiry was a private internal inquiry in respect of which
the relationship of Bingham LJ to his appointers was founded in contract.
He had no compulsory powers; he could administer no oaths; there was no    H
penalty against either the Bank or anyone else in the event that he was lied to
or if relevant material was suppressed and he could do no more than express
his opinion as to what had happened and why.  His report determined no
legal questions and no liabilities.  His inquiry was thus entirely different

A    from adversarial court proceedings, from non-adversarial proceedings before a judicial or quasi-judicial tribunal such as care proceedings, or from a statutory inquiry. The purpose of an inquiry is to establish facts. In so far as in establishing the facts an inquiry will lead to a situation in which, if those facts are subsequently raised in a trial, there will be legal consequences, there will be scope for legal advice privilege to come into play.

B    On the facts and in the nature of the Bingham Inquiry, however, there were not going to be legal consequences. Compare someone refused membership of a club, or not getting promotion. As to the relationship between inquiries and other proceedings, see the DCA Consultation Paper, paras 38–40, pp 19–20.

The Bank is attempting to sidestep In re *L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 and introduce the concept of a quasi-

C    litigation privilege by the back door. If there is a gap in the law between litigation privilege and legal advice privilege that the existence of inquiries demands should be filled, it should be filled by legislation after full and careful consideration by the bodies best suited for that purpose of, inter alia, what type of inquiries should attract the new type of privilege.

The claimants advance the following propositions. (1) The origin of the modern doctrine of legal professional privilege (from, say, the *Duchess of*

D    *Kingston's Case* 20 St Tr 355 onwards) lies in litigation privilege, a privilege in aid of litigation. The rule that legal advice privilege could be claimed in circumstances that did not involve actual or anticipated litigation was an outgrowth and extension of legal professional privilege. (2) The public purpose served by absolute privilege is the satisfactory administration of justice. (3) The administration of justice is concerned with all those matters

E    that impact on the legal position of the individual (including a corporation), whether in the carrying on of his affairs or in appearing in a criminal or a civil court or in appearing before an administrative tribunal or any other body where his legal position may be at risk. (4) Every authority supports the idea that the scope of legal advice privilege is limited to matters that relate to the legal position of the client or are necessarily ancillary thereto.

On (1), see the Law Reform Committee's Sixteenth Report on Privilege in

F    Civil Proceedings (1967) (Cmnd 3472), para 41, accepted as correct by Lord Edmund-Davies in *D v National Society for the Prevention of Cruelty to Children* [1978] AC 171, 244; *Ventouris v Mountain* [1991] 1 WLR 607, 617–618 and *Baker v Campbell* 153 CLR 52, 94–95.

On (2), see *Bolton v Liverpool Corpn* (1833) 1 M & K 88; *Greenough v Gaskell* 1 M & K 98; *Southwark and Vauxhall Water Co v Quick* 3 QBD

G    315; *Bullivant v Attorney General for Victoria* [1901] AC 196; *O'Rourke v Darbishire* [1920] AC 581; *Hobbs v Hobbs and Cousens* [1960] P 112; *R v Derby Magistrates' Court, Ex p B* [1996] AC 487; *B v Auckland District Law Society* [2003] 2 AC 736, 757, para 47 and *Esso Australia Resources Ltd v Comr of Taxation of the Commonwealth of Australia* (1999) 201 CLR 49, 54. There is no suggestion in any of these cases that privilege is granted because it is convenient, or even important, for the client to be able

H    to keep matters secret except in connection with the administration of justice, all the ways of describing which are connected with litigation or the ordering of a client's legal affairs. Equally, there is nothing to suggest that it is public policy to encourage candour save where the administration of justice requires it.

On (3), there is no case in which it has been suggested that forensic    *A*
assistance in a non-legal context would be covered by legal professional
privilege: see *Herring v Clobery* 1 Ph 91; *Wheeler v Le Marchant* 17 Ch D
675, 681; *Minter v Priest* [1929] 1 KB 655; *Waugh v British Railways Board*
[1980] AC 521, 542; *R (Morgan Grenfell & Co Ltd) v Special Comr of
Income Tax* [2003] 1 AC 563, 606–607 (Lord Hoffmann); *Jones v Smith*
[1999] 1 SCR 455, 474–475 and *Wigmore, Evidence in Trials at Common
Law*, vol 8, rev McNaughton (1961), pp 543–572 (as to "subjectively",    *B*
at p 543, see Foster v Hall (1831) 29 Mass (12 Pick) 89, 554).

The Law Reform Committee in their Sixteenth Report on Privilege in
Civil Proceedings (Cmnd 3472), paras 17–20 and 41 rejected the distinction
between privilege in support of litigation and privilege in protection of a
confidential relationship and concluded that legal advice privilege was not to
be classified as a form of protection of a confidential relationship but was an    *C*
outgrowth of privilege in aid of litigation. The importance of that approach
was that it focused the subject matter of legal advice privilege on the subject
matter of litigation, namely rights and obligations that exist as a matter of
law and are enforceable at law. It is hardly surprising that the Court of
Appeal should have adopted the analysis of legal advice privilege as an
outgrowth of litigation in view of the fact that such a view was supported by    *D*
the authorities and the Law Reform Committee.

As to the authorities relied on by the Court of Appeal, *Wheeler v Le
Marchant* 17 Ch D 675 shows that in the absence of litigation the scope of
privilege is to be closely confined. Non-litigation privilege involves a
balancing exercise wholly different from that which has led to the wide
scope of litigation privilege. Advice given by a lawyer to his client in a non-
litigious situation as to the latter's legal rights and liabilities, which    *E*
encompasses advice given as to the entering into and carrying out of a legal
transaction, attracts legal advice privilege, but it will not be extended
beyond direct communications between the client himself and his lawyer to
the ancillary communications in which relevant factual material is collected
or transmitted. Its scope should be restricted to the bare minimum necessary
to accord with decided authority. The Bank's approach, seeking to give it
the same broad scope as litigation privilege, is to be resisted. Both authority    *F*
and principle combine in the conclusion that advice as to the presentation of
facts in a context devoid of perceived legal consequences should not be
immune to the ordinary processes of discovery in some subsequent legal
proceedings. It never crossed the Bank's mind that as a result of the Bingham
Inquiry there would be any legal consequences in the sense that it would be
sued. That was because the only relevant possibility for suit was misfeasance    *G*
in public office.

*Waugh v British Railways Board* [1980] AC 521, adopting a dictum of
Barwick CJ, dissenting, in *Grant v Downs* (1976) 135 CLR 674, established
dominant purpose as the test for both categories of privilege, litigation and
non-litigation. The dominant purpose test was advanced by the Bank before
Tomlinson J [REF] and he accepted it. It was prominent in the Bank's
skeleton argument in the Court of Appeal. It may not matter if it has    *H*
abandoned it, because if a communication with a lawyer is not for the
purpose of seeking advice it seems unlikely that privilege should attach. The
claimants' case before the Court of Appeal, as before Tomlinson J, was that
preparatory material did not fall within the scope of potentially privileged

A communications. One has first to define the category of communications that are capable of falling within the scope of legal advice privilege and then apply the dominant purpose test to any communication within that category. It can only be applied to communications between a client and his lawyer. The only way in which one can test whether something like the report in *Waugh v British Railways Board* [1980] AC 521 is privileged is by asking what was the dominant purpose for which the communication

B between signalman X or railwayman Y and the author of the report took place.

"Legal advice" cannot be characterised as advice given by someone who happens to be a lawyer. It is the nature of the advice rather than its source that is relevant. For legal advice privilege the test is whether the advice being sought and given is advice given by a lawyer on a matter falling within the

C expertise of a lawyer as such, that is, as a man of the law rather than as a man of business or as an advocate: advice that only a lawyer can give. A considerable body of authority demonstrates that the courts have defined legal advice privilege by reference to the seeking of advice as to legal rights and obligations. In so far as presentational advice or assistance was concerned, that arose in connection with litigation and fell within the scope of litigation privilege. The flaw that underlies the Bank's approach, whether

D it uses the phrase "legal advice and assistance" or "advice and assistance of a legal nature", is that it is driven logically to separate the source of the advice and assistance from its nature or content and thereby in effect simply advance the formulation rejected in *Balabel v Air India* [1988] Ch 317 in a different guise.

There is no fundamental human right involved where there is merely the

E exercise of presentational skills in a context devoid of legal consequence. There is a distinction between legal skill and forensic skill.

[LORD SCOTT OF FOSCOTE.    When you say "devoid of legal consequence, does that mean legal consequence actually foreseen at the time or any legal consequence that is foreseeable?]

The approach to legal professional privilege has to be subjective: see *Wigmore, Evidence in Trials at Common Law*, vol 8, p 543, para 2290. One

F has to look at what the person who wishes to claim it thought at the time. That follows once one accepts that the purpose of the privilege is to promote candour and security in the mind of the client. For an example, see *United States of America v Philip Morris Inc* [2004] EWCA Civ 330. As to candour, see per Lord Wilberforce in *Waugh v British Railways Board* [1980] AC 521, 531; see also per Lord Edmund-Davies, at p 543.

G As to *Waugh*, it is not said anywhere that it was conceded to be a third party case, but it was treated in the present case throughout on the basis that the only privilege that could be claimed was litigation privilege, so that it would not seem to have occurred to anyone that legal advice privilege had any role to play. The claimants do not dissent from what was said in *Balabel v Air India* [1988] Ch 317: that if a solicitor carries out a legal transaction for a client the whole continuum of communication dealing with that

H transaction should be covered by legal advice privilege. [Reference was also made to *Smurfit Paribas Bank Ltd v AAB Export Finance Ltd* [1990] 1 IR 469 and *Wheeler v Le Marchant* 17 Ch D 675, 681.]

The practical effect of the Court of Appeal's rulings is in fact fairly limited. *Three Rivers (No 5)* [2003] QB 1556 was primarily concerned with

the question whether a fact-gathering exercise that was undertaken for the
purpose of an internal inquiry and where litigation, if contemplated at all,
was certainly not the dominant purpose of the exercise could be cloaked in
privilege if subsequent litigation arose. The House of Lords had clearly and
unequivocally held in *Waugh v British Railways Board* [1980] AC 521 that
privilege did not arise, and it would therefore seem unlikely that the decision
in *Three Rivers (No 5)* could have come as a surprise. In the Court of Appeal
in the present case the claimants advanced a very limited case, and it was
that case that was accepted. It was that on the peculiar facts of the case,
where one had an internal inquiry involving an institution that enjoyed a
statutory immunity from ordinary legal liability, it was possible to argue
that, in so far as the institution sought advice on purely presentational
matters that were not perceived as having any potential legal consequences,
that advice fell outside the scope of legal advice privilege. It has always been
accepted by the claimants that if an inquiry was reasonably believed to have
legal consequences for, say, a witness, and if the purpose of that witness
seeking legal advice was to enable him to present his case to avoid adverse
legal consequences, then legal advice privilege would be available. As the
Court of Appeal put it in *Balabel v Air India* [1988] Ch 317, advice as to
what to do in a specifically legal context falls within the concept of legal
advice. In a large number of inquiries there are likely to be legal
consequences for those involved, and in so far as they consult lawyers
because they are concerned as to those legal consequences it is likely that
their communications with their lawyers will fall within the scope of legal
advice privilege. It is only in the comparatively rare case where legal
consequences can be seen to be absent that the present issue arises. A risk to
reputation, devoid of legal consequence, is no sound ground for the creation
of privilege.

It is clear from the language of the judgments of those authorities that
have considered the issue of parties to communications that the term "third
party" is used to mean anyone who is not the client. There is no distinction
drawn between "true" and "pseudo" third parties. Moreover, the two
modern cases on the topic, *In re Highgrade Traders Ltd* [1984] BCLC 151
(see at pp 164–165) and *Price Waterhouse v BCCI Holdings (Luxembourg)
SA* [1992] BCLC 583, are inconsistent with any such distinction. On the
Bank's case *Wheeler v Le Marchant* 17 Ch D 675 is an anomaly, because
there is no rational difference between a communication with a solicitor by
an in-house surveyor providing information and one by an independent
contractor surveyor doing the same thing.

The "client" is the person actually seeking the advice, ie giving
instructions as to what he wants to know. That is a different type of
communication from that where a person is simply conveying factual
material.

[LORD SCOTT OF FOSCOTE. If the communication was sent by an agent
acting on instructions from his principal, would that be protected by the
principal's privilege?]

The question always goes back to the purpose of the communication: is it
merely the transmission of information or is it seeking or receiving advice:
giving instructions? That is the distinction. It has nothing to do with who is
the client. People who give instructions are those who are authorised on
behalf of the client to instruct the lawyer.

625
[2005] 1 AC                              Three Rivers DC v Bank of England (No 6) (HL(E))

A    Longmore J decided the matter correctly on the basis of precedent.
     As to *Upjohn Co v United States* 449 US 383, Burger CJ stated the rule as
     applying to employees and ex-employees.  All subsequent lower court
     decisions in the United States have followed his lead.

     *Jonathan Crow* for the Attorney General (written submissions).  For the
     reasons given in the Bank's and the Law Society's cases, the correct test for
B    the application of legal advice privilege is that set out in *Balabel v Air India*
     [1988] Ch 317, in particular at pp 330–332.  The Court of Appeal's
     judgment is wrong.  In particular: (i) it is incompatible with the public policy
     on which legal professional privilege is based; (ii) it is based on too narrow a
     definition of "legal advice"; (iii) it introduces an unwarranted distinction
     between individual and corporate witnesses and (iv) it is inconsistent with
     previous authority.
C    As to public policy, and the statement in paragraph 39 of the Court of
     Appeal's judgment [2004] QB 916, 935 that "it is not easy to see why
     communications with a solicitor should be privileged", the courts in the
     United Kingdom have for more than 150 years regarded legal advice
     privilege as being a fundamental right and an inviolable safeguard of the
     interests of justice: see per Lord Brougham LC in *Greenough v Gaskell* 1
D    M & K 98, 103 and Lord Hoffmann in *R (Morgan Grenfell & Co Ltd) v
     Special Comr of Income Tax* [2003] 1 AC 563, 606–607, para 7.  The same
     public policy imperative requires that not only should any instructions from
     the client to the lawyer be protected but also any advice from the lawyer to
     the client.  A similar approach has been taken in Scotland with regard to
     "confidentiality of communications": see per Lord Wood in *McCowan v
E    Wright* (1852) 15 D 229, 237 (obiter).  It is clear from these authorities that
     the policy basis for the privilege in relation to lawyer-client communications
     is exactly the same whether or not litigation is in progress or contemplation.
     Further, the policy basis for legal professional privilege is driven by entirely
     pragmatic considerations, namely the public benefits of clients having
     professional legal advice and assistance and the consequent need to ensure
     absolute candour and trust between lawyers and their clients.  As a result,
F    the rule must be clear in its application, so that an absolute assurance of
     confidentiality can be given to the client: see, e g, *B v Auckland District Law
     Society* [2003] 2 AC 736, 759, para 54.  By contrast, the Court of Appeal's
     comments would, if adopted, introduce an undesirable element of
     uncertainty.  It questions the need for legal professional privilege where
     "litigation is not anticipated" (see [2004] QB 916, 935, para 39), but no one
G    ever knows whether or when they may be sued, nor whether or when they
     may need to sue someone else.
     Given the important functions that inquisitorial proceedings now fulfil,
     the public policy on which legal professional privilege is based should lead to
     its scope being the same in relation to such proceedings as it is in relation to
     litigation.  As to "the purposes of such an investigation" (there an inquest),
     see per Lord Bingham of Cornhill in *R (Amin) v Secretary of State for the
H    Home Department* [2004] 1 AC 653, 672, para 31: thus an inquiry is easily
     capable of being highly confrontational, if not technically adversarial, and
     the resultant report is capable of having considerable influence both in the
     public eye and in subsequent proceedings even though the investigation does
     not in itself determine any legal rights or liabilities.  Furthermore, whilst it is

1 AC 2005—23

466

correct to say that inquiries involve the determination of facts rather than
the determination of legal rights and liabilities, that fact-finding exercise can
involve a significant element of apportionment of blame.  The fact that
inquiries generally raise matters of wider public concern rather than dealing
with purely private law rights suggests that the public interest in ensuring a
fair and proper disposal by allowing the participants to rely on legal
professional privilege is heightened, not lessened, when compared with
purely private interest litigation.  The importance of legal professional
privilege is also heightened by the fact that public inquiries often have to
handle an enormous volume of information, that the issues may be very
wide-ranging, that there are no pleadings and no claimant or defendant to
define those issues in advance and that as a result the potential for
disagreement between the witnesses may be, and the range and targets of any
potential criticism by the tribunal will be, unclear at the outset.

An inquest (i e, an inquisitorial process) will in general be capable of
satisfying the requirement for an effective official investigation under
article 2 of the Convention on Human Rights: see *R (Middleton) v West
Somerset Coroner* [2004] 2 AC 182, 198, para 20.  If, however, the Court of
Appeal's analysis is correct, legal professional privilege may not be available
to any party giving evidence at such an inquest.  There can be no public
policy justification for this.  Legal professional privilege is recognised in
criminal proceedings in other jurisdictions where the criminal process is
inquisitorial.  The European Court of Human Rights has recognised the
importance of legal professional privilege generally (see *Campbell v United
Kingdom* 15 EHRR 137, 160–161, paras 46–48 and *Foxley v United
Kingdom* (2000) 31 EHRR 637, 647, para 43) and the importance of legal
representation in relation to inquisitorial proceedings in particular: see
*R (Amin) v Secretary of State for the Home Department* [2004] 1 AC 653,
661–662, 673, paras 15 and 38.  Where advocacy is restricted it becomes
even more important, in the interests of preserving both the underlying aim
of fairness and the effectiveness of the inquiry, that witnesses should have
adequate legal advice and assistance in preparing for their participation in it.

The Court of Appeal's judgment creates uncertainty by requiring the
court to determine the dominant purpose for which the advice was sought.
It draws an unworkable distinction between presentational and substantive
advice and between reputational and legal concerns.  Although it is in terms
directed towards legal professional privilege in relation to an inquiry, it not
clear how its test would impact on it as it applies in litigation.  It is no answer
to the Government's concern to suggest that any reluctance on the part of
witnesses to co-operate with tribunals of inquiry could be overcome by the
exercise of powers of compulsion.  The same is true of litigation properly so
called.   The court has power to summon witnesses, but no power of
compulsion can cure the vice identified by Lord Brougham LC in *Greenough
v Gaskell* 1 M & K 98, 103, which is the foundation for the rule protecting
legal professional privilege, otherwise legal advice privilege would never
have arisen.  In any event, not all inquiries have compulsory powers: non-
statutory inquiries do not.  Furthermore, even where compulsory powers are
available it is widely regarded as undesirable for them to be used.

The practical effect of the Court of Appeal's judgment on current
inquiries is that it will inevitably cause huge delays and increased cost
because an enormous amount of further work will now have to be

undertaken. The judgment may also undermine public confidence in the inquiry system: findings that have hitherto stood on the basis of the evidence adduced at the inquiry will now be open to attack on the ground that they were reached without sight of all the relevant material because legal professional privilege was wrongly claimed by witnesses. This may also prompt demands for past inquiries to be reopened, or for new inquiries to be held.

*Charles Hollander QC* for the Bar Council. Issues as to the ambit of legal professional privilege constantly arise for members of the Bar. It is important for them, as also for their clients and the wider administration of justice, that rules as to its ambit should be capable of application on a day-to-day basis with ease and certainty.

Privilege is a fundamental right (see *R v Derby Magistrates' Court, Ex p B* [1996] AC 487; *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563 and *Daniels Corpn International Pty Ltd v Australian Competition and Consumer Commission* (2002) 192 ALR 561), but there is no reference to this approach in the Court of Appeal's judgment. It derived support for its conclusion (see [2004] QB 916, 930, para 25) from the Sixteenth report of the Law Reform Committee, Privilege in Civil Proceedings (Cmnd 3472), para 18, where legal advice privilege was described as "a privilege in aid of litigation". The narrow view of the law of privilege stated in paragraph 1 of the report was most notably espoused by Diplock LJ in *Parry-Jones v Law Society* [1969] 1 Ch 1, 9, shortly after its publication. In *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax*, at p 611, para 28 Lord Hoffmann cited the relevant passage from Diplock LJ's judgment, but he concluded, at pp 611–612, para 30 that legal professional privilege was not so limited. The report was published in 1967. Diplock LJ was a member. The conclusion in paragraph 18 no doubt reflects the narrower view then prevalent.

The public policy justification for legal professional privilege rests on the need for the client to be able freely to unburden himself to his lawyer: see *R v Derby Magistrates' Court, Ex p B*, p 507 (Lord Taylor of Gosforth CJ). The Court of Appeal's distinction between those proceedings that determine rights and liabilities and those that are concerned merely with reputational issues is a dangerous one.

Although a person who is asked to give evidence to an inquiry is merely a witness the rationale that protects privileged communications from disclosure applies as such to such a person. Even where the inquiry has no statutory powers, witnesses may in practice have little choice but to give evidence. They may be oblivious as to some or all of the potential consequences of their evidence and appearance before the inquiry. If the test for privilege were to depend on their subjective purpose in seeking advice, it might lead to anomalous results. On the basis of the Court of Appeal's judgment it would be possible for an order for disclosure to be made in the course of the same inquiry. It would seem to follow that the lawyers could be called to give evidence as to what they had been told in the very inquiry in which they continued to represent their clients. The lawyer's assistance may be required with an eye on subsequent litigation or criminal proceedings, but the public policy justification for the application of legal professional privilege is not limited to such cases. In very many inquiries, the proper and

628
**Three Rivers DC v Bank of England (No 6) (HL(E))**          [2005] 1 AC

expeditious conduct of the inquiry is facilitated by the parties seeking legal    A
assistance that will enable them to make admissions, focus on those matters
that are relevant and otherwise assist the tribunal.  The Court of Appeal's
judgment does not recognise the need for the lawyer to use his professional
experience and expertise to give the client strategic advice before making
submissions and giving evidence.

Moreover, many forms of non-adversarial process (such as a tax    B
investigation, a DTI investigation or a Financial Services Authority
investigation under the Financial Services and Markets Act 2000) may not
themselves involve the determination of legal rights and obligations but lead
on to proceedings that will do so.  It is difficult in this regard to see the
distinction between such investigations and inquiries.

The test in *Balabel v Air India* [1988] Ch 317 has not caused    C
difficulties in its practical application.  The application of the Court of
Appeal's judgment in the present case will give rise to significant
practical problems.  It seems to follow from it that where the dominant
purpose of a retainer (or part of a retainer) is not treated as being for
advice as to legal rights and obligations there is no "continuum".  The
"continuum" appears to assume a dominant purpose that in these
circumstances is by definition absent.  It presumably follows that in such    D
circumstances each communication passing between lawyer and client
must be reviewed individually for consideration as to whether it seeks or
contains advice as to legal rights and liabilities.  Problems will arise
where, for example, a communication contains a single sentence of
advice as to legal rights and obligations and two pages of legal assistance
falling outside the "legal rights and obligations" test.  Should one treat    E
this as a disclosable document subject to redaction?  Or is it all
privileged?  Is it necessary to look at each document individually, or at
each part of a document individually?  The latter appears to follow from
the terms of the order of Tomlinson J upheld by the Court of Appeal.
A principle that requires detailed analysis in each case of the purpose of
creation of the communication, the client's subjective purpose and his    F
cogniscance at the time of future potential liabilities is unlikely to be
capable of easy application on a day-to-day basis or enable a lawyer to
advise his client with confidence as to whether a communication will be
protected by privilege.  It may well open up a Pandora's box of
applications for disclosure of documents for which privilege has been
claimed on the ground that the other side has misunderstood the basis    G
for privilege.

It is in the public interest that there should be candour in dealings with
inquiries or investigations.  If communications are not privileged, the lawyer
may need to advise his client not to tell him the facts until he has at least had
an opportunity to review all material documents and, where appropriate, to
see the other side's evidence.

In 2004 there is a strong emphasis on avoiding litigation.  This may be    H
seen in the changes brought about by the Civil Procedure Rules and in the
important role of mediation.  The main reason for consulting a lawyer where
litigation is not anticipated is for the client's affairs to be organised in such a
way as to minimise the possibility of future litigation or dispute.

A    *Sir Sydney Kentridge QC* and *Tom Adam* for the Law Society.  The
decision under appeal and that in *Three Rivers (No 5)* have caused
widespread concern to clients when explained by solicitors and are generally
perceived by solicitors as being inconsistent with their previous
understanding of authority.  Their combined effect has been to create
uncertainty and anxiety for clients and amongst practitioners, particularly in
B    areas outside litigation.  They will encourage excessive dissection of client-
lawyer communications and thus satellite litigation as to the extent of
privilege.  This has already been the experience of some members of the Law
Society.

   The claimants' suggestion seems to be that a right to have access to all
relevant material is more important than the right to consult a lawyer in
confidence.  The law, however, does not place a greater value on one of these
C    fundamental but conflicting rights than on the other: see per Lord Simon of
Glaisdale in *Waugh v British Railways Board* [1980] AC 521, 535–537.  The
rationale for legal advice privilege is just as cogent outside litigation as
within it, as the authorities make clear and as members of the Law Society
can say from their own experience, for instance, in the case of employees and
clients encouraged by many regulatory regimes to act as "whistle-blowers".
D    Indeed, legal advice privilege has been recognised as being available in
numerous cases concerned with conveyancing and wills (see *O'Rourke v
Darbishire* [1920] AC 581; *Minter v Priest* [1930] AC 558 and *Balabel v Air
India* [1988] Ch 317), the two areas singled out by the Court of Appeal as
exemplars of its cause for scepticism over legal advice privilege outside
"anticipated" litigation, as well as in other non-contentious areas such as the
negotiation of a commercial agreement: see *Nederlandse Reassurantie
E    Groep Holding NV v Bacon & Woodrow* [1995] 1 All ER 976.  The
justification for legal advice privilege outside litigation was reviewed as
recently as 2002: see the consultation paper "In the public interest?:
A consultation by the Lord Chancellor's Department following the
OFT [Office of Fair Trading] report on Competition in Professions" CP 07/02
(July 2002), para 116, p 50, which accords with authority and contrasts with
F    the Court of Appeal's remarks [2004] QB 916, 935, para 39; see also the
conclusion in para 61 of "Competition and regulation in the legal services
market: A report following the consultation 'In the public interest?'",
Department of Constitutional Affairs (CP(R2) 07/02) (July 2003), para 61,
p 16.  Given the recent date and extensive nature of that consultation
process, the Court of Appeal's suggestion in paragraph 39 that the existence
G    of legal advice privilege be referred once again to the Law Reform
Committee is inapt.

   As to the meaning of "legal advice", some activities undertaken by some
solicitors are obviously not ones that would be likely to qualify for legal
advice privilege.  The *Balabel* test achieves a sensible balance.  It formulates
the principle in such a way as to ensure that a reasonably broad range of
communications is covered.  The result is that solicitors have found the test
H    to be workable and straightforward to apply in everyday practice.
Paragraph 10 of the Court of Appeal's judgment [2004] QB 916, 926 is
capable of being understood as meaning that "legal advice" is to be defined
strictly as being only "advice in relation to law", and this is further suggested
by the very narrow class of communications that the Court of Appeal went

on to hold, at p 935, para 38, would properly be privileged. This approach is   A
unduly restrictive and contradicts the *Balabel* principle.

The decision that advice as to the preparation and presentation of
evidence to the Bingham Inquiry was not "legal advice" causes the Law
Society great concern. Whether "advice on presentation" in general comes
within the privilege should be unaffected by whether the presentation is to
take place within litigation. In addition, to hold that "advice on
presentation" is not "legal advice" takes a monocular view of the skills that   B
lawyers possess and the reasons for which clients engage them. If the
claimants are contending only that privilege does not attach to advice from a
lawyer as to how the client should tell his story in a situation in which the
client has no "fear" of any legal consequence, such situations must be
extremely rare. Moreover, this is an unsatisfactory test for the future,
introducing an unwelcome element of subjective uncertainty. The   C
claimants' alternative objective test, "if an inquiry was reasonably believed
to have legal consequences", is inconsistent with the first test and creates
different uncertainties. The Court of Appeal left open whether the
representation of an individual witness, as opposed to an entity, whose rights
and obligations were not in issue and whose only concern was his reputation
could claim advice privilege. Apart from the difficulties in understanding the   D
rationale for any possible distinction between the two types of witness, it is
difficult to see why presentational advice at inquiries of this sort should not
be protected by advice privilege. The Law Society endorses what has already
been said on this subject by the Bank and the Attorney General.

The Law Society disagrees with the outcome of the decision under appeal.
Freshfields were retained to give advice and assistance to the Bank "as to
what should prudently and sensibly be done in the relevant legal context"   E
(the relevant legal context being the various possible effects of the whole
process of the inquiry on the Bank) within the meaning of *Balabel v Air India*
[1988] Ch 317.

As to the identity of "the client", the Court of Appeal's ruling in *Three
Rivers (No 5)* [2003] QB 1556 that in the case of a company the client is to
be defined so narrowly is causing considerable concern and practical
difficulty to clients and solicitors and is unjustified in principle. The Court of   F
Appeal seems to have based its decision principally on its reading of
*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, but *Anderson's*
case is not authority for the proposition stated by the Court of Appeal in
paragraph 18, at p 1574, "that information from an employee stands in the
same position as information from an independent agent". *Anderson* seems
to have been decided on the basis that the communication in question had   G
been created in the ordinary course of the bank's business, not for a
privileged purpose at all: see, e g, per Sir George Jessel MR, at p 648, and
James LJ, at p 657. Bingham LJ's analysis in *Ventouris v Mountain* [1991]
1 WLR 607, 612H is correct: the document in question would be subject to
privilege as now understood. Given that, and yet given that the judges in
*Anderson* all regarded it as such a plain case (none of the judgments was
reserved), *Anderson* is an insecure foundation for the Court of Appeal's   H
novel proposition. The process of reasoning that imputed the knowledge of
the Oregon agent to the bank and thus held that the communication of the
knowledge could not be privileged is unsound and should not have been
approved by the Court of Appeal. The only attempt by the Court of Appeal

631

[2005] 1 AC                     Three Rivers DC v Bank of England (No 6) (HL(E))

A    to justify as a matter of principle, as opposed to authority, the distinction between those employees who give the instructions and all other employees is unsatisfactory. The element of chance cuts both ways. Furthermore, the courts regularly confront the question of the status of employees, agents and independent third parties in many contexts. The Law Society does not accept the claimants' suggestion that it is not possible to distinguish between a "true third party" and a "false or pseudo third party", but for present
B    purposes it suffices to say that, whatever the full connotations of "third party", an employee of a company is not a third party vis-à-vis the company that employs him.

The claimants do not advance Anderson as authority for the proposition that "the client" can be redefined so as to exclude large categories of the employees of a company but rely on *Wheeler v Le Marchant* 17 Ch D 675.
C    That case, however, decides only that communications between a solicitor and "third parties" are not privileged. Any fair reading of the report indicates that the surveyors were (as one would expect) independent third party contractors who had been engaged by the defendants to undertake certain work. They were not "employed" by the defendants in the sense that a company "employs" its staff. They were in the same position as independent loss adjusters employed to investigate a suspected arson (*In re*
D    *Highgrade Traders Ltd* [1984] BCLC 151) or independent accountants employed to give advice to solicitors about problem loans (*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583), neither of which authorities gives the claimants the support that they claim from them. Neither *Wheeler v Le Marchant* nor any subsequent authority, including *Waugh v British Railways Board* [1980] AC 521 deals, decisively or
E    otherwise, with the question whether "the client" is to be restricted to one small group of a company's employees.

Where a solicitor is retained by a company, "the client" is simply the company. Any communication from any employee of the company should therefore be privileged provided that (a) the communication is made with the purpose of enabling the company to take legal advice and (b) the company authorises the employee to communicate his knowledge to the
F    solicitor, whether directly or indirectly. There is a parallel to this in section 10(1)(a) of the Police and Criminal Evidence Act 1984. Similarly, in Australia section 117(1)(b) of the Evidence Act 1995 expressly includes within the definition of "client" "an employee or agent of a client".

There are real risks in allowing the Court of Appeal's decision in this respect to stand. As one example, European (and consequently United
G    Kingdom) competition legislation has undergone a process of modernisation. Previously, clients could seek guidance from the competition authorities as to whether certain agreements contravened competition law. This process has been replaced in favour of a regime of "self-assessment". If clients become guarded in this process because they know that communications between their employees (or between some of their employees and their lawyers) will be treated as if they were
H    communications with third parties, the entire public policy behind self-assessment will be undermined. Another example woule be a "due diligence" exercise performed in the context of a commercial transaction.

External lawyers are often instructed only by in-house lawyers. Some in-house lawyers are beginning to rely more and more on oral communication

472

632
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC

with other employees because of the uncertainty that *Three Rivers (No 5)*    A
and *Three Rivers (No 6)* have created.

The final unwelcome development introduced by the combination of
those decisions is the encouragement that they give to the drawing of fine
distinctions and thus the dissection of whole chains of communications into
component parts: the dissection of solicitors' retainers into "legal advice"
and "non-legal advice" components and the dissection of communications    B
even within a "legal advice" retainer into privileged and unprivileged
communications.    The *Balabel* "continuum" principle has proved
straightforward to apply in practice and saved a great deal of cost and
satellite litigation.  It is not so easy to be guided by the decision under appeal.
The passage at [2004] QB 916, 930–931, para 26 ("broad protection [for]
communications passing between solicitor and client in the course of that
relationship") creates unwelcome uncertainty.  It is not clear whether the    C
Court of Appeal was intending to affirm the "continuum" principle, and
already the judgment has been interpreted to contrary effect: see *United
States of America v Philip Morris Inc* [2004] EWCA Civ 330, paras 79, 82.
The Law Society is already aware of cases in which parties providing
disclosure in litigation have been asked to provide undertakings to the effect
that each and every communication between client and solicitor has been    D
assessed in isolation to determine whether it is a communication specifically
providing advice on legal rights and obligations within the meaning of *Three
Rivers (No 6)*: precisely the sort of approach discouraged by *Balabel v Air
India* [1988] Ch 317.

The law should be clarified as follows.  The starting point should be to
examine the dominant purpose for which the solicitor was originally    E
retained (or sought to be retained).  This is consistent with authority (see
*Minter v Priest* [1930] AC 558) and seems to have been the approach of the
Court of Appeal [2004] QB 916, 929, 930–931, paras 21 and 26, sed quaere.
If that dominant purpose was the getting and giving of "legal advice"
(defined as not only advice that tells the client the law but also "advice as to
what should prudently and sensibly be done in the relevant legal context"),
then all communications created in the "continuum" of fulfilling the retainer    F
are not certain, but are likely, to be privileged, whether or not it is apparent
from the face of the documents that they were created for that dominant
purpose: see *Balabel v Air India*, p 330F.  Further, once the dominant
purpose of the retainer is established as being the getting and giving of "legal
advice" the courts should be very reluctant to allow a division of the retainer
into various sub-component purposes so as to say that some are not    G
privileged.  It is only if a subordinate purpose becomes in effect a new or
separate retainer that communications generated by it should lose
protection.

[LORD SCOTT OF FOSCOTE.   Is there any other difficulty that would arise
regarding the scope of legal advice with regard to the order made in *Three
Rivers (No 5)*?]    H

*Sumption* QC.  I have given your Lordships undertakings in relation to
*Three Rivers (No 5)* that effectively recognise that what has happened has
happened and that that is an end of it, except for the important purpose of
the guidance of the legal community.

A    *Sumption* QC in reply.  The exercise that Freshfields were performing in producing witness statements, etc, was exactly the sort of exercise that Lord Phillips, for example, in his Chairman's Note on Lawyers involved in the BSE inquiry envisaged as being part of the proper functions of a lawyer in the course of an inquiry.  The claimants accept that if that material had been generated in the course of litigation they would not have been entitled to

B    disclosure.  The critical question is thus whether the difference between litigation and an inquiry is really such as to justify such a radically different approach to exactly the same exercise.

The claimants' case involves an inconsistency.  On the one hand, they submit that litigation is by its very nature different from other proceedings in that it involves an adjudication on rights and obligations, whereas inquiries are only there to find facts, and that presentational advice is fundamentally

C    different from legal advice, or advice on points of law, and, outside the context of litigation, carries no privilege.  On the other hand, to mitigate the practical implications of that, they submit that privilege does attach to material generated by an inquiry if there may be knock-on consequences that in practice do affect rights and liabilities.  On that basis they say that this is a narrow case because this was an inquiry that was devoid of any legal

D    consequences and was therefore not a relevant legal context.  Their whole case thus depends on the proposition that the inquiry was a context devoid of legal consequences, including indirect, knock-on consequences, and was thus not in *Balabel* terms a relevant legal context.

That suggestion is untenable, as applied either to the Bingham Inquiry or to the generality of inquiries.  The claimants accept that so far as the individuals who might have lost their jobs were concerned that possibility

E    was a relevant legal context, or a relevant legal consequence, and that for them, therefore, the inquiry was a relevant legal context.  They do not explain why the rupture of the Bank's contracts of employment with its most senior officers as a result of sufficiently adverse findings should be regarded as a legal consequence for one side of those contracts but not for the other, or how the same inquiry charged with examining the performance of a

F    statutory duty to regulate banks can be a relevant legal context for some people whose conduct is being examined but not for others.  From the point of view of fairness, a rule that provides that in relation to the same inquiry some people can consult lawyers in confidence and others cannot is unacceptable.  The fact that the Bank considered that a claim against it would be unmeritorious does not mean that its fear of litigation was

G    unfounded, nor does it mean that its desire to minimise the risk of that litigation was irrelevant.

Many judges, particularly in the older cases, have given the avoidance of litigation as an example of the value of the privilege for lawyer-client communications, but none has suggested that there is nothing more to it than that or that the interests of the client himself are irrelevant.  That certainly could not be said today when every common law jurisdiction, with

H    the possible exception of Ireland, has put the interest of the client in having access to legal assistance at the forefront of legal policy and when all of them have in fact applied it to occasions that have nothing to do with litigation, either at the stage when the document was created or at the stage when the privilege was invoked.

634
**Three Rivers DC v Bank of England (No 6) (HL(E))**          [2005] 1 AC

Tribunals may lately have adopted a somewhat restrictive attitude *A*
towards actual representation before the tribunal itself of witnesses, but
ultimately it depends on the nature of the inquiry, the nature of the interests
at stake and the matters that may be levelled against witnesses or persons
under investigation.  There is positive discouragement against employing
lawyers in the small claims court, but there would be nothing wrong in a
litigant, before he appeared in person, consulting a lawyer as to what he was
going to say.  As to planning inquiries, see *R (Alconbury Developments Ltd)* *B*
*v Secretary of State for the Environment, Transport and the Regions* [2003]
2 AC 295.  Objectors at planning inquiries and persons in the position of the
mother in *In re L (A Minor) (Police Investigation: Privilege)* [1997]
AC 16 and the family in inquiries into unnatural deaths in prison (*R (Amin) v
Secretary of State for the Home Department* [2004] 1 AC 653) are entitled to
participate with the assistance of lawyers in spite of the fact that they have *C*
no rights or obligations of a kind that would give rise to litigation.  The
mother's privilege in *In re L* in respect of her communications with her
lawyers was unaffected by what the House of Lords decided: see per Lord
Jauncey of Tullichettle, at p 27H.  This is because there is nowadays an
altogether more general right of people to be treated fairly by bodies set up
for public purposes whose decisions significantly affect their lives.  That may *D*
be because of significant effect on their reputations, effect on their families or
on some significant but not necessarily legal interest, or the effect on some
deceased person, as in *Amin's* case.

The only authority cited by the claimants for their proposition that the
relevant distinction is between litigation and other occasions for employing
a lawyer and not between lawyer-client communications and third party
communications is the statement by Lord Denning MR in *Buttes Gas and* *E*
*Oil Co v Hammer (No 3)* [1981] QB 223, 243–244 as quoted by
Bingham LJ in *Ventouris v Mountain* [1991] 1 WLR 607, 617–618.  Lord
Denning summarised the law relating to third party communications in a
way that made it inapplicable to pre-existing documents that had not been
privileged at the time of their creation, which was the issue with which
Bingham LJ was concerned.  Bingham LJ himself, however, at p 611A–B,
warned against the inapposite nature of the expression "litigation privilege". *F*
The claimants do not meet the analysis of where the demarcation lines lie by
Lord Edmund-Davies in *Waugh v British Railways Board* [1980] AC 521 or
by Templeman LJ in *Great Atlantic Insurance Co v Home Insurance Co*
[1981] 1 WLR 529, nor do they meet *In re L (A Minor) (Police Investigation:
Privilege)* [1997] AC 16, where the House of Lords, as an important part of
the ratio of the decision, analysed the relevant distinction as being between *G*
lawyer-client communications and third party communications and made
the point that the difference between them was only relevant to third party
communications.  It is not an answer to that to quote selectively from judges
who have referred in general statements to legal advice but have not been
addressing the present issue, such as Lord Hoffmann's reference in
*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC
563, 607A to "advice about the law". *H*

A good modern statement of principle may be found in the judgment of
Wilson J in *Baker v Campbell* 153 CLR 52, 95 where he refers to the object
of fostering the confidential relationship in which legal advice is given and
received as serving the ends of justice because it is facilitating the orderly

**475**

A    arrangement of a client's affairs as a member of the community, "an essential mark of a free society".

As to *United States of America v Philip Morris Inc* [2004] EWCA Civ 330, the actual decision in the case was simply that it was impossible to say in advance whether Mr Foyle, the partner in Lovells, would be asked to disclose privileged material until the questions were actually put to him.

B    As to *Smurfit Paribas Bank Ltd v AAB Export Finance Ltd* [1990] 1 IR 469, it referred to very few of the English authorities and indeed did not refer to *Balabel v Air India* [1988] Ch 317, which had been decided two years before. The actual document concerned purely financial advice.

As to section 1(3) of the Tribunals of Inquiry (Evidence) Act 1921, it has been held that the similar section 127 of the New Zealand Law Practitioners Act 1982 does not preserve privilege in the case of witnesses: see *B v*

C    *Auckland District Law Society* [2003] 2 AC 736, 760, para 63. If, therefore, the claimants are right on the points of principle they have raised, that would remove the scope of protection of legal professional privilege in 1921 Act cases as well.

As to dominant purpose, contrary to the claimants' submission it makes no difference to the outcome of this case for the following reason. The documents in issue in this appeal are those communications between the

D    BIU and Freshfields that were concerned not with getting advice about legal rights and obligations but about how to present the facts against the background of the Bank's statutory duties. The dominant, indeed probably only, purpose of those communications was to get the advice, leaving aside what that means, of Freshfields and counsel. If that advice was of a kind that is protected by privilege, then the privileged purpose was the only purpose.

E    If it was not, then there was no privileged purpose at all. On the facts of this case there was no second purpose that could give rise to an issue about which of the two was dominant. The claimants say that the dominant purpose of the communications was communication to Bingham LJ pursuant to the Bank's undertaking to co-operate with his inquiry, but the material in issue is material that did not go to Bingham LJ.

One of the main differences between lawyer-client communications and

F    third party communications is that it is in most circumstances difficult to imagine how in practice, extremes apart, a communication to one's lawyer could ever be anything other than for the dominant purpose of obtaining his assistance. The only situation in which the dominant purpose test would have any real scope to operate is if the Court of Appeal are right in this case. If the proper functions of lawyers have to be dissected into advice about legal

G    rights and obligations, advice about presentation of the facts against the background of legal rights and obligations and advice about other matters calling for legal assistance, and privilege only reflects the first of those, then it might be relevant to ask whether the relevant purpose was dominant or merely ancillary. The inherent difficulty of dissecting the retainer so as to distinguish between different functions carried out within the same retainer is one of many reasons for supposing that that really cannot be what the law

H    requires.

Apart from a somewhat tentative dictum of Rix J in *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160, 167–168, there is no trace in the English authorities of the dominant purpose test in any context other than that of third party

636
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC

communications.  In *Waugh v British Railways Board* [1980] AC 521 Lord     A
Edmund-Davies, having carefully distinguished between lawyer-client
communications and third party communications, made it clear that his
analysis of the dominant purpose test was in the context of what were
conceded in that case to be third party communications.  In *Balabel v Air
India* [1988] Ch 317 the law was discussed at length without relevance to the
dominant purpose test.  Rix J's analysis in The *Sagheera* is an accurate     B
statement of the principle but probably not correctly described as the
application of the dominant purpose test.  The view that the dominant
purpose test applies to lawyer-client communications is supported by the
Australian cases, although in some of them in a rather special context.  It is
clear from the majority judgment in *Grant v Downs* 135 CLR 674 that the
real ground of the decision was that the purpose of the reports in question
was not to get legal advice at all, not even as a secondary objective.  In *Esso     C
Australia Resources Ltd v Comr of Taxation of the Commonwealth of
Australia* 201 CLR 49 the abstract question of law was decided without
reference to any facts.  A preliminary question of law was stated as to
whether the dominant purpose test, or the sole purpose test, was to apply to
lawyer-client communications, and, although most of the analysis was
concerned with the choice between those two tests, it was said that the     D
dominant purpose test did apply to lawyer-client communications.

The principle, though it may make very little difference in practice, is, as
Rix J says in *The Sagheera*, to ask what the purpose of the retainer is.  If the
solicitor is retained to perform a legal function, like carrying out a
conveyance, then the privilege will protect all communications pursuant to
that retainer that are (i) ancillary to the conveyancing process and (ii) part of     E
the normal professional function of a solicitor: see *Minter v Priest* [1929]
1 KB 655 and *Nederlandse Reassurantie Groep Holding NV v Bacon &
Woodrow* [1995] 1 All ER 976.  In *Minter v Priest* the loan was probably
more important than the conveyance.  It is not at all clear that the dominant
purpose test would have been satisfied on the facts.  The same approach of
asking whether the purpose of the retainer was a legal purpose was adopted     F
in the older cases, like *Carpmael v Powis* 1 Ph 687 and *O'Shea v Wood*
[1891] P 286.  Those decisions were based not on the dominant purpose test
but on the fact that the relationship between solicitor and client is a
confidential professional relationship and that it is undesirable to dissect
what is really a professional relationship into different parts.  That is the
principle that the English courts have traditionally applied.  It is probably
the preferable approach, but both will probably lead to the same result in the     G
overwhelming majority of cases.

As to the identity of the client, the question is really whether there is any
principled objection to the rule as stated in *Upjohn Co v United States* 449
US 383, 402–403, which is an application of exactly the same principle as
underlies the principle in England.  It is a succinct statement of the three
essential elements that justify, as a general rule, treating the employee as the     H
client: (i) he is in possession of knowledge acquired in the course of his
employment; (ii) he is directed or authorised by the employer to disclose that
knowledge on the employer's behalf to the attorney and (iii) that disclosure
is for a privileged purpose.

477

A   [LORD ROGER OF EARLSFERRY. Suppose that an employee is, for example, asked to speak as to something that he saw happen to another employee, is that covered by the statement in *Upjohn's* case?]

Burger CJ is not intending to exclude that. What he is saying is that the attorney must be asking the employee about something that is within the scope of his employment. The only objection that could be taken to the formulation as set out in *Upjohn's* case is based on an alleged distinction that
B   the claimants draw between communication of facts preparatory to getting legal advice and the actual process of getting the advice. The basic problem, as a matter of principle, about that distinction is that it has always been clear that the privilege protects not just the advice but also the process of disclosing the facts that leads to the advice. Privilege does not attach to pre-existing material created for some other purpose but sent to the lawyer
C   anyway, as was the position in *Grant v Downs* 135 CLR 674 and *Waugh v British Railways Board* [1980] AC 521, but provided that the documents were actually created by the client, or by his direction, for the purpose of obtaining the lawyer's advice, then what the claimants have called preparatory material is the very communication that is protected. Because the protection of the communication is mainly designed to enable the client
D   to disclose the facts without inhibition, it must apply to disclosures of the facts. The claimants' distinction means that, although an individual litigant would be entitled to privilege for his communication of the facts to his lawyer for the purpose of obtaining some relevant advice, a corporation would not be unless it happened that the very same employee was both (i) charged with dealing with the solicitors and (ii) authorised and able to disclose the facts on which the solicitors were to advise. That is an
E   absurd distinction. In *Ventouris v Mountain* [1991] 1 WLR 607, 612 Bingham LJ pointed out, taking the same view of the position as the Supreme Court did in Upjohn, that it was plain that, in the modern law, the communication in *Anderson v Bank of British Columbia* 2 Ch D 644 would have been privileged in spite of the separation between the process of instructing the lawyer and the process of giving the information about the facts. If the claimants' submission accepted by the Court of Appeal in *Three*
F   *Rivers (No 5)* was correct, that observation of Bingham LJ was wrong. Litigation may have been in the mind of the manager in London, but Bingham LJ's point is correct and would follow from the Upjohn principle, which is also correct.

[LORD SCOTT OF FOSCOTE. Their Lordships have indicated that reply briefs from the interveners can be sent in, but having regard to the fact that
G   the interveners all support the Bank and to the fact that this is an appeal brought in the middle of very difficult litigation we will say now that the appeal will be allowed and that we will give our reasons and report to the House in the ordinary way later.]

*Crow* in reply. It is wrong of the claimants to characterise the issue as being whether legal professional privilege can arise where there is "the giving of no legal advice". All parties accept that there can be no legal advice
H   privilege if there is no legal advice; the question is to determine the scope of the concept of "legal advice". The specific point in issue is that the Court of Appeal considered that "presentational advice" was not legal advice and therefore could not attract legal professional privilege. The claimants, however, in the course of argument, accepted that "presentational advice"

could be covered by legal professional privilege if litigation was in prospect. That concession is fatal to their case. Legal professional privilege attaches to (i) legal advice, whether or not litigation is in prospect, and (ii) communications with third parties, but only if litigation is in prospect. If, as the Court of Appeal held, presentational advice by a lawyer to his client is not legal advice in the absence of litigation, it cannot be transmuted into legal advice because litigation is in prospect; it is the same advice by the same person in either situation. Accordingly, the claimants' concession is necessarily a concession that presentational advice is legal advice.

As Lord Scott suggested in argument, "rights and obligations" must include public law rights and obligations. The authorities on which the Court of Appeal founded its approach were all concerned with private law rights and obligations. To that extent, it appears to have disregarded the potential impact of its ruling on public law proceedings.

The claimants in argument agreed with Lord Scott that the effect of the Court of Appeal's judgment would be to remove any legal professional privilege that might otherwise attach to the advice of Parliamentary counsel in the preparation of Bills. The preparation of Bills necessarily takes place before the relevant provisions form part of domestic law. The Government is thus in no different position from that of any private individual or company seeking advice on future or hypothetical legal rights or obligations. To the extent that the Court of Appeal's test confines legal professional privilege to rights and obligations that are extant at the time when the advice is sought, it is too narrow. If a Bill is being drafted to give effect in national law to some pre-existing legal obligation on the state arising under international law (e g under Community law or the Convention on Human Rights), the advice of Parliamentary counsel (and of all Government legal advisers) must relate to the state's legal rights and obligations. More usually, however, where any public body is involved in the preparation of legislation it will be preparing it in the absence of any pre-existing obligation to legislate. In such circumstances its legal advice will involve advice as to the rights and liabilities of those whose rights or interests are likely to be affected, including, but not limited to, what the current legal position is and how their rights and obligations will change. If the Court of Appeal's test excludes such advice from privilege, it is wrong for that reason.

As to Lord Scott's suggestion to the claimants in argument that the decision in *Calcraft v Guest* [1898] 1 QB 759 was inconsistent with the categorisation of legal professional privilege as a substantive legal right, as opposed to a mere rule of evidence, that decision does no more than illustrate that the substantive legal basis of legal professional privilege is the law on confidence, albeit a specially protected and unique form of confidence.

As to the identity of the client, the claimants' approach, accepted by the Court of Appeal, involves asking whether the individual communicating with the lawyer was personally charged with obtaining the legal advice or whether his function was merely to communicate factual information to the lawyer in circumstances where some other employee was charged with obtaining the advice. That approach is artificial and wrong, as it involves confusing the client's purpose with the state of mind or individual authority of its various employees. The client's purpose is to obtain legal advice. It does not vary according to the state of mind of each individual involved. To

639

A  apply the claimants' analysis to the Government would mean that some communications between administrators and legal advisers would be privileged while others, dealing with exactly the same issues in exactly the same context, would not be.

The question in *Wheeler v Le Marchant* 17 Ch D 675 was whether communications passing between a lawyer and a third party, who was not acting as agent of the client, were privileged in the absence of litigation: see
B  at pp 680–681. That is not the present case.

*Kentridge QC* in reply. As to the identity of the client, a company cannot lay what it knows before its lawyers in confidence if the relevant knowledge is spread among many of its employees but only a select few count as "the client". None of the cases relied on by the claimants, *Wheeler v Le Marchant* 17 Ch D 675; *In re Highgrade Traders Ltd* [1984] BCLC 151 and
C  *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, is authority for the proposition stated in *Three Rivers (No 5)* [2003] QB 1556. They were all concerned with true third party independent contractors. The test should, as the Bank submits, be whether the "agent" is working under the direction of the client (privileged) or is carrying on his own independent business (not privileged). That would be a principled distinction similar to that in the law relating to vicarious liability.
D  As to the "dominant purpose" test, its focus in the context of litigation privilege (*Waugh v British Railways Board* [1980] AC 521) was on the purposes for which individual communications with third parties were created. When assessing the privilege that attaches to lawyer-client communications, by contrast, there is normally less focus on the purpose of individual communications. What is of central importance is rather the
E  nature of the solicitor's retainer. As the Bank submits, it is undesirable for the nature of the retainer to be made subject to a "dominant purpose" test if as a result there will be attempts to dissect the professional relationship into component parts. The test should be whether the lawyer has been retained to undertake a legal function. When a solicitor is engaged professionally, then other than in a most unusual situation the dominant purpose of the retainer will be the performance of a legal function. A "dominant purpose"
F  test qualification in relation to the retainer might be adopted to eliminate the (admittedly unusual) case where the relationship with the solicitor is essentially a business rather than a professional relationship (see the examples given in *Balabel v Air India* [1988] Ch 317, 331G–332B), or perhaps in the far-fetched instances raised by the claimants, such as a retainer to assist in the application for membership of a social club. If such
G  considerations lead the House of Lords to hold that a dominant purpose test is to be applied to the retainer, it should be made clear that the test is being adopted to weed out such instances rather than to encourage dissection of the retainer in all cases.

The claimants have firmly stated in argument that whether a context is a legal context depends on the subjective belief of the client as to whether he faces any legal consequences or not. This is unsatisfactory: clients who are
H  optimists, or not very alert, or who simply have not applied their minds to the question, will find that their communications were not privileged. A legal context is a situation that may involve legal implications or consequences (and thus in which the solicitor's legal knowledge and skills may be or become significant to the client), whether the client appreciates it or not.

**480**

This is shown by the reference in *Balabel v Air India* [1988] Ch 317, 330G to the solicitor tendering advice "whether asked specifically or not" and by the observation, at p 330E, that advice "may be required or appropriate on matters great or small at various stages". The position is a fortiori where the situation in which the client is involved is governed by statute or other specific legal rules: see the terms of the order made in *Balabel v Air India*, at p 332E.

11 November. **LORD SCOTT OF FOSCOTE**

1   My Lords, on 29 July 2004, the Appellate Committee announced that this appeal should be allowed. I now give my reasons for reaching that decision.

*Introduction*

2   The actual issue for decision on this appeal is an apparently simple one that can be very shortly stated. Do the communications between the Bank of England, their solicitors, Freshfields, and counsel relating to the content and preparation of the so-called overarching statement submitted on behalf of the Bank to the Bingham Inquiry qualify for legal professional privilege? It is contended by the claimants, and was held by the Court of Appeal, that they do not. But the broader issues that have been debated on this appeal are not in the least simple. They have required your Lordships to consider the policy justifications for the existence of legal professional privilege in our law and, generally, the permissible scope of the privilege. In relation to what sort of communications can legal professional privilege be claimed? As to the scope of legal professional privilege, the focus has been, first, on the part, if any, that legal professional privilege should be allowed to play where the advice or assistance sought by the lawyers is not advice or assistance about the client's legal rights or obligations, and, second, on the criteria to be applied to determine whether communications between the lawyers and employees of the client can be treated for privilege purposes as communications between the lawyers and the client.

3   In order that the significance of the issues as I have broadly described them can be understood, it is necessary to provide a brief history of the events that have led up to this appeal.

*The history*

4   The starting point is the collapse of the Bank of Credit and Commerce International SA ("BCCI") in July 1991 with a huge excess of liabilities over assets. BCCI's depositors stood to lose a substantial part of their deposits. Shareholders in BCCI stood to lose their investments. Under the Banking Acts of 1979 and 1987 the Bank of England ("the Bank") has a supervisory role in relation to banks and financial institutions carrying on business in the United Kingdom. So the Bank had had statutory responsibilities and duties regarding the supervision of BCCI.

5   Very shortly after the collapse of BCCI the Chancellor of the Exchequer announced in Parliament that there would be an independent inquiry into the Bank's supervision of BCCI. Bingham LJ was appointed to conduct the Inquiry. Bingham LJ's terms of reference required him "to inquire into the supervision of BCCI under the Banking Acts; to consider

A    whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations". In a letter to the Chancellor of the Exchequer written in July 1992, Bingham LJ described his terms of reference as calling for the consideration of five broad questions. These were:

> "(1) What did the United Kingdom authorities know about BCCI at all relevant times? (2) Should they have known more? (3) What action did
B > the United Kingdom authorities take in relation to BCCI at all relevant times? (4) Should they have acted differently? (5) What should be done to prevent or minimise the risk of such an event recurring in the future?"

6    It was clear to all that the Bank was the principal party to be investigated and shortly after the inquiry had been established the Governor of the Bank appointed three Bank officials to deal with all communications
C    between the Bank and the inquiry. These officials, and other Bank personnel appointed to assist them from time to time, became known as the Bank's Bingham Inquiry Unit ("the BIU"). Freshfields were retained by the Bank to advise generally on all dealings of the Bank, its officials and employees with the inquiry. Freshfields retained counsel to assist in that process. One of the main functions of the BIU was the preparation and communication of information and instructions to Freshfields to enable them to carry out their
D    duties under their retainer. They (Freshfields) and counsel gave advice as to the preparation and presentation of the Bank's evidence to the inquiry and as to the submissions to be made to the inquiry on the Bank's behalf. Indeed, except for some routine administrative arrangements, all the Bank's communications with the inquiry were the subject of extensive advice from Freshfields and counsel.

E    7    The Bingham Inquiry Report was published on 22 October 1992. In 1993 some 6,231 persons, each of whom claimed to be a depositor with United Kingdom branches of BCCI, and BCCI itself (by its liquidators) commenced an action against the Bank for the loss they had respectively been caused by the BCCI collapse. Section 1(4) of the Banking Act 1987 relieves the Bank of any liability "for anything done or omitted in the discharge or purported discharge of the functions of the Bank under this Act
F    unless it is shown that the act or omission was in bad faith". It was, therefore, not possible for the action to be based merely on an alleged negligent performance by the Bank of its supervisory duties vis-à-vis BCCI. The various acts or omissions on the part of the Bank to which the collapse of BCCI was alleged to be attributable had to be "in bad faith". This requirement plainly placed before the claimants in the action (the
G    respondents before your Lordships) a very high hurdle and it is not in the least surprising that they have been, and still are, seeking the widest possible discovery from the Bank in order to assist their efforts to jump it.

8    By an application notice dated 25 October 2002 the claimants sought disclosure by the Bank of a large number of documents which the Bank claimed it had the right to withhold on the ground of legal professional privilege. These were documents which had been brought into existence by
H    employees of the Bank for the purpose of being passed to Freshfields. The parties were agreed that documents emanating from or prepared by independent third parties and then passed to Freshfields were not privileged. It was the status of documents prepared by Bank employees that was in question.

9  Tomlinson J in his judgment of 13 December 2002 (*Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2002] EWHC 2730 (Comm)) held that all these documents were privileged. In para 10 of his judgment, he described the documents as

"generated for the purpose of providing information to the Bank's legal advisers to enable them to prepare submissions and/or to advise on the nature, presentation, timing and/or content of the Bank's submissions to, evidence for and responses to requests from the inquiry".

And he proceeded to consider the privilege issue "upon the assumption that the material which the Bank seeks to protect from disclosure is both relevant to and probative as to the issues in the trial".

10  The modern case law on legal professional privilege has divided the privilege into two categories, legal advice privilege and litigation privilege. Litigation privilege covers all documents brought into being for the purposes of litigation. Legal advice privilege covers communications between lawyers and their clients whereby legal advice is sought or given. In *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 26 Lord Jauncey of Tullichettle described litigation privilege as "essentially a creature of adversarial proceedings" and held that the privilege could not be claimed in order to protect from disclosure a report prepared for use in non-adversarial proceedings. Lord Lloyd of Berwick and Lord Steyn, at pp 30 and 37, expressed their agreement. The Bingham Inquiry could not have been described as adversarial. It was, as inquiries invariably are, an inquisitorial proceeding. It was no doubt with *In re L* in mind that the Bank did not claim that the documents of which disclosure was being sought were entitled to litigation privilege. The Bank took its stand on legal advice privilege. As to that, the Bank claimed privilege for all documents prepared for at least the dominant purpose of obtaining or recording legal advice from Freshfields or counsel. In para 30 of his judgment Tomlinson J accepted this claim. He said:

"In my judgment an internal confidential document, not being a communication with a third party, which was produced or brought into existence with the dominant purpose that it or its contents be used to obtain legal advice is privileged from production."

He therefore dismissed the 25 October 2002 discovery application.

11  In an addendum to his judgment given on 6 February 2003 after a further hearing Tomlinson J dealt with the question whether documents prepared by ex-employees or ex-officers of BCCI stood on the same footing for legal advice privilege purposes as documents prepared by current employees or current officers. He held that provided the dominant purpose test that he had formulated in his main judgment were satisfied, no distinction for privilege purposes was to be drawn. He said, in para 6:

"In my judgment the former officers of the Bank who were concerned with the supervision of BCCI and who in that capacity acquired relevant knowledge which was confidential to the Bank are not for this purpose to be regarded as third parties."

12  The BCCI claimants appealed and on 3 April 2003, the Court of Appeal allowed the appeal. It is important to notice that Mr Gordon

643
[2005] 1 AC    Three Rivers DC v Bank of England (No 6) (HL(E))
Lord Scott of Foscote

*A*  Pollock, counsel for the claimants, did not argue for disclosure of documents passing between the BIU and Freshfields nor for disclosure of any of Freshfields' internal memoranda or drafts. Mr Pollock accepted that the BIU was, for the purpose of the inquiry, Freshfields' client and that communications passing between them were covered by legal advice privilege: see para 4 of the judgment handed down by Longmore LJ, *Three Rivers District Council v Governor and Company of the Bank of England*

*B*  *(No 5)* [2003] QB 1556, 1562.

13    The Court of Appeal judgment ("*Three Rivers (No 5)*") succinctly summed up the rival submissions, at pp 1562–1563:

"5. . . . Mr Pollock submitted that it was only communications between solicitor and client, and evidence of the content of such

*C*  communications, that were privileged. Preparatory materials obtained before such communications, even if prepared for the dominant purpose of being shown to a client's solicitor, even if prepared at the solicitor's request and even if subsequently sent to the solicitor, did not come within the privilege.

"6. Mr Stadlen, for the Bank, submitted that, as a matter of general principle, any document prepared with the dominant purpose of

*D*  obtaining the solicitor's advice upon it came within the ambit of the privilege, whether or not it was actually communicated to the solicitor . . . This general principle was subject to the exception that documents sent to or by an independent third party (even if created with the dominant purpose of obtaining a solicitor's advice) would not be covered by legal advice privilege."

*E*  The Court of Appeal accepted Mr Pollock's submission and held that the only documents for which legal professional privilege could be claimed were communications between the BIU and Freshfields seeking or giving legal advice. The BIU, and no one else, was to be treated as Freshfields' client for privilege purposes. And in para 37 of the judgment, at p 1583, the Court of Appeal expressed the view that material prepared "for the dominant purpose

*F*  of putting relevant factual material before the inquiry in an orderly and attractive fashion" was not prepared "for the dominant purpose of taking legal advice upon such material" and so could not attract legal professional privilege. The former purpose has, for convenience, been referred to as a "presentational" purpose.

14    As to the question of who, for privilege purposes, was to be regarded as Freshfields' client, the Court of Appeal, at p 1574, para 18, said that

*G*  information provided to solicitors by an employee stood in the same position as information provided by an independent third party and, specifically, at p 1581, para 31 when considering whether information provided to Freshfields by the Governor of the Bank would have qualified for privilege, that "the BIU . . . is . . . the client rather than any single officer however eminent he or she may be". In allowing the appeal the Court of Appeal made

*H*  a declaration that

"the only documents or parts of documents coming into the Bank's possession between the closure of BCCI on 5 July 1991 and the issue of the present proceedings in May 1993 which the Bank is entitled to withhold from inspection on the ground of legal advice privilege are:

(1) communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purposes of seeking or obtaining 'legal advice'; (2) any part of a document which evidences the substance of such a communication."

15    The Bank's petition to this House for leave to appeal against the Court of Appeal's order was dismissed: see p 1583.

16    After the dismissal of the Bank's petition for leave to appeal the Bank began the task of disclosing documents whose disclosure was required under the Court of Appeal order.  But the Bank disclosed none of the communications between the BIU and Freshfields or drafts of or internal memoranda relating to the overarching statement that had been submitted on behalf of the Bank to the inquiry.  These were withheld by the Bank from disclosure for two reasons.  First, Mr Pollock had told the Court of Appeal that his clients were not seeking disclosure of any communications between the BIU and Freshfields; secondly, the Bank contended that the expression "legal advice" in the Court of Appeal's declaration should be interpreted widely so as to cover all advice and assistance from Freshfields or counsel relating to the evidence to be submitted and the submissions to be made to the inquiry on behalf of the Bank, i e so as to cover advice given for presentational purposes.

17    The impasse regarding these documents led to a further discovery application by the claimants.  The application was made on 1 August 2003.  It sought "further documents from or relating to the Bingham Inquiry Unit arising from the judgment of the Court of Appeal dated 3 April 2003".  Tomlinson J [2003] EWHC 2565 (Comm) gave judgment on the application on 4 November 2003.  He held that the rationale of the Court of Appeal judgment overturning his own previous decision was that Freshfields' advice sought or given for presentational purposes should not in general be categorised as legal advice of the sort which attracted legal advice privilege: see para 13.  If, however, the dominant purpose of some particular communication between the BIU and Freshfields was the provision of advice as to the Bank's legal rights and obligations, as opposed to the question of how the Bank's evidence might be presented to the inquiry so as to be least likely to attract criticism, then that communication, or the relevant part of it, would be entitled to privilege.

18    So Tomlinson J made an order dated 10 November 2003 declaring that the only documents or parts of documents that the Bank was entitled to withhold from disclosure on the ground of legal advice privilege were communications passing between the BIU and its lawyers for the purpose of seeking or obtaining "advice concerning the Bank's rights and obligations".

19    The Bank appealed and on 1 March 2004, Lord Phillips of Worth Matravers MR, handed down the judgment of the Court of Appeal dismissing the appeal: *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] QB 916.  The judgment ("*Three Rivers (No 6)*") made clear the view of the Court of Appeal that for legal advice privilege purposes the advice being sought from the lawyers must be advice as to legal rights or liabilities.  Advice as to how the Bank should present its case to the Inquiry so as to lead to a conclusion as favourable to the Bank as possible did not qualify for privilege.

485

*A*  20  The Bank has now appealed to your Lordships. It is important to emphasise the narrowness of the actual issue. It is whether the communications between the BIU and Freshfields or counsel relating to the nquiry are protected by legal advice privilege. The Bank plainly believe that the Court of Appeal order in *Three Rivers (No 5)* went too far. But the Bank's petition for leave to appeal was refused and this is not an appeal against that order. Moreover the Bank has discharged the disclosure

*B*  obligation required by that order. However, the narrow scope allowed by the Court of Appeal in the judgment now under appeal to "legal advice" has heightened the concerns of many about the approach to legal advice privilege inherent in the first Court of Appeal judgment. This explains in part the applications for leave to intervene in this appeal made by the Attorney General, by the Law Society and by the Bar Council. Each has been

*C*  given leave to intervene by written submissions, including leave, if so advised, to submit a written reply at the conclusion of the oral hearing. Their Lordships are grateful for the written submissions they have received from the interveners.

21  The written submissions from the interveners, and particularly that from the Law Society, make clear their concern that the *Three Rivers*

*D*  *(No 5)* Court of Appeal judgment may have gone too far in treating communications between Freshfields and employees of the Bank, other than the BIU, as being for privilege purposes communications between Freshfields and third parties. Your Lordships have been invited to clarify the approach that should be adopted to determine whether a communication between an employee and his or her employer's lawyers should be treated for legal advice privilege purposes as a communication between the lawyers and their

*E*  client. This is of particular importance for corporate clients, who can only communicate through employees or officers.

22  The employee/client point does not, however, arise as an issue on this appeal. It did arise on the *Three Rivers (No 5)* discovery application, and the Court of Appeal's view that only communications between the lawyers and the BIU could be regarded as communications qualifying for

*F*  legal advice privilege was the basis on which disclosure by the Bank pursuant to the Court of Appeal order of 3 April 2003 has taken place. The disclosed documents have included communications between the Bank's lawyers and those Bank employees and officers who were not members of the BIU. Since then, and well before the hearing of this appeal, the hearing of the action before Tomlinson J commenced. Mr Pollock opened his case on the basis,

*G*  inter alia, of the documents disclosed pursuant to the 3 April 2003 order. He expressed before your Lordships on this appeal a natural concern that if your Lordships gave any ruling indicating that some of the disclosed documents ought to have been held to be privileged, serious complications affecting the trial might arise. However Mr Sumption, on behalf of the Bank, gave the Bank's undertaking that reliance by the claimants on the documents already disclosed would not, whatever view your Lordships might express on the

*H*  employer/client point, be resisted on privilege grounds, and that it would not be suggested that Tomlinson J's knowledge and sight of the contents of those documents constituted any reason why he should recuse himself. The point is, therefore, so far as the current litigation between the claimants and the Bank is concerned, strictly moot. Nothing turns on it. None the less your

646
**Three Rivers DC v Bank of England (No 6) (HL(E))**          [2005] 1 AC
**Lord Scott of Foscote**

Lordships have been asked to express on a view on the point.  I will return     A
to it.

*Policy*

23    It is impossible to express a coherent view about the issues which
have been debated on this appeal without taking into account the policy
reasons which led to legal advice privilege becoming established in our law     B
in the first place and to the policy reasons for its retention in our law today.
Before examining those reasons, however, it seems to me helpful to review
some of the features of legal advice privilege in order to provide a context for
the policy reasons underlying the privilege.

24    First, legal advice privilege arises out of a relationship of confidence
between lawyer and client.  Unless the communication or document for
which privilege is sought is a confidential one, there can be no question of     C
legal advice privilege arising.   The confidential character of the
communication or document is not by itself enough to enable privilege to be
claimed but is an essential requirement.

25    Second, if a communication or document qualifies for legal
professional privilege, the privilege is absolute.  It cannot be overridden by
some supposedly greater public interest.  It can be waived by the person, the     D
client, entitled to it and it can be overridden by statute (cf *R* (*Morgan
Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563), but it
is otherwise absolute.  There is no balancing exercise that has to be carried
out: see *B v Auckland District Law Society* [2003] 2 AC 736, 756–759,
paras 46–54).  The Supreme Court of Canada has held that legal professional
privilege although of great importance is not absolute and can be set aside if
a sufficiently compelling public interest for doing so, such as public safety,     E
can be shown: see *Jones v Smith* [1999] 1 SCR 455.  But no other common
law jurisdiction has, so far as I am aware, developed the law of privilege in
this way.   Certainly in this country legal professional privilege, if it is
attracted by a particular communication between lawyer and client or
attaches to a particular document, cannot be set aside on the ground that
some other higher public interest requires that to be done.

26    Third, legal advice privilege gives the person entitled to it the right to     F
decline   to   disclose   or   to   allow   to   be   disclosed   the   confidential
communication or document in question.  There has been some debate as to
whether this right is a procedural right or a substantive right.   In my
respectful opinion the debate is sterile.  Legal advice privilege is both.  It may
be used in legal proceedings to justify the refusal to answer certain questions
or  to  produce  for  inspection  certain  documents.   Its  characterisation  as     G
procedural or substantive neither adds to nor detracts from its features.

27    Fourth, legal advice privilege has an undoubted relationship with
litigation privilege.  Legal advice is frequently sought or given in connection
with current or contemplated litigation.  But it may equally well be sought or
given  in  circumstances  and  for  purposes  that  have  nothing  to  do  with
litigation.  If it is sought or given in connection with litigation, then the     H
advice would fall into both of the two categories.  But it is long settled that a
connection with litigation is not a necessary condition for privilege to be
attracted: see, e g, *Greenough v Gaskell* (1833) 1 M & K 98, 102–103,
per Lord Brougham and *Minet v Morgan* (1873) LR 8 Ch App 361.  On
the  other  hand  it  has  been  held  that  litigation  privilege  can  extend  to

**487**

communications between a lawyer or the lawyer's client and a third party or to any document brought into existence for the dominant purpose of being used in litigation. The connection between legal advice sought or given and the affording of privilege to the communication has thereby been cut.

28  So I must now come to policy. Why is it that the law has afforded this special privilege to communications between lawyers and their clients that it has denied to all other confidential communications? In relation to all other confidential communications, whether between doctor and patient, accountant and client, husband and wife, parent and child, priest and penitent, the common law recognises the confidentiality of the communication, will protect the confidentiality up to a point, but declines to allow the communication the absolute protection allowed to communications between lawyer and client giving or seeking legal advice. In relation to all these other confidential communications the law requires the public interest in the preservation of confidences and the private interest of the parties in maintaining the confidentiality of their communications to be balanced against the administration of justice reasons for requiring disclosure of the confidential material. There is a strong public interest that in criminal cases the innocent should be acquitted and the guilty convicted, that in civil cases the claimant should succeed if he is entitled to do so and should fail if he is not, that every trial should be a fair trial and that to provide the best chance of these desiderata being achieved all relevant material should be available to be taken into account. These are the administration of justice reasons to be placed in the balance. They will usually prevail.

29  In *Three Rivers (No 6)* [2004] QB 916, 935, para 39, the Court of Appeal commented that

> "the justification for litigation privilege is readily understood. Where, however, litigation is not anticipated it is not easy to see why communications with a solicitor should be privileged".

As to the justification for litigation privilege, I would respectfully agree that the need to afford privilege to the seeking or giving of legal advice for the purposes of actual or contemplated litigation is easy to understand. I do not, however, agree that that is so in relation to those documents or communications which although having the requisite connection with litigation neither constitute nor disclose the seeking or giving of legal advice. Communications between litigant and third parties are the obvious example. This House in *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 restricted litigation privilege to communications or documents with the requisite connection to *adversarial* proceedings. Civil litigation conducted pursuant to the current Civil Procedure Rules is in many respects no longer adversarial. The decision in *In re L* warrants, in my opinion, a new look at the justification for litigation privilege. But that is for another day. It does not arise on this appeal.

30  The second sentence of the cited passage does, however, pose a question of great relevance to this appeal. It questions the justification for legal advice privilege where the legal advice has no connection with adversarial litigation. A number of cases in our own jurisdiction and in other common law jurisdictions have sought to answer the question. In *R v*

*Derby Magistrates' Court, Ex p B* [1996] AC 487 Lord Taylor of Gosforth     A
CJ said, at pp 507, 508:

> "In *Balabel v Air India* [1988] Ch 317 the basic principle justifying
> legal professional privilege was again said to be that a client should be
> able to obtain legal advice in confidence.  The principle which runs
> through all these cases . . . is that a man must be able to consult his lawyer
> in confidence, since otherwise he might hold back half the truth.  The     B
> client must be sure that what he tells his lawyer in confidence will never be
> revealed without his consent . . . once any exception to the general rule is
> allowed, the client's confidence is necessarily lost."

In *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC
563, 607, para 7 Lord Hoffmann referred to legal professional privilege as "a
necessary corollary of the right of any person to obtain skilled advice about     C
the law" and continued:

> "Such advice cannot be effectively obtained unless the client is able to
> put all the facts before the adviser without fear that they may afterwards
> be disclosed and used to his prejudice."

And in *B v Auckland District Law Society* [2003] 2 AC 736, 757, para 47     D
Lord Millett justified legal professional privilege on the ground that

> "a lawyer must be able to give his client an absolute and unqualified
> assurance that whatever the client tells him in confidence will never be
> disclosed without his consent".

31    In the courts of foreign common law jurisdictions similar views have     E
been expressed.  In *Upjohn Co v United States* (1981) 449 US 383, a decision
of the United States Supreme Court, Justice Rehnquist said, at p 389, that the
purpose of legal professional privilege was

> "to encourage full and frank communication between attorneys and
> their clients and thereby promote broader public interests in the
> observance of law and administration of justice".                          F

He went on:

> "The privilege recognises that sound legal advice or advocacy serves
> public ends and that such advice or advocacy depends upon the lawyer
> being fully informed by the client."

In *Jones v Smith* [1999] 1 SCR 455, a decision of the Supreme Court of     G
Canada, the privilege was justified on the ground, at pp 474–475, para 46,
that

> "Clients seeking advice must be able to speak freely to their lawyers
> secure in the knowledge that what they say will not be divulged without
> their consent . . .  The privilege is essential if sound legal advice is to be
> given . . .  Family secrets, company secrets, personal foibles and     H
> indiscretions all must on occasion be revealed to the lawyer by the client.
> Without this privilege clients could never be candid and furnish all the
> relevant information that must be provided to lawyers if they are to
> properly advise their clients."

A    32    In leading cases in Australia and New Zealand the justification for a rule affording particular protection to confidential communications between lawyers and clients has been expressed on a broader policy basis than merely the need to ensure candour. In *Baker v Campbell* (1983) 153 CLR 52, a decision of the High Court of Australia, Murphy J, at p 89, commented that

B    "the client's legal privilege is essential for the orderly and dignified conduct of individual affairs in a social atmosphere which is being poisoned by official and unofficial eavesdropping and other invasions of privacy"

and Wilson J said, at p 95:

C    "In fostering the confidential relationship in which legal advice is given and received the common law is serving the ends of justice because it is facilitating the orderly arrangement of the client's affairs as a member of the community."

See also *Comr of Inland Revenue v West-Walker* [1954] NZLR 191, a decision of the Court of Appeal of New Zealand.

D    33    I would refer finally to the justification for legal professional privilege given by Advocate General Slynn in *A M & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913, a passage cited by Kirby J in *Daniels Corpn International Pty Ltd v Australian Competition and Consumer Commission* (2002) 213 CLR 643, 576, para 87. The Advocate General said:

E    "[The privilege] springs essentially from the basic need of a man in a civilised society to be able to turn to his lawyer for advice and help, and if proceedings begin, for representation; it springs no less from the advantages to a society which evolves complex law reaching into all the business affairs of persons, real and legal, that they should be able to know what they can do under the law, what is forbidden, where they must tread circumspectly, where they run risks."

F    34    None of these judicial dicta tie the justification for legal advice privilege to the conduct of litigation. They recognise that in the complex world in which we live there are a multitude of reasons why individuals, whether humble or powerful, or corporations, whether large or small, may need to seek the advice or assistance of lawyers in connection with their affairs; they recognise that the seeking and giving of this advice so that the clients may achieve an orderly arrangement of their affairs is strongly in the
G    public interest; they recognise that in order for the advice to bring about that desirable result it is essential that the full and complete facts are placed before the lawyers who are to give it; and they recognise that unless the clients can be assured that what they tell their lawyers will not be disclosed by the lawyers without their (the clients') consent, there will be cases in which the requisite candour will be absent. It is obviously true that in very many cases clients would have no inhibitions in providing their lawyers with
H    all the facts and information the lawyers might need whether or not there were the absolute assurance of non-disclosure that the present law of privilege provides. But the dicta to which I have referred all have in common the idea that it is necessary in our society, a society in which the restraining and controlling framework is built upon a belief in the rule of law, that

650
**Three Rivers DC v Bank of England (No 6) (HL(E))**        [2005] 1 AC
**Lord Scott of Foscote**

communications between clients and lawyers, whereby the clients are   *A*
hoping for the assistance of the lawyers' legal skills in the management of
their (the clients') affairs, should be secure against the possibility of any
scrutiny from others, whether the police, the executive, business
competitors, inquisitive busybodies or anyone else (see also paras 15.8 to
15.10 of *Zuckerman's Civil Procedure* (2003) where the author refers to the
rationale underlying legal advice privilege as "the rule of law rationale"). I,   *B*
for my part, subscribe to this idea. It justifies, in my opinion, the retention of
legal advice privilege in our law, notwithstanding that as a result cases may
sometimes have to be decided in ignorance of relevant probative material.

*The scope of legal advice privilege*

35   Legal advice privilege should, in my opinion, be given a scope that
reflects the policy reasons that justify its presence in our law. In my   *C*
respectful opinion, the approach of the Court of Appeal in the *Three Rivers
(No 6)* judgment [2004] QB 916 has failed to do so. The Court of Appeal
has restricted the scope of legal advice privilege to material constituting or
recording communications between clients and lawyers seeking or giving
advice about the clients' legal rights and obligations. It has excluded legal
advice sought or given for presentational purposes (see para 13 above). The   *D*
particular issue to be decided under the disclosure application of 1 August
2003 was whether advice that related to the presentation of material to the
inquiry qualified for legal advice privilege. In holding that it did not, the
Court of Appeal, at pp 930–931, para 26, distinguished between a lawyer-
client relationship "formed for the purpose of obtaining advice or assistance
in relation to rights and liabilities" and a lawyer-client relationship where
"the dominant purpose is not the obtaining of advice and assistance in   *E*
relation to legal rights and obligations". In relation to the former, "broad
protection will be given to communications passing between solicitor and
client in the course of that relationship"; in relation to the latter, a similar
broad protection could not be claimed.

36   The authorities on which the Court of Appeal founded their
approach were all concerned with private law rights and obligations
(ie *Greenough v Gaskell* 1 M & K 98, *Wheeler v Le Marchant* (1881)   *F*
17 Ch D 675, *Minter v Priest* [1930] AC 558 and *Great Atlantic Insurance
Co v Home Insurance Co* [1981] 1 WLR 529). It is clear, however, that
whatever view may be taken of the presentational advice point, legal advice
privilege must cover also advice and assistance in relation to public law
rights, liabilities and obligations. I understood Mr Pollock in his
submissions to your Lordships to accept that that was so.   *G*

37   In my opinion, the impossibility of a principled exclusion from legal
advice privilege of communications between lawyer and client relating to the
client's public law rights, liabilities and obligations is conclusive of the
narrow issue in this appeal. One of the main purposes of the inquiry was to
examine whether in relation to BCCI the Bank had properly discharged its
public law duties of supervision imposed by the Banking Acts. The Bank
was naturally anxious that the inquiry's conclusions should be as favourable   *H*
as possible or, to put the point in reverse, that the inquiry's criticisms of the
Bank should be as limited as possible. Every public inquiry conducts its
proceedings and expresses its conclusions under the shadow of potential
judicial review. The inquiry's procedures may be judicially reviewed if they

**491**

are perceived to be unfair. The inquiry's conclusions may be judicially reviewed if they are thought to be unsustainable in the light of the evidence the inquiry has received. Presentational advice or assistance given by lawyers to parties whose conduct may be the subject of criticism by the inquiry is advice or assistance that may serve to avoid the need to invoke public law remedies. It would be—or should be—readily accepted that, once an inquiry's conclusions have been reached and communicated to the sponsors of the inquiry, advice from lawyers to someone criticised as to whether a public law remedy might be available to quash the critical conclusions would be advice that qualified for legal advice privilege. It makes no sense at all, in my opinion, to withhold the protection of that privilege from presentational advice given by the lawyers for the purpose of preventing that criticism from being made in the first place.

38   In *Balabel v Air India* [1988] Ch 317 Taylor LJ said, at p 330, that for the purposes of attracting legal advice privilege

> "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context".

I would venture to draw attention to Taylor LJ's reference to "the relevant legal context". That there must be a "relevant legal context" in order for the advice to attract legal professional privilege should not be in doubt. Taylor LJ said, at p 331, that

> "to extend privilege without limit to all solicitor and client communication upon matters within the ordinary business of a solicitor and referable to that relationship [would be] too wide".

This remark is, in my respectful opinion, plainly correct. If a solicitor becomes the client's "man of business", and some solicitors do, responsible for advising the client on all matters of business, including investment policy, finance policy and other business matters, the advice may lack a relevant legal context. There is, in my opinion, no way of avoiding difficulty in deciding in marginal cases whether the seeking of advice from or the giving of advice by lawyers does or does not take place in a relevant legal context so as to attract legal advice privilege. In cases of doubt the judge called upon to make the decision should ask whether the advice relates to the rights, liabilities, obligations or remedies of the client either under private law or under public law. If it does not, then, in my opinion, legal advice privilege would not apply. If it does so relate then, in my opinion, the judge should ask himself whether the communication falls within the policy underlying the justification for legal advice privilege in our law. Is the occasion on which the communication takes place and is the purpose for which it takes place such as to make it reasonable to expect the privilege to apply? The criterion must, in my opinion, be an objective one.

39   In the discussion of the issue before your Lordships, and in the very helpful written submissions that the parties and the interveners have placed before your Lordships, a number of examples have been given of advice from lawyers in areas where it was suggested to be questionable whether legal advice privilege would be attracted. Planning inquiries were mentioned. Mr Pollock, as I understand it, contended that advice given by lawyers to an objector at a planning inquiry would not qualify for the

privilege. The objector's rights, liabilities and obligations would not be in issue—so, no privilege. That plainly could not be said of advice given to the developer seeking the planning permission. Advice to the developer would relate directly to the rights under planning law that the developer hoped to acquire and to any conditions accompanying the permission to develop with which the developer would be under an obligation to comply. But how could it be right to allow privilege to protect advice given to the developer but to deny it to comparable advice given to the objector? Every objector has the right under public law to present his case to the inquiry. So, in my opinion, advice given by lawyers to objectors for the purpose of enhancing the prospects of a successful outcome, from their point of view, to the inquiry would be advice given in a relevant legal context and would qualify for legal advice privilege. So to hold would not be to extend litigation privilege to inquiries. It would be to give legal advice privilege its due scope.

40  Advice given by lawyers to the promoters of private Bills was mentioned. I would myself be in no doubt at all but that advice and assistance given by lawyers to promoters of private Bills, although often, perhaps usually, presentational in character, would qualify for legal advice privilege. The relevant legal context seems to me clear. The same would apply to advice by lawyers given to opponents of the proposed Bill.

41  Mr Jonathan Crow, in a written reply submission on behalf of the Attorney General, has referred to advice given by parliamentary counsel to the Government in relation to the drafting and preparation of public Bills. This advice, too, Mr Crow submitted, should qualify for legal advice privilege. I agree that, here too, the relevant legal context is unmistakable and that legal advice privilege should apply.

42  Mr Pollock referred to advice sought from and given by a lawyer as to how to set about joining a private club. He put this forward as an obvious example of a case where legal advice privilege would not be attracted. The reason, Mr Pollock suggested, was that the advice being sought would not relate to the client's legal rights or obligations. I agree that legal advice privilege would not be attracted, not because the advice would necessarily not relate to the client's legal rights or obligations but because the bare bones of Mr Pollock's example had no legal context whatever. If his example were embellished with detail the answer might be different. Suppose the applicant for membership of the club had previously made an unsuccessful application to join the club, believed that his rejection had been inconsistent with the club's admission rules and wanted to make a fresh application with a view to testing the legality of his rejection if he were again to be blackballed. I think Mr Pollock would accept that in those circumstances the communications between the lawyer and the applicant would be protected by legal advice privilege. It would be protected because the communication would have a relevant legal context. It would relate to the legal remedies that might be available if the applicant's application were again unsuccessful.

43  There may, as I have said, be marginal cases where the answer is not easy. But, in my opinion, the present case is not in the least marginal. The preparation of the evidence to be submitted and the submissions to be made to the inquiry on behalf of the Bank were for the purpose of enhancing the Bank's prospects of persuading the inquiry that its discharge of its public law obligations under the Banking Acts in relation to BCCI was not deserving of criticism and had been reasonable in the circumstances. The presentational

A  advice given by Freshfields and counsel for that purpose was advice "as to what should prudently and sensibly be done in the relevant legal context": *Balabel v Air India* [1988] Ch 317, 330. The "relevant legal context" was the Bingham Inquiry and the question whether the Bank had properly discharged its public law duties under the Banking Acts. The presentational advice falls, in my opinion, squarely within the policy reasons underlying legal advice privilege.

B  44   I would be of the same opinion in relation to presentational advice sought from lawyers by any individual or company who believed himself, herself or itself to be at risk of criticism by an inquiry, whether a coroner's inquest, a statutory inquiry under the Tribunals of Inquiry (Evidence) Act 1921 or an ad hoc inquiry such as the Bingham Inquiry. The defence of personal reputation and integrity is at least as important to many individuals and companies as the pursuit or defence of legal rights whether under private

C  law or public law. The skills of professional lawyers when advising a client what evidence to place before an inquiry and how to present the client and his story to the inquiry in the most favourable light are, in my opinion, unquestionably legal skills being applied in a relevant legal context.

45   Accordingly, I would allow this appeal and set aside the order of 10 November 2003 made by Tomlinson J. In my opinion, all the

D  communications between the BIU and Freshfields or counsel regarding the content and manner of presentation of the overarching statement made on the Bank's behalf to the inquiry, and all internal notes and memoranda relating thereto, qualified for legal advice privilege. I have had the advantage of reading the opinions of my noble and learned friends, Lord Carswell and Lord Rodger of Earlsferry, and am in full agreement with the

E  reasons they give for allowing the appeal. I agree also with the comments made by my noble and learned friend, Lord Brown of Eaton-under-Heywood.

*Communications between lawyers and their clients' employees*

46   One of the matters debated at the Court of Appeal hearing that led to the *Three Rivers (No 5)* judgment [2003] QB 1556 was whether, or which,

F  communications between Freshfields and the Bank employees or ex-employees, or officers or ex-officers, could qualify for legal advice privilege. It was accepted that communications between the lawyers and third parties could not qualify. The Court of Appeal held that only communications between Freshfields and the BIU could qualify. All other communications had to be disclosed. This is not an issue which arises for decision on this

G  appeal but, for reasons which I have explained (see paras 20 and 21), submissions have been made to your Lordships on the issue and your Lordships have been invited to express views on them. I think your Lordships should decline the invitation for a number of reasons.

47   First, the issue is a difficult one with different views, leading to diametrically opposed conclusions, being eminently arguable. Second, there is a dearth of domestic authority. *Upjohn Co v United States* 449 US 383 in

H  the United States Supreme Court constitutes a valuable authority in a common law jurisdiction but whether (or to what extent) the principles there expressed should be accepted and applied in this jurisdiction is debatable. Third, whatever views your Lordships may express, and with whatever unanimity, the views will not constitute precedent binding on

the lower courts.  The guiding precedent on the issue will continue to be the    A
Court of Appeal judgment in *Three Rivers (No 5)*.  Fourth, if and when the
issue does come before the House (or a new Supreme Court) the panel of five
who sit on the case may or may not share the views of your Lordships, or a
majority of your Lordships, sitting on this appeal.  Fifth, and finally, this
House, represented by an Appeal Committee of three, refused leave to
appeal against the *Three Rivers (No 5)* judgment.

48    For all these reasons I think your Lordships should refrain from    B
expressing views on the issue.  Nothing that I have said should be construed
either as approval or disapproval of the Court of Appeal's ruling on the issue
in *Three Rivers (No 5)*.  The issue simply does not arise on this appeal.

**LORD RODGER OF EARLSFERRY**

49    My Lords, I have had the privilege of considering in draft the    C
speeches of my noble and learned friends, Lord Scott of Foscote, Lord
Carswell and Lord Brown of Eaton-under-Heywood.  I agree with them that
the appeal should be allowed for the reasons that they give.  I also agree that
the House should not deal with the second of the two points identified by
Lord Scott.  In adding some observations of my own I gratefully adopt the
accounts of the facts and issues given by Lord Scott and Lord Carswell.

50    The Bank of England ("the Bank") resist a claim for disclosure of    D
communications between the BIU and Freshfields on the ground that the
communications are covered by legal advice privilege.  In the formulation of
Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992]
BCLC 583, 588D–E legal advice privilege attaches to all communications
made in confidence between solicitors and their clients for the purpose of
giving or obtaining legal advice even at a stage when litigation is not in    E
contemplation.  It does not matter whether the communication is directly
between the client and his legal adviser or is made through an intermediate
agent of either.

51    It is common ground between the parties that legal advice privilege
has to be distinguished from litigation privilege.  As Lord Edmund-Davies
noted in *Waugh v British Railways Board* [1980] AC 521, 541–542, in the
past the need to make that distinction was sometimes overlooked:    F

"It is for the party refusing disclosure to establish his right to refuse.
It may well be that in some cases where that right has in the past
been upheld the courts have failed to keep clear the distinction
between (a) communications between client and legal adviser, and
(b) communications between the client and third parties, made (as the
Law Reform Committee (Sixteenth Report, Privilege in Civil Proceedings    G
(1967) (Cmnd 3472), para 17 (c)) put it) 'for the purpose of obtaining
information to be submitted to the client's professional legal advisers for
the purpose of obtaining advice upon pending or contemplated
litigation.' "

52    Litigation privilege relates to communications at the stage when
litigation is pending or in contemplation.  It is based on the idea that legal    H
proceedings take the form of a contest in which each of the opposing parties
assembles his own body of evidence and uses it to try to defeat the other,
with the judge or jury determining the winner.  In such a system each party
should be free to prepare his case as fully as possible without the risk that his

A    opponent will be able to recover the material generated by his preparations. In the words of Justice Jackson in *Hickman v Taylor* (1947) 329 US 495, 516, "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary."

53    In *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 your Lordships' House held, Lord Mustill and Lord Nicholls of Birkenhead dissenting, that proceedings under Part IV of the Children Act 1989 were "investigative" rather than "adversarial" in nature and that litigation privilege was therefore excluded by necessary implication. In the present case the Bank accept that Bingham LJ's inquiry was not to be regarded as adversarial in nature and that, for this reason, they cannot claim litigation privilege for the communications between the BIU and Freshfields. In these circumstances it is unnecessary to analyse more fully the characteristics of those kinds of proceedings which do attract litigation privilege. In his dissenting speech in *In re L,* at pp 31G–32D, Lord Nicholls of Birkenhead sounded a note of caution against basing any such analysis simply on the distinction between "adversarial" and "inquisitorial" proceedings. In the meantime those cautionary words have gained force since, for the purposes of the Human Rights Act 1998, one of the characteristics of a fair trial under article 6 is that the proceedings should be "adversarial": see, e g, *Lobo Machado v Portugal* (1996) 23 EHRR 79, para 31. The ethos of the new system of civil procedure in England and Wales, and of the more limited changes in civil procedure in Scotland, may also have a bearing on the question. Consideration of the issue must, however, await a case where the matter arises for decision.

54    The rationale of legal advice privilege has been identified in numerous cases, many of which are cited in the speeches of Lord Scott and Lord Carswell. I need not repeat them but venture to add a passage from Sir George Mackenzie's *Observations upon the 18th Act of the 23rd Parliament of King James the Sixth against Dispositions made in Defraud of Creditors etc* (1675), in *Sir George Mackenzie's Works,* vol 2 (1755), p 1. He said, at p 44:

"An Advocate is by the Nature of his Imployment tied to the same Faithfulness that any Depositor is: For his Client has depositate in his Breast his greatest Secrets; and it is the Interest of the Common-wealth, to have that Freedom allowed and secured without which Men cannot manage their Affairs and private Business: And who would use that Freedom if they might be ensnared by it? This were to beget a Diffidence betwixt such who should, of all others, have the greatest mutual Confidence with one another; and this will make Men so jealous of their Advocates that they will lose their private Business, or succumb in their just Defence, rather than Hazard the opening of their Secrets to those who can give them no Advice when the case is Half concealed, or may be forced to discover them when revealed."

As this passage shows, the public interest justification for the privilege is the same today as it was 350 years ago: it does not change, or need to change, because it is rooted in an aspect of human nature which does not change either. If the advice given by lawyers is to be sound, their clients must make them aware of all the relevant circumstances of the problem. Clients will be

656
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC
**Lord Rodger of Earlsferry**

reluctant to do so, however, unless they can be sure that what they say about any potentially damaging or embarrassing circumstances will not be revealed later. So it is settled that, in the absence of a waiver by the client, communications between clients and their lawyers for the purpose of obtaining legal advice must be kept confidential and cannot be made the subject of evidence. Of course, this means that, from time to time, a tribunal will be deprived of potentially useful evidence but the public interest in people being properly advised on matters of law is held to outweigh the competing public interest in making that evidence available. As Lord Reid succinctly remarked in *Duke of Argyll v Duchess of Argyll* 1962 SC (HL) 88, 93:

> "the effect, and indeed the purpose, of the law of confidentiality is to prevent the court from ascertaining the truth so far as regards those matters which the law holds to be confidential."

55    Despite its long pedigree the Court of Appeal in this case appear to have been less than enthusiastic about the very notion of legal advice privilege. In particular, they thought that it was not clear why it should attach to matters such as the conveyance of real property or the drawing up of a will: see [2004] QB 916, 935, para 39, per Lord Phillips of Worth Matravers MR. I do not share these doubts. A client's financial or tax position, or the financial or tax position of members of his family, may well be relevant to the way in which he asks his solicitor to structure a property transaction. Or else, for example, the client may have private worries about his son's ability to fend for himself which explain why he conveys a more valuable property to his son than to his more able daughter. People have a legitimate interest in keeping such matters private. The case for confidentiality is, if anything, even more obvious when it comes to the preparation of a will. Rightly or wrongly, the provisions are often shaped by past relationships, indiscretions, experiences, impressions and mistakes, as well as by jealousies, slights, animosities and affections, which the testator would not wish to have revealed but which he must nevertheless explain if the solicitor is to carry out his wishes. Divulging the provisions during the testator's lifetime or disclosing the reasons for them after the testator's death could often cause incalculable harm and misery. The public interest lies in minimising the risk of that happening. In these circumstances it is, in the words of *Sir George Mackenzie, Works,* vol 2, p 45, the interest of the commonwealth "not to unseal the Secrets of private Persons and thereby to render all Trust and Commerce suspect".

56    More often than not the lawyer will be advising his client on legal matters that relate to his own position—whether his public law or private law rights and obligations. Legal advice privilege also applies to advice on criminal matters, which it may not always be easy to characterise as relating, strictly speaking, to rights and obligations of the client. Mr Pollock accepted that legal advice privilege would apply in all these cases. In other cases, such as that of an objector at a public inquiry, the advice sought may relate partly to the client's own legal position and partly to the position of someone else, such as the developer. But clients may also legitimately consult their lawyers simply about someone else's legal position. Most obviously, a concerned parent may consult a lawyer about the potential repercussions for their adult child of some step which that child is contemplating. In all these cases the

657

**[2005] 1 AC**                          Three Rivers DC v Bank of England (No 6) (HL(E))
                                                        Lord Rodger of Earlsferry

client would be inhibited in obtaining proper advice from his lawyer if there were any risk that either of them might require to reveal what had passed between them. So legal advice privilege applies.

57    In the present case the Court of Appeal [2004] QB 916, 932, para 28, proceeded on the basis that

"the dominant role of Freshfields was to advise on preparation and presentation of evidence for the Bingham Inquiry but that it is possible that they may have given some advice as to the Bank's legal rights and obligations" and that "the advice and assistance sought was primarily in relation to the presentation of evidence to the inquiry rather than in relation to the Bank's rights and obligations."

Mr Sumption criticised that conclusion but, simply for present purposes, I am content to accept it without addressing those criticisms. The implication of the Court of Appeal's judgment that in these circumstances legal advice privilege is not engaged must be that, when the Bank were communicating with Freshfields in relation to the presentation of their evidence to the inquiry, they were not seeking legal advice from them.

58    In his important judgment in *Balabel v Air India* [1988] Ch 317, 331H–332B, Taylor LJ seems to have thought that in the past the business of solicitors was more restricted than it is today and that there is therefore now more of a need to keep legal advice privilege within justifiable bounds. In the present case the Court of Appeal [2004] QB 916, 933, para 30 adopted that observation. As counsel for both parties accepted, however, what Taylor LJ says in that passage is, at best, an over-simplification. Especially in the 19th century, many solicitors or attorneys acted as "men of business". They not only gave legal advice and assistance but carried on business, for instance, as patent agents, as agents for insurance companies, as deposit agents for colonial banks, and as stewards or factors running estates. They would also lend money to their clients, sometimes in relation to the purchase of property. Until fairly recently indeed, Scottish solicitors had succeeded in keeping for themselves all the work of selling houses that estate agents were doing in England. Given the varied functions performed by lawyers, it is scarcely surprising that questions frequently arose as to the capacity in which the lawyer or firm was acting in a particular transaction. For example, in both *Hagart and Burn-Murdoch v Inland Revenue Comrs* [1929] AC 386 and *Minter v Priest* [1930] AC 558 the House had to decide in what capacity solicitors had lent money to clients. And one of the issues in *Minter v Priest* was, precisely, the application of legal advice privilege in that kind of case. Lawyers today may be instructed in situations in which they would not have been instructed in the past or which did not even exist in the past; equally, however, lawyers in the past were employed in situations in which they would not be employed today and which do not even exist today. In relation to legal advice privilege what matters today remains the same as what mattered in the past: whether the lawyers are being asked qua lawyers to provide legal advice.

59    In *Balabel v Air India* [1988] Ch 317, 330 Taylor LJ reviewed the authorities and held that, for the purposes of legal advice privilege, "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context". According to his terms of reference, Bingham LJ was to inquire into the

1 AC 2005—24

**498**

supervision of BCCI under the Banking Acts and to consider whether the *A* action taken by all the United Kingdom authorities was appropriate and timely. Therefore the Banking Acts formed the relevant legal context in which Freshfields were asked to act for the Bank. So far as the Bank were concerned, what Bingham LJ had to decide was whether or not the steps that they took to supervise BCCI had been appropriate, having regard to their powers and duties under the Banking Acts as they stood at the relevant time. *B* The Bank's evidence to the inquiry was directed to that issue. It may be—the House was not told—that the BIU consulted other professionals, such as bankers, accountants or actuaries, about the presentation of the Bank's evidence. If so, the BIU would have expected them to bring their particular expertise to bear on the evidence and to comment accordingly—alerting the Bank, for instance, to any possible grounds of criticism, or to particularly favourable points which they noticed. Similarly, if—and there is no reason *C* to suppose this happened—the BIU had sought advice from the modern equivalent of a rhetorician on how to make sure that the Bank's evidence would be presented to the inquiry in a way that made it easily understood and assimilated, it would have expected him to use his rhetorical expertise when making his comments on the drafts.

60 When, however, the BIU consulted the lawyers in Freshfields, and *D* through them counsel, about the presentation of their evidence to the inquiry, it was not seeking their comments and assistance as bankers, accountants, rhetoricians or anything else: it was seeking their comments and assistance as lawyers professing expertise in the field. Either expressly or impliedly, the BIU was asking them to put on legal spectacles when reading, considering and commenting on the drafts. In other words it was *E* asking them to consider, as lawyers, how the Bank's evidence could be most effectively presented to Bingham LJ, given that he was inquiring into the Bank's discharge of their legal responsibilities under the Banking Acts. Such advice could come in many forms. For instance, the BIU could have expected Freshfields to draw attention to any implications, favourable or otherwise, which a particular line of evidence on one aspect of the Bank's supervisory obligations might have for a different aspect of their *F* responsibilities. Similarly, Freshfields would be in a position to point out matters which should not be laboured in evidence as they would be obvious to a senior judge like Bingham LJ with his ready grasp of the relevant law. Alternatively, they might highlight points that would be worth exploring more fully. Of course, your Lordships do not know which issues actually arose and were considered by the lawyers when *G* reading the Bank's draft evidence—far less what comments Freshfields communicated to the BIU which eventually helped to shape the Bank's "overarching" statement to the inquiry. That does not matter. What matters is that the BIU was instructing the lawyers in Freshfields to carry out a function which necessarily involved the use of their legal skills if it was to be performed properly. The communications between the BIU and Freshfields were therefore concerned with obtaining "legal advice" in the *H* broader sense in which, as Taylor LJ rightly said in *Balabel v Air India*, that term should be understood for this purpose. It follows that legal advice privilege applies to those communications. The appeal must be allowed.

659
[2005] 1 AC    Three Rivers DC v Bank of England (No 6) (HL(E))
Baroness Hale of Richmond

**BARONESS HALE OF RICHMOND**

61    My Lords, I agree, for the reasons given by each of you, that this appeal should be allowed. I do sympathise with the Court of Appeal's anxiety to set boundaries to the scope of legal advice privilege. Legal advice privilege restricts the power of a court to compel the production of what would otherwise be relevant evidence. It may thus impede the proper administration of justice in the individual case. This makes the communications covered different from most other types of confidential communication, where the need to encourage candour may be just as great. But the privilege is too well established in the common law for its existence to be doubted now. And there is a clear policy justification for singling out communications between lawyers and their clients from other professional communications. The privilege belongs to the client, but it attaches both to what the client tells his lawyer and to what the lawyer advises his client to do. It is in the interests of the whole community that lawyers give their clients sound advice, accurate as to the law and sensible as to their conduct. The client may not always act upon that advice (which will sometimes place the lawyer in professional difficulty, but that is a separate matter) but there is always a chance that he will. And there is little or no chance of the client taking the right or sensible course if the lawyer's advice is inaccurate or unsound because the lawyer has been given an incomplete or inaccurate picture of the client's position.

62    This rationale extends much more broadly than to advice about legal rights and obligations strictly so-called. I understand that we all endorse the approach of the Court of Appeal in *Balabel v Air India* [1988] Ch 317, and in particular the observation of Taylor LJ, at p 330, that "legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context". There will always be borderline cases in which it is difficult to decide whether there is or is not a "legal" context. But much will depend upon whether it is one in which it is reasonable for the client to consult the special professional knowledge and skills of a lawyer, so that the lawyer will be able to give the client sound advice as to what he should do, and just as importantly what he should not do, and how to do it. We want people to obey the law, enter into valid and effective transactions, settle their affairs responsibly when they separate or divorce, make wills which will withstand the challenge of the disappointed, and present their best case before all kinds of court, tribunal and inquiry in an honest and responsible manner.

63    Given this rationale, there are particular difficulties in identifying "the client" to whose communications privilege should attach in the case of a large organisation such as the Bank or a government department. As the point does not arise for decision in this case, I agree, for the reasons given by Lord Scott of Foscote, that we should not express any views upon the matter.

**LORD CARSWELL**

64    My Lords, the relatively brief but active trading history of the Bank of Credit and Commerce International SA ("BCCI"), which commenced business in 1972, came to an end on 5 July 1991, when it presented a petition for the appointment of a provisional liquidator. The history of the rise and fall of BCCI has been fully set out in the report of the inquiry held by Bingham LJ and well documented in several judgments, and it is unnecessary

to repeat it here.  It is sufficient merely to refer for convenience to the *A* summary contained in paras 16–26 of the speech of Lord Hope of Craighead in the appeal entitled *Three Rivers District Council v Bank of England (No 3)* [2003] 2 AC 1, 240–243.

65    The respondents, who are creditors of BCCI and the liquidators of the company, have brought the present claim against the Bank of England ("the Bank") for misfeasance in public office.  The essence of the claim is that *B* the Bank through its officials acted in bad faith in the exercise of its statutory responsibilities as a supervisor of BCCI as an institution licensed to accept deposits in the United Kingdom, in that it failed to take decisions that would protect the interests of depositors and potential depositors when it was aware that there was a serious and immediate threat that unless BCCI was rescued by the Abu Dhabi Government it would collapse.  The action, the *C* hearing of which has now commenced before Tomlinson J, has spawned a mass of satellite litigation which has brought the parties on a number of occasions to the Court of Appeal and to your Lordships' House.  The present appeal concerns documents in the control of the Bank, in circumstances to which I shall refer in more detail, and raises fundamental questions concerning the nature and ambit of legal professional privilege.  That *D* privilege is commonly classified in modern usage under the two sub-headings of legal advice privilege and litigation privilege (terminology which appears to owe its origin to the submission of counsel in *In re Highgrade Traders Ltd* [1984] BCLC 151, adopted by Oliver LJ, at p 161G–H).  The former covers communications passing between lawyer and client for the purpose of seeking and furnishing legal advice, whether or not in the context of litigation.  The latter, which is available when legal proceedings are in existence or contemplated, embraces a wider class of communication, such *E* as those passing between the legal adviser and potential witnesses.  The relationship between these two classes of privilege formed the subject of much of the argument before the House.

66    The Government reacted quickly to the failure of BCCI, largely due to expressions of concern which had emanated from the financial community about the quality of the Bank's supervision of BCCI under the Banking Acts.  On 19 July 1991 it was announced that an independent *F* inquiry would be held into the exercise by the Bank of its statutory duty of supervision of BCCI as a licensed deposit-taker, and on 22 July 1991 Bingham LJ was formally appointed to conduct the inquiry.  His comprehensive report on the affair was submitted in July 1992 to the Chancellor of the Exchequer and the Governor of the Bank.

67    The Bank considered it of great importance to make the most *G* effective response to the Bingham Inquiry.  For that purpose the Governor appointed a group of officials who became known as the Bingham Inquiry Unit ("BIU"), with the task of dealing with all communications between the Bank and the Inquiry.  Freshfields and counsel were instructed and over a period of time gave extensive advice and assistance, the nature of which is described in detail in paras 8 and 9 of the judgment of Tomlinson J given on 13 December 2002 in *Three Rivers District Council v Governor and* *H* *Company of the Bank of England (No 5)* [2003] QB 1556 and the documents quoted therein.  In the process the BIU and Freshfields generated a substantial volume of documents.  It may be summarised very baldly as the gathering of the necessary information to enable the solicitors and

counsel to advise on the way in which the Bank's case could be presented to the inquiry, the furnishing of such advice and the preparation and amendment of draft witness statements and submissions to and responses to requests from the inquiry. It is, however, worth adding to the material quoted by Tomlinson J the contents of para 17 of the second witness statement made by Mr Philip Mark Croall, a partner in Freshfields Bruckhaus Deringer, which gives a useful synopsis of the type of work carried out by the BIU and Freshfields:

> "So as to ensure that the Bank's legal advisers were properly instructed and fully informed to advise and assist the Bank in preparing its evidence and more generally in relation to all its dealings with the Bingham Inquiry, there was a constant flow of factual information from the Bank to its legal advisers, usually channelled through the BIU. The BIU and the Bank's legal advisers effectively operated as a single team, with members of the BIU undertaking, or delegating to others within the Bank, tasks of research or fact-gathering for the purpose of review and/or advice by the Bank's legal advisers. Specific requests for factual matters to be investigated and reported (typically in the form of notes) to the legal team were sometimes made by the legal team itself to the BIU which then initiated work within the Bank. Sometimes such work was carried out by the BIU itself and sometimes by others elsewhere within the Bank commissioned to do so by the BIU. Fact finding and research based exercises were sometimes commissioned by the BIU itself of its own initiative in order to furnish information to the legal advisers. The purpose of carrying out all of this work was to provide information to the Bank's legal advisers to enable them to prepare submissions and/or advise on the nature, presentation and/or content of the Bank's submissions to, evidence for and responses to requests from, the inquiry."

It was originally intended that witness statements from employees of the Bank and other persons would be furnished to Bingham LJ on behalf of the Bank, but in the event this was not done and the witnesses were called to give evidence to the inquiry without written statements having been supplied in advance. It appears, however, that a substantial volume of communications came into existence in the course of gathering the evidence of witnesses. Moreover, an "overarching" statement of some 258 pages was prepared on behalf of the Bank and furnished to the inquiry, which set out its case and the material evidence in some detail.

68   The inquiry itself amassed a large volume of documentation, which has been given the title of the "Bingham archive". Much of the satellite litigation to which I have referred has been concerned with attempts by the claimants to obtain access to various categories of documents in order to ascertain if there was material which they could use in support of their case. The phrase "fishing expedition" has been used more than once during the course of the series of proceedings, but it is no less than fair to recall the comment of Tomlinson J at para 72 of his judgment given on 31 May 2002 [2002] EWHC 1118 (Comm) in relation to the Bingham archive:

> "If the claimants are to be regarded as fishing, I am bound to say that they are fishing in waters which can be regarded as likely to be stocked, albeit not exclusively with fish likely to be to their taste."

69    The claimants brought two successive applications for disclosure of documents relating to the BIU. The first, the Court of Appeal decision in which is reported as *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556, is not directly the subject of this appeal, but an understanding of the issues dealt with in it is essential to consideration of the present proceedings. The second decision of the Court of Appeal, against which this appeal has been brought, is reported under the title of *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] QB 916. I shall refer to these proceedings respectively as "*Three Rivers (No 5)*" and "*Three Rivers (No 6)*".

70    In *Three Rivers (No 5)* the claimants, the present respondents, applied pursuant to CPR r 31.19 for disclosure by the Bank of a large number of documents for which the Bank had claimed legal privilege. In his judgment given on 13 December 2002, to which I have referred, Tomlinson J upheld the Bank's claim and refused the declaratory relief sought by the claimants. His reasons for so holding, which appear to me to have considerable force, are set out in para 30 of his judgment, in which he expressed his conclusion:

"In my judgment an internal confidential document, not being a communication with a third party, which was produced or brought into existence with the dominant purpose that it or its contents be used to obtain legal advice is privileged from production."

The judge stated that the necessary control is supplied by the dominant purpose test, which is applied at the time of creation of the documents. He summarised his conclusion on the dominant purpose test at para 32 of his judgment, where he held that:

"the Bank has properly identified as the dominant purpose for which much of the material was brought into existence by the BIU the obtaining or recording of legal advice. More broadly, the Bank has established that the material was prepared or commissioned pursuant to the retainer between the Bank and the legal advisers as part of the necessary exchange of information of which the object was the giving of legal advice."

71    The Court of Appeal (Lord Phillips of Worth Matravers MR, Sedley and Longmore LJJ) [2003] QB 1556 reversed the judge's decision, accepting the contention advanced by counsel for the claimants that documents prepared by the Bank's employees or ex-employees, whether prepared for submission to or at the direction of Freshfields or not, should be disclosed as being no more than raw material on which the BIU, as the client of Freshfields, would thereafter seek advice. It accordingly held that the Bank was not entitled to privilege in respect of any of the following four categories of documents in issue: (a) documents prepared by Bank employees, the dominant purpose of preparing which was that they should be sent to Freshfields and which were in fact so sent; (b) documents of the same class which were not in fact so sent to Freshfields; (c) documents prepared by Bank employees, without the dominant purpose of obtaining legal advice, which were in fact sent to Freshfields; (d) documents in categories (a) to (c) which had been prepared by Bank employees who were no longer employed by the Bank.

A    72    The court accepted that Freshfields' client was the BIU, not the Bank itself or any individual officer, but its conclusions did not turn so much on the identity of the authors of the documents in question as on the more general point that in the court's view legal advice privilege, as distinct from litigation privilege, was restricted to communications between a client and his legal advisers, to documents evidencing such communications, and to documents that were intended to be such communications even if they were B    not in fact communicated.  None of the four categories of documents concerned in the appeal came within that description and accordingly they were not covered by privilege.  It rejected the Bank's argument that communications from an employee were so covered, even though it recognised that a corporation can only act through its employees.

73    The court reached a subsidiary but distinct conclusion on a second C    issue, the dominant purpose of the preparation of the documents, which was set out in para 35 of the judgment of the court, at p 1582, given by Longmore LJ:

"In the former case of original documentary material supplied to assist in the compilation of the November 1991 statement or April 1992 paper, we think it impossible to say that the dominant purpose of its preparation D    was the obtaining of legal advice.  It is raw material for presentation to the inquiry and the dominant purpose for which it was prepared was so that the Bank could comply with its primary duty of putting all relevant factual material before Bingham LJ."

74    The Bank presented a petition for leave to appeal to your Lordships' House, but on 14 May 2003 (see at p 1583) the Appeal Committee dismissed E    the petition.  The Bank has disclosed documents to the claimants in accordance with the ruling of the Court of Appeal.  The claimants, as they state in their printed case, found that those documents proved to be a "veritable gold-mine of factual information as to what had happened during the years of BCCI's supervision and as to what various Bank officials had really thought."

75    In *Three Rivers (No 5)* Mr Pollock, leading counsel for the F    claimants, made it clear that he did not seek disclosure of any documents passing between Freshfields and the BIU, regarding them on thitherto accepted principle as being covered by legal advice privilege.  In the light of the content of the judgment of the Court of Appeal on the second issue in *Three Rivers (No 5)* the claimants mounted a further application—*Three Rivers (No 6)*—seeking disclosure of communications between the BIU and G    Freshfields in so far as those were seeking or obtaining assistance or advice as to the manner in which the Bank should most appropriately present evidence and material to the inquiry.  The essence of the case made by the respondents was that although the Court of Appeal had declared that the Bank was entitled to claim privilege for communications passing between the Bank and its legal advisers for the purpose of obtaining legal advice, the term "legal advice" was limited to advice on the legal rights and H    obligations of the Bank and, specifically, did not extend to advice and assistance directed towards the better presentation of the Bank's case to the inquiry.  Tomlinson J [2003] EWHC 2565 (Comm) permitted Mr Pollock to withdraw the concession which he had made in *Three Rivers (No 5)* and to present this new argument.  He expressed the view that it was implicit in

the decision of the Court of Appeal in *Three Rivers (No 5)* that it did not regard Freshfields' assistance and advice on presentational matters as attracting legal advice privilege. He held accordingly and made a declaration that

> "the only documents or parts of documents in the Bank's control and coming into existence between the closure of BCCI SA on 5 July 1991 and the issue of the present proceedings in May 1993 which the Bank is entitled to withhold from inspection on the ground of legal advice privilege are: (1) communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purposes of seeking or obtaining 'legal advice' (which means, for the avoidance of doubt, advice concerning the Bank's rights and obligations); and (2) any part of a document which evidences the substance of such a communication."

He ordered that the Bank should serve a further and better list of documents and make them available for inspection.

76    The Court of Appeal (Lord Phillips of Worth Matravers MR, Longmore and Thomas LJJ) [2004] QB 916 dismissed the Bank's appeal. In giving the judgment of the court, Lord Phillips MR commenced, at p 926, para 10, by defining legal advice, not as advice given by a lawyer but as "advice in relation to law". He examined in some detail a series of authorities, which I shall consider in due course, and concluded, at p 927, para 16, that the statements in them lent support to the argument that legal advice is restricted to advice about legal rights and liabilities. He referred, at p 930, para 25, to the opinion expressed by the Law Reform Committee in its Sixteenth Report on Privilege in Civil Proceedings (Cmnd 3472), to the effect that the true rationale of legal advice privilege was that it was "a privilege in aid of litigation" and was concerned exclusively with rights and liabilities enforceable in law. He regarded the authorities as supporting that statement, since he considered that in all of them the relationship of solicitor and client arose in relation to transactions involving legal rights and obligations capable of becoming the subject matter of litigation. The court set out in para 26, at pp 930–931, the conclusion which it drew from this examination:

> "In summary, the authorities to which we have referred show that, where a solicitor-client relationship is formed for the purpose of obtaining advice or assistance in relation to rights and liabilities, broad protection will be given to communications passing between solicitor and client in the course of that relationship. In all the cases, however, the primary object of the relationship was to obtain assistance that required knowledge of the law. We do not consider that the same principle applies to communications between solicitor and client when the dominant purpose is not the obtaining of advice and assistance in relation to legal rights and obligations."

77    The Court of Appeal rejected, in para 28, at pp 931–932, the Bank's argument that since the subject matter of the inquiry was very sensitive and the Bank could be subject to criticism or blame as a result of its findings, the giving of advice and assistance by the solicitors, being designed to protect the Bank against such a possibility, was in the context of a professional

A   relationship that involved advising on legal rights and obligations. It held that the advice and assistance sought was primarily in relation to the presentation of evidence to the inquiry rather than in relation to the Bank's rights and obligations. Nor did the possibility of damage to the Bank's reputation suffice to attract legal advice privilege for the communications in question. Although the role of the solicitor might have widened in recent times, the extent of legal advice privilege should not be widened to encompass that extension. The court expressed this conclusion in para 37 of its judgment, at p 934:

B

> "We do not consider that the facts of this case justify this extension to the law of privilege. The inquiry in this case was a private, non-statutory inquiry. One of the sponsors of that inquiry, albeit a reluctant sponsor, was the Bank itself. The Bank's primary concern was, or should have
C   been, to ascertain whether the collapse of BCCI was attributable to any regulatory shortcomings in this country. We cannot see that in these circumstances communications between the Bank and the solicitors who were assisting in the obtaining, preparation and presentation of evidence and submissions to the inquiry should attract privilege, even if the Bank was anxious that this assistance should enable the Bank's role to be
D   presented in the best possible light."

78   Lord Phillips of Worth Matravers MR concluded his judgment with remarks at p 935, para 39, which caused a degree of concern to the interveners in the appeal before the House, Her Majesty's Government, the Bar Council and the Law Society:

E   > "We have found this area of the law not merely difficult but unsatisfactory. The justification for litigation privilege is readily understood. Where, however, litigation is not anticipated it is not easy to see why communications with a solicitor should be privileged. Legal advice privilege attaches to matters such as the conveyance of real property or the drawing up of a will. It is not clear why it should. There would seem little reason to fear that, if privilege were not available in
F   such circumstances, communications between solicitor and client would be inhibited. Nearly 50 years have passed since the Law Reform Committee looked at this area. It is perhaps time for it to receive a further review."

79   Mr Sumption presented the case on behalf of the Bank on two main grounds, one broader and one narrower. The essence of the former was that
G   legal advice privilege attaches to the documents in question, as being communications between lawyer and client constituting advice and assistance of a kind which it is part of the proper function of a lawyer to give by virtue of his legal skills. Mr Pollock, upholding the decision of the Court of Appeal, contended that legal advice privilege is an "outgrowth and extension" of litigation privilege, the true root of legal professional privilege, which should be closely confined in extent to advice on legal rights and
H   obligations. It did not cover advice and assistance in the presentation of a client's case before a tribunal such as the Bingham Inquiry, the outcome of which did not have legal consequences for that client. Mr Sumption challenged this last point in advancing his narrower submission, to the effect that the Bingham Inquiry did have considerable potential legal consequences

**506**

for the Bank, and that even on the definition of legal advice propounded by the Court of Appeal Freshfields' advice to it was covered by legal advice privilege.

80   It is convenient first to consider the narrower submission, which involves looking at the nature of the inquiry and the implications which it held for the Bank. The terms of reference were:

> "To inquire into the supervision of BCCI under the Banking Acts; to consider whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations."

The focus of the inquiry was always going to be a critical examination of the Bank's performance of its supervisory duties under the Banking Acts. It was apparent that some would seek to attach blame to the Bank for failing to take earlier action—the then Prime Minister stated in the House of Commons that the inquiry would "determine where the blame lies"—and that public criticism in the inquiry report of the conduct of some officials was a distinct possibility. Nor could one rule out the possibility that some amendment, which might be unwelcome to the Bank, of its regulatory powers and duties might be recommended. There appears accordingly to be some substance in the suggestion made by Mr Croall in para 8 of his second witness statement that

> "any criticism and consequential damage to its reputation (or to that of any of its senior officials in the Banking Supervision Division) might impair its ability to supervise effectively".

81   Under section 1(4) of the Banking Act 1987 the Bank was immune against ordinary civil liability for failure to perform its duty to supervise deposit-takers, but if bad faith were established it would be liable to remedies in private law. Public law remedies could also be obtained against the Bank in respect of its performance of its functions.

82   In these circumstances I consider that the observations made by Tomlinson J were justified, when he stated at para 7 of his judgment in *Three Rivers (No 5)*:

> "Anything that the Bank did and said in relation to the inquiry was potentially of great legal sensitivity. It was an inquiry one outcome of which could be criticism of the conduct of the Bank from an informed and highly authoritative source, an outcome which would not only be of some importance in relation to the Bank's ongoing regulatory and supervisory role but would itself be likely either to lead to or to encourage the institution or attempted institution of proceeding against the Bank by depositors and others who had lost money in consequence of the collapse of BCCI."

Again, in para 15 of that judgment the judge referred to the "obvious possibility" that litigation might in due course be instituted against the Bank. Bingham LJ also appears to have envisaged the same possibility when he referred in his covering letter of July 1992 to the Chancellor of the Exchequer and the Governor of the Bank to "any forthcoming litigation".

83   Counsel for the Bank did not seek to argue that this possibility was sufficient to make the case one of litigation privilege. For that head of privilege to apply litigation must be reasonably in prospect: see *Matthews &*

667

[2005] 1 AC    Three Rivers DC v Bank of England (No 6) (HL(E))
Lord Carswell

*Malek*, *Disclosure*, 2nd ed (2001), para 9.034 and authorities cited there. He did contend, however, that the prospect of litigation, added to that of criticism and blame and the possibility of amendment of the regulatory regime, meant that the advice and assistance given by Freshfields concerned the Bank's legal rights and obligations. If, contrary to his submission, the Court of Appeal was correct in its definition of legal advice for which privilege can be claimed, the advice and assistance given fell within that definition on a correct view of the facts of the case. The Court of Appeal was not correct in stating at para 28 of the judgment of the court [2004] QB 916, 932 that the matter was concluded by the judge's finding in para 8 of his judgment, for that was to disregard what he stated in paras 7 and 15 which I have quoted.

84   In my opinion there is substantial force in the Bank's argument. Even if the definition of legal advice adopted by the Court of Appeal is to be regarded as correct, the circumstances in which the Bank sought advice and assistance from Freshfields were such that much of the focus was on the legal rights and obligations of the Bank. There may be room for argument, however, on the question whether that was the dominant purpose of the Bank in seeking that advice and assistance, but I do not propose to attempt to resolve that issue or to determine the appeal on this ground alone. I think that it is of some importance for the House to take the opportunity to examine more generally the basis of legal advice privilege and the correctness of the major thesis of the Court of Appeal in its judgment in this case.

85   The object of litigation privilege was described in the classic statement of Sir George Jessel MR in *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, 649:

"The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation. That is the meaning of the rule."

86   Determining the bounds of privilege involves finding the proper point of balance between two opposing imperatives, making the maximum relevant material available to the court of trial and avoiding unfairness to individuals by revealing confidential communications between their lawyers and themselves. The practice which has developed is a reconciliation between these principles: *Seabrook v British Transport Commission* [1959] 1 WLR 509, 513, per Havers J. There is a considerable public interest in each of these. The importance of keeping to a minimum the withholding of relevant material from the court, upon which Mr Pollock

**508**

laid emphasis, is self-evident. It was stressed by Wigmore (*Evidence in Trials at Common Law*, vol 8, rev McNaughton (1961), p 554, para 2291), who expressed the opinion that the privilege should be strictly confined within the narrowest possible limits consistent with the logic of its principle, an approach echoed in the speech of Lord Edmund-Davies in *Waugh v British Railways Board* [1980] AC 521, 543. The competing principle of legal professional privilege is also rooted in public policy: cf *B v Auckland District Law Society* [2003] 2 AC 736, 756–757, paras 46–47. It is not based upon the maintenance of confidentiality, although in earlier case law that was given as its foundation. If that were the only reason behind the principle the same privilege would be extended to such confidants as priests and doctors, whereas it has been settled in a line of authority stemming from the *Duchess of Kingston's Case* (1776) 1 East PC 469 that it is confined to legal advisers: see, e g, *Cross & Tapper on Evidence*, 9th ed (1999), pp 461–465.

87    It is stated in *Cross & Tapper*, at p 439, that in England the rule was traditionally regarded as a rule of evidence, but the editor points out that in some Commonwealth jurisdictions "the privilege was elevated into something more nearly resembling a basic constitutional principle, expressed in the rhetoric of rights". That development has been mirrored in this jurisdiction. In *R v Derby Magistrates' Court, Ex p B* [1996] AC 487 Lord Taylor of Gosforth CJ, with whose reasons the other members of the House agreed, stated, at p 507, after reviewing the authorities:

> "The principle which runs through all these cases, and the many other cases which were cited, is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth. The client must be sure that what he tells his lawyer will never be revealed without his consent. Legal professional privilege is thus much more than an ordinary rule of evidence, limited in its application to the facts of a particular case. It is a fundamental condition on which the administration of justice as a whole rests."

Lord Hoffmann expressed himself similarly, again with the concurrence of the other members of the House, in *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563, 606, para 7 when he described legal professional privilege as "a fundamental human right long established in the common law". In para 31, at p 612, he referred with approval to the judgments of the New Zealand Court of Appeal in *Comr of Inland Revenue v West-Walker* [1954] NZLR 191, where the privilege was described as not merely a rule of evidence but a substantive right founded on an important public policy.

88    The approach of the Court of Appeal [2004] QB 916 to ascertaining the ambit of legal advice which will attract privilege was conditioned by its acceptance of Mr Pollock's proposition to which I have referred, that legal professional privilege is an outgrowth and extension of litigation privilege. Lord Phillips of Worth Matravers MR stated, at p 930, para 25:

> "All of the cases to which we have thus far referred were ones in which the relationship of client and solicitor arose in relation to transactions involving legal rights and obligations capable of becoming the subject matter of litigation."

A One must therefore commence consideration of this part of the case by examining the validity of the proposition. One has to ask the question, does legal professional privilege stem from litigation, as the Court of Appeal held, in which event any extension of it outside that sphere requires to be carefully limited? Or is it, as the Bank contended, a more general privilege based on the relationship of lawyer and client and so extending to a wider area of advice and assistance given by legal advisers to their clients? Subsidiary
B arguments were developed about the need for certainty and the inconvenience which would ensue if the ruling given by the Court of Appeal were generally applied. But if answers are found to these questions which embody proper principles and are consistent with established lines of authority, that will, I think, take one a good distance towards conclusions which will settle the issues debated in this part of the case under appeal.

C 89 I propose to commence that search by examining the authorities. The arguments on the issue of principle depend to a large extent on one's starting point, which is determined by the answers to the questions which I have posed. There is no a priori reason why legal professional privilege should be regarded as stemming from litigation rather than more generally from the giving of legal advice, or vice versa, and therefore it is of
D assistance to attempt to ascertain the direction which the law has taken on this topic.

90 Both the Bank and the claimants claimed that the decided cases supported their respective interpretations of the law, so it is necessary to consider them in some detail. The early history of legal privilege is set out in the speech of Lord Taylor of Gosforth CJ in *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 507 et seq, where he traces it back to the earliest
E instances, to be found in 16th century reports, and follows it through a number of cases in the 18th and 19th centuries. For present purposes it is sufficient to commence with *Greenough v Gaskell* 1 M & K 98, decided by Lord Brougham LC in 1833. The defendant in the suit, a solicitor, objected to being required to produce book entries, memoranda, letters and other papers generated over a period in the course of furnishing professional legal
F advice to his client, to whom money was advanced out of a fund in court in an administration suit. In his judgment Lord Brougham LC set out his conclusions on the claim to privilege in a passage, at pp 101–103, which is worth quoting at length, since it is the fons et origo of the modern law:

"Here the question relates to the solicitor, who is called upon to produce the entries he had made in accounts, and letters received by him,
G and those written (chiefly to his town agent) by him, or by his direction, in his character or situation of confidential solicitor to the party; and I am of opinion that he cannot be compelled to disclose papers delivered, or communications made to him, or letters, or entries made by him in that capacity. To compel a party himself to answer upon oath, even as to his belief or his thoughts, is one thing; nay, to compel him to disclose what he has written or spoken to others, not being his professional advisers, is
H competent to the party seeking the discovery; for such communications are not necessary to the conduct of judicial business, and the defence or prosecution of men's rights by the aid of skilful persons. To force from the party himself the production of communications made by him to professional men seems inconsistent with the possibility of an ignorant

**510**

man safely resorting to professional advice, and can only be justified if the
authority of decided cases warrants it.  But no authority sanctions the
much wider violation of professional confidence, and in circumstances
wholly different, which would be involved in compelling counsel or
attorneys or solicitors to disclose matters committed to them in their
professional capacity, and which, but for their employment as
professional men, they would not have become possessed of.

"As regards them, it does not appear that the protection is qualified by
any reference to proceedings pending or in contemplation.  If touching
matters that come within the ordinary scope of professional employment,
they receive a communication in their professional capacity, either from a
client, or on his account, and for his benefit in the transaction of his
business, or, which amounts to the same thing, if they commit to paper, in
the course of their employment on his behalf, matters which they know
only through their professional relation to the client, they are not only
justified in withholding such matters, but bound to withhold them, and
will not be compelled to disclose the information or produce the papers in
any court of law or equity, either as party or as witness.  If this protection
were confined to cases where proceedings had commenced, the rule
would exclude the most confidential, and it may be the most important of
all communications—those made with a view of being prepared either for
instituting or defending a suit, up to the instant that the process of the
court issued.

"If it were confined to proceedings begun or in contemplation, then
every communication would be unprotected which a party makes with a
view to his general defence against attacks which he apprehends,
although at the time no one may have resolved to assail him.  But were it
allowed to extend over such communications, the protection would be
insufficient, if it only included communications more or less connected
with judicial proceedings; for a person oftentimes requires the aid of
professional advice upon the subject of his rights and his liabilities, with
no references to any particular litigation, and without any other reference
to litigation generally than all human affairs have, in so far as every
transaction may, by possibility, become the subject of judicial inquiry.  'It
would be most mischievous,' said the learned judges in the Common
Pleas, 'if it could be doubted whether or not an attorney, consulted upon a
man's title to an estate, was at liberty to divulge a flaw' (*Cromack v
Heathcote* 2 Brod & B 6).

"The foundation of this rule is not difficult to discover.  It is not (as has
sometimes been said) on account of any particular importance which the
law attributes to the business of legal professors, or any particular
disposition to afford them protection, though certainly it may not be very
easy to discover why a like privilege has been refused to others, and
especially to medical advisers.

"But it is out of regard to the interests of justice, which cannot be
upholden, and to the administration of justice, which cannot go on,
without the aid of men skilled in jurisprudence, in the practice of the
courts, and in those matters affecting rights and obligations which form
the subject of all judicial proceedings.  If the privilege did not exist at all,
every one would be thrown upon his own legal resources; deprived of all
professional assistance, a man would not venture to consult any skilful

671
[2005] 1 AC                     Three Rivers DC v Bank of England (No 6) (HL(E))
                                                                Lord Carswell

A person, or would only dare to tell his counsellor half his case.  If the privilege were confined to communications connected with suits begun, or intended, or expected, or apprehended, no one could safely adopt such precautions as might eventually render any proceedings successful, or all proceedings superfluous."

91    Statements to the same effect concerning advice given in relation to legal proceedings may be found in such cases as *Bolton v Liverpool Corpn* (1833) 1 M & K 88, 94–95, per Lord Brougham LC, and *Holmes v Baddeley* (1844) 1 Ph 476, 480–481, per Lord Lyndhurst LC.  In *Herring v Clobery* (1842) 1 Ph 91 Lord Lyndhurst LC followed the rule laid down in *Greenough v Gaskell* 1 M & K 98 in preference to a narrower rule confined to litigation, in progress or anticipated, which had been propounded by Lord Tenterden CJ at nisi prius.  He stated, at pp 94–95:

"But further, I think that restriction of the rule is not consistent with, and not founded on, any sound principle; for it may, and in a great variety of cases would, be of as much importance to parties that the communications made between a client and a solicitor with respect to the state of the client's property, with respect to his liabilities, with respect to his title, should be protected, as that protection should be afforded to communications made in the progress of a cause; and it appears to me that, as individuals must from time to time resort to their legal advisers for guidance in their ordinary transactions, public policy requires that communications of that kind should be privileged and protected, in order that they may be free and unfettered."

Lord Lyndhurst LC gave a similar ruling in *Carpmael v Powis* (1846) 1 Ph 687, where he held the privilege to exist in respect of communications relating to the fixing of a reserved bidding on a sale of land.  He said, at p 692: "I am of opinion that the privilege extends to all communications between a solicitor, as such, and his client, relating to matters within the ordinary scope of a solicitor's duty."  Lord Lyndhurst declined to confine it to the lawyer's work stricto sensu of drawing the agreements, investigating the title and preparing the conveyance.  The work done was all part of one transaction of the nature in which solicitors are ordinarily employed.  Knight Bruce V-C gave a decision to the same effect in *Pearse v Pearse* (1846) 1 De G & Sm 12, where the communications related to transactions concerning the client's lands and were unconnected with any existing or anticipated litigation.

92    Notwithstanding the clarity of the expressions of opinion which I have cited, there remained for some time some differences of view and some contrary statements in the case law.   The differences were authoritatively resolved by a judgment given by Lord Selborne LC in the Court of Appeal in Chancery in *Minet v Morgan* LR 8 ChApp 361, in which he said, at p 366, that the law had not at once reached a broad and reasonable footing, but reached it by successive steps.  He affirmed in very positive terms the propositions set out in the judgments to which I have referred, quoting with approval the statement of Kindersley V-C in *Lawrence v Campbell* (1859) 4 Drew 485, 490, in which he said that it was now sufficient for privilege if communications passed as professional communications in a professional capacity, even though they were not made either during or relating to an actual or even to an expected litigation.

**512**

Similarly, the operation of the rule was described in unqualified terms by the Earl of Halsbury LC, when he said in *Bullivant v Attorney General for Victoria* [1901] AC 196, 200–201 that

> "for the perfect administration of justice, and for the protection of the confidence which exists between a solicitor and his client, it has been established as a principle of public policy that those confidential communications shall not be subject to production".

93    In modern law authoritative statements support this view of the law. In *R v Derby Magistrates' Court, Ex p B* [1996] AC 487, 510 Lord Nicholls of Birkenhead said:

> "The law has been established for at least 150 years, since the time of Lord Brougham LC in 1833 in *Greenough v Gaskell* 1 M & K 98: subject to recognised exceptions, communications seeking professional legal advice, whether or not in connection with pending court proceedings, are absolutely and permanently privileged from disclosure even though, in consequence, the communications will not be available in court proceedings in which they might be important evidence."

Lord Jauncey of Tullichettle expressed himself similarly in *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 25 when he said that in the case of communications between solicitor and client "the privilege attaches to all communications whether related to litigation or not".

94    It is relevant also to inquire, since this doctrine is a judge-made development, what view other common law jurisdictions have taken of the nature of legal professional privilege.  One finds a similar approach in Australia and Canada.  In *Baker v Campbell* (1983) 153 CLR 52 in the High Court of Australia Wilson J stated, at p 94, that the privilege is not limited to a rule of evidence confined to judicial and quasi-judicial proceedings.  This statement was followed in *Esso Australia Resources Ltd v Federal Comr of Taxation* (1999) 201 CLR 49, 64–65, para 35, per Gleeson CJ, and in *Daniels Corpn International Pty Ltd v Australian Competition and Consumer Commission* 213 CLR 543, 563, para 44, per McHugh J, and at p 575, para 85, per Kirby J.  In *Descoteaux v Mierzwinski* (1982) 141 DLR (3d) 590 in the Supreme Court of Canada Lamer J, giving the judgment of the court, defined, at pp 604–605, the substantive rule of privilege, as distinct from the evidentiary rule applying in court proceedings, in terms which were clearly meant to encompass any circumstances in which a client consults a solicitor, irrespective of any existing or anticipated litigation.

95    A statement of the rationale of legal privilege which is consistent with the approach in the cases which I have cited may be found in the European case law in the opinion of Mr Advocate General Sir Gordon Slynn in *A M & S Europe Ltd v Commission of the European Communities* (Case 155/79) [1983] QB 878, 913:

> "Whether it is described as the right of the client or the duty of the lawyer, this principle has nothing to do with the protection or privilege of the lawyer.  It springs essentially from the basic need of a man in a civilised society to be able to turn to his lawyer for advice and help, and if proceedings begin, for representation; it springs no less from the advantages to a society which evolves complex law reaching into all the

513

673
[2005] 1 AC                    Three Rivers DC v Bank of England (No 6) (HL(E))
                                                              Lord Carswell

A  business affairs of persons, real and legal, that they should be able to know what they can do under the law, what is forbidden, where they must tread circumspectly, where they run risks."

96  The branch of legal professional privilege which is classified under the name of litigation privilege had a later origin in three cases decided in the later part of the 19th century, which were discussed in detail by the Court of Appeal in *Three Rivers (No 5)* [2003] QB 1556. The first was *Anderson v Bank of British Columbia* 2 Ch D 644, to which I have already referred briefly. The management of the defendant bank, whose headquarters were in London, apprehended litigation concerning the conduct of an account in a branch in Portland, Oregon. The London manager accordingly cabled the branch manager in Portland, requesting "fullest particulars" of the transactions in question. The latter duly sent details by letter, which was discussed with the Bank's solicitor at a meeting of the board of directors in London. In the ensuing litigation privilege was claimed for the letter, but refused by Sir George Jessel MR and the Court of Appeal. As Bingham LJ observed in *Ventouris v Mountain* [1991] 1 WLR 607, 612, on modern principles the Oregon manager's letter would be regarded as privileged as a letter written for the purpose of laying before a solicitor in order to obtain legal advice. The importance of the case, however, lies not in the conclusion reached but in the statements of the law propounded by the judges who heard the case.

97  Sir George Jessel MR defined the extent of the rule, at pp 649–650:

"Now, as to the extent of the rule. It goes not merely to a communication made to the professional agent himself by the client directly, it goes to all communications made by the client to the solicitor through intermediate agents, and he is not bound to write letters through the post, or to go himself personally to see the solicitor; he may employ a third person to write the letter, or he may send the letters through a messenger, or he may give a verbal message to a messenger, and ask him to deliver it to the solicitor, with a view to his prosecuting his claim, or of substantiating his defence.

"Again, the solicitor's acts must be protected for the use of the client. The solicitor requires further information, and says, I will obtain it from a third person. That is confidential. It is obtained by him as solicitor for the purpose of the litigation, and it must be protected upon the same ground, otherwise it would be dangerous, if not impossible, to employ a solicitor. You cannot ask him what the information he obtained was. It may be information simply for the purpose of knowing whether he ought to defend or prosecute the action, but it may be also obtained in the shape of collecting evidence for the purpose of such prosecution or defence. All that, therefore, is privileged."

In the Court of Appeal James LJ, at p 656, described the principle shortly as being "that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief." Mellish LJ said, at p 658:

"To be privileged it must come within one of two classes of privilege, namely, that a man is not bound to disclose confidential communications made between him and his solicitor, directly, or through an agent who is

to communicate them to the solicitor; or, secondly, that he is not bound to    *A*
communicate evidence which he has obtained for the purpose of
litigation."

98    In the second case of this trilogy, *Southwark and Vauxhall Water Co
v Quick* (1878) 3 QBD 315, documents prepared with the intention of laying
them before the plaintiff company's solicitor in order to obtain his advice
were held to be privileged.  I need not to go into the facts of the case, which    *B*
I cite only for the statement of law by Brett LJ, at p 320, which he deduced
from the judgments in *Anderson v Bank of British Columbia* 2 Ch D 644:

"it is clear that if a party seeks to inspect a document which comes into
existence merely as the materials for the brief, or that which is equivalent
to the brief, then the document cannot be seen, for it is privileged.  It has
been urged that the materials, or the information obtained for the brief,    *C*
should have been obtained 'at the instance' or 'at the request' of the
solicitor; but I think it is enough if they come into existence merely as the
materials for the brief, and I think that phrase may be enlarged into
'merely for the purpose of being laid before the solicitor for his advice or
for his consideration'."

99    In the third case, *Wheeler v Le Marchant* (1881) 17 Ch D 675 the    *D*
defendants sought privilege for reports obtained by their solicitors from
estate agents/surveyors in the course of previous administration proceedings
unconnected with the instant action brought by the plaintiff for specific
performance of an agreement.  The Court of Appeal, reversing the order of
Bacon V-C, held that the documents were not privileged.  Sir George
Jessel MR, at pp 680–681, discussed the limits of the privilege granted to    *E*
documents obtained by a solicitor from third parties for the purposes of
existing or anticipated litigation:

"What they contended for was that documents communicated to the
solicitors of the defendants by third parties, though not communicated by
such third parties as agents of the clients seeking advice, should be
protected, because those documents contained information required or
asked for by the solicitors, for the purpose of enabling them the better to    *F*
advise the clients.  The cases, no doubt, establish that such documents are
protected where they have come into existence after litigation
commenced or in contemplation, and when they have been made with a
view to such litigation, either for the purpose of obtaining advice as to
such litigation, or of obtaining evidence to be used in such litigation, or of
obtaining information which might lead to the obtaining of such    *G*
evidence, but it has never hitherto been decided that documents are
protected merely because they are produced by a third person in answer
to an inquiry made by the solicitor."

He described the rule, at p 682, as being "established and maintained solely
for the purpose of enabling a man to obtain legal advice with safety".  Brett
and Cotton LJJ expressed the rule in similar terms, Cotton LJ stating, at    *H*
pp 684–685:

"Hitherto such communications have only been protected when they
have been in contemplation of some litigation, or for the purpose of
giving advice or obtaining evidence with reference to it.  And that is

A    reasonable, because then the solicitor is preparing for the defence or for bringing the action, and all communications he makes for that purpose, and the communications made to him for the purpose of giving him the information, are, in fact, the brief in the action, and ought to be protected. But here we are asked to extend the principle to a very different class of cases, and it is not necessary, in order to enable persons freely to communicate with their solicitors and obtain their legal advice, that any

B    privilege should be extended to communications such as these."

100    The limits of this litigation privilege were defined by your Lordships' House in relatively recent times in *Waugh v British Railways Board* [1980] AC 521. The appeal concerned a report made very shortly after a railway accident, based on a joint internal inquiry conducted by the

C    board's personnel. The report was prepared, in Lord Wilberforce's words, at p 531, "for a dual purpose: for what may be called railway operation and safety purposes and for the purpose of obtaining legal advice in anticipation of litigation." The House rejected the claim for privilege, holding that it extended to such documents only if the latter purpose was the dominant one. It was made clear in the speeches given by their Lordships that the context was purely that of what is now termed litigation privilege, not legal advice

D    privilege. So Lord Edmund-Davies said, at p 542, that litigation, apprehended or actual, was the hallmark of this privilege, and that preparation with a view to litigation was the essential purpose which protects a communication from disclosure in such cases.

101    An exception to the availability of litigation privilege appears in the decision of your Lordships' House in *In re L (A Minor) (Police Investigation:*

E    *Privilege)* [1997] AC 16. The majority held that a party could not rely upon it in proceedings which were not adversarial. The jurisdiction concerned in that case was care proceedings under Part IV of the Children Act 1989. Such proceedings, as Lord Jauncey of Tullichettle stated, at p 27:

"are so far removed from normal actions that litigation privilege has no place in relation to reports obtained by a party thereto which could not

F    have been prepared without the leave of the court to disclose documents already filed or to examine the child."

102    The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and the qualifications expressed in the modern case-law is that communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection

G    with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial.

103    Mr Sumption relied on the cases which I have cited as a foundation for his submission that no fundamental distinction should be

H    drawn between communications in connection with litigation and others. He submitted that Lord Nicholls of Birkenhead was correct in his statement in *In re L (A Minor),* at p 33, when he described the two sub-headings of legal advice privilege and litigation privilege as integral parts of a single privilege. The only area in which the distinction became relevant

was that of third party communications.  Mr Pollock quoted, however, a
passage to the opposite effect from the 16th Report of the Law Reform
Committee, Privilege in Civil Proceedings (Cmnd 3472), produced in 1967.
In discussing what in present terminology is legal advice privilege, the
committee stated, at p 9, para 18:

> "This privilege, which is generally referred to as legal professional
> privilege, extends to all communications between the client or his agents
> and the client's legal advisers made for the purpose of obtaining legal
> advice other than communications made for the purpose of obtaining
> advice to enable the client to commit a crime or a fraud.  It differs from
> the other two kinds of privilege in aid of litigation in that it is not
> necessary to show that, at the time the advice was sought, any litigation
> was contemplated by the client in respect of the subject-matter of the
> advice.  For this reason, the privilege might also be classified as a privilege
> in protection of a confidential relationship.  Nevertheless, we think that
> its true rationale is as a privilege in aid of litigation."

It went on to say in para 19, in a passage relied upon by the Court of Appeal
[2004] QB 916, 930, para 25:

> "What distinguishes legal advice from other kinds of professional
> advice is that it is concerned exclusively with rights and liabilities
> enforceable in law, i e in the ultimate resort by litigation in the courts or in
> some administrative tribunal.  It is, of course, true that on many matters
> on which a client consults his solicitor he does not expect litigation and
> certainly hopes that it will not occur; but there would be no need for him
> to consult his solicitor to obtain *legal* advice unless there were *some* risk
> of litigation in the future in connection with the matter upon which
> advice is sought.  As Lord Brougham LC pointed out [*Greenough v
> Gaskell* 1 M & K 98, 103] it is to minimise that risk by ensuring that he so
> conducts his affairs as to make it reasonably certain that he would
> succeed in any litigation which might be brought in connection with
> them, that the client consults his solicitor at all."

104    In so stating the committee does not appear to have meant merely
that the operation of legal professional privilege is restricted to occasions
when a party wishes to resist production of documents in litigation in a court
of law, for it is apparent from cases such as *Parry-Jones v Law Society* [1969]
1 Ch 1 and *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax*
[2003] 1 AC 563 that it may operate in other situations.  The approach of the
committee may owe something to the reasoning of the Court of Appeal in
*Parry-Jones v Law Society,* to which it bears some similarity.  In their
judgments in that case Lord Denning MR and Diplock LJ (who was a
member of the Law Reform Committee) confined the definition of legal
professional privilege to the principle whereby a party can resist production
of documents in a court of law.  They classified what is now termed legal
advice privilege as a confidence which is created by an implied term in the
contract between solicitor and client.  This restriction of the ambit of legal
professional privilege was, however, rejected by Lord Hoffmann, with
whom the other members of the House agreed, in *Morgan Grenfell's* case,
when he said, at p 611, para 30:

517

A    "It is not the case that LPP does no more than entitle the client to require his lawyer to withhold privileged documents in judicial or quasi-judicial proceedings, leaving the question of whether he may disclose them on other occasions to the implied duty of confidence. The policy of LPP requires that the client should be secure in the knowledge that protected documents and information will not be disclosed at all."

B    With all respect to the eminence of the jurists who comprised the membership of the Law Reform Committee, accordingly, I think that para 18 of its Report would require to be rephrased in the light of modern case law and the correctness of the statements in para 19 requires consideration.

105    Mr Sumption submitted, in my opinion correctly, that the cases establish that, so far from legal advice privilege being an outgrowth and extension of litigation privilege, legal professional privilege is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege, and that it is litigation privilege which is restricted to proceedings in a court of law in the manner which the authorities show. The conclusions which the Court of Appeal sought in para 25 of its judgment [2004] QB 916, 930 to draw from the authorities cited by it do not appear to me to be well founded.

106    The Court of Appeal also expressed some doubts in para 39 of its judgment about the justification for legal advice privilege. The Law Society at para 18 of its helpful written case stated:

"In the course of giving instructions to draw a will, confidential information may be given about matrimonial or financial difficulties; about anticipated inheritance; about the parentage or adoption of children; about the perceived unsuitability of a former spouse to act as guardian; about the physical or mental health of the testator or spouse or other family member; about pensions, or businesses, or other assets. If a testator is to be free to supply the frank and full information necessary for the drafting of a will, he must be sure that what he says will remain confidential even though litigation is not 'anticipated'."

In relation to family matters it stated, at note 36:

"Family lawyers similarly receive a great deal of sensitive information, not only about businesses and assets, but also about family behaviour. Particularly while taking initial instructions, when litigation may well not be 'anticipated', this information can be very wide. To learn that some or all of this information might not be privileged would not only worry clients but also might lead to a failure to disclose."

One can add to these observations the experience of lawyers who have advised on taxation matters. This applies in particular to inheritance tax planning, where the focus is on the disposition of assets and litigation is not in prospect. It is essential that the legal adviser has a complete picture of financial matters, some of which may be highly confidential, especially when dealing with family businesses. Many clients seeking such advice would be very dismayed to think that the information they have made available to their lawyers might not remain confidential. In my view there is substantial force in the Law Society's submissions, and a well founded case has been made out for the retention of legal advice privilege in its present form.

107    Mr Sumption then relied on the proposition which I have accepted concerning the basis of legal professional privilege as a foundation for his argument on the main issue to be decided, which is the ambit of the term "legal advice" in legal advice privilege. His contention was that the content of legal advice qualifying for the protection of privilege was the same in respect of both legal advice privilege and litigation privilege and that the creation of a special head for litigation privilege would conflict both with principle and with the authorities.

108    Some statements about the ambit of the privilege may be garnered from the earlier authorities. In the passage which I have quoted from *Greenough v Gaskell* 1 M & K 98 Lord Brougham LC referred, at p 102, to "matters that come within the ordinary scope of professional employment" and in *Carpmael v Powis* 1 Ph 687, 692 Lord Lyndhurst LC used the same phrase and defined it further as "a transaction in which solicitors are ordinarily employed by their client". In *Herring v Clobery* 1 Ph 91 Lord Lyndhurst LC referred, at p 96, to "professional business", while in *Pearse v Pearse* (1846) 1 De G & Sm 12, 26 Knight Bruce V-C uses the phrase "communications made in confidence professionally".

109    The ambit of the privilege was examined in more depth in the Court of Appeal and your Lordships' House in *Minter v Priest* [1929] 1 KB 655; [1930] AC 558. One of the issues was whether conversations between a solicitor and his client relating to the business of obtaining a loan for the deposit on the purchase of real estate were privileged from disclosure. The Court of Appeal held that they were privileged. In the course of his judgment Lawrence LJ referred, at pp 675 and 678, to "the ordinary scope" of a solicitor's business or duties, while Greer LJ, at p 684, used the phrase "ordinary scope of a solicitor's employment". This House allowed the plaintiff's appeal, on the ground that the defendant was not acting as a solicitor at the relevant time because he was not undertaking the duty of a solicitor on the proposal made to him but had made a proposal involving "a malicious scheme" (per Lord Buckmaster, at p 569) to keep the plaintiff out of the transaction, with a view to making a profit from it himself. The House defined the ambit of the privilege, however, in essentially the same terms as the Court of Appeal. Lord Buckmaster referred, at p 568, to "the ordinary scope of a solicitor's business". Lord Atkin, at p 580, spoke of professional communications for the purpose of getting legal advice, but his explanation, at p 581, of what is covered by legal advice appears wider than that adopted by the Court of Appeal in the present case:

"If therefore the phrase is expanded to professional communications passing for the purpose of getting or giving professional advice, and it is understood that the profession is the legal profession, the nature of the protection is I think correctly defined."

He was more specific at pp 584–585, expressing the opinion that:

"If a person goes to a professional legal adviser for the purpose of seeing whether the professional person will give him professional advice, communications made for the purpose of indicating the advice required will be protected. And included in such communications will be those made on occasions such as the present where the parties go to a solicitor for the purpose of seeing whether he will either himself advance or

A    procure some third person to advance a sum of money to carry out the purchase of real property.  Such business is professional business, and communications made for its purpose appear to me to be covered by the protection, whether the solicitor eventually accedes to the request or not."

110    Other decided cases are reviewed by Taylor LJ in *Balabel v Air India* [1988] Ch 317, but it is always necessary to take account of the context in which such statements were made, for the ambit of legal advice may not have been in issue.

B

111    The issue in *Balabel v Air India* was whether the plaintiffs, who had sued the defendant airline for specific performance of an agreement for an underlease, could obtain discovery of various documents generated by the airline and its solicitors relating to the proposed underlease.  After examining the authorities in detail, Taylor LJ said, at p 330:

C

"Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business.  Nevertheless, despite that extension, the purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence.  In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice.  Those purposes have to be construed broadly.  Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice.  But it does not follow that all other communications between them lack privilege.  In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages.  There will be a continuum of communication and meetings between the solicitor and client . . .  Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach.  A letter from the client containing information may end with such words as 'please advise me what I should do'.  But, even if it does not, there will usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether asked specifically or not, tender appropriate advice.  Moreover, legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensibly be done in the relevant legal context."

D

E

F

In a later passage, at pp 331–332, relied upon by the Court of Appeal [2004] QB 916 as support for its conclusions Taylor LJ stated:

G

"It follows from this analysis that those dicta in the decided cases which appear to extend privilege without limit to all solicitor and client communications upon matters within the ordinary business of a solicitor and referable to that relationship are too wide.  It may be that the broad terms used in the earlier cases reflect the restricted range of solicitors' activities at the time.  Their role then would have been confined for the most part to that of lawyer and would not have extended to business adviser or man of affairs.  To speak therefore of matters 'within the ordinary business of a solicitor' would in practice usually have meant the giving of advice and assistance of a specifically legal nature.  But the range

H

680
**Three Rivers DC v Bank of England (No 6) (HL(E))**                    [2005] 1 AC
**Lord Carswell**

of assistance given by solicitors to their clients and of activities carried out    A
on their behalf has greatly broadened in recent times and is still
developing. Hence the need to re-examine the scope of legal professional
privilege and keep it within justifiable bounds."

I agree with the view expressed by Colman J in *Nederlandse Reassurantie
Groep Holding NV v Bacon & Woodrow Holding* [1995] 1 All ER 976, 982    B
that the statement of the law in *Balabel v Air India* [1988] Ch 317 does not
disturb or modify the principle affirmed in *Minter v Priest* [1929] 1 KB 655,
that all communications between a solicitor and his client relating to a
transaction in which the solicitor has been instructed for the purpose of
obtaining legal advice will be privileged, notwithstanding that they do not
contain advice on matters of law or construction, provided that they are
directly related to the performance by the solicitor of his professional duty as    C
legal adviser of his client.

112    There must, as Taylor LJ said, be limits to the scope of privilege, but
in my opinion the Court of Appeal has set them too tightly in concluding that
it is confined to advice relating to the legal rights and obligations of the
client. It has, I think, been too restrictive in its view, perhaps because of the
doubts expressed by the Master of the Rolls about the justification for legal
advice privilege. It is of course important not to permit a party to withhold    D
production of information which may be of significant importance when the
court is reaching its decision. As Bingham LJ put it in *Ventouris v Mountain*
[1991] 1 WLR 607, 612: "disclosure being generally regarded as beneficial,
any exception has to be justified as serving the public interest which gives
rise to the exception". In this connection it is worth quoting the remarks of
Knight Bruce V-C in *Pearse v Pearse* 1 De G & Sm 12, 28–29, which,    E
expressed in the style of the times, seem to me to retain considerable validity:

"The discovery and vindication and establishment of truth are main
purposes certainly of the existence of courts of justice; still, for the
obtaining of these objects, which, however valuable and important,
cannot be usefully pursued without moderation, cannot be either usefully
or creditably pursued unfairly or gained by unfair means, not every    F
channel is or ought to be open to them . . . Truth, like all other good
things, may be loved unwisely—may be pursued too keenly—may cost
too much. And surely the meanness and the mischief of prying into a
man's confidential communications with his legal adviser, the general evil
of infusing reserve and dissimulation, uneasiness, and suspicion and fear,
into those communications which must take place, and which, unless in a
condition of perfect security, must take place uselessly or worse, are too    G
great a price to pay for truth itself."

Lord Nicholls of Birkenhead summarised the same principle in more sober
modern legal parlance in *In re L (A Minor) (Police Investigation: Privilege)*
[1997] AC 16, 32 when he said:

"The public interest in a party being able to obtain informed legal    H
advice in confidence prevails over the public interest in all relevant
material being available to courts when deciding cases."

113    The question for decision is where the line is to be drawn and the
bounds of privilege are to be set. It is unquestionable that the breadth of

**521**

681
[2005] 1 AC                          Three Rivers DC v Bank of England (No 6) (HL(E))
                                                                    Lord Carswell

work commonly carried out by lawyers has increased since the early 19th century. The increase in the number and variety of tribunals other than courts of law has been marked in recent years. Statutory and non-statutory inquiries and investigations have proliferated, as Her Majesty's Government set out in its written case. The consequences of findings in inquiries such as the Bingham Inquiry may, as I have earlier outlined, be serious for some of the persons or bodies to whom they relate, and investigations such as those held under the Companies Act 1985 can have a substantial effect. It may be of considerable importance for those who may be affected to ensure that their case is put before the inquiry in as effective a manner as possible. The Court of Appeal stated [2004] QB 916, 934, para 33, that a desire to protect reputation to avoid more intrusive regulation does not put the Bank on the same footing as an individual whose reputation is at risk in a public inquiry. That may be so, but I cannot agree that the Bank should for that reason be deprived of any protection of legal professional privilege. Its interests may differ from those of individuals whose conduct is called in question, but it does not follow that they are to be disregarded.

114   The work of advising a client on the most suitable approach to adopt, assembling material for presentation of his case and taking statements which set out the relevant material in an orderly fashion and omit the irrelevant is to my mind the classic exercise of one of the lawyer's skills. I can see no valid reason why that should cease to be so because the forum is an inquiry or other tribunal which is not a court of law, provided that the advice is given in a legal context: see Lord Scott's opinion at para 42. The skills of a lawyer in assembling the facts and handling the evidence are of importance in that forum as well as a court of law. The availability of competent legal advice will materially assist an inquiry by reducing irrelevance and encouraging the making of proper admissions. As Lord Phillips of Worth Matravers himself expressed it in his Chairman's Note on Lawyers (5 November 1998) in connection with the BSE tribunal:

"Lawyers are experienced in gathering documentary evidence and have the skills essential to ensure that witness statements cover the relevant ground, without becoming unnecessarily prolix."

Dr Johnson described the function of lawyers, as Lord Simon of Glaisdale felicitously recalled in *Waugh v British Railways Board* [1980] AC 521, 535, in the following terms:

"As it rarely happens that a man is fit to plead his own cause, lawyers are a class of the community who, by study and experience, have acquired the art and power of arranging evidence, and of applying to the points at issue what the law has settled. A lawyer is to do for his client all that his client might fairly do for himself, if he could." (*Boswell, Life of Johnson*, ed Birkbeck Hill (1950), vol 5, p 26.)

The Court of Appeal acknowledged [2004] QB 916, 934, para 34 that the role of Freshfields in assisting with the preparation of evidence and submissions for the Bingham Inquiry was very similar to that which a solicitor plays in relation to litigation. It is an exercise in advocacy and good advocacy will be adapted to the tribunal concerned.

522

115   An inquest is a case in point.  The findings may not now have the      A
legal consequences which they formerly could have, but, as Lord Bingham of
Cornhill stated in *R (Amin) v Secretary of State for the Home Department*
[2004] 1 AC 653, 672, para 31, the inquest may have a vital function in
exposing culpable and discreditable conduct: cf the decision of the European
Court of Human Rights in *Jordan v United Kingdom* (2001) 37 EHRR
52 and the discussion in the speech of Lord Bingham of Cornhill in          B
*R (Middleton) v West Somerset Coroner* [2004] 2 AC 182.  It is difficult to
suppose that those whose conduct is investigated under such a searching
light should be deprived of the protection of legal professional privilege
when they obtain advice and assistance from their lawyers about how to
proceed.

116   I therefore conclude that there is a clear case for upholding the
Bank's submission that privilege attached to communications between the      C
BIU and Freshfields by which the advice and assistance of Freshfields was
sought and obtained as to the manner in which the Bank should
appropriately present evidence and material to the Bingham Inquiry.  To
repeat the phrase of Lord Nicholls of Birkenhead, the public interest in the
Bank's being able to obtain legal advice in confidence prevails over the
public interest in all relevant material being available to the inquiry when   D
reaching its conclusions.

117   It follows that the declaration and order made by Tomlinson J in
*Three Rivers (No 6)* [2003] EWHC 2565 (Comm) were incorrectly made.
I would allow the appeal and set aside the judge's declaration and order for
disclosure and inspection.

118   One other matter remains for mention.  Mr Sumption urged that
we should express an opinion on the correctness of the decision of the Court   E
of Appeal in *Three Rivers (No 5)* [2003] QB 1556, which he submitted
raised important issues about privilege which should be resolved.  The Court
of Appeal in that case found against the Bank and your Lordships refused the
Bank's petition for leave to appeal. Disclosure of large numbers of
documents has been made in accordance with the order of the Court of
Appeal and Mr Sumption gave an undertaking on behalf of the Bank that, if    F
the House were to rule that the decision of the Court of Appeal was
incorrect, the documents already disclosed will continue to be admissible in
the present action and no point will be taken about the judge having seen
them.  I should be reluctant, in the absence of a very pressing need, to express
an opinion on issues which are not before the House—even though we
permitted some argument on them to be put before us—the more so when
leave to appeal was refused.  For that reason, and for those given by my       G
noble and learned friend Lord Scott of Foscote in discussing this issue, I do
not propose to express any opinion on it.  Having said that, I am not to be
taken to have approved of the decision in *Three Rivers (No 5),* and I would
reserve my position on its correctness.

## LORD BROWN OF EATON-UNDER-HEYWOOD
119   My Lords, having had the advantage of reading in draft the           H
speeches of my noble and learned friends, Lord Scott of Foscote, Lord
Rodger of Earlsferry and Lord Carswell, I gratefully adopt Lord Scott's and
Lord Carswell's accounts of the facts and issues and proceed at once to add
just a very few observations of my own.

120  I think it clear that legal advice privilege attaches to the communications between the Bank and its lawyers concerning the preparation of the Bank's overarching statement (the statement of its case to the Bingham Inquiry). I would go so far as to state as a general principle that the process by which a client seeks and obtains his lawyer's assistance in the presentation of his case for the purposes of any formal inquiry—whether concerned with public law or private law issues, whether adversarial or inquisitorial in form, whether held in public or in private, whether or not directly affecting his rights or liabilities—attracts legal advice privilege. Such assistance to my mind clearly has the character of legal business. It is precisely the sort of professional service for which lawyers are ordinarily employed by virtue of their expertise and experience. Indeed, it falls squarely within Dr Johnson's description of a lawyer's function—see Lord Carswell's speech at para 114. It is, moreover, a service which can only effectively be rendered if the client is candid and forthcoming as to the true facts of his case—the very consideration which justifies the absolute character of legal advice privilege in the first place.

121  The Court of Appeal in *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] QB 916 to my mind adopted too narrow an approach to the scope of legal advice privilege, holding as it did that the privilege applies only where the client's legal rights and liabilities are at stake, seldom therefore in relation to an inquiry, perhaps not even where the inquiry puts the client's reputation at risk—a question expressly left undecided. But consider an inquiry where the client receives and must respond to a Salmon letter. Can the tribunal then insist on seeing the communications between the client and his lawyer by which the terms of his response come to be settled? Surely not. Rather this would seem to me a classic case for the application of the privilege. And by the same token that legal advice privilege must in my judgment apply to someone whose reputation is at stake, so too should it apply to anyone who instructs lawyers with a view to making the best presentation of his case at an inquiry. It is simply not practicable to seek to distinguish between the different interests of those appearing. This is, after all, an area of the law where clarity and certainty are at a premium. Furthermore, as Lord Scott points out at para 39 of his speech, it could hardly be right to allow legal advice privilege, for example, to a developer at a planning inquiry but deny it to an objector.

122  For these reasons, together with the reasons given in the speeches of my noble and learned friends, Lord Scott, Lord Rodger and Lord Carswell, I too would allow this appeal.

*Appeal allowed.*
*Question of costs adjourned.*

Solicitors: *Freshfields Bruckhaus Deringer; Lovells; Treasury Solicitor; Sharpe Pritchard; Linklaters.*

M G

Court of Appeal                                                        *A*

# Three Rivers District Council and others *v* Governor and Company of the Bank of England (No 5)

## [2003] EWCA Civ 474

2003   March 11, 12;                          Lord Phillips of Worth Matravers MR, Sedley      *B*
     April 3                                    and Longmore LJJ

*Practice — Discovery — Privilege — Legal advice privilege — Action alleging misfeasance in public office in respect of defendant's supervision of bank — Internal documents produced for inquiry into supervision of bank — Legal advice taken in relation to inquiry — Application for disclosure of internal documents — Whether documents sent to solicitors or prepared for purpose of* *C* *obtaining legal advice privileged*

The claimants, the liquidators and creditors of a bank ("BCCI"), brought an action against the Bank of England for misfeasance in public office in respect of its supervision of BCCI before its collapse.   The claimants sought disclosure of numerous documents which had been produced for a private non-statutory inquiry into the Bank's supervision of BCCI conducted by a senior judge.  The claimants did   *D* not seek disclosure of documents passing between the Bank's solicitors and the inquiry unit set up within the Bank to deal with all communications between the Bank and the inquiry, or of any of the solicitors' internal memoranda or drafts, accepting that, although they had not been generated in contemplation of litigation and therefore litigation privilege did not extend to them, they were covered by legal advice privilege.  The Bank claimed legal advice privilege in respect of four other categories of document: those that had been prepared by Bank employees with the   *E* intention that they should be sent to the solicitors and that had been so sent; those that it asserted had been prepared with the dominant purpose of obtaining legal advice but that had not in fact been sent to the solicitors; those that had been prepared not for the dominant purpose of legal advice but that had in fact been sent to the solicitors; and documents in all those categories that had been prepared by Bank employees who were no longer employed by the Bank.  Tomlinson J upheld the Bank's claim to privilege. On appeal by the claimants—   *F*

*Held*, allowing the appeal, that legal advice privilege, unlike litigation privilege, applied only to communications between a client and his legal advisers, to documents evidencing such communications, and to documents that were intended to be such communications even if not in fact communicated; that none of the four categories of document in issue came within that description; that it was not open to the court to extend the privilege; and that, accordingly, the Bank was not entitled to privilege in respect of any of those documents (*post*, paras 19, 21, 26, 31).   *G*

*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, CA; *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, CA; and *Wheeler v Le Marchant* (1881) 17 Ch D 675, CA applied.

*Waugh v British Railways Board* [1980] AC 521, HL(E) and *Balabel v Air India* [1988] Ch 317, CA distinguished.

Decision of Tomlinson J [2002] EWHC 2730 (Comm) reversed.

*H*

The following cases are referred to in the judgment of the court:

*Anderson v Bank of British Columbia* (1876) 2 Ch D 644, Sir George Jessel MR and CA
*Balabel v Air India* [1988] Ch 317; [1988] 2 WLR 1036; [1988] 2 All ER 246, CA

1557
[2003] QB                          Three Rivers DC v Bank of England (No 5) (CA)

*Buttes Gas and Oil Co v Hammer (No 3)* [1981] QB 223; [1980] 3 WLR 668; [1980] 3 All ER 475, CA

*Esso Australia Resources Ltd v Federal Comr of Taxation* (1999) 201 CLR 49

*Grant v Downs* (1976) 135 CLR 674

*Greenough v Gaskell* (1833) 1 My & K 98

*Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027; [1987] 2 All ER 716, CA

*Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160

*Highgrade Traders Ltd, In re* [1984] BCLC 151, CA

*L (A Minor) (Police Investigation: Privilege), In re* [1997] AC 16; [1996] 2 WLR 395; [1996] 2 All ER 78, HL(E)

*Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583

*R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21; [2003] 1 AC 563; [2002] 2 WLR 1299; [2002] 3 All ER 1, HL(E)

*Reece v Trye* (1846) 9 Beav 316

*Russell v Jackson* (1851) 9 Hare 387

*Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315, CA

*Ventouris v Mountain* [1991] 1 WLR 607; [1991] 3 All ER 472, CA

*Waugh v British Railways Board* [1980] AC 521; [1979] 3 WLR 150; [1979] 2 All ER 1169, HL(E)

*Wheeler v Le Marchant* (1881) 17 Ch D 675, CA

The following additional cases were cited in argument:

*Jones v Great Central Railway Co* [1910] AC 4, HL(E)

*Leif Hoegh & Co A/S v Petrolsea Inc (No 2) (The World Era)* [1993] 1 Lloyd's Rep 363

*R v Derby Magistrates' Court, Ex p B* [1996] AC 487; [1995] 3 WLR 681; [1995] 4 All ER 526, HL(E)

*Secretary of State for Trade and Industry v Baker* [1998] Ch 356; [1998] 2 WLR 667; [1998] 1 All ER 673

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Bank of Nova Scotia v Hellenic Mutual War Risks Mutual Association (Bermuda) Ltd (The Good Luck)(Note)(No 2)* [1992] 2 Lloyd's Rep 540

*British and Commonwealth Holdings plc, In re* (unreported) 4 July 1990, Gatehouse J

*Derby & Co Ltd v Weldon (No 7)* [1990] 1 WLR 1156; [1990] 3 All ER 161

*Formica Ltd v Secretary of State acting by the Export Credits Guarantee Department* [1995] 1 Lloyd's Rep 692

*GE Capital Corporate Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172; [1995] 2 All ER 993, CA

*Gotha City v Sotheby's* [1998] 1 WLR 114, CA

*Nederlandse Reassurantie Groep Holding NV v Bacon & Woodrow* [1995] 1 All ER 976

*Svenska Handelsbanken v Sun Alliance and London Insurance plc* [1995] 2 Lloyd's Rep 84

**APPEAL** from Tomlinson J

By an application notice dated 25 October 2002 the claimants, Three Rivers District Council, some 6,000 other creditors of the Bank of Credit and Commerce International SA ("BCCI") and the Bank of Credit and Commerce International SA (in liquidation), applied pursuant to CPR r 31.19 for disclosure by the defendant, the Governor and Company of the Bank of England, of a large number of documents which the Bank claimed it had the

526

right to withhold on the grounds of privilege. On 13 December 2002 *A*
Tomlinson J upheld the Bank's claim to privilege in respect of the disputed
documents.

By an appellant's notice filed on 17 January 2003 the claimants appealed
on the grounds, inter alia, that (1) the only documents produced by or to the
Bingham Inquiry Unit which were covered by legal advice privilege were
communications with the Bank's legal advisers for the purpose of obtaining
or receiving legal advice (and secondary evidence thereof), alternatively *B*
those which were produced for the dominant purpose of being
communicated between the Bank and its legal advisers for the purpose of
obtaining or receiving legal advice (and secondary evidence thereof); (2) the
Bank was under an obligation pursuant to CPR r 31.8 to disclose to the
claimants all documents produced by or to the Bingham Inquiry Unit other
than those which fell within paragraph (1); (3) the dominant purpose for *C*
which the documents had been produced was not the obtaining of legal
advice; (4) it was in the interests of justice that the Bank should list each of
the documents produced by or to the Bingham Inquiry Unit which the Bank
claimed to be entitled to withhold from inspection on the grounds of
privilege; and (5) the Bank was not entitled to withhold from inspection on
the grounds of privilege the documents listed in the schedule to the *D*
claimants' application notice dated 25 October 2002.

By a respondent's notice filed on 17 February 2003 the Bank invited the
court to uphold the order of Tomlinson J of 13 December 2002 (including an
addendum dated 6 February 2003) on the different or additional ground that
such documents were privileged from production by virtue of the doctrine of
common interest privilege.

The facts are stated in the judgment of the court. *E*

*Gordon Pollock QC, Barry Isaacs* and *Nathan Pillow* for the claimants.
Legal advice privilege is confined to communications which pass between a
client and his lawyer which either seek or convey legal advice. The privilege
does not extend to materials which are preparatory to such communications.

It is a fundamental principle of the English system of litigation that there
should be available to the parties and the court all material relevant to the *F*
issues which the court has to decide: see *Waugh v British Railways Board*
[1980] AC 521. Any exception to that principle must be limited to a scope
no wider than is absolutely necessary to achieve the objective of the
opposing rationale which justifies that exception. The courts recognise an
inevitable tension between the principles of justice and fairness to other
litigants which require all the facts to be before the court and the need for a *G*
layman to obtain legal advice free from the fear that the information he gives
his solicitor will later be used against him.

The distinction between litigation privilege and legal advice privilege was
established in the 19th century and remains. The criteria for and scope of
the two categories are different. Legal advice privilege in non-litigious
circumstances was first upheld in *Greenough v Gaskell* (1833) 1 My & K 98.
Legal advice privilege attaches only to communications between client and *H*
solicitor made either directly or through an agent, whereas litigation
privilege is wider, attaching to evidence obtained for the purpose of
litigation: see *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 and
*In re Highgrade Traders Ltd* [1984] BCLC 151. Communication of

A information for the purpose of legal advice in a non-litigation context is not privileged from discovery in subsequent litigation, unless the purpose of the communication was the asking for or the giving of legal advice: see *Wheeler v Le Marchant* (1881) 17 Ch D 675. It is the communication which is privileged, not the information. Legal advice privilege does not extend to communications to the client other than by the solicitor, even though the purpose of such communication was to inform the client in connection with

B the seeking of legal advice: see *Wheeler v Le Marchant* 17 Ch D 675.

Legal advice privilege does not extend to documents prepared for the purpose of seeking legal advice: see *Jones v Great Central Railway Co* [1910] AC 4. Documents which are not communications between solicitor and client, even if brought into existence in order to obtain legal advice, are only privileged if the dominant purpose of their creation was to obtain advice in

C relation to actual or contemplated litigation and therefore fall within the category of litigation privilege: see *In re Highgrade Traders Ltd* [1984] BCLC 151 and *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 58. *Balabel v Air India* [1988] Ch 317 and *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160 concerned solicitor and client communications only and

D did not extend legal advice privilege to preparatory documents generated by or for the client which were not themselves communications to the solicitor. What is inviolable is the actual communication between client and solicitor. Materials used for the giving of advice are not privileged: see *Secretary of State for Trade and Industry v Baker* [1998] Ch 356.

Even if privilege attaches to material prepared by employees and ex-

E employees (but not communications from a third party) with the dominant purpose that its contents be used to obtain legal advice, no privilege attached to the material in question. It was not prepared for communication to the Bank's solicitor to obtain legal advice but for communication to the Bingham Inquiry. That inquiry did not focus on liability since it was asked to examine the way BCCI was supervised and, if necessary, make recommendations in relation to supervision in the

F future. There is no independent category of common interest privilege which can be asserted by the Bank.

*Nicholas Stadlen QC* and *Bankim Thanki* for the Bank. Documents and information are protected by legal advice privilege where the dominant purpose of their creation or compilation was the seeking of legal advice, whether or not they were actually sent from the client to the lawyer or vice

G versa, and whether or not they expressly refer to legal advice. The dominant purpose test, which is primarily a question of fact, applies to both litigation privilege and legal advice privilege: see *Grant v Downs* (1976) 135 CLR 674; *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027; *Hellenic Mutual War Risks Association (Bermuda) v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160; *Secretary of State for Trade and*

H *Industry v Baker* [1998] Ch 356 and *Esso Australia Resources Ltd v Federal Comr of Taxation* (1999) 201 CLR 49. Legal advice privilege and litigation privilege are merely different facets of legal professional privilege: see *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16. It is not necessary to look at each document to identify the advice given in relation to

1560

**Three Rivers DC v Bank of England (No 5) (CA)**                    **[2003] QB**

it. It is sufficient if advice was given as to what it was prudent and sensible to do in the situation: see *Balabel v Air India* [1988] Ch 317.

It is in the public interest for communications between client and solicitor to be secret to encourage full and frank disclosure by the client of all the facts: see *R (Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2003] 1 AC 563 and *R v Derby Magistrates' Court, Ex p B* [1996] AC 487. That rationale applies as much to legal advice privilege as to litigation privilege. Communications from third parties are not privileged unless they were made in anticipation of litigation: see *Grant v Downs* 135 CLR 674; *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 58 and *In re Highgrade Traders Ltd* [1984] BCLC 151. Third party material is excluded because it has no part in the process of a client baring his breast to his solicitor.

If the dominant purpose of the creation of a document was the obtaining of legal advice, it does not have to be communicated before it attracts protection: see *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315; *Ventouris v Mountain* [1991] 1 WLR 607, *Grant v Downs* 135 CLR 674, *Esso Australia Resources Ltd v Federal Comr of Taxation* 201 CLR 49 and *Waugh v British Railways Board* [1980] AC 521. Where the predominant purpose of the creation of a document was the obtaining of legal advice the test is satisfied by the transfer of the document itself or its contents. Privilege attaches to such a document even where it is not delivered: see *Esso Australia Resources Ltd v Federal Comr of Taxation* 201 CLR 49.

A corporation can only act through its employees, who are not to be treated as third parties for the purposes of privilege. Similarly, former employees who in that capacity acquired relevant knowledge which was confidential to the employer and in relation to which the employer is seeking legal advice cannot be regarded as third parties. Where the client is a company it would fetter the client's ability to communicate with his solicitor if the communication had to be direct and in person. The principle must be applied to modern conditions: see *Southwark and Vauxhall Water Co v Quick* 3 QBD 315 and *Anderson v Bank of British Columbia* 2 Ch D 644; *Wheeler v Le Marchant* 17 Ch D 675; *In re Highgrade Traders Ltd* [1984] BCLC 151 and *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583 are to be confined to their own narrow ratios.

If, on the contrary, former employees are to be treated as third parties, there is nonetheless a common interest privilege between the Bank and its former officials which protects the confidentiality of the communications in issue. Where parties have a common interest all communications between them will attract privilege if they are made for the dominant purpose of obtaining legal advice or for the dominant purpose of anticipated litigation. Common interest privilege is a species of legal professional privilege. If parties with a common interest exchange information for such purposes their communications will be privileged from production: see *Buttes Gas and Oil Co v Hammer (No 3)* [1981] QB 223 and *Leif Hoegh & Co A/S v Petrolsea Inc (No 2) (The World Era)* [1993] 1 Lloyd's Rep 363.

*Pollock QC* replied.

*Cur adv vult*

**529**

1561

[2003] QB                                     Three Rivers DC v Bank of England (No 5) (CA)

A    3 April.  **LONGMORE LJ** handed down the following judgment of the court.

1    This is the judgment of the court in an interlocutory appeal from Tomlinson J in relation to disclosure of documents in the current litigation in which the claimants, the liquidators and creditors of the Bank of Credit and Commerce International SA ("BCCI"), are suing the Bank of England ("the Bank") for misfeasance in public office.  The Bank have claimed legal professional privilege for numerous documents which came into existence between the time when BCCI collapsed and the time when they made their final submissions to the Bingham Inquiry conducted by Bingham LJ.  The Bank does not claim that the documents were prepared in contemplation of litigation and are thus protected by that category of legal professional privilege which can be described as "litigation privilege"; rather the Bank claims that the documents are protected from disclosure by reason of that category of legal professional privilege known as "legal advice privilege", viz privilege in relation to legal advice that is not founded on the existence or the contemplation of litigation.  It is clear on the authorities that documents emanating from or prepared by third parties or employees of a party are covered by the principle of "litigation privilege" if prepared with the dominant purpose of use in existing or contemplated litigation.  The scope of "legal advice privilege" is less clear.  It is agreed that documents emanating from or prepared by independent third parties and then passed to the Bank's solicitors ("Freshfields") for the purpose of advice being given to the Bank are not privileged under the legal advice head but beyond this the scope of legal advice privilege is controversial.

2    The reason why the Bank accepts that it cannot rely on litigation privilege as opposed to legal advice privilege is that in *In re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 the House of Lords decided that litigation privilege is essentially a creature of adversarial proceedings and thus cannot exist in the context of non-adversarial proceedings.  The Bank further accepts that the Bingham inquiry was not adversarial; the terms of reference were: "To inquire into the supervision of BCCI under the Banking Acts; to consider whether the action taken by all the UK authorities was appropriate and timely; and to make recommendations."  The inquiry was set up on behalf of the Chancellor of the Exchequer and the Bank but was a private non-statutory inquiry.  As the judge said:

> "It was an inquiry one outcome of which could be criticism of the conduct of the Bank from an informed and highly authoritative source, an outcome which would not only be of some importance in relation to the Bank's ongoing regulatory and supervisory role but would itself be likely either to lead to or to encourage the institution or attempted institution of proceedings against the Bank by depositors and others who had lost money in consequence of the collapse of BCCI."

Nevertheless the inquiry did not constitute adversarial litigation and litigation privilege cannot arise.  To the extent that the Bank now wish to claim privilege in the current litigation, the Bank accept that they can only claim legal advice privilege.

3    The judge has set out the background to the dispute by referring to his earlier judgments and reciting at length from the evidence before him and reference can be made to his judgments for any matter of detail.  For present

QB 2003—56

**530**

1562
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

purposes it is sufficient to record that, shortly after the Bingham inquiry was
established, the Governor of the Bank of England appointed three Bank
officials, Mr Paul Tucker, Mr John Trundle and Mr John Rippon to deal
with all communications between the Bank and the inquiry. They became
known as the Bingham Inquiry Unit ("BIU"). On the day on which they were
appointed they met the Bank's solicitors, Freshfields. All the BIU's
communications with the inquiry were therefore the subject of extensive
legal advice from Freshfields and counsel instructed by them. This advice
covered all aspects of the preparation and presentation of the Bank's
evidence and submissions to the Bingham inquiry. The Bank and its
solicitors prepared a substantial 258-page document which constituted its
"Statement to the Inquiry"; they also prepared a paper entitled "Supervisory
Issues". Bingham LJ was not provided with witness statements but witnesses
gave evidence to him and that evidence was transcribed. The Bank has
disclosed both of its submissions in the form in which they were finally sent
to Bingham LJ and the transcripts of the evidence of its witnesses.

4   Mr Pollock, for the claimants, has made clear in his submissions that
disclosure is not sought of documents passing between the BIU and
Freshfields or vice versa, nor is disclosure sought of any of Freshfields'
internal memoranda or drafts. He accepted that the BIU was, for the
purpose of the inquiry, the client of Freshfields and that communications
passing between them are covered by legal advice privilege. But he
submitted that documents prepared by the Bank's employees or ex-
employees, whether prepared for submission to or at the direction of
Freshfields or not, should be disclosed as being no more than raw material
on which the BIU would, thereafter, seek advice. The evidence isolated and
the judge dealt with four separate categories of such documents; he asked
himself the following questions. (1) Does legal advice privilege extend to
documents prepared by Bank employees, which were intended to be sent to
and were in fact sent to Freshfields? (2) Does it extend to documents
prepared by Bank employees with the dominant purpose of the Bank's
obtaining legal advice but not, in fact, sent to Freshfields (though, perhaps,
their effect was incorporated into documents that were so sent)? (3) Does it
extend to documents prepared by Bank employees, without the dominant
purpose of obtaining legal advice, but in fact sent to Freshfields? (4) Are the
answers to (1), (2) and (3) above any different if the documents were
prepared by Bank employees who are now (viz as at 11 March 2003) ex-
employees of the Bank? It is accepted that some, at any rate, of the material
sought could be highly relevant to the litigation eg, the first memorandum or
statement of an officer intimately concerned in the supervision of BCCI.

5   In the course of argument, a surprisingly wide divergence about the
extent of legal advice privilege opened up. The judge observed that the law
on this topic is not as clear as one might have expected. Mr Pollock
submitted that it was only communications between solicitor and client, and
evidence of the content of such communications, that were privileged.
Preparatory materials obtained before such communications, even if
prepared for the dominant purpose of being shown to a client's solicitor,
even if prepared at the solicitor's request and even if subsequently sent to the
solicitor, did not come within the privilege.

6   Mr Stadlen, for the Bank, submitted that, as a matter of general
principle, any document prepared with the dominant purpose of obtaining

**531**

A   the solicitor's advice upon it came within the ambit of the privilege, whether or not it was actually communicated to the solicitor; he said that the authorities confined the class of documents that attracted legal advice privilege no further than that; in particular, there was no authority to support the proposition that it was only communications between solicitor and client that were privileged. This general principle was subject to the exception that documents sent to or by an independent third party (even if

B   created with the dominant purpose of obtaining a solicitor's advice) would not be covered by legal advice privilege. Both counsel maintained that the law was well-settled in favour of their submissions by the end of the 19th century and that we were bound by the law as so settled which had not changed in substance for over a hundred years.

    7   The judge's conclusion in favour of the Bank was: "an internal

C   confidential document, not being a communication with a third party, which was produced or brought into existence with the dominant purpose that it or its contents be used to obtain legal advice is privileged from production." It will be necessary to consider the 19th century authorities to see whether this is right.

D   *The law*

    8   Lawyer and client privilege is of great antiquity. In the early 19th century there was controversy whether the privilege only existed in relation to existing litigation. This debate was regarded as authoritatively settled by Lord Brougham LC, sitting on appeal, in *Greenough v Gaskell* (1833) 1 My & K 98 in which the question arose whether the defendant solicitor, sued for fraudulently concealing that his client was insolvent and thereby inducing

E   the plaintiff to issue a promissory note on the client's behalf, could claim privilege in respect of communications which he had received from his client. Lord Brougham LC held that the defendant could claim privilege, that it made no difference whether it was the client or the solicitor who was the defendant and that it did not matter that, at the time, there were no existing or contemplated proceedings. Since this is the first time that legal

F   advice privilege, in the absence of pending or contemplated litigation, was unequivocally upheld, it is necessary to quote a fairly lengthy passage from the judgment, at pp 101–103:

    "Here the question relates to the solicitor, who is called upon to produce the entries he had made in accounts, and letters received by him, and those written (chiefly to his town agent) by him, or by his direction, in

G     his character or situation of confidential solicitor to the party; and I am of opinion that he cannot be compelled to disclose papers delivered, or communications made to him, or letters, or entries made by him in that capacity. To compel a party himself to answer upon oath, even as to his belief or his thoughts, is one thing; nay, to compel him to disclose what he has written or spoken to others, not being his professional advisers, is

H     competent to the party seeking the discovery; for such communications are not necessary to the conduct of judicial business, and the defence or prosecution of men's rights by the aid of skilful persons. To force from the party himself the production of communications made by him to professional men seems inconsistent with the possibility of an ignorant man safely resorting to professional advice, and can only be justified if the

1564
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

A

authority of decided cases warrants it. But no authority sanctions the much wider violation of professional confidence, and in circumstances wholly different, which would be involved in compelling counsel or attorneys or solicitors to disclose matters committed to them in their professional capacity, and which, but for their employment as professional men, they would not have become possessed of. As regards them, it does not appear that the protection is qualified by any reference to proceedings pending or in contemplation. If, touching matters that come within the ordinary scope of professional employment, they receive a communication in their professional capacity, either from a client, or on his account, and for his benefit in the transaction of his business, or, which amounts to the same thing, if they commit to paper, in the course of their employment on his behalf, matters which they know only through their professional relations to the client, they are not only justified in withholding such matters, but bound to withhold them, and will not be compelled to disclose the information or produce the papers in any court of law or equity, either as party or as witness. If this protection were confined to cases where proceedings had commenced, the rule would exclude the most confidential, and it may be the most important of all communications—those made with a view of being prepared either for instituting or defending a suit, up to the instant that the process of the court issued. If it were confined to proceedings begun or in contemplation, then every communication would be unprotected which a party makes with a view to his general defence against attacks which he apprehends, although at the time no one may have resolved to assail him. But were it allowed to extend over such communications, the protection would be insufficient, if it only included communications more or less connected with judicial proceedings; for a person oftentimes requires the aid of professional advice upon the subject of his rights and his liabilities, with no references to any particular litigation, and without any other reference to litigation generally than all human affairs have, in so far as every transaction may, by possibility, become the subject of judicial inquiry. 'It would be most mischievous', said the learned judges in the Common Pleas, 'if it could be doubted whether or not an attorney, consulted upon a man's title to an estate, was at liberty to divulge a flaw' (2 Brod & Bing 6). The foundation of this rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, though certainly it may not be very easy to discover why a like privilege has been refused to others, and especially to medical advisers. But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings. If the privilege did not exist at all, every one would be thrown upon his own legal resources; deprived of all professional assistance, a man would not venture to consult any skilful person, or would only dare to tell his counsellor half his case. If the privilege were confined to communications connected with suits begun, or intended, or expected, or apprehended, no

B

C

D

E

F

G

H

A    one could safely adopt such precautions as might eventually render any proceedings successful, or all proceedings superfluous."

It is apparent from this lengthy extract that the privilege stemmed from the confidential relationship of client and solicitor and attached only to communications between the client and solicitor. It is also true to say that at this early stage in the law there was no distinction drawn between litigation

B    privilege and legal advice privilege; Lord Brougham LC thought there was a single lawyer/client privilege which applied even if proceedings were not contemplated. However, the reference to the competence of the party seeking discovery to compel the other party "to disclose what he has written or spoken to others, not being his professional advisers" (at the beginning of the quotation) militates against the submission that the client's internal

C    memoranda or materials preparatory to consulting his solicitor can be privileged.

9    This decision was not greeted everywhere with enthusiasm. Lord Langdale MR in particular seems to have put up a rearguard action but, by 1846, when counsel was still submitting that privilege only extended to client/lawyer communications which had taken place pending, or in contemplation of, litigation, he said in *Reece v Trye* (1846) 9 Beav 316,

D    318–319:

"I must refuse so much of the motion [for production] as relates to the documents alleged to be privileged; I have anxiously examined the subject, and arrived at a conclusion, which to me has seemed right; but it has not been approved, and I have no doubt, that, if I were to order the production of these documents, the order would be reversed elsewhere.

E    The unrestricted communication between parties and their professional advisers, has been considered to be of such importance as to make it advisable to protect it even by the concealment of matter without the discovery of which the truth of the case cannot be ascertained."

We note again the use of the phrase "communication between parties and their professional advisers".

F    10    There then follow three important cases in the Court of Appeal decided between 1876 and 1881 of which the first is *Anderson v Bank of British Columbia* (1876) 2 Ch D 644. Litigation was threatened against an English bank concerning the conduct of an account kept at the branch of the bank in Oregon. The English bank's London manager thought it necessary to ascertain the full facts and cabled the branch manager in Oregon

G    (Mr Russell) for full particulars of transactions on the account. Mr Russell replied with the particulars and in the ensuing litigation the bank claimed that the reply was privileged. As Bingham LJ pointed out in *Ventouris v Mountain* [1991] 1 WLR 607, 612H, a modern court would be likely to have held that privilege did attach since litigation was imminent and the letter was written for the purpose of obtaining advice in that litigation. But at this stage there was no clear-cut distinction between litigation and legal advice

H    privilege and both Sir George Jessel MR at first instance and the Court of Appeal thought it plain that Mr Russell's letter was not privileged; this was mainly because they concluded that the bank's London manager was taking steps to inform himself of the position rather than to obtain material which would find its way, in due course, into counsel's brief. Once again, in the

1566
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

light of the arguments addressed to us, it is unfortunately necessary to set out *A*
substantial parts of the judgments. Mr Stadlen relied in particular on the
first citation from the judgment of Sir George Jessel MR. Mr Pollock relied
on the judgments in the Court of Appeal.

11  Sir George Jessel MR refers to the affidavit of the London branch
manager claiming privilege for Mr Russell's letter 2 Ch D 644, 647–648:

> "The affidavit goes on to state this, that when he first saw the letter of *B*
> the plaintiff he observed—whatever 'observed' may mean—'that
> litigation was imminent, and I felt it was essential that the bank should
> have the benefit of legal advice, and that for that purpose there should be
> obtained from the other side'—that is, from Oregon—'the full particulars
> of all the facts and circumstances of the case likely to be required by the
> solicitor of the bank. I determined, therefore, at once to telegraph to Mr *C*
> Russell'—that is, the agent—'instructions for full particulars, and at the
> same time to request the attendance of the solicitor of the bank at the next
> meeting of the court of directors'; and, accordingly, he sent a telegram,
> and the solicitor attended the court of directors. Now, there is not a
> syllable there which shows that any communication, direct or indirect,
> expressed or implied, was made to the agent to the effect that his
> communication was to be a confidential one for the purpose of being *D*
> submitted to the professional man—that is, the solicitor—for advice. If it
> had been so, I apprehend that it would have been protected upon
> principles well understood. If you ask your agent to draw out a case for
> the opinion of your solicitor, or for the opinion of your counsel, that is a
> confidential communication made for that purpose. Here there is nothing
> of the sort. Nor is it suggested or alleged that, without being requested, *E*
> the agent did make the communication with the object of its being laid
> before the solicitor for advice. He therefore did not make it as a
> confidential communication in any other sense than that in which every
> communication from an agent to his principal, or from a sub-agent to the
> chief agent of the principal, is confidential. Every such communication,
> no doubt, is in a sense confidential, but not in the sense in which we call a
> communication to a professional man confidential. This communication, *F*
> then, as regards the sender, was not made or sent for the purpose of being
> laid before a professional adviser, nor was there any intimation of such
> purpose sent by the person who required the communication. All that
> you have got is a statement of the person who sent the telegram as to the
> state of his feelings at a particular time, which is not sufficient for the
> purpose of the point I have to determine. I therefore feel no difficulty *G*
> whatever in saying that this clearly was not a confidential communication
> made within the rule which protects confidential communications from
> discovery as regards the other side."

This, said Mr Stadlen, showed that any communication made or sent for the
purpose of being laid before a solicitor was privileged. Sir George
Jessel MR then, after referring to authority, including *Greenough v Gaskell* *H*
1 My & K 98, set out the object of the rule 2 Ch D 644, 649:

> "The object and meaning of the rule is this: that *as, by reason of the
> complexity and difficulty of our law, litigation can only be properly
> conducted by professional men,* it is absolutely necessary that a man, *in*

A  *order to prosecute his rights or to defend himself from an improper claim,* should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional

B  agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation. That is the meaning of the rule." (Our emphasis.)

Next, Sir George Jessel MR set out, at pp 649–650, the extent of the rule:

C  "Now, as to the extent of the rule. It goes not merely to a communication made to the professional agent himself by the client directly, it goes to all communications made by the client to the solicitor through intermediate agents, and he is not bound to write letters through the post, or to go himself personally to see the solicitor; he may employ a third person to write the letter, or he may send the letters through a messenger, or he may give a verbal message to a messenger, and ask him

D  to deliver it to the solicitor, with a view to his prosecuting his claim, or of substantiating his defence. Again, the solicitor's acts must be protected for the use of the client. The solicitor requires further information, and says, I will obtain it from a third person. That is confidential. *It is obtained by him as solicitor for the purpose of the litigation*, and it must be protected upon the same ground, otherwise it would be dangerous, if

E  not impossible, to employ a solicitor. You cannot ask him what the information he obtained was. It may be information simply for the purpose of knowing whether he ought to defend or prosecute the action, but it may be also obtained in the shape of collecting evidence for the purpose of such prosecution or defence. All that, therefore, is privileged. Then the rule goes a step further. The solicitor is not bound any more

F  than the client to do this work himself. He is not bound either to collect information or to collect testimony. He may employ his clerks or other agents to do it for him, and upon the same principle as the information acquired by himself directly is protected, so the information acquired by a clerk or agent employed by him is equally protected. But then the cases go still a step further. Suppose the information required is in a foreign country, where neither the solicitor nor his clerk nor an ordinary agent

G  can obtain it, he may request the client to obtain it himself, and then the information so obtained by the client at the request or under the advice of the solicitor is in a sense obtained by the agent of the solicitor, although it is a very odd way of expressing it. It is turning the client, so to say, into the agent of the solicitor for the purpose of obtaining information; but it is clearly within the rule of privilege. So far as I understand, the cases in

H  equity go no further." (Our emphasis.)

While the first passage that has been quoted, and on which Mr Stadlen relies, is in general terms, the sentences that we have emphasised in the later passages make it plain that the foundation of his approach was the existence or imminence of litigation.

12   The case then went to appeal and it is at this stage that we see the distinction between litigation privilege and legal advice privilege beginning to emerge. Mr Chitty QC for the bank, claiming that Mr Russell's letter was privileged, opened his argument by saying, at p 654: "We contend that this letter is privileged as being a confidential communication to enable the directors to obtain legal advice." Mellish LJ intervened: "I apprehend that a letter written by an agent who was getting up evidence to be used at the trial would be privileged; but this is not like that." He intervened again at the end of the argument to say at p 655: "The object here was, not to obtain evidence, but to learn what the facts were, in order to know whether the claim should be resisted. It seems to be an extension of the rule as to privileged communications to apply it to such a case."

13   James LJ, in giving judgment, thought the case one of the plainest cases to have come before the court. He said, at pp 656–657:

"Looking at the dicta and the judgments cited, they might require to be fully considered, but I think they may possibly all be based upon this, which is an intelligible principle, that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief. But that seems to me to have no application whatever to a communication between a principal and his agent in the matter of the agency, giving information of the facts and circumstances of the very transaction which is the subject matter of the litigation. Such a communication is, above all others, the very thing which ought to be produced."

There are two relevant passages from the judgment of Mellish LJ; first, at p 658:

"I am clearly of opinion that such a communication is not privileged. To be privileged it must come within one of two classes of privilege, namely, that a man is not bound to disclose confidential communications made between him and his solicitor, directly, or through an agent who is to communicate them to the solicitor; or, secondly, that he is not bound to communicate evidence which he has obtained for the purpose of litigation."

This appears to be the first occasion on which a clear distinction is drawn between legal advice privilege and litigation privilege; although many claims to privilege can be decided on either basis, it is a distinction which appears hereafter in the decided cases.

14   Later Mellish LJ says, at p 659, that potential evidence obtained in order to decide whether to bring or defend an action may be privileged:

"but I cannot think that that ought to be held to apply to information which a principal asks his agent to give respecting the matters which the agent has done for and on account of the principal. That is information respecting matters which in point of law are the acts of the principal himself, and it is information respecting matters as to which the knowledge of the agent is the knowledge of the principal. In point of law, the principal is to be deemed to have known the facts before he has actually got personal information about them. I cannot but think that, as you are entitled to ask the principal what he knows respecting those facts,

1569

[2003] QB                                    Three Rivers DC v Bank of England (No 5) (CA)

*A*  you must necessarily be entitled to the information which his agent has sent respecting them.”

Baggallay JA was of the same opinion and said, at pp 661–662:

*B*  “Now if the defendant in this case, instead of being a banking company, had been an individual banker, and his business either in London or Oregon had been carried on under his own immediate direction, it could not have been for one moment contended that he would not be bound to give the fullest particulars as to the circumstances under which this transfer from one account to the other took place. It would be no answer for him to say: ‘I did not attend to this matter personally. I sat upstairs, and the business was managed by my clerks here or by my clerks in Oregon.’ He would be bound, for the purpose of

*C*  making the discovery, to ascertain from his clerks or manager all the particulars of the case.”

These two citations show that information given by an employee to an employer or fellow-employee, or information given by an agent to a principal, stands in the same condition as matters known to the client and does not, of itself, attract privilege in the first of Mellish LJ’s two categories.

*D*  This is so even though, on the facts, it is intended that it be shown to a solicitor. If, however, it is intended that the information will be shown to a solicitor in the context of existing or contemplated litigation, it will fall into the second category, whether it was obtained for use as evidence or for the purpose of obtaining advice. The *Anderson* case thus does not support the wide ambit of privilege for which Mr Stadlen contends.

*E*  15   The next in this trio of cases was much relied on by Mr Stadlen, *Southwark and Vauxhall Water Co v Quick* (1878) 3 QBD 315. The water company sued its former engineer; before the action was brought but when it was contemplated, certain documents were prepared to be laid before the company’s solicitor for his advice, although in the event one of them (a transcript, made by a shorthand writer of a conversation between a chimney sweep employed by the company and the company’s current engineer) was

*F*  not in fact put before the solicitor. Cockburn CJ presiding in the Queen’s Bench Division said, at pp 317–318:

“The relation between the client and his professional legal adviser is a confidential relation of such a nature that to my mind the maintenance of the privilege with regard to it is essential to the interests of justice and the well-being of society. Though it might occasionally happen that the

*G*  removal of the privilege would assist in the elucidation of matters in dispute, I do not think that this occasional benefit justifies us in incurring the attendant risk. The question here is whether the documents of which inspection is sought are within the privilege. I think they are. It is clear that they were documents containing information which had been obtained by the plaintiffs with a view to consulting their professional adviser. Two out of the three sorts of documents were actually submitted

*H*  to him; as to the other it is not clear whether it was actually submitted to him or not. It is admitted upon the decisions that where information has been obtained on the advice of the party’s solicitor it is privileged. I can see no distinction between information obtained upon the suggestion of a solicitor, with the view of its being submitted to him for the purpose of his

advising upon it, and that procured spontaneously by the client for the same purpose. Again, I see no distinction between the information so voluntarily procured for that purpose and actually submitted to the solicitor, and that so procured but not yet submitted to him."

*A*

In the Court of Appeal Brett LJ, after referring to what had been said by James and Mellish LJJ in *Anderson's* case 2 Ch D 644, said 3 QBD 315, 320–321:

*B*

"it is clear that if a party seeks to inspect a document which comes into existence merely as the materials for the brief, or that which is equivalent to the brief, then the document cannot be seen, for it is privileged. It has been urged that the materials, or the information obtained for the brief, should have been obtained 'at the instance' or 'at the request' of the solicitor; but I think it is enough if they come into existence merely as the materials for the brief, and I think that phrase may be enlarged into 'merely for the purpose of being laid before the solicitor for his advice or for his consideration'. If this is the correct rule, the only question is whether the affidavits in the present case bring the documents under discussion within that rule. I think all the classes of documents mentioned are brought within the rule. The only document about which there can be any doubt is the transcript of the shorthand writer's note of the conversation between the chimneysweep and the company's engineer; but I think that the Queen's Bench Division construed the language of the affidavit to mean that the transcript was made in order that it might be furnished to the solicitor for his advice, although before passing on to him, it was to be laid before the board of directors, or reported to the board, in order than they also might see it. The object for which the notes were taken, and the transcript made, was that they might be furnished to the solicitor for his advice. If that is so, then it stands on the same footing as the others, except that it was not sent to the solicitor; that cannot make any difference. If at the time the document is brought into existence its purpose is that it should be laid before the solicitor, if that purpose is true and clearly appears upon the affidavit, it is not taken out of the privilege merely because afterwards it was not laid before the solicitor. It might not have been laid before the solicitor, because the person making the statement had died or went away and could not be found. I think, therefore, that this document having been made bona fide merely for the purpose of being laid before the solicitor for his advice or his consideration, it is precisely like the other documents, and that all the documents are privileged."

*C*

*D*

*E*

*F*

*G*

Mr Stadlen submitted that these passages from the judgments of Cockburn CJ and Brett LJ showed that, if documents were prepared the contents of which were to be made known to a solicitor for the purpose of his giving advice, it did not matter that they were not submitted to him. It followed that, even the documents in category (2) set out in paragraph 4 above were privileged. However that does not address the question whether memoranda or documents, produced to the Bingham Inquiry Unit by Bank employees, are, in general, privileged at all. That question is not settled by these citations; it is fair to say that the judgment of Cockburn CJ is in general terms which might arguably encompass legal advice privilege as well as

*H*

litigation privilege but it is quite clear that the "rule" identified and addressed by Brett LJ is the rule relating to litigation privilege and that he is not talking of legal advice privilege in any way.

16 Mr Stadlen also sought to rely on the judgment of Cotton LJ, particularly the following passages, at pp 321–322:

> "Privilege only extends to communications with legal advisers, or in some way connected with legal advisers; communications with a most confidential agent are not protected if that confidential agent happens not to be a solicitor. And this proceeds on the principle that laymen (by which I mean persons not learned in the law) cannot be expected to conduct their defence or litigation without the assistance of professional advisers; and, for the purpose of having the litigation conducted properly, the law has said that communications between the client and the solicitor shall be privileged, and that no one shall be entitled to call for the production of a document which has been submitted to the solicitor for the purpose of obtaining his advice, or for the purpose of enabling him to institute or to defend proceedings. There must be the freest possible communication between solicitor and client, and it is on this ground that professional communications are entitled to privilege, which excepts them from the general rule. The most obvious form of claiming privilege is when any litigant sends either directly or indirectly to his solicitor a document for the purpose of obtaining his advice, or for the purpose of enabling him to institute or defend an action. That is not quite the question here . . ."

And, at pp 322–323:

> "That, I think, is the true principle, that if a document comes into existence for the purpose of being communicated to the solicitor with the object of obtaining his advice, or of enabling him either to prosecute or defend an action, then it is privileged, because it is something done for the purpose of serving as a communication between the client and the solicitor."

He pointed to the disjunctive preposition "or" in both citations and submitted that Cotton LJ had the two quite separate categories of privilege in mind and that, for the purpose of each of them, it was sufficient that the document be prepared with the dominant purpose that it or its contents should be put before the solicitor for advice. This, however, reads too much into the word "or" when the context was solely that of litigation privilege. The "obtaining of the advice" is in contrast to "the purpose of the solicitor being enabled to institute or defend an action" and the advice contemplated by Cotton LJ is advice in relation to the intended action. That is made clear by the passage towards the end of his judgment, at p 323:

> "All these documents must be looked upon as having been prepared for the purpose of being laid before the solicitor, either for the purpose of enabling him to prosecute the action contemplated, or *for the purpose of obtaining his advice on the question at issue in the action*, and in my opinion are privileged." (Our emphasis.)

It is clear from this final citation that Cotton LJ was only talking in terms of litigation privilege.

17  The last of the three cases is *Wheeler v Le Marchant* (1881) 17 ChD 675 which was a case of legal advice privilege not litigation privilege.  In that context it was held that documents obtained from a third party to be shown to a solicitor for his advice did not fall within the privilege.  Advice was given to the defendant trustee of the will of a Mr Brett in the course of its administration in the Chancery Division; for the purpose of that advice information was sought from both the former and the current estate agent and surveyor.  Part of the estate consisted of land in respect of which the defendant made an agreement with Mr Wheeler that he (Mr Wheeler) was to erect certain buildings and then be granted a lease of that land.  The parties fell out.  Mr Wheeler brought an action for specific performance and the defendant trustee claimed privilege for the reports of the estate agent/surveyor made to the solicitors in the course of the administration of the estate.  It was held that while the communications between the defendant and the estate's solicitors were privileged, the reports of the estate agent/surveyor were not.  Cotton LJ is reported to have intervened in argument to say, at p 680: "Your proposition is that all communications by a solicitor with third parties, for the purpose of enabling him to give advice, are privileged.  Has any case protected them except when made post litem motam?" Counsel responded, after a little prevarication: "The question is whether the rule, though not distinctly carried to such a length by any of the cases, ought not to be extended to meet this case . . ."

18  Once again it is necessary to cite a little extensively from the judgments in order to get their flavour.  Sir George Jessel MR, now presiding in the Court of Appeal, recognised the two categories of privilege saying, at pp 680–681:

"As regards the main question in dispute, this appears to be an attempt on the part of the present respondents to extend the rule as to protection from discovery.  It was fairly admitted by their counsel that no decided case carries the rule to the extent to which they wish it carried, but they urged that as a matter of principle it ought to be so extended.  What they contended for was that documents communicated to the solicitors of the defendants by third parties, though not communicated by such third parties as agents of the clients seeking advice, should be protected, because those documents contained information required or asked for by the solicitors, for the purpose of enabling them the better to advise the clients.  The cases, no doubt, establish that such documents are protected where they have come into existence after litigation commenced or in contemplation, and when they have been made with a view to such litigation, either for the purpose of obtaining advice as to such litigation, or of obtaining evidence to be used in such litigation, or of obtaining information which might lead to the obtaining of such evidence, but it has never hitherto been decided that documents are protected merely because they are produced by a third person in answer to an inquiry made by the solicitor.  It does not appear to me to be necessary, either as a result of the principle which regulates this privilege or for the convenience of mankind, so to extend the rule."

And, at pp 681–682:

A      "it must not be supposed that there is any principle which says that every confidential communication which it is necessary to make in order to carry on the ordinary business of life is protected. The protection is of a very limited character, and in this country is restricted to the obtaining the assistance of lawyers, as regards the conduct of litigation or the rights to property. It has never gone beyond the obtaining legal advice and assistance, and all things reasonably necessary in the shape of
B      communication to the legal advisers are protected from production or discovery in order that that legal advice may be obtained safely and sufficiently."

And, at pp 682–683:

C      "But what we are asked to protect here is this. The solicitor, being consulted in a matter as to which no dispute has arisen, thinks he would like to know some further facts before giving his advice, and applies to a surveyor to tell him what the state of a given property is, and it is said that the information given ought to be protected because it is desired or required by the solicitor in order to enable him the better to give legal advice. It appears to me that to give such protection would not only extend the rule beyond what has been previously laid down, but beyond
D      what necessity warrants. The idea that documents like these require protection has been started, if I may say so, for the first time today, and I think the best proof that the necessities of mankind have not been supposed to require this protection is that it has never heretofore been asked. It seems to me we ought not to carry the rule any further than it has been carried. It is a rule established and maintained solely for the
E      purpose of enabling a man to obtain legal advice with safety. That rule does not, in my opinion, require to be carried further, and therefore I think this appeal ought to be allowed . . ."

Brett LJ said, at p 683:

F      "The proposition laid before us for approval is, that where one of the parties to an action has in his possession or control documents which passed between his solicitor and third parties, they are protected in his hands from inspection, on the ground that they were documents which passed between the solicitor and the third party for the purpose of enabling the solicitor to give legal advice to his client, although such information was obtained by the solicitor for that purpose at a time when there was no litigation pending between the parties, nor any
G      litigation contemplated. It seems to me that that proposition cannot be acceded to. It is beyond any rule which has ever been laid down by the court, and it seems to me that it is beyond the principles of the rules which have been laid down. The rule as to the non-production of communications between solicitor and client is a rule which has been established upon grounds of general or public policy. It is confined
H      entirely to communications which take place for the purpose of obtaining legal advice from professional persons. It is so confined in terms, it seems to me it is so confined in principle, and it does not extend to the suggested case."

Cotton LJ said, at pp 684–685:

1574
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

"It is said that as communications between a client and his legal advisers for the purpose of obtaining legal advice are privileged, therefore any communication between the representatives of the client and the solicitor must be also privileged. That is a fallacious use of the word 'representatives'. If the representative is a person employed as an agent on the part of the client to obtain the legal advice of the solicitor, of course he stands in exactly the same position as the client as regards protection, and his communications with the solicitor stand in the same position as the communications of his principal with the solicitor. But these persons were not representatives in that sense. They were representatives in this sense, that they were employed on behalf of the clients, the defendants, to do certain work, but that work was not the communicating with the solicitor to obtain legal advice. So their communications cannot be protected on the ground that they are communications between the client by his representatives and the solicitor. In fact, the contention of the [Banks] comes to this, that all communications between a solicitor and a third person in the course of his advising his client are to be protected. It was conceded there was no case that went that length, and the question is whether, in order fully to develop the principle with all its reasonable consequences, we ought to protect such documents. Hitherto such communications have only been protected when they have been in contemplation of some litigation, or for the purpose of giving advice or obtaining evidence with reference to it. And that is reasonable, because then the solicitor is preparing for the defence or for bringing the action, and all communications he makes for that purpose, and the communications made to him for the purpose of giving him the information, are, in fact, the brief in the action, and ought to be protected. But here we are asked to extend the principle to a very different class of cases, and it is not necessary, in order to enable persons freely to communicate with their solicitors and obtain their legal advice, that any privilege should be extended to communications such as these."

Here Cotton LJ, unlike in his judgment in *Southwark and Vauxhall Water Co v Quick* 3 QBD 315, considers each of the two categories of legal professional privilege and decides in terms that the documents in question do not fall within the first category because they are not communications between solicitor and client and not within the second category because litigation is not contemplated. This case thus makes clear that legal advice privilege does not extend to documents obtained from third parties to be shown to a solicitor for advice. Mr Stadlen, of course, accepted this but said that communications from an employee are different. The reason he gave is that a corporation can only act through its employees; while that is true, it is not a consideration that can carry Mr Stadlen home. Indeed the passage cited from *Anderson*'s case 2 Ch D 644 shows that information from an employee stands in the same position as information from an independent agent. It may, moreover, be a mere matter of chance whether a solicitor, in a legal advice privilege case, gets his information from an employee or an agent or other third party. It may also be problematical, in some cases, to decide whether any given individual is an employee or an agent and undesirable that the presence or absence of privilege should depend upon the answer.

**543**

A    19  By the end of the 19th century it was, therefore, clear that legal advice privilege did not apply to documents communicated to a client or his solicitor for advice to be taken upon them but only to communications passing between that client and his solicitor (whether or not through any intermediary) and documents evidencing such communications.  When Mr Edward Bray came to publish his book, *Bray on Discovery* (1885), he set out the object, meaning and scope of the doctrine of legal professional privilege in Part I of chapter II, by citing (inter alia) selections from the judgments of the following judges: (1) Sir George Jessel MR in *Anderson v Bank of British Columbia* 2 Ch D 644 as set out in the second citation of paragraph 11 above; (2) Lord Langdale MR in *Reece v Trye* 9 Beav 316 as set out in paragraph 9; (3) Cockburn CJ in *Southwark and Vauxhall Water Co v Quick* 3 QBD 315 as set out in paragraph 15; (4) Sir George Jessel MR in *Wheeler v Le Marchant* 17 Ch D 675 as set out in paragraph 18; (5) Turner V-C in *Russell v Jackson* (1851) 9 Hare 387, 391, itself citing from *Greenough v Gaskell* 1 My & K 98.  He then made his detailed exposition of the law by reference first to communication between client and adviser in sections I to IX of Part II of the relevant chapter and then, secondly, by reference to documents and oral communications having reference to (or connection with) existing or anticipated litigation in section X of the chapter "not being communications directly between the client and the professional legal adviser, or communication or documents standing on the same footing": p 404.

20    This exposition is remarkably similar in form to that adopted by the distinguished signatories of the 16th Report of the Law Reform Committee (Privilege in Civil Proceedings) (1967) (Cmnd 3472) which, under the head of "Privileges in aid of litigation", dealt first with "Communications between the client or his agents and the client's professional advisers" and, thereafter, with communications with third parties if made for the purpose of pending or contemplated litigation.  It is noteworthy that the committee, in dealing with the first heading, entitles it "Communications between . . .", and defines its true rationale as a privilege in aid of litigation.  The committee does not suggest that the category of privilege with which it is dealing attaches, in the absence of pending or contemplated litigation, to any documents other than communications between client and legal adviser.  To similar effect is *Buttes Gas and Oil Co v Hammer (No 3)* [1981] QB 223, 243F–244A, per Lord Denning MR and *Halsbury's Laws of England*, 4th ed (Reissue), vol 37 (2001), para 579:

G        "*Reports made by agents or employees to employer*.  Reports made by employees to their employers or by agents to their principals are not privileged unless they satisfy, and are privileged if they do satisfy, the conditions already set out, that is to say they must be reports made for the purpose of being laid before the party's legal adviser for the purpose of obtaining his advice in connection with the anticipated or pending litigation."

H    21    We, therefore, conclude that the 19th century authorities established that legal advice privilege was a well established category of legal professional privilege, but that such privilege could not be claimed for documents other than those passing between the client and his legal advisers and evidence of the contents of such communications.  Mr Stadlen made

much play of the concession in the court below that it was not necessary for
the communication to have actually been received before privilege could
attach; if, for example, the sender of the communication had died before the
communication had been sent to his legal adviser or the document concerned
had been lost the privilege would still exist; but that concession is not
inconsistent with the law as thus stated. If such a situation arose there would
be no difficulty in saying that a document which was intended to be a
communication between client and solicitor was still privileged even if not in
fact communicated. That might be a modest extension of the principle but
cannot be a foundation for the width of legal advice privilege which
Mr Stadlen sought to maintain.

*Later development*

22   Mr Stadlen submitted that, even if the law was as stated in the 19th
century, it had been elaborated by developments in the law of discovery
which occurred in the 20th century. Thus there was a lengthy debate in the
context of litigation privilege in relation to the right test to apply to a
document intended to be submitted to a solicitor for his consideration. Was
it sufficient that one of the purposes for which it had been prepared was to
obtain legal advice or did it have to be the dominant purpose or even the sole
purpose of the document coming into existence? In *Grant v Downs* (1976)
135 CLR 674 the majority of the High Court of Australia said it had to be
the sole purpose; Barwick CJ's dissenting judgment in favour of the
dominant purpose was ultimately preferred by the House of Lords in *Waugh
v British Railways Board* [1980] AC 521 and in *Esso Australia Resources
Ltd v Federal Comr of Taxation* (1999) 201 CLR 49 the English test has now
been adopted by the High Court of Australia in preference to its original
view. Mr Stadlen placed particular reliance on the statements of principle in
the judgment of Barwick CJ 135 CLR 674, 677 which was ultimately
adopted by the House of Lords in *Waugh's* case. It is in the following terms:

> "Having considered the decisions, the writings and the various aspects
> of the public interest which claim attention, I have come to the conclusion
> that the court should state the relevant principle as follows: a document
> which was produced or brought into existence either with the dominant
> purpose of its author, or of the person or authority under whose
> direction, whether particular or general, it was produced or brought into
> existence, of using it or its contents in order to obtain legal advice or to
> conduct or aid in the conduct of litigation, at the time of its production in
> reasonable prospect, should be privileged and excluded from inspection."

23   As to this passage the judge said, in paragraph 24 of his judgment:

> "On its natural reading this passage would seem to be concerned both
> with the obtaining of legal advice and with the conduct of litigation
> reasonably in prospect. It is possible that Sir Garfield had in mind only
> the obtaining of advice in relation to litigation in reasonable prospect, as
> opposed to the obtaining of legal advice which was not similarly focussed,
> but I can see no rational basis on which the principles which protect the
> confidentiality of the process of obtaining legal advice should differ as
> between these two distinct situations, although the exigencies of
> litigation, actual or contemplated, require the net to be cast wider than it

1577

A    is in relation to the obtaining of legal advice simpliciter, so as to enable a
     party to carry out confidential preparations for trial."

The judge further pointed out in paragraph 26 of his judgment that the
passage in the judgment of Barwick CJ was expressly approved by Lord
Wilberforce, Lord Simon of Glaisdale and Lord Edmund-Davies in *Waugh's*
case [1980] AC 521, 532–533, 534 and 537 and 543–544 respectively.  It
B   was this approval that, together with two authorities in relation to litigation
privilege and *Balabel v Air India* [1988] Ch 317 which undoubtedly
concerned legal advice privilege, persuaded the judge to accord the disputed
documents the privilege claimed by the Bank.

     24   We cannot read the principle set out by Barwick CJ and later
approved by the House of Lords as being a statement in relation to legal
C   advice privilege.   The context was only litigation privilege and when
Barwick CJ refers to a document brought into existence with the
dominant purpose of "using it or its contents in order to obtain legal
advice or to conduct or aid the conduct of litigation" it is more natural to
read the words "in order to obtain legal advice" not as referring to the
obtaining of legal advice in a free-standing situation but as a contrast with
the concept "in order to conduct, or aid in the conduct of, litigation".   In
D   other words, the use of the document envisaged by Barwick CJ is
potentially a twofold use, viz for obtaining advice in the pending litigation
or for conducting (or helping to conduct) the pending litigation.   So
understood it is a complete statement of the relevant law.   If it is to be
more widely understood, the statement of the law is incomplete, unless it
was intended to depart from *Wheeler v Le Marchant* 17 Ch D 675 and the
E   law as understood at the end of the 19th century.   There is no indication
of that.

     25   *Waugh's* case [1980] AC 521 itself was undoubtedly concerned only
with litigation privilege.  Mr Peter Weitzman QC, opening the appeal for the
ultimately successful plaintiff identified the issue before the House in this
way, at p 523:

F        "Where a report is brought into existence for several reasons or
     purposes only one of which is to obtain professional legal advice in
     litigation that is pending or anticipated, is it protected by legal
     professional privilege from discovery?"

This is echoed at both the beginning and conclusion of Lord Wilberforce's
speech, at pp 531 and 533 respectively:
G
         "the affidavit [of the defendant] makes it clear that the report was
     prepared for a dual purpose: for what may be called railway operation
     and safety purposes and for the purpose of obtaining legal advice in
     anticipation of litigation . . .   So the question arises whether this is
     enough to support a claim of privilege . . ."

H    and

         "It appears to me that unless the purpose of submission to the legal
     adviser in view of litigation is at least the dominant purpose for which the
     relevant document was prepared, the reasons which require privilege to
     be extended to it cannot apply."

Lord Simon's speech is to similar effect, at p 536A–B (where he cites   A
Cotton LJ's judgment in *Southwark and Vauxhall Water Co v Quick* 3 QBD
315 as being a case of pending or anticipated litigation), and p 538A.  Lord
Edmund-Davies, at pp 541G–542C, expressly draws attention to the
distinction between the two categories of legal professional privilege and
makes it clear that the case with which the House was dealing was privilege
in aid of existing or contemplated litigation.  He then cites *Anderson v Bank*
*of British Columbia* 2 Ch D 644, sets out the possible candidates for the   B
appropriate test in relation to a document prepared for use in such litigation
and states that the House of Lords was free to choose and declare the proper
test.  He continues [1980] AC 521, 543:

> "in my judgment we should start from the basis that the public interest
> is, on balance, best served by rigidly confining within narrow limits the
> cases where material relevant to litigation may be lawfully withheld.   C
> Justice is better served by candour than by suppression.  For, as it was put
> in the *Grant v Downs* 135 CLR 674 majority judgment, at p 686: 'the
> privilege . . . detracts from the fairness of the trial by denying a party
> access to relevant documents . . .'."

He then comes down in favour of Barwick CJ's "dominant purpose" and   D
quotes in full the passage set out in paragraph 22 above.  But the context is
all litigation privilege and it is clear that he was not considering legal advice
privilege.  If he had been considering legal advice privilege, it is unlikely, in
the light of the considerations advanced in the above passage, that Lord
Edmund-Davies would have wished to extend legal advice privilege in any
way.

26   The judge said that he could see no rational basis on which the   E
principles which protect the confidentiality of the process of obtaining legal
advice should differ as between the two distinct situations of contemplated
litigation and the absence of contemplated litigation.  It is perhaps possible
to separate two such bases that appealed to the 19th century judges in the
cases by which this court remains bound today.

(1) The need for a client to "be able to make a clean breast of it to the   F
gentleman whom he consults with a view to the prosecution of his claim, or
the substantiating of his defence against the claim of others" (to use the
words of Sir George Jessel MR in *Anderson's* case 2 Ch D 644) is paramount
when litigation either exists or is contemplated.  It is in the interests of the
state which provides the court system and its judges at taxpayers' expense
that legal advisers should be able to encourage strong cases and discourage
weak cases: see *Ventouris v Mountain* [1991] 1 WLR 607, 611C, per   G
Bingham LJ.  It is by no means so clear that, in the absence of contemplated
litigation, there is any temptation for the client not to offer a clean breast to
his legal adviser.  He wants advice and the prospect of winning or losing a
particular case will normally do nothing to cloud his judgment as to what
facts he places before his legal adviser.

(2) One ought not to lose sight of the public interest that the courts, if   H
possible, should come to correct judgments on the basis of all relevant
material.   Of course legal advice privilege must prevail over this
consideration to the appropriate extent.  It is a fundamental human right
which can be overridden only by the express words of a statute or by
necessary implication, see *R (Morgan Grenfell & Co Ltd) v Special Comr of*

**547**

*Income Tax* [2003] 1 AC 563. But it is a privilege possessed by the client in relation to no other adviser. Lord Brougham was exercised by the difficulty of discovering why the privilege has been refused in respect of other advisers, especially medical advisers. But the law is clear that it is so refused in respect of every profession other than that of the law. In these circumstances it is important that it be confined to its proper limits. The judges of the 19th century thought that it should only apply to communications between client and adviser. That is the proper compass of the privilege. It is not, in our judgment, open to this court to extend the privilege, even if we thought we should.

27   The remaining 20th century cases do not take the matter much further. It is certainly true that in *In re Highgrade Traders Ltd* [1984] BCLC 151 the court rejected a claim for legal advice privilege in relation to reports commissioned by an insurance company after a suspected arson. The documents were reports prepared by third parties rather than employees of the company but, as far as it goes, it supports Mr Pollock's argument. So does the decision of Millett J in *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583 where a claim for legal advice privilege was rejected for reports written by accountants both when the accountants were independent and when they reconstituted themselves as a committee of the client.

28   On the other side of the fence, the courts in both *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027 and *Hellenic Mutual War Risks Association (Bermuda) Ltd v Harrison (The Sagheera)* [1997] 1 Lloyd's Rep 160 (both cases of litigation privilege) were prepared to proceed on the basis that any document prepared with the dominant purpose of using it or its contents to obtain legal advice was privileged. In defining the extent of the privilege in the latter case, Rix J said that the dominant purpose test applies in relation to legal advice privilege in a different way from the way it applies in relation to litigation privilege and added, at p 168:

> "In legal advice privilege, I would suggest, the practical emphasis is upon the purpose of the retainer. If the dominant purpose of the retainer is the obtaining and giving of legal advice, then, although it is in theory possible that individual documents may fall outside that purpose, in practice it is unlikely."

This observation was not critical to his judgment and we would respectfully doubt whether the shift of focus from the dominant purpose for which a document or documents were prepared to the "dominant purpose of the retainer" can be justified by reference to authority or principle in relation to documents which are not communications between client and legal adviser.

29   *Balabel v Air India* [1988] Ch 317 is potentially more relevant since it is a case which relates to legal advice privilege. The issue was whether, once a solicitor had been instructed, legal advice privilege extended to all communications between solicitor and client on matters within the ordinary business of the solicitor and referable to the relationship or whether, although communications seeking or conveying advice were privileged, documents passing between the client and his solicitor recording information or transactions or meetings were not privileged. This court decided that the former was the law; the claimants' position in this case is, in

1580
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

no way, inconsistent with the decision since they accept that all documents *A*
passing between the BIU and Freshfields are privileged as, indeed, are
Freshfields' own drafts and memoranda. The issue in *Balabel's* case arose in
an action brought by Mr and Mrs Balabel for specific performance of an
agreement for an underlease, supposedly made between them and Air India
as underlessors; unfortunately for Mr and Mrs Balabel there was no note or
memorandum in writing passing between the parties for the purpose of *B*
section 40 of the Law of Property Act 1925 and they made a discovery
application in the hope that such a memorandum would be found in
(1) communications between Air India and their solicitors other than those
seeking or giving legal advice; (2) drafts, working papers and memoranda of
the solicitors; (3) internal communications of Air India other than those
seeking legal advice. Significantly Mr Lightman QC for the claimants, *C*
against whom an order for discovery had been made, abandoned any claim
to privilege for category (3) which was the category equivalent to the
category for which privilege is claimed in the present case: see p 319C.

  30   Nevertheless Tomlinson J cited two passages from the judgment of
Taylor LJ in favour of the claimants. First, at p 330:

> "Although originally confined to advice regarding litigation, the
> privilege was extended to non-litigious business. Nevertheless, despite *D*
> that extension, the purpose and scope of the privilege is still to enable
> legal advice to be sought and given in confidence. In my judgment,
> therefore, the test is whether the communication or other document was
> made confidentially for the purposes of legal advice. Those purposes have
> to be construed broadly."

The judge drew attention to the words "or other document" but the context *E*
of that phrase was that privilege was being sought for (2) "draft, working
papers and memoranda" which were not, of course, communications. No
argument was addressed on class (3) which would be the only relevant class
for the purpose of the argument in this case. Then the judge cited the
passage, at p 332: "As indicated, whether such documents are privileged or
not must depend on whether they are part of that necessary exchange of
information of which the object is the giving of legal advice as and *F*
when appropriate." That is a perfectly appropriate test to apply to
communications between the client and his solicitor but authority does not
support its wider application to memoranda supplied by employees for the
purpose of being sent to the client's solicitor and it is most unlikely that
Taylor LJ intended to deal with that question. Indeed, shortly before the
passage quoted, Taylor LJ pointed out that the range of assistance given by *G*
solicitors to their clients and of activities carried out on their behalf has been
greatly broadened in recent times and is still developing. He added: "Hence
the need to re-examine the scope of legal professional privilege and keep it
within justifiable bounds." *Balabel's* case is thus no authority for extending
the privilege.

  31   We therefore conclude that the Bank is not entitled to privilege in any
of the four categories itemised at the beginning of this judgment. Mr Stadlen *H*
asked what the position would be if the Governor himself had noted down
what he remembered in relation to the supervision of BCCI with the
intention of giving it to the BIU for transmission to Freshfields. No privilege
has been claimed for any such specific document but, as it seems to us,

**549**

Mr Pollock was right to say that on the evidence before the court, the BIU, which was established to deal with inquiries and to seek and receive Freshfields' advice, is for the purpose of this application, the client rather than any single officer however eminent he or she may be. It follows that no separate consideration need be given to the position of ex-employees who are, obviously, in no better position for the purpose of any claim to privilege.

*"Dominant purpose"?*

32   In the light of the conclusions so far, it is unnecessary to express a view on the question whether the internal documentation of the Bank, which came into existence after the setting up of the Bingham inquiry, was indeed prepared with the dominant purpose of obtaining advice. It would, no doubt, be right to say that the obtaining and giving of advice was an important purpose; but we would not say on the facts of the present case that it was the dominant purpose. On any natural view of the matter the dominant purpose of obtaining the information which employees and ex-employees could give to the Bingham inquiry was merely to present that evidence to the inquiry. No doubt the Bank would naturally have been anxious to present that evidence in the way least likely to attract criticism. One of Freshfields' many skills is, of course, to present their clients' cases in the most favourable light. That, after all, is in large part the art of the advocate. Is this assistance "legal advice" in the sense in which the phrase is used when one refers to privilege being claimed for legal advice?

33   At this stage it is sensible to remind ourselves of the salient evidence. The Bank compiled the 258-page statement to the inquiry in November 1991 and the paper entitled "Supervisory Lessons" in April 1992. Witnesses needed to be prepared, although no formal statements were taken from the witnesses. It is not surprising to read that the BIU communications with the inquiry were the subject of extensive legal advice from Freshfields. Mr Croall of Freshfields put the matter in this way in paragraph 17 of his second witness statement:

> "So as to ensure that the Bank's legal advisers were properly instructed and fully informed to advise and assist the Bank in preparing its evidence and more generally in relation to all its dealings with the Bingham Inquiry, there was a constant flow of factual information from the Bank to its legal advisers, usually channelled through the BIU. The BIU and the Bank's legal advisers effectively operated as a single team, with members of the BIU undertaking, or delegating to others within the Bank, tasks of research or fact-gathering for the purpose of review and/or advice by the Bank's legal advisers. Specific requests for factual matters to be investigated and reported (typically in the form of notes) to the legal team were sometimes made by the legal team itself to the BIU which then initiated work within the Bank. Sometimes such work was carried out by the BIU itself and sometimes by others elsewhere in the Bank commissioned to do so by the BIU. Fact finding and research based exercises were sometimes commissioned by the BIU itself of its own initiative in order to furnish information to the legal advisers. The purpose of carrying out all of this work was to provide information to the Bank's legal advisers to enable them to prepare submissions and/or advise

1582
**Three Rivers DC v Bank of England (No 5) (CA)**                    [2003] QB

on the nature, presentation and/or content of the Bank's submissions to,    *A*
evidence for and responses to requests from, the Inquiry."

He later asserts that the documents passed to Freshfields were prepared with
the dominant purpose of obtaining legal advice and that he has consulted
with the writers of documents not passed to Freshfields to ascertain whether
they were prepared with the same dominant purpose.

34   Mr Stadlen for the Bank, in these circumstances, relied on the    *B*
following paragraph in the judgment of Taylor LJ in *Balabel v Air India*
[1988] Ch 317, 330:

"Although originally confined to advice regarding litigation, the
privilege was extended to non-litigious business.  Nevertheless, despite
that extension, the purpose and scope of the privilege is still to enable
legal advice to be sought and given in confidence.  In my judgment,    *C*
therefore, the test is whether the communication or other document was
made confidentially for the purposes of legal advice.  Those purposes have
to be construed broadly.  Privilege obviously attaches to a document
conveying legal advice from solicitor to client and to a specific request
from the client for such advice.  But it does not follow that all other
communications between them lack privilege.  In most solicitor and client    *D*
relationships, especially where a transaction involves protracted dealings,
advice may be required [as] appropriate on matters great or small at
various stages.  There will be a continuum of communication and
meetings between the solicitor and client.  The negotiations for a lease
such as occurred in the present case are only one example.  Where
information is passed by the solicitor or client to the other as part of the
continuum aimed at keeping both informed so that advice may be sought    *E*
and given as required, privilege will attach.  A letter from the client
containing information may end with such words as 'please advise me
what I should do'.  But, even if it does not, there will usually be implied in
the relationship an overall expectation that the solicitor will at each stage,
whether asked specifically or not, tender appropriate advice.  Moreover,
legal advice is not confined to telling the client the law; it must include    *F*
advice as to what should prudently and sensibly be done in the relevant
legal context."

In applying this passage it seems to us that, on the facts of the present case,
there may be a temporal distinction to be drawn between (1) original
documentary material supplied by Bank employees to the BIU (or directly to
Freshfields), whether obtained in response to a Freshfields inquiry or not, for    *G*
the purpose of either the November 1991 submission or the April 1992
paper and (2) material supplied in "responses to requests from the Inquiry"
to use Mr Croall's words at the end of his paragraph 17.

35   In the former case of original documentary material supplied to
assist in the compilation of the November 1991 statement or April 1992
paper, we think it impossible to say that the dominant purpose of its    *H*
preparation was the obtaining of legal advice.  It is raw material for
presentation to the inquiry and the dominant purpose for which it was
prepared was so that the Bank could comply with its primary duty of putting
all relevant factual material before Bingham LJ.  Mr Stadlen submitted that
Mr Croall's assertion to the contrary must conclude the matter in the Bank's

**551**

A   favour unless Mr Croall's honesty was to be impugned.  We do not agree.
The question of dominant purpose is a matter for a court to determine after
consideration of the relevant evidence.  If it can be seen upon analysis that
the dominant purpose is not that of obtaining advice, as will seldom be the
case where a national institution is gathering evidence to put before an
inquiry set up by government, then it is the court's duty to say so.  The
"continuum of communication . . . as to what should prudently and sensibly

B   be done in the relevant legal context" has not yet begun.

36   We have considered whether material generated in specific response
to requests from the inquiry is different.  It can be said that the "relevant
legal context" has emerged and "what should prudently and sensibly be
done" is something about which advice is sufficiently desirable for the
obtaining of that advice now to be the dominant purpose for which

C   documents are prepared.

37   We recognise that no specific argument was addressed to us on this
matter.  Having reflected upon it, we have come to the conclusion that there
can be no relevant legal distinction between material generated at the early
stage of preparing the submission to Bingham LJ and material generated in
response to requests from him.  All such material is, in our judgment,
prepared for the dominant purpose of putting relevant factual material

D   before the inquiry in an orderly and attractive fashion, not for the dominant
purpose of taking legal advice upon such material.

*Conclusion*

38   As stated, however, we do not, in any event, consider that privilege
extends to any of the documentation or internal memoranda of the Bank's

E   employees and, subject to any argument on the detailed wording, would be
minded to grant the declaration for which the claimants asked in their
application of 25 October 2002, on the assumption it is in the same form as
recorded in paragraph 3.2 of Mr Grierson's eighth witness statement of
28 October 2002, and to order that the Bank serve a further and better list of
documents in accordance with the terms of such declaration.

F                                    *Appeal allowed.*
*Permission to appeal refused.*
*Order suspended pending petition to
appeal.*

14 May.  The Appeal Committee of the House of Lords (Lord Steyn, Lord

G   Hope of Craighead and Lord Hobhouse of Woodborough) dismissed a
petition by the Bank for leave to appeal.

*Solicitors: Lovells; Freshfields Bruckhaus Deringer.*

S L D

H   ————

END OF VOLUME AND OF QUEEN'S BENCH SERIES FOR 2003

**811**

A **United States of America v Philip Morris Inc (British American Tobacco (Investments) Ltd intervening).**
[2003] EWHC 3028 (Comm); [2004] EWCA Civ 330.

B Queen's Bench Division (Commercial Court); Court of Appeal (Civil Division).
Moore-Bick J; Brooke, Chadwick and Scott Baker L JJ.
Judgment delivered 10 December 2003 and 23 March 2004.

C *Letters of request – US court – Examination of witnesses – Legal advice privilege – Litigation privilege - Tobacco companies - Health risks of smoking - Destruction or suppression of documents - Solicitor allegedly involved in implementation of document destruction policies - Whether communications covered by privilege - Whether examination oppressive.*

D **This was an appeal by a company ('BATCo') and a solicitor ('F') against an order made by Moore-Bick J in the Commercial Court whereby he directed that F be examined for the purposes of making his evidence available in proceedings currently pending before the US District Court for the District of Columbia pursuant to letters of request issued by that court.**

E **The action in relation to which the evidence was sought involved a claim by the USA against a number of tobacco companies under the Racketeer Influenced and Corrupt Organisations law, 18 USC §1962. The US alleged that since 1953 the tobacco companies had engaged in an unlawful enterprise to deceive and defraud the American public and consumers of cigarettes about the health risks of smoking and about their knowledge and attitude to them. The US said that as F part of that unlawful enterprise the companies, among other things, suppressed information available to them to the effect that smoking was addictive and was, or might be, injurious to health, manipulated the nicotine levels in cigarettes, and made false statements about the research they were undertaking and their readiness to communicate the results to the public. It was an important part of G the US's case that the tobacco companies took active steps to ensure that documents which they thought might damage them in any litigation were destroyed or suppressed to ensure that they could not be disclosed. In particular, the companies were alleged to have systematically destroyed certain kinds of documents, to have sent others out of the jurisdiction to put them beyond the reach of the courts, and to have routed some communications through their H lawyers with 'confidential' or similar markings in order to enable them to claim legal professional privilege in respect of them. The companies were also accused of having interfered with the integrity of scientific research into the effects of smoking on health by causing it to be directed, edited and controlled by their lawyers. BATCo, an English company, was among the defendants to the action in Washington DC.**

**812**        USA v Philip Morris Inc                [2004] 1 CLC

A

   F was a partner in a firm of London solicitors who acted for various companies in the BAT group between about November 1985 and May 1994. The US notified BATCo that it wished to take a deposition from F and asked it to make him available for that purpose. Since F was not an employee of BATCo, that request was refused. The US therefore applied by motion for letters of request to be issued in respect of F asserting that it was seeking evidence for use at trial rather than evidence in the nature of pre-trial discovery and that F's evidence was necessary for the just disposal of the case because he had played a central role in the creation and implementation of document destruction policies to protect BAT and its affiliates, including BATCo. The US court issued letters of request of the examination of F. BATCo and F resisted on grounds of privilege and oppression arguing that all communications passing between F and BATCo and other members of the BAT group were covered by both legal advice privilege and litigation privilege. F could not therefore be required to answer any questions on any of the matters identified in the letter of request unless BATCo waived privilege. Since BATCo did not intend to waive privilege, it would be a waste of time and money to make an order for F's examination. The judge held that that many of the communications between F and BATCo were probably protected by legal advice privilege but that unless BATCo could show that its assertion of legal advice privilege would prevent F from answering any question of substance about its document management policies or procedures the court would not be justified refusing to make an order for his examination, since issues of privilege could be dealt with as they arose during the questioning of F. Equally the judge was not persuaded that all communications with BATCo which F might be asked to disclose in the course of the proposed examination would inevitably be protected by litigation privilege on the basis that they had been prepared when litigation was reasonably in prospect. Given that F had been granted immunity from prosecution, and the fact that the US had offered an undertaking not to pursue civil proceedings against F, the judge considered that any remaining risk of oppression could be adequately countered by giving appropriate directions for the conduct of the examination. BATCo and F appealed.

B

C

D

E

F

   *Held*, dismissing the appeal:

G

   1. The scope of legal advice privilege was restricted to communications passing between the lawyer and his client, whereas documents emanating from third parties might attract litigation privilege. The judge correctly considered that a 'mere possibility' of litigation did not suffice. He was also correct to conclude that the fact that there was 'a distinct possibility that sooner or later someone might make a claim' was insufficient. So was 'a general apprehension of future litigation'. The appropriate test was that litigation must have been reasonably in prospect. It would be impossible to conclude that litigation against BATCo itself was reasonably in prospect when the company engaged F's services to advise it. The exercise for which F's firm was retained had nothing to do with the

H

© DSP Publishing Ltd                        [2004] 1 CLC 811

**554**

A    **preparation of the brief for a trial which was the traditional justification for litigation privilege.**

**2. There was a clear distinction between adversarial proceedings (pending or contemplated) between two or more parties which were destined, in theory at any rate, for a contested hearing in a court or court-like body, and proceedings whereby a party might compel a non-party to produce relevant documents for the purposes of the main proceedings. The non-party might well wish to seek legal advice about his obligations in that regard, but all that would be in issue was whether he was or was not legally obliged to do what was required of him. If the non-party notified somebody else that it had received the application, and that other party wished to take steps to assert a claim for confidentiality or privilege in the documents sought, it was difficult to see why litigation privilege should attach to that communication. For those reasons, while the judge was correct to categorise the letter of request process as adversarial, that fact alone would not give rise to a sustainable claim for litigation privilege.**

**3. The judge was right to deny blanket approval to a claim for legal advice privilege in relation to all communications passing between F and anyone in the BATCo organisation (or outside it) over a nine-year period. It was too simplistic to refer simply to the dominant purpose of the original retainer, or to try and identify the dominant purpose of a role assumed over a number of years, involving the solicitor in many different activities. Advice or assistance in collecting and collating, listing, spring-cleaning, storing, transporting and warehousing documents did not amount to legal advice concerning BATCo's legal rights and obligations such as would attract privilege. If in the course of many communications passing between a firm of solicitors and their clients' representatives there were some letters which were written for the dominant purpose of seeking legal advice, that did not itself confer privilege on the entire correspondence. The judge was correct in the way he decided to police the furtherance of the letter of request.**

**4. The judge struck a fair balance, and did not wrongly expose F to the prospect of an unduly oppressive examination. There were likely to be areas which were quite plainly covered by legal advice privilege. There would be other areas which quite plainly were not. In the debatable areas the judge, at the restored directions hearing, and the judge-examiner would both have to proceed with care. But that was no good reason not to order examination at all when it was the duty and pleasure of the English court to respond positively to a letter of request if it could.**

The following cases were referred to in the judgments:

*Anderson v Bank of British Columbia* (1876) 2 Ch D 644.
*Balabel v Air India* [1988] Ch 317.

**814**                    **USA v Philip Morris Inc**                    **[2004] 1 CLC**

*Barclays Bank plc v Eustice* [1995] 1 WLR 1238.                                    A

*British American Tobacco Australia Services Ltd v Cowell* [2002] VSCA 197.

*Collins v London General Omnibus Co* (1893) 68 LT NS 831.

*First American Corp v Al-Nahyan* [1999] 1 WLR 1154.

*Golden Eagle Refinery Co Ltd v Associated International Insurance Co*
(unreported, 19 February 1998, CA).                                                 B

*Grant v Downs* (1976) 135 CLR 674.

*Highgrade Traders, Re* [1984] BCLC 151.

*Jarman v Lambert & Cooke Contractors Ltd* [1951] 2 KB 937.

*L (a Minor) (Police Investigation: Privilege), Re* [1997] AC 16.

*Ladd v Marshall* [1954] 1 WLR 1489.

*Mitsubishi Electric Australia Pty Ltd v Victorian Work Cover Authority* [2002]       C
VSCA 59.

*Norway's (State of) Application, Re* [1987] QB 433.

*R (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2002]
UKHL 21; [2003] 1 AC 563.

*R v Cox & Railton* (1884) 14 QBD 153.                                               D

*R v Derby Magistrates' Court, ex parte B* [1996] AC 487.

*Radio Corp of America v Rauland Corp* [1956] 1 QB 618.

*Refco Capital Markets Ltd v Credit Suisse (First Boston) Ltd* [2001] EWCA Civ
1733; [2002] CLC 301.

*Rio Tinto Zinc Corp v Westinghouse Electric Corp* [1978] AC 547.

*Sedgwick Group plc v Johns-Manville Fibreboard Corp (The Asbestos Insurance*         E
*Coverage Cases)* [1985] 1 WLR 331.

*State of Minnesota v Philip Morris Inc* [1997] ILPr 170.

*Three Rivers District Council v Bank of England* [2003] EWHC 2565 (Comm).

*Three Rivers District Council v Bank of England (No. 5)* [2003] EWCA Civ 474;
[2003] QB 1556.                                                                     F

*Three Rivers District Council v Bank of England (No. 6)* [2004] EWCA Civ 218;
[2004] QB 916.

*Venables v News Group Newspapers Ltd* [2001] Fam 430.

*Waugh v British Railways Board* [1980] AC 521.

*Wheeler v Le Marchant* (1881) 17 Ch D 675.

                                                                                    G

Kenneth MacLean QC and James Goldsmith (instructed by Loble Solicitors) for the claimant/respondent.

Barbara Dohmann QC (in the High Court), Mark Howard QC (in the Court of Appeal) and David Pievsky (instructed by Lovells) for the intervener/first appellant.

                                                                                    H

Mark Hapgood QC (in the High Court), Charles Hollander QC (in the Court of Appeal) (instructed by Norton Rose) for Mr Foyle, second appellant.

Jeffery Onions QC (instructed by Herbert Smith) for Mr Broughton in the High Court.

© DSP Publishing Ltd                                        [2004] 1 CLC 811

**QB**                         **USA v Philip Morris Inc**                         **815**
                                 (*Moore-Bick* J)

HIGH COURT JUDGMENT
(10 December 2003)

**Moore-Bick J:**

1. I have before me applications by the USA for orders that two witnesses, Mr Andrew Foyle and Mr Martin Broughton, be examined for the purposes of making their evidence available in proceedings currently pending before the US District Court for the District of Columbia pursuant to letters of request issued by that court. The applications have been made on notice to the witnesses because it was thought, correctly as it turns out, that they would be opposed and that, if orders for examination were made without notice, applications would inevitably be made to set them aside. British American Tobacco (Investments) Ltd ('BATCo'), which is one of the parties to the litigation in the United States for the purposes of which the evidence is sought, has been given permission to intervene to enable it to assert claims for privilege in respect of confidential communications which it fears Mr Foyle may be asked to disclose if an order for his examination is made.

2. The action in relation to which the evidence is sought involves a claim by the USA against a number of tobacco companies under the Racketeer Influenced and Corrupt Organisations law, 18 U.S.C. §1962, and is one of the largest cases ever brought in a US court. By way of illustration, it is said by Ms Sharon Eubanks, the director of the tobacco litigation team at the Department of Justice who has made a number of statements in support of the applications, that the sum claimed is at least US$289 billion and that in the region of 40 million documents will be produced in the course of discovery. The US alleges that since 1953 the tobacco companies have engaged in an unlawful enterprise to deceive and defraud the American public and consumers of cigarettes about the health risks of smoking and about their knowledge and attitude to them. The US says that as part of that unlawful enterprise the companies, among other things, suppressed information available to them that smoking was addictive and was, or might be, injurious to health, manipulated the nicotine levels in cigarettes, and made false statements about the research they were undertaking and their readiness to communicate the results to the public. Ms Eubanks says in her first statement that an important part of the US's case is that the tobacco companies took active steps to ensure that documents which they thought might damage them in any litigation were destroyed or suppressed to ensure that they could not be disclosed. In particular, the companies are alleged to have systematically destroyed certain kinds of documents, to have sent others out of the jurisdiction to put them beyond the reach of the courts, and to have routed some communications through their lawyers with 'confidential' or similar markings to enable them to claim legal professional privilege in respect of them. The companies are also accused of having interfered with the integrity of scientific research into the effects of smoking on health by causing it to be directed, edited and controlled by their lawyers.

**816**　　　　　　　**USA v Philip Morris Inc**　　　　**[2004] 1 CLC**
　　　　　　　　　　　(*Moore-Bick* J)

A

3. Among the defendants to the action in Washington D.C. are two companies in the British American Tobacco group, Brown & Williamson Tobacco Corporation, an American company, and BATCo, an English company, both of which are ultimately owned by British American Tobacco plc ('BAT plc'). BAT plc was incorporated on 23rd July 1997.

B

4. Mr Foyle is a solicitor and a partner in the firm of Lovells. He is a litigation specialist and acted for various companies in the BAT group between about November 1985 and May 1994 when he moved from London to Lovells' office in Hong Kong. Mr Broughton had held several senior positions in the BAT group, culminating in his appointment as chairman of BAT plc in February 1998.

C

5. Tobacco litigation is not confined to the US. In October 2001 Mrs Rolah McCabe brought an action in the Supreme Court of Victoria against British American Tobacco Australia Services Ltd ('BATAS') seeking damages for personal injury caused by smoking. On 6th February 2002 Eames J struck out BATAS's defence on the grounds that it had prevented the plaintiff from obtaining a fair trial by destroying potentially relevant documents at a time when it faced impending litigation. In his judgment Eames J referred at some length to the part played by Mr Foyle in advising the BAT group's companies in Australia and quoted extensively from a document which has since become known as the 'Foyle memorandum' to which it will be necessary to refer more fully at a later stage. On 6th December 2002 the judgment of Eames J was reversed on appeal, but in the meantime matters had moved on in the US.

D

E

6. Following the delivery of judgment by Eames J in the *McCabe* case the US notified BATCo that it wished to take a deposition from Mr Foyle and asked it to make him available for that purpose. Since Mr Foyle was not an employee of BATCo, that request was refused. Requests to make available Mr Broughton and another witness, Mr Nicholas Cannar, formerly company secretary and head of BATCo's legal department, were also refused. Accordingly, on 1st July 2002 the US applied by motion for letters of request to be issued in respect of Mr Foyle, Mr Broughton and Mr Cannar. The letters of request relating to Mr Foyle and Mr Broughton were directed to this court; the letter of request relating to Mr Cannar was directed to the Supreme Court of New South Wales, Mr Cannar then being resident in Australia.

F

G

7. In its motion applying for a letter of request in relation to Mr Foyle the US set out the grounds on which it made its application. They included an assurance that it sought evidence for use at trial rather than evidence in the nature of pre-trial discovery and an assertion that Mr Foyle's evidence was necessary for the just disposal of the case because he had played a 'central role in the creation and implementation of document destruction policies implemented to protect BAT and its affiliates, including BATCo and Brown and Williamson'. No evidence was offered in support of that allegation, but the draft letter of request submitted to the court with the application included the following recital:

H

© DSP Publishing Ltd　　　　　　　　　　　　　　　**[2004] 1 CLC 811**

**558**

**QB**                    **USA v Philip Morris Inc**                    **817**
                           (*Moore-Bick* J)

A    'WHEREAS, an attorney's providing advice on how to destroy documents relevant to current and anticipated litigation, amounts to the furtherance of a crime or fraud. In the US and other jurisdictions (including the United Kingdom), such conduct obviates any attorney-client or legal professional privilege that might otherwise attach to such advice. ... Likewise, an attorney's advising a client to have scientists route their contacts "through the lawyers" so that privilege could be asserted for scientific communications is an improper practice and a fraud upon any court in which such privilege is asserted. For these reasons, the legal professional and attorney-client privileges do not stand in the way of Mr Foyle's being required to give testimony.'

8. All three applications were opposed before the District Court on the grounds that they were in reality attempts to obtain discovery after the deadline for that stage of the proceedings had passed. In addition BATCo objected to the inclusion in any letter of request of a recital in the terms set out above on the grounds that it amounted to a finding by the court that what is known in the US as the 'crime-fraud exception' to the right to claim privilege applied in this case without there having been any proper investigation into the matter.

9. The applications were referred for consideration to Special Master Levie. He recommended that no letter of request be issued in respect of Mr Broughton and that a letter of request in modified form be issued in respect of Mr Foyle. He specifically recommended that the proposed recital referring to the crime-fraud exception be omitted from the letter of request issued in relation to Mr Foyle and his recommendation was accepted by Judge Kessler. On 3rd October 2002 Judge Kessler issued letters of request in respect of Mr Foyle, Mr Broughton and Mr Cannar.

10. On 9th December 2002 an application was made ex parte before James J in the Supreme Court of New South Wales for an order for the examination of Mr Cannar pursuant to the letter of request. The judge granted the order and an application to set it aside was subsequently made inter partes before Bell J on 4th June 2003. On 8th October 2003 she delivered a lengthy judgment refusing to set aside the order of James J, but holding that certain documents, in particular the Foyle memorandum, remained privileged despite the fact that their contents had been made public to a greater or lesser degree. I understand that an appeal is pending against her decision.

11. Meanwhile, back in Washington there had been further disputes arising out of BATCo's claim to privilege over certain documents. One of the documents under consideration was a memorandum ('document 182') written by Mr Foyle to Mr Cannar in September 1989 relating to the strategy to be adopted in preparing a defence to a pending patent action and the implications of that action for smoking and health litigation. The Special Master held that in principle document 182 was privileged, but that the crime-fraud exception applied because it had been prepared 'in furtherance of BATCo's concealment of documents related to smoking and health'.

**818**          **USA v Philip Morris Inc**          **[2004] 1 CLC**
(*Moore-Bick* J)

However, on 27th August 2003 Judge Kessler overturned that finding as 'clearly erroneous', concluding that the advice contained in document 182 fell within 'the generally accepted bounds of tactical legal planning engaged in by sophisticated corporate counsel'.

12. I have described the background to the present application at some length because many of the submissions made in the course of argument were based on these aspects of the proceedings in the US and Australia to which it will be necessary to refer more fully in due course.

### The court's approach to letters of request

13. There was little dispute between the parties as to the principles to be applied when considering an application of this kind. They are summarised by Waller LJ in paragraphs 28-32 of the judgment of the Court of Appeal in *Refco Capital Markets Ltd v Credit Suisse (First Boston) Ltd* [2001] EWCA (Civ) 1733; [2002] CLC 301. In particular, it is the duty and pleasure of the court to give all such assistance as it can to the requesting court within the limits imposed by the *Evidence (Proceedings in other Jurisdictions) Act* 1975 ('the 1975 Act') from which the jurisdiction to make orders of this kind is derived. One of the restrictions imposed by the Act which has assumed considerable importance in the present case relates to privilege. This is preserved by section 3(1)(a) of the Act which provides as follows:

'A person shall not be compelled by virtue of an order under section 2 above to give evidence which he could not be compelled to give-

(a) in the part of the United Kingdom in which the court that made the order exercises jurisdiction;'

14. Moreover, the authorities make it clear that the court must not only observe the restrictions imposed by the 1975 Act; it must also hold a fair balance between the interests of the requesting court and the interests of the witness: see per Lord Woolf MR in *State of Minnesota v Philip Morris Inc* [1997] ILPr 170, 176.

### The application relating to Mr Foyle

15. It was not disputed that Mr Foyle can give relevant and admissible evidence bearing on the issues in the litigation now going on in Washington DC, but the application for his examination was resisted on two grounds: privilege and oppression. Before turning to consider each of these, however, it is necessary to say something about Mr Foyle's personal position.

16. Mr Hapgood QC rightly drew my attention to the allegations of crime-fraud made against Mr Foyle in the US's motion for the issue of a letter of request and the

© DSP Publishing Ltd

**QB**                     **USA v Philip Morris Inc**                     **819**
                          (*Moore-Bick* J)

A    draft letter exhibited to it and to the fact that Judge Kessler (adopting the recommendation of the Special Master) had refused to include the offending passages in the letter of request. He also drew my attention to the fact that in her first witness statement dated 7th July 2003 Ms Eubanks had set out at some length the conclusions of Special Master Levie in relation to document 182, apparently as the basis for

B    pursuing an allegation of impropriety against Mr Foyle. Given the way things stood at the time that statement was made, that does not seem to me to be a matter for criticism.

17. In a statement made on 16th September Mr Foyle drew attention to Judge Kessler's decision of 27th August overturning the decision of Special Master Levie

C    and by implication invited Ms Eubanks to withdraw the allegations against him. However, when she returned to the matter in her third statement made on 14th October Ms Eubanks expressed the opinion that Judge Kessler had not overturned the Special Master's finding of crime-fraud as such but had simply disagreed with his conclusion that document 182 had been created in furtherance of the fraud alleged by the US in these proceedings. That observation, coupled with the statement that 'the

D    US has no *present* intention of bringing criminal or civil proceedings against Mr Foyle' (my emphasis), naturally gave rise to some concern on the part of Mr Hapgood (and no doubt Mr Foyle himself) that the allegations were being persisted in and that his position might not be entirely secure.

E    18. Had this matter not been satisfactorily resolved, Mr Hapgood would no doubt have submitted with some force that it would not be right to make an order the effect of which would be to compel Mr Foyle to give evidence about matters in relation to which he might be the subject of civil or criminal proceedings at a later date. However, shortly before the hearing began the US procured immunity from prosecution for Mr Foyle in relation to these matters, thereby lifting one of the threats

F    against him. Moreover, at an early stage of the hearing itself Mr MacLean Q.C. confirmed that the US does not intend to bring civil proceedings against him either and indicated that he was authorised to give an undertaking to that effect. He also made it clear that the US did not make any allegation of improper conduct against Mr Foyle and was not seeking any finding to that effect. In those circumstances I am

G    satisfied that the position of Mr Foyle and of Lovells is sufficiently protected.

**The claim to privilege**

19. The primary ground on which the application is resisted root and branch is that

H    of legal professional privilege. Mr Hapgood and Miss Barbara Dohmann QC who appeared for BATCo submitted that all communications passing between Mr Foyle and BATCo and other members of the BAT group were covered by both legal advice privilege and litigation privilege. Accordingly, Mr Foyle could not be required to answer any questions on any of the matters identified in the letter of request unless BATCo waived privilege and since BATCo did not intend to waive privilege, it would be a waste of time and money to make an order for his examination.

**[2004] 1 CLC 811**                                    **Commercial Law Cases**

**820**          **USA v Philip Morris Inc**          **[2004] 1 CLC**
(*Moore-Bick* J)

20. Mr MacLean recognised that Mr Foyle might well be entitled to refuse to answer many of the questions that the US might wish to put to him, but he submitted that the right course was for objections to be raised and for privilege to be invoked as specific questions were asked and that it would not be right for the court to accede to a blanket assertion of privilege at this stage. I can see much force in that argument. Although BATCo is entitled to waive privilege if it so chooses, I have little doubt that it will not do so and that I should approach this application on the assumption that objection will be taken to Mr Foyle's answering any question that touches on the substance of the matters described in the letter of request. Nonetheless, until specific questions are asked the problem remains theoretical rather than practical and it is difficult to be confident that every assertion of privilege will be well-founded.

21. Mr MacLean submitted that a blanket objection of this kind is contrary to the terms of section 3 of the 1975 Act which, he submitted, contemplates that claims to privilege are to be taken as and when questions are put to the witness. I accept that section 3 naturally contemplates that an order for the examination of the witness will already have been made by the time any question of privilege arises, but I think his submission mistakes the nature of Miss Dohmann's argument which is that it would be pointless in this case to make an order for the examination of Mr Foyle because he could not be required to answer any question of substance put to him. In most cases the issue of privilege is unlikely to be of such potentially wide significance and so there will rarely be any basis for making a submission of the kind made by Miss Dohmann. Nonetheless, if the court were satisfied on the evidence before it that the exercise would indeed be pointless because the witness could and would refuse to answer any questions of substance put to him, I can see no reason why in the exercise of its discretion it should not refuse to make an order for his examination. No doubt such a course would only be justified in the clearest case. Miss Dohmann, however, submits this is such a case and in order to determine whether that is so or not it is necessary to examine the range of subjects on which the US wishes to question Mr Foyle and the circumstances in which the communications about which he may be questioned occurred.

22. The matters on which Mr Foyle's evidence is sought are described in the letter of request. The five main categories (each of which is broken down into several sub-categories) are:

'1.  The creation of the document management policy.

2. The implementation of the document management policy.

3. Rules and procedures set forth by the document management policy.

4. Destruction of smoking and health documents that pertain to BATCo's and Brown & Williamson's litigation position in the US.

© DSP Publishing Ltd

**QB**  **USA v Philip Morris Inc**  **821**
(*Moore-Bick* J)

A     5. Transportation, routing, storage and warehousing of documents.'

23. Some of these, such as the creation of a document management policy, could obviously involve communications of a privileged nature; others, such as arrangements for the transportation, routing, storage and warehousing of documents seem less likely to do so. In each case, however, whether any particular
B    communication is privileged will depend on its particular nature and the circumstances under which it occurred.

24. In his witness statement Mr Foyle says that all the work he undertook for the BAT companies involved giving general legal advice in relation to the nature and
C    scope of claims by smokers and in relation to the obligation of disclosure under English law (whether in litigation in England or pursuant to letters of request) or giving legal advice directed specifically to the conduct of proceedings, whether existing or in contemplation. On that basis he says that all communications between himself and the BAT companies are privileged. Mr Foyle's general account of the
D    circumstances in which he acted for the BAT group was not challenged by Mr MacLean.

25. Miss Dohmann submitted that it is virtually unprecedented for one party to litigation to seek to call evidence under compulsion from an opposing party's solicitor. That is no doubt correct because all lawyers are well aware of the rules
E    relating to privilege and are inclined to assume, as I think Mr Foyle has in this case, that all communications made by and to a lawyer and all information obtained by him when acting for his client are privileged. However, recent decisions in this court and in the Court of Appeal make it clear that the court is not bound by the lawyer's own assessment of the position and that it may be necessary to adopt a rather more critical
F    approach to the question than has hitherto been the case.

26. It is necessary at this stage, therefore to refer to a little more of the evidence of the circumstances in which Lovells came to act for the BAT group and the nature of the advice and assistance they were asked to give.

G    27. In support of its submission that no order should be made for Mr Foyle's examination BATCo relies on evidence from its current senior litigation counsel, Mr Martyn Gilbey. He says that Lovells' advice was sought by BATCo and BAT (UK & Export) Ltd in November 1985 in relation to a review of its documents that was being put in hand in anticipation of litigation and of the need to give discovery. That was in
H    part because Brown & Williamson had been involved in tobacco litigation in the US. Accordingly, BATCo decided to instruct solicitors to advise it about the nature and scope of its potential liability in relation to claims by smokers and how it might best defend itself against them. Mr Gilbey says that in carrying out those instructions Mr Foyle and his team collected and analysed many thousands of BATCo research documents to evaluate their relevance to claims that might be made by smokers. Mr

**563**

**822**    USA v Philip Morris Inc    [2004] 1 CLC
(*Moore-Bick* J)

Foyle also drafted reports, memoranda and analyses which set out his views on those matters. The review of the Research & Development files which became known as 'Project Discovery, Phase I' was conducted between 1986 and 1989. The main purpose, apparently, was to identify those of the files that had been brought into existence before the end of 1986 which were likely to contain documents that would be disclosable in smoking and health litigation.

28. Project Discovery, Phase II was carried out in a similar way, this time on Research & Development files created from the end of 1986 onwards and files from other departments dating back to 1954. Mr Foyle was involved in planning Phase II, but ceased to be involved in its execution in May 1994 when he left to work in Hong Kong.

29. Mr Gilbey's account is reflected in some of the documents exhibited to the letter of request. The request itself sets out at some length the US's allegations relating to the document management policy on which it wishes to obtain Mr Foyle's evidence and a number of documents are exhibited in support. They include a memorandum dated 10th September 1985 written by Mr Cannar and another member of BATCo's legal department setting out the course of action to be taken in response to the risk, as they saw it, that orders for discovery of documents produced by the Research & Development department would be made against Brown & Williamson in proceedings then pending in the US. Although at that time no proceedings had been commenced or threatened against any members of the group outside the US, it is apparent from that memorandum that Mr Cannar was concerned that documents held by the Research & Development department were likely to be relevant to any product liability actions begun in Europe or elsewhere. According to the memorandum there had never been a full review of the department's files and he therefore considered it important to put such a review in hand at once with a view to assessing their contents. In order to review the documents from a European perspective Mr Cannar proposed to instruct a firm of solicitors to provide advice and additional manpower. The firm he instructed was Lovells and the partner who dealt with the matter was Mr Foyle.

30. Another document exhibited to the letter of request is a note of a meeting between Lovells and members of the BATCo legal department on 15th May 1986. It is headed 'Privileged and Confidential' but has since been disclosed in proceedings between the State of Minnesota and various tobacco companies including BATCo ('the Minnesota action') to which it will be necessary to refer in more detail at a later stage. The purpose of the meeting was to discuss the form of the discovery exercise, the steps necessary to begin the document review and the preparation of a 'defence package' to be used if BATCo became involved in direct or indirect legal action relating to smoking and health.

31. The nature of the exercise that BATCo was seeking to carry out is described in the note of the meeting. Mr Cannar wanted BATCo to be able to respond to orders for

**QB**            **USA v Philip Morris Inc**         **823**
(*Moore-Bick* J)

discovery or interrogatories to the same extent as Brown & Williamson whose documents had already been reviewed by its American lawyers. It appears that he appreciated that that might well require a more extensive exercise than would have been necessary for the purposes of complying with similar orders in England or other European jurisdictions. As a first step, therefore, it was proposed that Mr Foyle should meet the American lawyers to find out how they had gone about their document review. The question of destruction of documents arose and according to the note it was decided that no destruction policy should be adopted. There would, however, be a 'spring clean'

'which could involve the destruction of documents such as previous drafts.'

It was agreed that the legal department would circulate a note to the Research & Development department along lines to be suggested by Lovells instructing people to tidy up their files and loose documents, including documents held outside the official filing systems. Lovells would co-ordinate the systematic copying of the files for review by lawyers with the assistance, where necessary, of scientists. Mr Foyle described the organisation and structure of the team he thought would be necessary to carry out an exercise of that kind efficiently. It was agreed that the creation of the 'defence package' should be postponed.

32. Towards the end of the meeting BATCo asked Lovells to advise it of the ways in which an American plaintiff could obtain disclosure of documents in this country, how BATCo might delay or resist any applications for disclosure and what the consequences of doing so might be. It seems that Lovells may have already given some advice in that area but that it had not given advice on tactical questions. One exercise on which Lovells appear to have already carried out quite a lot of work was a description of the current structure of the Research & Development department which was intended to assist in identifying where documents might be kept.

33. The next document exhibited to the letter of request is a letter from Mr Foyle to Mr Thornton at the Research & Development centre at Southampton dated 21st March 1988 on the subject of Buerger's disease, an illness said to be related to smoking. In the last paragraph of that letter Mr Foyle reminded Mr Thornton that contact between the scientists employed by different tobacco companies should be routed through their lawyers to ensure that privilege in the communications was not lost. He also told him to ensure that any internal memoranda written on Buerger's disease in relation to the current investigations should be marked 'Privileged and Confidential'.

34. These last two documents are particularly informative, both because they provide a contemporaneous insight into the nature of the advice and assistance being provided to BATCo by Lovells at an early stage in their relationship and because they shed light on BATCo's assessment of the likely development of tobacco-related litigation in the US and elsewhere.

**[2004] 1 CLC 811**                                    **Commercial Law Cases**

**824**    USA v Philip Morris Inc    [2004] 1 CLC
(*Moore-Bick* J)

35. As a result of enquiries made by Mr Gilbey during the hearing it has been confirmed that Brown & Williamson was a party to the first tobacco claim made in the US in March 1954. That action was dismissed later the same year. By the end of 1985 over 200 smoking and health actions had been brought against tobacco companies in the US of which about a quarter had been started in that year alone. Most had been dismissed, but over 70 actions were still pending. By the middle of 1986 there were 120 actions pending including 20 in Texas involving Brown & Williamson.

### Legal advice privilege

36. It is convenient to consider first what is usually called 'legal advice' privilege, that is, the privilege that attaches to confidential communications between lawyer and client for the purposes of obtaining legal advice. This ground of privilege has recently been considered by the Court of Appeal in *Three Rivers District Council v Bank of England (No. 5)* [2003] EWCA Civ 474; [2003] QB 1556. The question for the court in that case was whether privilege attached to certain documents brought into being by the Bank of England in connection with the Bingham Inquiry into the collapse of BCCI. Four classes of documents arose for consideration: documents prepared by Bank employees with the intention that they should be sent to the Bank's solicitors and which had been sent to them; documents that were said to have been prepared with the dominant purpose of obtaining legal advice, but which had not been sent to the solicitors; documents prepared otherwise than for the dominant purpose of obtaining legal advice but which had been sent to the solicitors; and documents in all those categories that had been prepared by Bank employees who were no longer employed by the Bank. Having considered the authorities, the Court of Appeal held that legal advice privilege is restricted to communications passing between the client and his legal advisers for the purpose of requesting and communicating legal advice, to documents evidencing such communications and documents intended to be such communications. Accordingly, none of the categories of documents with which the court was concerned was privileged.

37. The precise ambit of what constitutes legal advice for these purposes was considered by Tomlinson J in a further application for disclosure in *Three Rivers District Council v Bank of England* [2003] EWHC 2565 (Comm). In the light of the Court of Appeal's judgment in relation to the previous application the claimants sought disclosure of documents passing between the Bank and the solicitors advising it in connection with the Bingham Inquiry which, as can be seen from paragraphs 4 and 29 of that judgment, they had previously accepted were privileged. The application was made on the basis that many of those communications were concerned not with seeking or giving legal advice but with the manner in which the Bank's evidence should be presented to the Inquiry. Having considered paragraphs 32-37 of the judgment in which the Court of Appeal considered the purpose for which the documents in question had been prepared, Tomlinson J concluded that

© DSP Publishing Ltd

A    communications between client and solicitor are privileged only if they were made for the dominant purpose of obtaining and communicating legal advice in the narrow sense of advice about the client's rights and obligations. I respectfully agree with that conclusion.

B    38. In my view it follows from these decisions that before legal advice privilege can be claimed in respect of any communication three conditions must be satisfied: (i) the communication must pass between the lawyer and his client; (ii) it must be confidential; and (iii) it must be for the dominant purpose of obtaining or giving legal advice, that is, advice about the client's rights and obligations. Moreover, the Court of Appeal has made it clear that the solicitor's own assertion that the dominant

C    purpose of a particular communication was the obtaining of legal advice is not conclusive; it is a matter for the court to determine on the basis of the whole of the evidence before it: see per Longmore LJ at page 691 (para. 35). Miss Dohmann reminded me of the observation made by Taylor LJ in *Balabel v Air India* [1988] Ch 317, 330 about the 'continuum of communications' (to which the Court of Appeal itself referred in the *Three Rivers* case) in support of her submission that the privilege

D    should not be unduly restricted. I would accept that nothing said by the Court of Appeal in the *Three Rivers* case can be read as detracting from what was said in *Balabel v Air India* and that the court should be careful not to allow incursions into what should properly be viewed as a continuous sequence of communications made for the dominant purpose of obtaining legal advice. However, in my view the

E    decisions in the *Three Rivers* case do highlight the fact that it is necessary to approach a claim of legal advice privilege in a rather more critical manner than has perhaps been the case in the past.

     39. In the present case the evidence strongly suggests that many of the communications between Mr Foyle and BATCo are protected by legal advice

F    privilege. For example, communications between Mr Foyle and Mr Cannar concerning the law relating to the disclosure and inspection of documents, privilege and related matters and their application to the particular circumstances of the BAT group would on the face of it all fall within the scope of legal advice privilege, as Mr MacLean quite properly recognised. However, the evidence also suggests that Mr

G    Foyle and his team from Lovells may have given advice and assistance on matters such as the organisation and implementation of the review of documents which less clearly fall within its scope. Moreover, without knowing the identity of the person with whom Mr Foyle communicated in any given case it is not possible to say whether that person is properly to be regarded as his client for these purposes.

H    Similarly, without further information about the general nature of the communication or the context in which it occurred, it is not possible to determine whether it was made for the dominant purpose of giving legal advice. Matters of that kind should be easier to decide in the context of specific questions. In order to succeed on this ground, however, it is necessary for BATCo to show that its assertion of legal advice privilege would prevent Mr Foyle from answering *any* question of substance about its

**826**  USA v Philip Morris Inc  [2004] 1 CLC
(*Moore-Bick* J)

document management policies or procedures. In my judgment that is not so clearly the case as to justify refusing to make an order for his examination.

### Litigation privilege

40. I turn next to the question of litigation privilege. Miss Dohmann submitted that all communications that passed between Mr Foyle and employees of the BAT group (or indeed anyone else) relating to tobacco litigation are covered by litigation privilege. In this case two requirements must be satisfied: (i) the communication must be confidential; and (ii) it must have been made for the dominant purpose of conducting or giving advice in relation to litigation, either pending or in contemplation.

41. Miss Dohmann and Mr Hapgood submitted that all the communications between Mr Foyle and BATCo (and indeed other companies in the group) were confidential and were made in contemplation of litigation. Mr MacLean submitted, however, that when Lovells were first instructed, and indeed for much of the period during which Mr Foyle was advising BATCo, no litigation had been commenced against it or even threatened. One question that arises for decision at this stage, therefore, is the extent to which litigation must be in contemplation in order to claim privilege in respect of confidential communications.

42. The leading authority on litigation privilege is *Waugh v British Railways Board* [1980] AC 521. The House of Lords was not directly concerned in that case with the likelihood of litigation, but Lord Simon and Lord Edmund Davies referred with approval to a passage in the judgment of Barwick CJ in the High Court of Australia in *Grant v Downs* (1976) 135 CLR 674 in which he referred to documents produced at a time when litigation was 'in reasonable prospect'. Subsequently in *Re Highgrade Traders* [1984] BCLC 151 the Court of Appeal, having considered a number of earlier authorities including *Waugh v British Railways Board*, held that litigation privilege may be claimed in respect of documents brought into being at a time when litigation is reasonably in prospect: see per Oliver LJ at page 172. That test has been applied in many subsequent cases.

43. I see little reason to doubt that by 1985 the increasing volume of tobacco litigation in the US, coupled with the fact that a significant number of claims were being made against Brown & Williamson, had alerted BATCo to the need to consider its own position. The documents to which I have referred and the evidence of Mr Gilbey show that BATCo was aware that it might be required to disclose documents generated by the group's Research & Development department in litigation against Brown & Williamson in the US and that in due course similar claims might be made against BATCo itself or other companies in the group in the US or elsewhere. (BATCo had in fact been joined in one action in Chicago in 1969 but it had been dismissed as a defendant at an early stage.)

**QB**                    **USA v Philip Morris Inc**                    **827**
                              (*Moore-Bick* J)

44. In the event those fears were justified, though litigation against BATCo did not begin until some years later. In August 1994 BATCo was made a party to the Minnesota action and in 1996 it was made a party to similar proceedings in Oklahoma and Washington. (The Minnesota action was finally settled in May 1998 on terms which included giving public access to a large number of documents disclosed during the course of the proceedings.) The present action in Washington D.C. was started in September 1999. Despite the rising number of claims made against tobacco companies in the US, however, there is no evidence that any proceedings were brought elsewhere against companies in the BAT group until the latter part of 1990. This was not a matter that was directly covered in the evidence filed on behalf of BATCo, but my attention was drawn to paragraphs 57-60 of the judgment of Eames J in the *McCabe* case in which he refers briefly to four actions brought against WD & HO Wills Ltd, the predecessor of BATAS, in Australia between November 1990 and some time in 1999. Mrs McCabe started her action against BATAS in the Supreme Court of Victoria in October 2001.

45. Miss Dohmann submitted that in these circumstances all communications passing between Lovells and BATCo and between Lovells and third parties between late 1985 and May 1994 relating to the document review procedures were made for the dominant purpose of preparing for litigation already in contemplation and are therefore in principle subject to litigation privilege. In relation to any given communication that depends primarily on whether litigation was reasonably in prospect at the time in question, although issues relating to its dominant purpose might also arise. Miss Dohmann submitted that litigation was indeed reasonably in prospect throughout the period of Mr Foyle's involvement, both because BATCo could itself expect to be sued in America and elsewhere before long and because it could expect that applications for disclosure would be made against it in proceedings to which it was not itself a party.

46. It has been recognised on many occasions that there is a conflict between the need to enable clients to communicate freely with their legal advisers in relation to litigation and the need to ensure that all relevant material is before the court: see, for example, Lord Wilberforce in *Waugh v British Railways Board* at page 531-532 and Lord Simon at pages 535-537. The point at which litigation should be regarded as sufficiently likely for confidential communications between client and his lawyer to attract privilege on this ground therefore involves striking an appropriate balance between these two factors. The requirement that litigation be 'reasonably in prospect' is not in my view satisfied unless the party seeking to claim privilege can show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility.

47. I am unable to accept that litigation against BATCo itself was reasonably in prospect in 1985 and 1986 when Lovells were first instructed. I quite accept that at that time Mr Cannar thought it a distinct possibility that sooner or later someone

**828**          USA v Philip Morris Inc          **[2004] 1 CLC**
                 (*Moore-Bick* J)

might make a claim against BATCo for smoking-related illness, if only because the burgeoning litigation in the US could be expected to provide an example to claimants in other countries, but at that stage no claim had been made or even threatened. The fact that Mr Cannar considered it desirable for BATCo to put its house in order because of a general apprehension of future litigation is not in my view sufficient to entitle it to claim litigation privilege in respect of communications made for that purpose. As time went on, of course, the position changed, but it is sufficient for present purposes to say that I am not persuaded that *all* communications which Mr Foyle might be asked to disclose in the course of the proposed examination are inevitably privileged on this ground.

48. As to Miss Dohmann's second argument, it is clear from the authorities that the justification for litigation privilege lies in the adversarial nature of legal proceedings: see *Re L (a Minor) (Police Investigation: Privilege)* [1997] AC 16. An application by one party to legal proceedings against a person who is not a party to those proceedings to compel him to give evidence or to produce documents is in my view essentially adversarial in nature. It follows that confidential communications between a solicitor and his client or a third party for the dominant purpose of considering, preparing or conducting a defence to such an application are covered by litigation privilege. It does not necessarily follow, however, that all communications relating to an application of that kind necessarily fall to be treated in the same way. The fact that disclosure is required for the purposes of litigation between third parties would not of itself be sufficient in my view to attract litigation privilege; what is required is that the communications be made for the preparation or conduct of litigation involving the solicitor's own client. Accordingly, practical advice about the best way of complying with an order for disclosure once it had been made might well not be covered by litigation privilege. Again, issues of that kind are better addressed in the context of specific questions as and when they are put to the witness. In the present case the US wishes to question Mr Foyle about steps taken by BATCo to review and organise its documents. Some communications on that subject may be privileged, but others may not. It is sufficient for present purposes that Miss Dohmann has not satisfied me that it would be pointless to make an order for the examination of Mr Foyle because he could properly refuse to answer any question of substance on the grounds of litigation privilege.

**Waiver of privilege**

49. Since I have already reached the conclusion that I should not refuse to make an order for the examination of Mr Foyle on the grounds of privilege it is unnecessary to consider the question whether and to what extent privilege in respect of certain communications has been lost as a result of the disclosure of documents in proceedings in the US and Australia. However, I think it desirable that I should deal with the arguments shortly.

© DSP Publishing Ltd                    **[2004] 1 CLC 811**

**570**

**QB**                     **USA v Philip Morris Inc**                   **829**
(*Moore-Bick* J)

50. In response to BATCo's assertion of privilege the US has contended that communications evidenced by documents that have entered the public domain have ceased to be confidential and have therefore ceased to be privileged. The documents relied on for that purpose at the hearing before me were those exhibited to the letter of request which entered the public domain as a result of the Minnesota action and certain passages from the 'Foyle memorandum' from which Eames J quoted extensively in his judgment in the *McCabe* case. Miss Dohmann's response was twofold: first, that the documents remain privileged because BATCo has never voluntarily waived its right to privilege; secondly, that even if some of them are no longer privileged, it does not follow that Mr Foyle can be required to answer questions of any kind about the matters with which they deal.

51. Many documents entered the public domain in the US by one of the following two routes which are described by Judge Kessler in her Memorandum Opinion delivered on 17th May 2002: (a) the production of documents to the House Commerce Committee chaired by Congressman Thomas Bliley and their subsequent publication on the Committee's web site; and (b) the production of documents in the Minnesota action pursuant to orders of the court and their subsequent release to the public under the terms of a consent judgment by which the action was terminated.

52. It is unnecessary to describe in any detail the circumstances which led to the production of documents by either route. Suffice it to say that, having obtained by the issue of subpoenas against the tobacco companies a number of documents in respect of which the Minnesota courts had rejected claims for privilege, the House Commerce Committee made them freely available to the public on its web site. These have become known as the 'Bliley documents'. They did not, however, include any of the documents in respect of which BATCo claims privilege.

53. About a month after the publication of the Bliley documents the parties to the Minnesota action reached a settlement that was embodied in a consent judgment. It was a term of that judgment that documents disclosed in the action (which included the Bliley documents) should be made available to the public on certain terms and that the plaintiffs should be entitled to seek the court's approval to making public those documents in respect of which privilege had been claimed but denied. In November 1998 the court in Minnesota gave the plaintiffs permission to release those documents (the 'Minnesota documents') to the public.

54. In her Memorandum Opinion Judge Kessler held that the defendants could not claim privilege over any of the documents that had been published in either of those ways. In the case of the Bliley documents she held that the companies had not taken sufficient steps to assert their claim to privilege before the Committee and had thereby waived any right they may have had. More importantly, perhaps, as far as the present application is concerned, she held that the defendants had waived any right to claim privilege in respect of the Minnesota documents by agreeing to the terms of the

**830**     USA v Philip Morris Inc     [2004] 1 CLC
(*Moore-Bick* J)

consent judgment giving the court the authority to release them to the public. I would
respectfully agree with that conclusion insofar as it turns on the facts surrounding the
publication of the documents. Mr MacLean submitted that Judge Kessler's decision
finally decides the issue of privilege as between BATCo and the US, but that cannot
be right as far as privilege under English law is concerned since that was not in issue
before her. Judge Kessler was concerned with the right to privilege under US law. In
the present case, by contrast, I am only concerned with whether BATCo is entitled to
claim privilege in accordance with the principles of English law which can be invoked
by virtue of section 2 of the 1975 Act. For the same reasons it cannot be said that it
would be contrary to comity or to the orderly and just disposal of the application to
allow BATCo to put forward a blanket assertion of privilege on the grounds that it had
failed to advance it before the District Court in opposition to the motion for the issue
of the letter of request. The issue is one that arises only in this country at the time
when the application for an order giving effect to the letter of request is made.

55. Judge Kessler also considered the matter from a broader public policy
perspective and came to the conclusion that it would be anomalous if documents to
which the general public had unfettered access could not be used in the litigation. In
my view there is considerable force in that argument. Miss Dohmann submitted that
one can draw a distinction for these purposes between making documents available to
those who have the knowledge and persistence to find them and publication of the
kind that brings them to the attention of the public at large, but in my view that is both
unrealistic and wrong in principle. Confidentiality is one of the essential foundations
of privilege, the purpose of which is to enable evidence of communications to be
withheld precisely in order to preserve their confidentiality. Once documents are
available to the public at large with no, or minimal, restriction, they can no longer be
regarded as confidential and it would be an affront to common sense as well as
contrary to the interests of justice to prevent their use in litigation. Miss Dohmann
submitted that the mere fact that information is available on the internet is not
sufficient to deter the court from seeking to protect it by injunction, relying on the
decision in *Venables v News Group Newspapers* [2001] Fam 430, but that case raised
very different considerations and is of little assistance in the present case.

56. However, I agree with Miss Dohmann that the mere fact that privilege in any
particular document has been lost does not mean that a witness can be questioned
without restriction on the matters to which it refers. Whether, and if so and to what
extent, privilege has been waived in relation to related communications will depend
on the particular circumstances of the case. Again, however, that can best be
determined in the context of a specific line of questioning at the time the witness gives
evidence.

**The Foyle memorandum**

57. The Foyle memorandum raises rather different questions. Early in 2002 Mrs
McCabe made an application to strike out the defence in her action against BATAS

© DSP Publishing Ltd     [2004] 1 CLC 811

on the grounds that the defendant had deprived her of a fair trial by destroying relevant documents. In the course of the hearing Eames J ruled that by exhibiting certain documents to an affidavit sworn in opposition to the application BATAS had waived privilege in relation to legal advice received since early in 1990. That led to the disclosure of a number of documents including the Foyle memorandum from which the judge quoted extensively in the course of his judgment. That judgment is publicly available, for example on the AUSTLII web site.

58. The judgment of Eames J was reversed on appeal under the name of *British American Tobacco Australia Services Ltd v Cowell* [2002] VSCA 197. The Court of Appeal declared that privilege over the Foyle memorandum had not been waived and the respondent was ordered to return it to BATAS together with any copies she had made. To the extent possible, therefore, the cat was put back into the bag, but Mr MacLean submitted that in reality those parts of the Foyle memorandum that had been quoted by Eames J had lost any confidentiality they had previously possessed and could no longer be the subject of a claim for privilege.

59. Since the Foyle memorandum ought not to have been before Eames J in the first place, it is not surprising that the Court of Appeal held that it could not be relied on to support his findings. The question in the present case, however, is not whether the US can rely at trial on the passages cited by Eames J – that is a matter for the District Court to determine in accordance with its own rules of evidence – but whether BATCo can continue to claim privilege (assuming the requirements for doing so are otherwise satisfied) in respect of communications other than those evidenced in those passages. In my judgment under English law it can. There has been no voluntary waiver of privilege; all that has happened is that certain parts of the document have wrongly entered the public domain and have thereby ceased to be confidential. It does not follow that privilege has been lost in other parts of the document or that any other confidential communications can be said to have been affected. I doubt, in fact, that they have, although it is unnecessary to decide that question at this stage. Again, it is better addressed in the context of a specific line of questioning.

**Crime-fraud and iniquitous conduct**

60. Both in the US and in this country the courts have recognised that a person should not be entitled to invoke legal professional privilege to withhold disclosure of documents or oral communications requesting or containing legal advice if the purpose of obtaining that advice was to further the commission of a crime or to achieve some other iniquitous end. In the US this is known as the 'crime-fraud' exception; in England the principle has most recently been described by reference to iniquitous conduct: see *Barclays Bank v Eustice* [1995] 1 WLR 1238. The leading case is *R v Cox & Railton* 14 QBD 153, a case involving fraud.

61. A good deal of heat was generated in the present case by the US's allegations in the letter of request and elsewhere that the BAT group had engaged in the

**832**    **USA v Philip Morris Inc**    **[2004] 1 CLC**
(*Moore-Bick* J)

systematic destruction of sensitive documents at a time when claims by smokers could be foreseen as a possibility, albeit they were not imminent. However, in view of Mr MacLean's unequivocal confirmation that the US did not accuse Mr Foyle of any personal misconduct or impropriety of any kind and did not seek a finding of impropriety on the part of BATCo either, it is unnecessary to examine the matter in any detail. I do not propose, therefore, to refer to the findings made by Eames J in the *McCabe* case about the BAT group's document retention policy, to the conclusions of the Victoria Court of Appeal reversing his findings, or to the affidavit recently sworn by Mr Gulson, formerly in-house legal adviser and company secretary of BATAS which deals with the same matters.

62. However, there is one other aspect of this that I should mention. In the light of Mr MacLean's assurances Miss Dohmann invited me make an order that would prevent the US from revisiting the matter at a later date and thus shut the door on this argument as far as the present application is concerned. I have some sympathy with her suggestion. When pressed for an explanation of his client's position Mr MacLean submitted that although he was not asking me to make a finding of iniquity against BATCo or Mr Foyle, it was relevant to my decision whether to make an order for the examination of Mr Foyle to have in mind the possibility that evidence might emerge at a later date that would support such a finding and thus deprive BATCo of the right to claim privilege. In other words, I should not refuse the order on the grounds of privilege now since by the time Mr Foyle came to give evidence the position might have changed.

63. Although one cannot rule out that possibility altogether, I do not think that it is a proper factor to take into account on this application given that the US has made it quite clear that on the evidence before me it does not seek any finding of impropriety on the part of Mr Foyle or BATCo. Nonetheless, I do not think that it would be right to make an order of the kind suggested by Miss Dohmann. Having adopted the stance described above, the US will be unable to raise this issue on any examination of Mr Foyle in the absence of some cogent new evidence. There is no reason to think that any such evidence is likely to come to light, but if it were to do so I see no reason why the US should not be free to deploy it as it sees fit, subject to any objection that might be raised by BATCo at the time.

**The decision of Bell J in the Cannar application**

64. Finally I must mention the decision of Bell J refusing to discharge the order made by James J for the examination of Mr Cannar on which Mr MacLean naturally placed some reliance. He submitted that the issues that arose on that application were essentially the same as those which arise on the application before me and that I should be guided by her decision to reaching the same conclusion. I have, of course, found Bell J's judgment interesting and informative, but in my view there are some significant differences between that case and the present. In the first place, Mr

© DSP Publishing Ltd

Cannar's position as head of BATCo's legal department differs from that of Mr Foyle as a solicitor in independent practice. Lawyers do not cease to be regarded as professional legal advisers simply because they are employed by their clients, for example in a company's legal department, but in the nature of things those who are employed in that capacity are more likely than independent practitioners to become involved in aspects of the business that are essentially managerial or administrative in nature. To that extent it is less easy to maintain that all communications passing between them and the company's management attract privilege. A blanket claim for privilege was not made in relation to Mr Cannar's evidence, but it would have been even more difficult to sustain for that reason. More significant, perhaps, is the fact that in New South Wales privilege is now governed by the Evidence Act 1995 which, as Bell J herself recognised, differs from the common law in some respects. In these circumstances I do not find that I am able to derive as much assistance from that decision as Mr MacLean submitted.

**Oppression**

65. Mr Hapgood submitted that an examination covering the range of matters described in the letter of request would place an excessive burden on Mr Foyle. Moreover, he submitted that, because the US had failed to provide either a list of questions which it wished to ask Mr Foyle or a list of the documents on which it wishes to question him, he would be unable to prepare for any examination in a way that would enable him to answer questions with confidence. He also submitted that it is not really practicable to carry out an examination in this case because Mr Foyle acquired an extensive knowledge of BATCo's affairs over a long period of time and cannot be expected to separate in his mind information derived from communications that are privileged from information derived from communications that are not.

66. I think it likely that an examination of Mr Foyle would give rise to questions of some difficulty, but for the reasons I have already given I am not persuaded that it would be right to refuse the application on those grounds. It may become apparent as the examination progresses that the exercise is largely a waste of time, but I do not think that the likelihood of that occurring is sufficient to justify refusing to make the order. I can see that it would be embarrassing for Mr Foyle to be left to grapple with the question of privilege without assistance, but that is not what is envisaged since all parties accept that BATCo should be permitted to attend any examination to raise objections on its own behalf as and when it considers it appropriate to do so.

67. Although the court will wish to provide all such assistance as it legitimately can in response to a request from a foreign court, it has a duty to ensure that the request does not become an instrument of oppression. However, I am not persuaded that the scope of the matters on which Mr Foyle's evidence is sought is so wide as to render an examination oppressive in itself. Although the request identifies 53 separate areas for questioning, in reality many of them are little more than different aspects of the

**834**     **USA v Philip Morris Inc**     **[2004] 1 CLC**
(*Moore-Bick* J)

same subject. Provided Mr Foyle is given an adequate opportunity to prepare himself, I do not think that an examination would be oppressive simply in terms of its extent. Concerns over Mr Foyle's personal exposure to prosecution or litigation arising out of matters that come to light during an examination have now been dispelled by the granting of immunity from prosecution and by the offer of an undertaking on the part of the US not to pursue civil proceedings against him or Lovells.

68. In those circumstances I think that any remaining risk of oppression can be adequately countered by giving appropriate directions for the conduct of the examination. These might well include, for example, directions requiring the US to identify more specifically the questions that it wishes to ask Mr Foyle and to provide him with copies of all the documents which will be put to him in the course of the examination a reasonable time in advance. In the ordinary way the court would appoint a practising lawyer to conduct the examination, but the particular nature of the matters on which Mr Foyle's evidence is sought, his position as the BAT group's former solicitor, the danger of questions touching upon privileged communications and the likely need to obtain rulings of an authoritative nature in the course of the examination all combine to make this an exceptional case. I think that it would therefore be appropriate to direct that the examination be conducted by English counsel before a judge of this court.

**Mr Broughton**

69. The letter requesting the examination of Mr Broughton seeks his evidence in two broad areas: the relationship of BAT plc to BATCo and Brown & Williamson respectively, and corporate reorganisations within the BAT group. Mr Onions Q.C. on behalf of Mr Broughton accepted that his client knows about these two matters generally and could, if necessary, give evidence about them. He submitted, however, that an order should not be made for his examination because the real object of the US is to carry out what Sir Richard Scott V-C in *First American Corp v Al-Nahyan* [1999] 1 WLR 1154 described as 'an impermissible investigatory exercise'. He also submitted that the subjects on which the US wishes to take Mr Broughton's evidence are so vaguely defined that it would be unfair to require him to be examined on them.

70. Mr MacLean submitted that if Mr Broughton could give any relevant and admissible evidence for use at the trial (as he submitted he plainly could), the right course was to make an order for his examination and leave it to Mr Broughton to indicate the limits of his knowledge and to the examiner to control the proceedings to prevent them being conducted in an improper way. In support of that he drew my attention to an observation made by Lord Fraser of Tullybelton in *Re Asbestos Insurance Coverage Cases* [1985] 1 WLR 331 at page 339 to the effect that if the witness is asked for evidence which he is unable to give, he can simply say so.

71. I can see the attraction of that course, but in my view it is not one that is supported by the authorities. It is well established that the court's jurisdiction to order

© DSP Publishing Ltd

the examination of a witness under the 1975 Act and the rules of court is limited to taking evidence for use as such in foreign proceedings and does not extend to the examination of the witness for the purposes of oral discovery. This has given rise to difficulty in a number of cases. In *Rio Tinto Zinc Corp v Westinghouse Electric Corp* [1978] AC 547 Lord Wilberforce referred at page 610 to the distinction drawn by Devlin J in *Radio Corp of America v Rauland Corp* [1956] 1 QB 618 between 'a process by way of discovery and testimony for that purpose' and 'testimony for the trial itself', making the point that:

> 'which it is in fact is not to be determined by the drafting of Westinghouse's lawyers but objectively by the nature of the testimony sought. The fact that any evidence obtained is intended to be put in at the trial is quite consistent with the inquiry extending (impermissibly) to trains of inquiry which might produce such evidence.'

Although he accepted that a 'blue pencil' approach was permissible in order to confine the request within proper limits, Lord Wilberforce recognised (at page 611) that the point might come at which the whole request should be rejected.

72. In *Re State of Norway's Application* [1987] QB 433 the Court of Appeal by a majority set aside an order for the examination of witnesses on the grounds that the scope of the request was so wide that it amounted to a roving enquiry of an impermissible kind. The problem surfaced again in *State of Minnesota v Philip Morris* [1998] ILPr 170 in connection with a letter of request issued by the court in the Minnesota action to which I referred earlier. In that case Owen J held at first instance that although the terms of the request were too broad in themselves, the court could give effect to it by imposing restrictions on the scope of questioning in the order for examination. That was a legitimate approach in principle, as can be seen from paragraph 18 of the judgment of Lord Woolf MR, but there are limits to what the court can do in that respect. Moreover, as Lord Woolf pointed out in the same paragraph, it is necessary to hold a balance between the requesting court and the witness who is entitled to know within reasonable limits the matters about which he is to be examined. In that case the court refused to order the examination of the witnesses despite the fact that it was accepted that they could give relevant evidence. The terms of the letter of request were far too vague and it was not the court's function to re-draft it. Where the letter is not too vague, but the court is satisfied that the evidence sought is required both for trial purposes and for the purposes of discovery, it has jurisdiction to order an examination limited to obtaining evidence for use at trial: see *Golden Eagle Refinery Co Ltd v Associated International Insurance Co* (unreported) (Court of Appeal, 19th February 1998).

73. The problem of 'fishing' as applied to oral evidence was considered in *First American Corp v Al-Nahyan* [1999] 1 WLR 1154. Sir Richard Scott V-C expressed the view at page 1163 that if there were good reason to believe that the intended

**836**          USA v Philip Morris Inc          **[2004] 1 CLC**
              (*Moore-Bick* J)

witness had knowledge of the matters in issue at the trial so as to be likely to be able
to give relevant evidence an application to have him orally examined could not be
described as 'fishing'. It is important to note, however, that that comment was made
in the context of a discussion of the court's jurisdiction. At page 1164 he made it clear
that he regarded *Re State of Norway's Application*:

A

'as authority for the proposition that, *as a matter of discretion*, a request for oral
testimony should not be acceded to if the intention were to obtain information
rather than to obtain evidence for use at the trial.' (my emphasis).

B

74. At page 1165 he summarised the position in these terms:

C

'In my opinion, therefore, an English court must look at the issue of the relevance
of the requested testimony, if it is raised, in broad terms, leaving to the foreign
court, in all but the clearest cases, the decision as to whether particular answers,
or answers on particular topics, would constitute relevant admissible evidence.

D

In summary, in considering the letters of request in this case the court should, in
my opinion, ask first whether the intended witnesses can reasonably be expected
to have relevant evidence to give on the topics mentioned in the amended
schedule of requested testimony, and second whether the intention underlying the
formulation of those topics is an intention to obtain evidence for use at the trial
or is some other investigatory, and therefore impermissible intention'

E

75. And returning to the question at page 1166 he said:

'The problem I have ... is that "fishing" is not a term of art so far as oral testimony
is concerned. In relation to oral testimony I do not think an objection of "fishing"
has substance *except in a case in which the conclusion can be reached, whether
from the terms of the request or from other sources, that the intention underlying
the request is not one of obtaining evidence for use at trial*. The width of a request
may indicate the absence of that intention. But, equally, the width of a request
may be an inevitable consequence of the complexities of the issues and of the
witness's involvement in them.

F

G

In the present case each of the letters of request contains an express statement as
to the purpose for which the examination of the witness is sought. For example,
the request for the examination of Mr Cowan states, under the heading "Purpose
of the evidence or judicial act sought", that "Sworn testimony of Mr Cowan
pursuant to a letter of request is admissible evidence and will be offered at trial".

H

Such a statement does not, I would accept, conclude the issue of intention. *If
other material justifies the inference that the intention is mainly of an
investigatory character, I think the request would have to be refused*.' (emphasis
added)

© DSP Publishing Ltd                                    **[2004] 1 CLC 811**

76. These authorities support the conclusion that the court should not make an order for the examination of a witness if it is satisfied that the letter of request is mainly of an investigatory character, even though it is satisfied that the witness may be able to give some relevant and admissible evidence, unless it is possible to exclude certain areas of the request without undue difficulty. It cannot leave the matter to the examiner because, as Lord Woolf pointed out in the *Minnesota* case, once the court makes an order for the examination of a witness it ceases to have any control of the examination. Moreover, the examiner will not be well-placed to determine where the line should be drawn. Lord Fraser's observation in *Re Asbestos* was directed to quite a different question, namely, whether the court should enquire for itself whether the witness can give relevant and admissible evidence. I do not understand his Lordship to have been casting any doubt on the court's duty to ensure that the request is a proper one to accede to on other grounds.

77. In the *Westinghouse* case and in subsequent cases the courts have emphasised that the relevance and admissibility at trial of the evidence which it is sought to obtain by means of the letter of request is essentially a matter for the requesting court and Mr Onions did not seek to persuade me that none of the evidence Mr Broughton could give would satisfy that requirement. However, he pointed out that the letter of request does not contain any statement that Mr Broughton's evidence is required for use at trial and submitted that the very broad description of the matter on which his evidence is sought provides ample evidence that the US is really seeking to carry out a wide-ranging investigation of an impermissible kind. He also submitted that even if that were not so, it would be oppressive to subject Mr Broughton to such a potentially wide-ranging examination.

78. The matters on which the US seeks to examine Mr Broughton fall under two heads: 'Relationship of BAT [plc] to BATCo and Brown & Williamson' and 'Corporate reorganizations'. The sub-headings are equally broadly framed. Under the first heading they include, for example, 'Financial relationship between BAT and BATCo' (paragraph 1.c), 'Control of BAT [plc] over BATCo' (paragraph 1.e) and 'Control of BAT [plc] over Brown & Williamson' (paragraph 1.f), in each case without any limitation as to time. In the case of the later two sub-headings Mr Broughton's evidence is sought on the following subjects: control over research and development, the companies' position on smoking and health, marketing decisions, board selection, and brand development. Under the second heading Mr Broughton's evidence is sought on the 'Effect of changes in corporate relationships of BAT [plc] entities' including their 'litigation position', 'stock price and 'financials', again without limitation of any kind.

79. In my view the extremely broad terms of this letter of request bear out both Mr Onions' submissions. The US alleges that the tobacco companies have been involved in a conspiracy which has continued over the past 50 years. It is impossible, therefore, to read down the letter of request by reference to the issues in the litigation so as to

**838**      USA v Philip Morris Inc      **[2004] 1 CLC**
(*Moore-Bick* J)

treat it as limited to any particular period of time. The fact that BAT plc was not incorporated until July 1997 might provide a basis for reading some limitation into it, but the description given by Ms Eubanks in her third witness statement of the issues to which Mr Broughton's evidence is likely to be relevant suggests strongly that the US wishes to question him about the relationship between Brown & Williamson and other companies in the group over a much longer period. Certainly many of the proposed subjects of the examination are described in such broad terms that almost any line of questioning could be justified and it would be impossible for Mr Broughton to prepare for the examination in any useful way. This only goes to reinforce the conclusion that the letter of request is designed more to enable the US to conduct a broad investigation into the relationships between the companies in the BAT group than to obtain Mr Broughton's evidence on specific topics for use at the trial.

80. As in the *Minnesota* case, I have considered whether the request can be redrafted in such a way as would restrict its ambit to what is permissible and fair. Mr MacLean sought to assist that approach by agreeing to give up any claim to question Mr Broughton on BAT plc's stock price or 'financials' and offering to confine questioning on other matters to the period from 1994 onwards, but the extreme width of the remaining subject matter headings remains a difficulty. Faced with a request couched in such broad terms I do not think it is possible for the court to attempt to redraft it. Nor do I think it appropriate in the light of the authorities for it do so.

81. For these reasons I have come to the conclusion that it would not be right to make an order for the examination of Mr Broughton.

(*Order accordingly*)

© DSP Publishing Ltd

**CA**                         **USA v Philip Morris Inc**                    **839**
                              (*Brooke* LJ)

A                          COURT OF APPEAL JUDGMENT
                                (23 March 2004)

**Index**

B   *No. Heading*
    *Para No.*
    1.  Introductory                                                        1
    2.  The history of the action                                           3
    3.  The application for the letter of request                          10
    4.  The court's approach to letters of request                         16
C   5.  The application relating to Mr Foyle                               18
    6.  The claim to legal professional privilege and the judge's order    20
    7.  The scope of Mr Foyle's involvement                                24
    8.  Legal advice privilege: the judge's analysis                       40
    9.  Litigation privilege: the judge's analysis                         47
D   10. Oppression: the judge's approach                                   58
    11. The appeal: litigation privilege                                   59
    12. The appeal: legal professional privilege                          74
    13. Oppression and a fair balance                                      84

**Brooke LJ:**

E

**1. Introductory**

1. This is an appeal by British American Tobacco (Investments) Ltd ('BATCo') and
Mr Andrew Foyle against an order made by Mr Justice Moore-Bick in the
Commercial Court on 10th December 2003 whereby he directed that Mr Foyle be
F examined for the purposes of making his evidence available in proceedings currently
pending before the US District Court for the District of Columbia pursuant to letters
of request issued by that court. BATCo is one of the parties to the litigation in the US
for the purposes of which the evidence is sought, and it was given permission to
intervene to enable it to assert claims for privilege in respect of confidential
G communications which it feared that Mr Foyle might be asked to disclose if an order
for his examination was made.

2. On the same occasion the judge refused to make a similar order in relation to Mr
Martin Broughton, who held several senior positions in the BAT group, culminating
in his appointment in February 1998 as chairman of British American Tobacco plc
H ('BAT plc'). There is no appeal against this part of the judge's order.

**2. The history of the action**

3. The action in relation to which the evidence was sought involves a claim by the
Unites States of America against a number of tobacco companies under the Racketeer

**840**          USA v Philip Morris Inc          **[2004] 1 CLC**
                        (*Brooke* LJ)

Influenced and Corrupt Organisations law, 18 USC §1962. It is one of the largest cases ever brought in a US court. The judge received evidence to the effect that the sum claimed is at least US$289 billion, and that about 40 million documents would be produced in the course of discovery.

4. The US alleges that since 1953 the tobacco companies have engaged in an unlawful enterprise to deceive and defraud the American public and consumers of cigarettes about the health risks of smoking and about their knowledge and attitude to them. The US says that as part of that unlawful enterprise the companies, among other things, suppressed information available to them to the effect that smoking was addictive and was, or might be, injurious to health, manipulated the nicotine levels in cigarettes, and made false statements about the research they were undertaking and their readiness to communicate the results to the public.

5. It is an important part of the US's case that the tobacco companies took active steps to ensure that documents which they thought might damage them in any litigation were destroyed or suppressed to ensure that they could not be disclosed. In particular, the companies are alleged to have systematically destroyed certain kinds of documents, to have sent others out of the jurisdiction to put them beyond the reach of the courts, and to have routed some communications through their lawyers with 'confidential' or similar markings in order to enable them to claim legal professional privilege in respect of them. The companies are also accused of having interfered with the integrity of scientific research into the effects of smoking on health by causing it to be directed, edited and controlled by their lawyers.

6. Two companies in the British American Tobacco group, Brown & Williamson Tobacco Corporation ('Brown & Williamson'), an American company, and BATCo, an English company, are among the defendants to the action in Washington DC. Both these companies are ultimately owned by BAT plc.

7. Mr Foyle is a partner in the firm of Lovells, the London solicitors. He is a litigation specialist. He acted for various companies in the BAT group between about November 1985 and May 1994 when he moved from London to Lovells' office in Hong Kong.

8. Tobacco litigation is not confined to the US. In October 2001 Mrs Rolah McCabe brought an action in the Supreme Court of Victoria against British American Tobacco Australia Services Ltd ('BATAS') seeking damages for personal injury caused by smoking. On 6th February 2002 Eames J struck out BATAS's defence on the grounds that it had prevented the plaintiff from obtaining a fair trial by destroying potentially relevant documents at a time when it faced impending litigation. In his judgment Eames J referred at some length to the part played by Mr Foyle in advising the BAT group's companies in Australia. He quoted extensively from a document which has since become known as the 'Foyle memorandum'. On 6th December 2002 his judgment was reversed on appeal.

| CA | **USA v Philip Morris Inc** | **841** |
|---|---|---|
| | (*Brooke* LJ) | |

9. In the meantime matters had moved on in the US. Following the delivery of judgment by Eames J in the *McCabe* case, the US notified BATCo that it wished to take a deposition from Mr Foyle and asked it to make him available for that purpose. Since Mr Foyle was not an employee of BATCo, this request was refused. Requests to make available Mr Broughton and Mr Nicholas Cannar, who was formerly company secretary and head of BATCo's legal department, were also refused. On 1st July 2002 the US therefore applied by motion for letters of request to be issued in respect of Mr Foyle, Mr Broughton and Mr Cannar. The letters of request relating to Mr Foyle and Mr Broughton were directed to the Royal Courts of Justice; the letter of request relating to Mr Cannar was directed to the Supreme Court of New South Wales, Mr Cannar then being resident in Australia.

### 3. The application for the letter of request

10. In its motion applying for a letter of request in relation to Mr Foyle the US set out the grounds on which it made its application. They included an assurance that it sought evidence for use at trial rather than evidence in the nature of pre-trial discovery and an assertion that Mr Foyle's evidence was necessary for the just disposal of the case because he had played a 'central role in the creation and implementation of document destruction policies implemented to protect BAT and its affiliates, including BATCo and Brown and Williamson'. No evidence was offered in support of that allegation, but the draft letter of request originally submitted to the District Court with the application included the following recital:

'WHEREAS, an attorney's providing advice on how to destroy documents relevant to current and anticipated litigation, amounts to the furtherance of a crime or fraud. In the US and other jurisdictions (including the United Kingdom), such conduct obviates any attorney-client or legal professional privilege that might otherwise attach to such advice. ... Likewise, an attorney's advising a client to have scientists route their contacts "through the lawyers" so that privilege could be asserted for scientific communications is an improper practice and a fraud upon any court in which such privilege is asserted. For these reasons, the legal professional and attorney-client privileges do not stand in the way of Mr Foyle's being required to give testimony.'

11. All three applications were opposed before the District Court on the grounds that they were in reality attempts to obtain discovery after the deadline for that stage of the proceedings had passed. In addition BATCo objected to the inclusion in any letter of request of a recital in the terms set out above on the grounds that it amounted to a finding by the court that what is known in the US as the 'crime-fraud exception' to the right to claim privilege applied in this case without there having been any proper investigation into the matter.

**842**      **USA v Philip Morris Inc**      **[2004] 1 CLC**
(*Brooke* LJ)

12. The applications were referred for consideration to Special Master Levie. He recommended that no letter of request be issued in respect of Mr Broughton and that a letter of request be issued in respect of Mr Foyle in a modified form. He specifically recommended that the proposed recital referring to the crime-fraud exception be omitted from the letter of request issued in relation to Mr Foyle. This recommendation was accepted by Judge Kessler. On 3rd October 2002 Judge Kessler issued letters of request in respect of Mr Foyle, Mr Broughton and Mr Cannar. The wording of the letter of request with which we are concerned made it clear that the factual statements in it were allegations made by the US and not findings by the Court.

13. On 9th December 2002 in the Supreme Court of New South Wales James J granted an order ex parte for the examination of Mr Cannar pursuant to the letter of request. On 8th October 2003 Bell J delivered a lengthy judgment refusing to set aside this order. She held, however, that certain documents, in particular the Foyle memorandum, remained privileged despite the fact that their contents had been made public to a greater or lesser degree. We were told that an appeal is still pending against her decision.

14. Meanwhile, back in Washington there had been further disputes arising out of BATCo's claim to privilege over certain documents. One of the documents under consideration was a memorandum ('document 182') written by Mr Foyle to Mr Cannar in September 1989 relating to the strategy to be adopted in preparing a defence to a pending patent action and the implications of that action for smoking and health litigation. The Special Master held that in principle document 182 was privileged, but that the crime-fraud exception applied because it had been prepared 'in furtherance of BATCo's concealment of documents related to smoking and health'. However, on 27th August 2003 Judge Kessler overturned that finding as 'clearly erroneous', concluding that the advice contained in document 182 fell within 'the generally accepted bounds of tactical legal planning engaged in by sophisticated corporate counsel'.

15. Although many of these matters are of no direct relevance to the issues we have to decide on this appeal, they set the scene for the applications Moore-Bick J was concerned to determine.

**4. The court's approach to letters of request**

16. There has never been much dispute between the parties as to the principles to be applied when considering an application of this kind. They are summarised by Waller LJ in paragraphs 28-32 of the judgment of the Court of Appeal in *Refco Capital Markets Ltd v Credit Suisse (First Boston) Ltd* [2001] EWCA (Civ) 1733; [2002] CLC 301. In particular, it is the duty and pleasure of the court to give all such assistance as it can to the requesting court within the limits imposed by the *Evidence (Proceedings in other Jurisdictions) Act* 1975 ('the 1975 Act') from which the

© DSP Publishing Ltd

jurisdiction to make orders of this kind is derived. One of the restrictions imposed by the 1975 Act which assumed considerable importance in the present case relates to privilege. This is preserved by section 3(1)(a) which provides as follows:

> 'A person shall not be compelled by virtue of an order under section 2 above to give evidence which he could not be compelled to give-
>
> (a) in the part of the United Kingdom in which the court that made the order exercises jurisdiction…'

17. Moreover, the authorities make it clear that while observing the restrictions imposed by the 1975 Act, the court must also hold a fair balance between the interests of the requesting court and the interests of the witness: see *State of Minnesota v Philip Morris Inc* [1997] ILPr 170, 176 per Lord Woolf MR.

### 5. The application relating to Mr Foyle

18. It was not disputed that Mr Foyle could give relevant and admissible evidence bearing on the issues in the litigation now proceeding in Washington DC. The application for his examination was resisted before the judge on two grounds: privilege and oppression. Like the judge, we are not concerned with any issues relating to the allegations of crime-fraud which were originally made against Mr Foyle in the US's motion for the issue of a letter of request and the draft letter exhibited to it. At an early stage of the hearing before the judge, Mr Kenneth MacLean QC, who appeared for the US, made it clear that his clients did not make any allegation of improper conduct against Mr Foyle and were not seeking any finding to that effect. He also stated that his clients did not intend to bring civil proceedings against him either, and indicated that he was authorised to give an undertaking to that effect.

19. On the appeal Mr MacLean said that there was still a live allegation in the principal proceedings to the effect that relevant documents had been destroyed while BATCo's document management policy was being implemented, but it was not being suggested that Mr Foyle was infected in any way by crime-fraud involvement.

### 6. The claim to legal professional privilege and the judge's order

20. The main ground on which the application is now resisted on this appeal is that of legal professional privilege although the 'oppression' argument remained in the context of arguments about the court's duty to achieve a fair balance between the interests of the requesting court and the interests of Mr Foyle. Mr Charles Hollander QC, who appeared for Mr Foyle, and Mr Mark Howard QC, who appeared for BATCo, submit, as their predecessors did before the judge, that all communications passing between Mr Foyle and BATCo and other members of the BAT group were

covered by both legal advice privilege and litigation privilege. Mr Foyle could not therefore be required to answer any questions on any of the matters identified in the letter of request unless BATCo waived privilege. Since BATCo did not intend to waive privilege, it would be a waste of time and money to make an order for his examination.

21. Mr MacLean has always recognised that Mr Foyle might well be entitled to refuse to answer many of the questions that the US might wish to put to him. He continued to argue, however, that the right course was for objections to be raised and for privilege to be invoked when specific questions were asked, and in this context he persuaded the judge that it would not be right for the court to accede to a blanket assertion of privilege at that stage. The judge approached this application on the assumption that objection would be taken to Mr Foyle's answering any question that touched on the substance of the matters described in the letter of request. He felt, however, that until specific questions were asked the problem would remain theoretical rather than practical, and it was difficult to be confident that every assertion of privilege would be well-founded.

22. In the event his order included a direction that by 4th February 2004 the US should supply to Mr Foyle and BATCo paginated bundles of documents on which it intended to rely at the examination, together with a written indication of the proposed lines of questioning, with reference, where appropriate, to documents, together with sample questions. He also fixed a directions hearing, which will take place at the end of March, at which he would be able to hear any objections by Mr Foyle and BATCo and give such further directions as seemed appropriate. The adoption of this procedure appears to me to be a sufficient answer to the appellants' complaint that no questions or lines of questions had been identified at the first hearing before the judge.

23. In his judgment under appeal the judge accepted that section 3 naturally contemplates that an order for the examination of the witness will already have been made by the time any question of privilege arises (see para 16 above). He said, however, that if the court were satisfied on the evidence before it that the exercise would be a pointless one because the witness could and would refuse to answer any questions of substance put to him, he could see no reason why in the exercise of its discretion the court might not refuse to make an order for his examination, although no doubt such a course would only be justified in the clearest case. Because BATCo submitted that this was such a case, the judge was obliged to examine the range of subjects on which the US wished to question Mr Foyle, and the circumstances in which the communications about which he might be questioned had occurred.

**7. The scope of Mr Foyle's involvement**

24. The matters on which Mr Foyle's evidence was sought were described in the letter of request. The five main categories (each of which is broken down into several sub-categories) are:

**CA**                          **USA v Philip Morris Inc**                          **845**
                                      (*Brooke* LJ)

1. The creation of the document management policy.

2. The implementation of the document management policy.

3. Rules and procedures set forth by the document management policy.

4. Destruction of smoking and health documents that pertain to BATCo's and Brown & Williamson's litigation position in the US.

5. Transportation, routing, storage and warehousing of documents.

25. The judge commented that some of these, such as the creation of a document management policy, could obviously involve communications of a privileged nature. Others, such as arrangements for the transportation, routing, storage and warehousing of documents, seemed less likely to do so. He said, however, that in each case the question whether any particular communication was privileged would depend on its particular nature and the circumstances under which it occurred.

26. In his witness statement, the contents of which were not challenged, Mr Foyle said that all the work he undertook for the BAT companies involved giving general legal advice in relation to the nature and scope of claims by smokers and in relation to the obligation of disclosure under English law (whether in litigation in England or pursuant to letters of request) or giving legal advice directed specifically to the preparation or conduct of proceedings, whether existing or in contemplation. He said that his advice included the preparation of a defence strategy known as a 'defence package', to be used if his clients became involved directly or indirectly in litigation of the type envisaged. On this basis he said that all communications between himself and the BAT companies were privileged.

27. Miss Dohmann QC, who appeared for BATCo in the court below, told the judge that it was virtually unprecedented for one party to litigation to seek to call evidence under compulsion from an opposing party's solicitor. The judge accepted that this was probably correct, because every lawyer is well aware of the rules relating to privilege and is inclined to assume that all communications made by and to a lawyer and all information obtained by him when acting for his client are privileged. He commented, however, that recent decisions in the Commercial Court and in the Court of Appeal make it clear that the court is not bound by the lawyer's own assessment of the position, and that it may be necessary to adopt a rather more critical approach to the question than has hitherto been the case. He therefore found himself obliged to refer to a little more of the evidence of the circumstances in which Lovells came to act for the BAT group, and the nature of the advice and assistance they were asked to give.

28. BATCo relied on evidence from its current senior litigation counsel, Mr Martyn Gilbey. He said that Lovells' advice was sought by BATCo and BAT (UK & Export)

**846**    USA v Philip Morris Inc    [2004] 1 CLC
(*Brooke* LJ)

Ltd in November 1985 in relation to a review of its documents that was being put in
hand in anticipation of litigation and of the need to give discovery. That was in part
because Brown & Williamson had been involved in tobacco litigation in the US.
BATCo had decided to instruct solicitors to advise it about the nature and scope of its
potential liability in relation to claims by smokers, and how it might best defend itself
against them.

29. Mr Gilbey said that in carrying out those instructions Mr Foyle and his team
collected, collated, reviewed and analysed many thousands of BATCo research
documents to evaluate their relevance to claims that might be made by smokers. Mr
Foyle also drafted reports, memoranda and analyses which set out his personal views
on those matters, and advised BATCo on how it might best defend itself against such
claims. The review of the Research & Development ('R & D') files which became
known as 'Project Discovery, Phase I' was conducted between 1986 and 1989. The
main purpose of this exercise was to identify those of the files that had been brought
into existence before the end of 1986 which were likely to contain documents that
would be disclosable in smoking and health litigation.

30. Project Discovery, Phase II was carried out in a similar way. On this occasion,
attention was concentrated on R & D files that had been created from the end of 1986
onwards, and files from other departments which dated back to 1954. Mr Foyle was
involved in planning Phase II, but he ceased to be involved in its execution in May
1994 when he left to work in Hong Kong.

31. Mr Gilbey's account of these matters was reflected in some of the documents
exhibited to the letter of request. The request itself set out at some length the US's
allegations relating to the document management policy on which it wished to obtain
Mr Foyle's evidence, and a number of documents were exhibited in support. They
included a memorandum dated 10th September 1985 written by Mr Cannar and
another member of BATCo's legal department setting out the course of action to be
taken in response to the risk, as they saw it, that orders for discovery of documents
produced by the R & D department would be made against Brown & Williamson in
proceedings then pending in the US.

32. Although at that time no proceedings had been commenced or threatened
against any members of the group outside the US, it was apparent from that
memorandum that Mr Cannar was concerned that documents held by the R & D
department were likely to be relevant to any product liability actions begun in Europe
or elsewhere. According to the memorandum there had never been a full review of the
department's files, and he therefore considered it important to put such a review in
hand at once with a view to assessing their contents. In order to review the documents
from a European perspective Mr Cannar proposed to instruct a firm of solicitors to
provide advice and additional manpower. The firm he instructed was Lovells and the
partner who dealt with the matter was Mr Foyle.

© DSP Publishing Ltd

**CA**  **USA v Philip Morris Inc**  **847**
(*Brooke* LJ)

33. Another document exhibited to the letter of request was a note of a meeting between Lovells and members of the BATCo legal department on 15th May 1986. It is headed 'Privileged and Confidential', but it was later disclosed in proceedings between the State of Minnesota and various tobacco companies including BATCo ('the Minnesota action', for which see para 51 below). The purpose of that meeting was to discuss the form of the discovery exercise, the steps necessary to begin the document review, and the preparation of the 'defence package' (see para 26 above).

34. The nature of the exercise that BATCo was seeking to carry out is described in the note of the meeting. Mr Cannar wanted BATCo to be able to respond to orders for discovery or interrogatories to the same extent as Brown & Williamson, whose documents had already been reviewed by its American lawyers. It appears that he appreciated that that might well require a more extensive exercise than would have been necessary for the purposes of complying with similar orders in England or other European jurisdictions. As a first step, therefore, it was proposed that Mr Foyle should meet the American lawyers to find out how they had gone about their document review. The question of destruction of documents arose, and according to the note it was decided that no destruction policy should be adopted. There would, however, be a 'spring clean',

'which could involve the destruction of documents such as previous drafts.'

35. It was agreed that the legal department would circulate a note to the R & D department along lines to be suggested by Lovells. This note would instruct people to tidy up their files and loose documents, including documents held outside the official filing systems. Lovells would then co-ordinate the systematic copying of the files for review by lawyers with the assistance of scientists, where necessary. Mr Foyle described the organisation and structure of the team he thought would be necessary to carry out an exercise of that kind efficiently. It was agreed that the creation of the 'defence package' should be postponed.

36. Towards the end of the meeting on 15th May 1986 BATCo asked Lovells to advise it on the ways in which an American plaintiff could obtain disclosure of documents in this country, how BATCo might delay or resist any applications for disclosure, and what the consequences of doing so might be. It seems that Lovells may have already given some advice in that area, but that it had not given advice on tactical questions. One exercise on which Lovells appear to have already carried out quite a lot of work was a description of the structure of the R & D department. This was intended to assist in identifying where documents might be kept.

37. The next document exhibited to the letter of request was a letter from Mr Foyle to Mr Thornton at the R & D centre at Southampton dated 21st March 1988 on the subject of Buerger's disease, an illness said to be related to smoking. In the last paragraph of that letter Mr Foyle reminded Mr Thornton that contact between the

**848**
USA v Philip Morris Inc
(*Brooke* LJ)
[2004] 1 CLC

scientists employed by different tobacco companies should be routed through their
lawyers to ensure that privilege in the communications was not lost. He also told him
to ensure that any internal memoranda written on Buerger's disease in relation to the
current investigations should be marked 'Privileged and Confidential'.

A

38. The judge found these last two documents particularly informative, both
because they provided a contemporaneous insight into the nature of the advice and
assistance being provided to BATCo by Lovells at an early stage in their relationship,
and also because they shed light on BATCo's assessment of the likely development
of tobacco-related litigation in the US and elsewhere.

B

39. The judge was told, as a result of enquiries made by Mr Gilbey during the
hearing, that Brown & Williamson was a party to the first tobacco claim made in the
US in March 1954. That action was dismissed later the same year. By the end of 1985
over 200 smoking and health actions had been brought against tobacco companies in
the US, of which about a quarter had been started in that year alone. Most of them had
been dismissed, but over 70 actions were still pending. By the middle of 1986 there
were 120 actions pending, including 20 in Texas involving Brown & Williamson.

C

D

**8. Legal advice privilege: the judge's analysis**

40. The judge started his analysis of the law by considering what is usually called
'legal advice' privilege. He defined this as the privilege that attaches to confidential
communications between lawyer and client for the purposes of obtaining legal advice.
He reminded himself that this ground of privilege had recently been considered by the
Court of Appeal in *Three Rivers District Council v Bank of England (No. 5)* [2003]
EWCA Civ 474; [2003] QB 1556. The question for the court in that case was whether
privilege attached to certain documents brought into being by the Bank of England in
connection with the Bingham Inquiry into the collapse of BCCI.

E

F

41. Four classes of documents arose for consideration: documents prepared by
Bank employees with the intention that they should be sent to the Bank's solicitors
and which had in fact been sent to them; documents that were said to have been
prepared with the dominant purpose of obtaining legal advice, but which had not been
sent to the solicitors; documents prepared otherwise than for the dominant purpose of
obtaining legal advice but which had been sent to the solicitors; and documents in all
those categories that had been prepared by Bank employees who were no longer
employed by the Bank. This court held that legal advice privilege was restricted to
communications passing between the client and his legal advisers for the purpose of
requesting and communicating legal advice, documents evidencing such
communications, and documents intended to be such communications. It therefore
held that none of the categories of documents with which it was concerned was
privileged.

G

H

© DSP Publishing Ltd

42. The judge said that the precise ambit of what constituted legal advice for these purposes had been considered by Tomlinson J in a further application for disclosure in *Three Rivers District Council v Bank of England* [2003] EWHC 2565 (Comm). Following the Court of Appeal's judgment on the previous application the claimants had sought disclosure of documents passing between the Bank and the solicitors advising it in connection with the Bingham Inquiry which they had previously accepted were privileged. The application was made on the basis that many of those communications were concerned not with seeking or giving legal advice but with the manner in which the Bank's evidence should be presented to the Inquiry. Tomlinson J considered paragraphs 32-37 of the earlier judgment, in which this court had considered the purpose for which the documents in question had been prepared, and concluded that communications between client and solicitor were privileged only if they were made for the dominant purpose of obtaining and communicating legal advice in the narrow sense of advice about the client's rights and obligations. The judge said that he agreed with that conclusion.

43. He said that it followed from these decisions that before legal advice privilege could be claimed in respect of any communication, three conditions must be satisfied:

(i) the communication must pass between the lawyer and his client;

(ii) it must be confidential; and

(iii) it must be for the dominant purpose of obtaining or giving legal advice, that is, advice about the client's rights and obligations.

44. He added that this court had made it clear that the solicitor's own assertion that the dominant purpose of a particular communication was the obtaining of legal advice is not conclusive. This was a matter for the court to determine on the basis of the whole of the evidence before it: see per Longmore LJ at para 35. Miss Dohmann had reminded him of the observation made by Taylor LJ in *Balabel v Air India* [1988] Ch 317, 330 about the 'continuum of communications' (to which this court itself referred in the *Three Rivers* case) in support of her submission that the privilege should not be unduly restricted. The judge said that he accepted that nothing said by this court in the *Three Rivers* case could be read as detracting from what was said in *Balabel v Air India*, and that the court should be careful not to allow incursions into what should properly be viewed as a continuous sequence of communications made for the dominant purpose of obtaining legal advice. However, in his view the decisions in the *Three Rivers* case highlighted the fact that it was necessary to approach a claim of legal advice privilege in a rather more critical manner than had perhaps been the case in the past.

45. He said that in the present case the evidence strongly suggested that many of the communications between Mr Foyle and BATCo were protected by legal advice

**850**    **USA v Philip Morris Inc**    **[2004] 1 CLC**
(*Brooke* LJ)

privilege. He cited as examples communications between Mr Foyle and Mr Cannar concerning the law relating to the disclosure and inspection of documents and the law relating to privilege and to related matters, and their application to the particular circumstances of the BAT group. He said that these would on the face of it all fall within the scope of legal advice privilege, as Mr MacLean quite properly recognised. He added, however, that the evidence also suggested that Mr Foyle and his team from Lovells might have given advice and assistance on matters such as the organisation and implementation of the review of documents which less clearly fell within its scope. Moreover, without knowing the identity of the person with whom Mr Foyle communicated in any given case, it was impossible to say whether that person was properly to be regarded as his client for these purposes. Similarly, without further information about the general nature of a communication or the context in which it occurred, it was not possible to determine whether it was made for the dominant purpose of giving legal advice. He said that matters of that kind should be easier to decide in the context of specific questions.

46. In order to succeed in resisting the whole of the US's application on this ground it would be necessary for BATCo to show that its assertion of legal advice privilege would prevent Mr Foyle from answering *any* question of substance about its document management policies or procedures. The judge said that this was not so clearly the case as to justify refusing to make an order for his examination.

### 9. Litigation privilege: the judge's analysis

47. The judge turned next to the question of litigation privilege. Miss Dohmann had submitted that all communications passing between Mr Foyle and employees of the BAT group (or indeed anyone else) relating to tobacco litigation were covered by litigation privilege. The judge said that in this case two requirements must be satisfied:

(i) the communication must be confidential; and

(ii) it must have been made for the dominant purpose of conducting or giving advice in relation to litigation, either pending or in contemplation.

48. Miss Dohmann and Mr Hapgood QC (who appeared for BATCo and Mr Foyle in the court below) had argued that all the communications between Mr Foyle and BATCo (and indeed other companies in the group) were confidential and were made in contemplation of litigation. Mr MacLean submitted, however, that when Lovells were first instructed, and indeed for much of the period during which Mr Foyle was advising BATCo, no litigation had been commenced against it or even threatened. The judge said that he therefore had to decide the extent to which litigation must be in contemplation in order to claim privilege in respect of confidential communications.

© DSP Publishing Ltd    **[2004] 1 CLC 811**

**592**

49. The leading authority on litigation privilege is *Waugh v British Railways Board* [1980] AC 521. The House of Lords was not directly concerned in that case with the likelihood of litigation, but Lord Simon of Glaisdale and Lord Edmund Davies referred with approval to a passage in the judgment of Barwick CJ in the High Court of Australia in *Grant v Downs* (1976) 135 CR 674 in which he referred to documents produced at a time when litigation was 'in reasonable prospect'. In the later case of *Re Highgrade Traders* [1984] BCLC 151 this court, after considering a number of earlier authorities, held that litigation privilege might be claimed in respect of documents brought into being at a time when litigation was reasonably in prospect: see per Oliver LJ at p 172. The judge said that that test had been applied in many subsequent cases.

50. He saw little reason to doubt that by 1985 the increasing volume of tobacco litigation in the US, coupled with the fact that a significant number of claims were being made against Brown & Williamson, had alerted BATCo to the need to consider its own position. The documents described in paras 31-37 of this judgment, together with the evidence of Mr Gilbey, showed that BATCo was aware that it might be required to disclose documents generated by the group's R & D department in litigation against Brown & Williamson in the US, and that in due course similar claims might be made against BATCo itself or other companies in the group, whether in the US or elsewhere. (BATCo had in fact been joined in one action in Chicago in 1969 but had been dismissed as a defendant at an early stage.)

51. In the event those fears were justified, although litigation against BATCo did not begin until some years later. In August 1994 BATCo was made a party to the Minnesota action, and in 1996 it was made a party to similar proceedings in Oklahoma and Washington. The Minnesota action was finally settled in May 1998 on terms which included giving public access to a large number of documents disclosed during the course of the proceedings. The present action in Washington DC was started in September 1999.

52. Despite the rising number of claims made against tobacco companies in the US, however, the judge said that there was no evidence that any proceedings had been brought elsewhere against companies in the BAT group until the latter part of 1990. This was not a matter that was directly covered in the evidence filed on behalf of BATCo, but Eames J in the *McCabe* case referred briefly in his judgment (at paras 57-60) to four actions brought against WD & HO Wills Ltd, the predecessor of BATAS, in Australia between November 1990 and some time in 1999. Mrs McCabe started her action against BATAS in the Supreme Court of Victoria in October 2001.

53. BATCo had contended that in these circumstances all communications passing between Lovells and BATCo, and between Lovells and third parties, between late 1985 and May 1994 relating to the document review procedures were made for the dominant purpose of preparing for litigation already in contemplation and were

**852**          USA v Philip Morris Inc          [2004] 1 CLC
                    (*Brooke* LJ)

therefore in principle subject to litigation privilege. The judge said that in relation to any given communication this depended primarily on whether litigation was reasonably in prospect at the time in question. Issues relating to its dominant purpose might also arise. BATCo's contention was that litigation was indeed reasonably in prospect throughout the period of Mr Foyle's involvement, both because it could expect to be sued itself in America and elsewhere before long, and because it could expect that applications for disclosure would be made against it in proceedings to which it was not itself a party.

54. The judge said that it had been recognised on many occasions that there was a conflict between the need to enable clients to communicate freely with their legal advisers in relation to litigation and the need to ensure that all relevant material was before the court. He cited in this context Lord Wilberforce in *Waugh v British Railways Board* at pp 531-532 and Lord Simon of Glaisdale at pp 535-537. The point at which litigation should be regarded as sufficiently likely for confidential communications between client and his lawyer to attract privilege on this ground therefore involved striking an appropriate balance between these two factors. The requirement that litigation be 'reasonably in prospect' was not in his view satisfied unless the party seeking to claim privilege could show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility.

55. The judge said he was unable to accept that litigation against BATCo itself was reasonably in prospect in 1985 and 1986 when Lovells were first instructed. He quite accepted that at that time Mr Cannar had thought it a distinct possibility that sooner or later someone might make a claim against BATCo for smoking-related illness, if only because the burgeoning litigation in the US could be expected to provide an example to claimants in other countries. At that stage, however, no claim had been made or even threatened. The fact that Mr Cannar considered it desirable for BATCo to put its house in order because of a general apprehension of future litigation was not in the judge's view sufficient to entitle it to claim litigation privilege in respect of communications made for that purpose. As time went on, of course, the position changed, but it was sufficient for present purposes to say that he was not persuaded that *all* communications which Mr Foyle might be asked to disclose in the course of the proposed examination were inevitably privileged on this ground.

56. The judge added that it was clear from the authorities that the justification for litigation privilege lay in the adversarial nature of legal proceedings: see *Re L (a Minor) (Police Investigation: Privilege)* [1997] AC 16. An application by one party to legal proceedings against a person who was not a party to those proceedings to compel him to give evidence or to produce documents was in his view essentially adversarial in nature. It followed that confidential communications between a solicitor and his client or a third party for the dominant purpose of considering, preparing or conducting a defence to such an application were covered by litigation privilege.

© DSP Publishing Ltd

57. It did not necessarily follow, however, that all communications relating to an application of that kind necessarily fell to be treated in the same way. The fact that disclosure was required for the purposes of litigation between third parties would not of itself be sufficient in his view to attract litigation privilege. What was required was that the communications be made for the preparation or conduct of litigation involving the solicitor's own client. Accordingly, practical advice about the best way of complying with an order for disclosure once it had been made might well not be covered by litigation privilege. Again, the judge thought that issues of that kind were better addressed in the context of specific questions as and when they were put to the witness. In the present case the US wished to question Mr Foyle about steps taken by BATCo to review and organise its documents. Some communications on that subject might be privileged, but others might not. It was sufficient for present purposes that BATCo had not satisfied him that it would be pointless to make an order for the examination of Mr Foyle because he could properly refuse to answer any question of substance on the grounds of litigation privilege.

### 10. Oppression: the judge's approach

58. The judge dealt quite briefly with Mr Foyle's contention that it would be oppressive to submit him to questioning of this kind. Given that he had now been granted immunity from prosecution, and the fact that the US had offered an undertaking not to pursue civil proceedings against him or Lovells, the judge considered that any remaining risk of oppression could be adequately countered by his giving appropriate directions for the conduct of the examination. I have mentioned some of his directions in para 20 above. The judge also directed that in all the circumstances it was appropriate to direct that the examination be conducted by English counsel before a judge of the Commercial Court. The examination has now been fixed to commence, subject to the outcome of this appeal, on 26th April 2004.

### 11. The appeal: litigation privilege

59. It is convenient to consider this aspect of the appeal first. I have summarised in paragraphs 47 to 57 of this judgment the judge's approach to this issue. Its importance lies in the fact that the scope of legal advice privilege is restricted to communications passing between the lawyer and his client, whereas documents emanating from third parties may attract litigation privilege. This distinction is most clearly drawn in the judgments in this court in *Wheeler v Le Marchant* 17 Ch D 675. Privilege was denied to a communication from a surveyor to a solicitor which had come into existence when the latter had wished to ascertain further facts before giving his client the advice he sought in some non-contentious matter. Sir George Jessel MR defined the scope of litigation privilege in relation to documents containing information required or asked for by solicitors in these terms (at p 681):

> 'The cases, no doubt, establish that such documents are protected where they have come into existence after litigation, either for the purpose of obtaining

**854**                         **USA v Philip Morris Inc**              **[2004] 1 CLC**
(*Brooke* LJ)

advice as to such litigation, or of obtaining evidence to be used in such litigation,      A
or of obtaining information which might lead to the obtaining of such evidence;
but it has never hitherto been decided that documents are protected merely
because they are produced by a third party in answer to an inquiry made by the
solicitor.'

60. In the same case Cotton LJ rationalised the position in these terms (at pp 684-   B
5):

'Hitherto such communications have only been protected when they have been in
contemplation of some litigation, or for the purpose of giving advice or obtaining
evidence with reference to it. And that is reasonable, because then the solicitor is   C
preparing for the defence or for bringing the action, and all the communications
he makes for that purpose, and the communications made to him for the purpose
of giving him the information, are, in fact, the brief in the action, and ought to be
protected.'

D

61. In *Wheeler v Le Marchant* all three members of the court used the expression
'contemplated' or 'in contemplation' when speaking of litigation which was not
actually pending. The Master of the Rolls also used the word 'threatened'. In *Collins
v London General Omnibus Co* (1893) 68 LT NS 831 Wills J and Charles J adopted
a very narrow approach, the former postulating circumstances being such that 'no
reasonable person could doubt that an action would follow', and the latter defining a   E
case in which litigation was reasonably apprehended as being one 'when there is a
high probability, amounting to certainty, that an action will ensue'. Later authority
adopted a rather less restrictive approach.

62. In *Jarman v Lambert & Cooke Contractors Ltd* [1951] 2 KB 937 this court was
concerned with the interpretation of section 1(3) of the Evidence Act 1938. This sub-   F
section restricted the general admissibility of written evidence permitted by section
1(1) by providing that:

'Nothing in this section shall render admissible as evidence any statement made
by a person interested at a time when proceedings were pending or anticipated   G
involving a dispute as to any fact which the statement might tend to establish.'

63. Denning LJ observed at p 946 that the words 'pending' or 'anticipated' were the
words habitually used in connection with legal professional privilege. He added:

H
'The privilege only obtains if litigation is "pending or anticipated", and in that
connection it is well settled that a mere vague apprehension of litigation
generally is not sufficient: see *The Annual Practice* (1950) p 499.'

64. In *Waugh v British Railways Board* [1980] AC 521 argument centred on the
status of an internal report prepared by two of the Board's officers two days after a

**CA**                     **USA v Philip Morris Inc**                     **855**
                              (*Brooke* LJ)

collision involving the death of a locomotive driver (whose widow brought the action). Lord Wilberforce said at p 536 that the report undoubtedly contained material collected by or on behalf of the Board for the use of their solicitors in anticipated litigation, but the House of Lords ruled that because it could not be shown that this was its dominant purpose the document did not attract litigation privilege. Lord Edmund-Davies, for his part, cited at pp 541-2 a passage in the Sixteenth Report of the Law Reform Committee (at para 17(a)) in which they had defined the scope of litigation privilege as covering communications between the client and third parties,

> 'for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice upon pending or contemplated litigation.'

65. He said of this aspect of privilege from disclosure:

> 'Litigation, apprehended or actual, is its hallmark. Referring to "the rule which protects confidential communications from discovery as regards the other side", Sir George Jessel MR said in *Anderson v Bank of British Columbia* 2 Ch D 644, 649:
>
> "The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enable properly to conduct his litigation. That is the meaning of the rule."
>
> And in the Court of Appeal James LJ summed up the position, at p 656, by speaking succinctly of,
>
> "… an intelligible principle, that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief."
>
> Preparation with a view to litigation – pending or anticipated – being thus the essential purpose which protects a communication from disclosure in such cases as the present, what in the last resort is the touchstone of the privilege?'

**[2004] 1 CLC 811**                                    **Commercial Law Cases**

66. Lord Wilberforce spoke of 'anticipated litigation', and Lord Simon of Glaisdale (at p 535) of 'apprehended litigation'. In *Re Highgrade Traders Ltd* [1984] BCLC 151, a case concerned with reports commissioned following a fire at the company's business premises, Oliver LJ at p 172 used the expression 'if litigation is reasonably in prospect'. As Moore-Bick J said, this approach has often been adopted in later cases. In *Mitsubishi Electric Australia Pty Ltd v Victorian Work Cover Authority* [2002] VSCA 59 Batt JA conducted a valuable survey of English and Australian authority (at paras 16-19) from which he concluded that:

> 'as a general rule at least, there must be a real prospect of litigation as distinct from a mere possibility, but it does not have to be more likely than not.'

This does not seem to be very far from Oliver LJ's formulation, although Batt JA did not cite it in his judgment.

67. On the appeal to this court Mr Howard contended that the judge had used the wrong test. Although he had purported to apply the test which involved examining whether litigation was reasonably in prospect (see para 42 of his judgment), he said at para 46:

> 'The requirement that litigation be "reasonably in prospect" is not in my view satisfied unless the party seeking to claim privilege can show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility.'

This, it was argued, was to set the hurdle too high.

68. For my part, I do not consider that the judge misdirected himself when this long passage of his judgment is read as a whole. Some concepts are difficult to express in words. It has, for example, been notoriously difficult to express in words the meaning of such concepts as 'a real prospect of success': indeed, the draftsman of CPR Part 54 included no criterion for the grant of permission to apply for judicial review because the whole topic of arguability is so fraught with difficulty. In the present case it is quite clear that the judge correctly considered that a 'mere possibility' of litigation did not suffice. He was also correct to conclude that the fact that there was 'a distinct possibility that sooner or later someone might make a claim' was insufficient. So was 'a general apprehension of future litigation'. He repeated three times that the appropriate test was that litigation must have been reasonably in prospect. The expression 'real likelihood' seems to have been used as a counterpoise to 'a mere possibility', and I do not consider that any more can properly be read into this phrase. The judge was certainly not saying that there must have been a greater than 50% chance of litigation.

69. In any event, I consider that it would be impossible to conclude that litigation against BATCo itself was reasonably in prospect when that company engaged Mr Foyle's services to advise it. The last time anyone had sued that company had been as long ago as 1969, and there had been no letters before action or other precursors of contentious litigation when Mr Foyle was advising it between 1986 and 1994. In his third witness statement the most that Mr Gilbey could say was that 'it would be reasonable for BATCo to have anticipated that it might be made a defendant to litigation in the US or elsewhere'. This tentative assessment accords well with the contemporary view, expressed in a minute dated 26th February 1986, to the effect that litigation experts in the UK had been briefed concerning 'possible' liability litigation against BATCo. Similarly, on 21st May 1986 there was a statement by a senior BATCo executive that he did not wish it to be seen that the company had only instituted a destruction policy when the possibility of their being involved in litigation became real.

70. My views on this matter are reinforced by the consideration that the exercise for which Lovells was retained had nothing to do with the preparation of the brief for a trial which is the traditional justification for litigation privilege (see, for example, Lord Simon of Glaisdale in *Waugh* at p 536). Its main objectives fall fairly and squarely within the traditional scope of legal advice privilege, although in the next main section of this judgment I will be considering the correctness (or otherwise) of the judge's view that it would be wrong to give blanket coverage on that ground for everything said and done in pursuance of Lovells' retainer.

71. The question whether a demand for the production of BATCo's documents in litigation against a sister company was reasonably in prospect in 1985-6 raises rather different considerations, as does the question whether litigation privilege would attach to any, and if so what, communications even if it did. The judge was clearly influenced by Lord Jauncey's description in *Re L (A Minor)* [1997] AC 16, 25 of litigation privilege as an essential component of adversarial procedure. Lord Jauncey said this in a case in which he was distinguishing ordinary adversarial procedure with the essentially non-adversarial character of care proceedings. This does not, however, mean that all adversarial proceedings are to be treated in the same way.

72. There is, in my judgment, a clear distinction to be made between adversarial proceedings (pending or contemplated) between two or more parties which are destined, in theory at any rate, for a contested hearing in a court or court-like body, and proceedings whereby a party may compel a non-party to produce relevant documents for the purposes of the main proceedings. The non-party may well wish to seek legal advice about his obligations in this regard, but all that will be in issue is whether he is or is not legally obliged to do what is required of him. In this context there is never any question of collecting evidence from third parties as part of the material for the brief in the action, or of seeking information which might lead to the obtaining of such evidence (see paras 59, 60 and 65 above). If the non-party wishes

to notify somebody else that it has received the application, and that other party may    A
wish to take steps to assert a claim for confidentiality or privilege in the documents
sought, it is difficult to see why litigation privilege should attach to that
communication.

73. For these reasons, while the judge was correct in my judgment to categorise the    B
letter of request process as adversarial, I do not consider that this fact alone would
give rise to a sustainable claim for litigation privilege. It follows that while I accept
the appellants' argument that the receipt of some form of letter of request in relation
to Brown & Williamson litigation in the US was reasonably in prospect when Mr
Foyle was first instructed (not least because that corporation had made financial
contributions to the R & D work conducted by BATCo in England, as Mr Cannar    C
observed in his September 1985 minute), I do not consider that any question of
litigation privilege arises as a result. Furthermore, I do not see any reason why this
issue should be capable of being reopened as a matter of right at some later stage of
the examination process. Of course a judge may always reconsider a finding he or she
has made during the case-management handling of a case, but this would be not be    D
appropriate in the present context unless, for instance, genuine new evidence emerged
which an appeal court would have been willing to admit under conventional *Ladd v
Marshall* principles.

### 12. The appeal: legal professional privilege

E

74. The scope of legal professional privilege has been pegged out in recent years in
three judgments of this court and in one decision of the House of Lords, and it is not
necessary for the purposes of this judgment to travel back beyond the first of these
cases, decided in 1988, although we were shown all the relevant earlier caselaw
mentioned in these decisions. It is convenient to begin with an extract from the speech    F
of Lord Nicholls in *R v Derby Magistrates' Court, ex parte B* [1996] AC 487, 510:

'Legal professional privilege is concerned with the interaction between two
aspects of the public interest in the administration of justice. The public interest
in the efficient working of the legal system requires that people should be able to
obtain professional legal advice on their rights and liabilities and obligations.    G
This is desirable for the orderly conduct of everyday affairs. Similarly, people
should be able to seek legal advice and assistance in connection with the proper
conduct of court proceedings. To this end communications between clients and
lawyers must be uninhibited. But, in practice, candour cannot be expected if
disclosure of the contents of communications between client and lawyer may be    H
compelled, to a client's prejudice and contrary to his wishes. That is one aspect
of the public interest. It takes the form of according to the client a right, or
privilege as it is unhelpfully called, to withhold disclosure of the contents of
client-lawyer communications. In the ordinary course the client has an interest in
asserting this right, in so far as disclosure would or might prejudice him.

© DSP Publishing Ltd

A    The other aspect of the public interest is that all relevant material should be available to courts when deciding cases. Courts should not have to reach decisions in ignorance of the contents of documents or other material which, if disclosed, might prejudice him.

B    All this is familiar ground, well traversed in many authorities over several centuries.'

75. The leading modern authority on the practical application of these principles is still *Balabel v Air India* [1988] Ch 317. In that case Taylor LJ, who gave the leading judgment, considered two diverging lines of authority, and after citing the well-known C    passage in the judgment of Sir George Jessel MR in *Anderson v Bank of British Columbia* (see para 65 above) he said (at pp 330-331):

'Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business. Nevertheless, despite that extension, the D    purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence. In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice. Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from a solicitor to client and to a specific request from the client for such advice. But it does not follow that all E    other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and client. The negotiations for a lease such as occurred in the present case are only one example. Where information is passed by the solicitor or client to the other F    as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach. A letter from the client containing information may end with such words as "please advise me what I should do". But, even if it does not, there will usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether G    asked specifically or not, tender appropriate advice. Moreover legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensible be done in the relevant legal context.

It may be that applying this test to any series of communications might isolate occasional letters or notes which could not be said to enjoy privilege. But to be H    disclosable such documents must be not only privilege-free but also material and relevant. Usually a letter which does no more than acknowledge receipt of a document or suggest a date for a meeting will be irrelevant and so non-disclosable. In effect therefore, the "purpose of legal advice" test will result in most communications between solicitor and client in, for example, a

**860**                    **USA v Philip Morris Inc**                    **[2004] 1 CLC**
                             (*Brooke* LJ)

conveyancing transaction being exempt from disclosure, either because they are
privileged or because they are immaterial or irrelevant.'

A

76. A little later (at pp 331-2) he said that the scope of the privilege had to be kept
within justifiable bounds. He stated, in relation to documents recording information
or transactions (with or without instructions) or recording meetings:

B

'[W]hether such documents are privileged or not must depend on whether they
are part of that necessary exchange of information of which the object is the
giving of legal advice as and when appropriate.'

77. In my recitation of Moore-Bick J's approach to the matters now under appeal I
included (at paras 40-41 above) his summary of the effect of the decision of this court
in *Three Rivers District Council v Bank of England (No. 5)* [2003] EWCA Civ 474;
[2003] QB 1556, and I need not repeat that here. It is sufficient to say that the court
excluded from the scope of privilege all documents which had not actually been sent
to the Bank's solicitors with the dominant purpose of obtaining legal advice.

C

D

78. In *Three Rivers District Council v Bank of England (No. 6)* [2004] EWCA Civ
218; [2004] QB 916 this court was concerned with the defendant's appeal from the
judgment of Tomlinson J which Moore-Bick J considered in his judgment. The topic
under consideration related to communications which came into being in connection
with Lord Justice Bingham's non-statutory inquiry into the collapse of BCCI. The
court rejected the Bank's claim for privilege in relation to its communications with
the solicitors who were assisting in the obtaining, preparation and presentation of
evidence and submissions to the Inquiry, unless they were sent in the context of
seeking specific legal advice.

E

F

79. Mr Howard submitted that this decision (and in particular paragraph 28 of the
court's judgment) endorsed his contention that the court should identify the dominant
purpose of a solicitor's retainer (or his 'dominant role'), and that if this related to the
giving of legal advice, that was conclusive of the matter however long the retainer
remained in being. I do not accept this submission. If part of the solicitor's duties
embrace the giving of legal advice on his client's rights, liabilities and obligations,
and a further significant part of his duties relate to activities which cannot be so
characterised, then the two recent decisions of this court in the *Three Rivers* cases
show that it is too simplistic to refer simply to the dominant purpose of the original
retainer, or to try and identify the dominant purpose of a role assumed over a number
of years, involving the solicitor in many different activities.

G

H

80. While it would be wrong for this court, not being apprised of the detail, to
express any views on any particular disputed item, there is obvious force in the
general thrust of Mr MacLean's submission that advice or assistance in collecting and
collating, listing, spring-cleaning, storing, transporting and warehousing documents

does not amount to legal advice concerning BATCo's legal rights and obligations and is not the sort of assistance that requires any knowledge of the law.

81. In the course of his submissions Mr Howard maintained that *Balabel* was still binding on this court, and that when the judge said that he felt it necessary to approach a claim of legal advice privilege in a rather more critical manner than had perhaps been the case in the past (see para 44 above) he had been wrong to do so if these words were interpreted as watering down in any way what Taylor LJ said in *Balabel*. I do not understand this to have been the judge's intention. He was simply concerned to deny blanket approval to a claim for privilege in relation to all communications passing between Mr Foyle and anyone in the BATCo organisation (or outside it) over a nine-year period, and in my judgment he was right to do so. The judgment in *Balabel* pegs out the ground rules, and the procedure the judge selected will give him the chance of expressing a view on the proposed lines of questioning at the forthcoming directions hearing, and will then leave it to the examining judge to exercise further control over individual questions. It will also provide an opportunity to identify more precisely the person or people who should be treated as Mr Foyle's clients to whom he was furnishing legal advice on their rights, liabilities and obligations.

82. The decision of this court in *Three Rivers (No. 6)* shows that if in the course of many communications passing between a firm of solicitors and their clients' representatives there are some letters which were written for the dominant purpose of seeking legal advice, this does not itself confer privilege on the entire correspondence. In *Balabel* Taylor LJ spoke on the one hand of the continuum of communication and meetings between solicitor and client with the aim of keeping both informed so that advice may be sought and given as required. On the other hand, however, he identified 'the necessary exchange of information of which the object is the giving of legal advice as and when appropriate' as distinguishable from the contents of the type of document he mentioned on pp 331-2 of his judgment.

83. In my judgment the judge was correct in the way he decided to police the furtherance of the letter of request. If I were satisfied that he had failed to take into account the fact that legal professional privilege is a fundamental human right (*Morgan Grenfell v Special Commissioner of Income Tax* [2003] UKHL 21 at [7]; [2003] 1 AC 563), then of course it would be open to this court to interfere with the judge's decision, but I can see no fault in the way the judge approached the question.

**13. Oppression and a fair balance**

84. Mr Hollander, for his part, argued that to submit Mr Foyle to an inquisition of this kind, ranging over the history of events between 10 and 20 years ago, would be unduly oppressive, and the judge had been clearly wrong in the way he had sought to strike a fair balance between the interests of the requesting court and the interests of

**862**                      **USA v Philip Morris Inc**                      **[2004] 1 CLC**
                                  (*Brooke* LJ)

the witness (see Lord Woolf MR in the *Minnesota* letter of request case, para 18      A
above). He said that this point was particularly important because of the way in which
the ground rules had shifted between the time the US first sought the letters of request
from the District Court (see para 11 above) and the time when Mr MacLean made his
concessions to the judge (see para 19 above).

                                                                                       B
85. It was pointed out to us that although Judge Kessler struck out the offending
preamble to the original letter of request (see para 11 above), the main thrust of that
document remained unaltered. Mr Howard argued that once Mr MacLean had made
his concessions, the court should have declined the invitation in the letter of request,
so that Judge Kessler could have the opportunity, if approached, of considering the
matter afresh now that all the insinuations of crime-fraud had been withdrawn.        C

86. Although this would have been a possible course to take, it would have been
productive of further delay at a time when the trial date was approaching, and I do not
consider that the judge went outside the ambit of discretion available to him when he
decided to act on the request as it stood rather than sending the whole process back to  D
start all over again.

87. The case that the judge did not strike a fair balance, so that he wrongly exposed
Mr Foyle to the prospect of an unduly oppressive examination, was vividly
encapsulated in BATCo's final written submission:
                                                                                       E
   'How, it may be asked, is the issue of whether a particular question can or cannot
   be answered due to privilege actually to be resolved, either at the directions
   hearing, or at the examination? How, for example, is Mr Foyle supposed to
   explain to the Court why he thinks he cannot answer a particular question, once
   he genuinely forms that view, without himself revealing the content of his answer
   in the presence of BATCo's litigation adversaries? How, further, is BATCo to      F
   know whether it can properly raise a valid privilege objection to Mr Foyle
   answering any particular question, without first knowing in advance what his
   answer is?'

And so on.                                                                             G

88. I do not accept that the situation is as clearcut as is suggested here. There are
likely to be areas which are quite plainly covered by legal advice privilege. There will
be other areas which quite plainly are not. In the debatable areas the judge, at the
restored directions hearing, and the judge-examiner will both have to proceed with     H
care. But this is no good reason why the whole enterprise should be called off now. It
must be remembered that it is the duty and pleasure of the English court to respond
positively to a letter of request if it can. It is also in the public interest that a court (on
either side of the Atlantic) should have all relevant material available to it when it
decides a case, let alone a case as important as this one, unless it is clear even at this

**604**

A    early stage that the overwhelming majority of relevant questions will be successfully resisted on the grounds of legal advice privilege. This, in my judgment, cannot be said in this case.

89. For these reasons I would dismiss these appeals.

B    **Chadwick LJ:**

90. I agree.

**Scott Baker LJ:**

C

91. I also agree.

*(Appeals dismissed)*

————————————————

D

E

F

G

H

Case No: HC 00 04556

**Neutral Citation Number: 2004 EWHC 373 (Ch)**
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 08/03/2004

**Before** :

**THE HONOURABLE MR JUSTICE MANN**

- - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |  |
|---|---|---|
| **(1)  USP Strategies Plc** | | **Claimants** |
| **(2)  Unicorn Strategies LLC** | | |
| - and - | | |
| **(1)  London General Holdings Limited** | | **Defendants** |
| **(2)  AON Warranty Group Limited** | | |
| **(3)  AON Warranty Services Limited** | | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Anthony Watson Q.C.** (instructed by **Denton Wilde Sapte**) for the **Claimants**
**Mr Andrew Monson** (instructed by **Berwin Leighton Paisner**) for the **Defendants**

Hearing dates: 2nd, 3rd, 4th and 5th February 2004
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................
Mr Justice Mann

**606**

**Mr Justice Mann :**

**Background**

1. The two applications before me are related applications which turn on the question of legal professional privilege and, to a more limited extent, general obligations of disclosure and listing.  In 1998 the claimants prepared, or caused to be prepared, documentation for a warranty scheme which they sought to sell to retailers to replace insurance based schemes which had been rendered commercially unattractive by a change in the tax regime.  A Mr Chan and a Mr Cooper, solicitors on the Isle of Man, devised a scheme involving moneys being held off-shore and in trust.  In the course of devising the scheme a document known in these proceedings as a CAA (an acronym for Collections Account Agreement) was prepared.  Copyright in that document vested in the second claimant; in due course it was transferred to the first claimant.  I shall not distinguish between those two companies for the purposes of this judgment (because it is not necessary to do so) and shall treat all relevant copyright and confidentiality rights as being vested in what I will call "USP".  The CAA came into the possession of the first defendant ("LGH") because that company was, at the time, the administrator of the scheme in question ("the Scottish Power scheme"), but it was the subject of a confidentiality agreement.  Modifications were carried out to it, and a finalised version was used in that scheme.  As a result of joint input into the final document, the judge at the hearing on liability referred to below found that copyright in that final version vested jointly in Scottish Power and USP.

2. In 2000 the claimants and LGH were rivals in bidding to participate in another scheme, this time for an entity which I will call Powerhouse.  In this context LGH and the other two defendants, who are all companies in the same group (the AON group), used the final form draft CAA as a starting point for the drafting of a similar document which they put forward in their bid to devise and operate a scheme for Powerhouse.  In doing so they are said to have been able to maintain a bidding position in competition with the claimants until Powerhouse ultimately decided that the claimants" scheme was one that they preferred.  In a judgment delivered on 8th November 2002 HH Judge Weeks QC held that that use was an infringement of the copyright in the 1998 original and a breach of confidentiality, and he ordered an inquiry as to the damages arising from those wrongs.  That inquiry is not confined to the actual breaches that he found; it is set to be held at the end of April before a Master.

3. In the context of the inquiry questions of privilege arise.  In the course of considering their participation in the Powerhouse scheme LGH instructed lawyers on the Isle of Man.  The results of their deliberations were apparently passed to Powerhouse.  It is in relation to that advice and certain matters passing among the defendants and between the defendants and Powerhouse that privilege questions arise.  In addition, the inquiry will consider infringements relating to  another transaction in relation to a concern identified as Apollo.  The defendants, or their group, did enter into a scheme with Apollo, and it is not alleged that the final scheme involved the use of any documents over which copyright or confidentiality is claimed.  However, it is said that at some stage consideration was given to using the CAA, and that there were infringements at that stage of the transaction.  Questions of privilege and disclosure arise in relation to that too.

**607**

**The Powerhouse claim facts – detail**

4.  The background to this matter leading up to the infringements found by HH Judge Weeks is set out in some detail in his judgment; I do not propose to set them out again here.  For present purposes I can take the story up at the beginning of 2000.  At that point of time, as HH Judge Weeks QC stated, LGH and USP found themselves in competition.  The claimants offered their scheme at a given price (the details do not matter).  A Mr Brimacombe of LGH had a copy of the Scottish Power CAA on his computer.  It was copied for a Mr Mian, a sales director of LGH, with names blanked out.  In due course it was sent to Powerhouse"s lawyers, on 7th March (which was the infringement relied on and established at the trial). Part of the case of the claimants is that the defendants did this in order to establish that they had a workable (or "robust", as it was put at the time) scheme, so that they remained in the game.  That gave Powerhouse competing bidders and they were able to play one off against the other.  As a result of this Powerhouse were able to come back to the claimants at the end of March and negotiate a reduction in the price quoted.  A deal was done at that reduced price.  This reduction in price forms part of the damages claim.  The claimants say that the infringement helped to keep the defendants in the running, and the fact that they were in the running enabled Powerhouse to come back and require a reduction in price. I do not need to consider this chain of causation – that is a matter for the inquiry.

5.  However, the claimants also now rely on earlier matters.  The claimants seek to establish an earlier breach.  I have already referred to a reduction of price at the end of March.  However, earlier, on 1st March 2000 Powerhouse had been also been able to negotiate a reduction in price from the claimants.   In the inquiry the claimants will seek to establish that that reduction was attributable to earlier infringements.  In mid-February 2000 LGH had sought advice from Manx lawyers.  According to a chronology submitted by Mr Monson, who appeared for the defendants, a letter from  Mr de Freitas, the solicitor acting for the defendants, stated that:

> "The nature of the advice sought from the solicitors in the Isle of Man concerned whether a trust based arrangement could be set up to protect monies from the Powerhouse scheme from being merged, or treated as merged, with other moneys held by AWS for other clients";

but at the same time it was made clear that in providing those details privilege was not waived in the instructions and the advice.  The claimants will seek to establish that in order to get that advice, the CAA was copied, and that copying was a further infringement of copyright and of confidentiality rights.   The advice that was obtained was apparently passed on to Powerhouse; it is said that it was the subject of a confidentiality agreement operating between the defendants and Powerhouse.   The agreement is dated 15th March 2000 and is made between "Aon Warranty Group" and Powerhouse Retail Ltd.  The relevant clauses are as follows:

> In consideration of AON making available to the Recipient [i.e. Powerhouse] certain information, the Recipient hereby undertakes to AON in the terms set out below:
>
> Confidential Information

**608**

For the purposes of this confidentiality agreement the expression Confidential Information includes information available (whether before or after this confidentiality agreement is agreed) in writing (including by fax) and other forms of electronic transmission (including but not limited to information relating to clients data belonging to AON, know-how, trade secrets and any other information concerning the Purpose and also any information or analyses derived from, containing or reflecting such information…

The recipient shall:

Keep the Confidential Information secret and confidential and not disclose any of it to any person other than the persons who need to know the same for the purposes of considering, evaluating, advising on or furthering the Purpose and whom the Recipient shall procure are informed of the terms of this confidentiality agreement and observe the terms of this confidentiality agreement as if they were party hereto;

Only use the Confidential Information for the sole purpose of considering, evaluating, advising on or furthering the Purpose and, in particular, not for any other commercial purpose;…

Keep the Confidential Information and any copies thereof secure and in such a way so as to prevent unauthorised access by any third party, shall not make copies of it or reproduce it in any form except for the purpose of supplying the same to those to whom disclosure is permitted in accordance with this confidentiality agreement.

[There is a provision for the return of all written Confidential Information within 7 days of termination of the agreement].

The Purpose is defined as being the wish of the group to "[launch] an offshore extended warranty programme".

6.  In late February 2000, Mr Borrill of the claimants was told by Mr Turner of Powerhouse that their bid was still too high, and on 1st March 2000 Mr Turner was able to negotiate a drop in the price that the claimants had originally quoted for their scheme. This price drop was bigger in amount than that negotiated at the end of the month. The case of the claimants is that Mr Turner was only able to do this because of what he had been told by the defendants; and the defendants were only able to say what they said by dint of their legal advice; and they were only able to get that legal advice by infringing copyright in the CAA, and breaking the confidentiality agreement. Since this earlier price drop is greater than the later one, it is a more valuable part of the claimant's claim. The losses flowing from this price drop are a material part of what the claimants seek in this action as flowing from the wrongs alleged. Again, it is not for me to comment on the merits of this chain of causation.

7.  It is in the context of that earlier part of the claim that the material which is the subject of this part of the present application came into existence. I am not asked to rule on relevance;

**609**

both parties accept that the documents and material that I have to consider are relevant. The question for me is whether it is privileged. The material, and the issues relating to each part of it, can be summarised as follows:

a) There are documents or parts of documents where the documents have already been disclosed by the defendants but in respect of which privilege is claimed in whole or as to part. Where privilege is claimed as to the whole, the document has not been produced for inspection. Where it has been claimed in part, the allegedly privileged part has been obscured for the purposes of inspection. These documents are e-mail or letter correspondence passing between one or more of the defendants of the one part and Powerhouse of the other, one e-mail from the Manx solicitors to the third defendant, and one e-mail from the third defendant to the first defendant.

b) I am asked to strike out parts of certain witness statements which are said to refer to privileged communications in a manner which makes it improper for the witnesses to give evidence of that material. The witnesses are witnesses for the claimants. One is Mr Turner, who at certain points in his evidence makes reference to the legal advice which the defendants had told him they had received, and at one point sets out the terms of an e-mail referring to it. The second and third are Mr Borrill (a director of each of the claimant companies) and Mr Chan, another director and also a Manx solicitor. The allegedly objectionable parts of their witness statements are those containing what Mr Turner told them in the negotiations leading up to the Powerhouse contract, and in which Mr Turner made reference to the advice which the defendants had obtained on their (the defendants') scheme. In Mr Chan's case objection is taken to a reference to legal advice which, it is to be inferred, he heard about from Mr Turner and one paragraph in an e-mail that he sent at the time which refers to the same sort of thing.

c) I am asked to order the removal from the evidence of part of two Powerhouse internal memoranda which Powerhouse has disclosed to the claimants and which contain, among other things, a reference to the legal advice which had been obtained in the Isle of Man. It is that reference which I am asked to order the deletion of.

d) There was one document, a copy letter from LGH to Powerhouse (document 15), in respect of which privilege was originally maintained, but which on reflection was sought to be excluded from inspection on the grounds that further consideration of the letter indicated that it was not relevant. The parties agreed that that dispute would be resolved by my looking at the document and ruling on the point. The claimants have not seen it, but were happy to adopt that expedient.

e) I am asked to strike out parts of the Particulars of Claim in the inquiry on the footing that they are abusive because they refer to and rely on privileged material, or can only be pleaded because the claimants are in possession of material which has been obtained in infringement of the rights of the defendants.

f) I am asked to order that the defendants serve a formal list of documents in relation to the inquiry.

**The contentions of the parties**

**610**

8.  Mr Monson, for the defendants, maintains that privilege exists in all the material that he seeks to have excluded, and that it has not been waived.  That being the case, the documentary material containing privileged material ought to be excluded, with limited exceptions.  All the material fell within the proper definition of material that was the subject of legal professional privilege.  For the purposes of the exercise of analysis, and to distinguish various types of material for the purposes of the debate, the written material was divided into three categories or levels:

a)  Level 1 – this was a reference which merely referred to the fact of getting solicitors advice, without indicating the instructions, advice or even the subject matter.

b)  Level 2 – these were indications that advice had been obtained from solicitors, and indicating its subject matter but not its content or the instructions given.

c)  Level 3 – written advice, or written instructions, or paraphrases, summaries or extracts from that advice.

Using this categorisation he was able to go through the redacted documents and explain the basis, in respect of each, on which privilege was claimed.  The same categorisation was adopted for the purposes of considering the witness statement material and the Powerhouse documents, but Mr Monson did abandon his claims to strike out the Level 1 and 2 material from those statements and documents, which narrowed the scope of the debate (but not by much).

9.  The principal dispute between the parties was the extent to which the defendants could claim privilege in relation to the substance of communications between the client (in effect, the defendants) and a third party where what was communicated was, or referred to, privileged advice given to the client.  Mr Monson‟s case was that the advice started out as privileged and it remained privileged notwithstanding its wider dissemination, as a result of two strands of authority.  The first is *The Good Luck* [1992] 2 Lloyds Rep 540, which demonstrates that privileged material disseminated within the client company that obtained it is capable of retaining its privilege, but he seeks to apply it to show that privilege exists in documents communicated to a third party on the facts of this case.  The second is *Gotha City v Southeby's* [1998] 1 WLR 114.  That case is said to demonstrate that it is possible to disclose advice to an outsider without destroying or waiving the privilege which attaches to it other than as between the privilege owner and the third party.  Those principles entitle the defendants to redact material which would otherwise be disclosed.  So far as restraining material which emanates from Powerhouse is concerned (the Powerhouse documents, Mr Turner‟s evidence and evidence from USP witnesses as to what Mr Turner told them at the time about legal advice) Mr Monson says that the defendants are entitled to restrain that on the footing that the material was and remained privileged, and its use ought to be restrained on principles to be gleaned from *Lord Ashburton v Pape* [1913] 2 Ch 469 and *Goddard v Nationwide Building Society* [1987] QB 670.  This applies whether or not Mr Turner, Mr Chan or Mr Borrill is giving evidence of it, or whether it is in documents revealed voluntarily by Powerhouse.  So far as the Particulars of Claim go, the claim which attempts to base itself on this material must similarly be struck out as an abuse of the process.

10.  Mr Watson QC, for the claimants, comes at this from a slightly different angle.  He obviously starts by accepting that there is privilege in the original advice from the Manx lawyers.  He also accepts that it remains privileged while being passed within the client

company, and he accepted that there would be common interest privilege where the advice was shared between the defendants. (This last concession makes it unnecessary for me to distinguish between the various defendants and enables me to treat the defendants as if they were one body for the purposes of considering the issues I have to decide).  However, with the exception of a passing on of the advice verbatim and in whole, which he accepts remains privileged, he says that passing on summaries or parts of the advice to a third party does not amount to a privileged communication.  This is because those communications do not fall within what he says are the requisite elements of privileged communications (which he extracts from the decision of Moore-Bick J in *United States of America v Philip Morris & others*, unreported, 10th December 2003) because:

a)  They are not communications passing between lawyer and client – they are communications passing between client and a third party.

b)  They are not confidential, on the facts of this case.  This means that the communications were not privileged, and if privilege might otherwise attach it has been waived.

c)  They were not for the dominant purpose of obtaining or giving legal advice – the legal advice was conveyed as part of a sales pitch.

11.  Mr Watson goes on to submit that so far as Level 1 and Level 2 communications are concerned, they do not even contain a sufficient reference to advice to get a privilege case off the ground, and in any event there has been waiver of privilege because of material already deployed by the defendants in this litigation.  *Gotha* is irrelevant, he says, because it is a case about waiver, and the question of whether a communication is privileged has to be answered first.  So far as restraining the use of information that has already been obtained is concerned, he says that the principles to be extracted from *Goddard* and *Lord Ashburton* do not apply so as to restrain officers of the claimants giving evidence of what they were told in negotiations by Mr Turner, and Mr Turner should not be constrained from giving the evidence sought because his communications did not infringe any confidentiality rights of the defendants.  He has various particular points on the wording which is sought to be excluded and in addition says that even if some of the material would otherwise be within an unwaived privilege, I should exercise my discretion not to strike it out, or otherwise restrain witnesses from giving evidence, because the defendants are using privilege to cover up wrong-doing (a sort of "clean hands" point), the claimants were innocent recipients of the information from Powerhouse and there has been delay on the part of the defendants in making their application.

12.  In relation to this last point Mr Watson relies on an e-mail which has already, as a matter of form, already appeared in evidence in this case.  He relies on this as showing not only that the defendants were or ought to have been aware of disclosures by Mr Turner as long ago as August 2001, when it was disclosed in this action as part of the disclosure process, but also in support of a proposition that much if not all of the position that the defendants seek to protect has been put in the public domain by the previous (and current) use of that e-mail.  I need to set out this material.

13.  On 6th March 2000 Mr Chan, who it will be remembered is a director of the Claimant companies, wrote to Mr Turner in the course of his negotiations.  Apparently, Mr Turner had asked for a copy of the Claimants" collection account agreement for the purpose of comparing it with the scheme proposed by the AON Group.  He declined to supply it.  The

**612**

email observes that at that stage Mr Chan suspected that the Defendants had used "a draft prepared from our precedent".  The sentence relied on by Mr Watson is a paragraph which reads as follows:

> "The solution promoted to you by AON and their advisors is that a Collections Account Agreement (sic) in the form of a trust will attain this and that therefore they have demonstrated the robustness required of them."

(This, I would observe, is the passage that the defendants seek to have removed from the evidence, as referred to above.  It will appear below that I am against redacting this material, so I am free to set it out in this judgment.)   This email was annexed to a witness statement used by Mr Chan at the trial on liability.  Mr Watson says that this email points to the fact that Mr Turner was saying things about legal advice, and that accordingly the Defendants have been aware of his disclosures, or the possibility of his disclosures, ever since the discovery process.  So far as publicity is concerned, Mr Watson also relies on this email as demonstrating that the present position which the Claimants rely on in their particulars of claim is already in the public domain because the judge will be taken to have read this material at the trial, and it was formally part of Mr Chan"s evidence on that occasion, although it does not appear that any specific reference was made to it at the trial.  I shall deal with the significance, if any, of this email below.

**The legal principles involved**

14. One doctrine can be put on one side for the purposes of this judgment, and that is the doctrine of common interest privilege.  I have already indicated that Mr Watson for his part accepted that common interest privilege existed as between the three defendant companies, so that communications of advice between the three of them attracted this form of privilege.  Mr Monson for his part accepted that the doctrine did not operate as between the defendants on the one hand and Powerhouse on the other, because one of the tests which have to be fulfilled in order for joint privilege to exist is that the parties in question have to be capable of acting by the same solicitor in the matter in question, which requirement could not be fulfilled in the case of the defendants and Powerhouse.

15. It is therefore necessary to consider the extent to which privilege is maintained in material which is communicated to a third party by the client, which is the issue lying at the heart of these applications.  This involves considering whether the communication was capable of being privileged, and if so whether the privilege has been waived.

16. Mr Watson"s submissions rely heavily on the effect of the Court of Appeal decision in *Three Rivers District Council v The Governor & The Company of the Bank of England (no 7)* [2003] EWCA Civ 474.  He claims that that authority confines privilege to communications between solicitor and client, or vice versa.  Communications with a third party fall outside that, because they do not fall within the description of communications between solicitor and client.  While the case allows evidence of the contents of communications to attract privilege, that is limited to internal communications disseminating the information in question.  Since the communication of advice to Powerhouse was not a solicitor/client communication, it cannot be privileged.

**613**

17. I do not think that that is a correct application or analysis of the *Three Rivers* case. That case concerned not advice given by the solicitors, but preparations for the giving of instructions which were to lead to advice. In that context it was held that information gathered for that purpose was not within the privilege, because only communications were. But before too much is read into that, it must be born in mind that it concerns instructions, not advice. The Court of Appeal in that case did not have before it the extent to which the product of those instructions (the advice) was or was not communicated and what might happen to it thereafter, and care must be taken before taking the concept of "communication" too literally for these purposes.

18. In my view, a correct reading of the case indicates that it does not support Mr Watson"s proposition, and that reading is consistent with authority preceding *Three Rivers*. In paragraph 19 of his judgment Longmore LJ stated that "By the end of the nineteenth century it was, therefore, clear that legal advice privilege … [applied] only to communications passing between [the] client and his solicitor (whether or not through any intermediary) and documents evidencing such communications" (my emphasis). A document evidencing the communication cannot be the communication itself, so Longmore LJ"s formulation goes beyond the communication itself. Again, at paragraph 21 he concludes that the 19th century authorities allowed privilege to "documents … passing between the client and his legal advisers and evidence of the contents of such communications", (again, my emphasis) and went on to apply that principle. Again, therefore, records of communications were privileged. If emphasis be needed, it can be seen in the form of order made by the Court of Appeal, which is set out in a judgment of Tomlinson J in a later hearing in the same case ([2003] EWHC 2565 (Comm)) – the declaration as to privilege encompassed:

> "(1)    Communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purposes of seeking or obtaining legal advice;
>
> (2) Any part of a document which evidences the substance of such a communication."

19. That extended formulation would be capable of catching a number of things beyond the actual communication (oral or written) between solicitor and client, when applied to advice rather than instructions, all of which would be consistent with the policy underlying privilege and with a common sense application of that policy to the practicalities of everyday commercial life.

   a) First, it obviously applies to a letter of legal advice, or a letter containing legal advice.

   b) Second, it would cover the client"s own written record of what his solicitor had told him orally. There is every reason why it should.

   c) Third, it would cover the situation where a client representative who obtains the advice passes that advice internally in the organisation in question. This would apply whether the advice is passed on verbatim or whether it is summarised or extracted. This is in line with *The Good Luck*, referred to above. In that case the relevant issue was whether or not breaches of duty by insurers were causative of a bank lending money to the owners

of a vessel.  The bank obtained some legal advice, and parts of the advice were disseminated internally so that the bank could decide whether to lend the money.  It was submitted that the advice so extracted was not privileged because "such documents cannot be described (using the words of Lord Justice Taylor in *Balabel v Air India*) as part of that necessary exchange of information of which the object is the giving of legal advice as and when appropriate nor (again using the words of the Lord Justice) as documents made confidentially for the purposes of legal advice …".  That argument looks rather like an argument that only solicitor/client communications strictly so called can be privileged.  Saville J rejected that argument.  First, he pointed out that if the argument were right then in a great number of commercial cases the ability of a client to get legal advice in confidence (which underlay the doctrine of privilege) would be destroyed.  He saw "no good reason or valid reason for the suggestion that the confidence which it is accepted attaches to the lawyer client communication itself, should somehow be lost once the advice is put to the commercial use for which it was sought in the first place".  After pointing out that the logic of the argument he was rejecting would allow cross-examination of the officers of the client company about privileged advice, which would be a strange conclusion, he ended this section in his judgment by saying:

> "[The argument] is, in truth, based on the false premise that that which is communicated ceases to be a communication and thus loses the privilege attaching to lawyer-client communications."

This last sentence is, perhaps (and with all due respect) a little dense.  In *The Sagheera* [1997] 1 Lloyds Rep 160 at p 169  Rix J wondered whether it should not be understood in the sense "the false premise that that which is communicated <u>internally</u> ceases to be <u>confidential</u>" (his emphasis).  Without wishing to pore over the sentence as if it were a statute, I think that it probably has a different meaning.  I take it to mean that a record of a privileged communication has the same sort of quality as the communication itself for the purposes of privilege.  In a literal sense a communication ceases to be that once it is communicated; but the law of privilege is not so blinkered as to regard privilege as attaching just to that event and to nothing else whatsoever.  For privilege purposes a record of a communication is the same as the communication itself, and that is as true of summaries as of the verbatim original communication.  That, I think, is what Savile J is saying.  That  formulation and reasoning recognises that something beyond the initial communication itself, strictly so called, is and should be within the privilege.  It remains good law after *Three Rivers*, and is consistent with it.

d)  It would continue to cover cases such as *Gotha City* and the examples discussed in that case.  In *Gotha City*, the apparent owner of a picture wished to sell it through Sothebys. It took advice from Messrs Herbert Smith (presumably relating to the sale, though the report does not say so) and sent a copy of the letter of advice to Sotheby"s.  Sotheby"s also sat in on a meeting between the seller and Herbert Smith in respect of which an attendance note was produced.  The plaintiff, who claimed to own the picture, sought inspection of the letter and attendance note.  The argument was, in effect, about waiver of privilege, and it was held on the facts that there was no waiver.  I shall return to that in the context of the present case.  For the moment it should be noted that privilege was assumed to exist in both documents; it was not argued that the copy letter sent to

**615**

Sotheby"s was not a privileged communication. If Mr Watson"s argument were correct then logically it ought not to be, subject to his distinction between verbatim content (privileged) and summarising content (not privileged); yet the argument did not occur to anyone in that case. In fact, it is quite clear that Staughton LJ had no difficulty with the concept of preserving privilege in privileged advice notwithstanding that it was communicated by the client to the third party, because at page 119 he cited, obviously with approval, a passage from *Style & Hollander on Documentary Evidence:*

> "If A shows a privileged document to his six best friends, he will not be able to assert privilege if one of the friends sues him because the document is not confidential as between him and the friend. But the fact six other people have seen it does not prevent him claiming privilege as against the rest of the world."

I think that it follows from that that A would be able to restrain each of the friends from disclosing to the outside world what they were told on the basis that it remained privileged. The friends could not give secondary evidence of the privileged material – it would be "evidence of [privileged] communications", or their evidence would be "evidencing such communications" within the formulation in *Three Rivers.* By the same token, if a client summarises or extracts advice in a letter to a third party, that written communication is capable of retaining or attracting the privilege which attached to the original advice, subject to waiver. It, too, is something which evidences a privileged communication.

e) This analysis gives rise to a regime which maintains intellectual consistency and maintains the policy underlying privilege, which is that a man is entitled to make a clean breast of matters to his lawyers without fear of disclosure, a policy which covers both the giving of instructions and the receiving of advice. It means that a client can reproduce the advice for his own purposes without necessarily risking that reproduction not being privileged, which in my view is essential to the sensible operation of the doctrine. It also means that he can discuss the advice with others without necessarily risking the same thing. A client may well wish to discuss advice received with a partner, or with another adviser, or (as in *Gotha City*) with a contractual counterparty who might be affected. The effect of privilege would be seriously dented if those communications were held to be not privileged so that, if evidence of them could be obtained, an insight as to the advice would become available. That is not a sensible result.

20. The position therefore seems to me to be as follows. Where privileged advice is disclosed to a third party the privilege is capable of attaching to the third party communication because that communication is evidence of the privileged advice within the formulation in *Three Rivers*. It does not matter whether that third party communication is of the whole of the advice (like the letter in Herbert Smith) or a paraphrase of or extract from the advice. To be fair to Mr Watson, he conceded that privilege would be maintained in relation to actual full copies of written advice obtained, so that in the present case he did not press for inspection of one document, or part of a document, which (on the evidence) is a straight reproduction, or forwarding, of the Manx legal advice verbatim. However, he sought to

616

distinguish between the complete advice and summaries, extracts or paraphrases. Those, he said, were not privileged. The only justifications he was able to advance for this distinction were first that the paraphrases were not the original communication, and second that there was a potential for inaccuracy in any summary or paraphrase. Any inaccurate summary would not be the original advice. These submissions are not convincing. If it is right that the original verbatim advice remains privileged, then it is illogical to exclude paraphrases or parts of it. If 100% is privileged, then would communicating 99% of it remain privileged? – it is hard to see why not. But if that is right, then why not 90%, or 75%, or 50%? There is no reason to draw a line anywhere, and every reason not to. Mr Watson"s demarcation would also, in practice, mean that any passing on of oral advice would be likely to be unprivileged, because it is most unlikely that it would be passed on in whole and verbatim. That, again, is an unmeritorious distinction. The proper analysis, consistent with *Three Rivers*, is to continue to afford privilege to material which evidences or reveals the substance of legal advice (subject, of course, to waiver). The possibility of inaccuracy is not a reason for departing from this principle. If the passed on "advice" were so inaccurate that it could no longer be properly described as a summary of the advice, then it might be that that communication would not be privileged (though even then it might attract privilege if it tended to reveal instructions given, which it might well), but there is no suggestion that that is the case here and I need not consider it further. Short of that, I do not see why some degree of inaccuracy, even if it exists, should necessarily destroy the privilege; so there is all the more reason for saying that the <u>possibility</u> of inaccuracy should not destroy the privilege which would otherwise exist in paraphrases or summaries.

21. This means that the subsistence or otherwise of privilege, where advice is communicated to a third party, turns on the extent to which there is a waiver of privilege on that occasion. *Gotha City* demonstrates that it is not inevitable that there is a waiver in those circumstances. In that case it was held that the receipt of the advice by Sotheby"s was attended by a degree of confidentiality which meant that, while there was waiver as between the owner and Sotheby"s, there was no waiver vis-à-vis the outside world. The question in the present case, therefore, is whether and to what extent there was a waiver. I consider the application of these principles to the facts of this case below.

22. In these proceedings the question was raised whether the Level 1 and Level 2 references were capable of being privileged. This raises (in theory) the question of whether, after *Three Rivers* and its emphasis on privilege attaching only to communications, there can be privilege attaching to evidence of the fact of instructing solicitors or getting advice from them (Level 1), or to evidence of the fact of instructing solicitors and getting advice on a particular subject (Level 2) because those facts are not communications or evidence of communications. I do not propose to consider this as a matter of principle, because on the facts of this case there has been a plain waiver even if there was privilege.

23. The next question of law which arises is the extent to which a party entitled to an unwaived privilege is entitled to restrain those in possession of the information from disclosing it or otherwise making use of it. It arises in this case if and insofar as Mr Turner received privileged information in confidence and then disclosed it to representatives of the claimants, if and insofar as Powerhouse has disclosed documents which contain unwaived privileged material. It is accepted by both sides that this material contains some Level 3 documents, though they do not always entirely agree as to which pieces of evidence fall into that category.

**617**

24. There is not much disagreement between the parties as to the principles applicable in this area, although there is serious disagreement as to how they should be applied. It is sufficient for these purposes to refer to only two authorities. The first is *Goddard v Nationwide Building Society* [1987] Q.B. 670. In that case the Court of Appeal was asked to consider whether or not to restrain the use of a note, containing privileged information, which a solicitor, who had at one stage been acting for both the plaintiff and defendant, had passed to the defendant. Privilege in the material contained in the note was held to belong to the Plaintiff. Having determined that, the Court of Appeal granted relief restraining use of the material contained in that note, which relief included striking out allegations in the pleading which were based on that note, an injunction restraining the Defendant from relying upon the note and orders for delivery up of all copies. In his leading judgment May L.J. considered the case of *Lord Ashburton v Pape* [1913] 2 Ch. 469 and another authority, and pronounced the following proposition (at page 683):

> "If a litigant has in his possession copies of documents to which legal professional privilege attaches he may nevertheless use such copies as secondary evidence in his litigation: however, if he has not yet used the documents in that way, the mere fact that he intends to do so is no answer to a claim against him by the person in whom the privilege is vested for delivery up of the copies or to restrain them from disclosing or making any use of any information contained in them."

His citation of authority indicates, I think, that he considered that he would normally expect the restraint to be ordered. That last point is rather clearer in the judgment or Nourse L.J. He made the following points, relevant to this application:

> "The crucial point is that the party who desires the protection must seek it before the other party has adduced the confidential communication in evidence or otherwise relied on it at trial.

> "… Although the equitable jurisdiction [that is to say, the jurisdiction to restrain the misuse of confidential information] is of much wider application, I have little doubt that it can prevail over the rule of evidence [viz the rule of evidence which allows secondary evidence to be given of primary material where the latter is privileged] only in cases where privilege can be claimed …

> "Once it is established that a case is governed by *Lord Ashburton v Pape*, there is no discretion in the court to refuse to exercise the equitable jurisdiction according to its view of materiality of the communication, the justice of admitting or excluding it or the like. The injunction is granted in aid of privilege which, unless and until it is waived, is absolute. In saying this I do not intend to suggest that there may not be cases where an injunction can properly be refused on general principles affecting the grant of a discretion remedy, for example on the ground of inordinate delay."

**618**

25. From this it is clear that not only does the court have jurisdiction to grant appropriate relief to prevent reliance upon privileged material where privilege has not been waived, the starting point is that one would expect that relief to be granted.  That was certainly the view of Lawrence Collins J in the second relevant authority, *ISTIL Group Inc. v Zahoor* [2003] 2 All E.R. 252.  At paragraph 91 of that judgment (at page 273) he observed that "in such cases the court should „ordinarily" intervene".  The court is "not concerned with weighing the materiality of the document and the justice of admitting it". (Paragraph 92).  He went on to say this:

> "93 Fifth, there is nothing in the authorities which would prevent the application of the rule that confidentiality is subject to the public interest.  In this context, the emergence of the truth is not of itself of sufficient public interest.  The reason why the balancing exercise is not appropriate is because the balance between privilege and truth has already been struck in favour of the former by the establishment of the rules concerning legal professional privilege.

> "94 Sixth, other public interest factors may still apply.  So there is no reason in principle why the court should not apply the rule that the court will not restrain publication of material in relation to misconduct of such a nature that it ought in the public interest to be disclosed to others… there is no confidence as to the disclosure of iniquity.  But the defence of public interest is not limited to iniquity."

He went on to hold that on the facts of his particular case, the public interest in the proper administration of justice meant that equitable relief, which would otherwise be granted to preserve the confidentiality in the privilege material, should not be granted. The facts of that case were very strong.  They involved a clear forgery, and the apparent possibility of the court actually being misled by the proposed evidence.

26. I therefore approach this point on the footing that the normal starting point would be for appropriate relief to be granted to restrain the use of privileged material.  So far as I have a discretion to do otherwise, it is not to be exercised merely on the footing that if I do not exercise it, the truth is more likely to come out.  There must be some other factors, such as delay, acquiescence or other equitable defences which must be sufficiently strong to override the normal, very strong principle, that privileged communications are protected from disclosure.  I shall consider the application of these principles to the facts of the case before me in a separate section of this judgment below.

**The application of the law to the facts**

27. It follows from the above that, subject to waiver, communications by the Defendants to Powerhouse which contain or refer to the content of legal advice are capable of being privileged.  This includes Level 3 communications.  Whether or not it includes Level 1 and Level 2 communications I do not have to decide, because on any footing there has been a

**619**

waiver of such privilege as might otherwise have existed in those references. At the trial on liability Mr Mian gave evidence. That evidence included his dealings with Mr Turner of Powerhouse. Having referred to the opening stages of the negotiation, when Mr Mian was trying to convince Mr Turner that he had an appealing scheme, he then said the following:

> "13  Stuart Turner wanted confirmation of a protected trust account. At this stage I sought advice from our lawyers and then passed on this advice to Stuart. This was in late February 2000. I wish to make it clear that I am not waiving the privilege that attaches these communications."

28. Since that is a clear indication both that solicitors were instructed and as to the subject matter of the instructions, I do not see how it can conceivably be argued that similar references, containing the same information, in documents or otherwise can have maintained any privilege if, indeed, it ever had any. To the same effect is the extract from the letter from Mr de Freitas, which I have quoted from above. I expect that both those references occurred because it never occurred to the Defendant that, in the context of this case, the fact that legal advice was obtained on this transaction was, in itself, in the least bit confidential. If that were right then it would mean that documents containing a reference to such limited matters would not have the necessary confidentiality to attract privilege in the first place, and my first instinct is that such references would not in any event, as a matter of principle, be privileged. However, as I have indicated above, I do not need to decide that in this case. I can and do deal with the point as a matter of waiver. In fairness to Mr Monson, I should record that he did not press privilege in relation to these matters particularly strongly. His main concern was that leaving them in the documents might amount to a waiver.

29. That leaves the level 3 communications. These are communications which somehow reveal the content of the advice that was obtained. Despite the fact this was contained in communications with a third party (Powerhouse), on the reasoning set out above, and unless waived, that privilege can be maintained. The question therefore arises whether or not there was a waiver when the material was conveyed to Powerhouse, and in particular to Mr Turner. The *Gotha City* case demonstrates that privileged matters can be conveyed to a third party in circumstances which limit the extent of the waiver. I consider that that was the case here. I have already set out the terms of the confidentiality agreement which operated between the Defendants and Powerhouse. Mr Watson submitted that it did not apply to legal advice, but only to such matters as know-how and trade secrets. I do not think that that submission is right. The expression "Confidential Information" is not defined in the agreement – the wording says what the expression includes but not what it means. That being the case, I have to consider what the expression actually does mean, particularly in its context. The very use of the word "confidential" connotes information with a degree of confidentiality, and it seems to me that legal advice is something that is likely to fall fairly and squarely within that concept. On 16th September 2003 Mr Turner signed a witness statement in which he conceded that the Defendants had asked him to keep the actual advice received from the lawyers, and forwarded to him, confidential. Indeed, confidentiality in the actual advice is in effect conceded by Mr Watson, although not in terms, when he concedes that he is not entitled to see the verbatim version of the advice which was forwarded to Powerhouse. In his witness statement Mr Turner states  that he did not consider that more general statements as to the nature or the effect of the advice (the nature of which I had seen in some of the material that I am invited to strike out of witness

**620**

statements) was confidential, but in my view he is wrong about that. It follows, then, that the advice retained its privileged character and any waiver of privilege was limited to Powerhouse, and the use to which it could be put was limited by the terms of the confidentiality agreement. The terms of that agreement permit only a very limited use. Accordingly, conveying the lawyers" advice to Mr Turner and Powerhouse, under those terms of confidentiality, did not destroy the confidential nature of the advice, and therefore any waiver of privilege was limited to Powerhouse and was not general.

30. Those conclusions can be summarised in relation to the redactions which have been made in the Defendants" disclosed documents is as follows:

(a)    References to the mere obtaining of legal advice are not privileged.

(b)    References to the obtaining of legal advice on a given subject matter are not privileged.

(c)    Level 3 references, which evidence the content of that advice, are prima facie privileged.

31. I add one small point which arises in another context in this case and which may or may not arise in relation to the redacted material. The Defendants have shown some sensitivity as to the identification of the lawyers concerned. Some of the documents which I have to come on to consider later on in this judgment actually identify the Manx lawyers. In the light of the conclusion that I have come to in relation to Levels 1 and 2, I do not think that the identity of the lawyers involved is capable of attracting privilege either.

32. That brings me to the material which the Defendants wish to have struck out of the documents voluntarily disclosed by Powerhouse, and various witness statements. I will take the witness statement material first.

33. Some of the disputed material is no longer in issue in the light of Mr Monson"s concession that he does not seek to strike out Level 1 and Level 2 material from the witness statements. That leaves it for me to consider what to do about what is said to be Level 3 material. So far as there is any such reference, this is made in two ways. First, there is a witness statement from Mr Turner in which he describes what he obtained from the AON Group in the course of the negotiations, which is said to include some Level 3 material; and second there is some material in witness statements of Mr Borrill and Mr Chan in which they reproduce what Mr Turner told them at the time of the negotiations, which is itself said to include some Level 3 disclosure. What is said by Mr Monson on behalf of the Defendants is that Mr Turner was not entitled to disclose the advice of the Manx lawyers to the Plaintiffs" negotiators, and it remained privileged and confidential. Privilege has not been waived, and in accordance with the "ordinary course" relief should be granted to make sure that that material is not deployed. He has applied in time.

34. To this analysis Mr Watson had a number of ripostes. They were (although not in the same order as he advanced them) as follows:

a)    On the facts, Mr Turner was at liberty to disclose what was disclosed to him within what was allowed to him by the confidentiality agreement. This distinguishes the present

**621**

case from the other authorities where the disclosee was not similarly at liberty.  I do not agree with this.  Since it was confidential, he was not at liberty to disclose it – see above.

b)  The blatant aim of the Defendants in seeking to have parts of the witness statements excised and to have the witness barred from giving evidence of the excised contents was to hide a wrongdoing, so the discretion of the court should not be exercised in favour of the Defendants.  Again, I think this begs the question.  Whether or not there was a wrongdoing at the end of February 2000 is precisely the question the court will have to decide on the enquiry.  Even in a case where the sole evidence of wrongdoing is in a privileged communication, that does not justify the court in exercising its discretion against the invocation of the privilege.  By and large, a party can only prove what he or she can prove without the aid of the other side"s privileged material.

c)  So far as the evidence of the Claimants" own officers is concerned they wish to give evidence of material that came into their possession without any wrongdoing on their part.  That, said Mr Watson, is a reason for not restraining their use of that information.  However, I do not think that that is a determining, or even a strong, factor.  The converse may well be true – wrongdoing on the part of the recipient may strengthen a claim for relief - but it does not follow that the absence of wrongdoing means that an injunction should not be granted.  I note that in *Goddard* there was no suggestion that the Defendant was guilty of wrongdoing in obtaining the privileged information from the solicitor.  The solicitor was, of course, technically guilty of breaching the Plaintiff"s confidentiality, but by the same token, on the facts of this case, so was Mr Turner.

d)  If the Level 3 material, such as it is, were excised from the witness statements of Mr Borrill and Mr Chan, then they would not be able to give full and frank evidence of what had actually happened and what their motivation was.  Their evidence will be that they received certain information and encouragement from Mr Turner and they adjusted their conduct accordingly.  If they are not allowed to give their full evidence then their evidence will have an air of artificiality about it, or even potentially a misleading quality.  I am rather more troubled about this.  They did what they did, and they relied on what they relied on.  To prevent them from telling the court what they actually relied on in reaching their conclusions as to pricing, when that is an issue which lies at that heart of the enquiry as to damages, would be a very strong thing.  However, I think that the answer to this problem may be a practical one.  I do not consider that their case will be harmed if they are allowed to give evidence (which it seems to me they must be) that they relied on what they had been told about the advice given by the Manx lawyers without actually identifying precisely what it was that they were told.  What lies at the heart of the causation question on this part of the enquiry is not the advice given by Manx lawyers but whether or not an infringing copy of the CAA had been made.  That is a different, though related, question.  I do not think that the proper conduct of the enquiry will be effected if the evidence were limited in that way; it is not necessary for them to go further and state what the advice was, and on my findings they are not entitled to anyway.  It not infrequently happens in a trial that a witness states that "as a result of the legal advice received, I did X", and it is well understood that in those circumstances the witness does not have to give evidence of what the advice was.  This is therefore not a reason for departing from the normal course.  On the facts of this particular case, if the Defendants were in fact to challenge that sort of evidence as to causation, then they might well risk the fact that the witness would be able to justify the statement by amplifying what he had understood the advice received by the Defendants

**622**

to have been, but that is a risk for the Defendants to assess, and whether or not the matter is opened up would be a matter for the Master at the enquiry.

e) Next Mr Watson submitted that since privilege was waived vis-à-vis Mr Turner, even if it was not waived vis-à-vis the rest of the world, Mr Turner was free to use the rest of the information disclosed to him in legal proceedings. I am not sure that Mr Watson was prepared to press this submission very strongly, but in any event it is wrong. The use to which Mr Turner was entitled to put the privileged material was governed by the Confidentiality Agreement, and, as the extracts set out above demonstrate, that use was strictly limited. It did not include disclosing legal advice to competitors, whether for use as a bargaining counter or not.

f) Next, Mr Watson said that in effect the material had been deployed, so it was too late to be prevent its further deployment – see *Goddard*. The privileged material had already been deployed because of the Chan e-mail referred to above, so the defendants are too late. Since this email was part of the documentation at the trial, and should be taken to have been read by the trial judge (even though no one says that it played any material part in the trial), the matter has already been given a form of publicity which means it has been deployed, so it is too late to prevent evidence of other disclosures of the same sort of material. Related to this is a laches point. He says that the fact that Mr Turner had made disclosures of the advice given would have been apparent to the Defendants on disclosure in the main action, which took place on 24th August 2001 when the defendants would have seen the Chan e-mail. Its wording, it will be remembered, contained the following paragraph.

> "The solution promoted to you by AON and their advisors is that a Collections Account Agreement [sic] in the form of a trust will attain this and that therefore they will have demonstrated the robustness required of them. You are now seeking counsels advice on the proposed trust."

This, says Mr Watson, should have alerted the Defendants to the fact that the Claimants had found out that legal advice had been obtained on the Defendants proposed transactions, and I infer that Mr Watson would say that they should have inferred that Mr Turner was the source of this information. They should therefore have inferred at that stage that privilege information had been crossing the divide; and since about two years elapsed before the Defendants took any point on the alleged wrongful disclosure of privileged information, it was by then too late for them to do so. Mr Monson"s response to this is that in the context of the claim made at the trial, when there was no suggestion that a claim of infringement of copyright was being made as early as the end of February, this passage had no great significance. He also said that the oral evidence of Mr Borrill at the trial as to the infringement of copyright contained no suggestion that the relevant date was being put as early as this. Since the email did not actually figure at the trial, and even though it was in trial bundles, that did not mean that the whole question of the legal advice given at the time had been sufficiently aired in public so as to amount to deployment of the material and so as to make it wrong to restrain its further being aired now. Since the point now in issue was not then in play, it is not surprising that the significance of this email passage was overlooked, and the fact that it was overlooked should now not be held against the Defendants now that the focus of the

**623**

case had shifted, or a little more precisely now that the case had acquired a second point of focus to which it had become relevant.  In my view Mr Monson is right.   I do not think that this single sentence, in the circumstances, amounts to deployment of the other material.  It does not amount to an airing of the other privileged material, so it does not give it a relevant degree of publicity to mean that the defendants are now too late.   So far as laches is concerned, in the light of the absence of any significance of that piece of evidence at the trial, and in the light of the fact that the pre-1st March infringement claim only came after the trial, I think it would be unfair on the Defendants to say that they are too late because the material has been deployed, and that in general laches terms they should have taken the point (so far as they have one) any earlier than they did.

35. My conclusion on this point is that, if there is Level 3 material relating to privileged matter, then there are no factors of any real weight which would lead me to take anything other than the ordinary course which is to exclude such matter.  I therefore have to go on to consider how much of the material falls into that category.  In this context, I shall take the various passages which the Defendants say infringe their privilege in turn.  Where I come to the conclusion that a matter is revealed in breach of privilege, I will not actually set out the material.

   i)  Borrill Fourth Witness Statement paragraph 25

   Two sentences are sought to be excised in order, in effect to prevent Mr Borrill giving indirect evidence of material passed to him in breach of privilege and in breach of confidence.  The first sentence refers to legal advice, the firm from which it was obtained, (by inference and in its context) the subject matter to which it related, and a very short expression summarising the advice it given.  The last of those elements is objectionable; the first three are not.  The sentence as it stands ought to be struck out, but I can see no objection to a replacement sentence which gives the first three elements and otherwise refers to the advice without stating what it was.  The second sentence describes how he had got the advice ("this advice had been forwarded by LGH to Stuart Turner").  This sentence is unobjectionable.

   ii)  Borrill Fourth Witness Statement paragraph 26

   The words objected to are words in which Mr Turner is recorded as having passed on to Mr Borrill the view of the Manx lawyers as to the workability of the Defendants" proposals.  Again, this is material said to come from Mr Turner; and again, it was imparted by the latter in breach of his duty of confidence by way of infringing the Defendants" privilege.  The words as they stand ought to be struck out because the court ought not to receive evidence of privileged matter obtained in this way.

   iii) Stuart Turner First Witness Statement paragraph 22

   In this paragraph Mr Turner narrates part of the history of his dealings with Mr Mian.  The first sentence describes the instruction of the Manx lawyers to advise on the Defendants" scheme structure.  It is not objectionable.  The first half of the second sentence refers to the fact that on 22nd February he saw the advice provided by those lawyers (Cains).   That, as it stands, again seems to me to be unobjectionable.  It does not reveal the contents of that advice.  The second half of

that sentence contains a reference to a document referred to in the advice which it goes on to describe it in a certain way. The third sentence contains a further description of the document just referred to. There is no statement as to what the advice actually was. The paragraph then goes on "I was asked by AON to keep the Cains" advice confidential. I told Mr Mian on that day that the advice did not really address my particular concerns and that I would need to see a copy of [a particular document, just referred to] in order to know whether it protected customers" money. He said that he would have to clear this with AON and AON Legal, and that he would have to delete the existing client names from the document; but subject to that he agreed to provide a copy." The last sentences that I have quoted do not disclose the advice, and this part of the evidence does not contravene Mr Turner"s obligation of confidentiality apart from the implicit cross-reference back. They are unobjectionable, apart from that. The immediately preceding elements, which I have not yet dealt with, present a little more difficulty. One could argue that where a third party, who is within the privilege, merely mentions the fact that a privileged communication refers to a given document is not an infringement of privilege because it is not disclosing information which tends to indicate what the advice was. However, I do not think that is right. The question is whether a communication is privileged. To the extent that it is, production or proof of it cannot be compelled or allowed. It is not appropriate to dissect very small elements out of it and say that disclosure of small elements is not an infringement of privilege. It is either privileged or not, and if it is it is wrong to allow Mr Turner to give evidence of its content. In any event, in relation to the references in this particular case, it could be argued that what Mr Turner says might reveal what instructions were given to the lawyers, and those instructions are as privileged as the advice. Accordingly, I consider that Mr Turner is not entitled to refer to, and give evidence of, the content of this advice so far as it contains a description of a document referred to within it. Those parts of paragraph 22 will have to be struck out. The remaining sentences will have to be modified so that they do not cross-refer to a document referred to in privileged advice. He would be entitled to give evidence that he asked for a copy of a document, but not in such a way to suggest that the advice referred to it. I accept that this tends to have an air of unreality or artificiality about it, but that is the position at which one sometimes arrives when a witness is required to skate delicately around the edge of privileged communications.

iv) Turner First Witness Statement paragraph 23 – last sentence

In this sentence, Mr Turner refers to the fact of receiving further advice from Cains via Mr Mian, and goes on to indicate something that it mentions. The first part of that sentence is permissible; the second part is not because it reveals an element of a privileged communications.

v) Turner First Witness Statement paragraph 25

This contains a statement which is quite clearly a Level 2 Statement. Mr Monson does not pursue the excision of this sentence, and in any event I would not have required its removal.

vi) Chan Second Witness Statement paragraph 5

**625**

This paragraph seeks to give evidence of a conversation that he had with Mr Turner during the negotiations.  The objected to part reads:

"However, he [i.e. Mr Turner] told me on the phone that AON and their advisors, Cains, had nonetheless demonstrated that their scheme was sufficiently robust for the purposes of Powerhouse, by describing how their collections account agreement would ring fence customer monies in the scheme."

I am not prepared to order the excision of this part of the witness statement.  It would be unobjectionable without the words "and their advisors, Cains", but it would also have a slight air of falsity about it if Mr Turner in fact referred to them.  I do not consider that a reference such as that contravenes privilege in any particular communication by revealing its content.

36. Next I have to deal with Mr Monson"s claim that I should order the redaction of certain parts of two documents emanating from Powerhouse.  The first is a memo from Mr Turner to Mr Broomfield and Mr Stanley, two of his colleagues in Powerhouse.  It refers to the competing bids, and compares various aspects of them.  Under the heading "AON" it contains first an innocuous sentence stating that the concern that Powerhouse had was to ring fence service fees and that that concern has yet to be satisfactorily resolved.  There is then a sentence which states what the "initial indications" from Cains are.  That sentence seems to summarise the advice of that firm, and as such it contains a reference to privileged information and ought to be redacted.  The second sentence is equivocal in that it refers to a suggestion which might or might not have been contained in Cains advice.  Mr Monson tells me on instructions that he and Mr de Frietas have checked whether or not it does reflect advice, and he tells me that it does.  On that footing, it falls to be redacted as does the first sentence.  The document then goes on, in a separate paragraph, to state as follows:

"We need to take into account that no precedent (as at the date of this memo) has been set in law, and therefore no proof exists to prove that the trust solution presented to Powerhouse by AON would have any legal weight.  It would seem only wise to secure further independent legal advice."

37. I do not see how a case can be made for excising this material and in the end Mr Monson did not press for the redaction.

38. The second Powerhouse document is an undated document which was generated internally so that someone could consider the various proposals that were before it.  On page 2, under the heading "The Issue" it contains wording that is identical to that which I have just considered.  That wording should be treated similarly.  There is one additional sentence under the heading "The Question", and it reads as follows:

"Powerhouse have read the Cains response (attached) with some interest but are concerned that they seem to have "skated around" the core issue for Powerhouse."

**626**

The Cains response referred to is not disclosed.  This sentence is objected to, but I cannot really see why.  It certainly does not contain any evidence of what the Cains advice was.  There is nothing objectionable about it.

39. The last document is the Chan email that I have referred to above.  I am not prepared to order the excision of this part of the evidence.  It is no more objectionable than paragraph 5 of his witness statement, which I have already declined to excise.

40. Next I turn to the particulars of claim in the enquiry.  Mr Monson says I should strike out certain allegations made in the Particulars of Claim because they were only able to be made because of unauthorised disclosure by Mr Turner.  In effect, he invites me to take the same approach in relation to this statement of case as the Court of Appeal took to the relevant pleading in the *Goddard* case.  Some of the objected to parts correspond to parts of witness statements which I have allowed to stand in that they refer merely to the receipt and transmission of legal advice.  However, two sentences go further and refer to the content of legal advice, in a similar manner to parts of Mr Turner''s witness statement which I have ordered should be excised.  I was at first tempted to accede to Mr Monson''s application to strike out at least those limited parts.  However, I have decided I should not do so.  Now that the position as to admissible evidence has (I hope) become clearer as a result of this judgment, Mr Watson may well wish to reconsider how he is going to make his case, since part of his submissions to me involve assertions that he could get to where he wanted through different routes in any event.  If he is right about that then he may wish to consider re-pleading.  I do not think it is necessary, in that context, for me to start striking out parts of the existing statement of case.   If Mr Watson has no other way of getting to where he wants apart from relying on evidence that I have required to be removed, then he will not be able to make good the allegations in the Particulars of Claim.  No harm is done by leaving them in.  If he thinks he can get there through another route, then he should be at liberty to do so.  It may be that in fact he may wish to reconsider how he puts his case and remove or amend certain parts of the present claim.  That is obviously a matter for him.  At the moment I think the most sensible course is to leave the particulars of claim where they are.

**Apollo Transaction**

41. In his judgment on the trial of liability, Judge Weeks Q.C. observed:

> "I suspect that in the morass of documents the parties may have lost sight of their commercial interests and the purpose of litigation".

42. In some ways I cannot help sharing that view in relation to this section of the application before me.  I find it difficult to see that the events to which I now have to refer can give rise to any particular material claim, and I cannot help thinking that what I shall call the Apollo claim is a storm in a teacup, and Mr Watson at one stage was disposed to accept that that was an accurate description of at least part of the dispute in relation to this matter.  However, it is a matter which is raised in the enquiry as to damages, and there has been no attempt to strike it out on the basis that it is frivolous or otherwise that it should not be dealt with, so I am forced to deal with it.

**627**

43. In 1999 the AON Group entered into a warranty support scheme with a concern that can be described as Apollo. It is common ground that this scheme was not a trust-based scheme so documents of the nature of the CAA played no part in it in its final form. Furthermore, there is no suggestion that the Claimants were in competition with the Defendants for that scheme, so there is no suggestion that they have suffered direct financial loss because the Defendants got the contract. However, the allegation is that in the course of considering the Apollo transaction, consideration was given at some stage to a trust-based scheme to which the CAA would have been appropriate, and that in that context there was some copying of the Scottish Power CAA or otherwise some infringement of the claimants" rights in respect to it. There is evidence for supposing that the CAA was considered in the context of the Apollo scheme, because the infringing copy forwarded to Powerhouse had originally been saved on the Defendants" computer systems under a file name whose path included something which appears to be a directory designated to "Apollo 2000". The case of the claimants, as described to me by Mr Watson, was that if there was some copying in this context, even if (as seems clearly to be the case) the copies were in no way deployed in the actual Apollo Scheme, the Defendants are liable to pay a payment in the nature of a royalty. They therefore seek disclosure of all drafts of the CAA prepared for the purpose of the Apollo transactions, and they also seek all memoranda and similar notes referring to any such documents.

44. The disclosure sought by the Claimants is in terms as follows:

> "All drafts of the collections account agreement or equivalent agreement (in both electronic and hard copy form) which have been prepared, used or intended to be used by the Defendants or any of them for the purposes of putting into effect the warranty scheme for:
>
> [Apollo];
>
> Any other Retailer
>
> All memoranda, attendance notes, board minutes and correspondence (including emails) which refer to any document referred to in [the preceding paragraph] (including internal documents prepared by the Defendants" and documents passing between any two or more the Defendants)."

45. Mr Monson accepted that his clients were under an obligation to disclose documents relating to the use of the CAA in Apollo but said that they have already been disclosed (and the Claimants have been given copies,) apart from such privileged documents as may exist. I should say at this stage that in case there is any daylight between Mr Monson"s concession and formulation of the category of documents sought by the Claimants, I would make an order in those terms, but I do not think that there would be much debate about that. The debate in this area centred around the question of privilege. Paragraph 17 of the particulars of claim in the enquiry states that:

**628**

> "It is to be inferred from [certain pleaded material] that the first and/or second Defendant also copied the CAA for the purpose of sending it and/or sent it to Apollo 2000."

46. It does not appear that a copy of any document specifically created at this stage has been disclosed, whether as a document that the defendants have in their possession or as a document which they once had.   Mr Watson seeks to make a case that CAA must at some stage have been copied for the purpose of considering whether or not to deploy it in a scheme for Apollo, even if it never was so used, and even if a copy was never sent to Apollo, and the suggestion is that such a document was, or may have been, sent to the defendants solicitors.   The debate before me was principally about privilege.   Various documents were debated, each of them hypothetical - they were hypothetical because the Defendants deliberately said nothing about the existence or non-existence of such documents because if they had then they would or might be admitting that which they claim they were entitled to decline to admit (because of privilege), and I suspect they were also concerned about waiver of privilege.   Those documents were as follows:

    i)   Copies of the CAA prepared for the purposes of being submitted to solicitors for their consideration.
    ii)  Any amended CAA arising as a result of work by the solicitors.
    iii) Versions of the CAA thus amended and put back in the hands of the Defendants or any of them.

47. Mr Watson''s final position in argument was that such documents could not be privileged. Those described under (i) would simply be copies of an unprivileged document, and would not be privileged because of the *Three Rivers* case.   Next he said that documents in category (ii) would not be privileged because once the to-ing and fro-ing on advice had been concluded it no longer formed part of the advice.   So far as the drafts back in the hands of the clients were concerned (category (iii)), then they were not privileged either because they fell within category (ii) or because the disclosure of a later draft to Powerhouse waived privilege in the predecessor draft on which it was apparently based.   As an alternative line of attack in relation to this alleged batch of infringements, Mr Watson also relied on the principle that "advice sought or given for the purpose of effecting iniquity is not privileged" *Barclays Bank Plc –v- Eustice* [1995] 1 WLR 1238 at 1249b.   The iniquity relied on by him was giving a lawyer a draft, in respect of which copyright existed, for the lawyer to improve.

48. I think that it is appropriate to deal with this part of the case shortly.   It is tempting to take the view that since it was not clearly proved that there were any documents which are worth debating (because of the position taken by Mr Monson) I should not deal with this at all. However, it has been a matter of some dispute between the parties, and I think that it would be useful and proper for me to make some rulings for the guidance of the parties, and in particular for the guidance of the defendants who can be seen to have taken a line in relation to privilege that was not justified (see their insistence on redacting level 1 and level 2 references, above).   However, I shall not deal with the point at great length because I think that the answers are relatively straightforward and, because I find it very hard to believe that any significant amount of damages can turn on them.   I consider the legal position to be as follows:

**629**

a) Any copy of the CAA which was created with a view to its being submitted to solicitors for advice does not, despite its purpose, attract privilege.  That this is clearly the case appears from *Dubai Bank Limited v Galadari* [1990] Ch 1980.  This principle was recently applied and approved in *Sumitomo Corporation v Credit Lyonnais Rouse Limited* [2002] 1 WLR 479.  Any such copy ought therefore to be disclosed and produced.

b) Any version produced by the solicitor in draft for the purpose of carrying out his function of giving legal advice to a client would, in my view, be privileged. Such drafts, until communicated, are not communications, but it is quite apparent from paragraph 29 of the judgment of Longmore L.J. in the *Three Rivers* case that that judge considered that solicitors" drafts are privileged – "all documents passing between the BIU and Freshfield are privileged <u>as, indeed, are Freshfields" own drafts and memoranda</u>." (my emphasis).

c) Drafts passed back to the clients, on the assumption that they were part and parcel of legal advice, are again privileged.  I do not understand on what principle it can be said that privilege in those drafts is waived when a yet further draft, which is derived from them, is disclosed in circumstances such that that later draft is not privileged.  Mr Watson advanced no authority in support of his proposition that privilege was waived, and I hold that it was not.

d) There is no evidential basis upon which the iniquity principle can be invoked in this case.  While I accept Mr Watson"s submission that dishonesty as such is not necessary in order to invoke the principle, and reject Mr Monson"s submission that it is, there is no evidence on which I can find that the Defendants were guilty of any conduct which even comes close to the level of iniquity which is required in order to bar the privilege that would otherwise cloak the communications between solicitor and client.  Since there is no evidence at all that solicitors were involved, but merely supposition, that is not surprising.   However, even if one were minded to suppose that solicitors were instructed, there is nothing in this case to suggest that the Defendants were anything other than innocent in what they did.  Indeed, in the trial on liability HH Judge Weeks Q.C. expressly rejected a finding that the later breach of copyright was flagrant.  He had that issue before him in the context of an assertion that the Powerhouse breach was flagrant within the meaning of Section 97 (2) of the Copyright, Design and Patents Act 1988.  He held that it was not.  In that instance the person who authorised the release to Powerhouse (Mr Witt) could be identified, as could the circumstances in which it happened.  He is said to have been honest and mistaken in believing that he was entitled to release it.  I have not been given evidence to suggest that any other servant or officer of the Defendants held any more iniquitous view.  I therefore reject the submission that the iniquity principle operated so as to deprive the Defendants of any privilege which might have arisen in respect of the putative instructions to solicitors.

**Issues Relating to Statements of Case**

49. The applications before me include an application that the Defendants be ordered to provide some further information in relation to their pleaded case.  However, it was agreed that I need not deal with that, and accordingly I do not do so.  There is also an application by the Claimants to amend their particulars of claim in the enquiry.  That was resisted on the grounds that those amendments introduced some inconsistencies.  I believe that most of

**630**

those points, if not all of them, were ironed out, but the fate of this application was, so far as I can see, a little lost in the detailed debate on the other, more substantial, issues that arose before me.  As I understand it, at present there is no longer any opposition to these amendments, and if that is right then I shall allow them so far as I need to do so.  If I am wrong about that, then I shall entertain such debate as may be necessary in order to resolve outstanding points.

**One Relevance Point**

50. The documents produced by the Defendants in respect of which redactions in whole or in part were made were comprised in a further list produced by the Defendants.  There were 15 of them.  It has not been necessary for me to describe those documents in detail in this judgment.;  I have described their nature in general terms.  One special point arises in relation to the 15th document, which is the last chronological document.  It is described as a "copy letter from the first Defendant to Powerhouse Retail Limited" dated 10th April 2000.  this is after the date when the effective deal was done between Powerhouse and the claimants, and therefore after the second price reduction which underpins the claim for damages.  The Defendants objected to the production of the whole of this document – it was not a question of merely redacting part – and the original basis of objection was privilege.  During the course of the hearing, Mr Monson told me that on further reflection this document was irrelevant as well, since it did not go to the issues in the inquiry, and he sought to resist inspection on that ground too.  The parties agreed that rather than have an extended debate, or even a short debate, on the appropriate course to be adopted in those changed circumstances, the convenient course would be for me to look at the document and express my view as to whether it was indeed irrelevant and need not be produced.  Mr Watson in terms agreed to that course.  I have looked at that document and read it carefully.  Having done so, I am satisfied that Mr Monson is right – while related to the overall situation, it is of no relevance (in the disclosure sense) to the issues to be debated in the enquiry.  I also record that it does contain privileged material, though in my view (which does not matter for these purposes in the light of my conclusion on relevance) only part of the content is privileged.  I therefore will make no disclosure order in relation to that document.

**Judicial inspection of other documents**

51. I should also record one further thing in relation to the disputed documents.  The debate as to what redactions should be made to witness statements and the documents emanating from Powerhouse took place with the benefit of both parties and my knowing what words in question were.  That was not the case in respect of the documents which the Defendants have themselves redacted.  It was at one stage suggested that I should look at all those documents (including document 15 to which I have referred) so that I could express a view as to whether they were or were not in fact privileged.  That suggestion was not actively pursued, and the debate took place with only the Defendants knowing what was in the allegedly privileged material, as is common in these situations.  Nevertheless during the course of the hearing, I was provided with a bundle which had unredacted versions of all those documents.  The provisional view which I reached was that it would not be necessary for me to consider the content of those documents if I were able to lay down, with sufficient clarify, the principles with which should be applied in deciding whether those documents were privileged.  Having come to the conclusions which I have set out in this judgment, I maintain that view.  The parties agreed that I should retain the unredacted bundle in my

**631**

possession whilst writing this judgment, so that if I thought it necessary or useful to refer to it I should be at liberty to do so. The position is that I consider that I have been able to lay down sufficient principles to enable Mr Monson and his instructing solicitors to do their job of ascertaining which parts of the relevant documents are privileged, and it is neither necessary nor appropriate for me to substitute my judgment for theirs in the circumstances now obtaining. Accordingly, with the exception of document 15 which I have referred to above, I have not looked at any of those documents.

## The Requirement for a New List

52. The Claimants have applied for an order that the Defendants should provide a further list of documents relevant to the inquiry. The Defendants have resisted this suggestion on the basis that there are no additional documents requiring disclosure beyond those that they have specifically listed for the purposes of the privilege claim, and beyond those which were already comprised within a list, or lists in the context of the trial on liability. Mr Watson countered this by saying it was still appropriate that a proper list should be supplied, not least because the Defendants ought to particularise what searches they have made. I am quite clear that the Defendants ought to provide a list. At the end of the trial on liability, HH Judge Weeks Q.C made an order providing for the enquiry, and paragraph 9 of that Order provides for the parties to give standard disclosure by a date in May 2003. Standard disclosure requires for the production of a list. I cannot see why the Defendants should not provide one, even if all it did was to relist documents already supplied, or even annex the old list. At the same time they could and should have given such statements as to searches made as were appropriate in the circumstances. That would have been very much easier and more cost effective than bringing the matter before me (albeit that the time in debate was short), and it and might well have done something to allay the suspicion that the Claimants clearly feel in relation to this matter. Declining to supply a list is only likely to fuel suspicion, not to allay it. Of course, were it the case that a further list were not being provided because the Defendants did not wish to say something that would have to be said in connection with such a list (as to which there is no evidence) then that would be all the more reason for their providing one; if it is not the case then dealing with the situation would be extremely simple. Either way, the Defendants should provide the list sought by the Claimants.

## Conclusions

53. I shall therefore make such orders as are appropriate in the light of the findings I have made in this judgment. The parties will doubtless want to consider that point and decide what is technically the best way of going about the matter. In the case of any dispute, I shall rule further.

**632**



Neutral Citation Number: [2021] EWCA Civ 993

Case No: A3/2021/1014

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE BUSINESS AND PROPERTY**
**COURTS OF ENGLAND AND WALES**
**CHANCERY APPEALS**
**MR ROBIN VOS (sitting as a Deputy Judge of the High Court)**
**[2021] EWHC 1543(Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 05/07/2021

**Before :**

**LORD JUSTICE BAKER**
**LADY JUSTICE ANDREWS**
and
**SIR STEPHEN IRWIN**

- - - - - - - - - - - - - - - - - - - -

**Between :**

|  |  |
|---|---|
| **(1) VICTORYGAME LIMITED**<br>**(2) SURJIT SINGH PANDHER** | **Appellants/**<br>**Defendants** |
| **- and -**<br>**AHUJA INVESTMENTS LIMITED** | **Respondent**<br>**/Claimant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Nicholas Trompeter QC** (instructed by **SBP Law**) for the **Appellants**
**David Holland QC and Edward Rowntree** (instructed by **Cardium Law Ltd**) for the
**Respondent**

Hearing date: 22 June 2021

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**633**

**Lady Justice Andrews:**

1.    This is an expedited appeal brought by the Defendants to the underlying proceedings, Victorygame Ltd and its director Mr Pandher, (collectively, "Victorygame") against the judgment and order of Mr Robin Vos, sitting as a deputy judge of the High Court, dated 8 June 2021.

2.    The Judge upheld a claim to legal professional privilege by the Claimants, Ahuja Investments Ltd, ("Ahuja") over correspondence between their current solicitors, Cardium Law, and their former solicitors, Stradbrooks, reversing the decision of Master Pester, dated 29 April 2021, to order disclosure of those documents. The documents concerned are:

    i)    A letter of claim from Cardium Law to Stradbrooks dated 10 February 2020, and

    ii)   A letter of response dated 19 December 2020 from Stradbrooks' professional indemnity insurers.

3.    Permission for a second appeal was granted on limited grounds on 14 June 2021 by Henderson LJ, who directed that the appeal be listed for hearing on 22 June. The reason for expedition was that the trial of the underlying claim had been listed to take place in a window commencing on 28 June.

4.    After hearing and considering the arguments, attractively presented by Mr Trompeter QC on behalf of Victorygame, and Mr Holland QC (assisted by Mr Rowntree) on behalf of Ahuja, the Court informed the parties that the appeal would be dismissed, and that we would give our reasons in our reserved judgments.

5.    For the purposes of this appeal it is unnecessary to set out the detail of the underlying claim. Suffice it to say that it arises out of the purchase by Ahuja from Victorygame of a commercial property in Southall, Middlesex, the ground floor units of which were rented out for retail purposes. Contracts were exchanged in March 2016, but the sale was not completed until 22 August 2018. Stradbrooks acted for Ahuja in the transaction. The solicitor who handled the file was a Mr Randeep Jandu.

6.    Ahuja claims that it was induced to enter into the sale contract and a related loan agreement by fraudulent (alternatively negligent) misrepresentations about the duration of the leases of the retail units and the rental income. It is common ground that a schedule was provided to Ahuja which stated, in capitalised text, that "all tenants have signed a 15 year lease". In fact the leases were for 6 years 9 months.

7.    Victorygame accept that there was a misrepresentation, which they say was due to an innocent mistake, but deny that there was any operative inducement. They contend that Ahuja knew the true term of the leases prior to the exchange of contracts, for a number of reasons, one of which is that the original leases were in the possession of Ahuja or Stradbrooks for around two months between February and April 2016 (which spanned the exchange of contracts). The leases were provided to Mr Sohal, Victorygame's selling agent, and subsequently delivered by him to Stradbrooks. It is argued that an inference can be drawn that, before they were returned to

**634**

Victorygame's then solicitors, Chhokar & Co., Mr Jandu inspected the leases and discussed them with his clients. Victorygame contend that:

"in this context, the advice [if any] which Mr Jandu gave to Ahuja regarding the length of the terms of the leases is of critical importance to the fair resolution of the proceedings."

Ahuja is not planning to call Mr Jandu as a witness at trial.

8.  In opposition to Victorygame's application for disclosure of the two letters, Ahuja's solicitor, Mr Davies of Cardium Law, served a witness statement, his sixth in the proceedings, dated 25 April 2021, claiming that they were subject to litigation privilege. In that statement, Mr Davies explained at [57] –[59] that Stradbrooks wrote the letter before action (in respect of Victorygame Ltd) to Chhokar & Co. on 29 November 2018, followed by an email expressly stating that Mr Pandher had made fraudulent and/or negligent representations and reserving Ahuja's rights in that regard. His firm was instructed in these proceedings in place of Stradbrooks in late December 2018. Numerous requests were then made by Cardium Law to Stradbrooks for their file relating to the matter, both before and after the commencement of the underlying proceedings against Victorygame in May 2019, but Stradbrooks refused to produce the file. Ahuja therefore had to issue a third party disclosure application for its production, which was successful. Stradbrooks produced their conveyancing file following the hearing of that application on 20 November 2019.

9.  Cardium Law reviewed the conveyancing file upon its receipt, and sought advice from leading and junior counsel. Mr Davies explained what happened thereafter in the following terms:

"64 … Without waiving privilege, it was decided that further information was required from Stradbrooks and Mr Jandu with a view to the conduct of this claim and to assess Mr Jandu's potential as a witness. Following this, on account of his prior lack of co-operation and his conduct, it was decided that the only way in which Stradbrooks or Mr Jandu would give any substantive comment in relation to his involvement in matters relevant to this action was to threaten to issue proceedings against him.

65.  Accordingly (and again without any waiver of privilege) on 10 February 2020 a letter in the form of a Letter before Action was sent to Stradbrooks. It must be emphasised that whilst, of course, the Claimant had approved the sending of the letter, no instructions had been given to issue proceedings against Stradbrooks. The dominant purpose of sending the Letter before Action was to obtain information relevant to these proceedings, which was not apparent from the conveyancing file. The Letter before Action made a series of statements and sought a response. It also mentioned the fact that these proceedings had been issued…

[Mr Davies then referred to the fact that various letters were sent chasing a response from Stradbrooks, and to the dates on which they were sent.]

**635**

Case 1:23-mc-00208-JGLC-GS    Document 60-2    Filed 04/10/24    Page 404 of 466

Judgment Approved by the court for handing down.                                    Victorygame Ltd v Ahuja Investments Ltd

67. Without any waiver of privilege, on 19 December 2020, a Letter of Response was received from solicitors instructed by Stradbrooks' professional indemnity insurer. This contained the information sought…

68.     The Claimant in this action has not issued proceedings against Stradbrooks and this firm has not been provided with instructions to issue proceedings."

The decision of the Master

10.     In his *ex tempore* judgment, the Master said he did not find the privilege point particularly easy. He was not going to go behind what Mr Davies said. He described the fact that Ahuja had to issue the third party disclosure application against Stradbrooks as "absolutely extraordinary." He then referred to the decision of Birss J in *Property Alliance Group v Royal Bank of Scotland plc (No.3)* [2016] 4 WLR 3, ("*PAG"*) which was relied on by Mr Trompeter.

11.     The facts of that case were most unusual. A claim was brought by PAG against the defendant bank alleging that it had been mis-sold swaps contracts. A director of PAG, Mr Russell, arranged a meeting with two of the bank's former employees, ostensibly to discuss future business opportunities, and surreptitiously recorded the meetings with a view to obtaining information and evidence that might assist PAG in its claim against the bank. PAG claimed privilege over the recordings and any transcripts of them on the basis that they had been produced for the dominant purpose of conducting litigation.

12.     Birss J accepted the bank's submission that what mattered in this context was the dominant purpose of the *meetings*, and not the dominant purpose of making the secret recordings of the conversations at the meetings. He considered and followed a number of authorities from this and other common law jurisdictions concerning the recording of conversations (including the decision of the Court of Appeal in *Parry v News Group Newspapers Ltd* [1990] 140 NLJ 1719, in which the leading judgment was delivered by Bingham LJ). Those cases establish that a record of a non-privileged conversation, whether in the form of a recording, a transcript or a verbatim note, cannot itself be privileged if the underlying conversation was not privileged, even if it can be said that the reason the recording was made was for use in litigation. Birss J decided that this principle applied irrespective of whether the non-privileged conversation was with a witness or between the parties to the litigation itself.

13.     Having established that this was the guiding principle, Birss J went on to consider whether the conversations with the ex-employees were privileged. He rejected the bank's contention that the dominant purpose of the meetings had to be ascertained from the point of view of a dispassionate observer. He found that an objective assessment of the dominant purpose of the meetings (and thus the discussions that took place at them) meant that the court had to take into account all the evidence, including evidence of the intentions of all the participants, (in other words, the dominant purpose of a meeting could not be objectively ascertained merely by considering the intention of the party who convened it). He found that, assessed objectively, Mr Russell's intention was to gather evidence for the litigation, but the purpose of the ex-employees attending the meeting was to catch up and discuss possible future business.

**636**

14.    Birss J said that it did not make a lot of sense to pretend that one could distil a dominant purpose from those two clear but entirely divergent purposes; however, the critical point was that Mr Russell actively deceived the ex-employees. The existence of the deception was what distinguished the circumstances from the example on which PAG had relied, of solicitors taking a proof of evidence. He said that in those circumstances: "Mr Russell could not complain if the court concluded that the fair and correct way of assessing what the dominant purpose of the meeting was, was to look at it from the ex-employees' point of view."

15.    The Master distinguished *PAG* on the basis that he did not see this case as being a matter of deception on the part of the claimant.  However, he decided that the two letters did not come into existence for the dominant purpose of being used in litigation because "the dominant purpose is not determined solely by what one party says it is." He drew the inference that, from Mr Jandu's and Mr Jandu's insurer's point of view, a professional negligence claim was being intimated against them. That appears to have been the reason for his conclusion that the documents were not privileged.

16.    Ahuja appealed to the High Court, on the basis that the Master wrongly held that the dominant purpose test was to be applied from the point of view of the third party recipient of the communication when, as a matter of authority and principle, it is the intention of the party claiming privilege which is the only consideration. They argued that the Master wrongly relied on or drew an analogy with the *PAG* case, and that any principle in that case has no application to the facts of this case. If necessary, they were prepared to assert that that case was wrongly decided.

The Judge's decision

17.    In his clear and well-structured judgment, the Judge directed himself in accordance with the classic statement of the requirements for litigation privilege by Lord Carswell in *Three Rivers District Council v Bank of England No 6)* [2005] 1 AC 610 ("*Three Rivers (No 6)"*) at [102]:

> "Communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only where the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial."

Since there was no dispute that adversarial litigation was in progress, he identified the key question as being whether the communications were made for the dominant purpose of conducting that litigation.

18.    The Judge referred to the rationale for litigation privilege, expressed in various authorities, including the oft-quoted passage from the judgment of Aikens J in *Winterthur Swiss Insurance Company v AG (Manchester) Ltd* [2006] EWHC 839 (Comm) at [68]:

> "to obtain the legal advice and to pursue adversarial litigation efficiently, the communications between a lawyer and his client and [between] a lawyer and a

third party and any communications brought into existence for the dominant purpose of being used in litigation must be kept confidential, without fear that what is said or written might be disclosed."

He also quoted from part of the well-known passage from Lord Wilberforce's speech in *Waugh v British Railways Board* [1980] AC 521 at p.531D:

"a more powerful argument to my mind is that everything should be done in order to encourage anyone who knows the facts to state them fully and candidly – as Sir George Jessel MR said, to bare his breast to his lawyer: *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, 699. This he may not do unless he knows that his communication is privileged".

19.    Having reminded himself of the fact that the privilege is that of the litigant, rather than of any witness, the Judge rightly said at [20] that in determining whether a claim to privilege should be upheld, the main focus should be on the position of the litigant who is claiming privilege. Having considered the leading cases on dominant purpose (*Waugh* (above), *Winterthur* (above), and *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027), he concluded that the purpose which was relevant was the purpose of the person who was the instigator of the document in question (who may or may not have been its author), and that the purpose of that person must be determined objectively based upon all the evidence, including their subjective intention.    Those conclusions are in accordance with principle and authority and cannot be challenged. Indeed, Henderson LJ refused Victorygame permission to appeal against them.

20.    The Judge then directed himself in accordance with Hamblen J's useful distillation of the principles to be applied when considering whether such a claim is made out, in *Starbev GP Ltd v Interbrew Central European Holdings BV* [2013] EWHC 4038 (Comm) at [11]-[13]. At [50] he acknowledged that the fact that the letter seeking the information took the form of a letter before claim could be evidence that Ahuja's purpose was to consider a possible claim in negligence against Stradbrooks; but that would involve going behind Mr Davies' witness statement, which Mr Trompeter had expressly stated he did not intend to do. He said that in any event, no other evidence had been put forward which would cast doubt on Mr Davies' explanation of why that request for information took the form that it did.

21.    The Judge concluded at [55] that, assessed objectively, the dominant purpose of Ahuja in bringing the correspondence into existence was to obtain information for use in the current proceedings. The next question was whether there was any deception on the part of Ahuja and if so, whether this changed his conclusion (about the dominant purpose) or prevented Ahuja from relying on litigation privilege.

22.    He said this at [57]:

"Although I accept Mr Holland's submission that there was no deception in relation to the fact that information was being requested, based on Mr Davies' witness statement, there clearly was an element of deception in the sense that Ahuja wanted information for the purposes of the present proceedings, anticipated that it would not get that information if it was requested on that basis, and so arranged for its solicitors to write a letter of claim under the professional

**638**

negligence pre-action protocol with a view to obtaining the information that it was seeking. The clear purpose of the letter was to make Stradbrooks believe that a professional negligence claim was being considered (when, in fact, it was not) and that it should therefore provide information in accordance with the professional negligence pre-action protocol".

23.    However, having considered the rationale for litigation privilege, the Judge said at [62] that whilst he did not condone Ahuja's tactics, there was no principled reason why the protection of privilege should not be available in relation to the information that was provided. He declined Mr Trompeter's invitation to find that there was a principle which would prevent a claim to privilege where the other party to the litigation is induced to provide information which they would not have provided had they known the true purpose of the request, and where the true purpose was deliberately concealed or suppressed, and (if such a principle did exist) to extend it to situations involving third parties rather than another party to the litigation.

24.    The Judge recorded at [64] that he had not been invited to consider whether privilege was unavailable as a result of the deception giving rise to some sort of estoppel or waiver.

25.    Victorygame sought permission to appeal on four grounds. Henderson LJ granted permission on Ground 1, which has two related limbs, and allowed the argument in Ground 4(b) to be run in conjunction with Ground 1. He refused to allow Victorygame to argue that the Judge was wrong to find that in ascertaining the dominant purpose, it was the purpose of the instigator of the document which matters, or to challenge his finding that Ahuja was the instigator of the relevant documents.

26.    Ground 1 is that the Judge erred in law in holding that:

    a)    There is no principle of law to the effect that if one party deliberately misleads another party as to the purpose for which information is required, and that party provides the information, the requesting party cannot thereafter maintain privilege over the information;

    b)    If there is such a principle, it does not extend to a situation involving third parties.

The Judge was therefore wrong to hold that whilst there was deception in the correspondence, it did not prevent Ahuja from claiming privilege.

27.    Ground 4(b) is that the Judge erred in law in holding that, objectively assessed, Ahuja's purpose in instigating the correspondence was for the dominant purpose of this litigation.

28.    In response to the Judge's finding that there was an "element of deception" and in order to counter any suggestion or inference that Stradbrooks and its professional indemnity insurers were unaware that information was sought in connection with the underlying claim against Victorygame, Ahuja sought permission to rely upon a seventh witness statement from Mr Davies, dated 16 June 2021. Mr Davies explained that his sixth witness statement was made before any allegations of deception were raised in respect of Cardium Law's conduct in corresponding with Stradbrooks and its

**639**

professional indemnity insurers, and that this was the first opportunity to deal with the unevidenced allegations of deception. The service of that witness statement prompted Victorygame to seek permission to raise a further argument that any privilege attaching to the correspondence had now been waived by Ahuja.

29. The Court decided to approach these applications pragmatically by considering Mr Davies' seventh witness statement *de bene esse* and hearing argument from Mr Trompeter and Mr Holland on the issue as to whether, by serving that statement, Ahuja had waived privilege.

30. I shall first address Victorygame's original grounds of appeal and then turn to consider the question of waiver.

<u>Does the principle alleged by Victorygame exist and if so, is it applicable?</u>

31. Mr Trompeter contended that if one party deliberately misleads another party as to the purpose for which information is required, and that party provides the information, the requesting party cannot thereafter maintain privilege over the information even if their dominant purpose in requesting it was for use in litigation. That is (or should be) the case irrespective of whether the request is made of another party to the litigation or a third party. He submitted that this principle was established by the decision of HH Judge Toulmin CMG QC in *London Fire and Emergency Planning Authority (LFEPA) v Halcrow Gilbert & Co Ltd* [2004] EWHC 2340 (QB), ("*LFEPA*") following an assumption to that effect made by Millett J in *Plummers Ltd v Debenhams plc* [1986] BCLC 447 ("*Plummers*") at pp 458i - 459a.

32. *Plummers* was a case in which a lender was considering taking proceedings against the borrower under a loan agreement. The lender had contractual rights under the loan agreement to send in a firm of accountants to examine and report upon the state of the borrower's business. It commissioned such a report, and in doing so it gave the borrower the impression that its purpose was to consider whether to continue to support the business, whereas in reality it had already decided to withdraw that support and enforce the loan.

33. Millett J accepted that the dominant purpose of the report was litigation. He firmly rejected the contention that there was a requirement that the party contemplating litigation had to make that intention known to the other party in order to be able to claim privilege, stating that there was no trace in the authorities of any such requirement. However, he went on to say (at 459a-b) that he was prepared to assume that it is not open to a party to litigation to withhold the production of a relevant document by claiming that the purpose for which it was brought into existence was to obtain legal advice in connection with contemplated litigation, when that purpose was deliberately concealed from the other party, and when the document contains and its conclusions are based on evidence obtained from the other party only by suppressing the purpose for which it was received. He did not explain the principles on which he was relying to found that assumption.

34. Millett J's assumption in *Plummers* was based purely upon the hypothesis of deliberate concealment from the other party to litigation of the true purpose for which information is sought from that party, who would not have provided the information had he known of that purpose. I find that difficult to reconcile that with his ruling that

**640**

there is no positive obligation to divulge the purpose for which the information is sought. If there is no such obligation, then concealment of the purpose, whether deliberate or otherwise, is surely immaterial.

35.    Moreover, if such a principle existed, then every time the requesting party failed to disclose why the information was wanted, or made known another legitimate reason for asking for it (but which was not the dominant purpose for which it was sought) the court would have to make findings about whether the non-disclosure of the dominant purpose was accidental, inadvertent or deliberate, and what the other party would have done if the dominant purpose had been revealed. This could lead to a most undesirable erosion of the right to claim privilege.

36.    As the Judge in the present case observed, even though Millett J held that the truth had been suppressed, he upheld the claim to privilege in *Plummers* because the lender had a contractual right to the information without stating the purpose for which it was required, and the only effect of suppressing the truth was "to avoid hostility on the part of the borrower."

37.    In the *LFEPA* case the issue was whether a report prepared by a third party for LFEPA based upon information provided by the other party to the litigation, Halcrow, was privileged. Halcrow was told at the time it provided the information that it was required for a project audit, but LFEPA subsequently claimed that the dominant purpose was to gather information for use in litigation contemplated against Halcrow relating to the project. HH Judge Toulmin was not prepared to find that LFEPA had lied; he decided that the dominant purpose of the report was not litigation, and therefore it was not privileged. However, he went on to suggest that even if the report had been privileged, the privilege was lost on the basis that "LFEPA is estopped by representation from asserting the privilege by falsely representing to Halcrow that the purpose of the investigation was one for which privilege could not be claimed."

38.    Mr Trompeter also relied on Lord Wilberforce's explanation of the rationale for litigation privilege expressed in *Waugh* and quoted above. He submitted that it cannot serve the public interest, and would subvert that rationale if a person was entitled to assert privilege over relevant documentation or information which he had obtained by deception, irrespective of the identity of the party deceived.

39.    In refusing to extend the supposed principle to third parties, the Judge had said (at [61]) that the purpose of litigation privilege was to enable a litigant to obtain information which could be placed before their legal advisers for the purposes of pursuing their proceedings without having to worry that such information may have to be disclosed to the other party. Mr Trompeter submitted that that reasoning applied irrespective of whether the provider of the information was a third party or the other party to the litigation, and in any event was inconsistent with the rationale given by Lord Wilberforce in *Waugh*.

40.    Finally Mr Trompeter submitted that the Judge's analysis was inconsistent with authority, namely, the *PAG* case.

41.    On behalf of Ahuja, Mr Holland submitted that the Judge was right for the reasons that he gave. The authorities establish that the purpose behind litigation privilege is the protection of the litigant in adversarial proceedings, as the Judge held. Lord

**641**

Wilberforce's observations in *Waugh* had to be read in context, and references to the need for candour were concerned with the relationship between lawyer and client. He pointed out that earlier in the same passage, Lord Wilberforce had expressly accepted the validity of the argument that litigation privilege was justified by what he called "the exigencies of the adversary system of litigation, under which a litigant is entitled within limits to refuse to disclose the nature of his case until the trial."

42.    A similar explanation for litigation privilege was given by Lord Rodger in *Three Rivers (No 6)* at [52]:

> "Litigation privilege relates to communications at the stage when litigation is pending or in contemplation. It is based on the idea that legal proceedings take the form of a contest in which each of the opposing parties assembles his own body of evidence and uses it to try to defeat the other, with the judge or jury determining the winner. In such a system each party should be free to prepare his case as fully as possible without the risk that his opponent will be able to recover the material generated by his preparations."

43.    Mr Holland pointed out that the information was not in the hands of (and therefore already known to) the other party to the litigation. It was only known to the third party from whom Ahuja was seeking to obtain it, Stradbrooks. They were being deliberately uncooperative despite the fact that the knowledge of Mr Jandu was acquired when he was providing professional services for and on behalf of Ahuja and Stradbrooks owed a continuing duty to act in the best interests of their (former) clients. Ahuja was placed in an invidious position because Mr Jandu would not have disclosed the information to Ahuja voluntarily, as he probably should have done.

44.    If Ahuja made a successful application for third party disclosure, as it had been forced to do by Stradbrooks' intransigence in respect of the conveyancing file, there was a real risk that it would be obliged to disclose the information to Victorygame irrespective of whether it was helpful or unhelpful to Ahuja's case against them. That would effectively deprive Ahuja of the opportunity to consider and evaluate that information privately with its legal advisers, and decide in the light of it whether to call Mr Jandu as a witness. In those circumstances, the only way to be sure of extracting the information that Ahuja wanted to obtain for the purposes of the litigation whilst maintaining privilege over it, was to indicate that it was considering issuing legal proceedings against Stradbrooks.

45.    Mr Holland also sought to rely, if necessary, on Mr Davies' explanation, in his seventh witness statement, that Stradbrooks and their professional indemnity insurers were well aware that the information was sought in connection with the underlying claim, and had been supplied with a copy of Victorygame's Re-Amended Defence and Counterclaim prior to the letter of claim being sent.

Discussion

46.    On the face of it, the documents are privileged; the Judge found as a fact that the dominant purpose for which they were sought by Ahuja was for use in the underlying litigation.

**642**

47. There was no error of law in the Judge's approach to that issue; he was entitled to reach that conclusion on the evidence before him. The Judge accepted Mr Davies' evidence, as he was entitled to do, for the reasons that he gave. His finding cannot be disturbed for any of the reasons advanced by Mr Trompeter, including that the evidence came from the solicitor who was responsible for sending the letter of claim, rather than from one of Ahuja's directors or officers. The court is not bound by a party's assertion that a document is privileged, nor is it obliged to accept at face value the evidence adduced by the party claiming privilege. The Judge was well aware of this, but, as he said, there was no other evidence to contradict the explanation Mr Davies gave for the form in which the request for information was made.

48. Mr Trompeter submitted that where there were two purposes, one patent and one latent, the court had no basis for refusing to treat the patent purpose as the dominant one. That is a highly unattractive proposition. It would be tantamount to allowing the form of the communication to take precedence over the substantive reason why it was sent, irrespective of the truth. The Judge properly took account of the fact that the form in which the request was made (a letter of claim) suggested that the information was required for a different (or additional) purpose, namely, potential litigation against Stradbrooks themselves, but he was not bound to treat that as a trump card. An objective assessment of the dominant purpose for which a document is created does not involve the application of an objective bystander test, particularly when it is the intention of the instigator of the documents that matters. The form of the request was therefore just one factor in the assessment. The Judge was entitled to accept Mr Davies' explanation. I would dismiss the appeal on Ground 4(b).

49. Turning to Ground 1 of the Grounds of Appeal, the starting point is that these documents are privileged. If Ahuja's solicitors had sent an ordinary letter requesting the information from Stradbrooks and it had been supplied, there would have been no obligation to disclose the correspondence. Victorygame's case is that the absolute privilege was lost because of the form in which the letter was sent (as a letter before claim). On the face of it, that does not seem to me to provide any, let alone any sufficient, justification in principle for precluding Ahuja from relying on an absolute right that derives from the purpose for which the information was sought.

50. The *PAG* case does not assist Victorygame. That case concerned the question whether the conversations were privileged in the first place, not whether the right to claim privilege was somehow lost. It also related to the different situation where the court was concerned with the status of a record of discussions at a meeting, which in turn depended on the purpose of the meeting, as that would determine whether the circumstances in which the conversations took place were privileged. In that specific context, Birss J decided that the intention of the party who arranged the meeting should not be the sole focus of attention (as it would have been where the subject of the claim for privilege was correspondence) but that it should be treated as only one aspect of the overall picture.

51. It is also clear from what Birss J said that the active deception of the bank's ex-employees, who had no idea that the meeting was an information-gathering exercise, and were told it was for a completely different purpose, was treated as the critical factor in distinguishing the situation from the normal one in which a solicitor was interviewing potential third party witnesses. It is unnecessary to express any view as to whether that was the correct approach; that is best saved for a case in which the

**643**

question directly arises. Whether or not it was rightly decided, the Judge was right to find that *PAG* is distinguishable. It sheds no light on the issues raised on this appeal.

52.     The question here is whether Ahuja has lost the right to maintain the privilege because of some competing public interest that outweighs it. Neither *LFEPA* nor *Plummers* establish the broad principle for which Mr Trompeter contends.

53.     Millett J's "assumption" in *Plummers* was made without reference to any authority, and both that assumption and the principle for which Mr Trompeter contends appear to me to be directly contradicted by what Lord Scott of Foscote said in *Three Rivers (No 6)* at [25]:

> "…if a communication or document qualifies for legal professional privilege, the privilege is absolute. It cannot be overridden by some supposedly greater public interest. It can be waived by the person, the client, entitled to it and it can be overridden by statute… but it is otherwise absolute. There is no balancing exercise that has to be carried out, see *B v Auckland District Law Society* [2003] 2 AC 736, 756-759, (paras 46-54). The Supreme Court of Canada has held that legal professional privilege although of great importance, is not absolute and can be set aside if a sufficiently compelling public interest for doing so, such as public safety, can be shown: see *Jones v Smith* [1999] 1 SCR 455. But no other common law jurisdiction has, so far as I am aware, developed the law of privilege in this way. Certainly in this country legal professional privilege, if it is attracted by a particular communication between lawyer and client or attaches to a particular document, cannot be set aside on the ground that some other higher public interest requires that to be done."

54.     It is well-established that a party can waive privilege. It also seems likely that Lord Scott's reference to waiver was shorthand for both waiver and estoppel, which is often put forward as an alternative argument to waiver and is a different way of giving up an otherwise inalienable right. It is generally the case that if a person can waive a right, he may also do or say something that precludes him from asserting that right because it would be unfair or unconscionable for him to do so. It must be possible for a party to become estopped from claiming privilege, though (like any other case of estoppel) the conduct or representation would have to be clear and unequivocal and relied on by the other party to their detriment. As with waiver, a court is unlikely to make a finding that someone entitled to assert privilege is estopped from doing so without very cogent evidence.

55.     HH Judge Toulmin's *obiter* comments in *LFEPA* were based on an estoppel by representation, not some wider public interest exception to the circumstances in which a party may claim privilege. The question whether such an estoppel has arisen is quintessentially fact-specific. There has been no suggestion of an estoppel in this case.

56.     In his oral submissions, Mr Trompeter contended that there was another established exception which Lord Scott had not mentioned in that passage, which he characterised as the exception for "iniquity". In support of that proposition he referred to *Dubai Aluminium Co Ltd v Al-Alawi* and others [1999] 1 WLR 1964. That was a case in which private investigators employed by the party claiming privilege had obtained otherwise confidential information by conduct which was, on the face of it, both

fraudulent and criminal, including impersonating the client to whom the Swiss banks concerned owed a duty of confidentiality.

57.    Rix J extended the principle adumbrated in cases such as *R v Cox & Railton* (1884) 14 QBD 153 and *Barclays Bank Plc v Eustice* [1995] 1 WLR 1238 that a claim for legal professional privilege does not apply to communications in furtherance of a criminal purpose, to cover a situation where a criminal offence was committed in order to obtain the documents. However, he made it clear that this extension to the principle that "there is no privilege in an iniquity" was limited. Therefore, it did not cover behaviour that was not of a criminal nature, or closely akin to it, even if that behaviour might otherwise be regarded as reprehensible, such as trespass by the private investigators on the other party's property in order to search his dustbins for discarded papers (which would then be copied before returning them to the bin.)

58.    As Mr Holland pointed out, Mr Trompeter's submissions appeared to be an illegitimate attempt to resurrect an "iniquity" argument based upon *Barclays Bank v Eustice* that had been rejected by the Master and was not renewed before the Judge. Irrespective of this, the *R v Cox & Railton* line of authority does not assist Victorygame. It does not concern the loss of privilege, once privilege is established, but whether as a matter of public policy it is open to someone who has committed a criminal offence (or whose agents have done so) to claim privilege over the documents in the first place. Cases of that nature are mercifully rare. The situation in the present case is far removed from that in *Dubai Aluminium*. That case does not detract from Lord Scott's proposition in *Three Rivers(No 6)* that legal professional privilege, *once acquired*, is absolute, unless waived by the party entitled to claim privilege or overridden by statute.

59.    I can accept, without deciding the point, that an estoppel might be found to arise in the context where, in order to get the prospective defendant to the contemplated litigation to divulge information to their opponent that they would not otherwise have been obliged to disclose, a deliberate lie is told by the opponent about why the information is required. The defendant is unlikely to want to divulge that information so as to give the claimant a tactical advantage in the litigation, even if they might be compelled to reveal it at a later stage. Therefore if they are induced to provide information which they would not otherwise have provided or been obliged to provide, on the basis of "grossly misleading" representations (as in the case of *LFEPA*, where the alternative factual hypothesis addressed by Judge Toulmin was that the supposed "technical audit" was a fictitious cover for the information-gathering exercise) there might be a good foundation for an estoppel argument.

60.    It is less easy to apply the estoppel analysis to a situation in which the supplier of the information is a third party, as in the present case, as it is less likely that they will be detrimentally affected by the use to which it is going to be put by the person requesting it, and therefore less likely that they would be detrimentally affected by handing it over even if they were materially misled. I would not go so far as to suggest that circumstances could never arise in which the party seeking the documents from a third party would be estopped from claiming privilege over them, but such circumstances are likely to be rare. In any event, Victorygame do not contend they arise in the present case.

**645**

61.    Moreover, if the instigator has a right to the information, as was the case in *Plummers*, then there seems to me to be no sound reason for allowing him to claim privilege if he has not revealed that he wants it for the purpose of litigation, and has left the provider of the information labouring under a misapprehension (as happened in *Plummers*), but on the other hand refusing to allow him to maintain the otherwise irrefutable claim for privilege because he has actively fostered the misapprehension, or even told a deliberate lie. If the person making the request is entitled to the information, it does not matter to the person who is obliged to provide it why he wants it or what use he plans to make of it. He must give him the information. If the only principled basis for denying the right to claim privilege in circumstances of this kind is an estoppel, as I consider it is, it would be very difficult to establish the necessary detrimental reliance in circumstances in which the representee was obliged to disgorge the information irrespective of why it was required.

62.    In the light of the principle that legal professional privilege, once acquired, is absolute, subject to waiver and, in an appropriate case, estoppel, I am not prepared to accept that the principle for which Mr Trompeter contends exists. However, even if it does exist, this is not a case in which anyone was deliberately deceived into handing over documents (or providing information) to which the requesting party was not entitled at that time.

63.    In the present case, the information was not obtained from the other party to the litigation. What the Judge chose to describe as "an element of deception" was very limited and very different from the reprehensible behaviour considered in cases such as *PAG* and *LFEPA*. It was also irrelevant.

64.    Taken at its highest, the fact that the information was requested in a letter of claim fostered an impression that there was a present intention to bring proceedings against Stradbrooks for professional negligence, when it can be inferred from the fact that Ahuja had not given instructions to sue Stradbrooks that, at most, that intention was contingent and depended upon what information was forthcoming. In common with the Master I would not, myself, characterise that as deception. It is of a completely different character from the lies told to the ex-employees about the purpose of the meeting in *PAG* or the (hypothetical) repeated false assurances given to Halcrow in the *LFEPA* case as to why the report was being prepared.

65.    The Judge was not prepared to draw the inference that Stradbrooks would have realised that the information would be used for the purposes of the litigation against Victorygame. However it does seem to me, with respect, that there was a strong basis for drawing that inference in the light of the protracted history of the attempts to get hold of the conveyancing file from them, and the fact that Stradbrooks were still instructed by Ahuja at the time when the letters before action were sent in respect of both defendants (and therefore knew the nature of the case). In any event, there was no evidential basis for concluding that Stradbrooks were misled into believing it was not going to be used for that purpose, let alone that Ahuja's intended use of the information would have made a difference to the decision to provide an answer to its solicitor's request. Even if they were led to believe that Ahuja was contemplating suing Stradbrooks for professional negligence, that would not rule out the use of the information in the underlying litigation.

**646**

66.    Mr Davies' further witness statement has provided clarification that Stradbrooks were well aware of the issues in the litigation between Ahuja and Victorygame and knew that Ahuja wanted the information for the purposes of that litigation. They may not have known it was the dominant purpose of the request, but that was not a matter of any concern to them.

67.    Moreover, although one cannot be completely sure without knowing what the information was that Stradbrook's insurers supplied, it seems highly likely that Ajuha was entitled to that information, as Mr Holland submitted it was. In my judgment it would be difficult for a former legal representative to justify withholding information from the client about what he knew and what he did in respect of a transaction at a time when he was engaged to represent that client's interests. Stradbrooks were probably obliged to provide the information irrespective of why their former clients wanted it; but they were plainly not going to do so voluntarily. By using a letter of claim to seek the information, Ahuja left them no room for manoeuvre.

68.    There is room for more than one view about those tactics, but even if one were to take the same critical view as the Judge, he was correct to find that any belief on the part of Stradbrooks that they might be sued for professional negligence and were therefore obliged to provide the information under the pre-action protocol, afforded Victorygame no principled basis for denying Ahuja's right to claim privilege.

69.    Gathering all these threads together, I can see no good reason why there should be a principle that a party that is otherwise entitled to claim litigation privilege over correspondence with a third party should lose it simply because in order to obtain the information it needed, it was forced by the third party's behaviour to bring pressure on them by threatening litigation against them (even if it did not then intend to carry out the threat) – especially when it was probably entitled to that information in the first place. Moreover, I can find no basis for concluding that the Judge's reasoning was inconsistent with the rationale underlying litigation privilege.

70.    Ahuja's behaviour comes nowhere near the type of reprehensible conduct that was justifiably criticised in the first instance cases on which Victorygame have sought to rely. Stradbrooks and their insurers were not deceived into handing the documents over on the basis of a misleading impression (deliberate or otherwise) that Ahuja was *not* going to use those documents for the purposes of the underlying litigation against Victorygame. There was no obligation to tell Stradbrooks what Ahuja intended to do with the information once it was obtained, or why it was wanted.

71.    Mr Trompeter at one point conceded that matters would have been different if the threat of litigation had been a threat to sue Stradbrooks for withholding the information, rather than a threat to sue for professional negligence. He accepted that if Ahuja's solicitors had said to Mr Jandu: "our clients intend to bring proceedings against you for withholding information relevant to our proceedings against Victorygame, which you are obliged to give us" and the dominant purpose of writing the letter was to obtain the information for use in the Victorygame proceedings, the exchange of correspondence would have been privileged. I do not accept that a distinction can be drawn between that scenario and what actually happened. Either there was a present intention to sue Stradbrooks, or there was not. But the implicit misrepresentation of Ahuja's present intentions towards Stradbrooks, even if

**647**

deliberate, is not a principled basis on which to deny an otherwise well-founded claim for privilege.

72.     The Judge was right to find that the privilege was not overridden by some wider public interest principle. I would dismiss this appeal on Ground 1.

Did the service of Mr Davies' fresh witness statement cause a waiver of privilege?

73.     That just leaves the new argument on waiver, which can be disposed of more swiftly. Mr Trompeter relied on the helpful distillation of the relevant principles and analysis of the authorities in the recent decision of Waksman J in *PCP Capital Partners LLP and another v Barclays Bank Plc* [2020] EWHC 1393 (Comm), particularly the six overarching points adumbrated at [47], which it is unnecessary to repeat. As the judge said in that case, at [48], it is not easy to find a succinct and clear definition of when waiver arises, going beyond general statements to the effect, for example, that the party alleged to have waived privilege over advice or documents has deployed them in some way as part of its case. However, the underlying principle is fairness and each case will turn on its own facts.

74.     As Elias J said in *Brennan v Sunderland City Council* [2009] ICR 479 (quoted in *PCP Capital* at [63]) the focus is typically on two factors, namely the nature of what has been revealed (is it the substance, the gist, the content or merely the effect of the legal advice or other privileged communication?) and the circumstances in which it is revealed. Has it simply been referred to, used or deployed, or relied upon in order to advance the party's case?

75.     In the present case, Mr Davies' seventh witness statement (which is entirely consistent with his sixth) was produced in order to rebut the suggestion that Ahuja and its legal advisers had sought to obtain information from Stradbrooks by fraud or deception, and to prevent the inference from being drawn that Stradbrooks were unaware that information was being sought for the purpose of the underlying proceedings, when in fact the contrary was the case. It is in that specific context that Mr Davies made reference to the fact and dates of certain privileged correspondence and discussions with Stradbrooks and their legal advisers, that pre-dated the two letters which are the subject of the application for disclosure. He did so in the context of explaining that Stradbooks were aware that the information subsequently requested in the letter of claim was required for use in the litigation against Victorygame.

76.     As Mr Holland submitted, there is nothing remotely unfair about allowing Ahuja to reveal that information, to prevent the Court of Appeal from being misled, whilst maintaining privilege. This is not an example of cherry-picking the aspects of privileged information which help to advance a party's case. It is difficult to see how else Ahuja could have rebutted the suggestion that they had actively deceived Stradbrooks as to the purpose for which they required the information, which Victorygame was advancing in order to try and persuade this Court that they could not claim privilege. In those circumstances, it would have been grossly unfair to find that their very limited references to privileged material for those purposes would have amounted to a waiver of privilege.

77.     We did not need to admit Mr Davies' seventh witness statement in order to find that the Judge was right and to dismiss the appeal on the limited grounds for which

**648**

permission was granted. However, Ahuja was entitled to rely upon that statement for the purposes set out above without waiving privilege by so doing, or by serving it in the first place.

78.    For all the above reasons, I would dismiss this appeal.

**Sir Stephen Irwin:**

79.    I agree.

**Lord Justice Baker:**

80.    I also agree.

521

A.C.

A

[HOUSE OF LORDS]

WAUGH . . . . . . . . . . APPELLANT

AND

BRITISH RAILWAYS BOARD . . . . . RESPONDENTS

B

1979 May 16, 17, 21;          Lord Wilberforce, Lord Simon of Glaisdale,
      July 12                  Lord Edmund-Davies, Lord Russell of Killowen
                               and Lord Keith of Kinkel

*Practice — Discovery — Privilege — Accident report by servants
of railways board in pursuance of practice of board—Partly
prepared for safety purposes and partly for obtaining legal
advice in anticipation of legal proceedings — Whether latter
purpose to be dominant for claim to privilege to succeed—
Whether form of wording of report conclusive as to purpose
for which prepared*

C

The plaintiff's husband was employed by the defendant
railways board. In a collision between locomotives, he
received injuries from which he died. The practice of the
board when an accident occurred was that on the day of the
accident a brief report was made to the railway inspectorate,
soon afterwards a joint internal report (" the joint inquiry
report ") was prepared incorporating statements of witnesses,
which was also sent to the inspectorate, and in due course a
report was made by the inspectorate for the Department of the
Environment. The heading of the joint inquiry report stated
that it had finally to be sent to the board's solicitor for the
purpose of enabling him to advise the board. The plaintiff
brought an action against the board under the Fatal Acci-
dents Acts, alleging that the collision had been caused by their
negligence, and sought discovery of, inter alia, the joint inquiry
report. The board, who denied negligence and alleged that
the collision had been caused or contributed to by the
deceased's own negligence, refused to disclose the report on
the ground, as stated in an affidavit sworn on their behalf,
that one of the principal purposes of preparing it had been
so that it could be passed to their chief solicitor to enable
him to advise the board on its legal liability and, if necessary,
conduct their defence to the proceedings, and that it was
accordingly the subject of legal professional privilege. On
an interlocutory application by the plaintiff for discovery of
the report, the master ordered discovery, but an appeal by the
board from his order was allowed by Donaldson J., and the
Court of Appeal by a majority (Eveleigh L.J. and Sir David
Cairns, Lord Denning M.R. dissenting) dismissed an appeal
by the plaintiff from Donaldson J.'s order.

On appeal by the plaintiff: —

*Held*, allowing the appeal, that the due administration of
justice strongly required that a document such as the internal
inquiry report, which was contemporary, contained statements
by witnesses on the spot and would almost certainly be the
best evidence as to the cause of the accident, should be dis-
closed; that for that important public interest to be overridden
by a claim of privilege the purpose of submission to the party's
legal advisers in anticipation of litigation must be at least the

D

E

F

G

H

**650**

522

dominant purpose for which it had been prepared; and that, in the present case, the purpose of obtaining legal advice in anticipation of litigation having been no more than of equal rank and weight with the purpose of railway operation and safety, the board's claim for privilege failed and the report should be disclosed (post, pp. 531A–B, H—532B, 533B–D, 534F–G, 535B–C, 537E–G, 538A–B, 543C—545A, D–F). A

Birmingham and Midland Motor Omnibus Co. Ltd. v. London and North Western Railway Co. [1913] 3 K.B. 850, C.A.; Ankin v. London and North Eastern Railway Co. [1930] 1 K.B. 527, C.A. and Ogden v. London Electric Railway Co. (1933) 49 T.L.R. 542, C.A. overruled. B

Anderson v. Bank of British Columbia (1876) 2 Ch.D. 644, Sir George Jessel M.R. and C.A. and Grant v. Downs (1976) 135 C.L.R. 674 considered.

Per curiam. The fact that the report stated on its face that it had finally to be sent to the board's solicitor for the purpose of enabling him to advise it cannot be conclusive as to the dominant purpose for which it was prepared (post, pp. 531A, 538A–B, 539E–G, 545E–F). C

Dictum of Lord Strathclyde, Lord President, in Whitehill v. Glasgow Corporation, 1915 S.C. 1015, 1017 applied.

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordships' opinions: D

Anderson v. Bank of British Columbia (1876) 2 Ch.D. 644, Sir George Jessel M.R. and C.A.

Ankin v. London and North Eastern Railway Co. [1930] 1 K.B. 527, C.A.

Birmingham and Midland Motor Omnibus Co. Ltd. v. London and North Western Railway Co. [1913] 3 K.B. 850, C.A.

Conway v. Rimmer [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1 All E.R. 874, H.L.(E.). E

Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch [1942] A.C. 435; [1942] 1 All E.R. 142, H.L.(Sc.).

Crompton (Alfred) Amusement Machines Ltd. v. Customs and Excise Commissioners (No. 2) [1974] A.C. 405; [1973] 3 W.L.R. 268; [1973] 2 All E.R. 1169, H.L.(E.).

D. v. National Society for the Prevention of Cruelty to Children [1978] A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.). F

Grant v. Downs (1976) 135 C.L.R. 674; 11 A.L.R. 577.

Jones v. Great Central Railway Co. [1910] A.C. 4, H.L.(E.).

Jones v. Monte Video Gas Co. (1880) 5 Q.B.D. 556, C.A.

Konia v. Morley [1976] 1 N.Z.L.R. 455.

Lawrence v. Campbell (1859) 4 Drew. 485.

Longthorn v. British Transport Commission [1959] 1 W.L.R. 530; [1959] 2 All E.R. 32. G

Northern Construction Co. v. British Columbia Hydro and Power Authority (1970) 75 W.W.R. 21.

Ogden v. London Electric Railway Co. (1933) 49 T.L.R. 542, C.A.

Reg. in Right of Canada v. Hawker Siddeley Canada Ltd. (1976) 73 D.L.R. (3d) 453. H

Seabrook v. British Transport Commission [1959] 1 W.L.R. 509; [1959] 2 All E.R. 15.

Southwark and Vauxhall Water Co. v. Quick (1878) 3 Q.B.D. 315, C.A.

523

A     *Vernon* v. *Board of Education for the Borough of North York* (1975)
     9 O.R.(2d) 613.
     *Whitehill* v. *Glasgow Corporation*, 1915 S.C. 1015.

   The following additional cases were cited in argument:

   *Adam Steamship Co. Ltd.* v. *London Assurance Corporation* [1914] 3
        K.B. 1256, C.A.

B     *Collins* v. *London General Omnibus Co.* (1893) 68 L.T. 831, D.C.
   *Cook* v. *North Metropolitan Tramway Co.* (1889) 54 J.P. 263, D.C.
   *London and Tilbury Railway Co.* v. *Kirk and Randall* (1884) 28 S.J. 688,
        D.C.
   *Westminster Airways Ltd.* v. *Kuwait Oil Co. Ltd.* [1951] 1 K.B. 134;
        [1950] 2 All E.R. 596, C.A.
   *Woolley* v. *North London Railway Co.* (1869) L.R. 4 C.P. 602.

C

   INTERLOCUTORY APPEAL from the Court of Appeal.

   By an action against the respondent defendants, the British Railways
Board, the appellant plaintiff, Alice Simpson Waugh (widow of John
Wallace Waugh, deceased), claimed damages against the board in respect
of the death of the deceased under the provisions of the Fatal Accidents

D  Acts 1846–1959, alleging that a collision between two of the board's
locomotives that had resulted in the death of the deceased, who had been
employed by the board, had been caused by the negligence of the board,
their servants or their agents. By their defence, the board denied negli-
gence, and alleged that the collision had been caused or contributed to by
the deceased's own negligence. The plaintiff sought discovery of an internal
inquiry report made by two officers of the board two days after the

E  accident, but the board refused discovery on the ground of legal pro-
fessional privilege. On an interlocutory application by the plaintiff, Master
Bickford Smith, on January 26, 1978, ordered disclosure of the report, but
Donaldson J., on May 8, 1978, allowed an appeal by the board from that
order. The Court of Appeal, on July 28, 1978, by a majority (Eveleigh L.J.
and Sir David Cairns, Lord Denning M.R. dissenting) dismissed an appeal

F  by the plaintiff. The plaintiff appealed by leave of the Court of Appeal.

   The facts are set out in their Lordships' opinions.

   *Peter Weitzman Q.C.* and *Michael Brent* for the plaintiff. Where a
report is brought into existence for several reasons or purposes only one
of which is to obtain professional legal advice in litigation that is pending
or anticipated, is it protected by legal professional privilege from dis-

G  covery? What is the test? There are a number of possible answers.
(1) It is enough to secure privilege if the intention to obtain legal advice is
*a* purpose, inter alia. (2) The intention to obtain legal advice must be at
least a *substantial* purpose. (3) The purpose for which the document is
brought into existence must be wholly or mainly that of obtaining profes-
sional legal advice, or it must have been " the *primary*," " the *substan-*

H  *tive*," or " the *dominant*," purpose (these different phrases have all been
used in the cases). (4) It must be the sole purpose. The plaintiff says
that the answer is (4), alternatively, possibly, (3).

   As to the authorities, the following preliminary observations may be

**652**

524

made.  At one time, the practice differed as between equity and common law.  (2) R.S.C., Ord. 24, r. 5, first came into existence in 1894 as A R.S.C., Ord. 31, r. 19A.  It was not until then that there was power in the court to inspect the documents in respect of which privilege was claimed.  The authorities fall into three groups: (i) pre-1913; (ii) *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London Electric Railway Co.* (1939) 49 T.L.R. 542; (iii) the cases after that, which do not add B much.  *Southwark and Vauxhall Water Co.* v. *Quick* (1878) 3 Q.B.D. 315 is strong authority for the " sole purpose " test, and *Collins* v. *London General Omnibus Co.* (1893) 68 L.T. 831 is also clear authority that at that stage the test was the " sole purpose " test.  [Reference was made to *Woolley* v. *North London Railway Co.* (1869) L.R. 4 C.P. 602; *Anderson* v. *Bank of British Columbia* (1876) 2 Ch.D. 644; *London and Tilbury Railway Co.* v. *Kirk and Randall* (1884) 28 S.J. 688; *Cook* v. C *North Metropolitan Tramway Co.* (1889) 54 J.P. 263; and the Sixteenth Report of the Law Reform Committee (Privilege in Civil Proceedings) (1967) (Cmnd. 3472), pp. 8 (para. 17), 13.]

   *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 turns, to begin with, on the form of words used in the affidavit (Eveleigh L.J. in the present case D said that the judgment of Buckley L.J. there could be read in that way). It was not, therefore, intended to deal with the proper principles or test to be applied.  Alternatively, Buckley and Hamilton L.JJ. were by implication referring to the " dominant purpose " test.  The plaintiff relies on the passage at p. 860: " The only authority . . ." Hamilton L.J. is at least saying that there is no authority for the view that the purpose does not at least have to be the primary or substantial purpose, and the judgment E of Buckley L.J., even taken on its own, does not go to the extent of contradicting that of Hamilton L.J.: see at p. 856: " It is not I think necessary . . ." (In *Southwark and Vauxhall Water Co.* v. *Quick*, 3 Q.B.D. 315, the word " merely " was used a number of times by Brett L.J.) The argument in the *Birmingham* case was directed largely to the form of the affidavit.  There is no suggestion in the report that there was any F other purpose.  The judgment of Buckley L.J. relates primarily to the wording of the affidavit rather than to the substance of it.  [Reference was made to *Adam Steamship Co. Ltd.* v. *London Assurance Corporation* [1914] 3 K.B. 1256 and *Ankin* v. *London and North Eastern Railway Co.* [1931] 1 K.B. 527.]

   *Ogden* v. *London Electric Railway Co.*, 49 T.L.R. 542, is moving to the position that, as a matter of substance, it is enough that one, substan- G tial, purpose for bringing the document into existence is that it shall be available for legal advice.  This is inconsistent with the judgments in *Southwark and Vauxhall Water Co.* v. *Quick*, 3 Q.B.D. 315.  Scrutton L.J. misinterpreted that case, and wrongly extended what the *Birmingham* case decided.  *Ogden* was wrongly decided, if it is authority that *a* substantial purpose is sufficient.  *Westminster Airways Ltd.* v. *Kuwait Oil Co. Ltd.* H [1951] 1 K.B. 134 is against the plaintiff: it shows that, since *Ogden*, the courts have been following *Ogden* and taking the view that a substantial purpose is enough.  There is a reference to " other purposes " at p. 143.

525

A.C.               Waugh v. British Railways Board (H.L.(E.) )

A   [Reference was made to *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509; *Longthorn* v. *British Transport Commission* [1959] 1 W.L.R. 530 and *Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No. 2)* [1974] A.C. 405.]

The privilege should only be accorded where it is necessary in order to achieve the purpose for which it is designed. Where the party would have brought the document into existence apart from the seeking of legal

B   advice, there is no need for the privilege. Before 1894, when only the affidavit was produced, the inability of the court to inspect the actual documents could lead to abuse or mistake. *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 was the first case where the court examined what the affidavit had to say and also looked at the documents. Thus, the language of the affidavit was no longer vital. There were now two questions:

C   should the court inspect the documents, and was the form of words conclusive? Because the court could inspect the documents, the form of words was no longer conclusive. [Reference was made to *Grant* v. *Downs* (1976) 135 C.L.R. 674; *Wigmore's Law of Evidence* (1905), vol. iv, paras. 2317–2319 and R.S.C., Ord. 38, r. 29.]

The plaintiff's submissions, in summary, are as follows. 1. *Ogden* v.

D   *London Electric Railway Co.*, 49 T.L.R. 542, was wrongly decided. One can go back to the situation before *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850, where, as was said in *Southwark and Vauxhall Water Co.* v. *Quick*, 3 Q.B.D. 315, the sole purpose test was the appropriate test. What is said by Lord Cross of Chelsea in *Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No. 2)* [1974]

E   A.C. 405, with the concurrence of the others of their Lordships, is that the matter is now open for the House to decide what is the appropriate test to be applied—that is, presumably, that which is most desirable in the interests of justice. If privilege is to be accorded to a document, it is only to be accorded where that is necessary for the basic rationale of the rule, as expressed, inter alia, by Sir George Jessel M.R. in

F   *Anderson* v. *Bank of British Columbia* (1876) 2 Ch.D. 644, 648–649. If a document comes into existence in circumstances such that it cannot be shown that it would not have come into existence but for the purposes of litigation, then in truth the privilege does not serve the purpose that is the basis of the rule, but merely provides an adventitious advantage. This is particularly the case with large corporate employers who are obliged to collect knowledge, as in this case. These

G   points were made in *Grant* v. *Downs*, 135 C.L.R. 674, on which the plaintiff very much relies. The problem posed can best be met by applying the sole purpose test; alternatively, the dominant purpose test, on the basis that the dominant purpose is the one that, if it had not existed, would mean that the document would not have come into existence. Here, the litigation purpose is at the highest one of two equal

H   purposes.

*Francis Irwin Q.C.* and *Frederick Marr-Johnson* for the board. The powers of the inspectors appointed by the Secretary of State are set out in section 4 of the Regulation of Railways Act 1871. The report of

526

October 29, 1976, can be obtained by anyone from the Ministry of Trans-     A
port or Her Majesty's Stationery Office.

One of the objects of privilege is to prevent one party from seeing in
detail what the other party's case is. It is very difficult to define "sub-
stantial." As to the tests, (1) once duality has been raised, there is no
English case that has approved the sole purpose test. The only case,
relied on by the plaintiff, is *Grant* v. *Downs*, 135 C.L.R. 674. (2) the     B
dominant purpose test has not been used by any judge except Barwick
C.J. in *Grant* v. *Downs*. How does one assess dominance? Dominance
in whose eyes? At what particular time?

[LORD EDMUND-DAVIES. In a civilised society, would not the domin-
ant purpose be to find out what happened, so as to prevent it from
happening again?]

In this case, there was no dominant purpose. The second report, the     C
joint inquiry report of May 6, 1976, was really the collection of evidence.
One difficulty of this approach is to distinguish between one aspect and
another: which is the important one? The answer here should therefore
be that the real test here can be described as a "substantial purpose"—
"*a* substantial purpose"—test, or an "appreciable purpose" test. "An
appreciable" means that it is something of consequence. The board does     D
not accept the substantial purpose test because there was not a substantial
purpose here. If there had been one, they would not go as far as to
accept that test. They would accept that it is a question of "dominant
in whose eyes?" Even there, there is difficulty, because one might have,
for example, two members of a family charged with making a report about
an accident that had happened to them: one might regard the dominant
purpose of the report as liability, the other safety. "*A* dominant pur-     E
pose" means a substantial purpose without the need to inquire whether it
was *the* dominant purpose. There are two basic criteria: (1) that the test
should be fair to both parties to the litigation; (2) that it should be simple
to understand and easy to apply in practice. Support for the "*a* substan-
tial purpose" test is found in the judgment of Diplock J. in *Longthorn*
v. *British Transport Commission* [1959] 1 W.L.R. 530, 534; see also *Konia*     F
v. *Morley* [1976] 1 N.Z.L.R. 455 and the test that Eveleigh L.J. applied
in the present case. Provided that the board establish *a* substantial purpose,
they concede that there may be cases—not this one—where there may be
a more important function. Thus, the substantial, appreciable purpose
test ought to be applied. It represents the law and practice of at least
the last 60 years. It is fair to both parties, in the sense that the privilege
attaching to the document supports the case of the board in this instance.     G
It has that advantage, but it precludes the plaintiff, on general grounds,
from having access to information to which otherwise she would be
entitled.

[LORD SIMON OF GLAISDALE. There are two conflicting principles—
curiously, both advanced to further the administration of justice. They
point in different directions. One usually tries to resolve such a conflict     H
by finding a middle line.]

That is the difficulty here: to find a workable middle line. This
advances the board's case for "substantial" or "appreciable."

655

527

A.C.                    Waugh v. British Railways Board (H.L.(E.))

A    [LORD RUSSELL OF KILLOWEN. What about the preliminary accident report? There must also have been a report to the police?]

The accident report was not disclosed. The coroner's notes were disclosed. The board could hold two inquiries, one as to liability and one as to safety. It could not then be said that the first would be disclosable. The second would be.

The plaintiff says that *Southwark and Vauxhall Water Co.* v. *Quick,*
B  3 Q.B.D. 315, is strong authority for the sole purpose test. There, the court was not concerned with any duality of purpose, and they were not directing their mind to that point. Secondly, the plaintiff says that *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 turned mainly on the form of words used in the affidavit and was not, therefore, intended to deal with the proper principles and the test to be applied; alternatively,
C  she suggests that Buckley and Hamilton L.JJ. were by implication referring to the dominant purpose test. That case has been considered ever since it was decided as settling matters of principle, and it is not correct to say that within the language used the court were favouring the dominant purpose test. There is no distinction between " primary " and " dominant "; that is why one should prefer the substantial purpose test.

D    The plaintiff said that *Ogden* v. *London Electric Railway Co.,* 49 T.L.R. 542, was wrongly decided: Scrutton L.J. misinterpreted the *Southwark and Vauxhall* case and extended what had been decided in the *Birmingham* case. *Ogden,* like the *Birmingham* case, has been regarded as settling matters of principle now for a great number of years; Scrutton L.J. took a correct view of the *Southwark and Vauxhall* case and correctly interpreted and applied the *Birmingham* case. The present state of the
E  law, based principally on the *Birmingham* case, the *Ogden* case and other cases referred to in *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509, may be summarised as follows. (1) All communications between a client or his legal adviser and third parties are prima facie privileged if one of the purposes for which they are made is the purpose of pending or contemplated litigation. (2) This purpose need not be the
F  " dominant " purpose for the document's existence, but it must be a " substantial " or " appreciable " purpose. (3) Whether or not the purpose is sufficiently substantial to attract the cloak of privilege will be a question of fact and degree in every case. There is no magic in any particular form of words, and (for example) it is not necessary that the affidavit should state that information was obtained " solely " or " merely " or " primarily " for the legal adviser. (4) Such a communication remains
G  privileged notwithstanding the fact that it is brought into existence as a matter of routine, or in accordance with standing instructions, and notwithstanding the fact that it may pass through various hands before coming finally to the legal adviser.

If the test is dominant purpose, it is possible to argue that the dominant purpose of the joint inquiry report was an inquiry into liability. The
H  " label " on the affidavit of the assistant to the general manager of the board's Eastern Region in support of the board's claim of privilege and on the joint inquiry report cannot be more than an indication of its purpose. Paragraph 2 of the board's list of documents, stating that they have

528

in their possession, custody or power the documents " relating to the    A
matters in question in this action" enumerated in the first schedule, is
standard form.

*Marr-Johnson* following on the Commonwealth authorities.  As to
*Grant* v. *Downs,* 135 C.L.R. 674, the House should have in mind the
principle set out by the majority there.  Using shorthand, they applied the
sole purpose test.  The judgment of the majority is based on a fallacy,
based on a misunderstanding of *Anderson* v. *Bank of British Columbia*    B
(1876) 2 Ch.D. 644: see at pp. 687–689.  It can be reduced to four pro-
positions.  (1) An ordinary individual can always be compelled to dis-
close his own knowledge of relevant facts.  (2) A corporation generally
has to acquire knowledge of relevant facts through the written communi-
cations of its agents.  (3) It would be extraordinary if a corporation could
claim the benefit of a privilege that was not available to an ordinary     C
individual.  (4) The majority conclude that, if the dual purpose claim
is allowed the effect would be precisely that.  The board agrees with
(3), but (4) does not follow from (1) and (2).  (1) is correct, but " relevant
facts " means the basic facts of the transaction, the res gestae, one
might almost say: the written documents in an accident case—typically,
the entry in the accident book in a factory case—or, in a commercial
case, the bank account in question.  *Anderson* v. *Bank of British*        D
*Columbia* is probably right if one reads it from end to end.  The facts
were wholly different from those in *Grant* v. *Downs.*  That is plain,
especially from the judgment of Mellish L.J., at p. 658: " . . . as to the
question that we have to decide in this case . . ."

It is well-established that a client is entitled to act on behalf of his
legal adviser in obtaining information from third parties.  A corporation
is in no different position from an individual.  That point was made     E
clearly by Cotton L.J. in *Southwark and Vauxhall Water Co.* v. *Quick,*
3 Q.B.D. 315, 321.  There is no difference at all that the board is aware
of.  It is plain from all the judgments in *Anderson* v. *Bank of British*
*Columbia,* 2 Ch.D. 644, particularly that of Mellish L.J., that all the docu-
ments there would legitimately have been the subject of discovery if the
bank had been in England: they were, in truth, bankers' records.       F

The board is not aware of any case other than *Grant* v. *Downs,* 135
C.L.R. 674, where the sole purpose test has been applied.  It is not right
to draw the line at that particular point.  If one is to draw a line at
all, one should draw it where it is capable of being applied easily in
practice (it is not only High Court judges who have to apply it).
Apart from Australia, the Commonwealth authorities all apply the sub-    G
stantial purpose test, which does work adequately in practice.  One
might have two different safety officers, one concerned with safety, one
with liability.  Or one might have a document 90 per cent. of which was
concerned with safety, 10 per cent. with liability.  These Commonwealth
cases follow the practice in England and Wales, and in two of them where
the substantial purpose test was applied the claim to privilege failed:
*Northern Construction Co.* v. *British Columbia Hydro and Power*       H
*Authority* (1970) 75 W.W.R. 21 and *Vernon* v. *Board of Education*
*for the Borough of New York* (1975) 9 O.R. (2d) 613.  *Alfred Crompton*
*Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No.* 2)

657

529

A   [1974] A.C. 405 was considered in *Reg. in Right of Canada* v. *Hawker Siddeley Canada Ltd.* (1976) 73 D.L.R. (3d) 453. [Reference was made to *Konia* v. *Morley* [1976] 1 N.Z.L.R. 455.]

*Weitzman Q.C.* in reply. One should not go through this report line by line, but should look at what the person says who inspired it. There is confusion in the board's argument between the function of pleadings on the one hand and particulars on the other. One should distinguish

B   between the purpose for which the report was made and the use eventually made of its contents. As to the proposition that the test should be simple to understand and easy to apply, that is the whole question here. It is very difficult to say exactly where such a test as "*a* substantial purpose" draws the line. It seems as though the Law Reform Committee in its Sixteenth Report (Privilege in Civil Proceedings) (1967) (Cmnd. 3472) were recommending the dominant purpose test: see at p. 8, para.

C   17: "wholly or mainly."

Even if the board's historical summation of the authorities be right, the House in *Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No.* 2) [1974] A.C. 405 regarded the matter as open for reconsideration.

It is quite impossible that the board should succeed on the dominant

D   purpose test, because their affidavit falls far short of it. That was recognised by Eveleigh L.J.

As to the Commonwealth authorities, see *Grant* v. *Downs*, 135 C.L.R. 674: the Commonwealth cases more or less follow what was said in *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509 and *Longthorn* v. *British Transport Commission* [1959] 1 W.L.R. 530.

E   Fairness and good sense suggest that the privilege should be limited to those cases where it is essential that it should be granted. Where a document would have been produced anyway, whether there was to be litigation or not, that suggests that the privilege is not necessary.

Their Lordships took time for consideration.

F

July 12. LORD WILBERFORCE. My Lords, the appellant's husband was an employee of the British Railways Board. A locomotive which he was driving collided with another so that he was crushed against a tank wagon. He received injuries from which he died. The present action is brought under the Fatal Accidents Acts 1846–1959 and this appeal arises out of an interlocutory application for discovery by the board of a report called the

G   "joint inquiry report," made by two officers of the board two days after the accident. This was resisted by the board on the ground of legal professional privilege. The Court of Appeal, Eveleigh L.J. and Sir David Cairns, Lord Denning M.R. dissenting, refused the application.

When an accident occurs on the board's railways, there are three reports which are made. 1. On the day of the accident a brief report of the

H   accident is made to the Railway Inspectorate. 2. Soon afterwards a joint internal report is prepared incorporating statements of witnesses. This too is sent to the Railway Inspectorate. Preparation of this report, it appears, is a matter of practice: it is not required by statute or statutory regula-

658

530

Lord Wilberforce    Waugh v. British Railways Board (H.L.(E.))    [1980]

tion. 3. In due course a report is made by the Railway Inspectorate for the Department of the Environment.

The document now in question is that numbered 2. The circumstances in which it came to be prepared, and the basis for the claim of privilege, were stated in an affidavit sworn on behalf of the board by Mr. G. T. Hastings, assistant to the general manager of the Eastern Region. I find it necessary to quote the significant passages in this affidavit.

"3. The general manager of the Eastern Region is required (as are the general managers of the other railways regions) to submit returns to the Department of [the] Environment in respect of accidents occurring on or about any railway . . . 6. It has long been the practice of the board and its predecessors to require that returns and reports on all accidents occurring on the railway and joint internal departmental inquiries into the causes of the said accident be made by the local officers of the board who would forward them to their superiors in order to assist in establishing the causes of such accidents. 7. Such reports and the statements of witnesses to such accidents are made for the purposes mentioned in paragraphs 3 and 6 of this affidavit and equally for the purpose of being submitted to the board's solicitor as material upon which he can advise the board upon its legal liability and for the purpose of conducting on behalf of the board any proceedings arising out of such accidents . . . 9. It is commonly anticipated by the board that: (a) where an employee of the board suffers personal injury or death at work or (b) where a passenger suffers loss [or] personal injury or death while on or about the railway a claim for damages will be made against the board and proceedings will ensue if liability is repudiated. The present action is brought as the result of a fatal accident suffered at work by the late husband of the plaintiff and it was anticipated from the very outset that a claim for damages would almost certainly ensue. 10. The documents in this action namely the reports made by the board's officers and servants and the report referred to in correspondence as the internal inquiry report for which the defendants have claimed privilege in part 2 of the first schedule of their list of documents dated November 11, 1977, came into existence by reason of the fact that the appropriate officer, in this case the divisional manager at Newcastle, in accordance with long standing practice was required to and did so call for such reports and statements. One of the principal purposes for so doing was so that they could be passed to the board's chief solicitor to enable him to advise the board on its legal liability and if necessary conduct its defence to these proceedings. 11. The internal inquiry report in fact states on the face of it that it has finally to be sent to the solicitor for the purpose of enabling him to advise the board."

This last paragraph refers to the wording which appears at the head of the report:

"For the information of the board's solicitor: This form is to be used by every person reporting an occurrence when litigation by or against the B.R.B. is anticipated. It is to be provided by the person

659

A       making it to his immediate superior officer and has finally to be sent to the solicitor for the purpose of enabling him to advise the B.R.B. in regard thereto."

Whatever this heading may say, the affidavit makes it clear that the report was prepared for a dual purpose: for what may be called railway operation and safety purposes and for the purpose of obtaining legal advice in anticipation of litigation, the first being more immediate than the second, but both being described as of equal rank or weight. So the question arises whether this is enough to support a claim of privilege, or whether, in order to do so, the second purpose must be the sole purpose, or the dominant or main purpose. If either of the latter is correct, the claim of privilege in this case must fail.

My Lords, before I consider the authorities, I think it desirable to attempt to discern the reason why what is (inaccurately) called legal professional privilege exists. It is sometimes ascribed to the exigencies of the adversary system of litigation under which a litigant is entitled within limits to refuse to disclose the nature of his case until the trial. Thus one side may not ask to see the proofs of the other side's witnesses or the opponent's brief or even know what witnesses will be called: he must wait until the card is played and cannot try to see it in the hand. This argument cannot be denied some validity even where the defendant is a public corporation whose duty it is, so it might be thought, while taking all proper steps to protect its revenues, to place all the facts before the public and to pay proper compensation to those it has injured. A more powerful argument to my mind is that everything should be done in order to encourage anyone who knows the facts to state them fully and candidly —as Sir George Jessel M.R. said, to bare his breast to his lawyer: *Anderson v. Bank of British Columbia* (1876) 2 Ch.D. 644, 699. This he may not do unless he knows that his communication is privileged.

   But the preparation of a case for litigation is not the only interest which call for candour. In accident cases ". . . the safety of the public may well depend on the candour and completeness of reports made by subordinates whose duty it is to draw attention to defects ": *Conway* v. *Rimmer* [1968] A.C. 910, *per* Lord Reid, at p. 941. This however does not by itself justify a claim to privilege since, as Lord Reid continues:

     ". . . no one has ever suggested that public safety has been endangered by the candour or completeness of such reports having been inhibited by the fact that they may have to be produced if the interests of the due administration of justice should ever require production at any time."

So one may deduce from this the principle that while privilege may be required in order to induce candour in statements made for the purposes of litigation it is not required in relation to statements whose purpose is different—for example to enable a railway to operate safety.

H      It is clear that the due administration of justice strongly requires disclosure and production of this report: it was contemporary; it contained statements by witnesses on the spot; it would be not merely relevant evidence, but almost certainly the best evidence as to the cause of the

532

**Lord Wilberforce    Waugh v. British Railways Board (H.L.(E.) )    [1980]**

accident. If one accepts that this important public interest can be over-
ridden in order that the defendant may properly prepare his case, how
close must the connection be between the preparation of the document
and the anticipation of litigation? On principle I would think that the
purpose of preparing for litigation ought to be either the sole purpose
or at least the dominant purpose of it: to carry the protection further into
cases where that purpose was secondary or equal with another purpose
would seem to be excessive, and unnecessary in the interest of encouraging
truthful revelation. At the lowest such desirability of protection as might
exist in such cases is not strong enough to outweigh the need for all rele-
vant documents to be made available.

There are numerous cases in which this kind of privilege has been con-
sidered. A very useful review of them is to be found in the judgment
of Havers J. in *Seabrook* v. *British Transport Commission* [1959] 1
W.L.R. 509 which I shall not repeat. It is not easy to extract a coherent
principle from them. The two dominant authorities at the present time
are *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and
North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London
Electric Railway Co.* (1933) 49 T.L.R. 542, both decisions of the Court
of Appeal. These cases were taken by the majority of the Court of
Appeal in the present case to require the granting of privilege in cases
where one purpose of preparing the document(s) in question was to enable
the defendants' case to be prepared whether or not they were to be
used for another substantial purpose. Whether in fact they compel such a
conclusion may be doubtful—in particular I do not understand the
*Birmingham* case to be one of dual purposes at all: but it is enough that
they have been taken so to require. What is clear is that, though loyally
followed, they do not now enjoy rational acceptance: in *Longthorn* v.
*British Transport Commission* [1959] 1 W.L.R. 530 the manner in which
Diplock J. managed to escape from them, and the tenor of his judgment,
shows him to have been unenthusiastic as to their merits. And in *Alfred
Crompton Amusement Machines Ltd.* v. *Customs and Excise Com-
missioners (No. 2)* [1974] A.C. 405 Lord Cross of Chelsea, at p. 432,
pointedly left their correctness open, while Lord Kilbrandon stated, at
p. 435, that he found the judgment of Scrutton L.J. in *Ogden* v. *London
Electric Railway Co.*, 49 T.L.R. 542, 543–544, " hard to accept." Only
Viscount Dilhorne (dissenting) felt able to follow them in holding it to be
enough if one purpose was the use by solicitors when litigation was
anticipated.

The whole question came to be considered by the High Court of
Australia in 1976: *Grant* v. *Downs*, 135 C.L.R. 674. This case involved
reports which had " as one of the material purposes for their preparation "
submission to legal advisers in the event of litigation. It was held that
privilege could not be claimed. In the joint judgment of Stephen, Mason
and Murphy JJ., in which the English cases I have mentioned were dis-
cussed and analysed, it was held that " legal professional privilege " must
be confined to documents brought into existence for the sole purpose of
submission to legal advisers for advice or use in legal proceedings.
Jacobs J. put the test in the form of a question, at p. 692: " . . . does
the purpose "—in the sense of intention, the intended use—" of supplying

**661**

533

A    the material to the legal adviser account for the existence of the material? " Barwick C.J. stated it in terms of " dominant " purpose. This is closely in line with the opinion of Lord Denning M.R. in the present case that the privilege extends only to material prepared " wholly or mainly for the purpose of preparing [the defendant's] case." The High Court of Australia and Lord Denning M.R. agree in refusing to follow *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London*

B    *and North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London Electric Railway Co.,* 49 T.L.R. 542, as generally understood.

My Lords, for the reasons I have given, when discussing the case in principle, I too would refuse to follow those cases. It appears to me that unless the purpose of submission to the legal adviser in view of litigation is at least the dominant purpose for which the relevant document was prepared, the reasons which require privilege to be extended to it cannot

C    apply. On the other hand to hold that the purpose, as above, must be the sole purpose would, apart from difficulties of proof, in my opinion, be too strict a requirement, and would confine the privilege too narrowly: as to this I agree with Barwick C.J. in *Grant* v. *Downs,* 135 C.L.R. 674, and in substance with Lord Denning M.R. While fully respecting the necessity for the Lords Justices to follow previous decisions of their court, I find

D    myself in the result in agreement with Lord Denning's judgment. I would allow the appeal and order disclosure of the joint report.

LORD SIMON OF GLAISDALE. My Lords, the appellant's late husband, an employee of the respondents, was killed in an accident on part of their railway system. In accordance with their usual practice, shared by many industrial and commercial undertakings in such circumstances, a report

E    was made about the accident. As so often, the report came into being partly for the purpose of ascertaining whether the working system was defective and could be improved so as to obviate such accidents, partly for the purpose of informing the respondents' solicitors in case of the threat or initiation of litigation, which, at the time when the report was made, was contemplated by the respondents as possible or probable.

F    The report, as is usual, contains statements by all such persons as could throw light on the circumstances of the accident, the majority of whom could be witnesses in any ensuing litigation. Litigation having in fact been started by the appellant against the respondents, the former has sought disclosure of the report to assist her in the preparation and/or conduct of her case. The respondents resist its disclosure, on the ground that it is protected by legal professional privilege.

G    The situation being far from unusual, the issue has quite frequently been before the courts. The English authorities were meticulously reviewed by Havers J. in *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509. His conclusion was that he was bound by what had been said by the majority of the Court of Appeal in *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.*

H    [1913] 3 K.B. 850, and by the ensuing Court of Appeal decisions in *Ankin* v. *London and North Eastern Railway Co.* [1930] 1 K.B. 527 and *Ogden* v. *London Electric Railway Co.,* 49 T.L.R. 542. The law thus laid down was that such a report need not be disclosed if one of its purposes

534
Lord Simon
of Glaisdale                 Waugh v. British Railways Board (H.L.(E.))                  [1980]

(even though subsidiary) was to inform the solicitor with a view to A
litigation contemplated as possible or probable. That this was the correct
distillation of the prevailing case law was recognised by Diplock J. in
*Longthorn* v. *British Transport Commission* [1959] 1 W.L.R. 530; though
he deftly avoided its application. It was also recognised as the prevailing
English law, and applied, by various Canadian courts: see *Northern
Construction Co.* v. *British Columbia Hydro and Power Authority* (1970)
75 W.W.R. 21; *Vernon* v. *Board of Education for the Borough of North* B
*York* (1975) 9 O.R.(2d) 613; *Reg. in Right of Canada* v. *Hawker Siddeley
Canada Ltd.* (1976) 73 D.L.R. (3d) 453. In New Zealand, too, the
Court of Appeal held that to attract privilege its use in reasonably
apprehended litigation need not be the only purpose of the document
(though it must be an appreciable purpose): *Konia* v. *Morley* [1976] 1
N.Z.L.R. 455. *Ankin* v. *London and North Eastern Railway Co.* [1930] C
1 K.B. 527 and *Ogden* v. *London Electric Railway Co.*, 49 T.L.R. 542
being English Court of Appeal decisions, the law declared there was
binding on, and applied by the majority of, the Court of Appeal in the
instant case.

The earlier authorities are, however, by no means so categorical; and
the views of Hamilton L.J. in *Birmingham and Midland Motor Omnibus
Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 D
were preferred, though not as a matter of decision, by the majority of the
members of the Appellate Committee in *Alfred Crompton Amusement
Machines Ltd.* v. *Customs and Excise Commissioners* (*No.* 2) [1974]
A.C. 405; and it was the *Birmingham* case which was the foundation of
*Ankin* and *Ogden.* In *Grant* v. *Downs*, 135 C.L.R. 674, the majority of
the High Court in Australia took those earlier authorities into account E
and also the doubt that had been thrown on the more recent ones in
*Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise
Commissioners* (*No.* 2); and, weighing various other considerations, held
that to attract privilege the use of the document for reasonably anticipated
litigation must be its sole purpose. Barwick C.J., at p. 677, " Having
considered the decisions, the writings and the various aspects of the
public interest which claim attention," thought that use of the document F
either for legal advice or to be used in reasonably apprehended litigation
had to be the dominant purpose in order to attract privilege from dis-
closure. The Law Reform Committee, in its Sixteenth Report (Privilege
in Civil Proceedings) (1967) (Cmnd. 3472) thought that, under the sub-
sisting English law, the test of privilege was that the document should
be " wholly or mainly " for the purpose of preparing one's case in G
litigation then pending or contemplated (para. 17); and, although I do not
myself consider that that was the prevailing law (nor, indeed, I think, did
Lord Denning M.R. in the instant case, for all that he favoured it as the
test), the views of such an eminent committee are entitled to great
respect.

The upshot of this cursory conspectus of the authorities is that your H
Lordships are, in my view, free to consider the issue on grounds of
principle and convenience, unembarrassed by previous authority, which,
rather, constitutes diverse springboards. The appellant argues that the

**663**

535

A.C.          Waugh v. British Railways Board (H.L.(E.))          Lord Simon
of Glaisdale

A  correct test is that preferred by the majority of the High Court in Grant v. Downs, 135 C.L.R. 674, namely the sole purpose; or, alternatively, that preferred by Barwick C.J. in that case, namely the dominant purpose. The respondents argue that Ankin v. London and North Eastern Railway Co. [1930] 1 K.B. 527 and Ogden v. London Electric Railway Co., 49 T.L.R. 542, were correctly decided, and that it is sufficient to attract privilege from disclosure if one of the purposes

B  (however subsidiary) is with a view to apprehended litigation.

The issue exemplifies a situation which frequently causes difficulties—where the forensic situation is covered by two valid legal principles which point each to a different forensic conclusion. Here, indeed, both principles subserve the same legal end—the administration of justice. The first principle is that the relevant rules of law should be applied to the

C  whole body of relevant evidence—in other words, in principle all relevant evidence should be adduced to the court. The report in question in this appeal undoubtedly contains information relevant to the matters in issue in the litigation here. The first principle thus indicates that it should be disclosed, so that the appellant may make use of it if she wishes.

The second general principle arises out of the adversary (in contradiction to the inquisitorial) system of administration of justice. Society

D  provides an objective code of law and courts where civil contentions can be decided. But it contents itself with so providing a forum and a code (and nowadays some finance for those who could not otherwise get justice). Having done so much, society considers that it can safely leave each party to bring forward the evidence and argument to establish his/her case, detaching the judge from the hurly-burly of contestation

E  and so enabling him to view the rival contentions dispassionately. It is true that this does not in itself give rise to legal professional privilege. Sir Thomas More, before his time for judicial and administrative responsibility, had a different system for the Utopians:

   " For they thinke it most mete, that euery man shuld pleade his owne matter, and tell the same tale before the iudge, that he would tel to

F      his man of lawe. So shall there be lesse circumstaunce of wordes, and the trwth shal soner cum to light; whiles the iudge with a discrete judgement doth waye the wordes of hym whom no lawier hath instruct with deceit; and whiles he helpeth and beareth out simple wittes agaynst the false and malicious circumuertions of craftie chyldren." (Utopia, 1516, tr. Ralph Robinson, 1551, Bk. 2, [ch. 7].)

G  This is all very fine; but that great moralist and master of common sense, Dr. Johnson, saw the snag. Quite apart from the descent of the judge into the arena:

   " As it rarely happens that a man is fit to plead his own cause, lawyers are a class of the community, who, by study and experience, have acquired the art and power of arranging evidence, and of

H      applying to the points at issue what the law has settled. A lawyer is to do for his client all that his client might fairly do for himself, if he could." (Boswell, Life of Johnson, ed. Birkbeck Hill (1950), vol. v, 26).

664

536
Lord Simon
of Glaisdale                    Waugh v. British Railways Board (H.L.(E.) )                    [1980]

So the adversary system calls for legal representation if it is to operate
with such justice as is vouchsafed to humankind.                                          A

This system of adversary forensic procedure with legal professional
advice and representation demands that communications between lawyer
and client should be confidential, since the lawyer is for the purpose of
litigation merely the client's alter ego. So too material which is to go
into the lawyer's (i.e. the client's) brief or file for litigation. This is the
basis for the privilege against disclosure of material collected by or on          B
behalf of a client for the use of his lawyer in pending or anticipated
litigation: see Cotton L.J. in *Southwark and Vauxhall Water Co.* v.
*Quick* (1878) 3 Q.B.D. 315, 321–322; *D.* v. *National Society for the
Prevention of Cruelty to Children* [1978] A.C. 171, 231; Sixteenth
Report of the Law Reform Committee, paras. 17–21. Apart from
the limited exception of some expert evidence, for which the Rules
of the Supreme Court make express provision (Ord. 38, r. 37), a          C
party in civil litigation is not entitled to see the adversary's proofs of
what his witnesses will say at the trial; there has been no suggestion
that he should be so entitled; and any such development would require
the most careful consideration based on widespread consultation. The
report in question in this appeal undoubtedly contains material collected
by or on behalf of the respondents for the use of their solicitors in anti-          D
cipated litigation. The second principle thus indicates that the respon-
dents are entitled to claim that it is confidential as between themselves
and their solicitors and that they are not bound to disclose it.

Historically, the second principle—that a litigant must bring forward
his own evidence to support his case, and cannot call on his adversary
to make or aid it—was fundamental to the outlook of the courts of
common law. The first principle—that the opponent might be compelled          E
to disclose relevant evidence in his possession—was the doctrine of the
Chancery, a court whose conscience would be affronted by forensic success
contrary to justice obtained merely through the silent non-cooperation
of the defendant (see Y.B. 9 Ed. IV, Trin. 9), and which therefore had
some inclination to limited inquisitorial procedures. The conflict between
the Chancery and the courts of common law was, here as elsewhere,          F
ultimately resolved by compromise and accommodation.

I can see no intrinsic reason why the one principle rather than the
other should prevail in a situation where they are counter-indicative.
Neither is absolute: both are subject to numerous exceptions. For
example, if a document protected by legal professional privilege (or
secondary evidence of it) has been obtained by the opposite party
independently—even through the default of the legal adviser—even by          G
dishonesty—either will probably be admissible: *Phipson on Evidence*,
12th ed. (1976), p. 241, para. 584; Sixteenth Report of the Law Reform
Committee, para. 31. The numerous exceptions to the principle that all
relevant evidence should be disclosed arise partly from historical reasons
(the tensions between the courts of common law, where questions of
fact were tried, and the Court of Chancery, where the remedy of discovery          H
was developed), partly from considerations of justice, partly from wider
social considerations: see *D.* v. *National Society for the Prevention of
Cruelty to Children* [1978] A.C. 171, at pp. 231 et seq. Thus the

665

537

A.C.                    Waugh v. British Railways Board (H.L.(E.))          Lord Simon
                                                                          of Glaisdale

A  historical exclusion of hearsay evidence, "the best evidence" rule and "without prejudice" communications are examples of exceptions to the principle of adduction of all relevant evidence. So too is the rule excluding, in general, evidence going merely to the discredit of a witness, even though the credibility of the witness may be decisive of the case. But the exception which most nearly touches the issue facing your Lordships was cogently invoked in this very connection by James L.J.

B  in *Anderson* v. *Bank of British Columbia*, 2 Ch.D. 644, 656:

> ". . . as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief."

The adversary's brief will contain much relevant material; nevertheless,
C  you cannot see it because that would be inconsistent with the adversary forensic process based on legal representation. I would, though, draw attention to the word "merely" in James L.J.'s dictum.

There is, then, no a priori reason why the one general principle should yield to the other. But in my judgment each party's main contention would virtually result in the total exclusion of the principle relied on by the other. The rule in *Ogden* in effect means that reports such as that
D  in the instant case will always be excluded, because it is unlikely that there is not in such circumstances even the subsidiary purpose of informing the legal advisers. On the other hand, to enjoin that privilege can only be claimed if the information of legal advisers is the sole purpose of the report will in effect mean that such reports must always be disclosed, because it is unlikely that in such circumstances there will not be
E  even the subsidiary purpose of ascertaining whether the system of work can be improved. Indeed, in this type of report causation and fault can hardly be kept apart.

Your Lordships will therefore, I apprehend, be seeking some intermediate line which will allow each of the two general principles scope in its proper sphere. Various intermediate formulae as a basis for the privilege have been canvassed in argument before your Lordships,
F  most based on some authority—the obtaining of legal advice was "an appreciable purpose"; "a substantial purpose"; "*the* substantial purpose"; it was "wholly or mainly" for that purpose; that was its "dominant" purpose; that was its "primary" purpose.

Some of these are in my view too vague. Some give little or no scope to the principle of open litigation with the minimum exclusion of
G  relevant evidence. The one that appeals most to me is "dominant" purpose, as it did to Barwick C.J. in *Grant* v. *Downs*, 135 C.L.R. 674. It allows scope to each of the governing principles. It seems to me less quantitative than "mainly"; and I think it would be easier to apply— the law is already cognisant of the concept of a dominant purpose—in the law of conspiracy, for example (see *Crofter Hand Woven Harris*
H  *Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435, especially at pp. 445 (Viscount Simon L.C.), 452 (Viscount Maugham) ), and in the law as to fraudulent preference in bankruptcy (see *Halsbury's Laws of England*, 4th ed., vol. 3 (1973), pp. 496, 499, paras. 908, 913).

538

Lord Simon
of Glaisdale                 **Waugh v. British Railways Board (H.L.(E.) )**                    [1980]

I would therefore overrule *Ankin* v. *London and North Eastern* A
*Railway Co.* [1930] 1 K.B. 527 and *Ogden* v. *London Electric Railway
Co.*, 49 T.L.R. 542.

My noble and learned friend on the Woolsack has already cited the
crucial passages from the affidavit of Mr. Hastings. These show that
the procuring of legal advice or preparation for litigation was not the
dominant purpose of the report. It follows that the claim for legal
professional privilege fails, and the report must be disclosed.          B

Accordingly, I would allow the appeal.


LORD EDMUND-DAVIES. My Lords, the circumstances of the fatal
accident on May 4, 1976, giving rise to this litigation have already been
related by my noble and learned friend Lord Wilberforce. A copy of
the short report sent the same day by the respondent board to the C
Ministry of Transport in accordance with section 6 of the Regulation of
Railways Act 1871 has been furnished to the appellant's solicitors. They
have also been supplied with a copy of the report of October 29, 1976,
prepared by the Railway Inspectorate of the Department of Transport.
But what has not been disclosed is the May 6, 1976, report based upon
a joint internal inquiry conducted by the board's personnel. The
importance to the appellant of such a report, made only two days after D
the accident and when the memory of witnesses were fresh, is manifest.
But from the outset disclosure of its contents has been resisted. In their
list of documents the board claimed that they were

". . . documents which came into existence and were made by the
defendants or their officers or servants after this litigation was in
contemplation and in view of such litigation for the purpose of E
obtaining for and furnishing to the solicitor of the defendants
evidence and information as to the evidence which will be obtained
or otherwise for the use of the said solicitor to enable him to
conduct the defence in this action or to advise the defendants."


But that the reports referred to were not made solely for litigation F
purposes emerged when the board, being nevertheless pressed for dis-
closure of the internal inquiry report, responded by an affidavit sworn
by Mr. Hastings, assistant to the general manager of their Eastern
Region. So important is it that I must quote from it at some length:

"6. It has long been the practice of the board and its predecessors
to require that returns and reports on all accidents occurring on the
railway and joint internal departmental inquiries into the causes of G
the said accident be made by the local officers of the board who
would forward them to their superiors in order to assist in establish-
ing the causes of such accidents. 7. Such reports and the statements
of witnesses to such accidents are made for the purposes mentioned
in paragraphs 3 and 6 of this affidavit and equally for the purpose
of being submitted to the board's solicitor as material upon which H
he can advise the board upon its legal liability and for the purpose
of conducting on behalf of the board any proceedings arising out of
such accidents. 8. This system of reporting accidents and making

539

joint internal departmental inquiries into the causes of the said accidents and laying down the necessary instructions to the relevant staff to do so for the purposes aforesaid continues today. 9. It is commonly anticipated by the board that: (a) where an employee of the board suffers personal injury or death at work or (b) where a passenger suffers loss [or] personal injury or death while on or about the railway a claim for damages will be made against the board and proceedings will ensue if liability is repudiated. The present action is brought as the result of a fatal accident suffered at work by the late husband of the plaintiff and it was anticipated from the very outset that a claim for damages would almost certainly ensue. 10. The documents in this action namely the reports made by the board's officers and servants and the report referred to in correspondence as the internal inquiry report for which the defendants have claimed privilege in part 2 of the first schedule of their list of documents dated November 11, 1977, came into existence by reason of the fact that the appropriate officer, in this case the divisional manager at Newcastle, in accordance with long standing practice was required to and did so call for such reports and statements. One of the principal purposes for so doing was so that they could be passed to the board's chief solicitor to enable him to advise the board on its legal liability and if necessary conduct its defence to these proceedings. 11. The internal inquiry report in fact states on the face of it that it has finally to be sent to the solicitor for the purpose of enabling him to advise the board."

In the light of such affidavit, counsel for the appellant accepts that he cannot challenge that litigation arising out of the fatal accident was anticipated when the report of May 6, 1976, was prepared: see *Jones* v. *Monte Video Gas Co.* (1880) 5 Q.B.D. 556. The fact that the report states on its face that it has *finally* to be sent to the solicitor for the purpose of enabling him to advise the board cannot, however, be determinative of the outcome of this appeal, for, as the Lord President (Lord Strathclyde) said in *Whitehill* v. *Glasgow Corporation*, 1915 S.C. 1015, 1017—quoted with approval by Lord Kilbrandon in *Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No. 2)* [1974] A.C. 405, 435–436:

"These words cannot alter the character of the report which is made by the employee for the purpose of informing his employers of the accident, and made at the time."

My Lords, in the light of their own affidavit, are the board entitled to resist disclosure? There is a very large body of case law on the topic of legal professional privilege, much of which was reviewed in *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509 by Havers J., who quoted extensively from earlier decisions. It would not, I think, be helpful were I to make a further attempt to do that which that learned judge so admirably accomplished. Instead, I propose to consider first whether Eveleigh L.J. and Sir David Cairns in the present case were right in holding that the earlier Court of Appeal decisions in *Birmingham*

540

Lord Edmund-Davies   **Waugh v. British Railways Board (H.L.(E.) )**        [1980]

and *Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London Electric Railway Co.,* 49 T.L.R. 542 compelled them to dismiss the plaintiff's appeal from the decision of Donaldson J. refusing disclosure.     A

In the *Birmingham* case Buckley L.J. (with whom Vaughan Williams L.J. concurred) said, at p. 856:

> "It is not I think necessary that the affidavit should state that the information was obtained solely or merely or primarily for the   B
> solicitor, if it was obtained for the solicitor, in the sense of being procured as materials upon which professional advice should be taken in proceedings pending, or threatened, or anticipated."

That passage was cited with approval in *Ogden* v. *London Electric Railway Co.,* the facts of which were strikingly similar to those of the present case, Scrutton L.J. saying, at pp. 543–544, with reference to a   C
non-privileged purpose for which accident reports had been obtained:

> "It may be that that is part of the purpose of making the reports, but there is also the *substantial* purpose that if a writ is issued these are the materials that will be wanted by the solicitor conducting the litigation, and they are obtained for that purpose, among others, and as appears from the form at which we look . . . the reports are made   D
> on a form headed: 'For the information of the company's solicitors only,' which is a very important heading to have, because if you know that you are making a confidential report to the solicitor you are much more likely to state accurately what has happened than if you are afraid that somebody presently seeing that report may take proceedings against you in respect of the statements that you have   E
> made, which may be defamatory." (Italics added.)

I have already indicated my inability (in concurrence with Lord Denning M.R. in the present case) to have regard to such a heading. Nevertheless, *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London*   F
*Electric Railway Co.,* 49 T.L.R. 542, are authorities for the proposition that reports such as that compiled in the instant case two days after the fatal accident are privileged even though they were obtained for other purposes as well as to meet impending or anticipated litigation. And they led the majority of the Court of Appeal to hold here that the internal inquiry report need not be disclosed, Eveleigh L.J. going to the length of saying:     G

> ". . . I believe that in so far as this court is concerned it has been firmly established that the documents in question in the present case are privileged. They were obtained for the purpose of being sent to the solicitors to serve in preparing the defendant's case for litigation which was anticipated. *And they would also be used for another very substantial and even more important purpose.* On the authori-   H
> ties I do not believe that this entitles me to say that the privilege which otherwise would have attached [to them] has been removed." (Italics added.)

**669**

541

**A.C.**          **Waugh v. British Railways Board (H.L.(E.))**     **Lord Edmund-Davies**

But Lord Denning M.R., in the course of his dissenting judgment, refused to be bound by such earlier Court of Appeal decisions. Instead, he adverted to the view expressed in the Sixteenth Report of the Law Reform Committee, para. 17, that

> "... it is, we think, essential ... that [a party] should be entitled to insist upon there being withheld from the court any material which came into existence ... wholly or mainly for the purpose of preparing his case in litigation then pending or contemplated by him."

Lord Denning M.R. added:

> "We should not extend it further. If material comes into being for a dual purpose—one to find out the cause of the accident—the other to furnish information to the solicitor—it should be disclosed, because it is not then 'wholly or mainly' for litigation. On this basis all the reports and inquiries into accidents—which are made shortly after the accident—should be disclosed on discovery and made available in evidence at the trial."

Applying that test to the facts of this case, Lord Denning M.R. said:

> "The main purpose of this inquiry and report was to ascertain the cause of the accident and to prevent further accidents or similar occurrences. Its nearby purpose was to put before the departmental inspectorate. Its far-off purpose was to put before the solicitors of the board, should a claim be made and litigation ensue."

My Lords, it will later emerge how closely I am at one with Lord Denning M.R. in this matter. I must, however, say that I am in respectful agreement with the view adopted by Eveleigh L.J. and Sir David Cairns that *Birmingham and Midland Motor Omnibus Co. Ltd.* v. *London and North Western Railway Co.* [1913] 3 K.B. 850 and *Ogden* v. *London Electric Railway Co.,* 49 T.L.R. 542, were binding upon the Court of Appeal and that none of the many other cases cited—such as *Jones* v. *Great Central Railway Co.* [1910] A.C. 4, *Alfred Crompton Amusement Machines Ltd.* v. *Customs and Excise Commissioners (No. 2)* [1974] A.C. 405, *Seabrook* v. *British Transport Commission* [1959] 1 W.L.R. 509 and *Longthorn* v. *British Transport Commission* [1959] 1 W.L.R. 530— enabled them to escape from that thraldom. In these circumstances, I regard it as fortunate for justice that an appeal has reached this House, for in my judgment a grievous wrong might have been done had Master Bickford Smith's original order in favour of disclosure not been finally upheld.

It is for the party refusing disclosure to establish his right to refuse. It may well be that in some cases where that right has in the past been upheld the courts have failed to keep clear the distinction between (a) communications between client and legal adviser, and (b) communications between the client and third parties, made (as the Law Reform Committee put it)

> "... for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice

**670**

542
Lord Edmund-Davies    Waugh v. British Railways Board (H.L.(E.))    [1980]

upon pending or contemplated litigation." (Sixteenth Report, A para. 17 (c).)

In cases falling within (a), privilege from disclosure attaches to communications for the purpose of obtaining legal advice and it is immaterial whether or not the possibility of litigation were even contemplated, Kindersley V.-C. saying in *Lawrence* v. *Campbell* (1859) 4 Drew. 485, 490:
B

". . . it is not now necessary as it formerly was for the purpose of obtaining production that the communications should be made either during or relating to an actual or even to an expected litigation. It is sufficient if they pass as professional communications in a professional capacity."

But in cases falling within (b) the position is quite otherwise. Litigation, C apprehended or actual, is its hallmark. Referring to "the rule which protects confidential communications from discovery as regards the other side," Sir George Jessel M.R. said in *Anderson* v. *Bank of British Columbia*, 2 Ch.D. 644, 649:

"The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be D properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view E to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation. That is the meaning of the rule." F

And in the Court of Appeal James L.J. summed up the position, at p. 656, by speaking succinctly of

". . . an intelligible principle, that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief."
G

Preparation with a view to litigation—pending or anticipated—being thus the essential purpose which protects a communication from disclosure in such cases as the present, what in the last resort is the touchstone of the privilege? Is it sufficient that the prospect of litigation be merely one of the several purposes leading to the communication coming into being? And is that sufficient (as Eveleigh L.J. in the present case held) H despite the fact that there is also "another . . . and even more important purpose"? Is it enough that the prospect of litigation is a *substantial* purpose, though there may be others equally substantial? Is an

671

543

A *appreciable* purpose sufficient? Or does it have to be *the main* purpose? Or *one* of its *main* purposes (as in *Ogden* v. *London Electric Railway Co.*, 49 T.L.R. 542)? Ought your Lordships to declare that privilege attaches only to material which (in the words of Lord Denning M.R.) "comes within the words 'wholly or mainly' for the purpose of litigation"? Or should this House adopt the majority decision of the High Court of Australia in *Grant* v. *Downs*, 135 C.L.R. 674, that legal

B professional privilege must be confined to documents brought into existence for the *sole* purpose of submission to legal advisers for advice or for use in legal proceedings?

An affirmative answer to each of the foregoing questions can be supported by one or more of the many reported decisions. And so can a negative answer. But no decision is binding upon this House, and

C your Lordships are accordingly in the fortunate position of being free to choose and declare what is the proper test. And in my judgment we should start from the basis that the public interest is, on balance, best served by rigidly confining within narrow limits the cases where material relevant to litigation may be lawfully withheld. Justice is better served by candour than by suppression. For, as it was put in the *Grant* v. *Downs* majority judgment, at p. 686: ". . . the privilege . . . detracts

D from the fairness of the trial by denying a party access to relevant documents or at least subjecting him to surprise."

Adopting that approach, I would certainly deny a claim to privilege when litigation was merely one of several purposes of equal or similar importance intended to be served by the material sought to be withheld from disclosure, and a fortiori where it was merely a minor purpose.

E On the other hand, I consider that it would be going too far to adopt the "*sole* purpose" test applied by the majority in *Grant* v. *Downs*, which has been adopted in no United Kingdom decision nor, as far as we are aware, elsewhere in the Commonwealth. Its adoption would deny privilege even to material whose outstanding purpose is to serve litigation, simply because another and very minor purpose was also being

F served. But, inasmuch as the *only* basis of the claim to privilege in such cases as the present one is that the material in question was brought into existence for use in legal proceedings, it is surely right to insist that, before the claim is conceded or upheld, such a purpose must be shown to have played a paramount part. Which phrase or epithet should be selected to designate this is a matter of individual judgment. Lord

G Denning M.R., as we have seen, favoured adoption of the phrase employed in the Law Reform Committee's Sixteenth Report, viz., "material which came into existence . . . *wholly or mainly*" for the purpose of litigation (para. 17). "Wholly" I personally would reject for the same reason as I dislike "solely," but "mainly" is nearer what I regard as the preferable test. Even so, it lacks the element of clear paramountcy which

H should, as I think, be the touchstone. After considerable deliberation, I have finally come down in favour of the test propounded by Barwick C.J. in *Grant* v. *Downs*, 135 C.L.R. 674, in the following words, at p. 677:

672

544

Lord Edmund-Davies    **Waugh v. British Railways Board (H.L.(E))**    [1980]

"Having considered the decisions, the writings and the various aspects of the public interest which claim attention, I have come to the conclusion that the court should state the relevant principle as follows: a document which was produced or brought into existence either with the *dominant* purpose of its author, or of the person or authority under whose direction, whether particular or general, it was produced or brought into existence, of using it or its contents in order to obtain legal advice or to conduct or aid in the conduct of litigation, at the time of its production in reasonable prospect, should be privileged and excluded from inspection." (Italics added.)

*Dominant* purpose, then, in my judgment, should now be declared by this House to be the touchstone. It is less stringent a test than "sole" purpose, for, as Barwick C.J. added, 135 C.L.R. 674, 677:

"... the fact that the person ... had in mind other uses of the document will not preclude that document being accorded privilege, if it were produced with the requisite dominant purpose."

Applying such test to the facts of the present case, we have already seen that privilege was claimed in Mr. Hastings's affidavit on several grounds. Thus, the report of May 6, 1976, was produced in accordance with the long-standing practice of the board regarding "accidents occurring on or about any railway . . . in order to assist in establishing the causes of such accidents," and this whether or not (so your Lordships were informed) any personal injuries were sustained and even where there was no prospect of litigation ensuing. This particular report was called for in accordance with such practice and:

"*One of the principal purposes* for so doing was so that they could be passed to the board's chief solicitor to enable him to advise the board on its legal liability and if necessary conduct its defence to these proceedings." (Italics added.)

Were the "sole purpose" test adopted and applied, on the board's own showing their claim to privilege must fail. Then what of the "dominant purpose" test which I favour? Dominance again is not claimed by the board, but merely that use in litigation was "one of the principal purposes." Such moderation is only to be expected in the face of a claim arising out of a fatal accident. Indeed, the claims of humanity must surely make the dominant purpose of any report upon an accident (particularly where personal injuries have been sustained) that of discovering what happened and why it happened, so that measures to prevent its recurrence could be discussed and, if possible, devised. And, although Barwick C.J. in *Grant* v. *Downs*, 135 C.L.R. 674, observed, at p. 677, that

"... the circumstance that the document is a 'routine document' will not be definitive. The dominant purpose of its production may none the less qualify it for professional privilege,"

the test of dominance will, as I think, be difficult to satisfy when inquiries are instituted and reports produced automatically whenever any mishap occurs, whatever its nature, its gravity, or even its triviality.

673

545

**A.C.**       Waugh v. British Railways Board (H.L.(E))       Lord Edmund-Davies

A    My Lords, if, as I hold, "*dominant* purpose" be the right test of privilege from disclosure, it follows that the board's claim to privilege must be disallowed, and the same applies if the "*sole* purpose" test be applied. I would therefore allow this appeal and restore the order of Master Bickford Smith in favour of disclosure.

LORD RUSSELL OF KILLOWEN. My Lords, it has already been
B    demonstrated by my noble and learned friend Lord Wilberforce that if, in order to attract privilege from its production, it is necessary that the joint internal report should owe its genesis to either the sole or the dominant purpose that it should be used for the purpose of obtaining legal advice in possible or probable litigation, the evidence in this case falls short of both those standards. At the conclusion of the arguments in this appeal I was minded, while agreeing that anything less than the
C    standard of the dominant purpose would not suffice to support a claim for privilege from production, to prefer the higher standard of the sole purpose, in line with as I understand them the judgments of the majority in the High Court of Australia in *Grant* v. *Downs,* 135 C.L.R. 674. It appeared to me that such a standard had the merit of greater simplicity in a decision on a claim for privilege from production, as being a line
D    easier to draw and to apply to the facts of a particular case. However on reflection I am persuaded that the standard of sole purpose would be in most, if not all, cases impossible to attain, and that to impose it would tilt the balance of policy in this field too sharply against the possible defendant. Moreover to select the standard of dominant purpose is not to impose a definition too difficult of measurement. It is to be met with in other fields of the law, of which I need instance only the question
E    in bankruptcy law whether there has been a fraudulent preference of a creditor.

In summary, therefore, my Lords, I am in agreement with the speech of my noble and learned friend Lord Wilberforce, and would allow this appeal and order the production to the plaintiff of the joint internal report.

F

LORD KEITH OF KINKEL. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Wilberforce. I agree with it, and accordingly I too would allow the appeal.

*Appeal allowed with costs.*

G

Solicitors: *Robin Thompson & Partners; Evan Harding.*

M. G.

H

Neutral Citation Number: [2018] EWCA Civ 2652

Case No: A3/2018/2580

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**CHANCERY DIVISION**
**Norris J**
**[2018] EWHC 2784 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 30/11/2018

**Before :**

**THE  MASTER OF THE ROLLS**
**LORD JUSTICE LEWISON** and
**LADY JUSTICE ASPLIN**

- - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **WH HOLDING LIMITED (1)** | **Appellants** |
| **WEST HAM  UNITED FOOTBALL CLUB LIMITED (2)** | |
| **- and -** | |
| **E20 STADIUM LLP** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Paul Downes QC**, **Joseph Sullivan** and **Luka Krsljanin** (instructed by **Gateley Plc**) for the
**Appellants**
**Thomas Plewman QC** and **Tom Wood** (instructed by **Gowling WLG (UK) LLP**) for the
**Respondent**

Hearing date: 15 November 2018
- - - - - - - - - - - - - - - - - - - -

# Judgment Approved

**675**

**Sir Terence Etherton MR, Lord Justice Lewison and Lady Justice Asplin:**

1.  This expedited appeal raises issues as to: the scope of litigation privilege; the grounds upon which the court will be prepared to inspect documents where there is a challenge to the assertion of privilege; and the application of the "dominant purpose" test in relation to documents produced for more than one reason.

2.  The appeal arises out of an application dated 10 September 2018 made by the Appellants, WH Holding Limited and West Ham United Football Club Limited (together referred to as "West Ham"), by which West Ham applied for the court to inspect a number of documents, by way of a sample of redacted disclosure in relation to which privilege had been asserted. The application was made pursuant to CPR 31.19(6)(a).

3.  By his order of 23 October 2018 Norris J dismissed the application save that: the parties were directed to make submissions on the issue of whether or not sample document 4 had been properly redacted pursuant to the claim of litigation privilege; and the solicitor with conduct of the matter, Ms Carr, was directed to conduct a further review of the two redactions to sample document 5. The citation for Norris J's judgment is [2018] EWHC 2784 (Ch).

4.  The Judge gave permission to appeal on two grounds, namely: whether the scope of litigation privilege is restricted to documents concerned with obtaining advice or evidence for the conduct of litigation; and the correct approach to be taken by a court to an application for inspection of documents by the court where a claim to privilege is challenged. Lewison LJ subsequently granted permission to appeal on the additional ground that the Judge did not consider or apply the "dominant purpose" test when addressing the question of whether to inspect documents 8 – 13 of the sample of redacted documents. It is not in dispute that in order to fall within the ambit of litigation privilege a document must at least have been produced for the dominant purpose of conducting that litigation. Lewison LJ also granted a request for expedition and the application to rely upon the email which had been referred to as document 4 and was made available in unredacted form as a result of the directions made by the Judge in his Order.

5.  The appeal is concerned only with West Ham's challenges to the documents numbered 8-13 of the sample (the "Disputed Documents"). They consist of six emails, all dated 30 January 2017, passing between the Board members of the Respondent, E20 Stadium LLP ("E20"), and between E20 Board members and stakeholders. E20 asserts that each of the six emails were composed with the dominant purpose of discussing a commercial proposal for the settlement of the dispute between E20 and West Ham in relation to rights arising under the agreement between the parties providing for West Ham to use the London Olympic Stadium for its home football matches (the "Concession Agreement") at a time when litigation was in reasonable contemplation.

6.  The main proceedings, in relation to which the disclosure and the challenges to it arise, were listed for trial for five weeks commencing on 19 November 2018. The claims and counterclaims relate to a dispute over the number of seats in the stadium that West Ham is entitled to use. E20 contends that West Ham is only entitled to use 53,500 seats whereas West Ham asserts that it is entitled to use all of the seats, subject

only to necessary permissions being granted by the appropriate authorities. West Ham also contends that E20 is obliged to maximise such permissions and consents, that the Concession Agreement imposes a general obligation of good faith and that E20's refusal in February 2017 to seek the relevant permissions or consents for an increase in capacity was not made in good faith. It is not in dispute that the Disputed Documents are relevant to the issues arising in the proceedings. The only question is whether litigation privilege applies to them.

7. We heard this appeal on Thursday 15 November 2018. In view of the imminence of the trial we announced our decision on the following day to allow the appeal and to order disclosure of the Disputed Documents, with reasons to be given in writing in due course. These are those reasons.

**Appeal Ground 1 - scope of litigation privilege**

8. The real issue under this ground is whether litigation privilege extends to documents which are concerned with the settlement or avoidance of litigation where the documents neither seek advice or information for the purpose of conducting litigation nor reveal the nature of such advice or information. Mr Downes QC, on behalf of West Ham, submits that it does not. The Judge dealt with the matter in the following way. First, he held that litigation privilege did not apply to the process of expert determination of disputes envisaged under clause 50 of the Concession Agreement and, therefore, on the facts of this case, if litigation privilege were to apply it must do so in relation to court-based proceedings: [38] of the judgment. Further, he noted that it was accepted that litigation privilege only arises when litigation is reasonably contemplated or anticipated, and he found at [44] that E20 could fairly and properly say that litigation was in reasonable contemplation from 31 August 2016. Having recorded that it was common ground that "litigation privilege relates to documents brought into existence for the purpose of the conduct of litigation, and passing between client, lawyer, agent or third party" (see [45] of the judgment), he went on to consider the scope of the principle and the documents in the sample. He concluded as follows:

> "46.  First, Mr Downes QC submitted that the only documents to which litigation privilege can attach are documents concerned with obtaining advice or evidence for use in litigation because only such communications could fairly be said to relate to "conducting" the litigation. He said the documents which concern strategy or potential settlement offers fall outside the ambit of litigation privilege. I do not accept that this narrow formulation is now correct. In *SFO v Eurasian Natural Resources Corporation Ltd* [2018] EWCA CIV 2006 ("the ENRC case") the Court of Appeal made clear (a) at para [102] that legal advice given to head off, avoid or settle reasonably contemplated proceedings is as much protected by litigation privilege as advice given for the purpose of defending those proceedings (a proposition that Mr Downes QC was inclined to accept); and (b) at para. [118] that documents prepared for the purpose (I will come back to that) of settling or avoiding a claim are created for the purpose of defending litigation. At a time when there is so much emphasis (by means of pre-action protocols and otherwise) on discouraging the commencement of proceedings and encouraging compromise this is entirely

**677**

understandable. The pre-action gathering of evidence for potential deployment in reasonably contemplated proceedings is plainly within the scope of litigation privilege: and so, in my judgment, is the pre-action gathering of information and material created for the purpose of settling or avoiding a claim (whether or not it might be deployed in evidence if litigation started), and the analysis of that material for the purpose of considering a settlement offer. The documents at issue in the *ENRC* case itself consisted not only of notes of evidence that could be given by individuals relevant to the events under investigation but also summaries of reviews of documents and information about the work being undertaken, presentations made to the Board or internal committees, and reports prepared by forensic accountants. These were held to be the proper subject of a claim to litigation privilege once litigation was reasonably in contemplation (and a consideration of self-reporting to avoid or mitigate criminal proceedings was under way).

47.   Second, Mr Downes QC submitted (in my judgment correctly) that it was not sufficient that a document was of the correct character; but it must also have been produced for the sole or dominant purpose of conducting the relevant litigation. He referred to *Rawlinson & Hunter v Akers* [2014] 2 BCLC 1 at [53]. So, the task of the person or tribunal considering a potential claim that litigation privilege applies is to determine the actual intention of the party claiming privilege, and, if there is more than one purpose, what is the dominant purpose of the author or of the person or entity commissioning the creation of the document. Faced with a challenge the Court must subject the evidence in support of such a claim to "anxious scrutiny". Given the evidential constraints upon challenging a witness statement on an interlocutory application this means that the Court must make an objective assessment of the document itself and of what is disclosed by the evidence as to the circumstances of its creation.

. . .

55.      Mr Downes QC submitted that the discussion of settlement proposals does not fall within the scope of litigation privilege, which is confined to documents generated to obtain advice or to gather evidence. The consequence of this submission appears to be that if E20 in fact made a "without prejudice" offer to West Ham to dispose of the impending litigation then that document *would not* be before the Court in any subsequent case: but any document (not passing between solicitor and client) recording the terms of the proposed offer, or recording discussion of the offer, or authorising the terms and putting of the offer *would* be open to inspection and to inclusion in the trial bundle. That is odd. It is even odder if the discussion within the board of a corporate party arises during the trial itself: can it really be the case that that party (under its ongoing disclosure obligation) is bound to disclose to its opponent documents recording its settlement strategy because they are not covered by litigation privilege?  I do not think that can be right.

**678**

56.    In my judgment documents prepared for the dominant purpose of formulating and proposing the settlement of litigation that is in reasonable contemplation (or in existence) are protected by litigation privilege. The principle must be carefully applied. Documents may, of course, be generated about the settlement of a claim for other purposes, such as the general management of the business ("We must dispose of this claim because its continuation is harming our fund-raising"). Litigation privilege would not apply. Documents may be generated which are relevant to a settlement e.g. a projected cashflow which has a bearing on the terms of an offer. But litigation privilege does not apply because if you ask the question "Why was this document created?" the answer is not "Because of the litigation" but "Because prudent management of the business requires cash flow projections". The document is created in connection with the litigation; but not for the sole or dominant purpose of the litigation."

9.    Mr Downes, on behalf of West Ham, submitted that it is well established that litigation privilege covers communications which are directed at obtaining advice or evidence, including information or documents which might lead to evidence and that that is the meaning of the phrase "conducting litigation". He said that the Judge erred in concluding at [46] that such a "narrow formulation" was no longer correct in the light of the decision of the Court of Appeal in *SFO v Eurasian Natural Resources Corporation Ltd* [2018] EWCA (Civ) 2006 ("*ENRC*"). Mr Downes submits that in *ENRC* the Court of Appeal did not remove the requirement that for a communication to be for the dominant purpose of conducting litigation it must be concerned with obtaining advice or evidence. The issue was whether evidence gathering for the purpose of avoiding litigation fell within the scope of the privilege. Mr Plewman QC, on behalf of E20, on the other hand, submitted that the phrase "conducting litigation" encompasses discussions relating to formulating, finalising, and setting out a purely commercial settlement proposal. He further submitted that in any event internal communications within a corporation for the dominant purpose of conducting the litigation are themselves subject to privilege.

10.    It is now clear from the decision of the House of Lords in *Three Rivers DC v Governor and Company of the Bank of England (No 6)* [2004] UKHL 48, [2005] 1 AC 610 that legal professional privilege is a single integral privilege, whose sub-heads are legal advice privilege and litigation privilege; and that litigation privilege is restricted to adversarial proceedings: Lord Carswell at [105]. But although these are two sub-heads of a single privilege, they are not necessarily coterminous. As the court pointed out in *ENRC* at [63], they have different characteristics. For example, legal advice privilege is dependent on the involvement of a lawyer. Litigation privilege is not.

11.    Lord Carswell's summary of the scope of litigation privilege in *Three Rivers* at [102] was accepted by both sides on this appeal as an authoritative statement. He said, having considered many authorities:

    "The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and the qualifications expressed in the modern case-law is that communications between parties or their solicitors and third parties for the purpose of obtaining

information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must have been made for the sole or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial."

12. Mr Plewman concentrated on sub-paragraph (b) in that formulation. He submitted that "conducting litigation" encompassed avoiding or settling litigation. We agree. That much is clear from *ENRC* at [102] in which the court stated:

"In both the civil and the criminal context, legal advice given so as to head off, avoid, or even settle reasonably contemplated proceedings is as much protected by litigation privilege as advice given for the purpose of resisting or defending such contemplated proceedings."

13. Nor, in our judgment, is that a new proposition. In *Anderson v Bank of British Columbia* (1876) 2 Ch D 644, at 649-650, Sir George Jessel MR said:

"Again, the solicitor's acts must be protected for the use of the client. The solicitor requires further information, and says, I will obtain it from a third person. That is confidential. It is obtained by him as solicitor for the purpose of the litigation, and it must be protected upon the same ground, otherwise it would be dangerous, if not impossible, to employ a solicitor. You cannot ask him what the information he obtained was. It may be information simply for the purpose of knowing *whether* he ought to defend or prosecute the action, but it may be also obtained in the shape of collecting evidence for the purpose of such prosecution or defence. All that, therefore, is privileged."
(Emphasis added)

14. Deciding "whether" to defend or prosecute an action must include a decision to head it off by compromise. Buckley LJ seems to have taken a similar view in *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* [1913] 3 KB 850 at 856.

15. In our judgment, however, the fallacy in Mr Plewman's argument is to treat sub-paragraph (b) as being an extension to the general proposition that Lord Carswell formulated. On the contrary, it is a qualification or restriction on the width of that principle. The principle itself is that the communication must be made "for the [sole or dominant] purpose of obtaining *information or advice* in connection with existing or contemplated litigation." The proposition that it must be for the sole or dominant purpose of conducting the litigation (including settling it) is a restriction on that principle.

16. The proposition that Lord Carswell formulated is consistent with all the authority to which we were referred, including leading textbooks. He himself said that it was

based on the 19th century cases. In *Wheeler v Le Marchant* (1881) 17 Ch D 675 at 681 Sir George Jessel MR said that documents were protected by privilege:

> "… where they have come into existence after litigation commenced or in contemplation, and when they have been made with a view to such litigation, either for the purpose of obtaining advice as to such litigation, or of obtaining evidence to be used in such litigation, or of obtaining information which might lead to the obtaining of such evidence…"

17.   Later cases have repeated the qualification: see, for example, *Starbev GP Ltd v Interbrew Central European Bank* [2013] EWHC 4038 (Comm) at [11] (4). Likewise, in *Excalibur Ventures LLC v Texas Keystone Inc* [2012] EWHC 2176 (QB) Popplewell J, in our judgment correctly, rejected the submission that litigation privilege covered all documents brought into existence for the purposes of actual or contemplated litigation.

18.   We were not shown any authority which would extend the scope of litigation privilege to purely commercial discussions. In particular we do not consider that *ENRC* extended the scope of the documents covered by litigation privilege. The disputed documents in that case all fell within the recognised categories of advice or information going to the merits of the contemplated litigation. The only possible change attributable to the decision in *ENRC* was the confirmation that the conduct of litigation includes its avoidance or compromise. In our judgment the Judge was wrong in thinking that *ENRC* had gone any further.

19.   We do not consider that there is any justification for extending the scope of litigation privilege in that respect. It has always been recognised that privilege is an inroad into the principle that a court should be able to decide disputes with the aid of all relevant material. Thus, in *Three Rivers* Lord Carswell said at [86]:

> "Determining the bounds of privilege involves finding the proper point of balance between two opposing imperatives, making the maximum relevant material available to the court of trial and avoiding unfairness to individuals by revealing confidential communications between their lawyers and themselves. The practice which has developed is a reconciliation between these principles: *Seabrook v British Transport Commission* [1959] 1 WLR 509, 513, per Havers J. There is a considerable public interest in each of these. The importance of keeping to a minimum the withholding of relevant material from the court, upon which Mr Pollock laid emphasis, is self-evident. It was stressed by Wigmore (Evidence in Trials at Common Law, vol 8, rev McNaughton (1961), p 554, para 2291), who expressed the opinion that the privilege should be strictly confined within the narrowest possible limits consistent with the logic of its principle, an approach echoed in the speech of Lord Edmund-Davies in *Waugh v British Railways Board* [1980] AC 521, 543. The competing principle of legal professional privilege is also rooted in public policy: cf *B v Auckland District Law Society*

**681**

> [2003] 2 AC 736, 756-757, paras 46-47. It is not based upon the maintenance of confidentiality, although in earlier case law that was given as its foundation."

20.  We would accept that a document in which advice or information obtained for the sole or dominant purpose of conducting litigation cannot be disentangled, or a document which would otherwise reveal the nature of such advice or litigation, would itself be covered by litigation privilege. It must also not be forgotten, as Popplewell J pointed out in *Excalibur* at [23], that even if a document is not covered by litigation privilege it may yet be covered by legal advice privilege.

21.  That is not, however, the basis on which privilege for the Disputed Documents is claimed in this case. In relation to some documents, which were in issue below but are not the subject of this appeal, privilege was claimed on the basis that they "implicitly reflect[ed]" legal advice. The Judge upheld that claim to privilege, and West Ham do not challenge that ruling. But the sole ground upon which privilege is claimed for the Disputed Documents is that (with immaterial variations) they were created:

> "… with the dominant purpose of discussing a commercial settlement of the dispute when litigation with [West Ham] was in contemplation."

22.  We do not consider that a claim in those terms falls within the scope of litigation privilege.

23.  Mr Plewman made something of the fact that the focus of the challenge had shifted during the course of the application. He also complained that the detailed grounds of challenge only emerged in a witness statement served very shortly before the hearing below. There is, however, no Respondent's Notice; and E20 have not adduced any further evidence to modify or amplify the grounds on which privilege was claimed.

24.  Mr Plewman also submitted that there was privilege for internal communications within a corporate body. For that proposition he relied on the decision of Pearson J in *Mayor and Corporation of Bristol v Cox* (1884) 26 Ch D 678. That was a case in which the defendant asked for disclosure of the minutes of meetings of two committees of the local authority with which he was in dispute. The minutes were records of meetings that had taken place after litigation was either contemplated or in progress.

25.  Pearson J upheld the claim. He said, at 681-682:

> "All those documents or minutes made by the committees of the corporation to whom the matters were referred, and which contain nothing more, as far as I can gather from the affidavit, and I may add also from the statement of counsel at the Bar, than simply a record of proceedings which took place at the meetings of the committee, with reference either to litigation, which it was contemplated might take place, or to the litigation which did take place before, or the litigation which is now in existence—whether the minutes relate to either one or the other of those matters, I am of opinion that those minutes are

**682**

> privileged. I conceive that any notes made by a man with reference to his own conduct in the litigation—simply notes made of his own opinions—are just as much privileged as the thoughts which pass through his mind, and I conceive, inasmuch as this corporation cannot in its corporate capacity either think or write or act except by certain machinery, which is, so to speak, extraneous of itself, the corporation is perfectly justified in referring all these matters to a committee and asking the committee to deal with them as it would deal with them itself, and they are *simply the agents of the corporation* for the purpose of considering what ought to be done, and *their reports are confidential matters; and under those circumstances* those matters are to my mind protected." (Emphasis added)

26.    No authority is cited in support of this part of the decision. The key to it appears to us to be that the reports were protected either because they were confidential or because the committee was simply the agent of the corporation. It was at one stage commonly thought that confidential documents need not be disclosed; but that is not (or is no longer) the law. We cannot see any justification for covering all internal corporate communications with a blanket of litigation privilege. Quite apart from anything else we do not see why corporations should have greater protection than, say, partners or bodies of trustees who in practice are equally likely to discuss matters among themselves. Nor is the fact of agency sufficient of itself to attract litigation privilege. That is amply demonstrated by *Anderson* where a letter from agent to principal was ordered to be disclosed even though it pertained to the facts underlying the dispute. In our judgment *Bristol v Cox* is wrong on this point and should be overruled.

27.    In summary, our conclusions are as follows:

  i)    Litigation privilege is engaged when litigation is in reasonable contemplation.

  ii)    Once litigation privilege is engaged it covers communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with the conduct of the litigation, provided it is for the sole or dominant purpose of the conduct of the litigation.

  iii)    Conducting the litigation includes deciding whether to litigate and also includes whether to settle the dispute giving rise to the litigation.

  iv)    Documents in which such information or advice cannot be disentangled or which would otherwise reveal such information or advice are covered by the privilege.

  v)    There is no separate head of privilege which covers internal communications falling outside the ambit of litigation privilege as described above.

28.    We decided to allow the appeal on this ground.

**Appeal Ground 2 – Inspection**

29.    In the light of our decision on Appeal Ground 1, it is not strictly necessary to consider the remainder of the grounds of appeal. As we heard full argument, however, we will address them both. First, what is the appropriate test for deciding when a court should inspect documents to ascertain whether they are privileged and did the Judge apply the correct test properly? The power to inspect documents in relation to which privilege has been asserted and challenged is now contained in CPR 31.19(6) which provides, so far as relevant, as follows:

> "For the purpose of deciding an application under paragraph (1) (application to withhold disclosure) or paragraph (3) (application to withhold inspection) the court may –
>
> (a) require the person seeking to withhold disclosure or inspection of a document to produce that document to the court;…"

30.    A power to inspect was first introduced into the Rules in November 1893 in the form of Order XXXI Rule 19A (2). It provided that:

> "Where on an application for an order for inspection privilege is claimed for any document, it shall be lawful for the Court or a judge to inspect the document for the purpose of deciding as to the validity of the claim of privilege."

Stirling J stated that he believed that the object of the new rule was to "to free the Court from the fetters imposed by the old practice, and enable it to be determined at once whether or no the objection which is sought to be raised is well or ill founded." See *Ehrmann v Ehrmann* [1896] 2 Ch 826 at 828.

31.    The power was expressed in a slightly different way in the Rules of the Supreme Court (1962) Order 24 at Rule 13 and subsequently at Rule 12 as follows:

> "At any stage of the proceedings in any cause or matter the Court may, subject to rule 13(1) [inspection only to be ordered when necessary], order any party to produce to the Court any document in his possession, custody or power relating to any matter in question in the cause or matter and the Court may deal with the document when produced in such manner as it thinks fit."

32.    Having noted at [17] that the relief sought by West Ham "may be granted under CPR 31.19(6)(a), provided that to do so is consistent with dealing with the case justly and at proportionate cost (as elaborated in CPR 1.1(2))", the Judge set out his guiding principles at [18] of the judgment as follows:

> "In approaching the exercise of that power, I shall apply the following principles:-

a) Legal professional privilege is a fundamental condition upon which the administration of justice rests: *Re Derby Magistrates* [1996] 1 AC 487.

b) The burden clearly lies on the party claiming legal professional privilege to make out the claim: *West London Pipeline and Storage Ltd v Total UK* [2008] 2 CLC 258 at [50]. The claiming party is not required to provide such detail as will disclose the very material in respect of which privilege is claimed: *ibid* at [86].

c) Given that constraint, the burden is ordinarily discharged by a witness statement from the solicitor to the party claiming privilege which sets out (as specifically as possible in the circumstances) the basis of the claim to withhold inspection.

d) Such a witness statement can be challenged (CPR 31.19(5)) and if challenged is not determinative: *Starbev GP v Interbrew Central European Holding* [2013] EWHC 4038 at [11]. The question then is whether (after considering the original claim to privilege, the challenge and any response to the challenge) it is reasonably certain that the person claiming privilege has mistakenly represented or has misconceived the character of the documents or it is apparent from other material that the evidence supporting the claim to privilege is incorrect on material points: *West London Pipeline* (*supra*) at [86]. If it is reasonably certain that the party claiming privilege has misunderstood the process or has proceeded upon an incorrect basis then the evidence supporting the claim for privilege cannot be treated as determinative of the question.

e) If that threshold is crossed, then the Court must determine how to reassess the claim to privilege. It may (1) decide that the evidence does not establish the right to withhold inspection, and order inspection: or (2) require the question to be reviewed again and direct the filing of further evidence (either in the form of a new disclosure statement or in the form of evidence supplementing that already supporting the existing disclosure statement); or (3) as a matter of last resort, itself inspect the documents if either (i) there is credible evidence that the party claiming privilege has misunderstood the duty or is not to be trusted with the decision making; or (ii) there is no reasonably practicable alternative: *West London Pipeline* (*supra*) at [86]."

33.  The Judge went on to apply these principles in relation to each of the sample documents, including the Disputed Documents. For example, at [48] he concluded that on the totality of the evidence, without having looked at the document itself, it was reasonably certain that Ms Carr had misconceived the character of document 4; and at [52] and [53] he concluded that, on the totality of the evidence, he was not reasonably certain that the claims for privilege in relation to documents 6 and 7 respectively were misconceived. Having considered the scope of litigation privilege, at [57] the Judge considered the description of document 8, and concluded that he "was not reasonably certain that Ms Carr's disclosure statement [was] incorrect." He

**685**

came to the same conclusion at [58] in relation the remainder of the Disputed Documents numbered 9 – 13.

34. Mr Downes submits that there is a broad and flexible discretion to inspect documents which are the subject of a challenged claim to privilege, and that the discretion will be exercised on the facts of each case on a common sense basis and will be affected by the overriding objective.   Mr Plewman, on the other hand, endorses the approach taken by the Judge and which was advocated by Beatson J in the *West London Pipeline* case. He says that there is good reason for the court to be cautious about inspecting documents.

35. In the *West London Pipeline* case Beatson J was concerned with an application by a third party for specific disclosure of documents over which the defendant asserted litigation privilege and in relation to which an order for cross examination was sought. Following a review of the authorities, Beatson J distilled the following propositions from the authorities on challenges to claims of privilege. Although the paragraph is lengthy, it is helpful to consider it as a whole:

> "86. . . .
>
> (1) The burden of proof is on the party claiming privilege to establish it: see *Matthews & Malek on Disclosure* (2007) 11-46, and paragraph [50] above. A claim for privilege is an unusual claim in the sense that the party claiming privilege and that party's legal advisers are, subject to the power of the court to inspect the documents, the judges in their or their own client's cause. Because of this, the court must be particularly careful to consider how the claim for privilege is made out and affidavits should be as specific as possible without making disclosure of the very matters that the claim for privilege is designed to protect: *Bank Austria Akt v Price Waterhouse*; *Sumitomo Corp v Credit Lyonnais Rouse Ltd* (*per* Andrew Smith J).
>
> (2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in an affidavit are not determinative and are evidence of a fact which may require to be independently proved: *Re Highgrade Traders Ltd; National Westminster Bank plc v Rabobank Nederland.*
>
> (3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:
>
> (a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority.*
>
> (b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharane* (the Chief

**686**

Constable's letter)*, Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co,* per A L Smith LJ.

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montivedeo Gas Co; Birmingham and Midland Motor Omnibus Co v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

(4) Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it:

(a) It may conclude that the evidence does not establish a legal right to withhold inspection and order inspection: *Neilson v Laugharane; Lask v Gloucester Health Authority.*

(b) It may order a further affidavit to deal with matters which the earlier affidavit does not cover or on which it is unsatisfactory: *Birmingham and Midland Motor Omnibus Co Ltd v London and North West Railway Co; National Westminster Bank plc v Rabobank Nederland.*

(c) It may inspect the documents: see CPR 31.19(6) and the discussion in *National Westminster Bank plc v Rabobank Nederland* and *Atos Consulting Ltd v Avis plc (No. 2).* Inspection should be a solution of last resort, in part because of the danger of looking at documents out of context at the interlocutory stage. It should not be undertaken unless there is credible evidence that those claiming privilege have either misunderstood their duty, or are not to be trusted with the decision making, or there is no reasonably practical alternative.

(d) At an interlocutory stage a court may, in certain circumstances, order cross-examination of a person who has sworn an affidavit, for example, an affidavit sworn as a result of the order of the court that a defendant to a freezing injunction should disclose his assets: (*House of Spring Gardens Ltd v Wait; Yukong Lines v Rensburg; Motorola Credit Corp v Uzan (No. 2)*). However, the weight of authority is that cross-examination may not be ordered in the case of an affidavit of documents: *Frankenstein's* case; *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* and *Fayed v Lonrho*. In cases where the issue is whether the documents exist (as it was in *Frankenstein's* case and *Fayed v Lonrho*) the existence of the documents is likely to be an issue at the trial and there is a particular risk of a court at an interlocutory stage impinging on that issue."

36.    Beatson J had considered *Lask v Gloucester Health Authority* (6 December 1985) at [68] – [71] of his judgment, a case in which the Court of Appeal went behind an affidavit sworn in support of a claim for privilege and concluded that the claim for privilege was not established. O'Connor LJ had applied the test stated in *Frankenstein v Gavin's House-to-House Cycle Cleaning and Insurance Co.* [1897] 2 QB 62 and *Attorney-General v Emerson* (1882) 10 QBD 191: is the court reasonably certain from

**687**

statements of the party making the affidavit that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed?

37.     Beatson J also considered, at [80] – [82] of his judgment, the older case of *Birmingham & Midland Motor Omnibus Co Ltd v London and North Western Railway Co* [1913] 3 KB 850 which was concerned with the power to inspect under Order XXXI, rule 19A(2). That was a case in which the Court of Appeal held that the Judge had been entitled to inspect the documents in question if in his discretion he thought fit to do so. The Court of Appeal inspected the documents itself and concluded that privilege had been appropriately claimed. Hamilton LJ (with whom Vaughan Williams and Buckley LJJ agreed on these matters) observed that claiming privilege in an affidavit was not "pronouncing a spell which, once uttered, makes all the documents taboo." He held that the power to inspect contained in Order XXXI, rule 19A (2) was "quite general", should be "read widely" and that "he [the Judge] can test the accuracy of the affidavit and of the terms in which it claims the privilege by means of the documents themselves." He went on:

> "I do not say that I think there is any ground for doubting the good faith of the affidavit in this case, but mis-understandings as to the meaning and application of the rules on discovery, and also misconceptions as to the character and contents of particular documents, are constant, and the judge cannot be wrong at least in using the documents themselves to see whether such misunderstanding or misconception has in fact occurred."

See 857, 858-9 and 860.

38.     We were also referred to the judgment of Jenkins LJ in *Westminster Airways Ltd v Kuwait Oil Co Ltd* [1951] 1 KB 134, to which Beatson J did not refer, which was also concerned with Order XXXI, rule 19A (2). At 146, Jenkins LJ referred to the *Birmingham and Midland Omnibus* case and concluded that:

> "The question whether the court should inspect the documents is one which is a matter for the discretion of the court, and primarily for the judge of first instance. Each case must depend on its own circumstances; but if, looking at the affidavit, the court finds that the claim to privilege is formally correct, and that the documents in respect of which it is made are sufficiently identified and are such that, prima facie, the claim to privilege would appear to be properly made in respect of them, then, in my judgment, the court should, generally speaking, accept the affidavit as sufficiently justifying the claim without going further and inspecting the documents."

39.     It seems to us that, contrary to Beatson J's narrow formulation contained in [86(3) and (4)(c)] of the *West London Pipeline* case, as the Court of Appeal identified in both the *Birmingham and Midland Omnibus* and the *Westminster Airways* cases the power to inspect a document is a matter of general discretion. That was also the approach of Lord Denning MR in *Alfred Crompton Amusement Machines Ltd v Customs and Excise Commissioners (No. 2)* [1971] 2 QB 102 at 130D-H. It is not limited to cases in which (without sight of the documents in question) the court is "reasonably certain" that the test has been misapplied. The need for "reasonable certainty" appears to have sprung from the earlier case of *Attorney-General v Emerson*, which was concerned

**688**

with the position prior to the introduction of the express power of inspection in November 1893 and which was followed in *Frankenstein v Gavin's House-to-House Cycle Cleaning and Insurance Co.*

40.    The court may inspect the documents in relation to which privilege is claimed in order to see whether the test has been correctly applied, although it should be cautious about doing so and should be alive to the dangers of looking at documents out of context. The discretion must be exercised in accordance with the overriding objective, which requires balancing dealing with cases justly, proportionately and at proportionate cost and allocating an appropriate share of the court's resources.   Among the factors which will be relevant to the exercise of the discretion are (a) the nature of the privilege claimed (b) the number of documents involved and (c) their potential relevance to the issues.

41.    The cases relied upon by E20, including *Atos v Avis Europe* [2008] Bus LR 20, *National Westminster Bank plc v Rabobank Nederland* [2006] EWHC 2332 (Comm) and *Bank Austria Aktiengesellschaft v Price Waterhouse* [1997] LC 1829, may provide useful guidance on how the discretion might be exercised in different circumstances but are not prescriptive and, to that extent, we do not agree with Beatson J.    As a result, we consider that the Judge was wrong to apply the test of "reasonable certainty" when approaching the question of whether to inspect the Disputed Documents.

## Appeal Ground 3 – Purpose test

42.    It is common ground that, in order to benefit from litigation privilege, a document must have been produced for the sole or dominant purpose of conducting litigation: see for example *Waugh v British Railways Board* [1980] AC 521 per Lord Wilberforce at 533.   The Judge so held at [47]. He had also held that litigation was in reasonable contemplation from 31 August 2016: see [44]. The third ground of appeal is that the Judge erred in law in failing to assess whether the Disputed Documents were actually created with the dominant purpose of adversarial litigation as opposed to non-adversarial expert determination.

43.    The complaint arises from the way in which the Judge dealt with this matter at [57] - [58] as follows:

> "57.        In the present case there is no doubt about the centrality of the dispute to the relationship between E20 and West Ham. I have no reason to doubt that the nature of the document is correctly described. It is headed "WH capacity commercial proposal" and the clear evidence of Ms Carr is that it related to the development of a potential settlement offer. If it was an e-mail regarding settlement proposals the remaining question is whether it was sent with the dominant purpose of discussing with the recipients a commercial settlement of the dispute to be put to West Ham. There is no direct evidence from the creator of the document: there is the evidence of Ms Carr that it was so related. That evidence must be looked at objectively. If the nature of the document is correctly described, then why else would the document be created other than to dispose of the litigation that had been threatened in December 2016? No-one has suggested (and the evidence to which I have been

**689**

directed does not establish) that there was some other emerging opportunity open to West Ham and E20 to which a commercial proposal might be directed. Rather the evidence shows that what dominated the fractious relationship was West Ham's demand for greater seating capacity at no extra cost and its assertion that E20 was bound to facilitate it, backed by the threat of legal proceedings. I am not reasonably certain that Ms Carr's disclosure statement is incorrect.

58.      I would give the same answer in relation to sample documents 9, 10, 11,12,13 and 17 (each of which I have separately considered). The point of objection taken was the point of principle that it is not possible to claim litigation privilege in respect of a settlement proposal. For the reasons I have given I do not accept that argument. No detailed argument was advanced in relation to any individual redaction. My determination of the point of principle therefore dictates the outcome of each of these challenges."

44.    It is true that the Judge did not analyse the purpose of each of the documents in order to determine whether they were produced with the dominant purpose of conducting the litigation which was in reasonable contemplation or the determination of the issues by an expert which had been aired as a possible means of dispute resolution. In relation to the document under consideration at [57], having noted the nature of its description, he asked rhetorically why else it would have been produced other than to dispose of the litigation. He came to the same conclusion at [58] in relation to documents 9 – 13.

45.    It seems to us that the Judge was entitled to take the course he did, even though the expert determination route may also have remained in the air, for two reasons. First, he had already found that litigation had been in reasonable contemplation since 31 August 2016, some five months or so before the Disputed Documents were produced: see the judgment at [44]. Secondly, and in any event, in circumstances in which there are two or more ways in which a dispute may be resolved by adjudication, one of which is adversarial litigation and litigation is in reasonable contemplation, the dominant purpose requirement of litigation privilege is met if the information or advice is obtained for the purposes of settling the dispute. It is not necessary to investigate further.

46.    Had it been necessary therefore, we would have allowed the appeal in relation to Appeal Ground 2 and dismissed the appeal on Appeal Ground 3.



[2022] UKFTT 00075 (TC)

# TC 08406/V

**Appeal number: TC/2020/01360**

*CAPITAL GAINS TAX – Information notice issued under Schedule 36 to the Finance Act 2008 – objection to disclosure on grounds of legal professional privilege – application under the Information Notice: Resolution of Disputes as to Privileges Communications Regulations 2009 SI 2009/1916*

**FIRST-TIER TRIBUNAL**
**TAX CHAMBER**


|                                   |             |
|-----------------------------------|-------------|
| **COLIN WISEMAN**                 | **Applicant** |
| **- and -**                       |             |
| **THE COMMISSIONERS FOR HER MAJESTY'S REVENUE & CUSTOMS** | **Respondents** |


**TRIBUNAL:   JUDGE JANE BAILEY**


**The Tribunal determined the appeal on 6 August 2020 on the basis of written representations and without a hearing, with the consent of the parties.**

1

**691**

DECISION

**Introduction**

1.      This application is made under Regulation 5 of the Information Notice: Resolution of Disputes as to Privileged Communications Regulations 2009 (SI 2009/1916) (the "Regulations") for the resolution of a dispute as to whether certain documents sought from the applicant by HMRC (under Paragraph 1 of Schedule 36 to the Finance Act 2008) are privileged from disclosure by virtue of Paragraph 23 of that Schedule.

2.      Both the applicant and HMRC have expressed themselves content for the application to be determined without a hearing on the basis of written submissions made by both parties.

**Background**

3.      It is unnecessary to provide a detailed factual background to the substantive dispute between the parties.  The background to this application is that, on 21 November 2019, HMRC issued the Applicant with a Notice under Paragraph 1 of Schedule 36 requiring disclosure of certain documents in order that HMRC could check the Applicant's tax position for the tax year 2002/03.  In a covering letter HMRC set out the procedure for resolution of a dispute concerning the application of privilege.

4.      On 23 December 2019, Mazars (on behalf of the Applicant) appealed against the Notice and notified HMRC of its belief that some of the documents were legally privileged.  Those documents related to communications between the Applicant and Turcan Connell, an Edinburgh based firm of solicitors which acted for the Applicant. HMRC acknowledged receipt of the appeal.

5.      By letter dated 29 January 2020, Mazars listed the eleven documents which they considered to be privileged.  HMRC responded by email on 20 February 2020, enclosing a copy of a letter dated 21 February 2020 which was sent to be the Applicant. In that letter, HMRC did not accept that the eleven documents (or a twelfth document which either does not exist or is not in the Applicant's possession) were privileged. HMRC accepted that Turcan Connell provided legal advice to the Applicant but did not accept that the documents listed by the Applicant related only to communications that were privileged.  HMRC expressed their concern that timetables, flowcharts, step by step plans, accountancy advice and financial records would not normally be privileged, and that implementation advice would not be privileged simply by reason of being provided by Turcan Connell.

6.      On 20 March 2020, the Applicant applied to the Tribunal for resolution of the dispute as to the scope of the privilege applying to the correspondence being sought. In the covering letter, copied to HMRC, the Applicant noted that HMRC's assumption that timetables, flowcharts, and step by step plans had been provided to the Applicant was inaccurate.

2

7.    On 30 April 2020, both parties made written representations to the Tribunal.  The Tribunal issued Directions on 26 May 2020 to provide both parties with the opportunity to make any further representations.  In accordance with the Tribunal directions, HMRC filed a Statement of Case on 19 June 2020, setting out their case in response to the Applicant's application.  On 17 July 2020, Mazars made further written representations on behalf of the Applicant.  HMRC chose to rely on their representations of 30 April 2020 and their Statement of Case, and filed no further submissions.

8.    On 26 May 2020, the Tribunal consented to the application being determined without an oral hearing.

**The relevant part of the Regulations**

9.    Regulation 3 of the Regulations provides:

> **3.** These Regulations apply where there is a dispute between HMRC and a person to whom an information notice has been given either—
>
> > (a)    during the course of correspondence, or
> >
> > (b)    during the course of an inspection of premises under Schedule 36,
>
> as to whether a document is privileged.

10.    Regulation 5 sets out the procedure to be followed to bring a dispute over whether a document is privileged to the resolution by the Tribunal.  That procedure has been correctly followed by the parties.

11.    Regulation 8 provides:

> **8.** When an application is made under regulation 5(5) …, the First-tier Tribunal shall—
>
> > (a)    resolve the dispute by confirming whether and to what extent the document, is or is not privileged;
> >
> > (b)    direct which part or parts of a document (if any) shall be disclosed.

12.    Regulation 7 provides that a person who has received an information notice and complied with the procedure under Regulation 5 shall be treated as having complied with the information notice in respect of any document in dispute until the First tier Tribunal has determined the status of that document.

13.    The role of the Tribunal in this application is to determine which of the disputed documents (or which parts of the disputed documents, as privilege will not necessarily apply to the whole of any document) are subject to privilege.  The Tribunal should then provide directions for the disclosure of any documents (or part documents) not subject to privilege.

14.    Before turning to the relevant case law and the parties' submissions, I note that the documents in dispute were created, sent and received in Scotland.  For the purposes of this application, I do not consider that there is a distinction to be made between the

3

**693**

concept of confidentiality of communications, applicable in Scotland and the concept of legal professional privilege, applicable in England and Wales (and I do not understand either party to disagree with that). During this course of this decision I shall refer to "privilege", reflecting the wording in the Regulations.

**The general law as to privilege and the parties' submissions**

15. I understand the parties to be agreed that communications between lawyers, acting in their professional capacity, and their clients are privileged. Acting in their professional capacity means the provision of advice concerning rights and liabilities under private or public law and "what should prudently and sensibly be done in the relevant legal context" (per Taylor L.J. in *Balabel v Air India* [1988] Ch 317 at page 330G).

16. I also understand the parties to be agreed that it is necessary to consider the context of the communication in order to understand whether the communications in question are part of the necessary exchange of information, what Taylor L.J. described (at page 330F) as the "continuum of communication and meetings between the solicitor and the client".

17. I agree with both of those propositions.

Dominant purpose

18. The parties differ on whether it is necessary, when legal advice privilege is claimed, to consider the dominant purpose of the communication in order to determine whether a document is privileged. HMRC argue that such consideration is necessary. The Applicant disagrees and also argues that, in any event, the nature of the communications was entirely bilateral (by which I understand the Applicant to be stating that each communication was between a lawyer and client only).

19. In light of the recent decision of the Court of Appeal in *CAA v R (oao Jet2.com Limited)* [2020] EWCA Civ 35 read as a whole (but in particular paragraph 96), I agree with HMRC that, when considering whether legal advice privilege applies to a document, it is relevant to ask for what purpose or purposes the communication was made, and whether the dominant purpose was the giving or seeking of legal advice.

20. However, as the Applicant noted, *CAA v R (oao Jet2.com Limited)* concerned a dispute where the documents in dispute were emails sent to multiple recipients, not all of whom were lawyers. So, while I consider that the question of whether the dominant purpose of a communication is to seek or receive legal advice, can still arise when that communication is between only a lawyer and a client, I consider it is significantly less likely that such a communication will have a purpose other than the seeking or receiving legal advice. I note the comments of Hickinbottom L.J. (at paragraph 100(iii) of *CAA v R (oao Jet2.com Limited))* that:

> The response from the lawyer, if it contains legal advice, will almost certainly be privileged, even if it is copied to more than one addressee.

4

**694**

Whose perspective?

21.    Although neither party specifically addressed the point, I consider that the dominant purpose is ordinarily to be viewed from the perspective of the author of the document or the person under whose direction the document was created.  I reach that conclusion on the basis of dicta in *Grant v Downs* 135 CLR 674 at 677 and (more recently and within this jurisdiction) the decision in *Property Alliance Group v RBS* [2015] EWHC 3341.  Although both of those decisions are concerned with litigation privilege, it would be illogical for the dominant purpose test to apply both to litigation privilege and legal advice privilege, and yet for that test to be applied from a different perspective depending on whether litigation privilege or legal advice privilege is claimed.

Redaction

22.    The parties also differ on whether redaction should be directed in this case.  I agree with HMRC that redaction is, in principle, possible and should be directed in an appropriate case.  Such an approach was adopted in *Behague v HMRC* [2013] UKFTT 596, where Judge Mosedale concluded that an engagement letter did not contain legal advice but that the parts of the letter which revealed the scope of the matters on which legal advice was sought should be redacted.  As Judge Mosedale said at paragraph 26 of *Behague*:

> LPP must extend not only to the content of the legal advice but the fact that a person sought legal advice on any particular matter.  Therefore, to the extent that an engagement letter sets out what the advice will cover it must be subject to LPP.

23.    Similarly, in respect of meetings, it was said (at paragraph 100(viii) of *CAA v R (oao Jet2.com Limited)*:

> If the dominant purpose of the meeting is to obtain legal advice … unless anything is said outside that legal context the contents of the meeting will be privileged.  If the dominant purpose of the discussions is commercial or otherwise non legal then the meeting and its contents will not generally be privileged; although any legal advice sought or given within the meeting may be.  It is likely that, where not inextricably intermingled, the non-privileged part will be severable and (on disclosure, redactable).

24.    However, I also agree with the Applicant that there may be practical difficulties in separating the parts of a document so that the privileged parts can be redacted.  The dicta quoted in the preceding paragraph suggests that in a document relating to communications with a non-legal dominant purpose, that also contains or evidences privileged communications then, to the extent that the two types of communications cannot be separated, the inextricably intermingled privileged communications should also be disclosed.

**My conclusion as to the relevant principles to be applied**

5

25.   The onus of proof is upon the Applicant.  Therefore, it is for the Applicant to establish that privilege attaches to each communication for which privilege is claimed.

26.   In respect of each document, it is necessary to consider whether the communication contained within (or the communication it evidences) is a communication between a client and a lawyer in which legal advice is sought or given or is part of the continuum of keeping solicitor and client informed.  Legal advice is the application of the law, a person's rights and responsibilities and what should prudently and sensibly be done in the legal context.

27.   Each document should be considered separately but viewed in the context of the communications which precede and follow it.

28.   Where there may be more than one purpose for the communication it is necessary to consider whether the dominant purpose is the seeking or giving of legal advice.  If the dominant purpose of a communication is to seek or give legal advice then the document containing or evidencing that communication will be privileged.  If the dominant purpose of the communication was non-legal, then the document will not be privileged.

29.   Legal advice in that document which can be separated should be redacted before the document is disclosed.

**Applying those principles to the documents in dispute**

30.   There are said to be eleven documents in dispute: seven letters, two notes of telephone calls and what is said to be two other documents.  As I explain below, I have formed the conclusion that one of those two other documents is actually two documents, so there are 12 documents in total.

31.   Applying the principles set out above to those 12 documents:

The letters

32.   I am satisfied that each of the seven letters records communications from Turcan Connell for the purpose of providing the Applicant with legal advice or as part of the continuum of keeping client and solicitor informed so that advice may be sought and provided.  I conclude that each letter is privileged from disclosure.

The notes of telephone calls

33.   I am satisfied that both of the two telephone calls record communications from the Applicant to Turcan Connell for the purpose of seeking legal advice or as part of the continuum of keeping client and solicitor informed so that advice may be sought and provided.  I conclude that each telephone note is privileged from disclosure.

The remaining documents

6

**696**

34. The remaining material is described as by the Applicant in correspondence as a "Tenon meeting" on 31 July 2002, and a "Mtg with [Turcan Connell]" on 3 September 2002. I understand that Turcan Connell and the Applicant were the only people present at the 3 September 2002 meeting; other people were also present at the meeting on 31 July 2002.

35. Although it does not make a difference to the disposition of this application, as noted above I have concluded that there are, in fact, three documents in this category: two documents relating to the 31 July 2002 meeting, and one document relating to the 3 September meeting. I reach this conclusion about what has been described as a single document relating to the 31 July meeting on the basis of the document reference (at the foot of each page) – the reference on the first page does not match the reference on subsequent pages – and on the basis of the content of the pages.

36. It is also relevant to record my conclusion, on the balance of probabilities, that these three meeting documents were all prepared by Turcan Connell. Therefore, when I consider the dominant purpose of the communications, I consider that from the perspective of Turcan Connell.

The 3 September 2002 meeting

37. Taking the meetings in reverse order, I look first at the document relating to the 3 September 2002 meeting.

38. My starting point, in accordance with paragraph 100(viii) of *CAA v R (oao Jet2.com Limited)* (set out above), is to consider the "dominant purpose of the discussions" which took place.

39. When the 3 September meeting is viewed in the context of the communications before and after, I am satisfied that – from the perspective of Turcan Connell – the dominant purpose of the discussions which took place on 3 September 2002 was for the Applicant to seek legal advice, for Turcan Connell to provide the Applicant with legal advice or as part of the continuum of keeping solicitor and client informed so that advice may be sought and provided. Therefore, I conclude that the document relating to the 3 September 2002 meeting is privileged from disclosure.

The 31 July 2002 meeting

40. Next I consider the documents relating to the meeting on 31 July 2002, and the dominant purpose of the discussions which took place at that meeting. While I accept that part of the purpose of the communications at this meeting was the continuum of keeping client and solicitor informed, I have concluded – in light of the privileged communications before and after the meeting – that – from the perspective of Turcan Connell – the dominant purpose of the communications at the 31 July 2002 meeting was for Tenon to present information to the Applicant.

41. Having concluded that the dominant purpose of the communications at the meeting on 31 July was not the provision of legal advice, it follows that the two documents relating to the 31 July 2002 meeting are not privileged from disclosure.

**697**

42. Insofar as either document would reveal what appears to be the giving or seeking of legal advice or the scope of that advice, and insofar as that material is not inextricably intermingled, then those parts should be redacted. However, where it is not possible to separate legal advice or the scope of the legal advice, then the privileged parts cannot be redacted.

43. I have given this aspect very careful consideration. I have eventually decided that it is not possible to extricate privileged communications from these two documents. Therefore, no part of the documents relating to the meeting of 31 July 2002 meeting should be withheld from disclosure.

**The date by which disclosure should be made**

44. HMRC have requested that any documents to be disclosed be provided within 30 days of the date of this decision. If I make such a direction then, if the Applicant wishes to challenge this decision, he will be obliged to make an application for permission to appeal significantly in advance of the statutory 56 day deadline for making such an application. While I understand HMRC's desire to see the two documents which I have decided should be disclosed, I do not consider it would be appropriate to shorten the time available to the Applicant to challenge this decision if he so wishes. That is particularly the case given that HMRC would still be able to wait until the 56th day if they wished to challenge this decision. It would be unfair to create that disparity between the parties.

**Conclusion**

45. I direct that ten of the documents are privileged and should not be disclosed. I direct that the two documents relating to the meeting of 31 July 2002 are to be disclosed by the Applicant to HMRC no later than 56 days after the date of release of this decision. If, no later than that date, an application is made to the Tribunal for permission to appeal against this decision, then the time limit for disclosure is automatically extended until 14 days after the final resolution of such an appeal.

46. This document contains full findings of fact and reasons for the decision. Any party dissatisfied with this decision has a right to apply for permission to appeal against it pursuant to Rule 39 of the Tribunal Procedure (First-tier Tribunal) (Tax Chamber) Rules 2009. The application must be received by this Tribunal not later than 56 days after this decision is sent to that party. The parties are referred to "Guidance to accompany a Decision from the First-tier Tribunal (Tax Chamber)" which accompanies and forms part of this decision notice.

<div align="center">

**JANE BAILEY**

**TRIBUNAL JUDGE**
**RELEASE DATE: 25 AUGUST 2020**

</div>

**698**