**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE APPLICATION OF BM BRAZIL 1 FUNDO DE
INVESTIMENTO EM PARTICIPAÇÕES
MULTISTRATÉGIA, BM BRAZIL 2 FUNDO DE
INVESTIMENTO EM PARTICIPAÇÕES
MULTISTRATÉGIA, AND ANRH COOPERATIEF U.A.
FOR AN ORDER SEEKING DISCOVERY PURSUANT
TO 28 U.S.C § 1782

**23 Misc. 208 (JGLC) (GS)**

<u>**OPINION & ORDER**</u>

-------------------------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

In this proceeding pursuant to 28 U.S.C. § 1782, Applicants, who are special

purpose entities affiliated with Appian Capital Advisory LLP ("Appian"), move to

compel Respondent Moelis & Company LLC ("Moelis") to produce documents Moelis

withheld based on privilege assertions made by Intervenors Sibanye-Stillwater

Limited and Sibanye BM Brazil (Pty) Ltd. (together, "Sibanye").  For the reasons set

forth below, Appian's motion to compel is **GRANTED IN PART** and **DENIED IN**

**PART**.

## BACKGROUND

### A. Procedural History

The Court assumes familiarity with the facts underlying this dispute as

described in the Court's prior Report & Recommendation dated January 18, 2024.

(Dkt. No. 47 ("R&R"), reported at *In re BM Brazil I Fundo de Investimento em*

*Participações Multistratégia*, No. 23 Misc. 208 (JGLC) (GS), 2024 WL 555780

(S.D.N.Y. Jan. 18, 2024), *adopted* 2024 WL 554302 (S.D.N.Y. Feb. 12, 2024)).

In brief, Appian commenced this Section 1782 proceeding on June 23, 2023,

seeking discovery in aid of a breach of contract litigation (the "English Case") it

brought against Sibanye in the High Court of Justice in England and Wales (the "English Court").[1]  (*See* R&R at 5).  Specifically, Appian sought permission to serve document and deposition subpoenas on Moelis, a U.S.-based investment bank, and two of its employees, Ashley Chen ("Chen") and Patrick Loftus-Hills ("Loftus-Hills"). (*Id.* at 1).  Moelis had served as Sibanye's financial advisor with respect to two Share Purchase Agreements dated October 26, 2021 (the "SPAs"), pursuant to which Sibanye had agreed to buy Appian's interest in two Brazilian mines (the "Transaction").  (*Id.* at 3).  Sibanye terminated the SPAs on January 24, 2022, claiming that a geotechnical event at one of the mines (the "Geotechnical Event") constituted a "Material Adverse Effect" under the agreements.  (*Id.* at 4).

On June 29, 2023, the Honorable Jessica G. L. Clarke initially granted Appian's application *ex parte* without prejudice to a future motion to quash.  (Dkt. No. 10).  Thereafter, Moelis moved to vacate Judge Clarke's Order and quash the subpoenas or, in the alternative, to stay this action.  (R&R at 1).  At the same time, Sibanye sought to intervene in the action and filed its own motion to vacate and quash.  (*Id.*).  Appian subsequently cross-moved to compel.  (*Id.*).

After evaluating these motions, the undersigned recommended (1) granting Sibanye's motion to intervene, (2) denying Sibanye's and Moelis's motions to vacate, (3) granting in part and denying in part Sibanye's and Moelis's motions to quash, (4) denying Moelis's alternative motion for a stay, (5) denying Appian's cross-motion to

---

[1] The English Case is captioned *BM Brazil 1 Fundo de Investimento EM et al. v. Sibanye BM Brazil (Pty) Ltd.*, CL 2022-000264 in the Business and Property Courts of England and Wales.  (*See* R&R at 5 n.4).

compel, and (6) allowing discovery to proceed with certain modifications to the subpoenas.  (*See id.* at 2, 42, 45).  Neither of the three parties objected to the R&R and Judge Clarke adopted it without modification on February 12, 2024.  (*See* Dkt. No. 49).

Following the resolution of those motions, the parties worked cooperatively to agree upon a document production schedule.  (*See* Dkt. Nos. 50, 52, 54, 56).  During March 2024 and into April 2024, Moelis made multiple productions of documents in compliance with Judge Clarke's February 12, 2024 Order and subject to the R&R's limitations.  (Dkt. No. 52; Dkt. No. 59 at 1).  As these productions were ongoing, Moelis refused to produce certain responsive documents based on Sibanye's assertion that they reflected privileged communications between Sibanye and its attorneys at Clifford Chance LLP ("Clifford Chance").  (Dkt. No. 59 at 1; Dkt. No. 61 Exs. 12-14).

Eventually, Sibanye identified a total of 86 Moelis documents as privileged in four privilege logs dated March 6, April 5, April 9, and April 19, 2024.  (Dkt. No. 61 Exs. 12-14; Dkt. No. 68 Exs. 4-6; Dkt. No. 73 Ex. 1 (the "Logs")).  Sibanye asserts that all of these documents are privileged under principles of English law, or in the alternative, if English law is found to be inapplicable, American law.  (*See id.*).  Many of the 86 documents are duplicates of one another.  According to Sibanye, excluding duplicates and "lesser included email threads," there are only 33 "unique" documents.  (Dkt. No. 69 at 2).[2]

---

[2] In addition to the 32 unique documents in Sibanye's first three privilege logs, Sibanye subsequently identified one other unique document after Appian filed its motion to compel.  (*See* Dkt. No. 73).

On April 10, 2024, a day after Sibanye provided its third privilege log, Appian brought the instant letter motion to compel (Dkt. Nos. 59 ("Mot.")) accompanied by two supporting declarations: one from Lord David Wolfson, Baron Wolfson of Tredegar KC, an English barrister with expertise in privilege law (Dkt. No. 60 ("Third Wolfson Decl.")) and one from its U.S. litigation counsel in this matter, Jonathan Schaffer-Goddard (Dkt. No. 61 ("Schaffer-Goddard Decl.")).  On April 17, 2024, Sibanye submitted a letter response in opposition (Dkt. No. 69 ("Opp.")), along with four declarations from (1) Alexandros Panayides, an English lawyer and member of Clifford Chance's litigation group who was part of the firm's team advising Sibanye on the Transaction (Dkt. No. 65 ("Panayides Decl.")), (2) Robert Philpot, a Sibanye executive (Dkt. No. 66 ("Philpot Decl.")), (3) Tamara Oppenheimer KC, an English barrister with expertise in privilege law (Dkt. No. 67 ("Oppenheimer Decl.")), and (4) Luke Tolaini, a Clifford Chance lawyer who represents Sibayne in the English Case (Dkt. No. 68 ("Second Tolaini Decl.")). Appian submitted a letter reply on April 19, 2024.  (Dkt. No. 70 ("Reply")).

At Appian's request (Mot. at 1, 3; Reply at 3), to which Sibanye and Moelis did not object, the Court ordered that the 33 unique documents at issue (the "Documents")[3] be made available for *in camera* review.  (Dkt. No. 72).  The Court has since reviewed the Documents *in camera*, and also heard oral argument from counsel on April 25, 2024.  The parties have informed the Court that depositions of Chen and Loftus-Hills are scheduled to begin on May 14, 2024 and that trial of the

---

[3] Across the Logs, the Documents correspond to entries 1, 26, 27, 28, 30, 36, 37, 38, 39, 42, 44, 47, 48, 49, 52, 53, 56, 59, 60, 64, 65, 66, 68, 69, 70, 71, 75, 76, 77, 78, 79, 80 and 85.

English Case will begin on June 10, 2024.  (Transcript of Oral Argument, April 25, 2024 ("Tr."), at 79:8-79:9; Mot. at 1).

## B. The Parties' Contentions

The parties disagree over a threshold issue: whether this Court or the English Court should resolve the instant privilege dispute.  Sibanye contends that English law governs whether the Documents are privileged and that the English Court is better suited to apply English law and decide that question, making it the "more convenient" forum under Rule 26 discovery principles.  (Opp. at 5-6 (citing Fed. R. Civ. P. 26(b)(2)(C)(i) and *Frasers Grp. PLC v. Morgan Stanley*, 95 F.4th 54, 60 (2d Cir. 2024)).  Sibanye also points to the English forum selection clause in the SPAs as an additional reason why Appian should raise its objections to Sibanye's privilege designations before the English Court.  (*Id*. at 6).

Appian argues that the question of whether Sibanye has a privilege that allows withholding of documents responsive to a subpoena issued under this Court's authority is properly a question for this Court, which has sole jurisdiction to enforce the subpoena.  (Reply at 3).  Appian also argues that Sibanye has identified no authority supporting its position, and that this Court, in the R&R, already rejected Sibanye's effort to invoke the SPA's forum selection clauses to defeat this Court's jurisdiction over Appian's Section 1782 application.  (*Id*.; *see also* Mot. at 1).

Notably, however, Appian does not seriously dispute Sibanye's position that English privilege law should govern whether the documents were properly withheld.  Although Appian's initial Motion focuses on U.S. privilege law and

discusses English privilege law secondarily (Mot. at 2-3), Appian's Reply emphasizes that the parties' submissions on English law show that there is no disagreement about the relevant principles thereunder and, hence, that the Court need not resolve any dispute over what English law is. (Reply at 1-3).

In the Logs, Sibanye claims that all of the 33 Documents are protected by the "legal advice privilege" under English law, which is akin to the American attorney-client privilege. Sibanye relies, in particular, on the "limited waiver" doctrine under English law, which (as described in more detail below) protects confidential communications with third parties (such as Moelis) that contain or reflect privileged communications between an attorney and client (such as Sibanye and Clifford Chance). (Opp. at 3-4). Appian acknowledges the "limited waiver" rule under English law. (Mot. at 2-3; Reply at 1-2). However, Appian stresses that commercial and other non-legal information or analysis that Moelis may have provided, even if requested by Clifford Chance, is not privileged under English law. (*Id.*).

Sibanye's Logs assert that 23 of the 33 Documents are also protected by the English "litigation privilege," the cousin of the attorney work-product protection under U.S. law.[4] Sibanye contends that as of a January 8, 2022 email from Appian to Sibanye, litigation was reasonably contemplated and the litigation privilege attached to all documents prepared thereafter for the dominant purpose of

---

[4] Documents for which Sibanye asserts both legal advice and litigation privilege correspond to the following entries in the Logs: 38, 39, 42, 44, 47, 48, 49, 52, 53, 56, 60, 64, 65, 66, 68, 69, 70, 71, 75, 76, 77, 78 and 80.

litigation.  (Opp. at 5).  Appian disagrees, arguing that Sibanye waived its right to

assert litigation privilege over the vast majority of Documents dated prior to the

January 24, 2022 termination by failing to invoke litigation privilege over the same

documents from its own production in the English Case.  (Mot. at 3).  Appian also

argues that Sibanye's evidentiary submissions fail to substantiate that the

Documents over which Sibayne has claimed litigation privilege were prepared for

the dominant purpose of litigation.  (Reply at 2-3).

**LEGAL STANDARDS**

### A. Privilege Under Section 1782

Under Section 1782, "[t]he district court of the district in which a person

resides or is found may order him to give his testimony or statement or to produce a

document or other thing for use in a proceeding in a foreign or international

tribunal."  28 U.S.C. § 1782(a).  The statute specifically provides, however, that "[a]

person may not be compelled to give his testimony or statement or to produce a

document or other thing in violation of any legally applicable privilege."  *Id*.

The Second Circuit has long recognized that parties may invoke foreign law

as a "legally applicable privilege" under Section 1782.  *See In re Erato*, 2 F.3d 11, 14

(2d Cir. 1993).  Not only does the broad language, "*any* legally applicable privilege,"

suggest as much, *see Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003) ("read

naturally, the word 'any' has an expansive meaning") (cleaned up), but the

"legislative history [of Section 1782] makes clear that [this language] 'provides for

the recognition of all privileges to which the person may be entitled, including

7

privileges recognized by foreign law.'" *Erato*, 2 F.3d at 14 (quoting S. Rep. No. 1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3790); *accord Mangouras v. Boggs*, 980 F.3d 88, 98 (2d Cir. 2020); *see also In re Arida, LLC*, No. 19 Misc. 522 (PKC), 2021 WL 2226852, at *2 (S.D.N.Y. June 2, 2021) ("a court has no discretion under the statute to grant discovery that is otherwise protected by a legally applicable privilege under foreign law").

In *Mangouras*, the Second Circuit held that, where a party invokes a foreign nation's privilege law in a Section 1782 proceeding, and "competing national laws provide different results, courts should first conduct a choice-of-law analysis to determine which body of privilege law applies." *Mangouras*, 980 F.3d at 98. Following *Mangouras*, district courts in this Circuit are mandated, in the context of Section 1782, to apply the "'touch base'" test, which is a "'traditional choice-of-law 'contacts' analysis to determine the law that applies to claims of privilege involving foreign documents.'" *Id.* (quoting *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002)).

Specifically, under the touch base test, district courts should identify "the law of the country that has the predominant or the most direct and compelling interest in whether . . . communications should remain confidential, unless that foreign law is contrary to the public policy of [the] forum." *Id.* at 99 (cleaned up). "The country with the predominant interest is either 'the place where the allegedly privileged relationship was entered into,' or 'the place in which that relationship was centered at the time the communication was sent.'" *Id.* (quoting *Astra*, 208 F.R.D. at 98).

**B. Motion to Compel**

Discovery in a Section 1782 proceeding must be conducted in accordance with the Federal Rules of Civil Procedure unless the district court orders otherwise.  *See* 28 U.S.C. § 1782(a); *In re Aso*, No. 19 Misc. 190 (JGK) (JLC), 2019 WL 2345443, at *8 (S.D.N.Y. June 3, 2019).  Under Rule 26(b)(1), a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).

On a motion to compel discovery, including one brought in a Section 1782 proceeding, "the movant has the burden of 'demonstrating that the information sought is relevant to the subject matter of the pending action.'"  *In re YS GM MARGIN II LLC*, No. 20 Misc. 182 (PGG), 2022 WL 624291, at *5 (S.D.N.Y. Mar. 2, 2022) (quoting *United States v. Int'l Bus. Machines Corp.*, 66 F.R.D. 215, 218 (S.D.N.Y. 1974)).  "'Once relevance has been shown, it is up to the responding party to justify curtailing discovery.'"  *Id.* (quoting *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012)).  "It is well established that the party invoking a privilege bears the burden of establishing its applicability to the case at hand."  *Deangelis v. Corzine*, No. 11 Civ. 7866 (VM) (JCF), 2016 WL 93862, at *3 (S.D.N.Y. Jan. 7, 2016) (cleaned up); *see In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 322 (S.D.N.Y. 2020) (applying this principle on a motion to compel discovery in a Section 1782 proceeding).

# DISCUSSION

In the analysis below, the Court first: (1) decides that the issues raised by Appian's motion to compel should be resolved by this Court rather than the English Court; and (2) finds that, under the "touch base test," English privilege law governs this dispute. After surveying the relevant and agreed-upon principles of English law, the Court then applies those principles to each of the Documents in question. Based on the Court's *in camera* review, the undersigned finds that 24 of the 33 Documents are protected by the legal advice privilege under English law and that certain of those documents are subject to the litigation privilege as well.[5] Conversely, the undersigned finds the remaining nine documents are not protected by either of the two relevant privileges, and thus Moelis must produce these Documents without redaction.[6]

## A. This Court, Not the English Court, Should Resolve This Dispute

As an initial matter, the Court rejects Sibanye's contention that the English Court is better situated than this Court to resolve the parties' privilege dispute. For the reasons stated on the record at the April 25, 2024 oral argument, the authorities cited by Sibanye do not support its novel argument. (*See* Tr. 3:8-4:20). Further, since the parties agree upon the relevant principles of English privilege law, the premise for Sibanye's argument—that this Court should not enmesh itself in

---

[5] The privileged unique documents correspond to privilege log numbers 1, 26, 27, 38, 39, 42, 44, 47, 48, 49, 52, 60, 64, 65, 66, 68, 69, 70, 71, 75, 76, 77, 78, and 80.

[6] The non-privileged unique documents correspond to privilege log numbers 28, 30, 36, 37, 53, 56, 59, 79, 85.

resolving disputed issues of foreign law—is lacking.  (*See id.* at 3:21-4:3).  Finally, Sibanye's reliance on the SPAs' forum selection clauses is unavailing.  Just as those clauses did not bar Appian's application for Section 1782 discovery from Moelis in the first instance (*see* R&R at 27-33), they likewise do not preclude Appian from moving to compel Moelis to comply with its discovery obligations.  At oral argument, Sibanye's counsel acknowledged that "[w]e don't disagree that the Court can decide this dispute."  (Tr. 45:6).  The Court believes it not only can, but should do so.[7]

## B. English Privilege Law Applies Under the Touch Base Test

*Mangouras* directs that a choice-of-law analysis be conducted where competing nations' privilege laws "provide different results." *Mangouras*, 980 F.3d at 98.  Here, each of Sibanye's entries in the Logs invokes English legal advice privilege and American attorney-client privilege in the alternative.  Appian's Motion contests Sibanye's invocation of both and suggests that American law could, and perhaps should, apply.  (*See* Mot. at 1-2).  Both parties recognize that the application of English legal advice privilege and American attorney-client privilege can yield different results as applied to the Documents in question, especially insofar as the "limited waiver" doctrine under English law allows far wider latitude to share privileged communications with third parties without effecting a waiver. (*Compare* Mot. at 2 *with* Oppenheimer Decl. ¶¶ 28-31; *see also infra* Discussion

---

[7] As the Court noted (and Appian acknowledged) during oral argument (Tr. 15:23-15:25), the English Court will be the ultimate arbiter of what evidence is admissible at trial in the English Case.  *See Mangouras*, 980 F.3d at 99 (noting that "a foreign jurisdiction retains the ability to refuse to consider any documents it deems privileged under its own law").

C.1.ii). Therefore, the Court must apply the touch base test to determine which nation's law to apply to the parties' privilege dispute.

Under the touch base test, England is the country which has "'the most direct and compelling interest' in whether . . . communications should remain confidential." *Astra*, 208 F.R.D. at 98 (quoting *Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992)). All of Sibanye's privilege assertions in this case arise from its relationship with its English lawyers located at Clifford Chance in London, who were providing Sibanye with advice under English law. (*See* Panayides Decl. ¶¶ 2-7, 9; Second Tolaini Decl. ¶¶ 1-7). English law is critical because the SPAs, which define the parties' respective rights and obligations, contain English choice-of-law clauses (as well as English forum selection clauses). (*See* R&R at 3-4 (detailing these clauses in the SPAs)).

Thus, during the period when the Documents were created—between November 2021 and January 2022—England was "the place in which [the allegedly privileged] relationship was centered at the time the communication was sent." *Mangouras*, 990 F.3d at 99 (cleaned up). Moreover, the underlying litigation that precipitated this Section 1782 application is in England, and any evidence obtained through Moelis's production is ultimately for use in the English Case.

In contrast to other cases in this District which have found American law to apply under the touch base test, here no U.S.-based attorneys were involved with the Documents at issue, nor were the parties preparing for litigation in the United States. *See, e.g.*, *Astra*, 208 F.R.D. at 99; *In re financialright GmbH*, No. 17 Misc.

12

105 (DAB), 2017 WL 2879696, at *3-4 (S.D.N.Y. Jun. 22, 2017).  Instead, the only connection to the United States is the presence of Moelis.[8]  But Moelis is not invoking any privilege of its own.  Rather, the privilege being asserted is exclusively Sibanye's privilege with its English counsel, Clifford Chance.[9]

These facts do not give rise to the United States having the "predominant," or even a significant, interest in this privilege dispute.  To the contrary, England plainly has the predominant interest in whether the Documents are found to be privileged.  Accordingly, the Court applies English privilege law.[10]

## C. Relevant Principles of English Privilege Law

As noted above, Sibanye invokes the English legal advice privilege as to all of the Documents and invokes litigation privilege as to most of them.  The Documents consist entirely of email communications except for one set of handwritten notes from Moelis employee Loftus-Hills.  The declarations from the English barristers Lord Wolfson and Tamara Oppenheimer, submitted by Appian and Sibanye respectively, elucidate the key features of both privilege doctrines as relevant to this case.

---

[8] The two Sibanye entities that are defendants in the English Case are South African corporations. (Dkt. No. 4 Ex. 1 at 4).  The Appian entities that are claimants in the English Case are two Brazilian funds and a Dutch cooperative.  (*Id.* at 3).  Appian Capital is based in England.  Appian Capital Advisory LLP, "Where We Operate," appiancapitaladvisory.com/overview/where-we-operate (last accessed May 5, 2023) ("Appian is . . . headquartered in London").

[9] Moelis's counsel confirmed at oral argument that "we identified what we would produce and let *Sibanye* make *its* privilege determinations."  (Tr. 9:25-10:3; emphasis added).  Moelis's counsel also confirmed that Clifford Chance did not represent Moelis in connection with the Transaction. (Tr. 62:9-62:11).

[10] At oral argument, counsel for Appian "accept[ed]" that English law applies to the instant dispute after the Court laid out its thinking with respect to the touch base test at that time.  (Tr. 15:22).

### 1.  Legal Advice Privilege

The parties' English law experts agree on the core principles of the English legal advice privilege.  Broadly speaking, the legal advice privilege applies to confidential communications between lawyers and their clients whose dominant purpose is to give or receive legal advice.  (Third Wolfson Decl. ¶ 3(a); Oppenheimer Decl. ¶ 11).  Confidentiality is a key requirement, and if a privileged communication is voluntarily shared with a third party who does not owe duties of confidence in relation to it, the document will cease to be privileged.  (Third Wolfson Decl. ¶ 27; Oppenheimer Decl. ¶ 28).  Where the privilege applies, it is absolute, and is not to be overridden by other considerations.  (Oppenheimer Decl. ¶ 8).

### i.  Dominant Purpose Test

To determine whether legal advice privilege attaches, the Court must evaluate whether the dominant purpose of the communication is to seek or disseminate legal advice.  If the communication has a non-privileged purpose that is of at least equal weight, such as seeking financial or business advice, then the privilege does not attach.  (*See* Third Wolfson Decl. ¶¶ 39-42; Oppenheimer Decl. ¶¶ 11 & 39).  Furthermore, when the Court applies the dominant purpose test in the context of emails sent to multiple recipients—which is the case for most of the Documents here—it must consider the email as comprising separate bilateral communications between the sender and each recipient and evaluate the dominant purpose of each communication.  (*See* Third Wolfson Decl. ¶¶ 44-46).

### ii. Limited Waiver

Because Sibanye is asserting privilege over documents in Moelis's possession, this dispute necessarily implicates whether the sharing of privileged communications with a third party—here, Clifford Chance and Sibanye sharing their allegedly privileged communications with Moelis—destroys the privilege.  On this question there is a marked difference between U.S. and English law.

Under U.S. law, "subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed."  *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973); *see also Richards v. Kallish*, No. 22 Civ. 9095 (CS) (VR), 2023 WL 8111831, at *6 (S.D.N.Y. Nov. 22, 2023) ("the presence of a third party, or the voluntary disclosure of privileged communications to a third party, destroys the privilege because the third-party's knowledge of the communication undermines the notion that 'the communication was intended to be, and actually was, kept confidential'") (quoting *United States v. Mejia*, 655 F.3d 126, 134 (2d Cir. 2011)).  Such a waiver may be found even where the third party receiving the privileged communication is under a duty to maintain the confidentiality of the communication.  *See, e.g.*, *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01 Civ. 8854 (LTS) (THK), 2004 WL 2375819, at *3-5 (S.D.N.Y. Oct. 21, 2004).

This is not the case under English law.  As Ms. Oppenheimer explains, under the principle of "limited waiver" recognized by English law, "privileged communications can be shared confidentially with third parties and there will be no

wider loss of confidentiality or privilege beyond the disclosure to that third party."

(Oppenheimer Decl. ¶¶ 28-29).  For the privilege to be preserved, the party

disclosing the communication must have intended to share it confidentially,

although this does not require an express statement to that effect.  (*Id*. ¶¶ 30-31).

Appian's expert, Lord Wolfson, offers essentially the same description of the limited

waiver doctrine: "If the client discloses a document attracting legal advice privilege

to a third party in circumstances imposing a duty on the third party to keep the

document confidential as against the rest of the world, the document will remain

privileged as between the client or the third party and the rest of the world."  (Third

Wolfson Decl. ¶ 31).

### iii. Continuum of Communications

Both parties' experts also agree that the concept of legal advice for purposes

of the privilege is not confined to "telling the client what the law is" and may

encompass any communications that are "directly related to the performance by the

solicitor of his professional duty as legal advisor of his client."  (Third Wolfson Decl.

¶¶ 23-24; Oppenheimer Decl. ¶¶ 14, 17).  Thus, a communication may be found to

form part of the "continuum of communications" that are protected by the privilege

where the "larger purpose" of surrounding communications is to obtain legal advice.

(Oppenheimer Decl. ¶ 18).

### 2. Litigation Privilege

The parties' English law experts further agree on the basic principles of the

English litigation privilege.  First, the privilege will attach where litigation has

commenced or is in "reasonable contemplation," and the communication in dispute was prepared for the dominant purpose of litigation. (Third Wolfson Decl. ¶¶ 3(b), 50-57; Oppeheimer Decl. ¶¶ 35, 38-39). Further, a court must view whether litigation is in reasonable contemplation from the perspective of the party invoking the privilege. (Third Wolfson Decl. ¶ 57(c)). And, unlike the legal advice privilege, disclosure to any third party in the normal course will not defeat the privilege. (Third Wolfson Decl. ¶ 4(a); Oppenheimer Decl. ¶ 36).

### 3. Burden of Establishing the Privilege

Finally, Lord Wolfson establishes, and Ms. Oppenheimer does not dispute, that in a privilege dispute under English law, "the burden of proving that the privilege applies rest on the party asserting the privilege." (Third Wolfson Decl. ¶ 58).

### D. Application to the Documents

### 1. When the Litigation Privilege Attaches

As a threshold matter, the Court addresses at what point in time the litigation privilege attached to the documents. As noted, Sibanye argues that litigation was in reasonable contemplation as of January 8, 2022, when Appian sent an email explicitly stating that if the Transaction did not close, it intended to seek specific performance. (Opp. at 1; Panayides Decl. ¶ 5; Tr. 37:16-38:6). Based on that position, Sibanye has claimed litigation privilege (in addition to legal advice privilege) over 12 of the Documents dated after January 8, 2022 and prior to January 24, 2022, when Sibanye terminated the Transaction.

For several reasons, the Court finds Sibanye has not shown the litigation privilege attached as early as January 8, 2022.  First, in an August 4, 2023 letter to Appian's counsel in the English Case, Sibanye invoked litigation privilege for only two documents from its own production that preceded the January 24, 2022 termination, only one of which is among the Documents designated as privileged here (a January 21, 2022 email, Logs No. 60).  (Schaffer-Goddard Decl. Ex. 3 at 1-2).  Thus, Sibanye did not assert litigation privilege over the very same documents that it now asserts litigation privilege over when sought from Moelis.  Second, in his declaration purporting to set forth the basis for Sibanye's privilege designations in this proceeding, Clifford Chance attorney Tolaini states that only one Document (the very same January 21, 2022 email) was prepared for the dominant purpose of litigation.  (Second Tolaini Decl. ¶ 25).  Notably, Tolaini does not make the same representation as to other Documents over which Sibanye claims litigation privilege.  (*See id*. ¶¶ 22-23, 26-31).  Third, the declaration submitted on this motion by Robert Philpot, who led the deal team from Sibanye, does not attest that Sibanye itself reasonably contemplated litigation as of the January 8, 2022 email.  (*See* Philpot Decl. ¶¶ 2, 4).  Sibanye has not offered a persuasive explanation for any of these deficiencies in its evidentiary showing, let alone all three.

Moreover, the January 8, 2022 email is insufficient to carry Sibanye's burden.  At that point in time, so far as the record reveals, Appian and Sibanye had not joined issue over whether the Geotechnical Event constituted a Material Adverse Effect under the SPAs.  Although Appian's January 8 email complained about

Sibanye's requests to extend the closing date of the Transaction and explicitly mentioned in its final paragraph the possibility that Appian would seek specific performance if the Transaction did not close by January 14, 2022, the email came from a principal of Appian and did not copy outside counsel.  (*See* Panayides Decl. ¶ 5 & Ex. 1).  The parties apparently continued to work toward a closing and Appian did not initiate litigation when the January 14 date came and went.  Under these circumstances, the Court cannot find that the email raised the prospects of litigation from a "mere possibility" to a "real likelihood" (Third Wolfson Decl. ¶ 57 (b) (cleaned up)) as of January 8, 2022.

Importantly, however, this does not affect the Court's ultimate privilege determinations.  Sibanye has also claimed legal advice privilege over all documents dated after January 8, 2022 and before January 21, 2022 and the Court has determined that the legal advice privilege applies to the majority of those documents.  (*See infra* Logs Nos. 38, 39, 42, 44, 47, 48, 49, 52 & 80).  Hence, those documents may be withheld from production regardless of whether they are also protected by the litigation privilege.  There are only two documents during this date range that, in the Court's view, are not protected by the legal advice privilege, but the Court also finds that those documents would not be protected by the litigation privilege even if the litigation privilege had attached on January 8, 2022.  (*See infra* Logs No. 53 & 56).

The Court now turns to the results of its *in camera* review, grouping and discussing certain Documents together where the analysis is essentially the same.

19

## 2.  Documents Determined to Be Privileged

**<u>Logs Nos. 26 & 27</u>**

These emails from November and December 2021 were included in Sibanye's

April 5, 2024 privilege logs and are described as "[r]edacted email chain[s] reflecting

legal advice . . . [regarding] an Australian action commenced against Atlantic

Nickel."  (*See* Logs at 26 & 27).  Following Moelis's counsel's disclosure of Logs Nos.

26 & 27 to Sibanye for inclusion in the latter's April 5, 2024 privilege log, Moelis

discovered that these documents should not have appeared on that log because

Moelis believes they are not responsive to the subpoenas as modified.

(Tr. 12:20-13:18).

The Court agrees with Moelis that these two documents are not responsive to

the subpoenas as modified by the R&R.  Although the documents do relate to the

"Transaction" as that term is defined in the subpoena initially served on Moelis (*see*

Dkt No. 4 Exs. C-E), the Court's modification thereof eliminated a request

demanding "[a]ll Documents and Communications related to the Transaction."  (*See*

R&R at 40-41).  As narrowed, the subpoena seeks only those documents relating to

Moelis's role as advisor to Sibanye, the Geotechnical Event, the Santa Rita mine

budget (business plan), Sibanye's termination of the Transaction, and the

circumstances or reasons behind the termination (*i.e.*, Request Nos. 1 & 4-7).  The

two documents at issue are not responsive to these requests.

At Appian's request (Tr. 13:5-13:6), the Court has nonetheless also reviewed

these two documents for privilege.  As Sibanye asserts in the April 5, 2024 privilege

20

log, Logs Nos. 26 & 27 are clearly protected under the legal advice privilege. (*See* Logs Nos. 26 & 27). Specifically, these documents reflect communications between attorney and client in which certain due diligence and litigation strategies are discussed in the context of a separate litigation in Australia against one of the Brazilian mining companies. Under the limited waiver doctrine, the presence of Loftus-Hills on some of these communications does not destroy the privilege.[11]

**Logs Nos. 38, 39, 42, 44, 47, 48, 49, 52 & 80**

As noted in the Logs, these documents are email communications (and, in the case of Logs No. 39, an attachment to an email) sent between January 12, 2022 and January 14, 2022. (*See* Logs Nos. 38, 39, 42, 44, 47-49, 52, 80). Common to all of them is the presence of Sibanye and Clifford Chance personnel as well as Chen and/or Loftus-Hills of Moelis. These documents contain and reflect communications between Clifford Chance and Sibanye for the dominant purpose of providing legal advice. No one from Moelis provides input in any of these communications except for an email from Loftus-Hills that is part of Logs No. 42, and that email cannot be disclosed without revealing privileged communications between Sibanye and Clifford Chance. (*See* Tr. 18:13-19:18 (Appian counsel's acknowledging that under such circumstances an email from Moelis may be withheld)). Moreover, although Logs Nos. 52 and 80 contain certain emails which, standing alone, do not reflect

---

[11] Appian does not dispute that Moelis was under a duty of confidentiality when Sibanye and Clifford Chance shared their privileged communications with Moelis. At oral argument, Moelis's counsel confirmed that Sibanye's engagement agreement with Moelis included an express confidentiality provision. (Tr. 56:6-57:3).

legal advice, these emails fall within the "continuum of communications" doctrine. (*See* Oppenheimer Decl. ¶ 24; *see also* Tr. 48:18-49:14).

**<u>Logs No. 60</u>**

This document contains three emails, two dated January 20, 2022 and one dated January 21, 2022, between Robert Philpot of Sibanye and employees of The Mineral Corporation ("TMC"), a mining consultancy retained (in part) by Sibanye to inform its understanding of the impacts of the Geotechnical Event, with Chen and Loftus-Hills copied on the latest one. (*See* Log No. 60). This document deserves separate analysis because, unlike the other withheld documents, no lawyer from Clifford Chance is present on the emails.

Nevertheless, the Court agrees with Sibanye that both privileges protect this document from disclosure. Regarding the legal advice privilege, Philpot's communications reflect the dissemination of legal advice from Sibanye's lawyers to third parties (TMC and Moelis), and there is no dispute that both TMC and Moelis owed a duty to Sibanye to keep this advice confidential. (*See* Oppenheimer Decl. ¶¶ 29-31; Third Wolfson Decl. ¶ 36 (limited waiver "ensures that [privileged advice] provided outside the presence of a third party is preserved, notwithstanding the limited disclosure of that same advice to a third party")). For these reasons, and when viewing Philpot's communications with both TMC and Moelis bilaterally, the legal advice privilege protects this document from disclosure.

Regarding the litigation privilege, the contents of this document make clear that litigation is in reasonable contemplation, and that the document was prepared

for the dominant purpose of preparing for litigation.  Because both privileges apply, this document may properly be withheld.

**Logs Nos. 64, 65, 66, 68, 69, 70, 71, 75, 76, 77 & 78**

As noted in the Logs, these documents are separate email chains (including, in the case of Logs Nos. 69, 70, 77, 78, attachments thereto) with dates ranging from January 25, 2022 to January 27, 2022.  (*See* Logs Nos. 64-66, 68-71, 75-78).  The Court agrees with Sibanye that both legal advice privilege and litigation privilege apply to these documents.

First, the purpose of each email chain is to seek and disseminate legal advice with respect to the fallout from Sibanye's January 24, 2024 letter terminating the SPAs, and to strategize regarding potential future communications with Appian. With respect to legal advice privilege, although Moelis personnel are included in the email chains, the limited waiver doctrine covers these communications. Furthermore, the documents appear to be prepared for the dominant purpose of providing legal advice.

These factual predicates lead to the same findings with respect to litigation privilege.  By January 25, 2022, it is clear that Sibanye reasonably contemplated litigation.  The Court's review of the email chains and the draft attachment makes clear that these communications between attorneys at Clifford Chance, Sibanye employees, and Moelis personnel were sent for the dominant purpose of addressing potential future litigation.  The litigation privilege is thus applicable as well.

23

**Logs No. 1**

Sibanye asserts legal advice privilege with respect to this single December 7, 2021 email described as "legal advice regarding progress toward the satisfaction of conditions precedent to closing under the SPAs." (Logs No. 1). The Court finds this communication from Joe Timmins, Sibanye's deal counsel, to be privileged despite the presence of Loftus-Hills as a recipient. (*See* Oppenheimer Decl. ¶¶ 28-29). Here, the presence of Loftus-Hills again falls within the limited waiver doctrine, and the communication otherwise reflects the dissemination of legal advice from Clifford Chance to Sibanye. This document may be withheld as privileged.

### 3. Documents Determined Not to Be Privileged

**Logs Nos. 28, 30, 36 & 85**

Sibanye claims legal advice privilege over these related and overlapping email chains dated January 11, 2022 to January 12, 2022 on the basis that they are "request[s] for legal advice regarding the parties' legal position under the SPAs relating to budget issues, to be based on Clifford Chance['s] discussion of financial analysis with Moelis." (*See* Logs Nos. 28, 30, 36 & 85).[12] However, the Court's review of these documents demonstrates that they fail the dominant purpose test. While a request for legal advice may be lurking in the background of these emails, it is not their dominant purpose and the communications do not reflect any legal advice.

---

[12] Sibanye seeks only to redact Logs No. 85 rather than withhold that document in full.

By contrast, based on the Court's review, the emails expressly reflect a request for financial advice from Moelis.  Even if that financial advice was intended to inform Clifford Chance's legal advice, that situation does not give rise to a privileged communication under English law.  (Third Wolfson Decl. ¶ 42 ("if a communication has a non-privileged purpose, such as obtaining information from a third-party to inform legal advice to be given, the communication will not be subject to legal advice privilege (even if the lawyer and/or client are party to the communication, and even if the ultimate purpose of obtaining the information from the third party is to enable the lawyer to provide legal advice to the client")).  Thus, these documents must be produced in unredacted form.

**Logs No. 37**

Sibanye describes Logs No. 37, a January 12, 2022 email with the subject line "Submission – Santa Rita and Serrote Business Plan 2022/23," as an "[e]mail reflecting request for legal advice regarding the parties' legal position under the SPAs relating to the [mines'] Business Plan."  (Logs No. 37).  On its own review, the Court strains itself to find such a request.  The email in question was sent by Sibanye's Laurent Charbonnier, a business executive, forwarding another, non-privileged email to two individuals at each of Sibanye, Moelis, and Clifford Chance. Charbonnier forwarded the email to these recipients without any comment or request.  The Court cannot find that the dominant purpose of the email was to request legal advice, particularly when viewed bilaterally as a communication

between Charbonnier and Chen and Loftus-Hills at Moelis.  Therefore, this document must be produced.

**Logs Nos. 53 & 56**

Sibanye claims both legal advice and litigation privilege with respect to two related email chains dated January 18, 2022.  (*See* Logs Nos. 53 & 56).  The Court finds that neither privilege applies, even if the litigation privilege had attached by this date.  Sibanye characterizes these emails as "chain[s] reflecting legal advice regarding dispute with Appian, and assistance from Moelis in connection therewith, in anticipation of litigation."  (*See id.*).  Yet, as with Logs No. 37, the Court cannot read into these emails more than what they appear to be on their face: discussions about scheduling.  While such discussions could fall within the continuum of communications doctrine (*see* Oppenheimer Decl. ¶¶ 17-18, 24; *see also* Tr. 48:18-50:16), this would only be so if an underlying privileged communication exists.  No such underlying privileged communication is discernible here.  In short, the "legal context" needed for the continuum of communications to apply has not been established on the face of these documents.  (*See* Oppenheimer Decl. ¶¶ 16-18).

Sibanye's litigation privilege claim fares no better.  Even accepting, *arguendo*, Sibanye's contention that litigation privilege attached as of January 8, 2022, Sibanye has failed to show based on the contents of the communications that they were prepared for the dominant purpose of litigation.  Thus, Sibanye's dual claims of privilege over these two documents fail, and the documents must be produced.

**Logs No. 59**

Sibanye claims legal advice privilege with respect to a single redacted January 19, 2022 email from Robert Philpot of Sibanye to a host of Sibanye employees and company advisors, including Moelis and Clifford Chance.  (Logs No. 59).  According to Sibanye, this email reflects a "request for legal advice in relation to the legal position of the parties under the SPAs considering the Geotechnical Event."  (*Id.*).  Notably, this email is a parent with a non-privileged attachment.

Logs No. 59 can be construed neither as a request for legal advice, nor as the dissemination of prior legal advice received.  Rather, the email evidences a broad request to confer directed to 14 members of Sibanye's deal team—a group which happens to include three Clifford Chance lawyers.  Accordingly, the dominant purpose test has not been satisfied and the email is not privileged and should be produced.

**Logs No. 79**

Claiming legal advice privilege only, Sibanye has redacted some of Loftus-Hills's handwritten notes, which he took on calls concerning the Transaction.  (Logs No. 79).  Two separate sets of notes have been redacted.  One set is headed "SSW Call" and is undated, although the privilege log entry indicates the call took place in December 2021.  The entry states that these notes "reflect[] legal advice from Clifford Chance regarding strategy about legal position under the SPAs discussed on calls with [Sibanye]."  (*Id.*)  The other set of notes is headed "Laurent. Sibanye." and is dated January 24 (presumably of 2022).  These notes allegedly

reflect a "summary of call with Laurent Charbonnier (Sibanye-Stillwater) disseminating legal advice from Clifford Chance and strategy in relation to the Material Adverse Effect under the SPA." (*Id.*).

Neither set of notes indicates that anyone from Clifford Chance attended these calls.  Nor has Sibanye identified, or provided a declaration from, any Clifford Chance lawyer who attended these calls.  To the contrary, Clifford Chance's Tolaini states, as to each call, that "despite a diligent effort, the precise attendees and date of the call have not yet been determined."  (Second Tolaini Decl. ¶ 32).  Accordingly, Sibanye has failed to establish that any Clifford Chance lawyer was present during either call.

Of course, even if no Clifford Chance lawyer was present during the calls, it is possible that Loftus-Hills's notes reflect legal advice that Sibanye told him it had received from Clifford Chance.  Having closely reviewed both sets of notes, however, the Court is not persuaded that this is the case.  There is no explicit or implicit statement that any of the information in the notes came from Clifford Chance.  In the Court's view, the information recorded is not information that necessarily, or even likely, would have come from Clifford Chance.  Indeed, as the Court noted during oral argument, and Sibanye's counsel did not dispute, certain of the redacted notes reflect information that plainly does *not* appear to have come from Clifford Chance.  (*See* Tr. 57:15-58:2).

Moreover, Sibanye failed to provide any other evidence to substantiate that any of Loftus-Hills's notes reflect legal advice.  There is no sworn statement from

Charbonnier that he was relaying legal advice from Clifford Chance during the January 24 call with Loftus-Hills.  Nor is there a sworn statement to that effect from any Sibanye executive who participated in the December 2021 call.  Likewise, there is no sworn statement from Loftus-Hills that he was told or understood that any of the information in his notes reflected legal advice from Clifford Chance.  In the absence of such evidentiary support, the Court cannot find that the notes are protected by the legal advice privilege.

As noted above, under English law, "[t]he burden of proof is on the party claiming privilege to establish it." (Third Wolfson Decl. ¶ 59 (cleaned up)).  Sibanye has failed to meet its burden to establish that the redacted handwritten notes in Logs No. 79 reflect legal advice from Clifford Chance to Sibanye and that the legal advice privilege applies.  Consequently, these handwritten notes must be produced in unredacted form.

## CONCLUSION

For the foregoing reasons, Appian's motion to compel is **GRANTED IN PART** and **DENIED IN PART**.  Moelis must produce the documents corresponding to privilege log entries 28, 30, 36, 37, 53, 56, 59, 79, 85.  These documents shall be produced by **Friday, May 10, 2024**.  Conversely, Moelis may withhold on the basis of Sibanye's privilege assertions the documents corresponding to privilege log entries 1, 26, 27, 38, 39, 42, 44, 47, 48, 49, 52, 60, 64, 65, 66, 68, 69, 70, 71, 75, 76, 77, 78, and 80.

The Clerk is respectfully directed to terminate the motion pending at Docket No. 59.

**SO ORDERED.**

DATED:     New York, New York
              May 7, 2024

_____
GARY STEIN
United States Magistrate Judge